**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**BILL McCOLLUM, ATTORNEY GENERAL**
**OF THE STATE OF FLORIDA;**

**STATE OF SOUTH CAROLINA, by and through**
**HENRY McMASTER, ATTORNEY GENERAL**
**OF THE STATE OF SOUTH CAROLINA;**

**STATE OF NEBRASKA, by and through**
**JON BRUNING, ATTORNEY GENERAL**
**OF THE STATE OF NEBRASKA;**

**STATE OF TEXAS, by and through**
**GREG ABBOTT, ATTORNEY GENERAL**
**OF THE STATE OF TEXAS;**

**STATE OF UTAH, by and through**
**MARK L. SHURTLEFF, ATTORNEY GENERAL**
**OF THE STATE OF UTAH;**

**STATE OF LOUISIANA, by and through**
**JAMES D. "BUDDY" CALDWELL, ATTORNEY**
**GENERAL OF THE STATE OF LOUISIANA;**

**STATE OF ALABAMA, by and through**
**TROY KING, ATTORNEY GENERAL**
**OF THE STATE OF ALABAMA;**

**STATE OF MICHIGAN, by and through**
**MICHAEL A. COX, ATTORNEY GENERAL**
**OF THE STATE OF MICHIGAN;**

**STATE OF COLORADO, by and through**
**JOHN W. SUTHERS, ATTORNEY GENERAL**
**OF THE STATE OF COLORADO;**

**COMMONWEALTH OF PENNSYLVANIA, by**
**and through THOMAS W. CORBETT, Jr.,**
**ATTORNEY GENERAL OF THE**
**COMMONWEALTH OF PENNSYLVANIA;**

**STATE OF WASHINGTON, by and through**
**ROBERT M. McKENNA, ATTORNEY GENERAL**
**OF THE STATE OF WASHINGTON;**

**STATE OF IDAHO, by and through**
**LAWRENCE G. WASDEN, ATTORNEY GENERAL**
**OF THE STATE OF IDAHO; and**

**STATE OF SOUTH DAKOTA, by and through**
**MARTY J. JACKLEY, ATTORNEY GENERAL**
**OF THE STATE OF SOUTH DAKOTA;**

 **Plaintiffs,**

**v.**              **Case No. 3:10-cv-91**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES;**
**KATHLEEN SEBELIUS, in her official**
**capacity as the Secretary of the United States**
**Department of Health and Human Services;**
**UNITED STATES DEPARTMENT OF**
**THE TREASURY; TIMOTHY F.**
**GEITHNER, in his official capacity as the**
**Secretary of the United States Department**
**of the Treasury; UNITED STATES**
**DEPARTMENT OF LABOR; and HILDA**
**L. SOLIS, in her official capacity as Secretary**
**of the United States Department of Labor,**

 **Defendants.**
_____/

## <u>COMPLAINT</u>

  Plaintiffs, STATE OF FLORIDA, by and through BILL McCOLLUM, ATTORNEY GENERAL OF THE STATE OF FLORIDA; STATE OF SOUTH CAROLINA, by and through HENRY McMASTER, ATTORNEY GENERAL OF THE STATE OF SOUTH CAROLINA; STATE OF NEBRASKA, by and through JON

BRUNING, ATTORNEY GENERAL OF THE STATE OF NEBRASKA; STATE OF TEXAS, by and through GREG ABBOTT, ATTORNEY GENERAL OF THE STATE OF TEXAS; STATE OF UTAH, by and through MARK L. SHURTLEFF, ATTORNEY GENERAL OF THE STATE OF UTAH; STATE OF LOUISIANA, by and through JAMES D. "BUDDY" CALDWELL, ATTORNEY GENERAL OF THE STATE OF LOUISIANA; STATE OF ALABAMA, by and through TROY KING, ATTORNEY GENERAL OF THE STATE OF ALABAMA; STATE OF MICHIGAN, by and through MICHAEL A. COX, ATTORNEY GENERAL OF THE STATE OF MICHIGAN; STATE OF COLORADO, by and through JOHN W. SUTHERS, ATTORNEY GENERAL OF THE STATE OF COLORADO; COMMONWEALTH OF PENNSYLVANIA, by and through THOMAS W. CORBETT, Jr., ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA; STATE OF WASHINGTON, by and through ROBERT M. McKENNA, ATTORNEY GENERAL OF THE STATE OF WASHINGTON; STATE OF IDAHO, by and through LAWRENCE G. WASDEN, ATTORNEY GENERAL OF THE STATE OF IDAHO; and STATE OF SOUTH DAKOTA, by and through MARTY J. JACKLEY, ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA, file this action against Defendants, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES (HHS); KATHLEEN SEBELIUS, in her official capacity as the Secretary of HHS; UNITED STATES DEPARTMENT OF THE TREASURY (Treasury); TIMOTHY F. GEITHNER, in his official capacity as the Secretary of the Treasury; UNITED

