**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

|  |  |  |
|---|---|---|
| STATE OF FLORIDA, by and through BILL McCOLLUM, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:10-cv-91-RV/EMT |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION AND SUMMARY ....................................................................................1

BACKGROUND ...................................................................................................................6

      A.    Statutory Background ..........................................................................................6

      B.    This Action..........................................................................................................8

ARGUMENT.........................................................................................................................8

I.     THE AMENDMENTS TO MEDICAID FALL WITHIN THE SPENDING
      POWER...........................................................................................................................8

      A.    The Medicaid Program .......................................................................................9

      B.    The ACA Amendments to Medicaid ................................................................10

      C.    There is No Basis to Invalidate Statutory Conditions on Medicaid
           Funds ...............................................................................................................11

      D.    The Act's Medicaid Provisions Are Not Coercive .............................................13

II.    THE ACT NEITHER COMPELS STATES TO ESTABLISH A HEALTH
      BENEFIT EXCHANGE NOR VIOLATES THE 10TH AMENDMENT ......................17

III.   REGULATION OF STATES AS EMPLOYERS IN THE NATIONAL LABOR
      MARKET DOES NOT OFFEND THE 10TH AMENDMENT .......................................19

      A.    Regulation of Large Employers..........................................................................20

      B.    The State Plaintiffs Lack Standing to Challenge the Act's Regulation of
           Large Employers................................................................................................21

      C.    Regulation of the Terms and Conditions of Employment in the National
           Labor Market Falls Within the Commerce Power...............................................22

      D.    Congress's Regulation of State Employers in the Same Manner as Private
           Employers Does Not Violate the 10th Amendment ............................................23

IV.    THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CHALLENGES
       TO THE MINIMUM COVERAGE PROVISION ............................................................. 25

       A.    Plaintiffs Brown and Ahlburg Lack Standing ...................................................... 25

       B.    Plaintiff NFIB Lacks Standing ............................................................................. 27

       C.    The State Plaintiffs Lack Standing to Challenge the Minimum Coverage
             Provision .............................................................................................................. 29

             1.    The States Cannot Bring a Parens Patriae Suit ......................................... 29

             2.    The States Have Not Identified an Imminent, Actual, and Concrete
                   Injury to Their Own Interests .................................................................... 30

       D.    Plaintiffs' Challenge to the Minimum Coverage Provision Is Unripe .................. 32

       E.    The Anti-Injunction Act Bars Plaintiffs' Challenge ............................................ 33

V.     THE MINIMUM COVERAGE PROVISION FALLS WITHIN CONGRESS'S
       CONSTITUTIONAL AUTHORITY .................................................................................. 34

       A.    The Comprehensive Regulatory Measures of the ACA, Including the
             Minimum Coverage Provision, Are a Proper Exercise of Congress's
             Powers Under the Commerce Clause and the Necessary and
             Proper Clause ........................................................................................................ 35

             1.    Congress's Authority to Regulate Interstate Commerce Is
                   Broad ......................................................................................................... 36

             2.    The ACA, and the Minimum Coverage Provision, Regulate
                   the Interstate Market in Health Insurance ................................................. 39

             3.    The Minimum Coverage Provision Regulates Conduct with
                   Substantial Effects on Interstate Commerce .............................................. 40

             4.    The Minimum Coverage Provision Is an Integral Part of the
                   Larger Regulatory Scheme and Is Necessary and Proper to
                   Congress's Regulation of Interstate Commerce ......................................... 44

                   a.    The Minimum Coverage Provision is Essential to the
                         Comprehensive Regulation Congress Enacted ............................... 45

                   b.    The Minimum Coverage Provision Is Valid Under the
                         Necessary and Proper Clause .......................................................... 47

B.     The Minimum Coverage Provision Is a Valid Exercise of
Congress's Independent Power Under the General Welfare Clause ......................48

VI.     THE MINIMUM COVERAGE PROVISION IS CONSISTENT WITH
DUE PROCESS .............................................................................................................52

VII.     THE MINIMUM COVERAGE PROVISION IS NOT A DIRECT TAX THAT
WOULD REQUIRE APPORTIONMENT AMONG THE STATES ..............................55

A.     As a Valid Exercise of Congress's Commerce Clause Powers, the
Minimum Coverage Provision Is Not Subject to Apportionment ........................55

B.     The Minimum Coverage Provision Is Not a "Direct Tax" ...................................57

CONCLUSION...................................................................................................................59

# TABLE OF AUTHORITIES

## CASES

*ACLU v. Miami-Dade County School Board,*
    557 F.3d 1177 (11th Cir. 2009) ......................................................................................26, 27

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967).......................................................................................................32, 33

*Adair v. United States,*
    208 U.S. 161 (1908).............................................................................................................53

*Alexander v. Choate,*
    469 U.S. 287 (1985)...............................................................................................................9

*Atlanta Gas Light Co. v. U.S. Dep't of Energy*
    666 F. 2d 1359 (11th Cir. 1982) .........................................................................................19

*Barr v. United States,*
    736 F.2d 1134 (7th Cir. 1984) ............................................................................................33

*Bartley v. United States,*
    123 F.3d 466 (7th Cir. 1997) ..............................................................................................34

*Bd. of Trustees v. United States,*
    289 U.S. 48 (1933)...............................................................................................................56

*Benning v. Georgia,*
    391 F.3d 1299 (11th Cir. 2004) ...............................................................................11, 12, 14

*Blanchette v. Conn. Gen. Ins. Corp.,*
    419 U.S. 102 (1974).............................................................................................................32

*Bob Jones Univ. v. Simon,*
    416 U.S. 725 (1974)...............................................................................................33, 34, 50

*Bowen v. POSSE,*
    477 U.S. 41 (1986)...............................................................................................................16

*Brushaber v. Union Pac. R. Co.,*
    240 U.S. 1 (1916).................................................................................................................58

*Buckley v. Valeo,*
    424 U.S. 1 (1976).........................................................................................................12, 52

*Burroughs v. United States,*
  290 U.S. 534 (1934)........................................................................................48

*California v. United States,*
  104 F.3d 1086 (9th Cir. 1997) .........................................................................14

*Charles v. Verhagen,*
  348 F.3d 601 (7th Cir. 2003) ...........................................................................14

*Charles C. Steward Machine Co. v. Davis,*
  301 U.S. 548 (1937)..............................................................................13, 14, 49

*Chavez v. Martinez,*
  538 U.S. 760 (2003).........................................................................................52

*Citizens United v. FEC,*
  130 S. Ct. 876 (2010).......................................................................................27

*Cruzan v. Director, Mo. Dept of Health,*
  497 U.S. 261 (1990).........................................................................................53

*DaimlerChrysler Corp. v. Cuno,*
  547 U.S. 332 (2006)....................................................................................25, 28

*Daniel v. Paul,*
  395 U.S. 298 (1969).........................................................................................44

*Dillard v. Chilton County Commn,*
  495 F.3d 1324 (11th Cir. 2007) .......................................................................28

*District of Columbia v. Heller,*
  128 S. Ct. 2783 (2009).....................................................................................11

*EEOC v. Wyoming,*
  460 U.S. 226 (1983).........................................................................................22

*Elend v. Basham,*
  471 F.3d 1199 (11th Cir. 2006) .......................................................................32

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000).........................................................................................51

*FERC v. Mississippi,*
  456 U.S. 742 (1982) ......................................................................................4, 19

*Fleck & Associates v. City of Phoenix,*
　　471 F.3d 1100 (9th Cir. 2006) ..................................................................28

*Florida State Conf. of the NAACP v. Browning,*
　　522 F.3d 1153 (11th Cir. 2008) .............................................................27, 29

*Garcia v. San Antonio Metropolitan Transit Authority,*
　　469 U.S. 528 (1985).........................................................................4, 22, 23

*Goetz v. Glickman,*
　　149 F.3d 1131 (10th Cir. 1998) ..............................................................56

*Gonzales v. Raich,*
　　545 U.S. 1 (2005)........................................................................... *passim*

*Grand Lodge of Fraternal Order of Police v. Ashcroft,*
　　185 F. Supp. 2d 9 (D.D.C. 2001) .............................................................32

*Harris v. McCrae,*
　　448 U.S. 297 (1980).................................................................................1

*Havens Realty Corp. v. Coleman,*
　　455 U.S. 363 (1982).........................................................................28, 29

*Head Money Cases (Edye v. Robertson),*
　　112 U.S. 580 (1884).........................................................................55, 56

*Heart of Atlanta Motel v. United States,*
　　379 U.S. 241 (1964)...............................................................................44

*Helvering v. Davis,*
　　301 U.S. 619 (1937)...............................................................................49

*Hibbs. v. Winn,*
　　542 U.S. 88 (2006)................................................................................34

*Hodel v. Va. Surface Mining & Reclamation Assn,*
　　452 U.S. 264 (1981)....................................................................18, 19, 47

*Hunt v. Washington State Apple Advertising Commn,*
　　432 U.S. 333 (1977).........................................................................27, 28

*Hylton v. United States,*
　　3 U.S. (3. Dall.) 171 (1796) ..............................................................57, 58

*Ill. Dept Transp. v. Hinson,*
   122 F.3d 370 (7th Cir. 1997) ...................................................................31

*Iowa ex rel. Miller v. Block,*
   771 F.2d 347 (8th Cir. 1985) ...................................................................32

*Jacobson v. Massachusetts,*
   197 U.S. 11 (1905) ...................................................................................53

*Kansas v. United States,*
   214 F.3d 1196 (10th Cir. 2000) ...............................................................14

*Knowlton v. Moore,*
   178 U.S. 41 (1900) ...............................................................................49, 58

*Lawrence v. Texas,*
   539 U.S. 558 (2003) .................................................................................53

*License Tax Cases,*
   72 U.S. (5 Wall.) 462 (1867) .................................................................5, 49

*Lincoln Fed. Labor Union v. Nw. Iron & Metal Co.,*
   335 U.S. 525 (1949) .................................................................................53

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ......................................................................25, 26, 30

*M'Culloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) ................................................................47

*Madison v. Virginia,*
   474 F.3d 118 (4th Cir. 2006) ...................................................................15

*Maryland v. Wirtz,*
   392 U.S. 183 (1968) .............................................................................22, 23

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) .................................................................................30

*Massachusetts v. Mellon,*
   262 U.S. 447 (1923) .............................................................................29, 30

*McCarthy v. Hawkins,*
   381 F.3d 407 (5th Cir. 2004) ...................................................................23

*McConnell v. FEC,*
 540 U.S. 93 (2003).................................................................................................27

*McCray v. United States,*
 195 U.S. 27 (1904)................................................................................................49

*Moon v. Freeman,*
 379 F.2d 382 (9th Cir. 1967) ...............................................................................56

*National League of Cities v. Usery,*
 426 U.S. 833 (1976)..............................................................................................22

*National Parks Conservation Assn v. Norton,*
 324 F.3d 1229 (11th Cir. 2003) ...........................................................................27

*National Taxpayers Union, Inc. v. United States,*
 68 F.3d 1428 (D.C. Cir. 1995)..............................................................................29

*Nevada v. Burford,*
 918 F.2d 854 (9th Cir. 1990) ................................................................................32

*Nevada v. Skinner,*
 884 F.2d 445 (9th Cir. 1989) ................................................................................15

*New Jersey v. Sargent,*
 269 U.S. 328 (1925)..............................................................................................31

*New York v. United States,*
 505 U.S. 144 (1992)...................................................................................... *passim*

*Oklahoma v. Schweiker,*
 655 F.2d 401 (D.C. Cir. 1981)..............................................................................15

*Oregon v. Mitchell,*
 400 U.S. 112 (1970)..............................................................................................30

*Pac. Ins. Co v. Soule,*
 74 U.S. 443 (1868)................................................................................................58

*Padavan v. United States,*
 82 F.3d 23 (2d Cir. 1996)......................................................................................14

*Penn Mut. Indem. Co. v. Comm'r,*
 277 F.2d 16 (3d Cir.1960)....................................................................................50

*Pennsylvania v. Kleppe,*
    533 F.2d 668 (D.C. Cir. 1976) ...........................................................................31

*Perez v. United States,*
    402 U.S. 146 (1971)..........................................................................................36

*Pollock v. Farmers Land & Trust Co.,*
    158 U.S. 601 (1895)..........................................................................................57

*Printz v. United States,*
    521 U.S. 898 (1997)....................................................................................19, 24

*Reich v. Dept of Conservation & Natl Resources,*
    28 F.3d 1076 (11th Cir. 1994) ..........................................................................22

*Reno v. Condon,*
    528 U.S. 141 (2000)....................................................................................23, 24

*Rodgers v. United States,*
    138 F.2d 992 (6th Cir. 1943) ...........................................................................56

*Sabri v. United States,*
    541 U.S. 600 (2004)..........................................................................................47

*Sonzinsky v. United States,*
    300 U.S. 506 (1937)..........................................................................................50

*South Carolina ex rel. Tindal v. Block,*
    717 F.2d 874 (4th Cir. 1983) ...........................................................................56

*South Carolina v. Baker,*
    485 U.S. 505 (1988)....................................................................................19, 23

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966)..........................................................................................32

*South Carolina v. Regan,*
    465 U.S. 367 (1984)..........................................................................................34

*South Dakota v. Dole,*
    483 U.S. 203 (1987)............................................................... 9, 12-14, 49

*Springer v. United States,*
    102 U.S. 586 (1881)..........................................................................................57

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007)...................................................................................................37

*Tenn. Elec. Power Co. v. Tenn. Valley Auth.,*
  306 U.S. 118 (1939)...................................................................................................28

*Texas v. Interstate Commerce Commission,*
  258 U.S. 158 (1922)...................................................................................................31

*Texas v. United States,*
  523 U.S. 296 (1998)...................................................................................................32

*Thomas v. Union Carbide Agric. Prods. Co.,*
  473 U.S. 568 (1985)..............................................................................................32, 33

*Toilet Goods Assn v. Gardner,*
  387 U.S. 158 (1967)...................................................................................................33

*Travis v. Reno,*
  163 F.3d 1000 (7th Cir. 1998) ...................................................................................24

*Tyler v. United States,*
  281 U.S. 497 (1930)................................................................................................6, 58

*Union Elec. Co. v. United States,*
  363 F.3d 1292 (Fed. Cir. 2004)..................................................................................58

*United States v. Butler,*
  297 U.S. 1 (1936)..............................................................................................12, 49

*United States v. Comstock,*
  No. 08-1224 (U.S. May 17, 2010) ........................................................................47, 48

*United States v. Doremus,*
  249 U.S. 86 (1919)...................................................................................................49

*United States v. Kahriger,*
  345 U.S. 22 (1953)...................................................................................................50

*United States v. Lopez,*
  514 U.S. 549 (1995)..............................................................................................37, 38

*United States v. Maxwell,*
  446 F.3d 1210 (11th Cir. 2006) ...........................................................................36, 37

*United States v. Metropolitan St. Louis Sewer Dist.,*
  569 F.3d 829 (8th Cir. 2009) ............................................................28

*United States v. Mfrs. Natl Bank of Detroit,*
  363 U.S. 194 (1960).........................................................................6, 58

*United States v. Miss. Dept of Pub. Safety,*
  321 F.3d 495 (5th Cir. 2003) ............................................................22

*United States v. Morrison,*
  529 U.S. 598 (2000).........................................................................38

*United States v. Peters,*
  403 F.3d 1263 (11th Cir. 2005) ........................................................35

*United States v. Ross,*
  458 F.2d 1144 (5th Cir. 1972) ..........................................................50

*United States v. Sanchez,*
  340 U.S. 42 (1950)..........................................................................5, 50

*United States v. South-Eastern Underwriters Assn,*
  322 U.S. 533 (1944)..........................................................................39

*United States v. Spoerke,*
  568 F.3d 1236 (11th Cir. 2009) ........................................................50

*United States v. Stangland,*
  242 F.2d 843 (7th Cir. 1957) ............................................................56

*United States v. Wrightwood Dairy Co.,*
  315 U.S. 110 (1942)..........................................................................48

*Usery v. Turner Elkhorn Mining Co.,*
  428 U.S. 1 (1976)..........................................................................54, 55

*Va. Dept of Educ. v. Riley,*
  106 F.3d 559 (4th Cir. 1997) ............................................................15

*Van Wyhe v. Reisch,*
  581 F.3d 639 (8th Cir. 2009) ............................................................15

*Veazie Bank v. Fenno,*
  75 U.S. (8 Wall.) 533 (1869) ............................................................57

*Vesta Fire Ins. Corp. v. Florida*
   141 F.3d 1427 (11th Cir. 1998) ................................................................54

*Warren v. United States,*
   874 F.2d 280 (5th Cir. 1989) .................................................................33

*Warth v. Seldin,*
   422 U.S. 490 (1975).............................................................................21

