**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Pensacola Division**

**Case No.: 3:10-cv-91-RV/EMT**

**STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY GENERAL
OF THE STATE OF FLORIDA;**

**STATE OF SOUTH CAROLINA, by and through
HENRY McMASTER, ATTORNEY GENERAL
OF THE STATE OF SOUTH CAROLINA;**

**STATE OF NEBRASKA, by and through
JON BRUNING, ATTORNEY GENERAL
OF THE STATE OF NEBRASKA;**

**STATE OF TEXAS, by and through
GREG ABBOTT, ATTORNEY GENERAL
OF THE STATE OF TEXAS;**

**STATE OF UTAH, by and through
MARK L. SHURTLEFF, ATTORNEY GENERAL
OF THE STATE OF UTAH;**

**STATE OF LOUISIANA, by and through
JAMES D. "BUDDY" CALDWELL, ATTORNEY
GENERAL OF THE STATE OF LOUISIANA;**

**STATE OF ALABAMA, by and through
TROY KING, ATTORNEY GENERAL
OF THE STATE OF ALABAMA;**

**MICHAEL A. COX, ATTORNEY GENERAL
OF THE STATE OF MICHIGAN, ON BEHALF OF
THE PEOPLE OF MICHIGAN;**

**STATE OF COLORADO, by and through
JOHN W. SUTHERS, ATTORNEY GENERAL
OF THE STATE OF COLORADO;**

**COMMONWEALTH OF PENNSYLVANIA, by
and through THOMAS W. CORBETT, Jr.,**

**ATTORNEY GENERAL OF THE**
**COMMONWEALTH OF PENNSYLVANIA;**

**STATE OF WASHINGTON, by and through**
**ROBERT M. McKENNA, ATTORNEY GENERAL**
**OF THE STATE OF WASHINGTON;**

**STATE OF IDAHO, by and through**
**LAWRENCE G. WASDEN, ATTORNEY GENERAL**
**OF THE STATE OF IDAHO;**

**STATE OF SOUTH DAKOTA, by and through**
**MARTY J. JACKLEY, ATTORNEY GENERAL**
**OF THE STATE OF SOUTH DAKOTA;**

**STATE OF INDIANA, by and through**
**GREGORY F. ZOELLER, ATTORNEY GENERAL**
**OF THE STATE OF INDIANA;**

**STATE OF NORTH DAKOTA, by and through**
**WAYNE STENEJHEM, ATTORNEY GENERAL**
**OF THE STATE OF NORTH DAKOTA;**

**STATE OF MISSISSIPPI, by and through**
**HALEY BARBOUR, GOVERNOR OF**
**THE STATE OF MISSISSIPPI;**

**STATE OF ARIZONA, by and through JANICE K.**
**BREWER, GOVERNOR OF THE STATE OF ARIZONA;**

**STATE OF NEVADA, by and through JIM GIBBONS,**
**GOVERNOR OF THE STATE OF NEVADA;**

**STATE OF GEORGIA, by and through SONNY PERDUE,**
**GOVERNOR OF THE STATE OF GEORGIA;**

**STATE OF ALASKA, by and through**
**DANIEL S. SULLIVAN, ATTORNEY GENERAL OF**
**THE STATE OF ALASKA;**

**NATIONAL FEDERATION OF INDEPENDENT**
**BUSINESS, a California nonprofit mutual benefit**
**corporation;**

**MARY BROWN, an individual; and**

**KAJ AHLBURG, an individual;**

    **Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES;
KATHLEEN SEBELIUS, in her official
capacity as the Secretary of the United States
Department of Health and Human Services;
UNITED STATES DEPARTMENT OF
THE TREASURY; TIMOTHY F.
GEITHNER, in his official capacity as the
Secretary of the United States Department
of the Treasury; UNITED STATES
DEPARTMENT OF LABOR; and HILDA
L. SOLIS, in her official capacity as Secretary
of the United States Department of Labor,**

    **Defendants.**

_____/


## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

Table of Authorities ..................................................................................................iii-xvi

Introduction.................................................................................................................. 1

Argument ..................................................................................................................... 3

I.     PLAINTIFFS HAVE STANDING TO CHALLENGE THE INDIVIDUAL
MANDATE, AND THEIR CHALLENGE IS RIPE ............................................3

     A.     Plaintiff States Allege Injuries-in-Fact ........................................................4

     B.     Plaintiff States Have Standing To Challenge Federal Laws That
Injure Their Sovereign Power To Legislate To Protect State Citizens
from Healthcare Coercion............................................................................8

     C.     Individual Plaintiffs and NFIB Have Standing, Providing Another
Basis for Plaintiff States To Challenge the Individual Mandate................10

           1. The Individual Plaintiffs ......................................................................11

           2. NFIB .....................................................................................................13

     D.     Plaintiffs' Claims Challenging the Individual Mandate Are Ripe............ 16

     E.     The Anti-Injunction Statute Does Not Apply ........................................... 18

II.    THE INDIVIDUAL MANDATE EXCEEDS CONGRESS'S POWERS
AND VIOLATES THE NINTH AND TENTH AMENDMENTS AND
CORE PRINCIPLES OF FEDERALISM ...........................................................23

     A.     The Individual Mandate Is Impermissible Under the Commerce
Clause.........................................................................................................24

           1.   Congress's Commerce Power Does Not Reach Inactivity .................24

           2.   The Individual Mandate Does Not Regulate Commerce, It
Compels It ..........................................................................................27

B. The Individual Mandate Cannot Be Saved by the Necessary and Proper Clause ...........................................................................30

 1. The Mandate Is Not a Means To Implement a Constitutionally Enumerated Power ...........................................................30

 2. The Individual Mandate Fails Under the *Comstock* Factors................33

C. The Individual Mandate Is Impermissible Under the Taxing and Spending Clause........................................................................36

D. Alternatively, if the Individual Mandate's Penalty Is a Tax, It Is an Unconstitutional Direct, Unapportioned Tax............................................ 39

E. The Individual Mandate Violates the Ninth and Tenth Amendments and Core Principles of Federalism............................................42

III. THE INDIVIDUAL MANDATE VIOLATES DUE PROCESS .........................43

IV. THE ACT'S SWEEPING CHANGES TO MEDICAID AND ADDED BURDENS ON PLAINTIFF STATES ARE UNCONSTITUTIONAL ...............45

A. The Act Transforms Medicaid in Violation of States' Sovereign Rights ....................................................................................46

B. The ACA Compels States To Administer and Enforce Federal Insurance-Related Programs in Violation of the Constitution's System of Dual Sovereignty ....................................................................51

C. The Act Unconstitutionally Interferes with the States' Sovereignty With Respect to State Employees and Officials .........................................54

 1. The Employer Mandate Regime Violates the Commerce Clause and the Tenth Amendment.................................................................55

 2. The Employer Mandates Discriminate Against States and Violate the Inter-Governmental-Tax-Immunity Doctrine ...............................58

CONCLUSION.........................................................................................60

CERTIFICATE OF SERVICE ....................................................................... 62

# TABLE OF AUTHORITIES

## CASES

*520 S. Mich. Ave. Assocs. v. Devine*,
   433 F.3d 961 (7th Cir. 2006) .................................................. 12

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967) .................................................... 16, 17

*ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.*,
   557 F.3d 1177 (11th Cir. 2009) ............................................ 13

*Adarand Constructors, Inc. v. Pena*,
   515 U.S. 200 (1995) ..................................................... 38

*Alaska Airlines, Inc. v. Brock*,
   480 U.S. 678 (1987) ...................................................... 7

*Alaska v. United States Dep't of Transp.*,
   868 F.2d 441 (D.C. Cir. 1989) ........................................... 8, 9

*Alden v. Maine*,
   527 U.S. 706 (1999) ..................................................... 43

*Am. Dental Ass'n v. Cigna Corp.*,
   605 F.3d 1283 (11th Cir. 2010) ............................................ 4

*Atlanta Gas & Light Co. v. U.S. Dep't of Energy*,
   666 F.2d 1359 (11th Cir. 1982) ........................................... 51

*Ayotte v. Planned Parenthood of N. New England*,
   546 U.S. 320 (2006) ...................................................... 7

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979) ..................................................... 13

*Bacon v. City of Richmond*,
   475 F.3d 633 (4th Cir. 2007) ........................................... 59-60

*Bailey v. Drexel Furniture Co. (The Child Labor Tax Case)*,
   259 U.S. 20 (1922) ................................................ 21, 37, 38

*Barr v. United States*,
   736 F.2d 1134 (7th Cir. 1984) ............................................................ 20

*Blanchette v. Ct. Gen. Ins. Corps.*,
   419 U.S. 102 (1974) .................................................................... 8, 16

*Bd. of Trs. v. United States*,
   289 U.S. 48 (1933) ........................................................................ 21

*Bob Jones Univ. v. Simon*,
   416 U.S. 725 (1974) ...................................................................... 22

*Bowsher v. Synar*,
   478 U.S. 714 (1986) ...................................................................... 11

*Bromley v. McCaughn*,
   280 U.S. 124 (1929) ...................................................................... 41

*Buckley v. Valeo*,
   424 U.S. 1 (1976) .......................................................................... 38

*Cities Serv. Co. v. Fed. Energy Admin.*,
   529 F.2d 1016 (Temp. Emer. Ct. App. 1975) ............................................ 18

*Clarke v. Sec. Indus. Ass'n*,
   479 U.S. 388 (1987) ...................................................................... 20

*Cobell v. Norton*,
   428 F.3d 1070 (D.C. Cir. 2005) .......................................................... 20

*Comm. of Immigrant Rights of Sonoma County v. County of Sonoma*,
   644 F. Supp. 2d 1177 (N.D. Cal. 2009) .................................................. 15

*Comm'r of Internal Revenue v. Glenshaw Glass Co.*,
   348 U.S. 426 (1955) ...................................................................... 41

*Commissioner v. Indianapolis Power & Light Co.*,
   493 U.S. 203 (1990) ...................................................................... 41

*Connecticut v. Am. Elec. Power Co.*,
   582 F.3d 309 (2d Cir. 2009) .............................................................. 12

*Coyle v. Smith*,
   221 U.S. 559 (1911) ...................................................................... 51

*Cruzan v. Dir., Mo. Dep't of Health*,
    497 U.S. 261 (1990) ................................................................. 44

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) ................................................................. 11

*Daniel v. Paul*,
    395 U.S. 298 (1969) ............................................................ 26, 27

*Davis v. Mich. Dep't of Treasury*,
    489 U.S. 803 (1989) ................................................................. 60

*Dep't of Commerce v. U.S. House of Reps.*,
    525 U.S. 316 (1999) ................................................................. 12

*DIRECTV, Inc. v. Brown*,
    371 F.3d 814 (11th Cir. 2004) .................................................. 19

*District of Columbia v. Heller*,
    128 S. Ct. 2783 (2008) ............................................................. 43

*Doe v. County of Montgomery*,
    41 F.3d 1156 (7th Cir. 1994) ................................................... 11

*Eisner v. Macomber*,
    252 U.S. 189 (1920) ................................................................. 41

*Elend v. Basham*,
    471 F.3d 1199 (11th Cir. 2006) ................................................ 16

*Ex parte Poresky*,
    290 U.S. 30 (1933) ................................................................... 34

*FERC v. Mississippi*,
    456 U.S. 742 (1982) ............................................................ 43, 52

*Fernandez v. Wiener*,
    326 U.S. 340 (1945) ................................................................. 40

*Fla. League of Prof'l Lobbyists, Inc. v. Meggs*,
    87 F.3d 457 (11th Cir. 1996) ................................................... 16

*Fla. State Conf. of the NAACP v. Browning,*
   522 F.3d 1153 (11th Cir. 2008) .......................................................................... passim

*Flint v. Stone Tracy Co.,*
   220 U.S. 107 (1911) ................................................................................................... 40

*Fountas v. Comm'r of Dep't Rev.,*
   2009 WL 3792468 (Mass. Super. Ct. Feb. 6, 2009) .................................................... 34

*Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians,*
   563 F.3d 1205 (11th Cir. 2009) ................................................................................. 19

*Fullilove v. Klutznick,*
   448 U.S. 448(1980), .................................................................................................... 38

*Garcia v. San Antonio Metro. Transit Auth.,*
   469 U.S. 528 (1985) ................................................................................................... 57

*Goetz v. Glickman,*
   920 F. Supp. 1173 (D. Kan. 1996), ............................................................................ 18

*Gonzales v. Oregon,*
   546 U.S. 243 (2006) ..................................................................................................... 8

*Gonzales v. Raich,*
   545 U.S. 1 (2005) ............................................................................... 26, 30, 31, 33

*Grand Lodge of Fraternal Order of Police v. Ashcroft,*
   185 F. Supp. 2d 9 (D.D.C. 2001) ............................................................................... 17

*Gustafson v. Alloyd Co.,*
   513 U.S. 561 (1995) ............................................................................................... 19-20

*Harris v. McRae,*
   448 U.S. 297 (1980) ................................................................................ 6, 46, 47, 48

*Harris v. Mexican Specialty Foods, Inc.,*
   564 F.3d 1301 (11th Cir. 2009) ................................................................................. 16

*Hasenfus v. LaJeunesse,*
   175 F.3d 68 (1st Cir. 1999) ........................................................................................ 44

*Head Money Cases,*
   112 U.S. 580 (1884) ............................................................................................ 18, 21

*Heart of Atlanta Motel v. United States*,
  379 U.S. 241 (1964)............................................................................ 26, 27

*Hill v. Wallace*,
  259 U.S. 44 (1922)................................................................................ 7, 38

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
  452 U.S. 264 (1981).................................................................... 51, 53, 57

*Hunnings v. Texaco, Inc.*,
  29 F.3d 1480 (11th Cir. 1994) ................................................................... 4

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977)...................................................................... 13, 14, 15

*Hylton v. United States*,
  3 Dall. 175 (1796)............................................................................... 39, 40

*In re DeRoche*,
  287 F.3d 751 (9th Cir. 2002) .................................................................. 40

*In re Leckie Smokeless Coal Co.*,
  99 F.3d 573 (4th Cir. 1996) .................................................................... 23

*Iraola & CIA, S.A. v. Kimberly-Clark Corp.*,
  232 F.3d 854 (11th Cir. 2000) ................................................................ 19

*Jacobson v. Massachusetts*,
  197 U.S. 11 (1905)............................................................................... 34, 45

*Jinks v. Richland Co.*,
  538 U.S. 456 (2003)................................................................................. 36

*Knowlton v. Moore*,
  178 U.S. 41 (1900).................................................................................... 39

*License Tax Cases*,
  72 U.S. 462 (1866)................................................................................... 37

*Lipke v. Lederer*,
  259 U.S. 557 (1922)................................................................................. 21

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................... 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .................................................................. 3, 4, 5, 12

*Marchetti v. United States*,
    390 U.S. 39 (1968) ............................................................................... 21

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ....................................................................... 10, 11

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ......................................................................... 6, 10

*McConnell v. FEC*,
    540 U.S. 93 (2003) ............................................................................... 12

*McCulloch v. Maryland*,
    17 U.S. 316 (1819) ........................................................... 30, 35, 36, 58

*Metcalf & Eddy v. Mitchell*,
    269 U.S. 514 (1926) ............................................................................. 58

*Meyer v. Nebraska*,
    262 U.S. 390 (1923) ............................................................................. 44

*Mobile Republican Assembly v. United States*,
    353 F.3d 1357 (11th Cir. 2003) ........................................................... 21

*Morales v. Daley*,
    116 F. Supp. 2d 801 (S.D. Tex. 2000) ................................................. 32

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ............................................................. 11

*Nat'l Taxpayers Union v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ....................................................... 15, 23

*Nevada v. Burford*,
    918 F.2d 854 (9th Cir. 1990) ............................................................... 17

*New York v. United States*,
    505 U.S. 144 (1992) ..................................................................... passim

*NLRB v. Jones & Laughlin Steel Corp.,*
    301 U.S. 1 (1937)................................................................................29-30

*N.Y. State Club Ass'n, Inc. v. City of New York,*
    487 U.S. 1 (1988)................................................................................ 14

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,*
    461 U.S. 190 (1983)............................................................................ 17

*Pennell v. City of San Jose,*
    485 U.S. 1 (1988)................................................................................ 13, 15

*Perlowin v. Sassi,*
    711 F.2d 910 (9th Cir. 1983) .............................................................. 23

