**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | | |
|---|---|---|
| STATE OF FLORIDA, by and through BILL McCOLLUM, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:10-cv-91-RV/EMT |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**<u>REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

I.  The Amendments to Medicaid Fall Within the Spending Power and Are Not
    "Coercive" ........................................................................................................ 2

II. The Act Neither Compels States to Establish a Health Benefit Exchange Nor
    Violates the 10th Amendment ......................................................................... 5

III. Congress's Regulation of State Employers in the Same Manner as Private
     Employers Does Not Violate the 10th Amendment ...................................... 7

IV. If the State Tax Immunity Doctrine Still Exists, the Employer Responsibility
    Provision Does Not Violate It .......................................................................... 8

V.  The Court Lacks Jurisdiction over Plaintiffs' Challenges to the Minimum
    Coverage Provision ......................................................................................... 11

    A.    The Private Plaintiffs Lack Standing ................................................. 12

    B.    The States Lack Standing to Challenge the Minimum Coverage Provision .......... 13

    C.    The Anti-Injunction Act Bars Plaintiffs' Claims ............................... 15

VI. The Minimum Coverage Provision Is Constitutional ...................................... 17

    A.    Congress Has Authority under the Commerce and Necessary and Proper
          Clauses to Enact the Minimum Coverage Provision ........................... 17

    B.    The Minimum Coverage Provision Is a Valid Exercise of Congress's
          Independent Power under the General Welfare Clause ........................ 22

    C.    The Minimum Coverage Provision Is Consistent with Due Process ........... 23

CONCLUSION ....................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Abigail Alliance v. Von Eschenbach,*
    495 F.3d 695 (D.C. Cir. 2007) ............................................................ 24

*Adventure Res., Inc. v. Holland,*
    137 F.3d 786 (4th Cir. 1998) ............................................................23

*Alaska Airlines v. Brock,*
    480 U.S. 678 (1987)............................................................14

*Alexander v. "Americans United," Inc.,*
    416 U.S. 752 (1974)............................................................16

*Ayotte v. Planned Parenthood of Northern New Eng.,*
    546 U.S. 320 (2006)............................................................14, 17

*Baldwin v. Sebelius,*
    No. 10-1033 (S.D. Cal. Aug. 27, 2010) ............................................8, 12

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)............................................................9

*Bob Jones Univ. v. Simon,*
    416 U.S. 725 (1974)............................................................16, 22

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973)............................................................14

*Brockett v. Spokane Arcades, Inc.,*
    472 U.S. 491 (1985)............................................................15

*California v. Regan,*
    641 F.2d 721 (9th Cir. 1981) ............................................................ 16

*California v. United States,*
    104 F.3d 1086 (9th Cir. 1997) ............................................................5

*Camp Legal Defense Fund v. City of Atlanta,*
    451 F.3d 1257 (11th Cir. 2006) ............................................................14

*Carter v. Carter Coal Co.,*
    298 U.S. 238 (1936) ............................................................23

*Champlin Refining Co. v. Corporation Comm'n of Okla.,*
    286 U.S. 210 (1932) .................................................................................................... 15

*Chavez v. Martinez,*
    538 U.S. 760 (2003) .................................................................................................... 23

*Cruzan v. Dir., Mo. Dep't of Health,*
    497 U.S. 261 (1990) .................................................................................................... 24

*Free Enterprise Fund v. Public Accounting Oversight Board,*
    130 S. Ct. 3138 (2010) ................................................................................................ 14

*Garcia v. San Antonio Metropolitan Transit Authority,*
    469 U.S. 528 (1968) .............................................................................................. 8, 10

*Get Outdoors II v. City of San Diego,*
    506 F.3d 886 (9th Cir. 2007) ...................................................................................... 14

*Gilmour v. Gates, McDonald & Co.,*
    382 F.3d 1312 (11th Cir. 2004) .................................................................................... 9

*Gonzales v. Raich*
    545 U.S. 1 (2005) ................................................................................................ *passim*

*Harris v. McRae,*
    448 U.S. 297 (1980) ............................................................................................ *passim*

*Head Money Cases,*
    112 U.S. 580 (1884) ...................................................................................................... 8

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) ...................................................................................................... 6

*Humane Soc'y v. Hodel,*
    840 F.2d 45 (D.C. Cir. 1988) ...................................................................................... 12

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) .................................................................................................... 12

*Hylton v. United States,*
    3 U.S. (3 Dall.) 171 (1796) ........................................................................................ 23

*Iowa ex rel. Miller v. Block,*
    771 F.2d 347 (8th Cir. 1985) ...................................................................................... 13

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905).................................................................................24, 25

*Jefferson County v. Acker,*
    527 U.S. 423 (1999).....................................................................................9

*Land v. Dollar,*
    330 U.S. 731 (1947)....................................................................................11

*Lewis v. Casey,*
    518 U.S. 343 (1996)....................................................................................13

*Luxton v. North River Bridge Co.,*
    153 U.S. 525 (1894)....................................................................................20

*Maryland v. Wirtz,*
    392 U.S. 183 (1968).....................................................................................8

*Massachusetts v. EPA,*
    549 U.S. 497 (2007)....................................................................................11

*Massachusetts v. United States,*
    435 U.S. 444 (1978)....................................................................................10

*Minnesota v. United States,*
    525 F.2d 231 (8th Cir. 1975) ......................................................................16

*New York v. United States,*
    326 U.S. 572 (1946)....................................................................................10

*New York v. United States,*
    505 U.S. 144 (1992).............................................................................2, 7, 8

*Oklahoma v. Schweiker,*
    655 F.2d 401 (D.C. Cir. 1981) ......................................................................5

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976)....................................................................................13

*Pierce v. Soc'y of Sisters,*
    268 U.S. 510 (1925)....................................................................................24

*Reno v. Condon,*
    528 U.S. 141 (2000).................................................................................7, 8

*South Carolina v. Baker,*
    485 U.S. 505 (1988)...........................................................................8, 9

*South Dakota v. Dole,*
    483 U.S. 203 (1987)...........................................................................2, 4

*Summers v. Earth Island Inst.,*
    129 S. Ct. 1142 (2009)......................................................................11, 12

*United States v. Comstock,*
    130 S. Ct. 1949 (2010)......................................................................21

*United States v. DiPietro,*
    No. 09-13726 (11th Cir. Aug. 27, 2010)........................................15

*United States v. Morrison,*
    529 U.S. 598 (2000) ........................................................................18, 19

*United States v. South-Eastern Underwriters Ass'n,*
    322 U.S. 533 (1944).........................................................................20

*Usery v. Turner Elkhorn Mining Co.,*
    428 U.S. 1 (1976) ............................................................................25

*Vesta Fire Ins. Corp. v. Florida,*
    141 F.3d 1427 (11th Cir. 1998) ......................................................24

*Virginia ex rel. Cuccinelli v. Sebelius,*
    No. 10-188, 2010 WL 2991385 (E.D. Va. Aug. 2, 2010)..............15

*W. Coast Hotel Co. v. Parrish,*
    300 U.S. 379 (1937)........................................................................24

*Washington v. Glucksberg,*
    521 U.S. 702 (1997)........................................................................24

*Wickard v. Filburn,*
    317 U.S. 111 (1942)........................................................................18, 20

*Williams v. Morgan,*
    478 F.3d 1316 (11th Cir. 2007) ......................................................24

*Wyoming ex rel. Crank v. United States*,
    539 F.3d 1236 (10th Cir. 2008) ......................................................15

