**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

STATE OF FLORIDA, by and through
Bill McCollum, et al.;

       Plaintiffs,

    v.                            Case No.: 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.,

       Defendants.

_____/

## ORDER AND MEMORANDUM OPINION

    Now pending is the defendants' motion to dismiss (doc. 55). This motion seeks dismissal of Counts One, Two, Three, and Six of the plaintiffs' amended complaint for lack of subject matter jurisdiction (pursuant to Rule 12(b)(1), Fed. R. Civ. P.), and dismissal of all counts in the amended complaint for failure to state a claim upon which relief can be granted (pursuant to Rule 12(b)(6), Fed. R. Civ. P.). The plaintiffs have filed a response in opposition, and the defendants have filed a reply to that response. A hearing was held in this matter on September 14, 2010.

## I. INTRODUCTION

    This litigation --- one of many filed throughout the country --- raises a facial Constitutional challenge to the federal healthcare reform law, Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), amended by Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (the "Act"). It has been filed by sixteen state Attorneys General and four state Governors (the "state plaintiffs");[1] two private citizens, Mary Brown

---

[1] The state plaintiffs represent: Alabama, Alaska, Arizona, Colorado, Florida, Georgia, Idaho, Indiana, Louisiana, Michigan, Mississippi, Nebraska, Nevada, North and South Dakota, Pennsylvania, South Carolina, Texas, Utah, and Washington.

and Kaj Ahlburg (the "individual plaintiffs"); and the National Federation of Independent Business ("NFIB") (together, the "plaintiffs"). The defendants are the United States Department of Health and Human Services, Department of Treasury, Department of Labor, and their respective secretaries (together, the "defendants").

Before addressing the plaintiffs' allegations, and the arguments in support of the defendants' motion to dismiss, I will take a moment to emphasize preliminarily what this case is, and is not, about.

The Act is a controversial and polarizing law about which reasonable and intelligent people can disagree in good faith. There are some who believe it will expand access to medical treatment, reduce costs, lead to improved care, have a positive effect on the national economy, and reduce the annual federal budgetary deficit, while others expect that it will do exactly the opposite. Some say it was the product of an open and honest process between lawmakers sufficiently acquainted with its myriad provisions, while others contend that it was drafted behind closed doors and pushed through Congress by parliamentary tricks, late night weekend votes, and last minute deals among members of Congress who did not read or otherwise know what was in it. There are some who believe the Act is designed to strengthen the private insurance market and build upon free market principles, and others who believe it will greatly expand the size and reach of the federal government and is intended to create a socialized government healthcare system.

While these competing arguments would make for an interesting debate and discussion, it is not my task or duty to wade into the thicket of conflicting opinion on any of these points of disagreement. For purposes of this case, it matters not whether the Act is wise or unwise, or whether it will positively or negatively impact healthcare and the economy. Nor (except to the limited extent noted in Part III.A(7) infra) am I concerned with the manner in which it was passed into law. My review of the statute is not to question or second guess the wisdom, motives, or methods

of Congress. I am only charged with deciding if the Act is Constitutional. If it is, the legislation must be upheld --- even if it is a bad law. United States v. Butler, 297 U.S. 1, 79, 56 S. Ct. 312, 80 L. Ed. 477 (1936) ("For the removal of unwise laws from the statute books appeal lies, not to the courts, but to the ballot and to the processes of democratic government") (Stone, J., dissenting). Conversely, if it is unconstitutional, the legislation must be struck down --- even if it is a good law. Bailey v. Drexel Furniture Co. (Child Labor Tax Case), 259 U.S. 20, 37, 42 S. Ct. 449, 66 L. Ed. 817 (1922) (reviewing court must strike down unconstitutional law even though that law is "designed to promote the highest good. The good sought in unconstitutional legislation is an insidious feature, because it leads citizens and legislators of good purpose to promote it, without thought of the serious breach it will make in the ark of our covenant, or the harm which will come from breaking down recognized standards.").

At this stage in the case, however, my job is much simpler and more narrow than that. In ruling on the defendants' motion to dismiss, I must only decide if this court has jurisdiction to consider some of the plaintiffs' claims, and whether each of the counts of the amended complaint states a plausible claim for relief.

## II. BACKGROUND

As Congress has recognized: "By most measures, we have the best medical care system in the world." H.R. Rep. No. 111-443, pt. 1. However, at the same time, no one can deny that there are significant and serious problems. Costs are high and millions do not have insurance. Lack of health insurance can preclude the uninsured from accessing preventative care. If and when the uninsured are injured or become ill, they receive treatment, as the defendants acknowledge, because in this country medical care is generally not denied due to lack of insurance coverage or inability to pay. However, the costs that are incurred to treat the uninsured are sometimes left unpaid --- to the tune of $43 billion in 2008 (which is less than 2% of all national healthcare expenditures for that year). The costs of uncompensated

care are passed along to market participants in the form of higher costs and raised premiums, which, in turn, can help perpetuate the cycle (or the "premium spiral," as the defendants call it) and add to the number of uninsured. It was against this backdrop that Congress passed the Act.

**A. The Legislative Scheme**

At nearly 2,700 pages, the Act is very lengthy and includes many provisions, only a few of which are specifically at issue in this litigation. Chief among them is Section 1501, which, beginning in 2014, will require that all citizens (with stated exceptions) obtain federally-approved health insurance, or pay a monetary penalty (the "individual mandate"). This provision is necessary, according to Congress and the defendants, to lower premiums (by spreading risks across a much larger pool) and to meet "a core objective of the Act," which is to expand insurance coverage to the uninsured by precluding the insurance companies from refusing to cover (or charging exorbitant rates to) people with pre-existing medical conditions. Without the individual mandate and penalty in place, the argument goes, people would simply "game the system" by waiting until they get sick or injured and only then purchase health insurance (that insurers must by law now provide), which would result in increased costs for the insurance companies. This is known as "the moral hazard." The increased costs would ultimately be passed along to consumers in the form of raised premiums, thereby creating market pressures that would (arguably) inevitably drive the health insurance industry into extinction. The plaintiffs allege that regardless of whether the individual mandate is well-meaning and essential to the Act, it is unconstitutional and will have both a "profound and injurious impact" on the states, individuals, and businesses.

The plaintiffs object to several interrelated portions of the Act as well. First, the Act significantly alters and expands the Medicaid program. Created in 1965, Medicaid is a cooperative federal-state program that provides for federal financial assistance (in the form of matching funds) to states that elect to provide medical

care to needy persons. The Act will add millions of new enrollees to the states'
Medicaid rolls by expanding the program to include all individuals under the age of
65 with incomes up to 133% of the federal poverty line. Second, the Act provides
for creation of "health benefit exchanges" designed to allow individuals and small
businesses to leverage their buying power to obtain competitive prices. The Act
contemplates that these exchanges will be set up and operated by the states, or by
the federal government if the states elect not to do so. And lastly, the Act requires
that the states (along with other "large employers") provide their employees with a
prescribed minimum level of health insurance coverage (the "employer mandate").
The plaintiffs allege that these several provisions violate the Constitution and state
sovereignty by coercing and commandeering the states and depriving them of their
"historic flexibility" to run their state government, healthcare, and Medicaid
programs. The plaintiffs anticipate that these and various other provisions in the
Act will cost Florida (and the other states similarly) billions of dollars between now
and the year 2019, not including the administrative costs it will take to implement
the Act, and that these costs will only increase in the subsequent years. In short,
the plaintiffs contend that the legislation is coercive, intrusive, and could bankrupt
the states.[2]

### B. This Lawsuit and the Motion to Dismiss

The plaintiffs advance six causes of action in their amended complaint, and
they seek declaratory and injunctive relief with respect to each. They contend that
the Act violates the Constitution in the following ways: (1) the individual mandate
and concomitant penalty exceed Congress's authority under the Commerce Clause

---

[2] Not all states feel this way, and there is even a division within a few of the
plaintiff states. Three Attorneys General and four Governors previously requested
leave to participate in this case as <u>amici</u> <u>curiae</u>, and they have indicated that they
favor the changes the Act will bring as they believe the new legislation will save
money and reduce their already overburdened state budgets (docs. 57, 59).

and violate the Ninth and Tenth Amendments (Count I); (2) the individual mandate and penalty violate substantive due process under the Fifth Amendment (Count II); (3) "alternatively," if the penalty imposed for failing to comply with the individual mandate is found to be a tax, it is an unconstitutional unapportioned capitation or direct tax in violation of U.S. Const. art. I, § 9, cl. 4, and the Ninth and Tenth Amendments (Count III); (4) the Act coerces and commandeers the states with respect to Medicaid by altering and expanding the program in violation of Article I and the Ninth and Tenth Amendments (Count IV); (5) it coerces and commandeers with respect to the health benefit exchanges in violation of Article I and the Ninth and Tenth Amendments (Count V); and (6) the employer mandate interferes with the states' sovereignty as large employers and in the performance of government functions in violation of Article I and the Ninth and Tenth Amendments (Count VI). See generally Amended Complaint ("Am. Compl.") (doc. 42).

 The defendants seek to have the complaint dismissed on numerous grounds; four of the counts for lack of jurisdiction (under Rule 12(b)(1)), and all six of them for failure to state a claim upon which relief can be granted (under Rule 12(b)(6)). With respect to jurisdiction, the defendants contend that for the challenges to the individual mandate and employer mandate (Counts I, II, and VI), the plaintiffs lack standing; the claims are not ripe; and the claims are barred by the Anti-Injunction Act. (By not raising similar arguments for Counts IV and V, the defendants appear to impliedly concede that those counts allege injuries that are immediately ripe for review). As for the plaintiffs' "alternative" cause of action contending that, if the individual mandate penalty is deemed to be a tax, then it is an impermissible and unconstitutional one (Count III), the defendants maintain that, too, is precluded by the Anti-Injunction Act.

 If the foregoing jurisdictional challenges fail, the defendants go on to assert that those causes of action, and all others, fail to state a claim for which relief can be granted.

## III. DISCUSSION

### A. Is the "Penalty" for Non-Compliance with the Individual Mandate Actually a "Tax" for Constitutional Analysis?

A fundamental issue overlaps the defendants' challenges to several of the plaintiffs' claims, and that is whether the individual mandate penalty is a "tax" within Congress's broad taxing power and thus subject to the Anti-Injunction Act, or instead, a "penalty" that must be authorized, if at all, by Congress's narrower Commerce Clause power. Because of the importance of this issue, I will analyze it first and at some length.

The defendants contend that the individual mandate penalty is a tax that is sustainable under Congress's expansive power to tax for the general welfare. U.S. Const. art I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the . . . general Welfare"). The plaintiffs urge that, if it is a tax, it is an unconstitutional one. The defendants maintain that the plaintiffs have no standing to raise the claim at this point in time because of the Anti-Injunction Act.

The Anti-Injunction Act [26 U.S.C. § 7421(a)] provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person . . . ." The remedy for challenging an improper tax is a post-collection suit for refund. As the Supreme Court has explained:

> The Anti-Injunction Act . . . could scarcely be more explicit --- "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court . . ." The Court has interpreted the principal purpose of this language to be the protection of the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference, "and to require that the legal right to the disputed sums be determined in a suit for refund." The Court has also identified "a collateral objective of the Act --- protection of the collector from litigation pending a suit for refund."

Bob Jones Univ. v. Simon, 416 U.S. 725, 736-37, 94 S. Ct. 2038, 40 L. Ed. 2d
496 (1974) (citations omitted); accord, e.g., United States v. Clintwood Elkhorn
Min. Co., 553 U.S. 1, 10, 128 S. Ct. 1511, 170 L. Ed. 2d 392 (2008) ("[The Anti-
Injunction Act] commands that (absent certain exceptions) 'no suit for the purpose
of restraining the assessment or collection of any tax shall be maintained in any
court,'" even if the tax is alleged to be unconstitutional, which means "the
taxpayer must succumb to an unconstitutional tax, and seek recourse only after it
has been unlawfully exacted"); Enochs v. Williams Packing & Navigation Co., 370
U.S. 1, 7, 82 S. Ct. 1125, 8 L. Ed. 2d 292 (1962) (explaining that the "manifest
purpose" of the Anti-Injunction Act "is to permit the United States to assess and
collect taxes alleged to be due without judicial intervention, and to require that the
legal right to the disputed sums be determined in a suit for refund. In this manner
the United States is assured of prompt collection of its lawful revenue."). The Anti-
Injunction Act, in short, applies to "truly revenue-raising tax statutes," see Bob
Jones Univ., supra, 416 U.S. at 743, and seeks "protection of the revenues"
pending a suit for refund. See id. at 737, 740.

Because the individual mandate does not go into effect until 2014, which
means the penalty for non-compliance could not be assessed until that time, the
Anti-Injunction Act, if it applies, could render much of this case premature and
inappropriate as any injunctive or declaratory relief in favor of the plaintiffs could
hinder collection of tax revenue. See id. at 732 n.7, 738-39 (where the outcome of
a suit seeking injunctive or declaratory relief will prevent assessment and collection
of tax revenue, the case "falls within the literal scope and the purposes of the
[Anti-Injunction Act]"). Consequently, whether the individual mandate penalty is a
tax is an important question that not only implicates jurisdiction (vis-a-vis the Anti-
Injunction Act), and is not only the specific basis of one of the plaintiffs' causes of
action, but it also goes to the merits of the individual mandate-related challenges of
Counts One and Two (that is, whether the penalty can be justified by, and enforced

through, Congress's indisputably broad taxing power), or whether, instead, the

penalty must pass Constitutional muster, if at all, under the more limited Commerce

Clause authority. As noted, I should, and will, consider this significant issue at the

outset.[3]

### (1) Revenue-raising vs. regulatory

The plaintiffs contend that the individual mandate penalty is not a "true tax"

because, among other things, it will (at most) "generate only 'some revenue,' and

then only as an incident to some persons' failure to obey the law." See Plaintiffs'

Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl. Mem."), at 19

(doc. 68). In other words, because its primary purpose is regulatory --- and will only

raise "little" revenue --- it is not a tax as the term is generally understood. It is true,

as held in certain of the early tax cases to which the plaintiffs cite, see, e.g., Lipke

v. Lederer, 259 U.S. 557, 42 S. Ct. 549, 66 L. Ed. 1061 (1922); Hill v. Wallace,

---

[3] The plaintiffs have briefly suggested that the Anti-Injunction does not apply to this case because their challenge "is to the individual mandate itself" and not the "incidental penalty that accompanies the individual mandate." While it is true that the language of the Anti-Injunction Act only prohibits suits "for the purpose of restraining the assessment or collection of any tax," which would not apply to the individual mandate for every citizen to maintain healthcare coverage, the mandate and penalty clearly work in tandem. If the penalty is a legitimate tax, striking the individual mandate down will necessarily impede assessment and collection of tax revenue. The Anti-Injunction Act is not limited to direct and actual tax assessment or collection; the Eleventh Circuit and other courts have held that the statute also reaches activities that may "eventually" impede the collection of revenue (even if indirectly). See, e.g., Gulden v. United States, 287 Fed. Appx. 813, 815-17 (11th Cir. 2008) (explaining that the Anti-Injunction Act is "interpreted broadly" and "bars not only suits that directly seek to restrain the assessment or collection of taxes, but also suits that seek to restrain . . . activities 'which are intended to or may culminate in the assessment or collection of taxes'") (citation omitted); Judicial Watch Inc. v. Rossotti, 317 F.3d 401, 405 (4th Cir. 2003) ("it is clear that the Anti-Injunction Act extends beyond the mere assessment and collection of taxes to embrace other activities," such as those that may eventually "culminate in the assessment or collection of taxes").

