**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**Case No.: 3:10-cv-91-RV/EMT**

**STATE OF FLORIDA, by and through**
**BILL McCOLLUM, ATTORNEY GENERAL**
**OF THE STATE OF FLORIDA;**

**STATE OF SOUTH CAROLINA, by and through**
**HENRY McMASTER, ATTORNEY GENERAL**
**OF THE STATE OF SOUTH CAROLINA;**

**STATE OF NEBRASKA, by and through**
**JON BRUNING, ATTORNEY GENERAL**
**OF THE STATE OF NEBRASKA;**

**STATE OF TEXAS, by and through**
**GREG ABBOTT, ATTORNEY GENERAL**
**OF THE STATE OF TEXAS;**

**STATE OF UTAH, by and through**
**MARK L. SHURTLEFF, ATTORNEY GENERAL**
**OF THE STATE OF UTAH;**

**STATE OF LOUISIANA, by and through**
**JAMES D. "BUDDY" CALDWELL, ATTORNEY**
**GENERAL OF THE STATE OF LOUISIANA;**

**STATE OF ALABAMA, by and through**
**TROY KING, ATTORNEY GENERAL**
**OF THE STATE OF ALABAMA;**

**MICHAEL A. COX, ATTORNEY GENERAL**
**OF THE STATE OF MICHIGAN, ON BEHALF OF**
**THE PEOPLE OF MICHIGAN;**

**STATE OF COLORADO, by and through**
**JOHN W. SUTHERS, ATTORNEY GENERAL**
**OF THE STATE OF COLORADO;**

**COMMONWEALTH OF PENNSYLVANIA, by**
**and through THOMAS W. CORBETT, Jr.,**

**ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA;**

**STATE OF WASHINGTON, by and through ROBERT M. McKENNA, ATTORNEY GENERAL OF THE STATE OF WASHINGTON;**

**STATE OF IDAHO, by and through LAWRENCE G. WASDEN, ATTORNEY GENERAL OF THE STATE OF IDAHO;**

**STATE OF SOUTH DAKOTA, by and through MARTY J. JACKLEY, ATTORNEY GENERAL OF THE STATE OF SOUTH DAKOTA;**

**STATE OF INDIANA, by and through GREGORY F. ZOELLER, ATTORNEY GENERAL OF THE STATE OF INDIANA;**

**STATE OF NORTH DAKOTA, by and through WAYNE STENEJHEM, ATTORNEY GENERAL OF THE STATE OF NORTH DAKOTA;**

**STATE OF MISSISSIPPI, by and through HALEY BARBOUR, GOVERNOR OF THE STATE OF MISSISSIPPI;**

**STATE OF ARIZONA, by and through JANICE K. BREWER, GOVERNOR OF THE STATE OF ARIZONA;**

**STATE OF NEVADA, by and through JIM GIBBONS, GOVERNOR OF THE STATE OF NEVADA;**

**STATE OF GEORGIA, by and through SONNY PERDUE, GOVERNOR OF THE STATE OF GEORGIA;**

**STATE OF ALASKA, by and through DANIEL S. SULLIVAN, ATTORNEY GENERAL OF THE STATE OF ALASKA;**

**NATIONAL FEDERATION OF INDEPENDENT BUSINESS, a California nonprofit mutual benefit corporation;**

**MARY BROWN, an individual; and**

**KAJ AHLBURG, an individual;**

**Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; KATHLEEN SEBELIUS, in her official capacity as the Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF THE TREASURY; TIMOTHY F. GEITHNER, in his official capacity as the Secretary of the United States Department of the Treasury; UNITED STATES DEPARTMENT OF LABOR; and HILDA L. SOLIS, in her official capacity as Secretary of the United States Department of Labor,**

**Defendants.**
________________________________________/

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**


Table of Authorities .................... iii

Introduction .................... 1

Argument .................... 3

I. GOVERNING STANDARDS FOR SUMMARY JUDGMENT .................... 3

II. STANDING, RIPENESS, AND JUSTICIABILITY ARE ESTABLISHED .................... 3

III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT ONE BECAUSE CONGRESS LACKS CONSTITUTIONAL AUTHORITY TO ENACT THE INDIVIDUAL MANDATE .................... 4

A. The Commerce Power Does Not Support the Individual Mandate .................... 5

1. The Commerce Clause Does Not Reach Inactivity .................... 5

2. The Lack of Healthcare Insurance Is Not a Regulable Activity .................... 9

3. The Individual Mandate Violates the Constitution's Federal Design .................... 13

B. The Necessary and Proper Clause Cannot Save the Individual .................... 17

C. The Individual Mandate Violates the Ninth and Tenth Amendments and Core Principles of Federalism .................... 23

IV. THE ACA UNCONSTITUTIONALLY FORCES A FUNDAMENTALLY TRANSFORMED MEDICAID REGIME ONTO PLAINTIFF STATES AND OTHERWISE EXCEEDS CONGRESS'S SPENDING POWER .................... 24

A. The ACA's Medicaid Changes Are Unconstitutionally Coercive .................... 26

1. The Act's Transformation of Medicaid .................... 26

2. The *Dole* Coercion Standard .................... 27

3. Plaintiff States Have No Choice and Must Accept the ACA's Transformation of Medicaid .................... 30

4. The States Did Not Voluntarily Enter the Medicaid Program with Knowledge of the Consequences Imposed by the ACA ......................36

B. The ACA's Modified Medicaid Regime Unconstitutionally Commandeers the States Into Federal Service .........................................38

C. The ACA's Medicaid Regime Violates All Five *Dole* Spending Clause Restrictions ......................................................................44

V. THE ACA SHOULD BE DECLARED UNCONSTITUTIONAL, AND DEFENDANTS SHOULD BE ENJOINED FROM ENFORCING IT ...............45

A. The ACA's Individual Mandate and Medicaid Provisions Are Unseverable Components of the Legislation ...........................................45

B. Permanent Injunctive Relief Against Defendants' Enforcement of the ACA Is Both Necessary and Appropriate ................................................49

CONCLUSION........................................................................................................ 50

CERTIFICATE OF SERVICE ............................................................................ 52

# TABLE OF AUTHORITIES

## CASES

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987)........................................................................................ 45, 46

*Alden v. Maine*,
527 U.S. 706 (1999)........................................................................................ 12, 24

*Amos v. Md. Dep't of Pub. Safety*,
126 F.3d 589 (4th Cir. 1997) ............................................................................ 29

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................. 3

*Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy*,
548 U.S. 291 (2006)............................................................................................ 37

*Ayotte v. Planned Parenthood of N. New England*,
546 U.S. 320 (2006)........................................................................................ 46, 47

*Bell v. Hood*,
327 U.S. 678 (1946)............................................................................................ 49

*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985)............................................................................................ 37

*Bennett v. New Jersey*,
470 U.S. 632 (1985)............................................................................................ 37

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) ............................................................................ 33

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
527 U.S. 666 (1999)................................................................... 29, 30, 32, 34, 44

*Cruzan v. Dir., Mo. Dep't of Health*,
497 U.S. 261 (1990)............................................................................................ 11

*Daniel v. Paul*,
395 U.S. 298 (1969)............................................................................................. 8

*Davis v. Gray*,
83 U.S. 203 (1872)........................................................................................ 49

*District of Columbia v. Heller*,
128 S. Ct. 2783 (2008).................................................................................. 24

*Doe v. Chiles*,
136 F.3d 709 (11th Cir. 1998) ........................................................................ 42

*Erzonznik v. City of Jacksonville*,
422 U.S. 205 (1975).......................................................................................... 3

*FERC v. Mississippi*,
456 U.S. 742 (1982)........................................................................................ 24

*Fountas v. Comm'r of Dep't of Revenue*,
2009 WL 3792468 (Mass. Super. Ct. Feb. 6, 2009) ...................................... 17

*Frost v. R.R. Comm'n of State of Cal.*,
271 U.S. 583 (1926)........................................................................................ 43

*Gonzales v. Raich*,
545 U.S. 1 (2005)................................................................................... 5, 7, 23

*Harris v. McRae*,
448 U.S. 297 (1980).................................................................................. 26, 37

*Heart of Atlanta Motel v. United States*,
379 U.S. 241 (1964).......................................................................................... 8

*Helvering v. Gerhardt*,
304 U.S. 405 (1938)........................................................................................ 20

*Hill v. Wallace*,
259 U.S. 44 (1922).................................................................................... 46, 48

*Jacobson v. Massachusetts*,
197 U.S. 11 (1905).......................................................................................... 16

*Jinks v. Richland Co.*,
538 U.S. 456 (2003).................................................................................. 20, 21

*Lyes v. City of Riviera Beach, Fla.*,
166 F.3d 1332 (11th Cir. 1999) ........................................................................ 3

*Marbury v. Madison*,
5 U.S. 137 (1803)........................................................................................ 15

*McCulloch v. Maryland*,
17 U.S. 316 (1819)............................................................................ 18, 20, 21

*Morales v. Daley*,
116 F. Supp. 2d 801 (S.D. Tex 2000) ............................................................. 16

*Monsanto Co. v. Geertson Seed Farms*,
130 S. Ct. 2743 (2010)...................................................................................... 50

*New York v. United States*,
505 U.S. 144 (1992)................................................................................ *passim*

*NLRB v. Jones & Laughlin Steel Corp.*,
301 U.S. 1 (1937)............................................................................................ 13

*Osborn v. Bank of the United States*,
22 U.S. 738 (1824)........................................................................................... 49

*Pennhurst State Sch. & Hosp. v. Haldeman*,
451 U.S. 1 (1981)............................................................................................ 37

*Printz v. United States*,
521 U.S. 898 (1997)................................................................................ *passim*

*Reeves v. Astrue*,
526 F.3d 732 (11th Cir. 2008) .......................................................................... 3

*Reid v. Covert*,
354 U.S. 1 (1957)............................................................................................ 24

*Robinson v. California*,
370 U.S. 660 (1962)......................................................................................... 16

*Schulz v. Williams*,
44 F.3d 48 (2d Cir. 1994)........................................................................... 49, 50

*South Dakota v. Dole*,
483 U.S. 203 (1987)................................................................................ *passim*

*Steward Mach. Co. v. Davis*,
301 U.S. 548 (1937)....................................................................................... 28

*Thomas More Law Ctr. v. Obama*,
2010 WL 3952805 (E.D. Mich. Oct. 7, 2010) ................................................. 9

*Trusler v. Crooks*,
269 U.S. 475 (1926)....................................................................................... 46

*United States v. Butler*,
297 U.S. 1 (1936)........................................................................................... 28

*United States v. Comstock*,
130 S. Ct. 1949 (2010)................................................................................ *passim*

*United States v. Lopez*,
514 U.S. 549 (1995).................................................................................... *passim*

*United States v. Morrison*,
529 U.S. 598 (2000).................................................................................... *passim*

*Virginia v. Sebelius*,
No. 3:10-cv-188 (E.D. Va. July 1, 2010)............................................... 10, 11

*Va. Dep't of Educ. v. Riley*,
106 F.3d 559 (4th Cir. 1997) ......................................................................... 29

*West Virginia v. U.S. Dep't of Health & Human Servs.*,
289 F.3d 281 (4th Cir. 2002) ......................................................................... 29

*Wisconsin v. Yoder*,
406 U.S. 205 (1972)....................................................................................... 16

*Witter v. Delta Air Lines, Inc.*,
138 F.3d 1366 (11th Cir. 1998) ....................................................................... 3

## CONSTITUTIONAL PROVISIONS


U.S. Const. amend. IX ........................................................ *passim*

U.S. Const. amend. X.......................................................... *passim*

U.S. Const. art. I, § 2, cl. 3............................................... 16

U.S. Const. art. I, § 8........................................................ *passim*

U.S. Const. art. IV, § 4...................................................... 24, 25


## STATUTES


Patient Protection and Affordable Care Act (“ACA”), Pub. L. No. 111-148,
124 Stat. 119 (2010)

§ 1401 ........................................................................ 31

§ 1402(c) .................................................................... 31

§ 1501(a) .................................................................... 5, 9, 31

§ 1501(a)(1)(2)............................................................. 9

§ 1501(a)(2)(D)............................................................. 1

§ 2001(b) .................................................................... 41

§ 2101(b) .................................................................... 41

§ 2304 ........................................................................ 26

§ 10106(a)(2)(D)........................................................... 1, 17

