**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
**__________________________________________/**

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56.1(A), Rules of the United States District Court for the Northern District of Florida, Plaintiffs hereby submit this Statement of Material Facts in Support of their Motion for Summary Judgment declaring unconstitutional the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("ACA"). True and correct copies of all referenced exhibits (and attachments thereto) are contained in the accompanying Appendix.

***Facts Regarding the ACA's Individual Mandate and the Plaintiffs' Standing***

1. After passing the Senate, the Patient Protection and Affordable Care Act was passed in the House of Representatives by a vote of 219 to 212, and signed into law by the President on March 23, 2010.

*See* 156 Cong. Rec. D314 (daily digest March 21, 2010));
http://www.whitehouse.gov/healthreform/healthcare-overview#healthcare-menu).

2. The ACA does not contain a severability provision. Months before, in November 2009, the House passed a different version of healthcare/insurance reform that *did* contain a severability provision, but that bill did not become law.

*See* H.R. 3962, 111th Cong. § 255 (as passed by the House Nov. 7, 2009).

3. The ACA requires that all Americans, with few exceptions, must from 2014 forward have and maintain qualifying healthcare coverage (the "Individual Mandate").

ACA § 1501(b).

4. Congress relied solely on its commerce power to enact the Individual Mandate, through which it aims to "achieve[] near-universal coverage."

ACA §§ 1501(a), 10106(a); Order and Memorandum Opinion of October 14, 2010 [Doc. 79] ("Mem.Op.") at 22, 27-29; Def.Mem.MTD [Doc. 55-1] at 5, 7, 46-48.

5. The Individual Mandate is unprecedented. Never before has Congress required Americans to purchase a good or service based simply on the fact of their residence.

Op.Mem. at 63-64 (Congress has "never required people to buy any good or service as a condition of lawful residence in the United States") (quoting Congressional Budget Office ["CBO"], *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance*, at 1 (Aug. 1994)); Jennifer Staman & Cynthia Brougher, *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis* 6 (Cong. Research Serv., July 24, 2009) ("This is a novel issue: whether Congress can use its Commerce Clause authority to require a person to buy a good or a service and whether this type of required participation can be considered economic activity").

6. "Activity" is characterized by "action" rather than "inaction."

*See, e.g.*, Webster's Third New International Dictionary 22 (1971) (defining "active" as "1: characterized by action rather than by contemplation or speculation […]"); Oxford English Dictionary (2d Ed. 1989) (defining "activity," in relevant part, as "1.a. The state of being active; the exertion of energy, action. […]" and "Opposed to passive: Originating or communicating action, exerting action upon others; acting of its own accord, spontaneous.").

7. Plaintiff States Arizona, Georgia, Idaho, Louisiana, and Utah have enacted statutes to protect their citizens from the sort of governmental coercion imposed by the

Individual Mandate. Many other Plaintiff States have proposed constitutional amendments or statutes to the same effect.

Nat'l Conf. of State Legislatures, http://www.ncsl.org/default.aspx?tabid=18906 (last visited Nov. 1, 2010) (listing state legislation and other actions challenging health reforms).

8. The ACA makes available two avenues for compliance with the Individual Mandate that require significant State action and resources (as detailed further below). Individuals may enroll in a transformed and expanded state Medicaid program, or, if they are State workers, may enroll in a group plan with federally defined minimum benefits that States, as large employers, must offer to those who work more than 30 hours a week.

ACA § 1501(b) (adding "(f) Minimum Essential Coverage" provisions); ACA §§ 1001, 1201, 1511, 1513, 2001, 2304.

9. Individual Plaintiffs Mary Brown and Kaj Ahlburg do not have qualifying healthcare insurance and do not intend to obtain it. Contrary to their wishes, they must arrange their affairs to comply with the Individual Mandate as they will (absent an unexpected change in the law or their circumstances) be subject to the Individual Mandate when it takes effect in 2014. Ex. 25 (Brown Decl.); Ex. 26 (Ahlburg Decl.).

10. Plaintiff National Federation of Independent Business ("NFIB"), an association, has included in its membership owners of small businesses, including Mary Brown and other NFIB members. These small business owners and their businesses must arrange their affairs to comply with the Individual Mandate, which will require the diversion of resources that otherwise could be used for their businesses.

