**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
**_______________________________________________/**

# APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**VOLUME I**

**(Exhibits 1-9)**

Plaintiffs hereby submit Volume I of their Appendix of Exhibits in Support of their Motion for Summary Judgment.

Respectfully submitted,
**BILL MCCOLLUM**
**ATTORNEY GENERAL OF FLORIDA**

/s/ Blaine H. Winship
Blaine H. Winship (Fla. Bar No. 0356913)
Special Counsel
Joseph W. Jacquot (Fla. Bar No. 189715)
Deputy Attorney General
Scott D. Makar (Fla. Bar No. 709697)
Solicitor General
Louis F. Hubener (Fla. Bar No. 0140084)
Timothy D. Osterhaus (Fla. Bar No. 0133728)
Deputy Solicitors General
Office of the Attorney General of Florida
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Email: blaine.winship@myfloridalegal.com
*Attorneys for Plaintiff States*

David B. Rivkin (D.C. Bar No. 394446)
Lee A. Casey (D.C. Bar No. 447443)
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Ste. 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
*Attorneys for Plaintiff States, National Federation of Independent Business, Mary Brown, and Kaj Ahlburg*

Katherine J. Spohn
Special Counsel to the Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, Nebraska 68508
Telephone: (402) 471-2834
Facsimile: (402) 471-1929
Email: katie.spohn@nebraska.gov

*Attorneys for Plaintiff the State of Nebraska*

Karen R. Harned
Executive Director
National Federation of Independent Business
Small Business Legal Center
1201 F Street, N.W., Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 554-5572
*Of counsel for Plaintiff National Federation of Independent Business*

Bill Cobb
Deputy Attorney General
for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-0131
Facsimile: (512) 936-0545
Email: bill.cobb@oag.state.tx.us
*Attorneys for Plaintiff the State of Texas*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 4th day of November, 2010, a copy of the foregoing Volume I of Appendix of Exhibits in Support of Plaintiffs' Motion for Summary Judgment was served on counsel of record for all Defendants through the Court's Notice of Electronic Filing system.

/s/ Blaine H. Winship
Blaine H. Winship
Special Counsel

# TABLE OF EXHIBITS

Exhibit No.

1 _____Dudek Declaration

2 _____Lange Declaration

3 _____Watkins Declaration

4 _____Leznoff Declaration

5 _____Robleto Declaration

6 _____Shier Declaration

7 _____Ashmore Declaration

8 _____Battilana Declaration

9 _____Betlach Declaration

10____Casanova Declaration

11 ____Damler Declaration

12 ____Phillips Declaration

13 ____Anderson Declaration

14 ____Chaumont Declaration

15 ____Wells Declaration

16 ____Willden Declaration

17 ____Van Camp Declaration

18 ____Bowman Declaration

19 ____Zinter Declaration

20 ____Millwee Declaration

21 ____Dial Declaration

22 ____Kukla Declaration

23 ____Gooch Declaration

24 ____Sundwall Declaration

25 ____Brown Declaration

26 ____Ahlburg Declaration

27 ____Danner Declaration

28 ____Grimes Declaration

29 ____Klemencic Declaration

30 ____McClain Declaration

31 ____Thompson Declaration

32 ____CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, April 1, 2010

33 ____Second CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, June 24, 2010

34 ____Chairman Ben S. Bernanke, Bd. of Governors of the Federal Reserve System, Challenges for the Economy and State Governments, Aug. 2, 2010

35 ____Policies for Increasing Economic Growth and Employment in 2010 and 2011, Cong. Budget Off., Jan. 2010

36 ____Variation in Analyses of PPACA's Fiscal Impact on States, Cong. Res.Serv., Sept. 8, 2010

37 ____State and Local Governments' Fiscal Outlook (GAO-10-358), Gov't Accountability Off, March 2010

38 ____State and Local Governments: Fiscal Pressures Could Have Implications for Future Delivery of Intergovernmental Programs (GAO-10-899), Gov't Accountability Off., July 2010

39____Richard S. Foster, Estimated Financial Effects of the "Patient Protection and Affordable Care Act," Centers for Medicare & Medicaid Service, April 22, 2010

40____Dubberly Declaration

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
_______________________________/

**DECLARATION OF ELIZABETH DUDEK**

Pursuant to 28 U.S.C. § 1746, I, Elizabeth Dudek, declare the following:

1. My name is Elizabeth Dudek. I am over the age of eighteen, of sound mind, and otherwise fully competent to testify to the matters described in this declaration. I am employed by the Florida Agency for Health Care Administration (AHCA) as the Interim Secretary.

2. I have served as Interim Secretary since September 2010.

3. As the Interim Secretary, I am the highest ranking official in AHCA and am responsible for all activities of the Agency including the operation of the Medicaid program.

4. Providing this declaration is within the scope of my authority and the facts and statements in this declaration are true, correct, and within my personal knowledge as of the date of this declaration. The facts and projections contained in this declaration regarding the impact of PPACA, however, were not originally prepared in anticipation of this or any other litigation. AHCA originally compiled the facts and projections contained herein as part of its responsibility to report to Florida's elected officials on developments that will impact the Medicaid program. AHCA has prepared and maintained those projections in the regular course of its state business.

**A. Florida's Medicaid Program**

5. Florida participates in the Medicaid program, and has participated continuously in the program for more than 40 years. The Federal Medicaid law requires states to

designate a "single state agency" responsible for the implementation of the state's Medicaid program. 42 U.S.C. § 1396a(a)(5). [The federal law does, however, allow states under certain circumstances to bifurcate their Medicaid programs so that one agency makes eligibility determinations, while another agency serves as the "single state agency" for those found eligible. Id. Florida has done just that, with the Florida Department of Children and Families (DCF) conducting eligibility determinations and AHCA administering the program for those found eligible. As Florida's eligibility agency, DCF may also be impacted by PPACA.]

6. As Florida's single state agency, AHCA cannot and does not delegate, to anyone other than its own officials, the authority to issue policies, rules, and regulations on Medicaid program matters. 42 C.F.R. § 431.10(e)(1)(ii). No other state agency or entity has the authority to change or disapprove of any of AHCA's administrative decisions, and no other state agency or entity can substitute its judgment for AHCA's with respect to the application of policies, rules, and regulations that AHCA has issued. 42 C.F.R. § 431.10(e)(3). Id.

7. As of fiscal year 2008-09, Florida's total Medicaid program budget (including federal and state dollars) consumed 24.16% percent of the State's total annual budget. This percentage has steadily increased over the years. In fiscal year 1991-1992, for example, the total Medicaid program budget consumed 13.10% of the total state budget.

8. For the current fiscal year, AHCA estimates that it will spend $20.2 billion dollars on the Medicaid program, which will exceed 28% of the state's total budget. AHCA anticipates that the program will serve over 2.9 million eligible recipients per month during this fiscal year.

## B. Impact of PPACA

***Medicaid Eligibility Expansion and Increased Rates for Primary Care Practitioners***

9. PPACA requires states to cover eligibility groups not previously covered.

10. Currently, Florida Medicaid has a variety of eligibility thresholds that depend on the age and condition of the recipient. Children from birth to 1, for example, are eligible if their family income does not exceed 185% of federal poverty level. Children from 1 through 5 are eligible if their family income does not exceed 133% of federal poverty level. Children 6 through 18 are eligible if their family income does not exceed 100% of federal poverty level. Children 19 and 20, as well as adults with children who are Medicaid-eligible, are eligible if their income does not exceed 22% of federal poverty level. Aged, blind, and disabled adults are eligible if their income does not exceed 74% of federal poverty level. Aged and disabled adults who need long term care (e.g. a nursing home) are eligible if their income does not exceed 222% of federal poverty level. Pregnant women are eligible if their income does not exceed 185% of

federal poverty level. Women with breast and/or cervical cancer are eligible in their income does not exceed 200% of federal poverty level. Women who have lost Medicaid coverage for any reason are provided limited family planning services for up to 24 months through the Family Planning Waiver. The program does not currently serve able-bodied, childless adults not otherwise covered in a current categorical coverage group.

11. Starting in 2014, PPACA requires that state Medicaid programs serve all individuals under 65 with incomes of up to 133% of the federal poverty level.[1] PPACA also requires a 5% income disregard for all populations (effectively raising the eligibility threshold to 138% of the federal poverty level). These newly-mandated populations ("newly eligibles") include childless adults whom the Florida Medicaid program has not previously served. It also expands eligibility in Florida for children ages 6-20 and for parents, the aged, the blind, and the disabled who do not need long term care.

12. PPACA provides for enhanced federal financial participation for the newly eligible populations. The Federal government uses the Federal Medical Assistance Percentage (or FMAP) to determine the amount of Federal matching funds for state's expenditures for assistance payments for certain social services, including Medicaid. Through the FMAP, the federal government has traditionally funded about 55% of the Florida Medicaid program, with Florida generally funding the other 45%. With respect to the newly eligible populations, the federal government will fund 100% of the cost of serving the newly eligible population from 2014 through calendar year 2016. Thereafter, states are required to start contributing to the cost of serving the expansion population, with the federal government's share dropping to 95% in 2017, 94% in 2018, 93% in 2019, and 90% in 2020 and beyond.

13. Currently, Florida has broad discretion to set reimbursement rates for health care providers who participate in the Medicaid program. Starting in state fiscal year 2012-13 (January 1, 2013), PPACA will require Florida to reimburse for certain primary care procedure codes used in the Medicaid program at a federally-mandated rate (in essence, they must be reimbursed at the same rate as in the federal Medi***care*** program). This requirement will continue through December 31, 2014. During this period the state will received 100% federal funding for the cost of the increased reimbursements. For estimation purposes, AHCA assumes that the federally-required rate increase would continue beyond the two-year period delineated in the law and these costs would then be partially funded with state funds.

14. AHCA has made projections regarding the fiscal and enrollment impact of PPACA, and presented its projections to the Florida legislature. The power point presentation created for this purpose is attached as Attachment 1 *(AHCA, Overview of Federal Affordable Care Act, August 18, 2010).* The power point

[1] PPACA, § 2001(a).

presentation describes the various assumptions that went into AHCA's projections, and these assumptions can be found at pages 4 through 10 of the presentation. See Attachment 1. This power point presentation was not prepared in anticipation of litigation. AHCA officials prepared it and have maintained it in the regular course of their public business.

15. The AHCA presentation projects the estimated cost to Florida of $142,460,765.00 in state general revenue in Florida's 2013-2014 fiscal year. This amount increases going forward, and by 2018-19 the projected costs to Florida are estimated to be just over a billion dollars per year, or $1,012,206,268.00, in state general revenue.

