**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
**_______________________________________________/**

**APPENDIX OF EXHIBITS IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**VOLUME III**

**(Exhibits 15-20)**

Plaintiffs hereby submit Volume III of their Appendix of Exhibits in Support of their Motion for Summary Judgment.

Respectfully submitted,
**BILL MCCOLLUM**
**ATTORNEY GENERAL OF FLORIDA**

/s/ Blaine H. Winship
Blaine H. Winship (Fla. Bar No. 0356913)
Special Counsel
Joseph W. Jacquot (Fla. Bar No. 189715)
Deputy Attorney General
Scott D. Makar (Fla. Bar No. 709697)
Solicitor General
Louis F. Hubener (Fla. Bar No. 0140084)
Timothy D. Osterhaus (Fla. Bar No. 0133728)
Deputy Solicitors General
Office of the Attorney General of Florida
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Email: blaine.winship@myfloridalegal.com
*Attorneys for Plaintiff States*

David B. Rivkin (D.C. Bar No. 394446)
Lee A. Casey (D.C. Bar No. 447443)
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Ste. 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
*Attorneys for Plaintiff States, National Federation of Independent Business, Mary Brown, and Kaj Ahlburg*

Katherine J. Spohn
Special Counsel to the Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, Nebraska 68508
Telephone: (402) 471-2834
Facsimile: (402) 471-1929
Email: katie.spohn@nebraska.gov

*Attorneys for Plaintiff the State of Nebraska*

Karen R. Harned
Executive Director
National Federation of Independent Business
Small Business Legal Center
1201 F Street, N.W., Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 554-5572
*Of counsel for Plaintiff National Federation of Independent Business*

Bill Cobb
Deputy Attorney General
for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-0131
Facsimile: (512) 936-0545
Email: bill.cobb@oag.state.tx.us
*Attorneys for Plaintiff the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 4th day of November, 2010, a copy of the foregoing Volume III of Appendix of Exhibits in Support of Plaintiffs' Motion for Summary Judgment was served on counsel of record for all Defendants through the Court's Notice of Electronic Filing system.

/s/ Blaine H. Winship
Blaine H. Winship
Special Counsel

# TABLE OF EXHIBITS

Exhibit No.

1 _____Dudek Declaration

2 _____Lange Declaration

3 _____Watkins Declaration

4 _____Leznoff Declaration

5 _____Robleto Declaration

6 _____Shier Declaration

7 _____Ashmore Declaration

8 _____Battilana Declaration

9 _____Betlach Declaration

10____Casanova Declaration

11 ____Damler Declaration

12 ____Phillips Declaration

13 ____Anderson Declaration

14 ____Chaumont Declaration

15 ____Wells Declaration

16 ____Willden Declaration

17 ____Van Camp Declaration

18 ____Bowman Declaration

19 ____Zinter Declaration

20 ____Millwee Declaration

21 ____Dial Declaration

22 ____Kukla Declaration

23 ____Gooch Declaration

24 ____Sundwall Declaration

25 ____Brown Declaration

26 ____Ahlburg Declaration

27 ____Danner Declaration

28 ____Grimes Declaration

29 ____Klemencic Declaration

30 ____McClain Declaration

31 ____Thompson Declaration

32 ____CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, April 1, 2010

33 ____Second CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, June 24, 2010

34 ____Chairman Ben S. Bernanke, Bd. of Governors of the Federal Reserve System, Challenges for the Economy and State Governments, Aug. 2, 2010

35 ____Policies for Increasing Economic Growth and Employment in 2010 and 2011, Cong. Budget Off., Jan. 2010

36 ____Variation in Analyses of PPACA's Fiscal Impact on States, Cong. Res.Serv., Sept. 8, 2010

37 ____State and Local Governments' Fiscal Outlook (GAO-10-358), Gov't Accountability Off, March 2010

38 ____State and Local Governments: Fiscal Pressures Could Have Implications for Future Delivery of Intergovernmental Programs (GAO-10-899), Gov't Accountability Off., July 2010

39____Richard S. Foster, Estimated Financial Effects of the "Patient Protection and Affordable Care Act," Centers for Medicare & Medicaid Service, April 22, 2010

40____Dubberly Declaration

# Exhibit 15

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**
_____________________________________________/

**DECLARATION OF JAMES R. WELLS**

Pursuant to 28 U.S.C. § 1746, I James R. Wells, declare the following:

1. I am a resident of the State of Nevada and I make the statements in this declaration based upon my personal knowledge and upon the books and records of the Nevada Public Employees' Benefits Program (PEBP).
2. I am the Executive Officer of PEBP and I am responsible for employee benefit administration for the State of Nevada. I have held this position since June 2010.
3. PEBP is created and governed by Nevada Revised Statutes (NRS) chapter 287 and the adopted regulations in Nevada Administrative Code (NAC) chapter 287.
4. PEBP administers the health, dental, vision, life, long-term disability and flexible spending account insurance programs for all eligible State employees, the employees of local government entities who have chosen to participate in the PEBP insurance programs pursuant to NRS 287.025, State retirees who have chosen to participate in one of the benefit plans offered by PEBP, local government retirees whose employers have contracted with PEBP pursuant to NRS 287.025 who have chosen to participate in one of the benefit plans offered by PEBP and local government retirees whose employers have not contracted with PEBP pursuant to NRS 287.025 but who were enrolled in the program on November 30, 2008.

PEBP also provides assistance to participants (employees, retirees and their dependents) with questions regarding eligibility, access to services and claims, including a claim appeal process.

5. PEBP operates on a July 1 to June 30 plan year.

6. PEBP offers a selection of comprehensive benefit programs to all State employees, retirees and public officers as well as to the employees, retirees and public officers of local government organizations who contract with PEBP for health care pursuant to NRS 287.025. PEBP offers both fully insured Health Maintenance Organization (HMO) options and a self-insured group medical insurance option. The dental benefit is self-insured for all participants. The administration and funding of the State's benefit programs is through the Fund for the Public Employees' Benefit Program (NRS 287.0435).

7. Federal health care reform, formally known as the Patient Protection and Affordable Care Act (H.R. 3590) (PPACA), requires PEBP to amend its Plan and offer PPACA prescribed benefits to participants, including:

   a. removal of any lifetime and annual policy limit provisions (ACA § 1001 (PHSA § 2711)) effective with the plan year beginning July 1, 2011;

   b. extending dependent coverage to age 26 (ACA § 1001 (PHSA § 2714)) effective with the plan year beginning July 1, 2011; and

   c. reporting requirements (ACA § 1001 (PHSA § 2718)) effective with the plan year beginning July 1, 2011.

8. As a result of PPACA's requirements that additional benefits be given to officers and employees in PEBP's Plan, increased costs will be imposed on PEBP.

9. PPACA's requirement that PEBP expand dependent coverage to age 26 has a projected impact between $4,000,000 and $6,100,000 for the plan year July 1, 2011 to June 30, 2012 and a projected impact between $4,250,000 and $6,440,000 for the plan year July 1, 2012 to June 30, 2013.

10. PPACA's requirement that PEBP remove lifetime and annual policy limits has a projected impact between $1,250,000 and $2,000,000 for the plan year July 1, 2011 to June 30, 2012

and a projected impact between $1,290,000 and $2,140,000 for the plan year July 1, 2012 to June 30, 2013.

11. The projections stated herein are complete and accurate to the best of PEBP's knowledge as of the date of this Declaration, and are subject to revision (a) as additional data are generated over time and (b) as the PPACA is amended or as regulations pursuant to the PPACA are announced and implemented by federal agencies.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of September, 2010.

James R. Wells, Executive Officer
Public Employees' Benefits Program

# Exhibit 16

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Pensacola Division

**STATE OF FLORIDA, by and through Bill McCollum, et al.,**

**Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**

**Case No.: 3:10-cv-91-RV/EMT**

**DECLARATION OF MICHAEL J. WILLDEN**

Pursuant to 28 U.S.C. § 1746, I, Michael J. Willden, declare the following:

1. I am the Director of the Nevada Department of Health and Human Services (DHHS). DHHS is the "umbrella organization" for Nevada's health care programs, including Medicaid and the Nevada Check-Up (CHIP) program.

2. I have been the Director of DHHS for over nine years and worked within the Department for over thirty-five years in many roles.

3. I have personal knowledge of the Medicaid and Check-up programs in Nevada and the impact of the Patient Protection and Affordable Care Act (PPACA) on these programs.

4. The sections that follow provide information on the Act's impact on DHHS in Nevada, most noticeably the Medicaid program, and if called to testify as a witness, I could explain that impact.

**Medicaid Program Prior to the Act**

1. The Nevada Medicaid program started in 1967.

2. Throughout the history of Nevada Medicaid, there has been an understanding that the federal/state partnership allowed for flexibility and state discretionary control in designing and administering the program. Restrictions of state discretionary authority have occurred in the past. However, the Act did significantly limit State discretionary authority more so than in the past by imposing Maintenance of Eligibility requirements limiting the State's ability to manage its Medicaid and CHIP programs within severe revenue and budget constraints.

3. Nevada's Medicaid program has experienced numerous federally mandated eligibility expansions from the outset. The program initially started funding medical care for the poor receiving welfare payments, primarily single parents with dependent children and aged, blind and disabled individuals. Federal legislation in the 1980 and 1990s expanded Medicaid eligibility beyond traditional welfare populations. However, the Act is expanding Medicaid eligibility requirements to unprecedented levels. While much of this expansion will initially be fully federally funded through 2016 for those made newly eligible through the Act, it is the State's belief that many more enrollees will obtain Medicaid coverage under current eligibility standards, imposing a significant cost burden on the State. Additionally, the new administrative expense associated with this expansion is significant. The State estimates that between 2013 and 2019 the Act will incrementally cost the State more than $574 million in state general funds. (See attached "Health Care Reform projected cost.")

4. Nevada has always understood the Medicaid program to be a "vendor payment" program; reimbursing health care professionals and entities for services provided to eligible recipients. The provision of the Act to "provide medical services" is a serious concern; as yet it is unclear what the impact of this may be.

5. Nevada has historically maintained stringent eligibility requirements for its Medicaid program, however, limiting access to the program only to those most in need. The significant expansion of eligibility under the Act departs from the historical use of Medicaid in Nevada.

**<u>The Act's Injurious Impact on the Federal-State Healthcare Partnership</u>**

1. The Act restricts Nevada's ability to revise Medicaid eligibility in order to administer the program under state budgetary constraints. The Maintenance of Eligibility requirements of the Act takes away one of the most effective cost-savings techniques available to manage the Medicaid program.

2. The Act limits Nevada's ability to operate the Medicaid program within budget constraints through Maintenance of Eligibility provisions. This instead requires the State to reduce provider payments, and reduce or eliminate essential services. Reductions in provider rates not only affect access to care for recipients, but also lead to cost-shifting to other payers and patients by provider. These changes are necessary for Nevada to continue to operate its Medicaid program, but may have the long-term effect of increasing costs due to delays in access to services that result in avoidable hospital admissions and emergency room services.

3. The Act requires the State to pay primary care physicians the Medicare rates in effect in 2013 and 2014. There will be 100% federal financing during this time based on Medicare rates in effect in 2009. The State will need to decide whether it will continue paying physicians at that level or to lower the rates after 2014. Assuming the State continues to pay primary care physicians at the Medicare level, the estimated cost between 2013 and 2019 is approximately $28.8 million in state general funds.

4. The Act changes how Medicaid drug rebates are calculated and shared with the federal government. The Act increases the minimum federal drug rebates for fee for service Medicaid program increase from 15.1 to 23.1 percent of the average manufacturer price.

Nevada estimates that the increase in the minimum drug rebate percentage will save approximately $881,000 in state fiscal year 2012. However, this increase may be partially offset by the need to increase payments to managed care plans for their loss of discounts and rebates also associated with the Act.

5. The Act expands Medicaid eligibility for individuals under age 65 with incomes up to 138 percent of the federal poverty level. Nevada estimates that between 2013 and 2019 the Act will incrementally cost the State more than $574 million in state general funds. (See attached "Health Care Reform projected cost.")

6. The Acts requirement that Nevada be responsible for providing healthcare services to Medicaid enrollees, as distinguished from paying providers for health care services, is a serious concern. However, until the full scope of the language of the Act cannot be assessed until regulations are promulgated by the Centers for Medicare and Medicaid Services (CMS).

**The Act's Injurious Impact on Your State**

1. Based on the 2008 Census Bureau statistics, Nevada had 486,000 uninsured people living here. Of those, an estimated 155,500 are below 133 percent of the federal poverty line and must be added to Nevada's Medicaid rolls under the act.

2. Medicaid outlays for Nevada consume more than 15% of the state budget. For the fiscal year that ended June 30, 2010, Nevada was budgeted to spend nearly $385 million in state general funds on Medicaid programs, servicing approximately 221,235 people.

3. Nevada estimates that by 2019, more than 56,000 currently eligible non-recipients of Medicaid will enroll in the program because of the Act's requirement for individuals to have insurance coverage. The estimated cost to provide medical benefits to this group between 2014 and 2019 is $348 million in state general funds. This estimate is based on the understanding that federal financial participation for this group of eligible recipients

will be at the regular Federal Medical Assistance Percentage (FMAP), which for purposes of this calculation was assumed to be 50.00%. (See attached "Health Care Reform projected cost.")

4. Current estimates are that between 2013 and 2019, the State will need an additional $574 million in state general funds to cover the cost of the Act's Medicaid expansion. Although that estimate includes about $35 million for a replacement of the state's current eligibility system to handle increased caseload due to reform. However, this estimate does not include potential costs associated with building a health insurance exchange, or other related information technology costs. (See attached "Health Care Reform projected cost.")

5. Nevada has evaluated the potential effects of opting out of the Medicaid program entirely. The issues and impacts are included in a white paper (attached) entitled "Medicaid Opt Out." Nevada feels that the affects of ending its Medicaid program would be extremely harmful to recipients and providers, and would have wide-ranging affects on state and local government entities, schools, hospitals and safety net programs. It is estimated that almost 200,000 Nevada residents would lose medical coverage. Nor would they be eligible for subsidizes health insurance exchange coverage provided in the Act. Critical long term care services for the elderly, disabled, as well as services for individuals with mental retardation and developmental disabilities would no longer be funded. Nursing facilities, with a high percentage of Medicaid patients making up their census, would be at risk of closure due to the loss of Medicaid revenue. Access to essential acute medical services, like physician and hospital services, would no longer be funded for these individuals, putting those with chronic medical conditions at serious risk. Community based supports and services that keep people out of institutions would not be available and likely would not be paid for through health insurance exchange plans, leading to unnecessary placements in nursing facilities and group homes. Eliminating Nevada Medicaid would also impact state and local government agency funding by eliminating federal Medicaid dollars as a source of revenue. This would affect adult and children's mental health services, as well as services provided by county agencies and

schools. Local government agencies would also see a significant reduction in federal revenues which would challenge their missions to serve the general public. Finally, supplemental payments to safety net hospitals would cease putting programs and services that provide essential community benefits at risk, such as HIV and AIDS clinics and clinics for high risk pregnant women. After considering these impacts, Nevada has determined that is cannot opt out of this essential program.

6. The added costs to Nevada associated with the Act will have a significant effect on the State's fiscal condition, beyond those it is currently experiencing. As demonstrated above, the incremental costs to Nevada associated with implementation of the Medicaid provisions of the Act are not offset by the federal funding support included the Act.

7. The Act's provisions also provide an opportunity for small businesses to consider dropping their current employer based insurance and allowing their employees to elect coverage through the health insurance exchange. Many of these employees are low-wage workers and will likely be eligible for expanded Medicaid coverage below 138% of the federal poverty level. We estimate that as many as 40,000 individuals previously covered through their employer may instead get their coverage through Nevada Medicaid.

8. To fund these incremental costs associated with the Medicaid provisions of the Act, Nevada will inevitably need to reduce spending in other essential areas that the State is already struggling to fund, including K-12 education, prisons, law enforcement and its universities and community colleges.

9. The Act includes timeframes that require Nevada begin spending funds to plan and implement a number of changes to the Medicaid program this fiscal year. The State has hired two dedicated staff to work solely on managing the Medicaid and Children's Health Insurance Program (CHIP) provisions of the Act. We have already engaged a consulting firm to help us with planning for numerous aspects of the Act. The largest component of these plans includes the development of a new electronic eligibility system that will be essential for determining Medicaid and CHIP eligibility. Legislative Interim Finance

Committee contingency funding totaling $279,118 was requested and provided to support the initial planning effects. Also to date Nevada has tracked 6522 planning hours by staff at a cost of $257,101. (Cost summary and memo attached.)

10. Nevada DHHS engaged the consulting firm Public Consulting Group (PCG) to assist us in planning to implement a Health Insurance Exchange and to develop a new electronic eligibility system to interface Medicaid/CHIP with an exchange. PCGs estimated costs for the "eligibility engine" was $23,849,037. Ongoing annual costs are estimated at $3,765,163. (PCG Study attached.)

**Your State Cannot Avoid the Act's Requirements and Effects**

1. The Act provides subsidies and credits for individuals between 100% and 400% of the federal poverty who obtain qualified coverage through the health insurance exchange. However, individuals below 100% of the federal poverty level are not eligible for subsidized coverage. Hence, should Nevada be forced to consider opting out of Medicaid, these individuals may find that health coverage is unaffordable and hence unavailable.

2. It is our current belief that the Act does not revise provisions of the Social Security Act that deal provide the option for the State to participate in the Medicaid program. As such, Nevada can still consider opting out of Medicaid a viable option. However, given the concerns outlined in the white paper, "Medicaid Opt Out," it is unlikely the State will chose to end its Medicaid program.

I declare under penalty of perjury that the foregoing is true and correct based on the information available to the Division.

DATED THIS 3RD DAY OF SEPTEMBER.

