IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Pensacola Division

STATE OF FLORIDA, by and through
Bill McCollum, et al.,

      Plaintiffs,

v.                                Case No.: 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
et al.,

      Defendants.
_____/


## APPENDIX OF EXHIBITS IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT


**VOLUME IV**

**(Exhibits 21-34)**

Plaintiffs hereby submit Volume IV of their Appendix of Exhibits in Support of their Motion for Summary Judgment.

Respectfully submitted,
**BILL MCCOLLUM**
**ATTORNEY GENERAL OF FLORIDA**

/s/ Blaine H. Winship
Blaine H. Winship (Fla. Bar No. 0356913)
Special Counsel
Joseph W. Jacquot (Fla. Bar No. 189715)
Deputy Attorney General
Scott D. Makar (Fla. Bar No. 709697)
Solicitor General
Louis F. Hubener (Fla. Bar No. 0140084)
Timothy D. Osterhaus (Fla. Bar No. 0133728)
Deputy Solicitors General
Office of the Attorney General of Florida
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Email: blaine.winship@myfloridalegal.com
*Attorneys for Plaintiff States*

David B. Rivkin (D.C. Bar No. 394446)
Lee A. Casey (D.C. Bar No. 447443)
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Ste. 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
*Attorneys for Plaintiff States, National Federation of Independent Business, Mary Brown, and Kaj Ahlburg*

Katherine J. Spohn
Special Counsel to the Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, Nebraska 68508
Telephone: (402) 471-2834
Facsimile: (402) 471-1929
Email: katie.spohn@nebraska.gov

*Attorneys for Plaintiff the State of Nebraska*

Karen R. Harned                             Bill Cobb
Executive Director                          Deputy Attorney General
National Federation of Independent          for Civil Litigation
Business                                    Office of the Attorney General of Texas
Small Business Legal Center                 P.O. Box 12548, Capitol Station
1201 F Street, N.W., Suite 200              Austin, Texas 78711-2548
Washington, DC 20004                        Telephone: (512) 475-0131
Telephone: (202) 314-2061                   Facsimile: (512) 936-0545
Facsimile: (202) 554-5572                   Email: bill.cobb@oag.state.tx.us
*Of counsel for Plaintiff National*         *Attorneys for Plaintiff the State of Texas*
*Federation of Independent Business*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 4th day of November, 2010, a copy of the foregoing Volume

IV of Appendix of Exhibits in Support of Plaintiffs' Motion for Summary Judgment was served

on counsel of record for all Defendants through the Court's Notice of Electronic Filing system.

<u>/s/ Blaine H. Winship</u>
Blaine H. Winship
Special Counsel

TABLE OF EXHIBITS

Exhibit No.

1 _____Dudek  Declaration

2 _____Lange  Declaration

3 _____Watkins Declaration

4 _____Leznoff  Declaration

5 _____Robleto  Declaration

6 _____Shier Declaration

7 _____Ashmore Declaration

8 _____Battilana Declaration

9 _____Betlach Declaration

10____Casanova Declaration

11 ____Damler Declaration

12 ____Phillips Declaration

13 ____Anderson Declaration

14 ____Chaumont Declaration

15 ____Wells Declaration

16 ____Willden Declaration

17 ____Van Camp Declaration

18 ____Bowman Declaration

19 ____Zinter Declaration

20 ____Millwee Declaration

21 ____Dial Declaration

22 ____Kukla Declaration

23 ____Gooch Declaration

24 ____Sundwall Declaration

25 ____Brown Declaration

26 ____Ahlburg Declaration

27 ____Danner Declaration

28 ____Grimes Declaration

29 ____Klemencic Declaration

30 ____McClain Declaration

31 ____Thompson Declaration

32 ____CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, April 1, 2010

33 ____Second CMS Letter from Acting Director Barbara K. Richards to Monica Curry, AZ Off. of Intergovernmental Relations, June 24, 2010

34 ____Chairman Ben S. Bernanke, Bd. of Governors of the Federal Reserve System, Challenges for the Economy and State Governments, Aug. 2, 2010

35 ____Policies for Increasing Economic Growth and Employment in 2010 and 2011, Cong. Budget Off., Jan. 2010

36 ____ Variation in Analyses of PPACA's Fiscal Impact on States, Cong. Res.Serv., Sept. 8, 2010

37 ____ State and Local Governments' Fiscal Outlook (GAO-10-358), Gov't Accountability Off, March 2010

38 ____ State and Local Governments: Fiscal Pressures Could Have Implications for Future Delivery of Intergovernmental Programs (GAO-10-899), Gov't Accountability Off., July 2010

39____ Richard S. Foster, Estimated Financial Effects of the "Patient Protection and Affordable Care Act," Centers for Medicare & Medicaid Service, April 22, 2010

40____ Dubberly Declaration

# Exhibit 21

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Pensacola Division

STATE OF FLORIDA, by and through
Bill McCollum, et al.,

      Plaintiffs,

v.                                                            Case No.: 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
et al.,

      Defendants.

---

## DECLARATION OF PHILIP S. DIAL, FSA

Pursuant to 28 U.S.C. § 1746, I, **PHILIP S. DIAL, FSA**, declare the following:

"My name is **PHILIP S. DIAL, FSA**. I am of sound mind. I have personal knowledge of each of the true and correct facts stated herein, and I am competent and authorized to make this affidavit.

I hold the positions of Senior Principal and Secretary for Rudd and Wisdom, Inc. ("Rudd and Wisdom") and have expertise in the design and financing of health and welfare plans, as described more fully in my attached resume. See Attachment 1.

Rudd and Wisdom provides consulting actuarial services to the Employees Retirement System of Texas ("ERS"), pursuant to a contract effective September, 2009 ("Contract"). Pursuant to the Contract, Rudd and Wisdom provides actuarial advice to the Texas Employees Group Benefits (Insurance) Program ("GBP") administered by ERS. Relevant Contract provisions are in Attachment 2.

Under the Contract, Rudd and Wisdom is responsible for providing actuarial services to ERS in connection with the GBP, including, but not limited to preparation of actuarial cost projections, development of recommendations for contribution rates and liability estimates, and provision of assistance to ERS in preparation of its submission of budget information requested by the Texas Legislative Budget Board ("LBB").

I am familiar with the State of Texas' and ERS' policies and practices concerning accounting and financial reporting for health insurance coverage contributions and benefits provided under the GBP administered by ERS.

1

I have verified and confirmed the accuracy of the information contained in the Attachments to this Declaration. Information submitted to ERS by Rudd and Wisdom is accurately contained in Attachment 3, the Legislative Appropriations Request for Texas State Fiscal Years 2012-2013 (September 1, 2011 to August 31, 2013) (hereinafter the "LAR"). The cost estimates included in LAR Schedule 6J were prepared by Rudd and Wisdom employees at the request of ERS. These estimates were prepared by Rudd and Wisdom employees on ERS' behalf in the regular course of business at or near the time of the act, event or condition described therein or reasonably soon thereafter.

## Legislative Appropriations Request:

I am familiar with LBB's request, in May, 2010, for ERS to prepare and submit its LAR. Part of Rudd and Wisdom's duties under the Contract are to assist ERS in doing so and it did assist with the LAR as required.

The LBB instructions required ERS to estimate the budgetary impact to the GBP of federal health care reform: Patient Protection and Affordable Care Act of 2010 ("PPACA;" Public Law 111-148), and the Health Care and Education Reconciliation Act of 2010 ("HCERA;" Public Law 111-152) (collectively referred to as "federal health care reform" and/or PPACA).

As requested by ERS, Rudd and Wisdom submitted budgetary estimates to ERS. ERS submitted the LAR containing those budgetary estimates to state leadership, on August 30, 2010. Relevant portions of the LAR related to federal health care reform are included in Attachment 3. The LAR containing Rudd and Wisdom's estimates is publically available on the ERS website: http://www.ers.state.tx.us/news/reports/documents/lar2012-2013.pdf.

The relevant portion of the LAR seeks state funding for ERS to provide basic life and health insurance benefits to state agency employees, retirees and their eligible dependents under the GBP.

The State appropriations requested in the LAR are only part of the GBP funding. Other funding currently comes from:

- Member contributions for dependent premiums;
- Contributions from higher education institutions and other employers; and
- Supplemental funding from the contingency reserve fund (when available) as required under Section 1551.211 of the Texas Insurance Code.

This declaration addresses only the costs associated with and the appropriation requests to the State of Texas for state agency members participating in the GBP and excludes contributions from members, higher education institutions, other employers, and any reserve funds.

## Estimated Budgetary Impact of Federal Health Care Reform:

The LAR includes an estimate of the budgetary impact to the State of Texas expected to result from the impact of federal health care reform on the GBP, shows, per capita, that GBP costs are

2

projected to increase based on a number of factors including federal health care reform, and accurately represents the advice Rudd and Wisdom provided under the Contract. See Attachment 3, Schedule 6.J.

The actuarial advice provided by Rudd and Wisdom was given to ERS in accordance with the limited, specific instructions of the LBB. See
http://www.lbb.state.tx.us/LAR/LAR_Agency_Instructions.pdf

The following summarizes the information prepared by Rudd and Wisdom at the request of ERS and included in the LAR pursuant to LBB instructions for the estimated State of Texas costs for state agency members participating in the GBP, known to ERS to date, due to federal health care reform for state fiscal years 2012 and 2013:

| LAR ITEM NAME: | Total Request SFY 2012 | Total Request SFY 2013 |
|---|---|---|
| Item 1-Expand coverage to dependent children up to age 26: | $7,693,000 | $8,389,000 |
| Item 2-Cover preventive care at 100%: | $14,269,000 | $15,508,000 |
| Item 3-Eliminate lifetime maximum: | $158,000 | $172,000 |
| Item 4-Patient Centered Outcome Research Fee: | $0 | $309,00 |
| TOTAL each state fiscal year: | $22,120,000 | $24,378,000 |
| TOTAL fiscal years 2012-2013: | $46,498,000 | |

See Attachment 3, Schedule 6.J PART A.

Concerns submitted for each item included, but were not limited to, that ERS continues to review the impact, application and requirements of federal health care reform to the GBP in conjunction with existing law.   As such, cost estimates are expected to change and new costs not yet identified are expected to be identified in the future.

The impact of enrollment growth was not considered, as instructed by the LBB.

I estimated the following additional cost to the State of Texas for state agency members participating in the GBP due to federal health care reform, as instructed by ERS and the LBB:

**Item 1 – Expand coverage to dependent children up to age 26.**

If the expansion of coverage to dependents up to age 26 in federal health care reform [PPACA Sec. 1001 adds Public Health Services Act (PHSA) Sec. 2714] is applicable to the GBP, I estimate the following additional cost to the State of Texas for state agency members:

1. Based on information provided by ERS, I estimate that an additional 6,500 dependent children will be eligible to participate each year as a result of this provision. ERS maintains date of birth information on dependents in the GBP. ERS runs a monthly process to drop dependents who reach age 25 since they are generally no longer eligible for coverage in the GBP. Dependent children who get married also lose

3

eligibility for coverage under the GBP. Based on the number of dependent children who are dropped from the GBP each year due to age or marriage, ERS estimated that an additional 6,500 dependent children will be eligible to participate in the GBP each year as a result of this provision.

2. Of these 6,500 dependent children, who would become eligible due to federal health care reform and assuming no growth in enrollment, I estimate that an additional 5,418 children will participate in the GBP each year. This estimate is based on the following assumptions:

   a. Under the GBP, the member contribution for child coverage is the same regardless of the number of children covered. Approximately two-thirds (4,336) of the newly eligible children will be from families for which the member is already purchasing child coverage. Since the member will not be required to make any additional contribution in order to enroll a newly eligible child, I assume that all of these children will participate.

   b. The remaining one-third (2,164) of the newly eligible children will be from families for which the member is not currently purchasing child coverage. Since the member will be required to make a contribution for the coverage of these children, I assume that only 50% of those eligible (1,082) will participate.

   c. Total participation from these two groups will be 5,418 (4,336 + 1,082).

   Based on actual GBP experience data for members under age 30, we estimate that it will cost approximately $4,096 to cover each additional child in FY12. This estimate takes into consideration the expectation that, on average, these new participants will cost more than other participants their age due to the voluntary nature of their participation; i.e., those with known health problems will be more likely to participate than those that are healthy. We expect this cost to increase in accordance with the health plan benefit cost trend of approximately 9.1% per year to $4,467 ($4,096 + 9.1%) per child in FY13. The health plan benefit cost trend represents the projected annual increase in per capita plan expenditures expected to result from increases in the utilization and price of health care services and increases in the health plan's share of such expenses given that member copays, deductibles and coinsurance are generally fixed.

   Based on these assumptions, the additional cost to the plan is estimated at $22.2 million (5,418 X $4,096) for FY12 and $24.2 million (5,418 X $4,467) for FY13. This cost is expected to increase each year in the future in accordance with the health plan benefit cost trend.

3. The change in eligibility for children will increase the cost of dependent coverage. The cost will be spread 50%/50% between the employers and the members assuming continuation of the current funding. Therefore, the employer cost will increase $11.1M (50% X $22.2M) for FY12 and $12.1M for FY13 (50% X $24.2M)

4. Based on current enrollment, the employer cost is split among the state (69.33%), higher education institutions (27.91%) and miscellaneous other employers (2.76%). Therefore, the additional cost to the State of Texas for state agency members is estimated to be $7.7 million (69.33% X $11.1 million) for FY12 and $8.4 million (69.33% X $12.1 million) for FY13.

## Item 2 – Cover preventive care at 100%.

If 100% coverage of preventive care in federal health care reform [PPACA Sec. 1001 adds PHSA Sec. 2713] is required under the GBP, I estimate the following additional cost to the State of Texas for state agency members:

1. I estimate that the plan will incur additional cost of approximately $46 for each of the 543,000 GBP participants expected to be enrolled in FY12 or $25.0 million ($46 X 543,000), based on the following assumptions:

   a. The $25 co-payment would be waived on an average of one wellness visit per year for each participant, thus generating additional cost of $25 per participant for FY12.
   b. Approximately 10% of the participants would incur expenses for labs, tests and other services that would have been subject to the 20% co-insurance which would be prohibited under federal health care reform. The average annual expenses that would have been subject to coinsurance for the affected participants would be $210. Therefore, the average additional expense for all participants would be $21 (10% X $210) per participant for FY12.
   c. The total additional cost resulting from 100% coverage of preventive care is estimated to be $46 ($25 + $21) per participant for FY12.
   d. The projected enrollment for FY12 is based on the average number of participants in FY10.

   I estimate this cost to increase to about $50 per participant in FY13 in accordance with the 9.1% health plan benefit cost trend ($46 + 9.1% = $50) Thus the projected additional cost would rise to $27.1 million ($50 X 543,000) in FY13.

2. Since this change will increase the cost of coverage for members and dependents, the cost will be split between the employers and the members. Based on the current distribution of contributions, the employers pay 82.15% of the contributions while the members pay 17.85% of the contributions. Therefore the employers' share of the projected additional cost would be approximately $20.5 million (82.15% X $25.0 million) for FY12 and $22.3 million (82.15% X $27.1 million) for FY13.

3. The additional cost to the State of Texas for state agency members would be $14.3 million (69.33% X $20.5 million) for FY12 and $15.5 million (69.33% X $22.3 million) for FY13.

5

**Item 3 – Eliminate lifetime maximum for out-of-network services.**

Though the GBP does not currently apply a lifetime maximum to in-network benefits, if the GBP is required to eliminate the lifetime maximum for out-of-network services as specified by federal health care reform [PPACA Sec. 1001 adds PHSA Sec. 2711], I estimate the following additional cost to the State of Texas for state agency members:

1. I estimate that this provision will increase GBP costs by $250,000 in FY11, $277,000 in FY12, and $303,000 in FY13. These amounts have been established based on actuarial judgment since data regarding expenses in excess of the current limit are not available due to the impact of the limit.

2. Since this change will increase the cost of coverage for members and dependents, the cost will be split between the employers and the members 82.15%/17.85%. The employers' share of the projected additional cost would be approximately $205,000 (82.15% X $250,000) for FY11, $228,000 (82.15% X $277,000) for FY12 and $249,000 (82.15% X $303,000) for FY13.

3. The additional cost to the State of Texas for state agency members would be $142,000 (69.33% X $205,000) for FY11, $158,000 (69.33% X $228,000) for FY12 and $172,000 (69.33% X $249,000) for FY13.

**Item 4 – Payment of annual fee required to fund Patient Centered Outcomes Research Trust Fund.**

If the GBP is required to pay into the Patient Centered Outcomes Research Trust Fund, as defined by the federal health care reform [PPACA Sec. 6301(e)(2)(A) adds Internal Revenue Code Subchapter B, Sec. 4376], I estimate the following additional cost to the State of Texas for state agency members:

1. The annual fee required under this provision will be $1.00 multiplied by the average number of participants enrolled in the GBP health plans (HealthSelect and the HMOs) during FY13, the first state fiscal year to which the fee applies, as defined by federal health care reform. *Id.*

2. The fee will be paid based on the average enrollment for the fiscal year, which I assume will be about 543,000 members and dependents or $543,000.

3. Since this change will increase the cost of coverage for members and dependents, the cost will be split between the employers and the members 82.15%/17.85%. The employers' share of the projected additional cost would be approximately $446,000 (82.15% X $543,000) for FY13.

4. The additional cost to the State of Texas for state agency members would be $309,000 (69.33% X $446,000) for FY13.

6

5. This fee will be incurred during FY13 even though it would not be paid until FY14.

I reserve the right to amend my testimony, as permitted by the Court, to address costs which may become known to ERS and Rudd and Wisdom in connection with existing and/or revised state and federal statutes or regulations and/or as relevant input or direction from Texas legislative leadership is received to permit various calculations and estimates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 30th day of September, 2010.

Philip S. Dial, FSA
Senior Principal
Rudd and Wisdom, Inc.

7

**ATTCHMENT 1**

***Philip S. Dial***

Mr. Dial is a graduate of the University of Texas at Austin with a Bachelor's degree in Business Administration. He also has a Master's degree in Actuarial Science from the University of Michigan. He is a Fellow of the Society of Actuaries and a member of the American Academy of Actuaries. Mr. Dial has been a consulting actuary with Rudd and Wisdom, Inc. since 1971 and is the firm's specialist in the group and health benefits field. He has seven years experience working with public pension plans. He is a Senior Principal and Secretary of the firm.

His experience includes:

- Service as consultant to large group and health benefits programs of large public employers, including that of the State of Texas, the University of Texas System, the Texas Medicaid Program and group benefits programs of several of the largest trade and professional associations in Texas. These consulting activities include:

    o Health and welfare plan design and financing
    o Risk evaluation
    o Evaluation and selection of insurance, reinsurance, managed care arrangements ,and administrative contracts
    o Valuation of other post employment benefits under GASB 43 and 45
    o Design of alternate funding mechanisms
    o Actuarial cost projections/statistical modeling
    o Preparation of budgets and legislative appropriation requests
    o Legislative impact evaluation and testimony before legislative committees
    o Provision of technical advise to boards of trustees
    o Assistance with and provision of testimony before legislative committees
    o Communication of complex actuarial and risk-related issues to non-technical personnel

- Extensive consulting activities with professional associations in the design, creation, implementation and operation of captive insurance companies designed to meet the individual insurance needs of their members. These consulting services have included strategic planning, financial analysis, policy design, premium rate determination, assistance in regulatory matters, procurement of reinsurance and general advice and counsel to staffs and boards of directors.

- Extensive consulting activities with large, public retirement systems in Texas including actuarial valuations, special studies and investigations of experience. These services have also included consultation with respect to policy matters, administrative methodology, benefit design and the drafting of legislation.

**ATTACHMENT 2**

STATE OF TEXAS          §
                        §
COUNTY OF TRAVIS        §

## THIRD RESTATED CONTRACT

### Article 1.  Background

1.1   The Employees Retirement System of Texas ("*ERS*" or "*retirement system*") is a constitutional trust fund established as mandated by Article XVI, Section 67, Texas Constitution, and further organized pursuant to Subtitle B, Title 8, Tex. Gov't Code, as well as 34 Tex. Admin. Code, Sections 61.1 et seq. ERS administers retirement and employment-related benefits, including insurance benefits, for several classes of public servants, including elected officials, appointed public officers, public employees and their dependents. The Board of Trustees for the Employees Retirement System of Texas (the "*Board*") is the trustee for trust funds maintained and administered by the retirement system.

1.2   RUDD AND WISDOM entered into a Restated and Amended Contract and Renewal (the "*First Restated Contract*"), which replaced prior contracts between the parties, for the purpose of Rudd and Wisdom providing ERS with actuarial services for the administration of the Texas Employees Group Benefits Program ("*GBP*"), formerly known as the UGIP, for the period beginning on January 1, 2003 and ending on December 31, 2003 ("the "*Services*"). Thereafter, ERS renewed and extended the Contract through May 31, 2008, through amendments to the First Restated Contract.  On May 30, 2008, the parties renewed and extended the Contract through August 31, 2009 by entering into the Second Restated Contract (the "*Second Restated Contract*"),

1.3   The parties hereby desire to enter into this Third Restated Contract ("*Third Restated Contract*" or "*the Contract*") in order to renew the Second Restated Contract for an additional term, and to add new language as outlined below.

1.4   As used herein, RUDD AND WISDOM shall mean and necessarily include the business entity selected by ERS to provide the Services (as defined in Article 4) pursuant to the Contract, and also includes RUDD AND WISDOM's Agents (as defined below) involved in performing, delivering or providing any representations, warranties, services, equipment, or products relating to the Contract or the Services. The term "*Agent*" shall mean affiliates, subsidiaries, representatives, officers, directors, principals, employees, agents, assigns and any subcontractors and independent contractors. References hereafter in the Contract listing Agent, Agents and/or any of the above specific entities, in addition to RUDD AND WISDOM, are for emphasis only and are not intended to limit the scope of the foregoing definition of RUDD AND WISDOM.

1.5   For and in consideration of the mutual promises, covenants, and consideration herein expressed, the receipt and sufficiency of which is hereby acknowledged, the Contract is entered into by and between RUDD AND WISDOM and ERS to be effective as of the date set forth herein.

### Article 2.  Contract Term, Renewal, Amendment and Termination

2.1   The Contract and all aspects of the Contract will be for a term beginning as of the date executed by an authorized representative of ERS as set forth on the signature page hereto and extending through August 31, 2011, unless terminated as provided herein or further extended by written agreement of the parties. ERS and RUDD AND WISDOM agree and acknowledge that the Services to be provided under the Contract are anticipated to be transacted primarily between September 1, 2009 and August 31, 2011 (the "*Service Period*").

2.2   Notwithstanding the immediately preceding paragraph, ERS and RUDD AND WISDOM agree and acknowledge that there are duties and obligations specified by the Contract to be performed prior to and following the Service Period, and the parties each agree to perform all such duties and obligations, and all damages provisions included herein shall thereby be in effect. All contractual provisions related to RUDD AND WISDOM's obligations that extend beyond the Service Period, shall survive the termination or expiration of the Contract. In the event any dispute arises in connection with any aspect of the Contract,

Rudd & Wisdom                    ERS

RUDD AND WISDOM's invoices, ERS must notify RUDD AND WISDOM within that thirty (30) day period. Any charge or portion of a charge outstanding (30) days after payment is due will be subject to a late charge, which ERS agrees to pay, equal to the lesser of 1.0% or the maximum allowed by law for each month that payment remains outstanding.

3.4     This entire Article shall survive any termination, expiration, renewal, extension or amendment of the Contract.

### Article 4. Scope of Services and Guidelines

4.1     RUDD AND WISDOM shall provide actuarial Services required in connection with the administration of the GBP. The Services include, but are not limited to RUDD AND WISDOM's agreement to:

A.  provide a wide range of actuarial consulting services;

B.  assist and advise ERS in the preparation of Requests for Proposals and Requests for Applications;

C.  review responses to Requests for Proposals and Requests for Applications submitted by carriers, administrators and health maintenance organizations (each an "*HMO*") for reasonableness, accuracy, and compliance with the theoretical cost model and other applicable pricing information;

D.  advise ERS on pricing standards, service fees, and industry norms and trends;

E.  develop actuarially sound funding projections and contribution rates for ERS' self-funded plans to be recommended to the Board and to form the basis for legislative appropriations;

F.  review and analyze proposed premium rates from carriers and HMO's for health plans and other insurance plans;

G.  assist in the preparation of ERS' Cost Containment Report;

H.  assist with fiscal note preparation during legislative sessions, and testify before the legislature as requested;

I.  assist with biennial budget submission to the Legislative Budget Board;

J.  assist ERS in the preparation and review of bids in connection with optional coverages;

K.  analyze utilization data and cost trends for all programs;

L.  assist with plan design for the dental program;

M.  analyze prescription drug program claims information, utilization, costs and rebates and advise on future trends;

N.  assist as requested in the review and verification that monthly claim summary totals agree with weekly benefit reimbursements made to the self-funded plan administrators;

O.  perform actuarial valuations of Other Postemployment Benefits as required in accordance with GASB 43 and guidance issued by the Comptroller of Public Accounts of the State of Texas;

P.  assist in presentations on financial matters to the Board and legislative committees as requested; and

Q.  perform other services reasonably requested by authorized ERS staff and by the Executive Director as needed.

Rudd & Wisdom          ERS

4.2 Numerous actuarial services are set forth in this Third Restated Contract; however, RUDD AND WISDOM shall perform only those Services provided for under this Third Restated Contract that are specifically requested by ERS. ERS is obligated to pay only for those Services so requested and subsequently rendered by RUDD AND WISDOM. All billings submitted by RUDD AND WISDOM to ERS shall be itemized in a manner acceptable to ERS.

4.3 RUDD AND WISDOM shall not revise the Services for the term of the Contract, unless required by law, or unless by written agreement between the authorized representatives of the parties. RUDD AND WISDOM understands that ERS may revise the Services at any time and agrees to cooperate with ERS and to negotiate in good faith as to any adjustment of the rates reasonably related to such Services.

4.4 RUDD AND WISDOM warrants and represents that the Services it provides under the Contract shall be performed in utmost good faith, in a professional and workmanlike manner and in accordance with applicable professional standards. RUDD AND WISDOM will immediately correct any work not in compliance with this warranty.

**Article 5.  Performance**
5.1 RUDD AND WISDOM will perform the services required by this Third Restated Contract on an as-needed basis from the effective date of this Third Restated Contract.

5.2 To enable RUDD AND WISDOM to perform its Services, ERS will promptly provide RUDD AND WISDOM with such direction, materials, information and access to ERS' representatives as RUDD AND WISDOM reasonably requests. RUDD AND WISDOM will not take responsibility for verifying the accuracy or completeness of information supplied to RUDD AND WISDOM by ERS or ERS' representatives, but RUDD AND WISDOM agrees to describe the information it requires from ERS in sufficient detail for ERS to fully, accurately and timely respond to the request. If RUDD AND WISDOM receives inaccurate, incomplete or improperly formatted information, any additional time and expense required to correct the information will be billed to ERS as additional services.

**Article 6.  Work Product**
6.1 RUDD AND WISDOM agrees that information provided by ERS which is specific to ERS or its employees, members, annuitants, retirees or business which is or could be incorporated into the work product, produced or created by ERS as a result of this Third Restated Contract using information provided by ERS will be the sole and exclusive property of ERS. RUDD AND WISDOM will not sell, lease, publish, or otherwise distribute any such work product content that belongs to ERS except as necessary for RUDD AND WISDOM's performance under this Third Restated Contract. *"Work Product"* is defined as any documents, plans, forms, reports, analyses, and account information, databases, participant information, participant lists, or communications in any communication medium, written or otherwise, which is created, provided or in any manner utilized in connection with RUDD AND WISDOM's performance of its obligations under the Third Restated Contract.

6.2 The Services RUDD AND WISDOM performs, together with the Work Product RUDD AND WISDOM delivers to ERS, are provided for ERS' use, solely for the intended purpose. ERS will own the copies of the Work Product delivered to ERS and have the right to use, reproduce and adapt it for ERS' purposes as ERS deems necessary. ERS will retain ownership of any information provided by or specific to ERS' employees, members, annuitants, retirees, GBP participants or business operations that is or could be incorporated into a deliverable or contained in RUDD AND WISDOM's Work Product, as well as any conclusions or recommendations of RUDD AND WISDOM specific to ERS' employees, members, annuitants, retirees, GBP participants or business operations. RUDD AND WISDOM shall maintain the confidentiality of all such information as specified in Article 14 herein.

6.3 Except as set out in the preceding paragraph, RUDD AND WISDOM will retain all intellectual property rights, (including patents, trade secrets and copyrights) in its Work Product, including derivative works of it, and may use it for any purpose.

Rudd & Wisdom     ERS

IN WITNESS WHEREOF, ERS and RUDD AND WISDOM, as the two signatories to the Contract, have memorialized this agreement by executing the Contract to be fully effective as of September 1, 2009, upon execution by an authorized representative of ERS as set forth below.

RUDD AND WISDOM

*By: _____

Printed Name:

Title: Secretary

Date: 8/20/09
*Signature must be notarized.

EMPLOYEES RETIREMENT SYSTEM
OF TEXAS

By: _____

Printed Name: Ann S. Fuelberg

Title:  Executive Director

Date:  8-18-09

STATE OF TEXAS       §
                     §
COUNTY OF TRAVIS     §

This instrument was subscribed, sworn to, and acknowledged before me on August 20, 2009, by Philip O Oleil , of Rudd and Wisdom, Inc., a Texas corporation, on behalf of said corporation.

