# Exhibit 39

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop N3-01-21
Baltimore, Maryland 21244-1850

CMS
CENTERS for MEDICARE & MEDICAID SERVICES

## Office of the Actuary

**DATE:** April 22, 2010

**FROM:** Richard S. Foster
Chief Actuary

**SUBJECT:** Estimated Financial Effects of the "Patient Protection and Affordable Care Act," as Amended

*The Office of the Actuary has prepared this memorandum in our longstanding capacity as an independent technical advisor to both the Administration and the Congress. The costs, savings, and coverage impacts shown herein represent our best estimates for the Patient Protection and Affordable Care Act. We offer this analysis in the hope that it will be of interest and value to policy makers and administrators as they implement and monitor these far-reaching national health care reforms. The statements, estimates, and other information provided in this memorandum are those of the Office of the Actuary and do not represent an official position of the Department of Health & Human Services or the Administration.*

This memorandum summarizes the Office of the Actuary's estimates of the financial and coverage effects through fiscal year 2019 of selected provisions of the "Patient Protection and Affordable Care Act" (P.L. 111-148) as enacted on March 23, 2010 and amended by the "Health Care and Education Reconciliation Act of 2010" (P.L. 111-152) as enacted on March 30, 2010. For convenience, the health reform legislation, including amendments, will be referred to in this memorandum as the Patient Protection and Affordable Care Act, or PPACA.

Included are the estimated net Federal expenditures in support of expanded health insurance coverage, the associated numbers of people by insured status, the changes in Medicare and Medicaid expenditures and revenues, and the overall impact on total national health expenditures. Except where noted, we have not estimated the impact of the various tax and fee provisions or the impact on income and payroll taxes due to economic effects of the legislation. Similarly, the impact on Federal administrative expenses is excluded. A summary of the data, assumptions, and methodology underlying our national health reform estimates will be available in a forthcoming memorandum by the OACT Health Reform Modeling Team.

### Summary

The table shown on page 2 presents financial impacts of the selected PPACA provisions on the Federal Budget in fiscal years 2010-2019. We have grouped the provisions of the legislation into six major categories:

(i) Coverage provisions, which include the mandated coverage for health insurance, a substantial expansion of Medicaid eligibility, and the additional funding for the Children's Health Insurance Program (CHIP);

(ii) Medicare provisions;

(iii) Medicaid and CHIP provisions other than the coverage expansion and CHIP funding;

(iv) Provisions aimed in part at changing the trend in health spending growth;

(v) The Community Living Assistance Services and Supports (CLASS) program; and

(vi) Immediate health insurance reforms.

The estimated costs and savings shown in the table are based on the effective dates specified in the law as enacted. Additionally, we assume that employers and individuals would take roughly 3 to 5 years to fully adapt to the new insurance coverage options and that the enrollment of additional individuals under the Medicaid coverage expansion would be completed by the third year of implementation. Because of these transition effects and the fact that most of the coverage provisions would be in effect for only 6 of the 10 years of the budget period, the cost estimates shown in this memorandum do not represent a full 10-year cost for the new legislation.

**Estimated Federal Costs (+) or Savings (−) under Selected Provisions of the Patient Protection and Affordable Care Act as Enacted and Amended**
(in billions)

| | Fiscal Year | | | | | | | | | | Total, |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Provisions | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2010-19 |
| Total* | $9.2 | −$0.7 | −$12.6 | −$22.3 | $16.8 | $57.9 | $63.1 | $54.2 | $47.2 | $38.5 | $251.3 |
| Coverage† | 3.3 | 4.6 | 4.9 | 5.2 | 82.9 | 119.2 | 138.2 | 146.6 | 157.6 | 165.8 | 828.2 |
| Medicare | 1.2 | −4.7 | −14.9 | −26.3 | −68.8 | −60.3 | −75.2 | −92.1 | −108.2 | −125.7 | −575.1 |
| Medicaid/CHIP | −0.9 | −0.9 | 0.8 | 4.5 | 8.6 | 5.1 | 4.6 | 3.4 | 1.3 | 1.7 | 28.3 |
| Cost trend‡ | — | — | — | — | −0.0 | −0.1 | −0.2 | −0.4 | −0.6 | −0.9 | −2.3 |
| CLASS program | — | −2.8 | −4.5 | −5.6 | −5.9 | −6.0 | −4.3 | −3.4 | −2.8 | −2.4 | −37.8 |
| Immediate reforms | 5.6 | 3.2 | 1.2 | — | — | — | — | — | — | — | 10.0 |

* Excludes Title IX revenue provisions except for sections 9008 and 9015, certain provisions with limited impacts, and Federal administrative costs.
† Includes expansion of Medicaid eligibility and additional funding for CHIP.
‡ Includes estimated non-Medicare Federal savings from provisions for comparative effectiveness research, prevention and wellness, fraud and abuse, and administrative simplification. Excludes impacts of other provisions that would affect cost growth rates, such as the productivity adjustments to Medicare payment rates (which are reflected in the Medicare line) and the section 9001 excise tax on high-cost employer plans.

As indicated in the table above, the provisions in support of expanding health insurance coverage (including the Medicaid eligibility changes and additional CHIP funding) are estimated to cost $828 billion through fiscal year 2019. The Medicare, Medicaid, growth-trend, CLASS, and immediate reform provisions are estimated to result in net savings of about $577 billion, leaving a net overall cost for this period of $251 billion before consideration of additional Federal administrative expenses and the increase in Federal revenues that would result from the excise tax on high-cost employer-sponsored health insurance coverage and other revenue provisions. (The additional Supplementary Medical Insurance revenues from fees on brand-name prescription drugs under section 9008 of the PPACA, and the additional Hospital Insurance payroll tax income under section 9015, are included in the estimated Medicare savings shown here.) The Congressional Budget Office and the Joint Committee on Taxation have estimated that the total net amount of Medicare savings and additional tax and other revenues would

somewhat more than offset the cost of the national coverage provisions, resulting in an overall reduction in the Federal deficit through 2019.

The following chart summarizes the estimated impacts of the PPACA on insurance coverage. The mandated coverage provisions, which include new responsibilities for both individuals and employers, and the creation of the American Health Benefit Exchanges (hereafter referred to as the “Exchanges”), would lead to shifts across coverage types and a substantial overall reduction in the number of uninsured, as many of these individuals become covered through their employers, Medicaid, or the Exchanges.

**Estimated Effect of the Patient Protection and Affordable Care Act,**
**as Enacted and Amended, on 2019 Enrollment by Insurance Coverage**
(in millions)




Note: Totals across categories are not meaningful due to overlaps among categories (e.g., Medicare and Medicaid).

By calendar year 2019, the mandates, coupled with the Medicaid expansion, would reduce the number of uninsured from 57 million, as projected under prior law, to an estimated 23 million under the PPACA. The additional 34 million people who would become insured by 2019 reflect the net effect of several shifts. First, an estimated 18 million would gain primary Medicaid coverage as a result of the expansion of eligibility to all legal resident adults under 133 percent[1] of the Federal Poverty Level (FPL).[2] (In addition, roughly 2 million people with employer-

---

[1] The health reform legislation specifies an income threshold of 133 percent of the Federal Poverty Level but also requires States to apply an “income disregard” of 5 percent of the FPL in meeting the income test. Consequently, the *effective* income threshold is actually 138 percent of the FPL. For convenience, we refer to the statutory factor of 133 percent in this memorandum.

[2] This provision would extend eligibility to two significant groups: (i) individuals who would meet current Medicaid eligibility requirements, for example as disabled adults, but who have incomes in excess of the existing State thresholds but less than 133 percent of the FPL; and (ii) people who live in households with incomes below 133 percent of the FPL but who have no other qualifying factors that make them eligible for Medicaid under prior law, such as being under age 18, age 65 or older, disabled, pregnant, or parents of eligible children.

sponsored health insurance would enroll in Medicaid for supplemental coverage.) Another 16 million persons (most of whom are currently uninsured) would receive individual insurance coverage through the newly created Exchanges, with the majority of these qualifying for Federal premium and cost-sharing subsidies. Finally, we estimate that the number of individuals with employer-sponsored health insurance would decrease overall by about 1 million, reflecting both gains and losses in such coverage under the PPACA.

As described in more detail in a later section of this memorandum, we estimate that overall national health expenditures under the health reform act would increase by a total of $311 billion (0.9 percent) during calendar years 2010-2019, principally reflecting the net impact of (i) greater utilization of health care services by individuals becoming newly covered (or having more complete coverage), (ii) lower prices paid to health providers for the subset of those individuals who become covered by Medicaid, (but with net Medicaid costs from provisions other than the coverage expansion), and (iii) lower payments and payment updates for Medicare services. Although several provisions would help to reduce health care cost growth, their impact would be more than offset through 2019 by the higher health expenditures resulting from the coverage expansions.

The actual future impacts of the PPACA on health expenditures, insured status, individual decisions, and employer behavior are very uncertain. The legislation would result in numerous changes in the way that health care insurance is provided and paid for in the U.S., and the scope and magnitude of these changes are such that few precedents exist for use in estimation. Consequently, the estimates presented here are subject to a substantially greater degree of uncertainty than is usually the case with more routine health care legislation.

The balance of this memorandum discusses these financial and coverage estimates—and their limitations—in greater detail.

**Effects of Coverage Provisions on Federal Expenditures and Health Insurance Coverage**

Federal Expenditure Impacts

The estimated Federal costs of the coverage provisions in the PPACA are provided in table 1, attached, for fiscal years 2010 through 2019. We estimate that Federal expenditures would increase by a net total of $251 billion during this period as a result of the selected PPACA provisions—a combination of $828 billion in net costs associated with coverage provisions, $575 billion in net savings for the Medicare provisions, a net cost of $28 billion for the Medicaid/CHIP provisions (excluding the expansion of Medicaid eligibility and the additional CHIP funding), $2 billion in savings from provisions intended to help reduce the rate of growth in health spending, $38 billion in net savings from the CLASS program, and $10 billion in costs for the immediate insurance reforms. These latter five impact categories are discussed in subsequent sections of this memorandum.

Of the estimated $828 billion net increase in Federal expenditures related to the coverage provisions of the PPACA, about one-half ($410 billion) can be attributed to expanding Medicaid coverage for all adults who live in households with incomes below 133 percent of the FPL. This cost reflects the fact that newly eligible persons would be covered with a Federal Medical Assistance Percentage (FMAP) of over 99 percent for the first 3 years, declining to 93 percent by the sixth year; that is, the Federal government would bear a significantly greater proportion of

the cost of the newly eligible enrollees than is the case for current Medicaid beneficiaries.[3] Also included in this cost is the additional funding for the CHIP program for 2014 and 2015, which would increase such expenditures by an estimated $29 billion. The remaining costs of the coverage provisions arise from the refundable tax credits and reduced cost-sharing requirements for low-to-middle-income enrollees purchasing health insurance through the Exchanges ($507 billion) and credits for small employers who choose to offer insurance coverage ($31 billion). The increases in Federal expenditures would be partially offset by the penalties paid by affected individuals who choose to remain uninsured and employers who opt not to offer coverage; such penalties total $120 billion through fiscal year 2019, reflecting the relatively low per-person penalty amounts specified in the legislation.[4]

The refundable premium tax credits in section 1401 of the PPACA (as amended by section 1001 of the Reconciliation Act) would limit the premiums paid by individuals with incomes up to 400 percent of the FPL to a range of 2.0 to 9.5 percent of their income and would cost an estimated $451 billion through 2019. An estimated 25 million Exchange enrollees (79 percent) would receive these Federal premium subsidies. The cost-sharing credits would reimburse individuals and families with incomes up to 400 percent of the FPL for a portion of the amounts they pay out-of-pocket for health services, as specified in section 1402, as amended. These credits are estimated to cost $55 billion through 2019.

The PPACA establishes the Exchange premium subsidies during 2014-2018 in such a way that the reduced premiums payable by those with incomes below 400 percent of FPL would maintain the same share of total premiums over time. As a result, the Federal premium subsidies for a qualifying individual would grow at the same pace as per capita health care costs during this period. Because the cost-sharing assistance is based on a percentage of health care costs incurred by qualifying individuals and families, average Federal expenditures for this assistance would also increase at the same rate as per capita health care costs. After 2018, if the Federal cost of the premium and cost-sharing subsidies exceeded 0.504 percent of GDP, then the share of Exchange health insurance premiums paid by enrollees below 400 percent of the FPL would increase such that the Federal cost would stay at approximately 0.504 percent of GDP. We estimate that the subsidy costs in 2018 would represent about 0.518 percent of GDP, with the result that the enrollee share of the total premium would generally increase in 2019 and later.

As noted previously, the Federal costs for the coverage expansion provisions are somewhat offset by the individual and employer penalties stipulated by the PPACA. We estimate that individual penalties would provide $33 billion in revenue to the Federal government in fiscal years 2014-2019, taking into account the time lag associated with collecting the penalty amounts through the Federal income tax system. (A discussion of the estimated number of individuals who would choose to remain uninsured is provided below.) Additionally, for firms that do not

---

[3] For the newly eligible enrollees, the FMAP for fiscal year 2020 and later will be 90 percent, compared to an average of 57 percent for the previously eligible enrollee population. In addition, the estimated cost includes new Medicaid enrollments by previously eligible individuals as a result of the publicity, enrollment assistance through the Exchanges, and reduced stigma associated with Federal assistance for health care. Also included here are the Medicaid costs for the provision to extend Medicaid coverage to individuals up to age 26 who were previously in foster care.

[4] Employer penalties would be $2,000 per employee in 2014, generally, which is substantially less than the cost of providing health insurance coverage. The relationship between penalties and premiums is much more complicated for individuals than for employers; still, for many individuals the applicable penalty would be considerably smaller than the cost of coverage.

offer health insurance and are subject to the "play or pay" penalties, we estimate that the penalties would total $87 billion in 2014-2019.

The penalty amounts for noncovered individuals will be indexed over time by the CPI (or, in certain instances, by growth in income) and would normally increase more slowly than health care costs. As a result, penalty revenues for nonparticipating individuals are estimated to grow more slowly than the Federal expenditures for the premium assistance credits. Penalties for employers who do not offer health insurance will be indexed by premium levels and will thus keep pace with health care cost growth.

The health reform act specifies maximum out-of-pocket limits in 2014 equal to the corresponding maximums as defined in the Internal Revenue Code for high-deductible health plans. We estimate that these limits would be $6,645 for an individual and $13,290 for a family with qualified creditable coverage (including employer-sponsored health insurance). For future years, the limits are indexed to the growth in the average health insurance premium in the U.S. Under this approach, the proportion of health care costs above the out-of-pocket maximum would be relatively stable over time. For the basic "bronze" benefit plan for individuals, with an actuarial value of 60 percent, we estimate that the cost-sharing percentage applicable before the out-of-pocket maximum is reached would average about 76 percent in 2014 and later. The corresponding cost-sharing rate for family coverage is 64 percent. For the "silver" benefit package, the individual and family cost-sharing rates below the out-of-pocket maximums would average about 47 percent and 40 percent, respectively. For the more comprehensive "gold" and "platinum" benefit packages authorized through the Exchanges, these initial cost-sharing levels would be significantly lower.

