# Exhibit 2

CONGRESS OF THE UNITED STATES
CONGRESSIONAL BUDGET OFFICE

# CBO

# Key Issues in Analyzing Major Health Insurance Proposals



© Royalty-free/bxp2598/Brand X

DECEMBER 2008

are paid for their services. Although those considerations are closely related, this report analyzes the following questions:

- For insurance policies with the same scope and total cost, how does the share of that cost that individuals have to pay affect whether they purchase insurance? How would various types of subsidies that reduce the cost to them directly or indirectly—or mandates to offer or purchase coverage—affect the rates and sources of insurance coverage?

- How does the cost of an insurance policy vary with the scope of its coverage, insurers' use of various cost-management techniques, and the types of people it covers? How would health care spending and average policy premiums be affected by extending coverage to people who are now uninsured?

- Taking the demand for insurance overall and the premiums charged for various options as given, how are individuals' decisions about which policy to choose affected by the laws and regulations governing those choices? How would consumers respond to changes in the structure of or incentives governing the insurance market?

- What impact do factors affecting the supply of health care services and the level and mechanism of payments to providers have on the costs of health care and insurance premiums? How would changes in those supply factors interact with demand to determine future spending on health care?

Proposals to modify the health insurance system that include subsidies would probably have the most immediate and direct impact on the federal budget. Their costs would depend primarily on the nature and extent of those subsidies, the number of people who take advantage of them, and the scope of insurance coverage that is purchased or provided as a result. This report also considers other effects, including any federal administrative costs and challenges that might be involved in implementing a proposal; the effects on eligibility for and spending under other federal programs; the impact of provisions that seek to reduce spending on health care by encouraging consumers to make healthier choices and providers to change some of the ways in which they practice medicine; and other macroeconomic effects or budgetary implications that a proposal might have.

The question of whether and how any net increases in federal spending for health care and health insurance would be financed by policy changes outside the health sector is beyond the scope of this report. Whether a proposal makes health insurance more affordable for a given individual or family would depend not only on its impact on the health insurance premiums that they face but also on the effect that its financing mechanisms have on the household's budget. To the extent that such proposals are financed by provisions that fall outside the health sector—through increases in tax revenues or reductions in spending for other federal programs—those effects are not addressed in this report.

As background for the discussion of the broad policy options presented in subsequent chapters of this report, the remainder of this chapter describes the primary sources of health insurance coverage, the reasons that people lack coverage, the extent and nature of the coverage that is currently purchased, and the main components and drivers of health care spending.

## Health Insurance Coverage

The primary purpose of health insurance is to protect individuals against the risk of financial hardship when they need expensive medical care. In principle, most people would be willing to pay an insurance premium that was somewhat higher than their own expected costs for health care in order to avoid that risk, but in practice many people with low income or high expected costs might consider the premiums they would face to be unaffordable.

Over the years, various policies have been adopted that subsidize insurance coverage for certain groups. Medicare provides highly subsidized coverage to the elderly and also insures several million people under the age of 65 who are disabled—two groups that have relatively high costs for health care. The Medicaid program and related initiatives offer free or low-priced coverage to many children and (to a more limited degree) their parents; Medicaid also covers many elderly and disabled individuals who have low income and few assets (and thus would have difficulty paying for insurance). Most employers offer health insurance to their workers and most workers enroll in a plan, motivated in part by a tax subsidy for employment-based insurance. People may also be able to purchase coverage in the individual insurance market, but that coverage is not generally subsidized. Those sources of

**Table 1-1.**

## Sources of Insurance Coverage and Insurance Status of the Nonelderly Population, 2009

| | Number (Millions) | Percent |
|---|---|---|
| | Source of Coverage | |
| Employment-Based[a] | 160 | 61 |
| Individually Purchased | 10 | 4 |
| Medicare | 7 | 3 |
| Medicaid[b] | 43 | 17 |
| Other[c] | 12 | 4 |
| | Insurance Status | |
| Insured, Any Source[d] | 216 | 83 |
| Uninsured | 45 | 17 |

Source: Congressional Budget Office's health insurance simulation model.

Note: The nonelderly population excludes people in institutions and residents of U.S. territories.

a. Includes coverage obtained through local, state, and federal employers.

b. Includes the State Children's Health Insurance Program.

c. Includes military and other sources of coverage.

d. The sum of people by their sources of coverage exceeds the total number who are insured because about 14.5 million people are covered by more than one source at a time.

coverage also vary in the ease of enrollment, which affects their attractiveness.

Because health insurance provides more benefits to people who incur relatively high costs for health care, health insurance coverage generally—or specific health insurance plans—may attract enrollees with above-average costs, a phenomenon known as "adverse selection." Conversely, people with low expected costs for health care may be reluctant to pay an insurance premium that reflects the average costs of all enrollees, or they might prefer to wait until they develop a health problem to sign up for coverage. To the extent that such adverse selection occurs, average insurance premiums (or the costs of government subsidies for insurance) would tend to rise to reflect the higher spending per enrollee. The potential for adverse selection exists with almost any health insurance plan, but the manner in which it arises and the mechanisms used to address it differ across insurance markets.

The availability of health insurance affects not only who enrolls but also how much health care people consume. People who are insured are likely to use more health care than they would if they had to pay the full costs of those services—a phenomenon economists call "moral hazard." To offset that tendency toward increased use, health insurance policies typically feature some degree of cost sharing by enrollees. Health plans may also seek to control their costs and premiums by using various methods of managing care and by varying the range of benefits offered. Of course, those features also affect the premiums for health insurance policies and the attractiveness of the coverage to enrollees.

### Sources of Insurance Coverage

In the United States, most people obtain health insurance coverage from either public or private sources, but about 17 percent of the nonelderly population will be uninsured in 2009 (see Table 1-1).[3] Insurance obtained through an individual's employment is the primary source of coverage for the nonelderly.

**Employment-Based Insurance.** In 2009, roughly 160 million people under the age of 65—or about three out of every five nonelderly Americans—are expected to have health insurance that is provided through an employer or other job-related arrangement, such as a plan offered through a labor union. That figure includes active workers, spouses and dependents who are covered by family policies, and nonelderly retirees.

One prominent feature of employment-based insurance is that employers generally contribute a large share of the total premium; that is, the amount that is directly and visibly deducted from workers' paychecks for health insurance (called the employees' contribution) usually represents a relatively small share of the average cost per enrollee. According to a survey of firms conducted in 2008, employers contribute 73 percent of the cost of a family policy for their workers and 84 percent of the cost

3. Estimates of health insurance coverage presented in this report are derived from a simulation model that the Congressional Budget Office (CBO) developed in order to analyze the effects of various policy options on coverage and spending for health care. For a detailed description of that model and the data and evidence on which it is based, see *CBO's Health Insurance Simulation Model: A Technical Description,* Background Paper (October 2007).

of single coverage, on average.[4] One reason employers make those contributions is to encourage broad participation by their employees, so as to limit the potential for adverse selection.

Although employers may appear to pay most of the costs of their workers' health insurance, economists generally agree that workers ultimately bear those costs. Employers' contributions are simply a form of compensation, and if labor markets are competitive (which is generally the case), an employee's total compensation should equal his or her contribution to the revenue of the firm. Thus, when an employer offers to pay for health insurance, it pays less in wages and other forms of compensation than it otherwise would, keeping total compensation about the same.[5]

That relationship can be difficult to observe and may not hold perfectly for every worker at every instant. In particular, workers who turned down an employer's offer of subsidized health insurance generally would not see an immediate or corresponding increase in their wages. Moreover, firms offering health insurance actually tend to pay higher wages than firms that do not do so, but those differences in total compensation reflect disparities in the skill and productivity of the workers, not a failure to pass on the costs of providing insurance. For their part, many employers behave as though they do bear the costs of the insurance plans they offer (as reflected in their efforts to control those costs). Nevertheless, the available evidence indicates that employees as a group ultimately bear the costs of any payments an employer makes for health insurance.[6]

How the costs of employers' contributions are allocated among different types of workers and how quickly wages would adjust to changes in those contributions is less clear. In principle, workers who would obtain more benefits from health insurance coverage—such as older workers, who have higher average costs for health care—would be willing to accept a greater reduction in their wages than other workers would accept in return for that coverage. The extent to which that phenomenon occurs in practice, however, is uncertain.[7] Similarly, it could take labor markets several years to adjust to unexpected changes in employers' costs for health care. For purposes of estimating the impact of proposed legislation, however, CBO makes the simplifying assumption that total compensation is fixed and that changes in the costs of health insurance translate immediately into offsetting changes in wages and other forms of compensation; the JCT staff makes the same assumption when estimating the effects of proposals on revenue collections.

Compared with the individual insurance market, employment-based coverage offers several advantages, particularly for employees of larger firms. Unlike wages, the employer's costs for providing that coverage are excluded from the enrollee's taxable income. As a result, that portion of employees' compensation is not subject to individual income and payroll taxes. In addition, most employees are also able to exclude the portion of the premium that they pay. For a typical worker, that favorable tax treatment provides a subsidy from the government that reduces the net cost of employment-based health insurance by about 30 percent.

That tax subsidy provides an incentive for workers to obtain insurance through their employer and for their employer to provide it. Because out-of-pocket costs for health care do not generally receive a tax subsidy, workers also have an incentive to secure more extensive coverage, thereby increasing the share of spending for health care that is covered and decreasing the share that they pay out of pocket. The value of the exclusion from taxation is generally somewhat larger for workers with higher income because they face higher income tax rates (although they may also face lower rates of payroll taxation).

4. Henry J. Kaiser Family Foundation and Health Research and Educational Trust (Kaiser/HRET), *Employer Health Benefits: 2008 Annual Survey* (Washington, D.C.: Kaiser/HRET, September 2008).

5. Even if a given labor market was not competitive, firms operating in that market would still be expected to hold total compensation fixed, so that other forms of compensation would be reduced to offset the costs of providing health insurance. The allocation of compensation among wages, health insurance, and other fringe benefits would reflect the preferences of workers and the firms' efforts to attract employees.

6. For a discussion of that evidence, see Jonathan Gruber, "Health Insurance and the Labor Market," in A.J. Culyer and J.P. Newhouse, eds., *Handbook of Health Economics,* vol. 1 (Amsterdam: North Holland, 2006), pp. 645–706.

7. One study examined the impact of a state mandate to cover maternity benefits and found that reductions in the wages of women of child-bearing age and their spouses roughly offset the average costs of providing those benefits. See Jonathan Gruber, "The Incidence of Mandated Maternity Benefits," *American Economic Review,* vol. 84, no. 3 (June 1994), pp. 622–641.

**Box 1-1.**

## Regulation of Health Insurance and the Employee Retirement Income Security Act

In the United States, some forms of private health insurance are subject to both state and federal regulation, but others are exempt from state regulation. That distinction, which is a common source of confusion, stems from the treatment of employment-based health plans under the Employee Retirement Income Security Act of 1974 (ERISA). Under that act, employers that bear the financial risk of covering their workers' health insurance claims—and thus effectively serve as the insurer—are exempt from state insurance laws and regulations. If, instead, an employer contracts with an insurance company to provide coverage and that company bears the associated financial risk, then state insurance laws and oversight apply.

The main practical effect of the difference in treatment is that employers who serve as the insurer for their employees are exempt from the benefit mandates and other insurance regulations that many states impose (such as requirements to cover certain treatments, procedures, or types of providers). A rationale for that arrangement is that an employer with operations in several states would otherwise be unable to offer the same coverage to all of its employees, given the variation in state mandates and regulations; similarly, complying with the differing requirements in each state might be cumbersome for such an employer.

Of the roughly 160 million people whose primary insurance will come from an employment-based plan in 2009, the Congressional Budget Office estimates that about 88 million will have coverage from an employer that bears the financial risk of providing it and that 72 million will have coverage from an insurer that is subject to state regulation. (Policies covering another 10 million enrollees that are bought in the individual insurance market are also regulated by the states.) Large firms are more likely to bear insurance risk for their workers; according to one survey, 86 percent of workers at firms with 5,000 or more employees were in such plans in 2007, compared with 12 percent of workers at firms with fewer than 200 employees.[1]

Confusion about the implications of ERISA may stem in part from the terminology that is used to describe its provisions and from subtle distinctions about the roles of employers and insurers. Employers that bear insurance risk are referred to as having "self-insured" or "self-funded" plans, whereas employers that contract with an insurer are said to have "insured" or "fully insured" plans. Many employers that bear insurance risk still use insurers to carry out some functions, such as developing networks of providers, negotiating payment rates, processing claims, and so forth. In those cases, the insurance company is called a third-party administrator. Further, employers may qualify for ERISA's exemptions even if they purchase a separate insurance policy (known as reinsurance or "stop loss" coverage) to protect themselves against unusually high claims, so long as the employer continues to bear sufficient financial risk.

1. William Pierron and Paul Fronstin, *ERISA Pre-emption: Implications for Health Reform and Coverage,* Issue Brief No. 314 (Washington, D.C.: Employee Benefit Research Institute, February 2008), www.ebri.org.

**Table 1-2.**

## Share of Employees Offered Health Insurance, by Size of Firm, 2009

| Size of Firm (Number of employees) | Total Employees: Number (Millions) | Total Employees: Percent | Employees Offered Health Insurance: Number (Millions) | Employees Offered Health Insurance: Percent |
|---|---|---|---|---|
| Fewer than 25 | 31.0 | 22 | 14.9 | 48 |
| 25 to 99 | 17.6 | 13 | 12.7 | 72 |
| 100 to 999 | 27.2 | 19 | 21.0 | 77 |
| 1,000 or More | 63.9 | 46 | 54.9 | 86 |
| All | 139.7 | 100 | 103.5 | 74 |

Source: Congressional Budget Office's health insurance simulation model.

