# Exhibit 13

S. HRG. 110–1052

# 47 MILLION AND COUNTING: WHY THE HEALTH CARE MARKETPLACE IS BROKEN

## HEARING

BEFORE THE

## COMMITTEE ON FINANCE
## UNITED STATES SENATE

ONE HUNDRED TENTH CONGRESS

SECOND SESSION

JUNE 10, 2008

Printed for the use of the Committee on Finance

U.S. GOVERNMENT PRINTING OFFICE

57–484—PDF WASHINGTON : 2008

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

# APPENDIX

ADDITIONAL MATERIAL SUBMITTED FOR THE RECORD

---

NSBA
National Small Business Association

**Testimony from**

**Raymond Arth, Phoenix Products, Inc.**

**On behalf of**
**THE NATIONAL SMALL BUSINESS ASSOCIATION**

*For the hearing*

"47 Million & Counting: Why the Health Care Marketplace is Broken"

**Senate Finance Committee**

**June 10, 2008**

Good morning. I would like to thank Chairman Baucus, Ranking Member Grassley and the committee for inviting me here today. I am honored to testify before a committee recognized for its hard work and for its bipartisan cooperation. Each of us testifying today will provide you with a different story, a diverse perspective and I expect one, common conclusion—small businesses are being crushed by the burden of the increasing cost of health care.

I am here today in two capacities, as a small business owner and as a past Chair of the National Small Business Association and so have two parts to my testimony. The first is an overview of the challenges I have faced in providing affordable, quality health insurance to my employees; the second to briefly describe NSBA's position and policy recommendations for reform. I am not an authority on health insurance but I have had a lot of experience as a consumer, and participated in developing NSBA's policy recommendations.

Before I get into my health insurance adventures, it is important that we understand how broad this issue is, and why dealing with the problems facing small business are important. According to data from the U.S. Census and Small Business Administration Office of Advocacy, there are approximately 70 million people in the U.S. who work for or run a small business – that is more than half of the private U.S. workforce. For the past 15 years, small business has created on average 93.5 percent of all net new jobs—resulting in an average of 4,000 new jobs EVERY day. The small-business community's role in creating jobs and stimulating economic growth cannot be underestimated or made merely into a talking point. Neither can the extreme time and financial drain the current health care system poses for small-business owners.

In nationwide surveys, small-business owners consistently rank health care among their top concerns. According to the recently-released NSBA Survey of Small and Mid-Sized Business, only 38 percent of respondents—nearly 90 percent of whom employ less than 19 workers—offer their employees health insurance. That is down 3 percent from one year ago, down 11 percent from 2000, and down 29 percent from 1995. Despite the low-rate of offering health insurance, 69 percent of respondents rated health insurance as the top benefit they WANT to offer.

The cost of health care disproportionately hurts the smallest businesses, with only 25 percent of companies with fewer than 5 employees offering health insurance to their employees. Furthermore, the Kaiser Family Foundation estimates that 60 percent of small businesses shop for a new health insurance plan every year, but of those, less than half actually make any changes. These statistics tell us one very important, and far too bleak fact: small businesses have very few viable options. Unfortunately, that is where I find myself today.

**Experience of Phoenix Products, Inc.**

From the day we started our company, providing affordable, comprehensive health insurance has been a primary priority. My partner was a cancer survivor who had a variety of chronic health problems that were the result of the severity of his illness and the extreme measures taken to battle it. For over 30 years I have had to confront the challenge of finding suitable health insurance plans during which period the health insurance landscape has changed dramatically.

During that time we moved through a progression of coverage options; going from 100 percent, company paid indemnity plans with low deductibles through Preferred Provider Organizations (PPOs), to an HMO plan with a Point of Service option to high deductible coverage. In our discussion this morning I will focus on changes over the last few years.

My company also has gone through substantial changes, growing from a youthful start-up into a fairly large, small business with nearly 100 employees. Today, due to fundamental changes in the size of our core market and fierce foreign competition we are a much smaller and mature organization.

