# Exhibit 14

# HEALTH REFORM IN THE 21ST CENTURY: INSURANCE MARKET REFORMS

## HEARING

BEFORE THE

## COMMITTEE ON WAYS AND MEANS
## U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

FIRST SESSION

APRIL 22, 2009

**Serial 111–14**

Printed for the use of the Committee on Ways and Means

U.S. GOVERNMENT PRINTING OFFICE

52–258 WASHINGTON : 2009

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

**Prepared Statement of Uwe E. Reinhardt, Ph.D., James Madison Professor of Political Economy and Professor of Economics and Public Affairs, Princeton University, Princeton, New Jersey**

My name is Uwe E. Reinhardt. I am Professor of Economics and Public Affairs at Princeton University, Princeton, New Jersey. My research work during the past several decades has been focused primarily on health-care economics and policy.

I would like to thank you, Chairman and your colleagues on this Committee for inviting me to present a statement on the problems of structuring a market for individually purchased health insurance in the United States.

After some remarks on the interface between social ethics and health reform, my statement will focus for the most part of ways of reforming the market for health insurance.

## I. INTRODUCTION

Any modern health system, regardless of its structure, must perform the following five major functions:

1. **FINANCING** health care, that is, extracting the requisite funds for the health system from individuals and households, who ultimately pay for all of health care. (Government, employers and private insurers are merely pumping stations in the flow of funds from individuals and households to the providers of health care).
2. **POOLING RISKS** for the purpose of protecting individuals and households from the uncertain financial cost of needed health care.
3. **PURCHASING** health care from its providers (doctors, hospitals, and so on), which includes negotiating or setting the prices to be paid for health care and determining the set of goods and services actually needed for the efficient, evidence-based best treatment of given medical conditions (including disease management and chronic care).
4. **PRODUCING** the goods and services required for the proper treatment of given medical conditions, including their diagnosis.
5. **REGULATING** the various clinical and economic activities involved in the operation of the nation's health system so that it works consistently towards socially desired ends.

As I understand it, this hearing is about the allocation of the first three functions between the private and the public sectors. The fifth function, of course, is the natural preserve of government, especially after the financial markets have demonstrated at such great cost to the rest of the world that private markets cannot be trusted to be self-regulating and working in society's interest, a point now grasped even by economists, including libertarian Alan Greenspan.

The allocation of the first three functions between government and the private sector, however, is not so clear-cut. It depends crucially on the social goals society wishes to posit for its health system, including how the financial burden of ill health is to be allocated to members of society and how care is to be distributed among them. I shall therefore offer a few remarks on that facet of a health system.

## II. THE SOCIAL GOALS OF HEALTH SYSTEMS

Most industrialized nations in the OECD, along with Taiwan, seek to operate their health systems on the *Principle of Social Solidarity*. It means to them that health care is to be viewed as a so-called "social good," like elementary and secondary education in the United States. That perspective, in turn, implies that the financial burden of health care for the nation as a whole should be allocated to individual members of society roughly in accordance with the individual's ability to pay, and that needed health care should be available to all members of society on toughly equal terms.

If the health system is to operated subject to this distributive social ethic, it requires that government either operate the financing, risk-pooling and purchasing functions directly (as is the case in Canada, Taiwan and the UK, for example) or that government tightly regulate all three functions, even if they are actually performed by private institutions outside of government proper (as is the case in Germany, the Netherlands and Switzerland).

Unfortunately, the United States never has been able to evolve a widely shared consensus on the distributive social ethic that ought to govern the U.S. health system. The bewildering American health system reflects that lack of consensus.

At one end of the ideological spectrum, many Americans appear to believe that health care ought to be treated as a private consumer good that should be distributed on the basis market principles. This means that the financing of health care ought to be viewed primarily as the responsibility of the individual, and only the

poorest members of society ought to be given public assistance in procuring a bare-bones package of health care. In other words, these Americans believe that, for the most part, health care should be rationed among members of American society on the basis of price and ability to pay, like other basic consumer goods, such as housing, clothing and food.

At the other end of the ideological, just as many other Americans share the ethical precepts of other nations in the OECD. These Americans, too, believe that our health system ought to be operated on the *Principle of Social Solidarity*, that is, that health care should be viewed a social good. If rationing of health care there must be, then it ought to be on principles other than price and ability to pay.

In between these distinct but coherent views reigns massive intellectual confusion.

To illustrate, the same citizens and politicians who look askance at "socialized medicine"[1] reserve the purest form of socialized medicine—the VA health system—for the nation's allegedly much admired veterans. A foreigner may be forgiven for finding this cognitive dissonance bizarre.

Similarly, there are many Americans, who believe that government does not have the right to impose on them a mandate to have health insurance, all the while considering it their moral right as Americans to receive even horrendously expensive tertiary health care in case of critical need, even if the recipients have no hope of financing that care with their own resources. Foreigners may be forgiven for shaking their heads at this immature and asocial entitlements mentality, which would be rare in their home countries.

Finally, a good many citizens and politicians who accept with equanimity the rationing of health care by price and ability in this country openly deplore the rationing of health by administrative means in other countries, perhaps not realizing that textbooks in economics explicitly ascribe to market prices the role of rationing scarce resources among unlimited want[2] Why the latter form of rationing is superior to the former is not obvious.

A much mouthed mantra in our debate on health policy is that "we all want the same thing in health care, but merely quibble over the means to get there." Nothing could be further from the truth. That debate has been and continues to be a tenacious ideological fight over the social ethic that ought to govern American health care; but we camouflage it as a technical debate strictly over means.

My plea before this Committee and to the Congress is that any health reform proposal put before the American people be preceded with a preamble that clearly articulates the social goals our health system is supposed to pursue and the social ethic it is to observe. Policy makers in other nations routinely do so and accept the constraints that this preamble imposes on their design of health reform. It would be helpful to have a clearly articulated statement on the social ethics for American health care as well.

With these preliminary remarks, I would now like to turn to the structure of the market for health insurance.

## III. THE MARKET FOR PRIVATE HEALTH INSURANCE

The value a health insurance system offers society is the ability to pool the financial risks faced by individuals in order to protect members of that risk pool from uncertainty over the financial inroads of high medical bills in case of illness. In return for receiving that value, individuals make a financial contribution to the risk pool, in the form of taxes (e.g., payroll taxes) or premiums.

Many economists view this risk pooling as the sole proper function of health insurance *per se*. To them, for example, the segmentation of a free market for private health insurance by risk class, with relatively higher insurance premiums charged to patients expected to be relatively sicker over the insured future period, is not only an inevitable outcome of such a market, but is viewed perfectly acceptable. Such

[1] The formal definition of "socialism," according to my American Heritage Desk Dictionary, is a system in which *government owns the means of production*. "Socialized medicine" thus is a system in which government owns, operates and finances health care, as in the VA health system. It is not the same as "social insurance," which merely is an arrangement under which individuals transfer financial risks they face to a larger collective body, often the government. The limited liability shareholders of corporations enjoy, for example, is one of the oldest forms of social insurance, as is the Federal Government's assistance to states struck by natural disasters, as is the many guarantees government extends to the financial sector and as is, of course, Medicare and Medicaid.

[2] As two well-known authors put it: "*Bread must be rationed somehow; and the price system accomplishes this in the following way: Everyone who is willing to pay the equilibrium price gets the good, and everyone who is not, does not.*" See Michael L. Katz and Harvey S. Rosen, *Microeconomics*, (1991): 15.

premiums are called "actuarially fair." On this view, if society wants greater equity in the financing of health care, then government should provide risk-adjusted subsidies toward the purchase of actuarially priced private insurance.

As a practical matter, however, most people seem to believe that both private and public insurers should not only protect individuals from the variance of their own health spending likely to be incurred by that individual over time, but also incorporate in its premium structure hidden cross subsidies from chronically healthy to chronically sick members of society. Most health insurance systems in the world actually do that, including the Medicare and Medicaid programs in the United States and the private employment-based health insurance system.

**A. Employment-Based Insurance**

In the market for employment-based group health-insurance, the insurance premium paid the insurer by the employer typically is "experienced rated" over the group of employees being insured. It means that the premium reflects the *average expected (actuarial) cost* of the health care likely to be used collectively by all of that employer's employees, plus a markup-up for the cost of marketing and administration and profits.

