# Exhibit 15

S. HRG. 111–344

# CONSUMER CHOICES AND TRANSPARENCY IN THE HEALTH INSURANCE INDUSTRY

## HEARING

BEFORE THE

## COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION UNITED STATES SENATE

ONE HUNDRED ELEVENTH CONGRESS

FIRST SESSION

JUNE 24, 2009

Printed for the use of the Committee on Commerce, Science, and Transportation

U.S. GOVERNMENT PRINTING OFFICE

53–061 PDF WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

And then show people in a very detailed way, here's what the policy would cover. Here's what the policy wouldn't cover and you would have to pay and give them a bottom line. So that when they are shopping and comparing the price of policies they can actually see what it would cover.

Transparency is going to be important. But accountability is also going to be very, very important because again of the strong financial incentives we just can't run the health insurance system on the honor system. There's going to need to be strong oversight and strong enforcement of the rules that are there to protect consumers.

In particular it's going to be very important for there to be resources to monitor the health insurance industry and to enforce the rules, resources that are sadly lacking today. At a hearing last summer, over on the House side, the Committee on Oversight and Government Reform, a Representative of the Administration testified that at HHS there were four part-time people whose job it was to monitor all of the HIPAA protections for private health insurance in Federal law. Four, part-time people, that's it.

And despite, this was a hearing on rescissions, despite press reports about abusive rescission practices, no one at HHS had looked into it. No one had asked any questions. No one had even checked to see if the state laws were up to speed and were protecting people in these ways.

Over at the Department of Labor which has oversight over employer sponsored health plans, where most of us get our coverage, testimony has been given that there are resources for that department to review each employer sponsored health plan under its jurisdiction once every 300 years.

And at the state level, regulatory resources are also very limited. I think the states are trying very hard. But state insurance departments have to oversee all lines of insurance, not just health insurance. They have seen staffing cuts, significant staffing cuts in recent years.

And most of them also oversee other things, banking, insurance, commerce, real estate. In four states the Insurance Commissioner is also the Fire Marshall. And they do not have the resources to have, in most states, a dedicated team that just keeps an eye on health insurance all the time doing regular monitoring, regular audits, to make sure that consumers are protected. They have to operate in response to complaints.

So in conclusion, Mr. Chairman, I want to congratulate you for introducing the Informed Consumer Choices in Health Care Act. That bill would provide for the transparency and accountability that we need and the resources to make that happen. I hope that will be part of health reform. And I'm very happy to take your questions.

[The prepared statement of Ms. Pollitz follows:]

PREPARED STATEMENT OF KAREN POLLITZ, RESEARCH PROFESSOR, GEORGETOWN UNIVERSITY HEALTH POLICY INSTITUTE

Good afternoon, Mr. Chairman and Members of the Committee.

My name is Karen Pollitz. I am a Research Professor at the Georgetown University Health Policy Institute where I study the regulation of private health insurance.

Thank you for holding this hearing today on transparency and accountability in health insurance. These characteristics are lacking in private health insurance today and must be strengthened as part of health care reform.

**The Paradox of Risk Spreading**

It has long been true that a small proportion of the population accounts for the majority of medical care spending. (See Figure 1) Most of us are healthy most of the time, but when serious or chronic illness or injury strikes, our medical care needs quickly become extensive and expensive.

**Figure 1. Concentration of Health Spending in the U.S. Population**




Source: Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey, 2003. Population includes those without any health care spending. Health spending defined as total payments, or the sum of spending by all payer sources.

Because of this distribution, we buy health insurance to spread risks and protect our access to health care in case we get sick. However, the same distribution creates a powerful financial incentive for insurers to *avoid* risk. In a competitive market, if an insurer can manage to avoid enrolling or paying claims for even a small share of the sickest patients, it can offer coverage at lower premiums and earn higher profits.

Today, insurance companies employ many methods to discriminate against consumers when they are sick. Medical underwriting may be the best known—a process used to assess the risk of applicants. People who have health problems may be denied health insurance when they apply. Or they may be offered a policy with a surcharged premium and/or limits on covered benefits including pre-existing condition exclusions.

