# Exhibit 24

# STATE COVERAGE INITIATIVES

# HEARING

BEFORE THE

SUBCOMMITTEE ON HEALTH

OF THE

COMMITTEE ON WAYS AND MEANS

U.S. HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

JULY 15, 2008

**Serial No. 110–91**

Printed for the use of the Committee on Ways and Means

U.S. GOVERNMENT PRINTING OFFICE

49–690 WASHINGTON : 2009

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104 Mail: Stop IDCC, Washington, DC 20402–0001

implementation of their coverage initiative and its progress to date, and perhaps discuss the challenges ahead.

Dr. Jack Lewin is familiar to many of us. He made a terrible, terrible mistake in his career path years ago when he left the great state of Hawaii, because we could have had the hearing there if he was still there. He moved from Hawaii—I must say moved up to the great state of California—and now is chief executive officer of the American College of Cardiology. I don't know just what Jack is going to tell us about, but I am sure he will discuss Hawaii's—I think first state to mandate coverage for all residents. And back in 1986, whenever that started, and what's happened to that since, and I think we will find that interesting.

Mr. Haislmaier, with the Heritage Foundation, and he has worked with several states in designing their health reform initiatives. I think he will talk to us about the themes that states have raised during his work, and the challenges they face. He is a strong proponent of consumer-driven health care, and is going to give us some alternatives to the plans that are on the books.

Ms. Trish Riley is the director of Maine Governor's Office of Health Policy and Finance. She will talk about Governor Baldacci's successful passage of a comprehensive health reform act, the Dirigo Heath Reform Act of 2003, and advise us to how that is doing, and whether or not our former colleague can run for reelection on the success of that plan, or whether he should look to his cousin success in writing mystery novels, and perhaps move that way.

So, we will just start down with the panel. Mr. Weil, if you would like to lead off, if you each want to take about 5 minutes to summarize, I am sure that the Members will want to inquire in more depth as you complete your testimony. Please proceed.

**STATEMENT OF ALAN R. WEIL, EXECUTIVE DIRECTOR, NATIONAL ACADEMY FOR STATE HEALTH POLICY**

Mr. WEIL. Thank you, Chairman Stark, Ranking Member Camp, distinguished Members of the Committee. My name is Alan Weil, I am the executive director of the National Academy for State Health Policy. NASHP is a non-profit, non-partisan organization that works with leaders in state health policy to identify emerging issues and address challenges in state health policy and practice.

This is an exciting time for states in our Nation, as the call for significant health care reforms grows louder. States are considering and implementing innovative and promising strategies to reverse the trend of an increasing number of Americans without health insurance.

Yet, given the barriers states face, my overarching message to you today is that states cannot do this alone. Federal leadership is required. In the absence of Federal action, a broad array of states in all regions of the country representing quite varied ideological perspectives is pursuing health reforms. You will hear about some of these efforts from other witnesses.

But despite successes, the states' ability to address our health care challenges is limited. States are constrained for many reasons. They lack authority to affect many of the health care activities within their borders. About half of a typical state's residents are completely outside the reach of state authority, because they are

enrolled in Medicare, have coverage through an employer that self-insures, or obtains services through various Federal programs.States face budgetary constraints, due to balanced budget requirements, and due to Federal policy that requires that Medicaid waivers be budget-neutral with respect to Federal costs. Expecting states to address the many vexing health policy issues on their own is unrealistic, and constrains the number of states that can even make such an effort.

Given these challenges, it is not surprising that only three states in the last decade—Maine, Vermont, and Massachusetts—have adopted comprehensive reforms, and efforts in larger states, such as California, Illinois, and Pennsylvania, remain stalled.

Now, while state efforts make a real contribution, Federal leadership is needed to make substantial sustained progress in health reform. Federal leadership could take several forms, including one that provides a substantial role for states to operate within a national framework. Indeed, approaches that combine the resources, stability, and uniformity of Federal involvement, with the dynamism of local involvement and creativity of states, can foster excellent results.

The Federal Government can bring its clout, as the largest purchaser, and stable funding to weather economic ups and downs, and standards that ensure that all Americans have meaningful access to needed services. States can design the details of a plan to conform to local market and medical practice conditions, develop models that enable us to learn what does and does not work, and ensure that program operations reflect local values. Federal waivers, though helpful in some instances, are no substitute for a clear, Federal commitment.

