# Exhibit 33

EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL OF ECONOMIC ADVISERS

# THE IMPACT OF HEALTH INSURANCE REFORM ON STATE AND LOCAL GOVERNMENTS

SEPTEMBER 15, 2009

# CONTENTS


| | |
|---|---|
| OVERVIEW | 3-9 |
| APPENDIX ON METHODOLOGY | 10-12 |
| ARKANSAS | 13-17 |
| CALIFORNIA | 18-22 |
| FLORIDA | 23-28 |
| IDAHO | 29-33 |
| INDIANA | 34-39 |
| IOWA | 40-44 |
| MAINE | 45-49 |
| MICHIGAN | 50-56 |
| MINNESOTA | 57-61 |
| MONTANA | 62-66 |
| NEBRASKA | 67-71 |
| NORTH CAROLINA | 72-79 |
| OREGON | 80-84 |
| PENNSYLVANIA | 85-89 |
| VERMONT | 90-94 |
| WYOMING | 95-99 |

# The Impact of Health Insurance Reform on State and Local Governments

## OVERVIEW

Health insurance reform as currently proposed in both the House Tri-Committee and in the Senate HELP Committee would ensure that virtually all Americans receive health insurance. As part of the proposed increases in health insurance coverage, the House Tri-Committee legislation calls for an expansion in Medicaid to all individuals under 133 percent of the federal poverty line (FPL).[1] Understandably, there has been some concern in state capitals surrounding this proposal given the possible increase in state Medicaid expenditures that could result.

However, state and local governments are already spending billions of dollars each year providing coverage to the uninsured – costs that could be significantly reduced as a result of the currently proposed reforms. Additionally, state and local governments employ more than 19 million individuals, and their total spending on health insurance premiums for this group in 2007 was approximately $95 billion.[2] This group currently pays a "hidden tax" in the form of higher health insurance premiums that helps to cover expenses incurred by the uninsured. This burden would be greatly reduced as a result of expansions in insurance coverage resulting from health insurance reform, which would generate significant savings for state and local governments.

A June report by the Council of Economic Advisers (CEA) demonstrated the health and overall economic benefits of health insurance reform (CEA, 2009a). A subsequent study produced by the CEA in July showed the significant benefits to small businesses and their employees from health insurance reform. This report, the third in the CEA series, illustrates the potential benefits of health insurance reform for state and local government budgets through a detailed analysis of current spending levels. Focusing on a sample of sixteen diverse states, we provide detailed case studies of the multitude of ways that state and local governments spend billions of dollars on uncompensated care. These estimates, combined with estimates of possible state expenditures associated with reform, indicate that the move to greater insurance coverage would likely result in substantial savings for state and local governments. Rather than harming the budget situation of the states, health insurance reform would improve it.

### *A. Scope and Methodology of the Study*

Determining what states spend on uncompensated care is difficult. This information is not collected in one place or in a consistent form across states. To gather this information, we examined publicly available information from each state government and in many cases from county and city governments. We supplemented this with information from federal agencies,

[1] The Senate HELP Committee does not have jurisdiction over Medicaid and we therefore focus on the House Tri-Committee legislation in this document.

[2] State spending on employee health premiums totaled $19.5 billion in 2003 (NASBO, 2005). Taking the ratio of national health care spending in 2007 to spending in 2003, we estimate this increased to $25 billion by 2007. However, this reflects only the cost of providing health insurance to the approximately 5 million state employees in 2007. Assuming that the average cost per employee of health insurance is the same for the 14 million employees of local governments, we estimate $95 billion in premium costs to state and local governments.

non-profit research organizations, and other sources, all of which we list in the references that are included at the end of each state summary.

Because of the inherent difficulty in locating comprehensive information on all government spending on the uninsured, the state and local government programs that we highlight are in no way meant to be an exhaustive list. Our estimates should be considered a plausible lower bound on the potential cost savings to state and local governments.

It is precisely because of the difficulty involved in gathering the information that we begin with a sample of states. The sixteen states that we examine are Arkansas, California, Florida, Idaho, Indiana, Iowa, Maine, Michigan, Minnesota, Montana, Nebraska, North Carolina, Oregon, Pennsylvania, Vermont, and Wyoming. While not a random sample, this group covers a range of geographic, economic, and demographic features. These states also run the gamut from low to high uncompensated care expenditures. For this reason we feel they are largely representative of the experience of the states we have not yet analyzed.

In addition to gathering uncompensated care expenditure data from a multitude of sources, we also provide estimates of how much states pay in higher health care premiums for state employees because of uncompensated care. Though not as large as some of the direct expenditures, this hidden tax is substantial, especially for larger states. The technical appendix provides details on the methodology that we use to do this calculation.

To estimate the possible cost to state governments of health insurance reform, we use detailed statistics for each state from the March 2008 Current Population Survey to estimate the number of uninsured citizens at various income levels. We combine these estimates with information on Medicaid expenditures by state and details from the proposed legislation on the share to be paid for by the states. Details of how we conduct this analysis are also included in the Appendix.

*B. State Spending on Uncompensated Care*

Our analysis reveals that states spend billions on uncompensated care in a wide variety of ways. Most obviously, there are state programs to cover low-income uninsured patients. Consider the following three examples.

- In California, counties are the "providers of last resort" for health services to low-income uninsured people with no other sources of care. In 2004-2005, 24 California counties spent $1.61 billion providing care to the uninsured through their Medically Indigent Services Programs. The remaining 34 (primarily rural) counties spent $283 million on care to the uninsured through their County Medical Services Programs during the 2008 fiscal year. Between both programs, California spent $1.90 billion.

- In Minnesota, the state-funded General Assistance Medical Care program provides full health coverage to uninsured adults up to 75 percent of the FPL who are not eligible for federal benefits. In FY 2007, the state spent $281 million in payments to providers for GAMC services.

- In Miami-Dade County, Florida, funding for uncompensated care through its public health facilities comes from a 0.5 percent sales tax. In FY 2007-2008, revenue from this tax amounted to $187 million.

Under current draft legislation, low-income uninsured citizens and legal residents would be covered by Medicaid, which would be primarily federally-funded, greatly reducing the need for such expenditures by state and local governments.

Many states fund programs which cover residents who earn above 133 percent of the federal poverty level. Consider the following three examples.

- In Maine, Dirigo Health subsidizes health insurance for certain individuals up to 300 percent of the FPL. These subsidies are financed by an earmarked assessment on health insurance and self-insured companies and drawing on the state treasury's cash pool. In 2008, Dirigo had subsidy costs of $41.5 million and operating costs of $2.8 million.

- In Pennsylvania, the adultBasic program provides subsidized basic health insurance to legal residents with incomes up to 200 percent of the FPL. In 2008, the program cost $172 million. Due to high demand and budget constraints, the program is limited in size and there is a substantial waiting list for the subsidized coverage.

- In Vermont, uninsured citizens who are not eligible for Medicaid or other state programs and do not have reliable access to an employer-sponsored plan can enroll in a "Catamount Health" plan, and may receive state-funded premium assistance if they meet certain qualifications. In state fiscal year 2008, Vermont paid a net amount of $10.2 million in state funds for Catamount Health enrollees.

Under current proposals for reform, these individuals would be eligible for subsidized health insurance through the national health insurance exchange, at no cost to the state.

Finally, providing uncompensated care to the uninsured imposes a "hidden tax" on health insurance premiums for the insured. This tax increases premiums for all employers, including state and local governments and their 19.4 million employees (16.5 million as measured by "full-time equivalents"). By greatly reducing uncompensated care, health insurance reform would reduce this hidden tax.[3]

Table 1 shows our estimates of the amount spent in each of our sixteen states on uncompensated care and the hidden tax on the health insurance provided to state employees each year. There is substantial variation across states, most obviously because states vary greatly in size and thus in the number of uninsured. But importantly, in each case, the estimates are large. Summing the sixteen states together, we estimate that they spend at least $4.2 billion on uncompensated care per year.

---

[3] It is possible that part of the savings from lower employer contributions to health insurance premiums would be passed on to workers in the form of higher wages. This would to some extent offset the estimated savings to state and local governments, though it would improve the economic well-being of their employees.

As described above, it is simply impossible to track down every state and local program that contributes to covering the uninsured. As a result, true expenditures on uncompensated care are surely substantially larger than our estimates. Therefore, health insurance reform that greatly reduces uncompensated care would reduce costs to the states by more than the amount that we identify. This is true even taking into account the fact that some uncompensated care would remain following reform.

**Table 1: Summary of Detailed Analyses of Net Health Insurance Reform Savings in 16 States ($ millions)**

| State | Spending on Existing Programs | Cost of Hidden Tax on State Employee Health Premiums | Lower Bound Estimate of Uncompensated Care Spending | Cost of Medicaid Expansion with 90% FMAP | Net Budget Impact with 90% FMAP | Net Budget Impact with 100% FMAP |
|---|---|---|---|---|---|---|
| Arkansas | $6.2 | $17.2 | $23.4 | -$20.4 | $3.0 | $23.4 |
| California | $1,934.0 | $210.0 | $2,144.0 | -$195.0 | $1,949.0 | $2,144.0 |
| Florida | $275.3 | $102.0 | $377.3 | -$251.6 | $125.7 | $377.3 |
| Idaho | $38.9 | $8.3 | $47.2 | -$25.8 | $21.4 | $47.2 |
| Indiana | $308.0 | $29.5 | $337.5 | -$62.3 | $275.2 | $337.5 |
| Iowa | $33.6 | $11.2 | $44.8 | -$20.0 | $24.8 | $44.8 |
| Maine | $45.7 | $5.1 | $50.8 | -$15.3 | $35.5 | $50.8 |
| Michigan | $168.4 | $43.5 | $211.9 | -$68.1 | $143.8 | $211.9 |
| Minnesota | $281.0 | $13.6 | $294.6 | -$31.7 | $262.9 | $294.6 |
| Montana | $22.8 | $7.0 | $29.8 | -$20.8 | $9.0 | $29.8 |
| Nebraska | $27.0 | $8.6 | $35.6 | -$17.8 | $17.8 | $35.6 |
| North Carolina | $150.7 | $58.6 | $209.3 | -$188.3 | $21.0 | $209.3 |
| Oregon | $116.0 | $22.3 | $138.3 | -$59.3 | $79.0 | $138.3 |
| Pennsylvania | $171.8 | $43.1 | $214.9 | -$149.7 | $65.2 | $214.9 |
| Vermont | $17.5 | $3.3 | $20.8 | -$6.8 | $14.0 | $20.8 |
| Wyoming | $6.9 | $4.5 | $11.4 | -$10.6 | $0.8 | $11.4 |
| Total | $3,603.8 | $587.8 | $4,191.6 | -$1,143.5 | $3,048.1 | $4,191.6 |

One way to quantify the degree to which our state-by-state estimates of uncompensated care could be too low is to compare it to estimates using different approaches. Hadley et al. (2008) use individual-level data from the Medical Expenditure Panel Survey to form an estimate of uncompensated care for the United States as a whole. They estimate that state and local governments spent $15.9 billion on care for the uninsured during the 2008 calendar year. We estimate that the hidden tax on the insurance policies provided to state employees adds another $1.6 billion to costs for state and local governments for the country as a whole.[4] Thus, these estimates suggest that state and local governments spend a total of $17.5 billion nationally on uncompensated care.

[4] See appendix for details of this calculation.

