# Exhibit 35

# What Is the Impact of the Patient Protection and Affordable Care Act (PPACA) on the States?

## Timely Analysis of Immediate Health Policy Issues

June 2010

John Holahan and Stan Dorn

The main components of PPACA that will affect state governments will not be implemented until 2014, when Medicaid coverage will substantially expand in most states. Federal funds will pay most of the resulting new costs, but there will be modest increases in state Medicaid spending on adults with incomes up to 133 percent of the federal poverty level (FPL). These state cost increases range from $21.1 billion to $43.2 billion over the 2014-2019 period,[1] with the difference depending on the extent of beneficiary participation. These represent increases in state spending of 1.4 to 2.9 percent relative to what states would spend on such adults in the absence of reform. States should be able to manage, since the economy almost certainly will be substantially stronger by 2014 and PPACA will generate new federal payments in other areas that will significantly exceed the rise in state Medicaid spending on low-income adults. Taking into account the provisions that affect children and Medicaid beneficiaries above 133 percent of FPL, the CMS Actuary projects that, through 2019, PPACA will cut net state spending on Medicaid and the Children's Health Insurance Program (CHIP) by $33 billion.[2] An additional $70 billion or more in state savings could result from shifting state and locally funded uncompensated care into federally matched Medicaid, as explained below. The impact of PPACA on the states is described below:

> *The health reform law would mean a small increase in state spending on Medicaid through 2019 but would allow states to reduce current spending in several areas.*

### *State Medicaid Costs for Newly Eligible Adults*

Beginning in 2014, Medicaid will cover adults with incomes up to 133 percent of FPL. For the newly eligible, the federal government will pay 100 percent of health care costs between 2014 and 2016. In 2017, this percentage will drop to 95 percent, and continue to decline until 2010—falling to 94 percent in 2018, 93 percent in 2019, and 90 percent in 2020 and thereafter. The states with the largest number of new eligibles will be those with limited coverage today, generally in the South and West. Medicaid enrollment increases will be the greatest in these states, as will increases in state and federal spending. The federal government will bear the overwhelming share of new spending on the new eligibles.[3]

### *State Medicaid Costs for Currently Eligible Individuals*

If participation increases among people who qualify for Medicaid under current law, states will pay their current share of the resulting costs. The Congressional Budget Office (CBO) expects that almost all of the increased Medicaid coverage will occur among the newly eligible, so this cost is likely to be modest in most states. Enrollment may increase further than expected because of PPACA's individual mandate, PPACA's streamlining of enrollment and retention procedures and outreach by advocacy groups and providers. Even with higher participation rates, the increased cost to states will be limited. States that will be affected the most from increased participation among those who are currently eligible are those with more current eligibles today—for example, states like New York, Massachusetts, Connecticut and California, which have already expanded coverage to parents at relatively high income levels, in some cases above 133 percent of FPL.

### *Section 1115 Waiver States*

Seven states have expanded coverage to childless adults through Section 1115 waiver programs with benefit packages that meet federal standards. To avoid disadvantaging these states, PPACA provides an expanded match rate for their childless adults, which increases over time and by 2020 is the same as the matching rate for new eligibles.

### *Other State Costs*

State administrative costs will rise because of increased applications and enrollment. The federal government pays just 50 percent of administrative costs, but these are small relative to medical benefits. Also, PPACA requires states to raise Medicaid provider payment rates to Medicare levels in 2013 and 2014 for primary care provided by pediatricians, internists, and general and family practitioners. In these two years, the fee increase will be fully paid by the federal government. If Congress does not continue this funding and political pressure forces states to retain the higher reimbursement rates, states will need to pay their share of these costs, which varies for new and current eligibles. CBO estimates that the federal cost would amount to $8.2 billion for 2013-2017.[4] Costs could be higher if states also decide to raise fees for more services and for other providers.

