**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Pensacola Division**

**STATE OF FLORIDA, by and through**
**Bill McCollum, et al.,**

      **Plaintiffs,**

**v.**                                      **Case No.: 3:10-cv-91-RV/EMT**

**UNITED STATES DEPARTMENT OF**
**HEALTH AND HUMAN SERVICES,**
**et al.,**

      **Defendants.**
_____/

**PLAINTIFFS' RESPONSE TO**
**DEFENDANTS' STATEMENT OF FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Rule 56, Federal Rules of Civil Procedure, and Rule 56.1(A), Rules of the United States District Court for the Northern District of Florida, Plaintiffs hereby submit this Response to Defendants' Statement of Facts As to Which There Is No Genuine Issue [No. 82-2] ("DSOMF"). As shown below and in Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, Defendants' asserted facts are either legally or factually irrelevant to the issues presented, or are demonstrably lacking in support or credibility, and thus fail to give rise to any genuine issue of material fact. Consequently, Defendants' asserted facts cannot prevent entry of summary judgment in Plaintiffs' favor on their facial constitutional challenge to the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) ("ACA"). True and correct copies of all referenced exhibits (and attachments thereto) are contained in Plaintiffs' accompanying Supplemental Appendix.

**Preliminary Statement:**

Plaintiffs begin by taking the opportunity to respond to preliminary statements included in DSOMF.

Defendants cite *Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005) out of context in suggesting that this Court's only task is to determine whether Congress had a "'rational basis' to conclude that the class of activities it undertook to regulate, when taken in the aggregate, has a substantial effect on interstate commerce."   DSOMF at 1.

Plaintiffs' citation of authority to the effect that "legislative facts" are not subject to courtroom proof is inapposite.  This case does not concern a challenge to legislative facts.  The economic consequences of some individuals not having healthcare insurance are immaterial to Plaintiffs' core argument in support of Count One, which is that whatever the alleged economic consequences of a particular individual's failure to have healthcare coverage, regulation of this lack of insurance is beyond the constitutional limits of the Commerce Clause.

As explained by the Supreme Court, the presence of economic activity is a key limit on Congress's power to regulate under the Commerce Clause.  *See United States v. Lopez*, 514 U.S. 549, 558 (1995) (demarcating "three broad categories of *activity* that Congress may regulate under its Commerce Clause power").  Whether being uninsured is subject to the commerce power as is a legal, and not a factual, question going directly to Congress's authority to enact the Individual Mandate.  Congress may not evade the constitutional limits on its power, or escape judicial review, by dressing its legal conclusions in the garb of legislative "facts."  *E.g.*, ACA § 1501(a)(2)(A) (finding that the Individual Mandate regulates "activity that is commercial and economic in nature: economic and financial decisions about ... health insurance").  Rather, the limits of Congress's authority under the Constitution are a question of law upon which the

judiciary, not Congress, must have the last word.  *See generally Cooper v. Aaron,* 358 U.S. 1, 18,

(1958) (noting the "permanent and indispensable feature of our constitutional system" that "the

federal judiciary is supreme in the exposition of the law of the Constitution").  *See also*

*Lamprecht v. FCC*, 958 F.2d 382, 392 n.2 (D.C. Cir. 1992) (Thomas, J.) ("If a legislature could

make a statute constitutional simply by "finding" that black is white or freedom, slavery, judicial

review would be an elaborate farce.").

Defendants also are incorrect in stating that the ACA's Medicaid Amendments' costs to

the states are immaterial to the resolution of Count Four at summary judgment.  Plaintiff States'

sovereignty will be unconstitutionally impaired if they are forced to comply with the ACA's

Medicaid provisions, quite apart from whether or not this compulsion is sufficient to meet the

standards of *South Dakota v. Dole*, 483 U.S. 203 (1987).  *See* PMSJ [Doc 80-1] at 39

("[R]emaining in the ACA Medicaid program will encumber the Plaintiff States with such

massive new expenses and responsibilities that their viability as sovereigns will be severely

threatened") & 42 ("Having to comply with these requirements will fundamentally undermine

Plaintiff States' abilities to function as sovereigns.").  The ACA's Medicaid Amendments' costs

to the States are therefore material to the Court's resolution of Count Four at summary judgment.

**Responses To Defendants' Asserted Facts:**

For the convenience of the Court, Plaintiffs have followed the paragraph numbering and

organization of Defendants' submission.  Plaintiffs respond individually to Defendants' asserted

material undisputed facts as follows:

## I.      Defendants' Asserted Facts Pertaining To The Minimum Coverage Provision

1.      Congress gave detailed consideration to the structure of the reforms of the interstate
health insurance market that it enacted in the ACA, as shown by the more than fifty hearings that

it held on the subject in the 110th and 111th Congresses alone. *See* H.R. Rep. No. 111-443, pt. II, at 954-68 (2010) (Ex. 1)

> **Response:** This statement is disputed. Plaintiffs do not agree with Defendants' characterization of the genesis of the ACA.  As noted by this Court, Congress's consideration of the ACA was widely criticized for being "drafted behind closed doors and pushed through Congress by parliamentary tricks, late night weekend votes, and last minute deals among members of Congress who did not read or otherwise know what was in it."  *See* Mem.Op. [Doc. 79] at 2.  H.R. Rep. No. 111-443, pt. II speaks for itself and Plaintiffs decline to characterize                                    its                                    contents.

2.       In 2009, the United States spent more than an estimated 17 percent of its gross domestic product on health care. ACA §§ 1501(a)(2)(B), 10106(a).

> **Response:** Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, except to admit that it is contained in the cited ACA sections. However, the statement is irrelevant and immaterial to the constitutionality of the Individual Mandate.

3.       Notwithstanding these expenditures, 45 million people — an estimated 15 percent of the population — went without health insurance for some portion of 2009. Absent the new statute, that number would have climbed to 54 million by 2019. Cong. Budget Office ("CBO"), *Key Issues in Analyzing Major Health Insurance Proposals* 11 (Dec. 2008) [hereinafter *Key Issues*] (Ex. 2); *see also* CBO, *The Long-Term Budget Outlook* 21-22 (June 2009) (Ex. 3).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, however they are irrelevant and immaterial to the constitutionality of the Individual Mandate.  Cong. Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals*, (Dec. 2008) ("*Key Issues*") and CBO, *The Long Term Budget Outlook* (June 2009) speak for themselves and Plaintiffs decline to characterize their contents.

4.       The pervasive lack of insurance occurred because "[t]he market for health insurance . . . is not a well-functioning market." Council of Economic Advisers ("CEA"), *The Economic Case for Health Care Reform* 16 (June 2009) (submitted into the record for *The Economic Case for Health Reform: Hearing Before the H. Comm. on the Budget*, 111th Cong. 5 (2009)) [hereinafter *The Economic Case*] (Ex. 4).

> **Response**: It is undisputed that the President's Council of Economic Advisers believes that the market for health insurance "is not a well-functioning market." However, as "Congress has recognized: 'By most measures, we have the best medical care system in the world.'" Mem.Op. at 3.  Plaintiffs dispute the implication that there is a causal connection between the lack of insurance and any market failures identified by CEA.  Plaintiffs also dispute Defendants' characterization that there is a "pervasive lack of insurance" because of the "market failures" identified by CEA.  CEA refers simply to "a large number of individuals and families without health insurance."  In addition, the averments in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate.  Council of

Economic Advisers ("CEA"), *The Economic Case for Health Care Reform* (June 2009) ("*The Economic Case*") and the record of *The Economic Case for Health Reform: Hearing Before the H. Comm. on the Budget*, 111th Cong. (2009).

5.      With rare exceptions, individuals cannot make a personal choice to eliminate the current or potential future consumption of health care services. Nor can individuals reliably predict whether they or their families will need health care. They may go without health care for some time, then unexpectedly suffer a debilitating injury or disease and suddenly incur high or even catastrophic health care costs. *See* J.P. Ruger, *The Moral Foundations of Health Insurance*, 100 Q.J. Med. 53, 54-55 (2007) (Ex. 5). In this market, everyone is a participant because everyone, in one way or another, is faced with managing the financial risks associated with unpredictable future health care costs. Katherine Baicker & Amitabh Chandra, *Myths and Misconceptions About U.S. Health Insurance*, 27 Health Affairs w533, w534 (2008) (Ex. 6); Jonathan Gruber, *Public Finance and Public Policy* 442-28 (3d ed. 2009) (Ex. 7).