STATES DEPARTMENT OF LABOR (DOL); and HILDA L. SOLIS, in her official capacity as the Secretary of DOL, and state:

## NATURE OF THE ACTION

1.     On March 23, 2010, a new universal healthcare regime, titled the "Patient Protection and Affordable Care Act," H.R. 3590 (the Act), was signed into law by the President.     The   Act,   which   exceeds   2,400   pages,   is   available   at http://frwebgate.access.gpo.gov/cgi-bin/getdoc.cgi?dbname=111_cong_bills&docid=f: h3590pp.txt.pdf (accessed March 23, 2010).

2.     The Act represents an unprecedented encroachment on the liberty of individuals living in the Plaintiffs' respective states, by mandating that all citizens and legal residents of the United States have qualifying healthcare coverage or pay a tax penalty.   The Constitution nowhere authorizes the United States to mandate, either directly or under threat of penalty, that all citizens and legal residents have qualifying healthcare coverage.   By imposing such a mandate, the Act exceeds the powers of the United States under Article I of the Constitution and violates the Tenth Amendment to the Constitution.

3.     In addition, the tax penalty required under the Act, which must be paid by uninsured citizens and residents, constitutes an unlawful capitation or direct tax, in violation of Article I, sections 2 and 9 of the Constitution of the United States.

4.     The Act also represents an unprecedented encroachment on the sovereignty of the states.   For example, it requires that Florida vastly broaden its Medicaid eligibility standards to accommodate upwards of 50 percent more enrollees,

many of whom must enroll or face a tax penalty under the Act, and imposes onerous new operating rules that Florida must follow.  The Act requires Florida to spend billions of additional dollars, and shifts substantial administrative costs to Florida for, *inter alia*, hiring and training new employees, as well as requiring that new and existing employees devote a considerable portion of their time to implementing the Act. This onerous encroachment occurs at a time when Florida faces having to make severe budget cuts to offset shortfalls in its already-strained budget, which the state constitution requires to be balanced each fiscal year (unlike the federal budget), and at a time when Florida's Medicaid program already consumes more than a quarter of the State's financial outlays. Plaintiffs cannot effectively withdraw from participating in Medicaid, because Medicaid has, over the more than four decades of its existence, become customary and necessary for citizens throughout the United States, including the Plaintiffs' respective states; and because individual enrollment in Plaintiffs' respective Medicaid programs, which presently cover tens of millions of residents, can only be accomplished by their continued participation in Medicaid.

5.      Further, the Act converts what had been a voluntary federal-state partnership into a compulsory top-down federal program in which the discretion of the Plaintiffs and their sister states is removed, in derogation of the core constitutional principle of federalism upon which this Nation was founded.  In so doing, the Act exceeds the powers of the United States and violates the Tenth Amendment to the Constitution.

6.     The Act contains several unfunded mandates that will cost state governments significantly.

7.     For example, no Florida government entity or infrastructure exists to discharge sufficiently all of the responsibilities that will be necessary to implement the Act, to meet requirements related to increases in Medicaid enrollment under the Act, and to operate healthcare insurance exchanges required by the Act.

8.     By making federal funds potentially available at the discretion of federal agencies, the Act acknowledges the immediate burden on Plaintiffs to invest and implement the Act, but provides no guarantee that they will receive such funds or that the Act's implementation costs will be met.

9.     Plaintiffs seek declaratory and injunctive relief against the Act's operation to preserve their respective sovereignty and solvency, and to protect the individual freedom, public health, and welfare of their citizens and residents.