*Washington v. Glucksberg,*
   521 U.S. 702 (1997).............................................................................52

*West Coast Hotel Co. v. Parrish,*
   300 U.S. 379 (1937).............................................................................53

*West Virginia v. DHHS,*
   289 F.3d 281 (4th Cir. 2002) .................................................................15

*Whites Place, Inc. v. Glover,*
   222 F.3d 1327 (11th Cir. 2000) ..............................................................28

*Whitmore v. Arkansas,*
   495 U.S. 149 (1990).............................................................................26

*Wickard v. Filburn,*
   317 U.S. 111 (1942)...........................................................36, 37, 43, 44, 56

*Wilder v. Virginia Hospital Assn,*
   496 U.S. 498 (1990)..............................................................................9

*Williams v. Atty Gen. of Ala.,*
   378 F.3d 1232 (11th Cir. 2004) ...........................................................52, 53

*Williams v. Morgan,*
   478 F.3d 1316 (11th Cir. 2007) ..............................................................54

*Wisc. Dept of Health & Family Servs. v. Blumer,*
   534 U.S. 473 (2002).............................................................................10

*Wyoming ex rel. Sullivan v. Lujan,*
   969 F.2d 877 (10th Cir. 1992) ................................................................31

## FEDERAL CONSTITUTION AND STATUTES

U.S. Const. amend. V ........................................................................................52

U.S. Const. amend. XIV ....................................................................................55

U.S. Const. amend. XVI ...............................................................................55, 59

U.S. Const. art. I ........................................................................................ *passim*

U.S. Const. art I, §2.........................................................................................55

U.S. Const. art. I, § 2, cl. 3..............................................................................55

U.S. Const. art. I, § 8, cl. 1.........................................................................12, 48

U.S. Const. art. I, § 8, cl. 3.........................................................................36, 58

U.S. Const. art I, § 8, cl. 18.............................................................................47

U.S. Const. art. I, § 9, cl. 4..............................................................................55

U.S. Const. art. III ........................................................................................ 27

28 U.S.C. § 2201(a) .....................................................................................4, 34

29 U.S.C. § 218a ............................................................................................20

29 U.S.C. § 1001 ............................................................................................22

29 U.S.C. § 1161 ............................................................................................22

29 U.S.C. § 1181 ............................................................................................22

29 U.S.C. § 1181(a) ........................................................................................39

29 U.S.C. § 1182 ............................................................................................39

42 U.S.C. §§ 300gg, 300gg-1 ..........................................................................39

42 U.S.C. § 1304....................................................................................... 10, 16

42 U.S.C. § 1395dd..........................................................................................41

42 U.S.C. § 1396a ...................................................................................1, 9, 10

42 U.S.C. § 1396a(a)(10)(A)(I) ...................................................................9

42 U.S.C. § 1396a(a)(10)(A)(ii) ...............................................................10

42 U.S.C § 1396a(a)(13)(C) ......................................................................11

42 U.S.C. § 1396a(a)(19) ............................................................................9

42 U.S.C. § 1396c .....................................................................................15

42 U.S.C. § 1396d(b) ..................................................................................9

42 U.S.C. § 1396d(dd) ..............................................................................11

I.R.C. § 36B(c)(2)(C)(i) ............................................................................20

I.R.C. § 36B(c)(2)(C)(ii) ...........................................................................20

I.R.C. § 4980B .........................................................................................50

I.R.C. § 4980D .........................................................................................50

I.R.C. § 4980H ........................................................................................20

I.R.C. § 4980H(a) ....................................................................................20

I.R.C. § 4980H(b)(1), (2) .........................................................................20

I.R.C. § 4980H(c)(2)(D)(i)(I) ....................................................................20

I.R.C. § 6671(a) .......................................................................................33

I.R.C. § 7421 .......................................................................................4, 22

I.R.C. § 7421(a) .......................................................................................33

I.R.C. §§ 8001-23 .....................................................................................51

I.R.C. §§ 9801-03 ...............................................................................39, 50

I.R.C. § 5000A(a) ...............................................................................49, 59

I.R.C. § 5000A(b) .....................................................................................33

I.R.C. § 5000A(b)(1) ..........................................................................49, 59

I.R.C. § 5000A(b)(2) ............................................................................49

I.R.C. § 5000A(c)(1) .......................................................................49, 59

I.R.C. § 5000A(c)(1)(B) .......................................................................59

I.R.C. § 5000A(c)(2) .......................................................................58, 59

I.R.C. § 5000A(d) ...............................................................................43

I.R.C. § 5000A(e) ...............................................................................43

I.R.C. § 5000A(e)(1) .............................................................................59

I.R.C. § 5000A(e)(2) .......................................................................49, 59

I.R.C. § 5000A(g)(1) .............................................................................31

I.R.C. § 5000A(g)(2) .............................................................................50

Pub. L. No. 92-603, 86 Stat. 1329 (1972) ...........................................10

Pub L. No. 93-406, 88 Stat. 829 (1974) ...............................................39

Pub. L. No. 99-272, 100 Stat. 82 (1985) ..............................................39

Pub. L. No. 104-191, 110 Stat. 1936 (1996) .........................................39

Pub. L. No. 101-239, 103 Stat. 2106 (1989) .........................................10

Pub. L. No. 104-204, 110 Stat. 2935 (1996) .........................................39

Pub. L. No. 105-277, 112 Stat. 2681 (1998) .........................................39

Pub. L. No. 110-343, 122 Stat. 3765 (2008) .........................................39

Pub. L. No. 111-148, 124 Stat. 119 (2010):

    §§ 701-02 .......................................................................................41
    § 1001 .......................................................................................3, 7
    § 1201 .................................................................................3, 7, 45
    § 1311 .......................................................................................3, 7
    § 1321 ...........................................................................................3
    § 1321(b) ......................................................................................17
    § 1321(c) ......................................................................................17

§§ 1401-02 ...........................................................................................................3, 7
§ 1421 .......................................................................................................................7
§ 1501 ...................................................................................................................3, 7
§ 1501(a) ........................................................................................................ *passim*
§ 1501(a)(2) ............................................................................................................12
§ 1501(a)(2)(A) .................................................................5, 7, 40, 43, 45, 54
§ 1501(a)(2)(B) ...............................................................................................6, 39
§ 1501(a)(2)(E) .........................................................................................................6
§ 1501(a)(2)(F) .................................................................................5, 6, 41, 43
§ 1501(a)(2)(G) ...................................................................................................5, 6
§ 1501(a)(2)(H) ............................................................................................ *passim*
§ 1501(a)(2)(I) ...................................................................................5, 45, 46, 54
§ 1501(a)(2)(J) ..................................................................................5, 46, 47, 54
§ 1501(b) ..............................................................................................49, 50, 58
§ 1511......................................................................................................................20
§ 1513 ........................................................................................................7, 20, 21
§ 1514 ......................................................................................................................20
§ 2001 ...................................................................................................................3, 7
§ 2001(a)(1) ...........................................................................................................10
§ 2001(a)(2) ...........................................................................................................10
§ 2001(a)(3)(B) .....................................................................................................10
§ 10101(a) ................................................................................................................7
§ 10106 ........................................................................................................... *passim*
§ 10106(a) ...................................................................................................... *passim*

Pub. L. No. 111-5, 123 Stat. 115 (2009).........................................................9

Pub. L. No. 111-152, 124 Stat. 1029 (2010):

§ 1002................................................................................................................49
§ 1201..........................................................................................................10, 11

## STATE STATUTES

Alaska Stat. § 14-30-125...................................................................................53

Fla. Stat. § 1003.22 ...........................................................................................53

Ala. Code. 11-47-132...........................................................................................53

## LEGISLATIVE MATERIALS

155 Cong. Rec. H6608 (June 11, 2009)...........................................................42

155 Cong. Rec. H8002-8003 (July 10, 2009) ............................................................42

H.R. Rep. No. 111-443 (2010)................................................................................7, 41, 42

*Health Reform in the 21st Century: Insurance Market Reforms:* Hearing Before the H.
    Comm. on Ways and Means, 111th Cong. (2009)....................................42, 46, 48

Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue
    Provisions of the Reconciliation Act of 2010, as amended, in Combination with the
    Patient Protection and Affordable Care Act* (Mar. 21, 2010) ...............................51

*State Coverage Initiatives:* Hearing Before the Subcomm. on Health of the H. Comm.
    on Ways and Means, 110th Cong. (2008)...............................................................40

*The Economic Case for Health Reform*: Hearing Before the H. Comm. on the Budget,
    111th Cong. (2009) ................................................................................................41

S. Rep. No. 111-89 (2009)......................................................................................41

## MISCELLANEOUS

*Bruce Ackerman, Taxation and the Constitution*, 99 Colum. L. Rev. 1 (1999) ...........................57

Cong. Budget Office, *2008 Key Issues in Analyzing Major Health Insurance
    Proposals* (Dec. 2008) ...............................................................6, 7, 23, 41, 42, 46

Cong. Budget Office, *An Analysis of Health Insurance Premiums Under the Patient
    Protection and Affordable Care Act* (Nov. 30, 2009)...............................................8

Council of Economic Advisers, *The Economic Case for Health Care Reform*
    (June 2009)........................................................................................................41, 42

Council of Economic Advisers, *Economic Report of the President* (Feb. 2010) .........................41

Fed. R. Evid. 201 ...................................................................................................37

John Klemm, *Medicaid Spending: A Brief History,* Health Care Financing Review
    (Fall 2000) ...........................................................................................................17

Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker,
    U.S. House of Representatives (Mar. 20, 2010) ...............................................8, 51

## INTRODUCTION AND SUMMARY

Plaintiffs seek to deny Congress the power to amend a federal statute specifying how federal money appropriated for Medicaid may be spent. They also seek to bar Congress from giving States a choice of creating health insurance exchanges or having the federal government do so. And they contend that the federal government cannot regulate States as it regulates other employers providing health insurance to their employees. Each of these claims runs afoul of consistent Supreme Court precedent. Plaintiffs fare no better in challenging the provision of the new healthcare law requiring individuals to maintain a minimum level of health insurance or else pay a penalty. Plaintiffs have no standing to raise the claim, and even if they did, Supreme Court precedent establishes that regulation of economic decisions such as how to pay for medical services is valid under the Commerce and General Welfare Clauses of the Constitution.

For more than 70 years, Congress has grappled with the problems of the healthcare market — from the Hill-Burton Act in 1934 for hospital construction to more recent legislation such as ERISA and HIPAA regulating health insurance. Medicaid has long been a cornerstone of these national efforts. Congress created Medicaid in 1965 "for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons." *Harris v. McCrae,* 448 U.S. 297, 301 (1980). Since then, Congress has provided the States hundreds of billions of dollars for this purpose, subject to conditions such as minimum eligibility requirements for Medicaid enrollees. As the Supreme Court has noted, participation by a State in the Medicaid program "is entirely optional," but, "once a State elects to participate, it must comply with the requirements" or potentially face termination of federal Medicaid funding. *Id.* Congress has expanded Medicaid eligibility requirements many times. *See* 42 U.S.C. § 1396a note. Each time, States had the option of complying with those requirements or not par-

1

ticipating in the program. The same is true now.

Despite these efforts, as of 2009, more than 45 million Americans lacked coverage under Medicaid or otherwise. Many of the uninsured cannot afford coverage. Others are excluded by insurers' restrictive underwriting criteria. Still others make the economic decision to forgo insurance. But the uninsured do not and cannot forgo health care entirely. When accidents and illnesses inevitably occur, the uninsured still receive medical assistance, even if they cannot pay. As Congress documented, the billions in uncompensated health care costs for the uninsured are passed on to other participants in the health care market: federal, state, and local governments, health care providers, insurers, and the insured. In addition to these burdens, Congress found that lack of insurance costs the economy $207 billion a year in poor health and contributes to 62 percent of all personal bankruptcies.

The Patient Protection and Affordable Care Act ("ACA" or the "Act") is designed to reduce the number of uninsured Americans and control such escalating costs.[1] The Act will extend coverage to about 32 million Americans by 2019. It will do so through market reforms and tax incentives, in addition to the expansion of eligibility for Medicaid. The federal government will pay 100 percent of the increased Medicaid benefits through 2016, declining gradually to 90 percent by 2020 and beyond. Even so, as with every prior expansion of Medicaid eligibility requirements, States can opt out of the program.

Plaintiffs argue, however, that Medicaid has become so successful and popular in their States as to preclude opting out. Therefore, they contend, the ACA forces them to incur the in-

---

[1] The ACA, Pub. L. No. 111-148, 124 Stat. 119 (2010), was amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("HCERA" or the "Reconciliation Act"). Unless otherwise expressly stated, all citations in this memorandum to the ACA are to that Act as amended by HCERA.

creased expenses not covered by the federal government, in violation of the 10th Amendment. But no case — *ever* — has invalidated a spending condition on such a theory, for good reason. A new constitutional rule of this sort would foreclose change, either by precluding Congress from amending its own statutes or requiring courts to calibrate on some novel scale the permissible scope of each amendment. It would also allow States to accept federal money and ignore the terms on which it is extended, a blank check that courts consistently have rejected. *E.g., Padavan v. United States*, 82 F.3d 23, 29 (2d Cir. 1996). In short, plaintiffs call upon this Court to relieve them of a difficult political choice, and in doing so, to break new legal ground and expand dramatically judicial review of laws enacted by the elected branches of government.

The ACA also contains other interrelated measures to reduce the number of uninsured Americans and the Nation's mounting health care costs. To make health insurance more available, the Act prohibits insurers from refusing to cover individuals with preexisting conditions, rescinding coverage for any reason other than fraud, or setting arbitrary benefit ceilings. ACA §§ 1001, 1201. To make insurance more affordable, the Act provides for "health benefit exchanges" allowing individuals and small businesses to leverage their buying power to obtain competitive prices, *id.* §§ 1311, 1321; provides tax credits for individuals and families with income between 133 and 400 percent of the federal poverty level, *id.* §§ 1401-02; and extends Medicaid to individuals with income below 133 percent of the federal poverty level, *id.* § 2001. The ACA also requires that, beginning in 2014, with certain exceptions, all who can afford health insurance obtain it or pay a penalty with their income tax returns. ACA § 1501. Plaintiffs object to these changes as well. Although acknowledging that States may choose not to set up health benefit exchanges, in which case the Secretary of Health and Human Services will do so, the State plaintiffs complain that refusing to participate cedes regulatory authority over health insur-

ance. The 10th Amendment, however, allows Congress to offer States just this type of choice. *See New York v. United States*, 505 U.S. 144, 167 (1992); *FERC v. Mississippi*, 456 U.S. 742, 764-71 (1982).

Plaintiffs' challenge to the provisions addressing insurance provided to a State's own employees fails on jurisdictional grounds and on the merits. The plaintiff States currently offer insurance to their employees and plaintiffs do not allege that their insurance plans are inadequate under the ACA. Thus, plaintiffs cannot show that they will be injured by the provisions they challenge. In any event, it is settled that Congress may impose on State employers the same type of requirements that it imposes on private employers. *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1968).

Plaintiffs' challenge to the minimum coverage provision likewise presents no case or controversy. The provision will not take effect until 2014, and it is entirely speculative whether the individual plaintiffs will be injured. The States and the National Federation of Independent Businesses have no standing to challenge this provision either. And the Anti-Injunction Act bars injunctive relief against payment of a tax penalty. *See* 26 U.S.C. (I.R.C.) § 7421.

Even if plaintiffs had standing to challenge the minimum coverage provision, the challenge would fail. The minimum coverage provision is well within Congress's authority under the Commerce Clause. Congress rightly understood, and plaintiffs do not deny, that virtually everyone at some point needs medical services, which cost money. The ACA regulates economic decisions about how to pay for those services — whether to pay in advance through insurance or attempt to do so later out of pocket — decisions that, "in the aggregate," substantially affect the $2.5 trillion interstate health care market. *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). Among other things, Congress found that these economic decisions shift costs to third parties, ACA

4

§§ 1501(a)(2)(F), 10106(a); "increas[e] financial risks to households and medical providers," *id.*

§§ 1501(a)(2)(A), 10106(a); raise insurance premiums, *id.* §§ 1501(a)(2)(F), 10106(a); precipi-

tate personal bankruptcies, §§ 1501(a)(2)(G), 10106(a); and impose higher administrative ex-

penses, *id.* §§ 1501(a)(2)(J), 10106(a). Congress determined that, without the minimum cover-

age provision, the reforms in the Act, such as the ban on denying coverage based on pre-existing

conditions, would not work, as they would amplify existing incentives for individuals to "wait to

purchase health insurance until they needed care," shifting even greater costs onto third parties.

*Id.* §§ 1501(a)(2)(I), 10106(a). Congress thus found that the minimum coverage provision "is

essential to creating effective health insurance markets in which improved health insurance

products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be

sold." *Id.* Congress also concluded that requiring the financially able to purchase insurance

would spread risks across a larger pool and lower premiums. *Id.* §§ 1501(a)(2)(I), 10106(a).