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925)............................................................................ 12, 44

*Pollock v. Farmers' Loan & Trust Co. (Pollock I),*
    157 U.S. 429 (1895)............................................................................ 39, 40

*Pollock v. Farmers' Loan & Trust Co. (Pollock II),*
    158 U.S. 601 (1895)............................................................................ 39, 40

*Printz v. United States,*
    521 U.S. 898 (1997)............................................................................ passim

*Regal Drug Corp. v. Wardell,*
    260 U.S. 386 (1922)............................................................................ 21

*Reid v. Covert,*
    354 U.S. 1 (1957)................................................................................ 42

*Reno v. Condon,*
    528 U.S. 141 (2000)............................................................................ 56

*Rodgers v. United States,*
    138 F.2d 992 (6th Cir. 1943) .............................................................. 19, 21

*Sanchez v. United States,*
    340 U.S. 42 (1950).............................................................................. 37

*Selective Service Cases,*
   245 U.S. 366 (1918) ................................................................................ 31-32

*Sierra Club v. TVA,*
   430 F.3d 1337 (11th Cir. 2005) ................................................................ 14

*Soc'y of Sisters of Holy Names v. Pierce,*
   296 F. 928 (D. Or. 1924)........................................................................... 12

*Sonzinsky v. United States,*
   300 U.S. 506 (1937)............................................................................ 21, 37

*South Carolina v. Baker,*
   485 U.S. 505 (1988)............................................................................ 56, 60

*South Carolina v. Katzenbach,*
   383 U.S. 301 (1966)................................................................................. 17

*South Carolina v. Regan,*
   465 U.S. 367 (1984)................................................................................. 23

*South Dakota v. Dole,*
   483 U.S. 203 (1987)................................................................ 3, 36, 49, 50

*Steward Machine Co. v. Davis,*
   301 U.S. 548 (1937)................................................................................. 49

*Thomas v. Union Carbide Agric. Prods.,*
   473 U.S. 568 (1985)................................................................................. 17

*Thomas v. United States,*
   192 U.S. 363 (1904)................................................................................. 40

*Toilet Goods Ass'n v. Gardner,*
   387 U.S. 158 (1967)................................................................................. 17

*Tyler v. United States,*
   281 U.S. 497 (1930)................................................................................. 41

*U.S. Term Limits, Inc. v. Thornton,*
   514 U.S. 779 (1995)................................................................................. 10

*Union Elec. Co. v. United States,*
   363 F.3d 1292 (Fed. Cir. 2004)............................................................... 40

x

*United States v. Butler*,
  297 U.S. 1 (1936) ............................................................. 36, 38

*United States v. Comstock*,
  130 S. Ct. 1949 (2010) ......................................................... passim

*United States v. Darby*,
  312 U.S. 100 (1941) .......................................................... 32, 37

*United States v. Doremus*,
  249 U.S. 86 (1919) ................................................................. 37

*United States v. Gonzales*,
  520 U.S. 1 (1997) .................................................................. 19

*United States v. Kahriger*,
  345 U.S. 22 (1953) ....................................................... 20, 21, 37

*United States v. La Franca*,
  282 U.S. 568 (1931) ............................................................... 21

*United States v. Lopez*,
  514 U.S. 549 (1995) ........................................................... passim

*United States v. Mfrs. Nat'l Bank of Detroit*,
  363 U.S. 194 (1960) ............................................................... 39

*United States v. Morrison*,
  529 U.S. 598 (2000) ............................................................... 25

*United States v. Reorganized CF&I Fabricators of Utah, Inc.*,
  518 U.S. 213 (1996) ............................................................... 18

*United States v. Ross*,
  458 F.2d 1144 (5th Cir. 1972) .................................................. 38

*United States v. Spoerke*,
  568 F.3d 1236 (11th Cir. 2009) ................................................ 38

*United States v. United Mine Workers*,
  330 U.S. 258 (1947) ............................................................... 22

*Usury v. Turner Elkhorn Mining Co.,*
    428 U.S. 1 (1976) ............................................................................. 45

*Vesta Fire Ins. Corp. v. Florida,*
    141 F.3d 1427 (11th Cir. 1998) ...................................................... 45

*Vill of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ......................................................................... 11

*Vill of Bensenville v. FAA,*
    376 F.3d 1114 (D.C. Cir. 2004) ...................................................... 12

*Virginia v. Sebelius,*
    Case No. 3:10-cv-00188, Mem. Op. (E.D. Va. Aug. 2, 2010) ................... 9, 17, 22, 23

*Vt. Agency of Natural Res. v. United States,*
    529 U.S. 765 (2000) ......................................................................... 22

*Warren v. United States,*
    874 F.2d 280 (5th Cir. 1989) .......................................................... 20

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ......................................................................... 44

*Watt v. Energy Action Educ. Found.,*
    454 U.S. 151 (1981) ......................................................................... 11

*Watts v. Fla. Int'l Univ.,*
    495 F.3d 1289 (11th Cir. 2007) ........................................................ 4

*West Coast Hotel v. Parrish,*
    300 U.S. 379 (1937) ......................................................................... 45

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ......................................................................... 12

*Wickard v. Filburn,*
    317 U.S. 111 (1942) ........................................................... 26, 30, 33

*Williams v. Alabama,*
    378 F.3d 1232 (11th Cir. 2004) ...................................................... 44

*Williams v. Morgan,*
    478 F.3d 1316 (11th Cir. 2007) ...................................................... 45

## <u>CONSTITUTIONAL PROVISIONS</u>

U.S. Const. amend. V (Due Process Cl.) .......................................................... 2, 30, 43-45

U.S. Const. amend. IX ....................................................................................... passim

U.S. Const. amend. X ........................................................................................ passim

U.S. Const. amend. XVI .................................................................................... 41

U.S. Const. art. I, § 2, cl. 3 ............................................................................... 32, 39

U.S. Const. art. I, § 8 ........................................................................................ 24, 36

U.S. Const. art. I, § 8, cl. 1 (Taxing & Spending Cl.).................................... 36-39

U.S. Const. art. I, § 8, cl. 3 (Commerce Cl.)................................................... passim

U.S. Const. art. I, § 8, cl. 12 ............................................................................ 32

U.S. Const. art. I, § 8, cl. 18 (Necessary & Proper Cl.) ........................... 30-36, 38

U.S. Const. art. I, § 9, cl. 4.............................................................................. 39

U.S. Const. art. IV, § 4 (Guarantee Cl.).......................................................... 43, 50

## <u>STATUTES</u>

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010)

("ACA")

   § 1001................................................................................................................ 54

   § 1003................................................................................................................ 52

   § 1201................................................................................................................ 54

   § 1311................................................................................................................ 53, 54

   § 1312(d)(3)(D)................................................................................................. 59

§ 1313(a)(4) ........................................................................................... 53

§ 1321 ............................................................................................... 53, 54

§ 1341 ................................................................................................ 51-52

§ 1411(c)(4) ........................................................................................... 52

§ 1413(c) ................................................................................................ 52

§ 1501(a)(2)(A) ...................................................................................... 38

§ 1501(a)(2)(D) ................................................................................... 4, 34

§ 1501(a)(2)(I) ........................................................................................ 18

§ 1501(a)(2)(J) ........................................................................................ 32

§ 1501(b) ........................................................................................... 13, 18

§ 1511 ............................................................................................... 54, 55

§ 1513 ............................................................................................... 54, 55

§ 1513(a) ............................................................................................ 5, 55

§ 1563 ..................................................................................................... 46

§ 2001(b) ............................................................................................... 53

§ 2101(b) ............................................................................................... 53

§ 2105(d)(3) ........................................................................................... 53

§ 2304 ..................................................................................................... 47

§ 9001........................................................................................... 19, 54, 55

§ 9004 ..................................................................................................... 19

§ 9015 ..................................................................................................... 19

§ 9017....................................................................................................... 19

§ 10106(a) ............................................................................................. 18, 32

§ 10106(a)(2)(D) ........................................................................................ 4

§ 10907 .................................................................................................. 18

Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("HCERA")

§ 1003(b) ........................................................................................... 5, 55

§ 1004(b) .............................................................................................. 47

§ 1401(a)(2)(C) ...................................................................................... 59

§ 2301 .................................................................................................. 54

1 U.S.C. § 1 ................................................................................................ 22

26 U.S.C. § 61 ........................................................................................... 41

26 U.S.C. § 4980H ................................................................................ 5, 55

26 U.S.C. § 5000A(g) ................................................................................ 22

26 U.S.C. § 6671 ....................................................................................... 22

26 U.S.C. § 7343 ....................................................................................... 22

26 U.S.C. § 7421(a) (The Anti-Injunction Act) ................................ 18-23, 55

26 U.S.C. § 7701 ....................................................................................... 22

26 U.S.C. § 7806(b) .................................................................................. 18

28 U.S.C. § 2201(a) (The Declaratory Judgment Act) .................................. 23

Fla. Stat. § 110.123(2)(c) (2009) ............................................................ 5, 55

Fla. Stat. § 110.123(2)(f) (2009) ............................................................. 5, 55

Mass. Gen. Laws ch. 111M, § 2 (2008) ...................................................... 34

## OTHER AUTHORITIES

Bipartisan Comm'n on the Medicaid Act of 2005, H.R. 985, 109th Cong. § 2(13) (2005) ..................................................................................................................50

13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3532.1 (3d ed. 2008) ....................................................................................................................8

Joint Comm. on Taxation, *Overview of Revenue Estimating Procedures and Methodologies* (JCX-1-05), February 2, 2005 ........................................................19, 20

Joint Comm. on Taxation, *Estimated Revenue Effects of the Amendment in the Nature of a Substitute to H.R. 4872, the "Reconciliation Act of 2010," as amended, in Combination with the Revenue Effects of H.R. 3590, the "Patient Protection and Affordable Care Act ('ACA'),"* as Passed by the Senate, and Scheduled for Consideration by the House Committee on Rules on March 20, 2010 (JCX-17-10), March 20, 2010.............................................................................20

Joint Comm. on Taxation, *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in combination with the "Patient Protection and Affordable Care Act"* (JCX-18-10), March 21, 2010 ...........19

Joint Comm. on Taxation, *Errata for JCX-18-10* (JCX-27-10), May 4, 2010 .................19

Letter from Douglas Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Reps. (Mar. 20, 2010).........................................................20, 46

Nat'l Conf. of State Legislatures, http://www.ncsl.org/default.aspx?tabid=18906............ 9

*Obama: Requiring health insurance is not a tax increase*, CNN (Sept. 29, 2009), http://www.cnn.com/2009/POLITICS/09/20/obama.health.care/index.html. .............. 20

Robert Hartman & Paul Van de Water, "The Budgetary Treatment of an Individual Mandate to Buy Health Insurance," CBO Memo. Aug. 1994 ................................24-25

*Virginia v. Sebelius,* Case No. 3:10-cv-00188, Hr'g Tr. (E.D. Va. July 1, 2010).......................................... 7

Defendants' arguments in their Memorandum in Support ("Def. Mem.") of their

Motion to Dismiss the Amended Complaint ("Am. Compl.") fail as a matter of law.

## Introduction

This case is about power, accountability, and the continuing vitality of our

federalist system.  The Patient Protection and Affordable Care Act[1] ("ACA" or "the Act")

represents an unprecedented intrusion on the sovereignty of the States and the freedom of

their citizens.  As such, it threatens to obliterate our system of dual sovereignty, under

which the federal government is to exercise only those limited powers conferred upon it

by the Constitution, with all other powers reserved to the States or the people.  *See New

York v. United States*, 505 U.S. 144, 155-56 (1992).  This system, as Justice Kennedy

explained in *United States v. Lopez*, 514 U.S. 549, 575 (1995) (concurring), "was the

unique contribution of the Framers to political science and political theory."  It was

designed to achieve a "healthy balance of power between the States and the Federal

Government [to] reduce the risk of tyranny and abuse from either front[,]" by

empowering both governments so that each "will control [the] other…." *Printz v. United

States*, 521 U.S. 898, 921-22 (1997).  In enacting the ACA, Congress upends that

balance, usurping powers denied it and thereby inflicting the very harm warned of in

*Printz*.

Plaintiff States, Individual Plaintiffs, and the National Federation of Independent

Business ("NFIB") are profoundly affected by the so-called "Individual Mandate," a

---

[1] Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by Health Care and Education
Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("HCERA").

requirement that virtually all Americans obtain and maintain a congressionally-approved level of healthcare insurance coverage for themselves and their families.  In addition to dictating that Individual Plaintiffs, NFIB members, and Plaintiff States' citizens must buy unwanted insurance, the mandate imposes significant costs on Plaintiff States by driving millions of individuals into greatly-expanded Medicaid programs, newly-created State insurance exchanges, and federally-enlarged insurance programs offered by States as employers.   Furthermore, the mandate is not severable from other Medicaid and insurance reforms in the ACA that require Plaintiff States to incur costs immediately. Plaintiffs' injuries are clear, are not contingent on any future event, and are legally redressable now, even though the mandate will not take effect until 2014.   Thus, Plaintiffs have standing to challenge the mandate, and their claims are ripe.

The Individual Mandate is manifestly unconstitutional.  No enumerated power of Congress permits this assertion of top-down centralized economic power; nor can the Necessary and Proper Clause expand congressional power to support the mandate. Congress's commerce power extends to regulation of *activities* having a substantial relation to interstate commerce, but does not allow it to compel inactive individuals to enter a marketplace against their will.  Likewise, Congress's power to tax does not authorize it to compel persons to buy specific insurance products.  By exerting such sweeping authority over Americans' individual decisions, Congress has seized powers denied it under the Tenth Amendment, in violation of the Constitution's federalist structure and individual rights under the Fifth and Ninth Amendments.

Moreover, the Act imposes staggering new costs and obligations on Plaintiff States, in violation of the Tenth Amendment and core principles of federalism.  The Act transforms Medicaid from a federal-State partnership to reimburse needy persons' medical costs into a vast federally-mandated program to benefit millions of persons with incomes above the poverty line.  It also compels the States to assume responsibility not only for cost reimbursement but for the provision of healthcare services themselves.

Plaintiff States cannot abandon Medicaid and leave millions of needy residents without coverage.  Yet, to accept the Act's requirements would devastate Plaintiff States' already-strained budgets, forcing them to surrender sovereign power to set their legislative agendas and determine their own priorities for meeting their citizens' needs.  The Act worsens these effects by unconstitutionally requiring Plaintiff States to administer federal insurance-related programs, by commandeering State resources, and by interfering with States' sovereignty in their employment relations.  The ACA thus "pass[es] the point at which 'pressure turns into compulsion[,]'" *South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (citation omitted), and must be declared invalid.

## Argument

## I.    PLAINTIFFS HAVE STANDING TO CHALLENGE THE INDIVIDUAL MANDATE, AND THEIR CHALLENGE IS RIPE

To establish standing, a plaintiff must demonstrate (1) "injury in fact"; (2) a causal relationship between the injury and the challenged conduct; and (3) harm that will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560-61 (1992).  Defendants dispute only Plaintiffs' injuries-in-fact.[2]  Their challenge fails

because the Amended Complaint demonstrates injuries that are "concrete and

particularized," and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan*, 504

U.S. at 560 (citations omitted).[3]

### A.   Plaintiff States Allege Injuries-in-Fact

Contrary to Defendants' contentions, Def. Mem. 32 n.14, the Amended

Complaint contains numerous allegations demonstrating how the Individual Mandate

actually and imminently harms the States.  Plaintiff States have detailed the need to

expend funds and commit resources *now* to meet the Act's requirements, Am. Compl. ¶¶

57 & 49, and allege that the Act will force them "to ignore other critical needs," *id.* ¶¶ 59

& 49.  Congress enacted the Individual Mandate to require millions of uninsured persons

to obtain qualifying coverage.  *See* ACA §§ 1501(a)(2)(D), 10106(a)(2)(D) ("The

requirement ... will add millions of new consumers to the health insurance market"); Def.

Mem. 8 (claiming that the Act will "reduce the ranks of the uninsured by approximately

32 million by 2019").[4]  Thus, by Defendants' own admission, the mandate will drive

millions of newly-eligible recipients onto States' Medicaid rolls, at a huge cost (increased

---

[2] The latter elements plainly are met.  *See Lujan*, 504 U.S. at 561-62 (when a plaintiff is
the object of governmental action, "there is ordinarily little question that the action … has
caused him injury, and that a judgment preventing … the action will redress it").