# FEDERAL STATUTES AND REGULATIONS

42 C.F.R. § 430.12 ....................................................................................................5

42 C.F.R. § 435.919 ..................................................................................................5

74 Fed. Reg. 4199 (Jan. 23, 2009) ...........................................................................4

28 U.S.C. § 2201(a) .................................................................................................17

30 U.S.C. § 1257(f) ..................................................................................................19

42 U.S.C. § 1396a(a)(10)(A)(i)(IV) ..........................................................................4

42 U.S.C. § 1396d(a) .................................................................................................4

42 U.S.C. § 4012a(e) ...............................................................................................19

49 U.S.C. § 13906(a)(1) ..........................................................................................19

I.R.C. § 4980I(a),(A) ...............................................................................................10

I.R.C. § 5000A(g)(1) ...............................................................................................16

I.R.C. § 7421(a) .......................................................................................................16

I.R.C. § 6671(a) .......................................................................................................16

Pub. L. No. 92-603 (1972) .........................................................................................4

Pub. L. No. 101-239 (1989) .......................................................................................4

Pub. L. No. 111-148, 124 Stat. 119 (2010)

    § 1003...............................................................................................................6
    § 1201.............................................................................................................20
    § 1312(d)(3)(D)..............................................................................................10
    § 1313(a)(4) .....................................................................................................7
    § 1321(b)................................................................................................6, 7, 10
    § 1321(c) ...........................................................................................................7
    § 1341(a)(2) .....................................................................................................6
    § 1341(b) ..........................................................................................................6
    § 1341(c) ...........................................................................................................6
    § 1341(d) ..........................................................................................................6
    § 1413(c) ...........................................................................................................6

§ 1413(e) ....................................................................................................................6
§ 1501(a)(2)(F).........................................................................................................17
§ 2001(a)(3)(B) ..........................................................................................................3
§ 2001(b)......................................................................................................................7
§ 2101(b)......................................................................................................................6
§ 9001(a)....................................................................................................................10
§ 10106(a)..................................................................................................................17

Pub. L. No. 111-152, 124 Stat. 1029 (2010)
§ 1201..........................................................................................................................3

## LEGISLATIVE MATERIALS

*Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the
H. Comm. on Ways and Means*, 111th Cong. 13 (2009) .......................................21

## MISCELLANEOUS

Congressional Budget Office, *How Many People Lack Health Insurance and for
How Long?* (May 2003)...........................................................................................19

David Kashihara & Kelly Carper, Agency for Healthcare Research and Quality,
Medical Expenditure Panel Survey, *National Health Care Expenses in the U.S.
Civilian Noninstitutionalized Population, 2007*, Dec. 2009 ...................................17

Gary S. Becker & Isaac Ehrlich, *Market Insurance, Self-Insurance, and Self-Protection*,
90 J. Pol. Econ. 623 (1972)......................................................................................19

Jack Hadley et al., *Covering The Uninsured In 2008: Current Costs, Sources Of
Payment, And Incremental Costs 2008*, 27 Health Aff. 399, 401 (2008) ...............17

June E. O'Neill & Dave M. O'Neill, *Who Are the Unisured? An Analysis of
America's Uninsured Population, Their Characteristics, and Their Health,*
Employment Policies Institute (June 2009) ........................................................17, 18

Kaiser Family Foundation, *Survey of People Who Purchase Their Own Insurance*
(June 2010)..................................................................................................................4

Press Release, U.S. Dep't of Health & Human Servs.,*$46 Million in Grants to Help
States Crack Down on Unreasonable Health Insurance Premium Hikes*
(Aug. 16, 2010) ...........................................................................................................6

W. E. Diewert, *Intertemporal Consumer Theory and the Demand for Durables,*
42 Econometrica 487 (1974)....................................................................................19

**INTRODUCTION**

The dire pronouncements in plaintiffs' opposition — that the ACA, for example, "trans-form[s] our Nation beyond recognition" and "arm[s] Congress with unbridled top-down control over virtually every aspect of persons' lives," Opp'n 24, 29 — signal the political rather than legal nature of plaintiffs' claims.   Beneath the rhetoric, what plaintiffs ask this Court to do is abandon the deference courts pay to democratically enacted legislation, depart from settled law, and disregard the limits of Article III.   They ask this Court to interpret provisions of the Patient Protection and Affordable Care Act ("ACA") as imposing requirements they do not impose and thereby commandeering the States' administrative machinery.  They ask this Court to treat the Medicaid amendments in the ACA differently than the many similar amendments to Medicaid over the last 45 years, and thus to convert an *offer* of participation in a joint federal-state program, which States are free to accept or reject, into a coercive *demand* for participation on the federal government's terms.  And they ask this Court to overturn a well-substantiated and permissible legislative response to a serious crisis afflicting a market comprising more than one-sixth of the American economy.

Contrary to plaintiffs' allegations, upholding the ACA requires no radical alteration of our constitutional landscape.  It is an important, but incremental, extension of prior federal reg-ulation of the health care market — an extension that is within the boundaries of congressional authority.  Clearly, plaintiffs disagree with the policy judgments embodied in the statute, as they are entitled to do.  But this Court is not the proper place to resolve those disagreements.

1

# ARGUMENT

## I.   The Amendments to Medicaid Fall Within the Spending Power and Are Not "Coercive"

Plaintiffs do not dispute that, under the Spending Clause, Congress may "fix the terms on which it shall disburse federal money to the States," *New York v. United States*, 505 U.S. 144, 158 (1992), and may "condition[] receipt of federal moneys upon compliance . . . with federal statutory and administrative directives," *South Dakota v. Dole*, 483 U.S. 203, 206 (1987).  They also do not dispute that the Act's amendments to Medicaid satisfy the four "general restrictions" on the spending power set forth in *Dole*.  *Id.* at 207.  Instead, they argue that, although their participation in Medicaid is voluntary, the Act's amendments are somehow "coercive."  But no case — ever — has invalidated a spending condition on such a theory.  Plaintiffs seek a radical departure from this uniform precedent, to allow the recipients of federal funds to dictate the terms on which Congress offers those funds.

Plaintiffs acknowledge, as they must, the Court's recognition in *Harris v. McRae*, 448 U.S. 297, 301 (1980), that participation in Medicaid is "entirely optional."  But, they say, that recognition rested on understandings that no longer hold true.  Plaintiffs are wrong about *McRae*, Medicaid, and the ACA.

In *McRae*, the Court addressed a narrow statutory question: whether the Medicaid Act requires a State to bear the full cost of abortion procedures where the Hyde Amendment bars the use of federal Medicaid matching funds for reimbursement.  *Id.* at 301.  Based on the language and legislative history of the Medicaid Act and the Hyde Amendment, the Court answered no. *Id.* at 309.  The Court's reasoning, if anything, undermines plaintiffs' coercion claims here.

Plaintiffs claim that the Court expressed "concern" that Congress might alter the "fun-

damental parameters" of Medicaid by removing the "'federal prop'" and imposing the "'total cost of providing [a] service upon the states.'"  Opp'n 48 (quoting *McRae*, 448 U.S. at 309 n.12). But the Court cited Medicaid's "basic structure" of "federal and state cooperation," *McRae*, 448 U.S. at 309 n.12, as evidence that Congress did not *intend* to shift the full costs of abortion procedures to the States.  It articulated no *constitutional mandate* to freeze the contours of the program as they stood in 1980.  To the contrary, immediately after noting that Medicaid was not "*designed . . .* as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund," the Court, in a statement that plaintiffs ignore, rejected the point they advance here:  "This is not to say that Congress may not now depart from the original design of [Medicaid] under which the Federal Government shares the financial responsibility for expenses incurred under an approved Medicaid plan." *Id.* at 309.  Indeed, the Court went on to note that "subsequent Congresses *have* deviated from the original structure of [Medicaid] by obligating a participating State to assume the full costs of a service as a prerequisite for continued federal funding of other services." *Id.* at 309 & n.13 (emphasis added).