259 U.S. 44, 42 S. Ct. 453, 66 L. Ed. 822 (1922), that the Supreme Court once drew distinctions between regulatory and revenue-raising taxes. However, those holdings had a very short shelf-life. As noted in Bob Jones Univ., supra, which cited to Lipke and Hill for that position, "the Court . . . subsequently abandoned such distinctions." 416 U.S. at 741 n.12; see also id. at 743 (further stating that the cases were "of narrow scope" and "produced a prompt correction in course"). Succeeding case law recognized that "[e]very tax is in some measure regulatory. To some extent it interposes an economic impediment to the activity taxed as compared with others not taxed. But a tax is not any the less a tax because it has a regulatory effect." Sonzinsky v. United States, 300 U.S. 506, 513, 57 S. Ct. 554, 81 L. Ed. 772 (1937); see also id. ("it has long been established that an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax . . . tends to restrict or suppress the thing taxed"). Thus, as the law currently exists, "[i]t is beyond serious question that a tax does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed. The principle applies even though the revenue obtained is obviously negligible, or the revenue purpose of the tax may be secondary." United States v. Sanchez, 340 U.S. 42, 44, 71 S. Ct. 108, 95 L. Ed. 47 (1950); accord United States v. Kahriger, 345 U.S. 22, 27 n.3, 28, 73 S. Ct. 510, 97 L. Ed. 754 (1953) (holding same and sustaining federal gambling tax even though its proponents sought to hinder the activity at issue and "'indulge[d] the hope that the imposition of this type of tax would eliminate that kind of activity'"), overruled on other grounds, Marchetti v. United States, 390 U.S. 39, 88 S. Ct. 697, 19 L. Ed. 2d 889 (1968). The elimination of the "regulatory vs. revenue-raising" test does not necessarily mean, however, that the exaction at issue in this case is a "tax."

## (2) The Court's role in ascertaining what Congress intended

In deciding this specific question, I will start from the assumption (only for the analysis of whether it is a tax) that Congress could have used its broad taxing

power to impose the exaction and that, if it had clearly (or even arguably) intended to do so, then the exaction would have been sustainable under its taxing authority. See Kahriger, supra, 345 U.S. at 28, 31 ("As is well known, the constitutional restraints on taxing are few," and courts are generally "without authority to limit the exercise of the taxing power"); see also United States v. Ptasynski, 462 U.S. 74, 103 S. Ct. 2239, 76 L. Ed. 2d 427 (1983) (observing that "Congress's power to tax is virtually without limitation").[4] However, that is not what happened here. Although factually dissimilar, on this point I find instructive the early case of Helwig v. United States, 188 U.S. 605, 23 S. Ct. 427, 47 L. Ed. 614 (1903). At issue in that case was a federal law that required importers to pay a duty on imported items based on their declared value, plus "a further sum" for any item subsequently found to have been inadequately valued. The sole question the Supreme Court was called upon to decide was whether, for jurisdictional purposes, the so-called "further sum" was "revenue from imports or tonnage" (i.e., a tax), or whether it was in the nature of a penalty. The Court stated:

> Although the statute, under § 7, supra, terms the money demanded as 'a further sum,' and does not describe it as a penalty, still the use of those words does not change the nature and character of the enactment. Congress may enact that such a provision shall not be considered as a penalty or in the nature of one, . . . and it is the duty of the court to be governed by such statutory direction, but the intrinsic nature of the provision remains, and, in the absence of any declaration by Congress affecting the manner in which the provision shall be treated, courts must decide the matter in accordance with their views of the nature of the act.

Id. at 612-13 (emphasis added). In concluding that the provision was a penalty, the Court stated that, based on the statutory language and its application to the facts

--------

[4] But see the discussion with respect to Count Three, Part III.C(4) infra.

of the case, it was "impossible . . . to hold this provision to be other than penal in its nature." Id. at 613. To be clear, it is not necessarily significant for our purposes that Helwig found the "further sum" to be in the nature of a penalty and not a tax; rather, what is significant is what the Supreme Court said along the way to getting there. In reaching its conclusion, the Court made it a point to stress --- as it did in the emphasized portion quoted above --- that regardless of the "ordinary or general meaning of the words" in the statute, and regardless of the "nature and character of the enactment," the exaction would not have been found a penalty if Congress intended otherwise. Thus, "[i]f it clearly appear that it is the will of Congress that the provision shall not be regarded as in the nature of a penalty, the court must be governed by that will." Id. (emphasis added).

As applied to the facts of this case, Helwig can be interpreted as concluding that, regardless of whether the exaction could otherwise qualify as a tax (based on the dictionary definition or "ordinary or general meaning of the word"), it cannot be regarded as one if it "clearly appears" that Congress did not intend it to be. In this case, there are several reasons (perhaps none dispositive alone, but convincing in total) why it is inarguably clear that Congress did not intend for the exaction to be regarded as a tax.[5]

### (3) Congress did not call it a tax, despite knowing how to do so

In addition to the Act, there were several healthcare reform bills introduced

---

[5] Although it only matters what Congress intended, I note for background purposes that before the Act was passed into law, one of its chief proponents, President Barack Obama, strongly and emphatically denied that the penalty was a tax. When confronted with the dictionary definition of a "tax" during a much-publicized interview widely disseminated by all of the news media, and asked how the penalty did not meet that definition, the President said it was "absolutely not a tax" and, in fact, "[n]obody considers [it] a tax increase." See, e.g., Obama: Requiring Health Insurance is Not a Tax Increase, CNN, Sept. 29, 2009, available at: http://www.cnn.com/2009/POLITICS/09/20/obama.health.care/index.html.

and debated during the 111th Congress. For example, "America's Affordable Health Choices Act of 2009" (H.R. 3200) was introduced in the House of Representatives on July 14, 2009. Like the Act, it contained an individual mandate and concomitant penalty. However, it called the penalty a tax. Section 401 was unambiguously titled "Tax on Individuals Without Acceptable Health Care Coverage," and went on to refer to the exaction as a "tax" no less than fourteen times in that section alone. See, e.g., id. (providing that with respect to "any individual who does not meet the requirements of subsection (d) at any time during the taxable year, there is hereby imposed a tax"). H.R. 3200 was thereafter superseded by a similar bill, "Affordable Health Care for America Act" (H.R. 3962), which was actually passed in the House of Representatives on November 7, 2009. That second House bill also included an individual mandate and penalty, and it repeatedly referred to the penalty as a "tax." See, e.g., Section 501 (providing that for any person who does not comply with the individual mandate "there is hereby imposed a tax," and referring to that "tax" multiple times); Section 307(c)(1)(A) (further referring to the penalty as a "tax[ ] on individuals not obtaining acceptable coverage").

    While the above bills were being considered in the House, the Senate was working on its healthcare reform bills as well. On October 13, 2009, the Senate Finance Committee passed a bill, "America's Healthy Future Act" (S. 1796). A precursor to the Act, this bill contained an individual mandate and accompanying penalty. In the section titled "Excise Tax on Individuals Without Essential Health Benefits Coverage," the penalty was called a "tax." See Section 1301 ("If an applicable individual fails to [obtain required insurance] there is hereby imposed a tax").

    In contrast to the foregoing, the Act --- which was the final version of the healthcare legislation later passed by the Senate on December 24, 2009 --- did not call the failure to comply with the individual mandate a tax; it was instead called a "penalty." The Act reads in pertinent part: "If an applicable individual fails to meet

the requirement of subsection (a) . . . there is hereby imposed a penalty." Act §
1501(b)(1). Congress's conspicuous decision to not use the term "tax" in the Act
when referring to the exaction (as it had done in at least three earlier incarnations
of the legislation) is significant. "'Few principles of statutory construction are more
compelling than the proposition that Congress does not intend sub silentio to enact
statutory language that it has earlier discarded in favor of other language.'" INS v.
Cardoza-Fonseca, 480 U.S. 421, 442, 107 S. Ct. 1207, 94 L. Ed. 2d 434 (1987).
Thus, "[w]here Congress includes [certain] language in an earlier version of a bill
but deletes it prior to enactment, it may be presumed that the [omitted text] was
not intended." Russello v. United States, 464 U.S. 16, 23-24, 104 S. Ct. 296, 78
L. Ed. 2d 17 (1983); see also United States v. NEC Corp., 931 F.2d 1493, 1502
(11th Cir. 1991) (changes in statutory language "generally indicate[ ] an intent to
change the meaning of the statute"); Southern Pac. Transportation Co. v. Usery,
539 F.2d 386, 390-91 (5th Cir. 1976) (rejecting the interpretation of a statute that
was based on language in an earlier House version that the Senate changed prior to
passing into law, and attaching "weight to the [Senate's] conscious and deliberate
substitution of [the House's] language") (binding under Bonner v. City of Prichard,
Alabama, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc)).

      Congress's failure to call the penalty a "tax" is especially significant in light
of the fact that the Act itself imposes a number of taxes in several other sections
(see, e.g., Excise Tax on Medical Device Manufacturers, § 1405 ("There is hereby
imposed on the sale of any taxable medical device by the manufacturer, producer,
or importer a tax"); Excise Tax on High Cost Employer-Sponsored Health Coverage,
§ 9001 ("there is hereby imposed a tax"); Additional Hospital Insurance Tax on
High-Income Taxpayers, § 9015 ("there is hereby imposed a tax"); Excise Tax on
Indoor Tanning Services, § 10907 ("There is hereby imposed on any indoor tanning
service a tax")). This shows beyond question that Congress knew how to impose a
tax when it meant to do so. Therefore, the strong inference and presumption must

be that Congress did not intend for the "penalty" to be a tax. See generally Hodge v. Muscatine County, 196 U.S. 276, 25 S. Ct. 237, 49 L. Ed. 477 (1905) (noting that "[i]t is not easy to draw an exact line of demarcation between a tax and a penalty," but where the statute uses "tax" in one section and "penalty" in another, courts "cannot go far afield" in treating the exaction as it is called; to do otherwise "would be a distortion of the words employed"); see also Duncan v. Walker, 533 U.S. 167, 173, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001) ("It is well settled that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (citations omitted); Freemanville Water Sys., Inc. v. Poarch Band of Creek Indians, 563 F.3d 1205, 1209 (11ᵗʰ Cir. 2009) ("[W]here Congress knows how to say something but chooses not to, its silence is controlling"); DIRECTV, Inc. v. Brown, 371 F.3d 814, 818 (11ᵗʰ Cir. 2004) ("[W]hen Congress uses different language in similar sections, it intends different meanings.").

The defendants assert in their memorandum, see Memorandum in Support of Defendants' Motion to Dismiss ("Def. Mem."), at 33, 50 n.23 (doc. 56-1), as they did during oral argument, that in deciding whether the exaction is a penalty or tax, "it doesn't matter" what Congress called it because the label "is not conclusive." See Transcript of Oral Argument ("Tr."), at 27-29 (doc. 77). As a general rule, it is true that the label used is not controlling or dispositive because Congress, at times, may be unclear and use inartful or ambiguous language. Therefore, as the Supreme Court recognized more than 100 years ago in Helwig, supra, the use of a particular word "does not change the nature and character of the [exaction]," and it is the ultimate duty of the court to decide the issue based on "the intrinsic nature of the provision" irrespective of what it is called. See 188 U.S. at 612-13; accord Cooley v. Bd. of Wardens, 53 U.S. (12 How.) 299, 314, 13 L. Ed. 996 (1851) ("it is the thing, and not the name, which is to be considered"). However, as also noted in

Helwig, this rule must be set aside when it is clear and manifest that Congress intended the exaction to be regarded as one and not the other. For that reason, the defendants are wrong to contend that what Congress called it "doesn't matter." To the extent that the label used is not just a label, but is actually indicative of legislative purpose and intent, it very much does matter. By deliberately changing the characterization of the exaction from a "tax" to a "penalty," but at the same time including many other "taxes" in the Act, it is manifestly clear that Congress intended it to be a penalty and not a tax.[6]

Quoting the Third Circuit in Penn Mut. Indem. Co. v. C.I.R, 277 F.2d 16, 20 (3d Cir. 1960), the defendants maintain that "'Congress has the power to impose taxes generally, and if the particular imposition does not run afoul of any constitutional restrictions then the tax is lawful, call it what you will.'" Def. Mem. at 50 n.23. I do not necessarily disagree with this position, at least not when it is quite clear that Congress intends to impose a tax and is acting pursuant to its taxing power. However, as will be discussed in the next section, that is not the situation here. In the Penn Mutual Indemnity case, for example, it was clear and undisputed that Congress had exercised its taxing authority to impose the exaction; it was inarguably a "tax," and the only question was whether it was an excise tax, an income tax, or some other type of tax. It was in that particular context that the Third Circuit's analysis included the quoted statement, and further elaborated that: "It is not necessary to uphold the validity of the tax imposed by the United States

---

[6] A hypothetical helps to further illustrate this point. Suppose that after the Act imposed the penalty it went on to expressly state: "This penalty is not a tax." According to the logic of the defendants' argument, if the intrinsic nature of the penalty was a tax, it could still be regarded as one despite what it was called and despite the clear and unmistakable Congressional intent to the contrary. Such an outcome would be absurd. In my view, changing the word from tax to penalty, but at the same time including various other true (and accurately characterized) taxes in the Act, is the equivalent of Congress saying "This penalty is not a tax."

that the tax itself bear an accurate label." <u>See</u> 277 F.2d at 20. That is obviously a very different situation from the one presented here, where the precise <u>label</u> of an acknowledged tax is not being disputed, but rather whether it is even a tax <u>at all</u>.