Mass. Gen. Laws ch. 111M, § 2 (2008) ................................ 16


## OTHER AUTHORITIES


Bd. of Governors of the Federal Reserve System, *Challenges for the Economy and State Governments*, Aug. 2, 2010 ................................................ 34

Bipartisan Comm'n on the Medicaid Act of 2005, H.R. 985, 109th Cong. § 2(13) (2005) ........................................................................................................ 31

Chairman Ben S. Bernanke, Bd. of Governors of the Federal Reserve System, *Challenges for the Economy and State Governments*, Aug. 2, 2010.................. 34, 39, 40

Christina D. Romer, *Back to a Better Normal: Unemployment and Growth in the Wake of the Great Recession,* Council of Economic Advisors, April 17, 2010 ................33

Citizen's Guide to the Federal Budget, http://www.gpoaccess.gov/usbudget/fy01/guide02.html ............................................. 32

CMS, *Justification of Estimates for Appropriations Committees*, FY 2011, https://www.cms.gov/PerformanceBudget/Downloads/CMSFY11CJ.pdf .................... 33

CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, April 1, 2010 ...............................................................30

http://www.hhs.gov/recovery/statefunds.html ................................................................ 32

http://www.statehealthfacts.org/comparereport.jsp?rep=45&cat=17 ............................... 32

*Hurricane Katrina: A Nation Still Unprepared,* U.S. Senate, Special Report of the Committee on Homeland Security and Governmental Affairs, Jan. 10, 2007 .............. 36

Ilya Somin, *Taking Stock of Comstock: The Necessary and Proper Clause and the Limits Of Federal Power,* Cato Supreme Court Review, 2009-2010 ........................18

Jennifer Staman & Cynthia Brougher, *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis* (Cong. Research Serv., July 24, 2009) ...............13

Oxford English Dictionary (2d ed. 1989) ....................................................................... 10

Peter Ferrara & Larry Hunter, *How ObamaCare Guts Medicare,* Wall St. J., Sept. 9, 2010 ...........................................................................................................42

*Policies for Increasing Economic Growth and Employment in 2010 and 2011*, Cong. Budget Off., Jan. 2010 ........................................................................34, 39

Richard S. Foster*, Estimated Financial Effects of the "Patient Protection and Affordable Care Act,"* Centers for Medicare & Medicaid Servs., April 22, 2010 .....41, 42

Second CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, June 24, 2010 .................................................41

*State and Local Governments' Fiscal Outlook (GAO-10-358)*, Gov't Accountability Off., March 2010 .......... 40

*State and Local Governments: Fiscal Pressures Could Have Implications For Future Delivery of Intergovernmental Programs (GAO-10-899)*, Gov't Accountability Off., July 2010 .......... 40

*The Budgetary Treatment of an Individual Mandate to Buy Health Insurance,* Cong. Budget Off., Aug. 1994 .......... 12

*The Federalist No. 39* (J. Madison) .......... 22

*The Long-Term Budget Outlook ("Budget Outlook"),* Cong. Budget Off., June 2010 .......... 32, 35, 40, 42

*Variation in Analyses of PPACA's Fiscal Impact on States,* Cong. Res. Serv., Sept. 8, 2010 .......... 41

Webster's Third New International Dictionary (1971) .......... 10

Plaintiffs hereby submit this memorandum in support of their Motion for Summary Judgment. As shown below, and as supported in the accompanying Statement of Material Facts and Appendix, no genuine issue of material fact exists in this action. Plaintiffs are entitled to judgment in their favor as a matter of law on Counts One and Four of the Amended Complaint ("Am. Compl."). Accordingly, summary judgment should be entered for Plaintiffs, and the Patient Protection and Affordable Care Act[1] ("ACA" or "the Act") should be declared unconstitutional and its enforcement enjoined.

**Introduction**

The ACA constitutes an unprecedented intrusion on the sovereignty of the States and the freedom of their citizens. In enacting it, Congress exceeded the limited enumerated powers conferred upon it by Article I of the Constitution.

The Act's "Individual Mandate" (ACA §§ 1501(a)(2)(D), 10106(a)(2)(D)) – a requirement that virtually all Americans obtain and maintain congressionally-approved healthcare insurance coverage for themselves and their families – is unconstitutional. Congress's power under the Commerce Clause is not infinite. At its furthest reach, the commerce power permits federal regulation of *activities* having a substantial relation to interstate commerce. The commerce power does not allow Congress to compel inactive individuals to engage in economic activity against their will. Nor is there any basis in law to treat an internal decision to abstain from activity as a form of "activity" subject to

[1] Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("HCERA").

regulation under the Commerce Clause, or to deem all Americans "active" participants within a regulable market merely by dint of their existence.

To uphold the Individual Mandate would give future Congresses unbridled power to compel Americans to engage in a variety of economic activities. Authority so novel and sweeping would be indistinguishable from a general federal "police power," which is irreconcilable with the well-established constitutional principle that Congress has only limited and enumerated powers. Moreover, because the mandate is concededly indispensable to the ACA, it cannot be severed: the Act must fall along with the mandate.

The ACA also impermissibly coerces Plaintiff States by effectively forcing them to accept a greatly expanded and fundamentally transformed Medicaid program that extends benefits to millions of individuals with incomes above the poverty level. Plaintiff States face an all-or-nothing proposition: either accept the Act's new Medicaid regime and suffer devastating consequences to their already-strained budgets, or forgo access to many billions of dollars annually which the federal government collects from the States' taxpayers and then returns to those States that remain in Medicaid. No mechanism is provided under the ACA or otherwise for States to withdraw from Medicaid, and no transitional process exists to protect the health and welfare of the States' poorest residents if their Medicaid programs are terminated. Thus, contrary to Defendants' suggestion, opting out of Medicaid is not a viable option for Plaintiff States to avoid the Act's ruinous effects. Accordingly, the Act's impositions upon Plaintiff States "pass the point at which 'pressure turns into compulsion[,]'" *South Dakota v. Dole*, 483 U.S. 203, 211 (1987), commandeer State governments, and exceed Congress's

spending power, in violation of the Constitution. Because the coerced participation of all States in the new Medicaid regime is essential to the Act's mandatory coverage scheme, the unconstitutionality of that regime renders the entire Act unconstitutional.

## **Argument**

## I. GOVERNING STANDARDS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine issue as to any material fact," such that "the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing Fed. R. Civ. P. 56(c)). At summary judgment, a court must view the evidence and draw all reasonable factual inferences in the light most favorable to the non-moving party. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations omitted). Where, as here, a case turns on the facial constitutionality of a law, statutory interpretation begins and ends with the text of the statute so long as the text's meaning is not ambiguous. *Reeves v. Astrue*, 526 F.3d 732, 734 (11th Cir. 2008); *see also Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1337 (11th Cir. 1999). Nor may courts rewrite laws to make them constitutional. *See Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216 (1975).

## II. STANDING, RIPENESS, AND JUSTICIABILITY ARE ESTABLISHED

By its Order and Memorandum Opinion of October 14, 2010 [Doc. 79] ("Mem.Op."), the Court denied Defendants' Motion to Dismiss as to Counts One (concerning the Individual Mandate) and Four (concerning Medicaid), holding that those counts state causes of action based upon the allegations of the Amended Complaint and

applicable legal principles. In so ruling, the Court rejected challenges to Plaintiffs' standing to assert, and the ripeness and justiciability of, their claims.

Plaintiffs' Statement of Material Facts ("PSOMF") and the referenced exhibits in their Appendix ("Pl.App.") fully support the allegations of the Amended Complaint, including those bearing on standing and ripeness. Injury to the Individual Plaintiffs and Plaintiff National Federation of Independent Business from the Individual Mandate, the imminence of that injury, and their need to divert resources to prepare for and comply with the mandate, are established. The PSOMF and Appendix exhibits also demonstrate Plaintiff States' standing to challenge the mandate, based upon: the added costs from surges in Medicaid rolls and State employee plan enrollments;[2] the injurious effects of the ACA's Medicaid changes, from which the mandate is not severable (as shown below); and the infringement of their sovereign power to create legal codes (four Plaintiff States have enacted statutes to protect their citizens from the type of coercion imposed by the mandate, and many other Plaintiff States have considered proposals to that effect).[3]

## III. PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT ONE BECAUSE CONGRESS LACKS CONSTITUTIONAL AUTHORITY TO ENACT THE INDIVIDUAL MANDATE

The Individual Mandate exceeds Congress's Article I powers and violates the Ninth and Tenth Amendments, which reserve powers not granted to the federal

[2] The Court found that the increase in numbers of persons in the States' employee plans would cost the States money and "qualifies as injury-in-fact, for essentially the same reasons discussed with respect to the individual mandate…." Mem.Op. at 36. Plaintiff States likewise will suffer costs from increased Medicaid enrollment under the ACA, also brought about by the Individual Mandate.

[3] The five distinct bases for finding States' standing under these circumstances were briefed in Pl.Opp.MTD [Doc. 68] at pp. 3-10 and argued orally on September 14, 2010.

government to the States and the People. Plaintiffs are entitled to judgment on Count One as a matter of law.

### A. <u>The Commerce Power Does Not Support the Individual Mandate</u>

The Individual Mandate is not a valid exercise of Congress's commerce power. As the Court has ruled, Congress relied entirely on the Commerce Clause in enacting the mandate and in asserting that the failure to have qualifying healthcare insurance as defined in the ACA both is "commercial" in nature and "substantially affects interstate commerce." Mem.Op. at 17. *See also* ACA § 1501(a). However, the *failure* to have ACA qualifying coverage is not commercial and does not "substantially affect interstate commerce" under the Supreme Court's Commerce Clause jurisprudence. Not having healthcare insurance simply is not an "activity" subject to Commerce Clause regulation.

Moreover, to sustain the Individual Mandate would empower Congress to exercise a general police power reserved to the States, robbing them of that exclusive authority and obliterating the Constitution's unique system of dual sovereignty.

#### 1. <u>The Commerce Clause Does Not Reach Inactivity</u>

The object of congressional regulation under the commerce power must be some form of commercial or "economic activity." Indeed, the term "commerce" inherently encompasses some form of an activity. Binding Supreme Court jurisprudence is permeated with recognition of this most fundamental requirement, which applies both in cases where the Court has upheld federal statutes under the commerce power, *see Gonzales v. Raich*, 545 U.S. 1, 17 (2005) ("... the power to regulate *activities* that substantially affect interstate commerce") (emphasis added), and in cases where the Court

has struck down laws as exceeding that authority. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 608-09 (2000) (Congress has "the power to regulate those *activities* having a substantial relation to interstate commerce") (emphasis added); *United States v. Lopez*, 514 U.S. 549, 558-59 (1995) (commerce power allows Congress to "regulate those *activities* having a substantial relation to interstate commerce.") (emphasis added).

In *Lopez*, the Court identified the "three broad categories of *activity* that Congress may regulate under its Commerce Clause power[]:"

> First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate commerce. Finally, Congress' commerce authority includes the power to regulate those *activities* having a substantial relation to interstate commerce.

514 U.S. at 558-59 (emphasis added, internal citations omitted).[4] There, the Court invalidated the Gun Free School Zones Act, holding that "possession of a gun in a local school zone is in no sense an *economic activity* that might, through repetition elsewhere, substantially affect any sort of interstate commerce." *Id*. at 567 (emphasis added). The Court also applied this three-category analysis in *Morrison*, striking down part of the Violence Against Women Act because "[g]ender motivated crimes of violence are not, in any sense of the phrase, *economic activity*." 529 U.S. at 613 (emphasis added).

No decision assessing any enactment other than the ACA under the Commerce Clause *ever* has gone beyond the three categories of permissible regulation identified in *Lopez* and *Morrison*, and none *ever* has found inactivity to be a proper subject of

[4] Only the third category was at issue in *Lopez* (the others being plainly inapplicable), and the same is true of the instant case. *See* Mem.Op. at 60.

regulation under the commerce power. In particular, neither *Gonzales v. Raich*, nor *Wickard v. Filburn* – the Supreme Court's most sweeping Commerce Clause rulings and on which Defendants principally rely – suggests that Congress through its commerce power can regulate anything other than economic activity. Indeed, in both cases Congress reached the plaintiffs' activities only based upon its overall regulation of commodities that were indisputably part of the interstate market.