Ex. 27 (NFIB (Danner) Decl.); Ex. 25 (Brown Decl.); Ex. 28 (Grimes Decl.); Ex. 29 (Klemencic Decl.); Ex. 30 (McClain Decl.); Ex. 31 (Thompson Decl.).

11. NFIB further is affected by its current need to educate its members about the impact of the Individual Mandate on them and their need to engage very soon in preparations that take into account the requirements of the Individual Mandate.

Ex. 27 (NFIB (Danner) Decl.).

12. The ACA will fiscally harm the Plaintiff States by adding significant new costs to already stressed state budgets. Even prior to the ACA's passage, States faced difficult fiscal prospects, substantial budget gaps, and forecasts of indefinite hardship to fund spiraling Medicaid and healthcare costs while also maintaining essential services.

*See* Ex. 34 (Chairman Ben S. Bernanke, Bd. of Governors of the Federal Reserve System, *Challenges for the Economy and State Governments*, Aug. 2, 2010) at 6-7, 11-12; *The Long-Term Budget Outlook*, Congressional Budget Office (CBO), June 2010, at 27, 30-31, available at http://www.cbo.gov/ftpdocs/115xx/doc11579/06-30-LTBO.pdf (last visited Oct. 25, 2010); Ex. 37 (*State and Local Governments' Fiscal Outlook* (GAO-10-358), Gov't Accountability Office (GAO), March 2010) at 8-9, 12; Ex. 38 (*State and Local Governments: Fiscal Pressures Could Have Implications for Future Delivery of Intergovernmental Programs* (GAO-10-899), GAO, July 2010) at 6-7; Ex. 35 (*Policies for Increasing Economic Growth and Employment in 2010 and 2011*, CBO, Jan. 2010) at 13, 16 (figure 4); Ex. 3 (Watkins Decl.) ¶¶ 7-14; Ex. 4 (Leznoff Decl.) ¶¶ 8-9; Ex. 40 (Dubberly Decl) p. 1.

13. Unlike the projections of increased harm to State finances (described below), the federal government estimates a positive fiscal impact for itself due to the ACA.

*See* ACA § 1563; *Long-Term Budget Outlook*, CBO, at 37-38 (calculating a reduction in the federal budget deficit of $143 billion in 2010-19).

14. The federal government's savings are projected to come mainly from reductions in Medicare providers' compensation.

Peter Ferrara & Larry Hunter, *How ObamaCare Guts Medicare*, Wall St. J. Sept. 9, 2010 (citing Richard Foster, *Annual Report of the Medicare Bd. of Tr.*).

15. The Individual Mandate's insurance coverage and penalty regime will force millions of persons to obtain qualifying coverage at substantial expense to the Plaintiff States through a transformed and expanded Medicaid program that adds to the States' cost,

responsibility, and liability in the program (detailed further below). The costs to the Plaintiff States will arise not only from servicing persons who are newly eligible for Medicaid under the ACA, but also millions of persons who were eligible but declined to enroll until now with the advent of the Individual Mandate's penalty. The ACA provides no additional financial assistance beyond that offered under current formulas for the latter category of persons.

*See* ACA §§ 1501(a)(2)(D), 10106(a)(2)(D) ("The requirement ... will add millions of new consumers to the health insurance market"); Def. Mem.MTD 8 (acknowledging that the ACA will "reduce the ranks of the uninsured by approximately 32 million by 2019"); Ex. 39 (Richard S. Foster, *Estimated Financial Effects of the "Patient Protection and Affordable Care Act," as Amended*, Centers for Medicare & Medicaid Servs. (CMS), April 22, 2010) at 6 (18 million new enrollees will receive Medicaid coverage "due to the [ACA's] expansion of eligibility"); Mem.Opp. at 36; Ex. 36 (*Variation in Analyses of PPACA's Fiscal Impact on States*, Cong. Research Serv., Sept. 8, 2010 (acknowledging the ACA's Medicaid program will cost the States billions of additional dollars: $20 billion through 2019 (CBO figure); $21.1 or $43 billion (Kaiser Commission figures); and various State projections in the billions of dollars)); Ex. 1 (Dudek Decl.) ¶¶ 15-22; Ex. 9 (Betlach Decl.) at B; Ex. 10 (Casanova Decl.) ¶¶ 7-9, 13; Ex. 12 (Phillips Decl.) §§ B.5, 7; C.5-8; Ex. 13 (Anderson Decl.) ¶¶ 7-8; Ex. 14 (Chaumont Decl.) ¶¶ 17-25; Ex. 15 (Wells Decl.) ¶¶ 7-10; Ex. 16 (Willden Decl.) pp. 2-5; Ex. 18 (Bowman Decl.) ¶¶ 9-15; Ex. 21 (Dial Decl.) pp. 2-7; Ex. 20 (Millwee Decl.) pp. 6-7; Ex. 24 (Sundwall Decl.), ¶¶ 10-15; Ex. 40 (Dubberly Decl.) pp. 1-2.