16. When fully implemented, AHCA projects that PPACA will add an additional 1.8 million people to Florida's Medicaid annual rolls, meaning that the program will, by as early as 2015, serve more than 4.5 million people annually.

17. AHCA developed projections regarding the growth in costs and enrollment as a result of PPACA which project that PPACA will result in the expansion of the Florida Medicaid caseload in four ways. First, it will extend Medicaid to persons previously ineligible (the "newly eligible"). By SFY 2018- 2019, AHCA projects that this population will cost Florida roughly $351 million per year in state revenue.

18. Second, AHCA projects that PPACA will increase program enrollment of uninsured persons who are currently eligible for Medicaid but who, for whatever reason, are not currently enrolled. By SFY 2018- 2019, AHCA projects that this population will cost Florida about $574 million per year in state revenue. The estimates developed reflect a higher commitment of state general revenue as the state will continue to receive the regular FMAP rate for this population.

19. Third, AHCA projects that PPACA will prompt some low-income individuals, who will be newly eligible for the Medicaid program under PPACA, to drop their private insurance coverage and enroll in Medicaid. By SFY 2018- 2019, AHCA projects that this population will cost Florida almost $47 million per year in state revenue.

20. Fourth, AHCA's projects reflect the transition of coverage of some CHIP enrollees to coverage under the Medicaid program. AHCA projects that children between the ages of 6-18 in families with incomes between 100-133% of FPL and currently covered by CHIP will be enrolled in Medicaid. AHCA projects that, by SFY 2018-2019, this change will cost Florida about $78 million in state revenue a year, while saving the state CHIP program about $62 million per year, for a net cost of roughly $16 million per year in state revenue.

21. Also, AHCA's projections assume that the changes PPACA makes to physician reimbursement rates will cost Florida an additional $391 million per year in state revenue by SFY 2018-2019.

22. In sum, AHCA projects that the expansion of Medicaid coverage to include all individuals under age 65 with incomes up to 133 percent of the federal poverty level will increase Florida's costs, less so in the early years but more so after 2016.

***Restrictions on State Ability to Change Eligibility and Tailor Medicaid Programs***

23. Traditionally, Medicaid programs have had some authority to develop eligibility standards, including reducing eligibility for groups above mandatory coverage levels. Starting on the date of its signing (March 23, 2010), PPACA takes this type of policy-making authority away. PPACA requires all states to maintain their current eligibility standards for adults through 2014, and for children through 2019. This is known as the "maintenance of effort" requirement.

24. The maintenance of effort requirement means that Florida cannot make any change to eligibility that would render a person ineligible for Medicaid or CHIP benefits when that same person would have been eligible for benefits on March 23, 2010. If Florida fails to comply with the maintenance of effort requirement, it risks losing federal matching funds for all Medicaid programs, including funds that support services to pregnant women, children, and the aged and disabled populations.

25. PPACA establishes separate maintenance of effort requirements for the adult and children's Medicaid populations and, as a result, alters the state's expectations for coverage of optional categorically needy populations. The maintenance of effort requirement for the adult Medicaid population will remain in place until the U.S. Department of Health and Human Services (HHS) determines that an exchange established by the state under PPACA section 1311 is fully operational.[2] The maintenance of effort requirement for CHIP and the children's Medicaid population up to age 19 will remain in effect through September 2019.[3]

26. As stated previously, consistent with federal law, Florida has opted to cover, as optional categorically needy groups: pregnant women between 150 and 185% of federal poverty level; women with breast and cervical cancer up to 200% of federal poverty level; and persons in need of long term care (e.g. nursing home services) between 74% and 222% of federal poverty level.

---

[2] PPACA, § 2001(b).
[3] *Id.*

27. AHCA created these groups according to policy direction from state leadership. The maintenance of effort provision precludes the state from reducing or eliminating these previously optional eligibility groups as a matter of policy.

***Loss of Prescription Drug Rebate Revenue***

28. PPACA modifies the minimum Medicaid federal unit rebate amount for most drugs.[4] These modifications were made retroactively effective to January 1, 2010, and have the effect of reducing the supplemental rebates available to the states.

29. CMS provided initial guidance to states regarding PPACA's pharmacy rebate provisions on April 22, 2010. In this initial guidance letter, CMS indicated that it would retain the difference between the old and new rebate percentages across the board for all drugs, not just for those drugs for which there is an actual increase in the federal rebate amount due to the Act. Final guidance was distributed to State Medicaid Programs on September 28, 2010. In this letter, CMS revised the previous instructions concerning the Federal offset of Medicaid prescription drug rebates. At this time, the Agency is still waiting for additional information from CMS so that the Agency can invoice for federal 2010 rebates for the Fee-For-Service program as well as begin invoicing for federal rebates based on utilization from the Medicaid Managed Care Plans.

30. AHCA currently estimates that Florida will lose approximately $40 million in rebate revenue from SFY 2010-2011 for those drugs for which we are receiving rebates in excess of the current minimums.[5] During that same timeframe, the state will receive approximately $551 million in rebate revenue.[6]

***The PPACA Depends Upon State Participation in Medicaid to Achieve Its Coverage Goals***

31. The PPACA provides subsidies and credits for individuals between 133% and 400% of the federal poverty level who obtain qualified coverage through a health insurance exchange, but relies solely upon state participation in Medicaid to cover individuals up to 133% of the federal poverty level.

32. In Florida, Medicaid covers and pays for health care services for almost 3 million persons, including 27% of Florida's children; pays for over 50% of Florida childbirths; pays for 63% of nursing home days; delivers services through more than 80,000 individual providers and 23 managed care plans.

33. If Florida's Medicaid and CHIP programs were ended, no current program exists that would cover the healthcare costs of individuals at 133% of the poverty level and, absent planning and implementation of some programmatic

---

[4] PPACA, § 2501.
[5] These projections were developed by AHCA based on ____SFY 2010-2011_______.
[6] *Id.*

substitute, Florida would face a health care emergency affecting its poorest and neediest citizens. If Florida were to cease participation abruptly without a programmatic substitute, it would likely result in severe health repercussions, including possible loss of life, among the most desperately ill and disabled within the current Medicaid population.

34. No known federal laws or regulations provide a non-abrupt process by which a state might make an orderly wind down or transition from Medicaid in a manner that would safeguard the health care of current Medicaid beneficiaries.

## C. Attachments

35. I have attached the following document to this affidavit, which are true and correct copies of the original as maintained by AHCA:

| # | Document Description |
|---|---|
| 1 | *Fla. AHCA, Overview of Federal Affordable Care Act, August 18, 2010* |

I declare under penalty of perjury that the foregoing is true and correct. The information and projections included above are complete and accurate to the best of my knowledge as of the date of this Declaration, and are subject to revision as additional information is generated over time and as PPACA is amended or as federal agencies promulgate guidance and regulations on PPACA's application.

Executed on November 3, 2010, in Tallahassee, Florida.

**Elizabeth Dudek**
**Interim Secretary**
**Agency for Health Care Administration**

**State of Florida, et al. v. U.S. Dept. of Health & Human Services, et al.**
**U.S. District Court, Northern District of Florida**
**Pensacola Division**
**Case No. 3:10-cv-91-RV/EMT**

# Attachment 1

## to

## Declaration of Elizabeth Dudek

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Agency for Health Care Administration

## Overview of Federal Affordable Care Act

## August 18, 2010

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Analysis

- This analysis addresses only the direct impact of changes to enrollment in the Title XIX (Medicaid) and Title (XXI) CHIP programs and the required increase in reimbursement rates to Medicaid primary care providers.
- At this time, impacts are not included for administration of new program elements, changes to the federal pharmacy rebate or changes to state disproportionate share allowances.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Changes to Medicaid and CHIP

| KEY ELEMENT | Affordable Care Act |
|---|---|
| Medicaid Expansion | Expand eligibility to 133% Federal Poverty Level – beginning 1/1/2014<br>•133% FPL for a family of 4: $29,326 |
| FMAP/ Medicaid Expansion | Provides for enhanced FMAP for expansion population:<br>•100% CY 2014<br>•100% CY 2015<br>•100% CY 2016<br>•95% CY 2017<br>•94% CY 2018<br>•93% CY 2019<br>•90% CY 2020 and beyond |
| FMAP/ Current Eligibility Level | Regular FMAP (57.50%) Based on 8/17/10 revised FMAP Calculation |
| CHIP Transition | Children under 133% FPL move from Title XXI CHIP Program to Title XIX Medicaid program. The regular Medicaid FMAP (57.50%) received for these children. |
| CHIP/ Eligible but not enrolled | Since our analysis begins on July 1,2013 (2013-2014 Fiscal Year), and the enhanced CHIP FMAP does not begin until 1/1/2015, the following FMAP are used for CHIP eligible but not enrolled<br>•70.21% SFY 2013-2014:<br>•70.21% SFY 2014-2015<br>•87.46% SFY 2015-2016<br>•93.21% SFY 2016-2017 and beyond |
| FMAP/ CHIP | Anticipated enhanced FMAP for CHIP Population begins 10/1/2015 (134% Federal Poverty Level and above)<br>•10/1/2015: 70.21+23.0=93.21% |
| Increased Rate for Practitioners | 100% federal funded increase to select codes for primary care providers for 2013 and 2014. This impacts approximately 35% of primary care codes under the Florida Medicaid Program |

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Current and Future Medicaid / CHIP Eligibility Levels



AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Assumptions: Newly Eligible Population

- Assumed 40% of new enrollees for the first year of expansion (beginning 1/1/2014).
- Assumed 90% of new enrollees for the second year of expansion (beginning 1/1/2015).
- Assumed 100% of new enrollees for the third year of expansion and beyond (beginning 1/1/2016).
- By fiscal year, that phase in translates as follows:
  - FY 2013-2014: 20%
  - FY 2014-2015: 65%
  - FY 2015-2016: 95%
  - FY 2016-2017 and beyond: 100%

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Assumptions: Eligible but not Enrolled

- Assumed that 20% of the uninsured population under 133% FPL would be eligible for Medicaid under the current program and for those enrollees the state would receive the normal FMAP. A weighted average FMAP is then used to calculate the cost to the program of the total caseload, including that 20%. Assumed the Title XIX expansion population will receive the enhanced FMAP beginning 1/1/2014.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Assumptions: Eligible but not Enrolled