MICHAEL J. WILLDEN
DIRECTOR, DEPARTMENT OF HEALTH AND HUMAN SERVICES

SUBSCRIBED and SWORN to before me
This 3rd day of September, 2010,
By Michael J. Willden

SUSAN MARIE McKINNISH
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-105090-3
MY APPT. EXPIRES APRIL 5, 2014

NOTARY PUBLIC

ATTACHMENTS:
Health Care Reform projected costs
Medicaid Opt Out Paper
Health Care Reform planning costs and memo
Public Consulting Group "Eligibility Engine" evaluation and cost estimate

**Nevada Division of Health Care Financing and Policy**
**Health Care Reform Projected Costs--Senate Bill**
**Summary** **Date** 3/30/2010
**Health Care Reform Start Date** 1/1/2014

**Health Care Reform Total Cost**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| New Eligibles Added Medical | 88,290,676 | 183,892,049 | 254,504,706 | 247,857,741 | 239,396,293 | 225,304,681 | 1,239,246,146 |
| Physician's Rate Increase | | 17,682,173 | 17,237,419 | 16,838,015 | 16,560,926 | 16,415,000 | 84,733,534 |
| Woodwork Effect Added Medical | 64,065,094 | 81,499,411 | 103,397,695 | 137,573,148 | 171,694,804 | 198,080,252 | 756,310,406 |
| Total Medical Costs | 152,355,771 | 265,391,460 | 357,902,401 | 385,430,889 | 411,091,097 | 423,384,933 | 2,080,290,085 |
| DHCFP Admin Costs | 6,370,579 | 12,027,327 | 16,617,413 | 17,885,198 | 19,050,734 | 19,566,539 | 91,517,791 |
| DWSS Admin Costs | 8,351,833 | 17,267,877 | 24,166,362 | 25,810,300 | 27,188,492 | 27,477,290 | 130,262,153 |
| NOMADS Replacement* | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | 15,000,000 | - | 75,000,000 |
| Total Admin Costs | 29,722,412 | 44,295,204 | 55,783,775 | 58,695,498 | 61,239,226 | 47,043,829 | 296,779,943 |
| Total Cost Health Care Reform | 182,078,182 | 309,686,664 | 413,686,176 | 444,126,387 | 472,330,323 | 470,428,762 | 2,377,070,029 |
| Current Medicaid w Normal Growth | 1,561,026,096 | 1,572,952,979 | 1,583,801,378 | 1,600,750,979 | 1,628,325,791 | 1,665,114,746 | 9,611,971,968 |
| Total Cost of Medicaid | 1,743,104,278 | 1,882,639,643 | 1,997,487,554 | 2,044,877,366 | 2,100,656,114 | 2,135,543,509 | 11,904,308,463 |

**NOMADS replacement cost assumes that 50% of NOMADS benefits Medicaid, so the Medicaid cost is $75,000,000. However, the cost to the state will be $150,000,000, with SGF portion of $75,000,000.*

**Health Care Reform State General Fund Cost**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| New Eligibles Added Medical | - | - | - | 16,190,164 | 23,122,041 | 23,950,232 | 63,262,436 |
| Physician's Rate Increase | | 3,298,296 | 6,414,791 | 6,362,506 | 6,378,781 | 6,359,894 | 28,814,267 |
| Woodwork Effect Added Medical | 11,019,800 | 32,868,938 | 46,247,963 | 66,605,345 | 86,645,134 | 105,206,785 | 348,593,965 |
| Reform Medical SGF Costs | 11,019,800 | 32,868,938 | 46,247,963 | 82,795,509 | 109,767,175 | 129,157,016 | 440,670,668 |
| DHCFP Admin Costs | 1,194,484 | 4,510,248 | 6,231,530 | 6,706,949 | 7,144,025 | 7,337,452 | 33,124,688 |
| DWSS Admin Costs | 2,087,958 | 8,633,939 | 12,083,181 | 12,905,150 | 13,594,246 | 13,738,645 | 63,043,118 |
| NOMADS Replacement* | 7,500,000 | 7,500,000 | 7,500,000 | 7,500,000 | 7,500,000 | - | 37,500,000 |
| Reform Admin SGF Costs | 10,782,442 | 20,644,186 | 25,814,711 | 27,112,099 | 28,238,271 | 21,076,097 | 133,667,806 |
| Reform Total SGFund Cost | 21,802,242 | 53,513,124 | 72,062,674 | 109,907,608 | 138,005,446 | 150,233,113 | 574,338,474 |
| Current Medicaid w Normal Growth | 836,350,125 | 841,367,899 | 845,822,627 | 853,545,248 | 866,929,403 | 885,199,976 | 5,129,215,279 |
| Total SGF Cost of Medicaid | 858,152,367 | 894,881,023 | 917,885,301 | 963,452,857 | 1,004,934,849 | 1,035,433,089 | 5,674,739,487 |

**Health Care Reform Caseload**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| New Eligibles | 35,891 | 72,930 | 98,472 | 93,561 | 88,163 | 80,950 |
| Woodwork Effect | 5,869 | 13,410 | 22,360 | 35,490 | 47,779 | 72,621 |
| Total Added Avg Monthly Caseload | 41,759 | 86,339 | 120,832 | 129,052 | 135,942 | 153,571 |
| Medicaid w Normal Caseload Growth | 274,442 | 269,794 | 265,029 | 261,332 | 259,350 | 258,741 |
| Total Eligibles | 316,201 | 356,133 | 385,861 | 390,384 | 395,292 | 412,312 |

## Nevada Department of Health and Human Services

## and the

## Division of Health Care Financing and Policy

# Medicaid Opt Out

## White Paper

## January 22, 2010

# OPTING OUT OF MEDICAID

The national health care reform debate has shed light on many important issues related to the uninsured and the financial sustainability of Medicare, Medicaid and private health coverage. An honest discussion about health care reform is needed, but it is not occurring. States, which are inherent partners with the federal government in providing health coverage, are watching from the sidelines as Congress shifts the burden of funding expanded coverage to the states at a time those states can ill-afford it.

The following analysis summarizes the Department of Health and Human Services' estimates for the impact proposed health care reform will have on Nevada Medicaid. It also assesses the fiscal and personal impact associated with Nevada opting out of the Medicaid program and creating a safety net program funded entirely by state General Funds.

Due to a lack of resources and the time necessary to conduct a comprehensive review, this analysis does not offer thorough consideration of many areas that will also be affected by the state dropping out of the Medicaid program, including:

- Complete fiscal impacts to hospitals and local governments that will still be mandated under federal law to provide emergency care to individuals even though Medicaid is no longer available as a pay source
- The full effect of taking billions of dollars out of the state economy by turning back the federal share of funding Medicaid
- A comprehensive review of other state programs, such as quality assurance and inspection programs, that will no longer be able to access federal funding

Because Medicaid has been in place as a significant pay source within the health care industry for so long, much of the industry touches the program in one way or another. A complete analysis of the effects of dropping the program is essential to fully understanding how such a change would affect the state as a whole.

## WHAT IS THE COST OF THE CURRENT NEVADA MEDICAID PROGRAM AND HOW IS IT FUNDED?

Medicaid is jointly funded by the state and federal governments, but administered by states. Federal financial participation in these programs is driven by a federal formula called the Federal Medical Assistance Percentage, or FMAP, defined in section 1905(b) of the Social Security Act. States must pay the bills and get reimbursed by the federal government using a state-specific FMAP rate. For Medicaid medical services in Nevada, that rate is usually 50%. The “state share” of Medicaid is the amount not reimbursed by the federal government.

***Increased FMAP under ARRA provides additional $400 million in federal funds to Nevada.***

Under the American Recovery and Reinvestment Act (ARRA), states were provided significant fiscal relief by increasing the FMAP rate for medical services incurred from October 1, 2008 through December 31, 2010. For Nevada, the increased FMAP is 63.93% and will provide over $400 million in additional federal revenue.

Besides state and federal funding, Nevada Medicaid also receives revenues from county government, local government entities, and provider taxes. These other sources of revenue provide the state share to help pay for a variety of Medicaid services including:

- hospital and long-term care services for county indigent patients;
- supplemental payments to hospitals serving Medicaid patients and the uninsured;
- supplemental service payments to the University of Nevada School of Medicine;
- increased fees to nursing facilities serving Medicaid clients;
- school-based medical and administrative services; and
- case management services for county child welfare and juvenile justice programs.




The 2010-2011 biennial budget for medical services by revenue source for Nevada Medicaid is provided below:

**2010-2011 Biennial Budget in millions**

| Revenue Source | 2010 | 2011 | Biennium |
|---|---|---|---|
| State General Fund | $439.0 | $547.9 | $986.9 |
| Intergovernmental Transfer | $82.2 | $86.3 | $168.5 |
| County Match | $21.0 | $26.7 | $47.7 |
| Provider Tax | $20.0 | $20.0 | $40.0 |
| Local Governments | $3.0 | $3.9 | $6.9 |
| Title XIX FMAP | $784.3 | $816.4 | $1,600.7 |
| ARRA FMAP Increase | $125.7 | $56.9 | $182.6 |
| **TOTAL** | $1,475.2 | $1,558.1 | $3,033.3 |

Medicaid covers a number of different groups of Nevadans. These include groups generally considered aged and/or disabled:

- Aged and disabled individuals that meet income and asset requirements;

- Individuals who qualify for nursing home care but receive services in home and community based settings;
- Individuals who are medically indigent in hospitals and nursing homes paid for by Nevada counties; and
- Low-income Medicare beneficiaries.

Other groups include families and children:

- Low-income families with children;
- Children and pregnant women below certain income levels; and
- Children in the child welfare system.

There are other smaller coverage groups, including: Low-income women with breast or cervical cancer; children aging out of foster care up to age 21; and, children with severe medical conditions served at home ("Katie Beckett" group).

***Services for aged and disabled Nevadans represent 63% of spending, but only 26% of caseload.***

Spending on these different coverage groups is not distributed evenly. In SFY 2009, 63% of total medical spending was for the aged and disabled, which represented 26% of the caseload. Families and children represented 37% of spending in SFY 2009 and 74% of the caseload.

**WHY ARE STATES CONSIDERING OPTING OUT OF MEDICAID?**
**Impact of National Health Care Reform on the State**

While there is a general acknowledgement that America's health care system is broken, there are many opinions as to how to fix it. The growing burden of the uninsured -- escalating out-of-pocket costs and premiums, and the cost of federal medical entitlements (Medicare and Medicaid) -- demand something be done to address these issues. Congress' current efforts have focused primarily on expanding access to health insurance to citizens, primarily though the expansion of Medicaid and the creation of a new system for individuals to purchase private insurance called Health Insurance Exchanges.

***Subsidies are not proposed for very low-income individuals and families who are presumed to get coverage through Medicaid.***

There are several key provisions in both the Senate bill (H.R. 3590), the *Patient Protection and Affordable Care Act,* and House bill (H.R. 3962), the *Affordable Health Care for America Act,* which seek to expand access to health insurance and define what coverage must include. Key provisions of both health reform bills include:

- An individual mandate to obtain health insurance. Failure to do so results in a tax penalty.
- An employer mandate to provide coverage. The Senate and House bills differ with the Senate mandating coverage to employers with 50 or more employees and the House bill mandating all employers to either provide coverage or pay into the Health Insurance Exchange. Both bills include employer penalties.
- Establishment of *Health Insurance Exchanges*. Individuals without insurance and some employers can purchase commercial insurance, possibly including a "public option," through the Exchange. "Affordability credits" and individual subsidies will offset the cost of purchasing this coverage for low-income individuals and families. However, these subsidies or credits are not available to very low-income individuals and families, as it is presumed they will get health coverage through Medicaid.

- Imposed changes to health insurance coverage including:
  - o Limits on out-of-pocket costs and no lifetime benefit limits;
  - o Coverage of preventive services and immunizations;
  - o Definitions of basic coverage, including mental health and substance abuse services
  - o No exclusion for pre-existing conditions; and
  - o Limits on insurance company administrative costs and profits.
- An expansion of the Medicaid program. The House bill expands Medicaid to 150% of the Federal Poverty Level (FPL), and the Senate bill expands coverage up to 133% of the FPL.

In 2009, approximately 20% of non-elderly Nevadans lacked health insurance for at least one month of the year. The remaining 80% obtained coverage through their employers, other private insurance, or from public programs like Nevada Medicaid and Nevada Check Up, our state's Children's Health Insurance Program (CHIP).




***In 2009, one out of five non-elderly Nevadans did not have health insurance for at least one month during the year.***

The potential effect of the Senate Health Care Reform legislation is summarized in the pie chart below. In essence, the number of uninsured drops significantly due to the creation of the Health Insurance Exchange and the expanded eligibility for Medicaid, driving those who are currently uninsured into these two areas to attain coverage. It is important to note that this analysis accepts the Congressional Budget Office estimate of the number of remaining uninsured following the implementation of health care reform.




***Pending health reform legislation seeks to cover the uninsured by making private health coverage more affordable and available, and expanding Medicaid.***

Finally, the below pie chart estimates the distribution of insured and uninsured in Nevada if the Senate Health Care Reform legislation becomes law and the state implements the Medicaid Opt Out proposal outlined in this white paper.




***Dropping Medicaid would significantly change the face of the uninsured in Nevada. It is likely most Nevadans currently on Medicaid would end up uninsured due to a lack of financial ability to purchase through the exchange.***

The three pie charts above incorporate the below assumptions:

| ***Assumptions:*** | ***Current Situation*** | ***Senate Proposal*** | ***Medicaid Opt-Out*** |
|---|---|---|---|
| ***Uninsured*** | -- | *6.0%* | *Remaining % after others computed* |
| ***Private Insurance, Employer-Sponsored*** | -- | *61.0%* | *Same as under reform* |
| ***Private Insurance, Direct Purchase*** | -- | *Move to HIE* | *Same as under reform* |
| ***Government Insurance (Estimate $500 million available for Long-Term Care and Child Welfare under Medicaid Opt-Out)*** | -- | *16.6%* | *4.9%* |
| ***Health Insurance Exchange*** | -- | *Remaining % after others computed* | *Same as under reform* |

The Medicaid aspects of Congress' proposals have been, for the most part, overlooked, particularly as to how states would fund the estimated 15-20 million Americans added to the program. State costs for this expansion are not included in the $871 billion ten-year federal cost estimate of the proposed Senate bill (CBO letter dated Dec. 19, 2009).

Arguably, health care reform legislation currently being debated in Congress provides many benefits, particularly to those currently unable to afford private insurance coverage or who meet eligibility criteria for federal health care programs. However, the legislation imposes significant new costs on states through the expansion of the Medicaid program at a time states can ill-afford any new spending. It also imposes a host of new mandates on states limiting their ability to effectively administer the program, described in detail below.

These issues were highlighted in *Medicaid Meltdown: Dropping Medicaid Could Save States $1 Trillion.*[1] The authors argue that Congress is imposing new costs on states through the expansion of Medicaid at a time when states need to cut spending. The authors also suggest that states may take the "rational and reasoned" approach of opting out of their Medicaid programs.

The cost impact of federal health reform legislation on Nevada is estimated in the table below, based on the provisions of the Senate Finance Committee mark passed on October 13, 2009.[2] Specific provisions and related assumptions are taken into account:

- An expansion of Medicaid income eligibility for adults from the current household income standard of 25% of FPL, which for a family of four is $5,513 per year, to 133% of the FPL, or $29,326 per year. [3]

---

[1] Dennis G. Smith and Edmund F. Haislmaier, The Heritage Foundation, December 1, 2009

[2] The major Medicaid provisions of the bill have not changed significantly as they affect Nevada.

[3] Coverage of new eligibles will be 100% federally funded from 2014-2016.

- The individual insurance mandate would spur enrollment from a percentage of individuals who meet current eligibility standards but are not currently enrolled; this is called the "woodwork effect."
- We also assume a percentage of small employers will drop coverage and their employees would become Medicaid eligible.
- Finally, we estimate the administrative costs associated with implementing this Medicaid expansion.[4]

**Health Care Reform State General Fund Cost**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total |
|---|---|---|---|---|---|---|---|
| New Eligibles Added Medical | - | - | - | 30,468,961 | 50,656,743 | 49,820,099 | 130,945,803 |
| Woodwork Effect Added Medical | 11,019,800 | 32,868,938 | 46,247,963 | 66,605,345 | 86,645,134 | 105,206,785 | 348,593,965 |
| Reform Medical SGF Costs | 11,019,800 | 32,868,938 | 46,247,963 | 97,074,306 | 137,301,878 | 155,026,884 | 479,539,768 |
| | | | | | | | |
| DHCFP Admin Costs | 1,194,484 | 4,510,248 | 6,231,530 | 6,706,949 | 7,144,025 | 7,337,452 | 33,124,688 |
| DWSS Admin Costs | 2,087,958 | 8,633,939 | 12,083,181 | 12,905,150 | 13,594,246 | 13,738,645 | 63,043,118 |
| NOMADS Replacement* | 7,500,000 | 7,500,000 | 7,500,000 | 7,500,000 | 7,500,000 | - | 37,500,000 |
| Reform Admin SGF Costs | 10,782,442 | 20,644,186 | 25,814,711 | 27,112,099 | 28,238,271 | 21,076,097 | 133,667,806 |
| | | | | | | | |
| Reform Total SGFund Cost | 21,802,242 | 53,513,124 | 72,062,674 | 124,186,405 | 165,540,149 | 176,102,981 | 613,207,575 |

***The total six-year state general fund cost estimate for proposed Medicaid expansion is $613 million.***

The total six-year state general fund cost estimate for the Medicaid expansion in the senate health reform legislation is $613 million. The six-year cost of providing Medicaid coverage to new Medicaid eligible Nevadans is estimated at $131 million. The cost of covering the "woodwork" group is estimated at $348 million. The bills also require significant administrative costs associated with development of new information systems and additional state staffing to handle Medicaid eligibility. Those costs are estimated at $134 million.

---

[4] In this estimate, we do not include the cost of developing and operating the proposed State Insurance Exchange.

In addition to the cost of the Medicaid expansion, there are numerous mandates in both bills which affect Nevada's ability to prudently manage this program. The most significant mandate is a Maintenance of Eligibility (MOE) requirement. States are not permitted to change income eligibility for adults until 12/13/2013 and cannot change income eligibility for children (Medicaid and CHIP) until 9/30/2019. Additionally, the House bill includes a new definition of "medical assistance" that many states worry will impose stringent new requirements that may result in higher provider payments.

### Unsustainable Growth in the Current Medicaid Program

***Medicaid caseload growth has exceeded all projections, primarily due to job loss and reduced employer coverage, crowding out spending for education and public safety.***

Notwithstanding the additional cost burdens imposed by current national health reform efforts, states have been struggling for years with the growing costs of their existing Medicaid programs. From State Fiscal Year (SFY) 2000 through December 2009, total Medicaid spending on medical services (federal and state funds) grew from $489 million to $1.34 billion, an average annual growth rate of over 7.7% per year.




Likewise, state spending on Medicaid medical services grew from $220 million to $428 million, representing an annual average growth rate of 9.6%. It is important to note that state general spending in SFY 2008 and 2009 was reduced by the increase in Medicaid federal financial participation through the ARRA. Despite this, growth rates in Nevada

Medicaid spending have exceeded all relevant price and population growth indices and thus should be considered unsustainable. This also “crowds out” spending in other areas such as K-12 education, higher education and public safety.

The primary driver for spending growth in the last decade has been caseload. While eligibility standards have remained relatively constant, the numbers of new eligible Nevadans has dramatically increased. Most of this growth can be related to two significant economic downturns in this time frame. As individuals and families lose jobs and employer-sponsored insurance, they often turn to Medicaid to provide medical assistance. From SFY 2000 through November 2009, Medicaid caseloads have grown from 96,000 to over 233,000 recipients, representing an average annual growth rate of 8.7%. Most of this growth is associated with increases in the families and children’s groups.




There are also secondary cost drivers that contribute to the significant increase in Medicaid spending. From SFY 2000 through SFY 2009 medical spending increased

dramatically in selective service categories beyond what would otherwise be related to caseload growth. Some examples include:

- Personal care services spending increased from $3 million to $65 million;
- Spending for durable medical equipment, e.g. wheelchairs, and disposable supplies increased from $7 million to $21 million;
- Non-emergency transportation spending increased from $1 million to $8 million; and
- Mental health rehabilitation services were expanded in 2006 increasing spending from $6 million to $53 million.