(stamp)

_____
Notary Public in and for the State of Texas

Printed Name of Notary: Jennifer Grissom

My Commission expires: 7-31-2013

JENNIFER GRISSOM
Notary Public
STATE OF TEXAS
Commission Exp. 07-31-2013
Notary without Bond

**ATTACHMENT 3**

# Legislative Appropriations Request

## FISCAL YEARS 2012 - 2013



Submitted to

The Governor's Office of Budget, Planning and Policy
and the Legislative Budget Board

by

The Employees Retirement System of Texas

August 30, 2010

EMPLOYEES RETIREMENT SYSTEM OF TEXAS
LEGISLATIVE APPROPRIATION REQUEST
FOR FISCAL YEARS 2012 AND 2013

TABLE OF CONTENTS

**Description**                                                                                               **Page**

Administrator's Statement ........................................................................................................... 1
Organizational Chart.................................................................................................................... 9
Summary of Base Request by Strategy ......................................................................................2.A
Summary of Base Request by Method of Finance .....................................................................2.B
Summary of Base Request by Object of Expense ......................................................................2.C
Summary of Base Request Objective Outcomes ........................................................................2.D
Summary of Exceptional Items Request .....................................................................................2.E
Summary of Total Request by Strategy ......................................................................................2.F
Summary of Total Request Objective Outcomes........................................................................2.G
Strategy Request..........................................................................................................................3.A
Rider Revisions and Additions Request .....................................................................................3.B
Exceptional Item Request Schedule............................................................................................4.A
Exceptional Items Strategy Allocation Schedule .......................................................................4.B
Exceptional Items Strategy Request ...........................................................................................4.C
Historically Underutilized Business Supporting Schedule ........................................................6.A
Federal Funds Supporting Schedule............................................................................................6.C
Estimated Total of All Funds Outside the General Appropriations Act Bill Pattern Schedule...6.H
Budgetary Impacts Related to Federal Health Care Reform.......................................................6.J

This page is intentionally left blank.

## Administrator's Statement
## 82nd Regular Session, Fiscal Years 2012-2013

Agency Code:   327
Agency Name:  Employees Retirement System of Texas

**Ann S. Fuelberg, Executive Director**

I am pleased to present the Legislative Appropriations Request (LAR) for the Employees Retirement System of Texas. The LAR requests funding to provide retirement and insurance benefits to more than 500,000 State of Texas employees, retirees and their eligible family members. These benefits support the State's goal to recruit, retain, and reward the high-quality workforce Texas needs to make government work for all of its citizens. The programs provide financial security for more than 76,000 retired Texans and health care for one of every 46 Texans, including 118,387 children under the age of 18. The programs benefit Texas through the impact of pension payments spent in Texas and medical claim payments to Texas doctors, hospitals, and pharmacies.

This request supports:

- Four retirement plans: service retirement for state employees (ERS); elected state officials and district attorneys (ESO), law enforcement and custodial officers (LECOS), and two judicial plans including state district and appellate judges (JRS I and JRS II). Disability retirement benefits -- occupational and non-occupational -- are a part of each plan.
- Two death benefit programs: $5,000 lump sum death benefit paid to survivors of state retirees; $250,000 special death benefit paid to the survivors of certain Texas public safety officers killed in the line of duty.
- Three insurance programs: employee and retiree health insurance, the State Kids Insurance Program (SKIP)and  employee and retiree basic life insurance.

## Accomplishments

The continued commitment and careful stewardship of the State, combined with active contract and investment management by ERS, have built a model benefits program. Over 200 employers rely on these benefits to attract the employees they need. Texas is a large and growing state, with diverse workforce needs ranging from professors to prison guards. The benefits program must compete with the private sector and other governmental entities, at a cost that Texas taxpayers can reasonably support. To earn that support, ERS manages the programs to lower costs without sacrificing quality or value.

This past biennium, ERS worked with the Legislature to modify both the retirement and insurance programs to address rising costs. House Bill 2559 addressed the sustainability of the state pension program by modifying key components of the program, such as retirement eligibility, benefit calculations, contribution rates, and return to work employment rules. The new provisions, which went into effect for all employees hired on or after September 1, 2009, are similar to provisions now being considered by states across the country. Texas already prohibits many other pension plan cost drivers, such as automatic retiree cost of living adjustments and increasing or "spiking" retirement benefits by manipulating final salary figures. All employees contribute to their own retirement security.

In the insurance plan, ERS took a multi-pronged approach to address a funding shortfall accelerated by higher than expected hospital costs. Negotiated

provider discounts shaved $2.7 billion from provider-billed charges. When hospitals requested unreasonable price increases, ERS terminated them from the provider network. Unlike many plan sponsors, ERS enforced a court settlement in the pharmacy program, holding our pharmacy benefit manager to honor contractual discounts based on a court ordered price rollback, saving the program an estimated $15 million a year.

Despite these cost-cutting successes, the health insurance plan faced a funding gap. Working with insurance plan participants, ERS developed proposals to share costs with participants. The plan, which goes into effect on September 1, 2010, targets high cost services, while allowing people to manage their budgets. The new benefit design is sensitive to members' preferences and feedback, which ERS received through a series of statewide listening sessions and a survey that drew a 26 percent response rate. Following these changes, participants will be responsible for about 21% of the health care costs of the program.

## External Challenges

Among the many external challenges ERS faced during the past biennium, the most significant was the downturn in the U.S. economy and its effect on the investment market. While ERS was not immune to the market decline, the trust fund's long-term horizon, conservative approach, and diversified investment portfolio makes it well suited to withstand such short-term market volatility.

Another challenge will be the impact and implementation of federal health care reform. While some provisions could have a positive effect, others will certainly increase some short-term costs. Having depleted the insurance contingency reserve fund to cover previous funding shortfalls, the program does not have reserves to deal with these cost increases.

A continuing challenge for the health care program is the rising costs associated with health care delivery. The costs continue to climb at rates well above inflation. Rising costs are due to continuing increases in the price and utilization of health care services because of several factors, including an aging population, an increase in chronic health conditions, the introduction of costly new procedures and medications, and cost shifting to insured patients.

External budget pressure could also affect the retirement program. If Texas reduces the workforce through layoffs or retirement incentives, retirement rates could skyrocket. Currently 13% of the state workforce is eligible to retire. Even employment practices such as furloughs or salary freezes could increase the number of retirements. Retirement rates that exceed current assumptions and experience increase the cost of providing benefits.  The last retirement incentive was a significant factor in increasing system costs by accelerating retirement rates above the system's funding assumptions.

## Retirement Appropriation Request

The state starts funding retirement benefits as soon as a worker enters the system. This funds the benefits throughout an employee's working career. The normal cost is calculated by determining the current rate of employer and employee contributions needed to pay for future retirement benefits, assuming that retirement rates and investment earnings match expectations. The current normal cost is 12.38%. System members contribute 6.5% of that cost.

The unfunded liability of a system is adversely affected when the system does not consistently receive enough contributions to pay the normal cost of providing benefits and pay down any unfunded liability. To cover this unfunded liability, contributions must increase to an actuarially sound contribution rate. The current actuarially sound contribution rate for the ERS employee retirement trust fund is 15.84% based on the valuation as of August 31, 2009.

Both the normal and the actuarially sound contribution rate will change based on the fiscal year end actuarial valuation of the trust fund. In addition to the fiscal year update, a special mid-year actuarial updated valuation of the fund will be done as of February 28, 2011 in order to provide the Legislature with the most current estimates.

**Baseline requests for the retirement program:**

▪ Employee and elected class retirement

  $814 million to fund the state retirement contribution at the base line of 6.95%.

  The member contribution is assumed to remain at 6.5% for the biennium. This baseline request (13.45%) slightly exceeds the current normal cost of 12.38%. This amount does not equal the actuarially sound contribution rate as set by state law and accounting standards. That means it is not enough to amortize the unfunded accrued liability, or even pay the interest on the liability.

▪ Law Enforcement and Custodial Officer Supplemental Retirement Trust Fund (LECOS)

  $47.7 million to fund the LECOS program at the base line of 1.59%.

  LECOS members began contributing to the LECOS retirement fund on September 1, 2009. The LECOS member contribution is assumed to remain at 0.5% of payroll for the biennium. This baseline request (2.09%) slightly exceeds the current normal cost of 2.07%, but it is not sufficient to amortize the unfunded accrued liability over a measurable period.

▪ JRS Plan I

  $54.5 million to fund the Judicial Retirement Plan I at current levels.

  JRS I is a closed plan that receives appropriations equal to benefit payments.

▪ JRS Plan II

  $22.7 million to fund the Judicial Retirement Plan II at the base line of 16.83%.

  Plan II judges contribute 6% of payroll to the plan. The JRS II member contribution is assumed to remain at 6% of payroll for the biennium. At these contribution levels, the plan is considered actuarially sound.

▪ Chapter 615

  $12.1 million to fund public safety officer death benefits at current levels.

▪ Retiree death benefit

  $16.2 million to fund retiree lump sum death benefits at current levels.

**Exceptional item requests for the retirement program:**

▪ Current Actuarially Sound Contribution for Retirement Trust Fund

$282.3 million to provide the actuarially sound contribution rate as required in Sec. 811.006 of the Texas Government Code.

The current actuarially sound contribution rate is 15.84%, requiring an employer contribution of 9.34%, in addition to the member contribution of 6.5%. The actuarially sound contribution rate is made up of the normal cost of 12.38%, and the contributions needed to erase the unfunded liability over 31 years. The current difference is 3.46% between the normal cost and the actuarially sound contribution rate. The system reported an unfunded liability in 2003, following years of below normal cost contributions, the impact of retirement incentives and two years of negative investment returns. The liability has continued to grow because the fund has not received enough contributions to cover the normal cost and pay down the unfunded debt.

- Current Actuarially Required Contribution for Law Enforcement and Custodial Officers Supplemental Fund

  $14.9 million for the LECOS fund to provide the actuarially sound contribution rate as required in Sec. 811.006 of the Texas Government Code.  The current actuarially sound contribution rate is 2.58%, requiring an employer contribution of 2.08%, in addition to the member contribution of 0.5%.

## Group Benefits (Insurance) Program Appropriations Request

### Baseline requests for the Group Benefits Program:

- $2.5 billion to fund the program at the prescribed base level,  below the current spending levels

  The baseline request for the FY2012-2013 biennium provides slightly more funding than the estimated and appropriated state funding for the FY2010-2011 biennium.  Current GBP expenditures are much higher than that appropriated amount. Those higher costs were covered by using funds from the GBP contingency reserve fund as supplemental funding; i.e., the contingency reserve fund is being used to supplement state contributions. ERS expects the contingency reserve fund to be almost fully depleted by August 31, 2011, and unavailable to supplement state contributions in the FY2012-2013 biennium.

  Funding the program at this baseline level would require GBP spending cuts of about 17%. This level of cuts cannot be achieved through standard cost-shifting strategies. This level of cuts would drastically alter the current benefit design and cost sharing structure of the plan. In order to meet this lower funding level, the state would not be able to maintain the current contribution strategy. Since at least 1993, the State has paid 100% of the cost of member coverage and 50% of the cost of dependent coverage. At this baseline funding level, it would be necessary for members (employees and retirees) to pay 20% of the cost of member only coverage and 60% of the dependent coverage cost. For employees covering their families, this would be a 41% increase to their premium contributions.

  Alternatively, the State could choose to restructure the plan design, shifting to a high deductible health plan with an associated health savings account for employees, or a catastrophic health plan.

### Exceptional item requests for the Group Benefits Program:

- Funding to maintain health plan benefits at FY2011 levels

  In addition to the baseline funding request, the program needs $575.6 million to fund the program at a level sufficient to cover GBP costs for the FY2012-2013 biennium, including projected increases in health plan costs. The baseline funding level is based on an average of the FY2010-2011 program costs and not the actual costs as of August 31, 2011.  This lower figure was then reduced by 5%. To make up for this deficit, and to cover

any cost increases, this exceptional item, together with the baseline, requests annual increases in per capita funding of 15.58% for FY2012 and 8.89% for FY2013. ERS expects the contingency reserve fund to be almost fully depleted at the start of the biennium and not available to supplement program funding.

Per capita health plan benefit costs are projected to increase based on a number of factors including:

- how many and what type of health care services and medications will be used by program participants,
- how much service and drug costs are expected to increase,
- how much plan costs will be lowered through cost containment and members' cost share and behavior, and
- the impact of legislative changes, such as expanded coverage required by federal health care reform.

The FY2012 percentage increase is larger than the FY2013 percentage increase. The FY2012 request includes replacing the contingency fund spend down (4.89%), plus the projected costs related to health care reform (1.74%) in addition to the plan cost trend of 8.95%. In FY2013, the per capita funding increase is equal to the per capita increase in GBP cost. Note that this item does not re-establish the contingency reserve fund. Re-establishment of the contingency reserve fund is in a separate exceptional item request.

State appropriations are only part of the GBP funding. Other funding comes from:

- Member contributions for dependent premiums,
- Contributions from higher education institutions, and other employers, and
- Supplemental funding from the contingency reserve fund (when available).

▪ Funding to meet statutory requirement for the GBP contingency reserve fund:

$311.2 million to re-establish the contingency reserve fund as required under Section 1551.211 of the Texas Insurance Code.

The statute requires ERS to request funding necessary to maintain a contingency reserve fund adequate to cover self-funded expenditures for an average 60-day period in the next biennium, or a balance of about $569 million as of August 31, 2013. This funding request, together with additional funding from (a) higher education institutions, (b) other employers participating in the program, and (c) members who elect dependent coverage, is expected to be sufficient to meet the statutory minimum.

## Estimated Budgetary Impacts Related to Federal Health Care Reform

This LAR includes an estimate of the budgetary impact to the Group Benefits Program (GBP) of the federal HR 3590, Patient Protection and Affordable Care Act of 2010 (PPACA), and HR 4872, the Health Care and Education Reconciliation Act of 2010, collectively referred to as federal health care reform. We appreciate the recognition that there is considerable uncertainty surrounding state implementation. The PPACA, as amended, includes many changes to existing statutes, regulations, and to other provisions of the PPACA itself, and many requirements and references are not clearly stated, organized, or cross-referenced and/or are vague and ambiguous. It is unclear whether some of the provisions will apply to the GBP, as noted throughout the Part 6.J. schedule.

ERS anticipates that legislative guidance will be issued that will affect these estimated costs. Some regulations are not yet published; others were only recently issued, without sufficient opportunity for ERS to consider all of the possible impacts and costs. ERS is prepared to revise this estimate as

additional information, such as newly issued or revised statutes, regulations, interpretations or other guidance and/or any court rulings become available.

There is the possibility that the GBP could qualify for revenue from the Early Retiree Reinsurance Program. The ERRP provides reimbursement to plan sponsors providing health insurance coverage to retirees who are over age 55 and who are not yet eligible for Medicare. Plan sponsors may be reimbursed for 80 percent of claims between $15,000 and $90,000 for eligible retirees and their spouses and dependent children.  ERS has applied for participation in the ERRP on behalf of the GBP.  If the application is accepted, ERS will submit periodic requests for the GBP's share of the $5 billion appropriation for the program. However, it is unclear if the funding is sufficient to respond to all applications, if the GBP application will be approved, and if the State would agree to accept any funding provided to the program. With all of these variables, any possible cost savings are too uncertain to include on the Part 6.J. schedule.

## GASB standards relating to Other Post Employment Benefits (OPEB)

As reported in the last LAR, the Governmental Accounting Standards Board (GASB) now requires governmental employers to value and report the projected cost of providing current and future retirees with other post-employment benefits (OPEB), primarily health care benefits.  Texas funds OPEB on a pay-as-you-go basis and does not have a continuing, or constitutional, obligation to provide insurance benefits to employees or retirees beyond each fiscal year. ERS reports the information required under GASB Statement No. 43, Financial Reporting for Postemployment Benefit Plans Other than Pension Plans, to the Texas Comptroller of Public Accounts. This LAR requests funding for the cost of providing life and health benefits to retirees during FY2012-2013, as detailed in the request, but does not request funding for any future costs associated with OPEB.

GASB is also considering changing the reporting method for pension liabilities that would change how the unfunded liability is reported. The proposal would report the unfunded liability (or net pension liability) on the State's balance sheet. This shifts the reporting to a total obligation and makes it harder to determine if an employer is meeting its short-term obligations to the plan. If approved, these proposed accounting standards could go into effect as early as 2012. The standards would initially be implemented for pension plan reporting and then could affect OPEB calculations.  GASB clearly states that the proposed standards are for accounting and financial reporting only and are separate from funding standards.

## Agency Authority and Policy on Criminal Background Checks

In accordance with Texas Government Code, Chapter 411.1402, ERS may obtain criminal history record information maintained by the Texas Department of Public Safety (DPS) for all job applicants.  The criminal history information may be used to evaluate an applicant for employment.  All ERS job postings will state that the agency conducts a criminal history check on the primary and secondary candidate(s) recommended for the position.

Criminal history checks may also be conducted on current or former employees when circumstances necessitate such checks.  Only the Executive Director or designee may approve a request for a criminal history check on current or former employees.

ERS will conduct an FBI fingerprint check on all applicants, including internal candidates, selected to fill "covered person" positions. Covered persons are defined in the ERS Investments Policy as all ERS Investments staff, Investment Accounting staff, the Investment Compliance Auditor, the Chief Operating Officer, and Executive Director.

A conviction is not an automatic cause for an adverse personnel action.  However, failure to report a conviction may result in corrective action up to and including termination of employment.

The ERS will review all criminal convictions on a case-by-case basis based on several factors including:

- The nature and seriousness of each offense and its relationship to the duties of the position.
- The number of offenses committed by the individual.
- The length of time since the offense,
- The individual's work performance and/or history,
- The accuracy of the information on the individual's employment application, and
- The explanation the candidate provides in the event of a criminal conviction.

## EMPLOYEES RETIREMENT SYSTEM OF TEXAS

| Board Members | Dates of Terms | | Hometown |
|---|---|---|---|
| I. Craig Hester, Chair | November 1, 2005 | – August 31, 2010 | Austin, Texas |
| Cydney Donnell, Vice-Chair | June 20, 2007 | – August 31, 2012 | Fredricksburg, Texas |
| Yolanda "Yoly" Griego | August 31, 2009 | – August 31, 2015 | El Paso, Texas |
| Owen Whitworth | September 1, 2005 | – August 31, 2011 | Austin, Texas |
| Donald Wood | January 8, 2009 | – August 31, 2014 | Odessa, Texas |
| Cheryl MacBride | October 19, 2009 | – August 31, 2013 | Austin, Texas |

# Employees Retirement System of Texas
## Agency Organization Chart



## Employees Retirement System of Texas
## Organizational Chart Supplementary Information

1) ### Board of Trustees

The board is composed of six members and headed by the Chairperson.  It is responsible for formulating the basic policies, rules and regulations consistent with the purposes, policies, principles and standards stated in the statutes.  The board members serve as fiduciaries of all trust funds administered by the ERS.  The Executive Director and Internal Audit report to the Board of Trustees.

2) ### Executive Director

The Executive Director, who manages a staff of four, is appointed by the Board of Trustees.  The Executive Director advises and recommends to the board what will be needed to transact the business of the ERS.  The Executive Director is responsible for the preparation of an annual operating budget indicating the amount needed to pay the retirement system's expenses for the following fiscal year. This budget is submitted to the board for review and adoption.  Governmental Relations, Investments, Communications and Research, and Legal Services staff report to the Executive Director.

3) ### Internal Audit

The Director of Internal Audit directs a staff of four.  Internal Audit provides independent, objective assurance and advisory services to the agency.

4) ### Legal Services

The General Counsel directs a staff of 15.  The Legal Services division advises the Board of Trustees, the Executive Director and Division Directors regarding all legal matters affecting ERS and the programs it administers.  Division staff represents ERS and the Board of Trustees in administrative appeals related to members and retirees claims for insurance benefits and disability retirement.

5) ### Governmental Relations

The Director of Governmental Relations directs a staff of two.  Governmental Relations serves as the key contact and liaison for requests and inquiries from the Governor's office, Legislature, and legislative agencies, and external communications with the media.  It monitors and reports on ERS related legislation, legislative studies, and studies or reports conducted by other state agencies.

6) ### Communications and Research

The Director of Communications and Research directs a staff of 14.  The Division manages communications with ERS members and participants including employees, retirees and human resources staff of the employers served by ERS. Writers, graphic designers, trainers, and speakers educate these audiences through print publications, the ERS website, face-to-face presentations, webcasts and benefits fairs.

7)   **INVESTMENTS**

The Deputy Executive Director of Investments directs a staff of 58.  The Investments Division is responsible for managing fund assets in order to earn a sufficient return on investments to insure the payments due to members of the retirement plan.

8)   **CHIEF OPERATING OFFICER**

The Chief Operating Officer, who directs a staff of six, is responsible for the daily operations of the ERS.  Benefit Contracts, Finance, Customer Benefits, Human Resources, Information Systems, and Operations Support staff report to the Chief Operating Officer.

9)   **HUMAN RESOURCES**

The Human Resources Manager directs a staff of three.  Human Resources is responsible for administering the personnel program for ERS.  It is responsible for hiring and retaining a competent, quality work force.

10)   **BENEFIT CONTRACTS**

The Director of Benefit Contracts directs a staff of 20.  The Benefit Contracts division is responsible for the administration of contracts with vendors that provide benefits related products and services to ERS customers.

11)   **FINANCE**

The Chief Financial Officer directs a staff of 35.  The Finance division includes Budget, General Accounting, Purchasing, Investment Accounting and Revenue Processing.  Finance performs the accounting and budgeting functions for the agency.

12)   **CUSTOMER BENEFITS**

The Director of Customer Benefits directs a staff of 97.  The Customer Benefits division communicates, counsels and responds to benefit related inquiries from ERS customers.  Division staff calculates and pays annuity and survivor benefits, processes insurance transactions, and oversees the flexible benefits and deferred compensation program.

13)   **INFORMATION SYSTEMS**

The Chief Technology Officer directs a staff of 63.  The Information Systems division is responsible for the development and operation of all automated systems in support of the agency's mission.

14)   **OPERATIONS SUPPORT**

The Operations Support Manager directs a staff of 15.  The Operations Support division provides support services such as records management, printing, mail and building maintenance.

**2 A. SUMMARY OF BASE REQUEST BY STRATEGY**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:26:12AM**

Agency code: **327**     Agency name: **Employees Retirement System**

| Goal / *Objective* / STRATEGY | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **1**   To Administer Comprehensive and Actuarially Sound Retirement Programs | | | | | |
| **1**   *Ensure Actuarially Sound Retirement Programs* | | | | | |
| **1** ERS - RETIREMENT | 359,777,501 | 396,828,631 | 408,042,003 | 407,055,299 | 407,055,303 |
| **2** LECOS RETIREMENT PROGRAM | 20,870,584 | 23,781,999 | 23,914,782 | 23,848,390 | 23,848,391 |
| **3** JUDICIAL RETIREMENT SYSTEM - PLAN 2 | 11,368,443 | 11,380,232 | 11,351,883 | 11,366,057 | 11,366,058 |
| **4** JUDICIAL RETIREMENT SYSTEM - PLAN 1 | 28,170,864 | 27,300,248 | 27,189,972 | 27,245,110 | 27,245,110 |
| **5** PUBLIC SAFETY BENEFITS | 3,865,675 | 5,923,207 | 6,173,207 | 6,048,207 | 6,048,207 |
| **6** RETIREE DEATH BENEFITS | 7,378,210 | 8,088,040 | 8,088,040 | 8,088,040 | 8,088,040 |
| **TOTAL, GOAL       1** | **$431,431,277** | **$473,302,357** | **$484,759,887** | **$483,651,103** | **$483,651,109** |
| **2**   Provide Employees & Retirees with Quality Health Program | | | | | |
| **1**   *Manage GBP for State & Higher Education Employees* | | | | | |
| **1** GBP - GENERAL STATE EMPLOYEES | 1,083,588,315 | 1,189,280,616 | 1,274,281,049 | 1,250,491,206 | 1,250,491,209 |
| **2** POST RETIREMENT HEALTH BENEFITS | 0 | 0 | 0 | 0 | 0 |
| **TOTAL, GOAL       2** | **$1,083,588,315** | **$1,189,280,616** | **$1,274,281,049** | **$1,250,491,206** | **$1,250,491,209** |
| **TOTAL, AGENCY STRATEGY REQUEST** | **$1,515,019,592** | **$1,662,582,973** | **$1,759,040,936** | **$1,734,142,309** | **$1,734,142,318** |
| **TOTAL, AGENCY RIDER APPROPRIATIONS REQUEST*** | | | | **$0** | **$0** |
| **GRAND TOTAL, AGENCY REQUEST** | **$1,515,019,592** | **$1,662,582,973** | **$1,759,040,936** | **$1,734,142,309** | **$1,734,142,318** |

**2 A. SUMMARY OF BASE REQUEST BY STRATEGY**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:26:12AM**

Agency code: **327**          Agency name: **Employees Retirement System**

| Goal / *Objective* / STRATEGY | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| METHOD OF FINANCING: | | | | | |
| **General Revenue Funds:** | | | | | |
| 1  General Revenue Fund | 909,430,452 | 997,559,567 | 1,057,179,806 | 1,041,075,242 | 1,041,075,244 |
| SUBTOTAL | $909,430,452 | $997,559,567 | $1,057,179,806 | $1,041,075,242 | $1,041,075,244 |
| **General Revenue Dedicated Funds:** | | | | | |
| 469  Crime Victims Comp Acct | 2,000,000 | 1,750,000 | 2,000,000 | 1,875,000 | 1,875,000 |
| 994  GR Dedicated Accounts | 52,112,961 | 58,923,931 | 62,876,335 | 61,715,608 | 61,715,611 |
| SUBTOTAL | $54,112,961 | $60,673,931 | $64,876,335 | $63,590,608 | $63,590,611 |
| **Federal Funds:** | | | | | |
| 555  Federal Funds | 268,601,581 | 312,556,973 | 327,471,839 | 324,591,624 | 324,591,626 |
| SUBTOTAL | $268,601,581 | $312,556,973 | $327,471,839 | $324,591,624 | $324,591,626 |
| **Other Funds:** | | | | | |
| 6  State Highway Fund | 272,338,340 | 279,447,366 | 296,391,452 | 292,020,018 | 292,020,019 |
| 573  Judicial Fund | 4,404,209 | 3,414,070 | 3,405,565 | 3,409,817 | 3,409,818 |
| 998  Other Special State Funds | 6,132,049 | 8,931,066 | 9,715,939 | 9,455,000 | 9,455,000 |
| SUBTOTAL | $282,874,598 | $291,792,502 | $309,512,956 | $304,884,835 | $304,884,837 |
| TOTAL,  METHOD OF FINANCING | $1,515,019,592 | $1,662,582,973 | $1,759,040,936 | $1,734,142,309 | $1,734,142,318 |

*Rider appropriations for the historical years are included in the strategy amounts

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

| Agency code: | **327** | Agency name: | **Employees Retirement System** | | |
|---|---|---|---|---|---|

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **GENERAL REVENUE** | | | | | |
| 1  General Revenue Fund | | | | | |
| *REGULAR APPROPRIATIONS* | | | | | |
| Estimated Appropriation Revision | | | | | |
| | $477,867 | $36,500,628 | $26,203,789 | $0 | $0 |
| Regular Appropriations | | | | | |
| | $953,312,255 | $940,441,300 | $1,002,108,979 | $1,041,075,242 | $1,041,075,244 |
| *RIDER APPROPRIATION* | | | | | |
| Art IX, Sec 17.01, Schedule C Pay Raises (2010-11 GAA) | | | | | |
| | $0 | $73,612 | $73,612 | $0 | $0 |
| Art IX, Sec 17.02(a) Additional Appropriation for Employees Benefits | | | | | |
| | $0 | $(456,013) | $1,315,372 | $0 | $0 |
| Art IX, Sec 17.02(b) Additional Appropriation for Employees Benefits | | | | | |
| | $0 | $11,359,152 | $11,883,072 | $0 | $0 |
| Art IX, Sec 19.61, Schedule C Pay Raises (2008-09 GAA) | | | | | |
| | $96,113 | $0 | $0 | $0 | $0 |
| Art IX, Sec 19.62(a), Salary Increase (2008-09 GAA) | | | | | |
| | $8,604,107 | $0 | $0 | $0 | $0 |
| HB 1, 80th Leg., R.S., Art I, page I-33, rider 14; Contingency SB1847 | | | | | |
| | $(7,989,735) | $0 | $0 | $0 | $0 |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:  **8/31/2010**
TIME:  **9:37:26AM**

Agency code:  **327**          Agency name:  **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **GENERAL REVENUE** | | | | | |
| HB 15 Data Centers Consolidation, Sec 30 (h-l) – Reductions | | | | | |
| | $(1,747,880) | $0 | $0 | $0 | $0 |
| *TRANSFERS* | | | | | |
| Art IX, Sec 17.13(a) One Time Payments | | | | | |
| | $0 | $11,462,784 | $17,527,155 | $0 | $0 |
| *LAPSED APPROPRIATIONS* | | | | | |
| Lapsed Appropriations | | | | | |
| | $(43,322,275) | $(1,821,896) | $(1,932,173) | $0 | $0 |
| **TOTAL,     General Revenue Fund** | | | | | |
| | **$909,430,452** | **$997,559,567** | **$1,057,179,806** | **$1,041,075,242** | **$1,041,075,244** |
| **TOTAL, ALL    GENERAL REVENUE** | | | | | |
| | **$909,430,452** | **$997,559,567** | **$1,057,179,806** | **$1,041,075,242** | **$1,041,075,244** |
| **GENERAL REVENUE FUND - DEDICATED** | | | | | |
| **469**  GR Dedicated - Compensation to Victims of Crime Account No. 469 | | | | | |
| *REGULAR APPROPRIATIONS* | | | | | |
| Estimated Appropriation Revision | | | | | |
| | $712,124 | $0 | $0 | $0 | $0 |
| Regular Appropriations | | | | | |
| | $1,287,876 | $2,208,940 | $2,208,940 | $1,875,000 | $1,875,000 |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