Health Insurance Coverage Impacts

The estimated effects of the PPACA on health insurance coverage are provided in table 2, attached. As summarized earlier, we believe that these effects will be quite significant. By calendar year 2019, the individual mandate, Medicaid expansion, and other provisions are estimated to reduce the number of uninsured from 57 million under prior law to 23 million after the PPACA. The percentage of the U.S. population with health insurance coverage is estimated to increase from 83 percent under the prior-law baseline to 93 percent after the changes have become fully effective.

Of the additional 34 million people who are estimated to be insured in 2019 as a result of the PPACA, a little more than one-half (18 million) would receive Medicaid coverage due to the expansion of eligibility to adults under 133 percent of the FPL. (Included in the total are an estimated 50,000 individuals who would gain Medicaid coverage as former children in foster care programs and who could be covered up to age 26 under the new law.) We anticipate that the intended enrollment facilitation under the PPACA—i.e., that the Health Benefits Exchanges help people determine which insurance plans are available and identify whether individuals qualify for Medicaid coverage, premium subsidies, etc.—would result in a high percentage of eligible persons becoming enrolled in Medicaid. We further believe that the great majority of such persons (15 million) would become covered in the first year, 2014, with the rest covered by 2016. About 2 million people who currently have employer-sponsored health insurance are estimated to enroll in Medicaid as a supplement to their existing coverage.

We estimate that 16 million people would receive health coverage in 2019 through the newly created Exchanges under the PPACA. (Another 15 million, who currently have individual health insurance policies, are also expected to switch to Exchange plans.) We modeled the choice to purchase coverage from the Exchanges as a function of individuals' and families' expected health expenditures relative to the cost of coverage if they were insured (taking into account applicable premium subsidies). We also considered the required penalty associated with the individual mandate if they chose to remain uninsured, along with other factors.[5] Our model indicated that roughly 63 percent of those eligible for the Exchanges would choose to take such coverage, with the principal incentive being the level of premium assistance available. For many individuals, the penalty amounts for not having insurance coverage were not sufficiently large to have a sizable impact on the coverage decision. Also, in this regard, individuals or families would not be subject to a penalty for failing to enroll in an Exchange plan if the "bronze" premium level (reduced by the premium tax credit, if applicable) would exceed 8 percent of income. We estimate that this provision would exempt individuals and families with incomes between about 400 percent and 542 percent of the FPL, representing about 16 percent of the non-aged population.

The new legislation would require the Office of Personnel Management to arrange for at least two private, multi-State health plans to be offered through each health insurance Exchange. The multi-State plans would generally meet the same benefit, cost-sharing, network, and other requirements applicable to private Exchange plans and would negotiate payment rates with providers. (A State could enact a requirement for additional benefits in the multi-State plans, beyond the essential benefits specified for a qualified plan, but would have to make payments on behalf of eligible individuals to defray the cost of the additional benefits.) We estimate that the multi-State plans would have costs that were very similar to those for other Exchange plans.

Employer-sponsored health insurance has traditionally been the largest source of coverage in the U.S., and we anticipate that it would continue to be so under the PPACA. By 2019, an estimated 13 million workers and family members would become newly covered as a result of additional employers offering health coverage, a greater proportion of workers enrolling in employer plans, and an extension of dependent coverage up to age 26. However, a number of workers who currently have employer coverage would likely become enrolled in the expanded Medicaid program or receive subsidized coverage through the Exchanges. For example, some smaller employers would be inclined to terminate their existing coverage, and companies with low average salaries might find it to their—and their employees'—advantage to end their plans, thereby allowing their workers to qualify for heavily subsidized coverage through the Exchanges. Somewhat similarly, many part-time workers could obtain coverage more inexpensively through the Exchanges or by enrolling in the expanded Medicaid program. Finally, as mentioned previously, the per-worker penalties assessed on nonparticipating employers are relatively low compared to prevailing health insurance costs. As a result, the penalties would not be a substantial deterrent to dropping or forgoing coverage. We estimate that such actions would collectively reduce the number of people with employer-sponsored health coverage by about 14 million, or slightly more than the number newly covered through

[5] Such other factors include age, gender of head of household, race, children, marital status, health status, and employment status (for both the head of household and the spouse), as well as adjustments to reflect the availability of health insurance on a guaranteed-issue basis and at community-rated, group insurance premium rates. Finally, we also considered the general desire to comply with the intent of the law, even in the significant number of cases in which the penalty amount would be small or would not apply.

existing and new employer plans under the PPACA. As indicated in table 2, the total number of persons with employer coverage in 2019 is estimated to be 1 million lower under the reform legislation than under the prior law.

For the estimated 23 million people who would remain uninsured in 2019, roughly 5 million are undocumented aliens who would be ineligible for Medicaid or the Exchange coverage subsidies under the health reform legislation. The balance of 18 million would choose not to be insured and to pay the penalty (if applicable) associated with the individual mandate. For the most part, these would be individuals with relatively low health care expenses for whom the individual or family insurance premium would be significantly in excess of any penalty and their anticipated health benefit value. In other instances, as happens currently, some people would not enroll in their employer plans or take advantage of the Exchange opportunities even though it would be in their best financial interest to do so.

**Impact on Medicare and Medicaid**

Medicare

The estimated financial impacts of the Medicare provisions in the PPACA are provided in detail in table 3, attached, which is organized by section of the legislation.[6] Net Medicare savings are estimated to total $575 billion for fiscal years 2010-2019. Substantial savings are attributable to provisions that would, among other changes, reduce Part A and Part B payment levels and adjust future "market basket" payment updates for productivity improvements ($233 billion); eliminate the Medicare Improvement Fund ($27 billion); reduce disproportionate share hospital (DSH) payments ($50 billion); reduce Medicare Advantage payment benchmarks and permanently extend the authority to adjust for coding intensity ($145 billion); freeze the income thresholds for the Part B income-related premium for 9 years ($8 billion); implement an Independent Payment Advisory Board together with strict Medicare expenditure growth rate targets ($24 billion); and increase the HI payroll tax rate by 0.9 percentage point for individuals with incomes above $200,000 and families above $250,000 ($63 billion). Other provisions would generate relatively smaller amounts of savings, through such means as reporting physician quality measures, reducing payments in cases involving hospital-acquired infections, reducing readmissions, refining imaging payments, increasing Part D premiums for higher-income beneficiaries, and implementing evidence-based coverage of preventive services.

These savings are slightly offset by the costs of closing the Part D coverage gap ($12 billion); reducing the growth in the Part D out-of-pocket cost threshold ($1 billion); extending a number of special payment provisions scheduled to expire, such as the postponement of therapy caps ($5 billion); and by the costs for improving preventive health services and access to primary care ($6 billion).

---

[6] For ease of interpretation, we have incorporated the Medicare and Medicaid provisions of the managers' amendments, as specified in Title X of the PPACA, into the corresponding provisions of Titles II through VII and Title IX. For example, the savings shown for section 3403 (Independent Payment Advisory Board) represent the impact of this provision from the original bill as amended by Senate managers' amendment section 10320. Similarly, any further amendments introduced by the Reconciliation Act and managers' amendments to the Reconciliation Act have also been included with the corresponding title of the PPACA. For example, the costs under section 1101 of the Reconciliation Act, to close the Part D coverage gap or "donut hole," are included with the Part D provisions of PPACA, as are the costs of slowing the growth in the enrollee out-of-pocket cost threshold, as added by the managers' amendments to the Reconciliation Act.

The Reconciliation Act amendments introduced a new 3.8-percent "unearned income Medicare contribution" on income from interest, dividends, annuities, and other non-earnings sources for individual taxpayers with incomes above $200,000 and couples filing joint returns with incomes above $250,000. Despite the title of this tax, this provision is unrelated to Medicare; in particular, the revenues generated by the tax on unearned income are not allocated to the Medicare trust funds (and thus are not shown in table 3).

Conversely, the revenues from fees on manufacturers and importers of brand-name prescription drugs under section 9008 of the PPACA are earmarked for the Part B account in the Medicare Supplementary Medical Insurance trust fund. From the standpoint of the Federal Budget, these amounts are new receipts and serve to reduce the Budget deficit. From a trust fund perspective, however, the situation is more complicated. No changes were made in the existing statutory provisions for Part B beneficiary premiums and general revenue matching amounts, which by law are set each year at a level adequate to finance Part B expenditures. With no change to the existing financing, the additional revenues under section 9008 would result in an excessive level of financing for Part B and an unnecessary accumulation of account assets. It would be reasonable to establish a negative "premium margin" to maintain Part B assets at an appropriate contingency level, which would reduce beneficiary premium rates and matching general revenues by an amount equal to the new revenues from prescription drug fees. The estimated savings amounts shown in table 3 for section 9008 represent the net Budget impact (additional fee receipts less the reduction in beneficiary premiums). In practice, there would be no net impact on the operations of the Part B trust fund account.

Based on the estimated savings for Part A of Medicare, the assets of the Hospital Insurance trust fund would be exhausted in 2029 compared to 2017 under the prior law—an extension of 12 years. The combination of lower Part A costs and higher tax revenues results in a lower Federal deficit based on budget accounting rules. However, trust fund accounting considers the same lower expenditures and additional revenues as extending the exhaustion date of the HI trust fund. In practice, the improved HI financing cannot be simultaneously used to finance other Federal outlays (such as the coverage expansions) and to extend the trust fund, despite the appearance of this result from the respective accounting conventions.

It is important to note that the estimated savings shown in this memorandum for one category of Medicare provisions may be unrealistic. The PPACA introduces permanent annual productivity adjustments to price updates for most providers (such as hospitals, skilled nursing facilities, and home health agencies), using a 10-year moving average of economy-wide private, non-farm productivity gains. While such payment update reductions will create a strong incentive for providers to maximize efficiency, it is doubtful that many will be able to improve their own productivity to the degree achieved by the economy at large.[7] Over time, a sustained reduction in payment updates, based on productivity expectations that are difficult to attain, would cause Medicare payment rates to grow more slowly than, and in a way that was unrelated to, the

[7] The provision of most health services tends to be very labor-intensive. Economy-wide productivity gains reflect relatively modest improvements in the service sector together with much larger improvements in manufacturing. Except in the case of physician services, we are not aware of any empirical evidence demonstrating the medical community's ability to achieve productivity improvements equal to those of the overall economy. The Office of the Actuary's most recent analysis of hospital productivity highlights the difficulties in measurement but suggests that such productivity has been small or negligible during 1981 to 2005.
(See http://www.cms.hhs.gov/HealthCareFinancingReview/downloads/07-08Winterpg49.pdf.)

providers' costs of furnishing services to beneficiaries. Thus, providers for whom Medicare constitutes a substantive portion of their business could find it difficult to remain profitable and, absent legislative intervention, might end their participation in the program (possibly jeopardizing access to care for beneficiaries). Simulations by the Office of the Actuary suggest that roughly 15 percent of Part A providers would become unprofitable within the 10-year projection period as a result of the productivity adjustments.[8] Although this policy could be monitored over time to avoid such an outcome, changes would likely result in smaller actual savings than shown here for these provisions.

A related concern is posed by the requirements that will be placed on the Independent Payment Advisory Board. The Board will be charged with recommending changes to certain Medicare payment categories in an effort to prevent per-beneficiary Medicare costs from increasing faster than the average of the CPI and the CPI-medical for "implementation years" 2015 through 2019.[9] The Secretary of HHS is required to implement the Board's recommendations unless the statutory process is overridden by new legislation.

Average Medicare costs per beneficiary usually increase over time as a function of (i) medical-specific price growth, (ii) more utilization of services by beneficiaries, and (iii) greater "intensity" or average complexity of these services. In general, limiting cost growth to a level below medical price inflation alone would represent an exceedingly difficult challenge. Actual Medicare cost growth per beneficiary was below the target level in only 4 of the last 25 years, with 3 of those years immediately following the Balanced Budget Act of 1997; the impact of the BBA prompted Congress to pass legislation in 1999 and 2000 moderating many of the BBA provisions. As an additional comparison, during the last 25 years the average increase in the target growth rate has been 0.33 percent per year below the average increase in nominal GDP per capita—which is approximately the target level for the physician sustainable growth rate (SGR) payment system. Congress has overridden the SGR-based payment reductions for each of the last 7 years (and, to date, for the first 5 months of 2010).

The Board's efforts would be further complicated by provisions that prohibit increases in cost-sharing requirements and that exempt certain categories of Medicare expenditures from consideration. We have estimated the savings for section 3403 under the assumption that the provision will be implemented as specified; in particular, we have not assumed that Congress would pass subsequent legislation to prevent implementation of the Board's recommendations. Although the savings from the other Medicare provisions in the PPACA are quite substantial, they would not be sufficient to meet the growth rate targets specified in conjunction with the Advisory Board. We estimate that meeting the growth rate targets in 2015-2019 would require changes that would reduce Medicare growth rates by another 0.3 percent per year, on average, in addition to the impacts of the productivity adjustments, MA and DSH reductions, and other provisions in the PPACA.

---

[8] The simulations were based on actual fiscal year 2007 Medicare and total facility margin distributions for hospitals, skilled nursing facilities, and home health agencies. Provider revenues and expenditures were projected using representative growth rates and the Office of the Actuary's best estimates of achievable productivity gains for each provider type, and holding all other factors constant. A sensitivity analysis suggested that the conclusions drawn from the simulations would not change significantly under different provider behavior assumptions.

[9] Maximum growth rate reductions of 0.5, 1.0, and 1.25 percentage points would apply to 2015, 2016, and 2017, respectively, and the maximum would be 1.5 percentage points thereafter. After implementation year 2019, the target growth amount would be based on the increase in per capita GDP plus 1 percentage point.

After 2019, further Advisory Board recommendations for growth rate reductions would generally not be required. The other Medicare savings provisions, if permitted to continue, would normally reduce expenditure growth rates to slightly below the post-2019 target level based on per capita GDP growth plus 1 percent. Even if Medicare growth rates exceeded the targets, recommendations might not be required if the projected Medicare growth rate were less than that for overall national health expenditures on a per capita basis—as would tend to be the case, given the continuing Medicare savings. (This exemption from the requirement to make recommendations could not be applied in 2 successive years.) Although the Advisory Board process would have no impact after 2019 based on the specific assumptions underlying these estimates, it would still serve as a brake during any periods of unusually rapid spending growth.

Under the prior law, Medicare Advantage payment benchmarks were generally in the range of 100 to 140 percent of fee-for-service costs. Section 1102 of reconciliation amendments sets the 2011 MA benchmarks equal to the benchmarks for 2010 and specifies that, ultimately, the benchmarks will equal a percentage (95, 100, 107.5, or 115 percent) of the fee-for-service rate in each county. During a transition period, the benchmarks will be based on a blend of the prior ratebook approach and the ultimate percentages. The phase-in schedule for the new benchmarks will occur over 2 to 6 years, with the longer transitions for counties with the larger benchmark decreases under the new method.