Employment-based insurance offers a number of other advantages. For example, because sales and marketing costs for insurers are relatively fixed, as the number of enrollees covered by an employer's policy increases, those fixed costs can be spread over a larger number of enrollees. As a result, the average premium needed to purchase a given amount of coverage is lower for employees of larger firms. Some analysts have suggested that employers also act as employees' agents, using their power to bargain for lower premiums, sorting out the employees' options, and making it easier for them to choose an insurance plan.[8] In particular, employers may take steps that substantially simplify the process of enrolling in a health insurance plan, and the use of automatic payroll deduction to pay for employees' premiums may also encourage participation.

Another important feature of employment-based insurance is that policies offered by firms of all sizes are subject to certain federal requirements, but most policies offered by larger firms are exempt from state insurance laws and regulations. That distinction stems from the provisions of the Employee Retirement Income Security Act, which are described in Box 1-1. As a result, policies offered by smaller employers generally must comply with requirements that vary by state regarding the benefits they cover, the premiums that insurers may charge, and other terms of purchase. (Those regulations are discussed further in Chapter 4.) Policies provided in the large-group market, by contrast, generally face few legal constraints regarding their benefits and premiums. One exception is that, among workers who are similarly situated (that is, workers who are in the same class of employment and work in the same geographic location), employers may not vary employees' contributions to premiums on the basis of their health.

Whether employers offer coverage largely reflects the aggregate preferences of their workers, but for several reasons smaller firms are less likely to offer insurance than larger firms. Overall, about half of the workers at very small firms (those that have fewer than 25 employees) are offered coverage and are eligible for it, compared with 77 percent of the workers at firms with 100 to 999 employees and 86 percent of the workers at firms with 1,000 or more employees (see Table 1-2).[9] One reason is that households with lower income find it more difficult to accept lower wages in return for health insurance, and smaller firms are more likely to employ low-wage workers. Another reason is that policies purchased by smaller firms incur higher administrative costs per enrollee, so the share of the policy premium that covers medical costs is lower, reducing the attractiveness of such policies. Because employees of larger firms constitute most of the total workforce, the percentage of all workers who are offered coverage—about three out of four—is closer to the proportion for larger firms.

The share of workers who are enrolled in employment-based coverage has varied somewhat over time, partly reflecting changes in the mix of employment and partly tracking fluctuations in the business cycle. According to recent surveys of employers, that share rose from 62 percent in 1999 to 65 percent in 2001 but has fallen since then and stands at 60 percent in 2008.[10] The coverage rate has been somewhat more volatile for smaller firms (those with fewer than 200 workers); that rate was

8. Jeff Liebman and Richard Zeckhauser, *Simple Humans, Complex Insurance, Subtle Subsidies,* Working Paper No. 14330 (Cambridge, Mass.: National Bureau of Economic Research, September 2008).

9. Among firms that have similar numbers of workers, the share of firms reporting that they offer coverage to their employees is generally larger than the share of employees reporting that they have an offer, but that discrepancy simply reflects the fact that some workers at firms that offer coverage are not eligible to enroll in it. For example, many part-time workers are ineligible.

10. Kaiser/HRET, *Employer Health Benefits: 2008 Annual Survey*; and *Employer Health Benefits: 1999 Annual Survey* (October 1999).

52 percent in 1996, rose to 58 percent in 2001, and fell back to 52 percent in 2008. Studies have attributed the recent decline in enrollment to a combination of modest reductions in the number of employers offering insurance, shifts in employment toward firms and industries that are less likely to offer health insurance coverage, and a reduction in enrollment rates among workers who are offered coverage. The estimated impact of each of those factors varies, however, depending on the specific years examined, the data used, and the methodology employed.

One source of employment-based health insurance that has received considerable attention is the Federal Employees Health Benefits (FEHB) program, which provides coverage to about 8 million active and retired federal employees in 2008. Under that program, several private health insurance plans are available nationwide, and in most regions employees have a range of local plans available to them as well. The federal government covers 75 percent of the cost of each participating plan up to a limit set at 72 percent of the national average premium; to purchase a policy more expensive than that, the enrollee has to pay the added costs (although those payments may also be excluded from taxable income).[11] Like employees of private firms that offer a choice of insurance plans, federal workers may generally sign up for coverage or change plans only during an annual open-enrollment season—a rule that limits their opportunities to wait until they develop a health problem to enroll or to switch plans for health reasons and thus limits the degree of adverse selection that can occur.

Although employment-based insurance has certain advantages, the central role of employers in sponsoring coverage also has disadvantages. Unlike federal workers, many employees are not offered a choice of insurance plans, and others may have only a few plans from which to select, so the plan in which they enroll might not fit their preferences. Furthermore, employees and their dependents typically have to change plans when changing jobs and could become uninsured if their new employer does not offer coverage—potentially making them reluctant to switch jobs in the first place (a phenomenon known as “job lock”).[12] In addition, employees who become disabled or too sick to keep their job may eventually lose their employment-based coverage.

**Individually Purchased Insurance.** Overall, CBO estimates that about 10 million nonelderly individuals will be covered by a policy purchased in the individual insurance market in 2009. In principle, anyone may purchase coverage in that market—to cover only themselves or their family as well—but in practice that option may be more attractive to some people than to others. (Such coverage is sometimes called “nongroup” insurance to distinguish it from group coverage, which is primarily employment based.)

The potential for adverse selection may be stronger in the individual market than in the employment-based market, partly because people can apply for individual insurance at any time and may therefore wait until a health problem arises before seeking coverage and partly because applicants do not have to be healthy enough to work. To address those possibilities, insurers usually “underwrite” the policy—a process by which they assess the health risk of applicants. Although most applicants end up being quoted a standard premium rate (which usually varies by age), underwriting can result in adjustments to premiums, adjustments to benefits (for example, to exclude coverage of known health conditions), or denials of coverage. As a result, individuals who have more health problems may face higher premiums when they apply for coverage. Some states, however, prohibit or limit those practices—which generally has the effect of reducing premiums charged to older or less healthy applicants and raising premiums for younger and healthier applicants (as discussed further in Chapter 4).

Individual insurance products have some other advantages and disadvantages compared with employment-based coverage. Some applicants may be able to obtain basic insurance protection (such as “catastrophic coverage” plans) in the individual market at a relatively low cost. That market generally offers consumers a greater choice of plans, and the coverage may be portable from one job to another. Insurers incur greater administrative costs for policies sold in the individual market, however,

11. For more information, see Mark Merlis, “The Federal Employees Health Benefits Program: Program Design, Recent Performance, and Implications for Medicare Reform” (briefing prepared for the Henry J. Kaiser Family Foundation, May 30, 2003).

12. Workers who previously held employment-based insurance may seek coverage in the individual insurance market, and insurers must generally offer them a policy if they apply, but some workers may find the terms of that coverage unattractive. See Chapter 4 for additional discussion.

and those costs are built into the policy premiums. Compared with the enrollment process for an employment-based plan, the effort required of applicants to search for a policy and sign up for coverage in the individual market can be considerably greater. In general, individually purchased coverage does not receive favorable tax treatment, which also makes its effective price higher.[13]

Reflecting those disadvantages, participation in the individual insurance market is relatively low. Only about 1 percent of nonelderly adults who are offered employment-based coverage (either by their own employer or through a spouse) elect to purchase individual coverage. Even among people who lack other coverage options, only about 20 percent elect to purchase a policy in the individual market; the rest are uninsured. In many cases, individually purchased policies are held for relatively short periods of time—serving to cover individuals between jobs, for a short period following college (a point at which children may become ineligible for coverage under their parents' plan), or between retirement and age 65 (the age of eligibility for Medicare).

**Medicare.** Medicare provides coverage for about 37 million people who are age 65 or older, and it also covers about 7 million nonelderly people who are disabled (and generally become eligible after a two-year waiting period) or have severe kidney disease.[14] In 2008, about 80 percent of Medicare's beneficiaries are insured through the traditional fee-for-service program, which pays providers for services directly using prices set administratively; the rest have chosen to receive coverage through private insurers that contract with Medicare to provide program benefits in return for a fixed monthly payment per enrollee (known as the Medicare Advantage option). About 3 percent of people under age 65 are covered by Medicare (see Table 1-1 on page 4), but their average costs to the program are substantial—more than $35,000 per person in 2007 for those with kidney failure and roughly $8,000 per person for other disabled enrollees.

13. Exceptions include self-employed individuals, who may deduct the costs of their health insurance from their taxable income, and individuals who claim itemized medical deductions in excess of 7.5 percent of their adjusted gross income. See Chapter 2 for additional discussion.

14. According to the most recent estimates from the Census Bureau, about 700,000 elderly people, or roughly 2 percent of individuals age 65 or older, were uninsured in 2007.

When it was created, Medicare had two primary components: Part A, which generally covers hospital care and other services provided by institutions; and Part B, which generally covers physicians' services and various forms of outpatient care. Enrollment in Part A is free of charge and essentially automatic for individuals (and their spouses) who have sufficient earnings subject to payroll taxes to qualify for Social Security benefits; certain others may enroll but must pay a monthly premium. To participate in Part B, enrollees must pay a monthly premium that covers about 25 percent of the program's average costs. Although participation is voluntary, seniors who choose not to participate in Part B when they are first eligible are subject to penalties if they decide to enroll at a later date—penalties that are intended to discourage eligible individuals from waiting to develop a health problem before they enroll. As a result of those provisions, nearly 95 percent of individuals who are eligible to enroll in Part B do so. Many of those who do not enroll have retiree coverage from a former employer that limits the benefits they would receive from enrolling in Part B (and may also exempt them from the late-enrollment penalty).

A voluntary outpatient prescription drug benefit—known as Part D—was added to Medicare in 2006; its premium subsidy and penalty for late enrollment are similar to Part B's. About 70 percent of the people who are eligible to participate in Part D have chosen to do so.[15] Analysis by the Centers for Medicare and Medicaid Services (CMS) indicates that a majority of those non-enrollees have drug coverage from another source that is at least as comprehensive as the Medicare benefit, but about 10 percent of the Medicare population appears to lack substantial drug coverage.

**Medicaid and the State Children's Health Insurance Program.** Medicaid is the main source of health insurance coverage for Americans who have very low income, and the smaller State Children's Health Insurance Program (SCHIP) provides coverage for children in families that have somewhat higher income. Unlike the Medicare program, which does not take into account income or assets when determining eligibility and is federally financed, Medicaid and SCHIP are needs-based assistance programs that are jointly financed by the federal government and state governments.

15. That figure includes retirees who continue to receive drug coverage from a former employer if that employer receives a subsidy payment from Medicare on their behalf.

CBO estimates that at any given point in 2009, roughly 64 million nonelderly individuals will be eligible for Medicaid or SCHIP coverage and that about 43 million will be enrolled.[16] Eligibility for Medicaid was originally limited to very low income families with dependent children and to poor elderly or disabled individuals. Over the past two decades, coverage has been extended to children in families with somewhat higher income and to pregnant women. Nonelderly, nondisabled adults who have no children are generally ineligible for the program. Able-bodied parents and children represent about three-fourths of all Medicaid enrollees, but about 70 percent of the program's spending is for the remaining enrollees who are either elderly or disabled and have low income and few assets.

Subject to broad federal requirements governing eligibility and benefits, the Medicaid program is largely administered by the states, and thus its specific features may vary considerably from state to state. On average, the federal government covers about 57 percent of the costs of the health care services received by enrollees (the share varies among states and is higher for states with relatively low per capita income). State Medicaid programs cover a comprehensive set of services, including hospital care (both inpatient and outpatient), physicians' services, nursing home care, home health care, and certain additional services for children. States have the authority to cover other services and populations and have used that authority extensively.[17] They may also apply to the federal government for waivers from various federal Medicaid rules.

16. That figure represents average enrollment and excludes nonelderly individuals living in institutions (such as nursing homes) and people living in U.S. territories. CBO has also projected that the total number of individuals enrolled in Medicaid at any point during 2009 (including elderly and institutionalized enrollees and residents of territories) will be 65 million, of which about 59 million will be nonelderly. Many of those individuals will be enrolled in the program for only part of the year.

17. According to one estimate, total spending on optional populations and benefits accounted for about 60 percent of the program's expenditures in 2001. Of that total, 30 percent was spent to provide optional benefits to mandatory groups; 50 percent, to provide mandatory benefits to optional groups; and 20 percent, to provide optional benefits to optional groups. See Kaiser Commission on Medicaid and the Uninsured, *Medicaid Enrollment and Spending by "Mandatory" and "Optional" Eligibility and Benefit Categories* (Washington, D.C.: Henry J. Kaiser Family Foundation, June 2005), p. 11.

SCHIP was established in 1997 to provide coverage to children whose family income is above the eligibility levels for Medicaid. States generally cover children in families that have income up to 200 percent of the federal poverty level (or about $44,000 for a family of four in 2009), but some states have higher income limits and some cover parents as well as their children. Like Medicaid, SCHIP is jointly funded by the federal government and the states, but the federal share of costs is higher for SCHIP—covering 70 percent of health care claims, on average. States have a fair amount of discretion in designing and implementing their programs: They may expand Medicaid, create a new state system specifically for SCHIP, or use some combination of the two approaches.[18]

SCHIP is currently authorized in law through March 2009. Consistent with statutory guidelines, CBO assumes in its baseline spending projections that federal funding for the program in later years will continue at $5.0 billion, the base amount provided for the first half of fiscal year 2009. In fiscal year 2008, the program's budget authority was $6 billion and its outlays were about $7 billion. Because average costs per enrollee are expected to rise, CBO projects that average enrollment would decline from a peak of about 5.3 million in 2008 to about 2 million in 2018 under that assumption about future funding. (References to Medicaid in the remainder of this chapter also include SCHIP.)