Phoenix Products is now 31 years old, and our employee group has gotten older with the company. Today our "average" employee is over 52 years old and has been with the company nearly 16 years. As the group has aged,

our health expenses have grown significantly and we have had to dramatically change the benefit structure of our plans to offset rising costs.

As recently as 2003 we still could afford to provide a plan with a $250/$500 deductible which included a $15 co-pay for office visits and modest co-pays for prescription drugs. The monthly premium for this plan was $218 for a single employee and ranged up to $677 for full family coverage. But our group was shrinking, growing older and consuming more health care. At the same time, the cost of health care was increasingly rapidly, out of step with the rate of cost increases in other market segments. So my plan demographics and the dynamic increase in cost for health care were working against my group.

By moving away from what was a pre-paid health care plan that covered almost everything to an insurance plan that protects our employees from catastrophic events we have been able to control the premium increases which have grown by only about 10 percent from 2003 to 2007. Last year alone we avoided a 22 percent increase by moving to a very high deductible level. We were forced to pay a little more to cover much less.

Today we have a plan with a $3,000 deductible for a single employee and $5,900 for a family. The insurance company does not pay a thing until that deductible is met. Prescription drugs and office visits are treated like any other medical expense and are included in the same deductible limits. However, our company self-insures a part of the deductible so the actual exposure is limited to $1,750/$3,500 per employee.

Following our renewal last year I learned that we had a covered participant who had been diagnosed with Gaucher's disease, a very rare enzyme deficiency. While not immediately life threatening its long term effects can be devastating. Treatment consists of bi-weekly enzyme replacement therapy. Because the condition is so rare the cost of the drug is extremely high. As a result we have had extremely high utilization this last year and our renewal rates reflect that.

Our 2008 renewal rates are 35 percent above last year; the maximum allowed under Ohio insurance regulations. Quotes from other carriers were two to two-and-a-half times higher than our current rates. At this point we have exhausted all of the plan design options that could minimize our increase. Neither the company nor our employees are in a position to absorb an increase of almost $40,000 in premiums.

The company pays a variable percentage of the premium based on the employee coverage, but in total we bear over 80 percent of the total cost. The increase in the cost of our health insurance has affected our employees over the last few years. The employee contributions have grown with the premiums. Wage rates have been frozen since 2001, though we do make occasional lump sum distributions of profits as conditions permit. The market is brutal so let me emphasize the word "occasional. "

We have not yet figured out exactly what we are going to do about this renewal. We provide life insurance plus short-term and long-term disability coverage at the company's expense. Our average employee is now eligible for four weeks of paid vacation in addition to nine paid holidays. We are a family-run business and our employees are part of our family. As much as I do not want to resort to reducing some of these benefits, there are few other viable alternatives to offset the cost of health insurance.

Our situation has been aggravated because we have a single case that has such a dramatic effect on the total group. But last year, before this case emerged, we were confronted with a 22 percent increase that we averted by substantially increasing the deductible and self-insuring part of that risk. Despite countless hours working to redesign our plan to ensure its affordability, the rapid inflation in health care costs and our aging group are catching up with us.

As this committee rightly focuses on how to help small businesses afford health insurance, I urge you not to lose sight of the indirect costs our health care system imposes upon entrepreneurs. Often overlooked in the policy discussion is the time required to create and sustain a health insurance group plan. There are plan policies, procedures and documents that must be created and maintained, along with filing requirements for larger plans.

Annual shopping for new carriers or the evaluation of other plan design options also consume countless hours. In most small companies this means that the owner or other key employees are devoting their limited time to this effort. I can not begin to describe the exasperation and frustration that I experience trying to select the best plan option while lacking basic information about the actual utilization of the plan benefits; this information being "protected" under the HIPAA confidentiality shroud or otherwise unavailable. Each hour I spend struggling to find a way to continue offering health insurance to my employees is an hour NOT spent working to hire more employees.