In effect, then, the bulk of the risk pooling for employment-based health insurance actually is performed by the employer, not the insurer. The insurer bears only a small fraction of the total risk, a fraction that varies inversely with the size of the insured group.

This is even clearer when the employer overtly self-insures, as most large employers in the United States now do. In that case, the employer bears all of the financial risk of the employees' illness, and private insurance carriers are engaged by the employer merely perform the purchasing function (the third function above) on behalf of the employer-run risk pool, including claims processing.

Economists are persuaded by both theory and empirical evidence that, over the longer run, the full cost of the employer's contribution to the employees' group health insurance is shifted back somehow to employees in the form of lower take-home pay or a reduction in other fringe benefits. The arrangement typically does force chronically healthier employees to cross-subsidize chronically sicker employees, because the reduction in take-home pay within a given skill level is independent of the individual employee's health status.

In a sense, then, employment-based insurance is a form of "social insurance." One may call it "private social insurance," especially for larger employers, as distinct from government-run social insurance. It is one reason that the employment-based system has such strong support among people who would like to see American health care governed by the *Principle of Social Solidarity*. The feature of employment-based insurance that attracts them is the pooling of risks in that system.

A problem, of course, is that this principle is vastly eroded, the smaller the number of employees is over which premiums are experience-rated. For very small firms, employment-based insurance approximates individually purchased insurance.

**B. The Market for Individual Insurance**

In the market for individually purchased insurance, risk pooling necessarily must take place at the level of the insurance company.

As is well known from a distinguished literature in economics, a price-competitive market of individually sold health insurance will naturally segment itself by risk class. By economic necessity—and not a mean spirit—insurers in such a market have no choice but to engage in "medical underwriting" if they want to survive.

This means that private insurers must (a) determine as best they can the health status and likely future cost to the risk pool that an individual prospective customer will cause and (b) charge the individual a premium that covers that anticipated cost (the "actuarially fair premium") plus a mark-up for the risk pool's cost of marketing and administration and for desired profits. The size of this mark-up is constrained through price competition. As the Lewin Group estimated in a recent report, this mark-up averages 31.7% for private insurers in the individual market.[3]

The general public and the media that informs the public seem insufficiently cognizant of the horrendously complex product insurers sell. A health insurance policy is a so-called "contingent contract" under which the insurer is obligated to pay the insured a specified amount of money—or, alternatively, to purchase for the insured specified medical benefits—should that contingency arise.

The problem has always been to define that "contingency" so that it does not trigger disputes on whether or not the contingency has occurred—e.g., whether a med-

[3] The Lewin group, *The Cost and Coverage Impacts of a Public Plan: Alternative Design Options,* Staff Working Paper # 44, April 6, 2009.

ical procedure was called for on clinical grounds. Furthermore, it should be clear that *both* sides to the contract—the insured and the insurer—have the opportunity to cheat on the contract, if they are so inclined. It is the reason why these types of contingent contracts typically are subject to penetrating government regulation and oversight.

There is a tendency among the critics on the private health insurance industry to vilify it. I find that unfair and unproductive. The important question is whether that industry, as it is currently structured, can serve the social objectives American society may wish to posit for it and, if not, what regulation of the industry would be required to make it march toward the desired social goal.

### C. Marrying a Purely Private Insurance Sector to the Principle of Social Solidarity

If the social objective of our health reform is to make health insurance available to all Americans on equal terms—as President Obama's campaign statements clearly imply—then the current private market for individual insurance has three major shortcomings.

The first is the practice of *medical underwriting,* that is, the practice of inquiring deeply into the personal health status of individual applicants for insurance and basing the quoted premium on the individual's health status. This practice could be eliminated by forcing every insurance company to charge the same premium to every one of its customers, with the possible exception of age. Every insurer would charge so-called *community-rated premiums*, although these could vary competitively among insurers.

A second practice at odds with the President's stated social goal for American health care is the practice of denying health insurance to anyone whose expected future medical bills exceed the premium that can be charged the individual, or to rescind insurance *ex post* when medical claims have piled up and he insurer cancels the policy over some flaw belatedly found in the original application for insurance. This practice can be eliminated by imposing *"guaranteed issue"* on the industry. It means every insurer must accept all applicants seeking to buy coverage at the insurer's quoted community-rated premium and may not cancel policies *ex post*.

But as both the theoretical and the empirical literature on this market clearly demonstrate, imposition of *community-rated premiums* and *guaranteed* issue on a market of competing private health insurers will inexorably drive that market into extinction, unless these two features are coupled with a third, highly controversial requirement, namely, a *mandate on individual to be insured* for a at lest a specified minimum package of health benefits.[4]

A mandate upon the individual to be insured, however, is likely to be disobeyed by large numbers of low-income individuals unless the government is willing and able to grant those individuals sufficient public subsidies toward the purchase of health insurance. One way to assess the adequacy of these subsides is to reach a political consensus on the maximum percentage X that the individual's (or family's) total outlay for health insurance premiums and out-of-pocket health-care spending takes out of the unit's discretionary income (disposable income minus outlays for other basic necessities, such as food, housing, clothing, etc.). That maximum percentage X probably would have to rise with income. Its proper size is a political call. It would be helpful if Congress could agree on such a number.

With these four features—*(1) community rating, (2) guaranteed issue, (3) mandated insurance* and *(4) adequate public subsidies*—a private, strictly monitored health insurance market for individually purchased health insurance probably could be made to march fairly closely in step with the distributive social ethic professed by the President and by many Members of Congress. It would require very tight regulations and supervision of the industry, however, most likely through the National Health Insurance Exchange provided for in the President's health-reform proposal. Within their ranks of enrollees, both the Medicare Advantage program and the Medicaid Managed Care program are tightly regulated and supervised in roughly this fashion.

## IV. THE POTENTIAL ROLE OF A NEW PUBLIC HEALTH PLAN

During his presidential campaign, President Obama firmly and quite explicitly promised not only to reform the market for private, individually sold health insur-

[4] For a report on how private insurance markets implode when the mandate to be insured is not imposed in a community-rated market with guaranteed issue, see Alan C. Monheit, Joel C. Cantor, Margaret Koller, and Kimberley S. Fox, "**Community Rating And Sustainable Individual Health Insurance Markets In New Jersey:** Trends in **New Jersey** 's Individual Health Coverage Program reveal troubled times for the program," *Health Affairs*, July/August 2004; 23(4): 167–175.

ance—along the lines outlined above—but to include among the insurance options in this market a new public plan for non-elderly Americans. This public plan would have to compete with private health insurers for enrollees.

**A. Why might a Public Plan be attractive to Americans?**

One could imagine a sizeable latent demand among the American public for such a public health plan, even in the absence of any significant cost advantage that such a public plan might have.

In recent years, Americans have seen retiree health benefits once promised them by private corporations melt away. They have seen their 401(k) savings in the private sector similarly melt down severely and the value of any other private pension plan vastly eroded. They have lost their employer-based health insurance with their job or, if they have not yet lost it, they fear of losing it. They have seen once revered and seemingly indestructible American corporations stumble toward bankruptcy and extinction, either at the hand of global competition or as a result of mismanagement. Finally, they have seen the once revered leaders of the financial sector behave in so irrational and destructive a manner as to make a mockery of received economic theory, with its instinctive belief in the economic superiority of private markets [5].

After all of this turbulence, destruction and self-immolation in the once hallowed private sector of the economy, many Americans may now seek the comfort of permanence that a fully portable, reliable and permanent government-run health insurance plan would offer them, side by side with the possibility of choosing a private health insurance plan instead. To deny them that opportunity would require a compelling justification.

**Advantages of a Public Plan:** A public health insurance plan for non-elderly Americans could offer society a number of advantages.

First, it would be likely to have the advantage of large economies of scale. Therefore, it could economically use expensive and powerful health-information technology to simplify claims processing, lower the cost of prudent purchasing ad quality monitoring, and engage in disease management, if it were allowed to do so.

Although a few large private insurers dominate the market in many areas, overall the market for private health insurance remains remarkably splintered, with many insurers carrying on somehow with very small enrollments, often below 20,000 insured [6] It is not clear how such small insurers can harvest the economies of scale of marketing and administration, and especially the benefits of health information technology. One must wonder what features in this market have allowed them to survive to this point. Presumably, the market for private insurance would have to consolidate significantly in a reformed insurance market.