However, underwriting is not confined just to the application process. New policyholders (both individuals and small groups) who make large claims during the first year or two of coverage will likely be subject to post-claims underwriting. During this process insurers will re-investigate the applicant's health status and history prior to the coverage effective date. Any discrepancy or omission, even if unintentional and unrelated to the current claim, can result in coverage being rescinded or canceled. At a hearing of the House Energy and Commerce Committee last week, patients testified about having their health insurance policies rescinded soon after making claims for serious health conditions. One woman who is currently battling breast cancer testified that her coverage was revoked for failure to disclose a visit to a dermatologist for acne. At this hearing, when asked whether they would cease

the practice of rescission except in cases of fraud, executives of leading private health insurance companies testified that they would not.[1]

Health care reform legislation will likely include rules to prohibit these practices—guaranteed issue, modified community rating, and prohibition on rescissions and preexisting condition exclusions. These rules are important, but alone, will not put an end to competition based on risk selection. The incentive to compete based on risk selection will not go away.

Insurers can use other formal and informal methods to discriminate based on health status. For example, they can make strategic decisions about where and to whom to market coverage, avoiding areas and populations associated with higher costs and risk. So-called "street underwriting" can be used to size up the health status of applicants before deciding whether to continue with the sales pitch. Insurers can also design covered benefits and provider networks to effectively attract healthy consumers and deter sicker patients from enrolling or remaining enrolled. Claims payment practices and care authorization protocols can also create hassles for patients that discourage coverage retention. Fine print in policy contracts may limit coverage or reimbursement for covered services, leaving consumers to pay out-of-pocket for medical bills they thought would be covered.

Therefore, rules will not be enough. To ensure health coverage is meaningful and secure, greater transparency and accountability must also be required of private health insurance.

**Transparency in Health Insurance**

Transparency in health insurance will involve three key elements:

- reporting to regulators of data on health insurance company products and practices;
- greater disclosure to consumers of how their coverage works and what it will pay; and
- standardization of health insurance terms, definitions, and practices so that consumers can have a choice of good coverage options without having to worry about falling into traps.

*Data*—Insurers should report information to health insurance regulators on an ongoing basis about their marketing practices. Data on the number of applications received and new enrollments, as well as data on enrollment retention, renewals, non-renewals, cancellations, and rescissions will be needed. In addition, data must be reported on health insurance rating practices at issue and at renewal. Regulators should know what policies are being sold, what they cover, and who is covered by them. Measures of coverage effectiveness will also be needed to track what medical bills insured consumers are left to pay on their own. Tracking of provider participation, fees, and insurer reimbursement levels is essential. Health insurance policy loss ratios (the share of premium that pays claims, vs. administrative costs) must be monitored. So must be insurer practices regarding claims payment and utilization review. If regulators have access to this kind of information, patterns of problems that affect the sickest consumers won't be easy to hide.

*Disclosure*—Consumers need much more information about their coverage and health plan choices. Adequate disclosure to consumers begins by ensuring that complete information about how coverage works is readily available. Policy contract language should be posted on insurance company websites so that it can always be inspected by consumers and their advocates. Current provider network directories and prescription drug formularies should also be open to public inspection at all times.

In addition, for each policy marketed, insurers should be required to provide "Coverage facts labels that illustrate how the policy will work to cover standard illustrative patient care scenarios. Recently we issued two reports on the adequacy and transparency of coverage sold in Massachusetts and California. Our reports found substantial differences in coverage protection provided by policies that might otherwise appear similar to consumers. Even in Massachusetts, with its extensive health care reforms and market regulation, significant variation in policy features persists and could leave patients to pay medical bills they did not expect and cannot afford. For example, under two so-called "bronze" policies that have the same actuarial value and cover the same benefits, we found a breast cancer patient might pay

[1] Lisa Girion, "Health insurers refuse to limit rescission of coverage," *Los Angeles Times,* June 17, 2009.

$7,600 out-of-pocket for her treatment under one policy, but $13,000 out-of-pocket for the same treatment under the other policy.[2]

To make coverage differences more obvious to consumers, a series of "Coverage Facts" labels could be developed that simulate the medical care claims patients might have under several expensive conditions, such as breast cancer, heart attack, diabetes, or pregnancy. Insurers would be required to take these standardized scenarios, "process" the simulated claims under policies they sell, and then, for each policy, present a detailed summary of what would be covered and would be left for patients to pay. The format for these labels could be patterned after the Nutrition Facts label that help consumers understand the ingredients and nutritional value of packaged foods. See Figure 2.