Federal leadership is required, if we are to bring down unwarranted variation across the country in health care practice and costs. A recent Commonwealth Fund report describes interstate variation in the use of antibiotics to reduce the risk of infection during surgery. Variation across states in the share of the adult population without health insurance has existed for decades. And in recent studies, they have ranged from a high of 35 percent in Texas to a low of 11 percent in Minnesota. National requirements, resources, and benchmarks can all serve to close some of these gaps.

The importance of Federal leadership is clearly demonstrated in the contrast between our recent experience covering adults and children. For adults, we have no national coverage strategy. Medicaid, which is the nation's primary commitment to health care to the poor, explicitly excludes non-elderly adults, unless they have a disability or dependent children.

For children, we have a national strategy. Despite some limitations, Medicaid and SCHIP extend coverage to nearly all children in families with incomes up to twice the poverty level. And the contrast, then, is stark. Between 1996—1999 and 2006, the percentage of uninsured adults increased in 43 states, while the percentage of uninsured children decreased in 32 states. The combination of a national priority with the resources to support it and state flexibility and the methods for achieving it can yield tremendous results.

In my job, I have the opportunity to speak to many state officials. Their message is surprisingly consistent, regardless of job title, political affiliation, or state. They are doing what they can to address issues and problems that are bigger than the resources available to them. They are eager for Federal leadership, they feel its absence, but they are also nervous about a heavy-handed or one-size-fits-all approach.

A true Federal solution to our health care problems requires something like a joint venture: cooperation between the Federal Government and the states that states have not seen lately. Delays in SCHIP reauthorization, CMS's August 17th letter, the new Medicaid citizenship and identity documentation burdens have all impeded state efforts to cover more folks.

Ultimately, in the absence of federal action, states will lead and states will accomplish as much as they can, given the constraints they face. But piecemeal state action will never add up to what the nation needs. A national response that honors the history of American Federalism would include a series of national commitments to universal coverage, improved access and quality, and tempering cost growth that frame and support what states can do.

I thank you for the opportunity to appear before the Committee today.

[The prepared statement of Mr. Weil follows:]

**Statement of Alan Weil, Executive Director, National Academy for State Health Policy**

Chairman Stark, Ranking Member Camp and other distinguished Members of the Ways and Means Health Subcommittee, my name is Alan Weil and I am the Executive Director of the National Academy for State Health Policy (NASHP). NASHP is a non-profit, nonpartisan organization that has worked with state leaders for more than two decades helping them to identify emerging issues and address challenges in state health policy and practice. NASHP seeks to amplify the voice of state health officials and support interstate learning—roles that we believe will be particularly important as health care rises on the national agenda.

This is an exciting time for states and our nation as the call for significant health care reforms grows louder. States are considering and implementing innovative and promising strategies to reverse our nation's trend of an increasing number of Americans without health insurance. Yet, states face substantial limitations in what they can accomplish in the absence of further support at the national level. States have demonstrated critical leadership and hold great promise for the success of any major coverage reforms, but states cannot do this alone. States need a national framework in order to achieve the promise of health reform—a framework of federal support, assistance, and guidance. I will discuss each of these points in my testimony [1]

1. **States are leading the way addressing major health system challenges.**

In the absence of federal action, states are leading the way in addressing many of the major challenges facing the American health care system. States are responding to the concerns raised by families, businesses, and health care providers and have made progress in improving access to health coverage, containing health costs, and improving quality.

A broad array of states in all regions of the country representing quite varied ideological perspectives is pursuing health reforms. Some state efforts are comprehensive in scope; others focus on particular problems facing the health care system. Although Massachusetts has received the most attention recently for its groundbreaking reforms that have already cut the number of people without health insurance in their state by half, many other states are also making real progress toward this goal. Iowa recently passed legislation to improve enrollment and retention for children in public programs and strengthen consumer protections in the pri-

[1] Much of this testimony draws from my article "How Far Can States Take Health Reform?" which appeared in the May/June 2008 issue of *Health Affairs* at pages 736–747.

perimentation. We cannot reform our health system piecemeal, or even by further state-to-state innovation. In the spirit of Federalism, the national government must commit to a national policy and a clear road map that achieves affordable, quality health care for all, and finally answers the question: Who pays?

Thank you very much.

[The prepared statement of Ms. Riley follows:]

**Statement of Trish Riley, Director, Maine Governor's Office of Health Policy and Finance, Augusta, Maine**

Thank you for this opportunity to talk with you about lessons learned at the state level about health care reform. Perhaps the most important lesson about state health reform is that it comes in waves, each building on the lessons of the past and learning from the challenges states find in building sustainable health reform over time. But each wave ultimately collides with the critical question—who pays?