Our estimate based on detailed analysis of state programs is $4.2 billion for sixteen states. These sixteen states include 38.1 percent of the total population of the United States. If one scaled up our estimate to be an estimate for the entire country (by multiplying by 100/38.1), the resulting number is $11.0 billion. This suggests that our direct identification of expenditures on uncompensated care is indeed a lower bound by a significant margin.

*C. Bottom Line for State Governments*

Table 1 also shows our estimates of the costs to the states of expanding coverage. For uninsured citizens and legal permanent residents above 133 percent of the federal poverty level, current proposals call for the creation of an insurance exchange with a sliding-scale subsidy. These subsidies would be paid for entirely by the federal government. Therefore, they would add nothing to state expenditures.

Current proposals call for uninsured citizens with incomes less than 133 percent of the federal poverty level to be covered by Medicaid. Under existing proposals, the federal government would pay 100 percent of the cost of this addition to Medicaid for the first three years and State governments would pay none. After that, the federal government would pay 90 percent and the State governments would pay 10 percent. As with the current Medicaid program, only citizens and legal permanent residents would be covered.

Table 1 shows our estimate of the cost of increased Medicaid coverage for each of the states we analyze and for the sum of the sixteen. Again, the estimated cost varies substantially across states because both the number of people who would be covered and the Medicaid costs per person vary substantially across states. The total cost of coverage expansion in the sixteen states we analyze is $11.4 billion (in 2007 dollars).[5] In current versions of the draft legislation, states would be required to pay zero under the 100 percent federal matching rates for the first three years. Under the 90 percent matching rate after three years, the amount would be $1.1 billion per year.[6]

For the sixteen states we analyze taken together, the total net saving is $4.2 billion per year for each of the first three years when the federal government is paying for all of the expansion of Medicaid. Importantly, even when the federal matching rate is reduced to 90 percent, the saving to state governments from health insurance reform is substantial. We estimate that the sixteen states we analyze would save $3.0 billion per year with the 90 percent match, with the savings more than offsetting the additional Medicaid costs in every one of the sixteen states. Thus, health insurance reform, far from harming state budgets, would likely improve them substantially.

In addition, further savings may come from the Children's Health Insurance Program (CHIP). In FY 2008, the sixteen states that we analyze spent $1.3 billion on CHIP coverage for low-income children, with the federal government paying an additional $2.7 billion on CHIP in these same

[5] Projections for Medicaid spending cited here and elsewhere in the document are in 2007 dollars to facilitate comparisons with existing spending by state and local governments on care for the uninsured and on their employees' health insurance premiums.

[6] If instead of a 90 percent FMAP, the sixteen states' existing FMAPs were in effect, their share of the $11.4 billion in total Medicaid costs would be $4.8 billion.

states (Kaiser Family Foundation, 2009). Under the current draft legislation, children in families with incomes above 133 percent of the FPL may transition to equivalent, federally-financed coverage through the national health insurance exchange, potentially allowing states to save a considerable amount of the costs of this program.[7] However, CEA does not include savings on CHIP in the bottom line calculations of net savings from health insurance reform detailed below, because transitioning children from CHIP to equivalent federal coverage would be subject to approval by the Secretary of Health and Human Services, and may not occur in all states.

Our study has only focused on sixteen states so far. However, there is every reason to believe that the findings for these states would generalize to others. Thus, health insurance reform is likely to be widely beneficial to state and local governments in the U.S.

This conclusion is strengthened by the fact that this analysis has only focused on the savings to state and local governments from reduced expenditures on uncompensated care. Health insurance reform is like to reduce their health care expenditures in a number of other ways. For example, cost savings from Medicaid reform and increased efficiency of health care utilization would reduce state Medicaid expenses and reduce the cost of providing health insurance for government employees. Similarly, increased health insurance coverage would imply more continuous care received by the millions of individuals who transition in and out of Medicaid eligibility in a typical year. To the extent that this greater continuity leads to improvements in health for Medicaid recipients, program expenditures would decline. Thus, there is every reason to expect health insurance reform to be even more beneficial to state budgets than our estimates suggest.

[7] In current draft legislation, CHIP would expire after 2013 and thus state governments would realize savings from this as these children would then be financed through the federally-financed exchange.

## References


Executive Office of the President. Council of Economic Advisers. "The Economic Case for Health Care Reform." June 2009.

Executive Office of the President. Council of Economic Advisers. "The Economic Effects of Health Care Reform on Small Businesses and Their Employees." July 25, 2009.

Hadley, Jack, J. Holahan, T. Coughlin, and D. Miller. "Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs." *Health Affairs*, 2008, 27(5): w399-w415.

U.S. Census Bureau. "Government Employment and Payroll." Accessed August 12, 2009. http://www.census.gov/govs/apes/index.html.

U.S. Centers for Medicare and Medicaid Services. "Medicaid Statistical Information System (MSIS) State Summary Datamart." Accessed August 11, 2009. http://msis.cms.hhs.gov/.

## APPENDIX ON METHODOLOGY

In each of the sixteen state reports that follow, we utilize data from several different sources to estimate the effects of health insurance reform on state and local governments. Two important components of these effects are the reduction in employee health insurance premiums that would result from an elimination of the "hidden tax" on state and local government employees' health insurance premiums and the cost of the Medicaid expansion to individuals with incomes of less than 133 percent of the FPL. In this section, we discuss our methodology for estimating the impact of both of these components and also describe our key data sources.

*A. Estimating the Savings to State and Local Governments from Reduction of the "Hidden Tax"*

Individuals without health insurance receive a significant amount of uncompensated care from hospitals and from other health care providers. Much of the cost of this care is then passed on to those with private health insurance in the form of higher prices for health care services, with this ultimately translating into higher health insurance premiums. Because state and local governments provide health insurance to most of their 19.4 million employees, this "hidden tax" results in higher costs for state and local governments. By extending health insurance to the uninsured, health insurance reform would lower these costs to state and local governments.

To estimate the magnitude of this effect for each state, we begin with the results from recent research by Hadley et al (2008), which indicates that $14.1 billion of this uncompensated care for the uninsured was not funded through government sources and thus would plausibly lead to higher premiums for individuals with private health insurance. We then divide this number by the 45.7 million uninsured U.S. residents[8] to obtain an average of $309 in uncompensated care costs per uninsured person. We then multiply this cost by our estimate of the number of non-elderly uninsured U.S. citizens and legal residents in each state.[9] Finally, we multiply this estimate of total uncompensated care costs in each state by the share of employment accounted for by state and local government workers to estimate the total savings to state and local governments from reduced health insurance premiums.[10]

*B. Estimating the Costs of the Medicaid Expansion*

Health insurance reform as currently proposed in draft legislation would expand Medicaid to uninsured individuals with incomes of less than 133 percent of the federal poverty line (FPL). To estimate the number of uninsured individuals who would become eligible for Medicaid in each state, we utilized data from the March 2008 Current Population Survey, which contains individual-level data on income, poverty, and health insurance coverage for a large sample of U.S. residents.

[8] New data from the Census indicate that the number of uninsured individuals increased to 46.3 million in 2008.

[9] We exclude undocumented immigrants from this calculation as they would not be eligible to obtain health insurance through Medicaid or through the exchange as a result of reform.

[10] Our 2007 employment data for state and local governments comes from the U.S. Census Bureau. Raw data is located at: http://www.census.gov/govs/apes/index.html. To calculate the share of employment accounted for by state and local employees, we divide the number of employees working for state and local governments by the total number of employees, taken from the March 2008 CPS.

We define individuals in the survey as uninsured if they do not report coverage from either private or public (e.g. Medicare, Medicaid, or military health care) health insurance. We combine these data with information on the ratio of each survey respondent's family income to the FPL to estimate the number who are both uninsured and who are in families with incomes of less than 133 percent of the FPL.[11] It is this group that would be potentially eligible for Medicaid as a result of health insurance reform. Uninsured individuals with family incomes above 133 percent of the FPL would be eligible for health insurance through the exchange.

In Table 1 of each state's report, we provide detailed information on the health insurance coverage of children (defined as ages 0 through 18 inclusive) and non-elderly adults residing in the state. We differentiate between those with high and low incomes (above and below 133 percent of the FPL, respectively) and place each individual into one of four mutually exclusive insurance categories: uninsured, privately insured, Medicaid, and Medicare / VA / TRICARE.[12]

In Table 2 of each state's report, in which we summarize our estimates of the cost of the Medicaid expansion, we list the estimated number of low-income uninsured adults and children residing in each state who are U.S. citizens or legal residents. We exclude undocumented immigrants because they would not be eligible for Medicaid as a result of health insurance reform.[13]

We next combine this estimate with data from the Centers for Medicare and Medicaid Services (CMS) regarding average Medicaid spending per recipient in each state. More specifically, we use the data that is available from the CMS Medicaid Statistical Information State Summary Datamart (http://msis.cms.hhs.gov/). We consider Medicaid spending for recipients who are not disabled, not dually eligible for Medicare, and who have a basis of eligibility (BOE) as either children (ages 0 to 18) or non-elderly adults (ages 19 to 64). We use the default settings of all other variables. Most states have data from 2007, although some states have data only for 2006 or (in one case) 2004. We adjust all numbers to a 2007 baseline using the average annual rate of Medicaid expenditure growth of 7.2 percent from 2006 to 2007.[14]

---

[11] The categorical variable "povll" in the March 2008 CPS takes on one of fourteen values depending on the ratio of the family's income to the poverty line. Those in one of the four lowest categories (0 to 49 percent up to 100 to 124 percent) are defined as being below 133 percent of the FPL. One of the categories for this variable is 125 to 149 percent of the FPL. For this group, we divide their reported family income by the state-specific (the value for Alsaska and Hawaii is different from other states) poverty guidelines that pertain to their family size and structure from http://aspe.hhs.gov/poverty/08fedreg.htm to determine whether they are below 133 percent of the FPL.

[12] Some individuals report multiple sources of health insurance coverage. If a person reports Medicare, VA, or TRICARE, then we place him or her in that category. If the person does not report coverage from any of these sources but reports that they were covered by Medicaid, he or she is placed in the Medicaid category. Individuals are placed into the private health insurance category if they report private health insurance coverage but do not report public health insurance coverage. Uninsured individuals are those who do not report coverage from any private or public source.

[13] We rely on estimates from Jeffrey Passel at the Pew Hispanic Center regarding the number of undocumented immigrants in each state. See Passel and Cohn's "A Portrait of Undocumented Immigrants in the U.S." at http://pewresearch.org/pubs/1190/portrait-unauthorized-immigrants-states for a description of their methodology, which accounts for under-sampling of undocumented immigrants in the CPS.

[14] See http://www.cms.hhs.gov/NationalHealthExpendData/downloads/highlights.pdf.

We then multiply these values for average Medicaid spending in each state by 1.20 to account for the fact that disabled individuals typically have higher health care costs than the non-disabled. For example, disabled Medicaid recipients have average program expenditures that are approximately five times greater than similarly aged non-disabled Medicaid recipients. Furthermore, approximately five percent of uninsured individuals report in the March 2008 CPS that they are disabled. If the same five-to-one spending ratio would hold for disabled and non-disabled uninsured individuals when they became eligible for Medicaid, then on average costs would be twenty percent greater than implied by the average for the non-disabled.[15]

We then multiply the estimated state-specific number of low-income, uninsured U.S. citizens and legal residents in each age group by the corresponding state-specific average Medicaid spending to estimate the average costs of the Medicaid expansion. The key assumption of this approach is that average Medicaid spending per uninsured individual would be equal to average Medicaid spending for current recipients. It also assumes that only the uninsured would enroll, and thus that the expansion would not "crowd out" health insurance from other sources.