### *Savings for States as a Result of PPACA*

For several reasons, PPACA will generate significant savings for states. First, some states provide poor or near-poor adults with entirely state-funded health coverage, and other states support such adults' uncompensated care provided by local hospitals and clinics. In either case, federal Medicaid dollars will replace much of this state and local spending, generating savings. The amount states now spend on either state-funded health coverage or uncompensated care is substantial. In previous work, Hadley, Holahan and colleagues estimated that state spending on the uninsured in 2008 amounted to $17.2 billion.[5] This would obviously be a much larger sum by 2019. Inflating this amount by expected health care cost growth, and assuming that states could save just half of the cost,[6] state and local governments would save approximately $70-80 billion over the 2014-2019 period by shifting this spending into federally matched Medicaid, clearly exceeding the new cost to states of the Medicaid expansion for adults up to 133 percent of FPL.

Second, states could also stop covering many current Medicaid beneficiaries who have incomes above 133 percent of FPL, such as many high-cost medically needy beneficiaries, and move them into exchanges, where they would be eligible for federal tax credits with no state matching payments. This could result in significant savings.

Third, states could save on CHIP, which has a complex fate under PPACA. States must continue covering children eligible for Medicaid and CHIP, but CHIP funding is guaranteed only through FY 2015. In many states, children ages 6-17 with family incomes between 100 and 133 percent of FPL will move from CHIP to Medicaid, where they will join younger children who currently receive mandatory Medicaid coverage up to 133 percent of FPL; the matching rate states will receive for these new Medicaid children is uncertain. Beginning in FY 2016, states will receive a 23 percentage point increase in federal matching rates for CHIP, up to a cap of 100 percent. This reduces state costs but increases the likelihood that states will use up their allocations, after which CHIP children can move into the exchange and qualify for tax credits. Overall, state financial responsibilities for CHIP should fall significantly, whether Congress ends CHIP funding after 2015 and children shift into purely federally funded exchanges or Congress continues the program while retaining PPACA's higher federal matching rates for 2016 and later years.

Fourth, PPACA helps states achieve savings with their elderly and disabled populations. For example, PPACA permits greater integration of funding and services for dual eligibles. If efficiencies result, this should generate savings to both federal and state governments. PPACA also increases states' ability to shift seniors and people with disabilities from nursing homes to home- and community-based services via a state plan amendment rather than a waiver. For those who are newly eligible because of higher Medicaid income limits, states could access PPACA's enhanced federal matching rate. Finally, the CLASS Act may modestly reduce projected Medicaid spending for long-term care, since long-term care insurance will prevent some people from qualifying for Medicaid by "spending down" their resources on out-of-pocket nursing home payments.

Fifth, some states may spend less on the coverage they provide to their employees and retirees. For example, PPACA offers $5 billion in subsidized reinsurance for early retirees (including those formerly employed by states and localities), so long as the employers offering coverage implement measures to reduce chronic care costs.

Finally, states that currently cover parents between 133 and 200 percent of FPL can, in effect, shift these parents to full federal funding by implementing PPACA's "basic health program" option, through which states convert PPACA's tax credits to funding for contracts with health plans serving adults in this income range. States could alternatively just end

coverage and have these parents purchase insurance through exchanges, but using the basic health program option would save these parents premiums and cost sharing obligations, though it may limit access to care because provider payment rates are likely to be lower.

In sum, states as a whole can probably achieve savings that significantly exceed their increased costs for low-income Medicaid adults. However, the precise balance between savings and costs will vary by state.

*Equity Issues*

Some states will argue that PPACA unfairly penalizes their prior generosity. For example, states that previously covered low-income parents up to relatively high income levels will continue to receive standard matching rates for those parents. By contrast, parents with the identical incomes will qualify for substantially increased federal matching rates in states that did not previously offer them Medicaid. Specifically, states with less generous current Medicaid eligibility for parents, generally in the South and West, will see much larger increases in their effective matching rates for total Medicaid spending than will states with broader current coverage. Nonetheless, states that were unusually generous with their prior coverage of childless adults will still come out ahead financially, as explained above.

*Medicaid Disproportionate Share (DSH) Payments*

The CBO baseline projects federal DSH spending of $9.9 billion in 2014 growing to $11.0 billion in 2019. Because PPACA will expand coverage, uncompensated care amounts will fall, thus allowing reductions in DSH payments of $0.5 billion in 2014, $0.6 billion in 2015, $0.6 billion in 2016, $1.8 billion in 2017, $5 billion in 2018, $5.6 billion in 2019 and $4 billion in 2020. The Department of Health and Human Services will decide how DSH reductions are distributed so state allotments reflect progress covering the uninsured.