> **Response**: The averments in this paragraph constitute Defendants' characterizations of the undisputed facts that a majority of human beings will, at some point in their lives, seek and/or receive medical attention, and that life is uncertain.  Plaintiffs dispute Defendants' claims that everyone is a participant in the market for medical services or health care because they must "manage[] the financial risks associated with unpredictable future health care costs."  This constitutes Plaintiffs characterization of the above-referenced statements and also constitutes a legal conclusion for purposes of this case.  Finally, the authorities cited by Defendants are without foundation and do not support their contention, but merely offer explanations of the insurance industry in general and healthcare insurance industry in particular.

6.      When a person does fall ill, he is effectively assured of at least a basic level of emergency care, without regard to his insured status. *See, e.g.*, Fla. Stat. § 395.1041 (2004) ("The Legislature finds and declares it to be of vital importance that emergency services and care be provided by hospitals and physicians to every person in need of such care"); Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd (hospitals that participate in Medicare and offer emergency services are required to stabilize, or provide an appropriate transfer for, any patient who arrives, regardless of whether he has insurance or otherwise can pay for that care); CBO, *Key Issues*, at 13. In addition, most hospitals are nonprofit organizations that "have some obligation to provide care for free or for a minimal charge to members of their community who could not afford it otherwise." *Id.* For-profit hospitals "also provide such charity or reduced-price care." *Id.*

> **Response**: It is undisputed that there are various federal and state requirements that covered hospitals and other healthcare providers treat individuals in need of certain, minimal emergency services.  Plaintiffs, however, dispute the implication that this amounts to a guarantee of free health are services for anyone who "fall[s] ill."  In addition, the averments in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate.  Fla. Stat. § 395.1041 (2004), 42 U.S.C. § 1395dd, and the CBO's *Key Issues* report all speak for themselves.

7.      Because of the availability of this backstop of free care, many persons have an incentive not to obtain insurance, knowing that they will not bear the full cost of their decision to attempt to pay for their health care needs out-of-pocket. *The Economic Case*, at 17; *see also* Bradley Herring, *The Effect of the Availability of Charity Care to the Uninsured on the Demand for Private Health Insurance*, 24 J. of Health Econ. 225, 226 (2005) (Ex. 10).

> **Response**: The averments in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate and are based on authorities that are without foundation.  It is undisputed that the availability of certain, minimal emergency care services could serve as an incentive for some individuals to forgo healthcare insurance coverage. However, Plaintiffs dispute Defendants' implication that this is the only reason, or even a particularly important reason, for being uninsured.  As Defendants' own authority explains in detail, there are several "factors" that lead to people not having healthcare insurance coverage.   The most important of these, according to the President's CEA, is "adverse selection" by insurance companies:
>
>> An insurance company will not price individual health insurance at the average cost of covering the uninsured.  If it did, the individuals who purchased the policy would be disproportionately those who knew they were likely to have high health care costs, and so the company would lose money.  To address adverse selection risks, most insurers use medical underwriting and incorporate a risk premium into the actual price of coverage. As a result, the price of health insurance that a typical person would face in the individual market greatly exceeds the average cost of covering him or her.  Moreover, a significant proportion of individuals may be uninsured because they are denied coverage as a result of medical underwriting.
>
>> *See Economic Case* at 17.
>
> In addition, and significantly, CEA also noted that "[i]mperfections in credit markets reduce the ability of households, especially low-income households, to obtain goods and services with immediate costs but long-term benefits.  Health insurance is a classic example of such a good. Similarly, the uninsured obtain some free medical care through emergency rooms, free clinics, and hospitals, which reduces their incentives to obtain health insurance."  *Id.*  Finally, CEA also noted that "positive externalities" (benefits of healthcare insurance coverage that accrue not to the policyholder but to society in general) "is another force that works in the direction of causing too few individuals and households to have health insurance."  *Id.*

8.      Most individuals make economic decisions whether to attempt to pay for their anticipated health care needs through insurance, or to attempt (often unsuccessfully) to pay out-of-pocket. In making these decisions, individuals weigh the cost of insurance against the cost of their potential out-of-pocket expenses. *See* Mark V. Pauly, *Risks and Benefits in Health Care: The View from Economics*, 26 Health Affairs 653, 657-58 (2007) (Ex. 11). Plaintiff Brown weighs whether purchasing insurance for herself will be a "worthwhile cost of doing business." Am. Compl. ¶ 62.

> **Response**: Plaintiffs dispute the statements in this paragraph that "most individuals make economic decisions whether to attempt to pay for their anticipated health care needs through insurance, or to attempt (often unsuccessfully) to pay out-of-pocket."   This constitutes

Defendants' self-serving characterization of some individuals having, and others lacking, healthcare insurance coverage, and also is a legal conclusion rather than a statement of fact.

Moreover, Defendants' cited authority does not support such a generalized claim, and is without foundation. This paper is not based upon empirical data, but constitutes theoretical discussion of "the economic views of risk" and how that may be applied to individual decision-making about health care. In particular, the author discusses application of the "expected utility" ("EU") model of decision-making in this area, noting that it "is at best a useful caricature describing general tendencies," and that "{i]ts value is really comparative. Does it do a better job of explaining or evaluating decisions in general than some other model, including the null hypothesis that people make choices at random?" 654-55.

It is undisputed that the Individual Mandate will compel Plaintiff Mary Brown, like other NFIB members, "to divert resources from their business endeavors, or otherwise to reorder their economic circumstances, in order to obtain qualifying healthcare coverage, regardless of their own conclusions on whether or not obtaining and maintaining such coverage for themselves and their dependents is a worthwhile cost of doing business." Am. Compl. ¶ 62.

9.     Individuals regularly revisit these economic decisions whether to purchase insurance or attempt to finance their health care needs through another manner. Movement in and out of insured status is "very fluid." Of those who are uninsured at some point in a given year, about 63 percent have coverage at some other point during the same year. CBO, *How Many People Lack Health Insurance and For How Long?* 4, 9 (May 2003) (Ex. 12); *see also* CBO, *Key Issues*, at 11.

Response: Plaintiffs dispute Defendants' characterization of the presence or absence of healthcare insurance as an economic decision and any implication that having or not having healthcare insurance makes individuals constant participants in the healthcare services or healthcare insurance market. Defendants' assertions as to what "individuals" may "regularly" do are speculative, and merely constitute Defendants' characterization of the phenomenon noted by CBO that, in the 1990's, many who did not have healthcare insurance at some point during the year also had such insurance at some other point during the year.

10.    The vast majority of the population — even of the uninsured population — has participated in the health care market by receiving medical services. *See* June E. O'Neill & Dave M. O'Neill, *Who Are the Uninsured?: An Analysis of America's Uninsured Population, Their Characteristics, and Their Health* 20-22 (2009) (Ex. 8) (94 percent of even long-term uninsured have received some level of medical care); *see also* National Center for Health Statistics, *Health, United States, 2009*, at 318 (2010) (for 2007, 62.6 percent of uninsured at a given point in time had at least one visit to a doctor or emergency room within the year) (Ex. 9).

Response: It is undisputed that most individuals will, as some point in their lives, receive medical services. Plaintiffs dispute any inference that this makes anyone who has received (or will receive) healthcare services a constant or continuing participant in the market for health care services or for healthcare insurance.

11.     About 20 percent of the population accounts for 80 percent of health spending, with the sickest one-percent accounting for nearly one-quarter of health expenditures. H.R. Rep. No. 111-443, pt. II, at 990.

 **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, except to admit that it is contained in the cited report.  However, the statement is irrelevant and immaterial to the constitutionality of the Individual Mandate. H.R. Rep. No. 111-443, pt. II speaks for itself.

12.     Insurers have sought to exclude those they deem most likely to incur expenses. *47 Million and Counting: Why the Health Care Marketplace Is Broken: Hearing Before the S. Comm. on Finance*, 110th Cong. 51-52 (2008) (statement of Mark Hall, Professor of Law and Public Health, Wake Forest Univ.) (Ex. 13). That is, they adopt practices designed — albeit imperfectly — to "cherry-pick healthy people and to weed out those who are not as healthy." H.R. Rep. No. 111-443, pt. II, at 990 (internal quotation omitted).

 **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the citied authorities, the first of which is without foundation.  However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

13.     These practices include medical underwriting, or the individualized review of an insurance applicant's health status. This practice is costly, resulting in administrative fees that are responsible for 26 to 30 percent of the cost of premiums in the individual and small group markets.  ACA §§ 1501(a)(2)(J), 10106(a). Medical underwriting yields substantially higher risk-adjusted premiums or outright denial of insurance coverage for an estimated one-fifth of applicants for individual coverage, a portion of the population that is most in need of coverage. CBO, *Key Issues*, at 81.