**JURISDICTION AND VENUE**

10.    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(3) because no real property is involved, the district is situated in Florida, and the defendants are agencies of the United States or officers thereof acting in their official capacity.

**PARTIES**

12.    The State of Florida is a sovereign state and protector of the individual freedom, public health, and welfare of its citizens and residents.  Bill McCollum,

Attorney General of Florida, has been directly elected by the people of Florida to serve as their chief legal officer and exercises broad statutory and common law authority to protect the rights of the State of Florida and its people; Fla. Const. art. IV, § 4(b).  The State, by and through the Attorney General, has standing to assert the unconstitutionality of the Act.  He is authorized to appear in and attend all suits in which the state is interested.  § 16.02(4) & (5), Fla. Stat.

13.     The State of South Carolina, by and through Henry McMaster, Attorney General of South Carolina, is a sovereign state in the United States of America.

14.     The State of Nebraska, by and through Jon Bruning, Attorney General of Nebraska, is a sovereign state in the United States of America.

15.     The State of Texas, by and through Greg Abbott, Attorney General of Texas, is a sovereign state in the United States of America.

16.     The State of Utah, by and through Mark L. Shurtleff, Attorney General of Utah, is a sovereign state in the United States of America.

17.     The State of Alabama, by and through Troy King, Attorney General of Alabama, is a sovereign state in the United States of America.

18.     The State of Louisiana, by and through James D. "Buddy" Caldwell, Attorney General of Louisiana, is a sovereign state in the United States of America.

19.     The State of Michigan, by and through Michael A. Cox, Attorney General of Michigan, is a sovereign state in the United States of America.

20.     The State of Colorado, by and through John W. Suthers, Attorney General of Colorado, is a sovereign state in the United States of America.

21.     The Commonwealth of Pennsylvania, by and through Thomas W. Corbett, Jr., Attorney General of Pennsylvania, is a sovereign state in the United States of America.

22.     The State of Washington, by and through Robert A. McKenna, Attorney General of Washington, is a sovereign state in the United States of America.

23.     The State of Idaho, by and through Lawrence G. Wasden, Attorney General of Idaho, is a sovereign state in the United States of America.

24.     The State of South Dakota, by and through Marty J. Jackley, Attorney General of South Dakota, is a sovereign state in the United States of America

25.     HHS is an agency of the United States, and is responsible for administration and enforcement of the Act, through its center for Medicare and Medicaid Services.

26.     Kathleen Sebelius is Secretary of HHS, and is named as a party in her official capacity.

27.     Treasury is an agency of the United States, and is responsible for administration and enforcement of the Act.

28.     Timothy F. Geithner is Secretary of the Treasury, and is named as a party in his official capacity.

29.     DOL is an agency of the United States, and is responsible for administration and enforcement of the Act.

30.     Hilda L. Solis is Secretary of DOL, and is named as a party in her official capacity.

**BACKGROUND**

**The Medicaid Program Prior to the Act**

31.     Medicaid was established by Title XIX of the Social Security Act of 1965, 42 U.S.C. §§ 1396 *et seq.*, as the nation's major healthcare initiative for low-income persons.  Each participating state's Medicaid program has been funded jointly by the state and the federal government.

32.     From the beginning of Medicaid until passage of the Act, the states were given considerable discretion to implement and operate their respective optional Medicaid programs in accordance with state-specific designs regarding eligibility, enrollment, and administration, so long as the programs met broad federal requirements.

33.     The states were free to opt out of Medicaid and set up their own state health or welfare plans, or to provide no such benefits at all.  States, including Plaintiffs, agreed to participate in Medicaid with the understanding that their continuing participation was voluntary, as a matter of both law and fact.

34.     None of the Plaintiffs agreed to become a Medicaid partner of the federal government with an expectation that the terms of its participation would be altered significantly by the federal government so as to make it financially infeasible for that state either to remain in or to withdraw from the Medicaid program.

35.     None of the Plaintiffs agreed to become a Medicaid partner of the federal government with an expectation that the federal government would increase significantly its control and reduce significantly that state's discretion with respect to the Medicaid program.