Congress's authority under the Commerce Clause and Necessary and Proper Clause to adopt the

minimum coverage provision is thus clear.

In addition, Congress has independent authority to enact this statute as an exercise of its

power under Article I, Section 8, to lay taxes and make expenditures to promote the general wel-

fare. *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867). The minimum coverage provision

— in particular, the requirement in the Internal Revenue Code that individuals pay a tax penalty

if they do not have the requisite coverage — will raise substantial revenue. The Supreme Court

has long held that an exercise of this power is valid even if it has a regulatory function, even if

the revenue purpose is subsidiary, and even if the moneys raised are only "negligible." *United

States v. Sanchez*, 340 U.S. 42, 44 (1950). It is equally clear that a tax predicated on a volitional

event — such as a decision not to purchase health insurance — is not a "direct tax" subject to

5

apportionment under Article I, Sections 2 and 9. *United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 197-98 (1960); *Tyler v. United States*, 281 U.S. 497, 502 (1930).

Reasonable people may disagree on how best to resolve the enormous problems in the interstate health care market, problems that threaten lives and livelihoods, jeopardize the competitive standing of American industry, and burden the federal budget. But those disagreements can move from the elected branches to the judicial arena only when a concrete case or controversy frames a genuine constitutional issue. Plaintiffs' challenge to the minimum coverage provision does not meet this test, and therefore should be dismissed.

## BACKGROUND

### A.   Statutory Background

In 2009, the United States spent an estimated 17 percent of its gross domestic product on health care. ACA §§ 1501(a)(2)(B), 10106(a). Nevertheless, 45 million people — 15 percent of the population — went without health insurance in 2009, and, absent the new legislation, that number would have climbed to 54 million by 2019. Cong. Budget Office ("CBO"), *Key Issues in Analyzing Major Health Insurance Proposals* 11 (Dec. 2008) [hereinafter *Key Issues*].

The record before Congress documents the staggering costs that a broken health care system visits on individual Americans and the Nation. The millions who have no health insurance coverage still receive medical care, but often cannot pay for it. The costs of that uncompensated care are shifted to governments, taxpayers, insurers, and the insured. In addition, the lack of insurance costs more than $200 billion a year "because of the poorer health and shorter lifespan of the uninsured," ACA §§ 1501(a)(2)(E), 10106(a), and causes most personal bankruptcies, *id.* §§ 1501(a)(2)(G), 10106(a). All these costs, Congress determined, substantially affect interstate commerce. *Id.* §§ 1501(a)(2)(F), 10106(a). To counter this critical threat to the American econ-

6

omy, the Act comprehensively "regulates activity that is commercial and economic in nature:
economic and financial decisions about how and when health care is paid for, and when health
insurance is purchased." *Id.* §§ 1501(a)(2)(A), 10106(a).

- *First,* to address inflated fees and premiums in the individual and small-business insurance market, the Act permits States (or, if they decline, the federal government) to establish health insurance exchanges "as an organized and transparent marketplace for the purchase of health insurance where individuals and employees . . . can shop and compare health insurance options." H.R. Rep. No. 111-443, pt. II, at 976 (2010) (internal quotation omitted). The exchanges coordinate participation and enrollment in health plans, and provide consumers with needed information. ACA § 1311.

- *Second,* the Act builds on the existing system of health insurance, in which most individuals receive coverage as part of employee compensation. *See* CBO, *Key Issues,* at 4-5. It creates tax incentives for small businesses to encourage the purchase of health insurance for employees and prescribes potential assessments on large businesses that do not provide employees a minimum level of coverage. ACA §§ 1421, 1513.

- *Third,* the Act subsidizes coverage for much of the uninsured population. Nearly two-thirds of the uninsured are in families with income less than 200 percent of the federal poverty level, H.R. Rep. No. 111-443, pt. II, at 978 (2010), compared to just 4 percent earning more than 400 percent of the poverty level. CBO, *Key Issues,* at 11, 27. The Act plugs this gap with tax credits and reduced cost-sharing for those with income between 133 and 400 percent of the federal poverty line, ACA §§ 1401-02, and by expanding Medicaid to cover individuals with income below 133 percent of the federal poverty level, *id.* § 2001.

- *Fourth,* the Act removes barriers to insurance coverage, barring widespread insurance industry practices that increase premiums or deny coverage to those most in need of health care. Most significantly, the Act bars insurers from refusing to cover individuals with pre-existing medical conditions. ACA § 1201.[2]

- *Fifth,* the Act requires that all Americans, with specified exceptions, maintain a minimum level of health insurance coverage, or pay a penalty. ACA §§ 1501, 10106. Congress found that this provision "is an essential part of this larger regulation of economic activity," and that its absence "would undercut Federal regulation of the health insurance market." *Id.* §§ 1501(a)(2)(H), 10106(a). Congress determined that the minimum coverage provision "is essential to creating effec-

---

[2] It also bars insurers from rescinding coverage other than for fraud or misrepresentation, or declining to renew coverage based on health status. *Id.* §§ 1001, 1201. And it prohibits caps on the coverage available to a policyholder. *Id.* §§ 1001, 10101(a).

7

tive health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.* The CBO projects that the Act will reduce the ranks of the uninsured by approximately 32 million by 2019, Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives 9, 15 (Mar. 20, 2010) [hereinafter CBO Letter to Speaker Pelosi], and that its combination of reforms, subsidies, and tax credits will reduce the average premium paid in the individual and small-group markets, CBO, *An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act* 23-25 (Nov. 30, 2009). And the CBO estimates that the interrelated revenue and spending provisions in the Act will net the federal government more than $100 billion over the next decade. CBO Letter to Speaker Pelosi at 2.

**B.    This Action**

Representatives of Florida and 19 other States have brought this action, along with Mary Brown, a resident of Panama City, Florida; Kaj Ahlburg, a resident of Washington State; and NFIB. Am. Compl. ¶¶ 6-28. The Amended Complaint contains six counts. Counts One through Three contend that the minimum coverage provision exceeds Congress's Article I powers, violates the 9th and 10th Amendments and the due process clause, and constitutes a direct tax not apportioned among the States. Am. Compl. ¶¶ 69-82. Counts Four through Six assert that the Act commandeers State resources by expanding Medicaid, *id.* ¶¶ 83-86, requires States to carry out insurance mandates and insurance exchange programs, *id.* ¶¶ 87-88, and regulates States as employers, *id.* ¶¶ 89-90, all in violation of the 10th Amendment.

As set forth below, each of these claims should be dismissed.

## ARGUMENT

**I.    THE AMENDMENTS TO MEDICAID FALL WITHIN THE SPENDING POWER**

In Count Four, the State plaintiffs allege that the ACA converts Medicaid into a "federally imposed universal healthcare regime" in which their "discretion is removed" and new expenses are "forced upon them in derogation of their sovereignty." Am. Compl. ¶ 2. These allegations not only misread the Act, but also obscure a fundamental point: State participation in

Medicaid under the Act is voluntary, as it always has been. States can accept federal funds *and* the accompanying conditions, or not. Congress, under the spending power, has the right to pose that choice, just as States have the right to make it. *South Dakota v. Dole*, 483 U.S. 203 (1987).

## A.   The Medicaid Program

Title XIX of the Social Security Act established Medicaid as "a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990). State participation in Medicaid is, and always has been, voluntary. *Id.* However, in order to receive the hundreds of billions of dollars Congress has appropriated, States that elect to participate must satisfy the conditions Congress has prescribed.[3] *Id.* As plaintiffs recognize, participating States have retained "considerable discretion to implement and operate their respective Medicaid programs in accordance with State-specific designs regarding eligibility, enrollment, and administration." Am. Compl. ¶ 40. "The [Medicaid] Act gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985) (quoting 42 U.S.C. § 1396a(a)(19)).

That discretion continues under the ACA, subject — as it always has been — to minimum federal requirements. *Compare* 42 U.S.C. § 1396a(a)(10)(A)(I) (States must extend medi-

---

[3] Procedurally, to be eligible for federal Medicaid matching funds, a State must submit to the Secretary of Health and Human Services ("HHS") a plan demonstrating compliance with statutory and regulatory requirements. *See* 42 U.S.C. § 1396a. If the Secretary approves the plan, the federal government reimburses part of the State's covered Medicaid expenditures. This "federal medical assistance percentage" ("FMAP") has ranged from 50 to 83 percent. *Id.* § 1396d(b). The American Recovery and Reinvestment Act of 2009, Public Law 111-5, 123 Stat. 115 (2009), temporarily increased FMAPs above these levels to provide States fiscal relief and to support Medicaid during the economic downturn. The federal government also pays at least 50 percent of the State's administrative costs for Medicaid. *See* 42 U.S.C. § 1396b(a)(2)-(5), (7).

9

cal assistance to certain "categorically needy" persons) *with id.* § 1396a(a)(10)(A)(ii) (providing

option to include other needy groups and thereby collect additional federal matching funds).

Thus, consistent with its "design[] to advance cooperative federalism," *Wisc. Dep't of Health &*

*Family Servs. v. Blumer,* 534 U.S. 473, 476 (2002), Medicaid gives States flexibility, so long as

they satisfy minimum federal requirements, to tailor plans to the needs of their citizens.

### B.    The ACA Amendments to Medicaid

Congress expressly reserved the right to amend any provision of the Social Security Act,

42 U.S.C. § 1304. It has exercised that right to amend Medicaid many times, *see, e.g., id.*

§ 1396a note — in particular, to expand eligibility. For example, in 1972, Congress generally

required participating States to extend Medicaid to recipients of Supplemental Security Income,

dramatically expanding overall enrollment. *See* Social Security Act Amendments of 1972, Pub.

L. No. 92-603, 86 Stat. 1329 (1972). In 1989, Congress required States to extend Medicaid to

pregnant women and children under age six who met certain income limits. *See* Omnibus Budg-

et Reconciliation Act of 1989, Pub. L. No. 101-239, 103 Stat. 2106 (1989). In the same vein, the

ACA expands Medicaid eligibility to include individuals under age 65 with incomes below 133

percent of the federal poverty level. ACA § 2001(a)(1). Congress also addressed the medical

care and services that must be covered, providing that these newly eligible adults must be offered

a "benchmark" benefits plan that contains the same minimum essential coverage required of

plans sold on state exchanges. ACA § 2001(a)(2). ACA § 2001(a)(2). These amendments will

take effect in 2014. *Id.* § 2001(a)(1).

Unlike past Medicaid expansions, where the FMAP for some States was as low as 50

percent, the federal government will reimburse States for *100 percent* of benefits paid to newly

eligible recipients from 2014 to 2016. ACA § 2001(a)(3)(B); HCERA § 1201. That percentage

will gradually decrease — to 95 percent in 2017, 94 percent in 2018, and 93 percent in 2019 —

leveling off at 90 percent thereafter. HCERA § 1201. *Id.*[4]

### C.   There is No Basis to Invalidate Statutory Conditions on Medicaid Funds

The conditions the Act places on receipt of federal Medicaid funds fall well within Con-

gress's power under the Spending Clause and conform to the 10th Amendment. As the Supreme

Court has explained, "[i]f a power is delegated to Congress in the Constitution, the Tenth

Amendment expressly disclaims any reservation of that power to the States." *New York v. Unit-

ed States*, 505 U.S. 144, 156 (1992); *see also Benning v. Georgia*, 391 F.3d 1299, 1308 (11th

Cir. 2004) (where an "enactment . . . is within an enumerated power of Congress . . . the Tenth

Amendment does not apply").[5] The sole question presented by plaintiffs' claim, then, is whether

the Medicaid provisions of the ACA satisfy the Spending Clause. They do.

---

[4] The States also cite two comparatively minor provisions of the Act. Am. Compl. ¶ 43. First, HCERA § 1202 sets the minimum payment for primary care physician services "furnished in 2013 and 2014" at the Medicare rate under 42 U.S.C. § 1396a(a)(13)(C). But the federal payment is 100 percent of the cost of meeting this requirement for those years, 42 U.S.C. § 1396d(dd), so there should be no additional burden on States during those years. Second, ACA § 2501 raises the minimum rebate levels for drugs, but provides that the resulting increased amount will be credited to the federal government. To the extent that the increase in the mini-mum rebate levels generates new rebate revenue, States will be no worse off than before. Only for States that collected supplemental rebates, or any amounts above the minimum rebates, could this result in some relatively modest reduction in rebate revenue.

[5] The 9th Amendment adds no force to plaintiffs' claims. It "unambiguously refer[s] to individual rights" only, *District of Columbia v. Heller*, 128 S. Ct. 2783, 2790 (2008), and does not cover plaintiffs' state sovereignty claims. Further, plaintiffs fail even to state a 9th Amend-ment claim because they do not specify what unenumerated right was allegedly infringed. *See Bishop v. Aronov*, 926 F.2d 1066, 1078 (11th Cir. 1991) (declining to address 9th Amendment claim pleaded only "in the barest language"); *Abdullah v. Gibbard*, No. 06-275, 2007 U.S. Dist. LEXIS 91980, at *3 (M.D. Fla. Dec. 14, 2007). And in any event, the 9th Amendment has been interpreted as a "rule of construction" that "does not confer substantive rights in addition to those conferred by other portions of our governing law." *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991) (citation omitted); *see also Jenkins v. Comm'r*, 483 F.3d 90, 92-93 (2d Cir. 2007).

11

Congress's powers under the Spending Clause are "not limited by the direct grants of legislative power found in the Constitution." *United States v. Butler*, 297 U.S. 1, 66 (1936). In particular, Congress can "fix the terms on which it shall disburse federal money to the States." *New York*, 505 U.S. at 158. Congress has "repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *Dole*, 483 U.S. at 206. There are only four "general restrictions" on the spending power. *Id.* at 207. The ACA satisfies each.

First, legislation under the Spending Clause must pursue the "general welfare," U.S. Const. art. I, § 8, cl. 1. *Dole* made clear that the Judiciary must "defer substantially" to Congressional judgment on this issue and, indeed, questioned "whether 'general welfare' is a judicially enforceable restriction at all." *Dole*, 483 U.S. at 208 n.2 (citing *Buckley v. Valeo*, 424 U.S. 1, 90-91 (1976)). Second, Congress must clearly state the conditions on receipt of federal funds to afford States notice of their obligations. *Id.* Third, conditions must relate to the purpose of the grant program. *Id.* And fourth, the conditions may not require States "to engage in activities that would themselves be unconstitutional." *Id.* at 210; *see also Benning*, 391 F.3d at 1305.

Plaintiffs appear not to dispute that the ACA meets these "general restrictions." The challenged provisions plainly are germane to the federal interest and were enacted in pursuit of the general welfare. As Congress found, the expansion "will increase the number and share of Americans who are insured," lessen the drag on the economy caused by the "poorer health and shorter life span of the uninsured," and reduce the "cost of providing uncompensated care to the uninsured" passed on to the insured and to taxpayers. ACA §§ 1501(a)(2), 10106(a). These findings merit substantial deference. *Dole*, 483 U.S. at 208 n.2.

12

Moreover, the provisions expanding Medicaid eligibility are clear, enabling state officials to assess whether continued participation is in the best interest of their citizens. *See id.* at 207. And plaintiffs do not appear to allege that the new provisions force States to violate individuals' constitutional rights. Just like prior amendments to Medicaid, those provisions do little more than require States to extend existing Medicaid programs to an additional group of needy citizens as a condition on the receipt of additional federal funds. In sum, the conditions specified for States to receive federal Medicaid funds are an unexceptional exercise of the spending power. They raise no 10th Amendment concerns. *See Dole*, 483 U.S. at 206; *New York*, 505 U.S. at 156.

**D.     The Act's Medicaid Provisions Are Not Coercive**

State participation in the Medicaid program is and always has been voluntary. Nonetheless, plaintiffs declare that they "have no choice other than to participate" because "if they were to end their longstanding participation in Medicaid, [they] would desert millions of their residents, leaving them without access to the healthcare services they have depended on for decades." Am. Compl. ¶¶ 84, 66. Under this rationale, the more popular a federal program becomes in the States, the less authority Congress has to change it. Courts have consistently rejected such "coercion" arguments and have never invalidated a spending condition on that basis.

In *Dole*, the Supreme Court emphasized the "breadth of [Congress's] power" to "attach conditions on the receipt of federal funds," *Dole*, 483 U.S. at 206-07, but hypothesized that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)). At the same time, the Court recognized, every federal spending statute "'is in some measure a temptation,'" and admonished that "'to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficul-

13

ties.'" *Id.* (quoting *Steward Machine*, 301 U.S. at 589-90). Indeed, in *Steward Machine*, the

Court expressed doubt as to the viability of a "coercion" theory. 301 U.S. at 590 (finding no

coercion even "assum[ing] that such a concept can ever be applied with fitness to the relations

between state and nation"). *Dole* thus reaffirmed the assumption, founded on "'robust common

sense,'" that States voluntarily choose whether to accept the conditions attached to the receipt of

federal funds. *Dole*, 483 U.S. at 211 (quoting *Steward Machine*, 301 U.S. at 590).