[3] All alleged facts and inferences arising therefrom are to be viewed in the light most
favorable to plaintiff.  *Hunnings v. Texaco, Inc.,* 29 F.3d 1480, 1484 (11th Cir. 1994).  A
motion to dismiss fails unless the complaint states no plausible claim.  *See Am. Dental
Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010); *Watts v. Fla. Int'l Univ.,* 495
F.3d 1289, 1296 (11th Cir. 2007).

[4] Defendants' speculation that the ACA actually will save Plaintiff States money is
neither factually supported nor legally relevant.  *See Hunnings*, 29 F.3d at 1484 (at
motion to dismiss stage, alleged facts and inferences to be viewed in plaintiffs' favor).

more by the Act's alteration to reimbursement rates for primary-care practitioners) to the States. *See*, *e.g.*, Am. Compl. ¶¶ 50, 52-54, 59, 72.[5]   In addition, the mandate's corresponding insurance provisions commandeer the States and their resources to establish a new insurance regime.  Those provisions "force many more State employees into State insurance plans ... at a significant added cost to the States." *Id.* ¶ 48.[6]

Defendants seem to suggest that Medicaid's voluntary nature allows States to avoid these injuries.  Def. Mem. 31.  But no statutory provision exists for opting out, much less any that would facilitate a responsible and orderly exit.  Nor would opting out avoid injury to Plaintiff States.  Am. Compl. ¶¶ 65-68.   Over the course of several decades, the federal government and States have collaborated in creating distinct, State-specific Medicaid programs.  Through Medicaid (with the partnership of the federal government), Plaintiff States have helped to insure millions of their citizens. Significantly, while the ACA makes higher-income groups eligible for federal subsidies and credits, it makes no provision for the healthcare needs of millions of the Nation's neediest except through the Medicaid partnership with States.  Thus, the federal government offers a false choice: States must either absorb the crushing costs associated

---

[5] That the mandate compels individuals to have qualifying coverage fully satisfies any need under *Lujan* to show, where "someone else" is being regulated, that the regulated party will act in ways that injure plaintiffs. *See Lujan*, 504 U.S. at 561-62.   Here, individuals are not making "unfettered choices" that harm Plaintiff States: Congress has made the choice for them.

[6] By law (*see* Fla. Stat. § 110.123(2)(c), (f) (2009)), Florida excludes from its group plan thousands of OPS (Other Personnel Services) employees who will be driven by the Individual Mandate to enroll in its ACA-required plan; failure to enroll will trigger penalties that could cost Florida, with 120,000 full-time employees and at a penalty of $2000 per employee, up to $240 million annually.  ACA § 1513(a) (including 26 U.S.C. § 4980H; HCERA § 1003(b)).

with a massively expanded Medicaid program, or opt out of Medicaid altogether.  The latter course would require States either to deny insurance to millions of citizens already receiving Medicaid, or to establish, administer, and fully fund their own benefits programs.[7]  Even if Plaintiff States have some control over *how* they are injured, they have no control (absent an injunction from this court) over *whether* they are injured.[8]

Because Plaintiff States allege substantial, concrete, and ongoing injuries, *see, e.g.,* Am. Compl. ¶¶ 56-57, Defendants' cited authorities, Def. Mem. 31-32, are inapposite.  The legislation at issue in those cases is wholly dissimilar from the ACA, which directly harms Plaintiff States by requiring significant immediate and long-term actions as described above.  By contrast, *Massachusetts v. Mellon*, 262 U.S. 447 (1923), relied on heavily by Defendants, involved a challenge to federal legislation that did not require Massachusetts "to do or to yield anything."  *Id.* at 482.

Even if their injuries did not flow directly from the Individual Mandate, Plaintiff States would have standing to challenge its constitutionality because other portions of the Act – expanded Medicaid coverage and insurance requirements (addressed in Counts

---

[7]  Indeed, no avenue is afforded for States to transition the care of these persons to another program.  Acting against this backdrop, the Centers for Medicare and Medicaid (CMS) have threatened to terminate federal Medicaid funding if a State does not comply with the Act.  Am. Compl. ¶ 68.  This threat carries even more coercive force than the already-staggering numbers suggest.  Because Medicaid requirements are linked to other federal programs, additional benefits would be jeopardized if a State's Medicaid participation were to be terminated.  Am. Compl. ¶ 68.

[8] *See Harris v. McRae*, 448 U.S. 297, 309 n.12 (1980) ("'[A] complete withdrawal of the federal prop in the [Medicaid] system with the intent to drop the total cost of providing the service upon the states, runs directly counter to the basic structure of the program and could *seriously cripple a state's attempts to provide other necessary medical services embraced by its plan*.'") (citation omitted ) (emphasis added).

Four and Five, stating coercion and commandeering claims for which Defendants do not dispute Plaintiff States' standing[9]) – clearly will injure them, and the mandate cannot be severed from those provisions.  The Act rises or falls with the Individual Mandate.

That the Individual Mandate's unconstitutionality renders the entire Act unconstitutional follows from established legal principles and binding admissions by Congress and Defendants.  The severability test looks to the functional interdependency of the parts of a statute.  *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684-86 (1987) ("Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute if the balance of the legislation *is incapable of functioning independently*") (emphasis added).  Significantly, the plaintiffs in *Alaska Airlines* brought suit to protest employee-protection provisions of federal legislation on the basis that a *different* provision (regarding a legislative veto) rendered the entire legislation ineffective.  Even though the Supreme Court ultimately concluded that Congress would have enacted the provisions affecting plaintiffs without the unconstitutional provision, *id.* at 691, the courts accepted plaintiffs' standing at every stage of the litigation.  Had the unconstitutional provision been unseverable, the district court's summary judgment for plaintiffs plainly would have been upheld.[10]

---

[9] *See Virginia v. Sebelius*, No. 3:10-cv-188, Hr'g Tr. at 86-87 (E.D. Va. July 1, 2010) (conceding that Plaintiffs in Florida case have standing to raise commandeering claims).

[10] *See also Hill v. Wallace*, 259 U.S. 44, 70 (1922) (cited and followed in *Alaska Airlines*) (no severability where challenged provision "so interwoven with those regulations that they cannot be separated.  None of them can stand."); *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (cautioning against too readily severing unconstitutional provision so as not to "substitute the judicial for the legislative department of the government.") (citation omitted).  Similarly, "inseverability can make

The ACA has no severability clause.  As Defendants repeatedly concede, Def. Mem. 5, 7, 46, 47, 48, Congress has spoken clearly and forcefully: the Individual Mandate is essential to the Act as a whole, including those portions that impose costs and burdens directly on Plaintiff States.[11]  Hence, it would be wholly inappropriate either to sever the Individual Mandate or to deny Plaintiffs' standing to challenge it.

      **B.**    <u>**Plaintiff States Have Standing To Challenge Federal Laws That Injure Their Sovereign Power To Legislate To Protect State Citizens from Healthcare Coercion**</u>

Plaintiff States suffer injuries to their sovereign interests, as well.  By enacting the Individual Mandate, Congress usurps Plaintiff States' sovereign power to enact statutes or State constitutional provisions to protect their State citizens from compulsion in their healthcare choices.  Am. Compl. ¶ 70.  The States' police powers, reserved under the Tenth Amendment, include the power to protect the health of their citizens.  *See Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) ("[T]he structure and limitations of federalism … allow the States 'great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons.'") (citations omitted).

In *Alaska v. United States Department of Transportation*, 868 F.2d 441 (D.C. Cir. 1989), 27 States were held to have standing to assert another State police power – to make and enforce laws to protect citizens from deceptive practices – in challenging DOT

---

ripe issues that otherwise would be better deferred" and "provisions that are not severable often can be attacked if a ripe claim is advanced as to any of them."  13B Charles Alan Wright et al., *Federal Practice and Procedure* § 3532.1 & n.53 (3d ed. 2008) (citing *Blanchette v. Ct. Gen. Ins. Corp.*, 419 U.S. 102, 137 n.20 (1974)).

[11] As noted below, while those other provisions could have been enacted without the Individual Mandate, they were enacted in the *context* of the ACA's purpose of coercing near-universal coverage, which is why Congress deemed the mandate *sine qua non*.

actions concerning airline industry advertising.  The Court of Appeals stated that "[i]t is common ground that States have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'"  *Id.* at 443 (citation omitted).  Finding the States' injury to be "caused by" the actions complained of and "redressable" by the judiciary, the Court concluded: "Inasmuch as this preemptive effect is the injury of which petitioners complain, we are satisfied that the States meet the standing requirements of Article III." *Id.* at 444.  The Court further noted: "The stringency with which DOT enforces its own regulations is a matter unrelated to the question whether the DOT may prevent the States from enforcing *their* laws."  *Id.* at 444 n.2.

Here, Plaintiff States Georgia, Idaho, Louisiana, and Utah have enacted statutes to protect their citizens from the very type of coercion imposed by the Individual Mandate, and most of the other Plaintiff States have proposed constitutional amendments or legislation to that effect.  *See* Nat'l Conf. of State Legislatures, http://www.ncsl.org/default.aspx?tabid=18906 (last visited August 2, 2010).   As in *Alaska*, Plaintiff States here must be deemed to have standing to assert their right to create such laws and to enforce them against the intrusion on their sovereignty represented by the Act and its coercive Individual Mandate.  *See also Virginia v. Sebelius*, Mem. Op. at 13-14 (Aug. 2, 2010) (State's challenge to the Individual Mandate meets standing requirements).

In sum, Plaintiff States suffer direct injuries to both proprietary and sovereign interests.[12]   The Individual Mandate's coercive force will drive millions of their citizens onto Plaintiff States' Medicaid rolls and into statewide insurance exchanges, will require the States to insure classes of employees not previously covered, and will divert resources away from other State priorities established on their citizens' behalf, all at great cost to the States.   Moreover, the Individual Mandate will usurp Plaintiff States' sovereign power to enact laws to protect the freedom of their citizens from compulsion in the healthcare arena.   Accordingly, Plaintiff States have standing to contest the constitutionality of the Individual Mandate.[13]

**C.      Individual Plaintiffs and NFIB Have Standing, Providing Another Basis for Plaintiff States To Challenge the Individual Mandate**

The Individual Mandate by its terms applies to Individual Plaintiffs and NFIB members.   Am. Compl. ¶¶ 26-28.   As shown below, the mandate causes Individual Plaintiffs and NFIB concrete, actual, and imminent injury.   No further administrative

---

[12] *Massachusetts v. Mellon* and *Massachusetts v. EPA*, 549 U.S. 497 (2007), relied on by Defendants, are inapposite to these standing bases.   Those cases deal with States' quasi-sovereign standing as *parens patriae*.

[13] Plaintiff States further have quasi-sovereign standing as *parens patriae* on behalf of the millions of their citizens who will be subject to the Individual Mandate in violation of their rights under the Ninth and Tenth Amendments.   Am. Compl. ¶ 61.   As the *Printz* Court explained, every citizen has "'two political capacities, one state and one federal, each protected from incursion by the other....'"   *Printz*, 521 U.S. at 920 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)).   The Supreme Court never has held that States cannot sue in that capacity.   On the contrary, the *Mellon* Court expressly acknowledged that the States would in some instances have standing "to protect [their] citizens against ... enforcement of unconstitutional acts of Congress...."   *Mellon*, 262 U.S. at 485.   Indeed, in *EPA*, the Court held that Massachusetts had a quasi-sovereign interest on its citizens' behalf, 549 U.S. at 518; and the dissent agreed that, in proper circumstances, a State "might assert a quasi-sovereign right as *parens patriae*" to protect its citizens, *id.* at 539.

action is required to trigger the mandate's facially coercive effects, and the Court's assessment of its constitutionality *vel non* will not be assisted by any actual experience with its application.[14]

### 1.   The Individual Plaintiffs

The Individual Mandate will require many NFIB members and Individual Plaintiffs to have qualifying healthcare insurance, even though they do not have it and do not want it.   Am. Compl. ¶¶ 27, 28.   Thus, they are forced either to enter into a transaction they want no part of, or to face monetary penalties.   Plainly, their alleged injuries are "distinct and palpable."   These are not mere "generalized grievances" about how tax dollars may be spent, or based on infringement of a broad right to constitutional government, as asserted in *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342-43 (2006), and similar cases on which Defendants rely.  Def. Mem. 25.

Nor are Plaintiffs' injuries too "indefinite" or remote in time to support standing. Def. Mem. 26.   Courts repeatedly have found standing to pursue a pre-enforcement constitutional challenge where the alleged harm will occur in the future.   *See, e.g., Massachusetts v. EPA*, 549 U.S. at 521-23 (standing based on rise in sea levels *by the end*

---

[14]   Individual Plaintiffs' and NFIB's standing affords yet another basis by which the Court can consider the constitutionality of the Individual Mandate.  *See Massachusetts v. EPA*, 549 U.S. at 518 ("Only one of the petitioners needs to have standing to permit us to consider the petition for review."); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (declining to bother to adjudicate a labor union's standing where a union member alleged an injury-in-fact); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("For each claim, if … standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim.").  *See also Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 n.9 (1977); *Doe v. County of Montgomery*, 41 F.3d 1156, 1161 n.4 (7th Cir. 1994).

*of this century*); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (standing to challenge education act at least two years and five months before effective date);[15] *Dep't of Commerce v. U.S. House of Reps.*, 525 U.S. 316, 332 (1999) (standing in February 1998 to challenge sampling method for 2000 Census); *Vill. of Bensenville v. FAA*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (standing to contest fees not collectible for 13 years). Standing "depends on the probability of harm, not its temporal proximity." *See 520 S. Mich. Ave. Assocs. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006). As the Eleventh Circuit has held, "immediacy requires only that the anticipated injury occur with some fixed period of time in the future, *not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months*." *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008) (emphasis added).[16] Individual Plaintiffs and NFIB's affected members *must* comply with the Individual Mandate beginning in 2014. ACA § 1501(b). That date is fixed in the law and is certain to occur.

---

[15] While *Pierce* did not quantify the "lead time," the lower court identified it as at least two years and five months. *Soc'y of Sisters of Holy Names v. Pierce*, 296 F. 928, 933 (D. Or. 1924).

[16] Defendants' reliance on *Whitmore v. Arkansas*, 495 U.S. 149 (1990), and similar authorities is misplaced. The issue in those cases was not passage of time, but the contingent and thus uncertain nature of the alleged injuries. *Whitmore* involved a prisoner's challenge to procedures that would not affect him unless he could secure federal habeas relief from his conviction and sentence. *See also McConnell v. FEC*, 540 U.S. 93, 226 (2003) (U.S. Senator would not be affected by challenged provisions unless he chose to run for reelection five years later); *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (no standing to seek injunction prohibiting police from potential future use of "choke holds"); *Lujan*, 504 U.S. at 564 (no standing where plaintiff expressed only vague intention "some day" to return to Sri Lanka to observe endangered species); *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 343 n.19 (2d Cir. 2009) (confirming Plaintiffs' reading of *McConnell*).

Moreover, there is nothing speculative or contingent about Plaintiffs' claims.  The mandate *will* take effect in 2014 and *will* apply to Individual Plaintiffs and NFIB members.  Plaintiffs Brown and Ahlburg do not now have qualifying coverage, and have no intention of changing their status in this regard.  Am. Compl. ¶¶ 27, 28.  Their injuries, like those of NFIB members generally, are not contingent upon further act or decision on their part.  The only speculation here is by Defendants.  Def. Mem. 26-27.[17]

## 2.  NFIB

NFIB has standing to challenge the Individual Mandate on behalf of its members under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977).  An association has such representative standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Id.* at 343.

As shown above, NFIB's individual members (including Mary Brown) have standing to bring these claims, thus meeting *Hunt*'s first element.  Protecting its members from the mandate also is germane to NFIB's purpose "to promote and protect the rights of its members to own, operate, and earn success in their businesses, in accordance with lawfully-imposed governmental requirements."  Am. Compl. ¶ 26.  Courts regularly

---

[17] Plaintiffs need only show that their injury is probable, not that it is absolutely certain. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) ("probability" that landlord's rent would be reduced by law "sufficient threat of actual injury" to satisfy Article III); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (standing where "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement"); *ACLU of Fla., Inc. v. Miami-Dade County Sch. Bd.*, 557 F.3d 1177, 1195-97 (11th Cir. 2009) (standing to challenge library's ban of book plaintiff intended to check out later that year).

allow organizations with similarly broad purposes to litigate a wide range of interests on members' behalf.  *See, e.g., N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 10 n.4 (1988) (suing to enjoin an anti-discrimination law was germane to a consortium of private clubs existing "'to promote the common business interests of its [member clubs]'") (alteration by Court).[18]  NFIB's broad purpose affords it the right to litigate this case on behalf of its members.