In the ACA, however, Congress did not exercise its authority to obligate States to assume the full costs of new Medicaid services (subject to the States' right to withdraw).  Instead, it substantially *increased* federal funding.  The federal government will reimburse *100 percent* of benefits paid to newly eligible recipients through 2016, gradually declining to 90 percent in 2020 and beyond, far above the usual federal matching rates.  ACA § 2001(a)(3)(B); HCERA § 1201. Plaintiffs also contend that Medicaid was intended to provide medical care only to "'needy persons,'" and that the ACA impermissibly expands coverage to individuals above the poverty line. Opp'n 47 (quoting *McRae*, 448 U.S. at 301).  Nothing in *McRae*, however, suggests that state

3

participation in Medicaid would cease to be voluntary if Congress extended eligibility to anyone above the poverty line, and plaintiffs cite no support for such an arbitrary principle.[1]

Moreover, any claim of coercion is particularly misplaced where, as here, the conditions being challenged define the terms of eligibility for the very program Congress is funding, rather than conditioning funding on the acceptance of subsidiary requirements.  *Cf. Dole*, 483 U.S. at 208-09 (conditioning grant of federal highway funds on establishing minimum drinking age).  Indeed, plaintiffs concede that prior Medicaid amendments "mainly addressed eligibility criteria to provide better and more extensive coverage for the needy" and thus "were within the original and foreseeable spirit of the Medicaid partnership."  Opp'n 46.  But the ACA's amendments to Medicaid likewise expand eligibility and coverage.  Plaintiffs offer no reason why Congress could constitutionally expand Medicaid to recipients of Supplemental Security Income in 1972, and to pregnant women and children in 1989, *see* Pub. L. No. 92-603 (1972); Pub. L. No. 101-239 (1989), but cannot constitutionally expand it to low-income adults without dependent children.  Nothing in the Constitution permits States or courts to invalidate statutory amendments they deem inconsistent with "the original and foreseeable spirit of the Medicaid" statute.  Where, as here, the four *Dole* factors are met, the Constitution requires only that Congress permit states

---

[1] In any event, the Medicaid Act has long required States to assist some groups above the poverty level, such as pregnant women and young children.  42 U.S.C. § 1396a(a)(10)(A)(i)(IV), (VI).  In addition, many States have already opted to provide Medicaid assistance to childless adults above the poverty level through optional eligibility categories or demonstration projects — including plaintiffs Indiana, Idaho, and Utah.  And the Medicaid Act specifically provides for assistance to those "whose income and resources are insufficient" to meet the costs of medical care.  42 U.S.C. § 1396d(a).  Those with incomes between 100 and 133 percent of the federal poverty level make just $10,830 to $14,404 per year, *see* 74 Fed. Reg. 4199, 4200 (Jan. 23, 2009), which is insufficient to manage the $4,530 average annual cost of health insurance (premiums and out-of-pocket costs) in the individual market.  *See* Kaiser Family Foundation, *Survey of People Who Purchase Their Own Insurance* 4 (June 2010), *available at* http://www.kff.org/kaiserpolls/upload/8077-R.pdf (all Internet authorities last visited Aug. 27, 2010).

to withdraw from a federally funded program, which Medicaid does.[2]

Plaintiffs thus are left to argue that federal Medicaid grants are so large, or so important, that States have "no choice" but to accept them. *See* Opp'n 50. But court after court has rejected the notion that the size of a federal grant renders a State's choice involuntary, *e.g.*, *Oklahoma v. Schweiker*, 655 F.2d 401, 414 (D.C. Cir. 1981) ("It is not the size of the stake that controls, but the rules of the game."), and they have specifically rejected the notion that Medicaid grants are too important for withdrawal to be a serious option, *see, e.g.*, *California v. United States*, 104 F.3d 1086, 1092 (9th Cir. 1997) (rejecting argument that withdrawal would result in a "collapse of its medical system"). *See also* Defs.' Mem. 14-15 & n.6 (collecting cases). Plaintiffs do not even acknowledge these precedents, let alone offer a reason to disregard them. If plaintiffs were correct that the size of federal Medicaid grants renders them coercive, then *any* amendments to Medicaid, no matter how big or small, would likewise be coercive. And States could effectively dictate how Congress designs and funds federal programs.

## II.    The Act Neither Compels States To Establish a Health Benefit Exchange Nor Violates the 10th Amendment

Having abandoned their initial claim that the ACA "requires" States to participate in health benefit exchanges, Compl. ¶ 57, plaintiffs now abandon their fallback position that the Act "coerces" them into operating exchanges "under threat of removing or significantly curtailing their long-held regulatory authority," Am. Compl. ¶ 88. They had little choice but to retreat, as

---

[2] Plaintiffs are wrong to insist that no mechanism permits a State to exit the Medicaid program if it decides that participation is no longer in its interests. Am. Compl. ¶ 65. To end its participation, a State could submit a state plan amendment to that effect, see 42 C.F.R. § 430.12, and the Center for Medicare and Medicaid Services would work with the State to wind down its program in accordance with other statutory and regulatory requirements, such as providing sufficient notice to Medicaid enrollees, see id. § 435.919. In fact, earlier this year plaintiff Arizona submitted (but later withdrew) a state plan amendment to end its participation in CHIP. The process for withdrawing from Medicaid is analogous.

the theory is squarely foreclosed by *Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452

U.S. 264, 290 (1981).  *See* Defs.' Mem. 18.  Belatedly, plaintiffs now cite six *other* provisions —

none sufficiently onerous, even on plaintiffs' theory, to have made it into the Amended

Complaint — that allegedly coerce them into operating an exchange.  *See* Opp'n 51-54.  Plain-

tiffs miss on this third strike as well.  Each of the provisions they cite is entirely voluntary.

- Plaintiffs argue that the Act requires States to establish "reinsurance entities" — not-for-profit organizations that provide payments to insurers that cover high-risk individuals. Opp'n 51-52 (citing ACA § 1341(a)(2), (c), (d)).  In fact, this provision applies *only* to States that choose to establish an exchange.  Under section 1321(b), States may "elect" to establish an exchange or not, but if — and only if — they do, they may be required to comply with the standards set forth in section 1341(b).

- Plaintiffs claim that the Act "requires that States work 'in conjunction with' the HHS Secretary to develop an insurance premium review process for insurers outside and inside the exchanges" beginning in fiscal year 2010.  Opp'n 52 (citing ACA § 1003).  In fact, this section merely obligates *the Secretary* to consult with the States.  It imposes no obligation on plaintiffs.  But if States choose to participate, they may apply for a portion of $250 million in federal grants to help develop their premium review processes — as *almost all* of the plaintiff States *already have*.[3]

- Plaintiffs assert that the Act "directs States to establish 'a secure electronic interface allowing an exchange of data' between the exchanges and other health subsidy programs."  Opp'n 52-53 (citing ACA § 1413(c)).  In fact, this provision applies only to "applicable State health subsidy programs," defined to include only Medicaid, CHIP, health benefit exchanges, and optional "basic health programs," *see* ACA § 1413(e). State participation in each of these programs is entirely voluntary.

- Plaintiffs contend that the Act "mandates that States establish an exchange where [CHIP] resources prove insufficient."  Opp'n 53 (citing ACA § 2101(b)).  In fact, this section provides that, if federal CHIP allotments are insufficient to cover all "targeted low-income children," a State must enroll them in Medicaid if they are eligible, and if not, in a qualified health plan offered through its exchange.  This provision does not require a State to establish an exchange if it has elected not to do so under section 1321(b); enrollment in an exchange operated by the Secretary would suffice.  Moreover, the provision simply adds a condition on the voluntary receipt of federal CHIP funds.