**(4) Congress did not state that it was acting under its taxing authority, and, in fact, it treated the penalty differently than traditional taxes**

Congress did not state in the Act that it was exercising its taxing authority to impose the individual mandate and penalty; instead, it relied exclusively on its power under the Commerce Clause. U.S. Const. art I, § 8, cl. 3 ("[Congress shall have Power] To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"). The Act recites numerous (and detailed) factual findings to show that the individual mandate regulates commercial activity important to the economy. Specifically, it states that: "The [individual mandate] is commercial and economic in nature, and substantially affects interstate commerce" in that, <u>inter alia</u>, "[h]ealth insurance and health care services are a significant part of the national economy" and the mandate "will add millions of new consumers to the health insurance market, increasing the supply of, and demand for, health care services." Act § 1501(a)(1)-(2)(B)(C). It further states that health insurance "is in interstate commerce," and the individual mandate is "essential to creating effective health insurance markets." <u>Id.</u> § 1501(a)(2)(F), (H). The Act contains <u>no</u> indication that Congress was exercising its taxing authority or that it meant for the penalty to be regarded as a tax. Although the penalty is to be placed in the Internal Revenue Code under the heading "Miscellaneous Excise Taxes," the plain language of the Code itself states that this does not give rise to any inference or presumption that it was intended to be a tax. <u>See</u> <u>United States v. Reorganized CF&I Fabricators of Utah, Inc.</u>, 518 U.S. 213, 222-23, 116 S. Ct. 2106, 135 L. Ed. 2d 506 (1996) (citing to 26 U.S.C. § 7806(b), which provides that: "No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision or portion of this title").

In fact, while the penalty is placed under the "Excise Taxes" heading of the Code,
at the same time Congress specifically exempted and divorced the penalty from all
the traditional enforcement and collection methods used by the Internal Revenue
Service, such as tax liens, levies, and criminal proceedings. See Act § 1501(b).
These exemptions from normal tax attributes --- coupled with Congress's failure to
identify its taxing authority --- belie the claim that, simply because it is mentioned
in the Internal Revenue Code, the penalty must be a tax.[7]

### (5) Lack of statutorily-identified revenue-generating purpose

Perhaps most significantly, the Act does not mention any revenue-generating
purpose that is to be served by the individual mandate penalty, even though such a
purpose is required. See Rosenberger v. Rector and Visitors of Univ. of Virginia,
515 U.S. 819, 841, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) ("'A tax, in the
general understanding of the term, and as used in the Constitution, signifies an
exaction for the support of the Government'"). In this circuit, the ultimate test of
tax validity "is whether on its face the tax operates as a revenue generating
measure and the attendant regulations are in aid of a revenue purpose." United

---

[7] In highlighting that Congress did not identify its taxing power as the basis
for imposing the "penalty," I am not suggesting that legislative action is invalid if a
power source is not identified. To the contrary, I recognize that "Congress's failure
to cite [a particular power] does not eliminate the possibility that [said power] can
sustain this legislation." United States v. Moghadam, 175 F.3d 1269, 1275 n.10
(11th Cir. 1999); see also Wilson-Jones v. Caviness, 99 F.3d 203, 208 (6th Cir.
1996) ("A source of power [can] justify an act of Congress even if Congress did
not state that it rested the act on the particular source of power.") (citing cases,
including Woods v. Cloyd W. Miller Co., 333 U.S. 138, 144, 68 S. Ct. 421, 92 L.
Ed. 596 (1948) ("The question of the constitutionality of action taken by Congress
does not depend on recitals of the power which it undertakes to exercise.")). Thus,
to be clear, I am not saying that the penalty is invalid as a tax because Congress
did not expressly identify its taxing power. Rather, its failure to do so (particularly
when it took time to extensively identify its Commerce Clause power), is merely
one of several facts that shows Congress was not exercising its taxing authority
and did not intend for the penalty to be regarded as a tax.

States v. Ross, 458 F.2d 1144, 1145 (5th Cir. 1972) (emphasis added) (binding under Bonner, supra, 661 F.2d at 1207).

The revenue-generating provisions in the Act were an important part of the legislation as they were necessary under current Congressional procedure to score its final cost. To be sure, much of the debate within and outside Congress focused on the bill's final price tag and whether it would exceed the threshold of $1 trillion over the course of the first ten years; and while the legislation was being debated, Congress worked closely and often with the Congressional Budget Office ("CBO") to ensure that it did not. Obviously, if the penalty had been intended by Congress to be a true revenue-generating tax (that could be used to keep the Act's final cost down) then it would have been treated as a tax "on its face." During oral argument, defense counsel stated that "[t]he purpose of the [penalty] is . . . to raise revenue to offset expenditures of the federal government that it makes in connection, for example, with the Medicaid expansion." See Tr. at 9. However, there is absolutely no support for that statement in the statute itself.

On its face, the Act lists seventeen "Revenue Offset Provisions" (including the several taxes described supra), and, as reconciled, it further includes a section entitled "Provisions Relating to Revenue" (which also references those taxes and other revenue offsetting provisions). However, the individual mandate penalty is not listed anywhere among them. Nowhere in the statute is the penalty provision identified or even mentioned as raising revenue and offsetting the Act's costs. It is especially noteworthy that the Act does not identify revenue to be generated from the penalty (which the defendants now maintain would raise about $4 billion each year), but the statute identifies the tanning salon tax as revenue-raising (even though that tax is expected to raise a significantly smaller $300 million annually). See Joint Committee on Taxation, Estimated Revenue Effects of the Manager's Amendment to the Revenue Provisions Contained in the "Patient Protection and Affordable Care Act," as Passed by the Senate on December 24, 2009 (JCX-10-

10), March 11, 2010, at 2. If Congress had intended and understood the penalty to be a tax that would raise revenue for the government, which could in turn be used to partially finance the Act's budgetary effect and help keep its ten-year cost below the $1 trillion threshold by offsetting its expenditures, it makes little sense that Congress would ignore a "tax" that could be expected to raise almost $20 billion in revenue between the years 2015-2019, yet mention another tax that was expected to raise less than one-tenth of that revenue annually during the same time period.

To the extent there is statutory ambiguity on this issue, both sides ask that I look to the Act's legislative history to determine if Congress intended the penalty to be a tax. Ironically, they rely on the same piece of legislative history in making their respective arguments, to wit, the 157-page "Technical Explanation" of the Act that was prepared by the Staff of the Joint Committee on Taxation on March 21, 2010 (the same day the House voted to approve and accept the Senate bill and two days before the bill was signed into law). The plaintiffs highlight the fact that the report "consistently" refers to the penalty as a penalty and not a tax, see Pl. Mem. at 19 (as compared, for example, with the tanning salon tax that is consistently referred to as a "tax" in that same report, see JCT, Technical Explanation of the Revenue Provisions of the "Reconciliation Act of 2010," as amended, in Combination with the "Patient Protection and Affordable Care Act" (JCX-18-10), March 21, 2010, at 108). The defendants, on the other hand, highlight the fact that the JCT referred to the penalty as an "excise tax" in a single heading in that report. See Def. Mem. at 51.

As the Supreme Court has repeatedly held, "the authoritative statement is the statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." Exxon Mobil Corp. v. Allapattah Services, Inc., 545 U.S. 546, 568, 125 S. Ct. 2611, 162 L. Ed. 2d 502 (2005) (emphasis added). On the facts

of this case, "penalty" is not an ambiguous term, but rather was a carefully and intentionally selected word that has a specific meaning and carries a particular import (discussed <u>infra</u>). Moreover, even if the term was ambiguous, the Supreme Court has pointed out two "serious criticisms" of attempting to rely on legislative history:

> Not all extrinsic materials are reliable sources of insight into legislative understandings . . ., and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in "'looking over a crowd and picking out your friends.'" <u>See</u> Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L. Rev. 195, 214 (1983). Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members --- or, worse yet, unelected staffers and lobbyists --- both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text. <u>Id.</u>

In this case, both criticisms are directly on the mark. The report is ambiguous and contradictory, as evidenced by the simple fact that both sides claim it supports their position. Should I look to the heading (that calls the exaction an "excise tax"), or should I look to the actual body of the report (that calls it a penalty no less than twenty times with no mention of it being a tax)? It is, as Judge Leventhal said, like "looking over a crowd and picking out your friends." Further, a strong argument could be (and has been) made that the staffers who drafted the report were merely engaging in last minute "strategic manipulation" to secure results they were unable to achieve through the Act itself. <u>See</u>, <u>e.g.</u>, <u>The Insurance Mandate in Peril</u>, Wall St. J., Apr. 29, 2010, at A19 (opining that the "excise tax" heading in the JCT

report should not be used to convert the penalty into a tax because the Supreme Court "will not allow staffers and lawyers to change the statutory cards that Congress already dealt when it adopted the Senate language"). For these reasons, as recognized by the Supreme Court, resort to, or reliance upon, the JCT staff's Technical Explanation would be inappropriate on the facts of this case --- even if the term "penalty" was ambiguous (which it is not).

To summarize the foregoing, it "clearly appears" from the statute itself, see Helwig, supra, 188 U.S. 613, that Congress did not intend to impose a tax when it imposed the penalty. To hold otherwise would require me to look beyond the plain words of the statute. I would have to ignore that Congress:

(i) specifically changed the term in previous incarnations of the statute from "tax" to "penalty;"

(ii) used the term "tax" in describing the several other exactions provided for in the Act;

(iii) specifically relied on and identified its Commerce Clause power and not its taxing power;

(iv) eliminated traditional IRS enforcement methods for the failure to pay the "tax;" and

(v) failed to identify in the legislation any revenue that would be raised from it, notwithstanding that at least seventeen other revenue-generating provisions were specifically so identified.

The defendants have not pointed to any reported case decided by any court of record that has ever found and sustained a tax in a situation such as the one presented here, and my independent research has also revealed none. At bottom, the defendants are asking that I divine hidden and unstated intentions, and despite considerable evidence to the contrary, conclude that Congress really meant to say one thing when it expressly said something else. The Supreme Court confronted the inverse of this situation in Sonzinsky, supra, and I believe the rationale of that

case forecloses the defendants' argument.

The issue in Sonzinsky was whether a levy on the sale of firearms was a tax. The exaction was called a tax on its face, and it was undisputed that it had been passed pursuant to Congress's taxing power. Nonetheless, the petitioner sought to invalidate the tax because it was "prohibitive in effect and [disclosed] unmistakably the legislative purpose to regulate rather than to tax." The petitioner argued that it was not "a true tax, but a penalty." In rejecting this argument, the Supreme Court explained:

> Inquiry into the hidden motives which may move Congress to exercise a power constitutionally conferred upon it is beyond the competency of courts. They will not undertake, by collateral inquiry as to the measure of the regulatory effect of a tax, to ascribe to Congress an attempt, under the guise of taxation, to exercise another power.

Stated somewhat differently, reviewing courts cannot look beyond a statute and inquire as to whether Congress meant something different than what it said. If an exaction says "tax" on its face and was imposed pursuant to Congress's taxing power, courts "are not free to speculate as to the motives which moved Congress to impose it, or as to the extent to which it may [be a penalty intended] to restrict the activities taxed." See generally Sonzinsky, supra, 300 U.S. at 511-14; accord Kahriger, supra, 345 U.S. at 22 (similarly declining invitation to hold that "under the pretense of exercising" a particular power, Congress was, in fact, exercising another power).

The holding of Sonzinsky cuts both ways, and applying that holding to the facts here, I have no choice but to find that the penalty is not a tax. Because it is called a penalty on its face (and because Congress knew how to say "tax" when it intended to, and for all the other reasons noted), it would be improper to inquire as to whether Congress really meant to impose a tax. I will not assume that Congress had an unstated design to act pursuant to its taxing authority, nor will I impute a

revenue-generating purpose to the penalty when Congress specifically chose not to provide one. It is "beyond the competency" of this court to question and ascertain whether Congress really meant to do and say something other than what it did. As the Supreme Court held by necessary implication, this court cannot "undertake, by collateral inquiry as to the measure of the [revenue-raising] effect of a [penalty], to ascribe to Congress an attempt, under the guise of [the Commerce Clause], to exercise another power." See Sonzinsky, supra, 300 U.S. at 514. This conclusion is further justified in this case since President Obama, who signed the bill into law, has "absolutely" rejected the argument that the penalty is a tax. See supra note 5.

To conclude, as I do, that Congress imposed a penalty and not a tax is not merely formalistic hair-splitting. There are clear, important, and well-established differences between the two. See Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 779-80, 114 S. Ct. 1937, 128 L. Ed. 2d 767 (1994) ("Whereas [penalties] are readily characterized as sanctions, taxes are typically different because they are usually motivated by revenue-raising, rather than punitive, purposes."); Reorganized CF&I Fabricators of Utah, Inc., supra, 518 U.S. at 224 ("'a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government,'" whereas, "if the concept of penalty means anything, it means punishment for an unlawful act or omission"); United States v. La Franca, 282 U.S. 568, 572, 51 S. Ct. 278, 75 L. Ed. 551 (1931) ("A 'tax' is an enforced contribution to provide for the support of government; a 'penalty,' as the word is here used, is an exaction imposed by statute as punishment for an unlawful act.'"). Thus, as the Supreme Court has said, "[t]he two words are not interchangeable one for the other . . . ; and if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such." La Franca, supra, 282 U.S. at 572.