In *Raich*, the Court engaged in the same three-category analysis as in *Lopez* and *Morrison* and upheld application of the Controlled Substances Act ("CSA") to the purely intrastate manufacture, possession, and use of marijuana for medical purposes. It reasoned that those *activities* were economic in character and, at least in the aggregate, had a substantial effect on interstate commerce. As the Court explained:

> Our case law firmly establishes Congress' power to regulate purely local *activities* that are part of an economic "class of *activities*" that have a substantial effect on interstate commerce. … As we stated in *Wickard*, "even if appellee's *activity* be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce." … When Congress decides that the "'total incidence'" of a *practice* poses a threat to a national market, it may regulate the entire class.

*Raich*, 545 U.S. at 26 (emphasis added).[5]

The CSA regulates all aspects of the production, sale, and use of certain drugs and pharmaceuticals. The petitioners in *Raich* properly were subject to the act's requirements *not* because they lived in the United States, but because they *voluntarily chose* to

[5] Of course, like virtually all Commerce Clause opinions, *Raich* is replete with references to "activity," "activities," "conduct," and "practice" in describing what Congress may regulate through its commerce power. *See, e.g.*, *Raich*, 545 U.S. at 17, 23-24, 26.

produce, use, or possess a CSA regulated substance: marijuana. Had they avoided active involvement with a controlled substance, including its possession or use, the CSA would have imposed no requirements or obligations on them whatsoever.

Similarly, in *Wickard v. Filburn*, the Court upheld federal regulation of the purely intrastate production and consumption of wheat, reasoning that homegrown wheat consumption had a substantial "economic effect on interstate commerce" when aggregated across the Nation. But Roscoe Filburn was a wheat farmer. He was engaged in an *economic activity* and hence was a voluntary participant in the regulated class. That his activities – growing wheat to be consumed by his animals and his family – were limited to a single State could not change this key fact. The same, of course, was true of those parties challenging the civil rights acts in *Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964), and *Daniel v. Paul*, 395 U.S. 298 (1969). Congress had not required anyone to become a hotelier or restaurateur; it simply established requirements for those who *voluntarily* engaged in those particular activities, which were carried out in or substantially affected interstate commerce. Indeed, this Court expressly distinguished *Heart of Atlanta* and *Wickard* on this very basis, explaining that they

> involved activities in which the plaintiffs had chosen to engage. All Congress was doing was saying that if you choose to engage in the activity of operating a motel or growing wheat, you are engaging in interstate commerce and subject to federal authority.

Mem.Op. at 63. Nor did the Supreme Court suggest that Congress could have forced these parties to *remain* active in the relevant markets to achieve its regulatory goals.

In this regard, Commerce Clause jurisprudence could not be clearer. Congress may not order Americans to buy, sell, manufacture, grow, distribute, use, obtain, or

maintain any product or service against their will unless and until they *choose* to engage in some type of *activity* properly subject to its authority to regulate interstate commerce.[6]

### 2. <u>The Lack of Healthcare Insurance Is Not a Regulable Activity</u>

To stretch its commerce power enough to impose the Individual Mandate, Congress would redefine the *absence* of healthcare insurance coverage as a species of regulable economic activity. Thus, Congress asserted that the mandate "is commercial and economic in nature, and substantially affects interstate commerce," because it regulates "economic and financial decisions about how and when health care is paid for, and when health insurance is purchased." *See* ACA § 1501(a)(1)(2).[7]

However, the Individual Mandate targets passive individuals and is intended to compel, rather than regulate, their activity. Congress's conclusion "that a particular activity substantially affects interstate commerce does not necessarily make it so." *Lopez*, 514 U.S. at 557 n.2. This is "ultimately a judicial rather than a legislative question." *Id.* That the courts need not accept Congress's conclusions when assessing whether a statute falls within the commerce power speaks with even greater force here:

---

[6] *Cf. Thomas More Law Ctr. v. Obama*, 2010 WL 3952805 at *8 (E.D. Mich. Oct. 7, 2010) ("in every Commerce Clause case presented thus far, there has been some sort of activity").

[7] Significantly, its findings supporting the Individual Mandate strongly suggest that Congress misunderstood the nature of its authority under the third prong of *Lopez*. *See* ACA § 1501(a) (finding that "[t]he *individual responsibility requirement* provided for in this section ... is commercial and economic in nature, and *substantially affects interstate commerce*") (emphasis added). In short, Congress did not find that the regulated "activity" (really, the "inactivity" or lack of activity) substantially affects commerce. Rather, Congress found that the *regulation* of that inactivity – i.e., the Individual Mandate itself – affects commerce. This puts the constitutional cart before the horse. The Supreme Court never has embraced such reasoning.

the courts need not accept the nonsensical proposition that inactivity is activity. Semantic gamesmanship simply cannot transform the lack or absence of qualifying insurance into an activity, event, or transaction subject to the commerce power.[8]

Defendants nevertheless persist in such efforts, by arguing that the "decision to forgo health insurance" is activity. Def.Mem.MTD [Doc. 55-1] at 43. Ultimately, Defendants assert that the commerce power reaches the absence of coverage because that absence constitutes an "economic decision." But a decision is purely a *mental process* which may, or may not, result in activity (economic or otherwise), *depending on the decision*. A decision to do nothing does not convert nothing to something. Nor does declaring inactivity to be "market timing," or "volitional events," or "cost shifting" (*id.* at 41-43) – or even characterizing it as a present intent to make later use of healthcare services without paying for them – metamorphose such inactivity into activity.[9]

It is no answer to suggest that everyone already is "in" the healthcare market even if everyone at some point in life will seek or require healthcare services. The same is true of virtually every other market for goods and services, including food, clothing, housing,

---

[8] Of course, the failure to participate in a market is passive, and not "activity" of any kind. *See, e.g.*, Webster's Third New International Dictionary 22 (1971) (defining "active" as "1: characterized by action rather than by contemplation or speculation […]"); Oxford English Dictionary (2d ed. 1989) (defining "activity," in relevant part, as "1.a. The state of being active; the exertion of energy, action. […]" and "Opposed to passive: Originating or communicating action, exerting action upon others; acting of its own accord, spontaneous.").

[9] *Compare* Def.Mem.MTD 5, 58 (claiming that the ACA regulates monthly decisions not to obtain insurance) *with Virginia v. Sebelius*, No. 3:10-cv-188, Hr'g Tr. at 100 (E.D. Va. July 1, 2010) (purporting to regulate the future use of – and failure to pay for – healthcare services). Defendants' inability to describe consistently the supposed "activity" being regulated underscores the untenability of their defense of the mandate.

transportation, communications, entertainment, and other leisure activities. Moreover, individual Americans have the freedom to refuse healthcare services, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990). It follows that they also have the freedom to refuse to buy unwanted insurance against the need for such services. That is, they have the freedom to declare themselves "out" of that market.

Certainly, the inevitability of someday needing food, clothing, etc., during one's lifetime has not been construed to make all persons "active" participants in any related markets for Commerce Clause purposes. At most, Defendants' inevitability argument merely makes the point that everyone at some time is likely – though not certain – to become active in the healthcare market. When, how, to what extent, and on what financial terms inactive individuals may enter the market are all unknown variables, precisely because these persons have not yet voluntarily entered the market and thereby rendered themselves subject to Commerce Clause regulation.

The Supreme Court *never* has suggested that the power to regulate interstate commerce, however broad, authorizes Congress to force individuals to obtain a particular good or service simply because they live in the United States. *See* Mem.Op. at 61 ("The power that the individual mandate seeks to harness is simply without prior prcedent."). *See also Virginia v. Sebelius*, No. 3:10-cv-188, Mem.Op. [Doc. 84] at 31 (Aug. 2, 2010) ("No reported case from any federal appellate court has extended the Commerce Clause ... to include regulation of a person's decision not to purchase a product ...."). The absence of Commerce Clause precedent for the mandate is no surprise: laws compelling individuals to buy a good or service do not regulate commerce.

The lack of judicial precedent for the Individual Mandate is consistent with the complete dearth of prior congressional action that would have generated such precedent. As both the Court and the Congressional Budget Office ("CBO") have acknowledged, Congress has "never required people to buy any good or service as a condition of lawful residence in the United States." Mem.Op. at 63-64 (quoting CBO, *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance*, at 1 (Aug. 1994)).

The nonexistence of comparable legislation from prior Congresses is significant. The Supreme Court has indicated that "almost two centuries of apparent congressional avoidance of the practice [at issue] tends to negate the existence of the congressional power asserted here." *Printz v. United States*, 521 U.S. 898, 918 (1997). Indeed, "the utter lack of statutes imposing obligations" of this type "suggests an assumed absence of such power." *Id.* at 907-08. *See also Alden v. Maine*, 527 U.S. 706, 744 (1999) (the persuasive force of statutes of "recent vintage" is "far outweighed by almost two centuries of apparent congressional avoidance of the practice"). Here, the Court has recognized that the "novel and unprecedented nature of the individual mandate" yields "perhaps a presumption" of its unconstitutionality. Mem.Op. at 64 n.21. However strong or weak any such presumption might be, Defendants cannot overcome it.

This Court has recognized the "obvious ways" in which this case differs from decisions upholding applications of the commerce power, *see* Mem.Op. at 63 ("we are dealing with something very different"), noting that "[p]eople have no choice and there is no way to avoid [the Individual Mandate]." *Id.* This goes to heart of the problem: the power to force inactive Americans into a marketplace is inconsistent with their personal

freedom,[10] and intrudes on their collective power as citizens of their respective States to act through the sovereignty of those States.[11]

### 3. **The Individual Mandate Violates the Constitution's Federal Design**

The commerce power must be construed "'in the light of our dual system of government and may not be extended so as to ... effectively obliterate the distinction between what is national and what is local ....'" *Lopez*, 514 U.S. at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). Accordingly, any valid interpretation of the Commerce Clause must preserve real and meaningful limits on congressional authority and cannot transform that provision into the source of "a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. Accepting

---

[10] *Compare* Jennifer Staman & Cynthia Brougher, *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis* 6 (Cong. Research Serv., July 24, 2009) (hereinafter "Cong. Res. Serv. Mem.") ("Congress has used its authority under the Commerce Clause to regulate individuals, employers, and others who *voluntarily take part in some type of economic activity*.") (emphasis added).

[11] The Supreme Court also has expressed concern over any instance in which Congress piles "inference upon inference" as a basis for "convert[ing] congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. *See also United States v. Comstock*, 130 S. Ct. 1949, 1967 (2010) (Kennedy, J., concurring) ("The rational basis referred to in the Commerce Clause context is a demonstrated link in fact, based on empirical demonstration."). Here, Congress only can connect an individual lack of healthcare insurance to the supposed need for the Individual Mandate to regulate insurance markets through a series of unsubstantiated and unquantifiable assumptions about human behavior and its effects, including the claim that the mandate will reduce premium costs. But an increase in the number of insured persons is just as likely to drive premiums up, as insured individuals – having "prepaid" for healthcare services (as Defendants would put it) – more liberally avail themselves of those services. Absent a commensurate increase in the number of providers, costs will increase. Indeed, as shown below, the ACA's expected savings are to come mainly from reducing providers' compensation, which is likely to decrease the supply of medical services, driving prices skyward.

Defendants' claims that the absence of qualifying insurance coverage with regard to any particular individual is regulable "commercial activity" would do just that.[12]

Defendants can articulate no judicially enforceable limiting doctrine consistent with their view of the commerce power that would preserve the Constitution's division of authority between the federal government (of limited and enumerated powers) and the States.[13] "Cost shifting" and "market timing" are not unique to the markets for healthcare services and insurance. Any time individuals make choices about what and when to buy they are engaged in "market timing" – presumably choosing the optimal moment to enter a particular market based on their own circumstances. This is true whether that market is for necessities such as food, clothing, shelter, and healthcare, or for luxuries such as entertainment, jewelry, or vacation travel. Whenever individuals

---

[12] The Supreme Court emphasized the importance of preserving the boundary between the federal commerce power and the States' police powers in both *Lopez* and *Morrison*. The *Lopez* Court explained that upholding the Gun Free School Zones Act as a valid exercise of the commerce power would have "convert[ed] congressional authority under the Commerce Clause to a general police power of the sort retained by the States," 514 U.S. at 561, and therefore struck it down. *See also id.* at 576 (Kennedy, J., and O'Connor, J., concurring) (a meaningful limiting doctrine constraining exercise of the commerce power is essential to fulfilling the "theory that two governments accord more liberty than one[,]" which "requires for its realization two distinct and discernible lines of political accountability: one between the citizens and the Federal Government; the second between the citizens and the States"). Likewise, the Supreme Court in *Morrison* refused to bring violent crime usually regulated under State law within the commerce power: "[T]he Constitution requires a distinction between what is truly national and what is truly local" and therefore "withholds from Congress a plenary police power." 529 U.S. at 617-19 (internal citations omitted).