16. The ACA's Individual Mandate regime is not the only way to ensure that persons with preexisting medical conditions can be provided insurance coverage.

*See*, e.g., Ilya Somin, *Taking Stock of Comstock: The Necessary and Proper Clause and the Limits of Federal Power*, Cato Supreme Court Review, 2009-2010, at 264 ("Pro-market economists have proposed ways to cover preexisting conditions that do not require an individual mandate for forcing insurers to accept customers they prefer to reject.") (cited references omitted).

17. The ACA's Individual Mandate, minimum essential coverage, and insurance regime harm the Plaintiff States (who are large employers) by requiring that, by 2014, they offer enrollment in a State group insurance plan to all who work 30 or more hours a week and that they now provide expanded benefits to all employees who participate in a State group plan.

ACA §§ 1501(b) (listing employer-sponsored plans as a means of satisfying the Individual Mandate); § 1511, § 1513; § 1201 (inserting § 2704 into the Public Health Service Act

("PHSA") (no preexisting condition restrictions up through age 18); § 1001 (PHSA § 2711) (exclusions for excessive waiting periods (ACA §); lifetime and annual policy limit provisions); § 1201 (PHSA § 2708) (prohibition on rescission of coverage); § 1001 (PHSA §2712)) (dependent coverage requirements); § 1001 (PHSA § 2714) (reporting requirements); Ex. 5 (Robleto Decl.) ¶¶ 9-17; Ex. 6 (Shier Decl.) pp 2-3; Ex. 7 (Ashmore Decl.) ¶¶ 7-9; Ex. 8 (Battilana Decl.) ¶¶ 5-9; Ex. 15 (Wells Decl.) ¶¶ 7-10; Ex. 17 (Van Camp Decl.) ¶¶ 4-5; Ex. 19 (Zinter Decl.) ¶¶ 11; Ex. 21 (Dial Decl.) pp. 2-7; Ex. 22 (Kukla Decl.) p. 3.

18. Plaintiff States have many employees who are or will be subject to the Individual Mandate and who not currently offered coverage by a State-employer health insurance plan, for whom the States must change their employment policies and assume the additional costs of offering insurance coverage

Ex. 5 (Robleto Decl.) ¶¶ 15-17; Ex. 8 (Battilana Decl.) ¶ 8; Ex. 22 (Kukla Decl.) p. 3.

19. Plaintiff States will be liable to pay taxes or penalties to the federal government under the ACA related to their employee healthcare benefit plans for: not offering coverage to all full-time employees (penalties based on the total number of state employees) (*see* ACA § 1513(a) (adding 26 U.S.C. § 4980H); HCERA § 1003(b)); giving "high cost" benefits that exceed a federally-defined threshold (ACA § 9001); and occasions in which State employees choose to enroll in federally-subsidized plan from an exchange.

Ex. 5 (Robleto Decl.) ¶¶ 16-17; Ex. 17 (Van Camp Decl.) ¶¶ 7-8; Ex. 19 (Zinter Decl.) ¶ 12.

***Facts Regarding Harm from the ACA-Transformed and Expanded Medicaid Program***

20. Medicaid was established in 1965 as a voluntary partnership between the federal government and participating States to reimburse medical expenses for the poor and needy.

*See Harris v. McRae*, 448 U.S. 297 (1980).

21. Plaintiff States in the Medicaid partnership did not contemplate a unilateral transformation and expansion of Medicaid by the federal government beyond its original purpose as the ACA has done, for example, by: substantially eliminating State discretion to determine

eligibility and control State costs; making States not only responsible (with their federal partner) for reimbursing healthcare costs, but responsibility (without their federal partner) to provide healthcare services; and locking States into providing optional Medicaid benefit categories through maintenance-of-effort provisions that they were free to alter, reduce, or eliminate prior to the ACA as State fiscal or policy goals changed.