- Phase in assumptions:
  - Assumed 40% of these enrollees for the first year of expansion (beginning 1/1/2014).
  - Assumed 90% of these enrollees for the second year of expansion (beginning 1/1/2015).
  - Assumed 100% of these enrollees for the third year of expansion and beyond (beginning 1/1/2016).
- By fiscal year, that phase in translates as follows:
  - FY 2013-2014: 20%
  - FY 2014-2015: 65%
  - FY 2015-2016: 95%
  - FY 2016-2017 and beyond: 100%

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Assumptions: Crowd Out Population

- Assumed that 80% of those under 133% FPL who are currently privately purchasing insurance (excludes employer sponsored insurance) will enroll in Medicaid under this proposal.
- Assumed enhanced FMAP would be received for these enrollees.
- Phase in assumptions:
  - Assumed 40% of these enrollees for the first year of expansion (beginning 1/1/2014).
  - Assumed 90% of these enrollees for the second year of expansion (beginning 1/1/2015).
  - Assumed 100% of these enrollees for the third year of expansion and beyond (beginning 1/1/2016).
- By fiscal year, that phase in translates as follows:
  - FY 2013-2014: 20%
  - FY 2014-2015: 65%
  - FY 2015-2016: 95%
  - FY 2016-2017 and beyond: 100%

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Assumptions: Impact to CHIP Population

- Children transitioning from CHIP to Medicaid:
  - Assumed that for children under 133% FPL who move from CHIP to Title XIX, Florida will receive regular Medicaid FMAP.
  - Based on June 2010 Enrollment for Florida Healthy Kids and Children's Medical Services enrollment.
- CHIP Eligible but not enrolled population based on 2009 Census data, with expenditures based on June 2010 enrollment and PMPM for all KidCare categories from July 20 KidCare SSEC.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# *Assumptions: Impact to CHIP Population*

- Assume phase in for CHIP Population:
  - On January 1, 2014: 27% of Healthy Kids Title XXI children will move to Title XIX (based on current distribution of Healthy Kids Children by Income Level). For future years it is assumed that the number of children will grow in Medicaid at 5% per year (the same rate as approved by SSEC for the 7/13 - 6/14 FY for Healthy Kids).
  - On January 1, 2014: 24.5% of CMS Title XXI children will move to CMS Title XIX (Based on current distribution of CMS Children by Income Level). For future years it is assumed that the number of children will grow in Medicaid at 61 children per month (calculated as 24.5% of the monthly growth of 250 children approved by the SSEC).
  - Beginning January 2014, Full Pay Program Growth for both Healthy Kids and MediKids will stop and 5% of Full Pay Enrollment as of December 2013 will migrate to an Exchange each month (assumption).

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Assumptions

- Expenditures:
  - Expenditures are based on August 3, 2010, SSEC estimate for SFY 2012-13 and then held flat for remainder of analysis.
  - FMAP used is based on estimates from August 3, 2010, FMAP Estimating Conference for SFY 2012-13 and then held flat for remainder of analysis.
- Caseload:
  - Title XIX Caseloads are based on July 12, 2010, Caseload Conference estimate for SFY 2012-13 and then held flat for remainder of analysis.
  - The expansion caseload is based on 2009 U.S. Census data regarding the uninsured. Increased by 1.6% through 2014 and then held flat for remainder of analysis.
- Other Assumptions:
  - Based on analysis of those under 65 years of age.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Impact of Affordable Care Act

| | | [illegible] and FMAP Changes to Title XIX and Title XXI | [illegible] for Primary Care Practitioners | [illegible] Elements |
|---|---|---|---|---|
| SFY 2013-2014 | State Cost | $142,460,765 | $0 | $142,460,765 |
| | Total Cost | $1,555,007,745 | $471,767,670 | $2,026,775,415 |
| | Enrollment | 379,274 | n/a | 379,274 |
| SFY 2014-2015 | State Cost | $455,518,788 | $185,723,537 | $641,242,325 |
| | Total Cost | $5,072,282,321 | $1,005,393,482 | $6,077,675,803 |
| | Enrollment | 1,232,637 | n/a | 1,232,637 |
| SFY 2015-2016 | State Cost | $601,775,964 | $377,232,845 | $979,008,809 |
| | Total Cost | $7,426,810,569 | $1,079,653,314 | $8,506,463,883 |
| | Enrollment | 1,801,545 | n/a | 1,801,545 |
| SFY 2016-2017 | State Cost | $765,909,539 | $383,337,982 | $1,149,247,521 |
| | Total Cost | $7,817,930,555 | $1,092,234,591 | $8,910,165,146 |
| | Enrollment | 1,896,363 | n/a | 1,896,363 |
| SFY 2017-2018 | State Cost | $950,280,071 | $389,511,113 | $1,339,791,184 |
| | Total Cost | $7,816,307,937 | $1,092,489,889 | $8,908,797,826 |
| | Enrollment | 1,896,363 | n/a | 1,896,363 |
| SFY 2018-2019 | State Cost | $1,012,206,268 | $391,646,501 | $1,403,852,769 |
| | Total Cost | $7,767,863,258 | $1,092,757,761 | $8,860,621,019 |
| | Enrollment | 1,896,363 | n/a | 1,896,363 |

AHCA

# Enrollment and Enhanced FMAP

| Enrollment and Enhanced Federal Matching Rate | | [illegible] 133% FPL | [illegible] | [illegible] | [illegible] CHIP program [illegible] move to Title XIX | [illegible] CHIP move to Title XIX | [illegible] not enrolled 134-200% FPL | [illegible] Enhanced FMAP between 134-200% FPL | [illegible] |
|---|---|---|---|---|---|---|---|---|---|
| SFY 2013-14 | FMAP | 100% | 57.50% | 100% | 57.50% | 70.21% | 70.21% | n/a | |
| | State Cost | $0 | $114,850,139 | $0 | $31,742,349 | ($25,414,082) | $21,282,359 | $0 | $142,460,765 |
| | Total Cost | $1,080,944,716 | $270,235,620 | $143,822,649 | $74,687,879 | ($90,350,534) | $75,667,415 | $0 | $1,555,007,745 |
| | Enrollment | 241,569 | 60,392 | 43,513 | 78,985 | (78,985) | 33,800 | $0 | 379,274 |
| SFY 2014-15 | FMAP | 100% | 57.50% | 100% | 57.50% | 70.21% | 70.21% | n/a | |
| | State Cost | $0 | $373,262,950 | $0 | $65,651,041 | ($52,562,618) | [illegible] | $0 | $455,518,786 |
| | Total Cost | $3,513,069,768 | $878,265,764 | $467,422,782 | $154,473,038 | ($186,867,289) | $245,918,258 | n/a | $5,072,282,321 |
| | Enrollment | 785,098 | 196,274 | 141,417 | 81,680 | (81,680) | 109,848 | $0 | 1,232,637 |
| SFY 2015-16 | FMAP | 100% | 57.50% | 100% | 57.50% | 70.21% | 87.46% | n/a | |
| | State Cost | $0 | $545,536,158 | $0 | $68,638,330 | ($54,954,349) | $42,553,825 | ($51,369,256) | $601,775,964 |
| | Total Cost | $5,134,485,724 | $1,283,619,194 | $683,155,102 | $161,501,952 | ($195,370,223) | $359,418,820 | n/a | $7,426,810,569 |
| | Enrollment | 1,147,450 | 286,862 | 206,686 | 85,397 | (85,397) | 160,547 | $0 | 1,801,545 |
| SFY 2016-17 | FMAP | 97.5% | 57.50% | 97.5% | 57.50% | 70.21% | 93.21% | n/a | |
| | State Cost | $135,118,034 | $574,250,692 | $17,977,749 | $71,772,521 | ($57,453,697) | $24,254,240 | ($68,472,262) | $765,909,539 |
| | Total Cost | $5,404,721,343 | $1,351,178,099 | $719,109,938 | $168,876,520 | ($204,291,298) | $378,335,953 | n/a | $7,817,930,555 |
| | Enrollment | 1,207,842 | 301,960 | 217,564 | 89,296 | (89,296) | 168,997 | $0 | 1,896,363 |
| SFY 2017-18 | FMAP | 94.5% | 57.50% | 94.5% | 57.50% | 70.21% | 93.21% | n/a | |
| | State Cost | $297,259,674 | $574,250,692 | ($39,551,047) | $75,060,960 | ($60,096,542) | $24,254,240 | ($68,472,262) | $958,280,071 |
| | Total Cost | $5,404,721,343 | $1,351,178,099 | $719,109,938 | $176,614,024 | ($213,651,420) | $378,335,953 | n/a | $7,816,307,937 |
| | Enrollment | 1,207,842 | 301,960 | 217,564 | 93,387 | (93,387) | 168,997 | $0 | 1,896,363 |
| SFY 2018-19 | FMAP | 93.5% | 57.50% | 93.5% | 57.50% | 70.21% | 93.21% | n/a | |
| | State Cost | $351,306,888 | $574,250,692 | $46,742,145 | $78,511,360 | ($62,859,068) | $24,254,240 | ($68,472,262) | $1,012,206,268 |
| | Total Cost | $5,404,721,343 | $1,351,178,099 | $672,367,792 | $184,732,612 | ($223,472.541) | $378,335,953 | $0 | $7,767,863,258 |
| | Enrollment | 1,207,842 | 301,960 | 217,564 | 97,680 | (97,680) | 168,997 | n/a | 1,896,363 |

**FLORIDA MEDICAID**

# Medicaid Eligibility - A Complex System of Coverages







| Family Size | **Monthly Income |
|---|---|
| 1 | $867 |
| 2 | $1,167 |
| 3 | $1,467 |
| 4 | $1,767 |
| 5 | $2,067 |
| 6 | $2,367 |
| 7 | $2,667 |
| 8 | $2,967 |
| Each Additional | $300 |