Efforts are underway to curtail spending in these categories. However, it is also important to point out that spending cuts need to be balanced against providing reasonable access to services and making front-end investments to reduce long-term costs.

**CAN NEVADA LEGALLY OPT OUT OF MEDICAID?**

This is one of the most important questions in this analysis, and one that has not yet been reviewed by the Office of the Attorney General.

It is, however, generally held that Medicaid is an optional program for states. For example, Nevada "opted in" to Medicaid in 1967 with the passage of state legislation placing Medicaid in the Nevada State Welfare Division. In 1997, the Nevada Legislature created the Division of Health Care Financing and Policy to administer Nevada Medicaid. The enabling statutes are found in the Nevada Revised Statutes (NRS) section 422. NRS section 422.260 specifically accepts the provisions of the Social Security Act with respect to accepting federal Medicaid funds. Numerous other sections of NRS 422 also direct the Department to submit state plan amendments to modify or expand the program.

Arizona was the last state in the union to offer a Medicaid program to its residents. It implemented a limited Medicaid program in October 1982 as a federal research and demonstration project. The program was substantially expanded in subsequent years.

Federal statutes governing the provisions of the Medicaid program, including the mandatory and optional services and coverage groups, are found in Title XIX of the Social Security Act. A review of these statutes does not point specifically to the program being considered an option for states.

However, Section 1901(a) of the Act describes the general provisions of Medicaid. This section of the Act not only describes the general purpose but also indicates how federal financial participation in the program can be secured.

> *The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for medical assistance.*

The requirement for states to submit a plan in order to receive federal funds suggests that submittal of such a plan is voluntary.

There is also federal case law suggesting the voluntary nature of the state's participation in Medicaid cited in The Heritage Foundation article by Smith and Haislmaier. Probably the most direct statement is made in the U.S. Supreme Court case, *Wilder vs. Virginia Hospital Association* (USC 88-2-43). In this case, the court says:

> *Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals. 42 U.S.C. § 1396 (1982 ed., Supp. V). Although participation in the program is voluntary, participating States must comply with certain requirements imposed by the Medicaid Act (Act) and regulations promulgated by the Secretary of Health and Human Services (Secretary). To qualify for federal assistance, a State must submit to the Secretary and have approved "a plan for medical assistance," 42 U.S.C. § 1396a(a), that contains a comprehensive statement describing the nature and scope of the State's Medicaid program. 42 CFR § 430.10 (1989). The state plan is required to establish, among other things, a scheme for reimbursing health care providers for the medical services provided to needy individuals.*

It is unclear what steps a state must take to elect to no longer provide Medicaid coverage. A very thorough legal review of all relevant state and federal laws would be necessary. We would also have to determine the sections of the NRS that would need to be revised or eliminated if the Nevada Legislature agreed to eliminate the program. Suffice it to say, the Nevada Legislature would probably need to eliminate most or all sections of NRS 422, and revise any related or referenced chapters.

An additional issue is the role of the counties in paying for indigent care. NRS 428.010 requires the counties to provide aid and relief to indigents who are lawful county

residents and have no other means of support or cannot obtain aid from other state, federal or private institutions or agencies. Consideration needs to be given to how the counties will bear the burden of individuals seeking their assistance because they are not longer eligible for Medicaid services.

**IF NEVADA "OPTED OUT" OF MEDICAID, WHO WOULD BE COVERED AND WHO WOULD NOT?**

If Nevada was able to opt out of Medicaid and chose to do so, there would remain a significant number of individuals who would not be able to obtain coverage under the current health reform bills. It is clear from both the Senate and House health reform bills that Congress did envision the possibility of states reducing Medicaid coverage and spending. Both bills try to forestall such state action by mandating that states maintain eligibility in the program, and both bills try to sweeten the deal by adding additional federal Medicaid funding for some aspects of the proposed expansion. However, Congress did not appear to envision a scenario where a state or states chose to act in their financial best interest by opting out of Medicaid.

***Neither the House nor the Senate bill provides for credits or subsidies for citizens who would otherwise qualify for Medicaid.***

This is evidenced by the lack of credits and subsidies in both bills for citizens who would otherwise qualify for Medicaid. The House bill provides affordability premium credits to individuals and families with incomes up to 400% of the FPL. However, these credits are not available to someone who is otherwise eligible for Medicaid. The House bill also provides cost-sharing credits to individuals and families, but those credits are only available to households with incomes between 133% and 400% of the FPL. Likewise, the Senate bill includes premium assistance credits to individuals and families with income above 100% of the FPL. Limits on out-of-pocket costs also start at 100% of the FPL.

The lack of subsidies and credits to very low-income households, and those who are Medicaid eligible, may create a significant potential coverage gap for those currently covered under the program, as well as those who would be newly eligible under health care reform. Presumably, some of these individuals may be able to obtain coverage through their employers or through the Health Insurance Exchange. The availability of affordable commercial coverage for this group after health reform is enacted is very difficult to determine. However, we must assume that there will be an increase in

Nevada's uninsured rate, at least temporarily, as individuals and families attempt to get health care coverage.

At the very least, there will be a dramatic shift in the socioeconomic conditions of the people in Nevada who are uninsured. A portion of the 20% of Nevada's current uninsured would be able to purchase insurance through the exchanges due to the federal subsidies. However, more than 200,000 of those currently enrolled in Medicaid would no longer receive state assistance under the proposal offered below and would not be eligible for federal subsidies to purchase insurance through the exchanges because their income is too low. Hence, the poor are the ones who would be left with no option and become uninsured.

While not addressed in either bill, we must also assume that without a Medicaid program, the Nevada Check Up program, Nevada's Children's Health Insurance Program (CHIP), would need to be terminated. There are currently 21,622 children enrolled in the program. Many of these children will likely qualify for Exchange coverage as the household income requirements for current eligibility is between 100% and 200% of the FPL. However, it is unclear, particularly, for the lower income households, whether the affordability credits and subsidies provided in the bills will be sufficient for them to afford Exchange coverage.

Another significant gap will be created if Medicaid ends for the aged and disabled currently eligible for Medicaid who would ostensibly not be helped by health care reform. Both bills in Congress do include a new voluntary long-term care insurance program, called the Community Living Assistance Services and Support (CLASS) Act. However, this provision of both bills will not meet the current and future long-term care needs of Nevada Medicaid recipients.

Therefore, we would propose to maintain the existing Long Term Care system (payment for nursing facility, intermediate care facility for those with mental retardation and related conditions and the home and community based waivers including the corresponding

medical care for these recipients) capped at its current enrollment level, as well as medical care for children under government guardianship (another group potentially excluded from health care reform), at full state dollars. This could be called the Nevada Safety Net for Health. We estimate the 2011 state general fund cost of providing safety net coverage to those currently receiving long-term care services and the child welfare population at $487 million. The chart below provides an estimate of those who would retain medical assistance under the proposed Nevada Safety Net for Health, and those who would lose Medicaid coverage:

| | Aged and Disabled | Families and Children | Total |
|---|---|---|---|
| Avg Caseload Losing Coverage | 54,900 | 198,600 | 253,500 |

| | Aged and Disabled | Child Welfare | Total |
|---|---|---|---|
| Avg Caseload Keeping Coverage | 7,000 | 8,700 | 15,700 |

Eliminating the Medicaid program would impact all other Medicaid recipients by removing the funding for their medical care. The changes above would affect the following:

- Medicaid coverage would be discontinued for 198,600 low income children and families, as well as 54,900 aged and disabled persons who are not in nursing facilities or in the home and community based long-term care programs. Again, it is unclear whether expanded employer coverage and the proposed Health Insurance Exchanges will be affordable and available for this segment of the population.
- These individuals would lose access to prenatal care, inpatient and outpatient hospital services, professional medical care, pharmaceuticals, infant and child preventive care, behavioral health care, dialysis, and Medicaid hospice care. These individuals would also lose funding for vision and dental care, home health care and medical equipment and supplies. For some of the most medically vulnerable and frail currently in Medicaid, it is also unclear whether Medicaid covered in-home support services such as medical equipment, supplies and personal assistance services will be available through Exchange plans.

- Medicaid assistance to low-income Medicare beneficiaries would end. Assistance with Medicare premium payments as well as help with out-of-pocket cost would discontinue for most of the 41,455 elderly and disabled persons who currently receive this benefit. Assistance with Medicare costs is not available in either health reform bill.

Eliminating Nevada Medicaid would also impact state and local government agency funding by eliminating federal Medicaid dollars as a source of revenue. Besides federal revenue losses to state sister agencies such as Mental Health and Developmental Services, local government agencies would also see a significant reduction in federal revenues which would challenge their missions to serve the general public. Some examples include:

- $7,316,861 for targeted case management;
- $1,867,616 for school based Medicaid administrative and medical services; and
- $2,966,929 for supplemental payments to the University of Nevada School of Medicine

This change would affect Nevada hospitals with the loss of $251,927,219 for supplemental payments to disproportionate share hospitals, supplemental hospital payments for upper payment dollars (UPL), and hospital claims for medical services.

It will also increase costs to counties as with more uninsured individuals there will be increased costs for indigent care for emergency medical services and long term care. In 2009, counties received $48,753,522 in federal and provider tax funding to reduce the cost of paying for institutionalized indigent individuals.

Elimination of the Nevada Medicaid program will also affect the ability of the State and private entities to receive numerous federal health care grant awards as many are tied to Medicaid participation. For example, this may affect the ability of the Bureau of Health Quality and Compliance in the Health Division from receiving their federal grant

for licensing and certification reviews of health care facilities. It will also affect the ability for Nevada providers to draw down federal funds to develop health information technology in Nevada.

Finally, assuming not all Medicaid eligible recipients get other health coverage, payments to providers will be affected. There is the potential for doctors, dentists, therapists, hospitals and other providers to see a reduction up to $135,784,019 per year. It will also eliminate Medicaid reimbursement of $2,617,695 to federally qualified health centers and $4,187,857 to tribal health centers. There will be a loss of funding for providers of Medicaid social based services such as personal care services, adult day health care and non emergency medical transportation, as these services will likely not be covered under the proposed Exchange plans.

## CONCLUSION

This analysis merely scratches the surface on all the legal, financial and coverage issues associated with health care reform and the impact of opting out of the Medicaid program. Much more extensive legal and financial analysis is necessary. However, it is clear that forcing states to deal with the burden of funding health coverage to new Medicaid eligibles under health care reform is forcing some to consider what previously was unthinkable – opting out of the Medicaid program. While some losing Medicaid coverage under such a scenario may find coverage as a result of health care reform, it is clear that coverage may not be affordable nor cover the services needed by many. A Nevada Safety Net for Health would provide continued medical assistance to the most vulnerable, individuals in need of long-term care services, and children in the child welfare system. However, neither this safety net nor coverage through the current health reform bills will address all the needs of Nevadans currently on Medicaid. We believe a significant number of Medicaid eligible Nevadans, as many as 200,000 will not be able to obtain or afford coverage through the proposed Health Insurance Exchanges, and will merely add to the numbers of uninsured in the Nevada and increase the cost burden to providers, state and local governments to serve the poor. In addition another 40,000 Nevada seniors will not receive the supplemental benefits to Medicare they currently receive from Medicaid.

**Department of Health and Human Services**
**Health Care Reform Cost**
**Summary**

| | 2010 | | | 2011 | | |
|---|---|---|---|---|---|---|
| | **Total** | **State** | **Federal** | **Total** | **State** | **Federal** |
| New Staff | | | | 160,529 | 80,264 | 80,265 |
| Consulting Contract | 52,960 | 26,480 | 26,480 | 317,760 | 158,880 | 158,880 |
| Travel and Training | 13,935 | 6,968 | 6,967 | 13,051 | 6,526 | 6,525 |
| | 66,895 | 33,448 | 33,447 | 491,340 | 245,670 | 245,670 |

Total State General Fund $ 279,118

*New staff positions are 2011 year. Positions start July 1, 2010.*
*Contract and travel/training costs are through October 2010.*

**Department of Health and Human Services**
**Health Care Reform**
**Consulting Contract / Medicaid Expansion Requirements**

| | Hours | Rate | Total |
|---|---|---|---|
| **Project Management** | | | |
| Associate Manager | 120 | 260 | 31,200 |
| **Identification of Health Care Reform Requirements** | | | |
| Associate Manager | 16 | 260 | 4,160 |
| Manager / Medicaid Expert | 24 | 275 | 6,600 |
| Consultant | 80 | 200 | 16,000 |
| Business Analysts | 40 | 160 | 6,400 |
| **Evaluation of Current Medicaid Health Care Policy** | | | |
| Associate Manager | 16 | 260 | 4,160 |
| Manager / Medicaid Expert | 40 | 275 | 11,000 |
| Senior Consultant | 80 | 250 | 20,000 |
| Consultant | 200 | 200 | 40,000 |
| **Evaluation of Current Medicaid Eligibility Criteria and Evaluation** | | | |
| Associate Manager | 16 | 260 | 4,160 |
| Manager / Medicaid Expert | 80 | 275 | 22,000 |
| Consultant | 80 | 200 | 16,000 |
| Business Analysts | 40 | 160 | 6,400 |
| **Evaluation of Public / Private Insurance Interaction** | | | |
| Associate Manager | 16 | 260 | 4,160 |
| Manager / Insurance Expert | 80 | 275 | 22,000 |
| Senior Consultant | 40 | 250 | 10,000 |
| Consultant | 80 | 200 | 16,000 |
| Business Analyst | 80 | 160 | 12,800 |
| **Gap Analysis** | | | |
| Associate Manager | 16 | 260 | 4,160 |
| Senior Consultant | 40 | 250 | 10,000 |
| Consultant | 160 | 200 | 32,000 |
| Business Analyst | 80 | 160 | 12,800 |
| **Preliminary Assessment of Staffing / Administrative Requirements / Policy Requirements** | | | |
| Associate Manager | 16 | 260 | 4,160 |
| Senior Consultant | 16 | 250 | 4,000 |
| Consultant | 240 | 200 | 48,000 |
| Business Analyst | 16 | 160 | 2,560 |
| Total | 1,712 | 5,920 | 370,720 |

| | | | | Total | SGF 2501 | Title XIX 3511 |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| 00 | 2501 | | State General Fund | 185,360 | 185,360 | |
| | 3511 | | Federal Title XIX | 185,360 | | 185,360 |
| | | | Total Revenues | 370,720 | 185,360 | 185,360 |
| **Expenditures** | | | | | | |
| 04 | | 7063 | Contracts | 370,720 | 185,360 | 185,360 |

| | |
|---|---|
| % 2010 | 14.29% |
| 2010 Total | 52,960.00 |

**Department of Health and Human Services**
**Health Care Reform Initial Staffing**
**ASO III & SSPS III - Start Date July 1, 2010**

| | | | 2011 Total | SGF 2501 | Title XIX 3511 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| 00 | 2501 | State General Fund | 80,265 | 80,265 | |
| | 3511 | Federal Title XIX | 80,264 | | 80,264 |
| | | Total Revenues | 160,529 | 80,265 | 80,264 |
| **Expenditures** | | | | | |
| **CAT** | **GL** | | | | |
| 01 | 5100 | SALARIES | 98,765 | 49,383 | 49,382 |
| | 5200 | WORKERS COMPENSATION | 2,568 | 1,284 | 1,284 |
| | 5300 | RETIREMENT | 20,247 | 10,123 | 10,124 |
| | 5400 | PERSONNEL ASSESSMENT | 879 | 439 | 440 |
| | 5500 | GROUP INSURANCE | 15,028 | 7,514 | 7,514 |
| | 5700 | PAYROLL ASSESSMENT | 287 | 143 | 144 |
| | 5750 | RETIRED EMPLOYEES GROUP INSURANC | 2,934 | 1,467 | 1,467 |
| | 5800 | UNEMPLOYMENT COMPENSATION | 119 | 60 | 59 |
| | 5840 | MEDICARE | 1,433 | 717 | 716 |
| | | Total Cat 01 | 142,260 | 71,130 | 71,130 |
| 04 | 7020 | OPERATING SUPPLIES | 790 | 395 | 395 |
| | 7050 | EMPLOYEE BOND INSURANCE | 6 | 3 | 3 |
| | 7054 | AG TORT CLAIM ASSESSMENT | 192 | 96 | 96 |
| | 705A | NON B&G - PROP. & CONT. INSURANCE | 7 | 4 | 3 |
| | 7110 | NON-STATE OWNED OFFICE RENT | 3,840 | 1,920 | 1,920 |
| | 7255 | B & G LEASE ASSESSMENT | 25 | 12 | 13 |
| | 7285 | POSTAGE - STATE MAILROOM | 100 | 50 | 50 |
| | 7290 | PHONE, FAX, COMMUNICATION LINE | 80 | 40 | 40 |
| | 7291 | CELL PHONE/PAGER CHARGES | 480 | 240 | 240 |
| | 7292 | DOIT VOICE MAIL | 102 | 51 | 51 |
| | 7295 | DOIT STATE PHONE LINE | 295 | 148 | 147 |
| | 7298 | DOIT PHONE CARD CHARGES | 400 | 200 | 200 |
| | 7299 | TELEPHONE & DATA WIRING | 600 | 300 | 300 |
| | | Total Cat 04 | 6,917 | 3,459 | 3,458 |
| 05 | 8241 | NEW FURNISHINGS <$5,000 - A | 6,276 | 3,138 | 3,138 |
| | 8291 | TELEPHONE SYSTEM EQUIPMENT - A | 800 | 400 | 400 |
| | | Total Cat 05 | 7,076 | 3,538 | 3,538 |
| 26 | 739T | DO NOT USE (OLD DOIT CONTRACT ADN | 64 | 32 | 32 |
| | 7533 | DOIT EMAIL SERVICE | 156 | 78 | 78 |
| | 7554 | DOIT INFRASTRUCTURE ASSESSMENT | 159 | 80 | 79 |
| | 7555 | DOIT PLANNING ASSESSMENT | 234 | 117 | 117 |
| | 7556 | DOIT SECURITY ASSESSMENT | 115 | 57 | 58 |
| | 7771 | COMPUTER SOFTWARE <$5,000 - A | 1,098 | 549 | 549 |
| | 8371 | COMPUTER HARDWARE <$5,000 - A | 2,450 | 1,225 | 1,225 |
| | | Total Cat 26 | 4,276 | 2,138 | 2,138 |
| | | Total Expenditures | 160,529 | 80,265 | 80,264 |

**Department of Health and Human Services**
**Travel and Training Costs**
**May - October 2010**

**Health Care Reform Conference/ Boston, Massachusetts/May 2010 / 5 Days**

| | Rate | Units | Total | |
|---|---|---|---|---|
| Airfare | 940 | 3 | 2,820 | |
| Per Diem | 302 | 15 | 4,530 | |
| Registration | 2,000 | 3 | 6,000 | |
| Mileage/Parking/Incidentals | 195 | 3 | 585 | ($14 per day airport parking, 50 total incidentals, 40 transport to/from hotel, $35 mileage to Reno) |
| | | | 13,935 | |

**IT Conference / Los Angeles, California / July 2010 / 4 Days**

| | Rate | Units | Total |
|---|---|---|---|
| Airfare | 500 | 2 | 1,000 |
| Per Diem | 206 | 8 | 1,648 |
| Registration | 1,500 | 2 | 3,000 |
| Mileage/Parking/Incidentals | 181 | 2 | 362 |
| | | | 6,010 |

**Health Care Reform Conference / Washington, DC / August 2010 / 5 Days**

| | Rate | Units | Total | |
|---|---|---|---|---|
| Airfare | 928 | 2 | 1,856 | |
| Per Diem | 241 | 10 | 2,410 | |
| Registration | - | 2 | - | |
| Mileage/Parking/Incidentals | 235 | 2 | 470 | ($14 per day airport parking,$50 total incidentals, $80 transport to/from hotel, $35 mileage to Reno) |
| | | | 4,736 | |

**National Academy for State Health Policy Confererence / New Orleans, Louisiana / October 2010 / 4 Days**

| | Rate | Units | Total |
|---|---|---|---|
| Airfare | 908 | 1 | 908 |
| Per Diem | 204 | 4 | 816 |
| Registration | 400 | 1 | 400 |
| Mileage/Parking/Incidentals | 181 | 1 | 181 |
| | | | 2,305 |

JIM GIBBONS
*Governor*

MICHAEL J. WILLDEN
*Director*

DEPARTMENT OF HEALTH AND HUMAN SERVICES
DIRECTOR'S OFFICE
4126 Technology Way, Room 100
Carson City, NV 89706-2009
Telephone (775) 684-4000 ● Fax (775) 684-4010
hr.state.nv.us

Date: April 5, 2010

To: Governor Jim Gibbons

CC; Robin Reedy, Chief of Staff
Lynn Hettrick, Deputy Chief of Staff
Stacy Woodbury, Deputy Chief of Staff
Andrew Clinger, Director, Department of Administration

From: Michael Willden, Director
Department of Health and Human Services

Subject: Health Care Reform Planning and Implementation

After reviewing the health care reform legislation, the Nevada Department of Health and Human Services staff believes that it will be some time before the full impact on state policy, infrastructure, and costs can be reasonably estimated. Over the long-term, DHHS and, perhaps, other state agencies will require staffing increases and significant consulting resources to implement all of the requirements of the Affordable Health Care for American Act. Because of the short timeframe for instituting such far-reaching changes, DHHS recommends that staff should be hired to form the nucleus of a project team and that a consultant should be immediately engaged to assist with preliminary planning and identification of resources requirements. As more information becomes available, DHHS will recommend hiring additional staff and employing consultants to address more specific elements of the health care reform package.