Agency code: **327**        Agency name:  **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **GENERAL REVENUE FUND - DEDICATED** | | | | | |
| *LAPSED APPROPRIATIONS* | | | | | |
| Lapsed Appropriations | | | | | |
| | $0 | $(458,940) | $(208,940) | $0 | $0 |
| **TOTAL,     GR Dedicated - Compensation to Victims of Crime Account No. 469** | | | | | |
| | **$2,000,000** | **$1,750,000** | **$2,000,000** | **$1,875,000** | **$1,875,000** |
| 994  General Revenue Dedicated Accounts | | | | | |
| *REGULAR APPROPRIATIONS* | | | | | |
| Estimated Appropriation Revision | | | | | |
| | $0 | $1,733,071 | $1,000,718 | $0 | $0 |
| Regular Appropriations | | | | | |
| | $56,056,996 | $55,214,544 | $59,010,447 | $61,715,608 | $61,715,611 |
| *RIDER APPROPRIATION* | | | | | |
| Art IX, Sec 17.01, Schedule C Pay Raises (2010-11 GAA) | | | | | |
| | $0 | $102,837 | $102,837 | $0 | $0 |
| Art IX, Sec 17.02(a) Additional Appropriation for Employees Benefits | | | | | |
| | $0 | $1,441,228 | $2,252,672 | $0 | $0 |
| Art IX, Sec 17.13(a) One Time Payments | | | | | |
| | $0 | $432,251 | $509,661 | $0 | $0 |
| Art IX, Sec 19.61, Schedule C Pay Raises (2008-09 GAA) | | | | | |
| | $102,575 | $0 | $0 | $0 | $0 |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

Agency code: **327**     Agency name: **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **GENERAL REVENUE FUND - DEDICATED** | | | | | |
| Art IX, Sec 19.62(a), Salary Increase (2008-09 GAA) | | | | | |
| | $583,280 | $0 | $0 | $0 | $0 |
| HB 1, 80th Leg., R.S., Art I, page I-33, rider 14; Contingency SB1847 | | | | | |
| | $(546,392) | $0 | $0 | $0 | $0 |
| HB 15 Data Centers Consolidation, Sec 30 (h-l) – Reductions | | | | | |
| | $(363,900) | $0 | $0 | $0 | $0 |
| *LAPSED APPROPRIATIONS* | | | | | |
| Lapsed Appropriations | | | | | |
| | $(3,719,598) | $0 | $0 | $0 | $0 |
| **TOTAL,**   **General Revenue Dedicated Accounts** | | | | | |
| | **$52,112,961** | **$58,923,931** | **$62,876,335** | **$61,715,608** | **$61,715,611** |
| **TOTAL, ALL**   **GENERAL REVENUE FUND - DEDICATED** | | | | | |
| | **$54,112,961** | **$60,673,931** | **$64,876,335** | **$63,590,608** | **$63,590,611** |
| **TOTAL,**   **GR & GR-DEDICATED FUNDS** | | | | | |
| | **$963,543,413** | **$1,058,233,498** | **$1,122,056,141** | **$1,104,665,850** | **$1,104,665,855** |
| **FEDERAL FUNDS** | | | | | |
| <u>555</u>   Federal Funds | | | | | |
| *REGULAR APPROPRIATIONS* | | | | | |
| Estimated Appropriation Revision | | | | | |
| | $0 | $8,960,462 | $4,912,648 | $0 | $0 |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

Agency code: **327**        Agency name: **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **FEDERAL FUNDS** | | | | | |
| Regular Appropriations | $279,375,181 | $299,895,516 | $317,737,242 | $324,591,624 | $324,591,626 |
| *RIDER APPROPRIATION* | | | | | |
| Art IX, Sec 17.01, Schedule C Pay Raises (2010-11 GAA) | $0 | $48,656 | $48,656 | $0 | $0 |
| Art IX, Sec 17.02(a) Additional Appropriation for Employees Benefits | $0 | $1,593,232 | $2,394,449 | $0 | $0 |
| Art IX, Sec 17.13(a) One Time Payments | $0 | $2,059,107 | $2,378,844 | $0 | $0 |
| Art IX, Sec 19.61, Schedule C Pay Raises (2008-09 GAA) | $51,416 | $0 | $0 | $0 | $0 |
| Art IX, Sec 19.62(a), Salary Increase (2008-09 GAA) | $2,665,387 | $0 | $0 | $0 | $0 |
| HB 1, 80th Leg., R.S., Art I, page I-33, rider 14; Contingency SB1847 | $(2,338,998) | $0 | $0 | $0 | $0 |
| HB 15 Data Centers Consolidation, Sec 30 (h-l) – Reductions | $(1,760,551) | $0 | $0 | $0 | $0 |
| *LAPSED APPROPRIATIONS* | | | | | |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

Agency code: **327**   Agency name: **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **FEDERAL FUNDS** | | | | | |
| Lapsed Appropriations | | | | | |
| | $(9,390,854) | $0 | $0 | $0 | $0 |
| **TOTAL,** **Federal Funds** | | | | | |
| | **$268,601,581** | **$312,556,973** | **$327,471,839** | **$324,591,624** | **$324,591,626** |
| **TOTAL, ALL** **FEDERAL FUNDS** | | | | | |
| | **$268,601,581** | **$312,556,973** | **$327,471,839** | **$324,591,624** | **$324,591,626** |
| **OTHER FUNDS** | | | | | |
| 6   State Highway Fund No. 006 | | | | | |
| *REGULAR APPROPRIATIONS* | | | | | |
| Estimated Appropriation Revision | | | | | |
| | $0 | $8,202,550 | $4,661,173 | $0 | $0 |
| State Highway Fund No. 006 | | | | | |
| | $281,589,751 | $279,828,161 | $300,262,419 | $292,020,018 | $292,020,019 |
| *RIDER APPROPRIATION* | | | | | |
| Art IX, Sec 17.01, Schedule C Pay Raises (2010-11 GAA) | | | | | |
| | $0 | $740,896 | $740,896 | $0 | $0 |
| Art IX, Sec 17.02(a) Additional Appropriation for Employees Benefits | | | | | |
| | $0 | $298,379 | $582,859 | $0 | $0 |
| Art IX, Sec 17.02(b) Additional Appropriation for Employees Benefits | | | | | |
| | $0 | $(11,359,152) | $(11,883,072) | $0 | $0 |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

Agency code: **327**      Agency name: **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **OTHER FUNDS** | | | | | |
| Art IX, Sec 17.13(a) One Time Payments | | | | | |
| | $0 | $1,736,532 | $2,027,177 | $0 | $0 |
| Art IX, Sec 19.61, Schedule C Pay Raises (2008-09 GAA) | | | | | |
| | $796,957 | $0 | $0 | $0 | $0 |
| Art IX, Sec 19.62(a), Salary Increase (2008-09 GAA) | | | | | |
| | $2,569,624 | $0 | $0 | $0 | $0 |
| HB 1, 80th Leg., R.S., Art I, page I-33, rider 14; Contingency SB1847 | | | | | |
| | $(2,359,711) | $0 | $0 | $0 | $0 |
| HB 15 Data Centers Consolidation, Sec 30 (h-l) – Reductions | | | | | |
| | $(704,897) | $0 | $0 | $0 | $0 |
| *LAPSED APPROPRIATIONS* | | | | | |
| Lapsed Appropriations | | | | | |
| | $(9,553,384) | $0 | $0 | $0 | $0 |
| **TOTAL,    State Highway Fund No. 006** | | | | | |
| | **$272,338,340** | **$279,447,366** | **$296,391,452** | **$292,020,018** | **$292,020,019** |
| 573   Judicial Fund No. 573 | | | | | |
| *REGULAR APPROPRIATIONS* | | | | | |
| Estimated Appropriation Revision | | | | | |
| | $2,678,202 | $36,493 | $27,988 | $0 | $0 |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

Agency code: **327**   Agency name: **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **OTHER FUNDS** | | | | | |
| Regular Appropriations | | | | | |
| | $1,726,007 | $3,377,577 | $3,377,577 | $3,409,817 | $3,409,818 |
| **TOTAL,    Judicial Fund No. 573** | | | | | |
| | **$4,404,209** | **$3,414,070** | **$3,405,565** | **$3,409,817** | **$3,409,818** |
| **998** Other Special State Funds | | | | | |
| *REGULAR APPROPRIATIONS* | | | | | |
| Estimated Appropriation Revision | | | | | |
| | $0 | $259,338 | $151,861 | $0 | $0 |
| Other Special State Funds | | | | | |
| | $6,339,824 | $8,188,711 | $8,744,923 | $9,455,000 | $9,455,000 |
| *RIDER APPROPRIATION* | | | | | |
| Art IX, Sec 17.02(a) Additional Appropriation for Employees Benefits | | | | | |
| | $0 | $410,975 | $732,513 | $0 | $0 |
| Art IX, Sec 17.13(a) One Time Payments | | | | | |
| | $0 | $72,042 | $86,642 | $0 | $0 |
| Art IX, Sec 19.62(a), Salary Increase (2008-09 GAA) | | | | | |
| | $87,057 | $0 | $0 | $0 | $0 |
| HB 1, 80th Leg., R.S., Art I, page I-33, rider 14; Contingency SB1847 | | | | | |
| | $(82,577) | $0 | $0 | $0 | $0 |

**2 B. SUMMARY OF BASE REQUEST BY METHOD OF FINANCE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:37:26AM**

Agency code: **327**   Agency name: **Employees Retirement System**

| METHOD OF FINANCING | Exp 2009 | Est 2010 | Bud 2011 | Req 2012 | Req 2013 |
|---|---|---|---|---|---|
| **OTHER FUNDS** | | | | | |
| *LAPSED APPROPRIATIONS* | | | | | |
| Lapsed Appropriations | $(212,255) | $0 | $0 | $0 | $0 |
| **TOTAL,   Other Special State Funds** | **$6,132,049** | **$8,931,066** | **$9,715,939** | **$9,455,000** | **$9,455,000** |
| **TOTAL, ALL   OTHER FUNDS** | **$282,874,598** | **$291,792,502** | **$309,512,956** | **$304,884,835** | **$304,884,837** |
| **GRAND TOTAL** | **$1,515,019,592** | **$1,662,582,973** | **$1,759,040,936** | **$1,734,142,309** | **$1,734,142,318** |

| FULL-TIME-EQUIVALENT POSITIONS | | | | | |
|---|---|---|---|---|---|
| REGULAR APPROPRIATIONS | | | | | |
| Regular Appropriations from MOF Table (2008-09 GAA) | 305.8 | 0.0 | 0.0 | 0.0 | 0.0 |
| Regular Appropriations from MOF Table (2010-11 GAA) | 0.0 | 312.0 | 323.0 | 0.0 | 0.0 |
| Regular Appropriations | 0.0 | 0.0 | 0.0 | 332.0 | 332.0 |
| **TOTAL, ADJUSTED FTES** | **305.8** | **312.0** | **323.0** | **332.0** | **332.0** |
| **NUMBER OF 100% FEDERALLY FUNDED FTEs** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

**2.C. SUMMARY OF BASE REQUEST BY OBJECT OF EXPENSE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:40:34AM**

Agency code:   **327**          Agency name:   **Employees Retirement System**

| OBJECT OF EXPENSE | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|
| 1002  OTHER PERSONNEL COSTS | $420,187,392 | $459,291,110 | $470,498,640 | $469,514,856 | $469,514,862 |
| 2009  OTHER OPERATING EXPENSE | $1,083,588,315 | $1,189,280,616 | $1,274,281,049 | $1,250,491,206 | $1,250,491,209 |
| 3001  CLIENT SERVICES | $11,243,885 | $14,011,247 | $14,261,247 | $14,136,247 | $14,136,247 |
| **OOE  Total (Excluding Riders)** | **$1,515,019,592** | **$1,662,582,973** | **$1,759,040,936** | **$1,734,142,309** | **$1,734,142,318** |
| **OOE Total (Riders)** | | | | | |
| **Grand Total** | **$1,515,019,592** | **$1,662,582,973** | **$1,759,040,936** | **$1,734,142,309** | **$1,734,142,318** |

**2.D. SUMMARY OF BASE REQUEST OBJECTIVE OUTCOMES**

82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation system of Texas (ABEST)

Date : **8/31/2010**
Time: **9:28:11AM**

Agency code: **327**                     Agency name:  **Employees Retirement System**

| Goal/ Objective / Outcome | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|
| 1   To Administer Comprehensive and Actuarially Sound Retirement Programs | | | | | |
| *1   Ensure Actuarially Sound Retirement Programs* | | | | | |
| KEY   **1   % of ERS Retirees Expressing Satisfaction with Member Benefit Services** | | | | | |
| | 95.04% | 95.00% | 97.00% | 97.00% | 97.00% |
| **2   # of Years to Amortize the ERS Unfunded Actuarial Accrued Liability** | | | | | |
| | 9,999,999,999.90 | 9,999,999,999.90 | 9,999,999,999.90 | 9,999,999,999.90 | 9,999,999,999.90 |
| **3   # Years to Amortize the LECOS Unfunded Actuarial Accrued Liability** | | | | | |
| | 9,999,999,999.90 | 9,999,999,999.90 | 9,999,999,999.90 | 9,999,999,999.90 | 9,999,999,999.90 |
| **4   # of Years to Amortize the JRS-2 Unfunded Actuarial Accrued Liability** | | | | | |
| | 4.80 | 3.80 | 2.80 | 1.80 | 0.80 |
| **5   ERS Time-weighted Rate of Return (5 Year Rolling Basis)** | | | | | |
| | 4.48% | 3.50% | 3.70% | 2.60% | 5.10% |
| **6   ERS Annual Operating Expense Per Member** | | | | | |
| | 59.83 | 59.90 | 59.90 | 59.90 | 59.90 |
| **7   Investment Expense as Basis Points of Net Assets** | | | | | |
| | 17.97 | 15.29 | 16.00 | 16.00 | 16.00 |
| **8   Percent of Time the ERS On-line System is Available to Customers** | | | | | |
| | 98.00 | 98.00 | 98.00 | 98.00 | 98.00 |
| 2   Provide Employees & Retirees with Quality Health Program | | | | | |
| *1   Manage GBP for State & Higher Education Employees* | | | | | |
| KEY   **1   Percent of HealthSelect Participants Satisfied with Network Services** | | | | | |
| | 90.00% | 89.00% | 89.00% | 89.00% | 89.00% |

**2.E. SUMMARY OF EXCEPTIONAL ITEMS REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**

TIME : **9:38:31AM**

---

Agency code: **327**                                Agency name: **Employees Retirement System**

| | | 2012 | | | 2013 | | | Biennium | |
|---|---|---|---|---|---|---|---|---|---|
| Priority | Item | GR and GR/GR Dedicated | All Funds | FTEs | GR and GR Dedicated | All Funds | FTEs | GR and GR Dedicated | All Funds |
| 1 | Retirement Progr Actuarially Sound | $89,142,848 | $141,160,489 | | $89,142,848 | $141,160,489 | | $178,285,696 | $282,320,978 |
| 2 | LECOS Progr Actuarially Sound | $6,769,075 | $7,436,355 | | $6,769,075 | $7,436,355 | | $13,538,150 | $14,872,710 |
| 3 | Group Benefit Program Cost Increase | $137,286,858 | $222,322,830 | | $218,139,566 | $353,255,995 | | $355,426,424 | $575,578,825 |
| 4 | Group Benefit Program Reserve Fund | $91,987,431 | $148,964,776 | | $100,163,023 | $162,204,358 | | $192,150,454 | $311,169,134 |
| **Total, Exceptional Items Request** | | **$325,186,212** | **$519,884,450** | | **$414,214,512** | **$664,057,197** | | **$739,400,724** | **$1,183,941,647** |

**Method of Financing**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|
| General Revenue | $305,731,960 | $305,731,960 | | $389,526,225 | $389,526,225 | | $695,258,185 | $695,258,185 |
| General Revenue - Dedicated | 19,454,252 | 19,454,252 | | 24,688,287 | 24,688,287 | | 44,142,539 | 44,142,539 |
| Federal Funds | | 100,867,925 | | | 129,287,421 | | | 230,155,346 |
| Other Funds | | 93,830,313 | | | 120,555,264 | | | 214,385,577 |
| | **$325,186,212** | **$519,884,450** | | **$414,214,512** | **$664,057,197** | | **$739,400,724** | **$1,183,941,647** |

**Full Time Equivalent Positions**

**Number of 100% Federally Funded FTEs**                          0.0                                    0.0

**2.F. SUMMARY OF TOTAL REQUEST BY STRATEGY**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE : **8/31/2010**
TIME : **9:29:10AM**

Agency code: **327**    Agency name: **Employees Retirement System**

| Goal/*Objective*/**STRATEGY** | Base 2012 | Base 2013 | Exceptional 2012 | Exceptional 2013 | Total Request 2012 | Total Request 2013 |
|---|---|---|---|---|---|---|
| **1** To Administer Comprehensive and Actuarially Sound Retirement Prog | | | | | | |
| **1** *Ensure Actuarially Sound Retirement Programs* | | | | | | |
| **1** ERS - RETIREMENT | $407,055,299 | $407,055,303 | $141,160,489 | $141,160,489 | $548,215,788 | $548,215,792 |
| **2** LECOS RETIREMENT PROGRAM | 23,848,390 | 23,848,391 | 7,436,355 | 7,436,355 | 31,284,745 | 31,284,746 |
| **3** JUDICIAL RETIREMENT SYSTEM - PLAN 2 | 11,366,057 | 11,366,058 | 0 | 0 | 11,366,057 | 11,366,058 |
| **4** JUDICIAL RETIREMENT SYSTEM - PLAN 1 | 27,245,110 | 27,245,110 | 0 | 0 | 27,245,110 | 27,245,110 |
| **5** PUBLIC SAFETY BENEFITS | 6,048,207 | 6,048,207 | 0 | 0 | 6,048,207 | 6,048,207 |
| **6** RETIREE DEATH BENEFITS | 8,088,040 | 8,088,040 | 0 | 0 | 8,088,040 | 8,088,040 |
| **TOTAL, GOAL 1** | **$483,651,103** | **$483,651,109** | **$148,596,844** | **$148,596,844** | **$632,247,947** | **$632,247,953** |
| **2** Provide Employees & Retirees with Quality Health Program | | | | | | |
| **1** *Manage GBP for State & Higher Education Employees* | | | | | | |
| **1** GBP - GENERAL STATE EMPLOYEES | 1,250,491,206 | 1,250,491,209 | 371,287,606 | 515,460,353 | 1,621,778,812 | 1,765,951,562 |
| **2** POST RETIREMENT HEALTH BENEFITS | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL, GOAL 2** | **$1,250,491,206** | **$1,250,491,209** | **$371,287,606** | **$515,460,353** | **$1,621,778,812** | **$1,765,951,562** |
| **TOTAL, AGENCY STRATEGY REQUEST** | **$1,734,142,309** | **$1,734,142,318** | **$519,884,450** | **$664,057,197** | **$2,254,026,759** | **$2,398,199,515** |
| **TOTAL, AGENCY RIDER APPROPRIATIONS REQUEST** | | | | | | |
| **GRAND TOTAL, AGENCY REQUEST** | **$1,734,142,309** | **$1,734,142,318** | **$519,884,450** | **$664,057,197** | **$2,254,026,759** | **$2,398,199,515** |

**2.F. SUMMARY OF TOTAL REQUEST BY STRATEGY**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE :   8/31/2010
TIME  :   9:29:10AM

Agency code:   **327**      Agency name:   **Employees Retirement System**

| Goal/*Objective*/**STRATEGY** | Base 2012 | Base 2013 | Exceptional 2012 | Exceptional 2013 | Total Request 2012 | Total Request 2013 |
|---|---|---|---|---|---|---|
| **General Revenue Funds:** | | | | | | |
| 1  General Revenue Fund | $1,041,075,242 | $1,041,075,244 | $305,731,960 | $389,526,225 | $1,346,807,202 | $1,430,601,469 |
| | **$1,041,075,242** | **$1,041,075,244** | **$305,731,960** | **$389,526,225** | **$1,346,807,202** | **$1,430,601,469** |
| **General Revenue Dedicated Funds:** | | | | | | |
| 469  Crime Victims Comp Acct | 1,875,000 | 1,875,000 | 0 | 0 | 1,875,000 | 1,875,000 |
| 994  GR Dedicated Accounts | 61,715,608 | 61,715,611 | 19,454,252 | 24,688,287 | 81,169,860 | 86,403,898 |
| | **$63,590,608** | **$63,590,611** | **$19,454,252** | **$24,688,287** | **$83,044,860** | **$88,278,898** |
| **Federal Funds:** | | | | | | |
| 555  Federal Funds | 324,591,624 | 324,591,626 | 100,867,925 | 129,287,421 | 425,459,549 | 453,879,047 |
| | **$324,591,624** | **$324,591,626** | **$100,867,925** | **$129,287,421** | **$425,459,549** | **$453,879,047** |
| **Other Funds:** | | | | | | |
| 6  State Highway Fund | 292,020,018 | 292,020,019 | 90,793,526 | 116,733,934 | 382,813,544 | 408,753,953 |
| 573  Judicial Fund | 3,409,817 | 3,409,818 | 0 | 0 | 3,409,817 | 3,409,818 |
| 998  Other Special State Funds | 9,455,000 | 9,455,000 | 3,036,787 | 3,821,330 | 12,491,787 | 13,276,330 |
| | **$304,884,835** | **$304,884,837** | **$93,830,313** | **$120,555,264** | **$398,715,148** | **$425,440,101** |
| **TOTAL, METHOD OF FINANCING** | **$1,734,142,309** | **$1,734,142,318** | **$519,884,450** | **$664,057,197** | **$2,254,026,759** | **$2,398,199,515** |
| **FULL TIME EQUIVALENT POSITIONS** | **332.0** | **332.0** | **0.0** | **0.0** | **332.0** | **332.0** |

**2.G. SUMMARY OF TOTAL REQUEST OBJECTIVE OUTCOMES**

Date: **8/31/2010**

82nd Regular Session, Agency Submission, Version 1

Time: **9:39:33AM**

Automated Budget and Evaluation system of Texas (ABEST)

---

Agency code: **327**          Agency name: **Employees Retirement System**

Goal/ *Objective/E* **Outcome**

| | | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 | Total Request 2012 | Total Request 2013 |
|---|---|---|---|---|---|---|---|

---

1          To Administer Comprehensive and Actuarially Sound Retirement Programs

        1     *n su  e/E ctra  ially/E ors d/Reti  emest/P  og  amu*

**KEY**        **1 % of ERS Retirees Expressing Satisfaction with Member Benefit Services**

| | | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 | Total Request 2012 | Total Request 2013 |
|---|---|---|---|---|---|---|---|
| | | 97.00% | 97.00% | | | 97.00% | 97.00% |

**2 # of Years to Amortize the ERS Unfunded Actuarial Accrued Liability**

| | | 9,999,999,999.90 | 9,999,999,999.90 | 31.00 | 31.00 | 31.00 | 31.00 |

**3 # Years to Amortize the LECOS Unfunded Actuarial Accrued Liability**

| | | 9,999,999,999.90 | 9,999,999,999.90 | 31.00 | 31.00 | 31.00 | 31.00 |

**4 # of Years to Amortize the JRS-2 Unfunded Actuarial Accrued Liability**

| | | 1.80 | 0.80 | | | 1.80 | 0.80 |

**5 ERS Time-weighted Rate of Return (5 Year Rolling Basis)**

| | | 2.60% | 5.10% | | | 2.60% | 5.10% |

**6 ERS Annual Operating Expense Per Member**

| | | 59.90 | 59.90 | | | 59.90 | 59.90 |

**7 Investment Expense as Basis Points of Net Assets**

| | | 16.00 | 16.00 | | | 16.00 | 16.00 |

**8 Percent of Time the ERS On-line System is Available to Customers**

| | | 98.00 | 98.00 | | | 98.00 | 98.00 |

2          Provide Employees & Retirees with Quality Health Program

**2.G. SUMMARY OF TOTAL REQUEST OBJECTIVE OUTCOMES**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation system of Texas (ABEST)

Date : **8/31/2010**

Time:  **9:39:33AM**

Agency code:  **327**                    Agency name:  **Employees Retirement System**

Goal/ *Objective*⁄ **Outcome**

| | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 | Total Request 2012 | Total Request 2013 |
|---|---|---|---|---|---|---|
| 1 | *Mas age⁄G⁄BP⁄fo  ⁄State⁄R⁄&⁄Highe  ⁄E⁄dr⁄catios⁄E⁄mployee⁄u* | | | | | |
| **KEY** | **1 Percent of HealthSelect Participants Satisfied with Network Services** | | | | | |
| | 89.00% | 89.00% | | | 89.00% | 89.00% |

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: 8/30/2010
TIME: 11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

GOAL: 1 To Administer Comprehensive and Actuarially Sound Retirement Programs       Statewide Goal/Benchmark: 8 0

OBJECTIVE: 1 Ensure Actuarially Sound Retirement Programs       Service Categories:

STRATEGY: 1 Provide an Actuarially Sound Level of Funding As Defined by State Law       Service: 06   Income: A.2   Age: B.3

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|
| **Output Measures:** | | | | | | |
| 1 | Number of ERS Retirees Added to Annuity Payroll | 5,016.00 | 5,218.00 | 5,425.00 | 5,650.00 | 5,880.00 |
| KEY 2 | Number of ERS Accounts Maintained | 213,808.00 | 222,290.00 | 229,000.00 | 236,000.00 | 243,000.00 |
| **Explanatory/Input Measures:** | | | | | | |
| 1 | Number of ERS Annuitants | 73,265.00 | 76,700.00 | 80,500.00 | 84,200.00 | 88,100.00 |
| **Objects of Expense:** | | | | | | |
| 1002 | OTHER PERSONNEL COSTS | $359,777,501 | $396,828,631 | $408,042,003 | $407,055,299 | $407,055,303 |
| | **TOTAL, OBJECT OF EXPENSE** | **$359,777,501** | **$396,828,631** | **$408,042,003** | **$407,055,299** | **$407,055,303** |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $213,160,791 | $238,116,824 | $247,859,830 | $245,854,882 | $245,854,883 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | **$213,160,791** | **$238,116,824** | **$247,859,830** | **$245,854,882** | **$245,854,883** |
| **Method of Financing:** | | | | | | |
| 994 | GR Dedicated Accounts | $14,421,110 | $15,943,427 | $16,308,833 | $16,234,225 | $16,234,226 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS - DEDICATED)** | **$14,421,110** | **$15,943,427** | **$16,308,833** | **$16,234,225** | **$16,234,226** |
| **Method of Financing:** | | | | | | |
| 555 | Federal Funds | | | | | |
| | 00.327.001 ERS Retirement | $66,249,533 | $76,001,924 | $76,190,838 | $76,969,972 | $76,969,973 |
| CFDA Subtotal, Fund | 555 | $66,249,533 | $76,001,924 | $76,190,838 | $76,969,972 | $76,969,973 |
| | **SUBTOTAL, MOF (FEDERAL FUNDS)** | **$66,249,533** | **$76,001,924** | **$76,190,838** | **$76,969,972** | **$76,969,973** |
| **Method of Financing:** | | | | | | |
| 6 | State Highway Fund | $63,798,266 | $64,090,000 | $64,900,803 | $65,235,813 | $65,235,813 |
| 998 | Other Special State Funds | $2,147,801 | $2,676,456 | $2,781,699 | $2,760,407 | $2,760,408 |

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:    8/30/2010
TIME:    11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

| | | | |
|---|---|---|---|
| GOAL: | 1 | To Administer Comprehensive and Actuarially Sound Retirement Programs | Statewide Goal/Benchmark:    8    0 |
| OBJECTIVE: | 1 | Ensure Actuarially Sound Retirement Programs | Service Categories: |
| STRATEGY: | 1 | Provide an Actuarially Sound Level of Funding As Defined by State Law | Service:   06    Income:  A.2    Age:    B.3 |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|
| **SUBTOTAL, MOF  (OTHER FUNDS)** | | $65,946,067 | $66,766,456 | $67,682,502 | $67,996,220 | $67,996,221 |
| **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | | $407,055,299 | $407,055,303 |
| **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | | $359,777,501 | $396,828,631 | $408,042,003 | $407,055,299 | $407,055,303 |
| **FULL TIME EQUIVALENT POSITIONS:** | | 305.8 | 312.0 | 323.0 | 332.0 | 332.0 |

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

The Employees Retirement System of Texas (ERS) is the administrative body for the State Employees Retirement System; authorized by Article XVI, Section 67(b) 3, Texas Constitution, and governed by Title 8, Subtitle B, Texas Government code. The retirement system covers employees of most state agencies, statewide elected officials, and legislators.

**EXTERNAL/INTERNAL FACTORS  IMPACTING STRATEGY:**

The retirement program administered by the ERS is a defined benefit pension plan. ERS members contribute 6.5% of their salary. The state contributes 6.95%. The combined contributions are held in a trust fund where they combine with investment earnings to fund retirement benefits. The funding is calculated by making actuarial assumptions about the future demographics of the members and the trust fund earnings. Any significant deviation between experience and actuarial assumptions can affect the funding calculation. Among the many factors that can affect the program are across-the-board pay raises that are above or below assumptions, significant turns in the investment markets, and retirement rates of state employees that are different than the assumptions, such as accelerated retirements as a result of a retirement incentive program.