The PPACA, as amended, also introduces MA bonuses and rebate levels that are tied to the plans' quality ratings. Beginning in 2012, benchmarks will be increased for plans that receive a 4-star or higher rating on a 5-star quality rating system. The bonuses will be 1.5 percent in 2012, 3.0 percent in 2013, and 5.0 percent in 2014 and later. An additional county bonus, which is equal to the plan bonus, will be provided on behalf of beneficiaries residing in specified counties. The percentage of the "benchmark minus bid" savings provided as a rebate, which historically has been 75 percent, will also be tied to a plan's quality rating. In 2014, when the provision is fully phased in, the rebate share will be 50 percent for plans with a quality rating of less than 3.5 stars; 65 percent for a quality rating of 3.5 to 4.49; and 70 percent for a quality rating of 4.5 or greater.

The new provisions will generally reduce MA rebates to plans and thereby result in less generous benefit packages.[10] We estimate that in 2017, when the MA provisions will be fully phased in, enrollment in MA plans will be lower by about 50 percent (from its projected level of 14.8 million under the prior law to 7.4 million under the new law).

<u>Medicaid/CHIP</u>

The estimated Federal financial effects of the Medicaid and CHIP provisions in the PPACA are shown in table 4, attached. As noted earlier, the costs associated with the expansion of Medicaid eligibility to individuals and families with incomes below 133 percent of the FPL and to children previously in foster care are included with the national coverage provisions shown in table 1. The additional funding for the CHIP program is also included in table 1 with the other coverage provisions.

---

[10] MA plans use rebate revenues to reduce Medicare coinsurance requirements, add extra benefits such as vision or dental care, and/or reduce enrollee premiums for Part B or Part D of Medicare. The new law also requires adjustments to offset the impact of excess "coding intensity" in determining plan risk scores. These adjustments would prevent increases in future payments to MA plans as a result of such coding.

The total net Federal cost of the other Medicaid and CHIP provisions is estimated to be $28 billion in fiscal years 2010-2019 and reflects numerous cost increases and decreases under the individual provisions. Those with significant Federal savings include various provisions increasing the level of Medicaid prescription drug rebates ($24 billion) and reductions in Medicaid DSH expenditures ($14 billion). Interactions between the different sections of the legislation, such as the lower Medicare Part B premiums under the PPACA, contribute an additional $9 billion in reduced Medicaid outlays.

The key provisions that would increase Federal Medicaid and CHIP costs are the Medicaid "Community First Choice Option" and other changes to encourage home and community-based services ($29 billion), higher Federal matching rates for States with existing childless-adult coverage expansions ($24 billion), a temporary increase in payments to primary care physicians ($11 billion), and increased payments to the territories ($7 billion). (The net impact of the Medicaid and CHIP provisions on State Medicaid costs is a reduction totaling $33 billion through fiscal year 2019. These savings result in part because certain of the provisions reallocate costs from States to the Federal government.)

**Impact of Provisions on the Rate of Growth in Health Care Costs**

The PPACA includes a number of provisions that are intended, in part, to help control health care costs and to change the overall trend in health spending growth. Many of these are specific to the Medicare program, and their estimated financial effects are shown in table 3. While some of the Medicare provisions would have a largely one-time impact on the *level* of expenditures (for example, the reduction in MA benchmarks), others would have an effect on expenditure *growth rates*. Examples of the latter include the productivity adjustments to Medicare payment updates for most categories of providers, which would reduce overall Medicare cost growth by roughly 0.6 to 0.7 percent per year, and the Independent Payment Advisory Board process, which would further reduce Medicare growth rates during 2015-2019 by about 0.3 percent per year. As discussed previously, however, the growth rate reductions from productivity adjustments are unlikely to be sustainable on a permanent annual basis, and meeting the CPI-based target growth rates prior to 2020 will be very challenging as well.

The Independent Payment Advisory Board will also be required to periodically submit recommendations to Congress and the President regarding methods of slowing the growth of non-Federal health care programs. In many cases, Federal or State legislation would need to be enacted to implement these recommendations. In other cases, they could be adopted voluntarily by private health insurance plans or by health providers or introduced administratively by government entities. Because the nature of these broader recommendations is not known and there is no mandate to adopt them, we have not estimated an explicit impact on health care spending growth.

Another provision that would tend to moderate health care cost growth rates is the excise tax on high-cost employer-sponsored health insurance coverage (section 9001), which is described in more detail in the section of this memorandum on national health expenditures. In reaction to the tax, which would take effect in 2018, many employers would reduce the scope of their health benefits. The resulting reductions in covered services and/or increases in employee cost-sharing requirements would induce workers to use fewer services. Because plan benefit values will generally increase faster than the threshold amounts for defining high-cost plans (which, after

2019, are indexed by the CPI), additional plans would become subject to the excise tax over time, prompting many of those employers to scale back coverage. This continuing cycle would have a moderate impact on the overall growth of expenditures for employer-sponsored insurance. It should be noted, however, that an estimated 12 percent of insured workers in 2019 would be in employer plans with benefit values in excess of the thresholds (before changes to reduce benefits) and that this percentage would increase rapidly thereafter. The effect of the excise tax on reducing health care cost growth would depend on its ongoing application to an expanding share of employer plans and on an increasing scope of benefit reductions for affected plans. Since this provision is characterized as affecting high-cost employer plans, its broader and deeper impact could become an issue.

Certain other provisions of the PPACA are also intended to help control health care costs more generally, through promotion of comparative effectiveness research, greater use of prevention and wellness measures, administrative simplification, and augmented fraud and abuse enforcement. For fiscal years 2010 through 2019, we estimate a relatively small reduction in non-Medicare Federal health care expenditures of $2 billion for these provisions, all of which is associated with comparative effectiveness research.

Comparative Effectiveness Research

We reviewed literature and consulted experts to determine the potential cost savings that could be derived from comparative effectiveness research (CER). We found that the magnitude of potential savings varies widely depending upon the scope and influence of comparative effectiveness efforts. Small savings could be achieved through the wide availability of non-binding research, while substantial savings could be generated by a comparative effectiveness board with authority over payment and coverage policies.

Our interpretation of the CER provisions in the PPACA, which allow the Secretary of HHS to use evidence and findings from CER within defined limits in making coverage determinations under Medicare, is consistent with a low level of influence, translating into an estimated total reduction in national health expenditures of $8 billion for calendar years 2010 through 2019, and Federal savings of about $4 billion for fiscal years 2010 through 2019 (including Medicare). We anticipate that such savings would develop gradually, as changes in provider practice and culture evolved over time. Expert input on this subject suggests that the full impact of comparative effectiveness research, together with dissemination and application of its results, would take many years to develop.

Other Provisions

We show a negligible financial impact over the next 10 years for the other provisions intended to help control future health care cost growth. There is no consensus in the available literature or among experts that prevention and wellness efforts result in lower costs. Several prominent studies conclude that such provisions—while improving the quality of individuals' lives in important ways—generally increase costs overall. For example, while it is possible that savings can be achieved for many people by diagnosing diseases in early stages and promoting lifestyle

and behavioral changes that reduce the risk for serious and costly illnesses, additional costs are incurred as a result of increased screenings, preventive care, and extended years of life.[11]

Regarding the general fraud and abuse and administrative simplification provisions (that is, excluding the Medicare and Medicaid provisions), we find that the language is not sufficiently specific to provide estimates.

**CLASS Program**

Title VIII of the health reform act establishes a new, voluntary, Federal insurance program providing a cash benefit if a participant is unable to perform at least two or three activities of daily living or has substantial cognitive impairment. The program will be financed by participant premiums, with no Federal subsidy. Participants will have to meet certain modest work requirements during a 5-year vesting period before becoming eligible for benefits. Benefits are intended to be used to help purchase community living assistance services and supports (CLASS) that would help qualifying beneficiaries maintain their personal and financial independence and continue living in the community. Benefits can also be used to help cover the cost of institutional long-term care.

As shown in the table on page 2, we estimate a net Federal savings for the CLASS program of $38 billion during the first 9 years of operations—the first 5 of which are prior to the commencement of benefit payments. After 2015, as benefits are paid, the net savings from this program will decline; in 2025 and later, projected benefits exceed premium revenues, resulting in a net Federal cost in the longer term.[12]

We estimate that roughly 2.8 million persons will participate in the program by the third year. This level represents about 2 percent of potential participants, compared to a participation rate of 4 percent for private long-term care insurance offered through employers. Factors affecting participation in CLASS include the program's voluntary nature, the lack of a Federal subsidy, a minimal premium for students and individuals with incomes under 100 percent of the FPL (initially $5 per month), a relatively high premium for all other participants as a result of adverse selection and the effect of subsidizing participants paying the $5 premium, a new and unfamiliar benefit, and the availability of lower-priced private long-term care insurance for many.

Compounding this situation will be the probable participation of a significant number of individuals who already meet the functional limitation requirements to qualify for benefits. In the sixth year of the program (2016), these participants would begin to receive benefits, along with others who had developed such limitations in the interim. We estimate that an initial

---

[11] Title IV in the PPACA creates a Prevention and Public Health Fund and authorizes the appropriation of $15 billion for these purposes. We consider these expenditures to be primarily administrative in nature and thus have not included them as program costs in this memorandum.

[12] The CLASS program is intended to be financed on a long-range, 75-year basis through participant premiums that would fully fund benefits and administrative expenses. If this goal can be achieved, despite anticipated serious adverse selection problems (described subsequently), then annual expenditures would be met through a combination of premium income and interest earnings on the assets of the CLASS trust fund. The Federal Budget impact would be the net difference between premium receipts and program outlays. Thus, the trust fund would be adequately financed in this scenario, but the Federal Budget would have a net savings each year prior to 2025 and a net cost each year thereafter.

average premium level of about $240 per month would be required to adequately fund CLASS program costs for this level of enrollment, adverse selection, and premium inadequacy for students and low-income participants. (Except for those paying the $5 premium, individuals enrolling in a given year will pay a constant premium amount throughout their participation, unless trust fund deficits necessitate a premium increase. Premiums will vary by age at enrollment and by year of enrollment.)

In general, voluntary, unsubsidized, and non-underwritten insurance programs such as CLASS face a significant risk of failure as a result of adverse selection by participants. Individuals with health problems or who anticipate a greater risk of functional limitation would be more likely to participate than those in better-than-average health. Setting the premium at a rate sufficient to cover the costs for such a group further discourages persons in better health from participating, thereby leading to additional premium increases. This effect has been termed the "classic assessment spiral" or "insurance death spiral." The problem of adverse selection is intensified by requiring participants to subsidize the $5 premiums for students and low-income enrollees. Although Title VIII includes modest work requirements in lieu of underwriting and specifies that the program is to be "actuarially sound" and based on "an actuarial analysis of the 75-year costs of the program that ensures solvency throughout such 75-year period," there is a very serious risk that the problem of adverse selection will make the CLASS program unsustainable.[13]

**Immediate Insurance Reforms**

A number of provisions in the PPACA have an immediate effect on insurance coverage. Most of these provisions, however, do not have a direct impact on Federal expenditures. (A discussion of their impact on national health expenditures is included in the following section of this memorandum.) Section 1101 of the PPACA authorizes the expenditure of up to $5 billion in support of a temporary national insurance pool for high-risk individuals without other health insurance. Section 1102 requires the Secretary of HHS to establish a Federal reinsurance program in 2010-2013 for early retirees and their families in employer-sponsored health plans. Participation by employers is optional, and the law authorizes up to $5 billion in Federal financing for the reinsurance costs. No other financing is provided, and reinsurance claims would be paid only as long as the authorized amount lasts. We estimate that the full amount of the authorizations for sections 1101 and 1102 would be expended during the first 1 to 3 calendar years of operation.

**National Health Expenditure Impacts**

The estimated effects of the PPACA on overall national health expenditures (NHE) are shown in table 5. In aggregate, we estimate that for calendar years 2010 through 2019, NHE would increase by $311 billion, or 0.9 percent, over the updated baseline projection that was released on June 29, 2009.[14] Year by year, the relative increases are largest in 2016, when the coverage expansions would be fully phased in (2.0 percent), and gradually decline thereafter to 1.0 percent

---

[13] An analysis of the potential adverse selection problems for the CLASS program was performed by a nonpartisan, joint workgroup of the American Academy of Actuaries and the Society of Actuaries. Their report was issued on July 22, 2009 and is available at http://www.actuary.org/pdf/health/class_july09.pdf .

[14] R. Foster and S. Heffler, "Updated and Extended National Health Expenditure Projections, 2010-2019." Memorandum dated June 29, 2009. Available online at http://www.cms.hhs.gov/NationalHealthExpendData/Downloads/NHE_Extended_Projections.pdf.

in 2019, as the effects of the Medicare market basket reductions compound and as the excise tax on high-cost employer health plans becomes effective. The NHE share of GDP is projected to be 21.0 percent in 2019, compared to 20.8 percent under prior law.

The increase in total NHE is estimated to occur primarily as a net result of the substantial expansions in coverage under the PPACA, together with the expenditure reductions for Medicare. Numerous studies have demonstrated that individuals and families with health insurance use more health services than otherwise-similar persons without insurance. Under the health reform legislation, as noted above, an estimated 34 million currently uninsured people would gain comprehensive coverage through the health insurance Exchanges, their employers, or Medicaid. The availability of coverage would typically result in a fairly substantial increase in the utilization of health care services, with a corresponding impact on total health expenditures. These higher costs would be partially offset by the sizable discounts imposed on providers by State Medicaid payment rules and by the significant discounts negotiated by private health insurance plans. We estimate that the net effect of the utilization increases and price reductions arising from the coverage provisions of the PPACA would increase NHE in 2019 by about 3.4 percent.

The PPACA will also affect aggregate NHE through the Medicare savings provisions. We estimate that these impacts would reduce NHE by roughly 2.4 percent in 2019, assuming that the productivity adjustments to Medicare payment updates and the impacts of the Independent Payment Advisory Board can be sustained through this period. The legislation would have only a slight impact on the utilization of health care services by Medicare beneficiaries (subject to the caveat mentioned previously regarding possible access issues under the provision to permanently reduce annual provider payment updates by economy-wide productivity gains). Medicaid outlays for health care would increase under some provisions and decrease under others; excluding the coverage expansion, the overall higher level of such costs would lower total U.S. health expenditures in 2019 by about 0.1 percent.

The immediate insurance reforms in Title I will affect national health expenditures as well, although by relatively small amounts. We estimate that the creation of a national high-risk insurance pool will result in roughly 375,000 people gaining coverage in 2010, increasing national health spending by $4 billion. By 2011 and 2012 the initial $5 billion in Federal funding for this program would be exhausted, resulting in substantial premium increases to sustain the program; we anticipate that such increases would limit further participation. An estimated 2.7 million retirees and dependents would be affected by the Federal reinsurance program for early retirees with employer-sponsored insurance. Although the reinsurance program would increase Federal costs by the allotted $5 billion, we estimate that the impact on total national health expenditures would be negligible.

Beginning in 2010, qualified child dependents below age 26 who are uninsured will be allowed to enroll under dependent coverage. An estimated 485,000 dependent children will gain insurance coverage through their parents' private group health plans, increasing national health spending by $0.9 billion. These impacts are expected to persist through 2013. Additionally, because this provision would not expire when the Medicaid expansion, individual mandate, and Exchanges start in 2014, we anticipate that these individuals would continue to remain covered as dependents even though they may be newly eligible for other coverage. Finally, we did not estimate NHE coverage or cost impacts for the other immediate reform provisions, such as prohibiting limitations on pre-existing conditions or elimination of lifetime aggregate benefit

limits. We believe that each of these provisions would have only a relatively minor upward impact on national health spending.