**Other Sources of Coverage.** A significant number of people obtain insurance coverage from various other sources including the military, universities (for students), and other organizations. CBO estimates that roughly 12 million people will be covered under such arrangements in 2009. Although military coverage could be considered a form of employment-based insurance, it is typically counted separately. The Department of Veterans Affairs provides some health care to military veterans, but its programs are not considered a comprehensive health insurance plan; similarly, the Indian Health Service provides some care to Native Americans and Alaska natives but is not counted as a source of health insurance (such programs are discussed more extensively in Chapter 6).

18. For additional information, see Congressional Budget Office, *The State Children's Health Insurance Program* (May 2007).

**Figure 1-1.**

## Patterns of Health Insurance Coverage for Nonelderly People, by Family Income Relative to the Federal Poverty Level, 2009




Source: Congressional Budget Office's health insurance simulation model.

### The Uninsured Population

About 45 million people, or about 15 percent of the total U.S. population, will be uninsured at any given point in 2009, by CBO's most recent estimates. Because the elderly have near-universal coverage from Medicare, many analyses of the uninsured focus on the nonelderly population, about 17 percent of which is expected to lack coverage in 2009. Those estimates for 2009 do not reflect the recent deterioration in economic conditions, which could result in a larger uninsured population.

In many cases, people's insurance status varies over the course of a year. For example, CBO's analysis of survey data showed that between 57 million and 59 million people—or roughly one-fourth of the nonelderly n population—were uninsured at some point during 1998. The average number of people who were uninsured at a give point in 1998 was smaller—between 39 million and 44 million, of which 21 million to 31 million were uninsured for all of that year.[19] CBO also found that for those who became uninsured at some point between July 1996 and June 1997, nearly half had spells of uninsurance lasting four months or less and about one in six had spells lasting two years or more.

According to CBO's projections, the average number of people who are uninsured at any one time will rise to about 54 million, or about 19 percent of the nonelderly population, by 2019. The number of uninsured individuals is expected to increase because health insurance premiums are likely to rise considerably faster than income, which will make insurance more difficult to afford.

**Characteristics of the Uninsured.** The purchase of health insurance in the United States is voluntary, so the main reason that people are uninsured is that they are unwilling or unable to purchase coverage. Several characteristics are associated with insurance status—including income, age, being offered insurance at work, or being eligible for public coverage—but whether they are a causal factor or are merely correlated with coverage rates is not always clear.

Because the costs of health insurance can represent a substantial share of income for lower-income individuals and families who are not eligible for subsidized public coverage, it is not surprising that coverage patterns are strongly correlated with income. In particular, as income rises, the share of nonelderly people who are uninsured or have public coverage declines and the share with private coverage rises (see Figure 1-1). In 2009, the highest rates of uninsurance—about 30 percent—will be found among people whose family income is below 200 percent of the federal poverty level. For people in that group that have insurance, those with family income below the poverty line will be much more likely to have public coverage, whereas those with income above the poverty line will be more likely to have private insurance. Only about 12 percent of people below the poverty line will have private coverage; that rate rises to 40 percent for those between 100 percent and 200 percent of the poverty level. For people whose income is between 200 percent and 400 percent of the poverty level, by contrast, 74 percent have private coverage and 16 percent are uninsured. For people with income above 400 percent of the poverty level, 90 percent have private coverage and 4 percent are uninsured.

19. Congressional Budget Office, *How Many People Lack Health Insurance and For How Long?* (May 2003).

**Figure 1-2.**

## Uninsurance Rates of Full-Time Workers, by Size of Firm and Family Income Relative to the Poverty Level, 2009

(Percent)




Source: Congressional Budget Office's health insurance simulation model.

Another characteristic that is associated with the lack of health insurance, at least among adults, is age. Younger adults are particularly likely to be uninsured—about 27 percent of those ages 18 to 34 lacked coverage, compared with about 14 percent of those ages 45 to 64 in 2007—possibly reflecting a lower perceived need for using health care services (younger people are generally healthier) as well as lower average income and assets.[20] Those younger adults make up about one-fourth of the nonelderly population but represent about 40 percent of the uninsured. Children under the age of 18 account for about the same share of that population but are much less likely to be uninsured.

Not surprisingly, rates of coverage are also associated with whether an individual (or a close family member) is offered insurance at work. In part that correlation probably reflects differences in income—firms with more low-wage workers are less likely to offer coverage—but even within a given income range, workers in relatively small firms (which are less likely to offer coverage) are much more likely to be uninsured than workers in larger firms (see Figure 1-2). For example, among full-time workers whose income is between 100 percent and 200 percent of the federal poverty level, CBO projects that 56 percent of those employed by very small firms (fewer than 25 employees) will be uninsured in 2009, compared with 30 percent for those employed by larger firms (those with 100 or more workers). Determining cause and effect is difficult, however, because workers with less of a desire for insurance or who consider coverage unaffordable would be more likely to join firms that do not offer coverage and pay those workers higher wages instead.

Looking at income levels and insurance options simultaneously may provide additional insights about the uninsured population. For example, CBO projects that among the uninsured in 2009, 17 percent will have family income above 300 percent of the poverty level (about $65,000 for a family of four); 18 percent will be eligible for but not enrolled in Medicaid; and 30 percent will be offered, but will decline, coverage from an employer (see Figure 1-3). Some people will be in more than one of those categories at the same time—so overall, about half of the uninsured will meet at least one of those three criteria. Conversely, the rest of the uninsured are projected to have relatively low income and to lack both an offer of employment-based coverage and eligibility for public coverage.

The reasons people remain uninsured even though they are offered employment-based coverage or are eligible for Medicaid are not always clear. In the case of employment-based coverage, the share of the premium that the employee must pay may be relatively high, or the employee may simply place a low value on having insurance. As for Medicaid, studies indicate a mixture of reasons for failing to enroll. Some people may not be aware that they are eligible; others may be deterred by the application process or see some stigma associated with a program for low-income families. An additional factor is that people who are eligible for Medicaid may be enrolled when they are hospitalized and then may gain retroactive coverage for recent medical expenses; thus, eligibility—even without enrollment—gives them some degree of protection against high medical costs and may reduce the incentive to enroll sooner.

20. U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2007,* P60-235 (August 2008).

**Figure 1-3.**

## Projected Distribution of the Uninsured Nonelderly Population, by Selected Characteristics, 2009




Source: Congressional Budget Office.

Note: This analysis categorizes uninsured nonelderly people according to whether they will meet any of the following criteria in 2009: Their family income will be above 300 percent of the federal poverty level; they will have an offer of employment-based insurance (EBI); or they will be eligible for Medicaid or the State Children's Health Insurance Program (SCHIP). The Congressional Budget Office estimates that a very small number of people will have family income above 300 percent of the federal poverty level and will be eligible for Medicaid or SCHIP.

**Use of Health Care by the Uninsured.** How the uninsured obtain health care affects both their incentives to seek insurance coverage and the impact that policies designed to reduce the number of uninsured have on spending and health. Many of the uninsured receive care from free clinics and other community health centers, which are funded by a combination of federal and state sources and private donations. Others may use traditional health care providers—hospitals as well as physicians in private practice—and pay all charges for the services they receive.

In many cases, however, people who are uninsured receive treatments from traditional providers for which they either do not pay or pay very little, which is known as "uncompensated care." Hospitals that participate in Medicare and offer emergency services are required by law to stabilize any patient who arrives, regardless of whether he or she has insurance or is able to pay for that care. In addition, most hospitals are nonprofit organizations and thus have some obligation to provide care for free or for a minimal charge to members of their community who could not afford it otherwise. For-profit hospitals also provide such charity or reduced-price care.[21]

Estimates of how much uncompensated care the uninsured receive vary depending on the data sources and methods used and the categories of spending that are included in the analysis. Some measures of uncompensated care compare the amount that providers are actually paid for their services with their list prices or posted charges for those services. A more useful comparison, however, is with the total payments that providers would receive for the same service when treating a privately insured patient, because that amount (which is generally much lower than the list price) more closely resembles their costs.

A recent study by Hadley and others, which used that analytic approach, examined a sample of medical claims for uninsured individuals and projected that they would receive about $28 billion in uncompensated care in 2008.[22] That study also examined reports by doctors and hospitals and derived a higher estimate: Their gross costs of providing uncompensated care would be about $43 billion in 2008, of which $8 billion would come from doctors and $35 billion would come from hospitals. But as the study noted, at least a portion of those costs could be offset by added payments under Medicare and Medicaid to hospitals that treat a disproportionate share of low-income patients (and by similar dedicated payments made under other federal and state programs). Another recent study found that, as a group, office-based

21. For a discussion, see Congressional Budget Office, *Nonprofit Hospitals and the Provision of Community Benefits* (December 2006).

22. Jack Hadley and others, "Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs," *Health Affairs,* Web Exclusive (August 25, 2008), pp. W399–W415. That study also reported that uncompensated care would total about $56 billion in 2008 if all costs not paid out of pocket by the uninsured were included in the tally. But that amount would seem to be an overestimate because the study found that, even though no payments were made by insurers, about half of those costs were directly compensated by various third parties (such as workers' compensation programs).

**Table 1-3.**

## Health Care Expenditures in 2008, by Insurance Status

| Insurance Status | Out-of-Pocket Spending | Third-Party Payments: Insurance | Third-Party Payments: Other[a] | Uncompensated Care | Total |
|---|---|---|---|---|---|
| | | | Dollars of Spending | | |
| Uninsured for Full Year | 583 | 0 | 567 | 536 | 1,686 |
| Insured for Part of the Year | 550 | 2,030 | 260 | 145 | 2,983 |
| Privately Insured for Full Year | 681 | 3,018 | 215 | 0 | 3,915 |
| Insured for Full Year | 654 | 3,563 | 246 | 0 | 4,463 |
| | | | Shares of Spending (Percent) | | |
| Uninsured for Full Year | 35 | 0 | 34 | 32 | 100 |
| Insured for Part of the Year | 18 | 68 | 9 | 5 | 100 |
| Privately Insured for Full Year | 17 | 77 | 5 | 0 | 100 |
| Insured for Full Year | 15 | 80 | 6 | 0 | 100 |

Source: Congressional Budget Office based on data from Jack Hadley and others, "Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs," *Health Affairs*, Web Exclusive (August 25, 2008), pp. W399–W415. The authors used data from the Medical Expenditure Panel Survey, 2002–2004, and adjusted the data to 2008.

a. Includes workers' compensation, veterans' benefits, and other payments not counted as health insurance.

physicians roughly "broke even" when treating uninsured patients because some of those patients paid more than the doctors would have received for treating a privately insured patient.[23] (The issue of whether and to what extent the net costs of providing uncompensated care are shifted to other payers in the health sector is discussed in Chapter 5.)

The uninsured generally use fewer health care services than people who have insurance, although estimates regarding the magnitude of the difference also vary. The study by Hadley and others estimated that an individual who is uninsured for all of 2008 will use about $1,700 worth of care—including about $540 in uncompensated care—or less than half as much as someone who is privately insured all year would use (see Table 1-3). The disparity in the amount spent for care is even larger; subtracting uncompensated care yields an estimate that spending incurred by and on behalf of people who are uninsured for the entire year (about $1,160) is about 30 percent of the amount spent for people who are privately insured all year (about $3,900). Spending by and for those who are insured for part of the year (about $3,000) falls between those two points. According to those estimates, average out-of-pocket payments are similar for each group, although those payments cover a higher share of total spending for the uninsured.

Reflecting a range of other findings on that topic, CBO estimates a somewhat smaller disparity in the use of health care services than the study by Hadley and others would indicate.[24] According to several other studies and CBO's own analysis of data for the nonelderly population, the uninsured do use fewer health care services than the insured, but the difference is generally in the range of 30 percent to 50 percent. (See Chapter 3 for a more extensive discussion of those estimates.) Studies comparing the insured and uninsured populations usually account for any differences that are observed in the demographic characteristics and health status of those populations, which would affect their use of health care.

23. Jonathan Gruber and David Rodriguez, *How Much Uncompensated Care Do Doctors Provide?* Working Paper No. 13585 (Cambridge, Mass.: National Bureau of Economic Research, November 2007).

24. If the study by Hadley and others underestimated the number of services used by uninsured individuals, its estimate of uncompensated care could also be correspondingly low. (That factor could account for the higher estimate of uncompensated care that study derived using reports by doctors and hospitals.) If, instead, the study overestimated the number of services used by insured individuals, that would not necessarily affect the estimate of uncompensated care.

Thus, CBO would expect an uninsured person to use 30 percent to 50 percent fewer health care services, on average, than a person who is similar in other respects but has typical private insurance coverage. Among people who have similar demographic characteristics and health status, there are two possible reasons why those who are uninsured would use fewer services than those who are insured: First, some of the uninsured may simply be less inclined to seek health care, resulting in less use of services; and second, the prospect of having to pay the full cost of the services they receive gives them an incentive to use less medical care or less expensive services.

A related consideration is whether the lack of insurance has adverse effects on health. Some studies examining the treatment of serious health conditions have found relatively clear links between insurance coverage and health outcomes.[25] For example, uninsured individuals who develop cancer generally have poorer outcomes and die more quickly than cancer patients who have private health insurance. That difference is attributed partly to later diagnosis for the uninsured; broader analyses of the uninsured population have found that they are less likely to receive screening tests, such as mammograms. Similarly, uninsured individuals who have heart disease are less likely to receive expensive treatments for it and also have higher rates of mortality than those who have heart disease but are privately insured.