Our group has experienced many challenges over the years and we have been fortunate to be able to find ways to continue providing our employees with a quality insurance plan that was affordable. But now we are squeezed between our group's demographics, the huge expense of a single case and the explosive increase in health care costs. After 31 years we may have finally found the limit of our ability to provide this benefit to our employees.

**Broad Reform Proposal**

My story is not unique. Small businesses are nearing a cliff, and we cannot continue down this path that creates such a significant competitive disadvantage globally and among larger businesses in our industry. When I was Chair of NSBA in 2004, the small-business community had been experiencing year-after-year double-digit increases in the cost of health insurance, and we decided it was time to come to the table with more than our horror-stories and criticisms. We spent a year working with myriad business owners, insurers and consumers, and crafted a proposal for reform that would fix not only our dilemma, but address the overall failures of the U.S. health care system.

While the need for reform is clearly urgent, and while there are a number of more short-term reforms that can improve on the system, what small businesses deserve is broad, comprehensive reform that will not only address the symptoms of a failing health care system, but cure the underlying illness plaguing the entire system.

*The Realities of the Insurance Market*

Implicit in the concept of insurance is that those who use it are subsidized by those who do not. In most arenas, voluntary insurance is most efficient since the actions of those outside the insurance pool do not directly affect those within it. If the home of someone without fire insurance burns down, those who are insured are not expected to finance a new house. But such is not the case in the health arena, where the costs of treating uninsured are split and shifted onto those with insurance in the form of increased costs. Moreover, individuals' ability to assess their own risk is somewhat unique regarding health insurance. People have a good sense of their own health, and healthier individuals are less likely to purchase insurance until they perceive they need it. As insurance becomes more expensive, this proclivity is further increased (which, of course, further decreases the likelihood of the healthy purchasing insurance).

Small businesses must function within the insurance markets created by their states. States have developed rules on rating and underwriting that attempt to establish the subsidies between the healthy and the sick. Most states require insurers operating in the small group market to take all comers and limit their ability to set rates based on health status and other factors. However, there is extensive variability among the states on these rules. Some states allow great latitude on rates, thereby limiting the cross-subsidies, but this makes insurance much more affordable for the relatively young and healthy. Other states severely limit rate variation, which often helps keep costs in check for many older, sicker workers, but drives up average premiums and puts insurance out of financial reach for many. These tight rating rules (known as "community rating" or "modified community rating") also can cause some insurers to leave certain markets they deem to be unprofitable. Problems in those states are then compounded by a lack of competitive pressures.

It is important to note the interplay between the small group and individual insurance markets, particularly in some states. In general, insurers in the individual market are not required to take all comers (at least not those not "continually insured") for all services and are allowed much greater discretion to underwrite and rate policies based on health history and a series of other factors. Individuals also can see their rates skyrocket if they get sick, usually to a much greater degree than in the small group market. In other words, there is far less of a cross subsidy in the

individual market than the small group market. That means that relatively young and healthy individuals can get much cheaper insurance in the individual market (at least initially) than they can get through an employer—particularly in states that have community rating in the small group market. In many of our smallest companies (under 10 employees but especially under five), it makes financial sense to increase wages to allow for the purchase of individual coverage. If the workforce becomes sicker, it may make sense to convert to the now-more-reasonably-priced small group market. This dynamic (and others) means that the "moribidity" of the under-ten market is much higher than the group market as a whole. Naturally, insurers often will seek ways to avoid serving an undue share of this market.

So long as we have in place a voluntary system of insurance, where individuals and businesses—at any given point in time—can choose whether or not to purchase insurance, this quest for the insurance rating "golden mean" will continue. While there has been endless debate about what the right set of rating rules should be, it is imperative that there be only one set of rules. Insurance markets where different players operate under different sets of rules are doomed to failure. Even in the interplay between the group and individual markets—which are different markets—we see the consequences of different rules. When two sets of rules operate within the same market, the self-interested gamesmanship that occurs among both insurers and consumers ultimately leads to dysfunction and paralysis.