Second, a public plan would not have to include in its premiums an allowance for profits and probably have low or no marketing costs. The previously cited Lewin Group sees that as a significant cost advantage of the public plan, reducing administrative costs as a percent of medical claims to about 13%, relative to 31% for private insurers. That advantage, however, may be exaggerated if private insurers offered their policies through a formal insurance exchange, reducing the cost of commissions to insurance brokers.

A third advantage could be the ability of a public plan to innovate in paying the providers of health care. Medicare already has been remarkably innovative on that front. The case-based DRG system for hospital payment, now being copied around the world, is Medicare's creation, and so is the development of the Resource-Based-Relative-Value Scale (RBRVS) which now forms the basis of negotiations over fees between physicians and private health insurers.

The next step in payment reform has to be a move away from the time-honored but inefficient fee-for-service system that dominates in both the private and public insurance sectors, and round the world, towards bundled, case-based payments for evidence based, clinically integrated care [7] Along with Medicare, a new public plan for non-elderly Americans could play a role in the development of this payment method as, of course, could private insurance plans.

Finally, government has already contributed substantially to the measurement of the quality of health care and websites that disseminate such information to the

[5] See, for example, George A. Akerlof and Robert J. Shiller, *How human Psychology Drives the Economy, and Why it Matters for Global Capitalism,* Princeton University Press, 2009.

[6] See, for example, Allan Baumgarten, *Texas Managed Care Review* 2006 (available at http://www.allanbaumgarten.com/images/presentations/TX_ManagedCareReview_2006.pdf) and similar reports by that author for other states.

[7] See, for example, the website of Prometheus Payment® Inc., http://www.prometheuspayment.org/

market place and has fielded demonstration projects for disease management, once again side by side with the private sector.

**Problems with a Public Plan:** As I see it, the main problems with the addition of a public health insurance plan to a menu of competing private insurance options are political, rather than technical.

There is in the realm of politics the overarching question whether government should perform functions that the private sector could also perform, even if the private-sector would use more resources—be more costly—to achieve the same end. We see that question debated now in connection with student loans[8] which, according to the Congressional Budget Office[9], cost taxpayers considerably more when channeled through the private banking sector than when loans are made directly by government to students. The outcome of the current debate over student loans may be an augury for the course of health reform.

But even if the answer to the previous question were "Yes"—that government may indeed intrude as a competitor on economic turf traditionally held by the private sector—there is the question of what would constitute a level playing field in a proposed competition of private insurers with a new public plan.

Private insurers argue that if they are forced to compete with a public plan that can piggy-back its payment system onto the administratively set Medicare fees, they are forced to play on an uneven playing field tilted unfavorably in their direction. This suggests a scenario in which the private insurance plans would be pushed to the wall until eventually the U.S. ends up with a single-payer system. The long queues in Canada for certain types of health care, the low fees paid doctors and tight budgets for hospitals there, along with and the much sparser endowment of Canada's health system with certain high-tech equipment are cited as the inevitable destination of a single-payer system.

At this stage, this scenario is mere conjecture, and I have some difficulties following it.

In Canada, private insurance for services covered by the government-run system is prohibited. It would not be in the United States. Thus, if a public health insurance plan for non-elderly Americans really began to deprive American patients of what they desire in health care, the private insurance industry offering superior benefits at higher premiums would not melt away or, if it had, it would quickly be reborn, just as we now see providers starting to refuse the allegedly low fees paid by large private insurer and resorting again to the indemnity insurance model. Markets work that way.

There does, however, remain the issue of the level playing field, which I would not brush aside so easily. In what follows, I shall offer some comments on that issue.

## V. DEFINING A LEVEL PLAYING FIELD

Two major facets define the evenness of the playing field on which insurance companies compete with one another: (1) the risk pool with which the insurer ends up and (2) the level of fees at which the insurer can procure health care from its providers.

**Risk Pool:** At this time roughly two thirds of the American population obtains health insurance from private insurance carries; but collectively private insurers account for only slightly more than one third of total national health spending. It is so because through its Medicare and Medicaid programs, government covers much higher risks on average than do private carriers.

It is not clear how the allocation of risks to private carriers and a new public plan would work out in a market for individual insurance. Chances are that a somewhat sicker risk pool would gravitate toward the public plan, which by itself would put it at a competitive disadvantage *vis a vis* the private plans, other things being equal.

Whatever the case may turn out to be, this facet of the playing field should be recognized in the debate on health reform. To mitigate any tilting of the playing field by that factor, one would ultimately have to install a differential-risk compensation mechanism, such as those operated in Germany, the Netherlands and Switzerland.

**Payment Levels:** The previously cited report by the Lewin Group projects that, if a new public health plan for non-elderly American paid Medicare fees, and if the overhead of such a plan were less than half of that experienced by private competi-

---

[8] http://www.washington monthly.com/archives/individual/2009_04/017728.php

[9] http://studentlending analytics.typepad.com/student_lending_analytics/2009/03/cbo-significantly-ups-cost-savings-estimate-from-eliminating-ffelp-.html

tors, then the premiums of the public plan would be 21% below those charged by the private plans.

Assuming a premium-elasticity of the demand for health insurance of −2.47 (meaning a 1% decrease in the premium of the public plan vis a vis the premium of private insurers would trigger a 2.47% migration from private to public insurance), the Lewin Group simulates that some 119 million Americans would shift from private insurance to the public plan, a large fraction of whom would be Americans hitherto covered by employment-based insurance in smaller firms. In fact, the Lewin Group estimates that if the public plan were forced to pay at what it calls "private payer levels," enrollment in private insurance would decline only by 12.5 million, rather than 119 million."

Any such simulation, however, is merely the product of a computer algorithm into which researchers feed assumptions that largely drive the predictions. I, for one, believe that the assumed differential of administrative overhead may be too large, if private insurers sold their policies through an organized exchange, rather than through brokers. Furthermore, research based on the Dutch and Swiss experience suggests considerable stickiness of insurance choices, suggesting that the premium-elasticity assumed by the Lewin Group may be too high. In Switzerland, in particular, very large differences in insurance premiums charged by private insurers for the same package in the same Canton exist with only minimal switching by consumers among plans in response to such differentials. A similar experience has been observed in the Netherlands.[10]

Be that as it may, there is the question what the Lewin Group means by "private payment level." Is there actually such a thing? If so, how is it defined and measured?

Table 6.3 below, taken directly from the *Final Report of the New Jersey Commission on Rationalizing Health Care Resources* (2008),[11] illustrates the variance of actual payments made by one large health insurer to different providers for a standard colonoscopy. Table 6.4 exhibits the variation in actual payments made to different New Jersey hospitals for identical hospital services. Finally, table 6.5 below exhibits similar variances for the same procedures paid by a different, large insurer to different hospitals in California.

**Table 6.3:**

**Large New Jersey Insurer's Payment for Colonoscopies Performed in Hospitals and Ambulatory Surgical Centers – Minimum Cost Per Procedure versus Maximum Cost Per Procedure**

| Cost per Colonoscopy | In-Network Minimum to Maximum Range |
|---|---|
| Physician | $178 to $431 |
| Hospital | $716 to $3,717 |
| ASC | $443 to $1,395 |

[10] See http://www.commonwealthfund.org/~/media/Files/ Publications/Fund%20Report/2009/Jan/The%20Swiss%20and%20Dutch%20Health%20Insurance%20Systems%20%20Universal%20Coverage%20and%20Regulated%20Competitive%20Insurance/Leu_swissdutchhltinssystems_1220%20pdf.pdf

[11] http://www.nj.gov/health/rhc/finalreport/index.shtml

**Table 6.4:**

**Payments by a N.J. Insurer to Various Hospitals for Four Standards Services, 2007[47]**

| | Normal Delivery[1] | CABG[2] | Appendectomy[3] | Hip Replacement[4] |
|---|---|---|---|---|
| Hospital A | $2,178 | $26,342 | $2,708 | $3,330 |
| Hospital B | $2,787 | $32,127 | $2,852 | $3,444 |
| Hospital C | $2,906 | $34,277 | $3,320 | $4,200 |
| Hospital D | $3,187 | $36,792 | $3,412 | $4,230 |
| Hospital E | $3,276 | $37,019 | $3,524 | $5,028 |
| Hospital F | $3,629 | $45,343 | $4,230 | $5,787 |

[1] Mother only, case rate.
[2] Coronary Bypass with Cardiac Catheterization (DRG 547), tertiary hospitals only.
[3] Surgical per diem (DRG 167) with average length of stay of 2 days.
[4] Surgical per diem for Total Hip replacement, average length of stay 3 days.