**Figure 2. Sample "Coverage Facts" Label for Health Insurance**

## Coverage Facts

Individually Purchased Health Insurance, 2008

### Plan C (Bronze)

| | |
|---|---|
| Monthly Premium (age 55) | $596 |
| Annual deductible | $2,000, $100 for Rx |
| Annual OOP limit | $5,000 |
| Cost sharing not subject to annual OOP | Medical, prescription, mental health co-pays |
| Significant exclusions, benefit limits | none |

### Breast Cancer Scenario ‡

(May 1 diagnosis, 87 weeks active treatment)

| | |
|---|---|
| Estimated allowed charges for all treatment | $143,180 |
| **Estimated paid by patient** | **$12,907 (9%)** |

| Care type | # billed | Total allowed charges ($) | $ paid by patient | % paid by patient |
|---|---|---|---|---|
| Office Visit | 48 | 4,387 | 1,200 | 38% |
| Office Procedure | 47 | 466 | 202 | 43% |
| Radiology | 12 | 5,789 | 898 | 6% |
| Laboratory | 40 | 2,924 | 472 | 10% |
| Surgery | 1 | 3,386 | 1,683 | 34% |
| Hospital | 1 | 3,293 | 659 | 0 |
| Inpat Med Care | 1 | 174 | 35 | 0 |
| Rx Drugs | 36 | 5,473 | 1,185 | 19% |
| Prostheses | 1 | 360 | 72 | 0 |
| Chemotherapy | 36 | 98,124 | 3,967 | * |
| Mental Health | 36 | 2,894 | 900 | 33% |
| Radiation Therapy | 35 | 15,911 | 1,635 | 10% |

* signifies less than 1/2 of 1%

| Source of expense | Number encountered | Amount |
|---|---|---|
| Annual deductibles | 3 | $4,300 |
| Co-pays | 120 | $3,160 |
| Co-insurance | - | $5,447 |
| Non-covered care | n/a | $0 |

‡Breast Cancer Scenario includes outpatient lumpectomy, 4 two-week cycles each of two chemotherapy regimens, 7 weeks of daily radiation therapy, one year of Herceptin therapy, short term mental health counseling, various diagnostic lab and imaging services and prescription drugs. Scenario based on treatment guidelines published by NCCN. ***Individual patient care needs may vary.***

All care assumed to be received from in-network providers following all plan rules for prior authorization. Receipt of care by non-plan providers or without required authorizations can result in substantially higher out-of-pocket costs.

Active treatment over 87 weeks beginning in May assumes patient faces annual deductibles and other cost sharing in three plan years. Diagnosis at different time during calendar year could produce different cost sharing results.

---

[2] Karen Pollitz, *et. al.,* "Coverage When It Counts: What Does Health Insurance in Massachusetts Cover and How Can Consumers Know?" May 2009. Available at *http://www.rwjf.org/pr/product.jsp?id=42248.*

Consumers will need to know other information about how health insurers operate, including rates of prompt payment of claims and claims denials, loss ratios, and the number and nature of complaints and enforcement actions taken against an insurer. Health plan report cards should be developed to provide this information. As people shop for coverage, they must be able to compare differences in efficiency and the level of customer service that insurers provide.

*Standardization*—People clearly value choice in health coverage, but so many dimensions of coverage vary in so many ways that choices can become overwhelming and even sometimes hide features that will later limit or prevent coverage for needed care. An important goal of health care reform must be to adopt a minimum benefit standard so consumers can be confident that all health plan choices will deliver at least a basic level of protection. Key health insurance terms and definitions must also be standardized. For example, the "out-of-pocket limit" on cost sharing should be defined to limit *all* patient cost sharing, not just some of it. If a plan says it covers hospital care, that should mean the entire hospitalization is covered, not all but the first day.[3] Further, when consumer choice of plans includes low-, medium- and high-option plans, standardized tiers should be developed so people can be confident they are comparing like policies.

**Accountability in Health Insurance**

Finally, Mr. Chairman, accountability in health insurance requires strong rules and the capacity to monitor and enforce compliance.

*Strong rules* must be clear, with few exceptions, so they are harder to evade. Weaker rules and exceptions create opportunities for current problems to persist. For example, health care reform legislation pending in the Senate will prohibit discrimination based on health status in premium rates, covered benefits, and eligibility. At the same time, however, Senate Committees are considering an exception to this rule that would allow premiums to vary based on health status in the context of so-called wellness programs. Some employers today offer wellness programs with pointed financial incentives for employees to not only participate, but actually change their health status. Under one popular program, all employee costs are increased by $2,000 at the outset. Workers then have the opportunity to reduce costs by $2,000, but only if they enroll in the incentive program and pass four health status tests, including normal readings for blood pressure, blood cholesterol, body mass index, and tobacco use. On the website for this wellness program, under "Frequently Asked Questions for Employers" it is acknowledged that employer savings are achieved when some employees "choose other health care options."[4]

Because this program discourages some sicker employees from taking coverage, it operates very similarly to other insurer practices of charging higher premiums to people with high blood pressure or high cholesterol in order to deter their enrollment. If discrimination like this is prohibited in one context but allowed in another, holding private health insurance to a nondiscrimination standard will be a challenge.