I have been fortunate to have been directly involved in many of these efforts as a former Medicaid director and to have worked closely with the reforming states in my service over the past several decades with the National Academy for State Health Policy. Enactment of Medicaid in the 1960s was arguably the beginning of state health reform, although the initial wave of state *initiated* reform began in the 1970s when Hawaii enacted the first mandate requiring most employers to offer health coverage, advanced soon after President Nixon's health reform—that included a similar provision—had failed. In the decade of the 1970s the first high risk pools were created. In the 1980s Washington State established the subsidized Basic Health Plan, Massachusetts enacted the Health Security Act and Oregon created the Oregon Health Plan. Children's health plans began in Minnesota and Vermont.

By the early 1990's 46 states had adopted insurance reforms, children's health programs grew in other states and Medicaid waivers yielded Arizona Access, TennCare and RiteCare, Medicaid managed care based programs to expand coverage. Each of these initiatives had their advocates and detractors, some failed, some changed, most held on in some form but following the failure of the Clinton health plan in the early 1990's state action again stalled and states were in the ebb of a third wave of reform.

In 2003, Maine led the fourth wave with the establishment of our Dirigo Health Reform. Our approach was comprehensive health system reform, focusing on affordability and driven by Maine's per capita health spending, which ranks the second highest in the U.S.,by then the highest rates of uninsured in New England, decline in employer sponsored plans and by limits in state budget capacity. In 2002 state and local revenues in the United States had the slowest growth since records were kept. Absent any sustainable, new sources of revenue, Governor Baldacci sought to achieve health reform by improving the efficiency and effectiveness of the health care system. By improving the system's efficiency, savings would be created and reinvested in health care access.

**Clear goals are important: "Covering the Uninsured" is not the same goal as "making sure every man, woman, and child has access to affordable, quality care".**

Covering the uninsured generally implies that we will find adequate financing to bring those now without coverage into the insured tent—covered through one or more of the myriad of coverage options available today or by creating special plans for the uninsured. Such an approach generally accepts the status quo in how care is delivered and coverage provided. But with growing pressure on the affordability of our employer based system, more costs are shifted to employees andcoverage can become less comprehensive. As a growing number ofpeople use more of their incomes for sometimes less coverage, more people are *under* insured—forestalling needed care for fear of incurring out of pocket costs they cannot afford. And the literature is filled with data documenting concerns with quality of care. Our goal of assuring every man woman and child has access to affordable; quality care seeks to provide health security for all—those without coverage; those with inadequate coverage and those who fear rising costs will jeopardize their coverage.

Numerous studies have documented that the U.S. spends far more than other developed nations yet we leave 47 million uninsured and do not achieve better health outcomes or quality for that additional investment. In fact, we pay for redundancy, inefficiency, variation and oversupply. Recently, McKinsey Global Institute published "Accounting for the Cost of Health Care in the United States" that concludes

that even after adjusting for its higher per capita income levels, the United States spends some $477 billion more on health care than peer countries.

McKinsey notes that higher health spending in the U.S. is not explained by higher disease burden but by these factors:

1. Higher input costs—salaries, drugs, devices and profits, (e.g.: we use 20% fewer drugs yet pay 50–70% more for them and we are the largest consumers of medical devices in the world).
2. Inefficiencies and complexity in the system's operational processes (eg: we have 3–6 more scanners than Germany, UK, France and Canada).
3. Costs of administration, regulation and intermediation of the system.

McKinsey's study reinforces Maine's approach to comprehensive, system reform, stating "most components of the U.S. health care system are economically distorted and no single factor is either the cause or the silver bullet for reform".[1] While it is unlikely that Americans, who value choice, will adopt all the provisions that make other countries' health care more affordable, unless Americans are ready to embrace higher costs and a greater investment of our GDP in health, then the cost issues must be addressed head on.

In crafting the Dirigo Health Reform, Maine's strategy was to affect cost, quality and access together, reflecting our conclusion that we had an inefficient health care system which led to unaffordability of health insurance and a growing number of people who were under- and uninsured.

We built the program by expanding Medicaid for the poorest of our citizens, establishing a subsidy program for those just beyond Medicaid eligibility; launching comprehensive activities to improve health and reduce the costly burden of chronic disease; creating the Maine Quality Forum to remediate costly variation in the system; initiating a variety of cost containment mechanisms; requiring medical loss ratios in the small and non-group markets; increasing transparency through price posting and standardized reporting by insurers and hospitals; supporting electronic medical record diffusion; strengthening certificate of need; establishing a capital investment fund as an annual budget for new capital investment and facilitating collaboration among providers.