---

[15] It is perhaps most useful to explain this with an example. Suppose that, on average, annual Medicaid spending for non-disabled adults in a state was $2,000 per year and for disabled adults in the same state it was $10,000 per year. If five percent of individuals were disabled, then average annual costs would be $2,400, which is twenty percent greater than the non-disabled average of $2,000 per year.

## ARKANSAS

Health insurance reform as currently proposed in both the House Tri-Committee and in the Senate HELP Committee would ensure that virtually all Americans receive health insurance. This memo explores the likely effects of this reform on the budget of the state of Arkansas and its local governments.

Arkansas subsidizes small businesses to offer their employees health insurance and both the state and local governments provide direct services to the uninsured. In addition, the state and local governments indirectly pay for uncompensated care through higher insurance premiums for government employees. On each of these fronts, the reform would save money for the state and local governments. On the other hand, the reform calls for an expansion in Medicaid for all individuals under 133 percent of the federal poverty line (FPL).

Our findings, which we summarize below, indicate that Arkansas and its local governments currently spend at least **$23 million** on care for the uninsured. Because this is a lower bound of such expenditures, we estimate that at least that much would be saved by current reform proposals. We estimate that the total annual cost of the Medicaid expansion to Arkansas' **143,713** low-income uninsured individuals would be $204 million (in 2007 dollars).[16] After initially sharing none of that cost, Arkansas' share with a 90 percent FMAP would be **$20 million**. Thus health insurance reform would provide a substantial financial benefit to the state of Arkansas and its local governments.

*A. Current State and Local Expenditures on Health Care for the Uninsured*

The state and local governments of Arkansas would benefit fiscally from health insurance reform because they currently spend money encouraging individuals to become insured, treating the uninsured, and providing uncompensated care. Health insurance reform would reduce each of these costs and would have additional financial benefits for Arkansas' private hospitals and other health care providers, which bear heavy costs for providing care to Arkansas' residents who are not insured. These and other uncompensated care costs are passed on to the privately insured, including the employees of state and local governments in Arkansas.

The following is a summary of *some* of the savings that Arkansas and its local governments could expect from health insurance reform.

- **ARHealthnet**: ARHealthnet is a group health insurance program for small to medium businesses (two to 500 employees) that have not offered insurance for 12 months (Arkansas Department of Human Services, 2009). Benefits are limited and premiums are subsidized for employees under 200 percent of the FPL (RWJF, 2009). In 2007, the first year of operations, the state spent **$781,000** on the program. Costs are expected to grow significantly as the program expands (Arkansas Tobacco Settlement Commission, 2008). It is reasonable to assume that under health insurance reform Arkansas would recover a substantial amount of what they currently spend on ARHealthnet. Under current reform proposals, small businesses

[16] The estimated number of low-income uninsured individuals excludes undocumented residents, who would not be eligible for Medicaid as a result of health insurance reform.

would be offered tax credits as an incentive to offer health insurance to their employees. Additionally, individuals now enrolled in ARHealthnet with incomes below 133 percent of the FPL would become eligible for Medicaid, with the vast majority of this cost funded by the federal government. Individuals with incomes above 133 percent would be eligible for subsidized health insurance through the national health insurance exchange. It would cost the state nothing to insure these individuals.

- **Hospital Indigent Care**: The University of Arkansas Medical Sciences (UAMS) provides services to the indigent. In 2009, the state allocated **$5.4 million** to UAMS for covering these costs (Arkansas Funded Operating Budget, FY 2008). Much of what Arkansas currently allocates for indigent care at UAMS would be saved under health insurance reform. All individuals below 133 percent would qualify for Medicaid and those above that threshold would be eligible to obtain subsidized insurance through the exchange, at no cost to the state.

- **Hidden Tax**: Arkansas' hospitals and other health care providers also shoulder much of the burden of the state's uncompensated care. Much of this cost is then shifted to those who have private health insurance in the form of higher prices for health care services. As a result of this uncompensated care, private health insurance premiums are higher than they otherwise would be. Health insurance reform would reduce this "hidden tax" that individuals with private health insurance pay for uncompensated care for the uninsured. This is of particular importance to Arkansas because the state and its local governments help pay for health insurance for many of their 165,666 full-time equivalent employees. We estimate that the hidden cost of uncompensated care costs the state of Arkansas and its local governments **$17.2 million** a year in the form of higher employee health insurance premiums.[17]

Additional savings may come from the Children's Health Insurance Program (CHIP). The state of Arkansas currently spends **$26.3 million** on CHIP coverage (Kaiser Family Foundation, 2009) for children in families with incomes up to 200 percent of the FPL (RWJF, 2009). Under the current draft of reform legislation, children in families with incomes above 133 percent of the FPL may transition to equivalent, federally-financed coverage through the national health insurance exchange, potentially allowing the state to save a considerable amount of the costs of this program. However, CEA does not include savings on CHIP in bottom line calculations of net state savings from health insurance reform, because transitioning children from CHIP to equivalent federal coverage would be subject to approval by the Secretary of Health and Human Services, and may not occur in all states.

The discussion above has highlighted some of the most important examples of state and local financing of care for the uninsured, though the list is by no means intended to be comprehensive. Instead, it is a lower bound on the savings that state and local governments would realize as a result of health insurance reform. Added together, we estimate that Arkansas would see at least

[17] CEA calculates the hidden tax for Arkansas and for all subsequent states in the following way. We use the estimate of $14.1 billion in uncompensated care that was not funded by other government sources from Hadley et al (2008). We then divide this by the 45.7 million uninsured to obtain an estimate of $309 per uninsured person. We then multiply this by the number of non-elderly non-illegal uninsured in the state to arrive at $118.9 million for the state of Arkansas. Finally, we multiply this by the share of employment accounted for by state and local employees (14.5 percent in Arkansas in 2007) to arrive at $17.2 million.

**$23 million** in savings in existing programs and in reduced health insurance premiums for state and local employees as a result of health insurance reform.

*B. A Snapshot of Health Insurance Coverage for Non-Elderly Residents of Arkansas*

A brief snapshot of insurance coverage in the state helps illustrate the fiscal and coverage impact of national health insurance reform. Table 1 shows the insurance status of Arkansas' non-elderly residents during the 2007 calendar year, broken down by poverty status and by age groups. These estimates suggest that there are roughly 135,000 uninsured adults and 23,000 uninsured children in Arkansas with family incomes below 133 percent of the FPL.

As the table shows, the majority of uninsured individuals (62 percent) in Arkansas has incomes above 133 percent of the FPL, and would therefore qualify for health insurance through the exchange rather than through Medicaid. The state of Arkansas would not be responsible for any of the financing for this group.

**Table 1: Total Estimated Non-Elderly Population of Arkansas**

| | Poverty Status | Uninsured | Private Insurance | Medicaid | Medicare, VA, or TRICARE |
|---|---|---|---|---|---|
| Adults (19-64) | ≥ 133% FPL | 228,576 | 1,043,576 | 30,143 | 102,349 |
| | < 133% FPL | 134,719 | 71,579 | 43,674 | 34,535 |
| Children (0-18) | ≥ 133% FPL | 24,433 | 339,906 | 161,297 | 18,521 |
| | < 133% FPL | 22,667 | 29,508 | 153,069 | 7,342 |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. Number of observations in the CPS for Arkansas: 1,241.

*C. Estimated Costs to the State of Arkansas from the Medicaid Expansions*

Table 2 lists the estimated number of legal, non-elderly residents in Arkansas with incomes of less than 133 percent of the FPL who would become eligible for Medicaid under the proposed legislation. The table also presents the projected costs of extending Medicaid to these individuals. These estimates suggest that the total cost of this expansion would be $204 million per year. With an FMAP of 90 percent, the annual cost to the state would be **$20 million.** We consider a 90 percent FMAP because it is the one scheduled to take effect in 2017 in current draft legislation, though we recognize that this could change as the legislation moves forward.

**Table 2: Uninsured, Low-Income, Legal, and Non-Elderly Population of Arkansas**

| | Number of Legal Uninsured Below 133% FPL | Cost of Medicaid Expansion ($ millions) | Cost per New Enrollee | State Population | Cost to State with 90% FMAP ($ millions) |
|---|---|---|---|---|---|
| Adults (19-64) | 124,771 | $165 | $1,321 | 2,834,797 | $20 |
| Children (18 and under) | 18,942 | $40 | $2,091 | | |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of health insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. These data exclude undocumented residents; estimates come from Passel and are described in the appendix.

*D. Bottom Line for Arkansas*

Table 3 shows the net impact for the Arkansas state budget of health insurance reform. It shows the likely cost of the Medicaid expansion under three FMAP matching rates – current, 90 percent and 100 percent. It then shows the identifiable savings from reducing uncompensated care. As the following table shows, those savings would more than offset the cost of the Medicaid expansion described above if a 90 percent FMAP were in effect, as is proposed in current draft legislation. And these other savings would offset 42 percent of the cost even if the current FMAP of 72.78 percent was used.[18]

**Table 3: Financial Impact of Health Insurance Reform on State and Local Governments in Arkansas ($ millions)**

| Component | Current FMAP | 90% FMAP | 100% FMAP |
|---|---|---|---|
| Medicaid Expansion | -55.6 | -20.4 | 0.0 |
| AR Health Net | +0.8 | +0.8 | +0.8 |
| U of Arkansas | +5.4 | +5.4 | +5.4 |
| Hidden Tax | +17.2 | +17.2 | +17.2 |
| Net Effect for Arkansas | -32.2 | +3.0 | +23.4 |

This table likely understates the benefits to the state of Arkansas and its local governments for at least three additional reasons. First, it does not include savings that would result from reductions in other state and local programs not listed above that finance health care for the uninsured. Second, it ignores the increase in tax revenue that would result from reform-induced increases in the efficiency of the labor market, including a reduction in "job lock." And finally, it does not include the benefits of reductions in health care spending that would result from more coordinated care. At present, many individuals transition in and out of health insurance, leading to inefficient care delivery including more care in emergency rooms.

[18] CEA recognizes that not all of the costs from some of these programs will be saved under health insurance reform, and thus our calculations are not exact. State and local governments retain the discretion to offer subsidized care programs to their residents. Additionally, some of the individuals covered by these programs are undocumented immigrants who would not obtain health insurance as a result of reform. However, given that the programs analyzed here are not exhaustive of all uncompensated care spending in the state, this table is meant to be illustrative of a conservative estimate of the potential cost savings Arkansas can expect to see from health insurance reform.

## References

Arkansas Department of Human Services. ARHealthNetworks. "What is ARHealthNetworks?" Accessed August 14, 2009. http://www.arhealthnetworks.com/.

Arkansas Tobacco Settlement Commission. "Biennial Progress Report: Arkansas Tobacco Settlement Proceeds Act." Report to the Governor and General Assembly of the State of Arkansas, August 1, 2008.

Kaiser Family Foundation. State Health Facts. "Medicaid & CHIP." Accessed August 14, 2009. http://www.statehealthfacts.org/comparetable.jsp?ind=235&cat=4.

Hadley, Jack, J. Holahan, T. Coughlin, and D. Miller. "Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs." *Health Affairs*, 2008, 27(5): w399-w415.

Robert Wood Johnson Foundation. State Coverage Initiatives. "Arkansas: Coverage Strategies." Accessed August 14, 2009. http://www.statecoverage.org/node/82/state_strategies.