*Income-Related Subsidies*

States will also benefit from the federal tax credits that will allow people to purchase health insurance through exchanges. Individuals will be eligible for subsidies that are keyed to a benchmark plan within the state's health insurance exchange. Subsidies are generous at low income levels and phase out as incomes increase. These subsidies will provide an amount of federal money to each state's economy that is roughly comparable to new federal payments for Medicaid. These dollars do not go directly to states, though they can substitute for some current state spending (as noted above), but will go to insurance plans on behalf of low- and moderate-income residents of these states. To the extent the subsidies increase disposable income and permit households to shift their spending from health care to other goods and services, they should have a positive effect on state economies and tax revenues. It is expected that a disproportionate share of these tax credits will go to the states in the South and West.

*The Effects of Financing*

Clearly, health reform will not just mean financial gain. The dollars that finance Medicaid expansion and tax credits ultimately come from providers (who face lower Medicare payments) and higher income individuals (who face increased taxes on payroll and unearned income). These providers and individuals are located in the same states that benefit from an influx of federal dollars to cover the previously uninsured. Thus, while PPACA generates huge gains to state governments as well as the economic growth that results from higher health care spending, the losses to providers and the federal taxes paid by various firms and individuals will have somewhat offsetting effects. It seems quite likely that the net gains to state governments and state economies will be greater in the South and many Western states, and the revenue contributions will be greater in the Northeast and some Midwestern states.

## Notes

[1] Holahan, J. and I. Headen. 2010. "Medicaid Coverage and Spending in Health Reform: National and State-By-State Results for Adults at or Below 133% FPL." Kaiser Commission on Medicaid and the Uninsured, May 26.

[2] Foster, R. S. 2010. "Estimated Financial Effects of the "Patient Protection and Affordable Care Act," as Amended," Memorandum, April 22. Baltimore, MD: Centers for Medicare and Medicaid Services. http://www.cms.gov/ActuarialStudies/Downloads/PPACA_2010-04-22.pdf.

[3] Holahan and Headen. 2010.

[4] Congressional Budget Office. 2010. Letter to the Honorable Nancy Pelosi providing estimates of the spending and revenue effects of the reconciliation proposal. Washington, DC: Congressional Budget Office, March 20.

[5] Hadley, J., J. Holahan, T. Coughlin, and D. Miller. 2008. "Covering the Uninsured In 2008: Current Costs, Sources of Payment, And Incremental Costs." *Health Affairs* 27(5): w399-w415.

[6] In truth, most of this spending is almost certainly for adults ineligible for Medicaid today, who would qualify for federal funding that begins at 100 percent of costs and gradually declines to 90 percent, as explained above.

*The views expressed are those of the authors and should not be attributed to any campaign or to the Robert Wood Johnson Foundation, or the Urban Institute, its trustees, or its funders.*

## About the Authors and Acknowledgements

John Holahan, Ph.D., is director and Stan Dorn is a senior fellow at the Health Policy Center of the Urban Institute.

This research was funded by the Robert Wood Johnson Foundation. The authors would like to thank Linda Blumberg for her valuable comments and suggestions.

## About the Urban Institute

The Urban Institute is a nonprofit, nonpartisan policy research and educational organization that examines the social, economic, and governance problems facing the nation.

## About the Robert Wood Johnson Foundation

The Robert Wood Johnson Foundation focuses on the pressing health and health care issues facing our country. As the nation's largest philanthropy devoted exclusively to improving the health and health care of all Americans, the Foundation works with a diverse group of organizations and individuals to identify solutions and achieve comprehensive, meaningful, and timely change. For more than 35 years, the Foundation has brought experience, commitment, and a rigorous, balanced approach to the problems that affect the health and health care of those it serves. When it comes to helping Americans lead healthier lives and get the care they need, the Foundation expects to make a difference in your lifetime. For more information, visit www.rwjf.org.