 **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the citied authorities. However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

14.     Before the ACA, health insurance company practices also included: denial of coverage for those with pre-existing conditions, even minor ones; exclusion of pre-existing conditions from coverage; higher, and often unaffordable, premiums based on the insured's medical history; and rescission of policies after claims are made. *Id.* As a result, "many who need coverage cannot obtain it, and many more who have some type of insurance may not have adequate coverage to meet their health care needs." *Health Reform in the 21st Century: Insurance Market Reforms: Hearing Before the H. Comm. on Ways and Means*, 111th Cong. 53 (2009) (Linda Blumberg, Senior Fellow, Urban Inst.) (Ex. 14). Insurers often revoke coverage even for relatively minor pre-existing conditions. *Consumer Choices and Transparency in the Health Insurance Industry: Hearing Before the S. Comm. on Commerce, Science & Transp.*, 111th

Cong. 29-30 (2009) (Karen Pollitz, Research Professor, Georgetown Univ. Health Policy Inst.) (Ex. 15).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the cited authorities, which are without foundation.  However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

15.    More than 57 million Americans have some pre-existing medical condition, and thus, absent reform, were at risk for the denial or rescission of insurance coverage. Families USA Foundation, *Health Reform: Help for Americans with Pre-Existing Conditions* 2 (2010) (Ex. 16).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the cited authority, which is without foundation.  However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

16.    Insurers operate in interstate commerce and can gauge their participation in state markets based on the nature of regulation in each state. *See* Sara Rosenbaum, *Can States Pick Up the Health Reform Torch?*, 362 New Engl. J. Med. e29, at 3 (2010) (Ex. 17).

> **Response**: The statement that "[i]nsurers operate in interstate commerce" is a legal conclusion rather than a statement of fact.  It is undisputed that insurance regulations often differ from State to State.  However, these statements are irrelevant and immaterial to the constitutionality of the Individual Mandate.

17.    Congress found that the widespread inability of Americans to obtain affordable coverage, or to obtain coverage at all, has significant additional economic effects.

> **Response**: The ACA speaks for itself.  Plaintiffs dispute that Congress's findings bind the Court or render the Individual Mandate constitutional.

18.    62 percent of all personal bankruptcies are caused in part by medical expenses. ACA §§ 1501(a)(2)(G), 10106(a).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, except to admit that it is contained in the cited ACA provisions. Plaintiffs dispute that Congress's findings bind the Court or render the Individual Mandate constitutional.  Moreover, the averment is irrelevant and immaterial to the constitutionality of the Individual Mandate.

19.    The uncertainty that many Americans experience as to whether they can obtain coverage constrains the labor market. The phenomenon of "job lock," in which employees avoid changing employment because they fear losing coverage, is widespread.  Employees are 25 percent less likely to change jobs if they are at risk of losing health insurance coverage in doing so. *The*

*Economic Case*, at 36-37; *see also* Gruber, *Public Finance and Public Policy* 431.

**Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the citied authorities, the second of which is without foundation. However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

20.    Insurance industry reform to guarantee coverage would alleviate "job lock" and increase wages, in the aggregate, by more than $10 billion annually, or 0.2 percent of the gross domestic product. *The Economic Case* 36-37.

**Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the citied authority, which is without foundation. However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

21.    One result of industry practices that deny, impede, or raise the cost of insurance coverage is that many millions of people are uninsured. In the aggregate, the uninsured shift much of the cost of their care onto other persons. The uninsured continue to receive health care services but pay only a portion of the cost. Jack Hadley et al., *Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs 2008*, 27 Health Affairs w399, w411 (2008) (Ex. 20); CBO, *Key Issues*, at 114; *see also* CBO, *Nonprofit Hospitals and the Provision of Community Benefits* 1-2 (2006) (Ex. 21).

**Response**: The statements in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate. However, it is nevertheless disputed that, as stated in sentence 3 of paragraph 21, "the uninsured *continue to receive health care services* but pay only a portion of the cost." Defendants have not established that all, or even a significant portion, of the uninsured receive services for which they only partially pay. Plaintiffs also dispute Defendants' suggestion that uninsured individuals are *continuously* receiving health care services such that they are always engaged in "economic activity" rendering the healthcare services or healthcare insurance market subject to regulation by Congress. In addition, Defendants' own authority, which is without sufficient foundation, makes clear that 75 percent of the unpaid costs of treating the uninsured are covered by government programs designed to meet these costs and states that "cost shifting to private insurance finances a relatively small amount of uncompensated care. Private insurance premiums are at most 1.7 percent higher because of the shifting of costs of the uninsured to private insurers in the form of higher charges." Jack Hadley, et al., at w411.

22.    This phenomenon is not limited to the uninsured with the lowest incomes. On average, uninsured persons with incomes of more than 300% of the federal poverty level pay for less than one half of the cost of the medical care that they receive. Herring, 24 J. of Health Econ. at 229-30.

**Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the citied authority, which

is without foundation.   However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

23.     The costs of "uncompensated care" for the uninsured fall on other participants in the health care market. In the aggregate, that cost-shifting amounted to $43 billion in 2008, about 5 percent of overall hospital revenues. CBO, *Key Issues*, at 114. Indeed, this figure may underestimate the cost-shifting. One study estimated that the uninsured in 2008 collectively received $86 billion in care during the time they lacked coverage, including $56 billion in services for which they did not pay, either in the form of bad debts or in the form of reduced-cost or free charitable care. Jack Hadley et al., *Covering the Uninsured in 2008: Current Costs, Sources of Payment, and Incremental Costs 2008*, 27 Health Affairs w399, w411 (2008) (Ex. 20); CBO, *Key Issues*, at 114; *see also* CBO, *Nonprofit Hospitals and the Provision of Community Benefits* 1-2 (2006) (Ex. 21).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the citied authorities, the second of which is without foundation.   However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

24.     These costs are in part paid by public funds. For example, through Disproportionate Share Hospital ("DSH") payments, the federal government paid for tens of billions of dollars in uncompensated care for the uninsured in 2008 alone. Congress determined that preventing or reducing cost-shifting would lower these public subsidies. H.R. Rep. No. 111-443, pt. II, at 983; *see also The Economic Case*, at 8.

> **Response**: It is undisputed that some costs of medical care for uninsured individuals are met through State and or federal programs designed to pay such costs.  Plaintiffs dispute that Congress's determinations in this respect bind the Court.  Moreover, the statements in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate.

25.     Other costs fall in the first instance on health care providers, who in turn "pass on the cost to private insurers, which pass on the cost to families." ACA § 1501(a)(2)(F), 10106(a). This cost-shifting effectively creates a "hidden tax" reflected in fees charged by health care providers and premiums charged by insurers. CEA, *Economic Report of the President* 187 (Feb. 2010) (Ex. 18); *see also* H.R. Rep. No. 111-443, pt. II, at 985 (2010); S. Rep. No. 111-89, at 2 (2009) (Ex. 19).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the citied authorities. Plaintiffs dispute the characterization of the "cost-shifting" claimed as a "hidden tax." However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

26.     When premiums increase as a result of cost-shifting by the uninsured, more people who see themselves as healthy make the economic calculation not to buy, or to drop, coverage. For many, this economic calculation leads them to wait to obtain coverage until they grow older, when they anticipate greater health care needs. *See* CBO, *Key Issues*, at 12 (percentage of

uninsured older adults in 2007 was roughly half the percentage of uninsured younger adults); *see also* M.E. Martinez & R.A. Cohen, National Center for Health Statistics, *Health Insurance Coverage: Early Release of Estimates From the National Health Interview Survey, January-June 2009*, at 2 (Dec. 2009) (Ex. 22); U.S. Census Bureau, *Census Population Survey, Annual Social and Economic Supplement* (2009) (Table H101, data on coverage status by age) (Ex. 23).

> **Response**: Plaintiffs dispute the averments in this paragraph as Defendants' characterizations of phenomena described in the cited authorities.  The averments are, in any case, irrelevant and immaterial to the constitutionality of the Individual Mandate.

27.     This self-selection further narrows the risk pool, which, in turn, further increases the price of coverage for the insured. The result is a self-reinforcing "premium spiral." *Health Reform in the 21st Century: Insurance Market Reforms* 118-19 (2009) (American Academy of Actuaries); *see also* H.R. Rep. No. 111-443, pt. II, at 985.

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that they are contained in the cited authorities, the first of which is without foundation.  However, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate. H.R. Rep. No. 111-443, pt. II speaks for itself and does not bind the Court.