36.     None of the Plaintiffs agreed to become a Medicaid partner of the federal government with an expectation that, after the Medicaid program became entrenched in the state, the federal government would alter the program's requirements to expand eligibility for enrollment beyond the state's ability to fund its participation.

37.     None of the Plaintiffs agreed to become a Medicaid partner of the federal government with an expectation that the federal government would exploit its control over Medicaid terms and eligibility as part of a coercive scheme to force all citizens and residents to have healthcare coverage.

**The Patient Protection and Affordable Care Act**

38.     The Act mandates that all United States citizens and legal residents have qualifying healthcare coverage.  If a person fails to do so, the federal government will force that person to pay a penalty, the amount of which will be increased gradually through 2016, reaching $750 per year up to a maximum of three times that amount ($2,250) per family, or 2 percent of household income, whichever is greater.  After 2016, the penalty will increase annually based on a cost-of-living adjustment.  Exemptions to the tax penalty only apply for individuals with certain religious objections, American Indians, those persons without coverage for less than three months, undocumented immigrants, incarcerated individuals, or some individuals with financial hardships.

39.     The Act greatly alters the federal-state relationship, to the detriment of the states, with respect to Medicaid programs specifically and healthcare coverage generally.

40.     The Act requires states to expand massively their Medicaid programs and to create exchanges through which individuals can purchase healthcare insurance

coverage.  The federal government is to provide partial funding for the exchanges, but will cease doing so after 2015.  Should a state not wish to participate in the exchanges, it can opt out only if it provides coverage for uninsured individuals with incomes between 133 percent and 200 percent of the federal poverty level, a higher income level than that which would be applied for participating states under the Act.  The only other way for a state to avoid the Act's requirements is to drop out of the Medicaid program, leaving millions of persons uninsured.

41.     Those states left with no practical alternative but to participate in the Act will have to expand their Medicaid coverage to include all individuals under age 65 with incomes up to 133 percent of the federal poverty level.  The states' coverage burdens will increase significantly after 2016, both in actual dollars and in proportion to the contributions of the federal government.

42.     The federal government will not provide necessary funding or resources to the states to administer the Act.  Nevertheless, states will be required to provide oversight of the newly-created insurance markets, including, *inter alia*, instituting regulations, consumer protections, rate reviews, solvency and reserve fund requirements, and premium taxes.  States also must enroll all of the newly-eligible Medicaid beneficiaries (many of whom will be subject to a penalty if they fail to enroll), coordinate enrollment with the new exchanges, and implement other specified changes.  The Act further requires states to establish an office of health insurance consumer assistance or an ombudsman program to advocate for people in the new programs.

**The Act's Impact on Florida's Medicaid Program, as an Example**

43.     The Act will have an impact on all Plaintiffs and in a manner similar to its impact on Florida, as described herein by way of example.

44.     Florida is the Nation's fourth largest state in population. Based on United States Census Bureau statistics from 2008, Florida has 3,641,933 uninsured persons living in the state.  Of those persons, 1,259,378 are below 133 percent of the federal poverty line, and therefore must be added to Florida's Medicaid rolls under the Act.

45.     Even before passage of the Act, the Medicaid program imposed an overwhelming cost on Florida, consuming 26 percent of its annual budget.  For fiscal year 2009-2010 alone, Florida will spend more than $18 billion on Medicaid, servicing more than 2.7 million persons.  Florida's Medicaid contributions and burdens, from the implementation of its Medicaid program in 1970 to the present, have gradually increased to the point where it would be infeasible for Florida to cease its participation in Medicaid.

46.     Although the federal government currently contributes 67.64 percent of every dollar Florida spends on Medicaid, that percentage is artificially and temporarily raised because of federal stimulus outlays.  After this year, the percentage of Florida's Medicaid program expenses covered by the federal government will decline, and by 2011 will reach 55.45 percent, a level that is closer to the recent average.  The federal government's contribution will not compensate for the dramatic increase to Florida's Medicaid rolls and the correspondingly soaring costs to be borne by Florida under the Act.