Accordingly, the "coercion" theory has never advanced beyond a *hypothetical* exception

to the spending power. The Eleventh Circuit, recognizing Congress's broad authority to place

conditions on the receipt of federal funds, has emphasized: "'If a State wishes to receive any fed-

eral funding, it must accept the related, unambiguous conditions in their entirety.'" *Benning*, 391

F.3d at 1308 (quoting *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003)). Other Courts of

Appeals, too, have uniformly rejected claims that conditions on Medicaid and other federal funds

are impermissibly coercive, often expressing doubt that the theory retains vitality. For example,

in *California v. United States*, 104 F.3d 1086 (9th Cir. 1997), the Ninth Circuit sustained a Me-

dicaid requirement that States provide emergency medical services to illegal aliens, even though

the State contended that it had "no choice but to remain in the [Medicaid] program in order to

prevent a collapse of its medical system." *Id.* at 1092. In *Padavan v. United States*, 82 F.3d 23

(2d Cir. 1996), the Second Circuit rejected the argument that the same Medicaid requirement

amounted to "commandeering," for the obvious reason — applicable here — that state participa-

tion in Medicaid is voluntary. *Id.* at 29. Similarly, in *Kansas v. United States*, 214 F.3d 1196

(10th Cir.), *cert. denied*, 531 U.S. 1035 (2000), the Tenth Circuit sustained conditions on federal

block grants, stating that "the coercion theory is unclear, suspect, and has little precedent to sup-

port its application." *Id.* at 1202. Much like plaintiffs here, Kansas argued that the size of its

14

grants left it "no choice but to accept" the statutory requirements. *Id.* at 1201. The court rejected

the view that "a large federal grant accompanied by a set of conditional requirements [is] coer-

cive because of the powerful incentive it creates for the states to accept it." *Id.* at 1203. As the

court observed, in a voluntary federal-state program, a State "is ultimately free to reject both the

conditions and the funding, no matter how hard that choice may be." *Id.*[6]

The choice remains voluntary even where *all* federal funding is at issue. As the D.C.

Circuit held in *Oklahoma v. Schweiker*, 655 F.2d 401, 414 (D.C. Cir. 1981), the amount of fund-

ing subject to conditions does not render the State's choice illusory: "'We do not agree that the

carrot has become a club because rewards for conforming have increased. It is not the size of the

stake that controls, but the rules of the game.'" *See id.* ("[C]ourts are not suited to evaluating

whether the states are faced here with an offer they cannot refuse or merely a hard choice.").[7]

Here, it defies not only precedent, but also logic and history, to contend that an expansion

of Medicaid eligibility financed almost entirely with federal dollars is impermissibly coercive.

---

[6] *See also Nevada v. Skinner*, 884 F.2d 445, 448 (9th Cir. 1989) ("The difficulty if not the impropriety of making judicial judgments regarding a state's financial capabilities renders the coercion theory highly suspect as a method for resolving disputes between state and federal governments."); *Van Wyhe v. Reisch*, 581 F.3d 639, 652 (8th Cir. 2009) (while "a potential loss of 100% of the federal funding for state prisons would indeed be painful," the statute "is intended as an inducement, and the final choice is left to each state"), *cert. denied sub nom. Reisch v. Sisney*, No. 09-953, 2010 WL 545428 (May 24, 2010); *Madison* v. *Virginia*, 474 F.3d 118, 128 (4th Cir. 2006) ("[H]ard choices do not alone amount to coercion.").

[7] The Fourth Circuit, while suggesting that, in theory, the coercion exception retains vitality, also has never invalidated a spending condition on this ground. *See, e.g., West Virginia v. DHHS*, 289 F.3d 281, 291-94 (4th Cir. 2002) ("the mere possibility" that a State could lose all of its Medicaid funds does not establish unconstitutional coercion given that the Secretary has discretion under the Medicaid Act, 42 U.S.C. § 1396c, to withhold only part of a State's Medicaid funds). In any event, that court has indicated that such a claim might lie, if at all, where the federal government "'withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some *insubstantial* respect.'" *Id.* (quoting dictum from *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 570 (4th Cir. 1997) (en banc) (emphasis added), which invalidated a spending condition on other grounds). Here, Congress changed a core element of Medicaid and financed nearly the full cost of that change with federal funds.

The mandatory coverage of groups that Congress has designated as "categorically needy" is and always has been *the* core requirement of Medicaid. Congress has always designated the groups to be covered, with States retaining discretion to expand but not contract the coverage. The Act does not change those central features.

Plaintiffs' suggestion that they did not anticipate an amendment of Medicaid, Am. Compl. ¶ 41, would be implausible even if Congress had not reserved the "right to alter, amend, or repeal any provision" of the Act. 42 U.S.C. § 1304. Indeed, the Supreme Court has explained that, with this "language of reservation," Congress "has given special notice of its intention to retain[] full and complete power to make such alterations and amendments as come within the just scope of legislative power." *Bowen v. POSSE*, 477 U.S. 41, 53 (1986) (citation omitted). In *POSSE*, the Supreme Court rejected a quasi-contractual argument far stronger than plaintiffs' claim here. In 1983, Congress amended the Social Security Act to bar States from withdrawing their employees from Social Security, even though the States had voluntarily entered the system by executing agreements that expressly allowed termination at their option. *Id.* at 45. The amendment negated this option, even as to withdrawals already in process. Nonetheless, the Supreme Court rejected a challenge brought by public agencies of California. *Id.* at 49-50. The Court reasoned that 42 U.S.C. § 1304 "expressly notified the State that Congress retained the power to amend the law under which the Agreement was executed and by amending that law to alter the Agreement itself." *Id.* at 54. *POSSE* thus establishes that States enter Medicaid subject to, and on notice of, Congress's authority to amend the program. Indeed, the ACA is, if anything, less intrusive on state prerogatives than the law upheld in *POSSE*, as the ACA's amendments do *not* revoke a State's option to withdraw from Medicaid if it concludes that participation is no longer advantageous.

If plaintiffs were correct that they can demand federal funding yet jettison "the terms on which" the monies are disbursed, *New York*, 505 U.S. at 158, Medicaid would be frozen in time. Congress could not amend its own statutes, even when it reserved the right to amend. Courts would be forced to assess which amendments change federal law too much, based on standards never before articulated — but only where the amendments expand the program. Medicaid has expanded from 4 million participants to more than 32 million. John Klemm, *Medicaid Spending: A Brief History* 106, *at* https://www.cms.gov/HealthCareFinancingReview/Downloads/00fallpg105.pdf (last visited June 16, 2010). It is unclear whether such expansions would have survived under plaintiffs' new constitutional rule, how frequently courts would have been called upon to assess the expansions, and what standards they would have applied. In addition, if plaintiffs were right, Congress presumably could never repeal Medicaid. Otherwise, it could do so and offer States the option of joining the new program set forth in the ACA. To hold that Congress could take that course, but not amend Medicaid as it has in the ACA, would elevate form over substance.

## II. THE ACT NEITHER COMPELS STATES TO ESTABLISH A HEALTH BENEFIT EXCHANGE NOR VIOLATES THE 10TH AMENDMENT

The Act permits but does not require States to establish a health benefit exchange. A State "that elects" to establish an exchange must operate it in accordance with guidelines promulgated by the HHS Secretary, adopting federal standards or a state law that implements them. ACA §1321(b). If a State elects not to establish an exchange, the Secretary will do so. ACA §1321(c). Thus, although the Act requires the establishment of exchanges, it does not require that *States* create or administer them. This scheme is fully consistent with Supreme Court precedent allowing Congress to "offer States the choice of regulating [an] activity according to federal standards or having state law pre-empted by federal regulation," *New York v. United*

17

*States*, 505 U.S. 144, 167 (1992) (citation omitted), as opposed to commanding a State to enact

or enforce a federal regulatory program, *Reno v. Condon*, 528 U.S. 141, 149 (2000).

Plaintiffs argue that even if the States are not actually "required" to establish exchanges,

they are "coerced" into doing so "under threat of removing or significantly curtailing their

long-held regulatory authority." Am. Compl. ¶ 88. They allege that if a State chooses not to

operate an exchange, and the Secretary instead takes on this responsibility, its choice "would

displace state authority over a substantial segment of intrastate insurance regulation ... that the

States have always possessed under [their] police powers." *Id.* ¶ 44. But the Supreme Court

rejected the same "coercion" argument in *Hodel v. Virginia Surface Mining & Reclamation*

*Ass'n*, 452 U.S. 264 (1981).

In *Hodel*, the Court considered the constitutionality of the Surface Mining Control and

Reclamation Act. *Id.* at 268. States "wishing to assume permanent regulatory authority" over

surface coal mining were required to submit to the Interior Secretary a "proposed permanent

program" demonstrating compliance with federal regulations. *Id.* at 271. If a State declined, the

Secretary would "develop and implement a federal permanent program" for that State, assuming

the "full regulatory burden." *Id.* at 272, 288. Virginia argued that this program violated the 10th

Amendment because "the threat of federal usurpation of their regulatory roles coerces the States

into enforcing the Surface Mining Act." *Id.* at 289. The Supreme Court flatly rejected the argu-

ment, explaining that a "wealth of precedent attests to congressional authority to displace or

pre-empt state laws regulating private activity affecting interstate commerce when these laws

conflict with federal law." *Id.* at 290 (citations omitted). Further, the Court stated, "it is clear

that the Commerce Clause empowers Congress to prohibit all — and not just inconsistent —

state regulation of such activities." *Id.* "Although such congressional enactments obviously cur-

18

tail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result." *Id.* The Court concluded: "Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining. We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role." *Id.*

*Hodel* controls here. The type of "cooperative federalism" arrangement in *Hodel*, and in this case, "is replicated in numerous federal schemes" and has been repeatedly reaffirmed by the Supreme Court. *New York*, 505 U.S. at 167 (Congress may "offer States the choice of regulating [an] activity according to federal standards or having state law pre-empted by federal regulation"); *Printz v. United States*, 521 U.S. 898, 926 (1997); *see also FERC v. Mississippi*, 456 U.S. 742, 764-71 (1982); *Atlanta Gas Light Co. v. U.S. Dep't of Energy*, 666 F.2d 1359, 1369 (11th Cir. 1982) (no coercion where "states remain free to reject the delegation" of federal authority); *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988) ("That a State wishing to engage in certain activity must take administrative . . . action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect."). Count Five should be dismissed.

## III.   REGULATION OF STATES AS EMPLOYERS IN THE NATIONAL LABOR MARKET DOES NOT OFFEND THE 10TH AMENDMENT

In Count Six, plaintiffs allege that Congress exceeded its Article I powers, and violated the 10th Amendment, by requiring States to (1) offer their employees a minimum level of health insurance coverage or face potential assessments; (2) enroll their employees automatically in a health insurance plan if they offer one; and (3) submit a tax return containing information about the coverage they offer their employees. Am. Compl. ¶ 90. Although the Act makes these requirements equally applicable to private employers, plaintiffs allege that the provisions somehow

19

infringe state sovereignty. But Congress has long regulated the terms and conditions of employment in the national labor market, including health insurance benefits. And Supreme Court precedent firmly demonstrates that where such laws are equally applicable to States and private employers — as they are here — the 10th Amendment is not implicated.

### A.   Regulation of Large Employers

Plaintiffs appear to challenge three provisions of the Act. Section 1513 of the Act adds a shared responsibility provision to the Internal Revenue Code that provides for potential assessments against large employers that do not offer their employees a minimum level of health insurance coverage. ACA § 1513 (adding I.R.C. § 4980H). The assessments do not apply to employers that offer coverage that is "affordable" (*i.e.*, an employee's required contribution does not exceed 9.5 percent of household income) and that provides "minimum value" (*i.e.*, at least 60 percent of the "total allowed costs of benefits are covered"). I.R.C. § 36B(c)(2)(C)(i), (ii). Beginning in 2014, the assessments do apply to employers that have 50 or more full-time equivalent employees but do not offer this minimum level of coverage, if any such employee buys coverage on an exchange and receives a premium tax credit.[8]

Section 1511 of the Act amends the Fair Labor Standards Act to require employers with more than 200 full-time employees automatically to enroll new full-time employees (and to continue enrollment of existing employees) in a health insurance plan, if the employer offers one. ACA § 1511 (adding 29 U.S.C. § 218a). Section 1514 of the Act amends the Internal Revenue Code to require certain employers, beginning in 2014, to submit a return containing information

---

[8] The assessment varies. If the employer does *not* offer coverage and any full-time employee receives a premium tax credit for a given month, $167 for *every* full-time employee is assessed for that month (excluding the first 30 employees). I.R.C. § 4980H(a), (c)(2)(D)(i)(I). If the employer *does* offer coverage and any full-time employee receives a premium tax credit for a given month, $250 for *each such* employee is assessed for that month (but no more than the penalty had the employer not offered any coverage). I.R.C. § 4980H(b)(1), (2).

about the coverage they offer their employees, and permits the Secretary of the Treasury to allow

employers to meet this requirement by adding the information to their employees' W-2s.

**B.     The State Plaintiffs Lack Standing to Challenge the Act's Regulation of Large Employers**

The Court lacks jurisdiction to entertain the State plaintiffs' challenge to these provisions

for many of the reasons discussed more thoroughly below in the context of the minimum cover-

age provision. First, Sections 1513 and 1514 do not take effect until 2014, and are too temporal-

ly remote to support standing. Further, because Section 1511 will not be enforced until the Sec-

retary issues implementing regulations that spell out the requirements, any challenge is unripe.

Second, plaintiffs have not met their burden to demonstrate that they are "certain" to be injured

by the potential assessments against large employers not offering a minimum level of insurance.

No State pleads that, in 2014, it will fail to offer coverage meeting the statutory definition of "af-

fordable" or that it will have to change its program significantly to do so. In fact, Florida appears

already to offer "affordable" coverage.[9]  Likewise, no State pleads that, in 2014, it will fail to

offer, or will have to change its program significantly to offer, coverage providing "minimum

value." Given these provisions, it is not clear that *any* State plaintiff will be subject to an as-

sessment come 2014; certainly, no State has met its burden "clearly to allege facts demonstrat-

ing" such injury. *Warth v. Seldin*, 422 U.S. 490, 518 (1975). And even if an assessment ulti-

mately were imposed, a State could challenge it at that time, just as States challenge other penal-

ties assessed under the Internal Revenue Code, such as for failing to deposit taxes, including em-

ployment taxes, *see* I.R.C. § 6656. The Anti-Injunction Act thus also bars the States' premature

---

[9] According to its website, Florida offers health insurance to career service employees and their families at a "very low cost" and to some executives and senior managers at "no cost." *See* http://www.flofr.com/director/jobopp/ofrbenefits.htm#HealthCare (last visited June 16, 2010).

attempt to enjoin the potential assessment provisions. *See* I.R.C. § 7421, discussed *infra* at 33-34.

**C.      Regulation of the Terms and Conditions of Employment in the National Labor Market Falls Within the Commerce Power**

Congress has long regulated the terms and conditions of employment, including health insurance benefits. In 1938, Congress passed the Fair Labor Standards Act ("FLSA"), which established minimum wage and overtime pay requirements. Although the FLSA did not originally apply to States, by 1974, it had been extended to cover nearly all state employees. In *Maryland v. Wirtz*, 392 U.S. 183 (1968),[10] the Court affirmed one such extension, finding it "clear" that labor conditions in public workplaces, such as schools and hospitals, affect interstate commerce. *Id.* at 194. The Court relied on Congress's findings that paying substandard wages gives employers an unfair competitive advantage, which depresses labor conditions generally, and that regulation of these conditions prevents labor disputes that disrupt interstate commerce, *id.* at 189-92. Congress has since used the Commerce power to extend to state employees the protections of the Age Discrimination in Employment Act, *see EEOC v. Wyoming*, 460 U.S. 226 (1983), COBRA's temporary continuation of coverage provisions, *see* 29 U.S.C. §§ 1001, 1161, and HIPAA's restrictions on the ability of health plans to deny coverage due to pre-existing conditions, *see* 29 U.S.C. §§ 1001, 1181. *See also infra* n.18. Indeed, the Court "has repeatedly upheld federal regulation of the national labor market as a valid exercise of the commerce power." *United States v. Miss. Dep't of Pub. Safety*, 321 F.3d 495, 500 (5th Cir. 2003).

---

[10] *Wirtz* was overruled by *National League of Cities v. Usery*, 426 U.S. 833, 854 (1976), which in turn was overruled by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 557 (1985). *See also Reich v. Dep't of Conservation & Nat'l Resources*, 28 F.3d 1076, 1079 (11th Cir. 1994) (*Garcia* "established the constitutionality of the extension of the federal wage and hour provisions to state employees").