Defendants cannot rely on the artificial distinction that NFIB represents "businesses" and the mandate applies only to individuals.  Def. Mem. 28.  Minimum healthcare insurance requirements for individual owners and operators uniquely impact their small businesses, imposing significant cost and cash flow consequences not suffered by larger concerns.  Moreover, many NFIB members operate as sole proprietors.  Such individual owners *are* the businesses.  Forcing them to have qualifying coverage for themselves and their dependents necessarily diverts resources away from their efforts to survive and grow as independent, self-employed small business people.  Challenging such requirements is very much germane to NFIB's purpose, satisfying *Hunt*'s second element.  *See N.Y. State Club Ass'n*, 487 U.S. at 10 n.4.

NFIB also meets *Hunt's* third element, because its individual members do not need to participate in this suit.  Individual joinder generally is not required when the organization seeks injunctive relief that will benefit its individual members.  *See, e.g.,*

---

[18] *See also Browning*, 522 F.3d at 1158, 1160 (NAACP's challenge to voter registration law was germane to its purpose to "work … to increase voter registration and participation among members of racial and ethnic minority communities"); *Sierra Club v. TVA*, 430 F.3d 1337, 1345 (11th Cir. 2005) (suit to require TVA plant to comply with opacity regulation was germane to its purpose to "aid in the preservation of areas … of scenic, ecological, biological, historical, or recreational importance").

*Hunt*, 432 U.S. at 343 (injunctive or declaratory relief is suitable for associational standing, since benefit will go to individual members); *Browning*, 522 F.3d at 1160 (when relief is injunctive, individual member participation is "not normally necessary"). This rule applies *a fortiorari* where, as here, the case involves questions of law and does not require an individualized factual inquiry. *See Pennell*, 485 U.S. at 7 n.3.[19]

NFIB also has standing in its own right to challenge the Individual Mandate's constitutionality, because the Act impedes its mission and causes the diversion of its resources to educate its membership and address problems created by the new law. *See Browning*, 522 F.3d at 1158, 1164-66 (NAACP showed a cognizable injury, because it "will have to divert personnel and time to educating volunteers on compliance with Subsection 6" and to address problems caused by the subsection). *See also Comm. of Immigrant Rights of Sonoma County v. County of Sonoma*, 644 F. Supp. 2d 1177, 1195-96 (N.D. Cal. 2009). Here, to meet its members' needs as it has done in the past, NFIB will be forced to expend "additional costs in assisting its members in understanding how the Act applies to them and affects their businesses." Am. Compl. ¶¶ 26, 63.[20]

---

[19] Nor is it relevant how many members have claims. NFIB need only show that *one* of its members, even if unidentified, will be required to obtain ACA-compliant healthcare coverage against his or her will. *See Browning*, 522 F.3d at 1160, 1163.

[20] *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (cited in Def. Mem. 28-29 n.13), is inapposite. There an organization founded to "promote fair, responsible, and legal revenue-raising practices by the United States government" challenged a law retroactively raising tax rates. The court reasoned that the organization could not show "injury" from expending resources to inform the public and its members about a tax bill, since this was its very purpose. *Id.* at 1434. NFIB does not exist solely to monitor and report on federal healthcare legislation, and doing so diverts its resources from other priorities, as with the NAACP in *Browning*. *See* 522 F.3d at 1164-66.

**D.      Plaintiffs' Claims Challenging the Individual Mandate Are Ripe**

Ripeness turns on two factors: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).  As Defendants admit, a "conspicuous overlap" exists between standing and ripeness inquiries in pre-enforcement challenges to statutes like the ACA, Def. Mem. 32 n.15, where ripeness often turns on "whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decision-making by the court." *Elend v. Basham*, 471 F.3d 1199, 1211 (11th Cir. 2006); *see also Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (purely legal claim is "presumptively ripe for judicial review" because no developed factual record needed).  Here, all Plaintiffs allege that the Individual Mandate will cause them actual, concrete, and imminent injury. Am. Compl. ¶¶ 47, 57, 62-63.

Defendants cannot rely on the mandate's effective date being in the future, because injury to Plaintiffs is inevitable and, "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions come into effect." *Blanchette v. Ct. Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974).  If "the enforcement of a statute is certain, a pre-enforcement challenge *will not be rejected on ripeness grounds*." *Browning*, 522 F.3d at 1164 (emphasis added).[21]  This is particularly

---

[21] S*ee also Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 459 (11th Cir. 1996) (lobbying group's prospective challenge to law's constitutionality was ripe where group was faced with choice to "refrain from engaging in protected First Amendment

true where, as here, the challenge mainly raises questions of law.  *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201-03 (1983) (case ripe where "predominantly legal" question raised).

Nor is there any "uncertainty" about whether the mandate will apply to Plaintiffs. Unlike *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163-64 (1967), and cases like it, the Individual Mandate as written will impact Plaintiffs, regardless of any additional administrative action.[22]   And unlike the FDA regulation at issue in *Toilet Goods*, the mandate's validity does not turn on factors (*e.g.*, practical enforcement problems) such that the "judicial appraisal ... is likely to stand on a much surer footing in the context of a specific application" of the challenged provision.   *Id.* at 164.   Congress itself has established the Individual Mandate's metes and bounds.  Its practical application by the agencies enforcing it will not illuminate the legal issues now raised.  This case is fully ripe for adjudication.  *See Virginia v. Sebelius*, Mem. Op. at 15-17 (Aug. 2, 2010) (State's challenge to the Individual Mandate is ripe).

---

activity or risk civil sanction for alleged unethical conduct"); *Abbott Labs.*, 387 U.S. at 152-53 (challenge to regulation was ripe where it was directed at plaintiffs, required them to change business practices, and subjected them to civil penalties for noncompliance).

[22] Defendants' cases, Def. Mem. 22-23, are inapposite.  They involve either injuries contingent on further agency action (ruling by arbitration tribunal in *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 577-78 (1985), completion of site selection process in *Nevada v. Burford*, 918 F.2d 854, 857 (9th Cir. 1990), additional FDA determinations in *Toilet Goods*)), or provisions forbidding conduct where no violation or desire to engage in the conduct was alleged (interference with voting rights in *South Carolina v. Katzenbach*, 383 U.S. 301, 317 (1966), deprivation of rights by officials in *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 17-18 (D.D.C. 2001)).

### E.    The Anti-Injunction Statute Does Not Apply

The Anti-Injunction Act, 26 U.S.C. § 7421(a) ("AIA"), does not bar Plaintiffs' challenge to the Individual Mandate and its penalty regime.  The mandate, which requires persons to have coverage, cannot be a tax subject to the AIA, because its stated purpose is not to raise revenue but to create "effective health insurance markets."  *See Goetz v. Glickman*, 920 F. Supp. 1173, 1181 (D. Kan. 1996), *aff'd*, 149 F.3d 1131 (10th Cir. 1998), *cert. denied*, 525 U.S. 1102 (1999) (citing *Head Money Cases*, 112 U.S. 580 (1884)) (a regulation "will not constitute a tax unless the real purpose and effect of the statute and regulations ... is to raise revenues for the general support of the government."); *Cities Serv. Co. v. Fed. Energy Admin.*, 529 F.2d 1016, 1029 (Temp. Emer. Ct. App. 1975) (same); *see also* Def. Mem. 5 (quoting ACA §§ 1501(a)(2)(I), 10106(a)).[23]  Indeed, the Individual Mandate itself raises *no* revenue, and significantly, in enacting the mandate, Congress expressly relied on its commerce power.

Thus, the Act's corresponding enforcement penalty also is not a tax.  As with the mandate itself, Congress grounded the penalty in the Commerce Clause, not in its taxing or spending powers.  It designed and denominated the penalty as a means to enforce the Individual Mandate.  ACA § 1501 at § 5000A(b)(1).  By contrast, where Congress levies taxes, it identifies them as such – as it did in at least five other sections of the Act.  *See, e.g.*, ACA §§ 9001, 9004, 9015, 9017, & 10907.

---

[23] Neither the Mandate's placement in the Internal Revenue Code, nor its inclusion in "Subtitle D – Miscellaneous Excise Taxes," may give rise to an inference or presumption of legislative construction.  *See United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 222 (1996); 26 U.S.C. § 7806(b) (providing that no inferences or implications can be made based on the penalty's placement).

The Individual Mandate's penalty was not enacted as a "tax" and this is dispositive. *Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205, 1209 (11th Cir. 2009) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling.").[24]   Indeed, the penalty will generate only "some revenue," Def. Mem 50, and then only as an incident to some persons' failure to obey the law.   *See Rodgers v. United States*, 138 F.2d 992, 994 (6th Cir. 1943) (if regulation is statute's primary purpose, "the mere fact that incidentally revenue is also obtained does not make the imposition a tax, but a sanction imposed for the purpose of making effective the congressional enactment.").

Contemporaneous legislative history confirms that Congress enacted a "penalty" and not a "tax."   Congress's Joint Committee on Taxation ("JCT"), which analyzes the effects of proposed taxes,[25] and on which Defendants rely, Def. Mem. 51, consistently refers to the penalty as a "penalty" in its technical explanation of the law.[26]   The JCT also

---

[24] Defendants treat "the statutory label of the provision as a 'penalty'" as inconsequential, Def. Mem. 50 n.23.   But it is well settled that "when Congress uses different language in similar sections it intends different meanings."   *DIRECTV, Inc. v. Brown*, 371 F.3d 814, 818 (11th Cir. 2004); *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 232 F.3d 854, 859 (11th Cir. 2000) (citing *United States v. Gonzales*, 520 U.S. 1, 5 (1997)).

[25] *See* JCT, *Overview of Revenue Estimating Procedures and Methodologies Used by the Staff of the Joint Committee on Taxation* (JCX-1-05), February 2, 2005, at 2.   Defendants admit that the JCT staff is "closely involved with every aspect of the legislative process…."   Def. Mem. 51 n.24.

[26] *See* JCT, *Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in combination with the "Patient Protection and Affordable Care Act"* (JCX-18-10), March 21, 2010, at 31-34.   (The JCT fails to call the penalty a "penalty" only in a heading.)   Not surprisingly, weeks after this lawsuit was filed, the JCT amended this Technical Explanation, in *Errata for JCX-18-10* (JCX-27-10), May 4, 2010, at 2, only then referring to the penalty as a "new excise tax."   Such after-the-fact "legislative history" is not indicative of Congressional intent.   *See, e.g., Gustafson v.*

conspicuously *fails to* estimate any revenue from the penalty – whereas it dutifully scored

the ACA's numerous other provisions imposing true taxes.  Defendants, of course, cite

Congressional Budget Office ("CBO") estimates.[27]  Def. Mem. 51.  But the CBO "has

responsibility for scoring the budget effects of *non-tax* legislation."  *See* JCX-1-05, at 16.

Congress enacted a penalty, as it clearly intended and understood, and not a "tax."

Indeed, cases cited by Defendants do not support their spurious suggestion that

the penalty is a tax.  Def. Mem. 33.  Both *Barr v. United States*, 736 F.2d 1134, 1135 (7th

Cir. 1984), and *Warren v. United States*, 874 F.2d 280, 281 (5th Cir. 1989), involved

efforts to enjoin collection of penalties directly assessed for failing properly to pay an

undisputed *tax:* falsely claiming a withholding exemption in *Barr*, and refusing to sign a

federal tax return in *Warren*.  Those penalties were essential to the collection of revenue

(*see United States v. Kahriger*, 345 U.S. 22, 31-32 (1953), *overruled in part on other*

---

*Alloyd Co.*, 513 U.S. 561, 579 (1995) ("Material not available to the lawmakers is not
considered, in the normal course, to be legislative history.  After-the-fact statements ...
are not a reliable indicator of what Congress intended when it passed the law."); *Clarke v.
Sec. Indus. Ass'n*, 479 U.S. 388, 407 (1987) (Supreme Court gives little weight to
legislative history entered 10 days after enactment of legislation); *Cobell v. Norton*, 428
F.3d 1070, 1075 (D.C. Cir. 2005) ("post-enactment legislative history is not only
oxymoronic but inherently entitled to little weight").

[27] *Compare* Letter from Douglas Elmendorf, Director, CBO, to the Hon. Nancy Pelosi,
Speaker, U.S. House of Reps. (Mar. 20, 2010) at 15, Table 4 (showing budget estimates
of inflows and outflows, including the Penalty) *with* JCT, *Estimated Revenue Effects of
the Amendment in the Nature of a Substitute to H.R. 4872, the "Reconciliation Act of
2010," as amended, in Combination with the Revenue Effects of H.R. 3590, the "Patient
Protection and Affordable Care Act ('ACA')," as Passed by the Senate, and Scheduled
for Consideration by the House Committee on Rules on March 20, 2010* (JCX-17-10),
March 20, 2010 (showing effects of tax provisions, but conspicuously not including
estimate of penalties).  The President also declared that the Individual Mandate was
"absolutely not" a tax.  *See, e.g., Obama: Requiring health insurance is not a tax
increase*, CNN (Sept. 29, 2009), http://www.cnn.com/2009/POLITICS/09/20
/obama.health.care/index.html (last visited August 5, 2010).

*grounds by Marchetti v. United States*, 390 U.S. 39 (1968)), not extraneous to the government's tax needs (*id.* at 31), and clearly "supportable as in aid of a revenue purpose" (*Sonzinsky v. United States*, 300 U.S. 506, 513 (1937)).  Here, however, the penalty is not incidental to collecting a tax, but is a "means of enforcing ... regulations" that are "extraneous to any tax need."  *See Sonzinsky*, 300 U.S. at 513; *Kahriger*, 345 U.S. at 31.  This distinction is critical – as the courts often have recognized.  *See, e.g.*, *United States v. La Franca*, 282 U.S. 568, 572 (1931) ("notwithstanding they are called taxes, [they] are in their nature also penalties ... the exaction here in question is not a true tax, but a penalty involving the idea of punishment for infraction of the law"); *Bailey v. Drexel Furniture Co. (The Child Labor Tax Case)*, 259 U.S. 20, 36 (1922) (a tax may involve an incidental regulatory restraint but a penalty actually regulates).[28]

---

[28] *See also Rodgers*, 138 F.2d at 994 (if primary purpose is regulatory, incidental revenue does not "make the imposition a tax"); *Lipke v. Lederer*, 259 U.S. 557, 561-62 (1922) (allowing challenge to penalties under Prohibition Act); *Regal Drug Corp. v. Wardell*, 260 U.S. 386, 391-92 (1922) (same); *Mobile Republican Assembly v. United States*, 353 F.3d 1357, 1361 (11th Cir. 2003) (analyzing whether provision was penalty or tax for AIA purposes).  Defendants also cite the *Head Money Cases*, 112 U.S. 580 (1894), *Rodgers*, and *Bd. of Trustees v. United States*, 289 U.S. 48 (1933), arguing that the Constitution's apportionment requirements do not apply to penalties enacted under the commerce power.  Def. Mem. 55-57.  Of course, such penalties were not subject to apportionment because they were not taxes *at all*.  In the *Head Money Cases*, Congress did not exercise its taxing power, but penalized "incident to the regulation of commerce." 112 U.S. at 595.  In *Bd. of Trustees*, the Supreme Court held that "customs duties" were not subject to tax-limiting doctrines, because they also were imposed pursuant to the Commerce Clause.  289 U.S. at 58-59.  The *Rodgers* Court held that revenues derived from penalties aimed at regulating interstate commerce "do not divest the regulation of its commerce character and render it an exercise of the taxing power."  138 F.2d at 995. Defendants' argument demonstrates precisely why the mandate's penalty is not a tax subject to the AIA.