---

[3] Press Release, U.S. Dep't Health & Human Servs., $46 Million in Grants to Help States Crack Down on Unreasonable Health Insurance Premium Hikes (Aug. 16, 2010), *available at* http://www.hhs.gov/news/press/2010pres/08/20100816a.html.

- Plaintiffs assert that the Act "conditions State relief from new strict Medicaid parameters on whether a State establishes a section 1311 exchange." Opp'n 53 (citing ACA § 2001(b)). In fact, section 2001(b) precludes a State from tightening its Medicaid "eligibility standards, methodologies, or procedures" until its exchange is "fully operational" — which, if the State so elects, must happen by 2014, *see* ACA § 1321(b)-(c). This section further precludes a State from tightening Medicaid eligibility for those 18 years and younger until 2019. These provisions do not require a State to establish an exchange. They are simply additional conditions on the receipt of federal Medicaid and CHIP funds.

- Plaintiffs claim that the Act penalizes States for noncompliance with Title I of the Act if they elect not to operate an exchange. Opp'n 53 (citing ACA § 1313(a)(4)). In fact, as its title reflects, section 1313 sets forth measures intended to ensure the "Financial Integrity" of exchanges. Plaintiffs focus on section 1313(a)(4), titled "Pattern of Abuse," which allows the Secretary to withhold payments from a State if she determines that "an Exchange or a State has engaged in serious misconduct." This provision applies to misconduct by an exchange that *a State* operates. It does not make States responsible for exchanges they do not operate.

Thus, none of these provisions commands plaintiffs to enact or enforce a federal regulatory program. *See Reno v. Condon*, 528 U.S. 141, 149 (2000). Each is voluntary, and several are simply conditions Congress is unquestionably entitled to impose on the receipt of federal funds. *See New York*, 505 U.S. at 171-72.

## III. Congress's Regulation of State Employers in the Same Manner as Private Employers Does Not Violate the 10th Amendment

Plaintiffs do not appear to dispute that regulation of the terms and conditions of employment in the national labor market falls within the commerce power, or that health coverage, like wages, is a term of employment Congress may regulate. *See* Defs.' Mem. 22-23. They also do not dispute that the employer shared responsibility provision applies equally to state and private entities. *Id.* at 23-24. Under established precedent, that defeats plaintiffs' claim.

Plaintiffs nonetheless contend that the provision infringes their sovereignty because it purportedly requires them to offer new benefits to State employees,[4] and thus diminishes their

---

[4] Defendants' opening brief explained that plaintiffs lack standing to challenge the

7

"authority over [their] own affairs" and their ability to "control appropriations." Opp'n 57-58

(citation omitted). But that is not the test. Indeed, virtually *any* regulation of State activities im-

poses some restrictions. Certainly, the minimum wage and overtime requirements the Court up-

held in *Maryland v. Wirtz*, 392 U.S. 183 (1968), and *Garcia v. San Antonio Metropolitan Transit*

*Authority*, 469 U.S. 528 (1985), had this effect. In fact, *Garcia* rejected "as unsound in principle

and unworkable in practice" the very argument plaintiffs urge here: that State immunity from

federal regulation "turns on a judicial appraisal of whether a particular governmental function is

'integral' or 'traditional.'" *Id.* at 546-47. Today, it is settled that a regulation does not implicate

the 10th Amendment when it merely "regulates state activities" rather than "seek[ing] to control

or influence the manner in which States regulate private parties." *Condon*, 528 U.S. at 150.[5]

    At bottom, plaintiffs "face[] nothing more than the same . . . obligations that hundreds of

thousands of other employers, public as well as private, have to meet," *Garcia*, 469 U.S. at 554.

It is thus inescapable that the Act "regulates state activities" rather than "the manner in which

States regulate private parties." *South Carolina v. Baker*, 485 U.S. 505, 514 (1988); *Condon*,

528 U.S. at 150. It is therefore consistent with the 10th Amendment.

**IV.    If the State Tax Immunity Doctrine Still Exists, the Employer Responsibility**
         **Provision Does Not Violate It**

    Plaintiffs' claim that the employer responsibility provision violates the State tax immun-

---

provision, in part because their Amended Complaint fails to allege facts to establish that any
State will be subject to an assessment come 2014. Defs.' Mem. 21; *see Baldwin*, slip op. at 5.

    [5] Moreover, the constitutionality of penalties enacted in aid of the commerce power is
well established. *See, e.g.*, *Head Money Cases*, 112 U.S. 580, 596 (1884). Indeed, both *New
York* and *Condon* affirmed such penalties. *New York*, 505 U.S. at 171 (collection from States of
waste disposal fees "is no more than a federal tax on interstate commerce"); *Condon*, 528 U.S. at
150 (approving "penalty provisions [that] hang over the States as a potential punishment should
they fail to comply"). The Act does not, as plaintiffs assert, offer a false choice between two
"unconstitutionally coercive" alternatives. Opp'n 57. Rather, it is a valid exercise of the
commerce power, coupled with an unexceptional penalty provision.

ity doctrine should be rejected.  To begin, the Amended Complaint nowhere states such a claim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); Fed. R. Civ. P. 8 (stating standards).  It does not even mention State tax immunity, which does *not* share a doctrinal basis in the 10th Amendment with plaintiffs' commandeering claims, *Baker*, 485 U.S. at 518 n.11.  Plaintiffs may not amend their complaint to add a new claim by way of a brief in opposition to a motion to dismiss.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004).

In any event, plaintiffs should have stuck with their decision not to raise the issue.  The doctrine has been all but repudiated and, to the extent it retains any vitality, does not apply where a penalty applies equally to State and private employers, as do the potential assessments here.

The concept of State tax immunity had some currency in the 19th Century.  But its application narrowed as States began to engage in activities that were once the province of private industry, and as it became clear that the political process provides an effective check on federal taxation.  Indeed, the Supreme Court has not invalidated a federal tax under this doctrine since the 1940s.  And there is substantial doubt whether the doctrine of State tax immunity still survives.  *Baker*, 485 U.S. at 518 n.11 (declining to decide "the extent, *if any*, to which States are currently immune from direct nondiscriminatory federal taxation") (emphasis added).

Two principles, however, are clear from the modern case law.  First, the Court views States' ability to petition Congress as a satisfactory method of resolving concerns related to federal taxation.  *See Jefferson County v. Acker*, 527 U.S. 423, 436-37 (1999) ("In contracting the once expansive intergovernmental tax immunity doctrine, we have recognized that the area is one over which Congress is the principal superintendent.").  Second, to the extent any part of the doctrine still stands, it is satisfied by a nondiscriminatory tax.  *See Baker*, 485 U.S. at 525 n.15

("[T]he best safeguard against excessive taxation (and the most judicially manageable) is the requirement that the government tax in a nondiscriminatory fashion.").

Under this controlling precedent, plaintiffs' arguments fail.  First, their contention that the employer responsibility provision interferes with the "essential functions" of State government, depriving them of the ability "to allocate their scarce resources," Opp'n 58-59, rests on distinctions discarded decades ago in *New York v. United States*, 326 U.S. 572, 586 (1946) (plurality opinion) (rejecting governmental/proprietary distinction), and *Garcia*, 469 U.S. at 546-47 (rejecting essential/nonessential function distinction).  *See also Massachusetts v. United States*, 435 U.S. 444, 461 (1978) ("an economic burden on traditional state functions without more is not a sufficient basis for sustaining a claim of immunity").  Second, plaintiffs' assertion that the provision discriminates against them vis-à-vis private or federal employers is wrong.  Contrary to plaintiffs' claims, the provision is independent of the Act's exchange provisions, which do not require State participation.  *See* ACA § 1321(b).  What plaintiffs refer to as the "baseline" for calculating the penalty on "high cost" plans applies equally across the board.  In any event, that penalty generally falls on the issuer of the health plan, not an employer.  *See* ACA § 9001(a) (adding I.R.C. § 4980I(a), (c)(2)(A)).  And the Act does not "excuse" Congress from the employer responsibility provision; rather, the Act separately requires that Congress offer federal legislators and staff coverage only through a plan created under the Act or offered through an exchange.  *See* ACA § 1312(d)(3)(D).