### (6) Does the Anti-Injunction Act apply anyway?

The defendants insist that the Anti-Injunction Act should still preclude the

individual mandate challenges even if the penalty is not a tax. For this argument,
the defendants rely on Title 26, United States Code, Section 6671, which states
that the "penalties" provided under subchapter B of chapter 68 of the IRS Code (a
classification that includes the individual mandate penalty) "shall be assessed and
collected in the same manner as taxes." If the penalty is intended to be assessed
and collected in the same manner as a tax, the defendants contend, then the Anti-
Injunction Act should apply. I do not agree. First of all, the penalty is obviously <u>not</u>
to be collected and treated "in the same manner as taxes" in light of the fact that
Congress specifically divorced the penalty from the tax code's traditional collection
and enforcement mechanisms. Further, and more significantly, as noted <u>supra</u>, the
whole point of the Anti-Injunction Act is to protect the government in the collection
of its lawful tax revenues, and thus it applies to "truly revenue-raising tax
statutes," which Congress plainly did not understand and intend the penalty to be.
The Eleventh Circuit has recognized (albeit by implication) that the Anti-Injunction
Act does not reach penalties that are, as here, "imposed for substantive violations
of laws not directly related to the tax code" and which are not good-faith efforts to
enforce the technical requirements of the tax law. <u>Cf.</u> <u>Mobile Republican Assembly</u>
<u>v. United States</u>, 353 F.3d 1357, 1362 n.5 (11th Cir. 2003). The defendants have
cited two out-of-circuit cases in support of their contention that Section 6671(a)
requires penalties to be treated the same as taxes for Anti-Injunction Act purposes,
<u>Barr v. United States</u>, 736 F.2d 1134 (7th Cir. 1984); <u>Warren v. United States</u>, 874
F.2d 280 (5th Cir. 1989). Although those cases did indeed hold that the penalties at
issue fell under the Anti-Injunction Act, they do not really support the defendants'
position. As the plaintiffs note, the penalties in both those cases were imposed for
failing to pay an undisputed <u>tax</u>, that is, falsely claiming an exemption in <u>Barr</u>, and
refusing to sign a tax return in <u>Warren</u>. In other words, the penalties were "directly
related to the tax code." <u>Cf.</u> <u>Mobile Republican Assembly</u>, <u>supra</u>, 353 F.3d at 1362
n.5. Allowing IRS penalties such as those to qualify as a tax for Anti-Injunction Act

purposes "is simply a means for ensuring that the [underlying] tax is paid." See Botta v. Scanlon, 314 F.2d 392, 393 (2d Cir. 1963). That is not the situation here. It would be inappropriate to give tax treatment under the Anti-Injunction Act to a civil penalty that, by its own terms, is not a tax; is not to be enforced as a tax; and does not bear any meaningful relationship to the revenue-generating purpose of the tax code. Merely placing a penalty (which virtually all federal statutes have) in the IRS Code, even though it otherwise bears no meaningful relationship thereto, is not enough to render the Anti-Injunction Act (which only applies to true revenue-raising exactions) applicable to this case.

   (7) Accountability

   I will say one final thing on the tax issue, which, although I believe it to be important, is not essential to my decision. For purposes of this discussion, I will assume that the defendants are correct and that the penalty is (and was always intended to be) a tax.

   In Virginia v. Sebelius, 3:10cv188, one of the twenty or so other lawsuits challenging the Act, the federal government's lead counsel (who is lead defense counsel in this litigation, as well) urged during oral argument in that case that the penalty is proper and sustainable under the taxing power. Although that power is broad and does not easily lend itself to judicial review, counsel stated, "there is a check. It's called Congress. And taxes are scrutinized. And the reason we don't have all sorts of crazy taxes is because taxes are among the most scrutinized things we have. And the elected representatives in Congress are held accountable for taxes that they impose." See Transcript of Oral Argument (Virginia case), at 45 (emphasis added).

   This foregoing statement highlights one of the more troubling aspects of the

defendants' "newfound"[8] tax argument. As noted at the outset of this order, and as anyone who paid attention to the healthcare reform debate already knew, the Act was very controversial at the time of passage. Irrespective of the merits of the arguments for or against it, the legislation required lawmakers in favor of the bill to cast politically difficult and tough votes. As it turned out, the voting was extremely close. Because by far the most publicized and controversial part of the Act was the individual mandate and penalty, it would no doubt have been even more difficult to pass the penalty as a tax. Not only are taxes always unpopular, but to do so at that time would have arguably violated pledges by politicians (including the President) to not raise taxes, which could have made it that much more difficult to secure the necessary votes for passage. One could reasonably infer that Congress proceeded as it did specifically <u>because</u> it did not want the penalty to be "scrutinized" as a $4 billion annual tax increase, and it did not want at that time to be "held accountable for taxes that they imposed." In other words, to the extent that the defendants are correct and the penalty was intended to be a tax, it seems likely that the members of Congress merely called it a penalty and did not describe it as revenue-generating to try and insulate themselves from the potential electoral ramifications of their votes.

Regardless of whether the members of Congress had this specific motivation and intent (which, once again, is not my place to say), it is obvious that Congress did not pass the penalty, in the version of the legislation that is now "the Act," as a tax under its taxing authority, but rather as a penalty pursuant to its Commerce

---

[8] <u>See</u>, <u>e.g.</u>, <u>Changing Stance, Administration Now Defends Insurance Mandate as a Tax</u>, N.Y. Times, July 17, 2010, at A14 ("When Congress required most Americans to obtain health insurance or pay a penalty, Democrats denied that they were creating a new tax. But in court, the Obama administration and its allies now defend the requirement as an exercise of the government's 'power to lay and collect taxes.'").

Clause power. Those two exactions, as previously noted, are not interchangeable. And, now that it has passed into law on that basis, government attorneys have come into this court and argued that it was a tax after all. This rather significant shift in position, if permitted, could have the consequence of allowing Congress to avoid the very same accountability that was identified by the government's counsel in the Virginia case as a check on Congress's broad taxing power in the first place. In other words, the members of Congress would have reaped a <u>political advantage</u> by calling and treating it as a penalty while the Act was being debated, <u>see</u> <u>Virginia v. Sebelius</u>, 702 F. Supp. 2d 598, 612 (E.D. Va. 2010) (referring to "preenactment representations by the Executive and Legislative branches" that the penalty was <u>not</u> "a product of the government's power to tax for the general welfare"), and then reap a <u>legal advantage</u> by calling it a tax in court once it passed into law. <u>See</u> Def. Mem. at 33-34, 49 (arguing that the Anti-Injunction Act bars any challenge to the penalty which, in any event, falls under Congress's "very extensive" authority to tax for the general welfare). This should not be allowed, and I am not aware of any reported case where it ever has been.

Congress should not be permitted to secure and cast politically difficult votes on controversial legislation by deliberately calling something one thing, after which the defenders of that legislation take an "Alice-in-Wonderland" tack[9] and argue in court that Congress really meant something else entirely, thereby circumventing the safeguard that exists to keep their broad power in check. If Congress intended for

---

[9] Lewis, Carroll, <u>Through the Looking-Glass</u>, Chapter 6 (Heritage 1969):

> "When <u>I</u> use a word," Humpty Dumpty said, in a rather scornful tone, "it means just what I choose it to mean --- neither more or less."

> "The question is," said Alice, "whether you <u>can</u> make words mean so many different things."

the penalty to be a tax, it should go back and make that intent clear (for example, by calling it a tax, relying on Congress's Constitutional taxing power, allowing it to be collected and enforced as a tax, or identifying revenue to be raised) so it can be "scrutinized" as a tax and Congress can accordingly be held accountable. They cannot, however, use a different linguistic with a perhaps secret understanding between themselves that the word, in fact, means something else entirely. As the First Circuit has explained, the integrity of the process must be guaranteed by the judiciary:

> In our republican form of government, legislators make laws by writing statutes --- an exercise that requires putting words on paper in a way that conveys a reasonably definite meaning. Once Congress has spoken, it is bound by what it has plainly said, notwithstanding the nods and winks that may have been exchanged. . . . And the judiciary must stand as the ultimate guarantor of the integrity of an enacted statute's text.

State of Rhode Island v. Narragansett Indian Tribe, 19 F.3d 685, 699-70 (1st Cir. 1994).

### (8) For Constitutional purposes, it is a penalty, and must be analyzed under Congress's Commerce Clause power

For all the above reasons, I conclude that the individual mandate penalty is not a "tax." It is (as the Act itself says) a penalty. The defendants may not rely on Congress's taxing authority under the General Welfare Clause to try and justify the penalty after-the-fact. If it is to be sustained, it must be sustained as a penalty imposed in aid of an enumerated power, to wit, the Commerce Clause power. See Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 393, 60 S. Ct. 907, 84 L. Ed. 1263 (1940) ("Congress may impose penalties in aid of the exercise of any of its enumerated powers"). Therefore, the Anti-Injunction Act does not deprive this court of jurisdiction. See Lipke, supra, 259 U.S. at 562 ("The collector demanded payment of a penalty, and [thus the Anti-Injunction Act], which prohibits suits to

restrain assessment or collection of any tax, is without application."). I will next consider the rest of the defendants' jurisdictional challenges.

## B. Rule 12(b)(1) ("Lack of Subject Matter Jurisdiction") Challenges

The defendants raise two additional jurisdictional arguments: first, that the individual plaintiffs and the NFIB do not have standing to pursue Counts One and Two, and the state plaintiffs do not have standing with respect to Count Six; and second, that those same causes of action are not ripe.

### (1) Standing

The Constitution limits the subject matter of the federal courts to "cases" and "controversies." U.S. Const. art III, § 2. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). The "irreducible constitutional minimum of standing" contains three elements: "(1) an injury in fact, meaning an injury that is concrete and particularized, and actual or imminent, (2) a causal connection between the injury and the causal conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." Granite State Outdoor Advertising Inc. v. City of Clearwater, 351 F.3d 1112, 1116 (11th Cir. 2003). The defendants appear to concede that (2) and (3) are present in this litigation, but contend that the plaintiffs cannot establish an injury-in-fact. Accordingly, only element (1) is at issue here.

For purposes of ruling on the defendants' motion to dismiss, I simply need to examine the plaintiffs' factual allegations:

> At the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."

Lujan, supra, 504 U.S. at 561 (quoting Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 889, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)). Thus, "mere allegations of

injury" are sufficient to withstand a motion to dismiss based on lack of standing. Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 329, 119 S. Ct. 765, 142 L. Ed. 2d 797 (1999); accord Miccosukee Tribe of Indians of Florida v. Southern Everglades Restoration Alliance, 304 F.3d 1076, 1081 (11th Cir. 2002) (noting "at the motion to dismiss stage [the plaintiff] is only required to generally allege a redressable injury caused by the actions of [the defendant] about which it complains").

The individual plaintiffs make numerous allegations in the amended complaint that are relevant to the standing issue. According to those allegations, Mary Brown is a small business owner and current member of the NFIB. She has not had health insurance for the last four years. She devotes her available resources to maintaining her business and paying her employees. She does not currently qualify for Medicaid or Medicare, and she does not expect to qualify for those programs prior to the individual mandate taking effect. Thus, "Ms. Brown will be subject to the mandate and objects to being forced to comply with it" because, inter alia, it will force her (and other NFIB members) "to divert resources from their business endeavors" and "reorder their economic circumstances" to obtain qualifying coverage. Similarly, Kaj Ahlburg has not had health insurance for more than six years; he has no intention or desire to get health insurance; he does not qualify for Medicaid or Medicare and will thus be subject to the individual mandate and penalty; and he is, and expects to remain, financially able to pay for his own healthcare services if and as needed. The individual plaintiffs object to the Act's "unconstitutional overreaching" and claim injury because the individual mandate will force them to spend their money to buy something they do not want or need (or be penalized). See Am. Compl. ¶¶ 27-28, 62. The defendants make several arguments why these claims are insufficient to establish an injury-in-fact.

First, quoting Lujan, supra, the defendants contend that "[a] plaintiff alleging 'only an injury at some indefinite future time' has not shown injury in fact." Def.

Mem. at 26. While that statement is certainly true, the injury alleged in this case will not occur at "some indefinite future time." Instead, the date is definitively fixed in the Act and will occur in 2014, when the individual mandate goes into effect and the individual plaintiffs are forced to buy insurance or pay the penalty. See ACLU of Florida, Inc. v. Miami-Dade County School Bd., 557 F.3d 1177, 1194 (11th Cir. 2009) (standing shown in pre-enforcement challenge where the claimed injury was "pegged to a sufficiently fixed period of time"). Because time is the primary factor here, this case presents a durational issue, and not a contingency issue. "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. But, 'one does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979) (citations and brackets omitted). The defendants contend that the forty-months gap between now and 2014 is "too far off" and not immediate enough to confer standing. However, as the Eleventh Circuit has expressly held:

> [P]laintiffs here have alleged when and in what manner the alleged injuries are likely going to occur. Immediacy requires only that the anticipated injury occur with some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months.

Fla. State Conf. of the NAACP v. Browning, 522 F.3d 1153, 1161 (11th Cir. 2008) (citing Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995)); accord 520 Michigan Ave. Associates, Ltd. v. Devine, 433 F.3d 961, 962 (7th Cir. 2006) ("Standing depends on the probability of harm, not its temporal proximity. When injury . . . is likely in the future, the fact that [the complained of harm] may be deferred does not prevent federal litigation now.").

The defendants concede that an injury does not have to occur immediately

to qualify as an injury-in-fact, but they argue that forty months "is far longer than typically allowed." Def. Mem. at 27. It is true that forty months is longer than the time period at issue in the particular cases the defendants cite. See, e.g., ACLU, supra, 557 F.3d at 1194 (harm was six weeks away); Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003) (harm was between one week to one month away). But, the fact that the harm was closer in those cases does not necessarily mean that forty months is ipso facto "too far off." In Village of Bensenville v. FAA, 376 F.3d 1114 (D.C. Cir. 2004), for example, the plaintiffs challenged a passenger fee at Chicago's O'Hare International Airport that was not scheduled to be imposed until thirteen years in the future. The District of Columbia Circuit held that, despite the significant time gap, there was an "'impending threat of injury'" to plaintiffs that was "'sufficiently real to constitute injury-in-fact and afford constitutional standing'" because the decision to impose the fee was "final and, absent action by us, come 2017 Chicago will begin collecting [it]." See id. at 1119 (citations omitted). That is the same situation at issue here. Imposition of the individual mandate and penalty, like the fee in Village of Bensenville, is definitively fixed in time and impending. And absent action by this court, starting in 2014, the federal government will begin enforcing it.