[13] The notion sometimes advanced by ACA proponents that Congress can be trusted, even in the absence of a judicially-enforceable limiting doctrine, to wield its powers wisely and not to impose further individual mandates is belied by historical experience and would eviscerate the key structural constitutional protections of individual liberties. This approach is just as unacceptable as a suggestion that the protections in the Bill of Rights ought to be enforced purely through political means.

avoid a particular market for any or no reason, economic or otherwise, they also can be said to "impose" costs in that market: their lack of demand may deflate prices (if supply remains constant) or increase prices (if supply falls), and may even affect whether particular goods and services are offered at all. This is to be expected in a free society.

Indeed, under Defendants' radical theory of federal power, every action and *all inaction* would be subject to Commerce Clause regulation. Almost any conceivable decision individuals make can be said, at some remote level of analysis, to have some economic purpose or effect and, in the aggregate, to have a not insubstantial impact on some segment of the Nation's economy. If Congress can compel individuals to buy or sell particular goods and services merely because their "decision" not to do so has broader economic consequences, then congressional power is virtually limitless.[14] If this had been the Framers' intent, and if this is the Constitution's meaning, then all of the remaining provisions of Article I, section 8 demarcating Congress's specific authority would be "mere surplusage." *Marbury v. Madison*, 5 U.S. 137, 174 (1803). The commerce power by itself would have been sufficient for any and all federal action.

This is not valid constitutional interpretation, *see id.* ("It cannot be presumed that any clause in the Constitution is intended to be without effect."), and nothing in the Supreme Court's Commerce Clause jurisprudence – let alone the text, structure, and history of the Constitution – supports such an unbounded expansion of federal power. Defendants cannot identify a single case suggesting that Congress may compel persons to

---

[14] For example, if every American who avoided debt were required to pay fees to maintain a certain number of credit card accounts, then the costs associated with defaulters would be spread more broadly. The same would be true if all Americans who could afford home mortgage loans were compelled to obtain them.

buy a good or service merely because their failure to do so might affect the national economy in a way that Congress finds undesirable.

Moreover, if applied as Defendants urge, this construction of the Commerce Clause would allow Congress the most intrusive of all police powers, trumping all powers reserved to the States under the Constitution and destroying the Constitution's system of dual sovereignty. It is no coincidence that nearly every "individual mandate" hitherto has been established through the exercise of State police powers. *See, e.g.*, *Jacobson v. Massachusetts*, 197 U.S. 11, 12, 24-25 (1905) (compulsory vaccination); *Robinson v. California*, 370 U.S. 660, 665 (1962) (drug rehabilitation); *Ex Parte Poresky*, 290 U.S. 30, 32 (1933) (automobile insurance and collecting cases). *Also cf. Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972) (compulsory education of children).[15] This also is true of the only other "individual mandate" to obtain healthcare insurance. It is highly revealing that Congress's findings in support of the ACA's Individual Mandate explicitly invoke the example of Massachusetts's program. *See* ACA § 1501(a)(2)(D).[16]

---

[15] While Congress on rare occasion has imposed affirmative obligations on individuals based only upon their being citizens or residents of the United States, it never has done so either under the Commerce Clause or pursuant to any claim of a general federal police power. Instead, such congressional impositions have been based upon explicit constitutional authorizations entirely inapplicable to this case. *E.g.*, *Selective Service Cases*, 245 U.S. 366, 383, 390 (1918) (finding the conscription of men into the armed services to be justified by Congress's power "to raise and support Armies" under U.S. Const. art. I, § 8, cl. 12); *Morales v. Daley*, 116 F. Supp. 2d 801 (S.D. Tex. 2000), *aff'd* 275 F.3d 45 (5th Cir. 2001), *cert. denied*, 534 U.S. 1135 (2002) (Congress may compel answer to census questions, pursuant to U.S. Const. art. I, § 2, cl. 3).

[16] Massachusetts law requires most adult residents to obtain healthcare insurance amounting to "creditable coverage," and failure to do so results in a penalty enforced through tax returns. Mass. Gen. Laws ch. 111M, § 2 (2008). Massachusetts courts have upheld this law under the Commonwealth's "police power" to act for the "welfare" of its

Although the commerce power and the States' police powers may sometimes overlap, Congress's open emulation of a State police-power regulation is telling. In enacting the Individual Mandate, Congress is attempting to exercise the very plenary power that the Constitution forbids it. The Supreme Court repeatedly has rejected any interpretation of the Commerce Clause that could transform it into a source of "a general police power of the sort retained by the States." *Comstock*, 130 S. Ct. at 1956; *see also Lopez*, 514 U.S. at 561; *Morrison*, 529 U.S. at 618.

This Court should decline Defendants' invitation to expand the Commerce Clause far beyond the scope of the Constitution's text and the Supreme Court's jurisprudence.

### B. <u>The Necessary and Proper Clause Cannot Save the Individual Mandate</u>

The Necessary and Proper Clause cannot sustain the Individual Mandate. That provision gives Congress the "means" to carry out a proper exercise of its enumerated powers. *See Comstock*, 130 S. Ct. at 1956-1957 (and cases cited therein). Chief Justice Marshall explained "in language that has come to define the scope of the Necessary and Proper Clause ... 'Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional.'" *Id.* at 1956 (quoting *McCulloch v. Maryland*, 17 U.S. 316, 421 (1819)).

The Individual Mandate is not a "means" to a legitimate end that facilitates a permissible exercise of the commerce power, nor is it consistent with the Constitution's

---

citizens. *Fountas v. Comm'r of Dep't of Revenue*, 2009 WL 3792468 (Mass. Super. Ct. Feb. 6, 2009) (dismissing suit), *aff'd*, 922 N.E.2d 862 (Mass App. Ct. 2009) (affirming for "substantially the same reasons"), *review denied*, 925 N.E.2d 865 (Mass. 2010).

letter and spirit.[17] Rather, it is an unprecedented attempt to impose a desired policy "end" – universal coverage – through a statutory command ungrounded in any enumerated power, and which invades the sovereignty of the States and the People's reserved rights in a constitutionally "improper" manner. It is unlike any other provision upheld under the Necessary and Proper Clause. *See* Mem.Op. at 61 ("The Commerce Clause and Necessary and Proper Clause have never been applied in such a manner before.").

First, unlike the statute recently upheld by the Supreme Court under the Necessary and Proper Clause in *Comstock,* the mandate is neither "modest" nor a "narrow" addition to a longstanding and indisputably legitimate federal program. Never before has a Congress even attempted to impose on Americans an affirmative obligation to buy a particular good or service simply because they live in the United States.

While the long "history of involvement" in the mental healthcare of federal inmates and their civil commitment supported the challenged law as a legitimate exercise of the Necessary and Proper Clause in *Comstock*, the unprecedented and extraordinary nature of the Individual Mandate, and the sheer magnitude of its scope, must lead to the

---

[17] Nor is the Mandate "necessary" in any practical sense to achieve Congress's policy goals. For example, Congress could have raised taxes to subsidize the costs created by other ACA provisions, or enacted tax incentives to encourage individuals to obtain healthcare insurance. Congress may have shied away from the political consequences of using its enumerated powers in a direct and accountable way, but political convenience cannot trump the Constitution, as this Court has recognized. *See* Mem.Op. at 26-29. *See also* Ilya Somin, *Taking Stock of Comstock: The Necessary and Proper Clause and the Limits of Federal Power*, Cato Supreme Court Review, 2009-2010, at 264 ("Pro-market economists have proposed ways to cover preexisting conditions that do not require an individual mandate for forcing insurers to accept customers they prefer to reject.") (cited references omitted).

opposite conclusion here.[18] Directly or indirectly, the mandate will affect nearly every man, woman, and child lawfully living in this country – and this is its purpose.

Moreover, the mandate simply is not the "means for implementing a constitutional grant of legislative authority." *Comstock*, 130 S. Ct. at 1962. Rather, as shown further below with regard to its unseverability from the ACA as a whole, the mandate is the central component of Congress's scheme to guarantee universal, national healthcare insurance coverage – as Defendants themselves have confirmed. *See* Def.Mem.MTD at 5, 7, 46, 47, 48. The Individual Mandate is not a means to a legitimate end sought under the Commerce Clause; it embodies that end.[19]

In addition, and perhaps most important of all for Necessary and Proper Clause purposes, the Individual Mandate does not "properly account[] for State interests" as did the law upheld in *Comstock*, 130 S. Ct. at 1962. Rather, in enacting the mandate, Congress has shoved the States aside and exerted an unfounded new federal power to impose on Americans a broad scheme of regulation that is in no way linked to individuals' voluntary participation in interstate commerce, or to any activity that substantially affects interstate commerce, or indeed to any activity at all. This is exactly

---

[18] While Defendants argue that Congress has been involved in many aspects of the healthcare market, this is quite unlike the precise match between the past and present modes of involvement presented in *Comstock*.

[19] In any case, it is no answer to suggest that the mandate can be upheld as part of a larger plan to regulate healthcare insurance. In *Lopez*, the Court rejected the contention that the statute at issue might stand as "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate *activity* were regulated." 514 U.S. at 561 (emphasis added). Regardless of which is the means and which the end, activity is requisite: Congress simply may not compel unwanted participation in commerce.

the power that the Constitution reserves to the States, *see United States v. Morrison*, 529 U.S. 598, 619 (2000) ("The Constitution withholds from Congress a plenary police power."), and it is the defining aspect of State sovereignty and of State citizenship.

If Congress can regulate individual Americans regardless of whether they are participating in commerce or in some other activity subject to Congress's enumerated powers, then the Supremacy Clause effectively eliminates any area in which the States are sovereign. This was not the Founders' intent, and cannot be squared with the Constitution's text, structure, and meaning. The Supreme Court has recognized repeatedly that the constitutional text throughout "'presupposes the continued existence of the States and ... those means and instrumentalities which are the creation of their sovereign and reserved rights.'" *Printz*, 521 U.S. at 919 (quoting *Helvering v. Gerhardt*, 304 U.S. 405 (1938)). This residual State sovereignty is "inviolable," *id.*, no less so than were it an explicit command. *New York v. United States*, 505 U.S. 144, 157 (1992) ("The Tenth Amendment thus directs us to determine ... whether an incident of State sovereignty is protected by a limitation on an Article I power.").

The Court has warned time and again that the federal government may not use the Necessary and Proper Clause as a pretext to exercise a type of authority denied it by the Constitution. *See McCulloch*, 17 U.S. at 423 ("Should Congress, under the pretext of executing its powers, pass laws for the accomplishment of objects not entrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land."); *Jinks v. Richland Co.*, 538 U.S. 456, 464 (2003) (measures adopted "as a 'pretext' for

'the accomplishment of objects not entrusted to the [federal] government,'" would not be a proper exercise of authority under the Necessary and Proper Clause (citing *McCulloch*, 17 U.S. at 423)); *Comstock*, 130 S. Ct. at 1964 (the Necessary and Proper Clause does not give Congress a general police power, which is reserved to the States).

Moreover, Congress cannot eliminate the core attributes of State sovereignty by claiming that a particular enactment is necessary to the success of an otherwise-permissible regulatory scheme. This is the teaching of *New York* and *Printz*. In both cases, the Court invalidated federal legislation that would have robbed the States of their status as independent sovereigns within our federal system.

In *New York*, the challenged law required States to dispose (in federally approved ways) of low-level radioactive waste generated within their borders. If a State failed to comply, by enacting the prescribed regulatory program, it would itself have been required to "take title" to the waste, thereby becoming directly liable for its proper handling. The States could not, in other words, "decline to administer the federal program. No matter which path the State chooses, it must follow the direction of Congress." 505 U.S. at 177. In *Printz*, Congress gave the States no "choice" at all. As part of the Brady Act, Congress mandated a federal instant background-check system for handgun sales and required State law enforcement officials to administer important aspects of the program.