Ex. 1 (Dudek Decl.) ¶¶ 5, 9-13, 23-27; Ex. 9 (Betlach Decl.) at A, C; Ex. 10 (Casanova Decl.) ¶¶ 6, 9; Ex. 12 (Phillips Decl.) at A, B; Ex. 14 (Chaumont Decl.) ¶ 12-16; Ex. 16 (Willden Decl.) pp. 2-3; Ex. 18 (Bowman Decl.) ¶¶ 4-5, 11, 12; Ex. 20 (Millwee Decl.) pp. 2-5; Ex. 24 (Sundwall Decl.) ¶¶ 5-8.

22. The ACA relies on the States to achieve a near-universal coverage goal by requiring State Medicaid programs to provide coverage for persons below 138 percent of the poverty level. For this group, States must shoulder substantial new costs and responsibilities.

ACA §§ 1501(b) (*see* "(f) Minimum Essential Coverage"), 2001, 2304; Julie Stone et al., *Medicaid and the State Children's Health Insurance Program (CHIP) Provisions in PPACA*, Cong. Research Serv., April 28, 2010, at 2-4, available at http://www.arkleg.state.ar.us/healthcare/medicaid/Documents/CRS%20Report%204_28_10.pdf (last visited Nov. 4, 2010); Ex. 1 (Dudek Decl.) ¶¶ 11-12, 14-20; Ex. 10 (Casanova Decl.) ¶¶ 7-12; Ex. 16 (Willden Decl.) p. 7; Ex. 18 (Bowman Decl.) ¶ 13.

23. Without Medicaid cooperation by the States, the ACA's insurance coverage regime could not work because the remaining "doors" by which individuals could obtain "minimum essential coverage" are not designed to accommodate the millions of needy persons expected to be covered by Medicaid. The ACA makes *no other provision* to cover the poorest adults *except* through Medicaid (excluding the Medicare-eligible population). In contrast, for higher-income persons, the ACA makes non-Medicaid federal subsidies and assistance available to individuals with incomes that *exceed* 100 percent of the federal poverty level up to 400 percent of the poverty line. ACA §§ 1401, 1402(c), 1501(b); Ex. 1 (Dudek Decl.) ¶¶ 31, 33; Ex. 10 (Casanova Decl.) ¶ 17; Ex. 16 (Willden Decl.) p. 7; Ex. 18 (Bowman Decl.) ¶ 16.

24. The ACA has caused immediate harm to the Plaintiff States because (1) they are devoting funds and resources *now* to prepare and implement changes necessary to comply with the ACA, (2) its "maintenance of efforts" terms are *now* restricting State flexibility to control costs, and (3) the States as employers must imminently expand benefits offered within their employer group insurance plans. After the ACA was signed into law, the Plaintiff States were given no opportunity to weigh or consider whether to accept the ACA's new Medicaid terms or to establish, fund, or implement an alternative program, before its "maintenance of efforts" provisions were unilaterally applied.

ACA §§ 1001, 1201, 2001(b), 2101(b)); Ex. 32 (Centers for Medicare & Medicaid Servs., Letter from Acting Director Barbara K. Richards to Monica Curry, April 1, 2010 (threatening to terminate Arizona's entire $7.8 billion annual Medicaid funding by reference to the ACA's maintenance of effort requirements just one week after the ACA's passage)); Ex. 33 (follow-up CMS Letter to Arizona); *Medicaid and the State Children's Health Insurance Program (CHIP) Provisions in PPACA*, Cong. Research Serv., April 28, 2010, at 2, available at http://www.arkleg.state.ar.us/healthcare/medicaid/Documents/CRS%20Report%204_28_10.pdf ("Maintenance of efforts provisions. The law requires states to maintain current Medicaid and CHIP eligibility levels – through 2013 for adults and 2019 for children."); Ex. 1 (Dudek Decl.) ¶¶ 14, 23-30; Ex. 2 (Lange Decl.), ¶¶ 5-10; Ex. 9 (Betlach Decl.) at B, C.5, D; Ex. 10 (Casanova Decl.) ¶ 14; Ex. 12 (Phillips Decl.) § B.1-2, C.7; Ex. 13 (Anderson Decl.) ¶ 9; Ex. 14 (Chaumont Decl.), ¶¶ 13-16, 25; Ex. 16 (Willden Decl.) pp. 2-3, 6-7; Ex. 18 (Bowman Decl.) ¶¶ 9-11; Ex. 20 (Millwee Decl.) p. 2-5.