***Coverage for infants up to 185% Federal Poverty Level is required in order for states to receive Title XXI funding.**

****Federal Poverty Level as of January 2008**

0

AHCA

# Increase Select Primary Care Rates to Medicare Rate

| Increase reimbursement to Primary Care Providers to the Medicare Rate | | [illegible] Population | [illegible] | [illegible] Enrolled | [illegible] Population | [illegible] | Total |
|---|---|---|---|---|---|---|---|
| SFY 2013-14 | FMAP | 100% | 100% | 100% | 100% | 100% | 0 |
| | State Cost | $0 | $0 | $0 | $0 | $0 | $0 |
| | Total Cost | $419,951,346 | $35,684,499 | $8,921,106 | $2,464,321 | $4,746,398 | $471,767,670 |
| | Enrollment | | 241,569 | 60,392 | 78,985 | 43,513 | n/a |
| SFY 2014-15 | FMAP | 78.75% | 100% | 78.75% | 78.75% | 100% | n/a |
| | State Cost | $178,479,322 | $0 | $5,161,139 | $1,083,076 | $0 | $185,723,597 |
| | Total Cost | $839,902,691 | $115,974,603 | $28,993,595 | $5,096,826 | $15,425,767 | $1,005,393,482 |
| | Enrollment | | 785,098 | 196,274 | 81,680 | 141,417 | n/a |
| SFY 2015-16 | FMAP | 57.50% | 100% | 57.50% | 57.50% | 100% | n/a |
| | State Cost | $356,958,644 | $0 | $18,009,484 | $2,264,717 | $0 | $377,232,845 |
| | Total Cost | $839,902,691 | $169,501,314 | $42,375,255 | $5,328,745 | $22,545,309 | $1,079,653,314 |
| | Enrollment | | 1,147,450 | 280,862 | 85,397 | 206,686 | n/a |
| SFY 2016-17 | FMAP | 57.50% | 97.5% | 57.50% | 57.50% | 97.5% | n/a |
| | State Cost | $356,958,644 | $4,460,551 | $18,957,351 | $2,368,129 | $593,297 | $383,337,982 |
| | Total Cost | $839,902,691 | $178,422,420 | $44,605,531 | $5,572,068 | $23,731,881 | $1,092,234,591 |
| | Enrollment | | 1,207,842 | 301,960 | 89,296 | 217,564 | n/a |
| SFY 2017-18 | FMAP | 57.50% | 94.5% | 57.50% | 57.50% | 94.5% | n/a |
| | State Cost | $356,958,644 | $9,813,233 | $18,957,351 | $2,476,631 | $1,305,254 | $389,511,113 |
| | Total Cost | $839,902,691 | $178,422,420 | $44,605,531 | $5,827,366 | $23,731,881 | $1,092,489,889 |
| | Enrollment | | 1,207,842 | 301,960 | 93,387 | 217,564 | n/a |
| SFY 2018-19 | FMAP | 57.50% | 93.5% | 57.50% | 57.50% | 93.5% | n/a |
| | State Cost | $356,958,644 | $11,597,457 | $18,957,351 | $2,590,476 | $1,542,573 | $391,646,501 |
| | Total Cost | $839,902,691 | $178,422,420 | $44,605,531 | $6,095,238 | $23,731,881 | $1,092,757,761 |
| | Enrollment | | 1,207,842 | 301,960 | 97,680 | 217,564 | n/a |

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Florida Medicaid: Program Overview

September 2010

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Medicaid
# A State and Federal Partnership

- In 1965, the federal Social Security Act was amended to establish two major national health care programs:
  - Title XVIII (Medicare).
  - Title XIX (Medicaid).
- Medicaid is jointly financed by state and federal funds.
- States administer their programs under federally approved state plans.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# The Medicaid Program
# Major Federal Requirements

- States must submit a Medicaid State Plan to the federal Centers for Medicare and Medicaid Services (CMS).
- Mandatory eligibility groups and services must be covered.
- Services must be available statewide in the same amount, duration and scope.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Medicaid Structure

- Federal Medicaid laws mandate certain benefits for certain populations.
- Medicaid programs vary considerably from state to state, and within states over time.
- State Medicaid programs vary because of differences in:
  - optional service coverages.
  - limits on mandatory and optional services.
  - optional eligibility groups.
  - income and asset limits on eligibility.
  - provider reimbursement levels.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Medicaid Structure
## (continued)

- Medicaid does not cover all low income individuals.
  - 27% of children.
  - 51.2% of deliveries.
  - 63% of nursing home days.
  - 1,162,020 adults - parents, aged and disabled.

AHCA

# Medicare vs. Medicaid

FLORIDA MEDICAID

| | Medicare | Medicaid |
|---|---|---|
| Enacted by Congress | 1965 | 1965 |
| Alternate Program Name | Title XVIII | Title XIX |
| Financing | Employee/Employer Payroll Tax; Premiums; Federal General Revenue | Federal and State Governments – Matching Rates Based on Per Capita Income |
| Eligibility | Not Income Based; All Persons Age 65+; Certain Younger Persons on Social Security Disability or Based on Disability and Specific Condition (ESRD); Totally and Permanently Disabled (24 months) | Income Based; All Ages; Mandatory Eligibility Groups; Optional Eligibility Groups |
| Cost Sharing | Part A Premium: For most there is no premium. Buy-in available for those not otherwise qualified ($461 for 2010)<br>Part A Deductible: $1,100/Benefit Period (2010)<br>Part B Premium: $110.50 (2010)<br>Part B Deductible: $155 (2010)<br>Part B Coinsurance: 20%<br>Part D Coinsurance up to 25% / Annual Deductible $310<br>Co-payments are variable with Income<br>Low Income Subsidies are provided for the above | Nominal; Spend Down for Medically Needy Individuals |
| Administering Agency | HHS/CMS/Carriers – Financed by Federal Government and Beneficiary Cost Sharing | States – Jointly Financed by State and Federal Governments; Medicaid Programs Vary by State |
| Benefits | Part A: Hospital Insurance for Hospital Care, Skilled Nursing Facilities, Hospice and Some Home Health Care (Qualifying Contributions)<br>Part B: Medical Insurance for Physician Services, Outpatient Care and Other Medical Services<br>Part C: Medicare+Choice – Health Maintenance Organization Coverage<br>Part D: Medicare Prescription drug Insurance | Acute and Long Term Care; Federal Mandated Services and State Optional Services |

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Florida Medicaid – A Snapshot

| | |
|---|---|
| | • $20.2 billion estimated spending in Fiscal Year 2010-11<br>• Federal-state matching program –64.83% federal, 35.17% state.<br>• Florida will spend approximately $6,802 per eligible in Fiscal Year 2010-2011.<br>• 45% of all Medicaid expenditures cover hospitals, nursing homes, Intermediate Care Facilities for the Developmentally Disabled (ICF/DD's); Low Income Pool and Disproportionate Share Payments.<br>• 10% of all Medicaid expenditures cover drugs.<br>• Fifth largest nationwide in Medicaid expenditures. |
| | • 2.97 million eligibles.<br>• Elders, disabled, families, pregnant women, children in families below poverty.<br>• Fourth largest Medicaid population in the nation. |
| | • Approximately 80,000 Fee-For-Service providers; 23 Medicaid Managed Care plans (16 HMOs and 7 PSNs). |

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Who's Eligible?

- Medicaid eligibility is determined by:
  - Categorical groups, i.e., pregnant women; families and children; and aged, blind, and disabled individuals.
  - Income.
  - Assets.
  - Citizenship.
  - Residency.
  - Cooperation with Child Support Enforcement (when one or both parents are absent from the home).
  - Medical need for home and community-based services, and persons in nursing facilities.
  - Level of medical bills (for Medically Needy).

FLORIDA MEDICAID

# Medicaid Eligibility - A Complex System of Coverages




- Mandatory Medicaid coverage (entitlement).
- Mandatory Medicaid coverage for low-income families using 1996 AFDC income standard (entitlement).
- Optional Medicaid coverage (entitlement).
- Federal Medicare coverage (entitlement).
- Optional child insurance coverage (non-entitlement).
- Optional Medically Needy income spend down level (entitlement).

| Family Size | **Monthly Income |
|---|---|
| 1 | $903 |
| 2 | $1,214 |
| 3 | $1,526 |
| 4 | $1,838 |
| 5 | $2,149 |
| 6 | $2,461 |
| 7 | $2,773 |
| 8 | $3,084 |
| Each Additional | $312 |

*Coverage for infants up to 185% Federal Poverty Level is required in order for states to receive Title XXI funding.

**Federal Poverty Level as of January 2010

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Florida Medicaid Mandatory Services

- Advanced Registered Nurse Practitioner Services
- Early & Periodic Screening, Diagnosis and Treatment of Children (EPSDT)/Child Health Check-Up
- Family Planning
- Home Health Care
- Hospital Inpatient
- Hospital Outpatient
- Independent Lab
- Nursing Facility
- Personal Care Services
- Physician Services
- Portable X-ray Services
- Private Duty Nursing
- Respiratory, Speech, Occupational Therapy
- Rural Health
- Therapeutic Services for Children
- Transportation

**Florida Medicaid Mandatory Services for All Eligibles FY 2010-11**



AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Florida Medicaid Optional Services*

- Adult Dental Services
- Adult Health Screening
- Ambulatory Surgical Centers
- Assistive Care Services
- Birth Center Services
- Hearing Services
- Vision Services
- Chiropractic Services
- Community Mental Health
- County Health Department Clinic Services
- Dialysis Facility Services
- Durable Medical Equipment
- Early Intervention Services
- Healthy Start Services
- Home and Community-Based Services
- Hospice Care
- Intermediate Care Facilities/ Developmentally Disabled
- Intermediate Nursing Home Care
- Optometric Services
- Physician Assistant Services
- Podiatry Services
- Prescribed Drugs
- Primary Care Case Management (MediPass)
- Registered Nurse First Assistant Services
- School-Based Services
- State Mental Hospital Services
- Subacute Inpatient Psychiatric Program for Children
- Targeted Case Management)

**Florida Medicaid Optional Services for All Eligibles FY 2010-11**

Optional
54.28% of
$20.2 Billion

*States are required to provide any medically necessary care required by child eligibles.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Who Can Provide Medicaid Services?

- Any willing health care practitioner or entity who:
  - provides one of the Medicaid covered services;
  - submits an application to Medicaid;
  - is licensed or certified to practice in the State of Florida;
  - is not terminated from any government health care program; and
  - signs an agreement with Medicaid.
- Managed Care plans with appropriate provider networks.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Institutional Providers / Other

- Institutional Providers / Other
  - Examples of provider types:
    - Inpatient Hospitals
    - Outpatient Hospitals
    - Nursing Homes
    - Intermediate Care Facilities for Developmentally Disabled (ICF/DD)
    - Rural Health Clinics (RHCs)
    - County Health Departments
    - Federally Qualified Health Centers
    - Pharmacy

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Fee For Service Providers

- Fee for Service Providers
  - Examples of provider types:
    - Physician Services
    - Home Health Services
    - Dental Services
    - Transportation (Emergency and Non-Emergency)
    - Dialysis
    - Nurse Practitioners
    - Laboratory and X-Ray

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Growth in Medicaid Average Monthly Caseload




Source: Medicaid Services Eligibility Subsystem Reports.
*FY 2009-10 July 2010 Caseload Social Services Estimating Conference.
*FY 2010-11 July 2010 Caseload Social Services Estimating Conference.
*FY 2011-12 July 2010 Caseload Social Services Estimating Conference.