The functional organization chart on the last page depicts the general areas that will need to be assigned resources to implement health care reform. These include:

- Project management
- Medicaid medical program and policy development
- Medicaid eligibility policy
- IT development

- Interaction between public and private insurance options, including a plan for a private insurance exchange and private insurance compliance oversight.
- Fiscal and contract management

Just as it is too early to determine the full resources requirements for this project, it is too early to determine how much of the work should be done be state staff and how much should be outsourced. Initially, DHHS recommends that an Administrative Services Officer III should be hired on July 1, 2010 to act as project manager for health care reform. The department also recommends that a Social Services Program Specialist III should be hired on July 1 to oversee Medicaid policy revisions and planning for development of Medicaid medical programs. The cost of staffing and costs associated with the new positions will be $160,529 total. The State General Fund portion of the cost will be $80,265. DHHS is requesting approval from the Interim Finance Committee to hire these staff positions.

DHHS is also requesting the IFC approve funds to immediately engage a consulting firm knowledgeable about Medicaid and familiar with the requirements of the Affordable Health Care for Americans Act to assist with preliminary planning and identification of resource requirements for the long-term project of implementing this legislation. If funding is approved in April, it is possible for the department to have a contract before the Board of Examiners in May 2010, assuming a sole source contract can be approved on the basis of exigency. Based on the rates of health care contractors currently employed by the Division of Health Care Financing and Policy, DHHS estimates the cost of this contract to be $370,720 (State General Fund cost: $185,360). If the contract is approved by the May BOE, DHHS projects that the initial engagement can be completed by October 2010. The department will request that the contractor provide a preliminary resource requirement assessment in time to request additional funds for staffing, consultants, or other resources from the Interim Finance Committee in September 2010.

DHHS is also recommending that funds be approved for training and travel to familiarize staff the legislation's provisions and implementation requirements and options. A conference in Massachusetts is budgeted for staff to attend in State Fiscal Year 2010. Conferences in Los Angeles, Washington, D.C., and New Orleans are budgeted for the first part of SFY 2011. Total cost associated with training and travel is $26,986 (State General Fund: $13,494).

The cost of the DHHS for health care reform preliminary planning and implementation that DHHS plans to propose to the April IFC is $558,235, with a State General Cost of $279,118. Based on the consultant's findings and recommendation of the health care reform project team, DHHS plans to return to the Interim Finance Committee in September 2010 to request additional resources. As planning progresses and understanding of the legislation increases, DHHS will continue to request the necessary resources to implement requirements and pursue opportunities, including federal funding for optional enhancements.

# Department of HHS

## Health Care Reform
## Project Management



# Department of HHS

## Health Care Reform
## Project Management



PUBLIC CONSULTING GROUP

# State of Nevada

## Department of Health and Human Services

### Establishment of Eligibility Engine to Support Publicly-Subsidized Health Coverage Programs

**Evaluation and Cost Estimate**

**August 24, 2010**

DRAFT

# Version History

| Version | Date | Comments |
|---|---|---|
| NV DWSS report 081610 v1 | August 16, 2010 | PCG delivered first draft of final report to DWSS |
| NV DWSS report 81610 v2 | August 23, 2010 | PCG incorporated DWSS comments into initial draft of the final report |
| NV DWSS report 82410 final draft | August 24, 2010 | PCG delivered final draft to DHHS, DHCFP and DWSS management for review. |

DRAFT

# Table of Contents

**1. EXECUTIVE SUMMARY ........ 1**
**2. PURPOSE, SCOPE, APPROACH ........ 3**
**3. ASSUMPTIONS ........ 5**
**4. CURRENT ENVIRONMENT ........ 7**
4.1. Program ........ 7
4.2. Technical ........ 9
4.3. Extending the life of NOMADS ........ 13
**5. PATIENT PROTECTION AND AFFORDABLE CARE ACT (PPACA) ........ 16**
5.1. Role of the Eligibility Engine under PPACA ........ 16
5.2. What the State is Trying to Achieve ........ 17
**6. MODELS CONSIDERED ........ 18**
6.1. Eligibility Engines ........ 18
6.2. Health Insurance Exchanges ........ 20
6.2.1. Overview ........ 20
6.2.2. Key Decisions for the State ........ 20
**7. RECOMMENDED APPROACH ........ 24**
7.1. Recommended Model ........ 24
7.1.1. Estimated Project Costs ........ 27
7.1.2. General Costing Assumptions ........ 28
7.2. Timeline ........ 36

# Table of Figures

Figure 4-1: Pulling Data from Access Nevada into AMPS ........ 10
Figure 4-2: Registering a Case in NOMADS ........ 12
Figure 4-3: NOMADS Mainframe / Database Environment ........ 13
Figure 7-1: No Wrong Door Approach to Eligibility Determination ........ 27

# Table of Tables

Table 6-1: The Benefits of Rules Engines ........ 18
Table 7-1: Estimated Eligibility Engine Costs by Fiscal Year ........ 28
Table 7-2: Breakdown of State Staffing Costs by Position and SFY ........ 30

DRAFT

Table 7-3: Feasibility Study / I-APD Engagement Efforts ........ 32
Table 7-4: RFP Engagements ........ 33
Table 7-5: Proposed Timeline for the Eligibility Engine Project ........ 37
Table 7-6: Proposed Calendar Year Project Gantt Chart ........ 38

DRAFT

# 1. Executive Summary

In March 2010, the Patient Protection and Affordable Care Act (PPACA) was passed by Congress and signed by the President. The Health Care Reform law mandates the creation of Health Insurance Exchanges that allow consumers to access and evaluate plans from commercial insurers and to apply for health subsidy programs (e.g., Medicaid, CHIP, premium subsidies through the Exchange) that best meet their needs by submitting an application online, in person, through the mail, or over the phone by January 2014. To that end, the Nevada Department of Health and Human Services is proposing the development and implementation of a new system that will store all of the eligibility rules for the State's publicly-subsidized health coverage programs in one place and that will be accessible to individuals shopping for health coverage from multiple entry points, such as the Health Insurance Exchange. In preparation for that, the Department of Welfare and Supportive Services (DWSS) and the Division of Health Care Financing and Policy (DHCFP) asked the Public Consulting Group (PCG) to conduct an initial assessment of this approach and to prepare a high-level cost estimate for developing and implementing a single eligibility engine in Nevada.

To conduct this analysis, the PCG project team reviewed materials that document the DWSS' current program and technical environments. The project team also met with staff from the DWSS and the DHCFP to better understand the current environment and to identify the changes that would be required to implement a new eligibility engine. This information was then considered in light of the project team's experience in developing cost estimates for other systems development projects, knowledge of industry best practices, and familiarity with the Health Care Reform law to identify critical decisions that Nevada needs to make to implement the Health Insurance Exchange's eligibility requirements and prepare a high-level cost estimate for developing the eligibility engine.

The successful establishment and operation of Health Insurance Exchanges across the country will likely determine whether the Health Care Reform law will meet its goal of extending coverage to tens of millions of Americans. In order to successfully implement the law, Nevada will need to decide whether to establish an Exchange (at the state level vs. relying on a federal exchange); how a state Exchange would be governed and administered; how it would be financed; and the manner in which the Exchange would interface with Nevada's Medicaid and CHIP Programs. Should Nevada decide to implement its own Exchange, the development of an eligibility engine will be critical to its success.

The proposed eligibility engine will determine an individual's eligibility for all publicly-subsidized health coverage programs, including Medicaid, Nevada Check Up (i.e., the State's CHIP program), a Basic Health Program (which may be offered at the State's discretion) and premium subsidies for commercial health insurance purchased through the Exchange. In so doing, the eligibility engine

DRAFT

will facilitate a “no wrong door” (i.e., allowing individuals to access health insurance in a variety of ways, and through multiple entry points) approach that will make health coverage and health insurance easily accessible to all.

Extracting the business rules out of the aging Nevada Operations of Multi-Automated Data Systems (NOMADS) system in order to share those, with new business rules, in a central repository that is more dynamic and flexible is a critical component of Nevada’s approach to implementing the Health Care Reform law. Based on PCG’s initial assessment, the cost of developing and implementing an eligibility rules engine to serve all publicly-subsidized health coverage programs is estimated to be $23.8 million in one-time costs and $3.8 million in ongoing costs. At this very early phase of the development cycle the preliminary cost estimate has an approximate margin of error of +/- 25% knowing that the initial estimate will be refined during the feasibility study. One-time costs are comprised of the costs associated with State personnel, contractor services, hardware and software, Nevada Department of Information Technology (DoIT) services, telecommunications, enhancements to NOMADS, and the integration with existing systems and programs (e.g., MMIS, Nevada Check Up). Ongoing costs are comprised of annual maintenance and operation expenses.

In order to meet the January 2014 deadline to have a streamlined eligibility system in place to serve all publicly-subsidized health coverage programs that may be available to Nevadans, the State will need to act aggressively. Project planning activity will need to begin by November 1, 2010. The feasibility study and Advanced Planning Documents (APDs) will need to be completed by the end of Calendar Year 2011 in order to develop and release an RFP for the design and development of the eligibility engine. This accelerated timeline then allows for approximately one year for a vendor to establish a rules-based eligibility engine that will serve as the single point of entry for individuals seeking coverage through the State’s Medicaid and CHIP programs, as well as the premium subsidies that may be available through the Exchange.

DRAFT

# 2. Purpose, Scope, Approach

The purpose of this project is to assist the Nevada Division of Welfare and Supportive Services (DWSS) in evaluating an eligibility engine concept that the DWSS developed to meet the requirements of the federal Health Care Reform law. The proposed eligibility engine will serve to determine eligibility for all publicly-subsidized health coverage programs, including the premium subsidies available under the Health Insurance Exchange, Medicaid, CHIP, and the Basic Health Program (which may be offered at the State's discretion).

The project scope includes:

- Reviewing the requirements for a single portal under federal Health Care Reform law and analyzing the proposed eligibility engine model.
- Providing a high-level overview of current infrastructure, applications, interfaces, and business processes that are presently used to determine eligibility for publicly-subsidized health coverage programs.
- Identifying methods of extending the Nevada Operations of Multi-Automated Data Systems (NOMADS) life expectancy from technical, functional, and volumetric (in terms of the anticipated increase in caseload volume) perspectives.
- Developing budget estimates for the design, development, and implementation of the eligibility engine.
- Developing budget estimates for acquiring consulting services to assist with a feasibility study, preparing an Implementation Advanced Planning Document (I-APD), and developing a Request for Proposal (RFP) to hire a vendor to perform the design and implementation work.
- Developing a timeline for completing the eligibility engine project in time to meet the January 1, 2014 effective date, as required by Health Care Reform law.
- Preparing a final report to summarize and document the project outcome and results.

To complete this project, the PCG project team performed the following tasks:

- Reviewed existing documentation provided by the program and Information Technology (IT) areas.
- Met with program and IT subject matter experts to discuss and modify/refine the model proposed for the eligibility engine.
- Met with the DWSS and the Division of Health Care Financing and Policy (DHCFP) management to discuss the proposed model, project assumptions, and vet preliminary findings.

DRAFT

- Met with the DWSS and DHCFP budget staff to ensure cost data was provided at the appropriate level of detail suitable for budgetary review and approval through the normal legislative process.
- Developed workflow diagrams to depict the process of applicants applying for medical insurance through the Health Insurance Exchange.

DRAFT

# 3. Assumptions

At the outset of this project, it became necessary to establish assumptions upon which the development of the proposed model and estimated costs were to be based. Once developed, the assumptions were vetted with the DHCFP and DWSS management to ensure agreement and buy-in. The agreed upon assumptions include:

- This project focuses on establishing a "no wrong door" process to determine eligibility for publicly-subsidized health coverage programs including Medicaid, CHIP, a Basic Health Program (that may be offered at the State's discretion), and premium subsidies[1] for commercial health insurance purchased through the Health Insurance Exchange (Exchange).
- The eligibility engine will be administered by the DWSS. A modular approach will be taken towards developing the eligibility engine such that it will be transportable to another entity, should the need arise. Functionality of the eligibility engine will be limited to determining eligibility, and will not include other functions (such as case management, applicant verification, etc.) that currently exist in NOMADS.
- Governance and administration of the Exchange are unknown at this time. Under federal Health Care Reform, the Exchange may be administered on a regional, state, multi-state, or federal basis. In addition, the Exchange administrator may be a government agency or a non-profit entity established by the State. These governance and administration issues have not yet been determined by Nevada officials.
- The eligibility engine will determine eligibility for publicly-subsidized health coverage programs only, including Medicaid, CHIP, a Basic Health Program (that may be offered at the State's discretion), and premium subsidies for commercial insurance purchased through the Exchange. Although the eligibility engine will <u>not</u> determine eligibility for other public assistance programs (e.g., SNAP, TANF, and the Energy Assistance Program), it will be designed to provide an indication of an individual's eligibility for these public assistance programs and direct them to where they might apply.
- The eligibility engine will <u>not</u> determine eligibility for employers or groups that may wish to purchase coverage through the Exchange's Small Business Health Options Program (SHOP).

[1] Members eligible for premium subsidies through the Exchange may also be eligible to enroll in health plans with reduced out-of-pocket limits. We assume these benefits design issues will be administered by the Exchange. The Eligibility Engine will be responsible for capturing and transferring to the Exchange information pertaining to the applicant's Federal Poverty Level (FPL). The applicant's FPL will then be used by the Exchange to determine eligibility for health plans with reduced out-of-pocket costs.

DRAFT

- The eligibility engine must be operational prior to January 1, 2014, the start date for premium subsidies through the Exchange and the effective date for expansion of Medicaid eligibility. In order to have the eligibility engine operating by this date, a feasibility study will need to be completed in an expedited fashion. In addition, the Nevada Technology Investment Request (TIR) and the federal Advanced Planning Document (APD) will need to be completed and reviewed under a shortened time frame.
- The eligibility engine will be rules-based.
- The provision of subsidies, as well as premium billing and collection, will be a function of the Exchange.
- NOMADS and/or other associated systems and interfaces will be modified and/or enhanced to support the needs of Health Care Reform. The need to modify or enhance the NOMADS system will be assessed as part of the feasibility study.
- NOMADS will continue to determine eligibility for SNAP, TANF, and other public assistance programs that it currently supports.
- NOMADS will continue to serve as the system of record for Medicaid, SNAP, TANF, and other public assistance programs that it currently supports.
- NOMADS will serve as the system of record for individuals and families receiving premium subsidies for commercial health insurance purchased through the Exchange and for CHIP.
- Health Care Reform will require the establishment of a multi-department governance structure and process at both the policy and information technology levels.

DRAFT

# 4. Current Environment

## 4.1. Program

This section provides program information related to the Nevada DHCFP and the DWSS, both of which are located within the Nevada Department of Health and Human Services.

### DHCFP

The mission of the Nevada DHCFP is to: 1) purchase and provide quality health care services to low-income Nevadans in the most efficient manner; 2) promote equal access to health care at an affordable cost to the taxpayers of Nevada; 3) restrain the growth of health care costs; and 4) review Medicaid and other state health care programs to maximize potential federal revenue. The DHCFP is a Division of government within the Nevada Department of Health and Human Services. Created in 1997, the DHCFP has 246 staff with offices in Carson City, Las Vegas, Reno, and Elko.

The DHCFP administers two major federal health coverage programs, Medicaid and State Health Insurance for Children Program or CHIP, that provide health care to eligible Nevadans. The largest program is Medicaid, which provides health care to low-income families, as well as aged, blind, and disabled individuals. The CHIP program in Nevada is known as Nevada Check Up, and provides healthcare coverage to low-income, uninsured children who are not eligible for Medicaid.

Nevada Check Up began providing services to children in October 1998. Enrollment peaked at nearly 30,000 in State Fiscal Year (SFY) 2008, but has since declined. In July 2010, the DHCFP reports that 21,469 children were enrolled in Nevada Check Up. Eligibility determinations are completed at the central office of Nevada Check Up in Carson City and at district offices in Reno and Las Vegas. The current Nevada Check Up application and eligibility determination process is as follows:

- Families complete a paper application and submit it to Nevada Check Up eligibility workers, along with proof of income.
- Eligibility workers review the application, calculate an estimated annual income for the family, and determine eligibility.
- When all requirements (including legal residency, non-Medicaid eligible children, etc.) are met, the children are enrolled and the families are notified of the premium due.

Coverage begins the first day of the next administrative month, following the date of the initial determination.

DRAFT

### DWSS

The mission of the Nevada DWSS is to provide quality, timely, and temporary services enabling Nevada families, the disabled, and the elderly to achieve their highest levels of self-sufficiency.