Assumptions:

The above funding request assumes 6.95% state contribution, 6.5% member contribution and no growth in payroll for Fiscal Year 2012 and 2013. The appropriation is requested to be "estimated" since it is payroll driven.

The method of finance reflects proportionality as provided by the LBB.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:    8/30/2010
TIME:    11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

GOAL:          1    To Administer Comprehensive and Actuarially Sound Retirement Programs          Statewide Goal/Benchmark:      8      0

OBJECTIVE:     1    Ensure Actuarially Sound Retirement Programs          Service Categories:

STRATEGY:      2    LECOS Retirement Program          Service:    06    Income:  A.2    Age:    B.3

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|------|-------------|----------|----------|----------|---------|---------|
| **Output Measures:** | | | | | | |
| 1 | Number of LECOS Retirees Added to Annuity Payroll | 766.00 | 665.00 | 700.00 | 740.00 | 780.00 |
| 2 | Number of LECOS Accounts Maintained | 53,876.00 | 54,547.00 | 55,500.00 | 56,500.00 | 57,500.00 |
| **Explanatory/Input Measures:** | | | | | | |
| 1 | Number of LECOS Annuitants | 6,793.00 | 7,289.00 | 7,375.00 | 7,450.00 | 7,525.00 |
| **Objects of Expense:** | | | | | | |
| 1002 | OTHER PERSONNEL COSTS | $20,870,584 | $23,781,999 | $23,914,782 | $23,848,390 | $23,848,391 |
| | **TOTAL, OBJECT OF EXPENSE** | **$20,870,584** | **$23,781,999** | **$23,914,782** | **$23,848,390** | **$23,848,391** |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $18,740,166 | $21,182,626 | $21,300,896 | $21,241,761 | $21,241,761 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | **$18,740,166** | **$21,182,626** | **$21,300,896** | **$21,241,761** | **$21,241,761** |
| **Method of Financing:** | | | | | | |
| 994 | GR Dedicated Accounts | $249,787 | $304,410 | $306,109 | $305,259 | $305,260 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS - DEDICATED)** | **$249,787** | **$304,410** | **$306,109** | **$305,259** | **$305,260** |
| **Method of Financing:** | | | | | | |
| 555 | Federal Funds | | | | | |
| | 00.327.003 LECOS Retirement | $73,327 | $92,750 | $93,268 | $93,009 | $93,009 |
| CFDA Subtotal, Fund | 555 | $73,327 | $92,750 | $93,268 | $93,009 | $93,009 |
| | **SUBTOTAL, MOF (FEDERAL FUNDS)** | **$73,327** | **$92,750** | **$93,268** | **$93,009** | **$93,009** |
| **Method of Financing:** | | | | | | |
| 6 | State Highway Fund | $1,807,304 | $2,202,213 | $2,214,509 | $2,208,361 | $2,208,361 |

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:  8/30/2010

TIME:  11:56:38AM

---

Agency code: **327**     Agency name: **Employees Retirement System**

| | | | | | | |
|---|---|---|---|---|---|---|
| GOAL: | 1 | To Administer Comprehensive and Actuarially Sound Retirement Programs | | Statewide Goal/Benchmark: | 8 | 0 |
| OBJECTIVE: | 1 | Ensure Actuarially Sound Retirement Programs | | Service Categories: | | |
| STRATEGY: | 2 | LECOS Retirement Program | | Service: 06   Income: A.2   Age: B.3 | | |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|
| **SUBTOTAL, MOF (OTHER FUNDS)** | | $1,807,304 | $2,202,213 | $2,214,509 | $2,208,361 | $2,208,361 |
| **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | | $23,848,390 | $23,848,391 |
| **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | | $20,870,584 | $23,781,999 | $23,914,782 | $23,848,390 | $23,848,391 |

**FULL TIME EQUIVALENT POSITIONS:**

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

The ERS is the administrator of the Law Enforcement and Custodial Officer Supplemental Retirement Fund (LECOSRF), governed by Title 8, Subtitle B, Texas Government Code. The program provides supplemental retirement benefits to certified peace officers employed by specific state agencies, including the Department of Public Safety, the Texas Alcoholic Beverage Commission, and the Parks and Wildlife Commission, and custodial officers employed by the Texas Department of Criminal Justice. The State contribution is appropriated by the legislature.

**EXTERNAL/INTERNAL FACTORS IMPACTING STRATEGY:**

The LECOSRF is a defined benefit retirement plan. As such, it is dependent on advance actuarial funding. The funding is analyzed each year through an Actuarial Valuation,which examines annual experience and projects future funding based on actuarial assumptions. Any significant deviation between future experience and actuarial assumptions can affect the outcome of these projections. Among the many factors that can affect the program are growth of the covered employee population, across the board pay raises that are above or below assumptions, significant turns in the investment market, and retirement rates that are different than the assumptions, such as accelerated retirements as a result of a retirement incentive program.


Assumptions:


The above funding request assumes 1.59% state contribution, 0.5% member contribution, and no growth in payroll for Fiscal Years 2012 and 2013. The appropriation is requested to be "estimated" since it is payroll driven.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: 8/30/2010
TIME: 11:56:38AM

---

Agency code: **327**     Agency name: **Employees Retirement System**

GOAL:     1   To Administer Comprehensive and Actuarially Sound Retirement Programs          Statewide Goal/Benchmark:   8     0

OBJECTIVE:  1   Ensure Actuarially Sound Retirement Programs          Service Categories:

STRATEGY:  3   Maintain Retirement Program for State Judicial Officers          Service:  06   Income: A.2   Age:  B.3

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|------|-------------|----------|----------|----------|---------|---------|
| **Output Measures:** | | | | | | |
| 1 | Number of JRS-2 Retirees Added to Annuity Payroll | 39.00 | 13.00 | 30.00 | 13.00 | 30.00 |
| 2 | Number of JRS-2 Accounts Maintained | 667.00 | 686.00 | 696.00 | 701.00 | 710.00 |
| **Explanatory/Input Measures:** | | | | | | |
| 1 | Number of JRS-2 Annuitants | 187.00 | 170.00 | 180.00 | 170.00 | 195.00 |
| **Objects of Expense:** | | | | | | |
| 1002 | OTHER PERSONNEL COSTS | $11,368,443 | $11,380,232 | $11,351,883 | $11,366,057 | $11,366,058 |
| | **TOTAL, OBJECT OF EXPENSE** | **$11,368,443** | **$11,380,232** | **$11,351,883** | **$11,366,057** | **$11,366,058** |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $6,964,234 | $7,966,162 | $7,946,318 | $7,956,240 | $7,956,240 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | **$6,964,234** | **$7,966,162** | **$7,946,318** | **$7,956,240** | **$7,956,240** |
| **Method of Financing:** | | | | | | |
| 573 | Judicial Fund | $4,404,209 | $3,414,070 | $3,405,565 | $3,409,817 | $3,409,818 |
| | **SUBTOTAL, MOF (OTHER FUNDS)** | **$4,404,209** | **$3,414,070** | **$3,405,565** | **$3,409,817** | **$3,409,818** |
| | **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | **$11,366,057** | **$11,366,058** |
| | **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | **$11,368,443** | **$11,380,232** | **$11,351,883** | **$11,366,057** | **$11,366,058** |

**FULL TIME EQUIVALENT POSITIONS:**

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:  8/30/2010
TIME:  11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

GOAL:         1   To Administer Comprehensive and Actuarially Sound Retirement Programs          Statewide Goal/Benchmark:          8          0

OBJECTIVE:    1   Ensure Actuarially Sound Retirement Programs          Service Categories:

STRATEGY:     3   Maintain Retirement Program for State Judicial Officers          Service:   06   Income: A.2   Age: B.3

---

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|------|-------------|----------|----------|----------|---------|---------|

The ERS is the administrator of the Judicial Retirement System of Texas, Plan Two (JRSII), created under Article XVI, section 67, of the Texas Constitution and governed by Title 8, Subtitle E, Texas Government Code. The JRS II covers state judicial officers who first took office on or after September 1, 1985. Members of the JRS II contribute 6 percent of salary. Under Sections 840.103 and 840.106, Texas Government Code, the State contributes a percentage of the members' aggregate state compensation sufficient to finance any actuarial liability over a period that does not exceed 30 years by one or more years. This strategy is part of the ERS goal of administering comprehensive and actuarially sound retirement programs and supports the objective of retaining proper funding and investment growth for the programs.

**EXTERNAL/INTERNAL FACTORS  IMPACTING STRATEGY:**

Like the State employee system, the JRS II program is a defined benefit pension plan. The funding of a defined benefit program is calculated by making actuarial assumptions about the future demographics of the covered employee group and about trust fund investment earnings. Any significant deviation between experience and actuarial assumptions can affect the funding calculation. A few of the many factors which can affect the program include pay raises for judicial officers, significant turns in the investment markets, and legislation which increases the number of covered positions.

Assumptions:

The above funding request assumes 16.83% state contribution, 6% member contribution and no growth in payroll for Fiscal Years 2012 and 2013. The appropriation is requested to be "estimated" since it is payroll driven.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: 8/30/2010
TIME: 11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

GOAL: 1   To Administer Comprehensive and Actuarially Sound Retirement Programs

OBJECTIVE: 1   Ensure Actuarially Sound Retirement Programs

STRATEGY: 4   Provide for the Payment of JRS-1 Benefits as Required by Law

Statewide Goal/Benchmark:   8   0

Service Categories:

Service:   06   Income:  A.2   Age:   B.2

---

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|------|-------------|----------|----------|----------|---------|---------|
| **Output Measures:** | | | | | | |
| 1 | Number of JRS-1 Retirees Added to Annuity Payroll | 13.00 | 6.00 | 10.00 | 5.00 | 9.00 |
| 2 | Number of JRS-1 Accounts Maintained | 30.00 | 33.00 | 30.00 | 29.00 | 28.00 |
| **Explanatory/Input Measures:** | | | | | | |
| 1 | Number of JRS-1 Annuitants | 472.00 | 459.00 | 450.00 | 435.00 | 419.00 |
| **Objects of Expense:** | | | | | | |
| 1002 | OTHER PERSONNEL COSTS | $28,170,864 | $27,300,248 | $27,189,972 | $27,245,110 | $27,245,110 |
| | **TOTAL, OBJECT OF EXPENSE** | **$28,170,864** | **$27,300,248** | **$27,189,972** | **$27,245,110** | **$27,245,110** |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $28,170,864 | $27,300,248 | $27,189,972 | $27,245,110 | $27,245,110 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | **$28,170,864** | **$27,300,248** | **$27,189,972** | **$27,245,110** | **$27,245,110** |
| | **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | **$27,245,110** | **$27,245,110** |
| | **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | **$28,170,864** | **$27,300,248** | **$27,189,972** | **$27,245,110** | **$27,245,110** |

**FULL TIME EQUIVALENT POSITIONS:**

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

The ERS is the administrative body for the Judicial Retirement System of Texas. Plan One (JRS I), created under Article XVI, Section 67, Texas Constitution, and governed by Title B, Subtitle D, Texas Government Code. Benefits under JRS I are paid by direct appropriation from General Revenue. State Judicial officers who first held office before September 1, 1985 are eligible for membership in the JRS I. This is a closed plan that has not had any new covered members since 1985. Judges who took office for the first time on or after September 1, 1985 are in the JRS II plan.

**EXTERNAL/INTERNAL FACTORS  IMPACTING STRATEGY:**

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:   8/30/2010
TIME:   11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| GOAL: | 1 | To Administer Comprehensive and Actuarially Sound Retirement Programs | | | Statewide Goal/Benchmark: | 8 | 0 |
| OBJECTIVE: | 1 | Ensure Actuarially Sound Retirement Programs | | | Service Categories: | | |
| STRATEGY: | 4 | Provide for the Payment of JRS-1 Benefits as Required by Law | | | Service: 06   Income: A.2   Age: B.2 | | |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|

External factors affecting the JRS I program include pay raises for state judicial officers and the demographics of the Plan's membership.

Assumptions:

Funding for Fiscal Years 2012 and 2013 is requested with no growth assumption from the Fiscal Year 2010/2011 base. Although this request does not include an amount for JRS I membership refunds, any JRS I membership refunds requested would be paid out of this appropriation. The appropriation is requested to be "estimated" since it is a pay-as-you-go plan.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:   8/30/2010
TIME:   11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

GOAL:          1    To Administer Comprehensive and Actuarially Sound Retirement Programs          Statewide Goal/Benchmark:        8        0

OBJECTIVE:   1    Ensure Actuarially Sound Retirement Programs          Service Categories:

STRATEGY:    5    Provide Death Benefits to Beneficiaries of Public Safety Workers          Service:    06    Income:  A.2    Age:    B.3

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|------|-------------|----------|----------|----------|---------|---------|
| **Output Measures:** | | | | | | |
| 1 | Number of Death Benefit Claims Processed | 13.00 | 22.00 | 20.00 | 20.00 | 20.00 |
| 2 | Number of Beneficiaries Receiving Benefits | 127.00 | 131.00 | 135.00 | 135.00 | 140.00 |
| **Objects of Expense:** | | | | | | |
| 3001 | CLIENT SERVICES | $3,865,675 | $5,923,207 | $6,173,207 | $6,048,207 | $6,048,207 |
| | **TOTAL, OBJECT OF EXPENSE** | **$3,865,675** | **$5,923,207** | **$6,173,207** | **$6,048,207** | **$6,048,207** |
| | | | | | | |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $1,865,675 | $4,173,207 | $4,173,207 | $4,173,207 | $4,173,207 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | **$1,865,675** | **$4,173,207** | **$4,173,207** | **$4,173,207** | **$4,173,207** |
| | | | | | | |
| **Method of Financing:** | | | | | | |
| 469 | Crime Victims Comp Acct | $2,000,000 | $1,750,000 | $2,000,000 | $1,875,000 | $1,875,000 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS - DEDICATED)** | **$2,000,000** | **$1,750,000** | **$2,000,000** | **$1,875,000** | **$1,875,000** |
| | | | | | | |
| | **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | **$6,048,207** | **$6,048,207** |
| | | | | | | |
| | **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | **$3,865,675** | **$5,923,207** | **$6,173,207** | **$6,048,207** | **$6,048,207** |

**FULL TIME EQUIVALENT POSITIONS:**

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

Chapter 615 Texas Government Code provides for payment by the state of a $250,000 lump sum, plus monthly dependent benefits, to the survivors of Texas law enforcement or fire fighting personnel who are killed in the line of duty. The eligibility for benefits is not tied to state employment and extends to local law enforcement and firefighters. In addition, certain survivors qualify for the payment of funeral expenses. The ERS is the administrative body for this program.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:  8/30/2010

TIME:  11:56:38AM

---

Agency code: **327**          Agency name:  **Employees Retirement System**

| | | | | | | |
|---|---|---|---|---|---|---|
| GOAL: | 1 | To Administer Comprehensive and Actuarially Sound Retirement Programs | | Statewide Goal/Benchmark: | 8 | 0 |
| OBJECTIVE: | 1 | Ensure Actuarially Sound Retirement Programs | | Service Categories: | | |
| STRATEGY: | 5 | Provide Death Benefits to Beneficiaries of Public Safety Workers | | Service: 06   Income:  A.2   Age:   B.3 | | |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|

**EXTERNAL/INTERNAL FACTORS  IMPACTING STRATEGY:**

Payments under this Program are directly dependent on the number of public safety officers killed in the line of duty each year within the State.

Assumptions:

Funding for Fiscal Years 2012 and 2013 is requested with no growth assumption from the Fiscal Year 2010/2011 base. The appropriation is requested to be "estimated" since it is event driven.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: 8/30/2010
TIME: 11:56:38AM

---

Agency code: **327**        Agency name: **Employees Retirement System**

GOAL:        1    To Administer Comprehensive and Actuarially Sound Retirement Programs        Statewide Goal/Benchmark:    8    0

OBJECTIVE:   1    Ensure Actuarially Sound Retirement Programs        Service Categories:

STRATEGY:    6    Provide Lump-sum Retiree Death Benefits. Estimated.        Service:    06    Income:  A.2    Age:    B.2

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|------|-------------|----------|----------|----------|---------|---------|
| **Output Measures:** | | | | | | |
| 1 | Number of Retiree Death Benefits Paid | 1,848.00 | 2,018.00 | 2,175.00 | 2,350.00 | 2,550.00 |
| **Efficiency Measures:** | | | | | | |
| 1 | Average Number of Days to Process Retiree Death Benefits | 7.00 | 7.00 | 7.00 | 7.00 | 7.00 |
| **Objects of Expense:** | | | | | | |
| 3001 | CLIENT SERVICES | $7,378,210 | $8,088,040 | $8,088,040 | $8,088,040 | $8,088,040 |
| | **TOTAL, OBJECT OF EXPENSE** | **$7,378,210** | **$8,088,040** | **$8,088,040** | **$8,088,040** | **$8,088,040** |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $7,378,210 | $8,088,040 | $8,088,040 | $8,088,040 | $8,088,040 |
| | **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | **$7,378,210** | **$8,088,040** | **$8,088,040** | **$8,088,040** | **$8,088,040** |
| | **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | **$8,088,040** | **$8,088,040** |
| | **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | **$7,378,210** | **$8,088,040** | **$8,088,040** | **$8,088,040** | **$8,088,040** |

**FULL TIME EQUIVALENT POSITIONS:**

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

Section 814.501, Texas Government Code, provides that the State shall pay a lump sum death benefit of $5,000 to the survivor or estate of a person retired under any of the retirement programs administered by the ERS Board of Trustees.

**EXTERNAL/INTERNAL FACTORS  IMPACTING STRATEGY:**

**3.A. STRATEGY REQUEST**

DATE:      8/30/2010

82nd Regular Session, Agency Submission, Version 1

TIME:      11:56:38AM

Automated Budget and Evaluation System of Texas (ABEST)

---

Agency code: **327**          Agency name: **Employees Retirement System**

| | | | |
|---|---|---|---|
| GOAL: | 1 | To Administer Comprehensive and Actuarially Sound Retirement Programs | Statewide Goal/Benchmark:        8        0 |
| OBJECTIVE: | 1 | Ensure Actuarially Sound Retirement Programs | Service Categories: |
| STRATEGY: | 6 | Provide Lump-sum Retiree Death Benefits. Estimated. | Service:     06     Income:  A.2     Age:     B.2 |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|

This strategy is affected by the annual death rate of ERS retired members.

Assumptions:

Funding for Fiscal Years 2012 and 2013 is requested with no growth assumption from the Fiscal Year 2010/2011 base. The appropriation is requested to be "estimated" since it is event driven.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:   8/30/2010

TIME:   11:56:38AM

---

Agency code: **327**          Agency name: **Employees Retirement System**

| | | | |
|---|---|---|---|
| GOAL: | 2 | Provide Employees & Retirees with Quality Health Program | Statewide Goal/Benchmark:   8   0 |
| OBJECTIVE: | 1 | Manage GBP for State & Higher Education Employees | Service Categories: |
| STRATEGY: | 1 | Provide Basic Insurance Program to General State Employees. Estimated | Service:   06   Income:  A.2   Age:   B.3 |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|
| **Output Measures:** | | | | | | |
| | 1 In-Network Services as a Percentage of Total Services | 93.20 % | 95.50 % | 95.50 % | 95.50 % | 95.50 % |
| | 2 Mental Health/Substance Abuse Costs as % of Total HealthSelect Costs | 1.90 % | 2.00 % | 2.00 % | 2.00 % | 2.00 % |
| | 3 Prescription Drug Program Costs as Percent of Total HealthSelect Costs | 21.90 % | 21.30 % | 19.50 % | 19.60 % | 19.90 % |
| **Efficiency Measures:** | | | | | | |
| KEY | 1 Percent of Medical Claims Processed within Thirty Days | 99.20 % | 98.90 % | 99.00 % | 99.00 % | 99.00 % |
| | 2 Percent of All Electronic Pharmacy Claims Paid Within 21 Days | 100.00 % | 100.00 % | 100.00 % | 100.00 % | 100.00 % |
| KEY | 3 Total Cost Paid Per HealthSelect Member for Admin & Claims Processing | 16.87 | 16.89 | 17.35 | 18.04 | 18.76 |
| | 4 Total Cost Paid/HealthSelect Member/ Pharmacy Admin & Claims Process | 1.29 | 1.31 | 1.34 | 1.37 | 1.42 |
| **Explanatory/Input Measures:** | | | | | | |
| | 1 # Employees, Retirees & Dependents Covered by GBP Health Care Plans | 518,140.00 | 534,636.00 | 536,131.00 | 544,763.00 | 553,533.00 |
| | 2 Percent of Participants in HMOs | 11.10 % | 6.60 % | 6.30 % | 6.30 % | 6.30 % |
| | 3 Average Monthly State Contribution Per SKIP Enrollee | 117.10 | 126.71 | 136.83 | 151.24 | 166.96 |
| | 4 Number of Members Enrolled in SKIP | 6,096.00 | 6,234.00 | 6,334.00 | 6,436.00 | 6,540.00 |
| | 5 Number of Children Covered by SKIP | 12,700.00 | 12,988.00 | 13,197.00 | 13,409.00 | 13,625.00 |
| **Objects of Expense:** | | | | | | |
| 2009 | OTHER OPERATING EXPENSE | $1,083,588,315 | $1,189,280,616 | $1,274,281,049 | $1,250,491,206 | $1,250,491,209 |
| | **TOTAL, OBJECT OF EXPENSE** | **$1,083,588,315** | **$1,189,280,616** | **$1,274,281,049** | **$1,250,491,206** | **$1,250,491,209** |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $633,150,512 | $690,732,460 | $740,621,543 | $726,516,002 | $726,516,003 |

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: 8/30/2010
TIME: 11:56:38AM

---

Agency code: **327**   Agency name: **Employees Retirement System**

| | | | |
|---|---|---|---|
| GOAL: | 2 | Provide Employees & Retirees with Quality Health Program | Statewide Goal/Benchmark: 8 0 |
| OBJECTIVE: | 1 | Manage GBP for State & Higher Education Employees | Service Categories: |
| STRATEGY: | 1 | Provide Basic Insurance Program to General State Employees. Estimated | Service: 06   Income: A.2   Age: B.3 |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|
| **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | | **$633,150,512** | **$690,732,460** | **$740,621,543** | **$726,516,002** | **$726,516,003** |
| **Method of Financing:** | | | | | | |
| 994 | GR Dedicated Accounts | $37,442,064 | $42,676,094 | $46,261,393 | $45,176,124 | $45,176,125 |
| **SUBTOTAL, MOF (GENERAL REVENUE FUNDS - DEDICATED)** | | **$37,442,064** | **$42,676,094** | **$46,261,393** | **$45,176,124** | **$45,176,125** |
| **Method of Financing:** | | | | | | |
| 555 | Federal Funds | | | | | |
| | 00.327.002 ERS Insurance | $202,278,721 | $236,462,299 | $251,187,733 | $247,528,643 | $247,528,644 |
| CFDA Subtotal, Fund | 555 | $202,278,721 | $236,462,299 | $251,187,733 | $247,528,643 | $247,528,644 |
| **SUBTOTAL, MOF (FEDERAL FUNDS)** | | **$202,278,721** | **$236,462,299** | **$251,187,733** | **$247,528,643** | **$247,528,644** |
| **Method of Financing:** | | | | | | |
| 6 | State Highway Fund | $206,732,770 | $213,155,153 | $229,276,140 | $224,575,844 | $224,575,845 |
| 998 | Other Special State Funds | $3,984,248 | $6,254,610 | $6,934,240 | $6,694,593 | $6,694,592 |
| **SUBTOTAL, MOF (OTHER FUNDS)** | | **$210,717,018** | **$219,409,763** | **$236,210,380** | **$231,270,437** | **$231,270,437** |
| **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | | **$1,250,491,206** | **$1,250,491,209** |
| **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | | **$1,083,588,315** | **$1,189,280,616** | **$1,274,281,049** | **$1,250,491,206** | **$1,250,491,209** |

**FULL TIME EQUIVALENT POSITIONS:**

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

Chapter 1551, § 1551.211 of the Texas Insurance Code, created the Texas Employees Group Benefits Program (GBP) and established the ERS as the administrative body for that program. That article explains that the State will provide a program of health care insurance and other appropriated insurance coverage to be funded by employee and state funds. This strategy supports the ERS goal of providing a comprehensive health care program and the attendant objective of efficiently managing the program.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:   8/30/2010

TIME:   11:56:38AM

---

Agency code: **327**        Agency name: **Employees Retirement System**

| | | | | | | |
|---|---|---|---|---|---|---|
| GOAL: | 2 | Provide Employees & Retirees with Quality Health Program | | Statewide Goal/Benchmark: | 8 | 0 |
| OBJECTIVE: | 1 | Manage GBP for State & Higher Education Employees | | Service Categories: | | |
| STRATEGY: | 1 | Provide Basic Insurance Program to General State Employees. Estimated | | Service:   06   Income:  A.2   Age:   B.3 | | |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|

**EXTERNAL/INTERNAL FACTORS  IMPACTING STRATEGY:**

This strategy is affected by a variety of elements, ranging from state policy toward its employees, to rising medical cost throughout the United States. Beginning September 1, 1992, the ERS created a self-funded managed care program, HealthSelect, to help ensure that state employees will continue to have access to affordable health insurance.

Assumptions:

The $2.5 billion in the ERS baseline request is calculated based on the Fiscal Year 2010 estimated and Fiscal Year 2011 budgeted base level with no state contribution increases for Fiscal Years 2012 and 2013. This baseline funding request is not enough to provide the same level of insurance benefits currently provided by the State and would require major changes to the current plan structure and benefits design. These changes would be in addition to the changes implemented in the current biennium that resulted in $143 million in additional cost shifting to members to close an insurance program funding gap. Additional funding is requested in our Exceptional Items to maintain existing benefits. The current level of benefits provides for full funding for the monthly premium contributions for full-time state employees and eligible retirees and a 50% contribution for eligible dependents of employees and retirees. This contribution request also includes funding for the State Kids Insurance Program (SKIP).

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: 8/30/2010
TIME: 11:56:38AM

---

Agency code: **327**     Agency name: **Employees Retirement System**

| | | | |
|---|---|---|---|
| GOAL: | 2 | Provide Employees & Retirees with Quality Health Program | Statewide Goal/Benchmark:   8   0 |
| OBJECTIVE: | 1 | Manage GBP for State & Higher Education Employees | Service Categories: |
| STRATEGY: | 2 | Provide Supplement to Post Retirement Health Benefits.  Estimated | Service:   06   Income: A.1   Age:   B.3 |

| CODE | DESCRIPTION | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|
| **Objects of Expense:** | | | | | | |
| 2009 | OTHER OPERATING EXPENSE | $0 | $0 | $0 | $0 | $0 |
| **TOTAL, OBJECT OF EXPENSE** | | **$0** | **$0** | **$0** | **$0** | **$0** |
| | | | | | | |
| **Method of Financing:** | | | | | | |
| 1 | General Revenue Fund | $0 | $0 | $0 | $0 | $0 |
| **SUBTOTAL, MOF (GENERAL REVENUE FUNDS)** | | **$0** | **$0** | **$0** | **$0** | **$0** |
| | | | | | | |
| **Method of Financing:** | | | | | | |
| 994 | GR Dedicated Accounts | $0 | $0 | $0 | $0 | $0 |
| **SUBTOTAL, MOF (GENERAL REVENUE FUNDS - DEDICATED)** | | **$0** | **$0** | **$0** | **$0** | **$0** |
| | | | | | | |
| **TOTAL, METHOD OF FINANCE (INCLUDING RIDERS)** | | | | | **$0** | **$0** |
| | | | | | | |
| **TOTAL, METHOD OF FINANCE (EXCLUDING RIDERS)** | | **$0** | **$0** | **$0** | **$0** | **$0** |

**FULL TIME EQUIVALENT POSITIONS:**

**STRATEGY DESCRIPTION AND JUSTIFICATION:**

Chapter 1551, § 1551.211 of the Texas Insurance Code, created the Texas Employees Group Benefits Program (GBP) and established the ERS as the administrative body for that program. The program provides insurance benefits to active employees and eligible retired employees and their dependents.  In the General Appropriations Act of the 80th Legislature, Regular Session, funds were appropriated to the ERS to cover costs to comply with possible federal requirements and reporting of post retirement benefits.

**EXTERNAL/INTERNAL FACTORS  IMPACTING STRATEGY:**

This strategy was affected by a variety of elements, ranging from state policy toward its retirees, to interpretation of federal regulations and reporting requirements. The end result was no change to current processes, and therefore, there was no additional cost to the state. The appropriation was lapsed at the end of FY2009.