Section 9001 of the PPACA places an excise tax on employer-sponsored health insurance coverage with a benefit value above specified levels (generally $10,200 for individuals and $27,500 for families in 2018, adjusted in 2019 by growth in the CPI plus 1 percentage point and by growth in the CPI thereafter).[15] The tax is 40 percent of the excess benefit value above these thresholds. We estimate that, in aggregate, affected employers will reduce their benefit packages in such a way as to eliminate about three-quarters of the excess benefit value. The resulting higher cost-sharing requirements for employees would have an initial impact on the overall level of health expenditures, reducing total NHE by an estimated 0.1 percent in 2019. Moreover, because health care costs will generally increase faster than the CPI, we anticipate additional, incremental benefit coverage reductions in future years to prevent an increase in the share of employer coverage subject to the excise tax. These further adjustments would contribute to a small reduction in the growth in total health care costs (but an increase in out-of-pocket costs) for affected employees in 2019 and later.[16] As mentioned earlier, the proportion of workers experiencing reductions in their employer-sponsored health coverage as a result of the excise tax is estimated to increase rapidly after 2019.

The health reform legislation, as enacted, imposes collective annual fees on manufacturers and importers of brand-name prescription drugs and on health insurance plans. In addition, the PPACA establishes an excise tax on non-personal-use retail sales by manufacturers and importers of medical devices. For manufacturers and importers of brand-name prescription drugs, the fee is $2.5 billion in 2011, increasing to a maximum of $4.1 billion by 2018, and then is set at $2.8 billion per year in 2019 and beyond.[17] For insurers, the annual fee is set at $8.0 billion starting in 2014 and rises to $14.3 billion by 2018; thereafter, the fee increases by the rate of premium growth. In each case, the total annual fee amount would be assessed on the specified industry as a whole; the share of the fee payable by any given firm in that industry would be determined based on sales (for manufacturers and importers of drugs) and on net premiums (in the case of insurers), with some limited exemptions. The excise tax on medical device sales is effective in 2011 and is set at 2.3 percent of first sales in each year. We anticipate that these fees and the excise tax would generally be passed through to health consumers in the form of higher drug and device prices and higher insurance premiums, with an associated increase in overall national health expenditures ranging from $2.1 billion in 2011 to $18.2 billion in 2018 and $17.8 billion in 2019.

Although, compared to prior law, the *level* of total national health expenditures is estimated to be higher through 2019 under the PPACA, two particular provisions of the legislation would help reduce NHE *growth rates* after 2016. Specifically, the productivity adjustments to most Medicare payment updates would reduce NHE growth by about 0.10 to 0.15 percent per year. In addition, the excise tax on high-cost employer health plans (with benefit thresholds indexed by the CPI plus 1 percent for 2019 and by the CPI thereafter) would exert a further decrease in NHE

---

[15] Higher thresholds apply in the case of qualified retirees and individuals in high-risk occupations. Additionally, a higher threshold applies for employers with above-average proportions of older and/or female workers.
[16] We have not included the excise taxes under this provision in the estimated financial effects of the PPACA shown in this memorandum. Similarly, the indirect impacts on Federal income taxes and social insurance payroll taxes are not shown.
[17] These fees are allocated to the Part B account of the Medicare Supplementary Medical Insurance trust fund.

growth rates of an estimated 0.05 percent in 2019 and slightly more than that for some years after. Although these growth rate differentials are not large, over time they would have a noticeable downward effect on the level of national health expenditures. Such an outcome, however, would depend critically on the sustainability of both provisions. As discussed previously, the Medicare productivity adjustments could become unsustainable even within the next 10 years, and over time the reductions in the scope of employer-sponsored health insurance could also become an issue. For these reasons, the estimated reductions in NHE growth rates after 2016 may not be fully achievable.

Underlying the overall moderate effects of the PPACA on NHE will be various changes by payer. Based on the net impact of (i) the substantial coverage expansions, (ii) the significant cost-sharing subsidies for low-to-middle-income persons, (iii) the maximum out-of-pocket limitations associated with the qualified health benefit, and (iv) the increases in workers' cost-sharing obligations in plans affected by the excise tax on high-cost employer-sponsored health insurance coverage, we estimate that overall out-of-pocket spending would be reduced significantly by the PPACA (a net total decline of $237 billion in calendar years 2010-2019).

Public spending would increase under the PPACA as a result of the expansion of the Medicaid program and additional CHIP funding but would be reduced by the net Medicare savings from the legislation. Private expenditures would decrease somewhat because of the net reduction in the number of persons with employer-sponsored health insurance and the reduced benefits for plans affected by the excise tax on high-cost employer coverage. The sizable growth in health insurance coverage through Exchange plans would also affect NHE amounts by payer. Prior to the PPACA, public expenditures (principally Medicare and Medicaid) were estimated to represent 52 percent of total NHE in 2019. Under the PPACA, the public share would be roughly 51 percent if health expenditures by Exchange plans are classified as private spending.[18]

**Caveats and Limitations of Estimates**

The Federal costs and savings, changes in health insurance coverage, and effects on total national health expenditures presented in this memorandum represent the Office of the Actuary's best estimates for the PPACA. Although we believe that these estimates are reasonable and fairly portray the likely future effects of this comprehensive package of health care reforms, they are

---

[18] The allocation of NHE *by payer* is based on the entity that is responsible for establishing the coverage and benefit provisions and that has the primary responsibility to ensure that payment is made for health care services. (Auxiliary analyses of NHE *by sponsor* are also prepared, based on the financing of health expenditures in the U.S.) Because all Exchange plans will be private plans, under the traditional NHE classification approach these expenditures would be considered private health insurance spending. However, the classification of health expenditures made by Exchange plans is complicated by three factors:

(i) The Exchanges will be government entities, with a role in setting minimum benefit standards, but they will not directly provide health insurance coverage. The same situation applies to the multi-State Exchange plans arranged by the Office of Personnel Management.

(ii) The Federal government, through the refundable tax credits and cost-sharing reductions, will subsidize a significant portion of Exchange plan premiums and cost-sharing liabilities.

(iii) The premium subsidies will vary between zero and 100 percent from one person to another, and the cost-sharing subsidies from zero to 80 percent on an insurance-value basis.

A more precise determination of the appropriate classification of the Exchange plan expenditures based on national health expenditure accounting principles will be conducted in the future.

subject to much greater uncertainty than normal. The following caveats should be noted, and the estimates should be interpreted cautiously in view of their limitations.

- These financial and coverage impacts are based on the provisions of the PPACA as enacted on March 23, 2010 and amended on March 30 by the Health Care and Education Reconciliation Act of 2010.

- Many of the provisions, particularly the coverage expansions, are unprecedented or have been implemented only on a smaller scale (for example, at the State level). Consequently, little historical experience is available with which to estimate the potential impacts.

- The behavioral responses to changes introduced by national health reform legislation are impossible to predict with certainty. In particular, the responses of individuals, employers, insurance companies, and Exchange administrators to the new coverage mandates, Exchange options, and insurance reforms could differ significantly from the assumptions underlying the estimates presented here.

- The nominal dollar amounts of costs and savings under national health reform are sensitive to the assumed trajectory of future health cost trends. Relative measures, such as the cost as a percentage of GDP, are less sensitive.

- Due to the very substantial challenges inherent in modeling national health reform legislation, our estimates will vary from those of other experts and agencies. Differences in results from one estimating entity to another may tend to cause confusion among policy makers. These differences, however, provide a useful reminder that all such estimates are uncertain and that actual future impacts could differ significantly from the estimates of any given organization. Indeed, the future costs and coverage effects could lie outside of the range of estimates provided by the various estimators.

- The existing number of uninsured persons in the U.S. is difficult to measure, and the number of uninsured persons who are undocumented aliens is considerably more uncertain. Medicaid coverage and Exchange premium subsidies under the PPACA are not available to undocumented aliens. As a result of these measurement difficulties, the actual costs under the PPACA and the reduction in the number of uninsured persons may be somewhat higher or lower than estimated in this memorandum.

- Certain Federal costs and savings were not included in our estimates if (i) a provision would have no, or only a minor, impact; (ii) the legislative language did not provide sufficient detail with which to estimate a provision's impact; or (iii) the estimates are outside of the scope of the Office of the Actuary's expertise and will be prepared by other agencies. In particular, we did not include any Federal savings pertaining to the excise tax on high-cost employer-sponsored health insurance coverage, the fees on insurance plans, the excise tax on devices, and other non-Medicare revenue provisions of the PPACA, as those estimates are provided by the Department of the Treasury. (In contrast, the impacts of these provisions on national health expenditures are reflected.) Similarly, Federal administrative expenses associated with the PPACA are not included here and will be estimated separately. The Congressional Budget Office and the Joint Committee on Taxation have estimated that the total amount of Medicare savings and additional excise tax and other revenues would somewhat more than offset the cost of the national coverage provisions, resulting in an overall small reduction in the Federal

deficit through 2019, and for the following 10 years as well, if all of the provisions continued to be fully implemented.

- In estimating the financial impacts of the PPACA, we assumed that the increased demand for health care services could be met without market disruptions. In practice, supply constraints might initially interfere with providing the services desired by the additional 34 million insured persons. Price reactions—that is, providers successfully negotiating higher fees in response to the greater demand—could result in higher total expenditures or in some of this demand being unsatisfied. Alternatively, providers might tend to accept more patients who have private insurance (with relatively attractive payment rates) and fewer Medicare or Medicaid patients, exacerbating existing access problems for Medicaid enrollees. Either outcome (or a combination of both) should be considered plausible and even probable initially.

  The latter possibility is especially likely in the case of the substantially higher volume of Medicaid services, for which provider payment rates are well below average. Therefore, it is reasonable to expect that a significant portion of the increased demand for Medicaid would be difficult to meet, particularly over the first few years.

  We have not attempted to model that impact or other plausible supply and price effects, such as supplier entry and exit or cost-shifting towards private payers. A specific estimate of these potential outcomes is impracticable at this time, given the uncertainty associated with both the magnitude of these effects and the interrelationships among these market dynamics. We may incorporate such factors in future estimates, should we determine that they can be estimated with a reasonable degree of confidence. For now, we believe that consideration should be given to the potential consequences of a significant increase in demand for health care meeting a relatively fixed supply of health care providers and services.

- As stated in the section on Medicare estimates, reductions in payment updates to health care providers, based on economy-wide productivity gains, are unlikely to be sustainable on a permanent annual basis. If these reductions were to prove unworkable within the 10-year period 2010-2019 (as appears probable for significant numbers of hospitals, skilled nursing facilities, and home health agencies), then the actual Medicare savings from these provisions would be less than shown in this memorandum. Similarly, the further reductions in Medicare growth rates mandated for 2015 through 2019 through the Independent Payment Advisory Board may be difficult to achieve in practice.

- In estimating the financial impact of the Medicaid eligibility expansion, we assumed that existing and new Medicaid enrollees would be appropriately classified for FMAP purposes.

- As discussed in the section on the CLASS program, we believe that there is a very serious risk that the program, as currently specified, will not be sustainable because of adverse selection.

**Conclusions**

The national health care reform provisions in the Patient Protection and Affordable Care Act, as amended, make far-reaching changes to the health sector, including mandated coverage for most people, required payments by most employers not offering insurance, expanded eligibility for Medicaid, Federal premium and cost-sharing subsidies for many individuals and families, a new system of health benefits Exchanges for facilitating coverage, and a new Federal insurance

program in support of long-term care. Additional provisions will reduce Medicare outlays, make other Medicaid modifications, provide more funding for the CHIP program, add certain benefit enhancements for these programs, and combat fraud and abuse. Federal revenues will be increased through an excise tax on high-cost insurance plans; fees or excise taxes on drugs, devices, and health plans; higher Hospital Insurance payroll taxes for high-income taxpayers; a new tax on investment revenues and other unearned income; and other provisions.

The Office of the Actuary at CMS has estimated the effects of the non-tax provisions of the PPACA on Federal outlays, overall national health expenditures, and health insurance coverage in the U.S. Our estimates are based on available data sources and what we believe are reasonable assumptions regarding individual, employer, and health plan responses to the legislation, together with analyses of the likely changes in the cost and use of health care services. Our primary estimates for the PPACA are as follows:

- The total Federal cost of the national insurance coverage provisions would be about $828 billion during fiscal years 2010 through 2019.

- By 2019, an additional 34 million U.S. citizens and other legal residents would have health insurance coverage meeting the essential-benefit requirements.

- Total net savings in 2010-2019 from Medicare provisions would offset about $575 billion of the Federal costs for the national coverage provisions. The Medicaid and CHIP provisions, excluding the expansion of Medicaid and increased CHIP funding, would raise costs by $28 billion. Additional Federal revenues would further offset the coverage costs; however, the Office of the Actuary does not have the expertise necessary to estimate all such impacts. The Congressional Budget Office and the Joint Committee on Taxation have estimated an overall reduction in the Federal Budget deficit through 2019 under the PPACA.

- The new Community Living Assistance Services and Supports (CLASS) insurance program would produce an estimated total net savings of $38 billion through fiscal year 2019. This effect, however, is due to the initial 5-year period during which no benefits would be paid. Over the longer term, expenditures would exceed premium receipts, and there is a very serious risk that the program would become unsustainable as a result of adverse selection by participants.

- Total national health expenditures in the U.S. during 2010-2019 would increase by about 0.9 percent. The additional demand for health services could be difficult to meet initially with existing health provider resources and could lead to price increases, cost-shifting, and/or changes in providers' willingness to treat patients with low-reimbursement health coverage.

- The mandated reductions in Medicare payment updates for providers, the actions of the Independent Payment Advisory Board, and the excise tax on high-cost employer-sponsored health insurance would have a downward impact on future health care cost growth rates. During 2010-2019, however, these effects would be outweighed by the increased costs associated with the expansions of health insurance coverage. Also, the longer-term viability of the Medicare update reductions is doubtful. Other provisions, such as comparative effectiveness research, are estimated to have a relatively small effect on expenditure growth rates.

We hope that the information presented here will be of value to policy makers and administrators as they endeavor to implement and monitor the health reform act.