For more routine care, however, disentangling the effects on health of being uninsured from the impact of other factors that are associated with lack of insurance is more difficult. One recent and comprehensive review of the literature noted that most studies of such effects on health simply compare insured and uninsured individuals and thus do not account for underlying differences between those populations.[26] Some studies with a better design have examined the effects of expanding eligibility for public insurance programs and have found specific health benefits for the targeted populations, but broad health improvements stemming from insurance coverage have been difficult to identify. For example, one recent study found that the creation of Medicare had no discernible effect on the mortality rates of the elderly during the first 10 years of the program's operation.[27] Of course, reduced mortality is a relatively crude measure of the benefits conferred by medical care, but the ability to analyze other outcomes, such as quality of life, is constrained because those effects are more difficult to measure.

25. For a summary of those studies, see Institute of Medicine, *Care Without Coverage: Too Little, Too Late* (Washington, D.C.: National Academy Press, 2002), www.iom.edu.

## Nature and Extent of Coverage

In addition to differences in the sources of and financing for health insurance and health care, coverage varies by the type of health plan providing it, the scope of services that are covered, and the cost-sharing requirements and limits that apply. That variation largely reflects different approaches to controlling costs for insured individuals and can have substantial effects on the premiums charged for an insurance policy (as discussed in Chapter 3).

**Types of Plans.** Through the 1980s, private health insurance coverage in the United States typically took the form of an "**indemnity**" **policy**, which reimbursed enrollees for their incurred costs, left it to them and their doctors to determine what care to provide, and largely allowed doctors and hospitals to set the prices for those services. As health care costs grew rapidly in the 1980s, however, private insurance coverage began to shift from indemnity policies toward other types of health plans, involving various degrees of managed care (as described below) and negotiated pricing.

One form of managed care plan that emerged was a **preferred provider organization** (PPO). PPOs establish lists or networks of preferred doctors and hospitals and—to give enrollees an incentive to use those providers—charge

26. Helen Levy and David Meltzer, "The Impact of Health Insurance on Health," *Annual Review of Public Health,* vol. 29 (April 2008), pp. 399–409. One study that sheds some light on the impact of health insurance on health is the RAND Health Insurance Experiment, which randomly assigned large groups of nonelderly individuals to different health insurance plans and tracked their experience over several years. In general, the study found that participants who faced cost sharing did not have worse health than those who got all of their care for free; one exception was lower-income participants with prior health problems, who did not control their blood pressure as effectively when they faced cost sharing. An important limitation of the study, however, is that no participants lacked insurance. For additional discussion of those findings, see Congressional Budget Office, *Consumer-Directed Health Plans: Potential Effects on Health Care Spending and Outcomes* (December 2006), pp. 54–55.

27. Amy Finkelstein and Robin McKnight, "What Did Medicare Do? The Initial Impact of Medicare on Mortality and Out of Pocket Medical Spending," *Journal of Public Economics,* vol. 92, no. 7 (July 2008), pp. 1644–1668.

more for care received outside the plan's network. The preferred providers thus gain a higher volume of patients and, in return, usually accept lower negotiated payment rates for each service from the health plan. According to a major survey of employers conducted by the Kaiser Family Foundation, PPOs are the most common type of managed care plan, accounting for about 58 percent of enrollees in employment-based plans in 2008.[28] (That survey is the primary source of statistics about coverage and benefits cited in this subsection.)

At the same time, more stringent forms of managed care, such as **health maintenance organizations** (HMOs), also grew in prominence. Like PPOs, those plans establish networks of providers; unlike PPOs, they offer no coverage for services received outside their networks (except for emergencies). HMOs have also instituted various measures to limit the use of certain services, such as requiring patients to get a referral from a primary care physician in order to see a specialist or to obtain prior authorization from the plan before using some types of specialty care. Some HMOs are fully integrated; the plan owns the hospitals, and doctors work on salary. A more common arrangement, however, is to have a network of independent hospitals and physicians' practices in which providers either receive a fixed payment per patient (in the case of some primary care physicians) or are paid negotiated rates on a fee-for-service basis. As a share of enrollment in employment-based plans, HMOs peaked at roughly 30 percent in the mid-1990s and then fell, reaching about 20 percent in 2008.

**Point-of-service** (POS) plans have emerged as a kind of middle ground between PPOs and HMOs. Like PPOs they allow enrollees to go outside a plan's network for care (albeit at a higher charge), but like HMOs they typically require enrollees to secure referrals for specialty care from a primary care physician within the plan's network. More common among small firms, they accounted for 12 percent of enrollment in employment-based plans in 2008.

Another design option that has arisen in recent years is a **consumer-directed health plan**, which combines a high-deductible insurance policy with an account that enrollees can use to finance their out-of-pocket payments on a tax-preferred basis. (In other respects, those plans are usually similar to PPOs.) As of 2008, those plans account for about 8 percent of enrollment in employment-based coverage; one form of consumer-directed plan (known as a **health savings account**) can also be purchased in the individual insurance market.[29]

**Scope of Covered Services.** Both public and private health insurance plans generally cover hospitalizations, visits to doctors and other outpatient care, tests and imaging services (such as X-rays), and prescription drugs. Coverage varies to a greater extent for dental care and vision-related services, particularly when care is discretionary (for example, laser surgery to correct vision problems is typically not covered). According to a 2004 survey of employers, about 20 percent offered vision benefits and two-thirds offered dental benefits (although nearly all firms with more than 500 employees offered dental benefits and about half of those firms offered vision benefits).[30] Another source of variation is government requirements to cover certain types of benefits (such as infertility treatments) or the services of specific providers (such as chiropractors), which some states impose and others do not. Those mandates generally affect policies offered in the individual market and by small employers.

**Cost-Sharing Requirements.** A more significant way in which health insurance plans vary, even among the broad categories of plans noted above, is their cost-sharing structure. Most plans include one or more of the following provisions:

- An annual deductible (expenses that enrollees must pay out of pocket before the insurer begins paying for services),
- Coinsurance (a specified percentage) or copayments (a specified amount) that enrollees pay out of pocket to providers after satisfying any deductible, and
- An out-of-pocket maximum (a cap on the total amount that an individual or family pays out of pocket in a given year).

Those features not only affect the share of health care costs covered by the insurance policy but also influence total spending for health care.

28. Kaiser/HRET, *Employer Health Benefits: 2008 Annual Survey.*

29. For additional discussion of those plans, see Congressional Budget Office, *Consumer-Directed Health Plans.*

30. Mercer Human Resource Consulting, *National Survey of Employer-Sponsored Health Plans 2004* (New York: Mercer, 2004).

Cost-sharing requirements typically differ by type of plan. According to the 2008 Kaiser/HRET survey of employment-based health insurance plans, almost 20 percent of HMO enrollees face a deductible in 2008, compared with about 68 percent of PPO enrollees. Among PPO enrollees, deductibles for care received within the plan's provider network average about $560 for single coverage and about $1,300 for family coverage in 2008. For hospital care, some enrollees face separate deductibles, and most (about 69 percent) are subject to coinsurance or copayments.

Most HMO and PPO plans that have a deductible exempt visits to a physician's office for care received within the network. Enrollees typically have a fixed copayment of around $20 for seeing a primary care physician and around $25 for seeing a specialist physician within their network. For visits outside the network, PPO enrollees who have met the deductible typically pay coinsurance in the range of 30 percent to 35 percent (thus encouraging enrollees to use network providers and also limiting the plan's liability for those costs). Most people who have employment-based insurance must also pay a portion of the costs for advanced diagnostic tests and outpatient surgery (coinsurance is more common) and for emergency room and urgent care visits (copayments are more common).

Most plans also limit total out-of-pocket spending that enrollees might incur in a given year. For PPO plans, median levels of the out-of-pocket maximum are roughly $2,000 for single coverage and $4,000 for family coverage in 2008, although those limits vary considerably across plans. Nearly half of HMOs do not have an out-of-pocket limit, but those plans typically have no deductible and relatively low cost sharing for individual services, so enrollees would be unlikely to incur very high out-of-pocket costs in the aggregate.

Many plans vary the amount of coinsurance by the type of service or exempt some services from the general deductible in an attempt to create differing incentives for enrollees to use certain types of care. For example, preventive services may have little or no cost sharing, either because insurers want to encourage their use or because those benefits are attractive to enrollees. Similarly, plans typically exempt prescription drugs from their general deductible and require relatively low copayments for less expensive generic drugs. Conversely, plans that cover dental and vision services may charge a separate deductible for them, require higher rates of cost sharing, or limit the maximum annual benefits that enrollees can receive.

Cost-sharing requirements tend to be higher in the individual insurance market, reflecting not only insurers' efforts to control the health care spending of their enrollees but also enrollees' desire for lower premiums (because those policies are generally not subsidized through the tax code). One survey of policies purchased in the individual market in late 2006 and early 2007 found that about 70 percent of single policies had deductibles of more than $1,000 and about two-thirds of family policies had deductibles of more than $2,000.[31] Largely because they cover a smaller share of enrollees' health care costs, the premiums for those policies are generally lower than the average premiums observed for employment-based insurance (even though the premiums for individually purchased policies include higher administrative costs per policy).

Cost-sharing requirements in the Medicaid program tend to be much lower than those in employment-based or individually purchased plans—typically $1 to $3 for a doctor's visit or $2 to $3 for a brand-name drug prescription—reflecting the limited income of Medicaid recipients. Cost-sharing requirements may be more substantial under SCHIP but are generally limited to about 5 percent of enrollees' family income.

Cost sharing under the Medicare program varies widely by service. In 2009, enrollees will face a deductible of about $135 for physicians' services and will be charged 20 percent coinsurance beyond that point. Some services, such as lab tests and home health care, are free to the enrollee. Most hospital admissions require a deductible of about $1,070, however, and the effective coinsurance rates for some skilled nursing care and outpatient hospital services may exceed 30 percent. In addition, the program does not cap annual out-of-pocket costs. To limit their financial exposure, most Medicare enrollees have some form of supplemental insurance that covers most or all of their cost-sharing obligations. That supplemental coverage typically comes from a former employer, the Medicaid program, a Medicare Advantage plan, or an individually purchased medigap policy.

31. AHIP Center for Policy Research, *Individual Health Insurance 2006–2007: A Comprehensive Survey of Premiums, Availability, and Benefits* (Washington, D.C.: America's Health Insurance Plans, December 2007).

CHAPTER

2

# Approaches for Reducing the Number of Uninsured People

About one in six nonelderly people in the United States will be without health insurance at any given time during 2009. Those without insurance will include nearly 10 million children, over 14 million adults living in families with children, and another 21 million adults who do not reside with children. Nearly two-thirds of the uninsured are in families whose income is less than 200 percent of the federal poverty level.

Concerns about the number of people who lack health insurance have generated proposals that seek to increase coverage rates substantially or to achieve universal or near-universal coverage. Coverage could be expanded by:

- Subsidizing health insurance premiums, either through the tax system or spending programs, which would make insurance less expensive for people who are eligible.
- Mandating health insurance coverage, either by requiring individuals to obtain coverage or by requiring employers to offer health insurance to their workers. If effective penalties were imposed on those who did not comply, a mandate would increase insurance coverage by making it more costly for individuals to be uninsured and for employers not to offer coverage to their employees.
- Automatically enrolling individuals in health plans, giving them the option to refuse coverage or switch plans. Recent studies suggest that automatic enrollment in plans that subsidize savings for retirement substantially increases participation rates, especially among young and low-income workers.

The three approaches could also be used in combination to reduce the number of people who are uninsured.

At the federal level, **subsidies** for health insurance premiums have been provided through spending programs and tax provisions. Millions of low-income children and their parents receive subsidized health insurance coverage through Medicaid and the State Children's Health Insurance Program; tax subsidies, such as the exemption of employer-paid premiums from taxation, encourage middle- and higher-income taxpayers to purchase private health insurance (primarily through their employer). Those subsidies, however, are distributed unevenly. Some low-income adults—particularly those who are under the age of 65, childless, and able-bodied—are generally not eligible for Medicaid or SCHIP. Taxpayers who do not work for a firm that offers coverage may not receive any tax subsidies for purchasing private health insurance.

Coverage could be expanded by restructuring tax subsidies, spending programs, or both. However, redesigning existing subsidies or creating new benefits raises several issues. First, the form of the subsidy can determine who would benefit. Tax preferences, such as the current-law exclusion or a tax deduction, reduce taxes but do not provide benefits to those who do not have any income tax liability. A refundable tax credit would provide full benefits to individuals, regardless of whether they have any income tax liability, but might require some people to file returns solely to obtain the subsidy. A second consideration is costs, which could be high depending on the numbers of uninsured receiving the subsidies and the amounts necessary to encourage them to enroll in health plans. Targeting benefits toward specific segments of the population would reduce costs but could also add to the burden of administering a program. A third consideration is the impact of the subsidies on people who already have coverage; although subsidies would probably increase coverage on net, some subsidies would go to people who would have coverage anyway, and the availability of subsi-

denied coverage in the private market because of their health problems.[6]

**Guaranteed Issue and Renewal.** The federal government and many states have taken various steps to require that insurers offer coverage to applicants (a practice known as guaranteed issue) and that they renew policies that are not delinquent (guaranteed renewal). The existing provisions differ between the individual and small-group markets, however. The Health Insurance Portability and Accountability Act (HIPAA) requires insurers that offer coverage to small businesses (those who have fewer than 50 employees) to accept all applicants; before the enactment of that federal legislation in 1996, most states had the same or similar requirements.