*Solution Principles*

Any solution to the problem should abide by the following, most important principle - primum non nocere: first, do no harm. Often, legislation passed has hidden, unintended consequences that can create a larger problem than the bill initially sought to fix. Lawmakers must use a keen eye when considering any solution, no matter how incremental or sweeping, to ensure that the fix doesn't unearth an even bigger problem.

The second principle when discussing a health care fix for small business is to understand the real problems small businesses face. The biggest problem small businesses face is cost and competitiveness. Health insurance in the United States has transformed from a "fringe benefit" to a central component of compensation. The realities of the small group market make it much more difficult for a small firm to secure quality, affordable insurance than it is for a large business. The ebb and flow of workforce in a large company can be compensated for in their insurance pool simply due to the large number of workers. Whereas in a small business, that natural shift in workers can lead to extraordinary fluctuations in health premiums. Given these costs and general level of instability in the insurance market, the ability for a small business to effectively compete for good workers against large companies is exponentially more difficult.

There exists another competitiveness issue, and that is a global one. The U.S. boasts a unique entrepreneurial spirit and has been a leader in technological advances. A great deal of that innovation and creation comes from small businesses. According to the U.S. Small Business Administration's Office of Advocacy, small firms represented 40 percent of the highly-innovative firms in 2002, a 21 percent increase in just two years. Unfortunately, health insurance costs can serve as the deciding factor whether or not an individual will opt to continue with his or her business. A report released earlier this week by that same Office of Advocacy states that the presence of the health insurance deduction decreases the rate of exit from entrepreneurship for self-employed individuals by 10.8 percent for single filers, and 64.9 percent for married filers. What this tells us is that we are losing potential new advances and innovations due to the cost of health insurance, which holds serious implications to our overall global competitiveness.

The third principle is equity and common sense. While competitiveness does touch on fairness between large and small companies, equity in our mind is a different animal altogether. Any health care solution ought to provide the same benefits to a business owner as they do an employee. Tax benefits should be extended fairly to whichever party is paying for the health insurance, be it employers or individuals. Continually providing tax benefits to companies and employment and not individuals perpetuates the current system where employers are practically forced into providing insurance to their employees.

*NSBA's Comprehensive Solution*

In attempting to create positive health care reform for small businesses, one quickly bumps up against the reality that small business problems cannot be solved in isolation from the rest of the system. Since small businesses purchase insurance as part of a larger pool with shared costs, the decisions of others directly affect what a small business must pay and the terms on which insurance is available to them. It has become clear to NSBA that—to bring meaningful affordability, access, and equity in health care to small businesses and their employees—a broad reform of the health care system is necessary. This reform must reduce health care costs while improving quality, bring about a fair sharing of health care costs, and focus on the empowerment and responsibility of individual health care consumers.

There is no hope of correcting these inequities until the U.S. has something close to universal participation of all individuals in some form of health care coverage. NSBA's plan for ensuring that all Americans have health coverage can be simply summarized: 1) require everyone to have coverage; 2) reform the insurance system so no one can be denied coverage and so costs are fairly spread; and 3) institute a system of subsidies, based upon family income, so that everyone can afford coverage.

Individual Responsibility

Small employers who purchase insurance face significantly higher premiums from at least two sources that have nothing to do with the underlying cost of health care. The first is the cost of "uncompensated care." These are the expenses health care providers incur for providing care to individuals without coverage; these costs get divided-up and passed on as increased costs to those who have insurance.

Second is the fact that millions of relatively healthy Americans choose not to purchase insurance (at least until they get older or sicker). Almost four million individuals aged 18-34 making more than $50,000 per year are uninsured. The absence of these relatively-healthy individuals from the insurance pool means that premiums are higher for the rest of the pool than they would be otherwise. Moving these two groups of individuals onto the insurance rolls would bring consequential premium reductions to current small business premiums.

Of course, the decision to require individuals to carry insurance coverage would mean that there must be some definition of the insurance package that would satisfy this requirement. Such a package must be truly basic. The required basic package should include only necessary benefits and should recognize the need for higher deductibles for those able to afford them. The shape of the package would help return a greater share of health insurance to its role as a financial backstop, rather than a reimbursement mechanism for all expenses. More robust consumer behavior will surely follow.