**Table 6.5:**

**Payments by One California Insurer to Various Hospitals, 2007 (Wage Adjusted)**

| | Appendectomy[1] | CABG[2] |
|---|---|---|
| Hospital A | $1,800 | $33,000 |
| Hospital B | $2,900 | $54,600 |
| Hospital C | $4,700 | $64,500 |
| Hospital D | $9,500 | $72,300 |
| Hospital E | $13,700 | $99,800 |

[1] Cost per case (DRG 167)
[2] Coronary Bypass with Cardiac Catheterization (DRG 107); tertiary hospitals only.

**Cost Shifting:** Medicare and Medicaid stand accused of shifting costs to private insurers by paying providers, especially hospitals, low prices, often below costs. In a study commissioned by the insurance industry, published in December of 2008, Milliman Inc. estimated the size of this cost shift for 2007 at $51 billion for hospitals and $37.8 billion for physicians, for a total of $88.8 billion.[12]

Although the phenomenon of the cost shift seems real to hospital—and insurance executives, it is less obvious to many economists who have debated the existence of the cost shift for decades among themselves. Indeed, with appeal to empirical data bearing on the issue, Congress' own Medicare Payment Advisory Commission (MedPAC) has cast doubt on the existence of a cost shift before this very Committee in a *Statement for the Record* dated March 2009.[13]

But even if one agreed that there actually were such a cost shift from the public to the private insurance sectors, Tables 6.3 to 6.5 presented above that there must be an even larger cost shift within the private insurance sector among private insurers. It raises the question whether the playing field is level even within that sector.

[12] Will Fox and John Pickering, "Hospital and Physician Cost Shift: Payment Level Comparison of Medicare, Medicaid, and Commercial Payers," (December, 2008) http://www.milliman.com/expertise/healthcare/publications/rr/pdfs/hospital-physician-cost-shift-RR12-01-08.pdf

[13] See also MedPAC, Medicare Payment Policy: MedPAC's March 2009 Report to Congress: 57–67 available at www.medpac.gov.

As Michael A. Porter and Elizabeth Olmsted Teisberg rightly observe on this point in their book *Redefining Health Care*: [14]

"Within the private sector, patients enrolled in large health plans are perversely subsidized by members of smaller groups, the uninsured and out-of-network patients. . . . The dysfunctional competition that has been created by price discrimination far outweighs any short term advantages that individual system participants gain from it, even for those participants who currently enjoy the biggest discounts." [15]

**What, then, is the Private Payer Level?:** Any proposal to force a new public health plan for non-elderly Americans to pay providers at "private payer levels"—the words used by the Lewin Group—would immediately run into the problem of the rampant price discrimination within the private sector, that is, and the huge variation in fees this price discrimination begets. Every insurer pays vastly different fees to different providers for the same service, and every provider bills different insurers different fees for the same service.

What in the chaos begotten by this system would the "private payer level" be to which a new public health plan should adjust. Would it be the average or the median of the prices paid by private insurers? Would they be simple or weighted averages and medians? If the latter, weighted by what? Over what geographic areas would these averages or medians be calculated?

Finally, if the public plan would have to pay such average or median fees, would it not by sheer arithmetic endow private insurers below that average or median with playing field tilted in its favor?

## VI. MAKING THE PUBLIC PLAN FUNCTION LIKE A PRIVATE PLAN

In a recent position paper, Len Nichols and John A. Bertko of the New America Foundation have gone to some length to design a level playing field for private insurers and a new public plan.[16]

Nichols' and Bertko's proposal is inspired by the thirty or so state governments that offer their employees a choice between (a) traditional private insurance plans and (b) and a self-insured public plan operated by the state. The authors would subject the competing private and the public plans to exactly the same rules, monitored by an entity other than the government itself. The public plan would have to be actuarially independent and not get any public subsidies not also available to the private plans. Like the private plans, the public plan would have to negotiate its own fees with providers.

Presumably, unlike Medicare, it would be allowed to exclude particular providers from its network of providers and would be allowed to engage in disease management and other strategies designed to enhance value for the dollar.

The advantage the authors can claim for that proposal is that it might find bipartisan approval. A drawback, however, would be the high administrative cost of forcing the new public plan to negotiate fees with each and every provider.

Furthermore, this approach would perpetuate the rampant price discrimination that should, at some time in the future, be replaced with a more efficient and fairer payment system—perhaps even an all-payer system, such as those used in Germany and Switzerland. As Michael Porter and Elizabeth Olmsted Teisberg [17] and others have argued, it is hard to detect any social value in the chaotic price-discrimination that now characterizes the private health insurance market in the United States.

## VII. A MARKET COMPOSED SOLELY OF PRIVATE INSURERS

In the end, the idea of the promised new public plan may be sacrificed on the altar of bipartisan political horse trading. In that case, if one wanted to offer Americans the stability and permanence they are likely to crave and run the market for health insurance on the *Principle of Social Solidarity*, one might structure the market for individually purchased insurance along the lines now used in Germany [18],

[14] Michael E. Porter and Elizabeth Olmsted Teisberg, *Redefining Health Care*, Harvard Business School Press, 2006: 66.

[15] For a proposal to begin to reduce this price discrimination see Uwe E. Reinhardt, "A More Rational Approach to Hospital pricing," http://economix.blogs.nytimes.com/2009/01/30/a-more-rational-approach-to-hospital-pricing/ and Uwe E. Reinhardt, "**The Pricing Of U.S. Hospital Services: Chaos Behind A Veil Of Secrecy,**" *Health Affairs*, January/February 2006; 25(1): 57–69.

[16] Len Nichols and John M. Bertko, "A Modest proposal for a Competing Public Health Plan, The New America Foundation, (March 11, 2009) http://www.newamerica.net/files/CompetingPublicHealthPlan.pdf

[17] Michael E. Porter and Elizabeth Olmsted Teisberg, *Redefining Health Care*, Harvard Business School Press, 2006: 66.

[18] See http://www.commonwealthfund.org/~/media/Files/Resources/2008/Health%20Care%20System%20Profiles/Germany_Country_Profile_2008_2%20pdf.pdf and http://content.

the Netherlands and Switzerland [19], all of whom seek to marry the Principle of Social Solidarity with a system of private, non-profit insurance carriers (Germany and Switzerland) or a mixture of non-profit and for-profit insurers (the Netherlands).

As already noted in the introduction, in these systems the first two functions of a health system—financing and risk pooling—is basically under the control of government, either directly or through tight regulation. The purchasing function, however, is delegated to private, competing entities, albeit under tight regulation as well.

In Germany and Switzerland these systems operate on the basis of an all-payer system, in which fees are negotiated, at the regional level of the state (*Land*) between associations of insurers and associations of providers, where after the negotiated fees apply to all payers and providers within the region. In the Netherlands, fees paid can vary among insurers; but the variance across plans is relatively small by American standards.

**VIII. CONCLUSION**

Even the opponents of a new public health plan for non-elderly Americans will probably concede that the private market for individually purchased health insurance remains underdeveloped and needs a restructuring before it can serve the needs of the American people better than it has heretofore.

As was argued in Sections III and VII above, even if Congress in the end decided not to permit the establishment of a new public health plan, a rather daunting set of new regulations would have to be imposed on that market to meet the social goals posited for our health system by President Obama. It would also require a mandate on individuals to have basic coverage, a proposal eschewed by the President during the election campaign, albeit not by his Democratic rivals.

Chairman RANGEL. Thank you, Doctor.

We would now like to hear from Bill Vaughan. I join with Chairman Stark in congratulating you and Consumers Union for the contribution you have made to our Congress over the years. And we would like to hear you.

**STATEMENT OF WILLIAM VAUGHAN, SENIOR POLICY ANALYST, CONSUMERS UNION**

Mr. VAUGHAN. Well, thank you very much, sir, and thank you for inviting us to testify. Consumers Union is the independent, non-profit publisher of Consumer Reports, and we don't just test toasters. We try to help people with health issues, and we are big, big fans of comparative effectiveness research, which we are using to save people, we think, millions of dollars in getting the most effective, safest, best buy drugs out there.

If Dante were alive writing about the independent health insurance market, it would be in the eighth circle just above where the uninsured are stuck. And it is exhibit number one for what is wrong with American health care.