*Regulatory resources*—Finally, accountability in health insurance requires resources. Private health insurance regulatory resources at the Federal level are particularly lacking and must be increased. At a hearing last summer of the House Committee on Oversight and Government Reform, a representative of the Bush Administration testified that the Centers for Medicare and Medicaid Services (CMS), which is responsible for oversight of HIPAA private health insurance protections, then dedicated only four part-time staff to HIPAA health insurance issues. Further, despite press reports alleging abusive rescission practices, the agency did not investigate or even make inquiries as to whether Federal law guaranteed renewability protections were being adequately enforced.[5]

Additional resources will also be needed at the U.S. Department of Labor (DOL). After the enactment of HIPAA, a witness for DOL testified the Department had resources to review each employer-sponsored health plan under its jurisdiction once every 300 years.[6]

At the state level, limited regulatory resources are also an issue. In addition to health coverage, state commissioners oversee all other lines of insurance. In several states the Insurance Commissioner also regulates banking, commerce, securities, or

[3] A discussion of plans that include these kinds of features is available in "Hazardous health plans: Coverage gaps can leave you in big trouble," *Consumer Reports,* May 2009.

[4] See *http://www.benicompadvantage.com/products/faq__employers.htm.*

[5] Testimony of Abby Block, Hearing on Business Practices in the Individual Health Insurance Market: Termination of Coverage, Committee on Oversight and Government Reform, U.S. House of Representatives, July 17, 2008.

[6] Testimony of Olena Berg, Assistant Secretary of Labor, Pension and Welfare Benefits Administration, Senate Labor and Human Resources Committee, October 1, 1997.

real estate. In four states, the Insurance Commissioner is also the fire marshal. State insurance departments collectively experienced an 11 percent staffing reduction in 2007 while the premium volume they oversaw increased 12 percent.[7] State regulators necessarily focus primarily on licensing and solvency. Dedicated staff to oversee health insurance—and in particular, insurer compliance with HIPAA rules—are limited.

**Informed Consumer Choices in Health Care Act of 2009**

Mr. Chairman, I want to congratulate you for introducing S. 1050, The Informed Consumer Choices in Health Care Act of 2009. And I commend Congresswoman Rosa DeLauro for authoring companion legislation in the House of Representatives, H.R. 2427. This bill would create a framework to assure greater transparency and accountability in health insurance. It would establish a new Federal agency within HHS tasked specifically with private health insurance oversight. This agency would develop new consumer information and disclosure tools, including a Coverage Facts label for health insurance. It would require regular reporting by insurers on industry products and practices. The bill provides resources for HHS to hire expert staff to carry out these functions and coordinate with state regulators. And it creates a grant program for state insurance departments so they, too, can have resources to better enforce market rules and protect consumers. This legislation and it deserves to be included in health care reform.

In conclusion, starting with the financial industry bailout this year and continuing with the economic stimulus package, transparency and accountability have become the watchwords of this Congress, as taxpayers demand to know how their money is spent and whether stated goals have been achieved. As Congress prepares to make another significant and critically important investment, this time in our health care system, transparency and accountability must also guide your way.

The CHAIRMAN. Thank you very much, Karen Pollitz. I will lead with the questions, will be followed by Senator Johanns and then Senator Klobuchar.

The focus of today's hearing and there are several focuses. But why is it so hard for consumers to get clear, reliable information? I don't always think so much in terms of insurance policies.

But if I get a prescription for something if I'm not well and then you take that little thing out of the bottom of the bag, and I have to get out magnifying glasses and things that Galileo invented in order to find out, you know, what's actually written there. And there's a reason for that, that I won't read it, which of course, I never do. Therefore whatever they want to have happen, can happen.

I'd like to start this discussion on this document which I'm holding up and which will be to some degree passed out, called Examples of Benefits Documents. And it's not very pretty either in appearance or in substance. It's called an Explanation of Benefits or Explanation of Benefits statement.

Every time a consumer goes to see a doctor or receives medical service he or she receives one of these Explanation of Benefits statements. And the health insurance companies send tens of millions of these statements to their policyholders every year. Now the Explanation of Benefits is supposed to "explain to the consumer how much the doctor charged for the service and how much the insurance company pays as a reimbursement for the service." And it sounds pretty simple, pretty straight forward, I would guess.

But it's not, when you start trying to read these statements. Each insurance company has its own specific terminology. And I want to emphasize that each one has its own specific terminology.

---

[7] National Association of Insurance Commissioners, *2007 Insurance Department Resources Report,* 2008.