Our cost containment goal is to assure coverage remains affordable for those who buy it privately but subsidizing health coverage remains a tool to meet the affordability gap for those with lower incomes. The foundation of Maine's coverage expansion was Medicaid. From that base we built a sliding scale subsidized insurance plan, DirigoChoice, targeted to those 3 times the poverty level who were employed in small businesses with fewer than 50 emplyees,were sole proprietors or individuals—categories that include the majority of uninsured—and built the reform on the employer based system. Specifically, the plan pooled small businesses to achieve economies of scale and purchasing power and adopted medical loss ratios in the small group and individual market to help make those markets more affordable. DirigoChoice is a voluntary program, recognizing that unless and until insurance became more affordable, mandates would not be tolerated. The program is financed through an assessment on insurers and those who administer self—insured plans that can only be levied if Dirigo's comprehensive reforms result in documented savings

When the Dirigo Health Reform began in 2003, Maine had the highest rate of uninsured in New England. In the years following, as Medicaid expansions took hold and DirigoChoice became the fastest growing product in the marketplace, every New England state saw its rate of uninsured increase; only Maine saw its rate fall to the lowest in the region by 2006.

But our progress has stalled, lacking adequate financing. While $110 million in savings has been independently documented since the program began, those savings have been contentious, subject to court challenge and highlight the complexity of cost containment in health care. Payers of the surcharge assert that reducing the rate of growth of health care costs is not the same as cost savings. The Legislature enacted alternative financing this session, including taxes on beer, wine and sugared beverages, but this alternative is also being challenged.

***Politics Trumps Policy—The process of enacting and implementing reform is as important as the reform.***

To launch Maine's reform, stakeholders were convened in a Health Action Team that met often and in public to guide the Governor's office in developing the original

[1] McKinsey & Company, *Accounting for the Cost of Health Care in the United States, January 2007*; p. 19.

proposal. The Legislature created a Special Joint Committee on Health Reform with bipartisan members from the health, insurance and appropriation committees.

The reform debate played out largely between two camps—those who wanted deregulation and market based solutions like high risk pools, arguing that lower costs would assure more coverage and others who wanted more investment to sustain comprehensive coverage to cover all the uninsured. Long negotiations resulted in significant amendments to the original bill and found a middle ground that won a unanimous committee report and strong bi-partisan support in both chambers.

Both the Health Action Team and the Joint Committee were dissolved once the bill was enacted. Numerous commissions, workgroups and an independent Board of Trustees for the Dirigo Health Agency assured citizen input throughout the implementation of the reform, but each group was responsible for a part of the reform only. In hindsight, with oversight of the reform split among different legislative committees and no one single stakeholder group to provide guidance for the overall reform, a vacuum was created that allowed the parties to "return to their corners" when the inevitable implementation challenges occurred. Amendments to the original bill, that eliminated a planned global budget and a fixed assessment that could not be passed on to premium payers, reduced the ability to generate stable, predictable funding and attain the amount of cost savings initially envisioned. As the program was launched, additional revisions were required that further challenged the ability to meet enrollment target timetables developed with the original legislation and never revised. Rather than recognize that these unexpected factors would slow but not deter program enrollment, proponents of alternative strategies quickly declared Dirigo a failure and revived advocacy for their favored market based reforms, which created a challenging environment for program modification and mid-course improvements.

As Maine's experience clearly shows, enacting health reform is tough enough—few states have done so—but implementing reform is even tougher. The devil is indeed in the details and health reform is a work in progress. But to achieve that progress, all parties, with strong leadership, need to commit to it and to work together to make mid course corrections rather than to see each bump in the road as an opportunity to defeat reform.

**Medicaid is a critical component for state-based reform but needs reliable, counter cyclical financing and clarity in its coverage for eligible, employed beneficiaries.**

Should national health reform maintain the current employer based system, Medicaid's role will remain critical. Medicaid is the essential building block in state health reform and is of paramount concern to the states and to Congress. As states face recessions and budget challenges, Medicaid's funding formula needs to keep pace with rising costs and demand.