State of Arkansas. "Funded Operating Budget: Fiscal Year 2008." June 30, 2008. http://www.state.ar.us/dfa/budget/documents/fy2008_funded_budget_schedule_063008.pdf.

## CALIFORNIA

Health insurance reform as currently proposed in both the House Tri-Committee and in the Senate HELP Committee would ensure that virtually all Americans receive health insurance. This memo explores the likely effects of this reform on the budget of the state of California and its local governments.

California and its local governments subsidize individuals to obtain health insurance and provide direct services to the uninsured. In addition, the state and local governments indirectly pay for uncompensated care through higher insurance premiums for government employees. On each of these fronts, the reform would save money for the state and local governments. On the other hand, the reform calls for an expansion in Medicaid for all individuals under 133 percent of the federal poverty line (FPL).

Our findings, which we summarize below, indicate that California and its local governments currently spend at least **$2.14 billion** on care for the uninsured. Because this is a lower bound of such expenditures, we estimate that at least that much would be saved by current reform proposals. We estimate that the total annual cost of the Medicaid expansion to California's **1,717,309** low-income uninsured individuals would be $1.95 billion (in 2007 dollars).[19] After initially sharing none of that cost, California's share with a 90 percent FMAP would be **$195 million**. Thus health insurance reform would provide a substantial financial benefit to the state of California and its local governments.

*A. Current State and Local Expenditures on Health Care for the Uninsured*

The state and local governments of California would benefit fiscally from health insurance reform because they currently spend money helping individuals to become insured, treating the uninsured, and providing uncompensated care. Health insurance reform would reduce each of these costs, and would have additional financial benefits for California's private hospitals and other health care providers, which bear heavy costs for providing care to California's residents who are not insured. These and other uncompensated care costs are passed on to the privately insured, including the employees of state and local governments in California.

The following is a summary of *some* of the savings that California and its local governments could expect from health insurance reform.

- **Medically Indigent Services Programs (MISP):** This program provides insurance coverage to low-income adults in 24 California mostly large, urban counties. Under California law, counties are the "providers of last resort" for health services to low-income uninsured people with no other sources of care. These programs vary in their eligibility requirements and coverage. Most programs provide care free of charge to adults under some income threshold (100 percent of the FPL to 300 percent of the FPL) and care with some measure of cost sharing to those earning above the threshold (California Health Care Foundation, 2006). In

[19] The estimated number of low-income uninsured individuals excludes undocumented residents, who would not be eligible for Medicaid as a result of health insurance reform.

2004-2005, the most recent year for which data are available, counties spent **$1.613 billion** on this program (California Department of Public Health, 2008).

- **County Medical Services Program (CMSP):** This program provides health insurance coverage to low-income adults in 34 primarily rural California counties. Enrollees must be legal citizens with incomes below 200 percent of the FPL (California Health Care Foundation, 2006). In 2008-09, the program had a budget of **$283 million** (County Medical Services Program, 2009). It is reasonable to assume that under health insurance reform California would recover a substantial amount of what they currently spend on the MISP and CMSP programs. Under current reform proposals, legal residents now enrolled in MISP or CMSP with incomes below 133 percent of the FPL would become eligible for Medicaid, with virtually all of this cost financed by the federal government. Individuals currently enrolled in MISP or CMSP with incomes above 133 percent of the FPL would be eligible for subsidized health insurance through the national health insurance exchange. It would cost the state nothing to insure these individuals.

- **California's Major Risk Medical Insurance Program (MRMIP):** This program provides California residents with subsidized insurance if they cannot otherwise obtain affordable insurance (California Managed Risk Medical Insurance Board, 2009). Enrollees must have been rejected for private insurance, involuntarily dropped from insurance, or been offered insurance only at a premium higher than the MRMIP rate. Due to budget constraints, there is often a waiting list for this program (National Conference of State Legislatures, 2009). In 2008-09, MRMIP's budget was **$37.7 million** (California Managed Risk Medical Insurance Board, 2008). California should save virtually all of the costs of this program under health insurance reform, since the national health insurance exchange would offer reasonably-price health insurance to all enrollees, regardless of pre-existing conditions.

- **Hidden Tax:** California's hospitals and other health care providers also shoulder much of the burden of the state's uncompensated care. Much of this cost is then shifted to those who have private health insurance in the form of higher prices for health care services. As a result of this uncompensated care, private health insurance premiums are higher than they otherwise would be. Health insurance reform would reduce this "hidden tax" that individuals with private health insurance pay for uncompensated care for the uninsured. This is of particular importance to California because the state and its local governments help pay for health insurance for many of their 1,835,452 full-time equivalent employees. We estimate that the hidden cost of uncompensated care costs the state of California and its local governments **$210 million** a year in the form of higher employee health insurance premiums.[20]

Additional savings may come from the Children's Health Insurance Program (CHIP). The state of California currently spends **$707 million** on CHIP coverage for children in families with incomes up to 250 percent of the FPL (Kaiser Family Foundation, 2009). Under the current draft of reform legislation, children in families with incomes above 133 percent of the FPL may transition to equivalent, federally-financed coverage through the national health insurance exchange, potentially allowing the state to save a considerable amount of the costs of this program. However, CEA does not include savings on CHIP in bottom line calculations of net

[20] Based on calculation that 13.3 percent of California's employment is in state and local government.

state savings from health insurance reform, because transitioning children from CHIP to equivalent federal coverage would be subject to approval by the Secretary of Health and Human Services, and may not occur in all states.

The discussion above has highlighted some of the most important examples of state and local financing of care for the uninsured, though the list is by no means intended to be comprehensive. Instead, it is a lower bound on the savings that state and local governments would realize as a result of health insurance reform. Added together, we estimate that California would see at least **$2.14 billion** in savings in existing programs and in reduced health insurance premiums for state and local employees as a result of health insurance reform.

*B. A Snapshot of Health Insurance Coverage for Non-Elderly Residents of California*

A brief snapshot of insurance coverage in the state helps illustrate the fiscal and coverage impact of national health insurance reform. Table 1 shows the insurance status of California's non-elderly residents, broken down by poverty status and by age groups. These estimates suggest that there are roughly 1.84 million uninsured adults and 454,000 uninsured children in California with family incomes below 133 percent of the FPL.

**Table 1: Total Estimated Non-Elderly Population of California**

| | **Poverty Status** | **Uninsured** | **Private Insurance** | **Medicaid** | **Medicare, VA, or TRICARE** |
|---|---|---|---|---|---|
| Adults (19-64) | ≥ 133% FPL | 3,482,926 | 13,583,882 | 895,274 | 564,625 |
| | < 133% FPL | 1,836,675 | 825,016 | 925,098 | 241,776 |
| Children (0-18) | ≥ 133% FPL | 706,707 | 5,048,759 | 1,235,885 | 146,040 |
| | < 133% FPL | 454,028 | 492,895 | 1,837,020 | 47,342 |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. Number of observations in the CPS for California: 10,049.

As the table also shows, the majority (65 percent) of the uninsured in California has incomes above 133 percent of the FPL, and would therefore qualify for health insurance through the exchange rather than through Medicaid. The state of California would not be responsible for any of the financing for this group.

*C. Estimated Costs to the State of California from the Medicaid Expansion*

Table 2 lists the estimated number of legal, non-elderly residents in California with incomes of less than 133 percent of the FPL who would become eligible for Medicaid under the proposed legislation. The table also presents the projected costs of extending Medicaid to these individuals. These estimates suggest that the total cost of this expansion would be approximately $1.950 billion per year. With a 90 percent FMAP, the annual cost to the state would be **$195 million**. We consider a 90 percent FMAP because it is the one scheduled to take effect in 2017 in current draft legislation, though we recognize that this could change as the legislation moves forward.

| Table 2: Uninsured, Low-Income, Legal, and Non-Elderly Population of California | | | | | |
|---|---|---|---|---|---|
| | **Number of Legal Uninsured Below 133% FPL** | **Cost of Medicaid Expansion ($ millions)** | **Cost per New Enrollee** | **State Population** | **Cost to State with 90% FMAP ($ millions)** |
| Adults (19-64) | 1,332,828 | $1,391 | $1,044 | 36,553,215 | $195 |
| Children (18 and under) | 384,481 | $559 | $1,454 | | |
| Note: Data from the March 2008 CPS. Uninsured individuals report having no form of health insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. These data exclude undocumented residents; estimates come from Passel and are described in the appendix. | | | | | |

*D. Bottom Line for California*

Table 3 shows the net impact for the California state budget of health insurance reform. It shows the likely cost of Medicaid expansion under three FMAP matching rates – current, 90 percent, and 100 percent. It then shows the identifiable savings from reducing uncompensated care. As the following table shows, those savings would more than offset the cost of the Medicaid expansion described even if the current FMAP of 50 percent was used.[21]

| Table 3: Financial Impact of Health Insurance Reform on State and Local Governments in California ($ millions) | | | |
|---|---|---|---|
| Component | Current FMAP | 90% FMAP | 100% FMAP |
| Medicaid Expansion | -975 | -195 | -0 |
| MISP | +1,613 | +1,613 | +1,613 |
| CMSP | +283 | +283 | +283 |
| MRMIP | +38 | +38 | +38 |
| Hidden Tax | +210 | +210 | +210 |
| Net Effect for California | +1,169 | +1,949 | +2,144 |

This table understates the benefits to the state of California and its local governments for at least three additional reasons. First, it does not include savings that would result from reductions in other state and local programs not listed above that finance health care for the uninsured. Second, it ignores the increase in tax revenue that would result from reform-induced increases in the efficiency of the labor market, including a reduction in "job lock." And finally, it does not include the benefits of reductions in health care spending that would result from more coordinated care. At present, many individuals transition in and out of health insurance, leading to inefficient care delivery including more care in emergency rooms.

[21] CEA recognizes that not all of the costs from some of these programs will be saved under health insurance reform, and thus our calculations are not exact. State and local governments retain the discretion to offer subsidized care programs to their residents. Additionally, some of the individuals covered by these programs are undocumented immigrants who would not obtain health insurance as a result of reform. However, given that the programs analyzed here are not exhaustive of all uncompensated care spending in the state, this table is meant to be illustrative of a conservative estimate of the potential cost savings California can expect to see from health insurance reform.

## References

California Department of Public Health. "County Health Care Program Expenditures for the Medically Indigent." March 27, 2008. http://www.cdph.ca.gov/data/statistics/Documents/MICRS-CountyIndigentExpendituresByTypeofService.pdf.

California Health Care Foundation. "County Programs for the Medically Indigent in California." August 2006. http://www.chcf.org/documents/policy/CountyPrgrmsMedicallyIndigentFactSheet.pdf.

California Healthy Families Program. "Welcome to the California Health Families Program." Accessed August 14, 2009. http://www.healthyfamilies.ca.gov/Home/default.aspx.

California Managed Risk Medical Insurance Board. "California's High-Risk Health Insurance Pool: Major Risk Medical Insurance Program." Presentation by Lesley Cummings, Executive Director, June 26, 2008. http://www.mrmib.ca.gov/MRMIB/MRMIP_June26-Capitol-Briefing.pdf.

California Managed Risk Medical Insurance Board. "Major Risk Medical Insurance Program (MRMIP)." Accessed August 14, 2009. http://www.mrmib.ca.gov/MRMIB/MRMIP.shtml.