28.     This premium spiral particularly hurts small employers, due to their relative lack of bargaining power. *See* H.R. Rep. No. 111-443, pt. II, at 986-88; *The Economic Case*, at 37-38; s*ee also 47 Million and Counting* 36 (Raymond Arth, Nat'l Small Business Ass'n) (noting need for insurance reform and minimum coverage provision to stem rise of small business premiums).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to admit that high healthcare insurance premium costs can hurt small employers.  Plaintiffs dispute any implication that the ACA can or will reduce those costs.  The Court is not bound by the first authority cited and the second lacks a sufficient foundation.  In any case, the averments in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate.

29.     To address the economic effects of these market failures, as well as to protect consumers, the ACA comprehensively "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased." ACA §§ 1501(a)(2)(A), 10106(a).

> **Response**: The averments contained in this paragraph constitute legal conclusions and argument.  Plaintiffs dispute Defendants' characterization of the purpose and effect of the ACA.  Plaintiffs also dispute that the Individual Mandate "regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health care is paid for, and when health insurance is purchased."  To the contrary, the Individual Mandate regulates inactivity by compelling individuals to obtain healthcare insurance when they do not want it.  It is further disputed that mere "decisions" are a form of "economic activity" subject to Congressional regulation.  "Factual" findings in the ACA §§ 1501(a)(2)(A) and 10106(a) do not bind the Court.

30.     The minimum coverage provision "is an essential part of this larger regulation of economic activity," and its absence "would undercut Federal regulation of the health insurance market." *Id.* §§1501(a)(2)(H), 10106(a).

> **Response**: Plaintiffs admit that the Individual Mandate is so functionally interdependent with other key aspects of the ACA, including its Medicaid transformation, as to render it unseverable.   Plaintiff deny that the absence of the Individual Mandate would prevent Congress from regulating the healthcare insurance market.   Plaintiffs also dispute that "findings" in the ACA §§1501(a)(2)(H), 10106(a) in any way bind the Court or render the Individual Mandate constitutional.

31.     By "significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums." *Id.* §§ 1501(a)(2)(F), 10106(a).

> **Response**: The averments in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate and are speculative.   They are based on congressional "findings" that do not bind the Court and which cannot render the Individual Mandate constitutional.

32.     Without the minimum coverage provision, the reforms in the Act, such as the ban on denying coverage or charging more based on pre-existing conditions, would amplify existing incentives for individuals to "wait to purchase health insurance until they needed care," thereby further shifting costs onto third parties. *Id.* §§ 1501(a)(2)(I), 10106(a). The minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.*

> **Response**: See response to No. 30, *supra*.   The averments contained in this paragraph constitute argument or legal conclusions.   Plaintiffs also dispute that "findings" in the ACA §§1501(a)(2)(I), 10106(a) in any way bind the Court or render the Individual Mandate constitutional.

33.     The new "guaranteed issue" and "community rating" requirements under section 1201 of the Act ensure that all Americans can obtain coverage subject to no coverage limits and despite the pre-existing conditions they may have at that time. ACA § 1201. Because these new insurance regulations would allow individuals to "wait to purchase health insurance until they needed care," *id.* §§ 1501(a)(2)(I), 10106(a), they would increase the incentives for individuals to "make an economic and financial decision to forego health insurance coverage" until their health care needs become substantial, *id.* §§ 1501(a)(2)(A), 10106(a).

> **Response**: The averments contained in this paragraph constitute argument or legal conclusions.   Plaintiffs dispute the characterization of an individual's having or not having healthcare insurance as an "economic and financial decision."   Plaintiffs also dispute that "findings" in the ACA §§1501(a)(2)(A), 10106(a) in any way bind the Court.   Moreover, the averments regarding the purpose and effect of section 1201 of the ACA are irrelevant and immaterial to the constitutionality of the Individual Mandate.   They are based on

congressional "findings" that do not bind the Court and which cannot render the Individual Mandate constitutional.

34.     Individuals who would make that decision would take advantage of the ACA's reforms by joining a coverage pool maintained in the interim through premiums paid by other market participants. Without a minimum coverage provision, this market timing would increase the costs of uncompensated care and the premiums for the insured pool, creating pressures that would "inexorably drive [the health insurance] market into extinction." *Health Reform in the 21st Century: Insurance Market Reforms* 13 (Uwe Reinhardt, Ph.D., Professor of Political Economy, Economics, and Public Affairs, Princeton University).

   **Response**: The averments contained in this paragraph are speculative and constitute argument or legal conclusions. Plaintiffs dispute the characterization of an individual's having or not having health insurance as an "economic and financial decision."  The cited authority is without foundation and cannot render the Individual Mandate constitutional.

35.     This danger is not merely theoretical, but is borne out in the experience of states that have attempted "guaranteed issue" and "community rating" reforms without an accompanying minimum coverage provision. After New Jersey enacted a similar reform, its individual health insurance market experienced higher premiums and decreased coverage. *See Alan C. Monheit et al., Community Rating and Sustainable Individual Health Insurance Markets in New Jersey*, 23 Health Affairs 167, 168 (2004) (Ex. 25) (describing potential for "adverse-selection death spiral" in a market with guaranteed issue); *see also Health Reform in the 21st Century: Insurance Market Reforms* 101-02 (Dr. Reinhardt).

   **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to the extent that it is undisputed that the cited authorities, which are without sufficient foundation, contain the stated claims.  However, the averments in this paragraph are irrelevant and immaterial to the constitutionality of the Individual Mandate.

36.     Likewise after New York enacted a similar reform, "the market for individual health insurance in New York has nearly disappeared." Stephen T. Parente & Tarren Bragdon, *Healthier Choice: An Examination of Market-Based Reforms for New York's Uninsured*, Medical Progress Report, No. 10 at I (Manhattan Institute, Sept. 2009) (Ex. 26).

   **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to the extent that it is undisputed that the cited authority, which is without sufficient foundation, contains the quoted statement.  However, the averments in this paragraph is irrelevant and immaterial to the constitutionality of the Individual Mandate.

37.     In contrast, Massachusetts enacted "guaranteed issue" and "community rating" reforms, coupled with a minimum coverage provision. Since 2006, the average individual premium in Massachusetts has decreased by 40 percent, compared to a 14 percent increase in the national average. Jonathan Gruber, Mass. Inst. of Tech., *The Senate Bill Lowers Non-Group Premiums: Updated for New CBO Estimates*, at 1 (Nov. 27, 2009) (Ex. 27); *see also* Letter from Mitt H.

Romney, Governor of Massachusetts, to State Legislature at 1-2 (Apr. 12, 2006) (Ex. 28) (signing statement for Massachusetts bill, noting need for insurance coverage requirement to prevent cost-shifting by the uninsured).

> **Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph, except to the extent that it is undisputed that Massachusetts enacted the provisions claimed and that the statement regarding that program's effect is contained in the cited authority, which is without sufficient foundation. Moreover, the averments are irrelevant and immaterial to the constitutionality of the Individual Mandate.

38.     In short, "fundamental insurance-market reform is impossible" if the guaranteed-issue and community-rating reforms are not coupled with a minimum coverage provision. Jonathan Gruber, *Getting the Facts Straight on Health Care Reform*, 316 New Eng. J. of Med. 2497, 2498 (2009) (Ex. 29). This is because "[a] health insurance market could never survive or even form if people could buy their insurance on the way to the hospital." *47 Million and Counting*, at 52 Prof. Hall). Accordingly, Congress found that the minimum coverage provision is "essential" to its broader effort to regulate health insurance industry underwriting practices that have prevented many from obtaining health insurance. ACA §§ 1501(a)(2)(I), (J), 10106(a).

> **Response**: The averments contained in this paragraph constitute argument or legal conclusions. It is undisputed that the quoted statements are contained in the cited authorities, which are without sufficient foundation. Plaintiffs dispute that "fundamental insurance market reform is impossible" without the Individual Mandate. Plaintiffs dispute that the "findings" in ACA §§ 1501(a)(2)(I), (J), 10106(a) bind the Court or render the Individual Mandate constitutional.

39.     The minimum coverage provision also addresses the unnecessary costs created by the insurance industry's practice of medical underwriting. "By significantly increasing health insurance coverage and the size of purchasing pools, which will increase economies of scale, the requirement, together with the other provisions of this Act, will significantly reduce administrative costs and lower health insurance premiums," and is therefore "essential to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs." ACA §§ 1501(a)(2)(J), 10106(a).

> **Response**: The averments contained in this paragraph constitute argument or legal conclusions and are speculative. Plaintiffs dispute that the "findings" in ACA §§ 1501(a)(2)(J), 10106(a) bind the Court or render the Individual Mandate constitutional.