47.     Florida's Agency for Health Care Administration (AHCA) estimates that at least 80 percent of persons who have some form of health insurance but fall below 133 percent of the federal poverty level will drop their current plans and enroll in Medicaid, because they are newly eligible under the Act.  The federal government does not offer any funding for these persons, because they qualified for insurance other than Medicaid prior to passage of the Act.  These persons represent a significant additional cost to Florida under the Act.

48.     The Act also makes a large new class of persons eligible for Medicaid in Florida.  Prior to passage of the Act, only certain specified low-income individuals and families qualified for Medicaid.  Moreover, the qualifying income level set by Florida was much lower than the level of 133 percent of the federal poverty line set by the federal government under the Act.  Now, Florida also must add to its Medicaid rolls all childless adults whose income falls below 133 percent of the federal poverty line.

49.     Prior to passage of the Act, AHCA was Florida's designated state Medicaid agency tasked with developing and carrying out policies related to the Medicaid program.  The Act will strip away much of AHCA's authority to set policies, transferring that authority to the federal government, which will dictate those policies to Florida.  AHCA and the other Florida agencies will be rendered arms of the federal government, and AHCA employees will be conscripted and forced to administer what now is essentially a federal Medicaid program for which Florida must bear a substantial cost.

50.     AHCA has prepared limited projections for the fiscal impact of the Act. The new additional costs to the state are as follows: $149,001,478 for 2014; $431,307,547 for 2015; $484,803,557 for 2016; $938,807,336 for 2017; $993,836,882 for 2018, and $1,048,866,307 for 2019.  Beyond this time frame, the costs to Florida will continue to grow.  These projections understate the Act's adverse impact on Florida. They do not include estimated costs to be borne by Florida to administer the Act or to prepare for the Act's implementation.  Such costs will include hiring and training new staff, creating new information technology infrastructures, developing an adequate provider base, creating a scheme for accountability and quality assurance, and many other expenses.

51.     The Act effectively requires that Florida immediately begin to devote funds and resources to implement the Act's sweeping reforms across multiple agencies of government.  Such implementation burdens include, but are not limited to: enforcing the Act's immediately-effective terms, including new mandates regarding healthcare insurance coverage; determining gaps between current resources in state government and the Act's requirements; evaluating infrastructure to consider how new programs and substantial expansion of existing programs will be implemented (e.g., new agencies, offices, etc.); developing a strategic plan and coordinating common issues across state agencies; initiating legislative and regulatory processes, while at the same time monitoring and engaging the substantial federal regulatory processes to ensure that Florida's interests are protected; and developing a communications structure and plan to disseminate new information regarding changes brought about by the Act to the many

affected persons and entities (legislators, state agencies, insurers, hospitals, doctors, community clinics, major employers, small businesses, advocacy groups, insurance brokers, legislators, the uninsured, and Floridians generally), and to achieve such dissemination in sufficient time for them to understand and adapt to the changes in accordance with federal timetables, without interruption or confusion in the provision of healthcare services.

52.     In sum, while the Act infringes on Florida's constitutional status as a sovereign, entitled to cooperate with but not to be controlled by the federal government under the Medicaid program, the Act also will force Florida to cover more than one million additional persons and, in so doing, to spend billions of additional dollars, a price it simply cannot afford to pay.

53.     At the same time, like the other Plaintiffs, Florida cannot avoid the Act's requirements by ending its longstanding participation in the Medicaid program, thereby leaving millions of current Medicaid recipients stranded without coverage.  In effect, the Plaintiffs' participation under the Act cannot be avoided, despite its devastating effects.

## CAUSES OF ACTION

### COUNT ONE

**UNCONSTITUTIONAL EXERCISE OF FEDERAL POWER
AND VIOLATION OF THE TENTH AMENDMENT
(Const. art. I & amend. X)**

54.     Plaintiffs reallege, adopt, and incorporate by reference paragraphs 1 through 53 above as though fully set forth herein.

55.     Plaintiffs cannot afford the exorbitant and unfunded costs of participating under the Act, but have no choice other than to participate.

56.     The Act exceeds Congress's powers under Article I of the Constitution of the United States, and cannot be upheld under the Commerce Clause, Const. art. I, §8; the Taxing and Spending Clause, id.; or any other provision of the Constitution.