This background makes clear that the ACA provisions regulating health coverage by large employers — like the FLSA, which they largely amend — are permissible under the Commerce Clause. Health coverage is a term of employment that, like wages, is part of an employee's compensation package. It is thus subject to federal regulation for the reasons identified in *Wirtz*, 392 U.S. at 189-94. Further, the record before Congress showed that interstate commerce is inhibited, and economic progress stymied, when workers decline to take better jobs because they must give up their current health plan and may be unable to obtain a comparable one. *See Key Issues* at 8, 164-65. By creating incentives for large employers to provide a minimum level of coverage, the Act addresses this "job lock" concern and facilitates interstate commerce.

### D.     Congress's Regulation of State Employers in the Same Manner as Private Employers Does Not Violate the 10th Amendment

Congress does not run afoul of the 10th Amendment when it merely "'regulate[s] state activities,'" rather than "'the manner in which States regulate private parties.'" *Reno v. Condon*, 528 U.S. 141, 150 (2000) (quoting *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988)). That test is met when Congress "regulate[s] states as they act in the 'national labor market.'" *McCarthy v. Hawkins*, 381 F.3d 407, 431 (5th Cir. 2004). Where, as here, Congress applies a federal statute equally to state and private entities, it is regulating state activities, not commandeering the regulatory machinery of state governments.

Accordingly, the Supreme Court has repeatedly rejected 10th Amendment challenges to the application of general federal regulatory statutes to state entities. For example, in affirming the application of the FLSA to state entities in *Wirtz*, the Court noted that Congress merely subjected States "to the same restrictions as a wide range of other employers whose activities affect interstate commerce, including privately operated schools and hospitals." 392 U.S. at 194. Reaffirming this view in *Garcia*, the Court emphasized that States "face[] nothing more than the

23

same minimum-wage and overtime obligations that hundreds of thousands of other employers, public as well as private, have to meet." 469 U.S. at 554. And in *Condon*, upholding the Driver's Privacy Protection Act, the Court noted that the statute is "'generally applicable' . . . to individuals as well as States." 528 U.S. at 151. The same is true here, and that alone defeats plaintiffs' claim. *See Travis v. Reno*, 163 F.3d 1000, 1002 (7th Cir. 1998) ("Neutrality between governmental and private spheres is a principal ground on which the Supreme Court has held that States may be subjected to regulation when they participate in the economic marketplace — for example, by hiring workers covered by the Fair Labor Standards Act.") (citations omitted).

Moreover, in regulating States as employers, the Act raises none of the federalism concerns the Court has previously identified. It does not require state legislatures "to enact any laws or regulations," or "require state officials to assist in the enforcement of federal statutes regulating private individuals," *Condon*, 528 U.S. at 150. This case is thus unlike *New York v. United States*, where Congress "commandeered the state legislative process by requiring a state legislature to enact a particular kind of law," *see Condon*, 528 U.S. at 149, or *Printz v. United States*, where Congress "commanded 'state and local enforcement officers to conduct background checks on prospective handgun purchasers,'" *Condon*, 528 U.S. at 149 (citing *Printz*, 521 U.S. at 902). And although plaintiffs allege that the reporting and automatic-enrollment requirements in the Act may be administratively burdensome, and that the potential assessments infringe state sovereignty, Am. Compl. ¶¶ 48, 90, *Condon* rejected the same complaints. *See* 528 U.S. at 150 (sustaining statute that would require "State's employees to learn and apply [its] substantive restrictions," "consume the employees' time and thus the State's resources," and impose "penalty provisions [that] hang over the States as a potential punishment should they fail to comply").

24

Because the Act regulates States as participants in the national labor market just as it regulates private employers, it does not violate the Commerce Clause or the 10th Amendment.

## IV.   THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CHALLENGES TO THE MINIMUM COVERAGE PROVISION

Federal courts sit to decide cases and controversies, not to resolve disagreements on policy or politics. To invoke the jurisdiction of this Court, plaintiffs must have standing to sue. *E.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Neither of the two individual plaintiffs could even arguably suffer injury from the minimum coverage provision until 2014 at the earliest; it is speculative whether they will suffer injury even then. In addition, NFIB does not have associational standing to represent its members, and the States do not have parens patriae standing to represent their citizens. Aside from standing, plaintiffs' challenges are not ripe, as the minimum coverage requirement will not take effect until 2014. Accordingly, the Court lacks jurisdiction over Counts One through Three challenging the minimum coverage requirement.

### A.   Plaintiffs Brown and Ahlburg Lack Standing

To establish standing, "the plaintiff must have suffered an injury in fact — invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations, quotation, and footnote omitted). The allegations of Mary Brown and Kaj Ahlburg do not satisfy these requirements.

First, Brown and Ahlburg "object to the Act's unconstitutional overreaching and its encroachment on the States' sovereignty." Am. Compl. ¶¶ 27, 28. Such philosophical or political opposition is a "generalized grievance," not a concrete and particularized injury in fact. *See, e.g., DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

Second, Brown and Ahlburg predict that they will not obtain health insurance in 2014 or before, and that the minimum coverage provision will therefore require them to alter their beha-

25

vior. *Id.* However, "[a]llegations of possible future injury do not satisfy the requirements of Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). A plaintiff alleging "only an injury at some indefinite future time" has not shown injury in fact, particularly where "the acts necessary to make the injury happen are at least partly within the plaintiff's own control." *Lujan*, 504 U.S. at 564 n.2. In these situations, "the injury [must] proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.* "Immediacy, in this context, means reasonably fixed and specific in time *and* not too far off." *ACLU v. Miami-Dade County Sch. Bd.*, 557 F.3d 1177, 1193-94 (11th Cir.) (emphasis added), *cert. denied*, 130 S. Ct. 659 (2009). Brown and Ahlburg do not meet this standard.

Brown and Ahlburg try to address only a few sources of uncertainty about events in 2014. They both allege that they are unlikely to qualify for Medicaid or Medicare in 2014. Am. Compl. ¶¶ 27-28. Brown alleges that now, instead of buying insurance, she "devotes her resources to maintaining her business." *Id.* ¶ 27. Ahlburg asserts that he "reasonably expects to remain financially able to pay for his own health care." *Id.* ¶ 28. But businesses fail, incomes fall, and disabilities occur. Plaintiffs are not immune from those vagaries. By making health insurance more affordable, moreover, the Act could change plaintiffs' economic incentives. Plaintiffs could obtain employment that offers cheaper insurance benefits. They could learn of a pre-existing condition or suffer an accident requiring continued care. In short, by 2014, plaintiffs could find that they need insurance, or that it is the most sensible choice. They cannot reliably predict that insurance will be an economic burden. By the time 2014 comes, the purchase of health insurance by Brown, Ahlburg, or both may be a benefit in fact, not an injury in fact.

Even if any potential injuries to Brown or Ahlburg in 2014 were "reasonably fixed and specific in time," they still would be "too far off" to accord standing. *ACLU*, 557 F.3d at 1193-

94. *See McConnell v. FEC*, 540 U.S. 93, 226 (2003) (injury four and a half years in the future "too remote temporally" to sustain standing), *overruled in part on other grounds by Citizens United v. FEC*, 130 S. Ct. 876 (2010). Although no "certain number of days, weeks, or months" marks a sharp boundary between injuries immediate and remote, *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008), 40 months is far longer than typically allowed. In *ACLU*, for example, the harm was six weeks away. 557 F.3d at 1194. In *NAACP*, the gap was four months. *See id.* at 1193. In *National Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir. 2003), the injury could be expected at intervals of between a week to a month. Here, the 40 months until 2014 is 10 times the longest of the periods in these cases. The interval is sufficiently long to confound predictions about what the circumstances will be. An opinion today about legal rights in 2014, even based on a best guess regarding 2014, runs a greater risk than Article III permits of becoming a mere advisory opinion if the world turns out differently than what plaintiffs now suppose.

### B.     Plaintiff NFIB Lacks Standing

Insofar as plaintiff NFIB seeks to proceed on behalf of its members, the three-pronged test of *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977) applies: "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." NFIB meets none of these requirements.[11]

---

[11] As with Brown and Ahlburg, we focus this discussion on NFIB's alleged standing to challenge the minimum coverage provision. To the extent that NFIB challenges requirements applicable to the States, it lacks standing because it asserts a mere "generalized grievance," not a

First, NFIB has no individual members who would have standing, for the reasons discussed above. Second, a challenge to the minimum essential coverage provision is not germane to NFIB's purpose as an organization of small businesses. Although NFIB lobbied against requirements imposed on Brown as a small business owner, here it challenges only a requirement that applies to her as an individual. Am. Compl. ¶ 26. NFIB argues that the requirement, though applicable only to individuals, could "diver[t] . . . resources from [members'] businesses." *Id.* On this theory, however, it is hard to imagine any organization that would *not* have standing: The American Philatelic Society could argue that the ACA diverts members' resources from buying stamps, or a debating society could claim that it diverts members' resources from buying books and paper. The theory is a far cry from *Hunt*, where the apple growers association challenged a law about apple grading, 432 U.S. at 344, not a law applicable to citizens generally. The Eleventh Circuit has thus recognized that *Hunt* precludes associational standing where the members' alleged injuries involve claims insufficiently germane to the organization's specific purposes.[12] As for the third *Hunt* prong, if ever there were a case where individual participation in a lawsuit is necessary, it is a dispute like this one over how much, if anything, individuals will owe in penalties (more than four years from now), where most members currently have insurance and intend to keep it.[13]

---

concrete and particularized injury necessary to support standing. *See, e.g., DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006); *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 144-45 (1939); *Dillard v. Chilton County Comm'n*, 495 F.3d 1324, 1335 (11th Cir. 2007).

[12] *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1330 (11th Cir. 2000); *see also United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834-35 (8th Cir. 2009); *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1106 (9th Cir. 2006).

[13] NFIB appears to contend that it can also sue in its own right. Although an organization suffering a "concrete and demonstrable injury to the organization's activities — with the consequent drain on the organization's resources," may have standing in its own right, *Havens Realty*

## C.   The State Plaintiffs Lack Standing to Challenge the Minimum Coverage Provision

The States apparently pursue two theories of standing. First, the States assert that the minimum coverage provision infringes on their "sovereign ability to confer rights upon their citizens." Am. Compl. ¶ 72. Second, the States argue that their own public fiscs will be adversely affected if citizens join Medicaid to avoid the penalty. *Id.* Neither theory meets the States' burden to show an actual or imminent concrete injury particularized to them.

### 1.   The States Cannot Bring a Parens Patriae Suit

The States cannot create a justiciable controversy by invoking a "sovereign ability to confer rights upon their citizens and residents to make healthcare decisions without government interference" notwithstanding relevant requirements of federal law. Am. Compl. ¶ 72. To the contrary, the Supreme Court has held that, in our federal system, a State may not sue to immunize its citizens from a federal statute. In *Massachusetts v. Mellon*, 262 U.S. 447, 479 (1923), a State sought to exempt its citizens from a federal act designed "to reduce maternal and infant mortality and protect the health of mothers and infants." In rejecting that challenge, the Court explained that the citizens of a State "are also citizens of the United States," and therefore "[i]t cannot be conceded that a state, as parens patriae, may institute judicial proceedings to protect citizens of the United States from the operation of the statutes thereof." *Id.* at 485. The Court stressed that "[i]t is no part of [a State's] duty or power to enforce [its citizens'] rights in respect

---

*Corp. v. Coleman*, 455 U.S. 363, 379 (1982), NFIB's "additional costs in assisting its members in understanding how the Act applies to them and affects their businesses," Am. Compl. ¶¶ 26, 63, is not the kind of drain on resources involved in *Havens* or *NAACP*, 522 F.3d at 1164-66. There, the organizations expended resources *counteracting* the effects of allegedly illegal policies on their core missions. By contrast, the "education" here is not to counteract any part of the ACA and does not pertain to the provisions plaintiffs challenge. An organization's mere "expend[iture] [of] resources to educate its members and others regarding [a federal statute] does not present an injury in fact." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).

of their relations with the federal government." *Id.* at 485-86. The Court emphasized, "it is the United States, and not the state, which represents [its citizens] as parens patriae." *Id.* at 486.

*Mellon* thus held that the State lacked standing to pursue a 10th Amendment challenge to actions assertedly outside the scope of federal power, relying on the long-established doctrine that general interests in sovereignty (*i.e.*, making and applying law to the exclusion of another government) are not justiciable. *Id.* at 484-85. The Supreme Court recently reiterated that *Mellon* "prohibits" a State from suing federal defendants "to protect her citizens from the operation of federal statutes." *Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007).

### 2. The States Have Not Identified an Imminent, Actual, and Concrete Injury to Their Own Interests

In some circumstances a State may have standing to challenge federal action that threatens its own distinct interests. However, as with any other injury, the harm to the State's interests must be "the invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560-61. A State suffers a cognizable injury when, for example, its physical territory such as its "coastal land" is harmed. *See Massachusetts v. EPA*, 549 U.S. at 522-23. A State likewise may challenge a measure commanding the State itself to act, *see New York v. United States*, 505 U.S. 144 (1992) (standing to challenge federal law requiring State to take title to nuclear waste or enact federally-approved regulations), or that prohibits it from acting, *see Oregon v. Mitchell*, 400 U.S. 112 (1970) (standing to challenge federal law barring literacy-test or durational-residency requirements in elections and requiring States to enfranchise 18-year-olds).

By contrast, *Mellon* held that the State lacked standing to pursue a 10th Amendment challenge to a federal statute that assertedly exceeded Congress's power, relying on the long-established doctrine that general interests in sovereignty (*i.e.*, making law to the exclusion of

30

another government) are not justiciable. 262 U.S. at 484-85; *see New Jersey v. Sargent*, 269

U.S. 328, 337 (1925) (claims that provisions of federal law "go beyond the power of Congress

and impinge on that of the state . . . do not suffice as a basis for invoking an exercise of judicial

power"). Similarly, *Texas v. Interstate Commerce Comm'n*, 258 U.S. 158, 162-63 (1922), found

Texas's claim that the Transportation Act violated the 10th Amendment to be merely "an ab-

stract question of legislative power," not a case or controversy. The States' alleged "sovereign

ability to confer rights upon their citizens and residents to make healthcare decisions without

government interference," Am. Compl. ¶¶ 72, 82, is thus insufficient to support standing.

The States also predict injury to state fiscs if citizens eligible for Medicaid enroll to avoid

paying the penalty. *Id.* ¶ 73. This is a far cry from actual or imminent injury that can support

standing. To begin with, State participation in Medicaid is voluntary. And even if a citizen's

choice to participate in a program the State chooses to offer could constitute injury, it is specula-

tive to assume any net cost for the States. Citizens who do not avail themselves of Medicaid still

suffer illness and injury. When they cannot pay, States and others bear the cost. For a State to

pay only a portion of these costs through Medicaid is, if anything, likely to impose less on the

state fisc than the *status quo*.

In any event, the link between the challenged federal action and the alleged injury must

be more than "a conjecture based on speculation that is bottomed on surmise." *Wyoming ex rel.*

*Sullivan v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992); *see Ill. Dep't Transp. v. Hinson*, 122 F.3d

370, 373 (7th Cir. 1997); *Pennsylvania v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976). Any fed-

eral tax will have some economic effects and, in consequence, indirect impact on state tax reve-

nues. Such an effect on state tax revenues would not give States at-large standing to challenge

the law, because, like the effect surmised here, it is "so distantly related to the wrong for which

31

relief is sought, as not to be cognizable for purposes of standing." *Kleppe*, 533 F.2d at 672; *see*

*Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985).[14]

### D.    Plaintiffs' Challenge to the Minimum Coverage Provision Is Unripe

Plaintiffs' challenge to the minimum coverage provision is not ripe.[15]   The ripeness in-

quiry "evaluate[s] both the fitness of the issues for judicial decision and the hardship to the par-

ties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

Plaintiffs' challenge satisfies neither prong of the inquiry because no injury could occur before

2014, and plaintiffs have not shown one will occur even then. *See Thomas v. Union Carbide*

*Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (claim not ripe if it rests upon "contingent future

events that may not occur as anticipated, or indeed may not occur at all" (citation and internal

quotation marks omitted)); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp.

2d 9, 17-18 (D.D.C. 2001) ("[W]ith respect to the 'hardship to the parties' prong, an abstract

harm is not sufficient; there must be an immediate harm with a 'direct effect on the day-to-day

business of the plaintiffs.'") (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)).