In addition, contrary to Defendants' position, the fact that the penalty is "assessed and collected in the same manner as an assessable penalty under Subchapter B of chapter 68" cannot transform it into a tax or a tax penalty.  Def. Mem. 33.  Unlike the tax enforcement penalties in Subchapter B, the mandate's penalty is not a collection mechanism for any other penalty or tax under the Internal Revenue Code.  Moreover, as Defendants admit, Def. Mem. 50 n.21, the penalty cannot be enforced through criminal prosecution or a tax lien or levy – the customary enforcement mechanisms when the public fisc is implicated.  *See* 26 U.S.C. § 5000A(g).  Because the mandate is purely a regulatory measure enforced by a penalty, the AIA does not apply.[29]

Even if the penalty were a "tax," the AIA would not bar Plaintiff States' challenge.  Plaintiff States are not "person[s]" to whom the AIA applies.  That term is repeatedly defined in the federal code to the exclusion of the States, *see, e.g.*, 1 U.S.C. § 1; 26 U.S.C. § 6671; 26 U.S.C. § 7343; 26 U.S.C. § 7701 (*see* parenthetical), and there is a "longstanding interpretive presumption that 'person' does not include the sovereign." *Vt. Agency of Natural Res. v. United States*, 529 U.S. 765, 780 (2000); *United States v. United Mine Workers*, 330 U.S. 258, 275 (1947).  *See also Virginia v. Sebelius*, Mem. Op. at 7-11 (Aug. 2, 2010) (AIA does not bar State's challenge to the Individual Mandate).

---

[29] Defendants' reliance on *Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12 (1974), also is misplaced.  Def. Mem. 50.  That case did not involve the critical distinction between a "tax" and a "penalty" at issue here, but rather whether the AIA applied to a challenge involving the withdrawal of an entity's tax-exempt status.  The Court itself noted that the suit was "aimed at the imposition of federal income, FICA and FUTA taxes which clearly are intended to raise revenue." *Id.*  In contrast, the Individual Mandate is neither a regulatory nor a revenue-raising tax at all, but a regulation enforced by a non-tax penalty.

Further, the AIA does not bar suits by States, because States cannot pay the "tax" and then sue for its return. Thus, in *South Carolina v. Regan*, 465 U.S. 367 (1984), the Court refused to apply the AIA to the State's challenge to the federal tax treatment of State bonds, because Congress had not "provided an alternative avenue for an aggrieved party to litigate its claims on its own behalf." *Id.* at 380-81. Here, Congress similarly has failed to provide States an alternative avenue to litigate claims regarding the mandate – including that its penalty, if a "tax," is an impermissible direct, unapportioned tax (as shown below).

Finally, States have undisputed standing to challenge the ACA's fundamental revisions to the Medicaid program and its conscription of the States and their officials to implement and manage the new federal healthcare program. Because the Individual Mandate is not severable from other parts of the ACA, Plaintiff States necessarily have standing to challenge the Mandate along with them.[30]

## II.  THE INDIVIDUAL MANDATE EXCEEDS CONGRESS'S POWERS AND VIOLATES THE NINTH AND TENTH AMENDMENTS AND CORE PRINCIPLES OF FEDERALISM

By enacting the Individual Mandate, Congress has exceeded its legislative authority under Article I. Neither its commerce and taxing powers, nor the Necessary and Proper Clause, affords Congress the power to coerce citizens – under threat of

---

[30] The Declaratory Judgment Act, 28 U.S.C. § 2201(a), also is no bar. "If [a] suit is allowed under the [AIA], it is not barred by the Declaratory Judgment Act." *Perlowin v. Sassi*, 711 F.2d 910, 911 (9th Cir. 1983) (per curiam). *See also In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 583 (4th Cir. 1996) (the two statutes "are, in underlying intent and practical effect, coextensive"); *Nat'l Taxpayers Union, Inc.*, 68 F.3d at 1435 (the statutes "operate coterminously"); *Virginia v. Sebelius*, Mem. Op. at 7 n.2 (Aug. 2, 2010) (Act does not bar State's challenge to the Individual Mandate).

penalty – into the stream of commerce, thereby subjecting them to its regulation.  This unprecedented assertion of unbridled authority usurps powers reserved to the States by the Tenth Amendment, disparages the rights of their citizens protected by the Ninth Amendment, and obliterates this Nation's unique system of dual sovereignty.

A.   **The Individual Mandate Is Impermissible Under the Commerce Clause**

Defendants' position that the Individual Mandate is a valid exercise of Congress's commerce power depends entirely upon the incredible contention that *inactivity* – the failure to have healthcare insurance – constitutes economic *activity* in the form of a "volitional event" itself subject to federal regulation.  Def. Mem. 34-44.  But no court ever has upheld so sweeping an assertion of federal power.  To do so would arm Congress with unbridled top-down control over virtually every aspect of persons' lives, as consumers and producers, and destroy this Nation's defining legacy of dual sovereignty, thereby transforming our federal government from one of limited, enumerated powers into one of limitless authority over States and their citizens.

1.   **Congress's Commerce Power Does Not Reach Inactivity**

The Constitution gives Congress the power "[t]o regulate Commerce with foreign nations, and among the several States, and with Indian Tribes[,]" U.S. Const., Art. I, § 8, effectively allowing it to superintend the Nation's commercial and economic activities. However, its power to regulate activity does not permit Congress to forbid *inactivity*. Congress may not order inactive Americans to buy, sell, manufacture, grow, or distribute any product or service against their will.  No federal court ever has upheld such a limitless exercise of the commerce power.  *See* Robert Hartman & Paul Van de Water,

"The Budgetary Treatment of an Individual Mandate to Buy Health Insurance," CBO Memo., at 1, Aug. 1994 ("The government has never required people to buy any good or service as a condition of lawful residence in the United States.").

In *United States v. Lopez*, 514 U.S. 549 (1995), the Court identified three broad categories of *activities* that Congress may regulate under its Commerce Clause power:

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those *activities* having a substantial relation to interstate commerce….

*Id.* at 558-59 (emphasis added). Applying these principles, the Court held that "[t]he possession of a gun in a local school zone is in no sense an economic *activity* that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id.* at 567 (emphasis added).

Similarly, in *United States v. Morrison*, 529 U.S. 598 (2000), the Court applied the same three-category analysis and struck down the challenged provision of the Violence Against Women Act because "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic *activity*." *Id.* at 613 (emphasis added). It concluded: "We accordingly reject the argument that Congress may regulate noneconomic, violent criminal *conduct* based solely on that *conduct's* aggregate effect on interstate commerce." *Id.* at 617 (emphasis added).

It bears emphasizing that the conduct at issue in *Lopez* and *Morrison*, although non-economic and unreachable under the Commerce Clause, was nonetheless activity

voluntarily engaged in by the parties.  In this key respect, the inactivity which Congress here seeks to regulate is even further removed from its legitimate commerce power.

Defendants rely heavily on *Gonzales v. Raich*, 545 U.S. 1 (2005), and *Wickard v. Filburn*, 317 U.S. 111 (1942).  However, both cases upheld regulation of *economic activity*.  In *Raich*, the Court's most recent Commerce Clause decision, it upheld application of the federal Controlled Substances Act (CSA) to the intrastate manufacture and possession of marijuana for medical purposes because those activities were economic in character and, at least in the aggregate, had a substantial effect on interstate commerce:

> Our case law firmly establishes Congress' power to regulate purely local *activities* that are part of an economic "class of *activities*" that have a substantial effect on interstate commerce.  … As we stated in *Wickard*, "even if appellee's *activity* be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce."  … When Congress decides that the "'total incidence'" of a *practice* poses a threat to a national market, it may regulate the entire class.

*Id.* at 26 (emphasis added) (citing *Wickard*, in which the Court held that the *activity* of growing wheat for personal consumption was subject to regulation).  The *Raich* Court, in discussing how the CSA "directly regulates economic, commercial activity," defined the term "economics" to refer to "the production, distribution, and consumption of commodities." 545 U.S. at 17.  In every respect – whether one is making, transferring, or using a good or service – economics refers to activity, not inactivity.  Indeed, in the absence of activity, the term would be devoid of meaning.

Ironically, Defendants cannot help but use the words "activities," "activity," and "conduct," Def. Mem. 36, in searching for support.  They misread *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964), and *Daniel v. Paul*, 395 U.S. 298 (1969), as

supporting their position.   But both cases involved commercial establishments offering

goods or services to the public: an inn "serv[ing] interstate travelers" in *Heart of Atlanta*,

379 U.S. at 261; a restaurant "offer[ing] … food [that] has moved in commerce" in

*Daniel*, 395 U.S. at 304.   Neither case fairly can be read to permit Congress to require

activity by someone who is inactive.   In both instances, the defendants could have opted

not to engage in any commerce.   It was their own commercial activity which subjected

them to congressional regulation.   Thus, the *Lopez* Court itself cited *Heart of Atlanta*

*Motel* as a case "where we have concluded that the *activity* substantially affected

interstate commerce." *Lopez*, 514 U.S. at 557 (emphasis added).

## 2.   The Individual Mandate Does Not Regulate Commerce, It Compels It

The Individual Mandate does not regulate economic activity, but compels it by

forcing individuals who lack a congressionally-dictated level of healthcare coverage –

and particularly those who would not qualify for Medicaid even under the Act's greatly

expanded eligibility criteria – into the insurance market.   In this crucial respect, the

mandate is unlike any legislation ever upheld under the Commerce Clause.

Defendants assert that not having insurance is reachable under the commerce

power because it is an "economic decision."   But a decision is purely a *mental process*

which may, or may not, result in activity (economic or otherwise), *depending on the*

*decision*.   A decision to do nothing does not convert nothing to something.   Zero

multiplied by any number still equals zero.   Defendants cannot fill that void with

references to congressional concern over "market timing" and "premium spirals."  Def.

Mem. 42-43.   Under Defendants' logic, any failure to buy – or sell – particular goods or

services is both a regulable prelude to future economic activity and a decision Congress can reach because it impacts the existing marketplace.[31]  Thus, the continued ownership of a home is transformed into a "decision" not to sell, which then can be characterized as an "economic activity," which Congress therefore can mandate.  That logic, which leads to an infinite commerce power, finds no support in any case decision.[32]

Moreover, Congress's conclusion "that a particular activity substantially affects interstate commerce does not necessarily make it so…."  *Lopez*, 514 U.S. at 557 n.2.  This is "ultimately a judicial rather than a legislative question," *id.*, and the Supreme Court has expressed concern over any instance in which Congress piles "inference upon inference" as a basis "to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States."  *Id.* at 567.  *See also United States v. Comstock*, 130 S. Ct. 1949, 1967 (2010) (Kennedy, J. concurring) ("The rational basis referred to in the Commerce Clause context is a demonstrated link in fact, based on empirical demonstration.").  Here, Congress only can connect an individual's lack of healthcare insurance with the supposed need for the mandate to regulate interstate insurance markets through a series of unsubstantiated and unquantifiable inferences and assumptions, some expressed and others implied (even if unacknowledged), about human

---

[31] Defendants cannot settle on a consistent alchemy to transform inactivity into activity. At times, they contend that the decision not to buy insurance is a properly regulable "volitional event," Def. Mem. 5, 43; but at other times they imply that a presumed *later* use of healthcare services renders a *current* failure to buy insurance regulable activity, *id.* at 43-44.  Both positions are nonsensical.

[32] Indeed, even in industries such as securities trading, where Congress presumably could preempt State regulation, the power to regulate commerce never has been construed to allow Congress to compel inactive individuals to purchase stocks or bonds.

behavior and its effects.[33]   This attenuated chain simply is too long and fragile to constitute the "substantial relation to interstate commerce" required by *Lopez*.

More fundamentally, accepting Defendants' position would make it impossible to maintain any outer limits on the commerce power.   *See Lopez*, 514 U.S. at 557.   It would permit Congress, upon the flimsiest of nexuses, itself to manufacture the basis on which it can regulate anyone at any time.   Such a ruling would transform our Nation beyond recognition.   The Commerce Clause makes no distinction between one type of economic activity and another.   Nor does it distinguish between demand (buying) and supply (producing and selling) activities.   Every decision individuals make, at some remote level of analysis, can be said to have economic purposes or consequences.

If Congress can compel Americans to buy healthcare insurance, then it can compel them to buy – or to make or sell – any good or service, based on a finding that such compulsion will assist its efforts to achieve some desired "economic" result. Congress could force citizens to buy government-acquired manufacturers' cars and government-rescued banks' financial instruments, or to work in any industry and on whatever terms it chooses.   Even in *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937), in which the Court abandoned its earlier efforts to restrict New Deal legislation, it

---

[33] These include assumptions that: (1) everyone at some point in life will consume healthcare services; (2) to save money, some persons who can afford healthcare insurance decide not to buy it; (3) some of these persons will not pay for healthcare services they consume; (4) some of these persons get away without being pursued for payment by their healthcare providers, who instead pass the costs on to other patients, providers, and insurers; (5) this passing on increases the aggregate cost of healthcare services, driving up the cost of insurance premiums; (6) the Act will drive up premium costs (especially by its requirement that insurers ignore preexisting conditions); and (7) the Individual Mandate will reduce premium costs.

warned that a Congress armed with excessive powers under the Commerce Clause would threaten our system of federalism and bring about "a completely centralized government." *Id.* at 37 (and quoted in *Lopez*, 514 U.S. at 557). The ACA underscores the prescience of that warning.

Defendants ask this Court to expand the commerce power far beyond the limits established by Supreme Court precedent, including *Wickard* and *Raich*. The Court should reject this doctrinal revolution out of hand and uphold the settled limits on the Commerce Clause articulated in the Supreme Court's existing jurisprudence.

    **B.**    **The Individual Mandate Cannot Be Saved by the Necessary and Proper Clause**

Defendants turn to the Necessary and Proper Clause, the "last, best hope of those who defend *ultra vires* Congressional action." *Printz v. United States*, 521 U.S. 898, 923 (1997). But that clause cannot rescue the Individual Mandate, because it is not a *means* of implementing a constitutionally enumerated power and it fails under the considerations recently described by the U.S. Supreme Court in *United States v. Comstock*.

    **1.**    **The Mandate is Not a Means To Implement a Constitutionally Enumerated Power**

The Necessary and Proper Clause grants Congress broad authority to pass laws in furtherance of constitutionally-enumerated powers. It was has been settled since *McCulloch v. Maryland*, 17 U.S. 316 (1819), that the clause may not substitute for powers the Constitution denied Congress, or empower Congress to violate rights otherwise protected by the Constitution, *e.g.*, by the Fifth, Ninth, and Tenth amendments:

> Let the end be legitimate, let it be *within the scope* of the constitution, and
> all means *which are appropriate*, which are *plainly adapted* to that end,

> *which are not prohibited, but consist with the letter and spirit of the constitution*, are constitutional.

*Id.* at 421 (emphasis added).   *See Raich*, 545 U.S. at 39 (Scalia, J., concurring) (*McCulloch*'s limits on Congress's power under the clause "are not merely hortatory").

"[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a *means* that is rationally related to the implementation of a constitutionally enumerated power."   *Comstock*, 130 S. Ct. at 1956 (emphasis added). The clause only allows Congress the authority to enact a statute that is "legitimately predicated on an enumerated power[,]" and only so long as the relationship between the statute as the means and the enumerated power as the end is "not too attenuated."   *Id.* at 1963-64.

The Individual Mandate does not implement or effectuate any enumerated power. Congress seeks coverage for uninsured Americans by ordering everyone to be covered. The Act's ultimate goal (universal coverage) and the substance of its mandate (requiring all to get coverage) are the same.   The mandate is not a *means* to the exercise of an enumerated power, but an end and a novel exercise of power to compel the American people.   The Necessary and Proper Clause is not an *independent* source of authority for such a policy goal, and therefore cannot validate the Individual Mandate.[34]

---

[34] The power to impose an affirmative mandate on individuals is unlike the power to regulate (control or proscribe) ongoing activities.  Significantly, in those rare instances in which Congress has imposed affirmative obligations on persons based solely upon their being citizens or residents, it has done so *not* by claiming expanded power over commerce or general health and welfare – *much less* by invocation of the Necessary and Proper Clause – but based on explicit constitutional authority.  *See, e.g., Selective Service*

31

Although Defendants would justify the mandate by reference to Congress's power to regulate the interstate insurance and healthcare markets, even under the Commerce Clause Congress cannot create or expand its own legislative authority simply by forcing inactive and unwilling people into markets so that they then can be regulated. Such coercion would be unprecedented in our history and, if upheld, would effectively eliminate any discernible limits on congressional power. If Congress can regulate the failure to have healthcare insurance coverage, it can equally regulate the "failure" to meet any other requirement it chooses to impose.