At bottom, the employer responsibility provision, and its potential assessments, apply equally to federal, state, and private employees.  Like other well-established federal taxes on States, including Federal Insurance Contribution Act ("FICA") payroll taxes, which fund Social

10

Security and Medicare, the assessments satisfy any remnant of the State tax immunity doctrine.

## V.      The Court Lacks Jurisdiction over Plaintiffs' Challenges to the Minimum Coverage Provision

Defendants' opening brief explained how plaintiffs have failed to demonstrate actual or imminent injury from a provision that will not go into effect for several years.  As neither side can know the future, plaintiffs' response seeks to shift to defendants the burden of proof.  Plaintiffs accuse defendants of engaging in mere "speculation" that there is no imminent threat of injury.  Opp'n 4 n.4, 13.  At the same time, plaintiffs assert that the Court must accept their allegations and even "inferences" of injury because this is a motion to dismiss.  *Id.* at 4 n.3.  Plaintiffs confuse the standards governing motions to dismiss for failure to state a claim with those governing motions to dismiss for lack of jurisdiction.  In assessing jurisdiction, courts are not bound to accept the factual allegations of the complaint, let alone conjecture and inference.  *E.g.*, *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947).  Particularly with respect to standing, it is *plaintiffs'* burden to show an "actual or imminent threat" of injury in fact that "is concrete and particularized."  *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009).  For plaintiffs to sustain that burden, "speculation does not suffice," because standing "is not 'an ingenious academic exercise in the conceivable' . . . but requires . . . a factual showing of perceptible harm."  *Id.* at 1152 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 566 (1992)).[6]

---

[6] Defendants' opening brief explains why plaintiffs' claims also are not ripe.  *See* Defs.' Mem. 32-33.  It suffices here to note that plaintiffs cannot garner support from *Massachusetts v. EPA*, 549 U.S. 497 (2007), by arguing that standing there was "based on rise in sea levels *by the end of this century*."  Opp'n at 11-12.  Not only did the challenge there involve EPA's *current* policies, *see* 549 U.S. at 511-12, but the Court found current injury based on "unchallenged affidavits [that] global sea levels *rose* somewhere between 10 and 20 centimeters *over the 20th century* as a result of global warming" and that "[t]hese rising seas have *already* begun to swallow Massachusetts' coastal land," *id.* at 522 (emphasis added).

**A.     The Private Plaintiffs Lack Standing**

Only two plaintiffs, Mary Brown and Kaj Ahlburg, could potentially be directly affected by the minimum coverage provision.  As explained previously, Defs.' Mem. 26, come 2014, that potential may not be realized.  And even if it is, buying conforming health insurance may *benefit* these plaintiffs rather than injure them.  Therefore, they cannot establish injury in fact.  *See Baldwin v. Sebelius*, No. 10-1033, slip op. at 5 (S.D. Cal. Aug. 27, 2010) (no standing in similarly premature challenge to minimum coverage provision).

Because plaintiff Brown, the only NFIB member identified in the Amended Complaint, does not have standing, NFIB cannot leverage its own standing through her.[7]  But even if Brown had standing, NFIB still would not, because it has not shown that the interests it seeks to protect are "germane" to its purposes.  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  NFIB represents businesses.  Its lobbying against the ACA was based on the Act's potential effect on businesses, not individuals.  Nonetheless, NFIB asserts that its challenge here is germane to its purposes because "individual owners *are* the businesses," and forcing an individual to spend money "necessarily diverts resources away" from the business.  Opp'n 14.  On this theory, NFIB would have standing to challenge divorce laws because alimony can divert owners' resources from their businesses.  NFIB could become its members' all-purpose "law firm[] with standing," precisely what the germaneness prong of *Hunt* seeks to prevent, *Humane Soc'y v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988).  A comparison with the cases plaintiffs cite, Opp'n 14 n.18, involving an environmental claim by the Sierra Club and a voting rights claim by the NAACP, only underscores how far afield NFIB's claim regarding individuals' health insurance

---

[7] NFIB argues that it would be enough to show that any of its members, "even if unidentified," would have standing.  Opp'n 15 n.19.  That is not correct.  *Summers*, 129 S. Ct. at 1152.

strays from the established principles of associational standing.

### B.        The States Lack Standing To Challenge the Minimum Coverage Provision

A State does not have standing to "litigat[e] as a volunteer the personal claims of its

citizens." *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976).  And the States fail in their

effort to bootstrap a claim that their own financial interests are at stake.  The States argue that the

minimum coverage provision will cost the States money because it may drive citizens to accept

Medicaid coverage or coverage provided by the State as an employer, benefits that many of those

citizens are already entitled to under State law.  Opp'n 3-5.  But it is difficult to see how a State

can claim injury on the ground that its citizens choose to accept benefits the State offers them

under State law.  *See Pennsylvania*, 426 U.S. at 664 (States that enacted tax credits for indivi-

duals' taxes paid to other States did not have standing to sue other States for damages, because

the "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by the respective

state legislatures").  That fatal flaw aside, the States can only speculate that any such effect will

exceed savings they will realize from the programs they now fund for care of the uninsured.  And

even if this flaw, too, is overlooked, potential second-order ricochet effects on state finances

cannot support standing.  *See Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985)

(rejecting standing notwithstanding claim that challenged federal policies would cause both a

decline in state revenue and an "increased [state] responsibility for the welfare and support of its

affected citizens").

The States also argue that, because they have standing to challenge some provisions of

the Act,  they have standing to challenge *all* provisions of the Act, because none is severable

from the minimum coverage provision.  "But standing is not dispensed in gross." *Lewis v.*

13

*Casey*, 518 U.S. 343, 358 n.6 (1996).  A person "to whom a statute may constitutionally be

applied will not be heard to challenge that statute on the ground that it may conceivably be

applied unconstitutionally to others."  *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

Accordingly, a plaintiff with standing to challenge one provision of a statute does not thereby

acquire a roving entitlement to challenge other provisions, whether severable or not, that do not

affect him.  *See Get Outdoors II v. City of San Diego*, 506 F.3d 886, 892 & n.4 (9th Cir. 2007);

*Camp Legal Def. Fund v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006).[8]

Plaintiffs respond by inflating defendants' position, that the minimum coverage provision

is essential to the *private market insurance reforms* in the ACA, into a concession that the provi-

sion is the necessary linchpin of the *entire* ACA.  Opp'n 8.  Defendants have never asserted, and

surely plaintiffs do not contend, that the minimum coverage provision is indispensable to every

other provision of the Act, from abstinence education, ACA § 2954, to disease prevention, *id.*

§ 4001.  As relevant here, provisions regarding Medicaid clearly stand on their own, apart from

the minimum coverage provision, and thus are severable from it.[9]  Indeed, that is an implication

---

[8] The States incorrectly characterize *Alaska Airlines v. Brock*, 480 U.S. 678 (1987), as
allowing "suit to protest employee-protection provisions of federal legislation on the basis that a
*different* provision (regarding a legislative veto) rendered the entire legislation ineffective."
Opp'n 7.  But the legislative veto was part of section 43 of the Airline Deregulation Act, the very
section that contained the employee-protection provisions, and the veto applied to regulations
implementing those provisions.  The airlines challenged only section 43 and the implementing
regulations, not the other 44 provisions of the Act.  *See* 480 U.S. at 682-83.  Thus, *Alaska
Airlines* does not suggest that standing to challenge some provisions of the ACA equals standing
to challenge every other provision.