The defendants suggest that the individual plaintiffs may not have to be forced to comply with the individual mandate in 2014. They contend that the individual plaintiffs "cannot reliably predict that insurance will be an economic burden" to them when the individual mandate is in place because, once the Act "mak[es] health insurance more affordable," they may decide to voluntarily buy insurance on their own. Def. Mem. at 26. This argument appears to presuppose that the individual plaintiffs object to the individual mandate solely on the grounds that it will be an "economic burden" to them, and that they do not currently have insurance because they cannot afford it. That does not appear to be the case. Ms. Brown alleges in the amended complaint that she devotes her resources to running

and maintaining her business and paying her employees; she does <u>not</u> allege that she has no money left over after doing so or that she is otherwise <u>unable</u> to buy insurance if she wanted it. Rather, she has apparently just made the decision that she would prefer to direct and divert her resources elsewhere because obtaining insurance, in her particular situation, is not "a worthwhile cost of doing business." <u>See</u> Am. Comp. ¶¶ 27, 62. Further, Mr. Ahlburg has affirmatively stated that he is financially able to pay for all of his own healthcare-related services. Thus, both he and Ms. Brown do not want to be forced to spend their money (whether they have a little or a lot) on something they do not want (or feel that they need), and, in this respect, they object to the individual mandate as "unconstitutional overreaching." <u>See</u> Am. Comp. at ¶¶ 27, 28.[10]

Continuing this argument, the defendants further contend that there is too much "uncertainty" surrounding the individual plaintiffs' allegations. They allege, for example, that while Ms. Brown may not want to purchase healthcare insurance now (because she would rather devote her resources to her business), and although Mr. Ahlburg does not need insurance now (because he is financially able to pay for his own healthcare out-of-pocket and as needed), the "vagaries" of life could alter their situations by 2014. Def Mem. at 26. The defendants suggest that because "businesses fail, incomes fall, and disabilities occur," by the time the individual mandate is in effect, the individual plaintiffs "could find that they need insurance, or that it is the most sensible choice." <u>See id.</u> That is possible, of course. It is also

---

[10] And in any event, the defendants' argument seems to assume that the Act will, in fact, reduce premiums so that insurance is "more affordable." That claim is both self-serving and far from undisputed. Indeed, most objective analyses indicate an insurance premium <u>increase</u>, and the CBO itself has predicted that premiums will rise 10-13% under the Act, at least with respect to individuals with certain policies who do not qualify for government subsidies. <u>See</u> Congressional Budget Office, An Analysis of Health Insurance Premiums Under the Patient Protection and Affordable Care Act, November 30, 2009.

"possible" that by 2014 either or both the plaintiffs will no longer be alive, or may at that time fall within one of the "exempt" categories. Such "vagaries" of life are always present, in almost every case that involves a pre-enforcement challenge. If the defendants' position were correct, then courts would essentially <u>never</u> be able to engage in pre-enforcement review. Indeed, it is easy to conjure up hypothetical events that could occur to moot a case or deprive any plaintiff of standing in the future. In <u>Pierce v. Society of Sisters</u>, 268 U.S. 510, 45 S. Ct. 571, 69 L. Ed. 2d 1070 (1925), for example, a private school sought and obtained review of a law that required children to attend public schools, even though that law was not to take effect for more than two years. Under the defendants' position, there was no standing to consider the case because --- since "businesses fail" --- it was possible that the school may have closed down by the time the law finally went into effect. However, the Supreme Court found that it had standing to consider the challenge, notwithstanding the universe of possibilities that could have occurred between the filing of the suit and the law going into effect years later. The Court concluded that it was appropriate to consider the challenge because the complained of injury "was present and very real, not a mere possibility in the remote future," and because the "[p]revention of impending injury by unlawful action is a well-recognized function of courts of equity." <u>Id.</u> at 536.

In short, to challenge the individual mandate, the individual plaintiffs need not show that their anticipated injury is absolutely certain to occur despite the "vagaries" of life; they need merely establish "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," <u>see</u> <u>Babbitt</u>, <u>supra</u>, 442 U.S. at 298, that is reasonably "pegged to a sufficiently fixed period of time," <u>see</u> <u>ACLU</u>, <u>supra</u>, 557 F.3d at 1194, and which is not "merely hypothetical or conjectural," <u>see</u> <u>NAACP</u>, <u>supra</u>, 522 F.3d at 1161. Based on the allegations in the amended complaint, I am satisfied that the individual plaintiffs have done so. Accordingly, they have standing to pursue Counts One and Two.

*Case No.: 3:10-cv-91-RV/EMT*

The defendants next contend that the state plaintiffs do not have standing to pursue the employer mandate being challenged in Count Six. They devote less than one paragraph to this argument, see Def. Mem. at 21, and I can be equally brief in addressing it. For this count, the state plaintiffs contend that in their capacities as "large employers," they will have to offer and enroll state employees in federally-approved health plans, which they currently do not do. They claim, for example, that under existing Florida law, thousands of OPS (Other Personnel Services) employees are excluded from that state's healthcare plan, but under the Act the employees will have to be enrolled in an approved health plan, which will cost the state money if they do, and will cost the state money (in the form of penalties) if they do not. I am satisfied that this qualifies as an injury-in-fact, for essentially the same reasons discussed with respect to the individual mandate --- to wit, the state plaintiffs have established a realistic (and not hypothetical or conjectural) danger of sustaining a redressable injury at a sufficiently fixed point in time as a result of the Act's operation or enforcement.

The individual plaintiffs thus have standing to pursue Counts One and Two, and the state plaintiffs have standing to pursue Count Six. Because those are the only causes of action for which the defendants have challenged standing, this eliminates any need to discuss whether the NFIB also has standing. See Watt v. Energy Action Educational Foundation, 454 U.S. 151, 160, 102 S. Ct. 205, 70 L. Ed. 2d 309 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 264 n.9, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit."); see also Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996) ("For each [challenged] claim, if . . . standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that

claim.") (citing Watt and Village of Arlington Heights, supra).

However, for the sake of completeness, I will briefly discuss whether the NFIB has standing as well. Under Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977), an association has representative standing when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Id. at 343. All three elements have been satisfied here. First, the NFIB's members (including Ms. Brown, as noted) plainly have standing to challenge the individual mandate, thus meeting Hunt's first element. Furthermore, the interests that the NFIB seeks to protect in challenging the individual mandate on behalf of its members --- certain of whom operate sole proprietorships and will suffer cost and cash flow consequences if they are compelled to buy qualifying healthcare insurance --- are germane to the NFIB's purpose and mission "to promote and protect the rights of its members to own, operate, and earn success in their businesses, in accordance with lawfully-imposed governmental requirements." Am. Comp. ¶ 26; see, e.g., New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 10 n.4, 108 S. Ct. 2225, 101 L. Ed. 2d 1 (1988) (consortium of private clubs had standing to sue on behalf of its members to enjoin state anti-discrimination law because the interests it sought to protect were "clearly" germane to its broad purpose "'to promote the common business interests of its [member clubs]'") (brackets in original). And lastly, because the NFIB seeks injunctive relief which, if granted, will benefit its individual members, joinder is generally not required. See, e.g., NAACP, supra, 522 F.3d at 1160 (Hunt's third element satisfied because, "when the relief sought is injunctive, individual participation of the organization's members is 'not normally necessary'") (citation omitted).

In light of the foregoing, the plaintiffs have standing to pursue their claims.

*Case No.: 3:10-cv-91-RV/EMT*

### (2) Ripeness

There is a "conspicuous overlap" between the doctrines of standing and ripeness and the two "often converge[ ]." See Elend v. Basham, 471 F.3d 1199, 1205 (11th Cir. 2006). Nevertheless, they warrant separate analyses.

"Ripeness is peculiarly a question of timing. Its basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." Thomas v. Union Carbide Agr. Products Co., 473 U.S. 568, 580, 105 S. Ct. 3325, 87 L. Ed. 2d 409 (1985) (citations and alterations omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United States, 523 U.S. 296, 300, 118 S. Ct. 1257, 140 L. Ed. 2d 406 (1998) (citation omitted). The ripeness inquiry turns on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration." Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 201, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983) (citation omitted). In the context of a facial challenge, as in this case, "a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record." Harris v. Mexican Speciality Foods, Inc., 564 F.3d 1301, 1308 (11th Cir. 2009).

Because the individual mandate and employer mandate will not take effect until 2014, the defendants contend that those claims are unripe because no injury can occur before that time. However, "[w]here the inevitability of the operation of a statute against [plaintiffs] is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions come into effect." Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 143, 95 S. Ct. 335, 42 L. Ed. 2d 320 (1974). "The Supreme Court has long . . . held that where the enforcement of a statute is certain, a preenforcement challenge will not be rejected on ripeness grounds." NAACP, supra, 522 F.3d at 1164 (citing Blanchette, supra, 419 U.S. at 143).

The complained of injury in this case is "certainly impending" as there is no reason whatsoever to doubt that the federal government will enforce the individual mandate and employer mandate against the plaintiffs. Indeed, with respect to the individual mandate in particular, the defendants concede that it is absolutely necessary for the Act's insurance market reforms to work as intended. In fact, they refer to it as an "essential" part of the Act at least fourteen times in their motion to dismiss. It will clearly have to be enforced. See Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 553, 592-93, 262 U.S. 553, 43 S. Ct. 658 (1923) (suit filed shortly after the challenged statute passed into law and before it was enforced was not premature where the statute "certainly would operate as the complainant states apprehended it would"). The individual mandate will have to be imposed and enforced against the plaintiffs and others because if it is not, and with proscriptions against insurance companies denying coverage for pre-existing medical conditions, there would the potential for an enormous moral hazard.

The fact that the individual mandate and employer mandate do not go into effect until 2014 does not mean that they will not be felt in the immediate or very near future. To be sure, responsible individuals, businesses, and states will have to start making plans now or very shortly to comply with the Act's various mandates. Individuals who are presently insured will have to confirm that their current plans comply with the Act's requirements and, if not, take appropriate steps to comply; the uninsured will need to research available insurance plans, find one that meets their needs, and begin budgeting accordingly; and employers and states will need to revamp their healthcare programs to ensure full compliance. I note that at least two courts considering challenges to the individual mandate have thus far denied motions to dismiss on standing and ripeness grounds. See Virginia, supra, 702 F. Supp. 2d at 607-08 (determining that because the individual mandate "radically changes the landscape of health insurance coverage in America," it will be felt by individuals, insurance carriers, employers, and states "in the near future"); Thomas

More Law Center v. Obama, 2010 WL 3952805, at *4 (E.D. Mich. Oct. 7, 2010)
("[T]he government is requiring plaintiffs to undertake an expenditure, for which the
government must anticipate that significant financial planning will be required. That
financial planning must take place well in advance of the actual purchase of
insurance in 2014 . . . There is nothing improbable about the contention that the
Individual Mandate is causing plaintiffs to feel economic pressure today.")[11]

The Supreme Court and the Eleventh Circuit, as noted, have not hesitated to
consider pre-enforcement challenges to the constitutionality of legislation when the
complained of injury is certainly impending and more than a hypothetical possibility.
Because the issues in this case are fully framed, and the relevant facts are settled,
"[n]othing would be gained by postponing a decision, and the public interest would
be well served by a prompt resolution of the constitutionality of [the statute]." See
Thomas, supra, 473 U.S. at 582. Therefore, the case is ripe for review.[12]

Because the defendants' jurisdictional challenges fail, I will now turn to their
arguments for failure to state a claim upon which relief can be granted under Rule

──────────────

[11] The defendants have recently filed a notice of supplemental authority in
which they have attempted to distinguish Thomas More Law Center by claiming
that the standing analysis in that case "hinge[d] on allegations not present here;"
specifically, according to the defendants, the plaintiffs alleged in that case that
"they were being compelled to 'reorganize their affairs,' and 'forego certain
spending today, so they will have the funds to pay for health insurance when the
Individual Mandate takes effect in 2014" (doc. 78 at 1-2). The defendants allege
that "[t]he individual plaintiffs here make no comparable assertion." See id. That
does not appear to be so. Ms. Brown has alleged that the individual mandate will
force her to "divert resources from [her] business" and "reorder [her] economic
circumstances" in order to obtain qualifying coverage. Am. Comp. ¶ 62.

[12] Further strengthening the conclusion that the public interest would be best
served by a prompt resolution, I recognize that this court is but the first of probably
several steps this case will take. Because that process will likely take another year
or two, and because this court "will be in no better position later than we are now"
to decide the case, see Blanchette, supra, 419 U.S. at 145, it would not serve the
public interest to postpone the first step of this litigation until at least 2014.

12(b)(6), Fed. R. Civ. P.

### C. Rule 12(b)(6) Challenges for Failure to State a Claim Upon which Relief Can be Granted

A motion to dismiss for failure to state a claim under Rule 12(b)(6) will be granted if the complaint alleges no set of facts that, if proved, would entitle the plaintiff to relief. Blackston v. Alabama, 30 F.3d 117, 120 (11ᵗʰ Cir. 1994). On a motion to dismiss, the court must accept all the alleged facts as true and take all the inferences from those facts in the light most favorable to plaintiff. See Cruz v. Beto, 405 U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972); Hunnings v. Texaco, Inc., 29 F.3d 1480, 1484 (11ᵗʰ Cir. 1994). Although the Federal Rules do not require plaintiffs to set out in detail the facts on which they base their claim --- Rule 8(a) only requires a "short and plain statement" showing that the plaintiff is entitled to relief --- the complaint's "factual allegations must be enough to raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); accord Ashcroft v. Iqbal, --- U.S. ---, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (explaining that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation'"). Thus, "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, supra, 129 S. Ct. at 1949 (quoting Twombly, supra, 550 U.S. at 570). This does not "impose a probability requirement at the pleading stage." See Twombly, 550 U.S. at 556. Rather, the test is whether the complaint "succeeds in 'identifying facts that are suggestive enough to render [the claim] plausible.'" See Watts v. Florida Int'l University, 495 F.3d 1289, 1296 (11ᵗʰ Cir. 2007) (quoting Twombly, supra, 550 U.S. at 556).