The Supreme Court invalidated both schemes based on the Constitution's federal architecture and the States' role as dual sovereigns in that structure. In *New York*, the Court reasoned that requiring States to adopt the prescribed federal regulatory requirements, or themselves accept responsibility for the radioactive waste produced by

private parties within their borders, effectively "'commandeered' State governments into the service of federal regulatory purposes." *New York*, 505 U.S. at 175. Similarly, in *Printz,* the Court concluded that Congress cannot directly "conscript[] the State's officers" to implement a federal program. In both cases, the constitutional objection was that the challenged laws impermissibly subordinated the States to federal control, thereby depriving them of their "'residuary and inviolable sovereignty.'" *Printz*, 521 U.S. at 919 (quoting *The Federalist No. 39*, at 245 (J. Madison)).

Permitting Congress to regulate "inactivity" as necessary and proper to the success of another federal program has the same result. Such a ruling would allow Congress to exceed its legitimate authority by purposefully adopting schemes dependent for their success on the exercise of authority otherwise denied to the federal government. If Congress is permitted to regulate on this basis, then, as the Court noted in *Lopez*, it is "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign. Thus, if we were to accept the Government's arguments, we are hard pressed to posit any activity by an individual that Congress is without power to regulate." 514 U.S. at 564. If that were the case, since the Supremacy Clause subordinates State law to federal enactments, there would be no area in which the States have the final say – i.e., where they are sovereign.

This result is fundamentally inconsistent with the Constitution's federal design and, therefore, cannot be a "proper" means of implementing Congress's enumerated powers under the Necessary and Proper Clause. As the *Printz* Court specifically stated:

> When a "la[w] ... for carrying into Execution" the Commerce Clause violates the principle of State sovereignty ... it is not a "La[w] ... *proper*

> for carrying into Execution the Commerce Clause," and is thus, in the words of The Federalist, "merely [an] ac[t] of usurpation" which "deserve[s] to be treated as such."

*Printz,* 521 U.S. at 923-24 (emphasis in original).

Sustaining the Individual Mandate as being necessary and proper for carrying out Congress's commerce power would stand our dual federalist constitutional structure on its head. This Court was entirely correct in stating, with respect to Defendants' arguments in support of the Individual Mandate: "[T]he Commerce Clause and the Necessary and Proper Clause have never been applied in such a manner before. The power that the individual mandate seeks to harness is simply without prior precedent." Mem.Op. at 61. The Individual Mandate cannot be upheld under the Necessary and Proper Clause in combination with the Commerce Clause.[20] The ACA must fall.

### C. <u>The Individual Mandate Violates the Ninth and Tenth Amendments and Core Principles of Federalism</u>

Article I provides no authority to Congress to enact the Individual Mandate. As the Supreme Court has observed, the "United States is entirely a creature of the

[20] Concurring in *Gonzales v. Raich*, Justice Scalia argues that the third category of Congress's commerce authority – *viz.*, the power to regulate activities having a substantial effect on interstate commerce – derives in part from the Necessary and Proper Clause such that the commerce power can reach even some intrastate non-economic *activities* "[w]here necessary to make a regulation of interstate commerce effective." 545 U.S. at 34-35. He is equally emphatic, however, that the Necessary and Proper Clause has limits that must be observed so as not "to obliterate the line between 'what is truly national and what is truly local.'" *Id*. at 38 (quoting *Lopez*, 514 U.S. at 561). His opinion contains numerous references to "activity," with not the slightest hint that inactivity could be reached. He further cabins the sweep of congressional power with other limitations on the Commerce/Necessary and Proper Clauses combination, including the requirements that legislation be "appropriate," "consistent with the letter and spirit" of the Constitution, "proper," and not violative of State sovereignty. *Id.* at 339.

Constitution" and "it can only act in accordance with all the limitations imposed by the Constitution." *Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (Black, J.) (plurality opinion). Whatever powers the Constitution does not delegate to the federal government "are reserved to the States respectively, or to the people" under the Tenth Amendment.[21]

The ACA violates this constitutional system of dual sovereignty. It is an illegitimate federal police power regulation that eliminates individuals' ability to make critical healthcare decisions for themselves whether directly or through their States, and that allows Congress to co-opt the States' budgetary processes and resources (as shown below). Because systemic safeguards in the Tenth Amendment, Article I, and the Guarantee Clause protect the States from the very kind of federal incursion attempted with the Individual Mandate, the ACA cannot be upheld.[22]

## IV. <u>THE ACA UNCONSTITUTIONALLY FORCES A FUNDAMENTALLY TRANSFORMED MEDICAID REGIME ONTO PLAINTIFF STATES AND OTHERWISE EXCEEDS CONGRESS'S SPENDING POWER</u>

Congress designed the ACA to achieve universal national healthcare coverage without a massive increase in federal taxation. It seeks to achieve this end, *inter alia*, by

[21] Thus, as the Court noted in *New York*, "The Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." 505 U.S. at 157.

[22] The Ninth Amendment "unambiguously refer[s] to individual rights." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2790 (2008). The Guarantee Clause directs the federal government to "guarantee to every State … a Republican Form of Government." U.S. Const., art. IV, § 4. Each State "is entitled to order the processes of its own governance." *Alden v. Maine*, 527 U.S. at 752. "Indeed, having the power to make decisions and to set policy is what gives the State its sovereign nature." *FERC v. Mississippi*, 456 U.S. 742, 761 (1982). The reserved powers of the People and their States must be protected against intrusion when Congress acts beyond its powers, as here.

transferring to the States substantial costs and obligations to cover millions more Americans through a fundamentally transformed Medicaid program.

Plaintiff States are given a Hobson's choice: either accept the ACA's radically changed Medicaid, or (1) forego billions of dollars annually, which the federal government collects from State taxpayers and then returns as Medicaid funds to the States; and (2) risk the welfare of their most vulnerable citizens, and the continuing vitality of their healthcare infrastructure, by attempting to opt out of Medicaid without any defined transition process or established programmatic alternative. No federal program besides Medicaid funds healthcare services for the States' poorest residents, and the States plainly are unable to establish, fund, and implement a Medicaid-like replacement program, much less to do so immediately.

These weighty and incontestable constraints unlawfully force the Plaintiff States to participate in the ACA's new Medicaid regime, and to assume billions of dollars of unaffordable new costs and other costly responsibilities against their will. Congress has made Plaintiff States "an offer they can't refuse" and, in so doing, has exceeded its Article I powers and violated fundamental principles of federalism, the Ninth and Tenth Amendments, and the Guarantee Clause. The "choice" offered to the States goes far beyond the point at which persuasion becomes coercion under *South Dakota v. Dole*, 483 U.S. 203 (1987), and impermissibly commandeers Plaintiff States into funding and administering a new federal program contrary to the teaching of *New York* and *Printz*. Moreover, imposition of the ACA's Medicaid regime on the States violates all restrictions on Congress's Article I, section 8 spending power under *Dole*.

Accordingly, summary judgment should be granted in Plaintiffs' favor on Count Four of the Amended Complaint.

**A. The ACA's Medicaid Changes Are Unconstitutionally Coercive**

**1. The Act's Transformation of Medicaid**

Medicaid was the hallmark of cooperative federalism, a true *partnership*, when the States joined the program in the 1960's and 1970's. *See Harris v. McRae*, 448 U.S. 297, 301, 308 (1980) ("The Medicaid program was created … for the purpose of providing federal financial assistance to States that *choose to reimburse* certain costs of medical treatment *for needy persons*.") (emphasis added).

The ACA destroys that partnership. The States now must conform their Medicaid programs to a new, federally dictated standard that undoes every critical characteristic of the Medicaid program into which all fifty opted long ago. Where Medicaid originally was supposed to address healthcare needs of the *poor*, the ACA requires that States cover virtually anyone who applies and whose income is up to 38 percent *above* the federal poverty line. Where Medicaid was designed to aid the lowest income families through joint *reimbursement* of healthcare expenses, the Act now requires that States (but not the federal government) assume the responsibility of *providing* medical care (ACA § 2304) – an open invitation to endless and costly lawsuits against the States. Presciently, in *Harris*, the Court expressed concern for an ACA-like federal overreach of the Medicaid partnership model: "Title XIX was designed as a cooperative program of shared financial responsibility, *not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund*." 448 U.S. at 309 (emphasis added).

The States cannot avoid these crushing new costs (Medicaid already accounts for roughly 7 percent of all federal outlays and 20 percent of State budgets) by simply opting out of Medicaid, as Defendants disingenuously suggest. The law provides no obvious mechanism for this, and there is no established process for the States to effect a transition from Medicaid, or to know how current Medicaid beneficiaries would be treated in such a transition. Moreover, as the Court acknowledged, the States would be left with little ability to meet the healthcare needs of their poorest citizens, because "federal funds taken from their citizens via taxation that used to flow back into the states from Washington, D.C., would instead be diverted to the states that have agreed to continue participating in the program." Mem.Op. at 56. These constraints, together with the enormous financial inducement in making States choose on an all-or-nothing basis to participate in a $251 billion per year federal program that averages 20 percent of their budgets, and which their taxpayers must continue to fund regardless of their own State's choice, unlawfully coerce the Plaintiff States to participate in the new Medicaid regime and assume billions of dollars of additional costs and other responsibilities against their will.

**2. The *Dole* Coercion Standard**

Congress may not coerce States with terms so onerous as to eliminate their freedom to decide whether to participate in a federal program. *See New York*, 505 U.S. at 166 ("Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal methods"). "Our decisions have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which

'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)); *see also Dole* at 217 (O'Connor, J., dissenting) ("If the spending power is to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives 'power to the Congress to tear down the barriers [and] to invade the states' jurisdiction'") (quoting *United States v. Butler*, 297 U.S. 1, 78 (1936)).

In *Steward Machine*, the Court rejected a coercion claim only after finding that a State could make a choice "of her unfettered will, [and not] under the strain of a persuasion equivalent to undue influence." 301 U.S. at 590. "[T]he point at which pressure turns into compulsion, and ceases to be inducement, would be a question of degree, at times, perhaps, of fact." *Id.* The Court provided that undue coercion is to be measured based on the magnitude of the harm imposed; it is a claim-specific inquiry. Likewise, in *Dole*, the Court considered the State's argument "more rhetoric than fact" because the stakes were so low: the price of refusing federal prescriptions was only five percent of certain highway-related grant funds. 483 U.S. at 211.

While this Court correctly observed that no law yet has been invalidated under *Dole*, and that some circuit courts have deemed coercion claims to involve merely "hard" or "political" choices (Op.Mem. at 53-54), the coercion doctrine unquestionably applies where Congress adopts an all-or-nothing strategy with enormous federal funding consequences to impose requirements on the States which it could not lawfully impose by other means. Although the Eleventh Circuit has not addressed this, the Fourth Circuit has deemed the coercion theory viable where the federal government threatens an entire

block of federal funds: "If the government in fact withheld the entirety of West Virginia's [federal Medicaid funds] because of the state's failure to implement an estate recovery program, then serious Tenth Amendment questions would be raised." *West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 291 (4th Cir. 2002). In another Fourth Circuit case, a six-judge plurality en banc believed unlawful federal coercion to exist where the Department of Education withheld all education grant funds to force a State to conform to federal policy dictates. The plurality reasoned that

> a Tenth Amendment claim of the highest order lies where, as here, the Federal Government … withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect rather than submit to the policy dictates of Washington in a matter peculiarly within their powers as sovereign States. In such a circumstance, the argument as to coercion is much more than rhetoric; it is an argument of fact.

*Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 570 (4th Cir. 1997) (en banc) (citing *Dole*) (Luttig, J.), *abrogated on other grounds by Amos v. Md. Dep't of Pub. Safety*, 126 F.3d 589 (4th Cir. 1997).

A more recent Supreme Court discussion of coercion further supports the *Riley* plurality's suggestion that an all-or-nothing inducement of States via substantial federal monies would exceed *Dole*'s coercion threshold. In *College Savings Bank v. Florida Prepaid Postsecondary Educuation Expense Bd.*, 527 U.S. 666, 687 (1999), all nine Justices acknowledged the coercion doctrine in a case that closely divided on the question of whether a federal act unlawfully could "coerce" a State to waive its sovereign immunity as a condition of pursuing lawful activity. The majority approvingly quoted *Dole's* "financial inducement" coercion standard. *Id.* More strikingly, Justice Breyer's

dissenting opinion (joined by three other Justices), in comparing the coercive forces of (1) compelling a State to forgo federal funds and (2) barring a State from engaging in otherwise lawful activity, quantified what it called the "more compelling and oppressive" financial inducement should Congress condition substantial funding sent to States annually, such as for highways ($20 billion in 1998) or education ($21 billion in 1998). *Id.* at 697. "Given the amount of money at stake, … [i]t is more compelling and oppressive for Congress to threaten to withhold from a State funds needed to educate its children …." *Id.* Far greater undue coercion arises here – where federal Medicaid funds are *twelve times* higher than the sums discussed by Justice Breyer – than in *College Savings Bank*, where unlawful coercion was found to exist.