25. The Act amends Medicaid requirements to increase the Plaintiff States' responsibility and potential costs and liability by modifying the definition of "medical assistance" that states must provide in 42 U.S.C. § 1396d(a) to include not only payment of costs for care and services, but also "*the care and services themselves, or both.*" ACA § 2304 (emphasis added). This changes Medicaid's original design to aid the lowest income families through federal-state joint *reimbursement* of healthcare expenses. Now the States (but not its federal Medicaid partner) must assume the responsibility of *providing care* and must bear a high risk of liability from lawsuits because the federal government predicts that it is "probable

initially" under the ACA that new demand for services will exceed the supply of doctors because doctors will accept fewer Medicaid patients.

Ex. 39 (Richard. S. Foster, *Estimated Financial Effects of the "Patient Protection and Affordable Care Act," as Amended*, Centers for Medicare & Medicaid, April 22, 2010) at 20; Ex. 9 (Betlach Decl.) at B.6; Ex. 10 (Casanova Decl.) ¶ 9; Ex. 12 (Phillips Decl.) § A.4, B.8; Ex. 14 (Chaumont Decl.) ¶ 19; Ex. 16 (Willden Decl.) pp. 2, 4; Ex. 18 (Bowman Decl.) ¶ 11; Ex. 24 (Sundwall Decl.) ¶ 18; Ex. 40 (Dubberly Decl.) p. 2.

26. The ACA's Medicaid program stands to cost Plaintiff States millions of additional dollars by changing the drug rebate allocation between the federal government and the States.

Ex. 1 (Dudek Decl.) ¶¶ 28-30; Ex. 14 (Chaumont Decl.) ¶ 17; Ex. 16 (Willden Decl.) p. 3-4; Ex. 20 (Millwee Decl.) p. 5-6.

27. The ACA's Medicaid program stands to cost the Plaintiff States billions of additional dollars due to increases the reimbursement rates for primary-care practitioners.

Ex. 1 (Dudek Decl.) ¶¶ 13, 21; Ex. 10 (Casanova Decl.), ¶ 7; Ex. 12 (Phillips Decl.) §§ B, C; Ex. 16 (Willden Decl.) p. 3; Ex. 20 (Millwee Decl.) p. 5.

28. With the ACA, the federal government imposes a Hobson's choice with respect to Medicaid. Plaintiff States must either absorb billions of dollars of additional cost and added responsibilities associated with the expansion of Medicaid, or attempt to opt out and totally exit the "single largest Federal grant-in-aid program to the States, accounting for over 40 percent of all Federal grants to States," which consumes roughly seven percent of total federal outlays ($251 billion in 2010) and makes up more than *20 percent* of total State spending nationally. These federal funds and spending derive mainly from taxes paid by individuals and businesses in the States, such that Medicaid funding to the States represents the return of a substantial portion of tax payments made to the federal government from taxpayers in the states.

Def.Opp.MTD [Doc. 55-1] at 9 (conceding that States must satisfy Congress's conditions "in order to receive the hundreds of billions of dollars Congress has appropriated"); Bipartisan Comm'n on the Medicaid Act of 2005, H.R. 985, 109th Cong. § 2(13) (2005); *Medicaid and the State Children's Health Insurance Program (CHIP) Provisions in PPACA*, Cong. Research

Serv., April 28, 2010, at 2 ("the law requires states to expand Medicaid"), available at http://www.arkleg.state.ar.us/healthcare/medicaid/Documents/CRS%20Report%204_28_10.pdf (last visited Nov. 4, 2010); *The Long-Term Budget Outlook*, CBO, June 2010, at 30, available at http://www.cbo.gov/ftpdocs/115xx/doc11579/06-30-LTBO.pdf (last visited Nov. 4, 2010); Citizen's Guide to the Federal Budget, http://www.gpoaccess. gov/usbudget/fy01/guide02.html (last visited Nov. 4, 2010); http://www.statehealthfacts.org/comparereport.jsp?rep=45&cat=17 (last visited Nov. 4, 2010); http://www.hhs.gov/recovery/statefunds.html (last visited Nov. 4, 2010) (more than $15 billion additional federal Medicaid dollars were distributed to the States in 2009); Ex. 1 (Dudek Decl.) ¶¶ 7-8, 33-34; Ex. 4 (Leznoff Decl.) ¶¶ 8-9; Ex. 9 (Betlach Decl.) at D; Ex. 10 (Casanova Decl.) ¶¶ 12-13; Ex. 18 (Bowman Decl.) ¶¶ 16-17; Ex. 20 (Millwee Decl.) p. 2; Ex. 32 (CMS Letter to Arizona threatening to terminate all of its annual Medicaid funding).