AHCA FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Growth in Medicaid
# Average Monthly Caseload for TANF




Source: Medicaid Services Eligibility Subsystem Reports. Caseload includes TANF and SOBRA Children
*FY 2009-10 July 2010 Caseload Social Services Estimating Conference.
*FY 2010-11 July 2010 Caseload Social Services Estimating Conference.
*FY 2011-12 July 2010 Caseload Social Services Estimating Conference.

AHCA FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Growth in Medicaid
# Average Monthly Caseload for SSI




Source: Medicaid Services Eligibility Subsystem Reports.
*FY 2009-10 July 2010 Social Services Estimating Conference.
*FY 2010-11 July 2010 Social Services Estimating Conference.
*FY 2011-12 July 2010 Social Services Estimating Conference.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Growth in Medicaid Average Monthly Caseload including TANF and SSI



AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Title XIX Federal Medical Assistance Percentage (FMAP)

| Federal Fiscal Year | Federal Share | State Share | Total |
|---|---|---|---|
| 2005 | 58.89% | 41.11% | 100% |
| 2006 | 58.76% | 41.24% | 100% |
| 2007 | 56.83% | 43.17% | 100% |
| 2008 | 55.40% | 44.60% | 100% |
| 2009 | 67.64% | 32.36% | 100% |
| 2010 | 64.83% | 35.17% | 100% |

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# TANF and SSI Related Eligibility Groups for 2010-11

| | Total Budget | Avg Monthly Caseload | PMPM |
|---|---|---|---|
| Supplemental Security Income (SSI) | $10,682,030,927 | 595,097 | $1,496 |
| Temporary Assistance for Needy Families (TANF) | $2,888,309,665 | 876,731 | $275 |
| Medically Needy | $1,102,910,637 | 43,425 | $2,117 |
| Children < = 100% of Poverty | $1,199,343,261 | 693,771 | $144 |
| Children > 100% of Poverty | $152,176,541 | 71,663 | $177 |
| Children – Medicaid Expansion Under Title XXI | $3,334,416 | 790 | $352 |
| Pregnant Women < = 100% of Poverty | $726,100,064 | 68,674 | $881 |
| Pregnant Women > 100% of Poverty | $155,691,796 | 15,088 | $860 |
| Family Planning Waiver | $12,148,383 | 52,120 | $19 |
| Categorically Eligible | $524,799,560 | 226,477 | $193 |
| Elderly and Disabled (MEDS AD) | $743,088,189 | 38,404 | $1,612 |
| Qualified Medicare Beneficiaries (QMB/SLMB/QI) | $516,433,338 | 278,452 | $155 |
| Refugee General Assistance | $21,580,660 | 7,969 | $226 |
| Other | $1,464,679,257 | N/A | N/A |
| Total | $20,192,626,694 | 2,968,661 | $567 |

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Growth In Medicaid Service Expenditures




Source: Medicaid Services' Budget Forecasting System Reports.
*FY 2009-10 Estimated Final Expenditures.
*FY 2010-11 August 2010 Social Services Estimating Conference.
*FY 2011-12 August 2010 Social Services Estimating Conference.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Medicaid Budget - How it is Spent FY 2010-11




•Adults and children refers to non disabled adults and children.

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Medicaid Spending for Fiscal Year 2010-11

FLORIDA MEDICAID

| Service | FY 2010-11 Estimated Spending | Percent of Total |
|---|---|---|
| Hospital Inpatient Services | $3,797,901,173 | 18.81% |
| Prepaid Health Plans | $3,125,828,565 | 15.48% |
| Nursing Home Care | $2,903,605,738 | 14.38% |
| Prescribed Medicine/Drugs & Part D | $1,694,364,084 | 8.39% |
| Physician Services | $1,191,907,167 | 5.90% |
| Supplemental Medical Insurance | $1,177,758,564 | 5.83% |
| Hospital Outpatient Services | $1,074,193,151 | 5.32% |
| Home & Community Based Services | $1,000,476,633 | 4.95% |
| Low Income Pool | $1,000,249,994 | 4.95% |
| Intermediate Care Facility/DD | $362,423,190 | 1.79% |
| Nursing Home Diversion Waiver | $347,884,910 | 1.72% |
| Hospice Services | $340,131,687 | 1.68% |
| Disproportionate Share Hospital Payments | $246,570,577 | 1.22% |
| Private Duty Nursing Services | $192,248,924 | 0.95% |
| Early and Periodic Screening/Children | $188,316,688 | 0.93% |
| Other | $1,549,765,649 | 7.67% |
| Total | $20,192,626,694 | 100.00% |

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Estimated Fiscal Year 2010-11 Medicaid Expenditures By Appropriation Category



AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Top 5 Medicaid Services Expenditures on Average

FLORIDA MEDICAID



AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

# Medicaid Expenditures by Fund Source FY 2010-11 - $20.2B

FLORIDA MEDICAID

| In Millions | |
|---|---|
| Medicaid (XIX) | $12,331.0 |
| General Revenue | $3,502.5 |
| Grants & Donations | $2,304.2 |
| Health Care TF | $884.8 |
| Other State Funds | $552.2 |
| PMATF | $546.1 |
| Tobacco Settlement | $50.2 |
| Refugee | $21.6 |
| TOTAL | $20,192.6 |




Source: *August 2010 Social Services Estimating Conference*

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Medicaid Program Grants & Donations Trust Fund FY 2010-11

| Sources of Funds (millions) | |
|---|---|
| Local IGT's | $1,534.4 |
| Rebates (F) | $486.7 |
| Rebates (S) | $264.0 |
| Fraud/Abuse | $19.1 |
| TOTAL | $2,304.2 |




*Source: August 2010 Social Services Estimating Conference*

AHCA
FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION

FLORIDA MEDICAID

# Medicaid Program
# Intergovernmental Transfers (IGT's)
# FY 2010-11

| Sources of Funds (millions) | |
|---|---|
| Hospital LIP | $376.07 |
| Hospital IP | $528.15 |
| DSH Program | $109.10 |
| Hospital OP | $136.51 |
| Other | $384.57 |
| TOTAL | $1,534.4 |




*Source: August 2010 Social Services Estimating Conference*

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**

______________________________/

# DECLARATION OF JENNIFER LANGE

Pursuant to 28 U.S.C. § 1746, I, JENNIFER LANGE, declare the following:

1. I am making this affidavit in connection with *State of Florida, et al. v. United States Department of Health and Human Services, et al.* The facts and statements in this declaration are true, correct, and within my personal knowledge.

2. I am the Director of the Automated Community Connection to Economic Self-Sufficiency (ACCESS) Program in the Florida Department of Children and Families (DCF). I am responsible for administration of eligibility requirements and determinations for the Medicaid Program in the State of Florida. I have held this position since April 2006.

3. I am a resident of the State of Florida; I am over the age of 21; and I make the statements in this declaration based upon my personal knowledge of analysis completed by DCF, with respect to the cost of implementing an adequate eligibility system related to the Medicaid programs that complies with or meets the requirements of the Patient Protection and Affordable Care Act (PPACA), H.R. 3590.

4. The Department of Children and Families' mission statement is "Protect the vulnerable, Promote strong and economically self-sufficient families, and Advance personal and family recovery and resiliency". We pursue our mission by, among other things:

(a) Participating in the administration of social service funds under Title XX of the Social Security Act pursuant to section 409.031, Florida Statutes;

(b) Participating in the eligibility determination of applicants for Florida Kidcare Program pursuant to section 409.810 et seq., Florida Statutes;

(c) Administering the eligibility determination of applicants for Florida Medicaid Program pursuant to section 409.902 et seq., Florida Statutes; and

(d) Administering the eligibility determination of applicants for the Florida Cash Assistance Program pursuant to chapter 414, Florida Statutes.

5. DCF has completed a high-level estimate of the impact of the PPACA and work that is required for the development and enhancement of DCF systems to meet the PPACA's requirements.

6. While the PPACA requires full implementation of Medicaid program changes by January 2014, technology programming must be completed sooner and require a multi-year effort beginning in 2011 to implement federal eligibility requirements in support of the PPACA.

7. To support the requirements identified in PPACA, DCF must retool the Medicaid eligibility determination component of its eligibility systems and informational web pages. PPACA also requires states to develop electronic interfaces with health subsidy programs including the American Health Benefit Exchanges.

8. DCF understands the PPACA will expand eligibility to individuals not currently covered by or eligible for Medicaid, such as individuals under age 65 with countable incomes of up to 133% of the federal poverty level, including adults who are neither disabled nor pregnant, which DCF anticipates will increase Florida's Medicaid rolls by at least 1.5 million individuals in the PPACA's early years after full implementation.

9. To accomplish the necessary programming during fiscal year (FY) 2011-12, DCF Information Systems staff project that the Department must spend $5,097,600 for FLORIDA system reprogramming ($2,528,800 in state funds and $2,528,800 in federal matching funds). Additional funding, currently estimated at $1,274,400, (half state and half federal) will be needed for FY 2012-13 to complete the programming of systems requirements not completely known at this time. The total initial estimated project cost is $6,372,000. Programming costs may change as additional requirements become defined or apparent for changes that must be in place and operational by January 1, 2014.

10. Twelve additional program office staff have been requested to start employment beginning in FY 2011, to prepare, plan, design and monitor the policy and technology needs of the expanded Medicaid system. These staff would coordinate with the Agency for Health Care Administration (AHCA) and the state health care exchanges to ensure appropriate information sharing, planning and interfaces.

11. Federal law in the 1996 Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA, Public Law 104-193), requires states to provide medical assistance under Medicaid to individuals who meet the eligibility requirements or are included in a state plan under Title IV-A of the Social Security Act as in effect prior to passage of PRWORA. This includes children in Foster Care or Adoption Assistance Programs under Part E and very low income families who would have qualified under the old Aid to Families with Dependent Children welfare program. Florida currently covers these individuals through Medicaid and receives federal matching funds to help cover the costs. Failure to provide Medicaid to these individuals could jeopardize Florida's TANF block grant.

12. Florida's federal TANF block grant is more than $562 million annually. These funds could be lost if Medicaid were discontinued or terminated for the above referenced individuals.

13. I declare under penalty of perjury that the foregoing is true and correct. The information and projections included above are complete and accurate to the best of my knowledge as of the date of this Declaration, and are subject to revision as additional information is generated over time and as PPACA is amended or as federal agencies promulgate guidance and regulations on PPACA's implementation and as AHCA and the North Florida Shared Resource Center receive more guidance from the appropriate participating entities. The statements pertain to DCF ACCESS and do not include assessment of impact of costs to other entities.