The DWSS is a division of government within the Nevada Department of Health and Human Services. With an annual budget of approximately $250 million, the DWSS accounts for the third largest budget within the Department of Health and Human Services. The Division has approximately 1,250 employees in over 20 locations across the State.

Programs that the DWSS oversees include: 1) the Temporary Assistance for Needy Families (TANF) Program; 2) the Supplemental Nutrition Assistance Program (SNAP) (formerly known as the Food Stamp Program); 3) the Child Support Enforcement Program; 4) the Child Care Assistance Program; 5) the Employment and Training Programs for TANF and SNAP recipients; 6) the Energy Assistance Program (EAP); and 7) eligibility for Nevada's Medicaid Program.

As of June 2010, Nevada Medicaid covered 255,041 individuals including pregnant women, children, the aged, blind, and/or disabled, and people who are eligible to receive federally assisted income maintenance payments.

To obtain Medicaid services, individuals can go onto the Internet and submit an application electronically (beginning in December 2010) through Access Nevada (described below). Individuals who are not applying electronically can request an application and apply through the mail or visit a local office. This process includes:

- Every person will be mailed or given a paper application and a pamphlet explaining the Medicaid program. Applicants will receive assistance in completing the application, if such help is requested.
- Initial requests for an application for assistance may be made verbally, in writing, in person, or through a representative. A faxed application is acceptable and must be date-stamped the day it is received to protect the applicant's filing date.
- The application date and information must be registered in NOMADS within two (2) work days.
- Federal law allows the DWSS 45 days from the date of application to process Medicaid applications and 90 days for applications for disabled individuals. Coverage begins the first day of the month in which the applicant is found eligible.

DRAFT

## 4.2. Technical

For the purposes of this report, the core systems that currently support the enrollment and eligibility determination functions of Nevada's Medicaid Program are briefly described below and include the following:

- Access Nevada (Access NV)
- Nevada Application Modernization and Productivity Services (AMPS)
- Nevada Operations of Multi-Automated Data Systems (NOMADS)

### ACCESS NV

The Access NV system is an Internet (public-facing) application that allows clients to apply for benefits online. The Access NV system provides a simple solution for the public to inquire and apply for public assistance and benefits from any location with Internet access. Through Access NV, applications are pre-screened – based on a simple set of pre-eligibility rules – for potential eligibility for SNAP, TANF, and/or Medicaid services.

The Access NV technical architecture is based on a standard web-enabled technical model. The technical implementation of the application is split across the following tiers:

- Presentation Tier
- Business Logic Tier
- Database Tier

The Presentation Tier is further split into the end user presentation-rendering component fulfilled by a desktop web browser such as Microsoft's Internet Explorer and the presentation generation (web page generation) component that is fulfilled by the WebSphere Portal Server product installed on hardware located at the Nevada Department of Information Technology (DoIT) data center.

The Business Logic Tier is constructed using the Java programming language conforming to the Java 2 Platform Enterprise Edition (J2EE) application model and executed in the run-time environment by IBM's WebSphere Application Server product. This tier is deployed across a suite of IBM AIX-based Application Servers located at the DoIT data center.

The Database Tier is fulfilled by the IBM DB2 database management system deployed on Database Servers located at the DoIT data center. Both Access NV and AMPS use Novell iManager and iChain for ID Management (IdM) and role-based access control (RBAC).

Once the user has entered their application into the Access NV database, the AMPS system pulls the applicant's data from the Access NV database (via a database listener in the AMPS system) into the AMPS database so that it can be incorporated into the AMPS workflow and displayed in the eligibility worker's

DRAFT

inbox (see description below). Eligibility workers can then pick up the application from their inbox and process it through the AMPS system.

A depiction of how applications are pulled from Access NV into AMPS is provided below[2].




**Figure 4-1: Pulling Data from Access Nevada into AMPS**

## AMPS

Nevada AMPS is a system designed to enhance worker productivity for processing benefit cases for SNAP, TANF, and Medicaid. The AMPS is a Java/J2EE and DB2 application employing a Service-Oriented Architecture (SOA). This provides a flexible and extensible system to serve as the front-end of the NOMADS. As such, AMPS submits all case and member information to NOMADS via information services that expose NOMADS functionality.

[2] Source: Technical Design Document, Nevada AMPS, Deloitte Consulting, June 2010.

The AMPS technical architecture is very similar to the Access NV architecture. The users interact with the application through a desktop web browser. The web browser communicates with the WebSphere Portal Server running on AIX to provide business logic and services processing. AMPS uses iLog jRules for running eligibility determination rules. The data is stored in the DB2 database management system.

The AMPS notifies workers (via workflow tools) of applications in the queue and allows workers to review/validate application data that is temporarily stored in the AMPS database. The system interaction diagram for registering a new case – either pulled in as a new application from Access NV or directly entered into AMPS from a paper application in NOMADS – is provided below.

As noted in the diagram, NOMADS serves as the “system of record” for the applicant once the case is registered.

DRAFT




**Figure 4-2: Registering a Case in NOMADS**

## NOMADS

The NOMADS application is a federally-certified system used to support Child Support, SNAP, TANF, Medicaid eligibility, and Employment and Training at the DWSS. The NOMADS is a monolithic mainframe application, written in IBM's Cross System Product (CSP) and COBOL, and uses a DB2 database. The

database stores approximately 85 gigabytes (GB) of case and client information. Implemented in 2001, NOMADS is used for eligibility determination, case processing, and case management, and serves as the "system of record" for all case and member-related information. The DoIT hosts and maintains the NOMADS infrastructure and the DWSS maintains the NOMADS application. NOMADS uses IBM Resource Access Control Facility (RACF) for ID Management and role-based access control (RBAC).

The NOMADS mainframe / database environment is depicted in the figure below.




**Figure 4-3: NOMADS Mainframe / Database Environment**

## 4.3. Extending the life of NOMADS

With the expansion of Medicaid eligibility slated to take place in January 2014, the number of Medicaid recipients may increase by as much as 136,000, or 60% by 2019.[3] Given that, it will be imperative for Nevada to have an eligibility system in place to support the increased number of recipients and perform the necessary administrative functions.

---

[3] "Medicaid Coverage and Spending in Health Reform: National and State-by-State Results for Adults at or Below 133%FPL," Kaiser Commission on Medicaid and the Uninsured, May 2010.



DRAFT

Nevada's automated eligibility system, NOMADS, began design in 1992 and was fully implemented in 2001. Acquired as a transfer system from the State of Rhode Island, NOMADS lacks several critical functions that have never been fully operational. Based on recent studies, NOMADS limitations include, but are not limited to, the following:

- While NOMADS is able to determine eligibility for most of the TANF, SNAP, and Medicaid cases, multiple manual workarounds are required to resolve the more difficult cases.
- Because NOMADS is unwieldy and is not user-friendly, six months of training are required for the DWSS to use the system. In addition, DWSS staff indicate that NOMADS requires duplicate data entry and provides inaccurate reports.
- NOMADS is written in Cross System Product (CSP), which has not been supported by the vendor since 2001. This problem is intensified by two factors – 1) a workforce with CSP skills that is retiring or is close to retirement age; and 2) a steep learning curve (one year or more) for new programmers – that will significantly impact the DWSS' ability to keep the system up and running in the coming years.
- Adding a program or additional interfaces to NOMADS can require up to a year from initial design to deployment and can be very expensive. For planning purposes, the DWSS generally budgets $100,000 for the addition of a single aid code.
- NOMADS is reaching capacity due to the caseload growth experienced during the current recession. With the increase of new eligibility records, the NOMADS system will be stressed and system availability may be reduced to unacceptable levels due to batch processing time window constraints.

## Recommendation

While it has been the DWSS' desire to replace NOMADS, the Division was informed during the 2009 Nevada Legislative Session that it is the preference of the Legislature to continue to use NOMADS and modernize the application currently in place.

In light of the Legislature's preference to maintain NOMADS, the DWSS has taken a modularized approach to addressing the system's inadequacies. Over time, core functionalities are being extracted from NOMADS and moved into re-usable applications that are more flexible, robust, and/or user-friendly, as exhibited in the development of AMPS, the creation of Access NV, and, now, with the proposed creation of a rules-based eligibility engine. Over time, NOMADS will devolve into a data repository that stores member information for the programs that the DWSS supports.

DRAFT

PCG recommends that the DWSS should proceed with migrating NOMADS from CSP to EGL in order to address its end-of-life software issues. Due to the lack of vendor support, if the DoIT encounters incompatibility or security issues that require updates to the mainframe operating system, the DWSS will be forced to migrate to EGL on an expedited schedule. As the NOMADS system is of considerable size and age, this will present considerable challenges – particularly if done under extreme time pressures.

This type of wholesale change to an application of the age of NOMADS will require more CSP resources – as the application will need to be continuously updated to handle new legal and legislative mandates alongside the conversion effort. Any software migration effort is fraught with risk, but one done on an expedited schedule, with little opportunity for schedule slippage, exacerbated by a lack of experienced resources, is a recipe for headline grabbing disaster.

DRAFT

# 5. Patient Protection and Affordable Care Act (PPACA)

In March 2010, the Patient Protection and Affordable Care Act was passed by Congress and signed by the President. The Health Care Reform law mandates the creation of Health Insurance Exchanges that will allow consumers to access and evaluate plans from commercial insurers and to apply for health subsidy programs (e.g., Medicaid, CHIP, premium subsidies through the Exchange) that best meet their needs through an online marketplace. As such, Exchanges are a central part of Health Care Reform, facilitating coverage for millions of people across the country starting in 2014.

## 5.1. Role of the Eligibility Engine under PPACA

The federal Health Care Reform law expects states to use a "single, streamlined form that: may be used [by individuals] to apply for all applicable State health subsidy programs within the State; may be filed online, in person, by mail, or by telephone; may be filed with an Exchange or with State officials operating one of the other applicable State health subsidy programs; and is structured to maximize an applicant's ability to complete the form satisfactorily, taking into account the characteristics of individuals who qualify for applicable State health subsidy programs."

In short, states are expected to establish a single application/entry point – possibly feeding into a single eligibility engine – to determine eligibility for Medicaid, CHIP, the Exchange, and any other subsidized health insurance programs. In states like Nevada with separate Medicaid and CHIP programs that operate under different eligibility rules and process applications through different eligibility systems, establishing a single portal (i.e., single eligibility engine) will require an upgrade to its existing eligibility systems or the development of a new eligibility system to process applications and determine eligibility.

The intent is that an individual will supply a limited amount of information that will then be used to determine whether he/she is eligible for coverage under any of the medical assistance programs available in the State. The elimination of the asset test for most Medicaid recipients (and no asset test for premium subsidies through the Exchange) will likely reduce the amount of information that will need to be collected to determine eligibility.

The federal government will be issuing regulations regarding the single portal eligibility system and is also charged with developing a standard eligibility form for use by the states. However, the State of Nevada will need to start planning for the development of a system that can process applications and determine eligibility for all subsidized health insurance programs. In addition, a mechanism to capture and store eligibility and enrollment information for all publicly-

DRAFT

subsidized health coverage programs will be needed to minimize the potential for individuals to be covered under more than one program simultaneously.

## 5.2. What the State is Trying to Achieve

Currently, Nevada operates two separate and distinct eligibility systems to determine eligibility for its Medicaid program and its CHIP program (Nevada Check Up). The DWSS operates and maintains the eligibility system for the State's Medicaid program, while the DHCFP operates and maintains the Nevada Check Up eligibility system. Individuals must complete separate applications for Medicaid and CHIP.

To establish a streamlined, single application to determine eligibility for an expanded Medicaid program, the Nevada Check Up program, the Basic Health Program (that may be provided at the State's discretion), and premium subsidies that will be available through the Exchange, Nevada DWSS and DHCFP are considering the development of a single eligibility engine that will be used to process applications for all medical assistance programs.

DRAFT

# 6. Models Considered

This section briefly describes models that were considered to implement the Health Care Reform law in the State of Nevada. The first model was to replace the NOMADS system with a new system. This model was discarded largely because it would not be feasible to design, develop, and implement an entirely new system by January 1, 2014. The second model, which involves extracting the eligibility rules out of the NOMADS system and placing them into a rules engine, is explained in more detail below.

## 6.1. Eligibility Engines

A rules engine is a framework for implementing complex business logic. In general, business rules engine products separate the "rules" portion of an application from the rest of the application logic. This allows the bulk of an application to remain the same while the rules portion can be adapted to fit new policies or business rules. Rules engines serve as a way to collect decision-making logic and work with data sets that are usually too large for humans to use effectively. A rules engine can make decisions based on hundreds of thousands of facts quickly, reliably, and repeatedly.

In this project, the rules engine would:

- Store all of the rules to determine eligibility for all publicly-subsidized health coverage programs, including the premium subsidies available under the Health Insurance Exchange, Medicaid, Nevada Check Up, and the Basic Health Program, if applicable.
- Assess whether an individual might be eligible for SNAP, TANF or the EAP, and direct them to where they might apply for these public assistance programs.
- Be accessible to individuals applying for benefits through the Health Insurance Exchange, Access NV, or on paper. The table below provides the benefits of rules engines in general, and shows how those benefits correlate to meeting Nevada's business needs.

**Table 6-1: The Benefits of Rules Engines**

| Using a Rules Engine Can: | In Nevada, this translates into: |
|---|---|
| • **Lower an application's maintenance and extensibility costs by making it easier to implement complex business logic.**<br>In any IT application, business rules change more frequently than the rest of the application code. Rules engines are pluggable software components that execute business rules that have been externalized from application code. | • Extracting the existing eligibility determination rules out of NOMADS, and moving the Medicaid rules and CHIP rules into the eligibility engine. In addition, new business rules based on the Health Care Reform law would be developed and contained in the eligibility engine.<br>• Avoiding the expensive and time-consuming process of modifying an outdated system |

DRAFT

| | |
|---|---|
| | (NOMADS) as needs arise and regulatory changes occur.<br>• Extending the life of NOMADS.<br>• Allowing business users to modify the rules with minimal IT support. |
| • **Facilitate knowledge-transfer to a centralized repository and help to combat issues due to the loss of key decision makers, managers, and subject matter experts from 'normal' turnover rates and aging baby-boomer populations.** | • Addressing the aging IT and program workforce problems.<br>• Migrating away from a programming language that is no longer supported by the vendor.<br>• Building new skill sets among IT and program staff. |
| • **Help to customize product and service offerings for customers and partners on an individual basis and to centralize the core logic allowing you to tailor the logic quickly and efficiently to the demands of ever-changing markets.** | • Providing greater flexibility in responding to policy changes and legislative demands.<br>• Being more responsive to the changing needs of Health Care Reform. |
| • **Create a knowledge-base that serves as a single "point of truth" for business policy.** | • Improving data integrity and reporting accuracy.<br>• Assuring consistency in eligibility determination processing when applicants attempt to access services through different entry points.<br>• Eliminating the potential for conflicting eligibility rules that may exist across multiple systems and platforms.<br>• Storing eligibility rules for Medicaid, Nevada Check Up, the Basic Healthcare Program, if applicable, and premium subsidies available through the Exchange in one place. |
| • **Reduce time to deliver and overall cost by separating the business rules from the application logic.** | • Increasing flexibility.<br>• Leveraging existing legacy systems.<br>• Reducing system enhancement costs in the long-term.<br>• Improving customer service and user satisfaction.<br>• Positioning the DWSS to be able to incorporate rules for SNAP and TANF in the eligibility engine in future years. |

Further information on how the proposed eligibility engine model will work to support the implementation of the Health Care Reform law in Nevada is provided in Section 7 below.

DRAFT

## 6.2. Health Insurance Exchanges

### 6.2.1. Overview

The successful establishment and operation of Health Insurance Exchanges will likely determine whether the health care reform law will meet its goal of extending coverage to tens of millions of Americans. The American Health Benefits Exchange (for individuals) and the Small Business Health Options (SHOP) Exchange (for small employers) are designed to serve as central points of access to commercial health insurance for millions of individuals and small employers.

By the end of Calendar Year (CY) 2013, individuals and small employers should be able to shop for insurance from a range of health plans offered through the Exchange. Lower and middle-income individuals with income up to four times the Federal Poverty Level (FPL) – more than $88,000 for a family of four in CY 2010 – may be eligible for premium subsidies for commercial health plans, with limits on point-of-service cost sharing and caps on out-of-pocket expenses. Small employers with lower-income workers that provide employer-sponsored insurance (ESI) may also be eligible for premium subsidies for up to two years.

In order to meet the January 2014 effective date, Nevada will need to create the necessary infrastructure and put in place policies and procedures to effectively enroll people in coverage efficiently and effectively through the Exchange. While the federal law sets broad parameters for the Exchange and federal regulations will provide additional guidance, the State will need to make a number of key decisions regarding the establishment and operation of the Exchange. The items listed below represent only the top-line issues that Nevada will need to consider and plan for as part of a larger effort to design and develop the Exchange.

### 6.2.2. Key Decisions for the State

As Nevada moves forward to implement the various provisions of Health Care Reform, there are a number of critical decisions that must be made. Those decisions are discussed below in the following areas:

- Whether to establish a state-based Exchange
- Governance and administration of the Exchange
- Financing for the Exchange
- The manner by which the Exchange will need to interface with the State's Medicaid and CHIP Programs

#### Whether to Establish a State Exchange

While the Health Care Reform law provides states with flexibility and some federal funding to establish and operate an Exchange, an immediate decision for

DRAFT

Nevada is whether to establish an Exchange at all, or to allow the federal government to do so.

To ensure that residents of every state have access to insurance through an Exchange, the law requires the federal Secretary of Health and Human Services to determine by January 2013 whether a state has taken the actions necessary to implement an Exchange (i.e., adopt necessary laws and regulations related to the Exchange) or whether a state, despite adopting the necessary laws and regulations, is unlikely to have an Exchange operational by January 1, 2014. For states that choose not to or are unable to establish an Exchange by the "go live" date, as determined by the Secretary, the federal government will establish and operate an Exchange within those states.

Nevada will need to weigh the pros and cons of deferring to the federal government the responsibility of operating the Exchange. On some levels this may appear appealing. Establishing an Exchange will require substantial effort and may consume scarce financial resources.

A key factor in whether Nevada decides to establish an Exchange will be the level of funding available from the federal government through planning and establishment grants. The extent to which state funds will be necessary to augment the federal allotment will be a contributing factor with regard to the establishment and operation of a state-based Exchange.

In late July 2010, the federal government announced the availability of up to $1 million per state in grants to assist with the planning and establishment of state-based Exchanges. Nevada plans to submit an application to access these funds, with the application due by September 1, 2010.

In addition to financial considerations, there are a number of policy issues to take into account. First and foremost, health insurance regulation has largely been – and will continue to be – the responsibility of state governments. Given the central role that the Exchange will play as a distribution network for commercial insurance, Nevada may be loathe to relinquish regulatory authority over what will likely be a sizeable share of the commercial health insurance market.

The Exchange can also be a tool for Nevada to advance other health care priorities such as payment reform, the development and promotion of health homes, accountable care organizations, consumer-directed health insurance, or the establishment of select or tiered hospital and physician networks. The combined volume of lives covered by the Exchange and Nevada's Medicaid program, particularly after the Medicaid eligibility expansion to 133% FPL, will greatly enhance the State's reach and potential influence in the health care market. A federally run Exchange may not align with Nevada's health care policy priorities.