**3.A. STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:   8/30/2010

TIME:   11:56:33AM

**SUMMARY TOTALS:**

| | | | | | |
|---|---|---|---|---|---|
| **OBJECTS OF EXPENSE:** | $1,515,019,592 | $1,662,582,973 | $1,759,040,936 | $1,734,142,309 | $1,734,142,318 |
| **METHODS OF FINANCE (INCLUDING RIDERS):** | | | | $1,734,142,309 | $1,734,142,318 |
| **METHODS OF FINANCE (EXCLUDING RIDERS):** | $1,515,019,592 | $1,662,582,973 | $1,759,040,936 | $1,734,142,309 | $1,734,142,318 |
| **FULL TIME EQUIVALENT POSITIONS:** | 305.8 | 312.0 | 323.0 | 332.0 | 332.0 |

**3.B. Rider Revisions and Additions Request**

| Agency Code: | Agency Name: | Prepared By: | Date: | Request Level: |
|---|---|---|---|---|
| 327 | Employees Retirement System | Michael C. Wheeler | **August 30, 2010** | Base |

| Current Rider Number | Page Number in 2010-2011 GAA | Proposed Rider Language |
|---|---|---|
| 4 | I-33 | **State Contribution to Employees Retirement Program.**  The amount specified above in A.1.1, Retirement Contributions, is based on a state contribution of ~~6.45~~ 6.95 percent of payroll, including annual membership fees of $3 for contributing members for each fiscal year. |
| 6 | I-~~32~~33 | **State Contribution to Group Insurance for General State Employees.**  Funds identified above for group insurance are intended to fund: <br><br> a.  the total cost of the basic life and health coverage for all active and retired employees; <br> b.  fifty percent of the total cost of health coverage for the spouses and dependent children of all active and retired employees who enroll in coverage categories which include a spouse and/or dependent children; <br> c.  the additional cost of providing a premium structure comparable to the Children's Health Insurance Program (CHIP) for dependent children of state employees enrolled in the State Kids Insurance Program (SKIP); and <br> d.  the incentive program to waive participation in the Group Benefit Plan (Opt-Out). <br><br> In no event shall the total amount of state contributions allocated to fund coverage in an optional health plan exceed the actuarially determined total amount of state contributions that would be required to fund basic health coverage for those active employees and retirees who have elected to participate in that optional health plan. <br><br> During each fiscal year, the state's monthly contribution shall be determined by multiplying (1) the per capita monthly contribution as certified herein by (2) the total number of full-time active and retired employees enrolled for coverage during that month. |

**3.B. Rider Revisions and Additions Request**

| Agency Code: | Agency Name: | Prepared By: | Date: | Request Level: |
|---|---|---|---|---|
| 327 | Employees Retirement System | Michael C. Wheeler | **August 30, 2010** | Base |

| Current Rider Number | Page Number in 2010-2011 GAA | Proposed Rider Language |
|---|---|---|
| | | For each employee or retiree that waives participation in the Group Benefit Plan and enrolls in allowable optional coverage, the Employees Retirement System shall receive $60 per month in lieu of the "employee-only" state contribution amount.  The waived participant may apply up to $60 per month towards the cost of the optional coverage. <br><br> Each year, upon adoption of group insurance rates by the Board of Trustees, the Employees Retirement System must notify the Comptroller, the Legislative Budget Board, and the Governor of the per capita monthly contribution required in accordance with this rider for each full-time active and retired employee enrolled for coverage during the fiscal year. <br><br> It is the intent of the Legislature that the Employees Retirement System control the cost of the group insurance program by not providing rate increases to health care providers participating in HealthSelect during the ~~2010-11~~ 2012-13 biennium. |
| ~~12~~ | ~~I-34~~ | ~~**Online Health Risk Assessment.**  Out of funds appropriated above in Strategy B.1.1, the Employee Retirement System shall use an amount not to exceed $100,000 in fiscal year 2010 for the purpose of purchasing access to an online health risk assessment for state employees that do not already have access to one.~~ |
| 13 | I-34 | **Appropriation for the Deferred Compensation Trust Fund and the TexaSaver Trust Fund.**  All money deposited into the Deferred Compensation Trust Fund, Employees Retirement System No. 0945 and the TexaSaver Trust Fund No. 0946 pursuant to § 609.512 Government Code are hereby appropriated to the system for the ~~2010-11~~ 2012-2013 biennium for the purposes authorized by law. |

**4.A. EXCEPTIONAL ITEM REQUEST SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**

TIME: **9:30:37AM**

Agency code: **327**       Agency name:

**Employees Retirement System**

| CODE | DESCRIPTION | | Excp 2012 | Excp 2013 |
|---|---|---|---|---|

**Item Name:**       Retirement Program Actuarially sound as per Sec. 811.006, Government Code

**Item Priority:**       1

**Includes Funding for the Following Strategy or Strategies:**   01-01-01      Provide an Actuarially Sound Level of Funding As Defined by State Law

**OBJECTS OF EXPENSE:**

| | | Excp 2012 | Excp 2013 |
|---|---|---|---|
| 1002 | OTHER PERSONNEL COSTS | 141,160,489 | 141,160,489 |
| | **TOTAL, OBJECT OF EXPENSE** | **$141,160,489** | **$141,160,489** |

**METHOD OF FINANCING:**

| | | | Excp 2012 | Excp 2013 |
|---|---|---|---|---|
| 1 | General Revenue Fund | | 83,256,456 | 83,256,456 |
| 6 | State Highway Fund | | 23,347,945 | 23,347,945 |
| 555 | Federal Funds | | | |
| 00.327.001 | | ERS Retirement | 27,653,340 | 27,653,340 |
| 994 | GR Dedicated Accounts | | 5,886,392 | 5,886,392 |
| 998 | Other Special State Funds | | 1,016,356 | 1,016,356 |
| | **TOTAL, METHOD OF FINANCING** | | **$141,160,489** | **$141,160,489** |

**DESCRIPTION / JUSTIFICATION:**

The funded ratio for the ERS retirement fund has declined steadily since 2001, driven downward by funding below actuarial sound levels and negative market returns at the beginning and end of the decade. Benefit enhancements that were approved in the 1990's intensified the decline.  The 81st Legislature passed new plan provisions that reduced plan liabilities and lowered the normal cost of the plan.  The legislation also increased contribution requirements for both the state and the member.  The total contribution rate (13.45%) now exceeds the normal cost by 1.07% of payroll, but it is not enough to amortize the unfunded liability over 31 years (15.84%).  In order to restore the fund to the actuarially sound level of funding set forth in Sec. 811.006 of the Texas Government Code, a 9.34% state contribution rate would be required along with the 6.5% member contribution.

**EXTERNAL/INTERNAL FACTORS:**

Assumptions:

The above request assumes a 9.34% state contribution, 6.5% member contribution, and no growth in payroll for Fiscal Years 2012 and 2013.

**4.A. EXCEPTIONAL ITEM REQUEST SCHEDULE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE:  **8/31/2010**
TIME:  **9:30:37AM**

Agency code:  **327**          Agency name:

**Employees Retirement System**

| CODE | DESCRIPTION | | Excp 2012 | Excp 2013 |
|------|-------------|--|-----------|-----------|
| | **Item Name:** | LECOS Program Actuarially Sound | | |
| | **Item Priority:** | 2 | | |
| | **Includes Funding for the Following Strategy or Strategies:** | 01-01-02      LECOS Retirement Program | | |

**OBJECTS OF EXPENSE:**

| CODE | DESCRIPTION | Excp 2012 | Excp 2013 |
|------|-------------|-----------|-----------|
| 1002 | OTHER PERSONNEL COSTS | 7,436,355 | 7,436,355 |
| | **TOTAL, OBJECT OF EXPENSE** | **$7,436,355** | **$7,436,355** |

**METHOD OF FINANCING:**

| CODE | DESCRIPTION | Excp 2012 | Excp 2013 |
|------|-------------|-----------|-----------|
| 1 | General Revenue Fund | 6,680,409 | 6,680,409 |
| 6 | State Highway Fund | 641,331 | 641,331 |
| 555 | Federal Funds | | |
| 00.327.003 | LECOS Retirement | 25,949 | 25,949 |
| 994 | GR Dedicated Accounts | 88,666 | 88,666 |
| | **TOTAL, METHOD OF FINANCING** | **$7,436,355** | **$7,436,355** |

**DESCRIPTION / JUSTIFICATION:**

This program provides a supplemental retirement benefit to Certified Peace Officers and Custodial Officers. The program funds a 0.5% supplement to the normal retirement formula, which increases the retirement formula multiplier to 2.8% per year of service. The benefit becomes payable after 20 years of service in a qualified position.
The funded ratio for the LECOS fund is declining and fell below 100% in Fiscal Year 2007. The LECOS funded ratio decline is a result of both benefit enhancements, negative market returns at the beginning and end of the decade, and insufficient State funding. The State had not contributed to this supplemental fund since 1993 until contributions resumed in Fiscal Year 2008. Although the legislature approved a normal cost contribution of 1.59% in the 80th Legislative Session, normal cost has risen to 2.07% based on the August 2009 Actuarial Valuation. In order to restore the trust to the actuarially sound level of funding as set forth in Sec 811.006 of the Texas Government code, a 2.08% state contribution rate would be required along with a 0.5% member contribution.

**EXTERNAL/INTERNAL FACTORS:**

Assumptions:

The above funding request assumes 2.08% state contribution, 0.5% member contribution, and no growth in payroll for Fiscal Years 2012 and 2013.

| | | | DATE: | 8/31/2010 |
|---|---|---|---|---|
| | **4.A. EXCEPTIONAL ITEM REQUEST SCHEDULE** | | | |
| | 82nd Regular Session, Agency Submission, Version 1 | | TIME: | 9:30:37AM |
| | Automated Budget and Evaluation System of Texas (ABEST) | | | |

Agency code:  **327**          Agency name:

**Employees Retirement System**

| CODE | DESCRIPTION | | Excp 2012 | Excp 2013 |
|---|---|---|---|---|

**Item Name:**     Group Benefit Program Cost Increases,Contingency Fund Spend Down Replacement, and Health Care Reform
**Item Priority:**     3
**Includes Funding for the Following Strategy or Strategies:** 02-01-01      Provide Basic Insurance Program to General State Employees. Estimated

**OBJECTS OF EXPENSE:**

| | | | Excp 2012 | Excp 2013 |
|---|---|---|---|---|
| 2009 | OTHER OPERATING EXPENSE | | 222,322,830 | 353,255,995 |
| | **TOTAL, OBJECT OF EXPENSE** | | **$222,322,830** | **$353,255,995** |

**METHOD OF FINANCING:**

| | | | Excp 2012 | Excp 2013 |
|---|---|---|---|---|
| 1 | General Revenue Fund | | 129,215,669 | 205,314,990 |
| 6 | State Highway Fund | | 40,001,631 | 63,559,896 |
| 555 | Federal Funds | | | |
| 00.327.002 | | ERS Insurance | 43,824,530 | 69,634,224 |
| 994 | GR Dedicated Accounts | | 8,071,189 | 12,824,576 |
| 998 | Other Special State Funds | | 1,209,811 | 1,922,309 |
| | **TOTAL, METHOD OF FINANCING** | | **$222,322,830** | **$353,255,995** |

**DESCRIPTION / JUSTIFICATION:**

Costs for the insurance program exceeded funding for the FY 2010-11 biennium.  To cover the shortfall, the plan used contingency reserves of $262 million. ERS also implemented plan changes that are expected to shift $143 million in additional cost to members.  With only an estimated $20.9 million in contingency reserve funds available to start the 2012-13 biennium, contributions will need to increase to maintain the current level of benefits.  The contribution increase required for the State to maintain the health insurance plan as it is currently structured is 15.58% in FY 2012 and 8.89% in FY 2013. Although the base level of funding was adjusted upward to reflect the supplemental funds from the contingency

reserve fund, it was also adjusted downward for the 5% reduction. The amount requested in this exceptional item represents the difference between the amount needed for increases of 15.58% in FY 2012 and 8.89% in FY 2013 and the adjusted base level for the GBP approved by the LBB.

**EXTERNAL/INTERNAL FACTORS:**

Assumptions:

The above request is based on state contribution increases of 15.58% in FY 2012 and 8.89% in FY 2013, and $20.9 million available for spend-down from the GBP contingency reserve.            The projected balance in the GBP contingency reserve would be zero at the end of Fiscal Year 2013.  Plan cost trend is projected as follows: 1) 2.7% -Utilization Trend;

2) 5.0% - Cost-Per-Unit Trend;  3) 1.4% - Member Cost Share Leverage; and 4) 9.1% - Plan Cost Trend.  The higher contribution in FY 2012 also reflects 4.89% needed to replace the funds that were used from the contingency reserve fund, and 1.74% in cost increases related to the federal health care reform act.

**4.A. EXCEPTIONAL ITEM REQUEST SCHEDULE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:30:37AM**

Agency code: **327**   Agency name:

**Employees Retirement System**

| CODE | DESCRIPTION | | Excp 2012 | Excp 2013 |
|------|-------------|--|-----------|-----------|

Item Name:   Group Benefit Program 60 Day Reserve Fund
Item Priority:   4
Includes Funding for the Following Strategy or Strategies:   02-01-01   Provide Basic Insurance Program to General State Employees. Estimated

**OBJECTS OF EXPENSE:**

| | | | Excp 2012 | Excp 2013 |
|---|---|---|---|---|
| 2009 | OTHER OPERATING EXPENSE | | 148,964,776 | 162,204,358 |
| | **TOTAL, OBJECT OF EXPENSE** | | **$148,964,776** | **$162,204,358** |

**METHOD OF FINANCING:**

| | | | | |
|---|---|---|---|---|
| 1 | General Revenue Fund | | 86,579,426 | 94,274,370 |
| 6 | State Highway Fund | | 26,802,619 | 29,184,762 |
| 555 | Federal Funds | | | |
| 00.327.002 | ERS Insurance | | 29,364,106 | 31,973,908 |
| 994 | GR Dedicated Accounts | | 5,408,005 | 5,888,653 |
| 998 | Other Special State Funds | | 810,620 | 882,665 |
| | **TOTAL, METHOD OF FINANCING** | | **$148,964,776** | **$162,204,358** |

**DESCRIPTION / JUSTIFICATION:**

Chapter 1551, Section 211 of the Texas Insurance Code requires ERS to request funding necessary to maintain a reserve adequate to pay 60 days of claims in the self-funded
health insurance program. At the end of Fiscal Year 2011, this fund is expected to have a balance of $20.8 million. In order to maintain the fiscally prudent 60-day
reserved fund,ERS requests $311.2 million in additional general state funds for this purpose. The claims reserve fund also receives local funding from higher education,
the Texas Municipal Retirement System, the Texas County and District Retirement System, the Community Supervision and Corrections Department and the Windham School
District,
all of which participate in the Group Benefits Program. Employees also contribute a portion of the funding through their share of out-of-pocket premium costs.

**EXTERNAL/INTERNAL FACTORS:**

Assumptions:

The above funding request is based on an increase of 27.27% in FY 2012 and 8.89% in FY 2013 in state contributions to achieve the GBP reserve balance of $569 million
(or 60 days of claims) at the end of Fiscal Year 2013.

**4 B. EXCEPTIONAL ITEMS STRATEGY ALLOCATION SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**

TIME: **9:49:42AM**

Agency code: **327**    Agency name: **Employees Retirement System**

| Code  Description | Exp 2012 | Exp 2013 |
|---|---|---|
| **Item Name:** Retirement Program Actuarially sound as per Sec. 811.006, Government Code | | |
| **Allocation to Strategy:**  1-1-1    Provide an Actuarially Sound Level of Funding As Defined by State Law | | |
| **STRATEGY IMPACT ON OUTCOME MEASURES:** | | |
| **2**  # of Years to Amortize the ERS Unfunded Actuarial Accrued Liability | 31.00 | 31.00 |
| **OBJECTS OF EXPENSE:** | | |
| 1002    OTHER PERSONNEL COSTS | 141,160,489 | 141,160,489 |
| **TOTAL, OBJECT OF EXPENSE** | **$141,160,489** | **$141,160,489** |
| **METHOD OF FINANCING:** | | |
| 1    General Revenue Fund | 83,256,456 | 83,256,456 |
| 6    State Highway Fund | 23,347,945 | 23,347,945 |
| 555    Federal Funds | | |
| 00.327.001    ERS Retirement | 27,653,340 | 27,653,340 |
| 994    GR Dedicated Accounts | 5,886,392 | 5,886,392 |
| 998    Other Special State Funds | 1,016,356 | 1,016,356 |
| **TOTAL, METHOD OF FINANCING** | **$141,160,489** | **$141,160,489** |

**4 B. EXCEPTIONAL ITEMS STRATEGY ALLOCATION SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**

TIME: **9:49:42AM**

Agency code: **327**    Agency name: **Employees Retirement System**

| Code  Description | Excp 2012 | Excp 2013 |
|---|---|---|
| **Item Name:**                    LECOS Program Actuarially Sound | | |
| **Allocation to Strategy:**         1-1-2        LECOS Retirement Program | | |
| **STRATEGY IMPACT ON OUTCOME MEASURES:** | | |
| **3**  # Years to Amortize the LECOS Unfunded Actuarial Accrued Liability | 31.00 | 31.00 |
| **OBJECTS OF EXPENSE:** | | |
| 1002     OTHER PERSONNEL COSTS | 7,436,355 | 7,436,355 |
| **TOTAL, OBJECT OF EXPENSE** | **$7,436,355** | **$7,436,355** |
| **METHOD OF FINANCING:** | | |
| 1   General Revenue Fund | 6,680,409 | 6,680,409 |
| 6   State Highway Fund | 641,331 | 641,331 |
| 555  Federal Funds | | |
| 00.327.003        LECOS Retirement | 25,949 | 25,949 |
| 994  GR Dedicated Accounts | 88,666 | 88,666 |
| **TOTAL, METHOD OF FINANCING** | **$7,436,355** | **$7,436,355** |

**4 B. EXCEPTIONAL ITEMS STRATEGY ALLOCATION SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**

TIME: **9:49:42AM**

Agency code: **327**      Agency name: **Employees Retirement System**

| Code | Description | Excp 2012 | Excp 2013 |
|---|---|---|---|
| **Item Name:** | Group Benefit Program Cost Increases,Contingency Fund Spend Down Replacement, and Health Care Reform | | |
| **Allocation to Strategy:** | 2-1-1      Provide Basic Insurance Program to General State Employees. Estimated | | |
| **OBJECTS OF EXPENSE:** | | | |
| 2009 | OTHER OPERATING EXPENSE | 222,322,830 | 353,255,995 |
| **TOTAL, OBJECT OF EXPENSE** | | **$222,322,830** | **$353,255,995** |
| | | | |
| **METHOD OF FINANCING:** | | | |
| 1 | General Revenue Fund | 129,215,669 | 205,314,990 |
| 6 | State Highway Fund | 40,001,631 | 63,559,896 |
| 555 | Federal Funds | | |
| 00.327.002 | ERS Insurance | 43,824,530 | 69,634,224 |
| 994 | GR Dedicated Accounts | 8,071,189 | 12,824,576 |
| 998 | Other Special State Funds | 1,209,811 | 1,922,309 |
| **TOTAL, METHOD OF FINANCING** | | **$222,322,830** | **$353,255,995** |

**4 B. EXCEPTIONAL ITEMS STRATEGY ALLOCATION SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**

TIME: **9:49:42AM**

Agency code: **327**     Agency name: **Employees Retirement System**

| Code | Description | Exp 2012 | Exp 2013 |
|------|-------------|----------|----------|
| **Item Name:** | Group Benefit Program 60 Day Reserve Fund | | |
| **Allocation to Strategy:** | 2-1-1     Provide Basic Insurance Program to General State Employees. Estimated | | |
| **OBJECTS OF EXPENSE:** | | | |
| 2009 | OTHER OPERATING EXPENSE | 148,964,776 | 162,204,358 |
| **TOTAL, OBJECT OF EXPENSE** | | **$148,964,776** | **$162,204,358** |
| | | | |
| **METHOD OF FINANCING:** | | | |
| 1 | General Revenue Fund | 86,579,426 | 94,274,370 |
| 6 | State Highway Fund | 26,802,619 | 29,184,762 |
| 555 | Federal Funds | | |
| 00.327.002 | ERS Insurance | 29,364,106 | 31,973,908 |
| 994 | GR Dedicated Accounts | 5,408,005 | 5,888,653 |
| 998 | Other Special State Funds | 810,620 | 882,665 |
| **TOTAL, METHOD OF FINANCING** | | **$148,964,776** | **$162,204,358** |

<table>
<tr><td></td><td align="right"><strong>4.C. EXCEPTIONAL ITEMS STRATEGY REQUEST</strong><br>82nd Regular Session, Agency Submission, Version 1<br>Automated Budget and Evaluation System of Texas (ABEST)</td><td><strong>DATE:</strong><br><strong>TIME:</strong></td><td><strong>8/31/2010</strong><br><strong>9:31:27AM</strong></td></tr>
</table>

| Agency Code: | **327** | Agency name: | **Employees Retirement System** | | |
|---|---|---|---|---|---|

GOAL: 1  To Administer Comprehensive and Actuarially Sound Retirement Programs       Statewide Goal/Benchmark:       8 - 0

OBJECTIVE: 1  Ensure Actuarially Sound Retirement Programs       Service Categories:

STRATEGY: 1  Provide an Actuarially Sound Level of Funding As Defined by State Law       Service: 06   Income: A.2   Age: B.3

| CODE   DESCRIPTION | Excp 2012 | Excp 2013 |
|---|---:|---:|
| **STRATEGY IMPACT ON OUTCOME MEASURES:** | | |
| | | |
| **2**   # of Years to Amortize the ERS Unfunded Actuarial Accrued Liability | 31.00 | 31.00 |
| **3**   # Years to Amortize the LECOS Unfunded Actuarial Accrued Liability | 31.00 | 31.00 |
| **OBJECTS OF EXPENSE:** | | |
| | | |
| 1002   OTHER PERSONNEL COSTS | 141,160,489 | 141,160,489 |
| **Total, Objects of Expense** | **$141,160,489** | **$141,160,489** |
| **METHOD OF FINANCING:** | | |
| | | |
| 1   General Revenue Fund | 83,256,456 | 83,256,456 |
| 6   State Highway Fund | 23,347,945 | 23,347,945 |
| 555   Federal Funds | | |
| 00.327.001   ERS Retirement | 27,653,340 | 27,653,340 |
| 994   GR Dedicated Accounts | 5,886,392 | 5,886,392 |
| 998   Other Special State Funds | 1,016,356 | 1,016,356 |
| **Total, Method of Finance** | **$141,160,489** | **$141,160,489** |

**EXCEPTIONAL ITEM(S) INCLUDED IN STRATEGY:**

Retirement Program Actuarially sound as per Sec. 811.006, Government Code

**4.C. EXCEPTIONAL ITEMS STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:     8/31/2010
TIME:     9:31:27AM

| | | | |
|---|---|---|---|
| Agency Code: | **327** | Agency name: | **Employees Retirement System** |

| | | | |
|---|---|---|---|
| GOAL: | 1 | To Administer Comprehensive and Actuarially Sound Retirement Programs | Statewide Goal/Benchmark:     8  -  0 |
| OBJECTIVE: | 1 | Ensure Actuarially Sound Retirement Programs | Service Categories: |
| STRATEGY: | 2 | LECOS Retirement Program | Service:  06     Income:  A.2     Age:  B.3 |

| CODE   DESCRIPTION | Excp 2012 | Excp 2013 |
|---|---:|---:|
| **OBJECTS OF EXPENSE:** | | |
| 1002   OTHER PERSONNEL COSTS | 7,436,355 | 7,436,355 |
| **Total, Objects of Expense** | **$7,436,355** | **$7,436,355** |
| | | |
| **METHOD OF FINANCING:** | | |
| 1   General Revenue Fund | 6,680,409 | 6,680,409 |
| 6   State Highway Fund | 641,331 | 641,331 |
| 555   Federal Funds | | |
| 00.327.003   LECOS Retirement | 25,949 | 25,949 |
| 994   GR Dedicated Accounts | 88,666 | 88,666 |
| **Total, Method of Finance** | **$7,436,355** | **$7,436,355** |

**EXCEPTIONAL ITEM(S) INCLUDED IN STRATEGY:**

LECOS Program Actuarially Sound

**4.C. EXCEPTIONAL ITEMS STRATEGY REQUEST**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:   8/31/2010
TIME:   9:31:27AM

| | | | | | |
|---|---|---|---|---|---|
| Agency Code: | **327** | Agency name: | **Employees Retirement System** | | |
| GOAL: | 2 | Provide Employees & Retirees with Quality Health Program | Statewide Goal/Benchmark: | | 8  -  0 |
| OBJECTIVE: | 1 | Manage GBP for State & Higher Education Employees | Service Categories: | | |
| STRATEGY: | 1 | Provide Basic Insurance Program to General State Employees. Estimated | Service:  06    Income:  A.2    Age:  B.3 | | |

| CODE  DESCRIPTION | Excp 2012 | Excp 2013 |
|---|---|---|
| **OBJECTS OF EXPENSE:** | | |
| 2009  OTHER OPERATING EXPENSE | 371,287,606 | 515,460,353 |
| **Total, Objects of Expense** | **$371,287,606** | **$515,460,353** |
| **METHOD OF FINANCING:** | | |
| 1  General Revenue Fund | 215,795,095 | 299,589,360 |
| 6  State Highway Fund | 66,804,250 | 92,744,658 |
| 555  Federal Funds | | |
| 00.327.002   ERS Insurance | 73,188,636 | 101,608,132 |
| 994  GR Dedicated Accounts | 13,479,194 | 18,713,229 |
| 998  Other Special State Funds | 2,020,431 | 2,804,974 |
| **Total, Method of Finance** | **$371,287,606** | **$515,460,353** |

**EXCEPTIONAL ITEM(S) INCLUDED IN STRATEGY:**

Group Benefit Program Cost Increases,Contingency Fund Spend Down Replacement, and Health Care Reform

Group Benefit Program 60 Day Reserve Fund

**6.A. HISTORICALLY UNDERUTILIZED BUSINESS SUPPORTING SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

Date: **8/31/2010**

Time: **9:56:41AM**

---

Agency Code:   **327**   Agency:   **Employees Retirement System**

COMPARISON TO STATEWIDE HUB PROCUREMENT GOALS

**A. Fiscal Year 2008 - 2009 HUB Expenditure Information**

| Statewide HUB Goals | Procurement Category | % Goal | HUB Expenditures FY 2008 | | | Total Expenditures FY 2008 | % Goal | HUB Expenditures FY 2009 | | | Total Expenditures FY 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | % Actual | Diff | Actual $ | | | % Actual | Diff | Actual $ | |
| 11.9% | Heavy Construction | 0.0 % | 0.0% | 0.0% | $0 | $0 | 0.0 % | 0.0% | 0.0% | $0 | $0 |
| 26.1% | Building Construction | 0.0 % | 0.0% | 0.0% | $0 | $30,307 | 32.7 % | 32.8% | 0.1% | $1,825 | $5,567 |
| 57.2% | Special Trade Construction | 2.7 % | 2.7% | 0.0% | $59,383 | $2,169,992 | 12.2 % | 12.2% | 0.0% | $350,039 | $2,857,963 |
| 20.0% | Professional Services | 7.5 % | 7.5% | 0.0% | $143,000 | $1,895,508 | 6.3 % | 6.3% | 0.0% | $122,153 | $1,931,798 |
| 33.0% | Other Services | 4.5 % | 4.5% | 0.0% | $1,284,470 | $28,256,077 | 5.3 % | 5.3% | 0.0% | $1,223,127 | $23,077,756 |
| 12.6% | Commodities | 36.6 % | 36.7% | 0.1% | $1,067,840 | $2,910,208 | 23.8 % | 23.9% | 0.1% | $677,928 | $2,838,773 |
| | **Total Expenditures** | | **7.2%** | | **$2,554,693** | **$35,262,092** | | **7.7%** | | **$2,375,072** | **$30,711,857** |

**B. Assessment of Fiscal Year 2008 - 2009 Efforts to Meet HUB Procurement Goals**

**Attainment:**

For fiscal year 2008, the agency exceeded the HUB procurement goal for Commodities by 24%.

For fiscal year 2009, the agency exceeded the HUB procurement goals for Building Construction by 6.6% and Commodities by 11.2%.

**Applicability:**

The "Heavy Construction" category is not applicable to agency operations in either fiscal year 2008 or 2009 since the agency did not have any strategies or programs related to this category of construction.

Employees Retirement System operates from trust funds and does not receive any appropriation from the State Legislature for its operating budget.

**Factors Affecting Attainment:**

In fiscal year 2008, the goal of "Building Construction" procurement category was not met. The majority of the contracts for this year involved major building improvements.

In both fiscal years, the goal of "Special Trade Construction" procurement category was not met. Most of the contracts involved major building renovation and improvements.

In both fiscal years, the goal of "Professional Services" procurement category was not met. The majority of ERS' required services involve actuarial and auditing services for pension and group insurance programs.

**6.A. HISTORICALLY  UNDERUTILIZED  BUSINESS  SUPPORTING  SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

Date:   **8/31/2010**

Time:   **9:56:41AM**

---

Agency Code:   **327**      Agency:   **Employees Retirement System**

In both fiscal years, the goal of "Other Services" procurement category was not met.  Most of the contracts involve investment services for the State retirement fund and insurance services for State employees.