Richard S. Foster, FSA, MAAA
Chief Actuary

Attachments: 5

**Table 1 — Estimated Federal Costs (+) or Savings (-) under the Patient Protection and Affordable Care Act, as Enacted and Amended, in billions**

| | Fiscal Year | | | | | | | | | | Total, FY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Provisions | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2010-2019 |
| Total* | $9.2 | -$0.7 | -$12.6 | -$22.3 | $16.8 | $57.9 | $63.1 | $54.2 | $47.2 | $38.5 | $251.3 |
| Coverage Provisions: | 3.3 | 4.6 | 4.9 | 5.2 | 82.9 | 119.2 | 138.2 | 146.6 | 157.6 | 165.8 | 828.2 |
| Medicaid Expansion and CHIP Funding | — | — | — | — | 38.8 | 62.9 | 78.7 | 72.2 | 76.3 | 81.2 | 410.3 |
| Credits: | 3.3 | 4.6 | 4.9 | 5.2 | 49.6 | 67.6 | 77.9 | 99.1 | 110.3 | 115.5 | 537.9 |
| Individual Exchange Subsidies: | — | — | — | — | 43.9 | 61.4 | 76.3 | 99.1 | 110.3 | 115.5 | 506.5 |
| Refundable Premium Tax Credits | — | — | — | — | 38.4 | 54.2 | 68.3 | 88.6 | 98.7 | 103.0 | 451.1 |
| Reduced Cost-Sharing Requirements | — | — | — | — | 5.5 | 7.2 | 8.0 | 10.5 | 11.6 | 12.5 | 55.4 |
| Small Employer Credits | 3.3 | 4.6 | 4.9 | 5.2 | 5.7 | 6.2 | 1.6 | 0.0 | 0.0 | 0.0 | 31.4 |
| Penalties: | — | — | — | — | -5.5 | -11.3 | -18.4 | -24.7 | -29.0 | -30.9 | -119.9 |
| Individual Penalties | — | — | — | — | 0.0 | -2.4 | -5.3 | -7.6 | -8.6 | -9.2 | -33.1 |
| Employer Penalties | — | — | — | — | -5.5 | -9.0 | -13.0 | -17.1 | -20.4 | -21.8 | -86.8 |
| Medicare | 1.2 | -4.7 | -14.9 | -26.3 | -68.8 | -60.3 | -75.2 | -92.1 | -108.2 | -125.7 | -575.1 |
| Medicaid/CHIP (Excluding Coverage Expansions) | -0.9 | -0.9 | 0.8 | 4.5 | 8.6 | 5.1 | 4.6 | 3.4 | 1.3 | 1.7 | 28.3 |
| Cost Trend Proposals: | — | — | — | — | 0.0 | -0.1 | -0.2 | -0.4 | -0.6 | -0.9 | -2.3 |
| Comparative Effectiveness Research† | — | — | — | — | 0.0 | -0.1 | -0.2 | -0.4 | -0.6 | -0.9 | -2.3 |
| Prevention and Wellness | — | — | — | — | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Fraud and Abuse | — | — | — | — | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Administrative Simplification | — | — | — | — | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Additional Proposals: | 5.6 | 0.4 | -3.3 | -5.6 | -5.9 | -6.0 | -4.3 | -3.4 | -2.8 | -2.4 | -27.8 |
| CLASS Program | — | -2.8 | -4.5 | -5.6 | -5.9 | -6.0 | -4.3 | -3.4 | -2.8 | -2.4 | -37.8 |
| Immediate Reforms | 5.6 | 3.2 | 1.2 | — | — | — | — | — | — | — | 10.0 |

* Excludes Title IX revenue provisions except for sections 9008 (fees on manufacturers and importers of brand-name prescription drugs) and 9015 (additional HI payroll tax). Also excludes certain provisions with limited impacts and Federal administrative costs.

† Excludes the Medicare impact of CER, which is included in the Medicare savings total.

Source: Centers for Medicare & Medicaid Services, Office of the Actuary.

April 22, 2010

**Table 2 — Estimated Effects of the Patient Protection and Affordable Care Act, as Enacted and Amended, on Enrollment by Insurance Coverage, in millions**

| | Calendar Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Prior Law Baseline | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Medicare | 46.9 | 48.0 | 49.4 | 50.9 | 52.4 | 53.9 | 55.4 | 57.1 | 58.7 | 60.5 |
| Medicaid/CHIP | 59.2 | 60.5 | 61.6 | 62.0 | 60.6 | 60.3 | 61.1 | 61.9 | 62.7 | 63.5 |
| Other Public | 12.3 | 12.6 | 12.9 | 13.2 | 13.6 | 13.9 | 14.2 | 14.6 | 14.9 | 15.2 |
| Employer-Sponsored Private Health Insurance | 163.8 | 163.2 | 164.5 | 165.0 | 166.1 | 166.6 | 166.4 | 166.2 | 166.0 | 165.9 |
| Other Private Health Insurance* | 26.1 | 25.3 | 25.5 | 25.6 | 25.8 | 25.8 | 25.8 | 25.8 | 25.8 | 25.7 |
| Uninsured | 48.3 | 48.6 | 47.9 | 48.1 | 50.0 | 51.7 | 53.1 | 54.4 | 55.6 | 56.9 |
| Insured Share of US Population† | 84.4% | 84.5% | 84.8% | 84.9% | 84.4% | 84.0% | 83.8% | 83.5% | 83.3% | 83.0% |

| | Calendar Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| New Law — PPACA | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Medicare | 46.9 | 48.0 | 49.4 | 50.9 | 52.4 | 53.9 | 55.4 | 57.1 | 58.7 | 60.5 |
| Medicaid/CHIP | 59.2 | 60.5 | 61.6 | 62.0 | 83.6 | 84.6 | 84.1 | 82.1 | 82.9 | 83.9 |
| Other Public | 12.6 | 12.6 | 12.9 | 13.2 | 13.6 | 13.9 | 14.2 | 14.6 | 14.9 | 15.2 |
| Employer-sponsored Private Health Insurance | 164.3 | 163.7 | 164.9 | 165.5 | 168.1 | 169.0 | 166.6 | 164.7 | 163.7 | 164.5 |
| Other Private Health Insurance* | 26.1 | 25.3 | 25.5 | 25.6 | 12.6 | 12.2 | 11.5 | 10.9 | 10.4 | 10.0 |
| Exchanges | — | — | — | — | 16.9 | 18.6 | 24.8 | 29.8 | 31.4 | 31.6 |
| Uninsured | 47.5 | 48.1 | 47.4 | 47.6 | 23.8 | 22.2 | 21.0 | 22.0 | 22.8 | 23.1 |
| Insured Share of US Population† | 84.7% | 84.6% | 85.0% | 85.0% | 92.6% | 93.2% | 93.6% | 93.3% | 93.1% | 93.1% |

| | Calendar Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Impact of PPACA | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| Medicare | — | — | — | — | — | — | — | — | — | — |
| Medicaid/CHIP | — | — | — | — | 23.0 | 24.3 | 23.1 | 20.2 | 20.2 | 20.4 |
| Other Public | 0.4 | — | — | — | — | — | — | — | — | — |
| Employer-sponsored Private Health Insurance | 0.5 | 0.5 | 0.5 | 0.5 | 2.0 | 2.5 | 0.2 | -1.5 | -2.4 | -1.4 |
| Other Private Health Insurance* | — | — | — | — | -13.2 | -13.7 | -14.3 | -14.9 | -15.3 | -15.7 |
| Exchanges | — | — | — | — | 16.9 | 18.6 | 24.8 | 29.8 | 31.4 | 31.6 |
| Uninsured | -0.9 | -0.5 | -0.5 | -0.5 | -26.2 | -29.5 | -32.1 | -32.4 | -32.9 | -33.8 |
| Insured Share of US Population† | 0.3% | 0.2% | 0.2% | 0.2% | 8.2% | 9.1% | 9.8% | 9.8% | 9.9% | 10.1% |

* In the prior-law baseline, other private health insurance includes private Medicare supplemental coverage and individual coverage. In the new-law estimates, other private health insurance includes only those with Medicare supplemental coverage.

† Calculated as a proportion of total U.S. population, including unauthorized immigrants.

Source: Centers for Medicare & Medicaid Services, Office of the Actuary.

April 22, 2010

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| | | Fiscal year | | | | | | | | | | Total, | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sec. | Provision | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2010-14 | 2010-19 |
| | **TITLE III-IMPROVING THE QUALITY AND EFFICIENCY OF HEALTH CARE** | | | | | | | | | | | | |
| | **SUBTITLE A-TRANSFORMING THE HEALTH CARE DELIVERY SYSTEM** | | | | | | | | | | | | |
| | **PART I-LINKING PAYMENT TO QUALITY OUTCOMES IN THE MEDICARE PROGRAM** | | | | | | | | | | | | |
| 3001 | Hospital Value-Based Purchasing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 3002 | Physician Quality Reporting Initiative | 0 | 0 | 0 | 210 | 120 | -190 | -390 | -580 | -560 | -530 | 330 | -1,920 |
| 3003 | Expansion of Physician Feedback Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3004 | Quality Reporting for Long-Term Care Hospitals, Inpatient Rehabilitation Hospitals, and Hospice Programs | 0 | 0 | 0 | 0 | -30 | -30 | -30 | -30 | -20 | -20 | -30 | -160 |
| 3005 | Quality Reporting for PPS-exempt Cancer Hospitals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3006 | Value-based Purchasing for SNF, HHA, & ASC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3007 | Value-based Payment Modifer under Physician Fee Schedule | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3008 | Payment Adjustment for Conditions Acquired in Hospitals | 0 | 0 | 0 | 0 | 0 | -520 | -610 | -660 | -700 | -750 | 0 | -3,240 |
| | **PART II-NATIONAL STRATEGY TO IMPROVE HEALTH CARE QUALITY** | | | | | | | | | | | | |
| 3011 | National Strategy | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3012 | Interagency Working Group on Health Care Quality | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3013 | Quality Measure Development | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3014 | Quality and Efficiency Measurement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3015 | Data Collection; Public Reporting | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **PART III-ENCOURAGING DEVELOPMENT OF THE NEW PATIENT CARE MODELS** | | | | | | | | | | | | |
| 3021 | CMS Innovation Center | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3022 | Medicare Shared Savings Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3023 | National Pilot Program on Payment Bundling | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3024 | Independence at Home Demonstration Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3025 | Hospital Readmissions Reduction Program | 0 | 0 | 0 | -530 | -630 | -1,180 | -1,320 | -1,410 | -1,510 | -1,620 | -1,160 | -8,200 |
| 3026 | Community-Based Care Transitions Program | | | | | | | | | | | | |
| | Part A | 0 | 100 | 100 | 100 | 100 | 100 | 0 | 0 | 0 | 0 | 400 | 500 |
| | Part B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3027 | Extension of Gainsharing Demonstration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE B-IMPROVING MEDICARE FOR PATIENTS AND PROVIDERS** | | | | | | | | | | | | |
| | **PART I-ENSURING BENEFICIARY ACCESS TO PHYSICIAN CARE AND OTHER SERVICES** | | | | | | | | | | | | |
| 3101 | Increase in Physician Payment Update | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3102 | Extension of Floor on Medicare Work Geographic Adjustment | 510 | 780 | 290 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,580 | 1,580 |
| 3103 | Extension of Exceptions for Therapy Caps | 520 | 1,160 | 500 | 10 | 10 | 20 | 20 | 20 | 20 | 20 | 2,200 | 2,300 |
| 3104 | Extension of Treatment of Certain Physician Pathology Services | 40 | 80 | 40 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 160 | 160 |
| 3105 | Extension of Ambulance Add-ons | 20 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30 | 30 |
| 3106 | Extension of Long-Term Care Hospital Provisions | 30 | 440 | 530 | 140 | 10 | 0 | 0 | 0 | 0 | 0 | 1,150 | 1,150 |
| 3107 | Extension of Physician Fee Schedule Mental Health Add-on | 40 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 60 | 60 |
| 3108 | Permitting Physician Assistants to Order Post-Hospital Extended Care Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3109 | Exemption of Certain Pharmacies from Accreditation Requirements | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3110 | Part B Special Enrollment for Disabled TRICARE | 0 | 10 | 20 | 30 | 40 | 40 | 40 | 40 | 50 | 50 | 100 | 320 |