By contrast, only a handful of states currently require insurers in the individual insurance market to offer policies to all individuals and families who apply for coverage, and federal legislation does not generally mandate that such offers be made. HIPAA prohibits insurers from failing to renew policies for health reasons, however, whether those policies are purchased in the individual market or by employers. Insurers may still terminate policies for fraud or failure to pay premiums, and they may also require that plans purchased by employers meet a participation requirement (for example, that a specified percentage of employees remain enrolled in the plan).

Federal legislation has addressed in a more limited way the question of guaranteed offers of coverage in the individual market and the related issue of whether new policies may exclude coverage for preexisting medical conditions—steps designed to increase the portability of insurance coverage. Specifically, HIPAA essentially requires insurers to offer coverage to anyone who had held insurance through a previous job but was losing or had recently lost that coverage (for example, because he or she changed jobs). The requirements differ somewhat depending on whether the new coverage is purchased in the individual market or comes through the new employer's group plan, but under most circumstances the new policy may not limit coverage for preexisting conditions. The law, however, does not restrict the premium that insurers may charge for new policies purchased in the individual market.

HIPAA allows states to take additional steps to regulate the portability of insurance, and many states have done so. For individuals who were not previously insured, however, states generally give insurers broad latitude to exclude certain benefits or services from coverage in the individual market. Currently, 38 states permit health care services that are related to preexisting conditions to be excluded from coverage permanently, and most states also allow insurers to determine whether a condition was in fact preexisting by examining more closely the medical history of enrollees when they submit a claim. Proposals that limit the ability of insurers to exclude high-risk individuals and preexisting conditions from coverage might benefit less healthy individuals, who might not be offered coverage otherwise, but the effects of those proposals on insurance premiums would depend on the rules that apply in each state.

**Direct Regulation of Premiums.** All insurers—whether they cover health care, property, automobiles and their drivers, or another type of risk—seek to set premiums so that the aggregate payments will at least cover the expected payouts for the policies they sell as well as the administrative and other costs they incur in providing insurance. Other things being equal, expected costs for health insurance are higher for older people and for people with more, or more serious, health problems. In theory, that relationship could yield premiums for individually purchased coverage that vary widely, with some enrollees paying many multiples of the average quote for a given policy to reflect their higher expected costs for health care.

In practice, however, premiums in the individual insurance market do not vary as widely as do individuals' expected costs for health care, for several reasons. First, insurers may find it difficult or costly to obtain information about each applicant's health status, so assessments of the applicant's expected costs (a practice known as "medical underwriting") are far from perfect. Second, to the extent that underwriting efforts are successful, insurers tend to limit coverage for or screen out applicants who have preexisting health problems that are costly to treat. According to a 2005 study, about 70 percent of appli-

6. Many other laws and regulations govern health insurance but are beyond the scope of this report. State insurance agencies are generally charged with monitoring the financial health of insurance firms to ensure that they will be able to meet their promises to pay claims. Furthermore, many of those agencies regulate the sales practices of insurers. Federal law also establishes reporting and disclosure requirements and fiduciary standards for the plans' administrators. All of those regulations can also affect insurance premiums and coverage.

cants for individual coverage are quoted a standard rate based only on their age; about 20 percent are either charged a higher premium (generally not exceeding twice the standard rate for their age group) or are sold a modified package that does not cover treatments for their preexisting health conditions (at least for some period of time); and about 10 percent are denied coverage.[7] Some applicants are charged a premium that is only modestly higher than the standard rate, so the share of applicants that are either charged a substantially higher premium or denied coverage is probably on the order of 20 percent.

A third reason that premiums in the individual market vary less than do enrollees' expected health care costs is the states' regulation of those premiums, which takes various forms. Many states restrict premium "rating"—that is, they directly limit the extent to which premiums are allowed to vary according to the age or health status of enrollees. The specific restrictions vary widely, however, in ways that differ between the individual and small-group markets. According to one survey of states' practices in the individual insurance market, three states require **pure community rating** of premiums, meaning that insurers may vary premiums for a given policy only by the size of the enrolling family and their place of residence within the state.[8] Six other states allow **adjusted community rating**, meaning that health insurance premiums are allowed to vary by family size and residence as well as by age and sex—but not by health status. Twelve states apply **rating bands** that allow premiums to vary on the basis of age and sex but prohibit insurers from deviating from the standard rate by more than a specified percentage for reasons relating to health.

Regulations may also affect the extent to which premiums can be changed over time. In the individual market, states generally preclude the practice—sometimes called "re-underwriting" or experience rating—of adjusting a particular enrollee's premium on the basis of his or her insurance claims or changes in health status after purchasing the policy. Thus, premiums for a given policy would generally increase over time to reflect higher expected costs for health care on average, but they do not vary across individuals to reflect updated estimates of each one's expected health costs. Insurers could circumvent those restrictions, however, by raising premiums for all enrollees in an existing policy and simultaneously offering a new, cheaper product whose applicants would be subject to underwriting. That practice would tend to discourage individuals who had developed expensive health conditions after enrolling in the original policy from changing plans, so they would pay the new, higher premium for that policy. It is not clear how common that practice is, however.

Premiums charged to small employers may be somewhat less volatile than are premiums in the individual market, for several reasons. First, those premiums reflect the average costs of their enrollees, so high expected costs for one person would be spread across all enrollees. Second, insurance is regulated more extensively in the small-group market than in the individual market. According to a 2003 survey, 35 states employed rating bands in the small-group market, 10 used adjusted community rating, 2 used pure community rating, and only 3 states and the District of Columbia chose not to regulate rates offered to small firms.[9] Some states also limit the degree to which premiums for small employers can increase from one year to the next to reflect enrollees' costs or changes in their health status (for example, permitting no more than a 15 percent adjustment for those reasons). In other states, however, high health care costs for an employee or a dependent in one year can lead to substantial increases in the average premium charged to the employer in the following year, and lower-than-expected claims can lead to corresponding reductions in premiums.

The overall effect of those state regulations is generally to compress the range of premiums offered. Although insurers could comply with a rating band by reducing the

7. See Mark Merlis, *Fundamentals of Underwriting in the Nongroup Health Insurance Market: Access to Coverage and Options for Reform*, NHPF Background Paper (Washington, D.C.: National Health Policy Forum, April 13, 2005). In principle, insurers could charge a higher premium to applicants who have very high expected costs, but in practice they appear to assume that individuals who would be willing to pay premiums exceeding twice the standard rate would be likely to have even higher covered costs for health care—so rather than charge a very high premium, insurers generally deny coverage to such applicants instead.

8. Ibid. A recent analysis also found that in three states, a dominant insurer used community rating even though the state did not require all insurers to adopt that practice; see Congressional Budget Office, *The Price Sensitivity of Demand for Nongroup Health Insurance*, Background Paper (August 2005).

9. General Accounting Office, *Private Health Insurance: Federal and State Requirements Affecting Coverage Offered by Small Businesses*, GAO-03-1133 (September 2003).

premiums charged to the least healthy enrollees or groups, they could also satisfy those regulations by raising their standard rates. In practice, they appear to do some of both, and rating restrictions have been found to increase premiums for healthier enrollees, decrease them for sicker enrollees, and to raise average premiums (primarily because of the resulting increase in enrollment of predictably higher-cost individuals).[10] The net impact of regulation of premiums on the number of people who have insurance coverage is difficult to predict in the abstract because some people face increases in premiums and others face decreases.

**High-Risk Pools.** Another approach to reducing health insurance premiums is to separate people with the highest health risks from the rest of the pool and partially subsidize their coverage. High-risk pools, as they are called, are a mechanism employed in varied forms by more than 30 states, primarily to assist individuals who are unable to obtain health insurance for medical reasons. Typically, such individuals must apply for private insurance and be denied coverage or be quoted a high premium before they can enroll in the pool. Enrollees are then charged a premium that usually ranges between 125 percent and 150 percent of the standard rate for their age group.

Those premiums are generally insufficient to cover those enrollees' costs for health care, however, so high-risk pools require subsidies to remain solvent (typically averaging several thousand dollars per enrollee). To limit the cost of those subsidies, states may cap enrollment in high-risk pools. As of 2007, however, all states with pools but one (Florida) appeared to be accepting new applicants.[11] In many cases, the costs of subsidizing high-risk pools are financed by an assessment or tax on other health insurance policies sold in the state; in recent years, the federal government has also provided some financial assistance to defray the costs of starting and operating high-risk pools.

As of 2007, about 200,000 people were enrolled in high-risk pools nationwide—about half of that total came from five states—so those enrollees account for about 2 percent of the approximately 10 million nonelderly people who purchase health insurance in the individual market.

High-risk pools obviously reduce the health insurance premiums that their enrollees pay, but covering those high-cost individuals separately could also lower premiums for other purchasers because it would reduce the average costs of the remaining enrollees. The strength of that ripple effect on premiums depends on the extent to which premiums are allowed to vary within the state. At one extreme, if no rating restrictions were in place and all enrollees were charged a premium exactly in accordance with their own expected expenses—or if high-risk applicants had been denied coverage—then establishing a new pool for those with the highest expected costs would have no effect on the premiums of other policyholders. In a community-rated state, by contrast, separating high risks could reduce premiums for the remaining enrollees in rough proportion to the share of covered costs that high-risk enrollees had generated. In states with rating bands, the likely effect would fall between those extremes; reductions in the costs of covering high-risk enrollees could make the bands less constraining and thus could lead insurers to reduce their standard rates.

## Effects of Proposals on Insurance Markets

Proposals to change the regulations governing insurance markets would generally have modest effects on the federal budget, and many of them would entail trade-offs between reducing average policy premiums and making insurance less expensive for individuals with health problems. Although generalizing about the precise effects of such proposals is difficult because their content might vary substantially, some indication of the likely magnitudes of budgetary effects and changes in insurance premiums and coverage can be gleaned from the Congressional Budget Office's recent analysis of legislative proposals to modify state regulations or to allow individuals to buy insurance across state lines. In addition, some quantitative or qualitative information can be provided to help illustrate the potential effects of or key considerations surrounding proposals for which CBO has not previously generated a cost estimate.

The Health Insurance Marketplace Modernization and Affordability Act of 2006 is one example of a proposal

10. See M. Susan Marquis and Stephen H. Long, "Effects of 'Second Generation' Small Group Health Insurance Market Reforms, 1993 to 1997," *Inquiry*, vol. 38, no. 4 (Winter 2001/2002), pp. 365–380; and Amy Davidoff, Linda Blumberg, and Len Nichols, "State Health Insurance Market Reforms and Access to Insurance for High Risk Employees," *Journal of Health Economics*, vol. 24, no. 4 (July 2005), pp. 725–750.

11. Information on the status of high-risk pools comes from www.statehealthfacts.org. See also Bernadette Fernandez, *Health Insurance: State High-Risk Pools*, RL31745 (Congressional Research Service, October 1, 2008).

affecting the regulation of insurance markets that CBO has analyzed.[12] That legislation would have created a more uniform set of regulatory standards for the individual and small-group health insurance markets—standards that would have fallen somewhere between the strictest and most lenient state regulations currently in place. CBO estimated that those changes would decrease the average premium paid by policyholders in those markets by 2 percent to 3 percent, primarily by overriding some benefit mandates and reducing costs that insurers incur in complying with varying state rules. The legislation would have increased insurance coverage by about 600,000 people, on net, but it would have tended to increase premiums (and thus reduce coverage) for people with health problems.

CBO also estimated the budgetary impact of that legislation, concluding that it would increase federal revenues by about $3 billion over 10 years and would reduce federal spending for Medicaid by about $1 billion over that period. The increase in revenues would reflect a net reduction in spending on employment-based health insurance (stemming from the decline in average premiums). Reflecting CBO's assumption that total compensation would not change, that development would shift some compensation from a form that is tax-preferred (health insurance premiums) to a form that is taxable (wages and salaries). Because employment-based insurance would become somewhat less expensive under the proposal, some people who would be covered by Medicaid under current law would switch to private coverage and federal Medicaid spending would decline.

Alternatively, proposals could allow individuals to avoid the requirements set in their home state by purchasing insurance across state lines. In particular, that approach would allow individuals who are relatively healthy and live in states that regulate insurance more extensively to purchase a less expensive policy.[13] CBO analyzed one proposal to allow cross-state purchasing of insurance—the Health Care Choice Act of 2005—and concluded that over 10 years it would increase federal revenues by about $13 billion and federal spending for Medicaid by about $1 billion.[14] The increase in revenues would result largely from a reduction of about 1 million in the number of people who receive health insurance through employment-based plans, which would occur because individually purchased insurance would become relatively attractive (especially to people with lower expected health care costs). The increase in Medicaid spending would reflect the net impact of an increase in spending for people who would lose private coverage and a decrease in spending for those who would gain it. Overall, CBO estimated that the legislation would not have a substantial effect on the number of people who have health insurance because the number who would gain coverage (including previously uninsured people who would purchase coverage in the individual market) would roughly offset the number who lost it.

CBO's previous estimates of federal proposals to add new regulatory requirements also indicate the important influence that existing state practices have on those estimates. For example, the effect of the requirement under HIPAA to guarantee renewal of insurance policies was judged to be limited because nearly all states already had such a requirement in place. Similarly, CBO estimated that HIPAA's requirement for portability of insurance from group to individual coverage would have a relatively small effect on insurance premiums in the individual market. Although insurers would have to offer coverage to relatively unhealthy individuals who would otherwise have been turned down, CBO estimated that in most cases the premiums for those policies could be set to reflect the expected costs for health care for those enrollees and thus would not have a substantial effect on premiums for other enrollees.[15]

Rather than add or remove regulations, the federal government could seek to affect the operation of insurance markets by offering additional subsidies for high-risk

12. Congressional Budget Office, cost estimate for S. 1955, the Health Insurance Marketplace Modernization and Affordability Act of 2006 (May 3, 2006).