Incumbent on any requirement to obtain coverage is the need to ensure that appropriate coverage is available to all. A coverage requirement would make insurers less risk averse, making broader insurance reform possible. Insurance standards should limit the ability of insurance companies to charge radically different prices to different populations and should eliminate the ability of insurers to deny or price coverage based upon health conditions, in both the group and individual markets. Further, individuals and families would receive federal financial assistance for health premiums, based upon income. The subsidies would be borne by society-at-large, rather than in the arbitrary way that cost-shifting currently allocates these expenses for those without insurance.

Finally, it should be clear that coverage could come from any source. Employer-based insurance, individual insurance, or an existing public program all would be acceptable means of demonstrating coverage. More and more health care policy leaders are realizing the need for universal coverage through individual responsibility and a requirement on each person to have health insurance.

Reshaping Incentives

There currently is an open-ended tax exclusion for employer-provided health coverage for both the employer and employee. This tax status has made health insurance preferable to other forms of compensation, leading many Americans to be "over-insured." This over-insurance leads to a lack of consumer behavior, increased utilization of

WAKE FOREST
UNIVERSITY
HEALTH SCIENCES

**Statement of Mark A. Hall, J.D.**

**Fred D. and Elizabeth L. Turnage Professor of Law and Public Health**

**Wake Forest University**
**Winston-Salem NC**

**U.S. Senate Committee on Finance, Hearing on**
**"47 Million and Counting: Why the Health Care Marketplace is Broken"**

**June 10, 2008**

Chairman Baucus, Ranking Member Grassley, and esteemed Senators, it is a distinct honor to appear before this distinguished committee as it begins the monumental undertaking of reforming our health care system. My name is Mark A. Hall, and I am a Professor of Law and Public Health at Wake Forest University, where I specialize in health care finance and regulation.

My testimony addresses problems in the structure and functioning of private health insurance markets. I have studied these markets for almost two decades, starting with a Fellowship at the Health Insurance Association of America in 1991, and continuing through fifteen years of empirical studies with insurers, agents, employers, and regulators.

Health policy analysts are fond of invoking medical metaphors, and I too cannot resist. Some might say that the private health insurance market is crippled, severely wounded or on life support. I am not quite that gloomy, but no one can deny that the market is far from a picture of rosy health. Some parts are functional, other parts are in steady decline from chronic ailments, and yet others are fairly stable but show ominous precursors of acute illness. I will describe these critical indicators and diagnose the underlying conditions that afflict different parts of the market organism.

**The Numbers**

Since 2000, insurance premiums have doubled, increasing four times faster than earnings or general inflation (Figure 2). Today, the average cost of family coverage is over $12,000 a year, which is about one-quarter of median household income. Single coverage averages about $4500 a year, which is almost half the income of someone at the federal poverty line.

These averages reflect employer-based coverage. For individual insurance, the industry reports average rates that are about half these amounts ($2600 single coverage and $5800 family), but this is for coverage that tends to be much less generous and more difficult to obtain than employer-based insurance.

Premium increases are driving people out of the insurance market. Since 2000, both the percentage of employers offering coverage and the percentage of people covered by employers have dropped more than five points, to around 60 percent (Figure 3 and Exhibit 1). This decline in employer coverage has not been accompanied by any increase in individual coverage. Therefore, the portion of the non-Medicare population covered by private insurance has slipped from about 3/4 to about 2/3 in the past six years.

These disturbing declines have occurred despite strenuous efforts to shore up the market's erosion through legislation. For instance, federal reforms expand tax benefits for purchasing insurance (HSAs) and restrict insurers' from rejecting group applicants (HIPAA). These laws have been vitally important. Without them, conditions would only have worsened much more than they have. But, we must keep in mind that it will take

considerable additional effort simply to keep things from getting worse, let alone to substantially improve or to fix this market.