I was going to go into that, but I think the opening statements of Mr. Camp, Mr. Stark, that is coals to Newcastle. Our statement documents why it is all goofed up, and has some very moving,

healthaffairs.org/cgi/content/abstract/27/3/771?ijkey=DsTX9syExLZLc&keytype=ref&siteid=healthaff

[19] See http://content.healthaffairs.org/cgi/content/full/27/3/w204) and (http://www.commonwealthfund.org/~E/media/Files/Publications/Fund%20Report/2009/Jan/The%20Swiss%20and%20Dutch%20Health%20Insurance%20Systems%20%20Universal%20Coverage%20and%20Regulated%20Competitive%20Insurance/Leu_swiss dutchhltinssystems_1220%20pdf.pdf and http://www.allhealth.org/BriefingMaterials/JAMA-Uwe-1183.pdfhttp://content.healthaffairs.org/cgi/content/full/27/3/w204) (http://www.commonwealthfund.org/~/media/Files/Publications/Fund%20Report/2009/Jan/ The%20Swiss%20and%20Dutch%20Health%20Insurance%20Systems%20%20Universal%20Coverage%20and%20Regulated%20Competitive%20Insurance/Leu_swissdutchhltinssystems_1220%20pdf.pd and http://www.allhealth.org/Briefing Materials/JAMA-Uwe-1183.pdf

Thank you very much, and I am happy to answer any questions that you might have.

[The prepared statement of Ms. Blumberg follows:]

# Improving Health Insurance Markets and Promoting Competition Under Health Care Reform

**Statement of**

**Linda J. Blumberg, Ph.D.**

**Senior Fellow**
**The Urban Institute**

**Committee on Ways and Means**
**United States House of Representatives**

**April 22, 2009**

Sections of this testimony are taken from John Holahan and Linda Blumberg, "Can a Public Insurance Plan Increase Competition and Lower the Costs of Health Reform?" Urban Institute Health Policy Center Issue Brief, 2008, available at http://www.healthpolicycenter.org, and Linda J. Blumberg and Karen Pollitz, "Health Insurance Exchanges: Organizing Health Insurance Marketplaces to Promote Health Reform Goals," Timely Analysis of Immediate Health Policy Issues brief, forthcoming, 2009.

Mr. Chairman and distinguished Members of the Committee: Thank you for inviting me to share my views on health insurance markets and health care reform. The views I express are mine alone and should not be attributed to the Urban Institute, its trustees, or its funders.

Current health insurance markets suffer from many shortcomings. I'm going to focus my remarks on three that I believe are central, and what I think we might be able to do under reform to address them. First the private insurance system is a voluntarily one for both employers and insurers, but too often those who would like to buy coverage face significant barriers to doing so, including lack of affordability and discrimination based on health status. These barriers contribute to the growing population of uninsured. Second, private health insurance markets are not very organized, making it difficult for individuals and employers to effectively compare options based on price, benefits, and quality of service. The lack of cohesive information on comparability of plan options limits the ability of purchasers to make cost-effective choices for their coverage.

Third, there is little competition between insurers, a consequence of a substantial amount of consolidation among insurers and health care providers in recent years. With little incentive on the part of large consolidated providers to negotiate over price with insurers, and insurers with large market shares being able to pass on these costs to purchasers while continuing to increase their own profits, rapid growth in insurance premiums is fueled.

I believe that comprehensive health care reform will be necessary to address these problems. Insurance market reforms and subsidies to make coverage affordable for the modest-income population within the context of a more organized health insurance

market are essential strategies. A health insurance exchange can be developed to organize the insurance market and to provide guidance and oversight in achieving reform goals. Making a public health insurance plan option available to purchasers can further promote competition in insurance markets and could be an effective strategy for slowing health care cost growth.

**Spreading Health Care Risk**

Competition in private health insurance markets today focuses largely on obtaining the lowest-risk enrollees. With a highly skewed distribution of health expenditures—the top 10 percent of spenders account for nearly two-thirds of total health expenditures[1]—the gains to insurers from excluding high-cost enrollees is tremendous. Insurance market regulations are required to prevent risk-selecting behavior by insurers. However, states allow insurers to risk select to varying degrees today so that they can protect themselves from the inherent nature of a voluntary insurance market, where individuals who expect to use significant health care services are those who are most likely to seek coverage. Without such leeway on the part of insurers, individuals may wait to purchase coverage until they know they need medical care, creating strong disincentives for the healthy to enroll. This dynamic would lead to very high premiums, reflecting a high-cost group of enrollees, and compromising the long-run stability of insurance pools. However, the consequences of allowing insurers to use such strategies are that many who need coverage cannot obtain it, and many more who have some type of insurance may not have adequate coverage to meet their health care needs.

---

[1] Samuel Zuvekas and Joel Cohen, "Prescription Drugs and the Changing Concentration of Health Care Expenditures," *Health Affairs*, vol. 26, no. 1 (2007): 249-57.

In the context of a health care system that is universal—where everyone is insured all of the time—there is no longer any reason to allow discrimination by health status. Consequently, coverage denials, benefit riders, pre-existing condition exclusions, and medical underwriting can be prohibited, and the costs of those with high medical needs can be spread broadly across the population. Without universal coverage, insurer discrimination by health status can only be eliminated in tandem with broad-based subsidization of the high medical need population, ideally using a source of revenue that is unrelated to the decision to purchase insurance coverage.[2]

In a context of universal or near-universal coverage that includes subsidies for the low-income population and possibly for the high-risk population and prohibits insurer discrimination by health status, an exchange can play an important role related to ensuring the broad-based spreading of health care risk. An exchange can penalize or exclude from participation companies that violate insurance market regulations, establishing market conduct rules to prevent evasion of regulations through informal means. Requiring enrollment through a centralized place, for example, can prevent carriers from denying coverage to particular groups with poor risk profiles or actively marketing only to the healthy. An exchange can also provide for risk adjustment to account for any uneven distribution of enrollee risks across insurers, requiring participating insurers to provide sufficient data on their health plan enrollees. With more accurate risk adjusters, exchanges can maintain a more diverse group of plan options, including highly managed and less tightly managed plans.

---

[2] See for example, John Holahan, Len Nichols, and Linda Blumberg, "Expanding Health Insurance Coverage: A New Federal/State Approach," in *Covering America – Real Remedies for the Uninsured*, Jack Meyer and Elliot Wicks, eds., Economic and Social Research Institute, 2001, *available at* http://www.urban.org/UploadedPDF/1000224_holahanuninsuredproposal.pdf.

If the exchange is the exclusive health insurance marketplace for some portion of the population (e.g., individual purchasers and some small groups), then opportunities for steering risks to alternative markets are eliminated. However, if insurers and purchasers can choose whether to participate in the exchange or whether to purchase coverage elsewhere, some risk segmentation potential will remain. In such a case, careful monitoring of the health risks of the enrolling and disenrolling populations will be important for the exchange to maintain, as risk adjustment between the exchange and non-exchange markets may be necessary to maintain the stability of all pools.

**Delivering Health Insurance Subsidies**

Exchanges can also be designed to efficiently deliver health insurance subsidies, an essential element of a reform intended to make coverage affordable for all incomes. Centralizing the subsidy determination and the process by which subsidy payments are made to insurers into a single agency, such as an exchange, would be a much more efficient approach to administration than that under the Health Coverage Tax Credit (HCTC) experience. Under the HCTC, a non-means-tested program that subsidizes coverage in the existing varied private insurance markets, roughly 34 percent of total spending for the program is attributable to the costs of administering the subsidy.[3] Processes for determining eligibility and for making appropriate payments to hundreds of different health plans require many separate transactions that are performed by multiple agencies under that program.

Having all of these processes centralized in one place could appreciably increase the efficiency of delivering subsidies. This one-stop-shopping approach has been taken

[3] Stan Dorn, "Health Coverage Tax Credits: A Small Program Offering Large Policy Lessons," Urban Institute Health Policy Center issue brief, 2008, http://www.urban.org/url.cfm?ID=411608.

Mr. STARK. Let's see. Mr. Pascrell, would you like to inquire?

Mr. PASCRELL. Thank you, Mr. Chairman.

Mr. Sperling, I read your—listened to your testimony and read your testimony, and I agree with a lot of what your testimony is, and even though you're supposed to be one of many, but you made a lot of sense in what you're talking about.