Since de-linking welfare and Medicaid eligibility and imposing work requirements, an increasing number of low wage and particularly part-time workers, work each day in firms large and small, and qualify for Medicaid—often ineligible for or unable to afford workplace coverage. The premium assistance provisions within the Medicaid program are difficult to administer, pay only for employee share of premium and require state match. Additional policy debate needs to address where the role of the Medicaid program ends and the role of the private employer begins. As costs escalate, private employers are increasingly reluctant to offer coverage to part-time workers and to make Medicaid eligible employees part of their workplace health plan. On the one hand, employers face difficult trade offs as the costs of health care grows. Increasingly employer—based coverage has passed more and more cost on to employees. As lower wage employees pay a larger part of their incomes for health care, we are witnessing a new and growing problem of underinsurance. But employers must balance the costs of health care against the ability to create jobs or increase wages and states need to be cautious in what demands they place on the very employers who assist in "welfare to work" programs or who, subject to state regulations they find intolerable, self insure, and abandon the consumer protections of the fully insured marketplace.

A design feature of the original Dirigo Health Reform sought to pool all revenues to the Dirigo Health Agency( employer contributions, employee contributions and others), and use those pooled state resources to match Medicaid for eligible employees and their dependents. CMS has rejected our approach, which will soon be reviewed by the courts.

The states that followed us in this fourth wave of state health reform relied heavily on Medicaid, unlike Maine which coupled system savings with program financing. Vermont accepted federal flexibility in exchange for a block grant—like approach to Medicaid. Massachusetts built its program with $400M in Medicaid funds

that had been supporting their uncompensated care. We appreciate the strength of Vermont's initiative but find the block grant approach, which abandons a long established health care entitlement program, to be counter—intuitive to efforts to expand access and, like most states, we did not have access to the Medicaid funds now supporting Massachusetts' landmark reform.

**Its time for a national policy to achieve affordable, quality health coverage for all.**

States serving as laboratories of innovation have gained public attention and achieved much, filling a void in the absence of national reform. The laboratories of democracy were at work testing reforms reflected in later Congressional action. Many states had adopted insurance regulations before HIPAA was enacted; had well running children's health programs before SCHIP was born and developed Patients' Bills of Rights before Congress took them up.

The many and varied state experiments have been operational since at least the early 1970's. While states have done extraordinary work to lay the foundation for reform, each state is operating relatively independently based on very different health systems, coverage and costs and reflecting different state priorities. While experimentation has generated significant reforms, it has also created state—to-state variation that may also account for fragmentation and complexity across the country which drives costs. Over three decades of state health reform, and the reams of studies and evaluations analyzing them, suggest to me that it is time to get out of the laboratory and learn from decades of state experimentation. This is certainly not to say that there will not be a role for the states in any emerging national health reform but that a national solution-and national financing—is essential. We cannot reform our health system piecemeal or even by further state by state imitative. In the spirit of federalism, the national government must commit to a national policy that achieves affordable, quality health care for all of us.

We need a national policy that makes the roadmap clear that will achieve the reforms needed to address cost and quality and to cover all of so that the U.S. can take our place as health leaders—not as the country that spends twice as much, doesn't get any better health or quality and leaves 47 million without any coverage.

There are several obvious first steps that the Federal Government can take.

Complexity and redundancy are costs in the system. Streamlining and creating a single system—that does not necessarily require a single payer—would help. The Federal Government should examine its considerable purchasing power across Medicare, Medicaid, FEHBP, Champus and others toward standardizing reporting, payment policy, benefits, eligibility and quality metrics. If states are to play a role in health care reform, they need the capacity to work in a level playing field. ERISA prohibits much creative work and even the collection of key data from self insured businesses.

In the end, then, the ultimate question remains—who pays? For those of us who believe we are already paying more than we need to through cost shifting of the uninsured and the inefficiency in our health care system, cost containment needs to be a part of any reform. But ultimately, the nation's uninsured, a growing number of under-insured and all of us who have coverage now and fear for its future, need a reliable and sustainable source of financing to affordable, quality care-that does not sacrifice the access expansions in place now—that only a strong and consistent national policy can assure.

Chairman STARK. Mr. Haislmaier.

## STATEMENT OF EDMUND F. HAISLMAIER, SENIOR RESEARCH FELLOW, THE HERITAGE FOUNDATION

Mr. HAISLMAIER. Thank you, Mr. Chairman, Ranking Member Camp, and Members of the Committee, for inviting me to testify today. My name is Edmund Haislmaier, I am a senior research fellow at the Center for Health Policy Studies at the Heritage Foundation, and I have to give you the caveat that my testimony is my own, and the Foundation does not take any institutional positions on these or other matters.

I come here, having spent the last 3 years—or more, actually—working with over 18 different states throughout the country, with