County Medical Services Program. "Budget: FY 08-09 Budget." Accessed August 4, 2009. http://74.125.155.132/search?q=cache:-xya64I21EcJ:www.cmspcounties.org/about/budget.html+County+Medical+Services+Program+%24283&cd=1&hl=en&ct=clnk&gl=us.

Kaiser Family Foundation. State Health Facts. "Medicaid & CHIP." Accessed August 14, 2009. http://www.statehealthfacts.org/comparetable.jsp?ind=235&cat=4.

National Conference of State Legislatures. "State Health Programs to Cover the Uninsured." July 2009. http://www.ncsl.org/IssuesResearch/Health/StateHealthProgramsToCoverTheUninsured2009/tabid/13878/Default.aspx#id.

## FLORIDA

Health insurance reform as currently proposed in both the House Tri-Committee and in the Senate HELP Committee would ensure that virtually all Americans receive health insurance. This memo explores the likely effects of this reform on the budget of the state of Florida and its local governments.

Florida and its local governments subsidize individuals to obtain health insurance and provide direct services to the uninsured. In addition, the state and local governments indirectly pay for uncompensated care through higher insurance premiums for government employees. On each of these fronts, the reform would save money for the state and local governments. On the other hand, the reform calls for an expansion in Medicaid for all individuals under 133 percent of the federal poverty line (FPL).

Our findings, which we summarize below, indicate that Florida and its local governments currently spend at least **$377 million** on care for the uninsured. Because this is a lower bound of such expenditures, we estimate that at least that much would be saved by current reform proposals. We estimate that the total annual cost of the Medicaid expansion to Florida's **933,638** low-income uninsured individuals would be $2.52 billion (in 2007 dollars).[22] After initially sharing none of that cost, Florida's share with a 90 percent FMAP would be **$252 million**. Thus health insurance reform would provide a substantial financial benefit to the state of Florida and its local governments.

*A. Current State and Local Expenditures on Health Care for the Uninsured*

The state and local governments of Florida would benefit fiscally from health insurance reform because they currently spend money encouraging individuals to become insured, treating the uninsured, and providing uncompensated care. Health insurance reform would reduce each of these costs, and would have additional financial benefits for Florida's private hospitals and other health care providers, which bear heavy costs for providing care to Florida's residents who are not insured. These and other uncompensated care costs are passed on to the privately insured, including the employees of state and local governments in Florida.

The following is a summary of *some* of the savings that Florida's state government and its local governments could expect from health insurance reform.

- **Florida's Health Flex**: This program allows private health insurers, as well as non-profits or local governments, to offer basic health insurance plans to individuals with income under 300 percent of the FPL. The plans offered through Health Flex do not have to meet Florida's regular criteria for licensed insurance companies. The Health Flex program has little cost to the state (Florida Agency for Health Care Administration, 2009). However, since coverage in the Health Flex program is often very basic, individuals who switch from Health Flex plans to the exchange would likely benefit from having more comprehensive coverage. In addition,

[22] The estimated number of low-income uninsured individuals excludes undocumented residents, who would not be eligible for Medicaid as a result of health insurance reform.

local governments that fund health coverage through Health Flex would see savings (see JaxCare, below.)

- **The Health Care Responsibility Act**: This requires counties to reimburse hospitals in other counties for providing uncompensated care to their residents. Some counties also provide reimbursement to their own hospitals. Hospitals are not eligible to get reimbursement until their uncompensated care costs exceed 2 percent of their total operations. In FY 2006-2007, counties spent **$5.6 million** reimbursing hospitals (Florida Agency for Health Care Administration, 2008).

- **Hidden Tax**: Florida's hospitals and other health care providers also shoulder much of the burden of the state's uncompensated care.[23] Much of this cost is then shifted to those who have private health insurance in the form of higher prices for health care services. As a result of this uncompensated care, private health insurance premiums are higher than they otherwise would be. Health insurance reform would reduce this "hidden tax" that individuals with private health insurance pay for uncompensated care for the uninsured. This is of particular importance to Florida because the state and its local governments help pay for health insurance for many of their 890,834 full-time equivalent employees. We estimate that the hidden cost of uncompensated care costs the state of Florida and its local governments **$102 million** a year in the form of higher employee health insurance premiums.[24]

Some counties have their own programs to provide health care or health insurance to low income residents. Examples of such programs:

- **Hillsborough County Health Care**: This program provides comprehensive managed health care for low-income individuals who are not eligible for Medicaid or Medicare. It is funded with a local sales tax. In FY 2007-2008, the program had expenses of **$82 million** for its Direct Health Care Services program (Hillsborough County, 2008).

- **Miami-Dade County**: This county, which has a high number of uninsured residents, funds its public health facilities, including Jackson Memorial Hospital, with a 0.5 percent sales tax. In FY 2007-2008, revenue from this tax in just this one county amounted to **$187 million** (Miami-Dade County, 2008).

- **Duval County's JaxCare**: This program provides health coverage in Duval County through the state Health Flex program. JaxCare provides subsidized coverage to individuals with incomes under 200 percent of the FPL, through the individual's employers. JaxCare is funded through premiums, donations, federal grants, and by the city of Jacksonville. In 2006, projected costs of the program were $2.6 million, **$660,000** of which was funded by the city of Jacksonville (Jacksonville Community Forums on Health Care and the Uninsured, 2006).

Additional savings may come from the Children's Health Insurance Program (CHIP). The state of Florida currently spends **$117.7 million** on CHIP coverage for children in families with

[23] Hospitals in Florida incurred $1.561 billion in uncompensated care costs in 2003 (U.S. Government Accountability Office, 2005).

[24] Based on calculation that 11.8 percent of Florida's employment is in state and local government.

incomes up to 200 percent of the FPL (Kaiser Family Foundation, 2009). Under the current draft of reform legislation, children in families with incomes above 133 percent of the FPL may transition to equivalent, federally-financed coverage through the national health insurance exchange, potentially allowing the state to save a considerable amount of the costs of this program. However, CEA does not include savings on CHIP in bottom line calculations of net state savings from health insurance reform, because transitioning children from CHIP to equivalent federal coverage would be subject to approval by the Secretary of Health and Human Services, and may not occur in all states.

The discussion above has highlighted some of the most important examples of state and local financing of care for the uninsured, though the list is by no means intended to be comprehensive. Instead, it is a lower bound on the savings that state and local governments would realize as a result of health insurance reform. Added together, we estimate that Florida would see at least **$377 million** in savings in existing programs and in reduced health insurance premiums for state and local employees as a result of health insurance reform.

*B. A Snapshot of Health Insurance Coverage for Non-Elderly Residents of Florida*

A brief snapshot of insurance coverage in the state helps illustrate the fiscal and coverage impact of national health insurance reform. Table 1 shows the insurance status of Florida's non-elderly residents, broken down by poverty status and by age groups. These estimates suggest that there are roughly 818,000 uninsured adults and 360,000 uninsured children in Florida with family incomes below 133 percent of the FPL.

**Table 1: Total Estimated Non-Elderly Population of Florida**

| | Poverty Status | Uninsured | Private Insurance | Medicaid | Medicare, VA, or TRICARE |
|---|---|---|---|---|---|
| Adults (19-64) | ≥ 133% FPL | 1,777,668 | 6,253,888 | 232,548 | 751,172 |
| | < 133% FPL | 817,593 | 425,288 | 215,899 | 162,284 |
| Children (18 and under) | ≥ 133% FPL | 425,341 | 2,075,165 | 448,184 | 137,771 |
| | < 133% FPL | 359,619 | 262,755 | 543,485 | 49,620 |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. Number of observations in the CPS for Florida: 4,226.

As the table also shows, the majority (65 percent) of the uninsured in Florida have incomes above 133 percent of the FPL, and would therefore qualify for health insurance through the exchange rather than through Medicaid. The state of Florida would not be responsible for any of the financing for this group.

*C. Estimated Costs to the State of Florida from the Medicaid Expansion*

Table 2 lists the estimated number of legal, non-elderly residents in Florida with incomes of less than 133 percent of the FPL who would become eligible for Medicaid under the proposed legislation. The table also presents the projected costs of extending Medicaid to these individuals.

| Table 2: Uninsured, Low-Income, Legal, and Non-Elderly Population of Florida | | | | | |
|---|---|---|---|---|---|
| | **Number of Legal Uninsured Below 133% FPL** | **Cost of Medicaid Expansion ($ millions)** | **Cost per New Enrollee** | **State Population** | **Cost to State with 90% FMAP ($ millions)** |
| Adults (19-64) | 618,769 | $1,987 | $3,211 | 18,251,243 | $252 |
| Children (18 and under) | 314,869 | $529 | $1,682 | | |
| Note: Data from the March 2008 CPS. Uninsured individuals report having no form of health insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. These data exclude undocumented residents; estimates come from Passel and are described in the appendix. | | | | | |

These estimates suggest that the total cost of this expansion would be approximately $2.516 billion per year. With an FMAP of 90 percent, the cost to the state would be **$252 million**. We consider a 90 percent FMAP because it is the one scheduled to take effect in 2017 in current draft legislation, though we recognize that this could change as the legislation moves forward.

*D. Bottom Line for Florida*

Table 3 shows the net impact for the Florida state budget of health insurance reform. It shows the likely cost of Medicaid expansion under three FMAP matching rates – current, 90 percent, and 100 percent. It then shows the identifiable savings from reducing uncompensated care. And as the following table shows, those savings would more than offset the cost of the Medicaid expansion described above if a 90 percent FMAP were in effect, as is proposed in current draft legislation. Moreover, these other savings would offset one-third of the cost even if the current FMAP of 54.98 percent was used.[25]

| Table 3: Financial Impact of Health Insurance Reform on State and Local Governments in Florida ($ millions) | | | |
|---|---|---|---|
| Component | Current FMAP | 90% FMAP | 100% FMAP |
| Medicaid Expansion | -1,132.9 | -251.6 | -0.0 |
| Miami-Dade hospital sales tax | +187 | +187 | +187 |
| Health Care Responsibility Act | +5.6 | +5.6 | +5.6 |
| Hillsborough County Health Care | +82 | +82 | +82 |
| JaxCare | +0.7 | +0.7 | +0.7 |
| Hidden Tax | +102.0 | +102.0 | +102.0 |
| Net Effect for Florida | -755.6 | +125.7 | +377.3 |

This table understates the benefits to the state of Florida and its local governments for at least three additional reasons. First, it does not include savings that would result from reductions in other state and local programs not listed above that finance health care for the uninsured. Second,

[25] CEA recognizes that not all of the costs from some of these programs will be saved under health insurance reform, and thus our calculations are not exact. State and local governments retain the discretion to offer subsidized care programs to their residents. Additionally, some of the individuals covered by these programs are undocumented immigrants who would not obtain health insurance as a result of reform. However, given that the programs analyzed here are not exhaustive of all uncompensated care spending in the state, this table is meant to be illustrative of a conservative estimate of the potential cost savings Florida can expect to see from health insurance reform.

it ignores the increase in tax revenue that would result from reform-induced increases in the efficiency of the labor market, including a reduction in "job lock." And finally, it does not include the benefits of reductions in health care spending that would result from more coordinated care. At present, many individuals transition in and out of health insurance, leading to inefficient care delivery including more care in emergency rooms.

## References

Florida Agency for Health Care Administration. "Health Care Responsibility Act (HCRA): County Expenditures CFY0203-CFY0607." February 8, 2008. http://www.fdhc.state.fl.us/MCHQ/Managed_Health_Care/HCRA/index.shtml.