## II.     Defendants' Asserted Facts Pertaining to the ACA's Amendments to Medicaid

40.     The CBO estimates that, under the ACA, federal Medicaid outlays will increase by $434 billion, and state outlays by $20 billion, through 2019. Letter from Douglas W. Elmendorf, Director, CBO, to the Hon. Nancy Pelosi, Speaker, U.S. House of Representatives tbl.4 (Mar. 20, 2010) (Ex. 32) [hereinafter CBO Letter to Speaker Pelosi].

**Response**: The CBO Letter to Speaker Pelosi speaks for itself.  It is undisputed that these averments are contained in the cited authority.  Other federal estimates indicate that the CBO significantly underestimate the impact on both State and federal governments.  The Congressional Research Service (CRS) notes that estimates vary based on assumptions of participation. *See* Pl.App. Ex. 36 ("Variation in Analyses of PPACA's Fiscal Impact on States," Congressional Research Serv., September 8, 2010) at tbl. 2.  CRS cites projections prepared by Kaiser Commission researchers that predict up to $43 billion in additional State costs and $532 billion in federal costs, assuming a 75 percent uptake rate in the expansion population and lower participation by persons currently eligible for Medicaid, but who are not enrolled.[1]  CRS also notes that the CBO did not provide information on its assumptions when publishing the estimates cited here by Defendants.  Certainly, projections vary as to how many tens of billions of dollars the ACA's Medicaid program will cost the States in the immediate future, but not that the program will cost the States substantially more money over-and-above current spiraling projections.

41.     The CBO estimates that, under the ACA, the federal government will shoulder more than 95 percent of all new Medicaid spending through 2019. *See* CBO Letter to Speaker Pelosi tbl.4.

**Response**: CBO Letter to Speaker Pelosi speaks for itself.  This averment is inaccurate because, while it may be true that the federal government will shoulder more than 95 percent of the costs of caring for the new, mandated expansion populations, this is not true as to "all" new Medicaid spending through 2019.  For example, many current eligibles who enter the program because of the Individual Mandate will be covered at the current, non-ACA federal match rate, and this is certainly "new" Medicaid spending from the States' perspective. *See, e.g.*, Pl.App. Ex. 1 (Dudek Decl.) ¶ 18 (calculating a $574 million/year cost due to the new enrollment of current eligibles).  That is, but for the Individual Mandate, many current eligibles would not have enrolled and States do not set their budgets based on the assumption that this group will enroll.[2]  Similarly, there is a great deal of other "new Medicaid spending"

---

[1] A higher uptake rate is consistent with the Centers for Medicare and Medicaid Services' (CMS) view that "the great majority" of new eligibles – 15 million of the 18 million new Medicaid eligibles – "would become covered in the first year, 2014, with the rest covered by 2016." Pl.App. Ex. 39 (Richard S. Foster*, Estimated Financial Effects of the "Patient Protection and Affordable Care Act,"* CMS, April 22, 2010) at 6.

[2] *See, e.g.,* Kaiser Family Foundation, *Financing New Medicaid Coverage Under Health Reform: The Role of the Federal Government & States*, at 3 (May 2010), available at http://www.kff.org/healthreform/upload/8072.pdf (describing that the "welcome mat effect" is expected to "be even more marked [than in prior circumstances] because of the broader reach of the legislation and the mandate that people purchase coverage"); *see also* Pl.App. Ex. 1 (Dudek Decl.) ¶ 18 & attach. 1, pp. 5, 6, 12; Pl.App. Ex. 9 (Betlach Decl.) at B.5; Pl.App. Ex. 10 (Casanova Decl.) ¶ 8 & attach. A, p. 5; Pl.App. Ex. 12 (Phillips Decl.) § B.7; Pl.App. Ex. 13 (Anderson Decl.) attach. C, p. 2; Pl.App. Ex. 14 (Chaumont Decl.) exhibit A, pp. 3, 4; Pl.App. Ex. 16 (Willden Decl.) pp. 4-5 & attach ("Health Care Reform Projected Costs"); Pl.App. Ex. 18 (Bowman Decl.) ¶ 13; Pl.App. Ex. 20 (Millwee Decl.) p. 7; Pl.App. Ex. 24 (Sundwall Decl.), ¶ 12; Pl.App. Ex. 40 (Dubberly Decl.) p. 2 (expecting significant costs from the "welcome mat" or "woodwork" effect).

that will not be shared by the federal government at 95 percent.  For example, new and significant administrative expenses are required by the ACA's changes to Medicaid eligibility processes, which will not be shared at 95 percent.[3]  Also, the ACA amended the obligation of States not only to pay for medically necessary services, but to provide care and services themselves. ACA § 2304.  The shift from ensuring payment to providing care and services is expected to have a significant negative impact on the States' cost of providing Medicaid services (see PSOMF [Doc. 80-2] ¶ 25), which will not be shared at the 95 percent rate, at least for the care of enrollees who are not part of the expansion population.  For these reasons, the Plaintiff States dispute that "all new Medicaid spending" required by ACA will be at a 95 percent federal share rate.

42.    The CBO estimates that, under the ACA, any new federal spending, including on Medicaid, will be offset by other revenue-raising and cost-saving provisions. CBO Letter to Speaker Pelosi at 2.

   **Response**:  The CBO Letter to Speaker Pelosi speaks for itself.  The *federal* government's potential to save under the ACA via spending offsets is irrelevant and immaterial to the issue of the constitutionality of the ACA-transformed Medicaid program.

43.    The CBO estimates that the Medicaid expansion will increase Medicaid enrollment by about 16 million by 2019. CBO Letter to Speaker Pelosi tbl.4.

   **Response**:  The CBO Letter to Speaker Pelosi speaks for itself, and is a modest estimate of increased Medicaid enrollment.  CMS projects a larger number of new Medicaid enrollees with "the great majority" (more than 83 percent) being covered in 2014:  "Of the additional 34 million people who are estimated to be insured in 2019 as a result of the [ACA], a little more than one-half (18 million) would receive Medicaid coverage due to the expansion of eligibility." Pl.App. Ex. 39 (Richard S. Foster, *Estimated Financial Effects of the "Patient Protection and Affordable Care Act,"* Centers for Medicare & Medicaid Servs., April 22, 2010) at 6.  CRS notes that estimates vary based on assumptions of participation.  The CRS cited estimates prepared by Kaiser Commission researchers predicting an increase of 22.8 million enrollees (assuming a 75 percent uptake rate in the expansion population and lower participation by current eligibles who are not enrolled).  *See* Pl.App. Ex. 36 (*Variation in Analyses of PPACA's Fiscal Impact on States,* CRS, Sept. 8, 2010), tbl 2.  CRS also notes that the CBO did not provide information on its assumptions when publishing the estimates

_____

   [3] One study estimates the cost to the States of additional Medicaid administrative expenses to be upwards of $12 billion through 2020, in addition to $21.5 billion for increased benefits for Medicaid Expansion. *See* Edmund Haislmaier & Brian Blase, *Obamacare: Impact on States,* The Heritage Foundation, July 1, 2010, table 2 http://www.heritage.org/research/reports/2010/07/obamacare-impact-on-states; *see also* John Holahan & Stan Dorn, Urban Inst., *What is the Impact of the [ACA] on the States?*, at 2 (June 2010) (Def. Ex. 35) (as cited by Defendants (*see* ¶ 57, infra), also expects the States' administrative costs to increase); Pl.App. Ex. 2 (Lange Decl.) ¶¶ 5-10; Pl.App. Ex. 10 (Casanova Decl.) attach. A, p. 7; Pl.App. Ex. 16 (Willden Decl.) p. 2 & attach ("Health Care Reform Projected Costs"); Pl.Supp.App. Ex. 2 (Church Decl.) ¶ 5.

cited by Defendants.  As such, there are differences in the projections related to the number of new enrollees, but no dispute that the number will be quite large.

44. Nationally, the Medicaid expansion will reduce by 44.5 percent the number of uninsured adults below 133 percent of the federal poverty level. Kaiser Comm'n on Medicaid & the Uninsured, *Medicaid Coverage & Spending in Health Reform*, at 10 tbl.1 (May 2010) (Ex. 34).

> **Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, except to admit that it is contained in the cited Kaiser Commission Report.  The effect of Medicaid expansion on the number of uninsured adults below 133 percent of the poverty level is irrelevant and immaterial to the constitutionality of the ACA-transformed Medicaid program.

45. In Florida, the federal government is expected to pay for 94.2 percent of the Medicaid expansion through 2019, while the number of uninsured adults below 133 percent of the federal poverty level is expected to decline by 44.4 percent. Kaiser Comm'n on Medicaid & the Uninsured, *Medicaid Coverage & Spending in Health Reform*, at 10 tbl.1 (May 2010).