57.     By effectively co-opting the Plaintiffs' control over their budgetary processes and legislative agendas through compelling them to assume costs they cannot afford, and by requiring them to establish health insurance exchanges, the Act deprives them of their sovereignty and their right to a republican form of government, in violation of Article IV, section 4 of the Constitution of the United States.

58.     The Act violates the Tenth Amendment of the Constitution of the United States, and runs afoul of the Constitution's principle of federalism, by commandeering the Plaintiffs and their employees as agents of the federal government's regulatory scheme at the states' own cost.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare the Patient Protection and Affordable Care Act to be in violation of Article I of and the Tenth Amendment to the Constitution of the United States;

B.     Declare Defendants to have violated the Plaintiffs' rights as sovereigns and protectors of the freedom, public health, and welfare of their citizens and residents, as aforesaid;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs, their citizens and

16

residents, and any of their agencies or officials or employees, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.      Award Plaintiffs their reasonable attorney's fees and costs, and grant such other relief as the Court may deem just and proper.

## COUNT TWO

### VIOLATION OF CONSTITUTIONAL PROHIBITION OF UNAPPORTIONED CAPITATION OR DIRECT TAX
### (Const. art. I, §§ 2, 9)

59.      Plaintiffs reallege, adopt, and incorporate by reference paragraphs 1 through 53 above as though fully set forth herein.

60.      The tax penalty on uninsured persons under the Act constitutes a capitation and a direct tax that is not apportioned among the states according to census data, thereby injuring the sovereign interests of Plaintiffs.

61.      Said tax penalty applies without regard to property, profession, or any other circumstance, and is unrelated to any taxable event or activity.  It is to be levied upon persons for their failure or refusal to do anything other than to exist and reside in the United States.

62.      Said tax penalty violates article I, sections 2 and 9 of the Constitution of the United States.  By its imposition of the penalty tax, and by the resulting coercion of many persons to enroll in Medicaid at a substantial cost to the Plaintiffs, the Act injures their interests as sovereigns vested with exclusive authority, except to the extent permitted to the federal government by the Constitution, to make all taxing decisions

affecting their citizens and to confer a right upon persons in their states to make healthcare decisions without government interference. The tax penalty is unconstitutional on its face and cannot be applied constitutionally.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare the Patient Protection and Affordable Care Act to be in violation of Article I, sections 2 and 9 of the Constitution of the United States;

B.     Declare Defendants to have violated the Plaintiffs' rights as sovereigns and protectors of the freedom, public health, and welfare of their citizens and residents, as aforesaid;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs, their citizens and residents, and any of their agencies or officials or employees, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their reasonable attorney's fees and costs, and grant such other relief as the Court may deem just and proper.

## COUNT THREE

### UNCONSTITUTIONAL MANDATE THAT ALL INDIVIDUALS HAVE HEALTH INSURANCE COVERAGE OR PAY TAX PENALTY
### (Const. art. I & amend. X)

63.     Plaintiffs reallege, adopt, and incorporate by reference paragraphs 1 through 53 above as though fully set forth herein.

64.     The Act forces citizens and residents to have healthcare coverage or pay a tax penalty.  In effect, the Act compels said persons to have healthcare coverage, whether or not they wish to do so, or be subject to sanction.  The Act thus compels persons to perform an affirmative act or incur a penalty, simply on the basis that they exist and reside in the United States.

65.     The Act is directed to a lack of or failure to engage in activity that is driven by the choices of individual Americans.  Such inactivity by its nature cannot be deemed to be in commerce or to have any substantial effect on commerce, whether interstate or otherwise.  As a result, the Act cannot be upheld under the Commerce Clause, Const. art. I, § 8.  The Act infringes upon Plaintiffs' interests in protecting the freedom, public health, and welfare of their citizens and their state fiscs, by coercing many persons to enroll in Medicaid at a substantial cost to Plaintiffs; and denies Plaintiffs their sovereign ability to confer rights upon their citizens and residents to make healthcare decisions without government interference, including the decision not to participate in any healthcare insurance program or scheme, in violation of the Tenth Amendment to the Constitution of the United States.