To be sure, where the operation of a statute against certain individuals is inevitable, "it is

irrelevant to the existence of a justiciable controversy that there will be a time delay before the

disputed provisions will come into effect." *Blanchette v. Conn. Gen. Ins. Corp.*, 419 U.S. 102,

143 (1974).  However, as explained above, in contrast to *Blanchette*, any injury to plaintiffs here

---

[14] Nor is any injury to State fiscs either "actual" or even "imminent." The minimum cov-
erage provision will not even take effect until 2014 and the federal government will be paying
100 percent of the costs of benefits to the newly eligible through 2016. The States' challenge
thus presents no case or controversy at this time. *See South Carolina v. Katzenbach*, 383 U.S.
301, 317 (1966) (state could not challenge a provision of a federal law before it had been en-
forced in that state); *Nevada v. Burford*, 918 F.2d 854, 857 (9th Cir. 1990) (no standing where
injury to state "many years and numerous procedural hurdles away").

[15] Despite the "conspicuous overlap" between the standing and ripeness inquiries, the is-
sues warrant separate discussion. *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006).

is far from "inevitabl[e]." Nor is this a case like *Abbott Laboratories*, where the plaintiffs demonstrated "a direct effect on [their] day-to-day business." 387 U.S. at 152. This case instead involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas*, 473 U.S. at 580-81. Even where only "a purely legal question," *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163 (1967), is presented, uncertainty as to whether a statute will harm the plaintiffs renders the controversy unripe. *Id.* at 163-64.

### E.   The Anti-Injunction Act Bars Plaintiffs' Challenge

The Court lacks subject-matter jurisdiction over plaintiffs' challenge to the minimum coverage provision for the additional reason that plaintiffs seek to restrain the federal government from collecting the penalty specified under the minimum coverage provision. Am. Compl. ¶¶ 75, 78, 82. The Anti-Injunction Act ("AIA") provides that, with statutory exceptions inapplicable here, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." I.R.C. § 7421(a). It does not matter whether the payment sought to be enjoined is labeled a "penalty" rather than a "tax." *Cf.* I.R.C. § 5000A(b) (imposing a "penalty"). With exceptions immaterial here, the penalty here is "assessed and collected in the same manner" as other penalties under the Internal Revenue Code, I.R.C. § 5000A(g)(1), and, like these other penalties, falls within the bar of the AIA. I.R.C. § 6671(a); *see Barr v. United States*, 736 F.2d 1134, 1135 (7th Cir. 1984) ("Section 6671 provides that the penalty at issue here is a tax for purposes of the Anti-Injunction Act."); *Warren v. United States*, 874 F.2d 280, 282 (5th Cir. 1989). Applying the AIA here serves its purpose, to preserve the government's ability to collect such assessments expeditiously with "a minimum of preenforcement judicial interference and to require that the legal right to disputed sums be determined in a suit for refund." *Bob*

33

*Jones Univ. v. Simon*, 416 U.S. 725, 736 (1974) (internal quotation omitted).[16]  District courts

accordingly lack jurisdiction to order the abatement of any liability for a tax or a penalty, apart

from their power to consider validly-filed claims for refunds.  *Bartley v. United States*, 123 F.3d

466, 467-68 (7th Cir. 1997).

     If plaintiffs Brown and Ahlburg actually end up being subject to the penalty in 2014,

they, along with other residents of the plaintiff States and NFIB members, will have an adequate

remedy — a challenge to the penalty in tax refund proceedings.  By contrast, in *South Carolina*

*v. Regan*, 465 U.S. 367 (1984), a State was allowed to challenge a statute providing that certain

types of state-issued bonds would not be tax exempt.  Although the tax would fall on the buyer

of the bond, as a practical matter, South Carolina could not even sell such bonds at the low rate

of interest a tax-exempt bond would carry, since few, if any, buyer/taxpayers would buy bonds at

a tax-exempt rate knowing they would have to mount an expensive challenge to the federal sta-

tute to get the benefits of the exemption.  *Id.* at 371-72, 380-81.  Since no one else could raise

South Carolina's claim of tax exemption, the State could do so in its own suit.  But that "unique"

exception, *Hibbs. v. Winn*, 542 U.S. 88, 103 n.6 (2004), is a far cry from this case, where those

subject to the tax will have both the opportunity and the incentive to raise the issue in tax refund

proceedings.  The AIA prohibits plaintiffs' attempt to end-run that procedure.

## V.    THE MINIMUM COVERAGE PROVISION FALLS WITHIN CONGRESS'S CONSTITUTIONAL AUTHORITY

     Even if this Court had subject matter jurisdiction over plaintiffs' challenges to the mini-

mum coverage provision, the challenge would fail on the merits.  "'Due respect for the decisions

---

[16] The Declaratory Judgment Act, 28 U.S.C. § 2201(a), similarly bars declaratory relief here, providing jurisdiction to the district courts to grant such relief "except with respect to Federal taxes."  As the Supreme Court noted in *Bob Jones University*, 416 U.S. at 732 n.7, the tax exception to the Declaratory Judgment Act demonstrates the "congressional antipathy for premature interference with the assessment or collection of any federal tax."

of a coordinate branch of Government demands that [this Court] invalidate a congressional enactment only upon a plain showing that Congress has exceeded its constitutional bounds.'" *United States v. Peters*, 403 F.3d 1263, 1271 (11th Cir. 2005) (quoting *United States v. Morrison*, 529 U.S. 598, 607 (2000)).  Plaintiffs can make no such showing.

**A.    The Comprehensive Regulatory Measures of the ACA, Including the Minimum Coverage Provision, Are a Proper Exercise of Congress's Powers Under the Commerce Clause and the Necessary and Proper Clause**

Plaintiffs assert that the minimum coverage provision exceeds Congress's authority under the Commerce Clause.  That claim is mistaken.  First, the provision regulates *economic* decisions regarding the way in which health care services are paid for — decisions that, in the aggregate, have a direct and substantial effect on interstate commerce.  Second, Congress had far more than a rational basis to find that the provision is an essential element of the Act's larger, unchallenged effort to regulate the interstate business of insurance.  The provision prohibits participants in the health care market from shifting the costs of their care to third parties and prevents individuals from relying on the Act's insurance reforms (*e.g.*, the ban on denying coverage for people with pre-existing conditions) to delay buying health insurance until illness strikes or accident occurs. In short, based on detailed congressional findings, which were the product of extensive hearings and debate, the provision directly addresses cost-shifting in those markets, quintessentially economic activity, and it forms an essential part of a comprehensive, interrelated regulatory scheme. Moreover, in focusing on services people almost certainly will receive, and regulating the economic decision whether to pay for health care in advance through insurance or to try to pay later out of pocket, the provision falls within Congress's authority to regulate interstate commerce. And because the provision is reasonably adapted as a means to accomplish the ends of the Act, it is well within Congress's authority under the Necessary and Proper Clause.

### 1.   Congress's Authority to Regulate Interstate Commerce Is Broad

The Constitution grants Congress the power to "regulate Commerce ... among the several

States," U.S. Const. art. I, § 8, cl. 3, and to "make all Laws which shall be necessary and proper"

to the execution of that power, *id.* cl. 18. This authority is broad. Congress may "regulate the

channels of interstate commerce"; it may "regulate and protect the instrumentalities of interstate

commerce, and persons or things in interstate commerce"; and it may "regulate activities that

substantially affect interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005). In as-

sessing whether an activity substantially affects interstate commerce, Congress may consider the

aggregate effect of a particular form of conduct. The question is not whether any one person's

conduct, considered in isolation, affects interstate commerce, but whether there is a rational basis

for concluding that the *class of activities*, "taken in the aggregate" at least has some substantial

effect on interstate commerce. *Raich*, 545 U.S. at 22; *see also Wickard v. Filburn*, 317 U.S. 111,

127-28 (1942). In other words, "'[w]here the class of activities is regulated and that class is

within the reach of federal power, the courts have no power to excise, as trivial, individual in-

stances' of the class." *Raich*, 545 U.S. at 23 (quoting *Perez v. United States*, 402 U.S. 146, 154

(1971)); *see also United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006) ("it is within

Congress's authority to regulate *all* intrastate possession of child pornography, not just that

which has traveled in interstate commerce or has been produced using materials that have tra-

veled in interstate commerce").

In exercising its Commerce Clause power, Congress may reach even wholly intrastate,

non-commercial matters when it concludes that failure to do so would undercut the operation of

a larger program regulating interstate commerce. *Raich*, 545 U.S. at 18. Thus, when "a general

regulatory statute bears a substantial relation to commerce, the *de minimis* character of individual

instances arising under that statute is of no consequence." *Id.* at 17 (internal quotation omitted). *See also id.* at 37 (Scalia, J., concurring in the judgment) (Congress's authority to make its regulation of commerce effective is "distinct" from its authority to regulate matters that substantially affect interstate commerce); *see Maxwell*, 446 F.3d at 1218.

In assessing these congressional judgments regarding the impact on interstate commerce and the necessity of individual provisions to the overall scheme of reform, the task of the Court "is a modest one." *Raich*, 545 U.S. at 22. The Court need not itself measure the impact on interstate commerce of the activities Congress sought to regulate, nor need the Court calculate how integral a particular provision is to a larger regulatory program. The Court's task instead is to determine "whether a 'rational basis' exists" for Congress's conclusions. *Id.* (quoting *United States v. Lopez*, 514 U.S. 549, 557 (1995)). Under rational basis review, this Court may not second-guess the factual record upon which Congress relied.[17]

*Raich* and *Wickard* illustrate the breadth of the Commerce power and the deference accorded Congress's judgments. In *Raich*, the Court sustained Congress's authority to prohibit the possession of home-grown marijuana intended solely for personal use. It was sufficient that the Controlled Substances Act "regulates the production, distribution, and consumption of commodities for which there is an established, and lucrative, interstate market." 545 U.S. at 26. In *Wickard*, the Court upheld a penalty on wheat grown for home consumption despite the farmer's protests that he did not intend to put the commodity on the market. It was sufficient that the existence of homegrown wheat, in the aggregate, could "suppl[y] a need of the man who grew it which would otherwise be reflected by purchases in the open market," thus undermining the efficacy of the federal price stabilization scheme. 317 U.S. at 128. In each case, the Court upheld

---

[17] "[L]egislative facts," Fed. R. Evid. 201 advisory comm. note, may be considered on a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

obligations even on individuals who claimed not to participate in interstate commerce, because those obligations were components of broad schemes regulating interstate commerce.

*Raich* followed *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000), and thus highlights the central focus and limited scope of those decisions. Unlike *Raich*, and unlike this case, neither *Lopez* nor *Morrison* involved regulation of economic decisions. Neither case addressed a measure integral to a comprehensive scheme to regulate activities in interstate commerce. *Lopez* was a challenge to the Gun-Free School Zones Act of 1990, "a brief, single-subject statute making it a crime for an individual to possess a gun in a school zone." *Raich*, 545 U.S. at 23. Possessing a gun in a school zone did not involve an economic decision. Nor was it "'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Id.* at 24 (quoting *Lopez*, 514 U.S. at 561). Indeed, the argument that this provision affected interstate commerce had to posit an extended chain reaction — guns near schools lead to violent crime; such violent crime imposes costs; and insurance spreads those costs. The Court found this reasoning too attenuated to sustain the gun law "'under [the Court's] cases upholding regulations of activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.'" *Id.* (quoting *Lopez*, 514 U.S. at 561). Likewise, the statute at issue in *Morrison* simply created a civil remedy for victims of gender-motivated violent crimes. *Id.* at 25. Unlike the purchase of health care services or health care insurance, gender-motivated violent crimes do not entail economic decisions, and the statute at issue focused on violence against women, not on any broader regulation of interstate markets.

38

2.    **The ACA, and the Minimum Coverage Provision, Regulate the Interstate Market in Health Insurance**

Regulation of a vast interstate market consuming an estimated 17.5 percent of our gross domestic product is within the compass of congressional authority under the Commerce Clause. ACA § 1501(a)(2)(B), 10106(a). Congress has power to regulate the interstate health insurance market, *see United States v. S.E. Underwriters Ass'n*, 322 U.S. 533, 553 (1944), and has repeatedly exercised that power, both by providing directly for government-funded health insurance through Medicare, and by adopting over the course of four decades numerous statutes regulating the content of private insurance policies.[18]

This history of federal regulation of health insurance buttressed Congress's understanding that only it, and not the States, could effectively counter the national health care crisis. Given the current scope of federal regulation — for example, through Medicare and ERISA — "[e]xpecting states to address the many vexing health policy issues on their own is unrealistic,

---

[18] In 1974, Congress enacted the Employee Retirement and Income Security Act, Pub L. No. 93-406, 88 Stat. 829 ("ERISA"), establishing federal requirements for health insurance plans offered by private employers. Congress passed the Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 82 ("COBRA"), allowing workers who lose their health benefits under certain circumstances the right to continue receiving certain benefits from their plans for a time. In 1996, Congress enacted the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 ("HIPAA"), to improve access to health insurance by, among other things, generally prohibiting group plans from discriminating against individual participants based on health status, requiring insurers to offer coverage to small businesses, and limiting the pre-existing condition exclusion period for group plans. I.R.C. §§ 9801-03; 29 U.S.C. §§ 1181(a), 1182; 42 U.S.C. §§ 300gg, 300gg-1. *See also* Mental Health Parity Act of 1996, Pub. L. No. 104-204, 110 Stat. 2944 (regulating limits on mental health benefits); Newborns' and Mothers' Health Protection Act of 1996, Pub. L. No. 104-204, 110 Stat. 2935 (requiring plans that offer maternity coverage to provide at least a 48-hour hospital stay following childbirth); Women's Health and Cancer Rights Act of 1998, Pub. L. No. 105-277, § 902, 112 Stat. 2681, 2681-436 (requiring certain plans to offer benefits related to mastectomies). More recently, Congress passed the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, Pub. L. No. 110-343, § 512, 122 Stat. 3765, 3881, requiring parity in financial requirements and treatment limitations for mental health benefits and medical and surgical benefits.

and constrains the number of states that can even make such an effort." *State Coverage Initiatives: Hearing Before the Subcomm. on Health of the H. Comm. on Ways and Means*, 110th Cong. 7 (2008) (Alan R. Weil, Executive Director, National Academy of State Health Policy).

Accordingly, Congress undertook in the ACA comprehensive regulation of the interstate health insurance market. To regulate health insurance provided through the workplace, the Act adopts incentives for employers to offer or expand coverage. To regulate health insurance provided through government programs, the Act, among other things, expands Medicaid. To regulate health insurance sold to individuals or in small group markets, the Act establishes exchanges enabling individuals to pool their purchasing power and obtain affordable insurance. And to regulate the overall scope of health insurance coverage, the Act extends subsidies and tax credits to the large majority of the uninsured; ends industry practices that have made insurance unobtainable or unaffordable for many; and, in Section 1501, requires most Americans who can afford insurance to obtain a minimum level of coverage or to pay a penalty.

Section 1501, like the Act as a whole, regulates decisions about how to pay for services in the health care market. These decisions are quintessentially economic, and within the traditional scope of the Commerce Clause. As Congress recognized, "decisions about how and when health care is paid for, and when health insurance is purchased" are "economic and financial" and thus "commercial and economic in nature." ACA §§ 1501(a)(2)(A), 10106(a).[19]

### 3. The Minimum Coverage Provision Regulates Conduct with Substantial Effects on Interstate Commerce

Congress needed no extended chain of inferences to determine that decisions about how to pay for health care, particularly decisions about whether to obtain health insurance or to at-

---

[19] Although Congress is not required to set forth particularized findings of an activity's effect on interstate commerce, when, as here, it does so, courts "will consider congressional findings in [their] analysis." *Raich*, 545 U.S. at 21.

tempt to pay for health care out of pocket, in the aggregate substantially affect the interstate

health care market. Individuals who forgo health insurance coverage do not thereby forgo health

care. To the contrary, many of the uninsured will "receive treatments from traditional providers

for which they either do not pay or pay very little, which is known as 'uncompensated care.'"

CBO, *Key Issues*, at 13; *see also* Council of Economic Advisers ("CEA"), *The Economic Case

for Health Care Reform* 8 (June 2009) (in *The Economic Case for Health Reform: Hearing Be-

fore the H. Comm. on the Budget*, 111th Cong. 5 (2009) [hereinafter *The Economic Case*]. In

this country, a minimum level of health care is guaranteed. Under the Emergency Medical

Treatment and Labor Act, 42 U.S.C. § 1395dd, for example, hospitals that participate in Medi-

care and offer emergency services are required to stabilize any patient who arrives, regardless of

insurance coverage or ability to pay. CBO, *Key Issues*, at 13. In addition, most hospitals are

nonprofit organizations with an "obligation to provide care for free or for a minimal charge to

members of their community who could not afford it otherwise." *Id.* For-profit hospitals "also

provide such charity or reduced-price care." *Id.*

"Uncompensated care," of course, is not free. In the aggregate, that uncompensated cost

was $43 billion in 2008, about 5 percent of hospital revenues. CBO, *Key Issues*, at 114. These

costs are subsidized by public funds, including tens of billions of federal dollars in 2008 alone.