Defendants also miss the mark in asserting that the Individual Mandate is valid because it effectuates *other* ACA provisions regulating the markets in healthcare and insurance, *e.g.*, increase in Medicaid eligibility, new insurance mandates. Def. Mem. 45-48. Unlike the Individual Mandate (*see* ACA §§ 1501(a)(2)(J), 10106(a)), Congress has not declared those other provisions "essential," and they could have been enacted, implemented, and enforced without the Individual Mandate. Thus, while they may be means to carry out the mandate, the converse is not true: the mandate is not a means for them. Unlike the recordkeeping requirements upheld in *United States v. Darby*, 312 U.S. 100, 125 (1941), for example, the mandate does not facilitate enforcement of the ACA's other regulations. Nor does it protect these new federal requirements from evasion or

---

*Cases*, 245 U.S. 366, 383, 390 (1918) (conscription into armed services justified by power "to raise and support Armies" under U.S. Const. art. I, § 8, cl. 12); *Morales v. Daley*, 116 F. Supp. 2d 801 (S.D. Tex. 2000), *aff'd,* 275 F.3d 45 (5th Cir. 2001), *cert. denied*, 534 U.S. 1135 (2002) (compelling answers to census questions justified by U.S. Const. art. I, § 2, cl. 3).

obstruction, as was the case in *Wickard* and *Raich* – on which Defendants rely.[35] Moreover, the Necessary and Proper Clause does not validate Congress's attempt to re-label and downplay its universal coverage *goal* as if the mandate were merely a *means* to cover individuals with preexisting conditions. Upholding the Individual Mandate by reference to the Act's various ancillary regulations would in effect grow the Necessary and Proper tail large enough to wag the enumerated power dog.

In sum, the Necessary and Proper Clause cannot confer on Congress a vast, new power to legislate its desired end whenever it chooses to wave the commerce flag.[36]

**2.      The Individual Mandate Fails Under the *Comstock* Factors**

*Comstock* only underscores that the Necessary and Proper Clause cannot save the mandate.  Examination of the five "considerations" relied on by the Court, in determining that the clause permitted the civil commitment of sexually dangerous former federal inmates, confirms that the Individual Mandate – unlike the law at issue in *Comstock* – is by no means a "discreet and narrow exercise of authority over a small class of persons already subject to the federal power."   130 S. Ct. at 1968 (Kennedy, J., concurring). First, the relevant enactment must be a rational means to implement an otherwise proper

---

[35] *Wickard* and *Raich* each involved an "as applied" challenge to the regulation of interstate commercial activity in producing a good that was included within a large class of fungible goods (wheat in *Wickard*, marijuana in *Raich*).  The Court simply approved regulation of a local subset of the very same commodity.

[36] This is not to say that the mandate cannot have a connection to such provisions, but that it necessarily must effectuate or protect Congress's legitimate regulation of *interstate commercial activities*.  *See Raich*, 545 U.S. at 38 (authority under the necessary and proper clause "extends only to those measures necessary to make the interstate regulation effective.") (Scalia, J., concurring).  If a legislative scheme is itself incapable of achieving an overall policy goal by dint of Congress's legitimately-wielded power, the Necessary and Proper Clause cannot make up the difference.

exercise of an enumerated power, not an end in itself.  *Id.* at 1956.  But, as explained above, the Individual Mandate is not a *means* to a proper end.  It stands alone as the Act's unseverable centerpiece, from which the other provisions flow.

Second, in sharp contrast to the long federal history (more than 150 years) of enacting and enforcing criminal laws, detaining prisoners, and providing them with mental health services present in *Comstock*, Congress has *no* history of directing Americans' individual healthcare or insurance decisions.  Any authority for such requirements resides solely in the States as sovereigns, as part of that general police power "which the State[s] did not surrender when becoming [] member[s] of the Union under the Constitution." *Jacobson v. Massachusetts*, 197 U.S. 11, 25 (1905).[37]

Third, no sound reason exists for the Individual Mandate in light of Congress's *lack* of authority to compel commerce, whether in regulating insurance, healthcare, or any other industry or field of endeavor.  Compelling activity differs fundamentally from simply regulating a market.

Fourth, the *Comstock* Court made clear that any exercise of power supportable under the Necessary and Proper Clause *must* be consistent with the Constitution's federal architecture, and reaffirmed that the clause does not "confer[] on Congress a general 'police power which the Founders denied the National Government and reposed in the States…'." *Comstock*, 130 S. Ct. at 1964.  But, far from "properly account[ing] for state

---

[37] Significantly, past mandates requiring citizens to have insurance have been grounded in the States' police powers.  *See Ex parte Poresky*, 290 U.S. 30, 32 (1933) (automobile insurance).  This also is true of the individual mandate enacted by Massachusetts – Mass. Gen. Laws ch. 111M, § 2 (2008); *see also Fountas v. Comm'r of Dep't of Rev.*, 2009 WL 3792468 (Mass. Super. Ct. Feb. 6, 2009), *aff'd*, 922 N.E.2d 862 (Mass. App. Ct. 2009) – which Congress admittedly emulated here.  *See* ACA § 1501(a)(2)(D).

interests," *id.* at 1962, the Individual Mandate can only be imposed through exercise of a police power, and it shreds the traditional federalism guaranteed by Tenth Amendment. As shown below, the federal government has no right to compel the States to commit their resources to accommodate the added costs stemming from the Individual Mandate or from the ACA's unprecedented expansion of Medicaid, its insurance exchanges and reinsurance requirements, and its expensive employer coverage provisions. *See Printz*, 521 U.S. at 923-24 ("When a law ... violates the principle of state sovereignty ... it is not a law ... proper for carrying into Execution the Commerce Clause."). Thus, the ACA "invade[s] state sovereignty [and] improperly limit[s] the scope of 'powers that remain with the States.'" *Comstock*, 130 S. Ct. at 1962.

Fifth, the Individual Mandate is not narrow in scope like the law upheld in *Comstock*, but threatens to bring about fundamental and unprecedented change by centralizing top-down economic power in Congress.[38]  The Necessary and Proper Clause cannot serve as a bootstrap by which Congress may evade the constitutional limits on its enumerated powers.  The *McCulloch* Court condemned this use of the Necessary and Proper Clause long ago and made clear it would not be tolerated:

> Should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government; it would

---

[38] Defendants assert a need for such sweeping new power, but ignore other avenues for Congress to achieve universal coverage through legitimate exercise of its enumerated powers, such as tax incentives, or laws encouraging or requiring payment for services rendered, all creating stronger incentives for uninsured persons to *choose* to buy coverage.  Moreover, any relation the mandate may have to the exercise of "an enumerated Article I power" is far "too attenuated" for Necessary and Proper Clause purposes. *Id.* at 1963 (quoting *Lopez*, 514 U.S. at 567).  As explained above, the mandate is separated by many degrees of speculation and inference from any enumerated power.

> become the painful duty of this tribunal … to say, that such an act was not
> the law of the land.

17 U.S. at 423.  *See also Jinks v. Richland Co.*, 538 U.S. 456, 464 (2003) (quoting

*McCulloch* for the proposition that a measure adopted "as a 'pretext' for 'the

accomplishment of objects not entrusted to the [federal] government'" would not be an

appropriate exercise of authority under the Necessary and Proper Clause).

### C.     The Individual Mandate Is Impermissible Under the Taxing and Spending Clause

Although sited within the Internal Revenue Code, neither the Individual Mandate

nor its associated penalty is a "tax" justified as an exercise of Congress's taxing power

under Article I, section 8 of the Constitution.  As explained above, the mandate itself is a

straightforward regulatory requirement, enacted under the Commerce Clause.  It has none

of the characteristics of a "tax," and cannot be upheld as such.

The same is true of the mandate's penalty.  Although Congress's power to "lay

and collect taxes" is broad, Congress cannot thwart Article I limitations and broaden that

power simply by tucking a penalty into a regulatory law:

> If, in lieu of compulsory regulation of subjects within the states' reserved
> jurisdiction, which is prohibited, the Congress could invoke the taxing and
> spending power as a means to accomplish the same end, clause 1 of
> section 8 of article 1 would become the instrument for total subversion of
> the governmental powers reserved to the individual states.

*United States v. Butler*, 297 U.S. 1, 75 (1936); *see also Dole*, 483 U.S. at 216-17

(O'Connor, J., dissenting) (Taxing and Spending Clause limits in *Butler* "remain sound").

Although taxes may have a regulatory effect, the Court has invalidated "[p]enalty

provisions in tax statutes added for breach of a regulation concerning activities in

36

themselves subject only to state regulation." *Kahriger*, 345 U.S. at 31 (citing *Bailey*, 259 U.S. at 34, 38). In *Bailey*, the Court struck down, as an improper use of Congress's taxing authority, a regulation incorporating a 10 percent tax on employers for use of child labor. *Id.* at 34. The decision distinguished permissible uses of the taxing power that serve legitimate tax purposes (a strong regulatory aim also may be present) from taxes added to otherwise impermissible regulations as penalties – the "so-called tax as a penalty." *Id.* at 36.[39]

*Sonzinsky*, on which Defendants rely, is not to the contrary. Def. Mem. 50. There, the Court upheld an annual federal tax on certain firearms dealers, explaining that "[o]n its face it is only a taxing measure" that was not "attended by an offensive regulation." *Sonzinsky*, 300 U.S. at 513-514. The Court refused to infer a nefarious congressional motive to avoid otherwise applicable constitutional limitations on federal power. *Id.* at 514. However, the Court – as if to distinguish the ACA – made clear that it was not dealing with a case "where the statute contains regulatory provisions related to a purported tax in such a way as has enabled this Court to say in other cases that the latter is a penalty resorted to as a means of enforcing the regulations." *Id.* at 513.[40]

---

[39] Although the Court later upheld *Bailey*-type labor regulations under the Commerce Clause (*see, e.g., Darby*), it has consistently reaffirmed *Bailey*'s Taxing and Spending Clause limiting principle. *See, e.g., Kahriger*, 345 U.S. at 31-32.

[40] In Defendants' other cases taxes were sustained because their regulatory mechanisms supported revenue collection. *See Sanchez v. United States*, 340 U.S. 42 (1950) (special taxes imposed on marijuana imports, production, and sales); *United States v. Doremus*, 249 U.S. 86 (1919) (same with respect to opiates and coca derivatives); *License Tax Cases*, 72 U.S. 462 (1866) ("license" requirements taxes because federal government lacked power to authorize licensed activity). In all of these cases, the test of a valid tax "is whether on its face the tax operates as a revenue generating measure and the attendant

Similarly, *Butler*, also relied on by Defendants, makes clear that Congress cannot avoid limits on its powers simply by denominating a penalty, designed to enforce otherwise impermissible regulations, as a "tax." The Court referenced *Bailey (The Child Labor Tax Case)* and *Hill v. Wallace*, noting that the laws at issue there "purported to be taxing measures," but really were meant to regulate conduct not otherwise subject to the commerce or any other enumerated power with "the levy of the tax a means to force compliance." *Butler*, 297 U.S. at 70.[41] This was held "an unconstitutional abuse of the power to tax." *Id.*[42]

Here, as noted, Congress did not even bother to label the mandate's penalty a "tax," and expressly relied on the Commerce Clause to support both provisions. *See* ACA § 1501(a)(2)(A). Neither mandate nor penalty is supported by the Taxing and Spending Clause, a result that also cannot be cured by reliance on the Necessary and Proper Clause (and Defendants conspicuously omit any such reliance).

---

regulations are in aid of a revenue purpose." *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972), *cert. denied*, 409 U.S. 868 (1972), cited in *United States v. Spoerke*, 568 F.3d 1236 (11th Cir. 2009).

[41] *Butler* also considered and rejected the same argument Defendants advance here based on the General Welfare Clause. *See* 297 U.S. at 68. Although the power to provide for the general welfare is an "independent grant of legislative authority" (*Fullilove v. Klutznick*, 448 U.S. 448, 473-74 (1980), *overruled on other grounds by Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995); *see also Buckley v. Valeo*, 424 U.S. 1, 90 (1976)), that authority is limited to the imposition of taxes and spending of revenues.

[42] The Court further noted "that the power to tax could not justify the regulation of the practice of a profession, under the pretext of raising revenue" and "that Congress could not, in the guise of a tax, impose sanctions for violation of state law respecting the local sale of liquor." *Id.* (citations omitted).

**D.     Alternatively, if The Individual Mandate's Penalty Is a Tax, It Is an Unconstitutional Direct, Unapportioned Tax**

In the alternative, if the Individual Mandate's penalty is a tax, it is a direct, capitation (or "head") tax that must be apportioned among the States according to Census data.  U.S. Const. Art. I, § 2, cl. 3 & Art. I, § 9, cl. 4.   The Constitution allows two broad types of taxation – indirect taxes, such as duties, imposts and excises, which must be "uniform throughout the United States," U.S. Const. art. I, § 8, cl. 1; and direct taxes, which must be apportioned.  All legitimate taxes must be one or the other.  *See Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 557 (1895) (*"Pollock I"*).  These requirements cannot be ignored.  *See United States v. Mfrs. Nat'l Bank of Detroit*, 363 U.S. 194, 199 (1960) (analyzing the merits of a direct tax challenge); *Knowlton v. Moore*, 178 U.S. 41, 82 (1900) ("The commands of the Constitution in this, as in all other respects, must be obeyed; direct taxes must be apportioned").

Holding personal property and income taxes to be direct, the Supreme Court also has defined direct taxes to include capitation and real property taxes.  *Pollock v. Farmer's Loan & Trust Co.*, 158 U.S. 601 (1895) (*"Pollock II"*); *Pollock I,* 157 U.S. at 558.  Contrary to Defendants' claim, Def. Mem. 58, the Court never has suggested that only property taxes are "direct" taxes.[43]   In *Knowlton*, the Court simply iterated the holding of *Pollock II* that "no sound distinction existed between a tax levied on a person solely because of his general ownership of real property, and that same tax imposed solely because of his general ownership of personal property."  178 U.S. at 82.  It held that the

---

[43] Any contrary suggestion in *Hylton v. United States*, 3 Dall. 175 (1796), was dictum.  Its result was based on the reverse logic that only an apportionable tax can be a direct tax.

tax at issue – an estate tax – was an excise tax upon the transfer of property, and thus not an unapportioned direct tax as defined in *Pollock II*.

The Individual Mandate's penalty, if a tax at all, is like the direct taxes in *Pollock I* and *II,* being levied *directly* on individuals and not on any specific transaction or event. Thus, it does not qualify as an excise or other indirect tax and, as discussed above, its placement among the Internal Revenue Code's true excise taxes is irrelevant.  Excises are imposed upon (1) the manufacture, sale, or consumption of a commodity requiring a taxable event or transaction; or (2) a fee levied for the privilege of transacting business.[44] As the Court explained in *Thomas v. United States* – addressing a stamp tax on stock transfers – imposts, duties, and excise taxes are imposed on "importation, consumption, manufacture, and sale of certain commodities, privileges, particular business transactions, vocations, occupations, and the like."  192 U.S. at 370.  "[A] fundamental characteristic of a typical excise tax" is that it is based on an "act by the person or entity taxed[,]" and such exactions can be avoided "by the simple expedient of refraining from an act that would give rise to the tax."  *In re DeRoche*, 287 F.3d 751, 756 (9th Cir. 2002).  *See also Flint v. Stone Tracy Co.*, 220 U.S. 107, 150-51 (1911) (excise taxes may be imposed on the privilege of doing business).[45]

---

[44] *See Fernandez v. Wiener*, 326 U.S. 340, 362 (1945) (excise tax is "a tax imposed upon the exercise of some of the numerous rights of property."); *Thomas v. United States*, 192 U.S. 363, 370 (1904).

[45] Defendants cannot rely on *Union Electric Co. v. United States,* 363 F.3d 1292 (Fed. Cir. 2004).  The tax there was levied on purchasing, not on the refusal to purchase, and does not bring *Pollock II*'s validity into question.  That case distinguished *Hylton* because the carriage tax there was an excise on a consumable expense, not a direct tax on personal property.

Relying on *Tyler v. United States*, 281 U.S. 497 (1930), Defendants make a novel argument that a tax predicated on a "decision" is indirect. But *Tyler* involved an estate tax imposed on the transfer of property and only confirms that a tax laid "upon the happening of an event" is an indirect tax. *Id.* at 502. An excise is triggered by an *action*, not by the decision which necessarily precedes it. To permit imposition of an excise on inaction is to "wipe[] out the distinction between direct and other classes of taxes." *Bromley v. McCaughn*, 280 U.S. 124, 137-138 (1929) (suggesting that a tax on keeping property was direct as no different from a tax on property).