[9] As the Supreme Court recently reiterated in *Free Enterprise Fund v. Public Accounting
Oversight Board*, 130 S. Ct. 3138, 3160 (2010):

> "Generally speaking, when confronting a constitutional flaw in a statute, we try to
> limit the solution to the problem," severing any "problematic portions while
> leaving the remainder intact."  *Ayotte v. Planned Parenthood of Northern New
> Eng.*, 546 U.S. 320, 328-329 (2006).  Because "[t]he unconstitutionality of a part

14

of the States' own arguments.  *See* Opp'n 32 (Medicaid provisions "could have been enacted, implemented and enforced without the Individual Mandate").  The States thus do not have standing to challenge the minimum coverage provision, even if they do have standing to challenge the Medicaid amendments (no matter how baseless those claims may be).

Four States argue that they have standing to "enforce" laws they have passed that purport to nullify the minimum coverage requirement.  Opp'n 9.  But because States cannot nullify federal laws, *e.g.*, *United States v. DiPietro*, No. 09-13726, slip op. at 9 (11th Cir. Aug. 27, 2010), those statutes merely declare an opinion regarding the federal law.  They have no regulatory effect, and articulate no legal obligation for the States to *enforce*.  These laws thus raise no issues about how the States administer their own laws and create no case or controversy.[10]

### C.    The Anti-Injunction Act Bars Plaintiffs' Challenge

Plaintiffs attempt to end-run the jurisdictional bar of the Anti-Injunction Act ("AIA") by supposing that the bar can apply only if one first accepts "[defendants'] spurious suggestion that the penalty is a tax."  Opp'n 20.  As explained previously, under the plain language of the statute, it does not matter whether the penalty is labeled a tax, or even whether it is a tax.  Defs.' Mem.

---

of an Act does not necessarily defeat or affect the validity of its remaining provisions," *Champlin Refining Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234 (1932), the "normal rule" is "that partial, rather than facial, invalidation is the required course," *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985).

[10] In holding that a similar Virginia law generated standing, *Virginia ex rel. Cuccinelli  v. Sebelius*, No. 10-188, 2010 WL 2991385, at *5 (E.D. Va. Aug. 2, 2010), relied heavily on its misreading of *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236 (10th Cir. 2008).  The federal law at issue in *Wyoming* provided that certain consequences would flow from actions under state law.  *See* 539 F.3d at 1239 & n.1.  The question Wyoming had standing to litigate was whether, under the federal law, the statute it had enacted and was enforcing created those federal consequences.  *Id.* at 1240-41.  Thus, Wyoming had an interest in whether the State's enforcement of its law achieved an intended result permitted by federal law.  By contrast, the four States' statutes have no function beyond expressing an opinion that federal law is invalid.

33.  While the AIA itself applies to "any tax," I.R.C. § 7421(a), I.R.C. § 6671(a) directs that "any reference in this title to 'tax' imposed by this title shall be deemed *also* to refer to the *penalties and liabilities provided by this subchapter*," *i.e.*, subchapter B of chapter 68.  (Emphasis added.) The minimum coverage provision, I.R.C. § 5000A(g)(1), in turn directs that "[t]he penalty provided by this section shall . . . be assessed and collected in the same manner as an assessable penalty *under subchapter B of chapter 68*."[11] (Emphasis added.)  Plaintiffs argue that this plain statutory language should be limited to cases in which the "penalty" is "directly assessed for failing properly to pay an undisputed *tax*."  Opp'n 20.  But that is not what the statute says, and none of the cases plaintiffs cite engrafts such a limitation onto the plain language of the law.

The State plaintiffs argue that the AIA does not bar their claims because they are not "persons" to whom the AIA applies.  Opp'n 22.  But courts have routinely applied the statute to states, *see California v. Regan*, 641 F.2d 721 (9th Cir. 1981); *Minnesota v. United States*, 525 F.2d 231 (8th Cir. 1975), and the Supreme Court's explanation of the history of the "person" provision conclusively refutes any claim that Congress intended to exclude States, thereby opening billions of dollars in taxes to pre-enforcement challenge.[12]  Moreover, the States acknowledge that the Anti-Injunction Act is coterminous with the bar on declaratory relief involving federal taxes, Opp'n 23 n.30, yet the tax exception to the Declaratory Judgment Act,

---

[11] The "exceptions" in subparagraph (2) to the treatment of the penalty as a subchapter B penalty further undermine plaintiffs' attempt to evade the AIA.  By waiving criminal penalties and the use of levies or notices of federal tax lien, those exceptions protect against the potential for the type of irrevocable harm that might otherwise invite injunctive relief.

[12] From 1867 to 1966, the statute provided simply that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court."  *See Bob Jones Univ. v. Simon*, 416 U.S. 725, 731-32 n.6 (1974).  Congress added the phrase beginning with "by any person" in 1966, not to narrow the Act, but to make clear that it extends to third parties who are not themselves the subject of the tax.  *Id.*  The addition of this phrase "reaffirm[ed] the plain meaning of the original language of the Act," *Alexander v. "Americans United," Inc.*, 416 U.S. 752, 760 n.11 (1974).  That plain meaning encompasses the States.

16

28 U.S.C. § 2201(a), is not limited to "persons," however defined.

## VI.    The Minimum Coverage Provision Is Constitutional

### A.    Congress Has Authority under the Commerce and Necessary and Proper Clauses to Enact the Minimum Coverage Provision

Congress's conclusion that the minimum coverage requirement is integral to the functioning of the health insurance markets rests on legislative judgments that command great deference. That deference reflects the Supreme Court's recognition that a "ruling of unconstitutionality frustrates the intent of the elected representatives of the people." *Ayotte*, 546 U.S. at 329.

Congress found that, before the ACA, uninsured individuals, as a class, shifted billions of dollars of health care costs each year to other participants in the health care market including providers, insurers, governments, and, ultimately, their fellow citizens. ACA §§ 1501(a)(2)(F), 10106(a). Plaintiffs assert that this legislative finding rests on "a series of unsubstantiated and unquantifiable inferences and assumptions . . . about human behavior and its effects." Opp'n 28. But mincing one conclusion into grammatical pieces does not transform it into what plaintiffs imply, a sequence of logical steps, each a precondition for the next. More importantly, the conclusion is both substantiated and verifiable. Abundant empirical evidence shows that nearly everyone consumes health care. Indeed, the evidence shows that uninsured individuals spend an average of $1,700 to $3,000 on health care services annually[13] and seek basic health care services at frequencies ranging from 50 to 95 percent compared to those who have insurance.[14] The

---

[13] Jack Hadley et al., *Covering The Uninsured In 2008: Current Costs, Sources Of Payment, And Incremental Costs*, 27 Health Aff. 399, 401 (2008); *see* David Kashihara & Kelly Carper, Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey, *National Health Care Expenses in the U.S. Civilian Noninstitutionalized Population, 2007*, Dec. 2009, at 8, *at* http://www.meps.ahrq.gov/mepsweb/data_files/publications/st272/stat272.shtml.

[14] June E. O'Neill & Dave M. O'Neill, *Who Are the Uninsured? An Analysis of America's Uninsured Population, Their Characteristics, and Their Health*, Employment Policies

evidence further shows, and Congress found, that individuals who self-insure rather than carry insurance pass a significant portion of their health care costs onto third parties. *See*, *e.g.*, Defs.' Mem. 42 (citing illustrative studies). In sum, the interstate market for health care is unique in crucial respects because participation is essentially universal and not always a matter of choice. Regulation of the participants in this interstate market in no way expands the commerce power.