The defendants claim that all counts in the amended complaint are deficient under Rule 12(b)(6); in other words, no cause of action is "plausible." Each claim

must be both factually and legally plausible. This requires me to examine each of the claims factually and to "take a peek" at the status of the applicable existing Constitutional law. Several of the plaintiffs' claims arise under Constitutional provisions for which the Supreme Court's interpretations have changed over the years. But, of course, the court is bound by the law as it exists now. Each count will be discussed below, in reverse order.

### (1) Interference with state sovereignty as employers and performance of governmental functions (Count VI)

For this count, the plaintiffs object to the Act's employer mandate which requires the states, in their capacities as large employers, to offer and automatically enroll state employees in federally-approved insurance plans or else face substantial penalties and assessments. These "extensive new benefits," the plaintiffs contend, will "impose immediate and expensive requirements on the States that will continue to increase," see Pl. Mem. at 55-56, and "burden[ ] the States' ability to procure goods and services and to carry out governmental functions," see Am. Compl. ¶ 90. The employer mandate allegedly exceeds Article I of the Constitution and also runs afoul of state sovereignty in violation of the Ninth and Tenth Amendments.

Regardless of whether the employer mandate will be costly and burdensome to the states in their capacity as large employers (which at this stage of the case is assumed to be true), it is a "generally applicable" law that reaches both public and private employers alike. Although a law of general applicability, as opposed to one directed only at the states, is not per se Constitutional, it is a factor that the Supreme Court and the courts of appeal have consistently found to be significant. In the landmark case of Garcia v. San Antonio Metro. Transit Auth., the Supreme Court held that a city's transit authority (SAMTA) was bound by the minimum wage and overtime pay provisions in the Fair Labor Standards Act ("FLSA"). During the course of its decision, the Court stated:

> [W]e need go no further than to state that we perceive

> nothing in the overtime and minimum-wage requirements
> of the FLSA, as applied to SAMTA, that is destructive of
> state sovereignty or violative of any constitutional
> provision. SAMTA faces nothing more than the same
> minimum-wage and overtime obligations that hundreds of
> thousands of other employers, public as well as private,
> have to meet.

469 U.S. 528, 554, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985); see also Reno v.

Condon, 528 U.S. 141, 151, 120 S. Ct. 666, 145 L. Ed. 2d 587 (2000) (generally

applicable law upheld that regulated the entire "universe of entities" in the market,

both in the public and private realm, and applied "to individuals as well as States");

see also Oklahoma Dep't of Public Safety v. United States, 161 F.3d 1266, 1271

(10th Cir. 1998) (noting the "logical distinction" that the Supreme Court has drawn

between generally applicable laws that "incidentally apply to states" and those that

apply only to states; explaining that "because generally applicable laws are not

aimed at uniquely governmental functions," and because such "laws affecting both

private and public interests are subject to stricter political monitoring by the private

sector," a law is less likely to be found oppressive "where the law is aimed at both

private and public entities"). The Seventh Circuit has thus stated:

> Neutrality between governmental and private spheres is a
> principal ground on which the Supreme Court has held
> that states may be subjected to regulation when they
> participate in the economic marketplace --- for example,
> by hiring workers covered by the Fair Labor Standards
> Act. So long as public market participants are treated the
> same as private ones, they enjoy the protection the latter
> have been able to secure from the legislature; and as
> Congress is not about to destroy private industry (think
> what that would do to the tax base!) it can not hobble
> the states either.

Travis v. Reno, 163 F.3d 1000, 1002-03 (7th Cir. 1998) (citations omitted). I find

these cases to be instructive. Although a law of general applicability may not be

per se Constitutional, see Condon, supra, 528 U.S. at 151 (leaving the question

open), the fact that the employer mandate is generally applicable goes a long way toward sustaining it.

Further, in this case, the mere fact that the states will be required to provide the same healthcare benefits to employees as private employers does not, by itself, implicate or interfere with state functions and sovereignty. In Maryland v. Wirtz, 392 U.S. 183, 88 S. Ct. 2017, 20 L. Ed. 2d 1020 (1968), the Supreme Court rejected the argument that extending FLSA wage and overtime pay provisions to the states would violate state sovereignty by telling public hospitals and schools how to carry out their sovereign functions:

> The Act establishes only a minimum wage and a maximum limit of hours unless overtime wages are paid, and does not otherwise affect the way in which school and hospital duties are performed. Thus appellants' characterization of the question in this case as whether Congress may, under the guise of the commerce power, tell the States how to perform medical and educational functions is not factually accurate. Congress has "interfered with" these state functions only to the extent of providing that when a State employs people in performing such functions it is subject to the same restrictions as a wide range of other employers whose activities affect commerce, including privately operated schools and hospitals.

Id. at 193-94. The state plaintiffs allege that the employer mandate will interfere with their sovereignty and impede state functions insofar as it will be financially burdensome and that, if it is allowed to stand, the state's authority "to define the conditions of its officeholders and employees and to control appropriations [will be] usurped." Pl. Mem. at 57; see also id. at 56 n.59 (contending that "Congress may [not] decree the basic terms of the employment relationship with State officers and employees and usurp the States' authority over their budgets and resources").

However, virtually any and all attempts to regulate the wages and conditions of employment in the national labor market (which Congress has long done) will

result in similar restrictions and adversely impact the state fisc. The minimum wage and overtime pay provisions in the FLSA, which the Supreme Court upheld against the states in Wirtz and Garcia, supra, certainly had much the same effect, as the dissenters in those cases made it a point to emphasize. See Garcia, supra, 469 U.S. at 528 ("The financial impact on States and localities of displacing their control over wages, hours, overtime regulations, pensions, and labor relations with their employees could have serious, as well as unanticipated, effects on state and local planning, budgeting, and the levying of taxes.") (Powell, J., dissenting); Wirtz, supra, 392 U.S. at 203 (stating that "[t]here can be no doubt" that if the FLSA is extended to the states it could "disrupt the fiscal policy of the States and threaten their autonomy in the regulation of health and education") (Douglas, J., dissenting). The majority opinions in those two cases control here, unless there is a discernable reason to treat healthcare benefits differently than compensation and conditions of employment.

I see no persuasive reason why healthcare benefits --- which are generally viewed as a condition of employment and part of an employee's compensation package[13] --- should be treated differently than other aspects of compensation and conditions of employment that the Supreme Court has already held Congress may regulate and mandate against the states (such as wages, hours, overtime pay, etc). This is particularly so in light of the fact that, as the defendants correctly point out,

---

[13] Cf., e.g., Owen v. McKibben, 78 Fed. Appx. 50, 51 n.3 (10th Cir. 2003) (compensation package at issue included healthcare insurance); United States v. City of New York, --- F. Supp. 2d ---, 2010 WL 1948562, at *1 (S.D.N.Y. May 13, 2010) (same); Portugues-Santa v. B. Fernandez Hermanos, Inc., 614 F. Supp. 2d 221, 228 (D.P.R. 2009) (same); Laselva v. Schmidt, 2009 WL 1312559, *1 (N.D.N.Y. May 7, 2009) (same); Plitt v. Ameristar Casino, Inc., 2009 WL 1297404, at *1 (E.D. Mo. May 6, 2009) (same); Perrotti v. Wal-Mart Stores, Inc., 2006 WL 146232, *1 (D.N.H. Jan. 19, 2006) (same); Hudson v. International Computer Negotiations, Inc., 2005 WL 3087865, at *1 (M.D. Fla. Nov. 16, 2005) (same).

to some extent Congress already regulates health benefits for state employees, for example, with respect to COBRA's temporary continuation of coverage provisions and HIPAA's restrictions on the ability of group plans to deny coverage due to pre-existing conditions. See Def. Mem. at 22. If the employer mandate in the Act is unconstitutional as applied to the states, for the reasons claimed by the plaintiffs, then the FLSA (and arguably COBRA and HIPAA) are likewise unconstitutional as applied to the states. The plaintiffs tried to distinguish Garcia during oral argument by contending that the case was justified because Congress there was trying to ensure that workers "were, in effect, not going to be abused with regard to hours or inadequate wages." Tr. at 79. Whether the plaintiffs feel that Congress had a more noble and well-meaning purpose in passing the FLSA is irrelevant. The power that Congress asserted (and the effect it would have on the state fisc) is essentially the same as here.

For the foregoing reasons, I believe Wirtz and Garcia control. I recognize that Wirtz (state employers subject to the FLSA) was overruled by National League of Cities v. Usery, 426 U.S. 833, 96 S. Ct. 2465, 49 L. Ed. 2d 245 (1975) (state employers not subject to the FLSA), which was in turn overruled by Garcia (state employers once again subject to the FLSA). Accordingly, in light of this "unsteady path" of Supreme Court jurisprudence, New York v. United States, 505 U.S. 144, 160, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992), the plaintiffs would most likely have stated a plausible claim if it had been brought between 1975 and 1985. But, of course, I am required to apply the law as it now exists.

Because the Act's employer mandate regulates the states as participants in the national labor market the same as it does private employers, and because the Supreme Court has held in this context that adversely impacting the state fisc (by requiring a minimum level of employment-based benefits) does not interfere with state sovereignty and impede state functions, the employer mandate does not violate the Constitution as a matter of law --- under the current law. Therefore,

Count Six does not state a plausible claim upon which relief can be granted and must be dismissed.[14]

### (2) Coercion and commandeering as to healthcare insurance (Count V)

The Act provides for the creation of health benefit exchanges to foster and provide "consumer choices and insurance competition." The Act gives the states the option to create and operate the exchanges themselves, or have the federal government do so. The plaintiffs acknowledge that they have a choice, but they claim it is tantamount to no choice because the Act forces them to operate the exchange "under threat of removing or significantly curtailing their long-held regulatory authority" (see Am. Compl. ¶ 88), which will "displace State authority over a substantial segment of intrastate insurance regulation . . . that the States have always possessed under the police powers provided in the Constitution." See id. ¶ 44. This is improper "coercion and commandeering" in violation of the Ninth and Tenth Amendments, according to the plaintiffs.

The plaintiffs' argument for this claim is directly foreclosed by Hodel v. Virginia Surface Min. & Reclamation Association, Inc., 452 U.S. 264, 101 S. Ct. 2352, 69 L. Ed. 2d 1 (1981). That case involved a pre-enforcement challenge to the Surface Mining Control and Reclamation Act, which was a comprehensive statute designed to "'establish a nationwide program to protect society and the

---

[14] The plaintiffs argue that the employer mandate runs afoul of the inter-governmental-tax-immunity doctrine, see Pl. Mem. at 58-60, but the defendants persuasively respond that the claim has not been pled in the amended complaint and that, in any event, it must fail as a matter of law, see Reply in Support of Defendants' Motion to Dismiss ("Reply Mem."), at 8-11 (doc. 74). Indeed, under the current state of the law, it is unclear if the inter-governmental-tax-immunity even retains any viability. See South Carolina v. Baker, 485 U.S. 505, 518 n.11, 108 S. Ct. 1355, 99 L. Ed. 2d 592 (1988) (noting the inter-governmental-tax-immunity doctrine has "shifted into the modern era," and declining to decide "the extent, if any, to which States are currently immune from direct nondiscriminatory federal taxation") (emphasis added).

environment from the adverse effects of surface coal mining operations.'" Id. at 268. Pursuant to the statute, "any State wishing to assume permanent regulatory authority over the surface coal mining operations" was required to submit a "proposed permanent program" demonstrating compliance with federal regulations. Id. at 271. If any state chose not to do so, the statute provided that the Secretary of the Interior would "develop and implement" the program for that particular state. Virginia filed suit and alleged that the statute violated the Constitution in that "the threat of federal usurpation of their regulatory roles coerces the States into enforcing the Surface Mining Act." Id. at 289. The district court agreed, reasoning that while the statute "allows a State to elect to have its own regulatory program, the 'choice that is purportedly given is no choice at all' because the state program must comply with federally prescribed standards." Id. at 285 n.25. However, the Supreme Court flatly rejected the argument and reversed. In doing so, the Court explained that the statute merely established "a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." Id. at 289. It "prescribes federal minimum standards governing surface coal mining, which a State may either implement itself or else yield to a federally administered regulatory program." Id. The Supreme Court further stated that:

> A wealth of precedent attests to congressional authority to displace or pre-empt state laws regulating private activity affecting interstate commerce when these laws conflict with federal law. Although such congressional enactments obviously curtail or prohibit the States' prerogatives to make legislative choices respecting subjects the States may consider important, the Supremacy Clause permits no other result.

* * *

> Thus, Congress could constitutionally have enacted a statute prohibiting any state regulation of surface coal mining. We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role.

Id. at 290 (citations omitted). Notably, the Court made it a point to emphasize that its conclusion applied even though --- as the plaintiffs maintain in this case --- "the federal legislation displaces laws enacted under the States' 'police powers.'" Id. at 291.