### 3. <u>Plaintiff States Have No Choice and Must Accept the ACA's Transformation of Medicaid</u>

Plaintiff States cannot simply drop Medicaid and thereby avoid the coercive (and financially adverse) effects of the ACA's new terms – and Congress never thought or intended that they could. As this Court noted, Congress did not "anticipate that the states will (or could) drop out of the program," Mem.Op. at 56, a conclusion necessitated by even the most cursory examination of the ACA itself.[23] The Act's entire architecture *depends* on the States remaining in Medicaid. Congress's purpose in enacting the ACA was to achieve near-universal coverage. ACA § 1501(a). The Individual Mandate

---

[23] CMS's conduct underscores the States' lack of any *real* choice. Shortly after the ACA's passage, CMS wielded the ACA against a Plaintiff State, threatening its entire $7.8 billion annual Medicaid funding over a State-planned revision to a children's health program that would have reduced State costs in line with GAO and Federal Reserve recommendations (discussed *infra*). Pl.App. Ex. 32 (CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, April 1, 2010).

requires virtually all Americans to have coverage, and Medicaid is a "door" (along with Medicare, employer plans, and exchanges) through which a person may pass to get that coverage. The scheme falls apart without Medicaid participation by every State, because the remaining doors are not designed to accommodate the same population.

Significantly, the Act makes *no provision* for healthcare coverage for the poorest citizens *except* through the new Medicaid regime. At the same time, the ACA makes non-Medicaid federal subsidies and assistance available to individuals with incomes that *exceed* 100 percent of the federal poverty level – and extend up to *400 percent* of the poverty line. *See* ACA §§ 1401, 1402(c). It is inconceivable that Congress would have made no provision for the Nation's poorest and neediest, as part of its effort to achieve universal healthcare coverage, if it imagined that any of the States actually could leave the Medicaid program. And, it is every bit as unseemly for Defendants now to argue that withdrawing is a viable option as it was for the federal government to assert that the Individual Mandate's enforcement penalty was not a "tax" (for legislation advantage) and then claim the exact opposite (for litigation advantage).

Plaintiff States would incur a stunningly large sanction if they were to opt out in an attempt to avoid the ACA's impositions of billions of dollars in new Medicaid costs and responsibilities. Non-participating States would forgo the "single largest Federal grant-in-aid program to the States, accounting for over 40 percent of all Federal grants to States."[24] *See* Def.Mem.MTD at 9 (conceding that States must satisfy Congress's

---

[24] Bipartisan Comm'n on the Medicaid Act of 2005, H.R. 985, 109th Cong. § 2(13) (2005); *see also* Pl.App. Ex.32 (CMS letter, *supra* n.23).

conditions "in order to receive the hundreds of billions of dollars Congress has appropriated"). That is, their citizens would be excluded from one of our Nation's largest social programs, consuming roughly seven percent of federal outlays – $251 billion in 2010 – and funded with tax payments sent to Washington, D.C., by the residents of the States. *The Long-Term Budget Outlook*, June 2010 ("Budget Outlook"), CBO, at 30, available at http://www.cbo.gov/ftpdocs/115xx/doc11579/06-30-LTBO.pdf (last visited Oct. 25, 2010); Citizen's Guide to the Federal Budget, http://www.gpoaccess.gov/usbudget/fy01/guide02.html (last visited Nov. 3, 2010). Without the return of Medicaid funds to the States by the federal government, extraordinary sums would be stripped from State budgets, because Medicaid averages more than *20 percent* of total State spending nationally.[25]

These factors dwarf the "mild encouragement" the *Dole* Court found permissible, 483 U.S. at 211, or that was at issue in any other case cited in this litigation. Instead, it constitutes the sort of "compelling and oppressive" action of Congress described by the dissent in *College Savings Bank*. 527 U.S. at 697. Because of the enormous annual funding at stake, "[w]hat Congress threatens if the State refuses to agree to its [ACA] condition is not the denial of a gift or gratuity, but a sanction" in violation of State sovereignty and the Constitution's federalism principles. *Id.* at 687.

The prospect of losing these vast sums coerces Plaintiff States not only because of the unprecedented funding levels at stake, but also because Congress has deprived

[25] *See* http://www.statehealthfacts.org/comparereport.jsp?rep=45&cat=17 (last visited Oct. 25, 2010); http://www.hhs.gov/recovery/statefunds.html (last visited Oct. 20, 2010) (more than $15 billion additional federal Medicaid dollars were distributed to the States in 2009).

Plaintiff States of the ability to replace their current Medicaid programs. As noted, the Court has identified this critical aspect of the ACA's program: the federal government "has little money except through taxpayers, who almost exclusively reside within the states," and if federal Medicaid funds are withheld the tax revenues collected in the States who opt out will be diverted to other, more compliant States. Mem.Op. at 56.

Plaintiff States cannot make up this shortfall. In particular, they cannot simply raise State taxes as suggested by the court in *California v. United States*, 104 F.3d 1086, 1089-92 (9th Cir. 1997).[26] In Florida, as an example, State tax collections in 2009 totaled less than $32 billion, whereas IRS collections from Florida were $110 billion.[27] In Fiscal Year 2010-11, Florida will spend about $20 billion on Medicaid, toward which the federal government will contribute approximately $13 billion.[28] For Florida now to opt out of Medicaid and itself provide the same $20 billion in benefits would consume *more than half* of its tax revenues, not counting the significant costs associated with administering such a program.[29]

---

[26] Indeed, federal policymakers suggested that State tax increases would only compound the States' fiscal dilemma, and provided federal aid for the *very purpose* of keeping the States from raising taxes. *See* Christina D. Romer, *Back to a Better Normal: Unemployment and Growth in the Wake of the Great Recession*, Council of Economic Advisors, April 17, 2010 at 9, available at http://www.whitehouse.gov/sites/default/files/rss_viewer/back_to_a_better_normal.pdf (last visited Nov. 3, 2010).

[27] *See* http://www.census.gov/govs/statetax/0910flstax.html (last visited Oct. 20, 2010); http://www.irs.gov/taxstats/article/0,,id=206488,00.html (last visited Oct. 20, 2010).

[28] *See* PSOMF ¶ 29.

[29] CMS estimates program management costs for 2011 to be $3.4 billion (including Medicare, Medicaid, CHIP, and other programs). *See* CMS, *Justification of Estimates for Appropriations Committees*, FY 2011, at 28-29, https://www.cms.gov/PerformanceBudget/Downloads/CMSFY11CJ.pdf (last visited Oct. 20, 2010).

Replacing these revenues would necessitate gargantuan State tax increases (more than 50 percent in Florida), from populations which must continue to pay federal taxes. This alone sets this case far apart from any previous coercion claims rejected by various circuit courts, and exceeds even the "compelling and oppressive" scenarios outlined by Justice Breyer in *College Savings Bank*.[30] Moreover, as demonstrated in PSOMF ¶ 29 and referenced declarations, there are both practical and legal constraints on Florida's ability to raise additional revenue of the magnitude required to replace federal Medicaid payments to the State.

In addition, the ACA's Medicaid regime unlawfully coerces the Plaintiff States because there is no defined process for a State to opt out, even if it dared, and States cannot adequately assess how the critically-necessary services now received by their Medicaid beneficiaries would be funded in a transition out of the program. As it stands, Medicaid serves populations with very serious and expensive health needs – frail seniors, ventilator-dependent children, and other individuals with serious mental and physical disabilities. In Florida, for instance, Medicaid covers 27 percent of the State's children; pays for over 50 percent of childbirths; pays for 63 percent of nursing home days; and

---

[30] Nor is debt-financing of recurring expenses a sustainable option for enabling States that opt out of Medicaid to provide comparable services without federal funding. "Most states have already borrowed as much as they can under their own budget rules and will probably remain up against those limits during the next few years." Pl.App. Ex.35 (*Policies for Increasing Economic Growth and Employment in 2010 and 2011*, Cong. Budget Off., Jan. 2010) at 13, 16 (figure 4). As Federal Reserve Chairman Ben S. Bernanke notes: "the balanced budget rules followed by 49 of the 50 states … provide important discipline and are a key reason that states have not built up long-term debt burdens comparable to those of many national governments." Pl.App. Ex. 34 (Bd. of Governors of the Federal Reserve System, *Challenges for the Economy and State Governments*, Aug. 2, 2010), at 6.

delivers services through more than 80,000 individual provider contracts and 23 managed care plans.[31]

Particularly where, as here, the health and lives of State citizens might be jeopardized by a disorderly transition, States must be in a position to assess how a transition from Medicaid would affect their residents.[32] They cannot simply be expected to walk off a cliff (pulling their most vulnerable citizens behind) without knowing how far they may fall. *See Dole*, 483 U.S. at 207 ("we have required that if Congress desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences") (internal quotation omitted). Neither the ACA nor the thousands of pages of Medicaid regulations and guidelines offer an answer to this vital question. And, although the Act provides federal subsidies to wealthier individuals for obtaining insurance, Plaintiff States can but guess at how a federal-State transition might impact their poorest residents, who would receive no such assistance under the ACA.[33]

---

[31] *See* Pl.App. Ex. 1 (Dudek Decl.) at ¶ 32.

[32] Medicaid enrollment will average about 58 million people in 2010 (about 19 percent of the entire population of the United States). CBO, *Budget Outlook*, *supra*, at 29.

[33] The Defendants' Reply to the Plaintiffs' Opposition to Defendants' Motion to Dismiss [Doc. 55] suggested, at 5 n.2, that States "could" find transition guidance by reference to provisions regarding the amendment of a State Medicaid plan. But the ill-fitting regulations they cite (which address *amending*, not ending, the program) require States to ask federal *permission* to make changes to Medicaid plans – meaning that the federal government retains the coercive power either to refuse to allow States' withdrawal or to impose conditions on withdrawal as it unilaterally sees fit. Also, in this scenario a State seeking to opt out of the ACA-expanded Medicaid program apparently first would have to give notice and a fair hearing to current beneficiaries, who number in the millions.

The lack of a withdrawal process exerts substantial coercion on the States because an unpredictable transition could wreak havoc upon millions of current beneficiaries, making any State's decision to leave Medicaid a high-stakes gamble with the health and welfare of needy individuals.[34] Because the ACA and current Medicaid laws do not define a process for States to effect a responsible transition out of the expanded Medicaid regime, the Plaintiff States lack a genuine option to withdraw, in violation of *Dole*.

**4. <u>The States Did Not Voluntarily Enter the Medicaid Program with Knowledge of the Consequences Imposed by the ACA</u>**

The ACA also violates the principle, recognized in *Dole* as a fundamental limitation on Congress's spending power, that conditions on federal funds must be unambiguous, so as to "'enabl[e] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst State Sch. & Hosp. v. Haldeman*, 451 U.S. 1, 17 & n.13 (1981)). This is because "'legislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds

[34] In the absence of an assured cooperative process between federal and State governments, States opting out of Medicaid cannot be confident of a safe transition. Difficulties in achieving effective cooperation among federal, State, and local governments had severe consequences for poor Americans during another recent health-related event. *See, e.g., Hurricane Katrina: A Nation Still Unprepared*, U.S. Senate, Special Report of the Comm. on Homeland Sec. and Gov't Affairs, Jan. 10, 2007, at 2 ("the suffering that continued in the days and weeks after the storm passed did not happen in a vacuum; instead, it was continued longer than it should have because of – and was in some cases exacerbated by – the failure of government at all levels to plan, prepare for, and respond aggressively to the storm."), available at http://www.gpoaccess.gov/serialset/creports/katrinanation.html (last visited Nov. 3, 2010).

must accept them 'voluntarily and knowingly.''' *Pennhurst*, 451 U.S. at 17, *quoted in Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006).