29. Due to both practical and legal constraints, Plaintiff States could not borrow or tax sufficiently to make up the shortfall in funds in the event that they no longer received federal Medicaid funds. Tax collections in the Plaintiff States are a fraction of federal collections from those States and could not fully fund a Medicaid-like program without an unfathomable increase in annual revenues. For example, approximately $20 billion will be spent on Medicaid in Florida in FY 2010-2011 (the federal government will be almost $13 billion), which is more than half the amount of tax collections in Florida ($32 billion in 2009). Also, unlike the federal government, States cannot print currency to help fund a Medicaid-like program.

*See* Ex. 34 (Federal Reserve Chairman Ben S. Bernanke, *Challenges for the Economy and State Governments*, Aug. 2, 2010); Ex. 37 (*State and Local Governments' Fiscal Outlook* (GAO-10-358), GAO, March 2010) at 8-9; Ex. 38 (*State and Local Governments: Fiscal Pressures Could Have Implications for Future Delivery of Intergovernmental Programs* (GAO-10-899), GAO, July 2010) at 6; Ex. 1 (Dudek Decl., attachment 1) (Fla. FMAP set at 64.83% for 2010); Ex. 4 (Leznoff Decl.) ¶¶ 4-9; Ex. 3 (Watkins Decl.) ¶¶ 3-14; http://www.census.gov/govs/statetax/0910flstax.html (last visited Nov. 4, 2010) (state tax collections in Florida were less than $32 billion in 2009); *cf.* http://www.irs.gov/taxstats/article/0,,id=206488,00.html (last visited Nov. 4, 2010) (*federal* tax collections from Florida were $110 billion in 2009).

30. Great harm would befall the Plaintiff States' basic healthcare infrastructure, including the loss of benefits from programs linked to Medicaid, if their participation in Medicaid were terminated.

Ex. 1 (Dudek Decl.) ¶¶ 31-34; Ex. 2 (Lange Decl.) ¶¶ 11-12; Ex. 9 (Betlach Decl.) at D.2; Ex. 12 (Phillips Decl.) § C.3, D; Ex. 18 (Bowman Decl.) ¶¶ 16-17; 42 U.S.C. § 671(a)(21) (linking eligibility to participate in the federal Temporary Assistance for Needy Families program with the provision of benefits of the type and kind provided by Medicaid).

31. Choosing to forgo Medicaid would require the Plaintiff States either to deny insurance to millions of citizens already receiving Medicaid, or to establish, administer, and fully fund their own replacement programs, which they could not practically accomplish for fiscal reasons and would reduce their commitment as sovereigns to other infrastructure needs and services, such as education, corrections, courts, environmental protection, etc. Plaintiff States do not administer Medicaid-like parallel programs, nor could they afford to emulate their existing Medicaid programs without federal funding.

Ex. 1 (Dudek Decl.) ¶ 33; Ex. 3 (Watkins Decl.) ¶ 4-13; Ex. 4 (Leznoff Decl.) ¶ 5-9; Ex. 9 (Betlach Decl.) at C; Ex. 10 (Casanova Decl.) ¶ 15-17; Ex. 12 (Phillips Decl.) § C.3-8, D; Ex. 13 (Anderson Decl.) ¶ 6; Ex. 14 (Chaumont Decl.) ¶¶ 8, 22-23; Ex. 18 (Bowman Decl.) ¶¶ 16-17; Ex. 24 (Sundwall Decl.) ¶ 16; Ex. 40 (Dubberly Decl.) pp. 1-2.

32. Choosing to forgo Medicaid would disrupt a long-standing history of federal-State partnership and State expectations for the program, and cause States to lose the value of their decades-long investment in their Medicaid infrastructure and collaboration with the federal government to create distinct, State-specific Medicaid programs.