Executed on November 3, 2010, in Tallahassee, Leon County, Florida.

JENNIFER LANGE
Director, ACCESS Program
Florida Dept. of Children and Families

**STATE OF FLORIDA**

**COUNTY OF LEON**

**JURAT**

The foregoing are acknowledged before me under oath this 3rd day of November, 2010, by Jennifer Lange, who is: ✓ known to me personally or ______ produced identification.

DEBBIE SMITH
Commission DD 830788
Expires October 13, 2012
Bonded Thru Troy Fain Insurance 800-385-7019

Notary Public, State of Florida at Large

# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
__________________________________/

**DECLARATION OF J. BEN WATKINS, III**

Pursuant to 28 U.S.C. § 1746, I, J. Ben Watkins, III, declare the following:

1. I am over the age of eighteen, of sound mind, and otherwise fully competent to testify to the matters described in this declaration. I am employed by the State of Florida (the "State") as the Director of the Florida Division of Bond Finance.

2. I declare that the statements made herein are based upon my personal knowledge, the Florida Statutes and State Constitution, and upon the records of the State.

3. The State is required by its Constitution to raise "…sufficient revenue to defray the expenses of the state for each fiscal period." Article VII, Section 1 (d), State Constitution. Accordingly, deficit spending is not permitted by the State.

4. The Governor is required to prepare a balanced budget of State expenditures. Section 216.162, Florida Statutes. If the Governor determines, at any time, that the recommended budget will no longer be in balance with estimated revenues, the Governor must amend the revenue or expenditure recommendations to bring the budget into balance. Section 216.168 (4) Florida Statutes.

5. It is the duty of the Governor and the Chief Financial Officer to ensure that revenues being collected by the State will be sufficient to fund appropriations and that no deficit will occur in any fund of the State. Sections 216.221 (1) and (8), Florida Statutes.

6. If a deficit occurs in the General Revenue Fund of the State, specific procedures are established for rectifying the budget deficit and maintaining a balanced budget, including the transfer of reserve funds to correct the deficit. Section 216.221, Florida Statutes.

7. The State's reserves have been reduced from a high of $6.1 billion at June 30, 2006, to $837 million expected at June 30, 2011.

8. State reserves have been used to mitigate spending reductions that would have otherwise been necessary to balance the State's budget.

9. The State is confronted with a projected budget deficit for fiscal 2011-12 of between $828 million and $2.5 billion, assuming that State General Revenue Fund reserves have been fully exhausted.

10. The State has experienced negative changes to the ratings on its debt due to difficult financial conditions. On December 11, 2008, Fitch Ratings revised its outlook for the State from stable to negative. This change was due to "... economic and revenue deterioration as well as the significant uncertainty associated with the economic and revenue outlook."

11. On January 1, 2009, Standard & Poor's Ratings Services also revised its rating outlook on the State's full faith and credit debt to negative from stable. The change was due to several factors including declining state revenues which resulted in spending reductions and a reliance on reserves to balance the State budget. The negative outlook continues to be in effect and reflects Standard & Poor's view that the State continues to confront continuing economic and financial pressure.

12. The State Constitution authorizes the State to borrow money by issuing bonds for fixed capital outlay projects only such as schools, roads and land acquisition. Articles VII and XII, State Constitution. The Constitution does not provide for borrowing for operating expenses.

13. The State's financial flexibility to absorb additional spending requirements from health care reform is severely impaired and borrowing money to provide funding is not permitted by the State Constitution.

14. The State's credit rating and continued access to low-cost borrowing to fund investment in infrastructure may be jeopardized by budget imbalances. A downgrade of the credit rating would adversely affect the State's cost of borrowing to meet its capital needs.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Tallahassee, Florida, this 3RD day of November, 2010.

J. Ben Watkins, III
Director, Florida Division of Bond Finance

# Exhibit 4

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
______________________________/

**DECLARATION OF JOANNE LEZNOFF**

Pursuant to 28 U.S.C. § 1746, I, JoAnne Leznoff, declare the following:

1. I am over the age of eighteen, of sound mind, and otherwise fully competent to testify to the matters described in this declaration. I am employed by the State of Florida, House of Representatives, as the Staff Director of the Appropriations Committee. As the Staff Director for the Appropriations Committee, I am the lead staff responsible for, among other things, the preparation of the General Appropriations Act for the House of Representatives ensuring that the budget is technically correct, balanced as required by the Florida Constitution and consistent with Florida law. Prior to assuming this role I was a Deputy Budget Director in the House of Representatives responsible for various aspects of budget development and coordination. Prior to my tenure in the House I served in various budget related capacities in the Governor's Office of Policy and Budget and as the Director of Financial Management for the Department of Corrections. I have over 23 years of experience in state government over 10 of which have been directly related to budget.

2. I declare that the statements made herein are based upon my personal knowledge and upon the records of the State of Florida.

3. Florida's Constitution provides authority to the Florida Legislature to exercise powers reserved to the States under the United States Constitution, including the power to pass laws that make appropriations.

4. The Florida Constitution also requires that provision be made in law that raises sufficient revenue to defray the expenses of the State for each fiscal year.

5. The State of Florida's budget for Fiscal Year ("FY") 2010-11 is $70.5 billion ($43.4 billion of which is comprised of state funds). From that total budget, the State pays for infrastructure and services including but not limited to education, law enforcement, judiciary, corrections, and healthcare services.

6. The State has limited sources of funds to provide for infrastructure and services, primarily its own source taxes and fees, and funds provided by the federal government. Additionally, Florida's Constitution allows limited borrowing for capital projects, such as school buildings, prisons, roads, and for environmentally sensitive lands.

7. Florida's Constitution also constrains the State's ability to increase revenue through increased taxation. For instance, personal income and inheritance taxes are prohibited, and other taxes are capped (intangibles tax) or require super-majority votes (corporate income tax).

8. The State of Florida has faced billions of dollars in budget shortfalls for the past several years. At the same time, the State's funding obligation to Medicaid has been substantial. Over the last decade, the State Medicaid Program has been the single largest cost driver of all government programs. At a cost of approximately $20 billion, Medicaid will serve an estimated 2.9 million Floridians in FY 2010-2011. The Medicaid program constitutes over 28 percent of the funds appropriated in the Florida State budget for FY 2010-11. The Patient Protection and Affordable Care Act of Congress ("PPACA") will significantly change the nature of Medicaid, greatly expanding both the costs and the obligations incumbent upon the State of Florida. Florida's Agency for Health Care Administration ("AHCA") estimates that these mandates may increase the State's Medicaid outlays by $1 billion or more annually by 2019.

9. Assuming the continuation of current or estimated fiscal conditions, funding the added costs imposed on its Medicaid program under the PPACA would present a significant challenge to the State of Florida. To provide that funding, the State likely would have to reduce its funding of other priorities or raise revenues. The federal portion of Medicaid funding appropriated for FY 2010-11 exceeds $12 billion and is equivalent to more than 27 percent of the total state funds in Florida's FY 2010-11 budget as well as comprising over 60 percent of the Medicaid budget. If the State of Florida were to cease participation in the Medicaid Program, the State by itself could not reasonably afford a comparable program, which would require in excess of a doubling of the outlays of state funds now devoted to Medicaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at Tallahassee, Florida, this 3rd day of November, 2010.

JoAnne Leznoff
Staff Director, Appropriations Committee
House of Representatives
State of Florida

# Exhibit 5

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
_______________________________________/

**DECLARATION OF Michelle Robleto**

Pursuant to 28 U.S.C. § 1746, I, Michelle Robleto, declare the following:

1. I am the Director of the Florida, Division of State Group Insurance (DSGI) and am responsible for employee benefit administration for the State of Florida. I have held this position since July 27, 2007.

2. I am a resident of the State of Florida; I am over the age of 21; and I make the statements in this declaration based upon my personal knowledge and upon the books and records of the DSGI.

3. I am making this affidavit in connection with *State of Florida, et al. v. United States Department of Health and Human Services, et al.*, a lawsuit to which the State of Florida is a party. The facts and statements in this declaration are true, correct, and within my personal knowledge.

4. DSGI is created and governed by Florida Statutes chapter 110.123, and the regulations in Florida Administrative Code (FAC) chapter 60P.

5. DSGI administers the health, dental, vision, life, long-term disability and flexible spending account insurance programs for all eligible State officials and employees, and retirees who have chosen to participate in the DSGI insurance programs pursuant to Fla. Stat. § 110.123 (Florida State Group Insurance Program).

6. DSGI also provides assistance to participants (employees, retirees and their dependents) with questions regarding eligibility, access to services and claims, including a claim appeal process.

7. The Florida State Group Insurance Program offers a selection of comprehensive benefit programs, including both fully insured Health Maintenance Organization (HMO) options and a self-insured group Preferred Provider Organization (PPO) option. The administration and funding of the State's benefit programs is through the State Employees' Health Insurance Trust Fund, Fla. Stat. § 110.123(6).

8. About 142 thousand of Florida's state employees participate in the Florida State Group Plan administered by DSGI. About 30 thousand state employees, who work 30 or more hours a week, do not participate in Florida State Group Plan either by choice or because Florida law excludes them from participation.

9. Federal health care reform, formally known as the Patient Protection and Affordable Care Act (H.R. 3590) (PPACA), requires DSGI to amend the Florida State Group Plan and to offer PPACA prescribed benefits not currently offered, including:

- extending dependent coverage to age 26 effective with the plan year beginning January 1, 2011;
- removal of any lifetime policy limit provisions effective with the plan year beginning January 1, 2011; and
- removal of pre-existing conditions limitations on persons to age 19, effective with the plan year beginning January 1, 2011.

10. The Division of State Group Insurance (DSGI) commissioned actuarial consulting services from Mercer Health & Benefits, LLC, under Requisition Number PR4753007-V2. The resulting work product, "Estimating the annual financial impact of federal health reform for FY 2010-11 through FY 2014-14," dated September 1, 2010 was received by DSGI and paid under Purchase Order A2590D.

11. Per the Mercer report, as a result of PPACA's requirements that additional benefits be given to officers and employees in the Florida State Group Plan, increased costs will be imposed on DSGI.

12. Per the Mercer report, PPACA's requirement that DSGI expand dependent coverage to age 26 has a projected cost of $37.3 million, for the period fiscal year (FY) 2010-11 through FY 2013-14.

13. Per the Mercer report, PPACA's requirement that DSGI remove lifetime policy limits has a projected impact of $11 million for the period FY 2010-11 through FY 2013-14.