Allowing the federal government to operate the Exchange is clearly an option to consider. But in making that decision, Nevada may forego the ability to maintain its authority over what will likely be a large share of the health insurance market

DRAFT

and may miss the opportunity to use the Exchange to help promote broader health reform efforts.

### Governance and Administration

Assuming Nevada decides to run its own Exchange, the governance structure and administration of the Exchange will be among the most important initial decisions, as these choices will have profound effects on the ability of the Exchange to meet the health insurance needs of individuals and small employers successfully.

At its core, an Exchange is a distribution channel for commercial insurance. Under federal Health Care Reform, the Exchange is also a conduit for premium subsidies and reduced cost-sharing, thereby enabling individuals – and to some extent small employers – to purchase insurance. The governance structure and administration of the Exchange will need to reflect this fundamental role.

The governance structure and administration of the Exchange may determine, among other things: 1) the overall management approach and the extent to which the Exchange will be allowed to operate outside the confines of state government; 2) the level of transparency and public accountability; 3) the manner by which goods and services will be procured; 4) staffing levels and hiring procedures; 5) the selection criteria that may be used to select health plans offered through the Exchange; and 6) the intersection between publicly subsidized coverage and commercial insurance.

The law requires that the Exchange be administered by a governmental agency or non-profit entity established by the State, providing some flexibility for Nevada to decide where to house the Exchange: (a) within an existing governmental agency, (b) in a new agency or quasi-public authority, or (c) at a non-profit entity established by the State.

The nature of the Exchange and its range of responsibilities will require an entity that is accountable to the public. Given the amount of work that will be required to set up and operate the Exchange and the inherently commercial nature of the Exchange, placing the administration of the Exchange within an existing state agency should be carefully evaluated. The high-profile nature of the Exchange and its wide-range of responsibilities suggest that the administration of the Exchange might best be placed in the hands of a new agency, a quasi-public authority, or a non-profit entity established for the express purpose of operating the Exchange.

### Financing

As noted above, federal planning and establishment grants have recently become available to support the work that states will need to undertake in order to plan, design, develop and operate the Exchange. The $1 million per state maximum grants, which represent the first of what may be a number of federal grant opportunities to support the establishment of Exchanges, do not require state matching funds.

DRAFT

However, by statute, these planning and establishment grants cannot be renewed beyond December 31, 2014 – one year after the Exchange is to be up and running. The law requires the Exchange to be self-sustaining, and allows for the ongoing operations of the Exchange to be funded through assessments on insurers whose products are offered through the Exchange. In much the same way that insurance brokers are paid out of the premiums paid by policyholders, the Exchange will likely need to generate operating revenues through retention of a portion of the premiums or through direct payments from the carriers.

### Interface with Medicaid and CHIP Programs

The expansion of Medicaid eligibility for adults and children with income at or below 133% FPL (as calculated based upon their Modified Adjusted Gross Income, or MAGI) will add tens of thousands of people to Nevada's Medicaid program; thousands more children will likely be added to Nevada Check Up; and tens of thousands of individuals and families with income up to 400% FPL will be eligible for subsidized commercial health insurance through the Exchange.

While the eligibility systems will need to be integrated to allow individuals to apply for coverage for all publicly-subsidized health programs through a single, streamlined point of entry, the State will also need to establish processes to effectively and efficiently handle the churn that will inevitably occur among these programs, as circumstances change and people become ineligible for one program (e.g., Medicaid) and eligible for another (e.g., the Exchange). Relationships and interfaces between the Medicaid/CHIP programs and the Exchange will need to be established to account for the transition between programs.

DRAFT

# 7. Recommended Approach

This section describes the recommended approach for designing, developing, and implementing an eligibility engine in the State of Nevada. It describes:

- The recommended model for the eligibility engine project.
- High-level cost estimates for the planning, design, development and implementation (DD&I) and maintenance and operations (M&O) of the eligibility engine project.
- A road map / project timeline for the DWSS and DHCFP to pursue in order to accomplish the above activities and implement the proposed model by January 1, 2014.

## 7.1. Recommended Model

With the advent of the Health Care Reform law, Nevada needs to find a “no wrong door” approach to determining eligibility that can be accessible to individuals who are shopping for medical insurance through:

- The Health Insurance Exchange (HIX)
- Access NV
- AMPS / NOMADS
- Nevada Check Up

The rules to determine eligibility for all publicly-subsidized health coverage programs, including the premium subsidies available under the Health Insurance Exchange, Medicaid, Nevada Check Up, and, if applicable, the Basic Health Program will require similar data. The underlying policies that determine coverage can be implemented as a set of rules in the eligibility engine that determine the appropriate publicly-subsidized health coverage program for an individual applying for coverage. Because of the overlapping needs of these business processes, in combination with a legacy system that is outdated and difficult to maintain, a solution that is external to NOMADS is highly desirable. By extracting the rules from existing legacy systems and building new rules into the eligibility engine, the engine in effect, facilitates the “no wrong door” approach.

Figure 7-1 depicts the “no wrong door” approach that will be made possible with the implementation of the eligibility engine. More specifically, it shows how someone will be able to apply for all publicly-subsidized health coverage programs, including the premium subsidies available under the Health Insurance Exchange, Medicaid, Nevada Check Up, and the Basic Health Program through the HIX, Access NV, and on paper. To guide the reader through the diagram, the steps for each access point are presented below:

DRAFT

### HIX Scenario

1. Applicant seeks medical coverage and accesses the HIX on the Internet.
2. Applicant enters required information into an online application that is available through the HIX.
3. Income and citizenship is electronically verified.
4. If applicant is not a citizen and/or income is not correct, they are deemed not eligible and processing ends.
5. If applicant is a citizen and income is correct, their information is sent to the eligibility engine.
6. If applicant is eligible for a subsidy, their information is sent to HIX, and the recipient data is stored in NOMADS.
7. If applicant is not eligible for a subsidy, the system checks for publicly-subsidized health program eligibility.
8. If applicant is eligible for a publicly-subsidized health coverage program, information is sent through the Access NV interface (I/F) to AMPS and NOMADS, where the recipient data is stored.
9. If applicant is not eligible for a publicly-subsidized health coverage program, information is returned to HIX for Purchase Option Only.

### Access NV Scenario

1. Applicant seeks medical coverage and accesses the Internet.
2. Applicant enters required information into an online application through Access NV.
3. Income and citizenship is electronically verified.
4. If applicant is not a citizen and/or income is not correct, they are deemed not eligible and processing ends.
5. If applicant is a citizen and income is correct, their information is sent to the eligibility engine.
6. If applicant is eligible for a subsidy, their information is sent to HIX and the recipient data is stored in NOMADS. If applicant is not eligible for a subsidy, the system checks for publicly-subsidized health coverage program eligibility.
7. If applicant is eligible for a publicly-subsidized health coverage program, information is sent through the Access NV I/F to AMPS and NOMADS where the recipient data is stored.
8. Applicant is not eligible for a publicly-subsidized health coverage program, information is returned to HIX for Purchase Option Only.

DRAFT

### Paper Application Scenario

1. Applicant requests, completes, and submits paper application form to the DWSS.
2. Caseworker enters applicant's information into AMPS.
3. Income and citizenship is electronically verified.
4. If applicant is not a citizen and/or income is not correct, they are deemed not eligible and processing ends.
5. If applicant is a citizen and income is correct, their information is sent to the eligibility engine.
6. If applicant is eligible for a subsidy, their information is sent to HIX and the recipient data is stored in NOMADS.
7. If applicant is not eligible for a subsidy, the system checks for publicly-subsidized health coverage program eligibility.
8. If applicant is eligible for a publicly-subsidized health coverage program, information is sent through AMPS and stored in NOMADS.
9. If applicant is not eligible for a publicly-subsidized health coverage program, information is returned to HIX for Purchase Option Only.

DRAFT




**Figure 7-1: No Wrong Door Approach to Eligibility Determination**

## 7.1.1. Estimated Project Costs

This section provides the high-level cost estimate for the eligibility engine project. The estimated one-time cost is $23,849,038. The annual ongoing Maintenance

and Operations (M&O) cost is estimated at $3,765,163. Based on PCG's estimation methodology, the preliminary cost estimate has an approximate margin of error of +/- 25% recognizing that the costs will be refined during the ensuing feasibility study. The total estimated project costs are broken out by State Fiscal Year (SFY) in the table below.

**Table 7-1: Estimated Eligibility Engine Costs by Fiscal Year**

| Cost Item | FY 2011* | FY2012 | FY2013 | FY2014** | Annual M&O |
|---|---|---|---|---|---|
| State Personnel | $220,470 | $387,044 | $788,796 | $789,922 | $438,925 |
| Planning Contractor Services | $343,663 | $589,137 | $0 | $0 | $0 |
| DD&I Contractor Services | $0 | $0 | $7,473,200 | $7,473,200 | $0 |
| Hardware | $0 | $0 | $742,538 | $0 | $0 |
| Software | $0 | $0 | $3,029,147 | $0 | $0 |
| DoIT Services | $0 | $0 | $0 | $1,163,019 | $1,163,019 |
| Telecommunications | $0 | $50,000 | $0 | $0 | $0 |
| CSP – EGL NOMADS Migration | $0 | $0 | $798,902 | $0 | $0 |
| DD&I Maintenance | $0 | $0 | $0 | $0 | $1,385,426 |
| Hardware Maintenance | $0 | $0 | $0 | $0 | $111,381 |
| Software Maintenance | $0 | $0 | $0 | $0 | $666,412 |
| **Total SFY Cost** | **$564,133** | **$1,026,181** | **$12,832,583** | **$9,426,141** | **$3,765,163** |
| **Total One-Time Cost** | | | | **$23,849,037** | |
| **Annual Ongoing Cost** | | | | | **$3,765,163** |

* Assumes start date of November 1, 2010.

** Assumes implementation date of December 15, 2013.

### 7.1.2. General Costing Assumptions

The assumptions that were made in developing the cost estimates are presented below:

- The eligibility engine project will receive ongoing commitment and support from executive management at the DHSS, DWSS, and DHCFP.
- Funding will be available in State Fiscal Year (SFY) 2011 and 2012 to support the Planning Phase, which will begin in November 2010 and conclude with the selection of a vendor in December 2012.

DRAFT

- The services of a vendor will be acquired to complete a study to determine the feasibility of implementing an eligibility engine, prepare an Implementation Advanced Planning Document (I-APD) that will be submitted to the federal government to obtain project approval and funding, and develop a Request for Proposal (RFP) to acquire a vendor to design, develop, and implement the eligibility engine. These activities will comprise the Planning Phase.

- The services of a vendor will be acquired to design, develop, and implement the eligibility engine project.

- The DWSS, DHCFP and DoIT will be required to dedicate additional state staff to the eligibility engine project in order to assure completion by January 1, 2014.

- The DWSS will serve as the primary contact for the DD&I vendor and will be responsible for providing project management, solution acquisition, and ongoing M&O.

- The eligibility engine must be implemented by January 1, 2014. In order for this to occur, the Design, Development and Implementation (DD&I) Phase is scheduled to occur from December 2012 through December 2013. The M&O Phase of the project will begin in January 2014.

- Project Management Oversight (PMO) support will be provided by the DWSS and the DHCFP. PMO support from the DWSS will begin during the Planning Phase and continue through DD&I. PMO support from the DHCFP will begin with DD&I. The expenses associated with PMO services are included in the state personnel costs. The project costs do not include the provision of Independent Verification and Validation (IV&V) services.

- The estimated costs do not take into account any changes to enrollment standards in accordance with the Public Health Service Act, § 3021 42 U.S.C. 300jj-51, which the federal government is expected to release in September 2010.

High-level summaries of the components of the total project cost are provided in the following paragraphs.

### State Personnel Costs

The state personnel costs are based upon data provided by the DWSS Budget Office and are comprised of salary and benefits, insurance expenses, DoIT assessment costs, and non-personnel expenses.

A breakdown of the state personnel costs, by position and fiscal year is provided in the table on the following page.

DRAFT

## Table 7-2: Breakdown of State Staffing Costs by Position and SFY

| Personnel | Units | Grade | 2011 Salary | FY 2011 | FY 2012 | FY 2013 | FY 2014 | M&O | Explanations |
|---|---|---|---|---|---|---|---|---|---|
| **Stateside PM** | | | | | | | | | |
| IT Professional 4 | 1 | 41 | $ 53,452.80 | $ 31,180.80 | $ 55,108.00 | $ 57,363.00 | $ 23,901.25 | | Start at Planning Phase (November 2010) |
| DWSS Business Process Analyst 2 | 1 | 36 | $ 42,991.92 | $ 25,078.62 | $ 44,242.00 | $ 45,991.00 | $ 19,162.92 | | Start at Planning Phase (November 2010) |
| DWSS Social Services Program Speclst 3 | 1 | 37 | $ 44,871.00 | $ 26,174.75 | $ 44,871.00 | $ 45,991.00 | $ 19,162.92 | | Start at Planning Phase (November 2010) |
| **PMO Resource** | | | | | | | | | |
| DHFCP IT Professional 3 | 1 | 39 | $ 48 942.72 | $ 28 549.92 | $ 50 401.00 | $ 52 462.00 | $ 21 859.17 | | Start at Planning Phase (November 2010) |
| DWSS IT Professional 3 | 1 | 39 | $ 48,942.72 | $ - | $ - | $ 28,128.00 | $ 26,231.00 | | Start at DD&I (12/2012) |
| **CHIP** | | | | | | | | | |
| Business Process Analyst 2 | 1 | 36 | $ 42,991.92 | $ 25,078.62 | $ 44,242.00 | $ 45,991.00 | $ 19,162.92 | | Start at Planning Phase (November 2010) |
| Business Process Analyst 2 | 1 | 36 | $ 42,991.92 | $ - | $ - | $ 24,704.00 | $ 22,995.50 | | Start at DD&I (December 2012) |
| IT Professional 3 (Dev/Support) | 1 | 39 | $ 48,942.72 | $ - | $ - | $ 28,128.00 | $ 26,231.00 | | Start at DD&I (December 2012) |
| | | | | | | | | | |
| **DWSS M&O Personnel** | | | | | | | | | |
| IT Professional 3 (Prod Support) | 1 | 39 | $ 48,942.72 | $ - | $ - | $ - | $ 34,974.67 | | Start 3 mos (10/2013) bef implementation |
| IT Professional 3 (Dev/Support) | 1 | 39 | $ 48,942.72 | $ - | $ - | $ 24,190.00 | $ 52,462.00 | $ 52,462.00 | Start at DD&I; stay through M&O |
| IT Professional 3 (Dev/Support) | 1 | 39 | $ 48,942.72 | $ - | $ - | $ 24,190.00 | $ 52,462.00 | $ 52,462.00 | Start at DD&I; stay through M&O |
| IT Professional 4 (Dev/Support) | 1 | 41 | $ 53,452.80 | $ - | $ - | $ 26,417.00 | $ 57,363.00 | $ 57,363.00 | Start at DD&I; stay through M&O |
| IT Professional 3 (Security) | 1 | 39 | $ 48,942.72 | $ - | $ - | $ 24,190.00 | $ 52,462.00 | $ 52,462.00 | Start at DD&I; stay through M&O |
| **DoIT Personnel** | | | | | | | | | |
| IT Professional 3 (DoIT Server Support) | 1 | 39 | $ 48,942.72 | $ - | $ - | $ 52,462.00 | $ 52,462.00 | $ 52,462.00 | Start FY 12/13; stay through M&O |
| | | | | | | | | | |
| **Total Salaries** | | | | **$ 136,062.71** | **$ 238,864.00** | **$ 480,207.00** | **$ 480,892.33** | **$ 267,211.00** | $ 1,603,237.04 |
| Planning Phase | | | | $ 136,062.71 | $ 238,864.00 | $ 123,899.00 | $ - | | $ 498,825.71 |
| DD&I Phase | | | | $ - | $ - | $ 280,583.50 | $ 347,286.83 | | $ 627,870.33 |
| M&O Phase | | | | $ - | $ - | $ 75,724.50 | $ 133,605.50 | $ 267,211.00 | $ 476,541.00 |
| | | | | $ 136,062.71 | $ 238,864.00 | $ 480,207.00 | $ 480,892.33 | $ 267,211.00 | $ 1,603,237.04 |
| | | | | | | | | | |
| Total One-Time Project Staffing Costs | | | | $ 136,062.71 | $ 238,864.00 | $ 404,482.50 | $ 347,286.83 | $ - | $ 1,126,696.04 |
| Annual Ongoing Project Staffing Costs | | | | $ - | $ - | $ 75,724.50 | $ 133,605.50 | $ 267,211.00 | $ 476,541.00 |
| | | | | $ 136,062.71 | $ 238,864.00 | $ 480,207.00 | $ 480,892.33 | $ 267,211.00 | $ 1,603,237.04 |
| | | | | | | | | | |
| **Benefits** | | | | **$ 62,726.45** | **$ 110,119.00** | **$ 207,119.00** | **$ 207,414.59** | **$ 115,251.29** | |
| **TOTAL SALARIES AND BENEFITS** | | | | **$ 198,789.16** | **$ 348,983.00** | **$ 687,326.00** | **$ 688,306.93** | **$ 382,462.29** | |
| Other: | | | | | | | | | |
| Cat 04 Insurance Expense | | | | $ 381.08 | $ 669.00 | $ 1,874.00 | $ 1,876.67 | $ 1,042.79 | |
| Cat 26 DoIT Assessment | | | | $ 342.91 | $ 602.00 | $ 1,687.00 | $ 1,689.41 | $ 938.73 | |
| Cat 50 Non Personnel Expenses | | | | $ 20,956.37 | $ 36,789.83 | $ 97,908.86 | $ 98,048.59 | $ 54,481.35 | |
| | | | | $ 21,680.37 | $ 38,060.83 | $ 101,469.86 | $ 101,614.68 | $ 56,462.87 | |
| **TOTAL STATE PERSONNEL COSTS** | | | | **$ 220,469.52** | **$ 387,043.83** | **$ 788,795.86** | **$ 789,921.60** | **$ 438,925.15** | **$ 2,625,155.97** |

DRAFT

## Planning Contractor Services Costs

The cost for contractor services is estimated to be $932,800. These costs will occur during SFY 2011 and 2012. This estimate is comprised of the cost for obtaining consulting services to conduct the feasibility study and prepare the I-APD ($580,800), and the cost to develop the RFP to acquire the DD&I vendor ($352,000). This cost estimate is based on the following:

- PCG's experience in conducting similar engagements. For comparative purposes, the table below provides seven recent projects that have included the development of a feasibility study and/or I-APD with an indication of the levels of complexity and effort associated with each project.
- PCG's consideration of the level of complexity associated with the NV eligibility engine project is between "High" and "Very High."
- This level of complexity indicates a level of effort of 3,300 hours. Experience has shown that feasibility studies conducted in association with the development of an I-APD require a 10% increase in the total level of effort, resulting in an additional 330 hours to develop the I-APD.
- Using a total of 3,680 hours at an hourly billing rate of $160 (reflecting a true bill rate of $125/hr with an additional $35/hr for expenses) equates to a total of $580,800 to conduct the feasibility study and prepare the I-APD.