**"Good-Faith" Efforts:**

The agency made the following efforts to comply with the statewide HUB procurement goals per 1 TAC Section 111.13(c):

• ensured that contract specifications and terms and conditions were clearly stated, reflected the agency's actual requirement, and did not impose any unreasonable or unnecessary requirements
• when applicable, potential bidders are provided with lists of certified HUBs for subcontracting
• attended HUB conferences and prepared and distributed information on how to contract with agency in order to encourage and increase participation
• meet regularly with HUB vendors to provide information for doing business with the agency and the state of Texas.
• purchasing staff directly solicits more certified HUBs than required on all applicable bid opportunities
• whenever possible, HUBs are contacted exclusively for procurements that are under the competitive procurement threshold
• publish solicitation notices to ERS external website
• improved website information to increase access to agency's opportunities and procurement processes

**6.C. FEDERAL FUNDS SUPPORTING SCHEDULE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE:  **8/31/2010**
TIME:  **9:52:42AM**

Agency code:  **327**      Agency name:  Employees Retirement System

| CFDA NUMBER/ STRATEGY | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|
| **00.327.001**    ERS Retirement | | | | | |
| 1   - 1   - 1   ERS - RETIREMENT | 66,249,533 | 76,001,924 | 76,190,838 | 76,969,972 | 76,969,973 |
| TOTAL, ALL STRATEGIES | $66,249,533 | $76,001,924 | $76,190,838 | $76,969,972 | $76,969,973 |
| ADDL FED FNDS FOR EMPL BENEFITS | 0 | 0 | 0 | 0 | 0 |
| TOTAL,  FEDERAL FUNDS | $66,249,533 | $76,001,924 | $76,190,838 | $76,969,972 | $76,969,973 |
| ADDL GR FOR EMPL BENEFITS | $0 | $0 | $0 | $0 | $0 |
| **00.327.002**    ERS Insurance | | | | | |
| 2   - 1   - 1   GBP - GENERAL STATE EMPLOYEES | 202,278,721 | 236,462,299 | 251,187,733 | 247,528,643 | 247,528,644 |
| TOTAL, ALL STRATEGIES | $202,278,721 | $236,462,299 | $251,187,733 | $247,528,643 | $247,528,644 |
| ADDL FED FNDS FOR EMPL BENEFITS | 0 | 0 | 0 | 0 | 0 |
| TOTAL,  FEDERAL FUNDS | $202,278,721 | $236,462,299 | $251,187,733 | $247,528,643 | $247,528,644 |
| ADDL GR FOR EMPL BENEFITS | $0 | $0 | $0 | $0 | $0 |
| **00.327.003**    LECOS Retirement | | | | | |
| 1   - 1   - 2   LECOS RETIREMENT PROGRAM | 73,327 | 92,750 | 93,268 | 93,009 | 93,009 |
| TOTAL, ALL STRATEGIES | $73,327 | $92,750 | $93,268 | $93,009 | $93,009 |
| ADDL FED FNDS FOR EMPL BENEFITS | 0 | 0 | 0 | 0 | 0 |
| TOTAL,  FEDERAL FUNDS | $73,327 | $92,750 | $93,268 | $93,009 | $93,009 |
| ADDL GR FOR EMPL BENEFITS | $0 | $0 | $0 | $0 | $0 |

**6.C. FEDERAL FUNDS SUPPORTING SCHEDULE**
82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE:   **8/31/2010**
TIME:   **9:52:42AM**

| Agency code: | **327** | Agency name: | Employees Retirement System | | | | |
|---|---|---|---|---|---|---|---|
| **CFDA NUMBER**/ STRATEGY | | | **Exp 2009** | **Est 2010** | **Bud 2011** | **BL 2012** | **BL 2013** |

**SUMMARY LISTING OF FEDERAL PROGRAM AMOUNTS**

| CFDA NUMBER/ STRATEGY | | Exp 2009 | Est 2010 | Bud 2011 | BL 2012 | BL 2013 |
|---|---|---|---|---|---|---|
| 00.327.001 | ERS Retirement | 66,249,533 | 76,001,924 | 76,190,838 | 76,969,972 | 76,969,973 |
| 00.327.002 | ERS Insurance | 202,278,721 | 236,462,299 | 251,187,733 | 247,528,643 | 247,528,644 |
| 00.327.003 | LECOS Retirement | 73,327 | 92,750 | 93,268 | 93,009 | 93,009 |
| **TOTAL, ALL STRATEGIES** | | $268,601,581 | $312,556,973 | $327,471,839 | $324,591,624 | $324,591,626 |
| **TOTAL , ADDL FED FUNDS FOR EMPL BENEFITS** | | 0 | 0 | 0 | 0 | 0 |
| **TOTAL, FEDERAL FUNDS** | | $268,601,581 | $312,556,973 | $327,471,839 | $324,591,624 | $324,591,626 |
| **TOTAL, ADDL GR FOR EMPL BENEFITS** | | $0 | $0 | $0 | $0 | $0 |

**SUMMARY OF SPECIAL CONCERNS/ISSUES**

**Assumptions and Methodology:**
 The method of finance reflects proportionality as provided by the LBB.

**Potential Loss:**

## 6.H. Estimated Total of All Agency Funds Outside the GAA Bill Pattern
## <u>Employees Retirement System of Texas</u>

| ESTIMATED GRAND TOTAL OF AGENCY FUNDS OUTSIDE THE 2012-13 GAA BILL PATTERN | $ | 31,982,414,589 |
|---|---|---|

**Retirement Trust Fund (0955)**

| | | |
|---|---|---|
| Estimated Beginning Balance in FY 2010 | $ | 19,097,775,053 |
| Estimated Revenues FY 2010 | $ | 1,385,387,056 |
| Estimated Revenues FY 2011 | $ | 2,692,929,633 |
| **FY 2010-11 Total** | $ | 23,176,091,742 |
| | | |
| Estimated Beginning Balance in FY 2012 | $ | 20,002,387,404 |
| Estimated Revenues FY 2012 | $ | 2,523,630,658 |
| Estimated Revenues FY 2013 | $ | 2,667,739,696 |
| **FY 2012-13 Total** | $ | 25,193,757,758 |

**Constitutional or Statutory Creation and Use of Funds:**

The ERS Retirement Trust Fund is created by Government Code, Section 815.310.  Funds in the account are used to pay retirement annuities and to operate the retirement system.

**Method of Calculation and Revenue Assumptions:**

Revenues to the trust fund include member contributions, state contributions, investment income, and other revenues. Investment income can vary widely from year to year.  State contributions are dependent upon legislative action. For this document, other revenue is assumed to remain constant at the FY 2010 level for FY 2011-13.  Investment Income is calculated using the 8% return assumption used in the ERS actuarial valuation report for August 31, 2009.  State contributions are estimated at the LAR Base Level of 6.95%. Zero payroll growth is assumed for FY 2012-13.

**6.H. Estimated Total of All Agency Funds Outside the GAA Bill Pattern**
**<u>Employees Retirement System of Texas</u>**

<u>**Insurance Fund (0973)**</u>

| | | |
|---|---|---:|
| Estimated Beginning Balance in FY 2010 | $ | 282,483,838 |
| Estimated Revenues FY 2010 | $ | 2,180,927,771 |
| Estimated Revenues FY 2011 | $ | 2,329,215,694 |
| **FY 2010-11 Total** | $ | 4,792,627,303 |
| | | |
| Estimated Beginning Balance in FY 2012 | $ | 20,855,627 |
| Estimated Revenues FY 2012 | $ | 2,692,107,499 |
| Estimated Revenues FY 2013 | $ | 2,931,435,856 |
| **FY 2012-13 Total** | $ | 5,644,398,982 |

**Constitutional or Statutory Creation and Use of Funds:**

The Insurance Fund is created by Insurance Code, Section 1551.401.  Funds in the account are used for all payments of any coverages provided for under the Group Benefits Program and for payment of expenses of administering the program.

**Method of Calculation and Revenue Assumptions:**

Revenues to the trust fund include member contributions, state contributions, investment income, and other revenues.   It is assumed that contributions from the state and the members for FY 2012 and FY 2013 will be established at the actuarial assumption levels of 15.58% in FY 2012 and 8.89% for FY 2013.  Contribution increases are estimated at 6.5 and  6.8% for FY 2010-11.

6.H. Page 2 of 4

**6.H. Estimated Total of All Agency Funds Outside the GAA Bill Pattern**
**Employees Retirement System of Texas**

---

**LECOS Trust Fund (0977)**

| | | |
|---|---|---:|
| Estimated Beginning Balance in FY 2010 | $ | 634,778,749 |
| Estimated Revenues FY 2010 | $ | 52,483,738 |
| Estimated Revenues FY 2011 | $ | 62,402,787 |
| **FY 2010-11 Total** $ | | 749,665,274 |
| | | |
| Estimated Beginning Balance in FY 2012 | $ | 665,201,845 |
| Estimated Revenues FY 2012 | $ | 76,554,626 |
| Estimated Revenues FY 2013 | $ | 80,785,024 |
| **FY 2012-13 Total** $ | | 822,541,494 |

**Constitutional or Statutory Creation and Use of Funds:**

The LECOS Trust Fund is created by Government Code, Section 815.317.  Funds in the account are used to pay law enforcement and custodial officer supplemental retirement and death benefits to law enforcement and custodial officers and to pay for the administration of the fund.

**Method of Calculation and Revenue Assumptions:**

Revenues to the trust fund include member contributions, state contributions, investment income, and other revenues.  Investment income can vary widely from year to year.  It is assumed that contributions from the state for FY 2012  and FY 2013 will be established at the current level of 1.59%.  Investment income is calculated using the 8% return assumption used in the ERS actuarial valuation report for August 31, 2009.  Enrollment is assumed to remain at the FY 2010 level with no payroll growth for FY 2012-13.

## 6.H. Estimated Total of All Agency Funds Outside the GAA Bill Pattern
## <u>Employees Retirement System of Texas</u>

**JRS II Trust Fund (0993)**

| | | |
|---|---|---:|
| Estimated Beginning Balance in FY 2010 | $ | 205,730,088 |
| Estimated Revenues FY 2010 | $ | 22,096,866 |
| Estimated Revenues FY 2011 | $ | 36,855,554 |
| **FY 2010-11 Total** | $ | 264,682,508 |
| | | |
| Estimated Beginning Balance in FY 2012 | $ | 245,417,073 |
| Estimated Revenues FY 2012 | $ | 36,456,353 |
| Estimated Revenues FY 2013 | $ | 39,842,929 |
| **FY 2012-13 Total** | $ | 321,716,355 |

**Constitutional or Statutory Creation and Use of Funds:**

The JRS II Trust Fund is created by Government Code, Section 840.305. Funds in the account are used to pay judicial retirement benefits and administrative expenses.

**Method of Calculation and Revenue Assumptions:**

Revenues to the trust fund include member contributions, state contributions, investment income, and other revenues. Investment income can vary widely from year to year. State contributions are dependent upon legislative action. Investment income is calculated using the 8% return assumption used in the ERS actuarial valuation report for August 31, 2009. State contributions are estimated at the LAR baseline request level of 16.83%. Enrollment is assumed to remain at the FY 2010 level with no payroll growth for FY 2012-13.

**6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE:    9/30/2010
TIME:    11:38:47AM

Agency code: **327**          Agency name: **Employees Retirement System**

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|------|-------------|----------|----------|---------|---------|-----------|-----------|
| **Item Number:** 1 | **Item Name:** Expand Coverage to Dep up to Age 26 | | | | | | |

**Includes Funding for the following Strategy or Strategies:**
0002-0001-0001  Provide Basic Insurance Program to General State Employees. Estimated

| | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|--|----------|----------|---------|---------|-----------|-----------|
| **OBJECTS OF EXPENSE** | | | | | | |
| 2009  OTHER OPERATING EXPENSE | $0 | $0 | $0 | $0 | $7,693,000 | $8,389,000 |
| **TOTAL, OBJECT OF EXPENSE** | **$0** | **$0** | **$0** | **$0** | **$7,693,000** | **$8,389,000** |
| **METHOD OF FINANCING** | | | | | | |
| 1  General Revenue Fund | $0 | $0 | $0 | $0 | $4,471,941 | $4,876,526 |
| **SUBTOTAL, GENERAL REVENUE FUNDS** | **$0** | **$0** | **$0** | **$0** | **$4,471,941** | **$4,876,526** |
| 994  GR Dedicated Accounts | $0 | $0 | $0 | $0 | $279,256 | $304,521 |
| **SUBTOTAL, GR DEDICATED** | **$0** | **$0** | **$0** | **$0** | **$279,256** | **$304,521** |
| 6  State Highway Fund | $0 | $0 | $0 | $0 | $1,383,971 | $1,509,181 |
| 998  Other Special State Funds | $0 | $0 | $0 | $0 | $41,542 | $45,300 |
| **SUBTOTAL, OTHER FUNDS** | **$0** | **$0** | **$0** | **$0** | **$1,425,513** | **$1,554,481** |
| 555  Federal Funds | | | | | | |
| 00.327.002  ERS Insurance | $0 | $0 | $0 | $0 | $1,516,290 | $1,653,472 |
| **SUBTOTAL, FEDERAL FUNDS** | **$0** | **$0** | **$0** | **$0** | **$1,516,290** | **$1,653,472** |
| **TOTAL, METHOD OF FINANCING** | **$0** | **$0** | **$0** | **$0** | **$7,693,000** | **$8,389,000** |
| **FULL-TIME-EQUIVALENT POSITIONS (FTE):** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

**6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:54:17AM**

---

Agency code: **327**     Agency name: **Employees Retirement System**

---

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|------|-------------|----------|----------|---------|---------|-----------|-----------|

---

**LEGAL AUTHORITY/STATUTORY REFERENCE FOR ITEM:**
H.R. 3590, Sec. 1001 (adds Sec 2714 of Public Health Services Act); H.R. 4872, Sec. 2301

**DESCRIPTION/KEY ASSUMPTIONS:**
1. This provision of the law may become applicable to the GBP September 1, 2011; i.e., for FY 2012.
2. No enrollment growth, but we estimate an additional 5,418 dependents (married and unmarried) will
   participate in the GBP at a cost per dependent of $4,096 in FY 2012
   and $4,467 in FY 2013.
3. Since this change will increase the cost of dependent coverage, the cost will be spread equally between the
   employers and the members assuming the current funding strategy continues.
4. The share of the additional employer cost attributable to state agency members is 69.33%
5. Expense amounts shown are the total projected increase in employer cost for state agency members only.

**CONCERNS:**
Disclaimer: ERS continues to review the impact of the PPACA and consider health reform obligations in conjunction with existing and/or revised state and federal statutes
and regulations. As such, costs estimated herein are expected to change and new costs not yet identified are expected to be identified in the future.

6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:54:17AM**

---

Agency code: **327**        Agency name: **Employees Retirement System**

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|---|---|---|---|---|---|---|---|
| **Item Number:** 2 | **Item Name:** 100% Preventive Care | | | | | | |
| **Includes Funding for the following Strategy or Strategies:** | | | | | | | |
| 0002-0001-0001  Provide Basic Insurance Program to General State Employees. Estimated | | | | | | | |
| **OBJECTS OF EXPENSE** | | | | | | | |
| 2009  OTHER OPERATING EXPENSE | | $0 | $0 | $0 | $0 | $14,269,000 | $15,508,000 |
| **TOTAL, OBJECT OF EXPENSE** | | **$0** | **$0** | **$0** | **$0** | **$14,269,000** | **$15,508,000** |
| | | | | | | | |
| **METHOD OF FINANCING** | | | | | | | |
| 1  General Revenue Fund | | $0 | $0 | $0 | $0 | $8,294,569 | $9,014,801 |
| **SUBTOTAL, GENERAL REVENUE FUNDS** | | **$0** | **$0** | **$0** | **$0** | **$8,294,569** | **$9,014,801** |
| | | | | | | | |
| 994  GR Dedicated Accounts | | $0 | $0 | $0 | $0 | $517,965 | $562,940 |
| **SUBTOTAL, GR DEDICATED** | | **$0** | **$0** | **$0** | **$0** | **$517,965** | **$562,940** |
| | | | | | | | |
| 6  State Highway Fund | | $0 | $0 | $0 | $0 | $2,566,993 | $2,789,889 |
| 998  Other Special State Funds | | $0 | $0 | $0 | $0 | $77,053 | $83,743 |
| **SUBTOTAL, OTHER FUNDS** | | **$0** | **$0** | **$0** | **$0** | **$2,644,046** | **$2,873,632** |
| | | | | | | | |
| 555  Federal Funds | | | | | | | |
| 00.327.002  ERS Insurance | | $0 | $0 | $0 | $0 | $2,812,420 | $3,056,627 |
| **SUBTOTAL, FEDERAL FUNDS** | | **$0** | **$0** | **$0** | **$0** | **$2,812,420** | **$3,056,627** |
| | | | | | | | |
| **TOTAL, METHOD OF FINANCING** | | **$0** | **$0** | **$0** | **$0** | **$14,269,000** | **$15,508,000** |
| | | | | | | | |
| **FULL-TIME-EQUIVALENT POSITIONS (FTE):** | | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

**6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE:   **8/31/2010**
TIME:   **9:54:17AM**

Agency code:  **327**          Agency name: **Employees Retirement System**

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|------|-------------|----------|----------|---------|---------|-----------|-----------|

**LEGAL AUTHORITY/STATUTORY REFERENCE FOR ITEM:**
H.R. 3590, Sec. 1001 (adds Sec 2714 of Public Health Services Act); H.R. 4872, Sec. 2301

**DESCRIPTION/KEY ASSUMPTIONS:**
1. This provision of the law may become applicable to the GBP on September 1, 2011.

2. No enrollment growth but assumes that the plan will incur additional cost of approximately $46 for each of the 543,000 GBP participants in FY2012.  We expect the cost to increase to about $50 per participant in FY2013.

3. Since this change will increase the cost of coverage for members and dependents, the cost increase will be split between the employers and the members 82.15%/17.85%, as is the current cost.

4. The share of the additional employer cost attributable to state agency members is 69.33%.

5. Expense amounts shown are the total projected increase in employer cost for state agency members only.

**CONCERNS:**
Disclaimer: ERS continues to review the impact of the PPACA and consider health reform obligations in conjunction with existing and/or revised state and federal statutes and regulations. As such, costs estimated herein are expected to change and new costs not yet identified are expected to be identified in the future.

**6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:54:17AM**

---

Agency code: **327**     Agency name: **Employees Retirement System**

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|------|-------------|----------|----------|---------|---------|-----------|-----------|
| **Item Number:** 3 | **Item Name:** Eliminate Lifetime Maximum | | | | | | |
| **Includes Funding for the following Strategy or Strategies:** | | | | | | | |
| 0002-0001-0001  Provide Basic Insurance Program to General State Employees. Estimated | | | | | | | |
| **OBJECTS OF EXPENSE** | | | | | | | |
| 2009  OTHER OPERATING EXPENSE | | $0 | $142,000 | $71,000 | $71,000 | $87,000 | $101,000 |
| | **TOTAL, OBJECT OF EXPENSE** | **$0** | **$142,000** | **$71,000** | **$71,000** | **$87,000** | **$101,000** |
| **METHOD OF FINANCING** | | | | | | | |
| 1  General Revenue Fund | | $0 | $82,544 | $41,273 | $41,273 | $50,573 | $58,712 |
| | **SUBTOTAL, GENERAL REVENUE FUNDS** | **$0** | **$82,544** | **$41,273** | **$41,273** | **$50,573** | **$58,712** |
| 994  GR Dedicated Accounts | | $0 | $5,155 | $2,577 | $2,577 | $3,158 | $3,666 |
| | **SUBTOTAL, GR DEDICATED** | **$0** | **$5,155** | **$2,577** | **$2,577** | **$3,158** | **$3,666** |
| 6  State Highway Fund | | $0 | $25,546 | $12,773 | $12,773 | $15,651 | $18,170 |
| 998  Other Special State Funds | | $0 | $767 | $383 | $383 | $470 | $545 |
| | **SUBTOTAL, OTHER FUNDS** | **$0** | **$26,313** | **$13,156** | **$13,156** | **$16,121** | **$18,715** |
| 555  Federal Funds | | | | | | | |
| 00.327.002  ERS Insurance | | $0 | $27,988 | $13,994 | $13,994 | $17,148 | $19,907 |
| | **SUBTOTAL, FEDERAL FUNDS** | **$0** | **$27,988** | **$13,994** | **$13,994** | **$17,148** | **$19,907** |
| | **TOTAL, METHOD OF FINANCING** | **$0** | **$142,000** | **$71,000** | **$71,000** | **$87,000** | **$101,000** |
| **FULL-TIME-EQUIVALENT POSITIONS (FTE):** | | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

**6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE:   **8/31/2010**
TIME:   **9:54:17AM**

Agency code: **327**      Agency name: **Employees Retirement System**

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|------|-------------|----------|----------|---------|---------|-----------|-----------|

**LEGAL AUTHORITY/STATUTORY REFERENCE FOR ITEM:**
H.R. 3590, Sec. 1001 (adds Sec 2714 of Public Health Services Act); H.R. 4872, 2301

**DESCRIPTION/KEY ASSUMPTIONS:**
1. This provision of the law may become applicable to the GBP on September 1, 2010.
2. No enrollment growth.
3. Since this change will increase the cost of dependent coverage, the cost will be spread equally between the
   employers and the members assuming the current funding strategy continues.
4. The share of the additional employer cost attributable to state agency members is 69.33%
5. Expense amounts shown are the total projected increase in employer cost for state agency members only.

**CONCERNS:**
Disclaimer: ERS continues to review the impact of the PPACA and consider health reform obligations in conjunction with existing and/or revised state and federal statutes
and regulations. As such, costs estimated herein are expected to change and new costs not yet identified are expected to be identified in the future.

**6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE:  **8/31/2010**
TIME:  **9:54:17AM**

Agency code:  **327**          Agency name: **Employees Retirement System**

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|------|-------------|----------|----------|---------|---------|-----------|-----------|

**Item Number:** 4          **Item Name:** PCORTF Fee

  **Includes Funding for the following Strategy or Strategies:**
  0002-0001-0001  Provide Basic Insurance Program to General State Employees. Estimated

**OBJECTS OF EXPENSE**

| | | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|---|---|---|---|---|---|---|---|
| 2009  OTHER OPERATING EXPENSE | | $0 | $0 | $0 | $0 | $0 | $309,000 |
| **TOTAL, OBJECT OF EXPENSE** | | **$0** | **$0** | **$0** | **$0** | **$0** | **$309,000** |
| **METHOD OF FINANCING** | | | | | | | |
| 1  General Revenue Fund | | $0 | $0 | $0 | $0 | $0 | $179,621 |
| **SUBTOTAL, GENERAL REVENUE FUNDS** | | **$0** | **$0** | **$0** | **$0** | **$0** | **$179,621** |
| 994  GR Dedicated Accounts | | $0 | $0 | $0 | $0 | $0 | $11,217 |
| **SUBTOTAL, GR DEDICATED** | | **$0** | **$0** | **$0** | **$0** | **$0** | **$11,217** |
| 6  State Highway Fund | | $0 | $0 | $0 | $0 | $0 | $55,589 |
| 998  Other Special State Funds | | $0 | $0 | $0 | $0 | $0 | $1,669 |
| **SUBTOTAL, OTHER FUNDS** | | **$0** | **$0** | **$0** | **$0** | **$0** | **$57,258** |
| 555  Federal Funds | | | | | | | |
| 00.327.002  ERS Insurance | | $0 | $0 | $0 | $0 | $0 | $60,904 |
| **SUBTOTAL, FEDERAL FUNDS** | | **$0** | **$0** | **$0** | **$0** | **$0** | **$60,904** |
| **TOTAL, METHOD OF FINANCING** | | **$0** | **$0** | **$0** | **$0** | **$0** | **$309,000** |
| **FULL-TIME-EQUIVALENT POSITIONS (FTE):** | | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

**6.J PART A BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1
Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:54:17AM**

---

Agency code: **327**      Agency name: **Employees Retirement System**

---

| CODE | DESCRIPTION | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 |
|------|-------------|----------|----------|---------|---------|-----------|-----------|

---

**LEGAL AUTHORITY/STATUTORY REFERENCE FOR ITEM:**
H.R. 3590, Sec. 1001 (adds /sec 2714 of Public Heatlh Services Act); H.R. 4872, Sec, 2301

**DESCRIPTION/KEY ASSUMPTIONS:**
1. This provision of the law may become applicable to the GBP September 1, 2012.

2. The law provides for payment of a fee equal to $1 per participant per year in FY2013 for funding the Patient-Centered Outcomes Research Provisions to study the quality and relevance of treatment received by patients. The fee increases to $2 per participant in FY2014.

3. No enrollment growth; Assumes that it will be paid on the average enrollment for the fiscal year, which we have assumed will be about 543,000 members and dependents.

4. Since this change will increase the cost of coverage for members and dependents, the cost will be split between the employer and members 82.15%/17.85%, as is the current cost.

5. The share of the additional employer cost attributable to state agency members is 69.33%.

6. Expense amounts shown are the total projected increase in employer cost for state agency members only.

**CONCERNS:**
Disclaimer: ERS continues to review the impact of the PPACA and consider health reform obligations in conjunction with existing and/or revised state and federal statutes and regulations. As such, costs estimated herein are expected to change and new costs not yet identified herein are expected to be identified in the future.

**6.J PART B SUMMARY OF BUDGETARY IMPACTS RELATED TO FEDERAL HEALTH CARE REFORM SCHEDULE**

82nd Regular Session, Agency Submission, Version 1

Automated Budget and Evaluation System of Texas (ABEST)

DATE: **8/31/2010**
TIME: **9:57:59AM**

Agency code: **327**       Agency name: **Employees Retirement System**

| ITEM | ITEM NAME | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 | Total Request 2012 | Total Request 2013 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Expand Coverage to Dep up to Age 26 | $0 | $0 | $0 | $0 | $7,693,000 | $8,389,000 | $7,693,000 | $8,389,000 |
| 2 | 100% Preventive Care | $0 | $0 | $0 | $0 | $14,269,000 | $15,508,000 | $14,269,000 | $15,508,000 |
| 3 | Eliminate Lifetime Maximum | $0 | $142,000 | $71,000 | $71,000 | $87,000 | $101,000 | $158,000 | $172,000 |
| 4 | PCORTF Fee | $0 | $0 | $0 | $0 | $0 | $309,000 | $0 | $309,000 |
| | **Total, Cost Related to Health Care Reform** | **$0** | **$142,000** | **$71,000** | **$71,000** | **$22,049,000** | **$24,307,000** | **$22,120,000** | **$24,378,000** |

**METHOD OF FINANCING**

| | Est 2010 | Bud 2011 | BL 2012 | BL 2013 | Excp 2012 | Excp 2013 | Total Request 2012 | Total Request 2013 |
|---|---|---|---|---|---|---|---|---|
| GENERAL REVENUE FUNDS | $0 | $82,544 | $41,273 | $41,273 | $12,817,083 | $14,129,660 | $12,858,356 | $14,170,933 |
| GR DEDICATED | $0 | $5,155 | $2,577 | $2,577 | $800,379 | $882,344 | $802,956 | $884,921 |
| **SUBTOTAL, GR & GR - DEDICATED FUNDS** | **$0** | **$87,699** | **$43,850** | **$43,850** | **$13,617,462** | **$15,012,004** | **$13,661,312** | **$15,055,854** |
| FEDERAL FUNDS | $0 | $27,988 | $13,994 | $13,994 | $4,345,858 | $4,790,910 | $4,359,852 | $4,804,904 |
| OTHER FUNDS | $0 | $26,313 | $13,156 | $13,156 | $4,085,680 | $4,504,086 | $4,098,836 | $4,517,242 |
| **TOTAL** | **$0** | **$142,000** | **$71,000** | **$71,000** | **$22,049,000** | **$24,307,000** | **$22,120,000** | **$24,378,000** |
| **FULL-TIME-EQUIVALENT POSITIONS(FTE):** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** | **0.0** |

# Exhibit 22

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
Pensacola Division

STATE OF FLORIDA, by and through
Bill McCollum, et al.,

       Plaintiffs,

v.                             Case No.: 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
et al.,

       Defendants.

---

STATE OF TEXAS        §
                                    §
COUNTY OF TRAVIS      §

## DECLARATION OF ROBERT KUKLA

Pursuant to 28 U.S.C. § 1746, I, **ROBERT KUKLA**, declare the following:

"My name is **ROBERT KUKLA**. I am of sound mind. I have personal knowledge of each of the facts stated herein, and I am competent and authorized to make this affidavit.

I hold the position of Director of Benefit Contracts for the Employees Retirement System of Texas (ERS). Additionally, I have a number of years of professional group insurance underwriting and other insurance industry experience.

My official duties at ERS include managing the Benefit Contracts division of ERS. The division manages the vendors and providers who serve as administering firms within the Texas Employees Group Benefit Program ("GBP"), including, but not limited to, third party administrators and HMOs for GBP health insurance. I oversee all benefit contract areas from procurement to award to contract monitoring, contract compliance and contract enforcement. Benefit Contracts is also responsible for the administration of the Social Security program for all public entities in the State of Texas. In addition, I am familiar with, and it is my official duty to manage the insurance coverage contributions and benefits provided under the GBP and administered by ERS. In the course of my duties, I am responsible for supplying information responsive to legislative inquiries regarding the GBP, among other duties.

1

The furnishing of the following information is within my official duties and those duties include making an accurate report, which has been done here. All of the statements contained herein are true and correct, and prepared by or received by ERS in the ordinary course of its business.

**GBP Eligibility, "full time employees" and waiting periods:**

Eligible GBP participants include state officers and employees who perform services for the State of Texas and their dependents, employees and retirees of certain institutions of higher education and their dependents, as specified by Texas Insurance Code Ch. 1551.

Additionally, the Health Select of Texas[SM] Plan within the GBP is a self-funded health plan. There are also two fully insured HMOs within the GBP for which ERS serves as the plan sponsor. Since at least 1993, the State has paid 100% of the cost of member coverage and 50% of the cost of dependent coverage.  Accordingly, any increase or decrease in GBP costs attributable to a member would be borne by the State at 100%, and any increase or decrease in GBP costs attributable to dependent coverage would be split 50%/50% by the State (including higher education) and member, under the current plan.