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| Sec. | Provision | Fiscal year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3111 | Bone Density Tests | 20 | 40 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80 | 80 |
| 3112 | Revision to Medicare Improvement Fund | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | -15,350 | 0 | 0 | 0 | 0 | 0 | -15,350 | -15,350 |
| | Part B | 0 | 0 | 0 | 0 | -11,890 | 0 | 0 | 0 | 0 | 0 | -11,890 | -11,890 |
| 3113 | Treatment of Certain Complex Diagnostic Lab Tests | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3114 | Improved Access for Certified Midwife Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **PART II-RURAL PROTECTIONS** | | | | | | | | | | | | |
| 3121 | Extend of Outpatient Hold Harmless Provision | 50 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 | 70 |
| 3122 | Extend Reasonable Cost Reimbursement for Laboratory Services in Small Rural Hospitals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3123 | Extend Rural Community Hospital Demonstration Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3124 | Extend Medicare Dependent Hospital Program | 0 | 0 | 100 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 110 | 110 |
| 3125 | Improvements to Hospital Payments for Low-volume Hospitals | 0 | 100 | 110 | 10 | 0 | 0 | 0 | 0 | 0 | 0 | 220 | 220 |
| 3126 | Demonstration Project on Community Health Integration Models | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3127 | MEDPAC Study on Payments in Rural Areas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3128 | Technical Correction to Critical Access Hospital Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3129 | Medicare Rural Hospital Flexibilty Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **PART III-IMPROVING PAYMENT ACCURACY** | | | | | | | | | | | | |
| 3131 | Payment Adjustment for Home Health Care | | | | | | | | | | | | |
| | Part A | 20 | -220 | -370 | -410 | -690 | -1,140 | -1,710 | -2,340 | -2,700 | -2,900 | -1,670 | -12,460 |
| | Part B | 20 | -260 | -450 | -510 | -860 | -1,410 | -2,120 | -2,900 | -3,350 | -3,600 | -2,060 | -15,440 |
| 3132 | Hospice Reform | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3133 | Improvement to Medicare DSH Payments | 0 | 0 | 0 | 0 | -110 | -7,100 | -9,170 | -10,610 | -11,180 | -11,760 | -110 | -49,930 |
| 3134 | Misvalued Codes under Physician Fee Schedule | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3135 | Equipment Utilization Factor for Advanced Imaging Services | 0 | -110 | -170 | -200 | -210 | -230 | -240 | -260 | -270 | -290 | -690 | -1,980 |
| 3136 | Revision of Payment for Power Wheelchairs | 0 | -40 | -50 | -50 | -50 | -60 | -70 | -70 | -80 | -80 | -190 | -550 |
| 3137 | Hospital Wage Index Improvement | 260 | 30 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 290 | 290 |
| 3138 | Treatment of Certain Cancer Hospitals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3139 | Payment for Biosimilar Biological Products | | | | | | | | | | | | |
| | Part B | 0 | 0 | 0 | 10 | 20 | -350 | -810 | -960 | -1,150 | -1,360 | 30 | -4,600 |
| | Part D | 0 | 0 | 0 | 10 | -20 | -80 | -130 | -150 | -180 | -220 | -10 | -770 |
| 3140 | Hospice Concurrent Care Demonstration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3141 | Budget Neutrality in Calculation of Hospital Wage Index Floor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3142 | Study on Urban Medicare-dependent Hospitals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE C-PROVISIONS RELATING TO PART C** | | | | | | | | | | | | |
| 3201 | Medicare Advantage Payment | | | | | | | | | | | | |
| | Part A | 0 | -3,170 | -5,170 | -7,170 | -9,000 | -10,160 | -11,350 | -12,480 | -13,270 | -14,190 | -24,510 | -85,960 |
| | Part B | 0 | -2,090 | -3,400 | -4,720 | -5,840 | -6,700 | -7,700 | -8,670 | -9,560 | -10,390 | -16,050 | -59,070 |
| 3202 | Benefit Protection and Simplification | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3203 | Coding Intensity Adjustment During MA Payment Transition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3204 | Simplification of Annual Beneficiary Election Periods | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3205 | Specialized MA Plans for Special Needs Individuals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3206 | Extension of Reasonable Cost Contracts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| | | Fiscal year | | | | | | | | | | Total, | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sec. | Provision | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2010-14 | 2010-19 |
| 3207 | Technical Correction to MA Private FFS Plans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3208 | Making Senior Housing Facility Demonstration Permanent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3209 | Authority to Deny Plan Bids | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3210 | Development of New Standards for Certain Medigap Plans | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | 0 | 0 | 0 | -50 | -70 | -80 | -90 | -90 | 0 | -380 |
| 1103 | Savings from limits on MA adminstrative costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE D-MEDICARE PART D IMPROVEMENTS FOR PRESCRIPTION DRUG PLANS AND MA-PD PLANS** | | | | | | | | | | | | |
| 3301 | Medicare Coverage Gap Discount Program | 0 | 110 | 140 | 160 | 180 | 200 | 240 | 250 | 250 | 310 | 590 | 1,840 |
| 3302 | Improving the Determination of Part D Low-Income Benchmarks | 0 | 90 | 120 | 130 | 140 | 140 | 150 | 170 | 180 | 190 | 480 | 1,310 |
| 3303 | Voluntary De Minimus Policy for Low-Income Subsidy Plans | 0 | 20 | 20 | 20 | 20 | 30 | 30 | 30 | 30 | 30 | 80 | 230 |
| 3304 | Special Rule for Widows and Widowers Regarding Eligibility for Low-Income Assistance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3305 | Improved Information for Subsidy Eligible Individuals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3306 | Funding Outreach and Assistance of Low-Income Programs | 45 | 45 | 45 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 135 | 135 |
| 3307 | Improving Formularies with Respect to Certain Categories or Classes of Drugs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3308 | Reducing the Part D Premium Subsidy for High-Income Beneficiaries | 0 | -390 | -590 | -670 | -760 | -860 | -980 | -1,110 | -1,260 | -1,430 | -2,410 | -8,050 |
| 3309 | Elimination of Cost Sharing for Certain Dual Eligible Individuals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3310 | Reducing Wasteful Dispensing of Outpatient Prescription Drugs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3311 | Improved Plan Complaint System | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3312 | Uniform Exception and Appeals Process | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3313 | OIG Studies and Reports | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3314 | Cost Incurred by AIDS Drug Assistance and HIS | 0 | 50 | 70 | 70 | 80 | 90 | 100 | 110 | 120 | 130 | 270 | 820 |
| 9012 | Elimination of deduction for Medicare Part D subsidy | 0 | 0 | 0 | 40 | 100 | 130 | 170 | 190 | 190 | 200 | 140 | 1,020 |
| 1101 | Closing the Medicare presription drug "donut hole" | 0 | 990 | 170 | 380 | 560 | 860 | 1,250 | 1,760 | 2,340 | 3,470 | 2,100 | 11,780 |
| — | Reducing growth rate of out-of-pocket threshold | 0 | 0 | 0 | 0 | 40 | 70 | 170 | 240 | 320 | 480 | 40 | 1,320 |
| 1206 | Drug rebates for new formulations of existing drugs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE E-ENSURING MEDICARE SUSTAINABILITY** | | | | | | | | | | | | |
| 3401 | Market Basket Revisions and Productivity Adjustments | | | | | | | | | | | | |
| | Skilled Nursing Faciltities | 0 | -30 | -440 | -1,000 | -1,560 | -2,160 | -2,920 | -3,700 | -4,530 | -5,660 | -3,030 | -22,000 |
| | Long-Term Care Hospitals | -10 | -50 | -120 | -220 | -340 | -450 | -590 | -780 | -980 | -1,250 | -740 | -4,790 |
| | Inpatient Rehabilitation Facilities | -10 | -40 | -130 | -250 | -390 | -530 | -700 | -930 | -1,180 | -1,510 | -820 | -5,670 |
| | Hospitals Paid Under the Inpatient Prospective Payment System | -140 | -870 | -2,670 | -4,940 | -7,630 | -10,360 | -13,940 | -18,550 | -23,510 | -29,990 | -16,250 | -112,600 |
| | Inpatient Psychiatric Facilities--Productivity Adjustments | -10 | -30 | -100 | -190 | -290 | -400 | -530 | -700 | -890 | -1,130 | -620 | -4,270 |
| | Inpatient Psychiatric Facilities--Quality Reporting | 0 | 0 | 0 | 0 | -10 | -10 | -10 | -10 | -10 | 0 | -10 | -50 |
| | Hospice | 0 | 0 | 0 | -220 | -450 | -690 | -980 | -1,330 | -1,700 | -2,120 | -670 | -7,490 |
| | Hospital Outpatient Services | 0 | 0 | -820 | -1,280 | -1,850 | -2,460 | -3,180 | -4,210 | -5,490 | -6,970 | -3,950 | -26,260 |
| | Durable Medical Equipment | 0 | -20 | -50 | -80 | -110 | -140 | -180 | -230 | -280 | -330 | -260 | -1,420 |
| | All Other Part B Fee Schedules, Except Physicians' Services | 0 | -100 | -300 | -520 | -750 | -1,010 | -1,310 | -1,680 | -2,100 | -2,600 | -1,670 | -10,370 |
| | Home Health--Part A | 0 | -60 | -160 | -290 | -350 | -440 | -610 | -780 | -970 | -1,230 | -860 | -4,890 |
| | Home Health--Part B | 0 | -70 | -180 | -320 | -380 | -490 | -680 | -870 | -1,080 | -1,370 | -950 | -5,440 |

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| Sec. | Provision | Fiscal year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3402 | Temporary Adjustment to Calculation of Part B Premiums | | | | | | | | | | | | |
| | Part B Income (additional premiums) | 0 | -70 | -190 | -320 | -510 | -740 | -990 | -1,320 | -1,700 | -2,300 | -1,090 | -8,140 |
| | Part B Benefits | 0 | 0 | 0 | -10 | -10 | -10 | -20 | -20 | -50 | -70 | -20 | -190 |
| 3403 | Independent Payment Advisory Board | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | -370 | -710 | -1,200 | -2,010 | -3,000 | 0 | -7,290 |
| | Part B | 0 | 0 | 0 | 0 | 0 | -440 | -830 | -1,430 | -2,420 | -3,680 | 0 | -8,800 |
| | Part D | 0 | 0 | 0 | 0 | 0 | -330 | -670 | -1,190 | -2,090 | -3,290 | 0 | -7,570 |
| 10323 | Hazards | | | | | | | | | | | | |
| | Part A | 10 | 10 | 10 | 10 | 10 | 20 | 20 | 20 | 20 | 20 | 50 | 150 |
| | Part B | 0 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 20 | 40 | 100 |
| 10324 | Protection for Frontier States | | | | | | | | | | | | |
| | Part A | 0 | 190 | 230 | 250 | 260 | 280 | 300 | 320 | 340 | 370 | 930 | 2,540 |
| | Part B | 0 | 80 | 150 | 170 | 170 | 190 | 200 | 230 | 240 | 280 | 570 | 1,710 |
| 10325 | Delay Implementation of RUG-IV | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10326 | Pilot Testing for Pay-for-Performance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10327 | Improvments to Physician Quality Reporting System | 0 | 0 | 0 | 110 | 120 | 140 | 160 | 0 | 0 | 0 | 230 | 530 |
| 10328 | Improvments to Part D Medication Therapy Management | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10329 | Methodology to Assess Health Plan Value | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10330 | Modernizing CMS Computer and Data System | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10331 | Public Reporting of Performance Information | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10332 | Availability of Medicare Data for Perfomance Measurement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10333 | Community Based Collaborative Care Networks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10334 | Minority Health | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10335 | Technical Correction to Hospital Value-based Purchasing | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 10336 | Report on Access to High-quality Dialysis Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE F-HEALTH CARE QUALITY IMPROVEMENTS** | | | | | | | | | | | | |
| 3501 | Health Care Delivery System Research | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3502 | Support Patient-Sentered Medical Home | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3503 | Medication Management Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3504 | Regionalized Systems for Emergency Care | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3505 | Trauma Care Centers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3506 | Shared Decisionmaking | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3507 | Prescription Drug Benefit and Risk Information | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3508 | Demonstration to Integrate Quality Care and Patient Safety | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3509 | Improving Woman's Health | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3510 | Patient Navigator Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3511 | Authorization of Appropriations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL, TITLE III** | | 1,415 | -3,235 | -12,685 | -22,020 | -58,080 | -48,770 | -62,690 | -77,850 | -92,760 | -110,160 | -94,605 | -486,835 |

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| Sec. | Provision | Fiscal year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **TITLE IV-PREVENTION OF CHRONIC DISEASE AND IMPROVING PUBLIC HEALTH** | | | | | | | | | | | | |
| | **SUBTITLE A-MODERNINZING DISEASE PREVENTION AND PUBLIC HEALTH SYSTEMS** | | | | | | | | | | | | |
| 4001-4004 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE B-INCREASING ACCESS TO CLINICAL PREVENTIVE SERVICES** | | | | | | | | | | | | |
| 4103 | Annual Wellness Visit Providing a Personalized Plan | 0 | 230 | 380 | 380 | 390 | 420 | 470 | 530 | 590 | 650 | 1,380 | 4,040 |
| 4104 | Removing Barriers to Preventive Services | 0 | 110 | 190 | 200 | 210 | 230 | 250 | 270 | 300 | 330 | 710 | 2,090 |
| 4105 | Evidence-Based Coverage of Preventive Services | -60 | -140 | -160 | -170 | -170 | -180 | -200 | -220 | -240 | -260 | -700 | -1,800 |
| | **SUBTITLE C-CREATING HEALTHIER COMMUNITIES** | | | | | | | | | | | | |
| 4201-4207 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE D-SUPPORT FOR PREVENTION AND PUBLIC HEALTH INNOVATION** | | | | | | | | | | | | |
| 4301-4306 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Additional Provisions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE E-MISCELLENEOUS PROVISIONS** | | | | | | | | | | | | |
| 4401-4402 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL, TITLE IV** | | -60 | 200 | 410 | 410 | 430 | 470 | 520 | 580 | 650 | 720 | 1,390 | 4,330 |
| | **TITLE V-HEALTH CARE WORKFORCE** | | | | | | | | | | | | |
| | **SUBTITLE A-PURPOSE AND DEFINITIONS** | | | | | | | | | | | | |
| 5001-5002 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE B-INNOVATIONS IN HEALTH CARE WORKFORCE** | | | | | | | | | | | | |
| 5101-5103 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE C- INCREASING THE SUPPLY OF THE HEALTH CARE WORKFORCE** | | | | | | | | | | | | |
| 5201-5210 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE D-EHANCING HEALTH CARE WORKFORCE EDUCATION AND TRAINING** | | | | | | | | | | | | |
| 5301-5315 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE E-SUPPORTING THE EXISTING HEALTH CARE WORKFORCE** | | | | | | | | | | | | |
| 5401-5405 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE F-STRENGTHENING PRIMARY CARE AND OTHER WORKFORCE IMPROVEMENTS** | | | | | | | | | | | | |
| 5501 | Expanding Access to Primary Care/General Surgery Services | 0 | 170 | 260 | 260 | 260 | 270 | 110 | 0 | 0 | 0 | 950 | 1,330 |
| 5502 | Medicare Federally Qualified Health Center Improvements | 0 | 10 | 10 | 20 | 20 | 70 | 90 | 100 | 100 | 110 | 60 | 530 |
| 5503 | Distribution of Additional Residency Positions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5504 | Counting Resident Time in Outpatient Setting | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5505 | Rules for Counting Resident Time for Didactic/Scholarly Activities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5506 | Preservation of Resident Cap Positions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5507 | Demonstration to Address Health Professions Workforce Needs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5508 | Increasing Teaching Capacity | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5509 | Graduate Nurse Education Demonstration Program | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| Sec. | Provision | Fiscal year | | | | | | | | | | Total, | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2010-14 | 2010-19 |
| | **SUBTITLE G-IMPROVING ACCESS TO HEALTH CARE SERVICES** | | | | | | | | | | | | |
| 5601-5605 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE H-GENERAL PROVISIONS** | | | | | | | | | | | | |
| 5701 | Reports | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL, TITLE V** | | 0 | 180 | 270 | 280 | 280 | 340 | 200 | 100 | 100 | 110 | 1,010 | 1,860 |
| | **TITLE VI-TRANSPARENCY AND PROGRAM INTEGRITY** | | | | | | | | | | | | |
| | **SUBTITLE A-PHYSICIAN OWNERSHIP AND OTHER TRANSPARENCY** | | | | | | | | | | | | |
| 6001 | Limitation on Medicare Exception to the Prohibition on Certain Physician Referrals for Hospitals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6002 | Transparency Reports on Physician Ownership | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6003 | Disclosure Requirements for in-Office Ancillary Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6004 | Prescription Drug Sample Transparency | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6005 | Pharmacy Benefit Managers Transparency Requirements | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE B-NURSING HOME TRANSPARENCY AND IMPROVEMENT** | | | | | | | | | | | | |
| 6101-6121 | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE C-NATIONWIDE PROGRAM FOR BACKGROUND CHECKS ON DIRECT PATIENT ACCESS EMPLOYEES OF LONG-TERM CARE FACILITIES AND PROVIDERS** | | | | | | | | | | | | |
| 6201 | Nationwide Program for Background Checks | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE D-PATIENT CENTERED OUTCOMES RESEARCH** | | | | | | | | | | | | |
| 6301 | Patient Centered Outcomes Research | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6302 | Federal Coordinating Council for CER | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE E-MEDICARE, MEDICAID, AND CHIP PROGRAM INTEGRITY** | | | | | | | | | | | | |
| 6401 | Provider Screening and Other Enrollment Requirements | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | -10 | -20 | -20 | -30 | -30 | -30 | -30 | -30 | -40 | -40 | -110 | -280 |
| 6402 | Enhanced Program Integrity Provisions | | | | | | | | | | | | |
| | Part A | 0 | 0 | -10 | -20 | -30 | -30 | -30 | -40 | -40 | -40 | -60 | -240 |
| | Part B | 0 | 0 | -10 | -10 | -20 | -20 | -20 | -20 | -20 | -20 | -40 | -140 |
| 6403 | Elimination of Duplication between Data Banks | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6404 | Maximum Period for Submission of Medicare Claims to Not More Than 12 Months | | | | | | | | | | | | |
| | Part A | 0 | 60 | 70 | 70 | 80 | 80 | 90 | 100 | 100 | 110 | 280 | 760 |
| | Part B | 0 | 50 | 50 | 50 | 50 | 60 | 60 | 70 | 70 | 80 | 200 | 540 |
| 6405 | Physicians Required to Be Enrolled Physicians | | | | | | | | | | | | |
| | Part A | -10 | -20 | -20 | -20 | -30 | -30 | -30 | -30 | -30 | -40 | -100 | -260 |
| | Part B | -30 | -50 | -50 | -50 | -60 | -60 | -60 | -70 | -70 | -80 | -240 | -580 |