13. A similar approach would facilitate the formation of association health plans, which can be offered by trade, industry, or professional associations to their member firms. That option would be attractive for smaller firms with relatively healthy workers that are located in states that regulate premiums more extensively or have more extensive benefit mandates. For an analysis of a recent legislative proposal, see Congressional Budget Office, cost estimate for H.R. 525, Small Business Health Fairness Act of 2005 (April 8, 2005).

14. Congressional Budget Office, cost estimate for H.R. 2355, Health Care Choice Act of 2005 (September 12, 2005).

15. See Statement of Joseph Antos, Assistant Director for Health and Human Resources, Congressional Budget Office, before the Subcommittee on Civil Service, House Committee on Government Reform and Oversight, October 8, 1997.

pools. The costs of such proposals and their effects on coverage rates and premiums would depend primarily on the following factors:

- The number of individuals who would be eligible for and enrolled in those pools;
- The scope of the insurance coverage they would receive;
- The premiums they would have to pay themselves; and
- The mechanism used to subsidize the difference between enrollees' costs for covered health care services and those premium payments.

Because nearly all states with high-risk pools are accepting new applicants, there may not be substantial unmet demand in those states given the coverage and premiums they currently feature (although additional subsidies could encourage more active efforts by states to enroll eligible individuals). Lower premiums for enrollees and more extensive coverage would generate higher enrollment but would also increase subsidy payments and make it more likely that individuals who would have been insured otherwise would switch into the high-risk pool.

The financing of subsidies for high-risk pools raises a number of issues. Larger federal subsidies could lead more states to create high-risk pools and could encourage states to expand existing pools, but they could also cause some substitution of federal funds for existing state funds. Proposals might also address whether payments would be made to states that currently require guaranteed issue and use community rating or narrow rating bands in the individual market; residents of those states might never meet the eligibility terms for a high-risk pool. Payments could be made to those states in an effort to reduce premiums in the individual market, but doing so would raise the cost of the proposal. More generally, the impact of a proposal on the federal budget would depend on whether and to what extent the costs of the subsidy payments were shared between the federal and state governments; a higher federal share would encourage states to participate but would also reduce the incentive for them to control the pool's costs.

## Revealing the Relative Costs of Health Plans

Most Americans with health insurance are shielded from—or may not be aware of—the price of their coverage, either in absolute terms or relative to other options. Many employers pay a large share of the premium for their workers; even though employees as a group ultimately bear that cost, they may not know its magnitude. Moreover, the tax code subsidizes employment-based health insurance by excluding the employer's contributions to the premium from the employee's taxable wages and income; in most cases, the employee's contribution is also excluded. Those features encourage people to have insurance coverage, but they also lead workers to buy more extensive insurance than they would if they faced the full price of their policy; those features also may limit the extent of price competition in the insurance market.

Some proposals would make consumers bear the cost of their health insurance more directly, either by paying the full cost themselves or by paying the added cost of more expensive policies. Proposals could achieve that goal by:

- Reducing or eliminating the current tax subsidy for employment-based insurance, perhaps replacing it with a tax credit or some other fixed-dollar subsidy (an approach discussed in Chapter 2); or
- Establishing a managed competition system, in which a range of plans is offered and the employer's or the government's contribution to the premium is a fixed amount—for example, the premium of the average plan or the least expensive plan available—thus requiring consumers to pay the additional cost of more expensive plans.

Those approaches—taken separately or in combination—would provide stronger incentives for enrollees to weigh the expected benefits and costs of policies when making their decisions about purchasing insurance. As a result, enrollees would generally choose health insurance policies that were less extensive, less expensive, or both, compared with the choices made under current law. A related option would be to give workers more readily accessible information about the full costs of their coverage, including the employer's contribution. Whether and how that information might affect their choice of a health plan is less clear, however.

## Reducing or Eliminating the Tax Exclusion

The current tax treatment of health insurance premiums constitutes a relatively large subsidy—known as a tax expenditure—for the purchase of employment-based insurance, amounting to $145 billion in forgone federal income taxes and $101 billion in forgone federal payroll taxes in 2007.[16] Individuals living in states that have income taxes receive an additional subsidy because those states generally follow federal definitions of taxable income and thus exclude the costs of employment-based health insurance as well. The total tax subsidy averages about 30 percent and generally ranges from about 20 percent to 40 percent of the premium for most workers, depending on their tax bracket and state of residence.[17]

Although the subsidy provides an incentive to purchase insurance—and to do so through one's employer—it also encourages people to buy policies that are more extensive or more expensive than they would purchase otherwise. Reducing or eliminating that exclusion thus could have a large effect on insurance premiums and coverage because it could substantially increase the effective price of any given policy—by 25 percent for someone who had been receiving a 20 percent subsidy and by two-thirds for someone who had been receiving a 40 percent subsidy.[18] (The impact of such changes on whether people purchase insurance is discussed in Chapter 2.)

**Relevant Studies.** Several studies have attempted to quantify how removing or limiting the favorable tax treatment for employment-based insurance would affect insurance coverage, insurance premiums, and total spending on health care. Ideally, a study would compare systemwide outcomes with and without those tax preferences, holding all other factors equal. In practice, however, that type of comparison cannot be readily made because income and payroll tax rates are largely determined at the federal level—so the rules are similar across all states at any given time. Although federal tax rates have changed over time, many other aspects of the health care system and the national economy have simultaneously changed, making it difficult to separate cause and effect when comparing one period with another. As a consequence of those methodological challenges, the findings of older studies using aggregate data on tax rates and insurance premiums vary widely, depending on the period they examined and the assumptions they made.

Two recent studies have attempted to address those methodological issues more carefully, but some concerns remain about using their results to estimate the impact of eliminating the tax exclusion. A 2004 study by Gruber and Lettau examined how employers' spending on health insurance varied across states with different tax structures, exploiting the fact that state income tax rates changed at different times (and did so in ways that were not caused by trends in health insurance).[19] Extrapolating from those results, they estimated that eliminating the tax exclusion for health insurance premiums—which in the sample that they studied would increase the effective price of health insurance by 58 percent, on average—would yield a 29 percent reduction in health care spending by employers who continued to offer coverage. In other words, the reduction in those employers' contributions would be about half as large (in percentage terms) as the increase in the effective price facing enrollees.

Gruber and Lettau's paper improved substantially on earlier work by better isolating the effect of the net price of health insurance on premiums, but it still has limitations. In particular, their estimate is based on relatively small differences in state tax rates, and extrapolating the effects of those differences could overstate the impact of larger changes. One way that employers could reduce premiums would be to limit the extent of the coverage they offer (for example, by increasing cost-sharing requirements). But that approach would also heighten the variability of health costs for employees, and workers might become increasingly reluctant to accept higher levels of cost sharing as their degree of financial risk grew. At the same time, more rigorous management efforts by health plans (or shifts in enrollment toward more tightly managed

16. Joint Committee on Taxation, *Tax Expenditures for Health Care*, JCX-66-08 (July 30, 2008).

17. One offsetting consideration is that excluding health insurance premiums from taxable wages reduces future Social Security benefits, which are based on average earnings, at the same time that it reduces payroll tax payments.

18. Assume, for example, that an insurance policy has a total premium of $5,000. Someone receiving a 20 percent tax subsidy would thus pay $4,000 on net. If the tax subsidy was eliminated, that person would pay $5,000, or 25 percent more. Someone receiving a 40 percent tax subsidy would currently pay $3,000 for that policy. If the tax subsidy was eliminated, that person would pay $5,000, or 67 percent more.

19. Jonathan Gruber and Michael Lettau, "How Elastic Is the Firm's Demand for Health Insurance?" *Journal of Public Economics*, vol. 88, no. 7 (July 2004), pp. 1273–1294.

plans) would yield somewhat lower premiums, but more substantial reductions might become increasingly difficult to achieve. In other words, existing differences in employers' contributions across states could largely reflect the use of cost-control options that represent the "low-hanging fruit."

Another limitation of the study is that it includes the impact of employers changing the share of the premium they pay in response to different tax rates. In that case, employees would see their contributions rise but the total premium for their coverage would not change. Even with that effect included, the impact of changes in tax rates that the study found barely meets the standard threshold for statistical significance—that is, the odds of getting their results by pure chance (assuming that the true effect of the tax exclusion was zero) were only slightly less than one in twenty. Gruber and Lettau estimated, on the basis of other studies, that reductions in the share of the premium that employers cover would account for about one-fourth of the effect on employers' spending that they report. But if that component was removed, the remaining effect they found might not meet a test of statistical significance.

A more recent study by Heim and Lurie avoided some of those methodological problems but was based on a relatively small segment of the population that may not be representative. The study analyzed spending on health insurance premiums for self-employed individuals, who were able to deduct a growing proportion of their premiums from their taxable income over time.[20] Their results, which were similar to Gruber and Lettau's estimate, imply that the reduction in premiums that would result from scaling back the tax exclusion for health insurance would be about half as large as the resulting price increase; that is, an increase of about 50 percent in the net price of health insurance would lead people to choose policies with premiums that were about 25 percent lower than otherwise. An advantage of their study is that it accounts for the full effect on insurance premiums rather than the impact on employers' contributions, because in their study the employer and the employee are the same person. The self-employed, however, may differ in both observable and unobservable ways from people who work in a firm; to the extent that their study did not fully account for those differences, caution must be used in extrapolating their results to a broader population.

**CBO's Assessment.** Reflecting the limitations of those two studies, CBO's assessment is that removing the tax preference would have a smaller effect on the level of premiums that individuals choose. Specifically, CBO estimates that a 50 percent increase in the price of health insurance, all else being equal, would lead people to select plans with premiums that are between 15 percent and 20 percent lower than the premiums they would pay under current law. Reaching that point would probably take several years, as health plans, employers, and enrollees adjusted their offerings and choices. A portion of that ultimate decrease in premiums would come from reductions in the extent of coverage that enrollees purchased (that is, fewer benefits covered or higher cost-sharing requirements), and the remainder would come from choosing plans that exercise tighter management over the use of health care (that is, plans might have more features typical of health maintenance organizations such as utilization review, restricted provider networks, or gatekeeper requirements).

The effect of a specific policy proposal would depend primarily on what changes it made in the tax treatment of health insurance. Removing the exclusion of premiums from income and payroll taxation would increase the after-tax price of health insurance by roughly 50 percent, on average, for people currently covered by employment-based insurance. Removing the exclusion only for income tax purposes (keeping the payroll tax exclusion in place) would raise the average price by roughly 30 percent, which would ultimately yield health insurance premiums that are 9 percent to 12 percent lower. In both cases, the reduction in overall spending on health care would be smaller than the reduction in premiums because some costs would be shifted from covered spending to out-of-pocket spending.

Alternatively, proposals could cap the amount of premium payments that may be excluded from workers' taxable income—the effects of which would depend critically on the level at which the cap was set. Workers whose premiums exceeded the cap by a substantial margin would have strong incentives to switch to a less expensive plan. Workers whose premiums fell below the cap, however, would not be affected, so the overall impact on premiums would generally be smaller. One objective of

20. Bradley T. Heim and Ithai Lurie, "Do Increased Premium Subsidies Affect How Much Health Insurance Is Purchased? Evidence from the Self-Employed" (draft, Department of Treasury, Office of Tax Analysis, January 7, 2008).

capping the exclusion might be to target employees who have relatively extensive insurance coverage and, as a result, above-average premiums. Workers who reside in areas with higher-than-average medical costs or whose firms have higher premiums because their covered workforce is older or in poorer health could also be affected by a fixed-dollar cap, however, even if the generosity of their health plan was not above average.

The effects of reducing, eliminating, or capping the exclusion for employment-based insurance would also depend on a number of issues relating to implementation. Insurers and employers would have to report to both employees and the Internal Revenue Service the amount of premiums subject to tax. However, calculating the average premium and allocating those costs among employees could be difficult, particularly for large employers whose plans cover employees' expenses for health care as they are incurred (in which case timely data may not be available). Limiting or eliminating the exclusion would also create incentives for employers to misrepresent benefits as company overhead or to reallocate costs among subsidiaries so as to reduce their employees' tax liability. (Those considerations would affect the proposal's impact on revenues as well as the incentives for workers to choose less expensive policies.)

Another source of uncertainty is whether the 41 states (and the District of Columbia) that have their own income tax would continue to follow the federal lead in the tax treatment of premiums for employment-based coverage. If, instead, some states took action to maintain the full exclusion of premiums from taxable income, the incentive for workers to choose a less expensive plan would be smaller. The extent of that difference would depend on the number of states that did not conform their tax systems to mirror the federal tax change and on the tax rate structure in those states.

## Establishing a Managed Competition System

The term "managed competition" refers to a purchasing strategy that seeks to create stronger incentives for consumers to be cost-conscious in their choice of health plans and for plans to compete more intensely on the basis of premiums and quality of care.[21] Under that approach, a sponsor—such as an employer or government agency—would offer a choice of health plans and would make a fixed-dollar contribution toward the cost of insurance. Enrollees would thus bear the cost of any difference in premiums across plans (although that effect would be muted if enrollees could continue to exclude their own premium payments from taxation). Sponsors would give enrollees comparative information about their options. Some versions of managed competition would also involve standardizing the benefits offered—to a greater or lesser degree—in order to foster stronger price competition. In addition, sponsors could adjust payments to health plans to account for differences in the health status of their enrollees (in an effort to limit the impact of those differences on the plans' premiums).