Things have gotten worse despite corrective efforts because the basic market conditions that cause the problems are still very much in place. Indeed, they are elemental. These market conditions will always plague us to some extent because they derive from a fundamental fact of the human condition – that the need for medical care is highly skewed throughout the population. This point is the main focus of my testimony.

**The Highly Concentrated Burden of Medical Costs**

The high concentration of most medical costs in a relative few people is the single most important fact for understanding the private insurance market. It is hard to find the right words to describe this foundational statistical phenomenon in terms that are sufficiently compelling, so I will start with a graphic depiction.

**Figure 1: Concentration of Health Care Spending in the U.S. Population, 2005**




Source: Kaiser Family Foundation calculations using data from U.S. Department of Health and Human Services, Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey (MEPS), 2005.

Arraying the population by health care spending in a year, this chart shows that

- the top 1% (those who spent more than $43,000) accounted for almost one-fourth of total spending
- the top 5% (who spent more than $14,000) accounted for half of all spending
- and the top 20% (who spent more than about $4000) accounted for 80% of spending.

The bottom half of the population distribution (who spent less than $800 that year) incurred less than 4% of total costs.

For convenience, I refer to this as "the 80/20 rule." I call it a rule because the pattern is remarkably universal. This pattern has a fractal geometry that appears wherever one looks. It holds true both for the population at large and for just about any subpopulation of any size one might choose to examine (see Exhibit 3). Medicare spending is essentially just as concentrated as that for people in their 40s, or that in just about any larger employer group. The extreme concentration of health care costs is an economic law of nature that has been observed as early as the 1930s and that will be with us for as long as anyone can foresee – regardless of how we deliver and pay for health care.

There is no easy way to reduce or eliminate the effects of concentrated medical costs because the extremes are so great. Various techniques such as high-risk pools, reinsurance, and risk adjustment have been tried or proposed. These measures can certainly help somewhat, but the amount of money involved is too large to eliminate the basic underlying phenomenon. For instance, if even the top half of expenditures (which are concentrated in 5% of the population) were removed from the market, we would still have a market in which some people's expenses were ten times greater than the *middle* of the distribution. Removing half the costs would cut the total costs in half, but this would not alter the basic dynamics created by the fact that the remaining costs would still be concentrated in a relatively small portion of people.

**Market Dynamics: Risk Segmentation, Adverse Selection, and Medical Underwriting**

I stress the 80/20 rule because it is the most elemental fact of health insurance. It is as fundamental as gravity, and as pervasive as the weather. It is the endemic First Cause that reaches everywhere and explains just about everything of importance in the market for insurance.

The high concentration of medical costs is why we need and have insurance in the first place. Pooling expenses across a population keeps them affordable for everyone, but the extreme costs at the high end also explain why insurance is so expensive, especially for those who anticipate no real need.

The extreme magnitude of differences in health risks also explains the private insurance market's most perplexing dynamics. I will describe several troubling phenomena, each of which derives from the basic fact that insurers stand to gain a great deal by avoiding or appropriately pricing people with higher risks. They also stand to lose a great deal if they

do not attract a good number of lower risks. Therefore, competitive forces in health insurance markets inevitably focus on risk selection (or risk segmentation). Other points of competitive focus – such as product design, benefit coverage, sales vehicles, and care management – either have much less impact on profitability or are themselves surrogates for risk selection or segmentation.

The most visible form of risk selection is *medical underwriting*. This consists of evaluating the health risks specific to each subscriber in order to assign an actuarially fair price. According to industry figures, about 70% of people who apply for health insurance receive an offer of coverage at standard rates or better. The rest are either declined (12%), offered higher rates (6%), or offered coverage that excludes one or more particular pre-existing conditions (13%). In field studies, market testers found that conditions as common as asthma, ear infections, and high blood pressure can create problems obtaining coverage.