One thing you made sense, I believe, in is you said on Page 5 that, "Our health care system rewards physicians when they provide more services for sick care, rather than rewarding them equally for spending time to help patients avoid the 80 percent of illnesses that are lifestyle related."

I think that's a mouthful. I would agree with you. Much of the debate on health care over the past 15 years has gone to finding money to cover people, rather than getting folks to understand what they're paying for and how we could prevent these kinds of situations. And if that's at the basis of our health care system in the future, we will not be on this one-path that my good friend, Congressman Boustany, talked about very briefly.

I don't agree with you at all on your ERISA comments. I believe they need not only renovation and review, but revamping. A tremendous amount of changes need to happen in those ERISA laws, for us to get on equal footing.

Dr. Reinhardt, there's no debate that the current market for health insurance is failing folks looking to buy health insurance on their own, and small businesses.

Back in 1992, in New Jersey—you're very familiar with New Jersey—New Jersey adopted sweeping health insurance market reforms. We standardized the standardization plan options for small businesses and individuals. We ended discrimination against sick people. And we provided subsidies to people who could not afford to purchase individual coverage. We did a lot of other things, but I think they were the main things that happened in that so-called reform.

These are some of the most progressive policies, supposedly, in the nation. However, healthier individuals disproportionately enrolled in the cheaper, more bare bones options, or dropped coverage altogether. That's a fact. I'm not making this up. It's not conjecture. The numbers indicate that that's exactly what happened. You tell me if I'm missing something.

The premiums quickly began to increase. The subsidies disappeared. And overall enrollment declined.

So I think there's an important lesson here, and if you could define that New Jersey thing very quickly, because that's not my question. Two questions, besides the questions of affordability.

With the experiences of Jersey in mind, and I think it's a good basis here to get off on our discussion about how we're going to change health policy in the country, what are the key pieces of health reform that ensures that healthy and sick people are optimally pooled together and that long-term affordability is sustained; and could you explain to us clearly and concisely the economic need for more standardization and a minimum benefit in terms of risk spreading and adverse selection? But give us a very brief point about why the plan in New Jersey, I think, failed.

Mr. REINHARDT. It failed because it wasn't accompanied by a mandate to be insured for a defined package. It doesn't have to be Cadillac. It should, however, cover what is necessary.

There was an initial study of it by Cathy Schwartz of Harvard, who reported that the New Jersey system worked well, but we, her colleagues argued, "This cannot be true, this will unravel." And sure enough, it did unravel, and I quote a paper here by Monheit et al and others that showed what happened to the New Jersey scheme. It imploded.

Mr. PASCRELL. I'm very proud of the fact that I'm the only legislator that voted against it in New Jersey at the time, and my worst analysis came true, unfortunately.

Mr. REINHARDT. You must be an economist, thought like one, because if those three things don't go together, markets will unravel. It's simply predictable. Young people will not insure, and wait until they can throw themselves on the mercy of a community-rated product.

That's why I favor a mandate, and there are various ways to rig this. One could tell people, "Look, if you postpone insurance and then want to join, you have to have a long waiting period, or your premiums will be higher."

In this country, we invite people to play games with adverse risk selection, because we allow people to change every year or even more frequently. If I had my druthers, I would not allow Medicare beneficiaries to join the private plan and come back within a year. I would say, "You have to do this for five-year periods," somehow to eliminate these games.

But that is what happened in New Jersey, so this is why, in my testimony, I stress those three things do have to go together: guaranteed issue, community rating, and a mandate to be insured, which of course, means you're forcing healthy young people to subsidize older, sicker people.

Mr. PASCRELL. Can I just continue, just for a second?

Mr. Sperling, what would your reaction be to Dr. Reinhardt on the three basic points that this reform of health care must have within it as ingredients, in order to—in Italian we say [Italian word]—in order for this stew to work?

Mr. SPERLING. Congressman, I've been in this business for 30 years. One of the first things I learned is never to argue with Dr. Reinhardt.

[Laughter.]

Mr. SPERLING. The concept of having everybody in, in order to have risk pooling, is something that is unassailable. He's absolutely right.

Mr. PASCRELL. So you agree with that?

Mr. SPERLING. He's absolutely right.

Mr. PASCRELL. You agree with that point?

Mr. SPERLING. Yes.

Mr. PASCRELL. Go ahead. What else?

Mr. SPERLING. Well, I think there's several aspects of the self-insured marketplace that work and can be applied as we try to expand access to——

would negotiate standard, reasonable and timely payments with all health care providers. No exclusions, no denials, no hassle. Everyone would have access to guaranteed health care. Instead of wasting time arguing with insurance companies about payments, doctors and nurses could focus on providing services to patients. A publicly financed, privately delivered system would also make the real costs of our system more visible and make true accountability possible.

Caring for each other. It is time for the American health care system to return to its roots—driven by mission rather than money. There are proposals in the Congress that would begin to move us toward that goal and rescue our failing health care system. They are the Conyers bill, H.R. 676 in the House, and the Sanders bill, S. 703 in the Senate. Congresswoman Pingree is already a co-sponsor of HR 676. We urge you to contact Congressman Michaud and ask him to join her as a co-sponsor of H.R. 676, and Senators Snowe and Collins to urge them to cosponsor S. 703.

In that way, we can join every other industrial country in the world in making access to affordable health care a right.

Phil Caper, M.D.
Joe Lendvai
*Brooklin, Maine*

This commentary appeared in the Bangor Daily News on April 17, 2009.

## The American Academy of Actuaries, Statement

The American Academy of Actuaries is a 16,000-member professional association whose mission is to serve the public on behalf of the U.S. actuarial profession. The Academy assists public policymakers on all levels by providing leadership, objective expertise, and actuarial advice on risk and financial security issues. The Academy also sets qualification, practice, and professionalism standards for actuaries in the United States.

As Congress considers various proposals to reform the individual health insurance market, the American Academy of Actuaries'[1] Health Practice Council appreciates this opportunity to submit written testimony outlining an actuarial perspective on market reforms. According to the latest estimates from the U.S. Census Bureau, about 45 million Americans under age 65, or 17 percent of the nonelderly population, lacked health insurance in 2007. The economic downturn has most likely led to an increase in the number of uninsured. Increasing access to health insurance coverage depends on making insurance more affordable, to individuals as well as to states and the Federal Government. Instituting health insurance market reforms are increasingly viewed as a method of increasing the availability of affordable insurance coverage. Although the potential impact of any given reform will depend on its specific details, actuarial considerations will be vital when determining whether particular proposals will lead to improved markets with increased access to affordable coverage. In particular:

- For insurance markets to be viable, they must attract a broad cross section of risks.
- Market competition requires a level playing field.
- For long-term sustainability, health spending growth must be reduced.

### Insurance markets must attract a broad cross section of risks

For health insurance markets to be viable, they must attract a broad cross section of risks. In other words, they must not enroll only high risks; they must enroll low risks as well. If an insurance plan draws only those with high expected health care spending, otherwise known as adverse selection, then premiums will be higher than average to reflect this higher risk. Adverse selection is a byproduct of a voluntary health insurance market. People can choose whether or not to purchase insurance coverage, depending in part on how their expectations for health care needs compare to the insurance premium charged. The higher premiums that result from adverse selection, in turn, may lead to more low risks opting out of coverage, which would result in even higher premiums. This process is typically referred to as a premium spiral. Avoiding such spirals requires minimizing adverse selection and instead at-

[1] The American Academy of Actuaries is a 16,000-member professional association whose mission is to serve the public on behalf of the U.S. actuarial profession. The Academy assists public policymakers on all levels by providing leadership, objective expertise, and actuarial advice on risk and financial security issues. The Academy also sets qualification, practice, and professionalism standards for actuaries in the United States.

tracting a broad base of low-risk individuals, over which the costs of high-risk individuals can be spread. Attracting healthier individuals will ultimately help keep premiums more affordable and stable.

How the various rules and regulations that apply to health insurance markets are defined can affect the degree of adverse selection. For instance, guaranteed-issue provisions can exacerbate adverse selection concerns, by giving individuals the ability and incentive to delay purchasing insurance until they have health care needs.[2] Likewise, pure community rating and adjusted community rating rules can raise the premiums for healthy individuals, relative to what they would pay if health status could be used as a rating factor.[3] This could cause healthy individuals to opt out of coverage, leaving a higher-risk insured population. Allowing insurers to deny coverage or to charge higher premiums to high-risk individuals can help reduce adverse selection by making insurance more attractive to healthy risks, but at the cost of reduced access to coverage and higher premiums for the higher-risk population.