Florida Agency for Health Care Administration. "Health Flex Plan Program Annual Report." January 2009. http://www.fdhc.state.fl.us/MCHQ/Managed_Health_Care/Health_Flex/HealthFlexAnnualReport-Jan09.pdf.

Jacksonville Community Forums on Health Care and the Uninsured. "JaxCare Mid-Point Report." April 2006. http://www.jaxcare.org/articles/JaxCare_Midpoint_Report_20060403.pdf

Kaiser Family Foundation. State Health Facts. "Medicaid & CHIP." Accessed August 14, 2009. http://www.statehealthfacts.org/comparetable.jsp?ind=235&cat=4.

Miami-Dade County. "Statement of Activities for Fiscal Year Ended September 30, 2008." Accessed September 13, 2009. http://www.miamidade.gov/finance/library/act08.pdf.

National Conference of State Legislatures. "State Health Programs to Cover the Uninsured." July 2009. http://www.ncsl.org/IssuesResearch/Health/StateHealthProgramsToCoverTheUninsured2009/tabid/13878/Default.aspx#id.

U.S. Government Accountability Office. "Nonprofit, For-Profit, and Government Hospitals: Uncompensated Care and Other Community Benefits." Testimony of Comptroller David M. Walker before the House Committee on Ways and Means, May 26, 2005.

## IDAHO

Health insurance reform as currently proposed in both the House Tri-Committee and in the Senate HELP Committee would ensure that virtually all Americans receive health insurance. This memo explores the likely effects of this reform on the budget of the state of Idaho and its local governments.

Idaho and its local governments subsidize individuals to obtain health insurance and provide direct services to the uninsured. In addition, the state and local governments indirectly pay for uncompensated care through higher insurance premiums for government employees. On each of these fronts, the reform would save money for the state and local governments. On the other hand, the reform calls for an expansion in Medicaid for all individuals under 133 percent of the federal poverty line (FPL).

Our findings, which we summarize below, indicate that Idaho and its local governments currently spend at least **$47 million** on care for the uninsured. Because this is a lower bound of such expenditures, we estimate that at least that much would be saved by current reform proposals. We estimate that the total annual cost of the Medicaid expansion to Idaho's **66,798** low-income uninsured individuals would be $258 million (in 2007 dollars).[26] After initially sharing none of that cost, Idaho's share with a 90 percent FMAP would be **$26 million**. Thus health insurance reform would provide a substantial financial benefit to the state of Idaho and its local governments.

*A. Current State and Local Expenditures on Health Care for the Uninsured*

The state and local governments of Idaho would benefit fiscally from health insurance reform because they currently spend money encouraging individuals to become insured, treating the uninsured, and providing uncompensated care. Health insurance reform would reduce each of these costs, and would have additional financial benefits for Idaho's private hospitals and other health care providers, which bear heavy costs for providing care to Idaho's residents who are not insured. These and other uncompensated care costs are passed on to the privately insured, including the employees of state and local governments in Idaho.

The following is a summary of *some* of the savings that Idaho and its local governments could expect from health insurance reform.

- **<u>The Idaho Individual High Risk Reinsurance Pool</u>**: The pool provides insurance to individuals who have been turned down by private insurers. All Idaho insurance companies must provide high risk plans; the state reinsurance program covers losses past a certain point for a single event. In 2006, state expenditures for this program were **$2.4 million** (SHADAC, 2007a). Under the bill, the individuals covered in the high risk pool could obtain insurance through the exchange instead.

[26] The estimated number of low-income uninsured individuals excludes undocumented residents, who would not be eligible for Medicaid as a result of health insurance reform.

- **County Governments**: Idaho's counties have traditionally been responsible for covering health care expenses for residents who have no other source of care, through the County Medical Indigency Program. In 2006, county expenditures under this program totaled **$16.1 million** (SHADAC, 2007a). These costs could be reduced substantially if the individuals using uncompensated care in Idaho were insured through the exchange.

- **The State Catastrophic Health Care Cost Program**: This program assists counties in covering uncompensated care costing more than $10,000 for a single incident. State expenditures under the Catastrophic Health Care Cost Program were **$20.4 million** in 2006 (SHADAC, 2007a). These costs could be reduced substantially if the individuals using uncompensated care in Idaho were insured through the exchange.

- **Hidden Tax**: Idaho's hospitals and other health care providers also shoulder much of the burden of the state's uncompensated care.[27] Much of this cost is then shifted to those who have private health insurance in the form of higher prices for health care services. As a result of this uncompensated care, private health insurance premiums are higher than they otherwise would be. Health insurance reform would reduce this "hidden tax" that individuals with private health insurance pay for uncompensated care for the uninsured. This is of particular importance to Idaho because the state and its local governments help pay for health insurance for many of their 80,585 full-time equivalent employees. We estimate that the hidden cost of uncompensated care costs the state of Idaho and its local governments **$8.3 million** a year in the form of higher employee health insurance premiums.[28]

Additional savings may come from the Children's Health Insurance Program (CHIP). The state of Idaho currently spends **$9.4 million** on CHIP coverage for children in families with incomes up to 185 percent of the FPL (Kaiser Family Foundation, 2009). Under the current draft of reform legislation, children in families with incomes above 133 percent of the FPL may transition to equivalent, federally-financed coverage through the national health insurance exchange, potentially allowing the state to save a considerable amount of the costs of this program. However, CEA does not include savings on CHIP in bottom line calculations of net state savings from health insurance reform, because transitioning children from CHIP to equivalent federal coverage would be subject to approval by the Secretary of Health and Human Services, and may not occur in all states.

The discussion above has highlighted some of the most important examples of state and local financing of care for the uninsured, though the list is by no means intended to be comprehensive. Instead, it is a lower bound on the savings that state and local governments would realize as a result of health insurance reform. Added together, we estimate that Idaho would see at least **$47 million** in savings in existing programs and in reduced health insurance premiums for state and local employees as a result of health insurance reform.

---

[27] Idaho hospitals incurred $42.7 million in uncompensated care costs in 2005 (SHADAC, 2007b).

[28] Based on calculation that 14.5 percent of Idaho's employment is in state and local government.

*B. A Snapshot of Health Insurance Coverage for Non-Elderly Residents of Idaho*

A brief snapshot of insurance coverage in the state helps illustrate the fiscal and coverage impact of national health insurance reform. Table 1 shows the insurance status of Idaho's non-elderly residents, broken down by poverty status and by age groups.

**Table 1: Total Estimated Non-Elderly Population of Idaho**

| | Poverty Status | Uninsured | Private Insurance | Medicaid | Medicare, VA, or TRICARE |
|---|---|---|---|---|---|
| Adults (19-64) | ≥ 133% FPL | 95,056 | 587,667 | 15,130 | 31,386 |
| | < 133% FPL | 55,028 | 35,292 | 21,431 | 11,484 |
| Children (18 and under) | ≥ 133% FPL | 34,623 | 261,130 | 40,933 | 11,366 |
| | < 133% FPL | 21,617 | 23,733 | 43,678 | 7,995 |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. Number of observations in the CPS for Idaho: 1,352.

These estimates suggest that there are roughly 55,000 uninsured adults and 22,000 uninsured children in Idaho with family incomes below 133 percent of the FPL.

As the table also shows, the majority (63 percent) of the uninsured in Idaho have incomes above 133 percent of the FPL, and would therefore qualify for health insurance through the exchange rather than through Medicaid. The state of Idaho would not be responsible for any of the financing for this group.

*C. Estimated Costs to the State of Idaho from the Medicaid Expansion*

Table 2 lists the estimated number of legal, non-elderly residents in Idaho with incomes of less than 133 percent of the FPL who would become eligible for Medicaid under the proposed legislation. The table also presents the projected costs of extending Medicaid to these individuals. These estimates suggest that the total cost of this expansion is approximately $258 million per year. With an FMAP of 90 percent, the cost to the state would be **$26 million**. We consider a 90 percent FMAP because it is the one scheduled to take effect in 2017 in current draft legislation, though we recognize that this could change as the legislation moves forward.

**Table 2: Uninsured, Low-Income, Legal, and Non-Elderly Population of Idaho**

| | Number of Legal Uninsured Below 133% FPL | Cost of Medicaid Expansion ($ millions) | Cost per New Enrollee | State Population | Cost to State with 90% FMAP ($ millions) |
|---|---|---|---|---|---|
| Adults (19-64) | 46,547 | $217 | $4,654 | 1,499,402 | $26 |
| Children (18 and under) | 20,251 | $41 | $2,048 | | |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of health insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. These data exclude undocumented residents; estimates come from Passel and are described in the appendix.

*D. Bottom Line for Idaho*

Table 3 shows the net impact for the Idaho state budget of health insurance reform. It shows the likely cost of Medicaid expansion under three FMAP matching rates – current, 90 percent, and 100 percent. It then shows the identifiable savings from reducing uncompensated care. And as the following table shows, those savings would more than offset the cost of the Medicaid expansion described above if a 90 percent FMAP were in effect, as is proposed in current draft legislation. Moreover, these other savings would offset nearly 60 percent of the cost even if the current FMAP of 69.4 percent was used.[29]

**Table 3: Financial Impact of Health Insurance Reform on State and Local Governments in Idaho ($ millions)**

| Component | Current FMAP | 90% FMAP | 100% FMAP |
|---|---|---|---|
| Medicaid Expansion | -79.0 | -25.8 | -0.0 |
| Idaho Individual High Risk Reinsurance Pool | +2.4 | +2.4 | +2.4 |
| County Governments | +16.1 | +16.1 | +16.1 |
| Catastrophic Care Program | +20.4 | +20.4 | +20.4 |
| Hidden Tax | +8.3 | +8.3 | +8.3 |
| Net Effect for Idaho | -31.8 | +21.4 | +47.2 |

This table understates the benefits to the state of Idaho and its local governments for at least three additional reasons. First, it does not include savings that would result from reductions in other state and local programs not listed above that finance health care for the uninsured. Second, it ignores the increase in tax revenue that would result from reform-induced increases in the efficiency of the labor market, including a reduction in "job lock." And finally, it does not include the benefits of reductions in health care spending that would result from more coordinated care. At present, many individuals transition in and out of health insurance, leading to inefficient care delivery including more care in emergency rooms.

[29] CEA recognizes that not all of the costs from some of these programs will be saved under health insurance reform, and thus our calculations are not exact. State and local governments retain the discretion to offer subsidized care programs to their residents. Additionally, some of the individuals covered by these programs are undocumented immigrants who would not obtain health insurance as a result of reform. However, given that these programs analyzed here are not exhaustive of all uncompensated care spending in the state, this table is meant to be illustrative of a conservative estimate of the potential cost savings Idaho can expect to see from health insurance reform.

## References

Kaiser Family Foundation. State Health Facts. "Medicaid & CHIP." Accessed August 14, 2009. http://www.statehealthfacts.org/comparetable.jsp?ind=235&cat=4.

State Health Access Data Assistance Center (SHADAC). "Idaho's Health Care Costs and Options to Improve Health Care Access: Report on Task 1." December 2007a. http://www.shadac.org/files/shadac/publications/Idaho2007_Task1_Report.pdf.

State Health Access Data Assistance Center (SHADAC). "Idaho's Health Care Costs and Options to Improve Health Care Access: Report on Task 2." December 2007b. http://www.shadac.org/files/shadac/publications/Idaho2007_Task2_Report.pdf.

## INDIANA

Health insurance reform as currently proposed in both the House Tri-Committee and in the Senate HELP Committee would ensure that virtually all Americans receive health insurance. This memo explores the likely effects of this reform on the budget of the state of Indiana and its local governments.