> **Response**:  Plaintiffs: deny the first averment made in this paragraph; lack knowledge of the figure in the second averment; and admit that these averments are contained in the cited Kaiser Commission Report.  The averments in this paragraph are irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid.
>
> Florida expects to pay about 13 percent of the cost of the ACA's expanded Medicaid program through 2019. *See* Pl.App. Ex. 1 (Dudek Decl.), attach. 1 at 11 [Doc. 80-3 at 27-28].
>
> Moreover, a decrease in uninsureds in that income group will not be caused solely by Medicaid's expansion. Currently 301,960 Floridians are eligible for Medicaid but are not enrolled.[4]  *See* discussion of cost of "woodwork" or "welcome mat" effect, *supra*, ¶ 41. If they enroll, and thereby reduce the number of uninsured, they will do so because of the ACA's Individual Mandate, an illness, or other precipitating event; not because of Medicaid's expansion.  Also, if they enroll, this group of previously uninsured people will not be paid for by the federal government at a 94.2 percent rate.  If they enroll, their costs will be shared by the federal government at a much lower rate – 57.5 percent. *Id.*

46. In South Carolina, the federal government is expected to pay for 95.9 percent of the Medicaid expansion through 2019, while the number of uninsured adults below 133 percent of the federal poverty level is expected to decrease by 56.4 percent. Kaiser Comm'n on Medicaid & the Uninsured, *Medicaid Coverage & Spending in Health Reform*, at 10 tbl.1 (May 2010).

> **Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, except to admit that it is contained in the cited Kaiser Commission

---

[4] *See* Pl.App. Ex. 1 (Dudek Decl.) attachment 1 (Fla. Agency for Health Care Admin., *Overview of Federal Affordable Care Act*, August 13, 2010).

Report.   The statements in this paragraph are irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid.

47.  Compared to baseline projections in the absence of reform, by the end of 2019, average state Medicaid spending under the ACA is expected to increase 1.4 percent. Kaiser Comm'n on Medicaid & the Uninsured, *Medicaid Coverage & Spending in Health Reform*, at 10 tbl.1 (May 2010).

**Response**:  *See* ¶ 40, *supra*.  Plaintiffs dispute this averment as it is materially incomplete and constitutes the low estimate made by the Kaiser Commission's Report. The Kaiser Commission Report provides *two* projections of State spending and this averment references only the less-likely lower projection. *See* Pl.App. Ex. 36 (*Variation in Analyses of PPACA's Fiscal Impact on States,* Cong. Res. Serv., Sept. 8, 2010) at tbl 2.  The Report's higher projection is for State Medicaid spending to increase by almost 3 percent compared to baseline projections. *Id*. (based on a 75 percent uptake) CMS's view would favor use of the higher projection as it expects "the great majority" of new eligibles – 15 million of the 18 million new Medicaid eligibles (more than 83 percent) – "would become covered in the first year, 2014, with the rest covered by 2016."  Pl.App. Ex. 39 (Richard S. Foster*, Estimated Financial Effects of the "Patient Protection and Affordable Care Act,"* CMS, April 22, 2010) at 6.

It is also materially important to analyze this information in view of existing baseline projections, which are for state spending to increase by more than 60 percent – *see, e.g*., *infra*, ¶ 60.  The ACA exacerbates the States' very difficult fiscal position by not only increasing their direct costs, but, via unprecedented maintenance of effort provisions (ACA §§ 2001(b) & 2101(b)), also limiting the States' flexibility to control and cut costs.

48.  Many states currently subsidize health care *outside* of Medicaid, in programs funded entirely with state or local dollars, for individuals that will be eligible for Medicaid under the ACA. Council of Economic Advisers ("CEA"), *The Impact of Health Insurance Reform on State and Local Governments*, at 4-5 (Sept. 15, 2009) (Ex. 33) [hereinafter "*The Impact on States*"].

**Response**:  The averments in this paragraph are disputed because they conflate State and local spending, are based on an authority that uses incorrect information without foundation, and are immaterial to the constitutionality of the ACA's transformation of Medicaid.  *See* Pl.Supp.App. Ex. 4 (Further Dudek Decl.); Pl.Supp.Ap. Ex. 1 (Further Chaumont Decl.); Pl.Supp.App. Ex. 3 (Damler Decl.).

This CEA Report predated passage of the ACA by either legislative body by many months and so cannot be considered a viable source of analysis on the ACA's final terms.  This report is seriously flawed.  *See, e.g., infra*, ¶ 56.  As such, no post-ACA analysis of State spending obligations by the federal government relies upon or even makes reference to the CEA's report.  *See, e.g*., Pl.App. Ex. 39 (Richard S. Foster*, Estimated Financial Effects of the "Patient Protection and Affordable Care Act,"* Centers for Medicare & Medicaid Servs., April 22, 2010); Pl.App. Ex. 36 (*Variation in Analyses of PPACA's Fiscal Impact on States,* Cong. Res. Serv., Sept. 8, 2010) at tbl 2; D. Ex. 32 (CBO Letter to Speaker Pelosi).

The averment conflates the spending of state and local governments.  See Pl.Supp.App. Ex. 4 (Further Dudek Decl.); Pl.Supp.App. Ex. 5 (Pridgeon Decl.).  Local government spending does not bear on the constitutional question presented in this case, insofar as savings by local governments arising from the expansion of Medicaid would come at the expense of State budgets. *Id.* Moreover, any current State or local policy to subsidize care will not altogether vanish under the ACA as, even by Defendants' estimation, Medicaid will not zero-out the number of uninsured adults below 133 percent of the federal poverty level altogether, but merely reduce this population by 44.5 percent. *See* ¶ 44, *supra*.

The CEA Report upon which Defendants rely forecasts that additional savings "may come" from the Children's Health Insurance Program (CHIP). Pl.Supp.App. Ex. 1 (Further Chaumont Decl.) ¶ 13.  However, under the PPACA no changes to eligibility regarding CHIP can be made until 2019, leaving no mechanism in place for States to manage or reduce this cost.  *Id.*

Finally, the CEA Report bases its conclusions on income levels of 133% of the federal poverty line, not 133% with a 5% disregard, as included in the ACA.  Pl.Supp.App. Ex. 1 (Further Chaumont Decl.) ¶ 17. As a result the CEA Report does not reflect the current eligibility levels contemplated by the ACA. *Id.*

49.  Pennsylvania subsidizes coverage for adults under 200 percent of FPL through its adultBasic program, at a cost of $172 million in 2008. CEA, *The Impact on States*, at 85.

**Response**: See ¶ 48. The statements in this paragraph are irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid.

50. Indiana subsidizes coverage for adults under 200 percent of FPL through its Healthy Indiana Plan, at a cost of $154.8 million in 2009, and separately funded millions in emergency care for the indigent in fiscal year 2010-11. CEA, *The Impact on States*, at 34-35.

**Response**: See ¶¶ 48-49. This averment is not projected to provide a savings to offset State costs under the ACA.  See Pl.Supp.App. Ex. 3 (Damler Decl.) ¶ 22.

51. Many states, like Pennsylvania and Indiana, currently subsidize health care for some individuals falling between 133 percent and 400 percent of FPL using only state or local funds. CEA, *The Impact on States*, at 34-35, 85.

**Response**: See ¶¶ 48-49.  This averment is not projected to provide a savings to offset State costs under the ACA.  See Pl.Supp.App. Ex. 3 (Damler Decl.) ¶ 22.

52. Many states, including Idaho, Indiana, and Nebraska, currently fund high-risk insurance pools to subsidize coverage for individuals who have been denied private coverage due to pre-existing conditions. CEA, *The Impact on States*, at 29, 35, 67.

**Response**: See ¶¶ 48-49.  This averment is not projected to provide a savings to offset state costs under the ACA.  See PRO Ex. 6 (Ramge Decl.); PRO Ex. 3 (Damler Decl.).

53.  [No entry by Defendants.]

54. Miami-Dade County, Florida, currently funds uncompensated care at public facilities through a 0.5 percent sales tax, which raised $187 million in fiscal year 2007. CEA, *The Impact on* 13 *States*, at 24.

**Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, except to admit that it is contained in the cited CEA Report.

See also ¶¶ 48-49.  The CEA Report does not specify whether or how much of these dollars (this is a total revenue figure) are spent on people who will be eligible for Medicaid under ACA.  It makes unstated and unsupported assumptions about the use of local tax dollars and apparently does not take into account varying uptake rates.  Furthermore, local governments will not be in a position to discontinue funding public care facilities because funding still will be needed to fund u*nder*compensated care.  Medicaid rates currently pay providers less than 60 percent of what a private insurer would pay for the same service.[5]  Although mandated to rise under the ACA, reimbursement still will not meet costs, and public hospitals still will need a source of revenue to make up the difference.  The net impact is incalculable at this time, but the increases in Medicaid payments are unlikely to offset the Medicare reductions.  This will lead to an even greater need for local dollars, not less, to pay for the undercompensated care.