66.     The tax penalty on uninsured persons under the Act unlawfully coerces persons to obtain healthcare coverage, thereby injuring the Plaintiffs' fiscs, because many persons will be compelled to enroll in Medicaid at a substantial cost to Plaintiffs. As a result, the Act cannot be upheld under the Taxing and Spending Clause, Const. art. I, § 8.

67.     In so coercing citizens and residents to have healthcare coverage, the Act exceeds Congress's powers under Article I of the Constitution of the United States, and cannot be upheld under any provision of the Constitution.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare the Patient Protection and Affordable Care Act to be in violation of Article I, section 8 of and the Tenth Amendment to the Constitution of the United States;

B.     Declare Defendants to have violated the Plaintiffs' rights as sovereigns and protectors of the freedom, health, and welfare of their citizens and residents, as aforesaid;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs, their citizens and residents, and any of their agencies or officials or employees, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their reasonable attorney's fees and costs, and grant such other relief as the Court may deem just and proper.

## COUNT FOUR

## DECLARATORY JUDGMENT
### (28 U.S.C. § 2201)

68.     Plaintiffs reallege, adopt, and incorporate by reference paragraphs 1 through 53 above as though fully set forth herein.

69.     There is an actual controversy of sufficient immediacy and concreteness relating to the legal rights and duties of the Plaintiffs and their legal relations with the Defendants to warrant relief under 28 U.S.C. § 2201.

70.     The harm to the Plaintiffs as a direct result of the Act is sufficiently real and imminent to warrant the issuance of a conclusive declaratory judgment clarifying the legal relations of the parties.

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare the Patient Protection and Affordable Care Act to be in violation of Article I of and the Tenth Amendment to the Constitution of the United States;

B.     Declare Defendants to have violated the Plaintiffs' rights as sovereigns and protectors of the freedom, health, and welfare of their citizens and residents, as aforesaid;

C.     Enjoin Defendants and any other agency or employee acting on behalf of the United States from enforcing the Act against the Plaintiffs, their citizens and residents, and any of their agencies or officials or employees, and to take such actions as are necessary and proper to remedy their violations deriving from any such actual or attempted enforcement; and

D.     Award Plaintiffs their reasonable attorney's fees and costs, and grant such

other relief as the Court may deem just and proper.

Respectfully submitted,

**BILL MCCOLLUM**
**ATTORNEY GENERAL OF FLORIDA**

**HENRY McMASTER**
**ATTORNEY GENERAL OF SOUTH**
**CAROLINA;**

**JON BRUNING**
**ATTORNEY GENERAL OF**
**NEBRASKA;**

**GREG ABBOTT**
**ATTORNEY GENERAL OF TEXAS;**

**MARK L. SHURTLEFF**
**ATTORNEY GENERAL OF UTAH;**

**JAMES D. "BUDDY" CALDWELL**
**ATTORNEY GENERAL OF**
**LOUISIANA;**

**TROY KING**
**ATTORNEY GENERAL OF**
**ALABAMA;**

**MICHAEL A. COX**
**ATTORNEY GENERAL OF**
**MICHIGAN;**

**JOHN W. SUTHERS**
**ATTORNEY GENERAL OF**
**COLORADO;**

**THOMAS W. CORBETT, Jr.**
**ATTORNEY GENERAL OF**
**PENNSYLVANIA;**

22

**ROBERT M. McKENNA**
**ATTORNEY GENERAL OF**
**WASHINGTON;**

**LAWRENCE G. WASDEN**
**ATTORNEY GENERAL OF IDAHO**

**MARTY J. JACKLEY**
**ATTORNEY GENERAL OF SOUTH**
**DAKOTA**

*Of counsel*:
David B. Rivkin, Jr.
Lee A. Casey
1050 Connecticut Avenue, N.W.
Suite 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783

/s/ Blaine H. Winship
Blaine H. Winship (FBN 0356913)
Assistant Attorney General
Joseph W. Jacquot (FBN 189715)
Deputy Attorney General
Scott D. Makar (FBN 709697)
Solicitor General
Louis F. Hubener (FBN 0140084)
Timothy D. Osterhaus (FBN 0133728)
Charles B. Upton II (FBN 0037241)
Deputy Solicitors General
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile:  (850) 488-4872
Email: blaine.winship@myfloridalegal.com