H.R. Rep. No. 111-443, pt. II, at 983 (2010); *see also* CEA, *The Economic Case*, at 8. The re-

maining costs are borne in the first instance by health care providers, which in turn "pass on the

cost to private insurers, which pass on the cost to families." ACA §§ 1501(a)(2)(F), 10106(a).

This cost-shifting creates a "hidden tax" reflected in the fees of health care providers and in in-

surance premiums. CEA, *Economic Report of the President* 187 (Feb. 2010); *see also* H.R. Rep.

No. 111-443, pt. II, at 985 (2010); S. Rep. No. 111-89, at 2 (2009). Furthermore, as premiums

41

increase, more people decide not to buy coverage. This self-selection further narrows the risk

pool, which, in turn, further increases premiums for the insured. The result is a self-reinforcing

"premium spiral." *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Be-*

*fore the H. Comm. on Ways and Means*, 111th Cong. 118-19 (2009) (American Academy of

Actuaries); *see also* H.R. Rep. No. 111-443, pt. II, at 985 (2010).

The putative right to forgo health insurance which plaintiffs champion includes decisions

by some to engage in market timing. They will purchase insurance in later years, but choose in

the short term to incur out-of-pocket costs with the safety net of emergency room services that

hospitals must provide whether or not the patient can pay. *See* CBO, *Key Issues*, at 12 (percen-

tage of uninsured older adults in 2007 was roughly half that of younger adults). By making the

economic calculation to opt out of health insurance during these years, these individuals skew

premiums upward for the insured population. Yet, when they need care, many of these unin-

sured opt back into the health insurance system maintained in the interim by an insured popula-

tion that has borne the costs of uncompensated care. This phenomenon would increase if the

Act's ban on pre-existing conditions exclusions allowed individuals to "game the system" by

waiting until disease develops or an accident occurs to purchase insurance.

Before the ACA, the system allowed such uninsured individuals to "free ride" — to

transfer many health care costs to health care providers, insurers, and governments, which in turn

passed them on to the insured and to taxpayers. *See* CBO, *Key Issues*, at 13-14; 155 Cong. Rec.

H8002-8003 (July 10, 2009) (Rep. Broun, citing cost-shifting by the uninsured); 155 Cong. Rec.

H6608 (June 11, 2009) (Rep. Murphy, same); *see also* CEA, *The Economic Case*, at 17 ("the un-

insured obtain some free medical care through emergency rooms, free clinics, and hospitals,

which reduces their incentives to obtain health insurance"). In the aggregate, these economic

decisions regarding how to pay for health care — including, in particular, decisions to forgo coverage and to pay later or, if need be, to depend on free care — substantially affect the interstate health care market. Congress may use its Commerce Clause authority to address these direct and aggregate effects. *See Raich*, 545 U.S. at 16-17; *Wickard*, 317 U.S. at 127-28.

Plaintiffs cannot brush aside these marketplace realities by claiming that an individual who decides to go without insurance coverage is "inactive," that "inactivity by its nature cannot be in commerce" or sufficiently affect commerce to justify congressional attention, Am. Compl. ¶ 71, and that allowing regulation here removes all boundaries on the Commerce Clause, *id.* ¶ 38. Those assertions misunderstand both the nature of the regulated activity here and the scope of Congress's power. Congress found that the decision to try to pay for health care services without reliance on insurance is "economic and financial." ACA §§ 1501(a)(2)(A), 10106(a). Indeed, that is precisely how plaintiff Brown portrays her own decision to forgo health insurance. Am. Compl. ¶ 27. Individuals who make that economic choice have not opted out of health care; they are not passive bystanders divorced from the health care market. Instead, they have chosen a method of payment for services they will receive, no more "inactive" than a decision to pay by credit card rather than by check. Congress specifically focused on those who have such an economic choice, exempting individuals who cannot purchase health insurance for religious reasons, as well as those who cannot afford insurance or would suffer hardship if required to purchase it. I.R.C. §§ 5000A(d), (e). And Congress found that these volitional economic decisions, in the aggregate, generate each year billions in uncompensated health care costs borne by governments and other third parties. *See, e.g.*, ACA §§ 1501(a)(2)(F), 10106(a). Notwithstanding plaintiffs' attempt to characterize those economic decisions as "inactivity," they have a di-

43

rect and substantial effect on the interstate health care market in which uninsured and insured

alike participate, and thus are subject to federal regulation.

The ACA in fact regulates economic activity far more directly than other provisions the

Supreme Court has upheld. In *Wickard*, for example, the Court upheld a system of production

quotas against the plaintiff farmer's claim that the statute required him to purchase wheat on the

open market rather than grow it himself. The Court reasoned that "[h]ome-grown wheat in this

sense competes with wheat in commerce. The stimulation of commerce is a use of the regulatory

function quite as definitely as prohibitions or restrictions thereon." 317 U.S. at 128; *see id.* at

127 (sustaining law restricting "the amount which may be produced for market *and the extent as*

*well to which one may forestall resort to the market* by producing to meet his own needs") (em-

phasis added); *see also Heart of Atlanta Motel v. United States*, 379 U.S. 241, 258-59 (1964)

(Commerce Clause reaches decisions *not to engage* in transactions with persons with whom

plaintiff did not wish to deal); *Daniel v. Paul*, 395 U.S. 298 (1969) (same). And in *Raich*, the

Court likewise rejected the plaintiffs' claim that their home-grown marijuana was "entirely sepa-

rated from the market" and thus not subject to regulation under the Commerce Clause. 545 U.S.

at 30. The ACA similarly regulates a class of individuals who almost certainly will participate in

the health care market, who decide to finance that participation in one particular way, and whose

decisions impose substantial costs on other participants in that market. Given the substantial ef-

fects of these economic decisions on interstate commerce, Congress has authority to regulate.

4.     **The Minimum Coverage Provision Is an Integral Part of the
       Larger Regulatory Scheme and Is Necessary and Proper to
       Congress's Regulation of Interstate Commerce**

The minimum coverage provision is a valid exercise of Congress's powers for a second

reason. The ACA's reforms of the interstate insurance market — particularly its requirement

44

that insurers guarantee coverage even for those with pre-existing medical conditions — could not

function without the minimum coverage provision. The provision is essential to a larger regula-

tion of interstate commerce, and thus, under *Raich*, is within Congress's Commerce Clause au-

thority. Analyzing the minimum coverage provision under the Necessary and Proper Clause

leads to the same conclusion for fundamentally the same reason. The provision is a reasonable

means to accomplish Congress's goal of ensuring affordable coverage for all Americans.

### a.  The Minimum Coverage Provision Is Essential to the Comprehensive Regulation Congress Enacted

As explained above, the Act adopts a series of measures to increase the availability and

affordability of health insurance, including, in particular, measures to prohibit insurance practic-

es that have denied coverage or have increased premiums for those with the greatest health care

needs. Beginning in 2014, the Act will bar insurers from refusing to cover individuals with pre-

existing medical conditions, and from setting eligibility rules based on health status, medical

condition, claims experience, or medical history. ACA § 1201. Plaintiffs do not and cannot con-

tend that these provisions, which directly regulate insurance policies sold nationwide, are outside

the Commerce Clause power. Congress found that, absent the minimum coverage provision,

these new regulations would encourage more individuals to forgo insurance, aggravating cost-

shifting and increasing premiums. Standing alone, the new insurance regulations would allow

individuals to "wait to purchase health insurance until they needed care" — at which point the

ACA would obligate insurers to provide coverage, without restrictions based on pre-existing

conditions. ACA §§ 1501(a)(2)(I), 10106(a). Individuals would have an incentive to "make an

economic and financial decision to forego health insurance coverage" until their health care

needs increase, *id.* §§ 1501(a)(2)(A), 10106(a), and only then to join a coverage pool maintained

in the interim by the premiums of others. Without a minimum coverage provision, this market

timing would increase the costs of uncompensated care and the premiums for the insured pool,

creating pressures that would "inexorably drive [the health insurance] market into extinction."

*Health Reform in the 21st Century*, at 13 (Uwe Reinhardt, Ph.D., Princeton University).[20]  Ac-

cordingly, Congress found the minimum coverage provision "essential" to its broader effort to

regulate health insurance industry practices that prevented many from obtaining health insurance.

ACA §§ 1501(a)(2)(I), (J), 10106(a).

    In other respects, the minimum coverage provision is essential to the Act's comprehen-

sive scheme to ensure that health insurance coverage is available and affordable.  In addition to

regulating industry underwriting practices, the Act promotes availability and affordability

through (a) "health benefit exchanges" that enable individuals and small businesses to obtain

competitive prices for health insurance, (b) financial incentives for employers to offer expanded

insurance coverage, (c) tax credits to low-income and middle-income individuals and families,

and (d) extension of Medicaid to additional low-income individuals.  The provision works in

tandem with these and other reforms, to reduce the upward pressure on premiums caused by cur-

rent underwriting practices.  CBO, *Key Issues*, at 81.  This individualized review of an appli-

cant's health status inflates the administrative fees comprising 26 to 30 percent of premiums in

the individual and small group markets.  ACA §§ 1501(a)(2)(J), 10106(a).  "By significantly in-

creasing health insurance coverage and the size of purchasing pools, which will increase econo-

mies of scale, the requirement, together with the other provisions of this Act, will significantly

reduce administrative costs and lower health insurance premiums," and is therefore "essential to

---

[20] *See also id.* at 101-02; *id.* at 123-24 (National Association of Health Underwriters) (observing, based on the experience of "states that already require guaranteed issue of individual policies, but do not require universal coverage," that "[w]ithout near universal participation, a guaranteed-issue requirement . . . would have the perverse effect of encouraging individuals to forego buying coverage until they are sick or require sudden and significant medical care").

creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs." ACA §§ 1501(a)(2)(J), 10106(a).

Congress thus found that failure to regulate the decision to forgo insurance — *i.e.*, the decision to shift costs to the larger health care system — would undermine the "comprehensive regulatory regime" in the Act. *Raich*, 545 U.S. at 27. Congress had ample basis to conclude that not regulating this "class of activity" would "undercut the regulation of the interstate market" in health insurance. *Raich*, 545 U.S. at 18; *see id.* at 37 (Scalia, J., concurring in the judgment) ("Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce").

> **b.     The Minimum Coverage Provision Is Valid Under the Necessary and Proper Clause**

Along the same lines, because the minimum coverage provision is essential to Congress's overall regulatory reform of the interstate health care and health insurance markets, it is plainly a valid exercise of Congress's authority under the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18. "[T]he Necessary and Proper Clause grants Congress broad authority to enact federal legislation." *United States v. Comstock*, No. 08-1224, slip op. at 5 (U.S. May 17, 2010). It has been settled since *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316 (1819), that this clause affords Congress the power to employ any means "reasonably adapted to the end permitted by the Constitution." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981) (internal quotation omitted). And when Congress legislates in furtherance of a legitimate end, its choice of means is accorded broad deference. *See Sabri v. United States*, 541 U.S. 600, 605 (2004); *see also Comstock*, slip op. at 6 ("[W]here Congress has the authority to enact a regulation of interstate commerce, 'it possesses every power needed to make that regulation effec-

tive.'" *Raich*, 545 U.S. at 36 (Scalia, J., concurring in the judgment) (quoting *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118-19 (1942)).

As Congress found, the minimum coverage provision not only is "reasonably adapted," but indeed is "essential," to achieving key reforms of the interstate health insurance market. As noted, the Act bars insurers from denying coverage or charging higher rates based on medical conditions, including pre-existing conditions. Congress plainly has the power under the Commerce Clause to impose these requirements; indeed, they are consistent with decades of Congressional regulation of private insurers. *See supra* n.18. Without the minimum coverage provision, healthy individuals would have overwhelmingly strong incentives to forgo insurance coverage, knowing that they could obtain coverage later if and when they became ill. As a result, the cost of insurance would skyrocket, and the larger system of reforms would fail. *See, e.g., Health Reform in the 21st Century*, at 13. Congress thus rationally concluded that the minimum coverage provision is necessary to make the other regulations in the Act effective. The provision is, therefore, easily justified under the Necessary and Proper Clause. *See Comstock*, slip op. at 7 ("'If it can be seen that the means adopted are really calculated to attain the end, the degree of their necessity, the extent to which they conduct to the end, the closeness of the relationship between the means adopted and the end to be attained, are matters for congressional determination alone.'") (quoting *Burroughs v. United States*, 290 U.S. 534, 547-48 (1934)).

### B.   The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power Under the General Welfare Clause

Plaintiffs' challenge fails for an additional reason. Independent of the Commerce Clause, Congress has the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress's taxing and spending power under the General Welfare Clause is "exten-

sive." *License Tax Cases*, 72 U.S. (5 Wall.) 462, 471 (1867); *see also McCray v. United States*, 195 U.S. 27, 56-59 (1904); *United States v. Doremus*, 249 U.S. 86, 93 (1919); *Steward Machine Co. v. Davis*, 301 U.S. 548, 581 (1937). Congress may use its authority under this Clause even for purposes beyond its powers under the other provisions of Article I. *See United States v. Sanchez*, 340 U.S. 42, 44 (1950) ("Nor does a tax statute necessarily fall because it touches on activities which Congress might not otherwise regulate."); *United States v. Butler*, 297 U.S. 1, 66 (1936); *Knowlton v. Moore*, 178 U.S. 41, 59-60 (1900) (Congress can tax inheritances, even if it could not regulate them under the Commerce Clause).

To be sure, Congress must use its power under Article I, Section 8, Clause 1, to "provide for the . . . general Welfare." As the Supreme Court held 75 years ago with regard to the Social Security Act, however, decisions of how best to provide for the general welfare are for the representative branches, not for the courts. *Helvering v. Davis*, 301 U.S. 619, 640, 645 & n.10 (1937); *see South Dakota v. Dole*, 483 U.S. 203, 207 (1987).

The minimum coverage provision falls within Congress's "extensive" General Welfare authority. *License Tax Cases*, 72 U.S. at 471. The Act requires individuals not otherwise exempt to obtain "minimum essential coverage" or pay a penalty. ACA § 1501(b) (adding I.R.C. § 5000A(a), (b)(1)). Individuals who are not required to file income tax returns for a given year are not subject to this provision. *Id.* § 1501(b) (as amended by HCERA § 1002) (adding I.R.C. § 5000A(e)(2)). In general, the penalty is the greater of a fixed amount or a percentage of the individual's household income, but cannot exceed the national average premium for the lowest-tier plans offered through health insurance exchanges for the taxpayer's family size. *Id.* § 1501(b) (adding I.R.C. § 5000A(c)(1), (2)). If the penalty applies, the individual must report it on the income tax return for the taxable year. *Id.* (adding I.R.C. § 5000A(b)(2)). The penalty is

49

assessed and collected in the same manner as other assessable penalties under the Internal Revenue Code.[21]

That the provision has a regulatory purpose does not place it beyond the taxing power.[22] *Sanchez*, 340 U.S. at 44 ("[A] tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed."); *see United States v. Kahriger*, 345 U.S. 22, 27-28 (1953); *cf. Bob Jones Univ.*, 416 U.S. at 741 n.12 (Court has "abandoned" older "distinctions between regulatory and revenue-raising taxes").[23]  So long as a statute is "productive of some revenue," courts will not second-guess Congress's exercise of these powers, and "will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power denied by the Federal Constitution." *Sonzinsky v. United States*, 300 U.S. 506, 514 (1937); *United States v. Spoerke*, 568 F.3d 1236, 1245 (11th Cir. 2009); *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972).

---

[21]  The Secretary of the Treasury may not collect the penalty through notice of federal liens or levies, and may not bring a criminal prosecution for a failure to pay it. ACA § 1501(b) (adding I.R.C. § 5000A(g)(2)).  Revenues from the minimum coverage penalty are paid into general revenues.

[22]  Congress has long used the taxing power as a regulatory tool, in particular, in regulating how health care is paid for in the national market.  HIPAA, for example, imposes a tax on any group health plan that fails to comply with limits on exclusions or terminations of applicants with pre-existing conditions. I.R.C. §§ 4980D, 9801-03. In addition, the Internal Revenue Code requires group health plans to offer COBRA continuing coverage to terminated employees, and similarly imposes taxes on any plan that fails to comply. I.R.C. § 4980B.

[23]  Nor does the statutory label of the provision as a "penalty" matter. *See Penn Mut. Indem. Co. v. Comm'r*, 277 F.2d 16, 20 (3d Cir. 1960) ("Congress has the power to impose taxes generally, and if the particular imposition does not run afoul of any constitutional restrictions then the tax is lawful, call it what you will.") (footnote omitted).