Nor is the mandate's penalty an "income" tax, exempted from apportionment by the Sixteenth Amendment. Although the penalty amount turns in part on income, an income *tax* is levied on "accessions to wealth." *Comm'r of Internal Revenue v. Glenshaw Glass Co.*, 348 U.S. 426, 429, 431 (1955). The Internal Revenue Code defines gross income in the constitutional sense as "all income from whatever source derived." 26 U.S.C. § 61 (H.R. Rep. No. 1337, 83rd Cong. 2d. Sess., A18 (1954)). Thus, to tax "income" there must be an actual increase in wealth; otherwise, the Sixteenth Amendment is inapplicable and cannot rescue an improper direct tax. *See Eisner v. Macomber*, 252 U.S. 189, 206 (1920) (the Sixteenth Amendment "shall not be extended by loose construction" to repeal or modify a direct tax apportionment requirement).[46]

The Individual Mandate's penalty does not require any accession to wealth, does not tax "income derived," and thus is not an income tax. It does not tax a transfer of

---

[46] The penalty also does not meet the constitutional requirement that income taxes be "derived" or "realized," *Commissioner v. Indianapolis Power & Light Co.*, 493 U.S. 203, 214 (1990), because it is imposed regardless of any realization event.

property or the manufacture, sale, or consumption of a commodity, nor does it impose a fee for the privilege of transacting business; thus, it is not an indirect tax.  The penalty falls on each American not otherwise excepted.  If it is a tax, it is an unconstitutional, unapportioned direct tax and must be invalidated on that account.[47]

> E.   **The Individual Mandate Violates the Ninth and Tenth Amendments and Core Principles of Federalism**

Because Article I provides no authority to Congress to enact the Individual Mandate, the power to make such individual healthcare insurance decisions rests with the States or individuals themselves.  As the Supreme Court has observed, the "United States is entirely a creature of the Constitution" and "it can only act in accordance with all the limitations imposed by the Constitution."  *Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (Black, J.) (plurality opinion).  Whatever authority the people refused to delegate to the federal government remained with them or their States.  This basic principle is enshrined in the Tenth Amendment, which declares that all powers neither delegated to the federal government nor prohibited to the States "are reserved to the States respectively, or to the people."  Thus, as the Court noted in *New York v. United States*, the Constitution's structure creates "essentially a tautology….  The Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."  *New York*, 505 U.S. at 157.

---

[47] Defendants' cases, Def. Mem. 55-57, posited as exempting penalties enacted under the Commerce Clause from the limits on direct taxes, involved penalties not subject to apportionment because they were not taxes *at all*.  Like the mandate's penalty, they were enacted to enforce regulations of commerce, not to raise revenue – however little.

The ACA violates this constitutional system of dual sovereignty and federalist principles by eliminating the ability of individuals to make critical healthcare decisions for themselves (or through their States), and instead allowing Congress to co-opt the budgetary processes, personnel, and resources of the States. Because systemic safeguards in the Tenth Amendment, Article I, and the Guarantee Clause protect the States from precisely the kind of federal incursion attempted with the Individual Mandate and corresponding mandates on the States, the Act cannot be upheld.[48]

## III.   THE INDIVIDUAL MANDATE VIOLATES DUE PROCESS

Count Two also states a valid due process claim against the federal government, because the Individual Mandate unconstitutionally deprives Plaintiffs of recognized liberty interests in the freedom to eschew entering into a contract, to direct matters concerning dependent children, and to make decisions regarding the acquisition and use

---

[48] The Ninth Amendment complements recent cases recognizing limits on federal power, and itself calls into question the constitutionality of the Individual Mandate and other ACA provisions. The Supreme Court has recognized that the Ninth Amendment "unambiguously refer[s] to individual rights." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2790 (2008). Here, the mandate clearly denies or disparages individual rights retained by the people, including their right to self-government through the States. The Guarantee Clause further complements the "dual sovereignty" in our constitutional system by directing the federal government to "guarantee to every State in this Union a Republican Form of Government." U.S. Const., art. IV, § 4. This guarantee operates alongside the Constitution's principle of federalism to preserve the States and their independence from the federal government. Each State "is entitled to order the processes of its own governance." *Alden v. Maine*, 527 U.S. 706, 752 (1999). "Indeed, having the power to make decisions and to set policy is what gives the State its sovereign nature." *FERC v. Mississippi*, 456 U.S. 742, 761 (1982). While the question of whether Guarantee Clause claims are justiciable was briefly noted in *New York,* 505 U.S. at 185, the Supreme Court nevertheless proceeded to analyze the challenged federal legislation under the clause, concluding that the clause was not violated there because "Congress offers the States a legitimate choice rather than issuing an unavoidable command." *Id.* The same cannot be said here of the ACA.

of medical services.  *See, e.g., Washington v. Glucksberg*, 521 U.S. 702, 720 (1997); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990); *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923).

Congressional imposition of the Individual Mandate is an extraordinary and unprecedented exercise of power beyond Congress's authority to act, as shown above. Defendants cite no case, and Plaintiffs have found none, where Congress under the Commerce Clause has purported to require virtually all Americans to have or contract for any particular good or service simply because they live in the United States.[49]

Defendants miss the mark in asserting that the Amended Complaint does not sufficiently define the due process interests at stake here.  Def. Mem. 52.  Their cited authorities do not address recognized liberty interests on a motion to dismiss, but instead analyze the merits of whether a *new* fundamental right or a new application of an existing such right should be recognized.  As the Eleventh Circuit explained in *Williams v. Alabama*, 378 F.3d 1232, 1239 (11th Cir. 2004), that limited sort of analysis "'must begin with a careful description of the asserted right[,]'" followed by consideration of whether such a right "is one of 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty.'"  *Id.* (citations omitted).  Plaintiffs here have alleged Due Process violations arising from long-recognized interests.  Am. Compl. ¶ 77 (alleging the Act to require,

---

[49] Indeed, Anglo-American common law (where the Court must look to determine the nature and scope of protected liberty interests) always has disfavored imposition of affirmative obligations absent some duty either willingly undertaken or properly inferred. *See, e.g.*, *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 (1st Cir. 1999) ("Under common law, inaction rarely gives rise to liability unless some special duty of care exists.").

under pain of penalty, that Individual Plaintiffs and NFIB's members obtain and maintain a federally-defined level of healthcare insurance for themselves and their dependents).

These interests are not diminished by *West Coast Hotel v. Parrish*, 300 U.S. 379 (1937), and its progeny, also relied on by Defendants.  Def. Mem. 53-54.  Those cases recognize that the *terms* on which entities and individuals may contract are subject to regulation in appropriate circumstances, but do not speak to the question of whether Congress can *compel* Americans to buy something in the first instance.  *Williams v. Morgan*, 478 F.3d 1316 (11th Cir. 2007), and *Vesta Fire Ins. Corp. v. Florida*, 141 F.3d 1427 (11th Cir. 1998), are similarly inapposite.  Like *Usury v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976), they considered regulation of economic activity of those already engaged in the marketplace, per their freely-made choices.[50]  For these reasons, the Amended Complaint sufficiently alleges a violation of the liberty guaranteed against federal encroachment by the Fifth Amendment's Due Process Clause.

## IV.   THE ACT'S SWEEPING CHANGES TO MEDICAID AND ADDED BURDENS ON PLAINTIFF STATES ARE UNCONSTITUTIONAL

The ACA shifts billions of dollars in costs, mandates, and responsibilities to the States, coerces and commandeers their resources, and renders them arms of the federal

---

[50] Significantly, *Parrish*, *Williams*, and *Vesta Fire Ins. Corp.* all involved the exercise of State police powers, which are broader than the federal commerce power.  Defendants' reliance on *Jacobson v. Massachusetts* is similarly misplaced.  In that case, the Supreme Court considered whether a State could require adult residents to be vaccinated against smallpox.  It upheld the law, but *only* as an exercise of *Massachusetts's* "police power – a power which the State did not surrender when becoming a member of the Union" and which includes the power to "protect the public health and the public safety."  *Jacobson*, 197 U.S. at 24-25.  This, of course, is precisely the power the Constitution denies to Congress, and the power Congress unlawfully has purported to exercise here.

government, in violation of Congress's Article I powers, the Ninth and Tenth Amendments, and the Constitution's federalist structure.[51]

### A. The Act Transforms Medicaid in Violation of States' Sovereign Rights

The ACA transforms the historic federal-State Medicaid partnership and forces States to accept staggering new costs and obligations under the program.[52]

In seeking dismissal, Defendants argue that the federal government has changed Medicaid before, that it has the right to make whatever changes to Medicaid it wishes, and that Plaintiff States can drop out of Medicaid if they object. But Defendants' claim that the ACA is just business-as-usual when it comes to congressional alterations to Medicaid is demonstrably wrong. Prior Medicaid changes mainly addressed eligibility criteria to provide better and more extensive coverage for the needy. Those changes were within the original and foreseeable spirit of the Medicaid partnership.

Defendants make much of the Supreme Court's statement in *Harris v. McRae*, 448 U.S. 297 (1980), that "[a]lthough participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." *Id.* at 301. But obviously this statement, from three decades ago, was made in the

---

[51] *Compare* ACA § 1563 *with* Letter from Douglas Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Reps. (Mar. 20, 2010) at 15, Table 4 (noting that the Act imposes "several" costly mandates, including a *$20 billion increase in States' Medicaid spending*).

[52] The Amended Complaint describes: the federal-State Medicaid partnership prior to passage of the Act (¶¶ 39-41); the many ways that the Act alters that relationship and imposes new and substantial insurance-related requirements on the States (¶¶ 42-48); the Act's adverse impact on Plaintiffs, including on Plaintiff States' sovereignty and fiscs (¶¶ 49-64); and the unavoidability of the Act's requirements and effects (¶¶ 65-68). These allegations support the claims in Counts Four, Five, and Six of the Amended Complaint.

expectation of Medicaid continuing to be for the benefit of the poor and remaining "entirely optional."   In fact, the *McRae* Court expressed concern for States in circumstances where the partnership model is abandoned: "Title XIX was designed as a cooperative program of shared financial responsibility, *not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund*." *Id.* at 309 (emphasis added).

The ACA undoes every critical characteristic of Medicaid identified in *McRae*. "The Medicaid program was created … for the purpose of providing federal financial assistance to States that *choose to reimburse* certain costs of medical treatment *for needy persons*." *Id.* at 301 (emphasis added).  The Court further stated:

> The Medicaid program … is a *cooperative endeavor* in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to *needy persons*.  …  The cornerstone of Medicaid is *financial contribution* by both the Federal Government and the participating State.

*Id.* at 308 (emphasis added).  Where Medicaid was supposed to be a *partnership*, the Act now makes the States wholly subservient to congressional dictates.  Where Medicaid was supposed to address healthcare needs of the *poor*, the Act now forces expansion of eligibility criteria to cover persons with incomes up to 33 percent *above* the poverty line.[53]  Where Medicaid was designed to aid the poor through the joint *reimbursement* of their healthcare expenses, the Act now requires that States (but not the federal government) be responsible for the *provision* of medical care, ACA § 2304, an open

---

[53] Actually, the correct figure is *38 percent* above the poverty line, because of a five percent "income disregard" provision that expands Medicaid eligibility yet further beyond caring for the poor.  HCERA § 1004(b).

invitation to endless lawsuits, the costs of which cannot begin to be estimated. The projected incremental costs to the States will be at least $20 billion over the next few years, with those costs increasing greatly thereafter as the federal government reduces its proportional contribution. *See* Am. Compl. ¶ 56.

All of this is so utterly beyond the scope of Medicaid, as originally conceived and implemented, as to constitute not merely a change of degree, but a change of kind. The ACA transforms Medicaid into something completely different.

The Supreme Court underscored its concern over the federal government altering fundamental Medicaid parameters by itself quoting from a lower court opinion:

> "The Medicaid program is one of federal and state cooperation in funding medical assistance; *a complete withdrawal of the federal prop in the system with the intent to drop the total cost of providing the service upon the states, runs directly counter to the basic structure of the program and could seriously cripple a state's attempts to provide other necessary medical services embraced by its plan*."

*McRae*, 448 U.S. at 309 n.12 (emphasis added).

The ACA's regime alters the fundamental parameters of Medicaid and "seriously cripples" the States by imposing a Hobson's Choice between: (1) accepting the ACA's transformed Medicaid program with its attendant obligations and costs that State budgets cannot afford; and (2) opting out of Medicaid and losing federal healthcare assistance for their neediest persons (as well as other Medicaid-linked federal funds), at a time when there is neither a programmatic substitute to provide care, nor an established transition process or a period for transferring this weighty responsibility completely to the States.[54]

---

[54] No federal statutory provision can be found, even in the ACA's 2,700 pages, to require the federal government to help States fund or transition to an independent State-run

Either way, the ACA's unconstitutional coercion puts Plaintiff States on a collision course with disaster through lost control over their sovereignty, budgets, and legislative agendas.

Congress may not use its financial clout to compel states to do its bidding.  As the Supreme Court has stated:

> Our decisions have recognized that in some circumstances *the financial inducement offered by Congress might be so coercive as to pass the point at which "pressure turns into compulsion*." *Steward Machine Co. v. Davis*, [301 U.S. 548, 590 (1937)]. Here, however, Congress has directed only that a State desiring to establish a minimum drinking age lower than 21 lose a relatively small percentage of certain federal highway funds.

*South Dakota v. Dole*, 483 U.S. at 211 (emphasis added).  Similarly, in *Steward Machine*, the Court acknowledged that "the point at which pressure turns in to compulsion, and ceases to be inducement, would be a question of degree, at times, perhaps, of fact."  301 U.S. at 590.  There, however, "the point had not been reached when Alabama made her choice.  We cannot say that she was acting, not of her unfettered will, but under the strain of a persuasion equivalent to undue influence…."  *Id.*   *See also New York v. United States,* 505 U.S. at 166 ("Our cases have identified a variety of methods, *short of outright coercion*, by which Congress may urge a State to adopt a legislative program consistent with federal methods.") (emphasis added).

---

Medicaid-like program.  Ironically, a State opting out of Medicaid still would be subject to the ACA's other coercive insurance requirements (discussed below), which require States to support and provide healthcare insurance benefits to comparatively high-income persons not qualifying for Medicaid.  Thus, the net effect of a State dropping out of Medicaid could be the loss of massive federal funding for its neediest residents, while federal and coerced State governments would continue to assist persons not in poverty.

The "point at which pressure turns into coercion" plainly has been reached here by enactment of the ACA.  In stark contrast from the subsidies at stake in *Dole* – a mere 5 percent of certain federal highway funds, which the Court characterized as "relatively mild encouragement to the States to enact higher minimum drinking ages[,]" 483 U.S. at 211 – "Medicaid is the single largest Federal grant-in-aid program to the States, accounting for over 40 percent of all Federal grants to States."  Bipartisan Comm'n on the Medicaid Act of 2005, H.R. 985, 109th Cong. § 2(13) (2005).  Taking Florida as an example, 26 percent of its budget presently is devoted to Medicaid outlays.  Am. Compl. ¶ 51.  In recent years, Florida on average has paid 44.55 percent of total Medicaid spending under its program, with the federal government contributing 55.45 percent.  *Id.* ¶ 52.  For Florida to establish its own Medicaid program offering the same level of benefits that 2.7 million participants now receive, Florida's outlays would have to be more than doubled, to the point of consuming *more than 58 percent of its budget*.[55]

The Hobson's Choice "offered" by Congress inflicts a "strain" on Plaintiff States' sovereignty and fiscs that is "equivalent to undue influence."  The Act's coercion and impact on State sovereignty violate Article I and the Ninth and Tenth Amendments, as alleged in Count Four.[56]

---

[55] In the meantime, federal funds taken via taxation of Florida's people and businesses – funds that used to flow back to Florida from Washington, D.C. – would be diverted to States that have agreed, in violation of constitutional principles, to surrender their sovereignty.  *See New York v. United States*, 505 U.S. at 182 (a State cannot constitutionally give away its sovereignty, or agree to the enlargement of Congress's powers beyond those enumerated in the Constitution).

[56] Indeed, the ACA's effects are so great as to warrant invocation of the Guarantee Clause.  *See supra*, note 48.