Plaintiffs cannot immunize this cost-shifting from federal regulation by characterizing it as "inactivity." The words "activity" and "inactivity" do not appear in the Commerce Clause, or, for that matter, anywhere else in the Constitution. And, while the Supreme Court used the word "activity" in recent Commerce Clause opinions, those decisions focused not at all on whether the targets of federal regulation were active or passive. The critical distinction between cases like *Wickard* and *Raich* on the one hand and *Morrison* and *Lopez* on the other was between *economic* and *non-economic* regulation.[15] On that scale, the ACA plainly is economic regulation.

In any event, plaintiffs' dichotomy does not work in the context of the health care market. Precisely because virtually everyone participates at some point in that market, individuals either

---

Institute (2009), *available at* http://www.epionline.org/studies/oneill_06-2009.pdf. A survey of individuals who had no insurance coverage for a full 12-month period found that 72% had received a basic medical test in the last 2 years, 86% in the last 5 years, and 94% in their adult lifetime. Additionally, 50% reported receiving a routine check-up in the last 2 years, 67% in the last 5 years, and 84% in their adult lifetime. *See* O'Neill & O'Neill, *supra*, at 21.

[15] Thus, for example, while plaintiffs quote only the first sentence of, and emphasize the word "activity" in, the following passage from *United States v. Morrison*, 529 U.S. 598, 613 (2000) (quoted in part at Opp'n 25), the full passage more accurately reflects the distinction the Court was drawing:

> Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of noneconomic activity in order to decide these cases, thus far in our Nation's history our case have upheld Commerce Clause regulation of interstate activity only where that activity is economic in nature.

18

carry insurance or they attempt to self-insure.[16]  Indeed, many of those who are self-insured or

uninsured, have recently been, or soon will be, market-insured, and thus participate in the health

insurance market despite bouts of self-insurance.[17]  Through the minimum coverage provision,

Congress has discouraged resort to self-insurance in the health care market, which, Congress

found, routinely results in under-insurance and concomitant transfers of costs.  It is difficult to

posit regulation that is more "commercial" in nature than the regulation of how health care is

paid for by market participants.  Nor is there anything novel about a federal requirement that

market participants carry insurance.  *See*, *e.g.*, 42 U.S.C. § 4012a(e) (borrowers in flood hazard

areas must either maintain insurance on their property or pay the lender the equivalent cost); 30

U.S.C. § 1257(f) (insurance for coal mine operators); 49 U.S.C. § 13906(a)(1) (insurance for

interstate truckers).

      Plaintiffs' attempt to cast the uninsured as passive bystanders in the health care market

thus fails.  Individuals who self-insure engage in economic activity at least as much as the plain-

tiffs in *Raich*, who consumed only home-grown marijuana, had not engaged in commerce, and

had no alleged plans to buy or sell marijuana at any time.  Individuals who decline to obtain

health care financing through the insurance market likewise remain in the market in the same

manner as Roscoe Filburn, who declined to obtain his wheat through the interstate market.  *See*

---

[16] "[M]arket-insurance and self-insurance are 'substitutes.'"  Gary S. Becker & Isaac Ehrlich, *Market Insurance, Self-Insurance, and Self-Protection*, 90 J. Pol. Econ. 623, 636 (1972).

[17] One study showed that, of those who are uninsured at some point in time over the course of a year, 63% had coverage at other points during that year.  CBO, How Many People Lack Health Insurance and for How Long? at 4, 9 (May 2003), *available at* http://www.cbo.gov/ftpdocs/42xx/doc4210/05-12-Uninsured.pdf.  General economic analyses of consumer markets seem to suggest that an individual who has consumed a good in the past and will consume that same good in the future should be considered a participant in the relevant market between episodes of consumption.  *See generally* W. E. Diewert, *Intertemporal Consumer Theory and the Demand for Durables*, 42 Econometrica 497 (1974).

*Wickard*, 317 U.S. 111.  Filburn's own consumption of the wheat he produced, when aggregated with the home consumption of other farmers, would have disrupted the federal price scheme and thus was subject to federal regulation.  Individuals who purport to provide their own financing for health care purchases cause similar price disruption, shifting costs to other health consumers, to service providers, and to the government itself, because, in times of serious illness or injury, for most individuals self-insurance will prove insufficient.

Plaintiffs' argument, in essence, harks back to a long discredited mode of analysis in Commerce Clause jurisprudence, which attempted to define rigid categories of permissible and impermissible economic regulation.  In particular, plaintiffs can cite no support for their asser-tion that the commerce power may be effectuated only through prohibitions and not through affirmative requirements.  Indeed, it is well settled that Congress may use the power of eminent domain to compel the private transfer of land in aid of the regulation of interstate commerce. *Luxton v. N. River Bridge Co.*, 153 U.S. 525, 529-30 (1894) (citing cases).

Plaintiffs' objection to the second, and independent, basis for the minimum coverage provision is equally unavailing.  The minimum coverage provision forms an essential part of the ACA's broader reforms of the health insurance market. *See* Defs.' Mem. 45-49.  In particular, Congress found that it is essential to success of the ACA's "guaranteed issue" provision, which will bar insurers from refusing to cover individuals with pre-existing medical conditions and from setting eligibility rules based on health status, medical condition, claims experience, or medical history.  ACA § 1201.  Congress's power to enact insurance regulations such as the guaranteed issue provision is well established and is uncontested here. *See United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 553 (1944).  Third, the guaranteed issue

reform will not work without a minimum coverage provision.  As experience has shown in States that tried to mandate guaranteed issue without a minimum coverage requirement, given an assurance that they will be able to buy insurance *once* they manifest a pre-existing condition, it becomes all too tempting for healthy individuals to wait *until* they develop such a condition, which makes insurance unsustainable.[18]

Plaintiffs do not dispute that the minimum coverage provision is necessary for Congress's insurance reforms to work; instead, they deem the guaranteed issue provision to be "ancillary" to the ACA.  Opp'n 33.  But those provisions protect millions of Americans who were previously denied coverage or charged exorbitant rates due to pre-existing conditions or prior claims experience, and Congress plainly regarded their protection as a core objective of the Act.  Perhaps Plaintiffs believe that requiring insurers to treat such individuals fairly should not have been a congressional priority, but Congress disagreed, and it was Congress's choice to make.

Plaintiffs alternatively argue that the minimum coverage requirement "fails" in light of factors discussed in *United States v. Comstock*, 130 S. Ct. 1949 (2010), which *rejected* a constitutional challenge to a federal statute.  Opp'n 33-36.  This misunderstands the significance of *Comstock* and its relation to the Court's decision in *Raich*.  The majority in *Raich* observed that the plaintiffs were engaged in economic activity even though they had neither sold nor purchased marijuana and had no plans to enter the market, rejecting arguments akin to the "bystander" claim that plaintiffs advance here.  Concurring, Justice Scalia found no need to determine

---

[18] *See Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 13 (2009) (testimony of Dr. Uwe Reinhardt that requiring guaranteed issue without a minimum coverage requirement would "inexorably" drive health insurance market "into extinction"); *id*. at 123-24 (testimony of National Association of Health Underwriters summarizing experience in States that tried requiring guaranteed issue without also enacting a minimum coverage provision).

whether the possession of homegrown marijuana was "economic activity" because the regulation of homegrown marijuana was necessary and proper to Congress's broader regulation of the interstate market in controlled substances.  *Raich*, 545 U.S. at 37.  Under either the majority's analysis or Justice Scalia's, the minimum coverage provision is easily sustained.