Commandeering was found in New York, supra, 505 U.S. at 144, where Congress passed a statute requiring state legislatures to enact a particular kind of law, and that holding was later extended in Printz v. United States, 521 U.S. 898, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997), to apply to individual state officials. Id. at 935 (holding that "Congress cannot circumvent [the prohibition in New York] by conscripting the State's officers directly"). The plaintiffs rely heavily on these two decisions for their argument, but both cases are factually and substantively different from the one here. The plaintiffs have not identified any provision in the Act that requires the states to enact a particular law or regulation, as in New York, nor have they identified any provision that requires state officials to enforce federal laws that regulate private individuals, as in Printz. "[T]he anti-commandeering rule comes into play only when the federal government calls on the states to use their sovereign powers as regulators of their citizens." Travis, supra, 163 F.3d at 1004-05 (emphasis added); see also id. at 1004 (noting that states may be objects of regulation but "cannot be compelled to become regulators of private conduct"). Indeed, both New York and Printz cited Hodel with approval and distinguished it from the facts presented in those two cases. See Printz, supra, 521 U.S. at 925-26 (explaining "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs," which the legislation at issue in Hodel did not do "because it merely made compliance with federal

standards a precondition to continued state regulation in an otherwise pre-empted field"); New York, supra, 505 U.S. at 161, 167 (the statute at issue in Hodel was an example of "cooperative federalism" that did not commandeer the legislative process because the states were not compelled to enforce the statute, expend any state funds, or participate in the program "in any manner whatsoever"; they could have elected not to participate and "the full regulatory burden will be borne by the Federal Government"). Because the health benefit exchanges are voluntary and do not compel states to regulate private conduct of their citizens, Count Five does not state a claim upon which relief can be granted. The Act gives the states the choice to establish the exchanges, and is therefore the type of cooperative federalism that was authorized in Hodel, supra.[15]

### (3) Coercion and commandeering as to Medicaid (Count IV)

For this claim, the state plaintiffs object to the "fundamental changes in the nature and scope of the Medicaid program" that the Act will bring about. See Am. Comp. ¶ 86. They have described these changes at length in their complaint, see Am. Comp. ¶¶ 39-60, and they need not be repeated here in any great detail. It is sufficient to say that the state plaintiffs maintain that the Act drastically expands and alters the Medicaid program to such an extent they cannot afford the newly-imposed costs as it will force them to "run [their] budgets off a cliff." Tr. 72. The Medicaid provisions in the Act allegedly run afoul of Congress's Article I powers; exceed the Commerce Clause; and violate the Ninth and Tenth Amendments.

---

[15] The plaintiffs appear to suggest that our case is distinguishable from Hodel because, unlike the statute under review in that case, the federal government here has not accepted the "full regulatory burden" of the health benefit exchanges. For this, the plaintiffs rely on six statutory provisions that they maintain "conscript and coerce States into carrying out critical elements of the insurance exchange program." See Pl. Mem. at 51-54. As the defendants correctly point out, however, see Reply Mem. at 6-7, upon close and careful review, each challenged provision is voluntary and generally applicable only if the state elects to establish the exchange.

The defendants do not appear to deny that the Act will significantly alter and expand the Medicaid program as it currently exists (although they do point out that the federal government will be absorbing 100% of the new costs for the first three years[16]). Rather, the defendants rest their argument on this simple and unassailable fact: state participation in Medicaid under the Act is, as it always has been, entirely voluntary. When the freedom to opt out of the program is considered in conjunction with the fact that Congress has expressly reserved the right to alter and amend the program, see 42 U.S.C. § 1304 ("The right to alter, amend, or repeal any provision of this chapter is hereby reserved to the Congress."), and, in fact, it has done so numerous times over the years, see Def. Mem. at 10, the defendants contend that the state plaintiffs have failed to state a claim. See Harris v. McRae, 448 U.S. 297, 301, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980) (noting "[a]lthough participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements" that Congress sees fit to impose).

The state plaintiffs assert that they do not actually have the freedom to opt out. They note that "'Medicaid is the single largest Federal grant-in-aid program to the States, accounting for over 40 percent of all Federal grants to states.'" See Pl. Mem. at 50 (quoting Bipartisan Comm'n on the Medicaid Act of 2005, H.R. 985, 109th Cong. § 2(13) (2005)). They further note that in Florida, for example, 26% of its budget is presently devoted to Medicaid outlays, and because the federal government contributes an average of 55.45% of Medicaid costs, Florida's outlays would have to be more than doubled (to the point of consuming more than 58% of its state budget) to offer the same level of benefits that its Medicaid enrollees now receive. In short, the plaintiffs contend that the Act imposes a Hobson's Choice.

---

[16] One could argue, however, that the "federal government" will not really be absorbing the costs as the government has little money except through taxpayers, who almost exclusively reside within the states.

They must either: (1) accept the Act's transformed Medicaid program with all its new obligations and costs that the states cannot afford; or (2) exit the program altogether and lose federal matching funds that are necessary and essential for them to provide healthcare to their neediest citizens (along with other Medicaid-linked federal funds). Either way, they contend that their Medicaid systems will eventually collapse, leaving millions of their neediest residents without any health insurance. Consequently, they claim that they are being forced into accepting the changes to the Medicaid program --- even though they cannot afford it and doing so will work an enormous financial hardship --- because they "effectively have no choice other than to participate." See Am. Comp. ¶ 84. Although this claim has intuitive appeal, the status of existing law makes it a close call as to whether it states a "plausible" claim upon which relief can be granted.

The underlying question presented is whether the Medicaid provisions satisfy the Spending Clause. There are four "general restrictions" on Congress's spending power: (1) the exercise of spending power must be for the general welfare; (2) the conditions must be stated clearly and unambiguously; (3) the conditions must bear a relationship to the purpose of the program; and (4) the conditions imposed may, of course, not require states "to engage in activities that would themselves be unconstitutional." See generally South Dakota v. Dole, 483 U.S. 203, 207-10, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987). The plaintiffs do not appear to dispute that the Act meets these restrictions. Rather, their claim is based principally on a single sentence near the end of Dole, where the Supreme Court speculated that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" Id. at 211. For that statement, the Court relied upon an earlier decision, Steward Machine Co. v. Davis, 301 U.S. 548, 57 S. Ct. 883, 81 L. Ed. 1279 (1937), which likewise speculated that there may be a point at which Congressional pressure turns into impermissible coercion. However, the Steward Machine Court made no attempt to define exactly

where that line might be drawn and, in fact, suggested that no such line could be drawn. Justice Cardozo cautioned that any spending measure (in that case, in the form of a tax rebate) "conditioned upon conduct is in some measure a temptation. But to hold that motive or temptation is equivalent to coercion is to plunge the law in endless difficulties." Id. at 589-90.

Accordingly, the coercion theory has been often discussed in case law and scholarship, but never actually applied. While it appears that the Eleventh Circuit has not yet been called upon to consider the issue, the courts of appeal that have considered the theory have been almost uniformly hostile to it. See, e.g., Doe v. Nebraska, 345 F.3d 593, 599 (8th Cir. 2003) (acknowledging what the Supreme Court said in Dole, but going on to note that the "circuits are in accord" with the view that no coercion is present if a state --- even when faced with the possible "sacrifice" of a large amount of federal funding --- voluntarily exercises its own choice in accepting the conditions attached to receipt of federal funds; noting that a "politically painful" choice does not compulsion make); Kansas v. United States, 214 F.3d 1196, 1201-02 (10th Cir. 2000) ("The cursory statements in Steward Machine and Dole mark the extent of the Supreme Court's discussion of the coercion theory. The Court has never employed the theory to invalidate a funding condition, and federal courts have been similarly reluctant to use it"; the theory is "unclear, suspect, and has little precedent to support its application."); Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) ("The coercion theory has been much discussed but infrequently applied in federal case law, and never in favor of the challenging party. . . . The difficulty if not the impropriety of making judicial judgments regarding a state's financial capabilities renders the coercion theory highly suspect as a method for resolving disputes between federal and state governments."); Oklahoma v. Schweiker, 655 F.2d 401, 413-14 (D.C. Cir. 1981) (pre-Dole) (coercion argument rejected because courts "are not suited to evaluating whether states are faced here with an offer they cannot refuse or merely a hard

choice. Even a rough assessment of the degree of temptation would require extensive and complex factual inquiries on a state-by-state basis. We therefore follow the lead of other courts that have explicitly declined to enter this thicket when similar funding conditions have been at issue."); State of New Hampshire Dep't of Employment Sec. v. Marshall, 616 F.2d 240, 246 (1st Cir. 1980) (pre-Dole) ("Petitioners argue, however, that this option of the state to refuse to participate in the program is illusory, since the severe financial consequences that would follow such refusal negate any real choice . . . . We do not agree that the carrot has become a club because rewards for conforming have increased. It is not the size of the stakes that controls, but the rules of the game.").

Perhaps the case most analogous to this one is California v. United States, 104 F.3d 1086 (9th Cir. 1997), where California challenged the Medicaid program, in pertinent part, because it conditioned the receipt of federal matching funds on the provision of emergency medical services to illegal aliens. Because illegal aliens comprised 5% of its population, the state was having to spend $400 million each year on providing health care to the aliens. California objected to having to spend that money and argued, like plaintiffs here, that it was being coerced into doing so because, while its initial decision to participate in Medicaid was voluntary, "it now has no choice but to remain in the program in order to prevent a collapse of its medical system." In rejecting this argument, the Ninth Circuit questioned the "viability" of the coercion theory, as well as the possibility that any "sovereign state which is always free to increase its tax revenues [could] ever be coerced by the withholding of federal funds." The Court of Appeals concluded --- as have all courts to have considered the issue --- that the state was merely presented with a "hard political choice." See generally id. at 1089-92; accord Padavan v. United States, 82 F.3d 23, 28-29 (2d Cir. 1996) (holding same and noting that "Medicaid is a voluntary program in which states are free to choose whether to particulate. If New York chose not to participate, there would be no federal regulation requiring

the state to provide medical services to illegal aliens").

The Fourth Circuit appears to be the one circuit where the coercion theory has been considered and "is not viewed with such suspicion." <u>West Virginia v. U.S. Dep't of Health & Human Servs.</u>, 289 F.3d 281, 290 (4th Cir. 2002) (referencing a prior decision of that court, <u>Commonwealth of Virginia Dep't of Education v. Riley</u>, 106 F.3d 559 (4th Cir. 1997), where six of the thirteen judges on the <u>en banc</u> panel stated in dicta that coercion theory may be viable). Notwithstanding that the theory may be available in the Fourth Circuit, <u>West Virginia</u> acknowledged that because of "strong doubts about the viability of the coercion theory"; in light of the fact that it is "somewhat amorphous and cannot easily be reduced to a neat set of black-letter rules of application"; and given the "difficulties associated with [its] application," there is "no decision from any court finding a conditional grant to be impermissibly coercive." Therefore, "most courts faced with the question have effectively abandoned any real effort to apply the coercion theory" after finding, in essence, that it "raises political questions that cannot be resolved by the courts." <u>See</u> <u>id.</u> at 288-90. All this to say, if the coercion theory stands at all, it stands on extremely "wobbly legs." <u>See</u> <u>Skinner</u>, <u>supra</u>, 884 F.2d at 454.

In light of the foregoing, the current status of the law provides very little support for the plaintiffs' coercion theory argument. Indeed, when the "pressure turns into compulsion" theory is traced back, its entire underpinning is shaky. In <u>Steward Machine Co.</u>, <u>supra</u>, the Supreme Court held that there was no coercion because "[n]othing in the case suggests the exertion of a power akin to undue influence, <u>if we assume that such a concept can ever be applied with the fitness to the relations between state and nation</u>." 301 U.S. at 590 (emphasis added). Thus, in addition to being left undefined, the theory appears to stem from a "what if" assumption. Nevertheless, while the law does not provide much support for the plaintiffs' argument, it does not preclude it either (at least not in this circuit).

Further, I cannot ignore that, based on the allegations in the complaint, the

plaintiffs are in an extremely difficult situation. They either accept the sweeping changes to Medicaid (which they contend will explode their state budgets), or they withdraw from the system entirely (which they allege could leave millions of their poorest and neediest citizens without any medical coverage). The plaintiffs have argued that this is tantamount to no choice at all, which can perhaps be inferred from the fact that Congress does not really anticipate that the states will (or could) drop out of the Medicaid program. To be sure, since the Act seeks to reduce costs, reduce uncompensated care, and reduce the number of uninsured, it would make little sense for Congress to expect that objecting states would opt out of Medicaid and leave millions of the country's poorest citizens without medical coverage, and thus make each of those stated problems significantly worse.

In addition, if the state plaintiffs make the decision to opt out of Medicaid, federal funds taken from their citizens via taxation that used to flow back into the states from Washington, D.C., would instead be diverted to the states that have agreed to continue participating in the program.[17]

If the Supreme Court meant what it said in Dole and Steward Machine Co. (and I must presume that it did), there is a line somewhere between mere pressure and impermissible coercion. The reluctance of some circuits to deal with this issue because of the potential legal and factual complexities is not entitled to a great deal of weight, because courts deal every day with the difficult complexities of applying

---

[17] See, e.g., Lynn A. Baker, The Spending Power and the Federalist Revival, 4 Chap. L. Rev. 195, 213-14 (2001) ("[S]hould a state decline proffered federal funds because it finds a condition intolerable, it receives no rebate of any tax dollars that its residents have paid into the federal fisc. In these cases, the state (through its residents) contributes a proportional share of federal revenue only to receive less than a proportional share of federal spending. Thus, when the federal government offers the states money, it can be understood as simply offering to return the states' money to them, often with unattractive conditions attached.").

Constitutional principles set forth and defined by the Supreme Court. Because the Eleventh Circuit (unlike the other circuits) has apparently not directly addressed and foreclosed this argument, and because, in any event, "the location of the point at which pressure turns into compulsion, and ceases to be inducement, would be a question of degree, at times, perhaps, of fact," Steward Machine Co., supra, 301 U.S. at 590 (emphasis added), the plaintiffs have stated a "plausible" claim in this circuit.

### (4) Violation of constitutional prohibition of unapportioned capitation or direct tax (Count III)

For this count, the plaintiffs object to the individual mandate penalty. They make an "alternative" claim that, if the penalty is a tax (which they do not believe it is, and some Constitutional authorities have concluded it could not be[18]), it is an unconstitutional capitation or direct tax, prohibited by Article I, Section 9, Clause 4 of the Constitution.[19] Although the argument is not only plausible, but appears to have actual merit, as some commentators have noted, see, e.g., Steven J. Willis and Nakku Chung, Constitutional Decapitation and Healthcare, Tax Notes (2010), I need not be concerned with the issue. As previously explained, it is quite clear that Congress did not intend the individual mandate penalty to be a tax; it is a penalty.