Of course, federal programs such as Medicaid are not necessarily "viewed in the same manner as a bilateral contract governing a discrete transaction," but rather as "ongoing, cooperative programs." *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985) (considering conditions applicable to grants under Title I of the Elementary and Secondary Education Act of 1965). Nevertheless, as a general rule, the conditions applicable to any particular federal grant are those in force at the time that grant is made, *id.; see also Bennett v. New Jersey*, 470 U.S. 632, 640 (1985), and "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist.*, 548 U.S. at 296.

In determining whether conditions have been stated with sufficient clarity to ensure a knowing and voluntary acceptance, the relevant regulatory scheme must be viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds." *Id.* Here, the States could not possibly have foreseen, when they originally opted into Medicaid and established their individual programs, that the federal government would make such sweeping unilateral changes to the program – changes which are contrary to Medicaid's purpose, as noted, "of providing federal financial assistance to States that *choose to reimburse* certain costs of medical treatment *for needy persons*." *Harris*, 448 U.S. at 301. Nor could the States have envisioned the ACA's removal of their discretion over eligibility criteria and optional Medicaid benefit categories that State

policymakers originated with the understanding that, in accordance with federal statutes and regulations, the States retained flexibility to alter, reduce, or eliminate as fiscal policies and goals changed. *See* PSOMF ¶¶ 20-21, 24-25, 32. The ACA fixes eligibility criteria and imposes maintenance-of-effort provisions that strip State flexibility and unilaterally lock them into providing optional benefits contrary to their expectations and fiscal well-being. *Id.*

Plaintiff States do not contend that Medicaid must be "frozen" in place, but they rightly object that the ACA goes so critically far afield as to constitute an ambush. The Act does not merely change the terms on which discrete federal funds are offered, but revolutionizes a program that – whatever relatively minor revisions have been made in the past – has for more than forty years been directed at assisting the States to help their neediest residents in accordance with their own versions of Medicaid.

### B. The ACA's Modified Medicaid Regime Unconstitutionally Commandeers the States Into Federal Service

Similarly, the ACA's imposition of vast new federal requirements on the States violates the principles articulated by the Supreme Court in *New York* and *Printz*. The States are not federal administrative units, and Congress cannot commandeer their resources and personnel to implement its policy choices and programs. As the *New York* Court made clear beyond question, "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." 483 U.S. at 188. Significantly, like the instant case (and unlike *Printz*, where Congress directly commanded State officials to take particular actions), *New York* involved a federal scheme that gave States an illusory "choice" between (1) "regulating according to the instructions of Congress" and (2)

addressing a problem (disposal of low-level radioactive waste) on their own while subject to federally-imposed obligations. In *New York*, those obligations involved taking title to the relevant waste products and accepting the related liabilities.

The "choice" offered by the ACA is just as illusory. As shown, States cannot opt out of Medicaid, because they are subject to unconstitutionally coercive consequences. This clearly was Congress's purpose and intent. However, remaining in the ACA Medicaid program will encumber the Plaintiff States with such massive new expenses and responsibilities that their viability as sovereigns will be severely threatened.

Even before the ACA's passage, States faced grim fiscal situations due largely to Medicaid and employee insurance costs requiring policy changes and budget cuts to avoid fiscal imbalances. Virtually all Plaintiff States face huge budget gaps (currently up to 41 percent in Fiscal Year 2010).[35] Indeed, federal authorities warn that State finances are at a breaking point, where States will struggle to cover Medicaid and other costs "as they try to maintain essential services while meeting their budgetary obligations."[36] According to the federal Government Accountability Office (GAO), States must immediately and persistently cut Medicaid and healthcare costs for many years ahead:

> Because most state and local governments are required to balance their operating budgets, the declining fiscal conditions shown in our simulations suggest [that] these governments will need to make substantial policy

[35] Pl.App. Ex. 35 (*Policies for Increasing Economic Growth and Employment in 2010 and 2011*, Cong. Budget Off., Jan. 2010) at 13, 16 (figure 4). *See also* PSOMF at ¶ 12; Pl.App. Ex. 4 (Leznoff Decl.) at ¶¶ 8-9.

[36] *See Challenges for the Economy and State Governments*, *supra* n.30, at 6; CBO, *Budget Outlook*, *supra*, at 27 ("state governments – which pay a large share of Medicaid's costs and have considerable influence on those costs – will need to reduce spending growth in order to balance their budgets").

> changes to avoid growing fiscal imbalances.… The primary driver of fiscal challenges for the state and local government sector continues to be … state and local expenditures on Medicaid and the cost of health insurance for state and local retirees and employees.

Pl.App. Ex. 37 (*State and Local Governments' Fiscal Outlook (GAO-10-358),* March 2010) at 8-9. State governments "will continue to be fiscally stressed[,] … will need to make substantial policy changes to avoid growing imbalances, … and reduce expenditures, increase revenues, or do both in order to maintain balance." Pl.App. Ex. 38 (*State and Local Governments: Fiscal Pressures Could Have Implications for Future Delivery of Intergovernmental Programs (GAO-10-899)*, Gov't Accountability Off., July 2010) at 6.[37] To prevent operating deficits – calculated to be $9.9 trillion from 2009 to 2058 – governments must take action now and "for each and every year going forward [achieve] equivalent to a 12.3 percent reduction in state and local government current expenditures." *Id.* Similarly, Federal Reserve Chairman Bernanke urges States to "intensively review the effectiveness of all programs and be willing to make significant changes to deliver necessary services … [which is] especially important in the case of health programs, where costs are growing the most quickly." *See Challenges for the Economy and State Governments*, *supra* n.30, at 12.

The ACA's Medicaid regime ignores the States' fiscal crisis. Instead, the Act propels them toward a federally-forecast disaster with a recipe that substantially increases their Medicaid outlays and eliminates their ability to cut costs. The ACA requires States:

---

[37] *See also* CBO, *Budget Outlook*, *supra*, at 30 (States spent $130 million on Medicaid in 2009); PSOMF at ¶ 12; Pl.App. Ex. 1 (Dudek Decl.) at ¶ 8 (Florida will spend $20 billion – 28 percent of its budget – in FY 2010-11 to service Medicaid recipients).

(1) to spend billions of dollars more each year[38] to fund an expanded[39] Medicaid program, instead of reducing costs to remain fiscally viable;

(2) to give up flexibility to control ballooning costs (ACA §§ 2001(b) (inserting "(gg) Maintenance of Effort" requirements), 2101(b));[40]

(3) to give up the value of drug rebates that States currently receive and which the federal government will expropriate to reduce its own costs;[41] and

---

[38] The Congressional Research Service ("CRS") reports that the ACA's Medicaid program will cost the States many billions of additional dollars, though its "many changes" make the impact on States very "difficult to estimate." Pl.App. Ex. 36, *Variation in Analyses of PPACA's Fiscal Impact on States*, Sept. 8, 2010, at 1. The CRS notes that the estimated magnitude of the States' additional Medicaid costs varies by source: $20 billion through 2019 (CBO figure), $21.1 or $43 billion (Kaiser Commission); and varies by the States' own projections: California ("low billions" annually), Florida ($1.203 billion annually by 2019), Indiana ($3.579 billion through 2020), Kansas ($621 million by 2020), Maryland (savings of $829 million through 2020), Michigan ($200 million by 2019), North Dakota ($1.114 billion through 2019), Texas ($27 billion through 2023). *Id.* at 11-16. While the CRS did not analyze the various methodologies, it recognized the "value" of State-specific analyses in understanding the ACA's "impacts on their state budgets." *Id.* at 3. The Plaintiff States estimate billions of dollars in additional Medicaid costs in the coming years. *See* PSOMF ¶ 15.

[39] "Of the additional 34 million people who are estimated to be insured in 2019 as a result of the [ACA], a little more than one-half (18 million) would receive Medicaid coverage due to the expansion of eligibility." Pl.App. Ex. 39 (Richard S. Foster, *Estimated Financial Effects of the "Patient Protection and Affordable Care Act,"* Centers for Medicare & Medicaid Servs., April 22, 2010) at 6. *See also* PSOMF ¶¶ 15.

[40] *See* PSOMF ¶ 24. As noted earlier, CMS threatened to terminate one State's entire $7.8 billion annual Medicaid funding just one week after the ACA's passage in response to a plan that would have reduced State costs. CMS letter, *supra* n.23. CMS's follow-up letter warned that Arizona would "be expected to identify funding from other sources" to meet program requirements even if federal funding failed to match State expectations. Pl.App. Ex. 33 (Second CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, June 24, 2010).

[41] *See* PSOMF ¶ 26. In contrast to the fiscal impact on the States, the federal government touts a savings under the ACA. *See* ACA § 1563; CBO, *Budget Outlook*, *supra*, at 35-36 (calculating a reduction in the federal budget deficit of $143 billion in 2010-19). Significantly, however, most if not all of any "savings" under the ACA will come from

(4) to be responsible for the *provision* of care, with the corresponding costs and liabilities associated with such an obligation.[42]

Thus, by the federal government's own admissions, the ACA's new Medicaid requirements are prohibitively expensive for the States, and include vast potential liabilities that cannot even be projected as of now. Having to comply with these requirements will fundamentally undermine Plaintiff States' abilities to function as sovereigns. As the Watkins and Leznoff Declarations graphically attest by reference to

---

deep reductions in compensation to physicians, hospitals, and other healthcare providers under Medicare – assuming that Congress does not continue (as it has in recent years) to intervene, on a year-by-year basis, to forestall reductions. *See* Peter Ferrara & Larry Hunter, *How ObamaCare Guts Medicare*, Wall St. J., Sept. 9, 2010 (citing Richard Foster, *Annual Report of the Medicare Bd. of Tr.*). Such reductions in Medicare physician compensation likely would exacerbate the shortage of physicians accepting Medicaid patients forecast by CMS's Office of the Actuary in the wake of the ACA's passage. (*See* n.42, *infra*.) In that event, the States, now required by the ACA to *provide* care, will be in a bind: either increase providers' compensation to offset the shortage, or face potentially massive liabilities for failing to meet Medicaid patients' needs.

[42] By modifying the definition of "medical assistance" in 42 U.S.C. § 1396d(a) to include not only payment of costs for care and services, but also "*the care and services themselves, or both*" (emphasis added), ACA section 2304 – while unclear in its import and effect, and thus not amenable to cost projections – surely will engender litigation against Plaintiff States for alleged failure to provide medical care and services. In fact, with passage of the ACA, CMS finds it "probable initially" that new demand for services will be difficult to meet because doctors will accept fewer Medicaid patients:

> [I]t is reasonable to expect that a significant portion of the increased demand for Medicaid would be difficult to meet, particularly over the first few years. … For now we believe that consideration should be given the potential consequences of a significant increase in demand for health care meeting a relatively fixed supply of health care providers and services.

Pl.App. Ex.39 (Richard S. Foster, *Estimated Financial Effects, supra* n.39) at 20. The ACA shifts this problem to the States to bear the legal consequences and costs of a programmatic failure that the federal government thoroughly foresees. *See, e.g., Doe v. Chiles*, 136 F.3d 709 (11th Cir. 1998) (allowing Medicaid-eligible persons to bring § 1983 claims against State officials where medical assistance was not promptly provided).

the State of Florida, the States cannot manage their budgets by engaging in continual borrowing to cover significant annual shortfalls in their recurring expenses, whether because they are required to maintain balanced budgets or because their credit ratings would be jeopardized or both; nor can they simply raise taxes steeply in the hope of substantially increasing their revenues without risking harm to their own economies. Pl.App. Ex. 3 (Watkins Decl.) at ¶¶ 6-11; Pl.App. Ex. 4 (Leznoff Decl.) at ¶¶ 4-9. *See also* PSOMF ¶ 29. And, unlike the federal government, States cannot print money to cover their debts.

Moreover, the States have responsibilities to their citizens that require the States to wield budgetary authority and discretion as sovereigns, including responsibility for infrastructure and services in the areas of education, law enforcement, judiciary, and correctional facilities (to name a few), in addition to healthcare services. *See* PSOMF ¶ 31. However, the States' budgets now will be controlled foremost by the federal government, and their legislatures' policy choices and priorities must give way to meeting the ACA's Medicaid obligations. The Act thus presents as clear a case of federal "commandeering" of State political processes and resources as does *New York* or *Printz*.