Ex. 1 (Dudek Decl.) ¶ 5-8, 10; Ex. 9 (Betlach Decl.) at C; Ex. 12 (Phillips Decl.) §§ A & B; Ex. 14 (Chaumont Decl.) ¶¶ 12-15; Ex. 16 (Willden Decl.) p. 2; Ex. 18 (Bowman Decl.) ¶¶ 4-5; Ex. 24 (Sundwall Decl.) ¶¶ 5-8.

33. The ACA and Medicaid statutes and rules neither establish a process for States to withdraw from Medicaid in a responsible and orderly manner, nor define a plan such that States can be confident that an orderly transition from Medicaid to an alternative program would sufficiently safeguard and limit the probability of harm or death to current Medicaid recipients.

Ex. 1 (Dudek Decl.) ¶¶ 31-34; Ex. 9 (Betlach Decl.) at D; Ex. 10 (Casanova Decl.) ¶ 15; Ex. 12 (Phillips Decl.) §§ C.3, D; Ex. 16 (Willden Dec.) pp. 5-7; Ex. 18 (Bowman Decl.) ¶ 16; Ex. 24 (Sundwall Decl.) ¶ 16.

34. Medicaid currently pays for services for many frail and needy persons who depend on the services and who would be harmed if the services were cut-off, even for a short period. If a State were to withdraw from Medicaid, the absence of an effective federal-State plan to coordinate a State's transition out of Medicaid could jeopardize the health and welfare of such persons receiving critically needed care through Medicaid.

Ex. 1 (Dudek Decl.) ¶¶ 32-34; Ex. 16 (Willden Decl.) pp. 5-6; Ex. 18 (Bowman Decl.) ¶¶ 16-17; Ex. 20 (Millwee Decl.) pp. 2-3; *Long-Term Budget Outlook*, CBO, at 31 (one-third of Medicaid's spending goes toward long-term care for those who cannot live independently). For an example of the effects of lack of cooperation among different levels of government, see *Hurricane Katrina: A Nation Still Unprepared*, U.S. Senate, Special Report of the Committee on Homeland Security and Governmental Affairs, Jan. 10, 2007, at 2 ("the suffering that continued in the days and weeks after the storm passed did not happen in a vacuum; instead, it continued longer than it should have because of – and was in some cases exacerbated by – the failure of government at all levels to plan, prepare for, and respond aggressively to the storm").

35. The ACA makes no provision as to the federal government's responsibilities if States withdraw from Medicaid.

Respectfully submitted,

**BILL MCCOLLUM**
**ATTORNEY GENERAL OF FLORIDA**

/s/ Blaine H. Winship
Blaine H. Winship (Fla. Bar No. 0356913)
Special Counsel
Joseph W. Jacquot (Fla. Bar No. 189715)
Deputy Attorney General
Scott D. Makar (Fla. Bar No. 709697)
Solicitor General
Louis F. Hubener (Fla. Bar No. 0140084)
Timothy D. Osterhaus (Fla. Bar No. 0133728)
Deputy Solicitors General
Office of the Attorney General of Florida
The Capitol, Suite PL-01

Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Email: blaine.winship@myfloridalegal.com
*Attorneys for Plaintiff States*

David B. Rivkin (D.C. Bar No. 394446)
Lee A. Casey (D.C. Bar No. 447443)
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Ste. 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
*Attorneys for Plaintiff States, National Federation of Independent Business, Mary Brown, and Kaj Ahlburg*

Katherine J. Spohn
Special Counsel to the Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, Nebraska 68508
Telephone: (402) 471-2834
Facsimile: (402) 471-1929
Email: katie.spohn@nebraska.gov
*Attorneys for Plaintiff the State of Nebraska*

Karen R. Harned
Executive Director
National Federation of Independent Business
Small Business Legal Center
1201 F Street, N.W., Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 554-5572
*Of counsel for Plaintiff National Federation of Independent Business*

Bill Cobb
Deputy Attorney General for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-0131
Facsimile: (512) 936-0545
Email: bill.cobb@oag.state.tx.us
*Attorneys for Plaintiff the State of Texas*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 4th day of November, 2010, a copy of the foregoing Statement of Material Facts in Support of Plaintiffs' Motion for Summary Judgment was served on counsel of record for all Defendants through the Court's Notice of Electronic Filing system.

/s/ Blaine H. Winship
Blaine H. Winship
Special Counsel