14. Per the Mercer report, PPACA's requirement that DSGI remove pre-existing conditions limitations on persons to age 19 has a projected impact of $6.2 million for the period fiscal FY 2010-11 through FY 2013-14.

15. By 2014, PPACA requires that Florida offer enrollment to all employees working 30 or more hours a week into the expanded Florida State Group Plan or pay an annual penalty based on the size of its entire workforce. Per the Mercer report, if the state decided to drop health coverage, the estimated penalty would exceed $330 million.

16. Per the Mercer report, in response to the PPACA's employer enrollment mandate and its mandate that individuals have qualifying coverage (such as through an employer plan), or pay a penalty to the federal government, DSGI expects over 20,000 additional state employees to enroll in the Florida State Group Plan at a cost of between $200 and $300 million in 2014.

17. Many of the state employees that will be newly eligible to enroll in the Florida State Group Insurance Program because of the employer mandate are designated currently as "other-personal-services" (OPS) employees (*see* Fla. Stat. § 110.123(2)(c) & (f)), who work more than 30 hours a week, but are not currently eligible for coverage in the Florida State Group Insurance Program pursuant to Florida law.

18. I declare under penalty of perjury that the foregoing is true and correct. The information and projections included above are complete and accurate to the best of my knowledge as of the date of this Declaration, and are subject to revision as additional information is generated over time and as PPACA is amended or as federal agencies promulgate guidance and regulations on PPACA's application.

Executed on October 21, 2010, in Tallahassee, Florida.

Michelle Robleto
[Name]
[Title] Director, DSGI

FURTHER AFFIANT SAYETH NAUGHT:

Michelle Robleto
Michelle Robleto

The foregoing Affidavit was SWORN TO AND SUBSCRIBED before me this October day of 21, 2010.

Toletha Sylvester-Harris
Notary Public at Large
My Commission Expires: August 25, 2014

TOLETHA SYLVESTER HARRIS
MY COMMISSION # EE20866
EXPIRES: August 25, 2014
1-800-3-NOTARY Fl. Notary Discount Assoc. Co.

Personally known ✓ or
Produced identification ________________ (check one)

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.:3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**

______________________________/

**DECLARATION OF PAT SHIER**

Pursuant to 28 U.S.C. § 1746, I Pat Shier, declare the following:

I am the Director of the Division of Retirement and Benefits (Division), Department of Administration, State of Alaska. I have been in this position since 2006. I have personal knowledge of the matters set forth in the Declaration.

The Division that I direct is responsible for administering state employee pension programs. Additionally, the Division administers the active and retiree health plans collectively referred to as the AlaskaCare Health Plans. Detailed information relating to both the pension plans and the AlaskaCare Health Plans is available on the Division's website at http://doa.alaska.gov/drb/. The Division's statutory authority to

make assessments and projections relating to the active employee AlaskaCare Health Plan is derived from AS 39.30.090 - .098. As of July 1, 2009, the third party administrator for the Division is Wells Fargo Insurance Services of Alaska, Inc. (WFIS). The Division also maintains a contract with Buck Consulting Services, Inc. (Buck) for actuarial services relating to the pension and health plans. The Division's statutory authority to retain WFIS and Buck for services relating to the AlaskaCare Health Plan is derived from AS 39.30.090 - .098, AS 39.35.001 - .990; AS 14.25.009 - .220; and AS 22.25.010 – 090.

Providing this Declaration is within the scope of my authority, and I submit that the representations are truthful and accurate.

I confirm that both state officers and employees participate in the active employee AlaskaCare Health Plan.

**Requirements and Costs For Alaska Employee Health Plan Under ACA**

I confirm that the Patient Protection and Affordable Care Act (ACA) requires the Division to amend the active employee AlaskaCare Health Plan and offer certain ACA-prescribed benefits to members in the next effective plan year following September 23, 2010, as follows: (1) pursuant to ACA § 1201 (inserting § 2704 into the Public Health Service Act ("PHSA")), the Division will amend its active employee health plan to eliminate preexisting conditions for individuals under age 19 by July 1, 2011; and (2) pursuant to ACA § 1001 (PHSA § 2718), by July 1, 2011, the Division will amend its active employee health plan to include coverage of dependents under age 26 who do not have coverage elsewhere.

The Division's actuarial consulting firm, Buck, estimates an increased cost due to covering dependents up to age 26 who do not have coverage elsewhere to be $275,341 in 2011. The State's actuarial consulting firm estimates no measurable cost increase following the removal of the pre-existing condition for children under age 19.

The statements and assessments stated herein are complete and accurate to the best of the Division's knowledge as of the date of this Declaration, and may be subject to revision as additional data are generated over time and as the ACA is amended or as regulations pursuant to the ACA are announced and implemented by federal agencies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3 day of September, 2010.

By: ______________________

Pat Shier, Director
Division of Retirement and Benefits
Department of Administration
State of Alaska
6th Floor State Office Building
P.O. Box 110203
Juneau, Alaska 99811-0203

# Exhibit 7

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**

_______________________________________/

## DECLARATION OF WILLIAM L. ASHMORE

Pursuant to 28 U.S.C. § 1746, I William L. Ashmore, declare the following:

1. I am a resident of Montgomery County, Alabama, am over the age of 21 years, and I have been the Chief Executive Officer for the State of Alabama Employees Health Insurance Board since 1990. I have read the complaint filed in the above-styled lawsuit, and am familiar generally with the allegations contained therein. I have personal knowledge of the facts and matters stated within this declaration.

2. A state-wide health insurance program for employees and officers of the State of Alabama was enacted in Alabama Acts 1965, No. 65-833, and various Acts enacted thereafter (all of which are now codified at *Ala. Code* § 36-29-1, *et seq.*).

3. *Ala. Code* § 36-29-2 established the State Employees' Health Insurance Board (hereinafter "the Board"), which is an agency of the State of Alabama. Pursuant to *Ala. Code* §§ 36-29-3 and 36-29-4, the Board was empowered and authorized to establish and administer a health insurance plan for employees and officers of the State of Alabama.

4. As a result of my long-standing service in the above capacity with the Board, I am knowledgeable concerning the development, implementation and operation of the State Employees Health Insurance Plan (hereinafter referred to as "SEHIP"). In my capacity as Chief Executive Officer of the Board one of my responsibilities is to keep abreast of health insurance trends not only for the SEHIP, but on a regional and national level as well. I continuously review and analyze claims data of the SEHIP in conjunction with national and regional trends in order to assess and project the effect on the SEHIP.

5. *Ala. Code* § 36-29-7 requires that the Chief Executive Officer of the Board certify after proper evaluation that any changes in the SEHIP are justified. Accordingly, the effect on the SEHIP of the Patient Protection and Affordable Care Act (hereinafter "ACA") are within my official duties. It is essential to the financial well-being of the SEHIP that my projections relating to the changes mandated by the ACA be as accurate as possible.

6. *Ala. Code* § 36-29-7 and § 36-29-15 provides that state officers and employees may participate in the SEHIP. The plan currently covers 37,265 active employees and 19,280 retired employees.

7. The SEHIP meets the definition of an employer group health plan covered under the ACA. At its September 1, 2010 meeting, the Board amended the SEHIP to incorporate the following provisions of the ACA: (1) new preexisting condition requirements for individuals up through age 18 (ACA § 1201 (inserting § 2704 into the Public Health Service Act ("PHSA")); (2) exclusions for excessive waiting periods (ACA § 1201 (PHSA § 2708)); (3) lifetime and annual policy limit provisions (ACA § 1001 (PHSA § 2711)); (4) prohibition on rescission of coverage (ACA § 1001 (PHSA §2712)); (5) dependent coverage requirements (ACA § 1001 (PHSA § 2714)); (6) and reporting

requirements (ACA § 1001 (PHSA § 2718)). These changes will become effective for the plan year beginning January 1, 2011.

8. As a result of the ACA's immediate requirements that additional benefits be given to employees and officers covered under the SEHIP, increased costs will be imposed on the State of Alabama.

9. Based on my experience with the SEHIP and an analysis of the additional benefits mandated by the ACA, I project that these additional benefits will increase the cost of the SEHIP by at least $2,900,000 in 2011. This projected cost will be significantly higher in future years as additional mandated benefits are imposed by the ACA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of September, 2010.

William L. Ashmore, Chief Executive Officer
State of Alabama Employees Insurance Board
201 South Union Street, Suite 200
Montgomery, Alabama 36104

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**

## DECLARATION OF KAREN BATTILANA

Pursuant to 28 U.S.C § 1746, I, Karen Battilana declare the following:

1. I am an adult resident of the State of Arizona and I make the statements in this declaration based upon my own personal knowledge and upon the books and records of the Arizona Department of Administration.

2 I am an Assistant Director of the Arizona Department of Administration, Benefit Services Division, and I am responsible for employee benefit administration for the State of Arizona. I have held this position since November 2009.

3. The Benefit Services Division (BSD) administers the health, life, dental, vision, and flexible-spending insurance programs for all eligible state employees and those state retirees who choose the State of Arizona's Benefit Options Plan (the "Plan"). The BSD also assists members (employees, retirees, and dependents) with problems of access to services, eligibility, and claims

4. The State of Arizona offers a comprehensive self-insured group medical insurance program to all State employees, retirees, and public officers. The administration and funding of State's self-insured program is through the Health Insurance Trust Fund (HITF)

5. Federal health care reform, formally known as the Patient Protection and Affordable Care Act (H.R. 3590) ("ACA"), requires the State of Arizona in 2010 to amend its Plan and offer ACA-prescribed benefits to recipients, including: (i) removal of any lifetime and annual policy limit provisions (ACA § 1001 (PHSA § 2711)); and (ii) dependent coverage requirements (ACA § 1001 (PHSA § 2714)).

6. ACA further requires the State of Arizona in 2014 to amend its Plan to include ACA reporting requirements (ACA § 1001 (PHSA § 2718)).

7. As a result of ACA's immediate requirements that additional benefits be given to officers and employees in Arizona's Plan, increased costs will be imposed on the State of Arizona.

8. ACA's immediate requirement that expands dependent coverage to age 26 has a projected increased cost of $12,050,000 for the 2011 Plan Year and a projected net increase of 3,000 new Plan participants.

9. ACA's immediate requirement that removes lifetime and annual policy limits has a projected increased cost of $ 1,217,000 for the 2011 Plan Year

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of August 2010, Phoenix, Arizona.