DRAFT

**Table 7-3: Feasibility Study / I-APD Engagement Efforts**

| Project | Complexity | Effort (Hours) |
|---|---|---|
| **CA Statewide Offender Management System** – an analysis to replace a paper-based offender management process with a statewide automated system | Very high | 4,100 |
| **CA Enterprise Enrollment Portal** – a study to determine the feasibility of implementing a statewide enrollment and eligibility determination portal for over ten health and human services programs | High | 2,400 |
| **CA Enhance Enterprise Storage –** a feasibility study to analyze how the State data center could implement a next generation of storage | High | 2,200 |
| **WA Provider Payroll** – a feasibility study for the implementation of a provider payroll system | Medium | 2,000 |
| **CA Statewide Controllers Accounting System** – a feasibility study to replace the State Controller's Office aging accounting system | Medium | 1,700 |
| **MT Child Welfare System –** a feasibility study to investigate the replacement of the Montana Statewide Child Welfare System | Medium | 1,500 |
| **CA Child Health and Disability Prevention (CHDP) Program** – a feasibility study to analyze the replacement of a rudimentary electronic enrollment system | Low | 1,000 |

The estimated cost for acquiring consulting services to develop the RFP for the eligibility engine project is $352,000. This cost estimate is based on the following:

- PCG's experience in developing RFPs. For comparative purposes, Table 7-2 provides four recent projects that have resulted in the development of a RFP with an indication of the levels of complexity and effort associated with each project.
- PCG's consideration of the level of complexity associated with the NV eligibility engine project is between "High" and "Very High."
- This level of complexity indicates a level of effort of 2,200 hours. These efforts do not include any hours after the RFP is released to support vendor selection.
- Using a total of 2,200 hours at an hourly billing rate of $160 (reflecting a true bill rate of $125/hr with an additional $35/hr for expenses) equates to a total of $352,000.

DRAFT

**Table 7-4: RFP Engagements**

| Project | Complexity | Effort (Hours) |
|---|---|---|
| **CA Statewide Offender Management System** – a RFP to replace a passed based offender management process with a statewide automated paperless system | Very high | 2,600 |
| **CA Enterprise Enrollment Portal** – a RFP for implementing a statewide one stop shopping portal to enrollment in public benefits | High | 1,800 |
| **MT Child Welfare System –** a RFP for the replacement of the Montana statewide Child Welfare System | Medium | 1,400 |
| **CA First Five Commission** – a RFP for the development of a mandated reporting application | Low | 1,100 |

Based on a project start-up date of November 1, 2010, the estimated consulting services costs in SFY 2011 will be provided over seven months. In SFY 2012, these costs will occur until the release of the RFP for the DD&I contractor, which is scheduled in May 2012.

### Estimated DD&I Costs

The total estimated cost for the DD&I contractor is $14,946,400. These costs were developed based on information gathered from the DWSS and DHCFP staff in the business and IT areas to identify the need for new development and/or modifications to existing systems and interfaces. Using that information, PCG's estimation methodology employs several metric-based models: 1) Function Point Analysis; 2) Analogy Model; and 3) a proprietary variation of the Wideband Delphi Model, which are described below.

The Function Point Analysis (FPA) model is an internationally recognized methodology developed by IBM for determining the overall size of a software application. It is one of the most common techniques for estimating management information system (MIS) application size. In its simplest terms, function points count the externally visible aspects of software products: 1) inputs to an application; 2) outputs from an application; 3) user inquiries; 4) the data files updated by the application; and 5) the number of interfaces to other applications. These items are then weighted by their complexity – the relative difficulty of implementing each. Once adjusted by their complexity factors, the total of all these represent the function point count of the application.

The Analogy Model estimates program size by comparison with one or more software applications with a similar user base and scope of business process support. The list of candidate comparable applications is culled from several sources: for public sector application development, the costs for other state's similar implementations; for private sector applications, the cost data for similarly sized, functionally equivalent systems.

DRAFT

The last model is an experiential-based model maintained by PCG Technology Consulting based on their experience of working as a Quality Assurance and Independent Verification and Validation (IV&V) consultant on a number of government and private sector systems.

These results are used to provide estimated project effort, scheduling, and costs.

Each model produces an independent high and low cost estimate for the development of an application. After close examination of the range of estimates based on the different models and approaches, a consensus estimate is reached using triangulation based on the low and high estimates from all models.

The DD&I costs cover the following work needed to implement the eligibility engine and changes to current systems:

- New screens and processing to accommodate input from the Exchange through AMPS/NOMADS
- New screens and processing to accommodate CHIP in AMPS/NOMADS
- Changes to current AMPS/NOMADS screens to accommodate the new Exchange and Eligibility Engine data
- Changes to current NOMADS batch jobs and reports to reflect the new Exchange and Eligibility Engine data
- New or changed interfaces to MMIS, CHIP, Internal Revenue Service, Social Security Agency, Homeland Security, the Exchange, and the Eligibility Engine
- New reports and Notices of Action (NOA)
- New data files
- Transfer and translation of eligibility rules from NOMADS to the Eligibility Engine
- Programming of new eligibility rules to support Health Care Reform

### Hardware Costs

The hardware costs for the eligibility engine project are estimated to be $742,538, based on discussions with the DWSS and DHCFP IT staff and cost information provided by Solutions II. The hardware costs allow for three new servers at the DHCFP and two IBM Power P770 servers.

### Software Costs

The software costs for the eligibility engine project are estimated to be $3,029,147, based on information provided by the DWSS and DHCFP IT staff.

DRAFT

The software costs primarily consist of software licenses for the following products or tools:

- Data encryption
- DB2
- DB2 Connect
- iLog jRules
- WebSphere process server
- WebSphere portal server
- Rational Rapid Application Tool

In addition, these costs allow for system security and other system architect tools.

### DoIT Costs

The DoIT costs for the eligibility engine project are estimated to be $1,163,019. These costs are based on DoIT's cost schedule and represent ongoing M&O expenses that are primarily comprised of increased CPU costs and hosting needs.

### Telecommunications Costs

The telecommunications costs for the eligibility engine project are estimated to be $50,000, based on discussions with the DWSS IT staff. These costs are to upgrade existing telecommunications in the DWSS' Fallon and Pahrump offices.

### CSP – EGL NOMADS Migration Costs

The CSP – EGL NOMADS migration costs are estimated to be $798,902, based on the costs estimated in the DWSS' *CSP Migration TIR* dated May 21, 2010.

### DD&I Maintenance Costs

The annual DD&I maintenance costs for the eligibility engine project are estimated to be $1,385,426, which represents 15% of the total DD&I costs.

### Hardware Maintenance Costs

The hardware maintenance costs for the eligibility engine project are estimated to be $111,381, which represents 15% of the total hardware costs.

### Software Maintenance Costs

The software maintenance costs for the eligibility engine project are estimated to be $666,412, which represents 22% of the total software costs.

DRAFT

## 7.2. Timeline

This section provides a proposed timeline for performing the activities that will be required to obtain approval for proceeding with and implementing the eligibility engine project. It presents an aggressive schedule in order to meet the Health Care Reform deadline of January 1, 2014. The underlying assumptions that were used, based on direction provided by DWSS management, include the following:

- In order for the DWSS and DHCFP to implement the eligibility engine by January 1, 2014, ongoing support and commitment will be required from executive level management.
- The Eligibility Engine DEC Unit will be approved.
- The timeline will encompass the development of a P-APD, a feasibility study, an Implementation Advanced Planning Document (I-APD), and a Request for Proposal (RFP) in order to secure funding for, and acquire assistance from, a vendor to design, develop, and implement the eligibility engine.
- The DWSS will develop the TIR and the Planning Advanced Planning Document (P-APD) for the eligibility engine project. The TIR and the P-APD will be developed upon the completion of the current eligibility engine project by January 1, 2011.
- The DWSS and the DHCFP will seek assistance from an outside vendor to develop the feasibility study, I-APD, and RFP.
- Five-day review cycles will be allowed for the DWSS/DHCFP review and finalization of documents prepared.
- Project deliverables associated with obtaining federal funding and acquiring an outside vendor to design, develop, and implement the eligibility engine will not be subject to review from outside stakeholders (e.g., advocacy groups, etc.).
- Information will be suitable for budgetary approval through the normal legislative process.
- Existing funding/budgetary authority will be available to support the commencement of the project by November 1, 2010.
- The DWSS will acquire project management support to assist with the planning phase, which will commence with CMS review and approval of the P-APD.
- The development of the RFP will commence with CMS' review of the I-APD.

The anticipated schedule for the proposed timeline is presented on the following pages.

DRAFT

**Table 7-5: Proposed Timeline for the Eligibility Engine Project**

| Milestone | Start | Duration | Finish |
|---|---|---|---|
| Develop P-APD | November 1, 2010 | 2 months | January 1, 2011 |
| CMS review and approval | January 1, 2011 | 2 months | March 1, 2011 |
| Acquire contractor to conduct feasibility study and develop the IAPD and RFP | January 1, 2011 | 5 months | June 1, 2011 |
| Conduct feasibility study / develop IAPD | June 1, 2011 | 5 months | November 1, 2011 |
| DWSS / DHCFP review | November 1, 2011 | 1 week | November 8, 2011 |
| CMS review and approval | November 8, 2011 | 2 months | January 8, 2012 |
| Develop RFP | November 8, 2011 | 4 months | March 8, 2012 |
| DWSS / DHCFP review | March 8, 2012 | 1 week | March 15, 2012 |
| CMS review and approval | March 15, 2012 | 2 months | May 15, 2012 |
| Release RFP | May 15, 2012 | | |
| Receive vendor responses | May 15, 2012 | 3 months | August 15, 2012 |
| Select vendor / contract award | August 15, 2012 | 2 months | October 15, 2012 |
| CMS approval of contract | October 15, 2012 | 2 months | December 15, 2012 |
| Design / develop | December 15, 2012 | 1 year | December 15, 2013 |
| Full Implementation | December 15, 2013 | | |
| Maintenance and Operations (M&O) | December 15, 2013 | 5 years | December 15, 2018 |

DRAFT

**Table 7-6: Proposed Calendar Year Project Gantt Chart**

| ID | Task Name |
|---|---|
| 37 | **Nevada Eligibility Engine Project** |
| 38 | Develop P-APD |
| 39 | CMS review and approval |
| 40 | Acquire contractor for planning phase |
| 41 | Conduct feasibility study / develop IAPD |
| 42 | DWSS / DHCFP review |
| 43 | CMS review and approval |
| 44 | Develop RFP |
| 45 | DWSS / DHCFP review |
| 46 | CMS review and approval |
| 47 | Release RFP |
| 48 | Receive vendor responses |
| 49 | Select vendor / contract award |
| 50 | CMS approval of contract |
| 51 | Design / develop |
| 52 | Full Implementation |



# Exhibit 17

STATE OF SOUTH CAROLINA )
) AFFIDAVIT
COUNTY OF RICHLAND )

PERSONALLY APPEARED before me, Stephen R. Van Camp, who being duly sworn, attests to the following:

1. He is the Director of the State of South Carolina's Employee Insurance Program, which administers the Group Health Benefits Plan of the Employees of the State of South Carolina, the public school districts, and participating entities (typically referenced as the "State Health Plan").

2. He is familiar with the Patient Protection and Affordable Care Act, P.L. 111-148, as amended by the Health Care and Education Reconciliation Act of 2010, P.L. 111-152 (ACA).

3. State Health Plan participants include state officers as well as employees of:

   - State agencies (pursuant to S.C. Code Ann. § 1-11-710)
   - Public school districts (pursuant to § 1-11-710)
   - Other participating entities/local subdivisions that elect to participate pursuant to § 1-11-720

   Participants also include retirees of these employers as defined in § 1-11-730 and the eligible spouses and eligible children of employees and retirees.

4. On January 1, 2011, the State Health Plan will comply with the following ACA-prescribed benefits that were not previously provided under the Plan:

   - No preexisting condition exclusion for individuals younger than 19
   - No lifetime limits on essential benefits
   - Restricted annual limits on essential benefits

- Prohibition on rescission of coverage
- Dependent coverage of children younger than 26 (Prior to 2014, the State Health Plan will require that the child is not eligible for other employer-sponsored group health plan.)

5. The ACA's immediate requirement that additional benefits be given to officers and employees under the State Health Plan will require an increase in budgeted contributions from the State of $19.34 million for plan year 2011 (January 1 to December 31).

6. The State Health Plan has "grandfather status" at least through 2011. If this status is lost due to the State's failure to adhere to requirements of the ACA, such as not increasing the co-insurance or co-payment costs, then the State would incur substantial additional costs under the ACA of $60-70 million a year. If the State adheres to the ACA's prohibition on making changes in the State Health Plan, then the State could incur substantial additional costs of funding the existing plan. These costs cannot be estimated at this time.

7. If the State were penalized in the future for not offering coverage to all full-time employees, the penalty would at least be $2,000 times the total number of employees of State agencies and public school districts. State agency and public school district employment now is approximately 120,000. Therefore, any such penalty could be as much as $240,000,000. Should the penalty be applied to local subdivisions and other entities that elect to participate pursuant to § 1-11-720, the penalty amount would greatly exceed this sum.

8. Should the State continue to offer the State Health Plan for employees of State agencies and public school districts in the future, and one or more of said employees chooses to enroll in a federally subsidized plan from an exchange instead of the State Health Plan, the penalty to the State would be $3,000 for each such employee enrolled in an exchange. Such penalty would not exceed $240,000,000. The number of employees who might enroll in such an exchange is speculative at this time.

9. The intention of this affidavit is to estimate costs and possible penalties that could be incurred by the State in the future under the ACA. The costs and possible penalties are projections now because regulations are still being developed. The State does not waive any claims or defenses that it might have now or in the future as to any penalty or attempted application of ACA provisions to the State or its Health Plan including, but not limited to, the above matters.

Stephen R. Van Camp

SWORN TO before me this 28th day of September, 2010

[signature]

NOTARY PUBLIC FOR SOUTH CAROLINA
My Commission Expires: 1-25-2014

# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH**
**AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
______________________________________/

**DECLARATION OF DEBORAH K. BOWMAN**

Pursuant to 28 U.S.C. § 1746, I, Deborah K. Bowman, declare the following:

1. I am the Secretary of the South Dakota Department of Social Services and have acted in that capacity since my initial appointment on April 5, 2005. As Secretary, I am charged with overseeing the activities of the South Dakota Department of Socials Services (DSS).

2. This Declaration is based upon personal knowledge, information received from my staff based upon their personal knowledge and records maintained by DSS.

3. DSS's statutory duties and responsibilities are many. One duty is to administer South Dakota's Medicaid Program. DSS has been designated by the Governor as the state Medicaid agency for South Dakota.

4. South Dakota began participating in the Medicaid Program in 1967. Neither I nor my staff have personal knowledge, and DSS maintains no records, regarding South Dakota's expectations at the outset of its participation in the Medicaid Program.

5. Over the years, South Dakota's Medicaid Program has grown, as well as the cost to operate the program. In 1987, there were

roughly 36,000 individuals enrolled in the Medicaid Program. Today, on a monthly average, there are roughly 101,000 enrolled individuals. These numbers do not include those individuals covered by the Children's Health Insurance Program (CHIP).

6. South Dakota's financial responsibility percentages for Medicaid Program benefit expenditures for recent federal fiscal years are:

FFY 02 - 34.07%
FFY 03 - 34.71%
FFY 04 - 34.33%
FFY 05 - 33.97%
FFY 06 - 34.93%
FFY 07 - 37.08%
FFY 08 - 39.97%
FFY 09 - 37.45%
FFY 10 - 37.28%
FFY 11 - 38.75%

For federal fiscal year 2010, this percentage was reduced to 29.20%, due to South Dakota's receipt of federal stimulus outlays under the American Recovery and Reinvestment Act (ARRA). The cost share percentage will rise in federal fiscal year 2011 to 31.08%. It is anticipated for fiscal year 2012, except for payment increases specified under the Patient Protection Affordable Care Act (PPACA), that South Dakota's cost share percentage will be 40.87%.

7. Despite South Dakota's relatively low cost share percentage, state funded Medicaid Program expenditures constitute the second largest expenditure of state general funds following education. South Dakota's share of Medicaid Program costs for fiscal year 2011 constitutes 22.93% of the general fund budget ($266,308,429.00 of the total general fund budget of $1,160,406,651.00). It is anticipated that during fiscal year 2011, over 141,000 persons will be served under South Dakota's Medicaid Program.

8. I have been asked to estimate the immediate fiscal impact that the PPACA will have on South Dakota's Medicaid Program. The estimates set forth below are complete and accurate to the best of my current knowledge and information as of the date of this Declaration.

9. The PPACA has required DSS to immediately devote substantial funds, resources and personnel to implement the

required Medicaid Program changes. Implementation of PPACA will tax DSS resources and will require additional state expenditures for associated costs. It is not possible to estimate the amount DSS will spend annually for state fiscal years 2011 through 2014 in money, resources and staff time to implement and comply with PPACA provisions. Lack of guidance from the federal government on the effect PPACA will have on the South Dakota Medicaid Program is a major factor in the ability to estimate.

10. The PPACA will have a significant long term impact on South Dakota's Medicaid Program. The number of individuals eligible for Medicaid will significantly increase. South Dakota will be required to expend additional state funds to provide Medicaid benefits to these individuals and pay increased administrative costs to comply with PPACA required changes.

11. The PPACA also reduces South Dakota's flexibility to manage the ever increasing costs of its Medicaid Program. The Act's provisions significantly restrict South Dakota's ability to reduce services, reimbursement rates and eligibility qualifications.

12. PPACA § 2301 changes the definition of medical assistance and requires South Dakota to provide medical services, as distinguished from providing payment for medical services. The prior definition was the basis for Medicaid Program payments prior to the PPACA. This definitional change may significantly alter South Dakota's Medicaid Program. To date, the Department of Health and Human Services has provided no guidance on whether or how the definitional change of medical assistance affects South Dakota's Medicaid Program. In operating its Medicaid Program, South Dakota has relied heavily on the prior definition to provide the same payments for the same service regardless of provider or locality. This may not be the case under the new definition and a wave of litigation to determine the affect of this new definition is likely. In addition to litigation costs, the outcome of this litigation may significantly effect South Dakota's administration of this Medicaid Program as well as dramatically increasing program costs.

13. It is estimated that as a result of PPACA South Dakota's Medicaid average monthly enrollment will increase from approximately 101,000 to 155,100 individuals. Based upon 2008 Census Bureau Statistics, South Dakota has 98,000 uninsured residents. Of those, it is estimated that 48,000 are below 133% of the federal poverty line. With the 5% income disregard mandated by federal requirements, DSS estimates that an

additional 49,600 individuals will be added to the South Dakota's Medicaid Program. It is also estimated that an additional 4,500 persons, who currently are eligible for Medicaid but have not enrolled, will enroll and obtain benefits, a result of the various PPACA insurance provisions going into effect, such as the PPACA's individual mandate. As to this latter category of individuals, South Dakota will have to pay its traditional Medicaid cost share, as the PPACA does not contemplate additional federal funds covering these expenditures.