ERS' statutory waiting period, in Tex. Ins. Code § 1551.104 provides that all "full time" employees are covered automatically by the GBP, subject to a waiting period that is never shorter than 90 days, but may be longer than 90 days, i.e. the first day of the month following the completion of 90 days of service. Id. at §1551.055 (see also 24 Texas Administrative Code §81.5). Under the current General Appropriations Act, the state pays 100% of the insurance contributions for each such employee. Id. at §1551.319(a). All part-time employees are offered an opportunity to enroll as well.  Any person working fewer than 40 hours per week is considered to be a "part-time" employee, Id. at §1551.003(11), and must pay one-half of the contribution for coverage, Id. at §1551.319(b). If the part-time employee agrees to pay his or her share of the contributions, then he/she is permitted to enroll in the program.

**Impacts of federal health care reform not contained in LAR:**

ERS is required to submit estimates and reports relating to appropriations requested by the Texas Legislative Budget Board (LBB) or under the board's direction.    In May, 2010, the LBB instructed ERS to prepare and submit its Legislative Appropriations Request for Texas State Fiscal Years 2012-2013 (September 1, 2011 to August 31, 2013) (hereinafter the "LAR").    The LBB instructions required ERS to estimate the budgetary impact to the GBP of federal health care reform: Patient Protection and Affordable Care Act of 2010 ("PPACA;" Public Law 111-148), and the Health Care and Education Reconciliation Act of 2010 ("HCERA;" Public Law 111-152)(collectively referred to as "federal health care reform" and/or PPACA).

Various expected cost impacts of federal health care reform were supplied to the LBB by ERS as required. *See* Declaration of Michael Wheeler, ERS Chief Financial Officer; *see also*, Declaration of Philip S. Dial, FSA, Rudd and Wisdom, Inc., ERS consulting actuary.

However, based on the limited, specific instructions the LBB requested for the LAR, such as the specific state fiscal years to be included, and with LBB recognition of uncertainties in federal

2

health care reform, the following federal health care reform provisions were not addressed in the LAR. If the following provisions are applicable to ERS and no exceptions apply, ERS expects at least the following requirements to have a negative cost impact to the GBP, though ERS has not estimated exact figures and/or has insufficient information to do so at this time:

Reporting:

If ERS is a group health plan providing minimum essential coverage and the federal health care reform "reporting" provisions [PPACA Sec. 1501 et seq.] require ERS or its third-party administrator(s) to issue statements to individuals about coverage, those requirements would require ERS to incur costs or pay its contractors to prepare such reports and statements. Those costs have not been calculated or estimated for the GBP and/or require input or direction from Texas legislative leadership.

Broader Automatic enrollment:

As described above, if ERS is subject to the automatic enrollment of "full time" employees as defined by federal health care reform, ERS expects the GBP to incur costs when additional participants are automatically enrolled who might otherwise not elect to be enrolled, and/or possibly be subject to the application of potential) penalties if it fails to automatically enroll these employees as defined by federal health care reform. Those costs have not been calculated or estimated for the GBP and/or require input or direction from Texas legislative leadership.

Insurance Exchange:

If ERS is subject to the various federal health care reform requirements for insurance exchange(s) [PPACA Sec. 1301 *et seq.* 1402], such as but not limited to establishing the health insurance exchange, participating in the exchange, being assessed penalties for (potentially) not offering qualified coverage, providing notice to individuals, etc., ERS expects the GBP to incur costs and/or possibly be applied fines. Too little is known about the exchange, and those costs have not been calculated or estimated for the GBP and/or require input or direction from Texas legislative leadership.

Rescissions:

If ERS is subject to the federal health care reform prohibitions of group health plan coverage rescissions once an enrollee is covered, except in cases of fraud or material intentional misrepresentation [PPACA Sec. 2712], ERS expects the GBP to incur costs because the GBP currently provides for rescission in cases of negligence and mistake for coverage that would otherwise be rescinded but for federal health care reform. Those costs have not been calculated or estimated for the GBP and/or require input or direction from Texas legislative leadership.

Independently, the GBP cannot reliably estimate the number of future expected cases of negligence or mistaken coverage.

Evidence of Insurability:

If ERS is subject to the federal health care reform evidence of insurability prohibitions [PPACA Sec. §1201 amending PHSA §2705] and those prohibitions apply to ERS late enrollees as defined by the GBP, which is unclear to ERS, ERS would expect the GBP to incur costs because the GBP currently screens late enrollees for evidence of insurability. Those costs have not been calculated or estimated for the GBP and/or require input or direction from Texas legislative leadership. Independently, the GBP cannot reliably estimate the number of late enrollees who would have otherwise been excluded for lack of evidence of insurability.

Grandfathered Status:

ERS has not determined grandfathered status and/or made elections to modify or revoke any plan changes that would result in loss of grandfathered status as permitted by federal health care reform [PPACA Sec. §1251(e)] on or before August 31, 2011. ERS expects that any GBP loss of grandfathered status would result in additional cost to comply with federal health care reform that would have otherwise been grandfathered. The loss of grandfathered status has not been confirmed by ERS, nor have all costs of any such loss been calculated or estimated for the GBP and/or require input or direction from Texas legislative leadership.

I reserve the right to amend my testimony, as permitted by the Court, if additional federal regulations or guidance is issued, and/or costs become known to ERS and/or relevant input or direction from Texas legislative leadership is received to permit various calculations and estimates.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2 9th day of September, 2010.

Robert Kukla, Director of Benefit Contracts
Employees Retirement System of Texas

SUBSCRIBED AND SWORN TO BEFORE ME on this the 29th day of September, 2010.

Notary Public, State of Texas

JENNIFER GRISSOM
Notary Public
STATE OF TEXAS
Commission Exp. 07-31-2013

Notary without Bond

4

# Exhibit 23

IN THE UNITED STATES DISTICE COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| STATE OF FLORIDA, by and through BILL McCOLLUM, *et al.*,       )<br>)<br>)<br>Plaintiffs,       )<br>)<br>v.       )<br>)<br>UNITED STATES DEPARTMENT<br>OF HEALTH AND HUMAN<br>SERVICES, *et al.*,       )<br>)<br>)<br>Defendants.       )<br>      ) | Case No. 3:10-cv-91-RV/EMT |

## DECLARATION OF NEAL T. GOOCH

1. Pursuant to 28 U.S.C. § 1746, I, Neal T. Gooch, being first duly sworn upon oath, declare as follows:

2. I have personal knowledge of the matters set forth in this Declaration.

3. I am and since May 19, 2010 have been the Utah Insurance Commissioner. Under the Utah Insurance Code (Title 31A, Utah Code Ann.), the Commissioner is the chief officer of the Utah Insurance Department ("Department").

4. From about September 1, 1997 to January 15, 2010, I served as Utah's Deputy Insurance Commissioner.

5. From January 15, 2010 to May 19, 2010 I served as Utah's Acting Insurance Commissioner.

6. Since the enactment of the Patient Protection and Affordable Care Act ("PPACA") on March 23, 2010, the focus of the Utah Insurance Department has been to understand PPACA and its impact on the work of the Department and the Utah insurance market.

7. The director of the Utah Insurance Department's Health Insurance Division has had to allocate a substantial portion, if not the principal amount of her work schedule toward indentifying which provisions of PPACA relate to the insurance market in Utah and developing a strategy to prevent affected Utah insurance statutes from being preempted by PPACA so that the regulation of insurance will remain under my jurisdiction.

8. The most immediate impact of PPACA arises from the provisions in PPACA related to changes in insurance coverage in the insurance market. These changes required the department to reallocate some of its resources in the Health Insurance Division, the Producer Licensing Division, the Market Conduct Division and the Property and Casualty Life Division to meet the demands of PPACA.

9. Because of the enactment of PPACA, the individuals in the Utah Insurance Department's Health Insurance Division have had to triage their work and work only on PPACA implementation and only address non-PPACA matters that are critical to the welfare of the current market. This has limited their ability to perform their duties as set forth in the Utah Insurance Code.

10. The two (2) full-time employees at the Utah Insurance Department's

Office of Consumer Health Assistance, who are tasked with educating the public on
insurance matters and assisting them with non-PPACA complaints and inquiries relating
to insurance companies and coverage, have also had to limit their work on their
statutorily mandated job assignments because they have been spending substantial time
on PPACA.

 11. The fiscal impact on the Utah Insurance Department's General Fund
appropriation arising from reallocating resources within the Department to perform
PPACA related duties is $628,000 per year.

**Reinsurance Program – PPACA § 1341**

 12. The situation is similar for the reinsurance mandates of PPACA. In
2009, it is estimated that the State of Utah had 302,400 uninsured individuals. It is
estimated that 10% of those individuals would be classified as being uninsurable and will
therefore be considered uninsurable or high risk individuals under PPACA. PPACA will
require these 302,400 individuals to be to be insured in the market place and that the risk
of the 30,000 high risk individuals in the State of Utah risk is to be managed with a risk
adjustment mechanism specified in PPACA. This risk adjustment function will require
an agency to administer the risk allocation among insurance companies that is required
by PPACA. It is estimated that such an agency will require a significant number of full
time employees and other costs to staff the operations of such an agency.

 13. The cost to the Department's General Fund appropriation of establishing and
operating such an agency to administer and implement the risk adjustment system

3

associated with the federally mandated health exchange system and is estimated to be $2,008,900 per year.

**Premium Review Process**

14. Another impact of PPACA is that it requires the Department to change the form and rate regulation and review scheme and process in regard to health insurance products that will be required to be offered both in and out of the exchange mandated by PPACA. Current law is a file and use statutory scheme. Products offered in the mandated federal exchanges will have to be filed, reviewed and certified before they can be used in the exchange. This will create a dual system and require the Department's rate and form analysts to be trained to apply the requirements imposed upon the policy form and rate review process by PPACA. For the rate review after the federal grants terminate, the state will have to fund the costs imposed by the new review process. The additional burden for certification of health insurance policy forms will be bourn fully by the State. We estimate those costs to the department's General Fund appropriation be $1,501,100 per year.

**Health Insurance Exchange**

15. Currently, the State of Utah has a Health Insurance Exchange organized in the Governor's Office of Economic Development. This exchange, organized as an independent effort by the State to mitigate the costs of the health insurance premiums to its residents, does not include many of the functions and services mandated under PPACA. As a result, I anticipate that the cost to the State of Utah in implementing the

4

requirements of PPACA for its Health Exchange will be significant.  It is my

understanding that to make the current health exchange compliant with PPACA, the

exchange will need a call center, administrative functions, program functions and

technology and other functions that are currently not part of the regulatory oversight

scheme of the industry or government and will require a full time staff to provide the

services and regulation required under PPACA.

DATED this _2nd_ day of September, 2010.

_Neal T. Gooch_

Neal T. Gooch
Utah Insurance Commissioner

STATE OF UTAH              )
                           :ss
COUNTY OF SALT LAKE        )

Elva Joanna Reese

On the _2_ day of September, 2010 before me, ~~Neal T. Gooch~~,
a notary public, personally appeared Neal T. Gooch, proved on the basis of satisfactory
evidence to be the person whose name is subscribed to this instrument, and
acknowledged that he executed the same.  Witness my hand and official seal.

_Elva Joanna Reese_
NOTARY PUBLIC

```
NOTARY PUBLIC
ELVA JOANNA REESE
4110 State Office Building
Salt Lake City, Utah 84114
My Commission Expires
November 28, 2010
STATE OF UTAH
```

# Exhibit 24

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| STATE OF FLORIDA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,<br><br>Defendants. | DECLARATION OF DAVID N. SUNDWALL, M.D., EXECUTIVE DIRECTOR, UTAH DEPARTMENT OF HEALTH, IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT<br><br>Case No. 3:10-cv-91-RV/EMT |

STATE OF UTAH            )
                                          :ss
COUNTY OF SALT LAKE   )

I, David N. Sundwall, M.D., being first duly sworn, declare as follows:

1. I am over the age of twenty-one and am familiar with the facts set forth herein.

2. I am a physician licensed to practice in the State of Utah.

3. I am the Executive Director of the Utah Department of Health, the single state agency operating the Medicaid program in the State of Utah..

4. I am responsible for the preparation of the budget of the Medicaid program and am

personally familiar with the records that support the assertions in this affidavit.

5. Utah joined the federal Medicaid program shortly after it was created by Congress in the 1960s. In 1981 the Utah Legislature enacted the "Medical Assistance Act" in Title 26, Chapter 18 of the Utah Code.

6. The Utah Legislature requires the Medicaid program to be operated in the most economical and cost-effective manner possible. Utah Code Ann. § 26-18-2.3 (1)(c) (Supp. 2010).

7. Utah's continued participation in the Medicaid program is based on the expectation that the terms of its participation would not be altered significantly by the federal government to increase the control of the federal government and to reduce Utah's discretionary authority.

8. The Patient Protection and Affordable Care Act ("the Act") expands eligibility for enrollment beyond Utah's ability to fund its participation. Under existing eligibility criteria, individuals applying for Medicaid must be under an income threshold, be under an asset threshold, and fit into a category of need (i.e., disabled, pregnant, etc.).

9. The Act increases the income threshold, eliminates the asset threshold, and eliminates categories of need. As a result, all Utahns under 133% of the federal poverty level (about $30,000 for a family of four) will qualify for Medicaid beginning January 1, 2014.

10. Utah projects this will result in at least 110,000 new individuals enrolling in Medicaid at that time. The current average monthly enrollment is about 210,000 individuals.

2

11. The costs for these "newly eligible" enrollees will be covered by 100 % federal funds for the first three years of the expansion. But that federal participation erodes to 90 % in 2020.

12. The Act's new mandate for individuals to maintain health insurance coverage will create an increased incentive for families currently eligible but not enrolled in Medicaid to enroll. Utah will have to cover the costs of this increased enrollment at the traditional match rate:  about a 70/30 federal-state split.

13. Medicaid and Children's Health Program outlays for Utah consume 19% of Utah's budget.

14. For FY 2009-2010, Utah spent $230 million in state funds on Medicaid.  The projected increases in state funds needed for Medicaid under the Act are $37 million in 2014, eventually growing to $157 million in 2021.

15. The Act therefore forces Utah to increase state funding for these programs from current levels by 16% in 2014, increasing year by year to 68% in 2021.

16. It would not now be feasible for Utah to cease its participation in Medicaid and make alternative arrangements for a traditional Medicaid-like program prior to the Act taking effect.

17. The added costs to Utah under the Act would not be offset by increased federal contributions under the Act.

3

18. The Act also will also require Utah to provide medical services, as distinguished from providing payment for medical services. The future costs to the state of this mandate are potentially massive, but have not yet been quantified.

DATED this 2nd day of September, 2010.

_David N. Sundwall, M.D._
Executive Director
Utah Department of Health

STATE OF UTAH            )
                                          :ss
COUNTY OF SALT LAKE   )

Subscribed and sworn to before me on this **2** day of September 2010 by David N. Sundwall, M.D.

_____
NOTARY PUBLIC

NOTARY PUBLIC
AUTUM R. WHITTEN
268 N. 1460 W., PO Box 141012
Salt Lake City, Utah  84114
My Commission Expires
January 1, 2011
STATE OF UTAH

4

# Exhibit 25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY
GENERAL OF THE STATE OF
FLORIDA, *et al.*,

        Plaintiffs,

vs.                         Case No. 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et
al.*,

        Defendants.

---

### DECLARATION OF PLAINTIFF MARY BROWN
### IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Mary Brown, under the provisions of 28 U.S.C. § 1746, hereby declare as follows:

1.      I am 55 years old, a citizen of the United States, and a citizen and resident of the State of Florida. I am personally familiar with the facts contained herein, and I am competent to testify thereto.

2.      I am a member of the National Federation of Independent Business ("NFIB") in good standing.

3.      I am the Co-Owner, Secretary, and Treasurer of Brown & Dockery, Inc., an automobile repair facility located at 2707 E. 15th St., Panama City, Florida 32405. My business has two employees apart from myself.

4.      I am married and have no children under the age of 26.

5.      I do not have health insurance and have not had health insurance for the past four years. I devote my financial resources to maintaining my business and paying my employees.

6.     I regularly use my personal funds to meet my business expenses. I have recently held off cashing my paycheck on occasion to meet my business expenses.

7.     I do not qualify for Medicare or Medicaid and I do not receive health or medical benefits from either program. I do not expect to qualify for Medicare in or before 2014, or for Medicaid under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

8.     I am subject to the ACA's individual insurance mandate. I object to being forced to obtain and maintain qualifying health insurance coverage for myself and my dependents, or to pay a penalty for failing to have such insurance, and to the ACA's unconstitutional overreaching and its encroachment on the States' sovereignty. I do not believe that the cost of health insurance coverage is a wise or acceptable use of my financial resources.

9.     Both my business and myself will be harmed if I must purchase health care insurance coverage, which I neither want nor need, to comply with the ACA, or pay the prescribed penalties for non-compliance. This is because, in either case, I will be forced to divert financial resources from my own priorities, and particularly from supporting and running my business as I consider to be best and most advantageous. I believe that the added costs of ACA compliant insurance will threaten my ability to maintain my own, independent business.

10.     To comply with the individual mandate, I would be forced to reorder my personal and business affairs. Well in advance of 2014, I must now investigate whether and how to both obtain and maintain the required insurance and at the same time to support my business and to make it grow.

11.     I must also now investigate the impact that complying with the individual insurance mandate will have on my priorities and especially whether, in light of the costs of complying with the individual mandate, my independent business can continue to be a viable going concern, or whether to comply I would have to lay off my employees, close my business, and seek employment that provides

-2-

qualifying health insurance as a benefit.

12.    In order to comply with the ACA's individual insurance mandate, I believe that I would have to plan and take appropriate action before 2014 if I am to avoid being penalized for not complying when this requirement becomes effective.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _2o_ day of October, 2010 at ___*11:15 AM*___.

*Mary J Brown*
Mary Brown

-3-

# Exhibit 26

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY
GENERAL OF THE STATE OF
FLORIDA, *et al.*,

       Plaintiffs,

vs.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et
al.*,

       Defendants.

Case No. 3:10-cv-91-RV/EMT

---

### DECLARATION OF PLAINTIFF KAJ AHLBURG
### IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Kaj Ahlburg, under the provisions of 28 U.S.C. § 1746, hereby declare as follows:

1.     I am 51 years old, a citizen of the United States, and a citizen and resident of the State of Washington. I am personally familiar with the facts contained herein, and I am competent to testify thereto.

2.     I am retired, holding no present employment.

3.     I am married and have two children under the age of 26.

4.     I do not have health insurance and have not had health insurance for the past six years. I have no intention or desire to purchase health insurance in the future, as I am now and reasonably expect to remain financially capable of fully paying for my and my family's healthcare services out of my own resources as needed.

5.     I do not qualify for Medicare or Medicaid and I do not receive health or medical benefits from either program. I do not expect to qualify for Medicare in or before 2014, or for Medicaid under

the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

6.    I am subject to the ACA's individual insurance mandate. I object to being forced to obtain and maintain qualifying health care insurance for myself and my dependents, or to pay a penalty for failing to have such insurance, and to the ACA's unconstitutional overreaching and its encroachment on the States' sovereignty.

7.    I do not believe that the cost of health insurance in general, or in particular the cost of coverage that is compliant with the ACA. represents a sensible or acceptable use of my financial resources.

8.    I will be harmed if I am required to obtain and maintain such insurance, which I neither need nor want, or to pay the prescribed penalties for non-compliance. This is because, in either case, I will be forced to divert funds from other priorities which I know to be more important for myself and my family.

9.    To comply with the individual insurance mandate. and well in advance of 2014, I must now investigate whether and how to rearrange my personal financial affairs so as to ensure the availability of sufficient funds to pay the premiums associated with ACA compliant insurance coverage. and to establish what impact meeting this requirement will have on my priorities for myself and my family, particularly how these priorities would have to change as a result.

10.    In order to comply with the individual mandate I believe that I would have to plan and take appropriate action before 2014 so as to meet its requirements if I am to avoid being penalized for not complying when this requirement becomes effective.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of November, 2010 at  Port Angeles, Washington.

Kaj Ahlburg
Kaj Ahlburg

-2-

# Exhibit 27

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY
GENERAL OF THE STATE OF
FLORIDA, et al.,

        Plaintiffs,

vs.                          Case No. 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et
al.,

        Defendants.

---

## DECLARATION OF DONALD A. DANNER
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, Donald A. Danner, under the provisions of 28 U.S.C. § 1746, hereby declare as follows:

1.     I am over the age of 18. I am personally familiar with the facts contained in this declaration, and I am competent to testify thereto.

2.     I am the President and Chief Executive Officer of the National Federation of Independent Business ("NFIB"). In this capacity, I am intimately familiar with the structure, operations and finances of NFIB and have personal knowledge of the injuries done to NFIB and many of its members as a result of the passage and enactment of the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

3.     NFIB, a California nonprofit mutual benefit corporation, is the nation's leading association of small businesses and has a presence in all 50 States and the District of Columbia. The NFIB Small Business Legal Center is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of

public interest affecting small businesses.

       4.     NFIB's mission is to promote and protect the rights of its members to own, operate, and earn success in their businesses, in accordance with lawfully-imposed government requirements.  In accordance with NFIB's articles of incorporation, a public document with which I am personally familiar, its corporate purpose is, among other things, "[t]o promote the economic, financial and political welfare of its members," "to organize the independent or small business men into an association to the end that his voice may be heard effectively in local, state, and national affairs affecting small business," and "[t]o foster the promotion and advancement of civic, commercial, industrial and political welfare of its members in their respective communities."

       5.     NFIB's membership includes nearly 40,000 sole proprietors.  Many of these individuals operate their businesses themselves or are otherwise personally involved in the day-to-day management of their enterprise.

       6.     NFIB's service to its members includes providing information regarding legal and regulatory issues faced by small businesses, as well as information and advice regarding compliance with federal and state regulatory requirements, including individuals who own and operate their own business.

       7.     Healthcare-related issues have been among NFIB's highest public policy priorities in the past twenty years.  NFIB's Research Foundation has conducted at least five polls and surveys specifically to determine the burden to its small business members of offering health care benefits to employees.  These polls and surveys have resulted in five publications: (1) "NFIB Small Business Poll: Health Insurance" (2003); (2) "Price Sensitivity in Health Care: Implications for Health Care Policy" (2005); (3) "A Study of Administrative Costs Accruing to Association Health Plans" (2005); (4) "NFIB Small Business Poll: Health Insurance, Purchasing" (2007); and (5) "Health Insurance Reform in an

Experimental Market" (2009).

8. In addition, NFIB members guide the organization's public policy positions through periodic "Member Ballots." In this way NFIB advances the consensus of its members as a whole rather than the more narrow interests of any particular trade group.

9. Since March of 1985, NFIB has asked its members a ballot question on either healthcare or health insurance at least 63 times. Of those questions, eleven dealt with employer-mandated healthcare and on five occasions members were asked whether Congress should establish a mandatory national health insurance program or whether individuals should be required to obtain health insurance coverage for themselves. On all but one occasion (1993), NFIB members overwhelmingly rejected adoption of an individual health insurance mandate.

10. NFIB also regularly produces a "Problems and Priorities" report identifying the issues of greatest concern to its membership. This publication is based on the responses of a large sample of NFIB's small business owner membership to a questionnaire. The questionnaire presents 75 potential business problems, including those related to public policy. Respondents are asked to rate the severity of each potential problem on a scale of 1 to 7, with answers ranging from "Critical Problem" to "Not a Problem."

11. Since 1986, the cost of health insurance has been the top priority of NFIB's small business members. NFIB sole proprietor members also rate the cost of health insurance as their top concern.

12. As demonstrated by the declarations of NFIB members submitted in this case, many NFIB members are suffering actual and immediate injuries because of the ACA's mandate that individuals obtain and maintain a statutorily established minimum level of health insurance coverage for themselves and their families. These uninsured small business owners are and will continue to be

subject to the ACA's individual insurance mandate and object to being forced to obtain healthcare insurance coverage for themselves and their dependents or pay a penalty. For individuals and small business owners who do not have insurance, and especially sole proprietors, the costs of obtaining qualifying coverage will mean that they have fewer financial resources available to operate and grow their businesses. These members will be forced to divert resources from their business endeavors, or otherwise reorder their economic circumstances and priorities, to obtain the required coverage, regardless of their own conclusions regarding whether or not having such coverage for themselves and their dependents is a worthwhile cost of doing business. In some cases, the costs associated with obtaining and maintaining ACA qualifying health insurance will threaten members' ability to maintain their own, independent small businesses as viable, going concerns.

13.     In addition, the passage and enactment of the ACA has resulted in significant new costs for NFIB. Since passage, NFIB has been required to expend substantial additional resources to advise its membership on ACA-related compliance issues.

14.     To this end, NFIB paid staff has to date collectively spent approximately 2,430 hours helping NFIB members understand and comply with the ACA. This is an unprecedented amount of time and resources for NFIB to spend on one issue.

15.     This new cost represents 2% of NFIB's total state and federal policy budget and

[rest of page intentionally left blank]

constitutes a significant burden on NFIB.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of November, 2010 at Washington, D.C. .

Donald A. Danner

-5-

# Exhibit 28

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY
GENERAL OF THE STATE OF
FLORIDA, *et al.*,

        Plaintiffs,

vs.                                 Case No. 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et
al.*,

        Defendants.

---

**DECLARATION OF DANA GRIMES
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Dana Grimes, under the provisions of 28 U.S.C. § 1746, hereby declare as follows:

1.      I am 48 years old, a citizen of the United States, and a citizen and resident of the State of New York. I am personally familiar with the facts contained in this declaration, and I am competent to testify thereto.

2.      I am a member of the National Federation of Independent Business ("NFIB") in good standing.

3.      I am the sole proprietor of Premier Renovations, located at 65 County Route 52, Greenwich, NY 12834. My business provides building and home contracting services and has no employees.

4.      I am divorced and have two children under the age of 26. My children live out-of-state with my ex-wife.

5.     I have used my personal funds to meet my business expenses when necessary and I invest a substantial amount of my income back into my business.

6.     I do not have health insurance.  Until recently, I had health insurance provided through the U.S. Chamber of Commerce, but I chose to terminate my coverage because I believed it was too expensive.  I am in excellent health and my medical expenses are roughly $100 per year, but my previous insurance cost me $6000 per year.  I last visited the doctor after injuring myself at work with a chainsaw, and I fully paid my own medical expenses out-of-pocket.

7.     I do not qualify for Medicare or Medicaid and I do not receive health or medical benefits from either program.  I do not expect to qualify for Medicare in or before 2014, or for Medicaid under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

8.     I will be subject to the ACA's individual insurance mandate.  I object to the ACA's unconstitutional overreaching and to being forced to obtain and maintain qualifying health care insurance for myself and my dependents, or to pay a penalty for failing to have such insurance.  I do not wish to have such insurance and I do not believe that the costs associated with health insurance are a wise or acceptable use of my financial resources.

9.     Both my business and myself will be harmed if I must purchase health care insurance coverage, which I neither want nor need, to comply with the ACA, or pay the prescribed penalties for non-compliance.  This is because, in either case, I will be forced to divert financial resources away from my own priorities, and particularly from supporting and running my business as I consider to be best and most advantageous.  I believe that the added costs of ACA compliant insurance will make it difficult, if not impossible, for me to remain in business.

10.     To comply with the individual mandate, I would be forced to reorder my personal and business affairs.  Well in advance of 2014, I must now investigate whether and how to both obtain and

-2-

maintain the required insurance and at the same time to support my business and make it grow.

11.     In particular, I must investigate what impact the costs of compliance with the individual insurance mandate will have on my priorities, and especially whether, in light of those costs, my independent business can continue to be a viable going concern, or whether to comply I would have to close my business and seek employment that provides qualifying health insurance coverage as a benefit.

12.     In order to comply with the ACA's individual insurance mandate, I believe that I would also have to plan and take appropriate action before 2014 if I am to avoid being penalized for not complying when this requirement becomes effective.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **21** day of October, 2010 at _____3:30 p.m._____.


_____
Dana Grimes

-3-

# Exhibit 29

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY
GENERAL OF THE STATE OF
FLORIDA, *et al.*,

          Plaintiffs,

vs.                            Case No. 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et
al.*,

          Defendants.

---

## DECLARATION OF DAVID KLEMENCIC
## IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

I, David Klemencic, under the provisions of 28 U.S.C. § 1746, hereby declare as follows:

1.      I am 50 years old, a citizen of the United States, and a citizen and resident of the State of West Virginia. I am personally familiar with the facts contained in this declaration, and I am competent to testify thereto.

2.      I am a member of the National Federation of Independent Business ("NFIB") in good standing.

3.      I am the sole proprietor of Ellenboro Floors, located at 108 W. Washington Street, Ellenboro, West Virginia 26346. My business sells flooring. I have no employees.

4.      I am married and have no children under the age of 26.

5.      My business and personal funds are not kept separate, and I use my personal funds to pay my business expenses when necessary.

6.      I do not have health insurance. My wife has insurance through her employer, Tim

Horton's Restaurant, but I am not covered under it. I last had health insurance over 12 years ago. I have looked into purchasing health insurance within the past year but have determined that it is too expensive.

7.     I do not qualify for Medicare or Medicaid and I do not receive health or medical benefits from either program. I do not expect to qualify for Medicare in or before 2014, or for Medicaid under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

8.     I am subject to the ACA's individual insurance mandate. I object to the ACA's unconstitutional overreaching and to being forced to obtain and maintain qualifying health care insurance for myself and my dependents, or to pay a penalty for failing to have such insurance. I do not wish to have such insurance and do not believe that the cost of health insurance is a wise or acceptable use of my financial resources.

9.     Both my business and myself will be harmed if I must purchase health care insurance coverage, which I neither want nor need, to comply with the ACA, or pay the prescribed penalties for non-compliance. This is because, in either case, I will be forced to divert financial resources from my own priorities, and particularly from supporting and running my business as I consider to be best and most advantageous. I believe that the added costs of ACA compliant insurance will threaten my ability to maintain my own, independent business.