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| Sec. | Provision | Fiscal year | | | | | | | | | | Total, | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2010-14 | 2010-19 |
| 6406 | Documentaion on Referrals to Programs at High Risk of Waste and Abuse | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6407 | Face to Face Encounter with Patient Required Before Physician May Certify for HHA or DME | | | | | | | | | | | | |
| | Part A | -50 | -70 | -70 | -80 | -80 | -90 | -100 | -100 | -110 | -120 | -350 | -870 |
| | Part B | -70 | -110 | -120 | -130 | -140 | -150 | -160 | -170 | -180 | -190 | -570 | -1,420 |
| 6408 | Enhanced Penalties | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6409 | Medicare Self-referral Disclosure Protocal | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6410 | Adjustments to DME, Prosthetics, Orthotics, and Supplies Competitive Acquisition Program | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | -10 | -20 | -20 | -20 | -20 | -80 | -120 | -130 | -140 | -70 | -560 |
| 6411 | Expansion of Recovery Audit Contractor (RAC) program | | | | | | | | | | | | |
| | Part A | 0 | -20 | -30 | -40 | -40 | -40 | -50 | -50 | -50 | -60 | -130 | -380 |
| | Part B | 0 | 0 | -10 | -10 | -10 | -10 | -10 | -10 | -10 | -10 | -30 | -80 |
| | Part D | 0 | -10 | -20 | -30 | -30 | -30 | -30 | -40 | -40 | -50 | -90 | -280 |
| 1301 | Limit MH Center Providers | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | -10 | -10 | -20 | -20 | -20 | -20 | -20 | -30 | -40 | -150 |
| 1302 | Repeal Limits on Claims Review | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | 0 | 0 | 0 | -10 | -10 | -10 | -10 | -10 | 0 | -50 |
| 1303 | CMS-IRS Data Match to Find Fraudulent Providers | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | -10 | -10 | -10 | -10 | -10 | 0 | -50 |
| | Part B | 0 | 0 | 0 | -20 | -60 | -110 | -130 | -140 | -150 | -160 | -80 | -770 |
| 1304 | Funding for Fraud and Abuse Activities | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1305 | Enhanced Claims Review of New DME Providers | | | | | | | | | | | | |
| | Part A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Part B | 0 | 0 | -10 | -10 | -10 | -10 | -10 | -20 | -20 | -20 | -30 | -110 |
| | **SUBTITLE G-ADDITIONAL PROGRAM INTEGRITY PROVISIONS** | | | | | | | | | | | | |
| 6601 | Prohibition on false Statements and Representations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6602 | Clarifying Definition | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6603 | Development of Model Uniform Report Form | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6604 | Applicability of State Law to Combat Fraud and Abuse | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6605 | Administrative Summary Cease and Desist Orders | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 3—Estimated Medicare Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended**
**(Amounts in millions)**

| Sec. | Provision | Fiscal year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6606 | MEWA Plan Registration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6607 | Permitting Evidentiary Privilege and Confidential Communications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Additional Provisions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE H-ELDER JUSTICE ACT** | | | | | | | | | | | | |
| 6701 | Short Title of Subtitle | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6702 | Definitions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6703 | Elder Justice | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **SUBTITLE I-SENSE OF THE SENATE REGARDING MEDICAL MALPRACTICE** | | | | | | | | | | | | |
| 6801 | Sense of the Senate Regarding Medical Malpractice | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTAL, TITLE VI** | | -170 | -200 | -280 | -360 | -450 | -530 | -630 | -710 | -760 | -830 | -1,460 | -4,920 |
| | **TITLE IX-REVENUE PROVISIONS** | | | | | | | | | | | | |
| 9008 | Fees on Brand-Name Pharmaceutical Manufacturers & Importers | 0 | -1,650 | -2,590 | -2,720 | -2,850 | -2,900 | -2,900 | -3,640 | -3,970 | -3,060 | -9,810 | -26,280 |
| 9015 | Additional hospital insurance tax on high-income taxpayers[1] | 0 | 0 | 0 | -1,936 | -8,090 | -8,901 | -9,735 | -10,580 | -11,504 | -12,484 | -10,026 | -63,230 |
| **TOTAL, TITLE IX** | | 0 | -1,650 | -2,590 | -4,656 | -10,940 | -11,801 | -12,635 | -14,220 | -15,474 | -15,544 | -19,836 | -89,510 |
| | **TOTAL IMPACT, III-VI and IX** | 1,185 | -4,705 | -14,875 | -26,346 | -68,760 | -60,291 | -75,235 | -92,100 | -108,244 | -125,704 | -113,501 | -575,075 |

[1] Estimates prepared by the Office of the Chief Actuary, Social Security Administration.

Notes: The effects of the managers' amendments, in Title X of P.L. 111-148 and in P.L. 111-152, on provisions in other titles have been incorporated with the estimates shown for those titles.
New proposals included in Title X have been grouped with the corresponding category of proposal in the estimates shown for earlier titles.
The estimates for provisions affecting Medicare Part B are net of premium offset.
The estimates for Medicare provisions that affect fee-for-service benefits also reflect interactions with payments to managed care plans.

**Table 4— Estimated Federal Medicaid and CHIP Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended, in billions**

| Sec. | Provision | Fiscal Year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Patient Protection and Affordable Care Act (P.L. 111-148)** | | | | | | | | | | | | |
| | **TITLE II—ROLE OF PUBLIC PROGRAMS** | | | | | | | | | | | | |
| | **Subtitle A—Improved Access to Medicaid** | | | | | | | | | | | | |
| 2001 | Medicaid coverage for the lowest income populations | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| | Impact of sections not affecting Medicaid expansion | $0 | $0 | $0 | $30 | $1,760 | $3,010 | $3,800 | $4,180 | $4,960 | $5,780 | $1,790 | $23,520 |
| 2002 | | | | | | | | | | | | | |
| | Income eligibility for nonelderly determined using modified gross income | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| 2003 | Requirement to offer premium assistance for employer-sponsored insurance | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| 2004 | Medicaid coverage for former foster care children | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| 2005 | Payments to territories | 0 | 191 | 764 | 764 | 930 | 930 | 930 | 930 | 930 | 930 | 2,648 | 7,300 |
| 2006 | Special adjustment to FMAP for major disaster recovery | 0 | 255 | 90 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 345 | 345 |
| 2007 | Medicaid Improvement Fund rescission | 0 | 0 | 0 | 0 | -100 | -150 | -150 | -150 | -150 | 0 | -100 | -700 |
| | **Subtitle B—Enhanced Support for CHIP** | | | | | | | | | | | | |
| 2101 | Additional federal financial participation for CHIP | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| 2102 | Technical corrections | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Subtitle C—Enrollment Simplification** | | | | | | | | | | | | |
| 2201 | Enrollment simplificiation and coordination with State health insurance exchanges | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| 2202 | Permitting hospitals to make presumptive eligibility determinations for all Medicaid eligible populations | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| | **Subtitle D—Improvements to Medicaid services** | | | | | | | | | | | | |
| 2301 | Coverage for freestanding birth center services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2302 | Concurrent care for children | 15 | 15 | 15 | 15 | 20 | 20 | 20 | 25 | 25 | 25 | 80 | 195 |
| 2303 | State eligibility option for family planning services | 1 | 0 | 0 | -2 | -4 | -6 | -9 | -12 | -15 | -18 | -5 | -65 |
| 2304 | Clarification of definition of medical assistance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Subtitle E—New State Options for Long-term Services & Supports** | | | | | | | | | | | | |
| 2401 | Community First Choice Option | 0 | 0 | 820 | 1,060 | 1,815 | 2,585 | 3,520 | 3,940 | 4,630 | 5,210 | 3,695 | 23,580 |
| 2402 | Removal of barriers to providing home and community-based services | 25 | 50 | 80 | 120 | 170 | 190 | 215 | 240 | 270 | 300 | 445 | 1,660 |
| 2403 | Money Follows the Person Rebalancing Demonstration | 0 | 0 | 450 | 450 | 450 | 450 | 450 | 0 | 0 | 0 | 1,350 | 2,250 |
| 2404 | Protection for recipients of home and community-based services against spousal impoverishment | 0 | 0 | 0 | 0 | 125 | 190 | 215 | 240 | 270 | 75 | 125 | 1,115 |
| 2405 | Funding to expand State Aging and Disability Resource Centers | 10 | 10 | 10 | 10 | 10 | 0 | 0 | 0 | 0 | 0 | 50 | 50 |
| 2406 | Sense of the Senate regarding long-term care | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Subtitle F—Medicaid Prescription Drug Coverage** | | | | | | | | | | | | |
| 2501(a)(1) | Increase minimum rebate percentage for brand drugs | -240 | -440 | -440 | -470 | -500 | -530 | -560 | -590 | -630 | -670 | -2,090 | -5,070 |
| 2501(a)(2) | Recapture of total savings | -230 | -610 | -680 | -720 | -770 | -820 | -870 | -920 | -980 | -1,040 | -3,010 | -7,640 |
| 2501(b) | Increase rebate percentage for generic drugs | -20 | -30 | -30 | -30 | -40 | -40 | -40 | -40 | -50 | -50 | -150 | -370 |
| 2501(c) | Extension of prescription drug discounts to enrollees of Medicaid managed care organizations | -580 | -720 | -720 | -770 | -820 | -870 | -930 | -990 | -1,040 | -1,100 | -3,610 | -8,540 |
| 2501(d) | Rebates on new drug formulations | -110 | -210 | -210 | -220 | -230 | -250 | -260 | -280 | -290 | -310 | -980 | -2,370 |
| 2501(e) | Maximum rebate amount | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2501(f) | Conforming Amendment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 4— Estimated Federal Medicaid and CHIP Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended, in billions**

| Sec. | Provision | Fiscal Year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2502 | Elimination of exclusion of coverage of certain drugs | 0 | 0 | 0 | 0 | 25 | 30 | 30 | 40 | 45 | 45 | 25 | 215 |
| 2503 | Providing adequate pharmacy reimbursement | 0 | 135 | 275 | 290 | 310 | 325 | 345 | 370 | 390 | 415 | 1,010 | 2,855 |
| | **Subtitle G—Medicaid Disproportionate Share Hospital Payments** | | | | | | | | | | | | |
| 2551 | Disproportionate share hospital payments | 0 | 0 | 0 | 0 | -500 | -600 | -600 | -1,800 | -5,000 | -5,600 | -500 | -14,100 |
| | **Subtitle H—Dual Eligibles** | | | | | | | | | | | | |
| 2601 | 5-year period for demonstration projects | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2602 | Providing Federal coverage and payment coordination for low-income Medicare beneficiaries | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Subtitle I—Medicaid Quality** | | | | | | | | | | | | |
| 2701 | Adult health quality measures | 40 | 50 | 60 | 70 | 80 | 0 | 0 | 0 | 0 | 0 | 300 | 300 |
| 2702 | Payment Adjustment for Health Care-Acquired Conditions | 0 | -1 | -4 | -5 | -5 | -5 | -6 | -6 | -7 | -7 | -15 | -46 |
| 2703 | State option to provide health homes for enrollees with chronic conditions | 0 | 35 | 90 | 115 | 145 | 175 | 150 | 135 | 135 | 135 | 385 | 1,115 |
| 2704 | Demonstration project to evaluate integrated care around a hopitalization | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2705 | Medicaid Global Payment System Demonstration Project | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2706 | Pediatric Accountable Care Organization Demonstration Project | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2707 | Medicaid emergency psychiatric demonstration project | 15 | 15 | 15 | 15 | 15 | 0 | 0 | 0 | 0 | 0 | 75 | 75 |
| | **Subtitle J—Improvements to the Medicaid and CHIP Payment and Access Commission (MACPAC)** | | | | | | | | | | | | |
| 2801 | MACPAC assessment of policies affecting all Medicaid beneficiaries | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Subtitle K—American Indians and Alaska Natives** | | | | | | | | | | | | |
| 2901 | Special rules relating to Indians | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ | 1/ |
| 2902 | Elimination of sunset for reimbursement for all Medicare Part B services furnished by certain Indian hospitals and clinics | 0 | 20 | 20 | 20 | 30 | 30 | 30 | 30 | 30 | 30 | 90 | 240 |
| | **TITLE III—IMPROVING THE QUALITY AND EFFICIENCY OF HEALTH CARE** | | | | | | | | | | | | |
| | **Subtitle B—Improving Medicare for Patients and Providers** | | | | | | | | | | | | |
| | **PART III—Improving payment accuracy** | | | | | | | | | | | | |
| 3139 | Payment for biosimilar biological products - Medicaid impact | 0 | 0 | 0 | 0 | -10 | -30 | -50 | -60 | -80 | -90 | -10 | -320 |
| | **TITLE IV—PREVENTION OF CHRONIC DISEASE AND IMPROVING PUBLIC HEALTH** | | | | | | | | | | | | |
| | **Subtitle A—Modernizing Disease prevention and Public Health Systems** | | | | | | | | | | | | |
| 4004(i) | Public awareness of preventive and obesity-related services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Subtitle B—Increasing Access to clinical Preventive Services** | | | | | | | | | | | | |
| 4101 | School-based health centers | 155 | 200 | 105 | 115 | 125 | 135 | 145 | 160 | 175 | 190 | 700 | 1,505 |
| 4106 | Improving access to preventive services for eligible adults | 0 | 0 | 0 | 6 | 9 | 9 | 10 | 11 | 11 | 12 | 15 | 68 |
| 4107 | Coverage of comprehensive tobacco cessation services for pregnant women | 0 | 0 | 0 | 0 | -10 | -10 | -10 | -10 | -10 | -20 | -10 | -70 |
| 4108 | Incentives for prevention of chronic disease | 0 | 20 | 20 | 20 | 20 | 20 | 0 | 0 | 0 | 0 | 80 | 100 |
| | **Subtitle D—Support for Prevention and Public Health Innovation** | | | | | | | | | | | | |
| 4302(b) | Addressing health care disparities in Medicaid and CHIP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4306 | Funding for Childhood Obesity Demonstration Project | 5 | 5 | 5 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 25 | 25 |