**Background.** Most employers do not use the principles of managed competition to purchase health insurance benefits for their employees. Indeed, surveys indicate that most firms that offer health insurance do not give their employees a choice of health plans. That statistic is somewhat misleading, however, because most firms have few employees. Large firms are much more likely than small firms to offer a choice of plans, and they also account for the majority of workers. Consequently, about 57 percent of workers who are offered insurance have a choice of plans. In the case of firms that do not offer their workers a choice of plans, health plans still compete on the basis of their price and value but do so in an effort to be chosen by the employer. For small employers in particular, the administrative costs of offering several competing plans and the potential problems of adverse selection that could arise may outweigh the benefits of giving their employees more options.

Even among firms offering a choice of plans, fixed-dollar contributions to employees' insurance premiums—another key feature of managed competition—are less common than fixed-percentage contributions. A 2002 survey found that among Fortune 500 companies (which generally offer their employees a choice of plans), only about one-quarter took the fixed-dollar approach.[22] The following example illustrates the incentives created by each approach. Suppose that an employer makes two plans available—one with a total premium of $4,000 per

21. See Alain C. Enthoven, "The History and Principles of Managed Competition," *Health Affairs*, vol. 12 (Supplement 1993), pp. 24–48.

22. James Maxwell and Peter Temin, "Managed Competition Versus Industrial Purchasing of Health Care Among the Fortune 500," *Journal of Health Politics, Policy, and Law*, vol. 27, no. 1 (2002), pp. 5–30.

year and one with a premium of $5,000. If that employer pays 80 percent of the total premium for each plan, an employee who chooses the more costly plan pays an additional $200 (20 percent of the $1,000 difference in premiums between the two plans). Under a managed competition system, however, the employer would contribute the same amount to both plans (for example, 80 percent of the *average* premium, or $3,600). Employees would face the full $1,000 price difference between the two plans and would therefore have a much stronger incentive to choose the lower-cost plan. Making employees pay the full difference in premiums could also stimulate greater competition among insurance plans to keep their premiums down. (Whether enrollees actually faced that full difference would also depend on whether their premium payments were tax-preferred.)

Some proposals that are based on the principles of managed competition would require health plans to offer a standard benefit package. In principle, standardizing benefits would promote competition among health plans by making it easier for consumers to compare their options; that step would also help prevent plans from structuring their benefit packages to attract enrollees who are less likely to use medical care (which could in turn reduce the plan's premiums and thus distort the comparison of plans). In practice, however, some aspects of health benefits are easier to standardize than others. For example, specifying uniform levels of cost sharing is relatively straightforward, but other aspects—such as definitions of covered services and utilization review procedures—can affect a consumer's ability to use certain benefits and are more to difficult to standardize.[23] Moreover, having standard benefits has two disadvantages. First, by limiting consumers' options, standardization would make some people worse off (specifically, those who would prefer a different design). Second, rigid standardization could prevent health plans from developing innovative designs that might lead to more efficient delivery of care.

Another important design issue is whether the sponsor's payments to insurers would vary to reflect differences in expected health care costs for different enrollees—a process known as risk adjustment. Under managed competition systems, all enrollees in a given health plan would typically pay the same premium—so if payments to plans were not adjusted, plans that attracted less healthy members would have higher premiums as a result.[24] Because enrollees would have strong financial incentives to switch out of those plans, the adoption of managed competition could trigger an "adverse selection spiral" for plans offering the most extensive coverage or doing little to manage benefits. In fact, some employers that implemented a managed competition system dropped such plans as their premiums skyrocketed and their enrollments plummeted.[25] (Health plans might also drop out of a managed competition system for other reasons that make them broadly unpopular with enrollees, such as being poorly run.)

In principle, adjusting the sponsors' payments to plans to account for expected differences in their enrollees' health care costs would limit the impact of adverse selection. If those adjustments worked well, the premiums that enrollees faced would vary across plans because of differences in the value of their benefits or the efficiency of their operation, but not because of differences in their mix of enrollees. Government programs currently use risk adjustment in cases in which private health plans compete against a government-administered option (as with Medicare Advantage plans or Medicaid HMOs) and against one another to deliver program benefits (as with the prescription drug plans in Medicare).

In practice, however, risk-adjustment methods are imprecise, so fully offsetting the effects of enrollees' characteristics on a plan's premium may not be feasible. Those methods do not need to account for all differences in health care spending across enrollees to be effective; indeed, comparisons of predicted spending using risk-adjustment models with actual spending will inevitably find some enrollees who used more care than was expected and some who used less. What matters is

23. For a discussion of this issue, see Mark McClellan and Sontine Kalba, "Benefit Diversity in Medicare: Choice, Competition, and Selection," in Richard Kronick and Joy de Beyer, eds., *Medicare HMOs: Making Them Work for the Chronically Ill* (Chicago: Health Administration Press, 1999), pp. 133–160.

24. Under a managed competition system, insurers could be allowed to vary individuals' premiums so that the premiums reflected each enrollee's expected costs for health care, in which case those premiums would already be adjusted for risk. In many respects, such an arrangement would resemble the current market for individually purchased insurance.

25. David M. Cutler and Sarah J. Reber, "Paying for Health Insurance: The Trade-Off Between Competition and Adverse Selection," *Quarterly Journal of Economics*, vol. 113, no. 2 (May 1998), pp. 433–466.

Case 3:10-cv-00091-RV-EMT Document 83-3 Filed 11/05/10 Page 28 of 33



accounting for the predictable differences in spending that might affect an enrollee's choice of a health plan or a health plan's efforts to attract or discourage particular types of members. Some experts have indicated that at least 20 percent to 25 percent of health care spending may be predictable from one year to the next, yet studies show that existing risk-adjustment methods account for no more than half of that variation.[26] That degree of predictive power may be sufficient to prevent widespread problems from arising because of selection pressures. Even so, individual health plans could receive overpayments or underpayments relative to the true expected health care costs of their enrollees.

**Relevant Studies.** Limited evidence is available about the effects of managed competition on health care costs. A few studies have conducted in-depth analyses of particular employers that implemented that approach. Other studies have compared employers that make fixed-dollar contributions to their employees' insurance premiums with employers that use other contribution formulas. Both types of studies have limitations—employers who adopted managed competition (or their workers) may differ from firms that did not, and all of those studies have used data from the mid-1990s or earlier. A more recent example comes from the new Medicare drug benefit, which incorporates many elements of managed competition, but it has not been operating long enough to permit detailed analysis. In any event, comparisons with alternative designs for the drug benefit would be hypothetical because the same approach was adopted nationwide.

The available evidence indicates that, when compared with systems in which employers make a larger premium contribution for more expensive health plans, setting the employer contribution as a fixed-dollar amount reduces total health insurance premiums (the amount paid by employers and employees combined) by 5 percent to 10 percent.[27] Employers that have implemented managed competition have seen large numbers of their employees switch to lower-cost plans, which is an important source of the cost reductions. Some evidence indicates that adopting managed competition has also led insurance plans to lower their premiums; whether the plans did so because of changes in benefit design, tighter management of benefits, or reductions in profits or administrative costs is not clear. Studies of managed competition systems have generally not involved standardization of benefits or risk-adjustment of premium payments, however, so the effects of those features are more difficult to determine.

**CBO's Assessment.** The effects of specific proposals on average premiums would depend on how extensively they adopted the key features of a managed competition system; those proposals could vary along several dimensions. First, proposals would tend to have a larger impact if they gave sponsors clearly defined roles in overseeing the competition among health plans on the basis of price and quality. For example, sponsors could be responsible for enforcing the requirements that plans must satisfy to be included in the system; providing comparative information to consumers on the plans' premiums, benefits, and quality of care; and managing the enrollment process. Less structured systems that relied more on individual enrollees to gather that information would have less of an impact because the cost to enrollees of doing so would be greater and the pressure on insurers to demonstrate value would thus be less intense.

A second key consideration in determining the effects of a managed competition proposal is whether and to what extent enrollees would be required to pay the full additional cost of more expensive plans. The incentives for enrollees to choose lower-cost plans would be strongest if sponsors made a fixed-dollar contribution toward the premium. That contribution could be based on the premium for the lowest-cost plan that is available, the average premium, or some other fixed reference point. The key feature is that enrollees would be able to capture the savings from joining a less expensive plan, which

26. Newhouse, Buntin, and Chapman, "Risk Adjustment and Medicare." Studies finding that at least 20 percent to 25 percent of health care spending is predictable largely reflect comparisons of individuals' average spending over several years and thus account for any reason that one person's spending is higher than another's. Risk-adjustment models, by contrast, generally adjust payments using information only about individuals' age and sex and the diseases or health conditions with which they have been diagnosed. Those models thus do not take into account other differences among individuals (such as their preferences about health care) that affect their spending. Those features reflect an apparent reluctance to assign different adjustment factors to people who have the same demographic characteristics and health problems.

27. For a discussion of that evidence, see Congressional Budget Office, *Designing a Premium Support System for Medicare* (December 2006), pp. 31–35.

the impact on health care spending of the changing mix of doctors' activities. A survey of patients did find that waiting times to schedule an appointment roughly doubled, indicating that the supply of services did not increase as much as patients would have wanted when care became free to them. Moreover, total contacts with patients rose for lower-income families (whose demand for care increased most sharply) but fell for higher-income families—indicating that the overall supply of services was constrained, at least in the short run.

A more recent example comes from Taiwan, which implemented universal health insurance in 1995. One study examined the effects on services used by adults and found that among the one-quarter who were previously uninsured, the number of visits to physicians increased by about 70 percent and the number of hospital admissions more than doubled; use rates for people who had been insured previously were largely unchanged.[31] Another analysis found that the overall rate of hospital admissions in Taiwan grew by about 10 percent between 1994 and 1996.[32] Those figures would suggest that Taiwan's health care system was able to accommodate the increase in demand, but another factor was that payments to physicians working in primary care clinics were raised by about 20 percent. That change helps explain why the number of physicians working in such clinics, which had been increasing by about 5 percent per year, grew by 10 percent in 1995. (Whether those doctors shifted from the hospital sector, which accounted for about 60 percent of physicians' employment, or came from another source is not clear.)

## Uncompensated Care and Cost Shifting

Another issue that arises when analyzing providers' payments is whether relatively low payments by public programs or the costs of providing uncompensated care to the uninsured result in higher payment rates for private insurers—a process known as cost shifting. In many cases, uninsured individuals pay much less than the costs of the care they receive, so doctors and hospitals might seek to make up those losses by charging more to private health plans. Similar pressures to raise private payment rates could occur if payments from public programs did not cover the average costs of their patients (which could be termed "undercompensated" care). To the extent that costs are being shifted, proposals that reduced the uninsured population or switched enrollees from public to private insurance plans would have ripple effects on private payment rates and thus on private insurance premiums.

The evidence indicating that private payment rates are higher than public rates—and that they also appear to exceed the costs of treating privately insured patients—is sometimes taken as proof of cost shifting. There are, however, other explanations. In general, a firm that has some monopoly power will be more profitable if it charges different prices to different sets of purchasers that reflect differences in the groups' willingness to pay (a practice known as price discrimination). The fact that hospitals receive different payment rates from public and private insurers may reflect that same behavior. Differences in payment rates across different types of insurers do not, however, mean that costs have been shifted from one type to another. The key question about cost shifting is whether an *increase* in the rates paid on behalf of some patients (including people who used to receive charity care but would now have insurance) would cause a *decline* in the rates paid by others (such as private insurers).

Whether and how such cost shifting would occur depends on several other factors, including the amount of uncompensated care that is provided, the adequacy of public payment rates, and the degree of competition facing hospitals and doctors. Recent estimates (discussed below) indicate that hospitals provided about $35 billion in uncompensated care in 2008, but the available evidence suggests that less than half of those costs—and probably much less—were shifted to private insurers. Estimates of uncompensated care provided by doctors are considerably smaller, and cost shifting does not appear to be a substantial factor affecting payment rates for physicians. Although assessing the adequacy of Medicare's payments to doctors and hospitals is more difficult, MedPAC's analysis indicates that those payments are sufficient to cover the costs of efficient providers in 2008; that finding suggests that Medicare's payments do not

31. Shou-Hsia Cheng and Tung-Liang Chiang, "The Effect of Universal Health Insurance on Health Care Utilization in Taiwan: Results from a Natural Experiment," *Journal of the American Medical Association*, vol. 278, no. 2 (July 9, 1997), pp. 89–93.

32. Jui-Fen Rachel Lu and William C. Hsiao, "Does Universal Health Insurance Make Health Care Unaffordable? Lessons from Taiwan," *Health Affairs*, vol. 22, no. 3 (May/June 2003), pp. 77–88. That study also found that subsequent efforts by the government to institute a global budget for health care services helped control the growth of spending in that country. For a discussion of such global budgets, see Chapter 8 of this report.

generate cost shifting in competitive markets. Medicaid's payment rates for doctors and hospitals probably fall below the costs of treating that program's enrollees, but whether the costs of those shortfalls are shifted is not clear.

## The Potential for Cost Shifting

Cost shifting could occur only under certain conditions, so it is useful to review them carefully. There are two basic scenarios: one that involves a provider market with limited competition, and one that involves a competitive provider market.