Medical underwriting is necessary because of *adverse selection* – the tendency of people to avoid the purchase of insurance unless they expect to need it, and for those with more need to buy more insurance. A health insurance market could never survive or even form if people could buy their insurance on the way to the hospital. Therefore, medical underwriting rewards people who purchase while they are still young and healthy, and imposes pre-existing condition exclusions or charges higher rates, for those who are not.

An especially aggressive form of risk screening is called "post-claims underwriting" – namely, waiting to assess pre-existing conditions until a paying subscriber submits large claims. If, after more scrutiny, insurers find that applicants were not completely forthcoming, they have been known to *rescind coverage retroactively*, even after people have paid premiums and received authorized treatment. State insurance regulators monitor such practices and determine when they are excessive or inappropriate, but it is a constant tension between public-minded regulators and competing insurers to determine the boundary of proper underwriting and claims adjudication.

The mirror image of adverse *selection* is adverse *retention*. A newly underwritten insurance pool will tend to deteriorate over time, meaning that the pool's health costs will increase fairly steeply relative to marketwide averages. This *durational effect* is pronounced because people are free to shop around for cheaper or better insurance – but only if they are still healthy. To remain competitive, insurers target these shoppers by offering them their most attractive rates. To compensate, they must increase the rates of renewing subscribers – which is one reason people experience rate hikes that are much steeper than their increases in wages.

Existing subscribers who no longer can pass medical underwriting, or who would be subjected to new pre-existing condition exclusion periods, are stuck with the insurance they have. Although they are guaranteed to be able to keep this coverage forever, at some point mounting medical costs in the pool make it no longer economical for the insurer to sell that particular policy. And, once no new healthier subscribers are entering the pool, the costs skyrocket into what is called a "death spiral." Some insurers exploit

this dynamic by *churning* risk pools. They frequently close off existing policies to any new subscribers and instead market new policies that are very similar but that are available only to freshly underwritten subscribers. This practice results in more hermetically separating lower versus higher risk subscribers into differently-priced policies.

Medical underwriting, plus constantly searching for a better price, adds additional costs to the system. These transaction costs account for a sizeable portion of the premiums people pay – on the order of roughly 20-25% for individual insurance and 10-15% for small groups. Constant turnover in coverage also undercuts the inherent efficiency of insurance markets. Insurers have little incentive to invest in life-long health prevention measures because the typical policyholder remains with a plan for an average of only about three years.

The natural dynamics of risk segmentation are so strong that risk selection occurs even without overt medical underwriting. Subscribers naturally sort themselves by risk to some extent, according to the covered benefits and plan features they find most attractive. Insurers and employers have learned that features such as deductibles, managed care, and particular benefits that are covered or excluded appeal differently to people with lesser versus greater health care needs. This is one reason many health policy analysts favor uniform benefits and why most employers limit their workers' choice of health plans.

**Necessary Reforms**

Various insurance market reforms have worked well to mitigate the worst excesses of these market-driven competitive practices, but these counteractive measures are not capable of eliminating these effects. Risk selection practices flow directly from the very nature of how competitive markets should and must respond to highly concentrated health risks. Therefore, these effects will never be eliminated unless the market is fundamentally restructured.

The basic requirement is to place people into large groups whose membership is not tied to health risk, and to limit the choice of plans within the group. This is currently how large employer groups work, which is why they remain the best-functioning part of the market. These conditions also fit subsidized insurance pools such as the Massachusetts Connector. To meet these essential conditions, everyone (or almost everyone) who is eligible must agree to purchase insurance from their assigned group, and the insurers must not have a great deal to lose or gain according to how healthy or sick each subscriber is. This is easy enough to state in the abstract, but exceedingly difficult to achieve in practice.

I wish this Committee and the Senate Godspeed and wisdom in pursing this formidable challenge.

**Figure 2: Annual Growth Rates for Health Insurance Premiums, Workers Earnings, and Overall Inflation, 1988-2007**




Source: Kaiser Family Foundation/Health Research and Educational Trust.

**Figure 3: Percentage of Employers Offering Health Benefits by Firm Size, 1996-2007**




Source: Kaiser/HRET Survey of Employer-Sponsored Health Benefits.