Increasing overall participation in health insurance plans could be an effective way to minimize adverse selection. Requiring individuals to have insurance coverage is one way to increase participation rates, especially among low-risk individuals, and thereby reduce adverse selection risk. Other types of incentives are also available to increase participation, including: limiting open-enrollment periods with penalties for delayed enrollment, subsidizing premiums, and instituting automatic enrollment (i.e., opt-out rather than opt-in provisions). Medicare Parts B and D include some of these incentives. Nevertheless, an effective and enforceable individual mandate would likely achieve higher participation rates than these types of voluntary incentives.

In the absence of universal coverage, some degree of adverse selection is inevitable. And even with universal coverage, some insurance plans could end up with a disproportionate share of high-risk individuals. If plan premiums do not reflect this, the plan could be at risk for large losses. As a result, plans could develop strategies to avoid enrolling less healthy individuals. Risk adjustment could be used to adjust plan payments to take into account the health status of plan participants. This would reduce the incentive an insurer might have to avoid enrolling higher-risk individuals. In addition, some type of reinsurance mechanism could limit insurers' downside risk by protecting against unexpected high-cost claims.

**Market competition requires a level playing field**

For health insurance markets to be viable, plans trying to enroll the same participants must operate under the same rules. If one set of plans or insurers operate under rules that are more advantageous to high-risk individuals, then they will migrate to those plans; low-risk individuals will migrate to the plans more advantageous to them. In other words, the plans that have rules more amenable to high-risk individuals will suffer from adverse selection. Over time, the premiums for these plans will increase to reflect this, leading to more adverse selection and threatening the viability of those plans.

For example, if a regional health exchange or connector is created, and plans are offered inside and outside the exchange, the rules governing plans inside and outside of the exchange need to be the same. Otherwise either the plans inside the exchange or outside the exchange could get a disproportionate share of high-risk individuals, depending on which set of plans is subject to rules that are more advantageous to those in poorer health.

Similarly, adverse selection can occur when insurance is allowed to be purchased across state lines. High-risk individuals will purchase plans from states with stricter regulations (e.g., those mandating guaranteed issue and community rating), and low-risk individuals will purchase plans from states with looser regulations (e.g., allowing underwriting and premium variations by health status). Premiums for the plans in states with stricter regulations will increase accordingly, which could lead to even fewer insurance purchases among the low-risk population.

**For long-term sustainability, health spending growth must be reduced**

According to National Health Expenditure data, health care spending increased 6.1 percent in 2007. Although this is the lowest growth rate in a decade, it far exceeds the rate of inflation, and exceeds the growth in the overall economy as well.

---

[2] Guaranteed issue provisions require that all health insurance applicants must be offered coverage, regardless of their health status or likelihood of large medical expenditures.

[3] Under pure community rating, every insured under a particular insurance plan pays the same premium; premiums cannot vary by factors such as age, gender, and health status. Under modified (or adjusted) community rating, premiums are allowed to vary, often within limits, by certain characteristics, such as age and gender. However, premiums are not allowed to vary by health status.

If health spending continues to grow at this pace, as projected, health insurance premiums will continue to increase as well. Unless health care costs are controlled, efforts to achieve universal coverage may be in vain. Reining in health insurance premiums in the near term will be for naught if rising health spending means that premiums will return to their original levels within a few years, and continue to rise rapidly thereafter. Therefore, to have the potential for sustainable success, health reform proposals need to focus on controlling the rate of health spending growth. And because there is mounting evidence that the money being spent for health care is not providing enough value and that the vast variations in health spending across the country aren't correlated with variations in health care outcomes, spending growth should be addressed within the context of quality and value reforms.

Several factors contribute to the growth in health spending, and there are options to address many of them, each offering promising opportunities to improve quality while reducing costs. The introduction of new technology and treatments can increase health care spending by increasing utilization, particularly of higher-intensity services. More comparative effectiveness research should be conducted to better ensure that new technologies and treatments add value, not just costs. Another driver of health spending growth is that current provider payment systems do not align provider financial incentives with the goal of maximizing the quality and value of health care provided. Instead, the most common provider payment mechanisms reward more care, and more intense care. Restructuring provider payment systems could result in more coordinated, cost-effective, and quality care.

Comprehensive insurance benefits, by lowering the cost of care to the insured, can also result in increased utilization of health care services. Although some of the utilization increases are for necessary care, some are not. Benefit design features such as cost-sharing requirements can be used to encourage more effective use of health care services. However, any incentives to make the insured, particularly those with chronic conditions, more sensitive to benefit costs should be balanced so that individuals are not discouraged from seeking needed care. Value Based Insurance Design (VBID), a relatively new concept in insurance benefit design, attempts to better target cost-shsaring requirements so they more effectively encourage needed care, yet discourage unnecessary care.

**Conclusion**

Health insurance market reforms have the potential to increase the availability of affordable health insurance coverage and, thereby reduce the number of uninsured Americans. However, for reforms to be viable, they must adhere to actuarial principles. In particular, insurance markets must attract a broad cross section of risks, especially low-risk individuals. Otherwise, adverse selection will result, potentially leading to a premium spiral. In addition, market competition requires a level playing field. Subjecting market competition to the same rules and regulations will help minimize adverse selection between plans and markets. And finally, health spending growth must be curtailed in order to ensure long-term sustainability.

## The American Medical Association, Statement

The American Medical Association (AMA) appreciates the opportunity to present the views of our physician and medical student members regarding reforming the health insurance market to ensure greater accessibility and affordability. We commend Chairman Rangel, Ranking Member Camp, and members of the Ways and Means Committee for your leadership in recognizing the need to examine the problems in the health insurance market. The AMA agrees that major reforms are required to make the health insurance market work better for both physicians and their patients.

Covering the uninsured is a top priority of the AMA. The AMA believes that we must enact comprehensive health system reform that will cover the uninsured, improve our health care delivery system, and place affordable, high quality care within reach of all Americans. As advocates for patients, physicians have a particular stake in finding viable, effective approaches to these issues, especially the challenge of covering the uninsured. The AMA's comprehensive proposal to expand health insurance coverage and choice addresses the needs of all patients, regardless of income, and builds on the current employer-based system to promote individual choice and ownership of health insurance coverage.

The AMA proposal allows for the continuation of employment-based insurance in the private sector, while encouraging new sources of health insurance that would

be available to both the uninsured and the currently insured. Under our proposal, individuals who are satisfied with their existing coverage will be able to maintain that coverage. Those who are uninsured or dissatisfied with their current coverage will be able to purchase the coverage they want. One of the goals of our proposal is to give patients more control over their choice of health coverage and their own care and to preserve and improve the patient-physician relationship.

The AMA proposal is based on three pillars designed to expand health insurance coverage and choice: 1) helping people buy health insurance through tax credits or vouchers; 2) choice for individuals and families in what health plan to join; and 3) fostering insurance market reforms that establish fair ground rules and encourage the creation of innovative and affordable health insurance options. In addition, the AMA supports individual responsibility for Americans who have incomes of more than 500 percent of the Federal poverty level and can afford to purchase coverage. Those who cannot afford it and do not qualify for public programs should receive tax credits for the purchase of health insurance. Once affordable, everyone should have the responsibility to obtain health insurance.

The AMA proposes streamlined, more uniform health insurance market regulation, in tandem with targeted government subsidies for coverage of high-risk patients. Market regulations must establish fair ground rules in order for the private insurance market to function properly while also protecting high-risk patients without driving up health insurance premiums for the rest of the population. The sheer number and variety of state and Federal market regulations make it unnecessarily costly to provide health insurance in many markets. There should be greater national uniformity of market regulation across health insurance markets, regardless of type of submarket (i.e., large group, small group, individual), geographic location, or type of health plan. Appropriate regulations would permit market experimentation to find the most attractive combinations of plan benefits, patient cost-sharing, and premiums. Limited state variation in market regulation should be permitted as long as it does not drive up the number of uninsured, unduly hamper the development of multi-state group purchasing alliances or create adverse selection across states.