Indiana and its local governments subsidize individuals to obtain health insurance and provide direct services to the uninsured. In addition, the state and local governments indirectly pay for uncompensated care through higher insurance premiums for government employees. On each of these fronts, the reform would save money for the state and local governments. On the other hand, the reform calls for an expansion in Medicaid for all individuals under 133 percent of the federal poverty line (FPL).

Our findings, which we summarize below, indicate that Indian and its local governments currently spend at least **$338 million** on care for the uninsured. Because this is a lower bound of such expenditures, we estimate that at least that much would be saved by current reform proposals. We estimate that the total annual cost of the Medicaid expansion to Indiana's **220,939** low-income uninsured individuals would be $623 million (in 2007 dollars).[30] After initially sharing none of that cost, Indiana's share with a 90 percent FMAP would be **$62 million**. Thus health insurance reform would provide a substantial financial benefit to the state of Indiana and its local governments.

*A. Current State and Local Expenditures on Health Care for the Uninsured*

The state and local governments of Indiana would benefit fiscally from health insurance reform because they currently spend money encouraging individuals to become insured, treating the uninsured, and providing uncompensated care. Health insurance reform would reduce each of these costs, and would have additional financial benefits for Indiana's private hospitals and other health care providers, which bear heavy costs for providing care to Indiana's residents who are not insured. These and other uncompensated care costs are passed on to the privately insured, including the employees of state and local governments in Indiana.

The following is a summary of *some* of the savings that Indiana and its local governments could expect from health insurance reform.

- **The Healthy Indiana Plan (HIP)**: This program covers individuals up to 200 percent of the FPL who are ineligible for Medicaid. The HIP program provides a high deductible health plan and a health savings account. HIP provides $500 in "first-dollar" preventive benefits. Members make monthly contributions to their health savings account based on income level (RWJF, 2009). Funding for HIP comes from $50 million in disproportionate share hospital (DSH) payments and through a 44 cent per pack tax on cigarettes. The money is allocated to a special fund that maintains reserves (State University of New York, 2009). In 2009, Indiana

[30] The estimated number of low-income uninsured individuals excludes undocumented immigrants, who would not be eligible for Medicaid as a result of health insurance reform.

allocated **$154.8 million** to the fund for HIP, of which $11 million is reserved for childhood immunization programs (Indiana Legislative Services Agency, 2007).

It is reasonable to assume that under health insurance reform Indiana would recover a substantial amount of what they currently spend on the HIP program. Under current reform proposals, individuals now enrolled in HIP with incomes below 133 percent of the FPL would become eligible for Medicaid, likely at no additional cost to the state. Individuals currently enrolled in HIP with incomes above 133 percent of the FPL would be eligible for subsidized health insurance through the national health insurance exchange. It would cost the state nothing to insure these individuals.

- **The Indiana Comprehensive Health Insurance Association (ICHIA)**: The ICHIA, the state's high-risk pool, provides coverage for individuals who cannot obtain it through Medicaid or private insurers as well as to those who have federal eligibility through HIPAA or TAA. The program offers premium subsidies for those with incomes up to 350 percent of the FPL. The program is funded by premiums, state general funds and insurance carrier assessments (National Conference of State Legislatures, 2009). In 2008, the state spent **$15 million** on the program (Indiana Comprehensive Health Insurance Association, 2008). Indiana would save the costs of this program under health insurance reform, since the federal government would take responsibility for providing a larger, more efficient subsidized pool for low-income uninsured individuals in the form of a national health insurance exchange.

- **Tax Credit**: Indiana's tax credit incentive for businesses to offer health insurance provides the lesser of $50 per employee or $2,500 for two years if the employer establishes a Section 125 plan. In 2009, Indiana spent **$12.2 million** on this program (Indiana Legislative Services Agency, 2007). Indiana would much of the cost of this program under health insurance reform, since the federal government would take responsibility for offering small businesses tax credits as an incentive to offer health insurance to their employees.

- **Hospital Uncompensated Care for the Indigent Program (HCIP)**: HCIP is available to patients who receive emergency medical care and meet other program criteria. As of January 2009, funding for the HCIP predominantly comes from state funding streams (Community Catalyst, 2009). In 2009, the governor recommended allocating **$126 million** to the HCI fund in the FY 2010-11 state budget (Indiana State Budget Agency, 2009). Much of what Indiana currently allocates for hospital indigent care would be saved under health insurance reform. All individuals below 133 percent of the FPL would qualify for Medicaid and those above that threshold would be eligible to obtain subsidized insurance through the exchange, at no cost to the state.

- **Hidden Tax**: Indiana's hospitals and other health care providers also shoulder much of the burden of the state's uncompensated care.[31] Much of this cost is then shifted to those who have private health insurance in the form of higher prices for health care services. As a result of this uncompensated care, private health insurance premiums are higher than they otherwise would be. Health insurance reform would reduce this "hidden tax" that individuals

[31] Hospitals in Indiana incurred $342 million in uncompensated care costs in 2003 (U.S. Government Accountability Office, 2005).

with private health insurance pay for uncompensated care for the uninsured. This is of particular importance to Indiana because the state and its local governments help pay for health insurance for many of their 339,787 full-time equivalent employees. We estimate that the hidden cost of uncompensated care costs the state of Indiana and its local governments **$29.5 million** a year in the form of higher employee health insurance premiums.[32]

Additional savings may come from the Children's Health Insurance Program (CHIP). The state of Indiana currently spends **$36.2 million** on CHIP coverage (Kaiser Family Foundation, 2009) for children in families with incomes up to 200 percent of the FPL (RWJF, 2009). Under the current draft of reform legislation, children in families with incomes above 133 percent of the FPL may transition to equivalent, federally-financed coverage through the national health insurance exchange, potentially allowing the state to save a considerable amount of the costs of this program. However, CEA does not include savings on CHIP in bottom line calculations of net state savings from health insurance reform, because transitioning children from CHIP to equivalent federal coverage would be subject to approval by the Secretary of Health and Human Services, and may not occur in all states.

The discussion above has highlighted some of the most important examples of state and local financing of care for the uninsured, though the list is by no means intended to be comprehensive. Instead, it is a lower bound on the savings that state and local governments would realize as a result of health insurance reform. Added together, we estimate that Indiana would see at least **$338 million** in savings in existing programs and in reduced health insurance premiums for state and local employees as a result of health insurance reform.

*B. A Snapshot of Health Insurance Coverage for Non-Elderly Residents of Indiana*

A brief snapshot of insurance coverage in the state helps illustrate the fiscal and coverage impact of national health insurance reform. Table 1 shows the insurance status of Indiana's non-elderly residents, broken down by poverty status and by age groups. These estimates suggest that there are roughly 211,000 uninsured adults and 34,000 uninsured children in Indiana with family incomes below 133 percent of the FPL.

**Table 1: Total Estimated Non-Elderly Population of Indiana**

| | Poverty Status | Uninsured | Private Insurance | Medicaid | Medicare, VA, or TRICARE |
|---|---|---|---|---|---|
| Adults (19-64) | ≥ 133% FPL | 443,780 | 2,700,676 | 50,330 | 152,716 |
| | < 133% FPL | 210,607 | 113,573 | 117,548 | 45,474 |
| Children (18 and under) | ≥ 133% FPL | 75,810 | 1,036,075 | 156,813 | 20,878 |
| | < 133% FPL | 33,777 | 76,753 | 258,794 | 14,217 |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. Number of observations in the CPS for Indiana: 1,783.

As the table also shows, the majority (68 percent) of the uninsured in Indiana have incomes above 133 percent of the FPL, and would therefore qualify for health insurance through the

[32] Based on calculation that 13.4 percent of Indiana's employment is in state and local government.

exchange rather than through Medicaid. The state of Indiana would not be responsible for any of the financing for this group.

*C. Estimated Costs to the State of Indiana from the Medicaid Expansion*

Table 2 lists the estimated number of legal, non-elderly residents in Indiana with incomes of less than 133 percent of the FPL who would become eligible for Medicaid under the proposed legislation. The table also presents the projected costs of extending Medicaid to these individuals. These estimates suggest that the total cost of this expansion is approximately $623 million per year. With an FMAP of 90 percent, the cost to the state would be **$62 million.** We consider a 90 percent FMAP because it is the one scheduled to take effect in 2017 in current draft legislation, though we recognize that this could change as the legislation moves forward.

**Table 2: Uninsured, Low-Income, Legal, and Non-Elderly Population of Indiana**

| | Number of Legal Uninsured Below 133% FPL | Cost of Medicaid Expansion ($ millions) | Cost per New Enrollee | State Population | Cost to State with 90% FMAP ($ millions) |
|---|---|---|---|---|---|
| Adults (19-64) | 189,296 | $563 | $2,974 | 6,345,389 | $62 |
| Children (18 and under) | 31,643 | $60 | $1,898 | | |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of health insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. These data exclude undocumented residents; estimates come from Passel and are described in the appendix.

*D. Bottom Line for Indiana*

Table 3 shows the net impact for the Indiana state budget of health insurance reform. It shows the likely cost of Medicaid expansion under three FMAP matching rates – current, 90 percent, and 100 percent. It then shows the identifiable savings from reducing uncompensated care. And as the following table shows, those savings would more than offset the cost of the Medicaid expansion described above even if the current FMAP of 65.93 percent was used.[33]

[33] CEA recognizes that not all of the costs from some of these programs will be saved under health insurance reform, and thus our calculations are not exact. State and local governments retain the discretion to offer subsidized care programs to their residents. Additionally, some of the individuals covered by these programs are undocumented immigrants who would not obtain health insurance as a result of reform. However, given that these programs analyzed here are not exhaustive of all uncompensated care spending in the state, this table is meant to be illustrative of a conservative estimate of the potential cost savings Indiana can expect to see from health insurance reform.

| Table 3: Financial Impact of Health Insurance Reform on State and Local Governments in Indiana ($ millions) | | | |
|---|---|---|---|
| Component | Current FMAP | 90% FMAP | 100% FMAP |
| Medicaid Expansion | -212.3 | -62.3 | -0.0 |
| Healthy Indiana Plan | +154.8 | +154.8 | +154.8 |
| ICHIA | +15 | +15 | +15 |
| Tax Credit | +12.2 | +12.2 | +12.2 |
| HCIP | +126 | +126 | +126 |
| Hidden Tax | +29.5 | +29.5 | +29.5 |
| Net Effect for Indiana | +125.2 | +275.2 | +337.5 |

This table understates the benefits to the state of Indiana and its local governments for at least three additional reasons. First, it does not include savings that would result from reductions in other state and local programs not listed above that finance health care for the uninsured. Second, it ignores the increase in tax revenue that would result from reform-induced increases in the efficiency of the labor market, including a reduction in "job lock." And finally, it does not include the benefits of reductions in health care spending that would result from more coordinated care. At present, many individuals transition in and out of health insurance, leading to inefficient care delivery including more care in emergency rooms.

## References

Community Catalyst. "Free Care Compendium: Indiana." Accessed August 14, 2009. http://www.communitycatalyst.org/projects/hap/free_care?id=0014.

Indiana Comprehensive Health Insurance Association. "Statement of Net Assets." January 2008. https://www.onlinehealthplan.com/content/html/acs/12/01_Jan_08.pdf.

Indiana Family and Social Services Administration. "Hoosier Healthwise Health Care Program." Accessed August 14, 2009. http://www.in.gov/fssa/ompp/2544.htm.