55. It is estimated that, under the ACA, state and local governments will recoup up to $1.6 billion per year of the "hidden tax" that cost-shifting imposes on health insurance premiums for their employees. CEA, *The Impact on States*, at 6.

**Response**:   The averment in this paragraph is irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid and is disputed.

*See* ¶ 48, *supra*. The basis for the CEA Report's conclusion cited in the above averment is a mystery as it does not fully explain its methodology for reaching this conclusion.  While some cost-shifting applies to healthcare spending, this figure appears unsupported in the cited document.  *See* Pl.Supp.App. Ex. 1 (Further Chaumont Decl.) ¶¶ 11-12. Moreover, this conclusion misleadingly groups together the spending of State and local governments.  *Id.; see also* Pl.Supp.App. Ex. 4 (Further Dudek Decl.) ¶¶ 8-12; Pl.Supp.App. Ex. 5 (Pridgeon Decl.) ¶¶ 14-16. Local government spending does not bear on the constitutional question presented in this case insofar as "hidden tax" savings by local governments would not result in a savings for State budgets.  *Id.* Local governments employ about three times more persons than State governments.  *See* http://www.census.gov/govs/apes/. To the contrary,

---

[5] Devon Herrick, *Medicaid Expansion will Bankrupt the States*, National Center for Policy Analysis, Brief Analysis # 729, October 23, 2010, available at http://www.ncpa.org/pub/ba729 (last visited Nov. 22, 2010).

record evidence in this case – based on analysis completed *after* the ACA was passed – shows that the ACA's employer mandates will *increase* the Plaintiff States' expenses for healthcare insurance premiums and not provide a savings. See Pl.App. Ex. 5 (Robleto Decl.) ¶¶ 9-17; Pl.App. Ex. 6 (Shier Decl.) pp 2-3; Pl.App. Ex. 7 (Ashmore Decl.) ¶¶ 7-9; Pl.App. Ex. 8 (Battilana Decl.) ¶¶ 5-9; Pl.App. Ex. 15 (Wells Decl.) ¶¶ 7-10; Pl.App. Ex. 17 (Van Camp Decl.) ¶¶ 4-5; Pl.App. Ex. 19 (Zinter Decl.) ¶¶ 11; Pl.App. Ex. 21 (Dial Decl.) pp. 2-7; Pl.App. Ex. 22 (Kukla Decl.) p. 3.

56. Taken together, the savings that will accrue to states from (1) the downsizing or elimination of duplicative state programs and (2) the reduction in the "hidden tax" on premiums now borne by state governments, are estimated at $11 billion *per year* after 2013. CEA, *The Impact on States*, at 6-7. Florida alone is projected to save $377 million per year. *Id.* at 6, 26.

**Response**:  *See* ¶¶ 48-55.  The Florida-specific $377 million figure is disputed as wholly inaccurate. The large programs cited in the CEA report do not use *State* dollars, but local government dollars:

- More than $256 million that Defendants describe applies to local governments only, not to the State of Florida's budget: $187 million for Miami-Dade County, $82 million for Hillsborough County, $660,000 in Duval County, and $5.6 million relating to inter-county reimbursements. *See* CEA Report at 24, 26.  The State of Florida will not see savings from these local government programs financed through local taxes, although the State may see cost *increases* as persons switch out of such local programs to Medicaid.  See Pl.Supp.App. Ex. 4 (Further Dudek Decl.) ¶¶ 8-12; Pl.Supp.App. Ex. 5 (Pridgeon Decl.) ¶¶ 7-16.

- The CEA Report's "Hidden Tax" ($102 million) figure (pp. 6, 24) erroneously assumes that the healthcare bill will eliminate uncompensated care altogether.  This figure is flawed as Defendants admit, for instance, that 55 percent of current uninsured persons under the federal poverty line will remain uninsured in Florida (DMSJ 82-1] at 39) and 21 million nationally. *See Payments of Penalties for Being Uninsured Under the Patient Protection and Affordable Care Act*, CBO, April 22, 2010. The CEA Report also bases this estimate on costs borne by both State *and local* governments, so it is inaccurate to attribute the full $102 million savings estimate to the State of Florida alone.

- The CEA Report forecasts State savings of ($117 million) that "may come" from the Children's Health Insurance Program (CEA Report at 24-25).  Florida already has taken State CHIP-related savings projections into account in its own forecast (*see* Pl.App. Ex. (Dudek Decl.) ¶ 20), wherein Florida estimates the ACA will cost it more than $1 billion annually by 2018-19.

57. It is estimated that state and local governments would save approximately $70-80 billion over the 2014-2019 period by shifting currently state-funded coverage into federally matched Medicaid. John Holahan & Stan Dorn, Urban Institute, *What Is the Impact of the [ACA] on the States?*, at 2 (June 2010) (Ex. 35).

**Response**:   The statements in this paragraph are irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid and also are disputed.

The authority cited by Defendants is without foundation.  This report is unreliable because: it does not explain its data sources and conflates the spending of State and local governments. Pl.Supp.App. Ex. 5 (Pridgeon Decl.) ¶¶ 16.  Local government spending does not bear on the constitutional question presented in this case, insofar as savings by local governments arising from the expansion of Medicaid would come at the expense of State budgets.  *See* Pl.Supp.App. Ex. 4 (Further Dudek Decl.) ¶¶ 8-12; Pl.Supp.App. Ex. 5 (Pridgeon Decl.) ¶¶ 7-16; Pl.Supp.App. Ex. 1 (Further Chaumont Decl.) ¶¶ 8-12.  Moreover, any current State or local policy to subsidize care will not altogether vanish under the ACA as, even by Defendants' estimation, Medicaid will reduce the number of uninsured adults below 133 percent of the federal poverty level by merely 44.5 percent. Moreover, a CRS publication of several States' estimates indicates that six States a total of more than \$38 billion in increased enrollment costs.  *See* Pl.App. Ex. 36 (*Variation in Analyses of PPACA's Fiscal Impact on States,* Cong. Res. Serv., Sept. 8, 2010), tbls 1 & 2.  This CRS report shows varying impacts, including one state which anticipates some savings, but no offsets proportional to a national magnitude of \$70-\$80 billion.  *Id.*

58. It is estimated that states' savings from no longer having to finance as much of the cost of providing uncompensated care to the uninsured may fully offset the increase in Medicaid costs resulting from the Medicaid expansion. J. Angeles, Center on Budget and Policy Priorities, *Some Recent Reports Overstate the Effect on State Budgets of the Medicaid Expansions in the Health Reform Law*, at 10 (Oct. 21, 2010) (Ex. 36).

**Response**:   The statements in this paragraph are irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid and also disputed.  The authority cited by Defendants is without foundation.  *See* ¶ 57 (Angeles' cites to Holahan's (Urban Institute) estimate).

59. Increases in federal Medicaid funding will generate economic activity at the state level, including jobs and state tax revenues. Kaiser Family Foundation, *Health Reform Issues: Key Issues About State Financing and Medicaid*, at 3 (May 2010) (Ex. 37).

**Response**:   The statements in this paragraph are irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid.   It is also speculative and inconsistent with various paragraphs above in which Defendants insist that federal spending will merely shift tens of billions of dollars in state spending to the federal government. Also, increases in State Medicaid funding will require significant funding cuts to other programs or new revenues.  Cuts to other programs may have negative economic effects, suggesting that any economic increase due to State and federal Medicaid spending increases may be offset by loss of State spending elsewhere.  CMS, *Medicaid Spending Projected to Rise Much Faster Than the Economy*, http://www.hhs.gov/news/press/2008pres/10/20081017a.html (last visited Nov. 23, 2010) (CMS's Acting Administrator acknowledged that "[h]igh and increasing Medicaid spending clearly leaves States less able to fund other state priorities").

Similarly, increased taxes or fees to support State Medicaid spending would have an adverse effect on the Florida economy, which may offset any economic increase due to State and federal Medicaid spending increases.  *See* Pl.App. Ex. 3 (Watkins Decl.); Christina D. Romer, *Back to a Better Normal:  Unemployment and Growth in the Wake of the Great Recession*, Council of Economic Advisors, April 17, 2010 at 9 (suggesting that tax increases would only compound the States' fiscal dilemma and that aid to the States was given for the *very purpose* of keeping them from raising taxes),

60. Absent reform, state Medicaid/CHIP spending is estimated to increase 60.7 percent by 2019 even under the best-case scenario. Bowen Garrett et al., Urban Institute, *The Cost of Failure to Enact Health Reform: Implications for States*, at 13 tbl.2B (Sept. 30, 2009) (Ex. 38).

**Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, except to admit that it is contained in the cited Urban Institute Report.  This Report speaks for itself.  CMS projected a baseline increase in spending projections at an annual average rate of 7.9 percent through 2019 (and 9.9 percent just in 2009).   CMS, National Health Expenditure Projections 2009-2019, at 1-2, https://www.cms.gov/NationalHealthExpendData/downloads/proj2009.pdf (last visited Nov. 10, 2010).  Importantly, however, more than 60 percent of Medicaid spending is considered optional spending that has not been mandatory for states and, until the ACA, could be cut if necessary to control costs.  *See* Anna Sommers, *Medicaid Enrollment and Spending by "Mandatory" and "Optional" Eligibility and Benefit Categories*, Kaiser Comm'n on Medicaid & the Uninsured, June 2005, at 11.  The ACA's maintenance of effort provisions lock States into significant, formerly optional Medicaid spending.

61. There is a "great deal of variation across states in terms of Medicaid coverage, the uninsured, state fiscal capacity, leadership, and priorities." Kaiser Comm'n on Medicaid & the Uninsured, *Medicaid Coverage & Spending in Health Reform*, at 1 (May 2010).

**Response**:  The Kaiser Commission Report speaks for itself.  Whatever the variations, they are irrelevant and immaterial to the constitutionality of the ACA's transformation of Medicaid.

62. In fiscal year 2008, federal Medicaid grants ranged from $246 million (Wyoming) to $23.8 billion (New York). Kaiser Family Foundation, *Federal & State Share of Medicaid Spending, FY2008* (Ex. 39).

**Response**: Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph. The Kaiser Commission Report speaks for itself.

63. In fiscal year 2008, federal medical assistance percentages ("FMAPs") ranged from 50 percent (several states, including Colorado) to 76 percent (Mississippi). 71 Fed. Reg. 69209, 69210 (Nov. 30, 2006).

**Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph. This citation speaks for itself.

64. In fiscal year 2008, state spending on Medicaid, as a proportion of total state revenues, ranged from 8.4 percent (Alaska) to 34.5 percent (Missouri). Nat'l Ass'n of State Budget Officers, *Fiscal Year 2008 State Expenditure Report*, at 10 tbl.5 (Fall 2009) (Ex. 40) [hereinafter NASBO Report].

**Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph. This citation speaks for itself.

65. In fiscal year 2008, the proportion of total state revenues formed by federal Medicaid grants ranged from 4.4 percent (Alaska) to 21.5 percent (Missouri). *See* NASBO Report at 10 tbl.5; 71 Fed. Reg. at 69210.

**Response**:   Plaintiffs lack knowledge or information sufficient to admit or deny the averments made in this paragraph. This citation speaks for itself.

66. In fiscal year 2008, Mississippi spent 11 percent of its budget on Medicaid. NASBO Report at 10 tbl.5.

**Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph.  This averment appears to be disputed in the table it cites, which provides that 22.4 percent of Mississippi's total expenditures were for Medicaid.

67. In fiscal year 2008, Pennsylvania spent more than 30 percent of its budget on Medicaid. NASBO Report at 10 tbl.5.

**Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph. This citation speaks for itself.

68. Many states, including Florida, provide subsidized care outside of Medicaid, funded entirely with state or local dollars. CEA, *The Impact on States*, at 23-26.

**Response**: See ¶¶ 48-56.

69. The vast majority of states collect personal income, corporate income, and sales taxes. Fed'n of Tax Adm'rs, *2009 State Tax Collection by Source* (Ex. 42).

**Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph. This citation speaks for itself.

70. Six plaintiff states (Alaska, Florida, Nevada, South Dakota, Texas, and Washington) impose no personal income tax. Fed'n of Tax Adm'rs, *2009 State Tax Collection by Source*.

**Response**:  This citation speaks for itself.

71. Three plaintiff states (Nevada, Texas, and Washington) impose no corporate income tax. Fed'n of Tax Adm'rs, *2009 State Tax Collection by Source*.

   **Response**:  This citation speaks for itself.

72. One plaintiff state (Alaska) imposes no sales tax. Fed'n of Tax Adm'rs, *2009 State Tax Collection by Source*.

   **Response**:  This citation speaks for itself.

73. Of the 10 states in the nation with the lowest per capita tax burden, 7 are plaintiffs here (Alabama, Arizona, Colorado, Florida, Georgia, South Carolina, South Dakota, and Texas). Fed'n of Tax Admins., *2009 State Tax Revenue* (Ex. 43).

   **Response**:  This citation speaks for itself.

74. Between 1966 and 2000, Medicaid enrollment expanded from 4 million to 33 million. John Klemm, Ph.D., *Medicaid Spending: A Brief History*, 22 Health Care Fin. Rev. 106 (Fall 2000) (Ex. 31).

   **Response**:  Plaintiffs lack knowledge or information sufficient to admit or deny the averment made in this paragraph, which is irrelevant and immaterial to the constitutionality of the ACA's Medicaid program. Moreover, the statement is misleading to the extent that it would ascribe enrollment expansion to vast changes in Medicaid's eligibility terms over the years. For example, all 50 states participated in Medicaid in 2000, but many did not participate in 1966 (the inaugural year).  Furthermore, more than 60 percent of Medicaid spending is considered optional spending that was not mandatory for States during these years.  *See* Anna Sommers, *Medicaid Enrollment and Spending by "Mandatory" and "Optional" Eligibility and Benefit Categories*, Kaiser Comm'n on Medicaid & the Uninsured, June 2005, at 11. The ACA transforms the Medicaid program from its traditional bounds as a partnership to assist poor and needy persons to one that locks States into providing services for those in formerly optional eligibility categories and requires States to cover approximately 20 million more higher-income persons (83.9 million persons within Medicaid & CHIP programs) virtually overnight.  *See* Pl.App. Ex. 39 (Richard S. Foster, *Estimated Financial Effects of the "Patient Protection and Affordable Care Act,"* Centers for Medicare & Medicaid Servs., April 22, 2010) at 3.  This figure represents more than one-quarter of the U.S. population. *See* http://www.census.gov/compendia/statab/2010/tables/10s0002.pdf.

   Respectfully submitted,

   **BILL MCCOLLUM**
   **ATTORNEY GENERAL OF FLORIDA**

   /s/ Blaine H. Winship
   Blaine H. Winship (Fla. Bar No. 0356913)
   Special Counsel

Joseph W. Jacquot (Fla. Bar No. 189715)
Deputy Attorney General
Scott D. Makar (Fla. Bar No. 709697)
Solicitor General
Louis F. Hubener (Fla. Bar No. 0140084)
Timothy D. Osterhaus (Fla. Bar No.
0133728)
Deputy Solicitors General
Office of the Attorney General of Florida
The Capitol, Suite PL-01
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 488-4872
Email: blaine.winship@myfloridalegal.com
*Attorneys for Plaintiff States*

David B. Rivkin (D.C. Bar No. 394446)
Lee A. Casey (D.C. Bar No. 447443)
Baker & Hostetler LLP
1050 Connecticut Avenue, N.W., Ste. 1100
Washington, DC 20036
Telephone: (202) 861-1731
Facsimile: (202) 861-1783
*Attorneys for Plaintiff States, National*
*Federation of Independent Business, Mary*
*Brown, and Kaj Ahlburg*

Katherine J. Spohn
Special Counsel to the Attorney General
Office of the Attorney General of Nebraska
2115 State Capitol Building
Lincoln, Nebraska 68508
Telephone: (402) 471-2834
Facsimile: (402) 471-1929
Email: katie.spohn@nebraska.gov
*Attorneys for Plaintiff the State of Nebraska*

Karen R. Harned
Executive Director
National Federation of Independent
Business
Small Business Legal Center
1201 F Street, N.W., Suite 200
Washington, DC 20004
Telephone: (202) 314-2061
Facsimile: (202) 554-5572

Bill Cobb
Deputy Attorney General for
Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 475-0131
Facsimile: (512) 936-0545
Email: bill.cobb@oag.state.tx.us

27

*Of counsel for Plaintiff National*        *Attorneys for Plaintiff the State of Texas*
*Federation of Independent Business*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 23rd day of November, 2010, a copy of the foregoing Plaintiffs' Response to Defendants' Statement of Facts As to Which There Is No Genuine Issue was served on counsel of record for all Defendants through the Court's Notice of Electronic Filing system.

<u>/s/ Blaine H. Winship</u>
Blaine H. Winship
Special Counsel