The minimum coverage provision easily meets this standard. The Joint Committee on Taxation included the provision in its review of the "Revenue Provisions" of the Act and the Reconciliation Act, analyzing it as a "tax," an "excise tax," and a "penalty." *See* Joint Comm. on Taxation, 111th Cong., *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act"* 31 (Mar. 21, 2010).[24] Moreover, the Joint Committee, along with the CBO, repeatedly predicted how much revenue the provision would raise and considered that amount in determining the impact of the bill on the deficit. The CBO estimated that the minimum coverage provision would produce about $4 billion in annual revenue. CBO Letter to Speaker Pelosi at tbl. 4 at 2. Thus, as Congress recognized, the minimum coverage provision produces revenue alongside its regulatory purpose, which is all that Article I, Section 8, Clause 1 requires.

In any event, just as a court should interpret the "words of a statute . . . in their context and with a view to their place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation omitted), so, too, the Court should analyze the purpose and function of the minimum coverage provision in context, as an integral part of the overall statutory scheme it advances. Congress reasonably concluded that the minimum coverage provision would increase insurance coverage, permit the restrictions imposed on insurers to function efficiently, and lower insurance premiums. ACA §§ 1501(a), 10106(a). And Congress determined, also with substantial reason, that this provision was essential to its comprehensive scheme of reform. Congress acted well within its authority to integrate the provision

---

[24] The Joint Committee on Taxation is "a nonpartisan committee of the United States Congress, originally established under the Revenue Act of 1926" that "is closely involved with every aspect of the tax legislative process." *See* Joint Committee on Taxation, Overview, *at* http://www.jct.gov/about-us/overview.html (last visited June 16, 2010); *see also* I.R.C. §§ 8001-23.

51

into the interrelated revenue and spending provisions of the Act, and to treat it as necessary and

proper to the overall goal of advancing the general welfare. *See Buckley v. Valeo*, 424 U.S. 1, 90

(1976) (grant of power under General Welfare Clause "is quite expansive, particularly in view of

the enlargement of power by the Necessary and Proper Clause").

## VI.   THE MINIMUM COVERAGE PROVISION IS CONSISTENT WITH DUE PROCESS

In Count Two, plaintiffs allege that by "coercing [them] to obtain and maintain . . .

healthcare coverage," the Act violates "their right to be free of unwarranted and unlawful federal

government compulsion." Am. Compl. ¶ 78. For reasons already explained, *see supra* Part IV,

plaintiffs lack standing to raise this claim. Moreover, as a threshold matter, they neglect to arti-

culate what particular "life, liberty, or property" interest the Act allegedly infringes. U.S. Const.

amend. V. For this reason alone, their due process claim should fail.

In its modern jurisprudence, the Supreme Court has made clear that a plaintiff must pro-

vide "a 'careful description' of the asserted fundamental liberty interest" when raising a substan-

tive due process claim. *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003); *see also Washington

v. Glucksberg*, 521 U.S. 702, 722 (1997) (noting the "tradition of carefully formulating the inter-

est at stake in substantive-due-process cases"); *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232,

1241 (11th Cir. 2004) (the "scope of the liberty interest at stake . . . must be defined in reference

to the scope of the [challenged] statute"). Vague generalizations, like plaintiffs' assertion that

the Act offends an indistinct right to be free from "government compulsion," Am. Compl. ¶ 78,

"will not suffice." *Chavez*, 538 U.S. at 776.

Even if plaintiffs' vague allegations could state a claim that the minimum coverage pro-

vision infringes an alleged right to refuse to purchase health insurance without penalty, the claim

would still fail. No court has recognized such a right as "fundamental" — that is, both "objec-

tively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of or-

dered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucks-

burg*, 521 U.S. at 720-21 (citation omitted).  While acknowledging the fundamental rights to

make "personal decisions relating to marriage, procreation, contraception, family relationships,

child rearing, and education," *Lawrence v. Texas*, 539 U.S. 558, 574 (2003), the Court has never

extended the concept to the purchase of health insurance. *See Glucksburg*, 521 U.S. at 719-21

(cautioning against recognizing new fundamental rights, "lest the liberty protected by the Due

Process Clause be subtly transformed into the policy preferences of the Members of this Court");

*Williams*, 378 F.3d at 1239 (emphasizing "dangers inherent in the process of elevating extra-

textual rights to constitutional status, thereby removing them from the democratic field of play").

And while the Court has assumed that an individual has a fundamental right to refuse medical

treatment, *see Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990), nothing in the Act re-

quires plaintiffs to submit to such treatment of any kind, unlike, for example, the mandatory vac-

cination laws in most of the plaintiff States.[25]  At most, the Act affects their ability to decline in-

surance coverage — a purely economic interest, not a fundamental right.

Furthermore, although plaintiffs hark back to the Supreme Court's *Lochner*-era decisions

treating contract rights as absolute, *see Adair v. United States*, 208 U.S. 161 (1908), the Court

has long since repudiated those precedents. *See, e.g., Lincoln Fed. Labor Union v. Nw. Iron &*

*Metal Co.*, 335 U.S. 525, 536 (1949) (Court "has steadily rejected the due process philosophy

enunciated in the *Adair-Coppage* line of cases"); *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379,

392 (1937) ("[F]reedom of contract is a qualified, and not an absolute, right. . . . Liberty implies

---

[25] *E.g.*, Fla. Stat. § 1003.22 (2010); Ala. Code § 11-47-132 (2010); Alaska Stat. § 14-30-125 (2010).  *See Jacobson v. Massachusetts*, 197 U.S. 11, 25-26 (1905) (rejecting argument that such laws infringe on any liberty interest protected by the Constitution).

the absence of arbitrary restraint, not immunity from reasonable regulations.").

Legislative acts "adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and . . . the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). Under this "highly deferential standard," a court must "uphold the [law] so long as it bears a rational relation to some legitimate end." *Williams v. Morgan*, 478 F.3d 1316, 1320 (11th Cir. 2007) (citation omitted); *see also id.* at 1321 (noting "leeway" permitting even "significantly over-inclusive or under-inclusive" legislative choices); *Vesta Fire Ins. Corp. v. Florida*, 141 F.3d 1427, 1430-31 & n.5 (11th Cir. 1998) (rejecting insurers' claim that statute restricting their ability to decline to renew policies violates due process by making it "mandatory . . . to remain in [a] market" they preferred to exit, or by "preclud[ing] them from allocating their companies' resources as they see fit"). The Supreme Court thus has not invalidated any economic or social welfare legislation on substantive due process grounds since the 1930s.

The Act as a whole, and the minimum coverage provision in particular, meet this standard. Congress passed the ACA to address the mounting costs imposed on the economy, the government, and the public as a result of the inability of millions of Americans to obtain affordable health insurance. These are undeniably legitimate legislative aims. And, as noted, Congress sensibly found that, without the minimum coverage provision, the Act's insurance market reforms would be counterproductive, ACA §§ 1501(a)(2)(A), 10106(a), while, with it, the reforms would reduce administrative costs and lower premiums, *id.* §§ 1501(a)(2)(I)-(J), 10106(a). Because Congress's objectives were plainly legitimate and its chosen means were rational, under the deferential standard of review applied to substantive due process challenges to economic and

54

social welfare legislation, *Turner Elkhorn*, 428 U.S. at 15, the inquiry ends there. Plaintiffs'

claim is a throwback to a bygone era of substantive due process. It should be rejected.

## VII.   THE MINIMUM COVERAGE PROVISION IS NOT A DIRECT TAX THAT WOULD REQUIRE APPORTIONMENT AMONG THE STATES

Plaintiffs challenge the minimum coverage provision as a "direct tax" that is not appor-

tioned among the States, allegedly in violation of Article I, Sections 2 and 9 of the Constitution.

That argument is doubly incorrect. Measures enacted in aid of Congress's Commerce Clause

powers are not subject to the apportionment requirement that can apply — but very rarely does

— when Congress relies exclusively on its taxing powers. Moreover, if analyzed as an exercise

of Congress's taxing authority, the minimum coverage provision is not a "direct tax" — histori-

cally, an exceedingly narrow category.

### A.   As a Valid Exercise of Congress's Commerce Clause Powers, the Minimum Coverage Provision Is Not Subject to Apportionment

Article I, Section 8, Clause 1 grants Congress the "Power To lay and collect Taxes, Du-

ties, Imposts and Excises," but requires that "all Duties, Imposts and Excises shall be uniform

throughout the United States." Article I, Section 2 provides that "direct Taxes shall be appor-

tioned among the several States which may be included within this Union, according to their re-

spective Numbers." Article I, Section 9 similarly provides that "[n]o Capitation, or other direct,

Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be

taken." U.S. Const. art. I, § 2, cl. 3 (amended by U.S. Const. amends. XIV, XVI); *id.*, art. I, § 9,

cl. 4 (amended by U.S. Const. amend. XVI).

These requirements apply only to statutes enacted exclusively in the exercise of Con-

gress's taxing power, and not to statutory penalties in aid of other constitutional authorities —

including the Commerce Clause. In the *Head Money Cases* (*Edye v. Robertson*), 112 U.S. 580,

595-96 (1884), the Supreme Court considered whether a fee levied on non-citizen passengers brought into a U.S. port complied with the uniformity requirement of Article I, Section 8. Although the fee appeared to satisfy the requirements of uniformity and "general welfare" applicable when Congress exercises its taxing power, the Court explained, such issues were beside the point because the fee was a "mere incident of the regulation of commerce." The dispositive question was whether the fee was valid under the Commerce Clause, regardless of the limits of Congress's taxing authority. *Id.* at 596.

In accord with the *Head Money Cases*, the courts of appeals have repeatedly emphasized that "direct tax" claims offer no cause to set aside a statutory penalty enacted in aid of Congress's regulatory powers under the Commerce Clause. Thus, after the Supreme Court upheld the Agricultural Adjustment Act's quota provisions under the Commerce Clause in *Wickard*, 317 U.S. 111, various plaintiffs argued that the penalties enforcing the quotas were "in reality a direct tax not levied in proportion to the census or enumeration as required under Article 1, Sections 2 and 9 and Clauses 3 and 4 of the Constitution." *Rodgers v. United States*, 138 F.2d 992, 994 (6th Cir. 1943). The *Rodgers* court disagreed, because the penalty was "a method adopted by the Congress for the express purpose of regulating the production of cotton affecting interstate commerce" as well as "the fostering, protecting and conserving of interstate commerce and the prevention of harm to the people from its flow." The incidental effect of raising revenue therefore did "not divest the regulation of its commerce character," and Article I, Section 9 had "no application." *Id.* at 995 (citing *Head Money Cases*, 112 U.S. at 595).[26] Congress's Commerce Clause authority is not cabined by Congress's taxing power. *See, e.g., Bd. of Trustees v. United*

---

[26] Other circuits agree. *United States v. Stangland*, 242 F.2d 843, 848 (7th Cir. 1957); *Moon v. Freeman*, 379 F.2d 382, 390-93 (9th Cir. 1967); *see also South Carolina ex rel. Tindal v. Block*, 717 F.2d 874 (4th Cir. 1983); *Goetz v. Glickman*, 149 F.3d 1131 (10th Cir. 1998).

*States*, 289 U.S. 48, 58 (1933) ("[B]ecause the taxing power is a distinct power and embraces the power to lay duties, it does not follow that duties may not be imposed in the exercise of the power to regulate commerce. The contrary is well established." (citations omitted)).  Plaintiffs' attempt to conflate these authorities, and their respective limits, fails.

### B.     The Minimum Coverage Provision Is Not a "Direct Tax"

Even if the taxing power alone justifies the minimum coverage provision, the direct tax clause would still not be implicated here.  From the beginning of the Republic, the Court has treated only a very narrow category of taxes as subject to apportionment.  The minimum coverage provision does not fall within that category.

The rule of apportionment was part of the compromise that counted slaves as three-fifths of a person.  *See* Bruce Ackerman, *Taxation and the Constitution*, 99 Colum. L. Rev. 1, 8-13 (Jan. 1999).  Any effort, for example, to impose a tax on slaves would fall disproportionately on non-slaveholding states, as it would have to be apportioned by population, with the slave-holding states paying less per capita because of the three-fifths rule.  As Justice Paterson explained in one of the Court's first landmark opinions, the "rule of apportionment" was "the work of a compromise" that "cannot be supported by any solid reasoning" and that "therefore, ought not to be extended by construction."  *Hylton v. United States*, 3 U.S. (3 Dall.) 171, 178 (1796) (opinion of Paterson, J.)  Accordingly, courts have construed capitation or other direct taxes narrowly to mean only head or poll taxes and taxes on property.[27]

The Supreme Court briefly expanded the definition of a "direct tax" to include a tax on personal property, as well as on income derived from real or personal property.  *Pollock v. Farmers' Land & Trust Co.*, 158 U.S. 601 (1895).  The Sixteenth Amendment, however, repudiated

---

[27] *See Springer v. United States*, 102 U.S. 586, 602 (1881); *Veazie Bank v. Fenno*, 75 U.S. (8 Wall.) 533, 543 (1869); *Hylton v. United States*, 3 U.S. (3 Dall.) 171 (1796).

the latter aspect of that holding. *See Brushaber v. Union Pac. R.R. Co.*, 240 U.S. 1, 19 (1916). The continued validity of the first aspect of *Pollock*'s holding — that taxes imposed on the ownership of personal property are "direct" — is also in doubt. *See* Ackerman, 99 Colum. L. Rev. at 51-52. At most, *Pollock* stands for the proposition that a general tax on the whole of an individual's personal property would be direct. *See Union Elec. Co. v. United States*, 363 F.3d 1292, 1300 (Fed. Cir. 2004). In sum, whether or not any part of *Pollock* survives, the Court has since made clear that only a tax imposed on property, "solely by reason of its ownership," is a "direct tax." *Knowlton v. Moore*, 178 U.S. 41, 81 (1900).

The antiquity of plaintiffs' argument aside, there is no sensible basis to claim that the minimum coverage provision imposes taxes on property, real or personal. It is not tied to the value of the individual's property. It instead imposes a tax on the choice of a method to finance the future costs of one's health care, a decision made against the backdrop of a regulatory scheme that guarantees emergency care and requires insurance companies to allow people to purchase insurance after they are already sick. The penalty is imposed monthly, ACA § 1501(b) (adding I.R.C. § 5000A(c)(2)), and each month gives rise to a new taxable event: the individual's decision whether to obtain qualifying health insurance coverage. A tax predicated on a decision, as opposed to a tax on property, has always been understood to be indirect. *United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 197-98 (1960); *Tyler v. United States*, 281 U.S. 497, 502 (1930). Under any plausible interpretation, the penalty is not a direct tax.

Nor is the requirement a "capitation tax." Justice Chase explained that a capitation (or poll, or head) tax is one imposed "simply, without regard to property, profession, or any other circumstance." *Hylton*, 3 U.S. at 175 (opinion of Chase, J.); *see also Pac. Ins. Co. v. Soule*, 74 U.S. 443, 444 (1868) (adopting Justice Chase's definition). The minimum coverage provision is

58

not a flat tax imposed without regard to the taxpayer's circumstances. To the contrary, among other exemptions, the Act excuses persons with incomes below the threshold for filing a return, as well as persons for whom the cost of coverage would exceed 8 percent of household income. I.R.C. § 5000A(e)(1), (2).[28] The payment required by the Act further varies with the taxpayer's income, subject to a floor of a particular dollar amount, and to a cap equal to the cost of qualifying coverage. I.R.C. § 5000A(c)(1), (2). And, of course, the penalty does not apply at all if individuals obtain coverage. I.R.C. § 5000A(a), (b)(1). The minimum coverage provision thus is tailored to the individual's circumstances and is not a capitation tax.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be granted and this case should be dismissed in its entirety.

Dated:  June 16, 2010

Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

THOMAS F. KIRWIN
United States Attorney

---

[28] Thus, even if the minimum coverage provision would have been viewed as a direct tax prior to the Sixteenth Amendment, given that Congress designed the minimum coverage provision penalty to vary in proportion to the taxpayer's income, I.R.C. § 5000A(c)(1)(B), (c)(2), it would fall within Congress's authority to "to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." U.S. Const. amend. XVI. There is no basis to second-guess Congress's decision to tailor the Act's penalty to individual taxpayers' incomes — a decision that is squarely within Congress's authority under the Sixteenth Amendment.

SHEILA LIEBER
Deputy Director

*/s/ Eric Beckenhauer*
BRIAN G. KENNEDY, D.C. Bar No. 228726
Senior Trial Counsel
ERIC B. BECKENHAUER, Cal. Bar No. 237526
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Telephone: (202) 514-3338
Facsimile: (202) 616-8470
E-mail: eric.beckenhauer@usdoj.gov

*Attorneys for Defendants*

60

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2010, the foregoing document was filed with the Clerk of Court via the CM/ECF system, causing it to be served on Plaintiffs' counsel of record.

/s/ *Eric B. Beckenhauer*
ERIC B. BECKENHAUER