**B.**     **The ACA Compels States To Administer and Enforce Federal Insurance-Related Programs in Violation of the Constitution's System of Dual Sovereignty**

The ACA clearly violates the Constitution's system of dual sovereignty by, *inter alia*, directing the States to establish critical elements, and bear regulatory burdens, of a new federal exchange and insurance coverage program.  Because the States retain an inviolable sovereignty, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162 (citing *Coyle v. Smith*, 221 U.S. 559, 565 (1911)).  Congress may not simply commandeer State processes by directly compelling them to enforce a federal regulatory scheme.  *Id.* at 161.  *See also Printz*, 521 U.S. at 935 ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the State's officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. ... [S]uch commands are fundamentally incompatible with our constitutional system of dual sovereignty.").  The federal government must accept the "full regulatory burden" of its programs, *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 288 (1981), and allow States and their officers to "remain free to reject" a delegation of federal authority, *Atlanta Gas & Light Co. v. U.S. Dep't of Energy*, 666 F.2d 1359, 1369 (11th Cir. 1982).

Defendants acknowledge these principles, Def. Mem. 17-19, but ignore numerous ACA provisions that conscript and coerce States into carrying out critical elements of the insurance exchange program.  First, States must, to ensure that exchanges can survive in the Act's early years, establish reinsurance entities not later than January 1, 2014.  ACA §

1341 (a)(2) & (c).  The exchanges depend on the States and these entities, during the very time that they face the "greatest" risk, to stabilize insurance premiums in the individual and small-group markets.  *Id.* § 1341(c)(1)(A).  States are not free to reject this federal mandate, but have discretion only to set up more than one such entity if they wish.  *Id.* § 1341(c)(2).  In conjunction with this requirement, the Act mandates that States must conform *State* programs "to the extent necessary to carry out the reinsurance program." *Id.* § 1341(d).  By requiring States both to assist in the Act's enforcement and to modify their own laws and programs, this provision violates the Constitution.

Second, the Act requires that States work "in conjunction with" the HHS Secretary to develop an insurance premium review process for insurers outside and inside the exchanges.  ACA § 1003.  This annual review process must be established for the 2010 plan year and continue into the future.  Insurers will have to justify unreasonable premium increase proposals in filings with the States, and the States must continually "monitor premium increases of health insurance coverage offered through an Exchange and outside of an Exchange."  *Id.*  This provision gives States no "opt-out" discretion, but unlawfully makes "use [of] state regulatory machinery to advance federal goals" in violation of States' sovereignty.  *FERC v. Mississippi*, 456 U.S. 742, 759 (1982).

Third, the Act directs States to establish "a secure electronic interface allowing an exchange of data" between the exchanges and other health subsidy programs.  ACA § 1413(c).  Here, again, the Act conscripts States in support of federal programmatic goals – in this case an e-system that is "compatible with [a federally-established system] for data verification under section 1411(c)(4)" – as if the States were arms of the federal

government or (unpaid) government contractors.   This treatment squarely violates constitutional commandeering principles which require the federal government to accept the "full regulatory burden" of its programs.  *Hodel*, 452 U.S. at 288.

Moreover, the ACA links State exchange participation with compliance requirements in other federal programs so as to give States no real choice but to establish an exchange.  For instance, section 2101(b) mandates that States establish an exchange where Children's Health Insurance Program resources prove insufficient.   ACA § 2101(b) (amending Social Security Act § 2105(d)(3)).  This provision relies on States not only to ensure coverage for children, but to do so through a State-established, section 1311 exchange.   Similarly, the Act conditions State relief from new strict Medicaid parameters on whether a State establishes a section 1311 exchange.   ACA § 2001(b) (inserting "(gg) Maintenance of Effort" requirements into Social Security Act § 1902).

Finally, the Act also holds States responsible for exchange compliance without regard for a State's section 1321 election to decline to establish and operate an exchange:

> If the Secretary determines that *an Exchange or* a State has engaged in serious misconduct with respect to compliance with the requirements of, or carrying out of activities required under, this title, the Secretary may rescind from payments otherwise due to such *State* involved under this *or any other Act* administered by the Secretary an amount not to exceed 1 percent of such payments per year until corrective actions are taken by the State that are determined to be adequate by the Secretary.

ACA § 1313(a)(4) (emphasis added).  This provision broadly subjects States to penalties, irrespective of their election to establish an exchange or other actions, if an exchange is noncompliant with the Act.  As such, States have no practical choice but to operate and oversee the exchanges in order to safeguard their federal funding in unrelated programs.

Taken together, the plain language of these provisions renders the section 1321 "election" illusory.  Because the Act requires States to establish a section 1311 exchange or at least to bear regulatory burdens of the federal insurance exchange program, Count Five of the Amended Complaint states a valid claim, consistent with the constitutional principles enunciated in *New York* and *Printz.*

### C.    The Act Unconstitutionally Interferes with the States' Sovereignty With Respect to State Employees and Officials

Plaintiff States also state a claim for relief in Count Six, which challenges the "employer mandate" portions of the ACA, specifically sections 1511, 1513, and 9001 as violative of Congress's commerce power and the Ninth and Tenth Amendments.

As alleged, the ACA harms States by forcing them to offer federally-prescribed benefits, without regard for current State practice, policy preferences, or financial constraints.  First, States must immediately expand benefits offered to employees within their State group insurance plans – presumably including governors, judges, legislators and staff, department secretaries, and other state officers.  ACA § 1001.[57]  Second, States must by 2014 enroll automatically any other employees working 30 or more hours a week into these expanded State insurance plans and pay applicable taxes and penalties.  ACA

---

[57] By September 23, 2010, State group plans, including grandfathered plans (HCERA § 2301), must comply with new requirements relating to: pre-existing conditions (ACA § 1201 (inserting § 2704 into the Public Health Service Act ("PHSA")); exclusions for excessive waiting periods (ACA § 1201 (PHSA § 2708)); lifetime and annual policy limits (ACA § 1001 (PHSA § 2711)); prohibition on rescission of coverage (ACA § 1001 (PHSA §2712)); dependent coverage (ACA § 1001 (PHSA § 2714)); and reporting requirements (ACA § 1001 (PHSA § 2718)).

§§ 1511, 1513; Am. Compl. ¶¶ 48, 57, 58, 89-90.   These mandates violate State sovereignty and consume State resources.  *Id.*[58]

Moreover, even if States do offer coverage to this broader set of employees, the Act will penalize them for each State employee who opts for other federally-subsidized coverage.  *Id.*  Also, ACA section 9001 taxes States if they give "high cost" benefits that exceed a federal threshold.  Am. Compl. ¶¶ 48, 58, 89-90.  Count Four states a valid and ripe claim because these employer mandates impose immediate and expensive requirements on the States that will continue and increase.

### 1.   The Employer Mandate Regime Violates the Commerce Clause and the Tenth Amendment

The employer mandate is a blatant attempt by Congress to commandeer the legislative processes of the States, compelling them to enact and support a federal program in clear violation of the Tenth Amendment.  *See New York v. United States*. There, the Supreme Court held that Congress had no power to compel States to subsidize producers of radioactive waste by forcing them either to accept ownership of that waste or to become liable for damages suffered by the producers as a result of the States' failure to do so.  *New York*, 505 U.S. at 174-76.  The point, as the Supreme Court was at pains to

---

[58] Contrary to Defendants' assertion, Florida does not cover or offer to cover all full-time equivalent employees in a healthcare insurance plan as required by the Act, nor has it previously offered all of the expanded benefits required by the Act.  Am. Compl. ¶¶ 48, 57, 58.  As noted above, by law Florida excludes from participation thousands of OPS employees, Fla. Stat. § 110.123(2)(c) & (f), whom Florida now will have to enroll in its plan or face penalties up to $240 million annually, ACA § 1513(a) (adding 26 U.S.C. § 4980H); HCERA § 1003(b).  Furthermore, the Anti-Injunction Act does not foreclose this claim for the reasons noted in Part I.E. above.

make, is that Congress may not usurp the sovereignty of the States by compelling them to enact, enforce, or administer a federal regulatory program.  *Id.* at 176, 188.

The employer mandate is not, as Defendants claim, merely a regulatory program addressing the terms and conditions of employment, no different from the programs at issue in *Reno v. Condon*, 528 U.S. 141 (2000), and *South Carolina v. Baker*, 485 U.S. 505 (1988).  In *Reno* and *Baker*, the States were required to do little more than obey the *negative* commands of federal law; in the former, not to sell or disclose certain private information; in the latter, not to issue unregistered bonds.  As the Court observed, "[a]ny federal regulation demands compliance."  *Reno*, 528 U.S. at 150 (quoting *Baker*, 485 U.S. at 514).  That the States must be cognizant of and comply with federal law in numerous other contexts is not the issue here.

The Act compels States to provide extensive new benefits to State officers and employees, or to pay substantial penalties.  This is exactly the kind of conscription of State governments and resources prohibited by *New York* and *Printz*, 521 U.S. at 912 ("We have held … that state legislatures are *not* subject to federal direction.") (citing *New York*).[59]

---

[59] In *Baker*, the Court noted: "That a State wishing to engage in a certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect."  485 U.S. at 514-515.  However, employing State officers and others to carry out essential government functions is not an "activity" that States may wish to undertake, or not.  That Congress may decree the basic terms of the employment relationship with State officers and employees and usurp the States' authority over their budgets and resources goes far beyond what was approved in *Baker* and *Reno*.

*Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528 (1985), cannot save these provisions. In *New York*, the Supreme Court identified *Garcia* as an example of the "unsteady path" of its Tenth Amendment jurisprudence. 505 U.S. at 160. The *New York* Court found no reason to revisit *Garcia* because Congress had not "subjected a State to the same legislation applicable to private parties[,]" *id.*, but made clear that Congress may not impair States' sovereignty by forcing a choice between unconstitutional alternatives:

> Congress has not held out the threat of exercising its spending power or its commerce power; it has instead held out the threat, should the States not regulate according to one federal instruction, of simply forcing the States to submit to another federal instruction. A choice between two unconstitutionally coercive regulatory techniques is no choice at all. Either way, "the Act commandeers the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program."

*New York*, 505 U.S. at 176 (quoting *Hodel*, 452 U.S. at 288).[60]

Here, commanding the States to provide the mandated employee insurance benefits or pay penalties is logically indistinguishable from the choice found wanting in *New York*. Either way, State authority to define the conditions of its officeholders and employees and to control appropriations has been usurped. Congress may not compel the States to provide employer benefits on pain of penalty simply because a similar obligation has been imposed upon select, private employers. "The alleged diminution in

---

[60] The ACA itself is proof positive that *Garcia*'s underlying assumption (469 U.S. at 555-56) – that the political process alone will protect State sovereignty – is no longer tenable, if it ever was. Here, Congress's interference in States' relations with their officers and employees is a far cry from the mere regulation of employees' hours and wages.

state authority over its own affairs is not any less because the federal mandate restricts the activities of private parties." *New York*, 505 U.S. at 202 (White, J., dissenting).

2.  **The Employer Mandates Discriminate Against States and Violate the Inter-Governmental-Tax-Immunity Doctrine**

The Act's employer mandate penalty regime also levies discriminatory penalties or taxes against the States *qua* States.  As noted, States that do not provide benefits to all employees qualifying under the Act will pay an exorbitant annual penalty, as will States that give "high cost" benefits that exceed a federally-defined threshold, and States will be penalized if State employees enroll in federally-subsidized plans instead of offered State plans.

These exactions substantially interfere with essential functions of State government in violation of the inter-governmental-tax-immunity doctrine ("ITID").  The Court has long recognized that the Constitution's federal structure forbids the federal government from imposing such costs on States as States: the very nature of our system of dual sovereign governments impliedly prohibits the federal government from so burdening the instrumentalities of a State government.  *See Metcalf & Eddy v. Mitchell*, 269 U.S. 514, 521 (1926); *see also McCulloch v. Maryland*, 17 U.S. 316, 431 (1819) (warning that the "the power to tax involves the power to destroy") (Marshall, C.J.).

Although the exact contours of the ITID are not firmly established, the Supreme Court made clear in *New York* that States enjoy immunity from federal taxation that is discriminatory or interferes with the essential functions of State government and State sovereignty.  505 U.S. at 582, 587-88, 590-97.

58

Here, the Act's employer penalty regime discriminates by penalizing States more harshly than other employers.  States not only must pay penalties for unenrolled employees, but, unlike private employers, must assume costs and responsibilities related to operating the very exchanges from which non-enrolled employees would seek coverage (see Count Five discussion above).  Also, the regime prefers federal employees by using the most popular federal employee healthcare plan as a baseline for calculating the healthcare cost adjustment percentage from which taxes will be determined for the so-called "high cost" plans.  HCERA § 1401(a)(2)(C).  Moreover, unlike with States, the ACA substantially excuses the federal legislature from covering all employees within an employer plan and, thus, from coverage-related penalties.   ACA § 1312(d)(3)(D) (exempting Members of Congress and staff and requiring that they obtain coverage through an exchange).  Furthermore, the regime's penalties impact States differently from private employers, because States lack the same flexibility to meet increased labor costs by raising product and service prices or by altering employee relationships.   Unlike private employers, States must retain certain officials and employees to carry out essential obligations under law.

In addition, the regime unduly influences and interferes with State relationships with officials and employees, whose employment is essential to operating a sovereign government.   Congress's use of taxes to assume authority over such relationships effectively permits the federal government to co-opt the States' ability to govern themselves, to control their budgets, and to allocate their scarce resources among competing sovereign interests.  Am. Compl. ¶¶ 48, 57, 58, 89-90; *cf. Bacon v. City of*

*Richmond*, 475 F.3d 633, 641 (4th Cir. 2007) (noting a State's "power to structure its internal government is among those reserved … by the Tenth Amendment").[61]

Because the Act's employer penalty and tax regime clearly discriminates against the States and violates the ITID's purpose "to protect each sovereign's governmental operations from undue interference by the other," these provisions cannot stand. *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 814 (1989).

<u>Conclusion</u>

For all the reasons stated above, Defendants' motion should be denied in its entirety.

Respectfully submitted,

**BILL MCCOLLUM**
**ATTORNEY GENERAL OF FLORIDA**

<u>/s/ Blaine H. Winship</u>
Blaine H. Winship (Fla. Bar No. 0356913)
Assistant Attorney General
Joseph W. Jacquot (Fla. Bar No. 189715)
(*admission pending*)
Deputy Attorney General
Scott D. Makar (Fla. Bar No. 709697)
Solicitor General
Louis F. Hubener (Fla. Bar No. 0140084)
Timothy D. Osterhaus (Fla. Bar No. 0133728)
Deputy Solicitors General
Office of the Attorney General of Florida
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050

---

[61] The regime is not saved merely because a State may pay prescribed benefits and thereby avoid taxes. "The United States cannot convert an unconstitutional tax into a constitutional one simply by making the tax conditional. Whether Congress could have imposed the condition by direct regulation is irrelevant; Congress cannot employ unconstitutional means to reach a constitutional end." *Baker*, 485 U.S. at 516.

Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Email: blaine.winship@myfloridalegal.com
*Attorneys for Plaintiff States*

David B. Rivkin (D.C. Bar No. 394446)
Lee A. Casey (D.C. Bar No. 447443)
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Ste. 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
*Attorneys for Plaintiff States, National*
*Federation of Independent Business, Mary*
*Brown, and Kaj Ahlburg*

Katherine J. Spohn
Special Counsel to the Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, Nebraska 68508
Telephone: (402) 471-2834
Facsimile: (402) 471-1929
Email: katie.spohn@nebraska.gov
*Attorneys for Plaintiff the State of Nebraska*

Karen R. Harned
Executive Director
National Federation of Independent
Business
Small Business Legal Center
1201 F Street, N.W., Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 554-5572
*Of counsel for Plaintiff National*
*Federation of Independent Business*

William J. Cobb III
Special Assistant and Senior Counsel
to the Attorney General
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-0131
Facsimile: (512) 936-0545
Email: bill.cobb@oag.state.tx.us
*Attorneys for Plaintiff the State of Texas*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 6th day of August, 2010, a copy of the foregoing Memorandum in Opposition to Defendants' Motion to Dismiss was served on counsel of record for all Defendants through the Court's Notice of Electronic Filing system.

<u>/s/ Blaine H. Winship</u>
Blaine H. Winship
Assistant Attorney General
Office of the Attorney General of Florida