*Comstock* affirmed the broad scope of congressional power to determine what is necessary and proper to the functioning of federal institutions even when — in contrast to *Raich* and this case — a regulation does not directly further a scheme authorized by a specific enumerated power.  The Supreme Court sustained civil commitment procedures applicable to persons reaching the end of federal criminal sentences.  The crimes giving rise to the original incarcerations were violations of statutes enacted as necessary and proper to the implementation of the Commerce Clause.  The subsequent civil commitment, however, could not be justified on this basis.  The Court nevertheless held that a link to a specific enumerated power was unnecessary; it was sufficient that the commitment provisions were necessary and proper to the general operation of the criminal justice and penal systems.  The various considerations cited by the Court in approving the exercise of congressional power over prisoners who reach the end of their federal sentences are inapposite, where, as here, a challenged provision is necessary and proper to the exercise of the Commerce Clause power.

**B.    The Minimum Coverage Provision Is a Valid Exercise of Congress's Independent Power under the General Welfare Clause**

Plaintiffs' argument (Opp'n 36-38) that the minimum coverage requirement — a provision of the Internal Revenue Code expected to raise $4 billion annually — cannot be sustained as a tax, revives "distinctions between regulatory and revenue-raising taxes" long abandoned by the Supreme Court.  *Bob Jones Univ.*, 416 U.S. at 741 n.12.  There is no basis to

22

resuscitate those distinctions here.[19]  Further, that the ACA included findings related to the

Commerce Clause in no way undermines the point that it was also an exercise of the taxing

power.[20]  In other instances where Congress made such findings, courts have treated regulatory

assessments for health coverage as taxes.  *See, e.g.*, *Adventure Res., Inc. v. Holland,* 137 F.3d

786, 794 (4th Cir. 1998).  Indeed, it is not surprising that Congress would make findings relating

to the Commerce Clause, but not the General Welfare Clause.  The effect of a statute on inter-

state commerce is at least partly an empirical determination, as to which congressional findings

may be helpful.  Whether the statute furthers the general welfare, by contrast, is a policy judg-

ment committed to Congress, as to which findings are unnecessary.[21]

### C.    The Minimum Coverage Provision Is Consistent with Due Process

Despite the Supreme Court's admonition that a plaintiff raising a substantive due process

claim must carefully describe the asserted fundamental right, *Chavez v. Martinez*, 538 U.S. 760,

775-76 (2003), plaintiffs curiously insist that this requirement does not apply to them, either

because this is a motion to dismiss, or because they assert not a "new" fundamental right, but one

---

[19] Even if those earlier cases had any lingering validity, at most they suggest that a court may invalidate only punitive or coercive penalties, and even then, only those that coerce the taxpayer into a separate administrative scheme with detailed enforcement mechanisms not allowable under the Commerce Clause.  *See*, *e.g.*, *Carter v. Carter Coal Co.*, 298 U.S. 238 (1936).  Here, the minimum coverage provision is neither punitive nor coercive; the maximum penalty is no greater than the cost of obtaining insurance.

[20] Plaintiffs wrongly assert that the bipartisan Joint Tax Committee "pointedly" did not treat the minimum coverage provision as a tax.  Aside from calling it an "excise tax" that was to be accounted for "as an additional amount of Federal tax owed," JCX-18-10, at 33 n.68, the Committee "pointedly" cross-referenced the CBO's estimates regarding "the tax provisions included in Title I," among which was the minimum coverage provision, JCX-10-10, at 3 n.1.

[21] Contrary to plaintiffs' view (Opp'n 39-41), the penalty is not a flat tax assessed without regard to an individual's circumstances or other direct tax subject to apportionment.  *See Hylton v. United States*, 3 U.S. (3 Dall.) 171 (1796).  Plaintiffs argue (Opp'n 40-41) that indirect taxes must always be imposed on actions, never on inaction or decision.  In addition to having many of the problems of their Commerce Clause inaction argument, plaintiffs' argument cannot distin-guish *Hylton*, where the tax was on "having or keeping" carriages rather than on using them.

that is "long-recognized."  Plaintiffs provide no support for either proposition, and neither is

correct.  Whether an asserted right is fundamental is a quintessential question of law, and courts

regularly require a careful description of such rights on a motion to dismiss.  *See, e.g.*, *Abigail

Alliance v. Von Eschenbach*, 495 F.3d 695, 700-01 (D.C. Cir. 2007) (en banc) (affirming grant of

motion to dismiss).  And the generic right plaintiffs assert here — to be free from "government

compulsion," Am. Compl. ¶ 78 — has not been recognized.  *Washington v. Glucksberg*, 521

U.S. 702, 722 (1997).  Indeed, if such an unbounded right were to exist, much of the United

States Code — not to mention the laws of the plaintiff States — would be a dead letter.

Plaintiffs attempt to ground their asserted due process right in various liberty interests

they claim have been recognized.  Opp'n 43-44.  But what they spin as the freedom "to direct

matters concerning dependent children" has been recognized only as a narrower right to control

education and upbringing, *e.g.*, *Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925), something the

Act does not affect.  What they describe as the freedom "to make decisions regarding the ac-

quisition and use of medical services" is actually a right to refuse medical treatment, *Cruzan v.

Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990); regardless, the Act does not require them to

submit to medical treatment of any kind.  And if there were any doubt that plaintiffs seek to

reinstate the long-discredited *Lochner* line of cases, it would be dispelled by their invocation of

an unfettered "freedom to eschew entering into a contract."  Opp'n 43.  The Court has not

recognized such a right since the 1930s, when it repudiated the doctrines plaintiffs embrace.[22]

---

[22] Plaintiffs err in suggesting that the due process challenges rejected in *W. Coast Hotel
Co. v. Parrish*, 300 U.S. 379 (1937), *Williams v. Morgan*, 478 F.3d 1316 (11th Cir. 2007), *Vesta
Fire Ins. Corp. v. Florida*, 141 F.3d 1427 (11th Cir. 1998), and *Jacobson v. Massachusetts*, 197
U.S. 11 (1905), are irrelevant because those statutes were enacted pursuant to state police
powers, rather than a federal enumerated power.  Opp'n 45 n.50.  Substantive due process limits
government interference — state *and* federal — with fundamental rights.  If a federal law

Plaintiffs attempt to shift the burden to defendants to demonstrate that Congress has previously used the commerce power "to require virtually all Americans to have or contract for any particular good or service." Opp'n 44. This is empty rhetoric, not a legal test. Where a legislative act merely "adjust[s] the burdens and benefits of economic life," it is presumed constitutional, and "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). Plaintiffs fall well short of that burden here, and their due process claim should be rejected.

## CONCLUSION

For the foregoing reasons, as well as those set forth in defendants' opening brief, defendants' motion to dismiss should be granted and this case should be dismissed in its entirety.

Dated:  August 27, 2010              Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

THOMAS F. KIRWIN
United States Attorney

SHEILA LIEBER
Deputy Director

 /s/ *Brian G. Kennedy*
BRIAN G. KENNEDY, D.C. Bar No. 228726
Senior Trial Counsel
ERIC B. BECKENHAUER, Cal. Bar No. 237526

intruded on a fundamental right, so too would an analogous state law, even if it were an exercise of state police powers. Likewise, if a state law were consistent with substantive due process — like the mandatory vaccination laws sustained in *Jacobson*, 197 U.S. at 25-26 — so too would be an analogous federal law.

25

Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Telephone: (202) 514-3338
Facsimile: (202) 616-8470
E-mail: eric.beckenhauer@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2010, the foregoing document was filed with the

Clerk of Court via the CM/ECF system, causing it to be served on Plaintiffs' counsel of record.


 /s/ *Brian G. Kennedy*
BRIAN G. KENNEDY