---

[18] See, e.g., Randy Barnett, Commandeering the People: Why the Individual Health Insurance Mandate is Unconstitutional, N.Y.U. J.L. & Liberty (forthcoming), at 27 (stating that the argument for the penalty being justified under Congress's broad taxing authority is based on a "radical" theory that, if accepted, would authorize Congress "to penalize or mandate any activity by anyone in the country, provided it limited the sanction to a fine enforced by the Internal Revenue Service," which would "effectively grant Congress a general police power").

[19] This is the same Constitutional provision under which the Supreme Court held that the first attempt to impose a federal income tax was unconstitutional to the extent it was not apportioned. See generally Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 15 S. Ct. 673, 39 L. Ed. 759 (1895). Subsequently, passage of the Sixteenth Amendment in 1913 authorized the imposition of an income tax without the need for apportionment among the states.

It must be analyzed on the basis of whether it is authorized under Congress's Commerce Clause power, not its taxing power. Therefore, Count Three will be dismissed as moot.

### (5) Challenge to individual mandate on due process grounds (Count II)

The plaintiffs next allege that the individual mandate violates their rights to substantive due process under the Fifth Amendment. Again, this claim would have found Constitutional support in the Supreme Court's decisions in the years prior to the New Deal legislation of the mid-1930's, when the Due Process Clause was interpreted to reach economic rights and liberties. See Lochner v. New York, 198 U.S. 45, 25 S. Ct. 539, 49 L. Ed. 937 (1905); see also Coppage v. Kansas, 236 U.S. 1, 35 S. Ct. 240, 59 L. Ed. 441 (1915), Adkins v. Children's Hospital, 261 U.S. 525, 43 S. Ct. 394, 67 L. Ed. 785 (1923); Jay Burns Baking Co. v. Bryan, 264 U.S. 504, 44 S. Ct. 412, 68 L. Ed. 813 (1924). However, "[t]he doctrine that prevailed in Lochner, Coppage, Adkins, Burns, and like cases --- that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely --- has long since been discarded." Ferguson v. Skrupa, 372 U.S. 726, 730, 83 S. Ct. 1028, 10 L. Ed. 2d 93 (1963); see also New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 106-07, 99 S. Ct. 403, 58 L. Ed. 2d 361 (1978) (since the demise of substantive due process in the arena of economic regulation, legislatures have "broad scope to experiment with economic problems").

Therefore, as the law now exists, if a challenged statute does not implicate the very limited and narrow class of rights that have been labeled "fundamental," courts reviewing legislative action on substantive due process grounds will accord substantial deference to the legislative judgments. In the absence of a fundamental right, the question is not whether the court thinks the legislative action is wise, but whether the legislature could reasonably conclude that the measure at issue is "rationally related" to a legitimate end. As the Eleventh Circuit has explained:

> Substantive due process claims not involving a
> fundamental right are reviewed under the rational basis
> test. The rational basis test is not a rigorous standard
> [and] is generally easily met. A searching inquiry into the
> validity of legislative judgments concerning economic
> regulation is not required. . . . The task is to determine if
> "any set of facts may be reasonably conceived to justify"
> the legislation. . . . To put it another way, the legislation
> must be sustained if there is any conceivable basis for the
> legislature to believe that the means they have selected
> will tend to accomplish the desired end. Even if the court
> is convinced that the political branch has made an
> improvident, ill-advised or unnecessary decision, it must
> uphold the act if it bears a rational relation to a legitimate
> governmental purpose.

TRM, Inc. v. United States, 52 F.3d 941, 945-46 (11th Cir. 1995) (citations

omitted).

The plaintiffs contend that the individual mandate does, in fact, implicate

fundamental rights to the extent that people have "recognized liberty interests in

the freedom to eschew entering into a contract, to direct matters concerning

dependent children, and to make decisions regarding the acquisition and use of

medical services." See Pl. Mem. at 43-44; accord Tr. at 82 ("The fundamental

interest involved here, aside from the liberty of contract, is the right to . . . bodily

autonomy and use of medical care . . . the right to run your family life as you see

fit with some limited intrusions available"). Fundamental rights are a narrow class

of rights involving the rights to marry, have children, direct the education of those

children, marital privacy, contraception, bodily integrity, and abortion; and the

Supreme Court is "very reluctant to expand" that list. See Doe v. Moore, 410 F.3d

1337, 1343 (11th Cir. 2005). There is, to be sure, a liberty interest in the freedom

to be left alone by the government. We all treasure the freedom to make our own

life decisions, including what to buy with respect to medical services. Is that a

"fundamental right"? The Supreme Court has not indicated that it is --- at least not

yet. That is the current state of the law, and it is not a district court's place to expand upon that law.

Congress made factual findings in the Act and concluded that the individual mandate was "essential" to the insurance market reforms contained in the statute. This is a "rational basis" justifying the individual mandate --- if it does not relate to a fundamental right, which only the Supreme Court can recognize. In the absence of such a recognized fundamental right, that stated "rational basis" is sufficient to withstand a substantive due process challenge. This count must be dismissed.

### (6) Challenge to individual mandate as exceeding Commerce Clause (Count I)

Under the Commerce Clause, Congress may regulate: (1) the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities "affecting" interstate commerce. Perez v. United States, 402 U.S. 146, 150, 91 S. Ct. 1357, 28 L. Ed. 2d 686 (1971). Only (3) is at issue here.

For this count, the plaintiffs maintain that the individual mandate does not regulate activity affecting interstate commerce; instead, it seeks to impermissibly regulate economic inactivity. The decision not to buy insurance, according to the plaintiffs, is the exact opposite of economic activity. Because the individual mandate "compels all Americans to perform an affirmative act or incur a penalty, simply on the basis that they exist and reside within any of the United States," the plaintiffs contend that it will deprive them of "their rights under State law to make personal healthcare decisions without governmental interference." Am. Comp. ¶¶ 70, 75. Thus alleged, the individual mandate exceeds the Commerce Clause, and violates the Ninth and Tenth Amendments.

The defendants, of course, have a different take. They contend that "[t]he appearance of inactivity here is just an illusion" because the people who decide to not buy insurance are participating in the relevant economic market. See Tr. at 30. Their argument on this point can be broken down to the following syllogism: (1) because the majority of people will at some point in their lives need and consume

healthcare services, and (2) because some of the people are unwilling or unable to pay for those services, (3) Congress may regulate everyone and require that everyone have specific, federally-approved insurance. Framed this way, the defendants insist that the individual mandate does not require people to pay for a service they do not want; rather, it merely tells them how they must pay for a service they will almost certainly consume in the future.

It is, according to the defendants, no different than Congress telling people "you need to pay by cash instead of check or credit card." Tr. at 88; accord Def. Mem. at 43 ("[Individuals who choose not to buy insurance] have not opted out of health care; they are not passive bystanders divorced from the health care market. Instead, they have chosen a method of payment for services they will receive, no more 'inactive' than a decision to pay by credit card rather than by check."). Also, because the individual mandate is essential to the insurance market reforms in the Act, the defendants argue that it is sustainable for the "second reason" that it falls within the Necessary and Proper Clause. See Def. Mem. at 44-48.

At this stage in the litigation, this is not even a close call. I have read and am familiar with all the pertinent Commerce Clause cases, from Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L. Ed. 23 (1824), to Gonzales v. Raich, 545 U.S. 1, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005). I am also familiar with the relevant Necessary and Proper Clause cases, from M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L. Ed. 579 (1819), to United States v. Comstock, --- U.S. ---, 130 S. Ct. 1949, 176 L. Ed. 2d 878 (2010). This case law is instructive, but ultimately inconclusive because the Commerce Clause and Necessary and Proper Clause have never been applied in such a manner before. The power that the individual mandate seeks to harness is simply without prior precedent. The Congressional Research Service (a nonpartisan legal "think tank" that works exclusively for Congress and provides analysis on the constitutionality of pending legislation) advised Congress on July 24, 2009, long before the Act was passed into law, that "it is unclear whether the

[Commerce Clause] would provide a solid constitutional foundation for legislation containing a requirement to have health insurance." The analysis goes on to state that the individual mandate presents "the most challenging question . . . as it is a novel issue whether Congress may use this clause to require an individual to purchase a good or service." Congressional Research Service, Requiring Individuals to Obtain Health Insurance:  A Constitutional Analysis, July 24, 2009, at 3. Even Thomas More Law Center, supra, 2010 WL 3952805, which recently upheld the individual mandate, seems to recognize that the individual mandate is without any precedent. See id. at *8 ("The Supreme Court has always required an economic or commercial component in order to uphold an act under the Commerce Clause. The Court has never needed to address the activity/inactivity distinction advanced by plaintiffs because in every Commerce Clause case presented thus far, there has been some sort of activity").[20]

The defendants "firmly disagree" with the characterization of the individual mandate as "unprecedented" and maintain that it is "just false" to suggest that it breaks any new ground. See Tr. 31, 33. During oral argument, as they did in their memorandum, see Def. Mem. at 44, they attempted to analogize this case to Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S. Ct. 348, 13 L. Ed. 2d 258 (1964), which held that Congress had the power under the Commerce Clause and the Civil Rights Act to require a local motel to rent rooms to black guests; and Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942), which held that Congress could limit the amount of wheat grown for personal consumption on a private farm in an effort to control supply and avoid surpluses or shortages that

---

[20] The district court, however, went on to adopt the government's argument that the Commerce Clause should not only reach economic activity --- which had "always" been present in "every Commerce Clause case" decided to date --- but it should be applied to "economic decisions" as well, such as the decision not to buy health insurance.

could result in abnormally low or high wheat prices. The defendants have therefore suggested that because the motel owner in <u>Heart of Atlanta</u> was required to rent rooms to a class of people he did not want to serve, Congress was regulating inactivity. And, because the farmer in <u>Wickard</u> was limited in the amount of wheat he could grow for his own personal consumption, Congress was forcing him to buy a product (at least to the extent that he wanted or needed more wheat than he was allowed). There are several obvious ways in which <u>Heart of Atlanta</u> and <u>Wickard</u> differ markedly from this case, but I will only focus on perhaps the most significant one: the motel owner and the farmer were each involved in an <u>activity</u> (regardless of whether it could readily be deemed interstate commerce) and each had a choice to discontinue that activity. The plaintiff in the former was not required to be in the motel business, and the plaintiff in the latter did not have to grow wheat (and if he did decide to grow the wheat, he could have opted to stay within his allotment and use other grains to feed his livestock --- which would have been most logical, since wheat is usually more expensive and not an economical animal feed --- and perhaps buy flour for him and his family). Their respective obligations under the laws being challenged were tethered to a voluntary undertaking. Those cases, in other words, involved activities in which the plaintiffs had chosen to engage. All Congress was doing was saying that if you <u>choose</u> to engage in the activity of operating a motel or growing wheat, you are engaging in interstate commerce and subject to federal authority.

But, in this case we are dealing with something very different. The individual mandate applies across the board. People have no choice and there is no way to avoid it. Those who fall under the individual mandate either comply with it, or they are penalized. It is not based on an activity that they make the choice to undertake. Rather, it is based solely on citizenship and on being alive. As the nonpartisan CBO concluded sixteen years ago (when the individual mandate was considered, but not pursued during the 1994 national healthcare reform efforts): "A mandate requiring

all individuals to purchase health insurance would be an unprecedented form of federal action. The government has never required people to buy any good or service <u>as a condition of lawful residence in the United States</u>." <u>See</u> Congressional Budget Office Memorandum, <u>The Budgetary Treatment of an Individual Mandate to Buy Health Insurance</u>, August 1994 (emphasis added).

Of course, to say that something is "novel" and "unprecedented" does not necessarily mean that it is "unconstitutional" and "improper." There may be a first time for anything. But, at this stage of the case, the plaintiffs have most definitely stated a plausible claim with respect to this cause of action.[21]

## IV. <u>CONCLUSION</u>

The Supreme Court has said:

> Some truths are so basic that, like the air around us, they are easily overlooked. Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "formalistic" in a given case to partisans of the measure at issue, because such measures are typically the product

---

[21] Starting in the First World War, there have been at least six attempts by the federal government to introduce some kind of universal healthcare insurance coverage. At no point --- until now --- did it mandate that everyone buy insurance (although it was considered during the healthcare reform efforts in 1994, as noted above). While the novel and unprecedented nature of the individual mandate does not automatically render it unconstitutional, there is perhaps a <u>presumption</u> that it is. In <u>Printz</u>, <u>supra</u>, 521 U.S. at 898, the Supreme Court stated several times that an "absence of power" to do something could be inferred because Congress had never made an attempt to exercise that power before. <u>See</u> <u>id.</u> at 905 (stating that if "earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist"); <u>see</u> <u>id.</u> at 907-08 ("the utter lack of statutes imposing obligations [like the one at issue there] (notwithstanding the attractiveness of that course to Congress), suggests an assumed <u>absence</u> of such power") (emphasis in original); <u>see</u> <u>id.</u> at 918 (stating "almost two centuries of apparent congressional avoidance of the practice [at issue] tends to negate the existence of the congressional power asserted here").

> of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.

New York, supra, 505 U.S. at 187. As noted at the outset of this order, there is a widely recognized need to improve our healthcare system. How to accomplish that is quite controversial. For many people, including many members of Congress, it is one of the most pressing national problems of the day and justifies extraordinary measures to deal with it. However, "a judiciary that licensed extraconstitutional government with each issue of comparable gravity would, in the long run, be far worse." See id. at 187-88. In this order, I have not attempted to determine whether the line between Constitutional and extraconstitutional government has been crossed. That will be decided on the basis of the parties' expected motions for summary judgment, when I will have the benefit of additional argument and all evidence in the record that may bear on the outstanding issues. I am only saying that (with respect to two of the particular causes of action discussed above) the plaintiffs have at least stated a plausible claim that the line has been crossed.

Accordingly, the defendants' motion to dismiss (doc. 55) is GRANTED with respect to Counts Two, Five, and Six, and those counts are hereby DISMISSED. The motion is DENIED with respect to Counts One and Four. Count Three is also DISMISSED, as moot. The case will continue as to Counts One and Four pursuant to the scheduling order previously entered.

DONE and ORDERED this 14th day of October, 2010.

/s/  *Roger Vinson*
ROGER VINSON
Senior United States District Judge

*Case No.: 3:10-cv-91-RV/EMT*