In sum, the Plaintiff States' decision to participate in the ACA's modified Medicaid regime presents much more than a "hard" or "political" choice; it is no choice at all. *Cf. Frost v. R.R. Comm'n of State of Cal.*, 271 U.S. 583, 593 (1926) ("no choice" exists where the alternatives are "to forego a privilege which may be vital to [one's] livelihood or submit to a requirement which may constitute an intolerable burden"). The ACA forces the Plaintiff States to accept destructive new terms, because of the magnitude

of funds extracted annually from State taxpayers and returned as Medicaid funds that would be lost to the States, and because there is no process for States to exit Medicaid.

These factors far surpass the "point at which pressure turns into coercion." The ACA involves an all-or-nothing Medicaid spending condition that induces States with sums *12 times higher* than the "compelling and oppressive" levels cited in *College Savings Bank* – not counting the non-financial coercion – warranting summary judgment.

At the same time, the ACA's new Medicaid regime imposes such onerous obligations and burdens that it impermissibly commandeers the States "into the service of federal regulatory purposes." *New York*, 505 U.S. at 175. States must provide the benefits and services adopted by Congress and federal regulators under Medicaid, and State legislatures must reorder their priorities in order to meet these requirements. For this reason alone the ACA is "inconsistent with the Constitution's division of authority between federal and state governments," *id.*, and consequently the Act must be struck.

### C. The Act's Medicaid Regime Violates All Five *Dole* Spending Clause Restrictions

Finally, it is clear that the ACA violates all five restrictions on congressional spending power set forth in *Dole*, 483 U.S. at 207-08. First, the Hobson's choice imposed on the States – to give way to federal dictates or attempt to withdraw from Medicaid – cannot reasonably be characterized as furthering the general welfare. Either way, the States' ability to aid the poor will be impaired, because their participation in the ACA-altered Medicaid program threatens to leave them without the resources to provide medical care to indigents, while withdrawal would leave no federally-funded indigent care program at all, and the States alone cannot afford to offer Medicaid-level benefits.

Second, Congress did not condition Medicaid funds on unambiguous terms: the ACA's sweeping changes could not reasonably have been foreseen by the States when they started their Medicaid programs or later chose to add costlier optional elements.

Third, the ACA's altered and expanded conditions – a critical component of a new universal healthcare regime – change the fundamental purpose for which Medicaid was established: *viz.*, as a means to aid the States' poorest residents.

Fourth, the ACA violates State sovereignty and federalism principles, as shown.

Fifth, the ACA unlawfully coerces the States, for all the reasons discussed above.

Because the ACA exceeds every restriction on Congress's spending power, Plaintiffs are entitled to summary judgment in their favor on Count Four.

## V. THE ACA SHOULD BE DECLARED UNCONSTITUTIONAL, AND DEFENDANTS SHOULD BE ENJOINED FROM ENFORCING IT

Plaintiffs have established that the Act's Individual Mandate and Medicaid provisions are unconstitutional. Because each of these portions is essential to the ACA as a whole, neither can be severed. It follows, as a matter of law, that the unconstitutionality of either renders the entire Act unconstitutional. Accordingly, Plaintiffs ask, as requested in Counts One and Four of the Amended Complaint, that the Court declare the entire ACA unconstitutional and enjoin its enforcement.

### A. The ACA's Individual Mandate and Medicaid Provisions Are Unseverable Components of the Legislation

The controlling legal standards governing severability are set forth in *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987), where the Supreme Court stated:

> Congress could not have intended a constitutionally flawed provision to be severed from the remainder of the statute *if the balance of the legislation*

> *is incapable of functioning independently* [citing *Hill v. Wallace*, 259 U.S. 44 (1922)]. …
>
> The more relevant inquiry in evaluating severability is whether the statute will function in a manner *consistent with the intent of Congress*. … The final test … is the traditional one: the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.
>
> The inquiry is eased when Congress has explicitly provided for severance by including a severability clause in the statute.

*Id.* at 684-686 (emphasis added). There, based on its review of the particular legislation at issue and its history, the Supreme Court concluded that Congress would have enacted the remaining provisions of the legislation even if the portion found to be unconstitutional had been omitted. *Id.* at 691.

Application of the same principles led to a different outcome in *Hill v. Wallace*, 259 U.S. 44 (1922) (cited and followed in *Alaska Airlines*). In *Hill*, *despite the inclusion of a severability clause* by Congress in the challenged legislation, the Court refused to sever the unconstitutional penalty provision, concluding:

> *Section 4* with its penalty to secure compliance with the regulations of the Boards of Trade *is so interwoven with those regulations that they cannot be separated. None of them can stand*. Section 11 [the severability clause] did not intend the court to dissect an unconstitutional measure and reframe a valid one out of it by inserting limitations it does not contain.

*Id.* at 458-59 (emphasis added). *See also Trusler v. Crooks*, 269 U.S. 475, 482 (1926) ("The major part of this plan was condemned in Hill v. Wallace, and section 3, being a mere feature, without separate purpose, must share in the invalidity of the whole.").

The danger of severing unconstitutional portions was addressed more recently in *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320 (2006). There,

the Court, having posed the question of whether the legislature would prefer a statute with the unconstitutional provision removed or no statute at all, cautioned:

> All the while, we are wary of legislatures who would rely on our intervention, for "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside" to announce to whom the statute may be applied. … "This would, to some extent, substitute the judicial for the legislative department of the government."

*Id.* at 330 (citations omitted). Rather than speculate, the Court remanded the case for a determination of whether the legislation could "survive in part." *Id.* at 331-32.

Turning to the ACA, it is highly instructive that Congress did not include a severability clause. While a prior version contained a severability provision (H.R. 3962, section 255), it was omitted in the final bill, which passed the House of Representatives by a vote of 219 to 212. Although not dispositive here, the absence of a severability clause speaks volumes as to Congress's intent and the functional interdependency of the ACA's central provisions, including the Individual Mandate and Medicaid alterations.

That the Individual Mandate is the linchpin of the ACA and its stated mission to achieve near-universal healthcare insurance coverage is beyond reasonable dispute, especially in light of Congress's own declarations and Defendants' admissions. As the Court noted, "Congress made factual findings in the Act and concluded that the individual mandate was 'essential' to the insurance market reforms contained in the statute." Mem.Op. at 6. Defendants repeatedly have conceded the central role of the mandate, as the Court further noted: "Indeed, with respect to the individual mandate in particular, the defendants concede that it is absolutely necessary for the Act's insurance

market reforms to work as intended. In fact, they refer to it as an 'essential' part of the Act at least fourteen times in their motion to dismiss." Mem.Op. at 39.

It follows that the Individual Mandate cannot be severed from the balance of the ACA. The mandate is essential to the Act, and – as in *Hill v. Wallace* – it is "so interwoven with" the Act's coverage provisions "that they cannot be separated." Congress's own reliance on the mandate makes undeniable that the ACA would not have been enacted in its absence. Indeed, the slender margin of the ACA's House passage renders entirely speculative any assertion that the Act would have passed had any provisions been omitted or changed – even ones far less central than those at issue. As a matter of law, the mandate's unconstitutionality renders the entire Act unconstitutional, warranting the declaratory relief sought in Count One of the Amended Complaint.

Likewise, the Act's provisions transforming Medicaid into a very wide "door" (on the supply side) for obeying the Individual Mandate (on the demand side) cannot be severed. Defendants admit as much:

> In other respects, *the minimum coverage provision is essential to the Act's comprehensive scheme to ensure that health insurance coverage is available and affordable*. In addition to regulating industry underwriting practices, the Act promotes availability and affordability through (a) "health benefit exchanges" that enable individuals and small businesses to obtain competitive prices for health insurance, (b) financial incentives for employers to offer expanded insurance coverage, (c) tax credits to low-income and middle-income individuals and families, and (d) *extension of Medicaid to additional low-income individuals. The provision works in tandem with these other reforms*….
>
> * * *
>
> Congress thus rationally concluded that *the minimum coverage provision is necessary to make the other regulations in the Act effective.*

Def.Mem.MTD at 46, 48 (emphasis added).

It follows that the challenged Medicaid provisions, comprising an integral part of "the Act's comprehensive scheme to ensure that health coverage is available and affordable," cannot be severed from the Act. Those provisions also are "so interwoven with" the Individual Mandate and the overall architecture of the Act "that they cannot be separated." As is true of the mandate, there is no basis for any reasonable inference that Congress would have passed the ACA without the transformative Medicaid provisions. In the absence of the Medicaid expansion, the Act would have left millions of Americans without a door to pass through to comply with the Individual Mandate, a result contrary to the ACA's express goal. Hence, as a matter of law, the unconstitutionality of the ACA's Medicaid provisions renders the entire Act unconstitutional, warranting the declaratory relief sought in Count Four.

### B. Permanent Injunctive Relief Against Defendants' Enforcement of the ACA Is Both Necessary and Appropriate

Federal courts long have exercised the equitable power to prevent violations of constitutional rights. *See, e.g., Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 858-59 (1824) (Marshall, C.J.); *Davis v. Gray,* 83 U.S. 203, 220 (1872) (recognizing that courts may enjoin government officers from executing a law "in conflict with the Constitution ..., when such execution will violate the rights of the complainant."); *Ex Parte Young,* 209 U.S. 123, 151-56 (1908) (tracing the history of the doctrine holding that government officers "may be enjoined by a Federal court of equity" from enforcing unconstitutional statutes); *Bell v. Hood,* 327 U.S. 678, 684 (1946) (recognizing the "jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution"). *See also Schulz v. Williams*, 44 F.3d 48, 60 (2d Cir. 1994) ("The typical

remedy afforded when a statute is found to be facially unconstitutional is an injunction enjoining its enforcement”).

Permanent injunctive relief clearly is warranted here under the traditional four-prong test. *See Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010). The ACA threatens irreparable injury to the Plaintiff States by imperiling their sovereignty and budgets; no adequate remedy at law exists, because piecemeal damages awards (even if recoverable against the federal government) would not restore States’ sovereignty and budgetary integrity; the balancing of hardships favors Plaintiff States, which cannot print money to cover the unaffordable costs imposed by the ACA; and the public interest manifestly is served by preventing the enforcement of federal legislation that exceeds Congress’s authority, violates federalism principles and the Ninth and Tenth Amendments (as well as the Guarantee Clause), and threatens the sustainability of healthcare services for the poor.

## Conclusion

For all the reasons stated above, summary judgment should be entered in Plaintiffs’ favor on Counts One and Four of the Amended Complaint; the Patient Protection and Affordable Care Act, as amended, should be struck down as unconstitutional; and the relief sought in the Amended Complaint should be granted in its entirety.

Respectfully submitted,

**BILL MCCOLLUM**
**ATTORNEY GENERAL OF FLORIDA**

/s/ Blaine H. Winship

Blaine H. Winship (Fla. Bar No. 0356913)
Special Counsel
Joseph W. Jacquot (Fla. Bar No. 189715)
Deputy Attorney General
Scott D. Makar (Fla. Bar No. 709697)
Solicitor General
Louis F. Hubener (Fla. Bar No. 0140084)
Timothy D. Osterhaus (Fla. Bar No. 0133728)
Deputy Solicitors General
Office of the Attorney General of Florida
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Email: blaine.winship@myfloridalegal.com
*Attorneys for Plaintiff States*

David B. Rivkin (D.C. Bar No. 394446)
Lee A. Casey (D.C. Bar No. 447443)
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Ste. 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
*Attorneys for Plaintiff States, National Federation of Independent Business, Mary Brown, and Kaj Ahlburg*

Katherine J. Spohn
Special Counsel to the Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, Nebraska 68508
Telephone: (402) 471-2834
Facsimile: (402) 471-1929
Email: katie.spohn@nebraska.gov
*Attorneys for Plaintiff the State of Nebraska*

Karen R. Harned
Executive Director
National Federation of Independent Business
Small Business Legal Center

Bill Cobb
Deputy Attorney General
for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station

1201 F Street, N.W., Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 554-5572
*Of counsel for Plaintiff National Federation of Independent Business*

Austin, Texas 78711-2548
Telephone: (512) 475-0131
Facsimile: (512) 936-0545
Email: bill.cobb@oag.state.tx.us
*Attorneys for Plaintiff the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 4th day of November, 2010, a copy of the foregoing Memorandum in Support of Plaintiffs' Motion for Summary Judgment was served on counsel of record for all Defendants through the Court's Notice of Electronic Filing system.

/s/ Blaine H. Winship
Blaine H. Winship
Special Counsel
Office of the Attorney General of Florida