______________________________

Karen M. Battilana, Assistant Director
Arizona Department of Administration, Benefit Services Division

# Exhibit 9

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**

---

# DECLARATION OF THOMAS J. BETLACH

Pursuant to 28 U.S.C. § 1746, I, Thomas J. Betlach, declare the following:

1. I am the Director of the Arizona Health Care Cost Containment System ("AHCCCS"), Arizona's single State Medicaid agency.
2. I have worked in the AHCCCS program both as Director and Deputy Director for over eight years.
3. I have personal knowledge of the Medicaid program in Arizona and the impact of the Patient Protection and Affordable Care Act (the "Act") on the AHCCCS program.
4. The sections that follow provide further information on the Act's injurious impact on AHCCCS and, if called to testify as a witness, I could explain that impact competently.

## A. <u>Arizona's Medicaid Program Prior to the Act</u>

1. Arizona's Medicaid Program, known as the Arizona Health Care Cost Containment System ("AHCCCS"), began in 1982.
2. When Arizona entered into the Medicaid Program, the State understood it to be a state/federal partnership that allowed state flexibility and control over a variety of aspects of the program. This allowed states to specifically construct a Medicaid Program that is (a) tailored to meet the needs of its citizenry and (b) within its budgetary means.
3. It was Arizona's expectation that the terms of its participation in Medicaid would not be altered significantly by the federal government to expand eligibility for

enrollment beyond the State's ability to fund its participation. There are certain coverage groups that have always been optional within the Medicaid Program and Arizona fully expected those groups to remain optional, at the discretion of the State, for purposes of participation within AHCCCS. The reason for this flexibility is so that the states could ensure that they were meeting the needs of the most vulnerable within their state while still living within budgetary constraints of state government.

4. Moreover, it was always Arizona's understanding that the Medicaid Program required Arizona to provide payment for medical services, as opposed to actually providing medical services as now defined under the Act.
5. Finally, Arizona entered into the Medicaid Program with the understanding that Medicaid was a partnership between the states and the federal government. The role of the federal government in the Medicaid program, as understood by Arizona at the time it began participation, was not one of coercion. Had Medicaid been an all or nothing proposition at the outset, Arizona's decision making with respect to its level of participation in the Medicaid program would clearly have been impacted both at its inception and when contemplating future expansions.

B. **The Act's Injurious Impact on the Federal-State Healthcare Partnership**

1. The Act eliminates Arizona's flexibility with respect to eligibility. The states used to have flexibility to carve a Medicaid program that the state felt was best suited to caring for its most vulnerable and still fell within state budgetary constraints. Defining eligibility was a key part of that flexibility that was completely eliminated by the Act. Arizona is now locked into a program that is covering over 200,000 childless adults, over 120,000 parents in an optional category and several other optional populations. Arizona has exercised the option to allow persons with an institutional level of need to participate in the program up to 300% of the Federal Benefit Rate. AHCCCS also elected a parental income disregard for children with an institutional level of need. The State also provides coverage under the Breast and Cervical Cancer Treatment Program and Ticket to Work. These are examples of options the State has elected that now have become mandated. These are also examples of options that, during this major recession, the State simply cannot afford, but the Act has forced Arizona to retain them in the program.
2. The Act essentially requires the State to make cost-saving adjustments to the AHCCCS Program on the backs of its providers. Medicaid funding is a three-legged stool, in essence – eligibility, provider reimbursement and benefits. The Act prohibits states from adjusting eligibility. Thus, states can make changes to benefits and provider rates. Changes to benefits may save money in the short term but often are more costly in the long term because managing a member's care is more effective than paying for emergency care. Arizona has already reduced benefits by over $6 million (General Fund). Meanwhile, the real dollar savings comes from reducing rates. Provider reimbursement is critical to maintaining access to care and an adequate provider network that will meet the

needs of the Medicaid members. The states cannot so damage their relationships with providers by reducing reimbursement to a point where providers are no longer willing to accept Medicaid patients. Providers should be reimbursed fairly and adequately for the care they provide. The Act disregards this issue and forces states to reduce provider rates. Arizona has reduced payments to providers by $555,820,800 (Total Fund). In addition, recent Ninth Circuit Court of Appeals decisions regarding Section 1902(a)(30)(A), have imposed significant and costly administrative burdens on states considering provider rate reductions.

3. The Act allowed managed care organizations (MCOs) to participate in the drug rebate program for the first time. Because of the pharmaceutical industry's response, it will end up expending a lot of administrative resources for very little gain to the State. Already the process to come into compliance with the drug rebate program has required the reallocation of scarce internal resources.
4. Arizona is currently undergoing review as to whether the State will operate its own Exchange. Regardless of the outcome of that policy decision, AHCCCS will have to upgrade its eligibility systems in order to be interoperable with the Exchange such that it can screen for Medicaid/CHIP. The State will also need to acquire resources and expert staffing in order to address Exchange requirements relating to instituting regulations, consumer protections, rate reviews, solvency and reserve fund requirements, and premium taxes. Looking to the Massachusetts example, that state needed $25 million on front end costs for Exchange and currently spends $30 million per year (funded largely through user fees). Massachusetts' up front costs were largely funded by their State General Fund. Arizona is currently not in any position to provide that type of start up funds.
5. The expansion of Medicaid coverage to include all individuals under age 65 with incomes up to 133 percent of the federal poverty level will increase Arizona's costs, less so in the early years but more so after 2016. Arizona anticipates that the mandated expansion coupled with the woodwork effect of the individual mandate and maintenance of eligibility of previously optional groups is estimated to cost the State between $7.5 billion and $11.6 billion (General Fund) from 2011 to 2020.
6. The Act's requirement that Arizona be responsible for providing healthcare services to Medicaid enrollees (as distinguished from providing healthcare funding) will almost certainly expose the State to increased costs and litigation risks. Neither the Medicaid Act nor state law gives the State Medicaid agency any authority to compel providers to render care to Medicaid patients. The only way to encourage provider participation is to raise payment rates, which is not feasible at this time.

## C. <u>The Act's Injurious Impact on Arizona</u>

1. Based on 2008 Census Bureau statistics, Arizona has nearly 1.2 million uninsured individuals. Of those, approximately 223,000 are below 133 percent of the federal poverty line and must be added to the AHCCCS program as required by the Act.

2. Medicaid outlays for Arizona consume roughly 20 percent of the State's budget. For FY 2009-2010, Arizona spent nearly $2 billion on Medicaid, servicing approximately 1.35 million persons.
3. It is not now feasible for Arizona to cease its participation in Medicaid and make alternative arrangements for a traditional Medicaid-like program. The AHCCCS program accounts for approximately $9.5 billion in health care spending for the State of Arizona. Funding to hospitals alone accounts for nearly 40 percent of that spending. Moreover, AHCCCS members are integrated within the overall Arizona health care delivery system. That means that Medicaid members rely on the very same providers from whom all Arizonans receive care. Eliminating Medicaid would mean that hospital uncompensated care would skyrocket, hospitals would have to close certain departments, stop expansion projects, and physicians would see a loss in revenue. In addition, community health centers would see a severe decline in their insured patient mix. The hit to Arizona's health care system would be devastating.
4. The added costs to Arizona under the Act would not be offset by increased federal contributions under the Act. In fact, Arizona believes that overall, the Act will cost the State $7.5 billion to $11.6 billion (General Fund) from 2011 to 2020.
5. One of the most difficult aspects of the Act is allocating scarce resources in order to implement the Act's requirements. There are numerous provisions directly impacting the Medicaid program. Then there are a variety of other provisions that will require action on the part of State Medicaid programs, like the Exchange. The AHCCCS Administration is down 31% in staff, representing a reduction of over 400 employees. Meanwhile, our membership has grown by over 300,000. The AHCCCS Administration has made reductions and streamlined administrative functions wherever possible, including mandatory furlough days. Currently, all staff is focused on only critical core Medicaid functions. The Act has disrupted this focus and mandated how the State allocates scarce resources. Almost overnight, AHCCCS has had to devote funds and human resources to implement changes such as enforcing immediately-effective provisions of the Act; determining gaps between current State resources and resources that are projected to be needed to comply with the Act; evaluating current State infrastructure to determine how to implement new programs and to expand existing programs to comply with the Act; developing a strategic plan and coordinating the plan across various affected State agencies; initiating legislative and regulatory processes to comply with the Act; being familiar and dealing with federal regulatory processes to protect State interests; deciding whether to participate in optional programs under the Act; developing communications to disseminate information regarding changes brought about by the Act to affected persons or entities in Arizona.
6. These added costs under the Act will have a significant effect on Arizona's fiscal state, lessening the General Fund's discretion to fund other critical needs such as education, corrections, law enforcement and more. To mitigate this crisis, Arizonans overwhelmingly voted to raise their own taxes by supporting a one cent sales tax increase under the leadership of the Governor. Nevertheless, the Act's

mandates coupled with the end of the ARRA stimulus funding will still leave a $1 billion shortfall in the AHCCCS program.

**D. Arizona Cannot Avoid the Act's Requirements and Effects**

1. If Arizona terminates its participation in Medicaid, 1.35 million of its most vulnerable citizens would be left without access to the healthcare services they have depended on for years under the AHCCCS program. Such an occurrence is unfathomable. Regardless, there are some within the state legislature and elsewhere who believe opting out of Medicaid is the only solution.
2. As partly noted above, ending Arizona's participation in Medicaid would devastate the overall health care system upon which all Arizonans rely. Medicaid has been critical to allowing the growth and development of Arizona's hospitals to meet the demands of a growing Arizona population since the inception of the Medicaid program. Medicaid funding has been a significant part of hospitals' ability to gain a payor source for what was previously uncompensated care, allowing them to expand their physical capacity and develop centers of excellence that can now treat Arizonans for all their health care needs. Arizona's safety net hospitals would be completely devastated and would have to shut down beds and close down entire areas. Community Health Centers would also be hurt by the elimination of Medicaid. Since they serve as a critical safety net, having Medicaid as a payor is tremendously important. There also are so many Arizona physicians who are dedicated to caring for Arizona's most vulnerable citizens. These physicians would not be able to continue their mission without Medicaid as a payor. Of particular concern would be the impact to behavioral health providers, nursing facilities and home and community based services providers who are largely dependent on Medicaid. Finally, the impact to ancillary services, such as labs, transportation companies, etc., that support the health care community cannot be underestimated. These are important businesses in Arizona. Combined, the termination of Medicaid would not only harm health care but impact the State's economy and increase job losses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of August 2010, Phoenix, Arizona.

Thomas J. Betlach
Director, Arizona Health Care Cost Containment System
801 East Jefferson, MD-4100
Phoenix, Arizona 85034