14. DSS estimates that the increased costs to South Dakota associated with the projected Medicaid Program enrollment increases will be $62,600,000 from 2010 through 2019 and $36,000,000 annually there after. This estimate does not take into account any inflationary increases, increased provider payments and additional administrative costs.

15. Implementation of the PPACA's Medicaid Program provisions will increase state expenditures necessary to cover DSS's administrative costs. PPACA does not alter the current requirement that South Dakota must cover 50% of all Medicaid Program administrative expenses. It is estimated that South Dakota will expend an additional $37.1 million to cover PPACA related administrative expenses for 2014 through 2019.

16. Though theoretically possible, South Dakota cannot cease participation in the Medicaid Program. Currently, South Dakota is required to continue participation as a condition it agreed to when it accepted ARRA funds for Medicaid related costs. This agreement allowed South Dakota to free up state funds needed for other state expenditures due to revenue short falls arising during the latest recession. Even without the receipt of ARRA funds, it is not economically feasible for South Dakota to terminate its Medicaid Program and separately provide comparable benefits to South Dakota citizens. South Dakota's Medicaid budget (state and federal funds) for state fiscal year 2011 is $877,749,102.00. To provide pre PPACA Medicaid benefits, South Dakota would be required to expend 75.58% of its total state general fund budget. There simply would not be enough money remaining to fund other vital state programs such as education. Further, to terminate the Medicaid Program and not provide comparable benefit coverage, would be very detrimental to the 101,000 persons who monthly receive healthcare paid by the South Dakota Medicaid Program. For example, Medicaid pays for 60% of the individuals living in South Dakota nursing homes.

17. Termination of South Dakota's participation in Medicaid would also have a severe impact on the state's healthcare providers. For example, approximately 60% of nursing home revenue is through Medicaid. Medicaid constitutes between 10 and 12% of general hospital revenues in any given year. This amount increases to approximately 25.2% for rural health care clinics and federally qualified clinics.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of September, 2010.

Deborah K. Bowman
Secretary, Department of Social Services
Kneip Building
700 Governors Drive
Pierre, SD 57501

# Exhibit 19

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH**
**AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
______________________________________/

**DECLARATION OF SANDRA J. ZINTER**

Pursuant to 28 U.S.C. § 1746, I, Sandra J. Zinter, declare the following:

1. I am the Commissioner of the South Dakota Bureau of Personnel and have acted in that capacity since my initial appointment on June 6, 1995. As commissioner, I am charged with overseeing the activities of the South Dakota Bureau of Personnel (BOP).

2. This Declaration is based upon personal knowledge, information received from my staff based upon their personal knowledge, and records maintained by BOP.

3. BOP is the state agency authorized under South Dakota Codified laws chapter 3-12A to establish and administer health, life and flexible-spending benefit insurance plans for eligible state employees, former employees who wish to continue coverage under COBRA, retired employees and their dependents (State Plan). The State Plan is self-insured. The State Plan is funded by appropriations from the South Dakota Legislature and various member payments. For state fiscal year 2011, the Legislature has appropriated approximately $78,000,000 for the State Plan.

cost for coverage under the State Plan could be much higher if dependents are included and COBRA is applicable.

10. ACA § 6301, effective 2012, requires South Dakota to pay the federal government a $1 comparative effectiveness excise tax for each member of the State Plan. This excise tax is $2 per member for 2013 and the tax is payable annually through 2018 with inflationary increases. The estimated cost of the seven year excise tax without the inflation increases is $460,000.

11. It is estimated that the lifetime annual policy limit provisions (ACA § 1001, PHSA § 2711) will cost South Dakota an additional $1,000,000 for state fiscal year 2012 which will escalate thereafter due to increased healthcare costs and an aging state work force. It is estimated that the required preventative care requirements (ACA § PHSA 2713) will cost South Dakota an additional $2,000,000 annually. It is estimated that the immediate impact of the preexisting condition requirements for individuals up through age 18 (ACA § 1201, PHSA § 2704); dependent coverage requirements (ACA § 1001, PHSA § 2714); and reporting requirements (ACA § 1001, PHSA § 2718) will cost South Dakota an additional $150,000 annually.

12. Additionally, there will be other ACA compliance related cost increases to the State Plan which BOP is unable to estimate at this time. BOP is unable to provide cost estimates regarding ACA §§ 1511 and 1513 that create potential liability by penalizing South Dakota due to state employees choosing to enroll in a federal-subsidized plan from an exchange instead of the State Plan. Also, BOP is unable to determine whether the benefits provided under the State Plan will subject South Dakota to potential liability for providing "high cost" benefits that exceed a federally defined threshold (ACA §9001).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of September, 2010.

Sandra J. Zinter, Commissioner
Bureau of Personnel
500 E. Capitol Building
Pierre, SD 57501

# Exhibit 20

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,**

**Defendants.**

**DECLARATION OF BILLY R. MILLWEE**

Pursuant to 28 U.S.C. § 1746, I, Billy R. Millwee, declare the following:

My name is Billy Millwee. I am over the age of eighteen, of sound mind, and otherwise fully competent to testify to the matters described in this declaration. I am employed by the Texas Health and Human Services Commission (HHSC) as the Associate Commissioner for Medicaid and the Children's Health Insurance Program (CHIP), also referred to as the State Medicaid/CHIP Director.

I have served as State Medicaid/CHIP Director since January 2010. I have 15 years experience working in the Medicaid program, including serving as the deputy Medicaid/CHIP director, administering the Medicaid claims administration contract with the Texas Medicaid and Healthcare Partnership, and managing HHSC's Medicaid Eligibility and Health Information System.

As the State Medicaid/CHIP Director, I am responsible for administering the Texas Medicaid program, including serving as the primary point of contact with the federal government and implementing policy direction established by the Texas Legislature and state leadership. Based on my employment, I have personal knowledge of the Texas Medicaid program and the effects of the Patient Protection and Affordable Care Act (PPACA) on the Texas Medicaid program.

I am making this affidavit in connection with *State of Florida, et al. v. United States Department of Health and Human Services, et al.*, a lawsuit to which the State of Texas is a party.

### A. The Texas Medicaid Program

Congress established the Medicaid program under Title XIX of the Social Security Act of 1965. Following authorization by the Texas Legislature, Texas began participating in the Medicaid program in September 1967.

The Texas Medicaid program consumes approximately 25% percent of the State's budget.[1] For FY 2009-2010, Texas will spend $22 billion / year on Medicaid services to approximately 4.3 million individuals.[2]

HHSC has been the single state agency for the Texas Medicaid program since January 1993. As the single state agency, HHSC's Medicaid responsibilities include:

- Administering the Medicaid State Plan;
- Contracting with the various state departments to carry out certain operations of the Medicaid program;
- Operating the state's acute care, vendor drug, and Medicaid managed care programs;
- Determining Medicaid eligibility; and
- Approving Medicaid policies, rules, reimbursement rates, and oversight of operations of the state departments contracted to operate Medicaid programs, subject to direction from the Texas Legislature and state leadership.

In Texas, HHSC delegates some day-to-day operations of the Medicaid program to other state agencies, such as the Texas Department of Aging and Disability Services, the Texas Department of Assistive and Rehabilitative Services, and the Texas Department of State Health Services. Each of these operating departments will be impacted by PPACA.

### B. Impact of PPACA

***Restrictions on State Ability to Define Eligibility and Tailor Medicaid Programs***

PPACA precludes a state from adopting eligibility standards, methodologies, or procedures for Medicaid or CHIP that are more restrictive than those in place on March 23, 2010, the date PPACA was signed into law.[3] This requirement is the "maintenance of effort" requirement.

The maintenance of effort requirement means that Texas cannot make any change to eligibility that would render a person ineligible for Medicaid or CHIP benefits when that same person would have been eligible for benefits on March 23, 2010. If Texas fails to comply with the maintenance of effort requirement, it risks losing federal matching funds

---

[1] *See* General Appropriations Act, Chapter 1428, 80th Leg., R.S., 2007; General Appropriations Act, Chapter 1424, 81st Leg., R.S., 2009.
[2] *Id.*
[3] PPACA, § 2001(b).

for all Medicaid programs, including funds that support services to pregnant women, children, and the aged and disabled populations.

Through the maintenance of effort requirement, PPACA severely restricts the discretion of the Texas Legislature and state leadership to design programs and allocate the state's limited resources in the way that best serves all Texans. Further, by imposing an immediate freeze effective on the date of its passage, PPACA deprives the state of any opportunity to evaluate its current allocation of resources and to make adjustments in preparation for the long-term commitments required under the Act.

Women's Health Program

The Women's Health Program (WHP) is a five-year Medicaid demonstration project authorized by the Texas Legislature in 2005 to expand access to preventive health and family planning services for women. The statute authorizing the project, section 32.0248 of the Texas Human Resources Code, expires September 1, 2011. The federal Centers for Medicare and Medicaid Services (CMS) approved the state's request for a demonstration project and HHSC implemented the WHP beginning January 1, 2007. The WHP is scheduled to expire December 31, 2011.

Although HHSC believes that the statutory and CMS-approved expiration dates are not a "more restrictive" eligibility standard, methodology, or procedure than was in effect before March 23, 2010, CMS's interpretation of the maintenance of effort requirement indicates that CMS may require Texas to maintain coverage of all clients served through the WHP until the maintenance of effort requirement expires. Thus, Texas may be required to extend the WHP even if the Legislature decides not to renew or extend the statute beyond September 1, 2011, or wishes to change the scope of program benefits or conditions of eligibility.

HHSC has asked CMS for guidance as to whether Texas may rely on CMS's prior approval and allow the project to expire by its terms without violating the maintenance of effort requirement. Further, HHSC asked CMS for guidance as to whether, if CMS believes failure to renew the statute would violate the MOE provision, Texas will need to take specific action, either through an extension or State Plan amendment, to continue the program. CMS has not yet responded.

Home and Community-Based Services Waiver Programs

Medicaid Home and Community-Based Services (HCBS) waiver programs are optional programs created by a state, with permission from CMS, under §1915(c) of the Social Security Act. Through the use of waiver programs, a state can provide a broad array of home and community-based services to targeted populations as an alternative to institutionalization. States historically have had discretion to tailor the size of HCBS waiver programs and to allocate funding to accommodate changing service needs and limits on available resources.

Under PPACA, it is not clear that the state retains the discretion to control the services or size of its waiver programs. PPACA requires the state to maintain eligibility standards,

methodologies, and procedures for a waiver program and gives the state the option of rolling the waiver services into the State Plan services; it is not clear whether these instructions are meant to preclude termination or reduction in the size of a waiver program.

CMS has not issued guidance on the application of PPACA's maintenance of effort requirement to the HCBS waiver programs. However, CMS did issue guidance on the application of a similar maintenance of effort requirement in the American Recovery and Reinvestment Act (ARRA). In State Medicaid Director Letter #09-005, CMS provided a list of examples that CMS considers to be restrictions on "eligibility standards, methodologies, or procedures," that includes:

- Reducing occupied waiver capacity for section 1915(c) HCBS waivers.
- Reducing or eliminating section 1915(c) waiver slots that were funded by the legislature but unoccupied as of July 1, 2008.[4]

These restrictions could be interpreted to limit the Texas Legislature's discretion to allocate funding for waiver programs. Texas may not have the flexibility to implement small reductions in funds appropriated for some waiver programs based on budget constraints and performance goals that are intended to assure client service needs.

HHSC has asked CMS to reconsider its interpretation of ARRA's maintenance of effort requirement and to provide guidance on the application of PPACA's similar requirement to the HCBS waiver programs.

<u>Treatment of Children and Adults in Optional Programs</u>

PPACA establishes separate maintenance of effort requirements for the adult and children's Medicaid populations and, as a result, significantly alters the state's expectations for coverage of optional categorically needy populations. The maintenance of effort requirement for the adult Medicaid population will remain in place until the U.S. Department of Health and Human Services (HHS) determines that the state's health insurance exchange is fully operational.[5] The maintenance of effort requirement for CHIP and the children's Medicaid population up to age 19 will remain in effect through September 2019.[6]

Consistent with federal law, Texas has opted to cover, as optional categorically needy groups, individuals who are eligible under a special income level and who are in nursing facilities; ICF-MR facilities; acute care hospitals; and institutions for mental diseases for individuals over the age of 65. With one exception, these groups—unlike the PPACA's maintenance of effort requirements—are not age-specific.

---

[4] State Medicaid Director Letter (SMDL) #09-005, available at http://www.cms.gov/SMDL/downloads/SMD081909.pdf (Letter) and http://www.cms.gov/SMDL/downloads/SMD081909Att2.pdf (Enclosure B), last visited September 2, 2010.

[5] PPACA, § 2001(b).

[6] *Id.*

HHSC created these groups according to policy direction from state leadership and with the understanding that, in accordance with federal statute and regulation, if the state provided Medicaid coverage to one eligible individual in a group, it would provide Medicaid coverage to all eligible individuals. If, therefore, the state provides Medicaid coverage to children in an optional categorically needy group that is not age-specific, the state may also be required to cover adults in the same group. So, while PPACA's maintenance of effort requirement for the adult Medicaid population purportedly ends when the health insurance exchange is operational, it may in effect be extended through September 2019 with respect to adults in these non-age-specific, optional categorically needy groups. As a result, Texas could be forced to provide Medicaid coverage to adult and child members of an optional categorically needy group through September 2019, although it may be more cost-effective for the state if the adult group members could be covered through the Exchange.

***Primary Care Physician Rate Increases***

PPACA increases Medicaid rates for primary care services furnished in 2013 and 2014 to not less than 100 percent of the Medicare rates for similar services.[7] HHSC projects that the required rate increase will cost Texas approximately $631 million / year.[8] Because of the difficulties inherent in reducing provider reimbursement rates, HHSC assumes in its projections that the rate increase would continue beyond the two-year period delineated in the law.

***Loss of Prescription Drug Rebate Revenue***

PPACA modifies the minimum Medicaid federal unit rebate amount for most drugs.[9] These modifications were made retroactively effective to January 1, 2010, and have the effect of reducing the supplemental rebates available to the states.

CMS provided initial guidance to states regarding PPACA's pharmacy rebate provisions on April 22, 2010.[10] In this initial guidance letter, CMS indicated that it would retain the difference between the old and new rebate percentages across the board for all drugs, not just for those drugs for which there is an actual increase in the federal rebate amount due to the Act.

Texas Medicaid requested that CMS revise its position. On July 28, HHSC received draft guidance that proposed two options for calculating the federal recapture of the federal rebates. The new approach proposed by CMS would limit the rebate amount that is recaptured by CMS to the amount of increase attributable to PPACA.

---

[7] PPACA, § 1202.
[8] These projections were developed by HHSC Strategic Decision Support staff (HHSC SDS) based on claims information maintained by the TMHP's Medicaid Acute Care Claims Payment System.
[9] PPACA, § 2501.
[10] *See* State Medicaid Director Letter #10-006, available at http://www.cms.gov/smdl/downloads/SMD10006.pdf , last visited September 2, 2010.

HHSC currently estimates that Texas will lose approximately $70.4 million in rebate revenue from January 2010-August 2013.[11] During that same timeframe, the state will receive approximately $1.5 billion in rebate revenue.[12]

*Intrastate Insurance Exchange*

PPACA requires Texas to establish one or more Health Insurance Exchanges, or the federal government will do so.[13] An Exchange must be operated by a governmental entity or non-profit organization. If, by January 1, 2013, the federal government determines that Texas will not be ready to operate an Exchange by January 1, 2014, the federal government will designate an entity to operate an Exchange for the State. Texas is exploring whether to establish one or more Exchanges.

No single entity has been designated to design or operate an Exchange if Texas opts to do so. We anticipate receiving further direction the establishment and operation of the Exchange when the Texas Legislature meets from January - May 2011. In the meantime, HHSC and the Texas Department of Insurance (TDI) are coordinating preliminary Exchange planning activities.

If Texas chooses to establish an Exchange, HHSC will incur costs associated with Exchange planning and operations. HHSC's eligibility and enrollment experience will be necessary to begin to plan and estimate costs for the eligibility and enrollment infrastructure required for the Exchange. In addition, regardless of which entity operates the Exchange in Texas, HHSC will be responsible for closely coordinating with the Exchange for streamlined eligibility and enrollment for the Exchange, Medicaid and CHIP. HHSC also will be involved in outreach to vulnerable populations who may be eligible for Medicaid, CHIP, or Exchange subsidies and cost sharing assistance.

For the purposes of estimating costs to develop and operate the Exchange, and pending federal guidance, HHSC has taken the lead in analyzing and estimating costs associated with: eligibility and enrollment; subsidy determination; premium payment; and eligibility-related customer service functions. HHSC expects significant planning and system development efforts from 2011-2013 in order to be ready to operate an Exchange by January 1, 2014.

*Medicaid Eligibility Expansion*

PPACA expands Medicaid eligibility to all individuals under 65 with incomes of up to 133% of the Federal Poverty Level (FPL).[14] Based on 2008 Census Bureau statistics,

[11] These projections were developed by HHSC Forecasting staff based on information from the Texas Medicaid Vendor Drug claims extract file maintained by FirstHealth, HHSC's pharmacy claims administrator, and the rebate estimate analysis prepared by HHSC Forecasting.
[12] *Id.*
[13] PPACA, § 1311.
[14] PPACA, § 2001(a).

Texas has 6,500,000 uninsured residents. Of those, 2,145,000 Texas citizens have incomes below 133% of the FPL.[15]

In Texas, this expansion means that several new populations will be eligible for benefits, including: parents and caretakers with incomes from 14% to 133% of FPL; childless adults up to 133% of FPL; foster-care recipients through age 25; and emergency Medicaid in expansion populations. Texas anticipates caseload growth as a result of these newly eligible individuals as well as individuals who are currently eligible for services but not enrolled.

The expansion of Medicaid coverage to include all individuals under age 65 with incomes up to 133 percent of the federal poverty level will increase Texas's costs, less so in the early years but more so after 2016. HHSC projects PPACA will increase the state's costs by $1.0 billion / year between 2014 and 2016. This will increase to an estimated $2.1 billion / year between 2017 and 2019. Between 2020 and 2023, HHSC projects the state's costs will run to approximately $4.4 billion / year.[16]

I declare under penalty of perjury that the foregoing is true and correct. The information and projections included above are complete and accurate to the best of my knowledge as of the date of this Declaration, and are subject to revision as additional information is generated over time and as PPACA is amended or as federal agencies promulgate guidance and regulations on PPACA's application.

Executed on November 4, 2010, in Austin, Texas.

**BILLY R. MILLWEE**
**Texas State Medicaid Director**

[15] Information provided by HHSC SDS, based on data from the U.S. Census Bureau, March 2009 Current Population Survey – Texas Sample – 2008 figures.
[16] These projections were developed by HHSC SDS based on data from the U.S. Census Bureau, March 2009 Current Population Survey – Texas Sample – 2008 figures and TMHP, Medicaid Acute Care Claims Payment System.