10.     To comply with the individual mandate, I would be forced to reorder my personal and business affairs. Well in advance of 2014, I must now investigate whether and how to both obtain and maintain the required insurance and at the same time to support my business and to make it grow.

11.     In particular, I must investigate what impact the costs of compliance with the individual insurance mandate will have on my priorities, and especially whether, in light of those costs, my independent business can continue to be a viable going concern, or whether to comply I must close my business and seek employment that provides qualifying health insurance as a benefit.

-2-

12.    In order to comply with the ACA's individual insurance mandate, I believe that I would also have to plan and take appropriate action before 2014 if I am to avoid being penalized for not complying when this requirement becomes effective.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _22_ day of October, 2010 at ___8:00 Am___.

David Klemencic

-3-

# Exhibit 30

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY
GENERAL OF THE STATE OF
FLORIDA, *et al.*,

      Plaintiffs,

vs.

Case No. 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et
al.*,

      Defendants.

_____

## **DECLARATION OF PAUL MCCLAIN**
## **IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Paul McClain, under the provisions of 28 U.S.C. § 1746, hereby declare as follows:

1.    I am over the age of 18, a citizen of the United States, and a citizen and resident of the State of Indiana. I am personally familiar with the facts contained herein, and I am competent to testify thereto.

2.    I am a member of the National Federation of Independent Business ("NFIB") in good standing.

3.    I am the sole proprietor of AJ Towing & Recovery, located at 1415 Lafayette St., Fort Wayne, Indiana 46802. My business provides automotive towing and recovery services and has two employees.

4.    I sometimes use my personal funds to meet my business expenses.

5.    I do not have health insurance, nor have I had health insurance as an adult in the past. I

do not offer health insurance to my employees.

6.      I do not qualify for Medicare or Medicaid and I do not receive health or medical benefits from either program. I do not expect to qualify for Medicare in or before 2014, or for Medicaid under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

7.      I am subject to the ACA's individual insurance mandate. I object to the ACA's unconstitutional overreaching, and to being forced to obtain and maintain qualifying health care insurance for myself and my dependents, or to pay a penalty for failing to have such insurance. I do not believe that the cost of health insurance is a wise or acceptable use of my financial resources.

8.      Both my business and myself will be harmed if I must purchase health care insurance coverage, which I neither want nor need, to comply with the ACA, or pay the prescribed penalties for non-compliance. This is because, in either case, I will be forced to divert financial resources away from my own priorities, and particularly from supporting and running my business as I consider to be best and most advantageous. I believe that the added costs of ACA compliant insurance will make it difficult, if not impossible, for me to remain in business.

9.      To comply with the individual mandate, I would be forced to reorder my personal and business affairs. Well in advance of 2014, I must now investigate whether and how to both obtain and maintain the required insurance and at the same time to support my business and to make it grow.

10.     In particular, I must investigate what impact the costs of compliance with the individual insurance mandate will have on my priorities, and especially whether, in light of those costs, my independent business can continue to be a viable going concern, or whether to comply I must close my business and seek employment that provides qualifying health insurance as a benefit.

11.     In order to comply with the ACA's individual insurance mandate, I believe that I would also have to plan and take appropriate action before 2014 if I am to avoid being penalized for not

-2-

complying when this requirement becomes effective.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _2/_ day of October, 2010 at _3:00   1415 Lafayette St. Fort Wayne, In_

Paul McClain

-3-

# Exhibit 31

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
BILL McCOLLUM, ATTORNEY
GENERAL OF THE STATE OF
FLORIDA, *et al.*,

        Plaintiffs,

vs.                                Case No. 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et
al.*,

        Defendants.

---

**DECLARATION OF TIMOTHY THOMPSON
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Timothy Thompson, under the provisions of 28 U.S.C. § 1746, hereby declare as follows:

1.      I am 46 years old, a citizen of the United States, and a citizen and resident of the State of Ohio. I am personally familiar with the facts contained herein, and I am competent to testify thereto.

2.      I am a member of the National Federation of Independent Business ("NFIB") in good standing.

3.      I am the sole proprietor of Thompson's Automotive, located at 893 ½ U.S. Highway 250, North Ashland, Ohio 44805. My business provides automotive repair services and has no employees.

4.      I am single and have two children under the age of 26.

5.      I regularly use my personal funds to meet my business expenses.

6.      I do not have health insurance. I last had health insurance many years ago when I worked at a factory.

7.      I do not qualify for Medicare or Medicaid and I do not receive health or medical benefits from either program. I do not expect to qualify for Medicare in or before 2014, or for Medicaid under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010).

8.      I am subject to the ACA's individual insurance mandate. I object to the ACA's unconstitutional overreaching, and to being forced to obtain and maintain qualifying health care insurance for myself and my dependents, or to pay a penalty for failing to have such insurance. I do not wish to have health insurance, and I do not believe that the costs associated with that coverage are a wise or acceptable use of my financial resources.

9.      Both my business and myself will be harmed if I must purchase health care insurance coverage, which I neither want nor need, to comply with the ACA, or pay the prescribed penalties for non-compliance. This is because, in either case, I will be forced to divert financial resources away from my own priorities, and particularly from supporting and running my business as I consider to be best and most advantageous. I believe that the added costs of ACA compliant health insurance will threaten my ability to maintain my own, independent business.

10.     To comply with the individual mandate I would be forced to reorder my personal and business affairs. Well in advance of 2014, I must now investigate whether and how to both obtain and maintain the required insurance and at the same time to support my business and to make it grow.

11.     In particular, I must investigate what impact the costs of compliance with the individual insurance mandate will have on my priorities, and especially whether, in light of those costs, my independent business can continue to be a viable going concern, or whether to comply I must close my business and seek employment that provides qualifying health insurance as a benefit.

12.     In order to comply with the ACA's individual insurance mandate, I believe that I would

-2-

also have to plan and take appropriate action before 2014 if I am to avoid being penalized for not complying when this requirement becomes effective.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this $\underline{21}$ day of October, 2010 at $\underline{8:00\,Am\ \ Ashland,\ OH}$.


Timothy Thompson

-3-

# Exhibit 32

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-01-16
Baltimore, Maryland 21244-1850



## Center for Medicaid, CHIP and Survey & Certification

JUN 2 4 2010

Ms. Monica Coury
Assistant Director
Office of Intergovernmental Relations
Arizona Health Care Cost Containment System
801 East Jefferson
Phoenix, AZ 85034

Dear Ms. Coury:

I write to acknowledge your May 12th letter withdrawing Arizona's March 18th request to terminate the KidsCare program. Since the KidsCare program has been reinstated, Arizona is not currently considered to be in violation of the "maintenance of effort" provisions in the Affordable Care Act and consequently will be able to continue receiving Federal financial participation for Medicaid and CHIP.

We understand that the renewed funding for the KidsCare program appropriated in Arizona SB 1043 is primarily contingent on Federal action to extend the enhanced Federal Medical Assistance Percentage (FMAP) in the American Reinvestment and Recovery Act (ARRA). If the extension of the enhanced ARRA FMAP is not approved by Congress, Arizona will be expected to indentify funding from other sources. Please keep us informed about the status of the renewed funding for the reinstated KidsCare program.

Please contact me at 410-786-5143 if you have questions or need clarification.

Sincerely,

Barbara K. Richards

Barbara K. Richards
Acting Director
Division of State Children's Health Insurance

cc:     Ms. Gloria Nagle, Associate Regional Administrator, Region IX
        Ms. Susan Ruiz, Regional CHIP Coordinator

1

# Exhibit 33

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop S2-01-16
Baltimore, Maryland 21244-1850



Center for Medicaid and State Operations, Family and Children's Health Programs Group

APR 0 1 2010

Ms. Monica Coury
Assistant Director
Office of Intergovernmental Relations
Arizona Health Care Cost Containment System
801 East Jefferson
Phoenix, AZ 85034

Dear Ms. Coury:

This letter is in regard to your letter of March 18, 2010, indicating Arizona's intention to terminate the KidsCare program. You have requested that we treat this letter as a Children's Health Insurance Program (CHIP) State Plan Amendment (SPA), which we understand would withdraw the Arizona State Child Health Plan effective June 15, 2010.

The Patient Protection and Affordable Care Act of 2010, provides additional resources to the States to pay for health services for children and low income working families. To ensure that these additional resources achieve the intended purposes and do not simply replace State resources that are shifted to other priorities, the statute contains "maintenance of effort" provisions conditioning Medicaid funding on the continuation of current levels of State Medicaid and CHIP eligibility. We want you to be aware that it appears that your request triggers one of these provisions. Specifically, it appears that your request would result in a loss of Medicaid funding for Arizona under section 2105(d)(3) of the CHIP statute, as amended by sections 2101 and 10203 of the Patient Protection and Affordable Care Act of 2010, which was enacted on March 23, 2010. Arizona currently receives about $7.8 billion in Federal Medicaid funding per year and this funding is potentially at risk as a result of eliminating the CHIP program (KidsCare).

To be certain that the State is informed of this possibility, we are asking Arizona to confirm that the State intends that CMS continue with its review of this CHIP SPA. If you do choose to proceed, your letter indicated that the State provided prior public notice consistent with State law. Please provide a copy of the applicable State law and the prior public notice.

We will also need to work with you regarding how the termination of coverage will affect beneficiaries. Our primary area of focus is section 2102(b) of the Social Security Act (the Act), as interpreted in section 457.340 of the CHIP regulations, which requires that if eligibility is suspended or terminated, the State must provide sufficient notice to enable the child's parent or caretaker to take any appropriate actions that may be required to allow coverage to continue without interruption to the extent possible. We request more information on how Arizona plans to effectuate this termination of coverage to the thousands of children enrolled in the State's program. The State's letter only provides that "members will be notified no later than 10 days prior to the termination of the program." Specifically, we request that you provide more

Page 2 – Ms. Monica Coury

information on the substance and timing of the notice that you intend to provide to families as required by the statute and address what the State would do to assist children who are in mid-treatment so that they would not be left adrift without necessary care. In addition, section 2102(c)(2) of the Act requires coordination of title XXI with other public and private health insurance programs, as interpreted in section 457.80(c) of the CHIP regulations, which requires states to describe the procedures used to accomplish coordination between CHIP and Medicaid. Please describe how the State will ensure that children will be screened for Medicaid eligibility before their CHIP coverage is terminated and how families will be informed that their children may be eligible for Medicaid at another point in time if family circumstances, such as income, change.

In our telephone conference on March 30, 2010, the State asked whether Arizona would be able to continue its current CHIP enrollment freeze (implemented on January 1, 2010) without similarly triggering the maintenance of effort provision at section 2105(d)(3), as amended. We are still reviewing the relevant facts and will respond separately on this issue.

Under section 2106(c) of the Social Security Act, CMS must approve, disapprove or request additional information on an amendment to a title XXI state plan within 90 days. This letter constitutes our notification that specified additional information is needed in order to fully assess your amendment. The 90-day review period has been stopped by this request and will resume as soon as a complete and substantive response to all of the concerns described in this letter is received. The members of the review team are available to answer any questions you may have in regard to this letter and to assist your staff in formulating a response.

Please send your response electronically, as well as in hard copy to Ms. Stacey Green, Technical Director for the Arizona title XXI program, with a copy to the CMS Region IX Office. Ms. Green's email address is stacey.green@cms.hhs.gov. Her mailing address is:

Centers for Medicare and Medicaid Services
Center for Medicaid and State Operations
Mail Stop S2-04-04
7500 Security Boulevard
Baltimore, Maryland 21244-1850

Please contact me at 410-786-5143 if you have questions or need clarification.

Sincerely,

Barbara K. Richards
Acting Director
Division of State Children's Health Insurance

cc:  Ms.Gloria Nagle, Associate Regional Administrator, Region IX
     Ms.Susan Ruiz, Regional CHIP Coordinator

# Exhibit 34

For release on delivery
10:15 a.m. EDT
August 2, 2010

Challenges for the Economy and State Governments

Remarks by

Ben S. Bernanke

Chairman

Board of Governors of the Federal Reserve System

at the

Annual Meeting of the Southern Legislative Conference
of the Council of State Governments

Charleston, South Carolina

August 2, 2010

It is a pleasure to be able to address this conference of southern leaders and legislators.  As some of you may know, I was raised only about 150 miles from here in Dillon, South Carolina, and remain connected to this area through family ties.

Our nation has endured a deep recession that in turn was triggered by the most severe financial crisis since the Great Depression.  Today, the financial crisis appears to be mostly behind us, and the economy seems to have stabilized and is expanding again.  But we have a considerable way to go to achieve a full recovery in our economy, and many Americans are still grappling with unemployment, foreclosure, and lost savings.

The recession--as all of you know too well--has also battered the budgets of state and local governments, primarily because tax revenues have declined sharply.  Many states and localities continue to face difficulties in maintaining essential services and have significantly cut their programs and work forces.  These cuts have imposed hardships in local jurisdictions around the country and are also part of the reason for the sluggishness of the national recovery.

Today, I will touch on current economic and financial conditions and then turn to some near-term and longer-term challenges--fiscal and otherwise--facing state governments.

**The Economic Outlook**

After a precipitous decline in late 2008 and early 2009, the U.S. economy stabilized in the middle of last year and is now expanding at a moderate pace.  While the support to economic activity from stimulative fiscal policies and firms' restocking of their inventories will diminish over time, rising demand from households and businesses should help sustain growth.  In particular, in the household sector, growth in real

consumer spending seems likely to pick up in coming quarters from its recent modest pace, supported by gains in income and improving credit conditions.  In the business sector, investment in equipment and software has been increasing rapidly, in part as a result of the deferral of capital outlays during the downturn and the need of many businesses to replace aging equipment.  At the same time, rising U.S. exports, reflecting the expansion of the global economy and the recovery of world trade, have helped foster growth in the U.S. manufacturing sector.

To be sure, notable restraints on the recovery persist.  The housing market has remained weak, with the overhang of vacant or foreclosed houses weighing on home prices and new construction.  Similarly, poor economic fundamentals and tight credit are holding back investment in nonresidential structures, such as office buildings, hotels, and shopping malls.

Importantly, the slow recovery in the labor market and the attendant uncertainty about job prospects are weighing on household confidence and spending.  After two years of job losses, private payrolls expanded at an average of about 100,000 per month during the first half of this year, an improvement but still a pace insufficient to reduce the unemployment rate materially.  In all likelihood, significant time will be required to restore the nearly 8-1/2 million jobs that were lost over 2008 and 2009.  Moreover, nearly half of the unemployed have been out of work for longer than six months.  Long-term unemployment not only imposes exceptional near-term hardships on workers and their families, it also erodes skills and may have long-lasting effects on workers' employment and earnings prospects.

Financial conditions--though much improved since the depth of the financial crisis--have become somewhat less supportive of economic growth in recent months. Notably, concerns about the ability of Greece and a number of other euro-area countries to manage their sizable budget deficits and high levels of public debt roiled global financial markets in the spring, including our own.  In response to these fiscal pressures, European leaders put in place a number of strong measures, including an assistance package for Greece and backstop financing for euro-area countries.  And, recently, European banking supervisors released the results of comprehensive stress tests of their banks.[1]  On net, these measures appear to have reduced concerns in financial markets about European prospects.

Like financial conditions generally, the state of the U.S. banking system has also improved significantly since the worst of the crisis.  Loss rates on most types of loans seem to be peaking, and, in the aggregate, bank capital ratios have risen to new highs. However, many banks continue to have a large volume of troubled loans, and bank lending standards remain tight.  With credit demand weak and with banks writing down problem credits, bank loans outstanding have continued to decline.  Small businesses, which depend importantly on bank credit, have been particularly hard hit by restrictive lending standards.  At the Federal Reserve, we have been working to facilitate the flow of funds to creditworthy small businesses.  Along with the other banking supervisors, we have emphasized to banks and examiners that lenders should do all they can to meet the needs of creditworthy borrowers, including small businesses.[2]  We also have conducted

---

[1] For information on the 2010 European Union stress testing, see the Committee on European Banking Supervisors' website at www.c-ebs.org/EuWideStressTesting.aspx.
[2] See Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, National Credit Union Administration, Office of the Comptroller of the Currency, Office of Thrift Supervision, and

extensive training of our bank examiners, with the message that lending to viable small businesses is good for the safety and soundness of our banking system as well as for our economy. We will continue to monitor bank lending and to seek feedback from banks and borrowers.

Inflation has been low, with consumer prices rising at an average annual rate of about 1 percent in the first half of this year, and we anticipate it will remain subdued over the next couple of years.[3] Slack in labor and product markets has damped wage and price pressures, and rapid productivity increases have helped firms control their production costs. Meanwhile, measures of expected inflation generally have remained stable.

**Fiscal Challenges for State Governments**

Cuts in state and local programs and employment are also weighing on economic activity. These cuts principally reflect the historically large decreases in state tax revenues during the recession. Sales tax revenues have declined with household and business spending, and income tax revenues have been hit by drops in wages and salaries, capital gains, and corporate profits. In contrast, property tax revenues collected by local governments generally held up well through the beginning of this year, although reappraisals of the values of homes and commercial properties may affect those collections in the future. For the 15 states represented in the Southern Legislative

---

Conference of State Bank Supervisors (2010), "Regulators Issue Statement on Lending to Creditworthy Small Businesses," joint press release, February 5, www.federalreserve.gov/newsevents/press/bcreg/20100205a htm.

[3] The discussion in the text refers to inflation as measured by the price index for personal consumption expenditures.

- 5 -

Conference (SLC), state tax revenues fell roughly 10 percent in 2009, similar to the average of all states.[4]

Medicaid spending is another source of pressure on state budgets.  The recession and the weak job market have swelled the rolls of Medicaid participants.  In 2009, caseloads were 11 percent above their 2007 level in the region represented by the SLC, again similar to the average in all states.

With revenues down and Medicaid spending up, other categories of spending by state governments have been tightly squeezed.  Over the past year, numerous state governments have laid off or furloughed employees, decreased capital spending, and reduced aid to local governments.  Indeed, state and local payrolls have fallen by more than 200,000 jobs from their peak near the end of 2008.  Some states have also raised taxes, but the weak economy has made it difficult to find significant new revenues.

Assistance from the federal government, especially through the fiscal stimulus package, has eased, but certainly not eliminated, the budget difficulties faced by states. Although states and localities will continue to receive significant aid this year, that source of help will be winding down next year.

On a more positive note, state and local tax revenues seem set to increase as economic activity expands.  Indeed, 11 of the 15 states of the SLC reported earlier this year that they expect fiscal year 2011 revenues to be at least somewhat higher than the previous fiscal year.[5]  And improvements in the job market should gradually ease some

---

[4] The Southern Legislative Conference comprises the states of Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, Missouri, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, and West Virginia.
[5] See Southern Legislative Conference (2010), "What Are the Revenue Estimates for Fiscal Years 2010 and 2011 in the SLC States?" Question of the Month, February, www.slcatlanta.org/QoM/2010/QuesFeb10 html.

of the demands on Medicaid and other social services.  Moreover, the municipal bond market has remained reasonably receptive this year to most borrowers, with rates low and new issuance relatively solid, despite the concerns about the fiscal positions of many state and local governments.  All that being said, with economic conditions still far from normal, state budgets will probably remain under substantial pressure for a while, leaving governors and legislatures a difficult juggling act as they try to maintain essential services while meeting their budgetary obligations.

A question for the longer run is whether the vulnerability of state budgets to business-cycle downturns can be ameliorated.  The pressures that states face during and after a recession are the result, in part, of balanced-budget rules in state constitutions that prohibit the use of long-term borrowing to cover operating budget shortfalls, a constraint not faced by the federal government, as you know.  I do not advocate changing the balanced-budget rules followed by 49 of the 50 states; they provide important discipline and are a key reason that states have not built up long-term debt burdens comparable to those of many national governments.  However, as is the case today, these rules may force significant state cutbacks in bad economic times when services are most needed.  Moreover, many government programs--in areas such as education or health care, for example--are likely to be most effective when funding sources are stable and predictable, allowing for longer-term planning.

Tools exist to help mitigate the effects of the business cycle on state budgets.  Many states deal with revenue fluctuations by building up reserve--or "rainy day"--funds during good economic times.  Measured as a percent of general fund expenditures, the aggregate reserve fund balances for all state governments stood at a record of about

12 percent at the end of 2006; the states represented by the SLC had accumulated above-average reserves of around 16 percent.  These high reserve-fund balances were helpful in lessening the severity of spending cuts or tax increases in many states.  Nevertheless, given the depth of the recent recession, even these historically high reserve-fund balances proved insufficient to buffer fully the budgets of most states.  Thus, state governments may wish to revisit their criteria for accumulating fiscal reserves.  Building a rainy-day fund during good times may not be politically popular, but it can pay off during the bad times.

In principle, some smoothing of state government expenditures over time could take place through the capital budget.  Maintaining or even increasing the pace of infrastructure construction when the economy is weak fosters economic development and provides local jobs, and it may even allow the state to get more bang for the buck because of increased competition among private contractors when demand is slack.  However, voters and policymakers may understandably be reluctant to approve new bond issues and take on additional costs for debt payments in a period of fiscal and economic stress.

Beyond balanced-budget rules, state government finances also fluctuate because of the increasing sensitivity of their revenues to changes in economic conditions.  For example, capital income, which tends to vary substantially more than wage and salary income, has over time become a relatively more important source of state personal income taxes.[6]  Also, sales taxes that understandably exempt certain necessities may also lead to more cyclicality in collections.  As state legislatures review their tax systems, they

---

[6] See Richard Mattoon and Leslie McGranahan (2008), "Revenue Bubbles and Structural Deficits:  What's a State to Do?" Working Paper No. 2008-15 (Chicago:  Federal Reserve Bank of Chicago, July), available at www.chicagofed.org/webpages/publications/working_papers/2008/wp_15.cfm; and David L. Sjoquist and Sally Wallace (2003), "Capital Gains:  Its Recent, Varied, and Growing (?) Impact on State Revenues," *State Tax Notes*, August 18, available at www.taxpolicycenter.org/publications/url.cfm?ID=1000613.

may wish to consider revenue stability along with other critical features of the tax code

such as fairness, support for economic growth, and administrative costs.

      Of course, healthy economic growth can ease state and local fiscal problems--and

federal fiscal problems, for that matter.  Notwithstanding the very difficult near-term

budget issues you face, I urge you not to take your eye off the important goal of

promoting growth.

      A basic economic principle is that growth requires investment.  Investment

includes physical investment such as infrastructure development; surely, adequate

transportation networks and the like are necessary for economic growth.  But for

sustained economic development, investment in people--in their knowledge and skills--is

even more important.  No economy can succeed without a high-quality workforce,

particularly in an age of globalization and technical change.  I think this is a lesson that

the South, as a region, has learned quite well.  When I attended public schools in South

Carolina in the 1960s, measures of per-pupil spending, years of schooling, and student

achievement in the South lagged significantly behind other parts of the country.  Since

then, those indicators have changed, very much for the better.  Because of the concerted

efforts of state and local governments, high school completion rates in the South have

gradually converged to the national average.  Southern colleges and universities have

become more prominent nationally and internationally, and we have seen the emergence

of leading centers of education and innovation, such as the Research Triangle Park area

in North Carolina and the high-tech area around Austin, Texas.  Economic progress and a

high quality of life have in turn attracted educated workers and new industries.

Doubtless, investment in education and training has been a key source of the remarkable economic gains that the South has achieved over the past 50 years or so.

I am confident that, in light of this experience, your efforts to improve education and workforce skills will continue.  As you do that, please keep in mind that formal K-12 and post-secondary education, as important as they are, do not alone build better workforces.  Research increasingly has shown the importance for both individuals and the economy as a whole of both early childhood education as well as efforts to promote the lifelong acquisition of skills.  The payoffs of early childhood programs can be especially high.[7]  For instance, investment in preschool programs for disadvantaged children has been shown to increase high school graduation rates.  Because high school graduates have higher earnings, pay more taxes, and are less likely to need to use public health programs, such investments can pay off even from the narrow perspective of state budgets; of course, the returns to the overall economy and to the individuals themselves are much greater.[8]

Additionally, in a dynamic economy in which job requirements are constantly changing, individuals already in the workforce need opportunities to improve their skills throughout their lives.  There are many ways to provide such opportunities.  For example, community colleges and vocational schools play essential roles in training and retraining workers, especially if they do so in close collaboration with private employers, and they do so at a relatively low cost.  State governments can facilitate public-private

---

[7] For example, see the work of the Human Capital Research Collaborative, a joint project of the University of Minnesota and the Federal Reserve Bank of Minneapolis, at www.humancapitalrc.org.
[8] See, for example, Henry M. Levin, Clive Belfield, Peter Muennig, Cecilia Rouse, Barbara Wolfe, and Nathan Tefft (2007), "The Public Returns to Public Educational Investments in African American Males," Discussion Paper 112 (Minneapolis:  Early Childhood Research Collaborative, April), available at www.earlychildhoodrc.org/papers/dp112-abstract.cfm.

collaboration to help individuals gain skills that the market demands.  Though creating

opportunities for workers to retrain is always important, it is especially critical now,

when the high rate of long-term unemployment threatens the longer-term employability

and productivity of many.

Providing economic opportunity and rising living standards for as many people as

possible is, of course, the fundamental rationale for continued economic development.

From the perspective of government finances, however, healthy local economies will also

be necessary if state governments are to successfully confront some difficult, longer-term

fiscal issues.  As you know, with the retirement of state employees that are part of the

baby-boom generation and the continued rise in health-care costs, states' retiree pension

and health-care obligations will become even more difficult to meet in coming years.

Estimates of states' unfunded pension liabilities span a wide range, but some researchers

put the figure as high as $2 trillion at the end of last year.[9]  States' unfunded liabilities are

significantly higher than before the recession and financial crisis because many pension

fund investments have declined in value, and because many states have found it difficult

to maintain pension contributions while their budgets are under stress.  Indeed, some

estimates suggest that, on average, states would need to more than double their typical

annual pension contributions over the next decade to avoid collectively exhausting their

pension funds during the next couple of decades. [10]  This daunting problem has no easy

solution; in particular, proposals that include modifications of benefits schedules must

[9]See Alicia H. Munnell, Richard W. Kopcke, Jean-Pierre Aubry, and Laura Quinby (2010), *Valuing Liabilities in State and Local Plans* (Chestnut Hill, Mass.:  Center for Retirement Research at Boston College, June), available at http://crr.bc.edu/briefs/valuing_liabilities_in_state_and_local_plans.html.
[10] See Joshua Rauh (2010), "Are State Public Pensions Sustainable?  Why the Federal Government Should Worry About State Pension Liabilities," Working Paper Series (Evanston, Ill.:  Northwestern University, May), available at http://ssrn.com/abstract=1596679.

take into account that accrued pension benefits of state and local workers in many jurisdictions are accorded strong legal protection, including, in some states, constitutional protection.[11]

In addition to pensions, states will have to address the burgeoning cost of retiree health benefits. Estimates of these liabilities are subject to significant uncertainty, largely because we have little basis on which to project health-care costs decades into the future. However, one recent estimate suggests that state governments have a collective liability of almost $600 billion for retiree health benefits.[12] These benefits have traditionally been funded on a pay-as-you-go basis and therefore could entail a substantial fiscal burden in coming years as large numbers of state workers retire.

Of course, the demographic and health-care trends faced by state governments present severe challenges for federal fiscal policymakers as well. Long-term projections of the federal government's budget under current policies and plausible economic assumptions show a structural budget gap that is both large relative to the size of the economy and increasing over time.[13] To steer clear of sudden, sharp, and disruptive shifts in spending programs and tax policies, and to retain the confidence of the public and financial markets, federal policymakers need to develop a credible plan to restore fiscal sustainability.

---

[11] See Jeffrey R. Brown and David W. Wilcox (2009), "Discounting State and Local Pension Liabilities," *American Economic Review*, vol. 99 (May), 538-42. It should be noted that *future* pension accruals and health benefits generally seem to be accorded a lower level of protection.

[12] See Pew Center on the States (2010), *The Trillion Dollar Gap: Underfunded State Retirement Systems and the Road to Reform* (Washington: PCS, February), available at www.pewcenteronthestates.org/report_detail.aspx?id=56695.

[13] For example, see the alternative fiscal scenario in the Congressional Budget Office (2010), *The Long-Term Budget Outlook* (Washington: CBO, June), available at www.cbo.gov/doc.cfm?index=11579&zzz=40884.

The states have the opportunity to serve as role models for effective long-term fiscal planning.  Given the size of long-term obligations and the importance of meeting commitments to employees and the public, I don't think these problems can be solved simply through across-the-board cuts in existing state programs.  Instead, states should intensively review the effectiveness of all of their programs and be willing to make significant changes to deliver necessary services at lower cost.  This willingness to look for new solutions seems especially important in the case of health programs, where costs are growing the most quickly.

**Conclusion**

Today I have highlighted the challenges that state legislators face, both in the South and in other regions.  In the past few years, the weak economy has significantly reduced state and local government revenues, which in turn has forced difficult decisions on spending and taxes.  An improving economy should help, but state finances will remain under pressure for some time.  In the longer term, like the federal government, state governments must respond to the aging of the population and the seemingly inexorable rise in health-care costs.  These are daunting challenges indeed, but I believe we can find constructive ways to meet them, and I suspect that many of these solutions will be found at the state level.  Dealing with the fiscal challenges at all levels of government will be essential to ensuring that our resilient and dynamic economy delivers rising living standards to the citizens of your states and to our nation as a whole.