**Table 4— Estimated Federal Medicaid and CHIP Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended, in billions**

| Sec. | Provision | Fiscal Year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **TITLE VI—TRANSPARENCY AND PROGRAM INTEGRITY** | | | | | | | | | | | | |
| | **Subtitle E—Medicare, Medicaid & CHIP Program Integrity Provisions** | | | | | | | | | | | | |
| 6201 | Background checks for certain employees of LTC facilities | 0 | 30 | 20 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 110 | 260 |
| 6401 | Provider screening and other enrollment requirements under Medicare, Medicaid & CHIP | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6402 | Enhanced Medicare and Medicaid program integrity provisions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6403 | Elimination of duplication between the Healthcare Integrity and Protection Data Bank and the National Practitioner Data Bank | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6407 | Face to face encounter with patient required before physicians may certify eligibility for home health services or durable medical equipment under Medicare | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6408 | Enhanced penalties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6411 | Expansion of the Recovery Audit Contractor Program | 0 | -80 | -170 | -250 | -310 | -330 | -360 | -390 | -420 | -450 | -810 | -2,760 |
| | **Subtitle F—Additional Medicaid Program Integrity Provisions** | | | | | | | | | | | | |
| 6501 | Termination of provider participation under Medicaid if terminated under Medicare or other State plan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6502 | Medicaid exclusion from participation relating to certain ownership, control, and management affiliations | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6503 | Billing agents, clearninghouses, or other alternate payees required to register under Medicaid | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6504 | Requirement to report expanded set of data elements under MMIS to detect fraud and abuse | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6505 | Prohibition on payments to institutions or entities located outside of the United States | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6506 | Overpayments | 260 | 480 | -65 | -70 | -75 | -80 | -85 | -90 | -95 | -105 | 530 | 75 |
| 6507 | Mandatory State use of national correct coding initiative | -10 | -25 | -40 | -45 | -55 | -75 | -85 | -90 | -95 | -100 | -175 | -620 |
| 6508 | General effective date | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **TITLE VII—IMPROVING ACCESS TO INNOVATIVE MEDICAL THERAPIES** | | | | | | | | | | | | |
| | **Subtitle B—More Affordable Medicines for Children and Underserved Communities** | | | | | | | | | | | | |
| 7101(d) | Expanded participation in 340B programs - Medicaid credits | 2/ | 2/ | 2/ | 2/ | 2/ | 2/ | 2/ | 2/ | 2/ | 2/ | 2/ | 2/ |
| | **TITLE X—STRENGTHENING QUALITY, AFFORDABLE HEALTH CARE FOR ALL AMERICANS** | | | | | | | | | | | | |
| | **Subtitle B—Provisions Relating to Title II** | | | | | | | | | | | | |
| | **Part I—Medicaid and CHIP** | | | | | | | | | | | | |
| 10202 | Incentives for States to offer home and community-based services as a long-term care alternative to nursing homes | 0 | 0 | 800 | 910 | 1,030 | 260 | 0 | 0 | 0 | 0 | 2,740 | 3,000 |
| ***SUBTOTAL, P.L. 111-148*** | | *-664* | *-605* | *1,279* | *1,463* | *3,675* | *4,593* | *5,875* | *4,903* | *3,040* | *3,617* | *5,149* | *27,177* |

**Table 4— Estimated Federal Medicaid and CHIP Costs (+) or Savings (–) under the Patient Protection and Affordable Care Act, as Enacted and Amended, in billions**

| Sec. | Provision | Fiscal Year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, 2010-14 | Total, 2010-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Health Care and Education Reconciliation Act of 2010 (P.L. 111-152)** | | | | | | | | | | | | |
| | **TITLE I—Coverage Medicare, Medicaid, and Revenues** | | | | | | | | | | | | |
| | **Subtitle C—Medicaid** | | | | | | | | | | | | |
| 1202 | Payment to primary care physicians | 0 | 0 | 0 | 3,670 | 5,460 | 1,450 | 0 | 0 | 0 | 0 | 9,130 | 10,580 |
| ***SUBTOTAL, P.L. 111-152*** | | *0* | *0* | *0* | *3,670* | *5,460* | *1,450* | *0* | *0* | *0* | *0* | *9,130* | *10,580* |
| | Interaction - Prescription Drugs | -190 | -250 | -270 | -280 | -300 | -320 | -330 | -360 | -390 | -410 | -1,290 | -3,100 |
| | Interaction - Medicaid Expansion | 0 | 0 | 0 | 0 | 200 | -90 | -270 | -300 | -320 | -350 | 200 | -1,130 |
| | Interaction with Medicare Premium Provisions | 0 | -70 | -220 | -320 | -400 | -520 | -670 | -840 | -1,010 | -1,140 | -1,010 | -5,190 |
| **TOTAL, P.L. 111-148 and P.L. 111-152, with interactions** | | **-854** | **-925** | **789** | **4,533** | **8,635** | **5,113** | **4,605** | **3,403** | **1,320** | **1,717** | **12,179** | **28,337** |

[1] Included with Title I impacts.
[2] Insufficient detail for estimation.

**Table 5 — Estimated Increases (+) or Decreases (–) in National Health Expenditures under the Patient Protection and Affordable Care Act, as Enacted and Amended, in billions**

| Prior Law Baseline | Calendar Year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, CY 2010-2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total National Health Expenditures (NHE) | $ 2,632.2 | $ 2,778.7 | $ 2,944.4 | $ 3,125.4 | **$ 3,325.5** | **$ 3,551.5** | $ 3,798.5 | **$ 4,067.7** | $ 4,358.8 | $ 4,670.6 | $ 35,253.3 |
| Medicare | 515.5 | 550.5 | 591.0 | 634.1 | 679.7 | 732.1 | 790.4 | 857.2 | 930.9 | 1,010.9 | 7,292.3 |
| Medicaid/CHIP | 436.1 | 473.0 | 512.4 | 553.4 | 593.9 | 641.7 | 696.6 | 755.9 | 821.7 | 893.2 | 6,377.9 |
| Federal | 282.2 | 277.9 | 292.7 | 315.9 | 337.8 | 364.3 | 395.0 | 427.9 | 464.6 | 504.5 | 3,662.8 |
| State & Local | 153.9 | 195.1 | 219.6 | 237.6 | 256.1 | 277.4 | 301.5 | 328.0 | 357.1 | 388.7 | 2,715.1 |
| Other Public | 307.7 | 325.1 | 343.9 | 364.6 | 386.6 | 410.5 | 436.4 | 464.0 | 493.2 | 523.6 | 4,055.5 |
| Out of Pocket | 285.1 | 297.7 | 308.9 | 322.3 | 340.3 | 359.4 | 379.1 | 400.2 | 422.8 | 446.7 | 3,562.4 |
| Employer-Sponsored Private Health Insurance | 847.0 | 879.0 | 919.3 | 966.0 | 1,024.5 | 1,088.4 | 1,156.0 | 1,228.7 | 1,305.6 | 1,387.3 | 10,801.8 |
| Other Private Health Insurance* | 49.2 | 51.0 | 54.6 | 57.7 | 59.4 | 61.5 | 63.5 | 65.9 | 68.2 | 70.6 | 601.7 |
| Other Private† | 191.6 | 202.4 | 214.5 | 227.3 | 241.1 | 257.8 | 276.4 | 296.0 | 316.4 | 338.3 | 2,561.8 |
| NHE as percent of Gross Domestic Product (GDP)‡ | 17.8% | 17.9% | 18.1% | 18.3% | 18.6% | 19.0% | 19.4% | 19.8% | 20.3% | 20.8% | |

| New Law — PPACA | Calendar Year 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Total, CY 2010-2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total National Health Expenditures (NHE) | $ 2,636.4 | $ 2,774.4 | $ 2,932.7 | $ 3,101.5 | **$ 3,358.8** | **$ 3,615.9** | **$ 3,875.2** | **$ 4,139.6** | $ 4,413.1 | $ 4,716.5 | $ 35,564.0 |
| Medicare | 516.0 | 545.7 | 577.1 | 604.8 | 626.1 | 682.1 | 726.1 | 778.1 | 836.4 | 897.9 | 6,790.2 |
| Medicaid/CHIP | 434.2 | 471.4 | 513.3 | 557.7 | 657.3 | 716.6 | 779.4 | 832.7 | 900.8 | 977.9 | 6,841.4 |
| Federal | 281.2 | 277.4 | 294.5 | 321.4 | 398.3 | 435.7 | 478.2 | 503.6 | 543.8 | 588.7 | 4,122.7 |
| State & Local | 153.0 | 194.1 | 218.9 | 236.3 | 259.0 | 280.8 | 301.2 | 329.1 | 357.1 | 389.2 | 2,718.7 |
| Other Public | 312.3 | 325.2 | 344.0 | 364.9 | 381.7 | 406.2 | 434.6 | 463.4 | 493.5 | 523.6 | 4,049.4 |
| Out of Pocket | 285.1 | 297.9 | 308.6 | 321.6 | 313.6 | 323.9 | 334.7 | 352.5 | 381.4 | 405.8 | 3,325.1 |
| Employer-Sponsored Private Health Insurance | 848.2 | 881.0 | 921.3 | 968.3 | 1,038.8 | 1,112.3 | 1,160.7 | 1,212.2 | 1,259.7 | 1,336.1 | 10,738.7 |
| Other Private Health Insurance* | 49.3 | 50.9 | 54.1 | 57.0 | 14.9 | 14.9 | 14.5 | 14.2 | 13.9 | 13.6 | 297.4 |
| Other Private† | 191.4 | 202.3 | 214.3 | 227.2 | 234.8 | 251.9 | 272.8 | 293.4 | 314.5 | 335.6 | 2,538.1 |
| Exchanges | — | — | — | — | 91.7 | 107.9 | 152.4 | 193.1 | 212.8 | 225.8 | 983.7 |
| NHE as percent of Gross Domestic Product (GDP)‡ | 17.8% | 17.9% | 18.0% | 18.2% | 18.8% | 19.3% | 19.8% | 20.2% | 20.5% | 21.0% | |

**Table 5, continued — Estimated Increases (+) or Decreases (–) in National Health Expenditures under the Patient Protection and Affordable Care Act, as Enacted and Amended, in billions**

| | Calendar Year | | | | | | | | | | Total, CY |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Impact of PPACA | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2010-2019 |
| Total National Health Expenditures (NHE) | $ 4.2 | -$ 4.3 | -$ 11.7 | -$ 24.0 | $ 33.4 | $ 64.4 | $ 76.7 | $ 71.9 | $ 54.3 | $ 45.8 | $ 310.8 |
| Medicare | 0.4 | -4.8 | -13.9 | -29.4 | -53.6 | -50.0 | -64.3 | -79.1 | -94.5 | -113.0 | -502.1 |
| Medicaid/CHIP | -1.9 | -1.5 | 1.0 | 4.3 | 63.4 | 74.8 | 82.8 | 76.8 | 79.2 | 84.7 | 463.5 |
| Federal | -1.1 | -0.5 | 1.7 | 5.6 | 60.4 | 71.4 | 83.2 | 75.7 | 79.2 | 84.2 | 459.9 |
| State & Local | -0.8 | -1.0 | -0.8 | -1.3 | 2.9 | 3.5 | -0.4 | 1.1 | 0.0 | 0.5 | 3.6 |
| Other Public | 4.6 | 0.1 | 0.2 | 0.3 | -4.9 | -4.3 | -1.9 | -0.6 | 0.3 | 0.0 | -6.1 |
| Out of Pocket | -0.1 | 0.2 | -0.3 | -0.7 | -26.7 | -35.5 | -44.4 | -47.6 | -41.3 | -40.9 | -237.3 |
| Employer-Sponsored Private Health Insurance | 1.2 | 2.0 | 2.0 | 2.3 | 14.3 | 24.0 | 4.8 | -16.4 | -45.9 | -51.2 | -63.1 |
| Other Private Health Insurance* | 0.1 | -0.1 | -0.4 | -0.7 | -44.5 | -46.5 | -49.1 | -51.7 | -54.3 | -57.0 | -304.2 |
| Other Private† | -0.2 | -0.2 | -0.2 | -0.1 | -6.3 | -5.9 | -3.7 | -2.6 | -2.0 | -2.7 | -23.7 |
| Exchanges | — | — | — | — | 91.7 | 107.9 | 152.4 | 193.1 | 212.8 | 225.8 | 983.7 |
| NHE as percent of Gross Domestic Product (GDP)‡ | 0.0% | 0.0% | -0.1% | -0.1% | 0.2% | 0.3% | 0.4% | 0.3% | 0.3% | 0.2% | |

*In the prior-law baseline, other private health insurance includes private Medicare supplemental coverage and individual coverage. In the new-law estimates, other private health insurance includes only those with Medicare supplemental coverage.

†In the NHE accounts, other private spending includes philanthropic giving and income from non-patient sources, such as parking and investment income, for institutional providers.

‡Based on Gross Domestic Product (GDP) projections that accompanied the February 24, 2009 NHE projections release for 2008-2018. (http://www.cms.hhs.gov/NationalHealthExpendData/downloads/proj2008.pdf)

Source: Centers for Medicare & Medicaid Services, Office of the Actuary.

April 22, 2010

# Exhibit 40

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

**Plaintiffs,**

**v.** **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

**Defendants.**
______________________________________/

**DECLARATION OF JERRY DUBBERLY**

Pursuant to 28 U.S.C. § 1746, I Jerry Dubberly, declare the following:

I am over the age of twenty-one and am familiar with the facts set forth herein.

I am a pharmacist licensed to practice in the State of Georgia.

I am the Medicaid Director of the Georgia Department of Community Health, the single state agency operating the Medicaid program in the State of Georgia.

I am responsible for the preparation of the budget of the Medicaid program and am personally familiar with the records that support the assertions of this affidavit.

Georgia joined the federal Medicaid program shortly after it was created by Congress in the 1960s. In 1981, the Georgia General Assembly created the Department of Community Health in Title 31, Chapter 2 of the Georgia Code.

The Patient Protection and Affordable Care Act (the "PPACA") expands eligibility for enrolment beyond Georgia's current ability to fund its participation. Under existing eligibility criteria, individuals applying for Medicaid must be under an income threshold, be under an asset threshold, and fit into a category of need (i.e., disabled, pregnant, etc.).

The Act increases the income threshold, eliminates the asset threshold, and eliminates categories of need. As a result, all Georgians under 133% of federal poverty level (about $30,000 for a family of four) will qualify for Medicaid beginning January 1, 2014.

Georgia projects this will result in at least 560, 769 new individuals enrolling in Medicaid at that time. The current average monthly enrollment is about 1,477,838.

The costs for these newly eligible enrollees will be covered by 100% federal funds for the first three years of the expansion. But that federal participation erodes to 90% in 2020.

The Act's new mandate for individuals to maintain health insurance coverage will create an increased incentive for families currently eligible but not enrolled in Medicaid to enroll. Georgia will have to cover the costs of this increased enrollment at the traditional match rate: approximately a 65/35 federal-state split.

Medicaid and Peachcare for Kids outlays for Georgia consume 11.8% of Georgia's current budget. The portion of the state budget dedicated to health care is projected to increase to approximately 14.3% by 2014.

It is estimated that there will be a 31.7% increase in Medicaid and PeachCare for Kids membership due to the PPACA beginning in 2014.

For FY 2009-2010, Georgia spent $1.733 billion in state funds on Medicaid benefits. The projected increases in state funds needed for Medicaid under the Act are $71.2 million in 2014, eventually growing to $410.8 million in 2019.

It would not now be feasible for Georgia to cease its participation in Medicaid and make alternative arrangements for a traditional Medicaid-like program prior to the PPACA taking effect.

The added costs to Georgia under the Act would not be offset by increased federal contributions under the PPACA.

The PPACA also will required Georgia to provide medical services, as distinguished from providing payment for medical services. The future costs to Georgia of this mandate are potentially massive, but have not yet been quantified.

DATED this 4th day of November, 2010

[signature]

Jerry Dubberly
Medicaid Director
Georgia Department of Community Health

State of Georgia)
County of Fulton)

Subscribed and sworn to me on this 4th day of November 2010 by Jerry Dubberly.

[signature]
NOTARY PUBLIC

Notary Public, DeKalb County, Georgia
My Commission Expires August 21, 2011

CASSAUNDRA SCOTT NOTARY PUBLIC DeKALB COUNTY, GA