An extreme example of **limited competition** would be an isolated community that is served by a single hospital. Because of its monopoly power, such a hospital could negotiate payment rates from private insurers that exceed its costs for those patients. In response to a reduction in payments from public insurance programs or an increase in the amount of uncompensated care that it provides, that hospital might be able to secure higher payments from private insurers to offset its losses. In order for such cost shifting to occur, however, the hospital would have to have been charging private insurers less than it could have; that is, the hospital would have to have had monopoly power that it had refrained from using fully.[33]

Whether some hospitals have market power that they have failed to exploit is unclear. One reason that many hospitals might not have fully used their market power is that most of them are nonprofit organizations. As a result, their goals of serving the community and the corresponding makeup of their governing boards may lead them to charge private insurers less than the profit-maximizing price (that is, the price a monopolist would charge).[34] In other respects, however, the behavior of nonprofit and for-profit hospitals can be difficult to distinguish. For example, a recent study by CBO found that nonprofit and for-profit hospitals provided similar amounts of uncompensated care.[35] Whether a hospital's goal is to maximize profits, serve the community, or some combination of the two, the key questions remain: Would hospitals (and other providers) that have market power lower private payment rates if proposals either reduced uncompensated care or raised the payments that providers receive for enrollees in public programs? Or would hospitals still seek to charge private insurers a profit-maximizing price, either as an end in itself or as a means of financing other efforts to serve their community?

Cost shifting could also occur in a **competitive provider market** in order to offset the costs of uncompensated care or to make up for losses that might arise from relatively low public payment rates. Why would they accept those rates in the first place? In general, providers have some operating costs that do not vary with their patient load (fixed costs) and some that do (variable costs). If public payment rates were high enough to cover the variable costs of serving those patients—but contributed little or nothing toward covering providers' fixed costs—it would still be worthwhile for providers to accept those payments, at least in the short run. Providers could try to make up for losses from undercompensated care by charging more to private insurers. If competing providers had roughly comparable burdens of uncompensated and undercompensated care, then those higher private rates could probably be sustained in a competitive market.[36]

Providers facing shortfalls in payments would also have alternatives, however, including the option of reducing their costs. That approach would yield higher payment-to-cost ratios and could reduce the quality of care that patients receive, but it would not raise private payment rates. Indeed, with a lower cost structure, hospitals may reduce their rates for private insurers. By the same token, a decline in uncompensated or undercompensated care

33. To the extent that a hospital with market power charges prices that exceed its costs, the question of why competing hospitals have not entered those markets arises. The apparent persistence of limited competition among hospitals in many areas, however, indicates that some barriers to entering the market exist, at least in some areas of the country.

34. See Paul B. Ginsburg, "Can Hospitals and Physicians Shift the Effects of Cuts in Medicare Reimbursement to Private Payers?" *Health Affairs*, Web Exclusive (October 8, 2003), pp. W3-472 to W3-479.

35. See Congressional Budget Office, *Nonprofit Hospitals and the Provision of Community Benefits* (December 2006).

36. In the strict sense of the term, such markets might not be considered fully competitive because hospitals would have to feel compelled to continue serving patients for which they were under-compensated. Without that constraint, some hospitals would probably stop accepting those patients; those hospitals could then lower their fees to private payers and take private business away from competing hospitals (to the extent that they had sufficient capacity). Hospitals that continued to be undercompensated would suffer financial losses and would either have to receive outside assistance or eventually exit the market.

might allow providers to offer care of higher quality (at a higher cost), but it might not yield a corresponding reduction in private payment rates and could even cause private rates to increase.

## Estimates of Uncompensated Care and the Adequacy of Public Payments

Estimates of how much uncompensated care the uninsured receive vary depending on the data sources used and on how the concept is defined and measured. Analysts generally define uncompensated care as care for which the provider is not paid in full by the patient or a third party.[37] It includes both charity care (for which little or no payment is expected) and bad debt (for cases in which payment is sought but not collected). Studies differ, however, in how they define "full" payment, with some comparing the payments that are received to the list prices that providers post. A more useful comparison, however, is to the total payments that providers would receive for the same service when treating a privately insured patient, because that amount (which is generally much lower than the list price) more closely resembles their costs.

A recent study by Hadley and others, which used that analytic approach, examined a sample of medical claims for uninsured individuals and projected that they would receive about $28 billion in uncompensated care in 2008.[38] That study also examined cost reports from hospitals and a survey of doctors and generated a different estimate: The gross costs of providing uncompensated care would be about $43 billion in 2008, of which $35 billion would come from hospitals and $8 billion from doctors. Total spending on hospital care in 2008 is estimated to be about $750 billion, so those figures would imply that uncompensated care accounts for about 5 percent of hospital revenues, on average. Those findings are consistent with CBO's analysis of uncompensated hospital care (cited above), which found that a sample of for-profit and nonprofit hospitals incurred costs for such care that averaged between 4 percent and 5 percent of their operating revenues.

Another point on which analysts disagree is whether to consider only the gross costs of providing uncompensated care or to net out offsetting payments that providers receive from sources other than insurers. As the Hadley study noted, about half of hospitals' aggregate costs for uncompensated care may be offset by added payments under Medicare and Medicaid to hospitals that treat a disproportionate share of low-income patients.[39] Whether hospitals seek to recoup from private payers the gross costs they incur for providing uncompensated care or their net costs after accounting for those offsetting payments is not clear; the answer depends in part on how well the offsetting payments are targeted toward hospitals that provide uncompensated care.

As for physicians, the figures cited above indicate that they provide a relatively small amount of uncompensated care—representing about 1 percent of the roughly $500 billion spent on physicians' and clinical services in 2008. Another study found that, on net, uncompensated care provided by office-based physicians was close to zero after the higher payments made by some uninsured individuals were taken into account.[40] That study also found that if those offsetting payments were ignored, the gross amount of uncompensated care provided by physicians was about $3 billion per year in the 2004–2005 period. Either way, the uncompensated care that physicians provide seems unlikely to have a substantial effect on private payment rates.

As with estimates of uncompensated care, assessments of the adequacy of payments from Medicare and Medicaid vary depending on the data and the points of comparison that are used. The data from hospitals' cost reports compiled by the American Hospital Association indicate that Medicare's payments covered about 91 percent of costs for those patients in 2006 (whereas private payments were reported to average about 130 percent of the costs of

37. By definition, no payments are received from insurers, but some care provided to uninsured individuals is paid for by other third-party sources, such as workers' compensation programs (for on-the-job injuries) or veterans' benefits.

38. Jack Hadley and others, "Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs," *Health Affairs*, Web Exclusive (August 25, 2008), pp. W399–W415. As discussed in Chapter 1, that study estimated that people who are uninsured for all of 2008 receive about $540 in uncompensated care, on average, and that people who are uninsured for part of that year receive about $150 in uncompensated care.

39. Conversely, a reduction in uncompensated care could provide a policy rationale to reduce those payments from Medicare and Medicaid.

40. Jonathan Gruber and David Rodriguez, *How Much Uncompensated Care Do Doctors Provide?* Working Paper No. 13585 (Cambridge, Mass.: National Bureau of Economic Research, November 2007).

treating those patients).[41] Correspondingly, the AHA estimated a shortfall in Medicare's payments to hospitals of about $19 billion in 2006. As noted above, however, those calculations depend partly on how hospitals' fixed costs are allocated.

MedPAC's most recent analysis indicates that Medicare's payments are sufficient to cover the costs of efficient hospitals. That assessment took into account hospitals' reported losses on Medicare patients, although MedPAC's calculations used a slightly different approach and found a smaller gap between payments and costs (about 5 percent in 2006, compared with AHA's estimate of 9 percent). That analysis also considered other indicators of whether payments were adequate, including beneficiaries' access to care, the volume of services provided to them, and hospitals' plans for expansion (a measure of financial health). Indeed, MedPAC's analysis suggests an alternative explanation: Instead of low Medicare payment rates causing private rates to be higher, high private payment rates at some hospitals may be leading them to relax their efforts to control costs. In turn, that tendency may have pushed up per-patient costs and thus caused payment-to-cost ratios for Medicare (and private) patients at those hospitals to be lower than they would be at hospitals that have lower per-patient costs.

As for Medicaid, AHA's analysis of hospitals' cost reports indicates that the program's payments covered about 86 percent of costs, on average, in 2006 (with the added Medicaid payments to hospitals that treat a disproportionate share of low-income patients included in that analysis). That calculation translates into an estimated shortfall in payments of about $11 billion. Medicaid's payment rates appear to be lower than Medicare's, so even if AHA's calculation overstates the shortfall, it seems likely that Medicaid's payment rates fall somewhat below hospitals' average costs for those patients.

Because physician markets are generally competitive, individual doctors or group practices would be able to shift costs to private payers only to the extent that Medicare and Medicaid payments did not cover their costs (which can be difficult to estimate). Even so, MedPAC's conclusion that Medicare's 2008 rates for doctors are adequate indicates that little scope for cost shifting exists in that sector. As for Medicaid, the available evidence indicates that many doctors do not accept Medicaid patients, which implies that those payments, in many cases, fail to cover doctors' costs. The extent to which doctors who accept Medicaid payments are able to shift costs to private payers depends in part on whether their competitors have comparable numbers of Medicaid patients.

41. American Hospital Association, *Trendwatch Chartbook 2008*.

### Evidence About Cost Shifting

How much cost shifting actually occurs? Differences in public and private payment rates are sometimes taken as proof that costs are being shifted, but those differences reflect several factors, and it is not obvious whether or to what extent private payment rates would change as a result of changes in uncompensated care or public payment rates. Researchers who have attempted to evaluate whether hospitals shift costs to private payers have generally focused not on payment levels but on changes in the prices paid by private insurers following increases or (more commonly) reductions in Medicare or Medicaid fees.

Those studies have produced varied results, depending on the period studied and the methods used. The evidence that some cost shifting had occurred was relatively strong when researchers examined periods of less vigorous competition in the medical marketplace, such as the early 1980s. For example, a 1988 study that examined how hospitals in Illinois responded to cuts in Medicaid payments found that hospitals raised private prices to offset about half of the revenue from Medicaid that had been lost.[42] Other studies from that period suggest that financial pressures led to a limited amount of cost shifting and also encouraged hospitals to adopt cost-containment measures.[43] The early 1980s were conducive to cost shifting because private insurers usually paid hospitals on the basis of their charges and engaged in little price negotiation or selective contracting. In such an environment, it may have been relatively easy for hospitals that faced a

42. See David Dranove, "Pricing by Non-Profit Institutions: The Case of Hospital Cost-Shifting," *Journal of Health Economics*, vol. 7, no. 1 (1988), pp. 47–57.

43. Stephen Zuckerman, "Commercial Insurers and All-Payer Regulation: Evidence on Hospitals' Responses to Financial Need," *Journal of Health Economics*, vol. 6, no. 3 (September 1987), pp. 165–187, and Jack Hadley and Judith Feder, "Hospital Cost Shifting and Care for the Uninsured," *Health Affairs*, vol. 4, no. 3 (Fall 1985), pp. 67–80.

revenue shortfall on other patients to raise prices for private insurers.

After the mid-1980s, however, competitive pressures on hospitals intensified as private insurers became more aggressive in negotiating payments and establishing networks of preferred hospitals. Accordingly, the evidence of cost shifting generally became weaker.[44] For example, a study examining data from hospitals in California for the 1993–2001 period indicated that cost shifting in response to a 10 percent reduction in Medicare and Medicaid's fees increased the ratio of private payments to costs by 1.7 percent and 0.4 percent, respectively; that response for Medicare was generally lower than the effect that was estimated by applying a similar analytic approach to data from the 1980s.[45] In fact, one study suggested that cuts in public payment rates prompted hospitals with high numbers of Medicaid patients to *decrease* prices to private payers in an effort to attract more private patients.[46]

Overall, the impact of cost shifting on payment rates and premiums for private insurance seems likely to be relatively small. The available evidence indicates that hospitals shift less than half of the costs of reductions in public payment rates to private insurers—and in all probability, substantially less. Studies have not examined changes in uncompensated care as closely, but it seems reasonable to conclude that those costs are shifted to a comparable degree. Developments since the late 1990s—particularly consolidation of hospitals and pressure on private insurers to broaden their provider networks—appear to have strengthened hospitals' bargaining position, raising the possibility that more cost shifting will occur than was observed in the 1990s. Although payment-to-cost ratios for private insurers rose sharply between 2001 and 2004, it remains unclear whether hospitals have taken full advantage of their strengthened position or still have the degree of untapped market power that is necessary for cost shifting to occur in markets with limited competition.

44. Michael A. Morrisey, *Cost Shifting in Health Care: Separating Evidence from Rhetoric* (Washington, D.C.: AEI Press, 1994); and Jack Hadley, Stephen Zuckerman, and Lisa I. Iezzoni, "Financial Pressure and Competition: Changes in Hospital Efficiency and Cost-Shifting Behavior," *Medical Care*, vol. 34, no. 3 (1996), pp. 205–219.

45. See Jack Zwanziger, Glenn A. Melnick, and Anil Bamezai, "Can Cost Shifting Continue in a Price Competitive Environment?" *Health Economics*, vol. 9, no. 3 (April 2000), pp. 211–226; and Jack Zwanziger and Anil Bamezai, "Evidence of Cost Shifting in California Hospitals," *Health Affairs*, vol. 25, no. 1 (January/February 2006), pp. 197–203. Although Zwanziger and colleagues concluded that the strength of cost shifting had not diminished by 1991, the 2006 paper generally finds less cost shifting in the more recent period. The estimated effect of a cut in Medicaid's fees was low in both periods.

46. See David Dranove and William D. White, "Medicaid-Dependent Hospitals and Their Patients: How Have They Fared?" *Health Services Research*, vol. 33, no. 2, pt. 1 (June 1998), pp. 163–185.