**EXHIBIT 1**

**Health Insurance Coverage Among Nonelderly Americans, By Age And Source Of Coverage, 2000–2004 And 2004–2006**

| | All nonelderly | | | Adults | | | Children | | |
|---|---|---|---|---|---|---|---|---|---|
| | Coverage distribution | | Change (millions of people) | Coverage distribution | | Change (millions of people) | Coverage distribution | | Change (millions of people) |
| **2000–2004** | **2000** | **2004** | **2000–04** | **2000** | **2004** | **2000–04** | **2000** | **2004** | **2000–04** |
| All incomes (millions of people) | 245.1 | 255.1 | 10.0[c] | 168.8 | 177.3 | 8.5[c] | 76.3 | 77.8 | 1.5[c] |
| Employer | 67.8% | 63.3%[a] | -4.9[c] | 68.9% | 64.4%[a] | -2.2[c] | 65.4% | 60.7%[a] | -2.6[c] |
| Medicaid/state | 8.6 | 11.2[a] | 6.9[c] | 5.3 | 6.5[a] | 2.6[c] | 16.7 | 21.9[a] | 4.3[c] |
| TRICARE/Medicare | 2.1 | 2.3[a] | 0.7[c] | 2.3 | 2.7[a] | 1.0[c] | 1.7 | 1.3[a] | -0.3[c] |
| Private nongroup | 5.1 | 5.4[a] | 1.3[c] | 5.6 | 5.8[b] | 0.9[d] | 3.9 | 4.4[a] | 0.4[c] |
| Uninsured | 16.1 | 17.8[a] | 6.0[c] | 17.9 | 20.6[a] | 6.3[c] | 12.3 | 11.6[a] | -0.4 |
| **2004–2006** | **2004** | **2006** | **2004–06** | **2004** | **2006** | **2004–06** | **2004** | **2006** | **2004–06** |
| All incomes (millions of people) | 255.1 | 260.0 | 4.9[c] | 177.3 | 181.8 | 4.5[c] | 77.8 | 78.2 | 0.4 |
| Employer | 64.0% | 63.0%[a] | 0.5 | 65.2% | 64.4%[a] | 1.5[c] | 61.4% | 59.7%[a] | -1.0[c] |
| Medicaid/state | 11.2 | 11.3 | 0.7[c] | 6.6 | 6.6 | 0.3 | 21.9 | 22.4 | 0.5[c] |
| TRICARE/Medicare | 2.3 | 2.3 | 0.3 | 2.7 | 2.8 | 0.3[d] | 1.4 | 1.4 | 0.0 |
| Private nongroup | 5.6 | 5.5 | 0.0 | 6.0 | 5.9 | 0.1 | 4.5 | 4.5 | 0.0 |
| Uninsured | 16.9 | 17.9[a] | 3.4[c] | 19.5 | 20.4[a] | 2.4[c] | 10.9 | 12.1[a] | 1.0[c] |

**SOURCE:** Urban Institute, 2007, based on data from the 2001, 2005, and 2007 March Supplements of the Current Population Survey.

**NOTE:** Excludes those age sixty-five and older and those in the Armed Forces.

[a] Change in percentage of people is statistically significant (at the 95% confidence level).

[b] Change in percentage of people is statistically significant (at the 90% confidence level).

[c] Change in numbers of people is statistically significant (at the 95% confidence level).

[d] Change in numbers of people is statistically significant (at the 90% confidence level).

**EXHIBIT 4**

**Percentage Of Medicare Spending Attributable To The Most Expensive 5 Percent And 1 Percent Of Beneficiaries, Aggregated Over Four-Year Periods, 1975–2004**




**SOURCE:** Claims and enrollment data from the Continuous Medicare History Sample, various years.

**NOTES:** Data are for beneficiaries entitled to Part A and Part B and in fee-for-service in each year they were alive. Data have been inflation adjusted to the last year in the period using the Consumer Price Index–All Urban Consumers.