**Health Insurance Exchanges**

The AMA supports the creation of new opportunities to buy health insurance individually or as part of a group, such as health insurance exchanges modeled after the Federal Employees Health Benefits Program (FEHBP), small employer purchasing alliances, or health plans offered through professional, trade, religious, or alumni organizations. Insurance must be portable and individuals must have a choice among insurance options that best suit their needs. For those individuals who do not have access to or do not select employer-based insurance, the AMA supports establishing a health insurance purchasing exchange to increase choice, facilitate plan comparisons, and streamline enrollment that will assist individuals in choosing coverage that best suits their needs. Insurers should provide understandable and comparable information about their policies, benefits, and costs to empower patients, employers, and other purchasers and consumers to make more informed decisions about plan choice.

**Modified Community Rating**

Strict community rating should be replaced with modified community rating. By allowing some degree of premium variation based on individual risk factors, but limiting premium differences within specified risk bands, modified community rating strikes a balance between protecting high-risk individuals and the rest of the population. Some degree of age rating is acceptable, as are lower premiums for nonsmokers, but an individual's genetic information should not be used to determine premiums or eligibility for coverage.

**Guaranteed Renewability**

The AMA supports the replacement of guaranteed issue regulations with guaranteed renewability. Guaranteed issue requires insurers to accept all applicants regardless of pre-existing conditions, even if they are uninsured. Similarly, prohibiting insurers from imposing pre-existing condition limitations means that insurers must offer the same level of benefits coverage to all applicants. In the context of the current market, which does not have an individual mandate, these regulations permit people to "free-ride" by waiting until they need medical attention to buy health insurance, exposing insurers and all those who have maintained their insurance coverage to unfair risk (once everyone has coverage through individual responsibility or an individual mandate, the concern about guaranteed issue is resolved). As an alternative, the AMA supports guaranteed renewability. Guaranteed renewability would protect individuals from losing coverage or being singled out for premium

hikes due to changes in health status, rewarding people for obtaining and maintaining coverage. Similarly, people who wish to switch health plans should face limited underwriting and pre-existing condition limitations, compared with those who are newly seeking coverage.

**Individual Responsibility**

The AMA supports requiring individuals and families who can afford coverage to obtain health insurance. Those earning greater than 500 percent of the Federal poverty level should be required to obtain at least catastrophic and preventive coverage, or face adverse tax consequences. The requirement would extend to people of all incomes only after implementation of subsidies for those who need financial assistance obtaining coverage (i.e., sliding-scale, refundable tax credits or vouchers to buy insurance). A requirement to have insurance would enable insurers to move toward community rating. Simplified, automated underwriting would result in de facto modified community rating, as the natural byproduct of market function rather than as a result of market regulation.

**Targeted Subsidies for High-Risk Individuals**

The AMA believes that insurance market reform must include protections for high-risk patients. The AMA advocates explicit, targeted government subsidies to help high-risk people obtain coverage without paying prohibitively high premiums. Risk-based subsidies make high-risk patients more attractive to insurers without driving up premiums for the general population. Such subsidies can take the form of high-risk pools, reinsurance, and risk adjustment. For example, providing subsidized coverage through high-risk pools gives insurers reassurance that they are unlikely to insure an unfavorable selection of high-cost enrollees in the regular market, allowing them to offer lower premiums and making coverage attractive to the young and healthy. Financing risk-based subsidies with general tax revenues rather than through premiums avoids the unintended consequences of driving up premiums and distorting health insurance markets.

**Health Insurer Transparency**

We believe that health insurance market reform must include efforts to improve transparency for patients and physicians. The AMA has long supported efforts to promote transparency in health care. We believe that empowering patients with understandable price information and incentives to make prudent choices will strengthen the health care market. To that end, we believe that all methods of physician payment should incorporate mechanisms to foster increased cost-awareness by both providers and recipients of service. Disclosure of price information, however, can only be meaningful if, in addition to disclosure of physician fees, there is disclosure of insurance claims processing and payment practices. Without transparency on the part of health plans and insurers, both patients and physicians suffer.

Insurers must make available to enrollees and prospective enrollees information, in a standard format, about the amount of payment provided toward each type of service identified as a covered benefit. In addition, health plans and insurers should make medical payment policies, claim edits, and benefit plan provisions embedded in their fee schedules or "negotiated rates" available to patients. Physicians must also have access to health plan pricing information. Without this information, it is impossible for patients to know what their costs will be.

It is critical that employers and consumers have a clear understanding of how health care premiums are allocated by health insurance companies, and in particular how much of their premium dollar is spent on health care services as opposed to administration, profit, or other purposes. Full transparency of how health care insurance premiums are spent will empower patients, employers, and other health insurance purchasers to make more informed decisions, foster competition, and reward companies that minimize administrative waste.

Clarifying and illuminating health care claims payment and adjudication is the only way to ensure that patients will have accurate, current information at their disposal. Such information will enable them to make informed decisions about the most priceless thing in life—their health. Moreover, bringing health care pricing information out of the dark will allow physicians to regain some control over their practices and focus on what they were trained for—treating and healing their patients.

There are a number of claims processing and payment issues that have contributed to the incredibly difficult climate for physicians attempting to be paid promptly, accurately, and fairly by insurers. Failure to comply with state prompt payment claims and attempts to delay and improperly discount physician payments can financially debilitating effects on small physician practices and can severely limit pa-

tient access. Yet often, patients and physicians have little, if any, recourse to challenge health plan actions.

Efforts should be made to deal with prompt payment and other critical insurer payment practices. One-sided contract terms, lack of transparency or conformity in payer payment rules, repricing of physician claims, refusal to accept valid assignments of benefits, and other manipulative payment practices represent egregious business practices. These practices would be unacceptable in any other business context and should not be permitted to continue and flourish in the health insurance industry.

In conclusion, the AMA looks forward to working with you and your colleagues in Congress as you develop health system reform legislation. Thank you again for your strong leadership in this important endeavor.

## The National Association of Health Underwriters, Statement

The National Association of Health Underwriters (NAHU) is a professional trade association representing more than 20,000 health insurance agents, brokers and employee benefit specialists all across America. Our members work on a daily basis to help individuals and employers of all sizes purchase health insurance coverage. They also help their clients use their coverage effectively and make sure they get the right coverage at the most affordable price.

All of this experience gives our membership a unique perspective on the health insurance market place. Our members are intimately familiar with the needs and challenges of health insurance consumers, and they also have a clear understanding of the economic realities of the health insurance business, including both consumer and employer behavioral responses to public policy changes. They have had the chance to observe the health insurance market reform experiments that have been tried by the states and private enterprise, and are in a unique position to report on which of these efforts have worked the best.

NAHU strongly feels that any health reform effort should be centered around employer sponsored plans, which efficiently provide comprehensive coverage to over 160 million Americans. However, employer-sponsored coverage is not the right choice for everyone; approximately 14.5 million Americans have private health insurance coverage that is not connected with an employer-sponsored plan.[1]

In terms of needed health insurance market reforms, NAHU believes the current individual health insurance marketplace is not always serving consumers in the most effective manner. In our work helping consumers from all over the country obtain private health coverage, we have observed that problems relating to access, pre-existing conditions and affordability are prevalent nationwide. Since each state's individual market is uniquely regulated, consumers in some states are faring better than in others, but no state's individual health insurance market is problem-free.

### Coverage for Everyone

One of the greatest problems with individual health insurance today is that not all Americans are able to purchase coverage. In some states, people with serious medical conditions who do not have access to employer-sponsored plans cannot buy individual coverage at any price.

One of the simplest ways to address the access issue in the individual market would be to require that all individual health insurance policies be issued on a guaranteed issue basis, without regard to pre-existing medical history. However, in addition to being accessible to all Americans, individual coverage also must be affordable. It would be unwise to require insurers to guarantee issue individual coverage to all applicants unless a system where nearly all Americans have coverage and full participation in the insurance risk pool has been achieved. Due to their small size and the propensity towards adverse selection, state individual health insurance markets are very fragile and price sensitive. Also, there currently is no controlled means of entry and exit into the individual health insurance market independent of health status, like there is with employer-group coverage. Without near universal participation, a guaranteed-issue requirement in this market would have the perverse effect of encouraging individuals to forgo buying coverage until they are sick or require sudden and significant medical care. This, in turn, would undermine the core principle of insurance—spreading risk amongst a large population. The result

[1] Urban Institute and Kaiser Commission on Medicaid and the Uninsured estimates based on the Census Bureau's March 2007 and 2008 Current Population Survey (CPS: Annual Social and Economic Supplements) http://www.statehealthfacts.org/comparebar.jsp?ind=125&cat=3