Indiana Legislative Services Agency. Office of Fiscal and Management Analysis. "Fiscal Impact Statement." May 14, 2007. http://www.in.gov/legislative/bills/2007/PDF/FISCAL/HB1678.008.pdf.

Indiana State Budget Agency. Office of Management and Budget. "FY 2010-11 Budget Recommendations." January 8, 2009. http://www.in.gov/sba/files/as_2009_Pres_to_BC_20090108.pdf.

Kaiser Family Foundation. State Health Facts. "Medicaid & CHIP." Accessed August 14, 2009. http://www.statehealthfacts.org/comparetable.jsp?ind=235&cat=4.

National Conference of State Legislatures. "State Health Programs to Cover the Uninsured." July 2009. http://www.ncsl.org/IssuesResearch/Health/StateHealthProgramsToCoverTheUninsured2009/tabid/13878/Default.aspx#id.

Robert Wood Johnson Foundation. State Coverage Initiatives. "Indiana: Coverage Strategies." Accessed August 14, 2009. http://www.statecoverage.org/node/95/state_strategies.

State University of New York. The Nelson A. Rockefeller Institute of Government. Health Policy Research Center. "State Financing for Health Coverage Initiatives: Observations and Options." June 2009. http://www.rockinst.org/pdf/health_care/2009-06-03-HPRC_State_Financing.pdf.

U.S. Government Accountability Office. "Nonprofit, For-Profit, and Government Hospitals: Uncompensated Care and Other Community Benefits." Testimony of Comptroller David M. Walker before the House Committee on Ways and Means, May 26, 2005.

## IOWA

Health insurance reform as currently proposed in both the House Tri-Committee and in the Senate HELP Committee would ensure that virtually all Americans receive health insurance. This memo explores the likely effects of this reform on the budget of the state of Iowa and its local governments.

Iowa and its local governments subsidize individuals to obtain health insurance and provide direct services to the uninsured. In addition, the state and local governments indirectly pay for uncompensated care through higher insurance premiums for government employees. On each of these fronts, the reform would save money for the state and local governments. On the other hand, the reform calls for an expansion in Medicaid for all individuals under 133 percent of the federal poverty line (FPL).

Our findings, which we summarize below, indicate that Iowa and its local governments currently spend at least **$45 million** on care for the uninsured. Because this is a lower bound of such expenditures, we estimate that at least that much would be saved by current reform proposals. We estimate that the total annual cost of the Medicaid expansion to Iowa's **90,745** low-income uninsured individuals would be $200 million (in 2007 dollars).[34] After initially sharing none of that cost, Iowa's share with a 90 percent FMAP would be **$20 million**. Thus health insurance reform would provide a substantial financial benefit to the state of Iowa and its local governments.

*A. Current State and Local Expenditures on Health Care for the Uninsured*

The state and local governments of Iowa would benefit fiscally from health insurance reform because they currently spend money encouraging individuals to become insured, treating the uninsured, and providing uncompensated care. Health insurance reform would reduce each of these costs, and would have additional financial benefits for Iowa's private hospitals and other health care providers, which bear heavy costs for providing care to Iowa's residents who are not insured. These and other uncompensated care costs are passed on to the privately insured, including the employees of state and local governments in Iowa.

The following is a summary of *some* of the savings that Iowa and its local governments could expect from health insurance reform.

- **IowaCare**: IowaCare is a Medicaid expansion program created with a Section 1115 waiver. The program provides a limited set of Medicaid benefits to uninsured adults ages 19 through 64 with incomes up to 200 percent of the FPL (RWJF, 2009). In 2010, it is estimated that state funding for IowaCare will total **$33.6 million** (Iowa Department of Human Services, 2009). It is reasonable to assume that under health insurance reform Iowa would recover a substantial amount of what they currently spend on the IowaCare program. For example, individuals currently enrolled in IowaCare with incomes above 133 percent of the FPL would

[34] The estimated number of low-income uninsured individuals excludes undocumented immigrants, who would not be eligible for Medicaid as a result of health insurance reform.

be eligible for subsidized health insurance through the national health insurance exchange. It would cost the state nothing to insure these individuals.

- **Hidden Tax**: Iowa's hospitals and other health care providers also shoulder much of the burden of the state's uncompensated care.[35] Much of this cost is then shifted to those who have private health insurance in the form of higher prices for health care services. As a result of this uncompensated care, private health insurance premiums are higher than they otherwise would be. Health insurance reform would reduce this "hidden tax" that individuals with private health insurance pay for uncompensated care for the uninsured. This is of particular importance to Iowa because the state and its local governments help pay for health insurance for many of their 182,356 full-time equivalent employees. We estimate that the hidden cost of uncompensated care costs the state of Iowa and its local governments **$11.2 million** a year in the form of higher employee health insurance premiums.[36]

Additional savings may come from the Children's Health Insurance Program (CHIP). The state of Iowa currently spends **$20.2 million** on CHIP coverage (Kaiser Family Foundation, 2009) for children in families with incomes up to 300 percent of the FPL (RWJF, 2009). Under the current draft of reform legislation, children in families with incomes above 133 percent of the FPL may transition to equivalent, federally-financed coverage through the national health insurance exchange, potentially allowing the state to save a considerable amount of the costs of this program. However, CEA does not include savings on CHIP in bottom line calculations of net state savings from health insurance reform, because transitioning children from CHIP to equivalent federal coverage would be subject to approval by the Secretary of Health and Human Services, and may not occur in all states.

The discussion above has highlighted some of the most important examples of state and local financing of care for the uninsured, though the list is by no means intended to be comprehensive. Instead, it is a lower bound on the savings that state and local governments would realize as a result of health insurance reform. Added together, we estimate that Iowa would see at least **$45 million** in savings in existing programs and in reduced health insurance premiums for state and local employees as a result of health insurance reform.

*B. A Snapshot of Health Insurance Coverage for Non-Elderly Residents of Iowa*

A brief snapshot of insurance coverage in the state helps illustrate the fiscal and coverage impact of national health insurance reform. Table 1 shows the insurance status of Iowa's non-elderly residents, broken down by poverty status and by age groups. These estimates suggest that there are roughly 95,000 uninsured adults and 11,000 uninsured children in Iowa with family incomes below 133 percent of the FPL.

[35] Iowa's hospitals incurred $465 million in uncompensated care costs in 2005 (Iowa Hospital Association, 2005).
[36] Based on calculation that 15.0 percent of Iowa's employment is in state and local government

| Table 1: Total Estimated Non-Elderly Population of Iowa | | | | | |
|---|---|---|---|---|---|
| | **Poverty Status** | **Uninsured** | **Private Insurance** | **Medicaid** | **Medicare, VA, or TRICARE** |
| Adults (19-64) | ≥ 133% FPL | 141,802 | 1,340,990 | 49,661 | 70,152 |
| | < 133% FPL | 94,539 | 53,758 | 52,969 | 18,589 |
| Children (18 and under) | ≥ 133% FPL | 17,191 | 475,417 | 92,127 | 13,025 |
| | < 133% FPL | 10,744 | 14,955 | 115,217 | 6,477 |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. Number of observations in the CPS for Iowa: 2,202.

As the table also shows, the majority (60 percent) of the uninsured in Iowa have incomes above 133 percent of the FPL, and would therefore qualify for health insurance through the exchange rather than through Medicaid. The state of Iowa would not be responsible for any of the financing for this group.

*C. Estimated Costs to the State of Iowa from the Medicaid Expansion*

Table 2 lists the estimated number of legal, non-elderly residents in Iowa with incomes of less than 133 percent of the FPL who would become eligible for Medicaid under the proposed legislation. The table also presents the projected costs of extending Medicaid to these individuals. These estimates suggest that the total cost of this expansion is approximately $200 million per year. With an FMAP of 90 percent, the cost to the state would be **$20 million.** We consider a 90 percent FMAP because it is the one scheduled to take effect in 2017 in current draft legislation, though we recognize that this could change as the legislation moves forward.

| Table 2: Uninsured, Low-Income, Legal, and Non-Elderly Population of Iowa | | | | | |
|---|---|---|---|---|---|
| | **Number of Legal Uninsured Below 133% FPL** | **Cost of Medicaid Expansion ($ millions)** | **Cost per New Enrollee** | **State Population** | **Cost to State with 90% FMAP ($ millions)** |
| Adults (19-64) | 81,075 | $184 | $2,264 | 2,988,046 | $20 |
| Children (18 and under) | 9,670 | $17 | $1,736 | | |

Note: Data from the March 2008 CPS. Uninsured individuals report having no form of health insurance. See the technical appendix for a further discussion of the data used and CEA's methodology with respect to poverty and insurance status classification. These data exclude undocumented residents; estimates come from Passel and are described in the appendix.

*D. Bottom Line for Iowa*

Table 3 shows the net impact for the Iowa state budget of health insurance reform. It shows the likely cost of Medicaid expansion under three FMAP matching rates – current, 90 percent, and 100 percent. It then shows the identifiable savings from reducing uncompensated care. As the following table shows, those savings would more than offset the cost of the Medicaid expansion described above if a 90 percent FMAP were in effect, as is proposed in current draft legislation.

Moreover, these other savings would offset more than 60 percent of the cost even if the current FMAP of 63.51 percent was used.[37]

**Table 3: Financial Impact of Health Insurance Reform on State and Local Governments in Iowa ($ millions)**

| Component | Current FMAP | 90% FMAP | 100% FMAP |
|---|---|---|---|
| Medicaid Expansion | -73.1 | -20.0 | -0.0 |
| IowaCare | +33.6 | +33.6 | +33.6 |
| Hidden Tax | +11.2 | +11.2 | +11.2 |
| Net Effect for Iowa | -28.3 | +24.8 | +44.8 |

This table understates the benefits to the state of Iowa and its local governments for at least three additional reasons. First, it does not include savings that would result from reductions in other state and local programs not listed above that finance health care for the uninsured. Second, it ignores the increase in tax revenue that would result from reform-induced increases in the efficiency of the labor market, including a reduction in "job lock." And finally, it does not include the benefits of reductions in health care spending that would result from more coordinated care. At present, many individuals transition in and out of health insurance, leading to inefficient care delivery including more care in emergency rooms.

[37] CEA recognizes that not all of the costs from some of these programs will be saved under health insurance reform, and thus our calculations are not exact. State and local governments retain the discretion to offer subsidized care programs to their residents. Additionally, some of the individuals covered by these programs are undocumented immigrants who would not obtain health insurance as a result of reform. However, given that these programs analyzed here are not exhaustive of all uncompensated care spending in the state, this table is meant to be illustrative of a conservative estimate of the potential cost savings Iowa can expect to see from health insurance reform.

## References

Iowa Department of Human Services. "Offer 401-HHS-003: Medical Services." Accessed August 14, 2009. http://www.dhs.state.ia.us/docs/10-401-HHS-003B-Medical-Assistance.pdf.

Iowa Hospital Association. "Iowa Hospital Association Policy Statement on Hospital Billing and Collection Practices." October 5, 2005. http://www.ihaonline.org/govrelations/finance/billing/IHA%20statement.pdf.

Kaiser Family Foundation. State Health Facts. "Medicaid & CHIP." Accessed August 14, 2009. http://www.statehealthfacts.org/comparetable.jsp?ind=235&cat=4.

Robert Wood Johnson Foundation. State Coverage Initiatives. "Iowa: Coverage Strategies." Accessed August 14, 2009. http://www.statecoverage.org/node/96/state_strategies.