**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

STATE OF FLORIDA, by and through
Attorney General Pam Bondi, et al.;

      Plaintiffs,

    v.                          Case No.: 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.,

      Defendants.

_____/

## ORDER GRANTING SUMMARY JUDGMENT

On March 23, 2010, President Obama signed health care reform legislation: "The Patient Protection and Affordable Care Act." Pub. L. No. 111-148, 124 Stat. 119 (2010), as amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (the "Act").

This case, challenging the Constitutionality of the Act, was filed minutes after the President signed. It has been brought by the Attorneys General and/or Governors of twenty-six states (the "state plaintiffs")[1]; two private citizens (the "individual plaintiffs"); and the National Federation of Independent Business ("NFIB") (collectively, the "plaintiffs"). The defendants are the United States Department of Health and Human Services, the Department of Treasury, the Department of Labor, and their secretaries (collectively, the "defendants"). I emphasized once before, but it bears repeating again: this case is not about

---

[1] The states are Alabama, Alaska, Arizona, Colorado, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Louisiana, Maine, Michigan, Mississippi, Nebraska, Nevada, North Dakota, Ohio, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Washington, Wisconsin, and Wyoming.

whether the Act is wise or unwise legislation, or whether it will solve or exacerbate the myriad problems in our health care system. In fact, it is not really about our health care system at all. It is principally about our federalist system, and it raises very important issues regarding the Constitutional role of the federal government.

James Madison, the chief architect of our federalist system, once famously observed:

> If men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself.

The Federalist No. 51, at 348 (N.Y. Heritage Press ed., 1945) ("The Federalist").[2] In establishing our government, the Founders endeavored to resolve Madison's identified "great difficulty" by creating a system of dual sovereignty under which "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." The Federalist No. 45, at 311 (Madison); see also U.S. Const. art. I, § 1 (setting forth the specific legislative powers "herein granted" to Congress). When the Bill of Rights was later added to the Constitution in 1791, the Tenth Amendment reaffirmed that relationship: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to

---

[2] The Federalist consists of 85 articles or essays written by James Madison, Alexander Hamilton, and John Jay, advocating for ratification of the Constitution. "The opinion of the Federalist has always been considered as of great authority. It is a complete commentary on our constitution; and is appealed to by all parties in the questions to which that instrument has given birth. Its intrinsic merit entitles it to this high rank." Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 418, 5 L. Ed. 257 (1821) (Marshall, C.J.). It will be cited to, and relied on, several times throughout the course of this opinion.

the States respectively, or to the people."

The Framers believed that limiting federal power, and allowing the "residual" power to remain in the hands of the states (and of the people), would help "ensure protection of our fundamental liberties" and "reduce the risk of tyranny and abuse." See Gregory v. Ashcroft, 501 U.S. 452, 458, 111 S. Ct. 2395, 115 L. Ed. 2d 410 (1991) (citation omitted). Very early, the great Chief Justice John Marshall noted "that those limits may not be mistaken, or forgotten, the constitution is written." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L. Ed. 60 (1803). Over two centuries later, this delicate balancing act continues. Rather than being the mere historic relic of a bygone era, the principle behind a central government with limited power has "never been more relevant than in this day, when accretion, if not actual accession, of power to the federal government seems not only unavoidable, but even expedient." Brzonkala v. Virginia Polytechnic Institute, 169 F.3d 820, 826 (4th Cir. 1999) (en banc), aff'd sub nom, United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000).[3]

To say that the federal government has limited and enumerated power does not get one far, however, for that statement is a long-recognized and well-settled

---

[3] In United States v. Lopez, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), a watershed decision that will be discussed infra, the Supreme Court began its analysis by referring to these limits on federal power as "first principles." In a manner of speaking, they may be said to be "last principles" as well, for the Lopez Court deemed them to be so important that it also ended its opinion with a full discussion of them. See id. at 567-68. Shortly thereafter, in United States v. Morrison, 529 U.S. 598, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000), which will also be discussed infra, the Supreme Court referred to the division of authority and limits on federal power as the "central principle of our constitutional system." See id. at 616 n.7. Clearly, if the modern Supreme Court regards the limits of federal power as first, central, and last principles, those principles are profoundly important --- even in this day and age --- and they must be treated accordingly in deciding this case.

truism. <u>McCulloch v. Maryland</u>, 17 U.S. (4 Wheat) 316, 405, 4 L. Ed. 579 (1819) ("This government is acknowledged by all, to be one of enumerated powers. The principle, that it can exercise only the powers granted to it, . . . is now universally admitted.") (Marshall, C.J.). The ongoing challenge is deciding whether a particular federal law falls within or outside those powers. It is frequently a difficult task and the subject of heated debate and strong disagreement. As Chief Justice Marshall aptly predicted nearly 200 years ago, while everyone may agree that the federal government is one of enumerated powers, "the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, so long as our system shall exist." <u>Id.</u> This case presents such a question.

## BACKGROUND

The background of this case --- including a discussion of the original claims, the defenses, and an overview of the relevant law --- is set out in my order dated October 14, 2010, which addressed the defendants' motion to dismiss, and it is incorporated herein. I will only discuss the background necessary to resolving the case as it has been winnowed down to the two causes of action that remain.

In Count I, all of the plaintiffs challenge the "individual mandate" set forth in Section 1501 of the Act, which, beginning in 2014 will require that everyone (with certain limited exceptions) purchase federally-approved health insurance, or pay a monetary penalty.[4] The individual mandate allegedly violates the Commerce Clause,

---

[4] I previously rejected the defendants' argument that this penalty was really a tax, and that any challenge thereto was barred by the Anti-Injunction Act. My earlier ruling on the defendants' tax argument is incorporated into this order and, significantly, has the effect of focusing the issue of the individual mandate on whether it is authorized by the Commerce Clause. To date, every court to consider this issue (even those that have ruled in favor of the federal government) have also rejected the tax and/or Anti-Injunction arguments. <u>See</u> <u>Goudy-Bachman v. U.S. Dep't of Health & Human Servs.</u>, 2011 WL 223010, at *9-*12 (M.D. Pa. Jan. 24, 2011); <u>Virginia v. Sebelius</u>, 728 F. Supp. 2d 768, 786-88 (E.D. Va. 2010); <u>Liberty</u>

which is the provision of the Constitution Congress relied on in passing it. In Count IV, the state plaintiffs challenge the Act to the extent that it alters and amends the Medicaid program by expanding that program, inter alia, to: (i) include individuals under the age of 65 with incomes up to 133% of the federal poverty level, and (ii) render the states responsible for the actual provision of health services thereunder. This expansion of Medicaid allegedly violates the Spending Clause and principles of federalism protected under the Ninth and Tenth Amendments. The plaintiffs seek a declaratory judgment that the Act is unconstitutional and an injunction against its enforcement.

These two claims are now pending on cross motions for summary judgment (docs. 80, 82), which is a pre-trial vehicle through which a party shall prevail if the evidence in the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. While the parties dispute numerous facts (primarily in the context of the Medicaid count, noted infra), they appear to agree that disposition of this case by summary judgment is appropriate --- as the dispute ultimately comes down to, and involves, pure issues of law. Both sides have filed strong and well researched memoranda in support of their motions for summary judgment ("Mem."), responses in opposition ("Opp."), and replies ("Reply") in further support. I held a lengthy hearing and oral argument on the motions December 16, 2010 ("Tr."). In addition to this extensive briefing by the parties, numerous organizations and individuals were granted leave to, and did, file amicus curiae briefs (sixteen total) in support of the arguments and claims at issue.

---

Univ., Inc. v. Geithner, --- F. Supp. 2d ---, 2010 WL 4860299, at *9-*11 (W.D. Va. Nov. 30, 2010); U.S. Citizens Assoc. v. Sebelius, --- F. Supp. 2d ---, 2010 WL 4947043, at *5 (N.D. Ohio Nov. 22, 2010); Thomas More Law Center v. Obama, 720 F. Supp. 2d 882, 890-91 (E.D. Mich. 2010).

I have carefully reviewed and considered all the foregoing materials, and now set forth my rulings on the motions and cross-motions for summary judgment. I will take up the plaintiffs' two claims in reverse order.

## DISCUSSION

### I. Medicaid Expansion (Count Four)

For this claim, the state plaintiffs object to the fundamental and "massive" changes in the nature and scope of the Medicaid program that the Act will bring about. They contend that the Act violates the Spending Clause [U.S. Const. art. I, § 8, cl. 1] as it significantly expands and alters the Medicaid program to such an extent they cannot afford the newly-imposed costs and burdens. They insist that they have no choice but to remain in Medicaid as amended by the Act, which will eventually require them to "run their budgets off a cliff." This is alleged to violate the Constitutional spending principles set forth in South Dakota v. Dole, 483 U.S. 203, 107 S. Ct. 2793, 97 L. Ed. 2d 171 (1987), and in other cases.[5]

Under Dole, there are four restrictions on Congress' Constitutional spending power: (1) the spending must be for the general welfare; (2) the conditions must be stated clearly and unambiguously; (3) the conditions must bear a relationship to the purpose of the program; and 4) the conditions imposed may not require states "to engage in activities that would themselves be unconstitutional." Supra, 483 U.S. at 207-10. In addition, a spending condition cannot be "coercive." This conceptional requirement is also from Dole, where the Supreme Court speculated (in dicta at the end of that opinion) that "in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into

---

[5] The state plaintiffs alleged in their complaint that the Medicaid provisions also violated the Ninth and Tenth Amendments, but those claims have not been advanced or briefed in their summary judgment motion (except in a single passing sentence, see Pl. Mem. at 25).

compulsion.'" See id. at 211 (citation omitted). If that line is crossed, the Spending Clause is violated.

Preliminarily, I note that in their complaint the state plaintiffs appear to have relied solely on a "coercion and commandeering" theory. Nowhere in that pleading do they allege or intimate that the Act also violates the four "general restrictions" in Dole, nor did they make the argument in opposition to the defendants' previous motion to dismiss. Thus, as I stated in my earlier order after describing Dole's four general restrictions: "The plaintiffs do not appear to dispute that the Act meets these restrictions. Rather, their claim is based principally on [the coercion theory]." Apparently expanding that argument, the state plaintiffs now argue (very briefly, in less than one full page) that the Act's Medicaid provisions violate the four general restrictions. See Pl. Mem. at 44-45. This belated argument is unpersuasive. The Act plainly meets the first three of Dole's spending restrictions, and it meets the fourth as long as there is no other required activity that would be independently unconstitutional. Thus, the only real issue with respect to Count IV, as framed in the pleadings, is whether the Medicaid provisions are impermissibly coercive and effectively commandeer the states.

The gist of this claim is that because Medicaid is the single largest federal grant-in-aid program to the states, and because the states and the needy persons receiving that aid have come to depend upon it, the state plaintiffs are faced with an untenable Hobson's Choice. They must either (1) accept the Act's transformed Medicaid program with its new costs and obligations, which they cannot afford, or (2) exit the program altogether and lose the federal matching funds that are necessary and essential to provide health care coverage to their neediest citizens (along with other Medicaid-linked federal funds). Either way, they contend that their state Medicaid systems will eventually collapse, leaving millions of their neediest residents without health care. The state plaintiffs assert that they effectively have

no choice other than to participate in the program.

In their voluminous materials filed in support of their motion for summary judgment, the state plaintiffs have identified some serious financial and practical problems that they are facing under the Act, especially its costs. They present a bleak fiscal picture. At the same time, much of those facts have been disputed by the defendants in their equally voluminous filings; and also by some of the states appearing in the case as amici curiae, who have asserted that the Act will in the long run save money for the states. It is simply impossible to resolve this factual dispute now as both sides' financial data are based on economic assumptions, estimates, and projections many years out. In short, there are numerous genuine disputed issues of material fact with respect to this claim that cannot be resolved on summary judgment.[6] However, even looking beyond these presently impossible-to-resolve disputed issues of fact, there is simply no support for the state plaintiffs' coercion argument in existing case law.

In considering this issue at the motion to dismiss stage, I noted that state

---

[6] Perhaps anticipating this, the state plaintiffs maintained in response to the defendants' filings that "the entire question of whether the States' costs might to some extent be offset by collateral savings is legally irrelevant." See Pl. Opp. at 29. Thus, "even if the States were projected to achieve collateral savings, those savings would in no way lessen the coercion and commandeering of which Plaintiff States complain, because they would still be required to do Congress's bidding." Id. at 41-42. However, it would appear from the operative complaint that the coercion claim has always been rooted in the underlying contention that the Act forces the states to expend resources that they cannot afford: "Plaintiff States cannot afford the unfunded costs of participating under the Act, but effectively have no choice other than to participate." Second Amended Complaint at ¶ 84; see also id. at ¶ 86 (referring to the "fiscal impact" of the Medicaid expansion and explaining that it will compel states "to assume costs they cannot afford"); id. at ¶ 41 (Act will "expand eligibility for enrollment beyond the State's ability to fund its participation"); id. at ¶ 56 (referring to the projected billions of dollars in additional costs "stemming from the Medicaid-related portions of the Act" which will "grow in succeeding years"); id. at ¶ 66 (referencing the "harmful effects of the Act on [the state] fiscs").

*Case No.: 3:10-cv-91-RV/EMT*

participation in the Medicaid program under the Act is --- as it always has been --- voluntary. This is a fundamental binary element: it either is voluntary, or it is not. While the state plaintiffs insist that their participation is involuntary, and that they cannot exit the program, the claim is contrary to the judicial findings in numerous other Medicaid cases [see, e.g., Wilder v. Virginia Hosp. Assoc., 496 U.S. 498, 502, 110 S. Ct. 2510, 110 L. Ed. 2d 455 (1990) (observing that "Medicaid is a cooperative federal-state program [and] participation in the program is voluntary"); Florida Assoc. of Rehab. Facilities v. Florida Dep't of Health & Rehab. Servs, 225 F.3d 1208, 1211 (11th Cir. 2000) ("No state is obligated to participate in the Medicaid program."); Doe v. Chiles, 136 F.3d 709, 722 (11th Cir. 1998) (Medicaid is a program from which the state "always retains [the] option" to withdraw)], and belied by numerous published news reports that several states (including certain of the plaintiffs in this case) are presently considering doing exactly that. Furthermore, two plaintiff states have acknowledged in declarations filed in support of summary judgment that they can withdraw from the program. See Declaration of Michael J. Willden (Director of Department of Health and Human Services, Nevada) ("Nevada can still consider opting out of Medicaid a viable option."); Declaration of Deborah K. Bowman (Secretary of Department of Social Services, South Dakota) (conceding that although it would be detrimental to its Medicaid recipients, South Dakota could "cease participation in the Medicaid Program"). When the freedom to "opt out" of the program is viewed in light of the fact that Congress has expressly reserved the right to alter or amend the Medicaid program [see 42 U.S.C. § 1304 ("The right to alter, amend, or repeal any provision of this chapter is hereby reserved to the Congress.")], and has done so many times over the years, I observed in my earlier order that the plaintiffs' argument was not strong. See Harris v. McRae, 448 U.S. 297, 301, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980) (stating that "participation in the Medicaid program is entirely optional, [but] once a State elects to participate, it

must comply with the requirements").

Indeed, a survey of the legal landscape revealed that there was "very little support for the plaintiffs' coercion theory argument" as every single federal Court of Appeals called upon to consider the issue has rejected the coercion theory as a viable claim. See, e.g., Doe v. Nebraska, 345 F.3d 593, 599-600 (8th Cir. 2003); Kansas v. United States, 214 F.3d 1196, 1201-02 (10th Cir. 2000); California v. United States, 104 F.3d 1086, 1092 (9th Cir. 1997); Oklahoma v. Schweiker, 655 F.2d 401, 413-14 (D.C. Cir. 1981); State of New Hampshire Dep't of Employment Sec. v. Marshall, 616 F.2d 240, 246 (1st Cir. 1980); but see West Virginia v. U.S. Dep't of Health & Human Servs., 289 F.3d 281, 288-90 (4th Cir. 2002) (referring to a prior decision of that court, Commonwealth of Virginia Dep't of Education v. Riley, 106 F.3d 559 (4th Cir. 1997), where six of the thirteen judges on an en banc panel stated in dicta that a coercion claim may be viable in that court, but going on to note that due to "strong doubts" about the viability of the coercion theory "most courts faced with the question have effectively abandoned any real effort to apply the coercion theory" after finding, in essence, that it "raises political questions that cannot be resolved by the courts").

In the absence of an Eleventh Circuit case on point, the state plaintiffs' claim was "plausible" at the motion to dismiss stage. Thus, the plaintiffs were allowed to proceed and provide evidentiary support and further legal support for a judicially manageable standard or coherent theory for determining when, in the words of the Supreme Court, a federal spending condition "pass[es] the point at which 'pressure turns into compulsion.'" See Dole, supra, 483 U.S. at 211. The evidentiary support is substantially in dispute, as already noted, and further legal support has not been forthcoming. It is now apparent that existing case law is inadequate to support the state plaintiffs' coercion claim. As the Ninth Circuit has explained in its analysis of an earlier coercion claim made by the State of Nevada:

> We can hardly fault appellant [for not providing the court
> with any principled definition of the word "coercion"]
> because our own inquiry has left us with only a series of
> unanswered questions. Does the relevant inquiry turn on
> how high a percentage of the total programmatic funds is
> lost when federal aid is cut-off? Or does it turn, as
> Nevada claims in this case, on what percentage of the
> federal share is withheld? Or on what percentage of the
> state's total income would be required to replace those
> funds? Or on the extent to which alternative private,
> state, or federal sources of . . . funding are available?
> There are other interesting and more fundamental
> questions. For example, should the fact that Nevada,
> unlike most states, fails to impose a state income tax on
> its residents play a part in our analysis? Or, to put the
> question more basically, can a sovereign state which is
> always free to increase its tax revenues ever be coerced
> by the withholding of federal funds --- or is the state
> merely presented with hard political choices?

Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989). It is not simply a matter of

these being generally difficult or complex questions for courts to resolve because,

as I have said, "courts deal every day with the difficult complexities of applying

Constitutional principles set forth and defined by the Supreme Court." Rather, as

Justice Cardozo cautioned in what appears to have been the first case to hint at

the possibility of a coercion theory claim, "to hold that motive or temptation is

equivalent to coercion is to plunge the law in endless difficulties." See Steward

Machine Co. v. Davis, 301 U.S. 548, 589-90, 57 S. Ct. 883, 81 L. Ed. 1279

(1937) (emphasis added); see also, e.g., Skinner, supra, 884 F.2d at 448 ("The

difficulty if not the impropriety of making judicial judgments regarding a state's

financial capabilities renders the coercion theory highly suspect as a method for

resolving disputes between federal and state governments.").

In short, while the plaintiffs' coercion theory claim was plausible enough to

survive dismissal, upon full consideration of the relevant law and the Constitutional

principles involved, and in light of the numerous disputed facts alluded to above, I must conclude that this claim cannot succeed and that the defendants are entitled to judgment as a matter of law. In so ruling, I join all courts to have considered this issue and reached the same result, even in factual situations that involved (as here) the potential withdrawal of a state's entire Medicaid grant. See, e.g., Schweiker, supra, 655 F.2d at 414 ("The courts are not suited to evaluating whether the states are faced here with an offer they cannot refuse or merely a hard choice."); California, supra, 104 F.3d at 1086 (rejecting coercion theory argument based on the claim that while the state joined Medicaid voluntarily, it had grown to depend on federal funds and "now has no choice but to remain in the program in order to prevent a collapse of its medical system").

I appreciate the difficult situation in which the states find themselves. It is a matter of historical fact that at the time the Constitution was drafted and ratified, the Founders did not expect that the federal government would be able to provide sizeable funding to the states and, consequently, be able to exert power over the states to the extent that it currently does. To the contrary, it was expected that the federal government would have limited sources of tax and tariff revenue, and might have to be supported by the states. This reversal of roles makes any state-federal partnership somewhat precarious given the federal government's enormous economic advantage. Some have suggested that, in the interest of federalism, the Supreme Court should revisit and reconsider its Spending Clause cases. See Lynn A. Baker, The Spending Power and the Federalist Revival, 4 Chap. L. Rev. 195-96 (2001) (maintaining the "greatest threat to state autonomy is, and has long been, Congress's spending power" and "the states will be at the mercy of Congress so long as there are no meaningful limits on its spending power"). However, unless and until that happens, the states have little recourse to remaining the very junior partner in this partnership.

Accordingly, summary judgment must be granted in favor of the defendants on Count IV.

## II. __Individual Mandate (Count One)__

For this claim, the plaintiffs contend that the individual mandate exceeds Congress' power under the Commerce Clause. To date, three district courts have ruled on this issue on the merits. Two have held that the individual mandate is a proper exercise of the commerce power [Liberty Univ., Inc. v. Geithner, --- F. Supp. 2d ---, 2010 WL 4860299 (W.D. Va. Nov. 30, 2010); Thomas More Law Center v. Obama, 720 F. Supp. 2d 882 (E.D. Mich. 2010)], while the other court held that it violates the Commerce Clause. Virginia v. Sebelius, 728 F. Supp. 2d 768 (E.D. Va. 2010).

At issue here, as in the other cases decided so far, is the assertion that the Commerce Clause can only reach individuals and entities engaged in an "activity"; and because the plaintiffs maintain that an individual's failure to purchase health insurance is, almost by definition, "inactivity," the individual mandate goes beyond the Commere Clause and is unconstitutional. The defendants contend that activity is not required before Congress can exercise its Commerce Clause power, but that, even if it is required, not having insurance constitutes activity. The defendants also claim that the individual mandate is sustainable for the "second reason" that it falls within the Necessary and Proper Clause.[7]

---

[7] The Necessary and Proper Clause is not really a separate inquiry, but rather is part and parcel of the Commerce Clause analysis as it augments that enumerated power by authorizing Congress "To make all Laws which shall be necessary and proper" to regulate interstate commerce. See, e.g., Gonzales v. Raich, 545 U.S. 1, 22, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005); see also id. at 34-35, 39 (Scalia, J., concurring in judgment); accord Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1249 (11th Cir. 2008) (the Commerce Clause power is "the combination of the Commerce Clause per se and the Necessary and Proper Clause"). Nevertheless, I will consider the two arguments separately for ease of analysis, and because that

A. Standing to Challenge the Individual Mandate

Before addressing the individual mandate, I must first take up the issue of the plaintiffs' standing to pursue this claim. I previously held on the motion to dismiss that the individual plaintiffs and NFIB had standing, but the defendants have re-raised the issue on summary judgment.[8]

One of the individual plaintiffs, Mary Brown, has filed a declaration in which she avers, among other things: (i) that she is a small business owner and member of NFIB; (ii) that she does not currently have health insurance and has not had health insurance for the past four years; (iii) that she regularly uses her personal funds to meet her business expenses; (iv) that she is not eligible for Medicaid or Medicare and will not be eligible in 2014; (v) that she is subject to the individual mandate and objects to being required to comply as she does not believe the cost of health insurance is a wise or acceptable use of her resources; (vi) that both she and her business will be harmed if she is required to buy health insurance that she neither wants nor needs because it will force her to divert financial resources from her other priorities, including running her business, and doing so will "threaten my ability to maintain my own, independent business"; (vii) that she would be forced to reorder her personal and business affairs because, "[w]ell in advance of 2014, I must now investigate whether and how to both obtain and maintain the required insurance"; and lastly, (viii) that she "must also now investigate the impact" that compliance with the individual mandate will have on her priorities and whether she

---

is how the defendants have framed and presented their arguments. See Def. Mem. at 23 (contending that the individual mandate is an essential part of the regulatory health care reform effort, and is thus "also a valid exercise of Congress's authority if the provision is analyzed under the Necessary and Proper Clause").

[8] It was not necessary to address standing for the Medicaid challenge as the defendants did not dispute that the states could pursue that claim.

can maintain her business, or whether, instead, she will have to lay off employees, close her business, and seek employment that provides qualifying health insurance as a benefit.

The other individual plaintiff, Kaj Ahlburg, has filed a declaration in which he avers, inter alia: (i) that he is retired and holds no present employment; (ii) that he has not had health care insurance for the past six years; (iii) that he has no desire or intention to buy health insurance as he is currently, and expects to remain, able to pay for his and his family's own health care needs; (iv) that he is not eligible for Medicaid or Medicare and will not be eligible in 2014; (v) that he is subject to the individual mandate and he objects to being forced to comply with it as it does not represent "a sensible or acceptable use of my financial resources" and will force him "to divert funds from other priorities which I know to be more important for myself and my family"; and (vi) that he "must now investigate" how and whether to rearrange his finances "to ensure the availability of sufficient funds" to pay for the required insurance premiums.

These declarations are adequate to support standing for the reasons set forth and discussed at length in my prior opinion, which need not be repeated here in any great detail. To establish standing to challenge a statute, a plaintiff needs to show "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement" [Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298, 99 S. Ct. 2301, 60 L. Ed. 2d 895 (1979)]; that is "pegged to a sufficiently fixed period of time" [ACLU of Florida, Inc. v. Miami-Dade County School Bd., 557 F.3d 1177, 1194 (11th Cir. 2009)]; and which is not "merely hypothetical or conjectural" [Florida State Conference of the NAACP v. Browning, 522 F.3d 1153, 1161 (11th Cir. 2008)]. The individual plaintiffs, Ms. Brown in particular, have established that because of the financial expense they will definitively incur under the Act in 2014, they are needing to take investigatory steps and make financial arrangements now

to ensure compliance then. That is enough to show standing, as the clear majority of district courts to consider legal challenges to the individual mandate have held. See Goudy-Bachman v. U.S. Dep't of Health & Human Servs., 2011 WL 223010, at *4-*7 (M.D. Pa. Jan. 24, 2011); Liberty Univ., Inc., supra, 2010 WL 4860299, at *5-*7; U.S. Citizens Assoc., supra, 2010 WL 4947043, at *3; Thomas More Law Center, supra, 720 F. Supp. 2d 882, 887-89; but see Baldwin v. Sebelius, 2010 WL 3418436, at *3 (S.D. Cal. Aug. 27, 2010) (holding that plaintiff in that case lacked standing to challenge individual mandate on the grounds that by 2014 he may have secured insurance on his own). As the District Court for the Eastern District of Michigan properly noted in Thomas More Law Center (a case on which the defendants heavily rely because it ultimately upheld the individual mandate): "[T]he government is requiring plaintiffs to undertake an expenditure, for which the government must anticipate that significant financial planning will be required. That financial planning must take place well in advance of the actual purchase of insurance in 2014 . . . There is nothing improbable about the contention that the Individual Mandate is causing plaintiffs to feel economic pressure today." Thomas More Law Center, supra, 720 F. Supp. 2d at 889.[9]

Because the individual plaintiffs have demonstrated standing, including NFIB member Mary Brown, that means (as also discussed in my earlier order) that NFIB has associational standing as well. This leaves the question of the state plaintiffs' standing to contest the individual mandate --- an issue which was not necessary to reach on the motion to dismiss, but which the plaintiffs request that I address now.

The state plaintiffs have raised several different grounds for standing. One of those grounds is that some of the states have passed legislation seeking to protect

---

[9] I note that Thomas More Law Center is on appeal to the Sixth Circuit, and in their recently-filed appellate brief the Department of Justice has expressly declined to challenge the district court's conclusion that the plaintiffs had standing.

their citizens from forced compliance with the individual mandate. For example, on March 17, 2010, before the Act passed into law, plaintiff Idaho enacted the Idaho Health Freedom Act, which provides in pertinent part:

> (1) The power to require or regulate a person's choice in the mode of securing health care services, or to impose a penalty related thereto, is not found in the Constitution of the United States of America, and is therefore a power reserved to the people pursuant to the Ninth Amendment, and to the several states pursuant to the Tenth Amendment. The state of Idaho hereby exercises its sovereign power to declare the public policy of the state of Idaho regarding the right of all persons residing in the state of Idaho in choosing the mode of securing health care services free from the imposition of penalties, or the threat thereof, by the federal government of the United States of America relating thereto.

> (2) It is hereby declared that . . . every person within the state of Idaho is and shall be free to choose or decline to choose any mode of securing health care services without penalty or threat of penalty by the federal government of the United States of America.

I.C. § 39-9003 (2010).

Similarly, on March 22, 2010, also before the Act became law, Utah passed legislation declaring that the then-pending federal government proposals for health care reform "infringe on state powers" and "infringe on the rights of citizens of this state to provide for their own health care" by "requiring a person to enroll in a third party payment system" and "imposing fines on a person who chooses to pay directly for health care rather than use a third party payer." See generally U.C.A. 1953 § 63M-1-2505.5.

Judge Henry Hudson considered similar legislation in one of the two Virginia cases. After engaging in a lengthy analysis and full discussion of the applicable law [see generally Virginia v. Sebelius, 702 F. Supp. 2d 598, 602-07 (E.D. Va. 2010)],

he concluded that despite the statute's declaratory nature, the Commonwealth had adequate standing to bring the suit insofar as "[t]he mere existence of the lawfully-enacted statue is sufficient to trigger the duty of the Attorney General of Virginia to defend the law and the associated sovereign power to enact it." See id. at 605-06. I agree with Judge Hudson's thoughtful analysis of the issue and adopt it here. The States of Idaho and Utah, through plaintiff Attorneys General Lawrence G. Wasden and Mark L. Shurtleff, have standing to prosecute this case based on statutes duly passed by their legislatures, and signed into law by their Governors.[10]

     In sum, the two individual plaintiffs (Brown and Ahlburg), the association (NFIB), and at least two of the states (Idaho and Utah) have standing to challenge the individual mandate. This eliminates the need to discuss the standing issue with respect to the other state plaintiffs, or the other asserted bases for standing. See Watt v. Energy Action Educ. Found., 454 U.S. 151, 160, 102 S. Ct. 205, 70 L. Ed. 2d 309 (1981) ("Because we find California has standing, we do not consider the standing of the other plaintiffs."); Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 264 n.9, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977) ("Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain this suit."); see also Mountain States Legal Foundation v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (if standing is shown for at least one plaintiff with respect to each claim, "we need not consider the standing of the other plaintiffs to raise that claim").

     Having reaffirmed that the plaintiffs have adequate standing to challenge the individual mandate, I will consider whether that provision is an appropriate exercise of power under the Commerce Clause, and, if not, whether it is sustainable under

---

     [10] I note that several other plaintiff states passed similar laws after the Act became law and during the pendency of this litigation. Other states have similar laws still pending in their state legislatures.

the Necessary and Proper Clause. The Constitutionality of the individual mandate is the crux of this entire case.

**B. <u>Analysis</u>**

**(1) <u>The Commerce Clause</u>**

The current state of Commerce Clause law has been summarized and defined by the Supreme Court on several occasions:

> [W]e have identified three broad categories of activity that Congress may regulate under its commerce power. First, Congress may regulate the use of the channels of interstate commerce. Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities. Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

<u>United States v. Lopez</u>, 514 U.S. 549, 558-59, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995) (citations omitted); <u>accord</u> <u>United States v. Morrison</u>, 529 U.S. 598, 608-09, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000); <u>see</u> <u>also</u> <u>Hodel v. Virginia Surface Min. & Reclamation Assoc., Inc.</u>, 452 U.S. 264, 276-77, 101 S. Ct. 2352, 69 L. Ed. 2d 1 (1981); <u>Perez v. United States</u>, 402 U.S. 146, 150, 91 S. Ct. 1357, 28 L. Ed. 2d 686 (1971). It is thus well settled that Congress has the authority under the Commerce Clause to regulate three --- and only three --- "categories of activity." <u>Lopez</u>, <u>supra</u>, 514 U.S. at 558; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Garcia v. Vanguard Car Rental USA, Inc.</u>, 540 F.3d 1242, 1249-51 (11th Cir. 2008) (discussing in detail the "three categories of activities" that Congress can regulate); <u>United States v. Maxwell</u>, 446 F.3d 1210, 1212 (11th Cir. 2006) (noting that, "to date," Congress can regulate only "three categories of activities"). The third category is the one at issue in this case.

As will be seen, the "substantially affects" category is the most frequently disputed and "most hotly contested facet of the commerce power." Garcia, supra, 540 F.3d at 1250. This is because, while under the first two categories Congress may regulate and protect actual interstate commerce,

> the third allows Congress to regulate intrastate noncommercial activity, based on its effects. Consideration of effects necessarily involves matters of degree [and] thus poses not two hazards, like Scylla and Charybdis, but three. If we entertain too expansive an understanding of effects, the Constitution's enumeration of powers becomes meaningless and federal power becomes effectively limitless. If we entertain too narrow an understanding, Congress is stripped of its enumerated power, reinforced by the Necessary and Proper Clause, to protect and control commerce among the several states. If we employ too nebulous a standard, we exacerbate the risk that judges will substitute their own subjective or political calculus for that of the elected representatives of the people, or will appear to be doing so.

United States v. Patton, 451 F.3d 615, 622-23 (10th Cir. 2006). Before attempting to navigate among these three "hazards," a full review of the historical roots of the commerce power, and a discussion of how we got to where we are today, may be instructive.

### *(a) The Commerce Clause in its Historical Context*

Chief Justice Marshall wrote in 1824, in the first ever Commerce Clause case to reach the Supreme Court:

> As men, whose intentions require no concealment, generally employ the words which most directly and aptly express the ideas they intend to convey, the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they have said.

Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 188, 6 L. Ed. 23 (1824). Justice Marshall

continued his opinion by noting that if, "from the imperfection of human language," there are doubts as to the extent of any power authorized under the Constitution, the underlying object or purpose for which that power was granted "should have great influence in the construction." Id. at 188-89. In other words, in determining the full extent of any granted power, it may be helpful to not only focus on what the Constitution says (i.e., the actual language used), but also why it says what it says (i.e., the problem or issue it was designed to address). Both will be discussed in turn.

The Commerce Clause is a mere sixteen words long, and it provides that Congress shall have the power:

> To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

U.S. Const. art I, § 8, cl. 3. For purposes of this case, only seven words are relevant: "To regulate Commerce . . . among the several States." There is considerable historical evidence that in the early years of the Union, the word "commerce" was understood to encompass trade, and the intercourse, traffic, or exchange of goods; in short, "the activities of buying and selling that come after production and before the goods come to rest." Robert H. Bork & Daniel E. Troy, Locating the Boundaries: The Scope of Congress's Power to Regulate Commerce, 25 Harv. J. L. & Pub. Pol'y 849, 861-62 (2002) ("Bork & Troy") (citing, inter alia, dictionaries from that time which defined commerce as "exchange of one thing for another"). In a frequently cited law review article, one Constitutional scholar has painstakingly tallied each appearance of the word "commerce" in Madison's notes on the Constitutional Convention and in The Federalist, and discovered that in none of the ninety-seven appearances of that term is it ever used to refer unambiguously to activity beyond trade or exchange. See Randy E. Barnett, The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101, 114-16 (2001) ("Barnett"); see

also id. at 116 (further examining each and every use of the word that appeared in the state ratification convention reports and finding "the term was uniformly used to refer to trade or exchange"). Even a Constitutional scholar who has argued for an expansive interpretation of the Commerce Clause (and, in fact, has been cited to, and relied on, by the defendants in this case) has acknowledged that when the Constitution was drafted and ratified, commerce "was the practical equivalent of the word 'trade.'" See Robert L. Stern, That Commerce Which Concerns More States than One, 47 Harv. L. Rev. 1335, 1346 (1934) ("Stern").

The Supreme Court's first description of commerce (and still the most widely accepted) is from Gibbons v. Ogden, supra, which involved a New York law that sought to limit the navigable waters within the jurisdiction of that state. In holding that "commerce" comprehended navigation, and thus it fell within the reach of the Commerce Clause, Chief Justice Marshall explained that "Commerce, undoubtedly, is traffic, but it is something more: it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse." 22 U.S. at 72. This definition is consistent with accepted dictionary definitions of the Founders' time. See 1 Samuel Johnson, A Dictionary of the English Language (4th ed. 1773) (commerce defined as "Intercourse; exchange of one thing for another; interchange of any thing; trade; traffick"). And it remained a good definition of the Supreme Court's Commerce Clause interpretation throughout the Nineteenth Century. See, e.g., Kidd v. Pearson, 128 U.S. 1, 20-21, 9 S. Ct. 6, 32 L. Ed. 346 (1888) ("The legal definition of the term [commerce] . . . consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale, and exchange of commodities"). As Alexander Hamilton intimated in The Federalist, however, it did not at that time encompass manufacturing or agriculture. See The Federalist No. 34, at 212-13

(noting that the "encouragement of agriculture and manufactures" was to remain an object of state expenditure). This interpretation of commerce as being primarily concerned with the commercial intercourse associated with the trade or exchange of goods and commodities is consistent with the original purpose of the Commerce Clause (discussed immediately below), which is entitled to "great influence in [its] construction." See Gibbons, supra, 22 U.S. at 188-89.[11]

There is no doubt historically that the primary purpose behind the Commerce Clause was to give Congress power to regulate commerce so that it could eliminate the trade restrictions and barriers by and between the states that had existed under the Articles of Confederation. Such obstructions to commerce were destructive to the Union and believed to be precursors to war. The Supreme Court has explained this rationale:

> When victory relieved the Colonies from the pressure for
> solidarity that war had exerted, a drift toward anarchy

---

[11] As an historical aside, I note that pursuant to this original understanding and interpretation of "commerce," insurance contracts did not qualify because "[i]ssuing a policy of insurance is not a transaction of commerce." Paul v. Virginia, 75 U.S. (8 Wall.) 168, 183, 19 L. Ed. 357 (1868) (further explaining that insurance contracts "are not articles of commerce in any proper meaning of the word" as they are not objects "of trade and barter," nor are they "commodities to be shipped or forwarded from one State to another, and then put up for sale"). That changed in 1944, when the Supreme Court held that Congress could regulate the insurance business under the Commerce Clause. United States v. South-Eastern Underwriters Assoc., 322 U.S. 533, 64 S. Ct. 1162, 88 L. Ed. 1440 (1944). "Concerned that [this] decision might undermine state efforts to regulate insurance, Congress in 1945 enacted the McCarran-Ferguson Act. Section 1 of the Act provides that 'continued regulation and taxation by the several States of the business of insurance is in the public interest,' and that 'silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.'" Humana Inc. v. Forsyth, 525 U.S. 299, 306, 119 S. Ct. 710, 142 L. Ed.2d 753 (1999) (quoting 15 U.S.C. § 1011). Thus, ever since passage of the McCarran-Ferguson Act, the insurance business has continued to be regulated almost exclusively by the states.

and commercial warfare between states began . . . [E]ach state would legislate according to its estimate of its own interests, the importance of its own products, and the local advantages or disadvantages of its position in a political or commercial view. This came to threaten at once the peace and safety of the Union. The sole purpose for which Virginia initiated the movement which ultimately produced the Constitution was to take into consideration the trade of the United States; to examine the relative situations and trade of the said states; to consider how far a uniform system in their commercial regulation may be necessary to their common interest and their permanent harmony and for that purpose the General Assembly of Virginia in January of 1786 named commissioners and proposed their meeting with those from other states.

The desire of the Forefathers to federalize regulation of foreign and interstate commerce stands in sharp contrast to their jealous preservation of power over their internal affairs. No other federal power was so universally assumed to be necessary, no other state power was so readily relin[q]uished. There was no desire to authorize federal interference with social conditions or legal institutions of the states. Even the Bill of Rights amendments were framed only as a limitation upon the powers of Congress. The states were quite content with their several and diverse controls over most matters but, as Madison has indicated, "want of a general power over Commerce led to an exercise of this power separately, by the States, which not only proved abortive, but engendered rival, conflicting and angry regulations."

H.P. Hood & Sons, Inc. v. Du Mond, 336 U.S. 525, 533-34, 69 S. Ct. 657, 93 L. Ed. 865 (1949) (citations and quotations omitted). The foregoing is a frequently repeated history lesson from the Supreme Court. In his concurring opinion in the landmark 1824 case of Gibbons v. Ogden, supra, for example, Justice Johnson provided a similar historical summary:

*Case No.: 3:10-cv-91-RV/EMT*

> For a century the States [as British colonies] had submitted, with murmurs, to the commercial restrictions imposed by the parent State; and now, finding themselves in the unlimited possession of those powers over their own commerce, which they had so long been deprived of, and so earnestly coveted, that selfish principle which, well controlled, is so salutary, and which, unrestricted, is so unjust and tyrannical, guided by inexperience and jealousy, began to show itself in iniquitous laws and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the States, and fatal to their commercial interests abroad.

> This was the immediate cause, that led to the forming of a convention.

Gibbons, supra, 22 U.S. at 224. In the Supreme Court's 1888 decision in Kidd v. Pearson, Justice Lamar noted that "it is a matter of public history that the object of vesting in congress the power to regulate commerce . . . among the several states was to insure uniformity for regulation against conflicting and discriminatory state legislation." See Kidd, supra, 128 U.S. at 21. More recently, Justice Stevens has advised that when "construing the scope of the power granted to Congress by the Commerce Clause . . . [i]t is important to remember that this clause was the Framers' response to the central problem that gave rise to the Constitution itself," that is, the Founders had "'set out only to find a way to reduce trade restrictions.'" See EEOC v. Wyoming, 460 U.S. 226, 244-45, 103 S. Ct. 1054, 75 L. Ed. 2d 18 (1983) (Stevens, J., concurring). The foregoing history is so "widely shared," [see id. at 245 n.1], that Constitutional scholars with opposing views on the Commerce Clause readily agree on this point. Compare Stern, supra, at 1344 ("There can be no question, of course, that in 1787 [when] the framers and ratifiers of the Constitution . . . considered the need for regulating 'commerce with foreign nations and among the several states,' they were thinking only in terms of . . . the removal

of barriers obstructing the physical movements of goods across state lines."), with Bork & Troy, supra, at 858, 865 ("One thing is certain: the Founders turned to a federal commerce power to carve stability out of this commercial anarchy" and "keep the States from treating one another as hostile foreign powers"; in short, "the Clause was drafted to grant Congress the power to craft a coherent national trade policy, to restore and maintain viable trade among the states, and to prevent interstate war."). Hamilton and Madison both shared this concern that conflicting and discriminatory state trade legislation "would naturally lead to outrages, and these to reprisals and wars." The Federalist No. 7, at 37 (Hamilton); see also The Federalist No. 42, at 282 (Madison) (referencing the "unceasing animosities" and "serious interruptions of the public tranquility" that would inevitably flow from the lack of national commerce power).

To acknowledge the foregoing historical facts is not necessarily to say that the power under the Commerce Clause was intended to (and must) remain limited to the trade or exchange of goods, and be confined to the task of eliminating trade barriers erected by and between the states.[12] The drafters of the Constitution were aware that they were preparing an instrument for the ages, not one suited only for the exigencies of that particular time. See, e.g., McCulloch, supra, 17 U.S. at 415 (the Constitution was "intended to endure for ages to come" and "to be adapted to the various crises of human affairs") (Marshall, C.J.); Weems v. United States, 217 U.S. 349, 373, 30 S. Ct. 544, 54 L. Ed. 793 (1910) (explaining that constitutions

---

[12] Although there is some evidence that is exactly what Madison, at least, had intended. In one of his letters, he wrote that the Commerce Clause "'grew out of the abuse of the power by the importing States in taxing the non-importing, and was intended as a negative and preventive provision against injustice among the States themselves, rather than as a power to be used for the positive purposes of the General Government.'" West Lynn Creamery, Inc. v. Healy, 512 U.S. 186, 193 n.9, 114 S. Ct. 2205, 129 L. Ed. 2d 157 (1994) (quoting 3 M. Farrand, Records of the Federal Convention of 1787, p. 478 (1911)).

"are not ephemeral enactments, designed to meet passing occasions," but rather are "designed to approach immortality as nearly as human institutions can approach it . . . [and], therefore, our contemplation cannot be only of what has been, but of what may be"); accord New York v. United States, 505 U.S. 144, 157, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992) (the Constitution was "phrased in language broad enough to allow for the expansion" of federal power and allow "enormous changes in the nature of government"). As Hamilton explained:

> Constitutions of civil government are not to be framed upon a calculation of existing exigencies, but upon a combination of these with the probable exigencies of ages, according to the natural and tried course of human affairs. Nothing, therefore, can be more fallacious than to infer the extent of any power, proper to be lodged in the national government, from an estimate of its immediate necessities. There ought to be a capacity to provide for future contingencies as they may happen; and as these are illimitable in their nature, it is impossible safely to limit that capacity.

The Federalist No. 34, at 210-11 (emphasis in original).

Thus, the exercise and interpretation of the commerce power has evolved and undergone a significant change "as the needs of a dynamic and constantly expanding national economy have changed." See EEOC, supra, 460 U.S. at 246 (Stevens, J., concurring). But, I will begin at the beginning.

### (b) Evolution of Commerce Clause Jurisprudence

Some have maintained that the Commerce Clause power began as, and was intended to remain, a narrow and limited one. See, e.g., Raoul Berger, Federalism: The Founders Design (1987) (arguing that the founders sought to create a limited federal government whose power, including the commerce power, was narrow in scope); Barnett, supra, at 146 (concluding that "the most persuasive evidence of original meaning . . . strongly supports [the] narrow interpretation of Congress's

power [under the Commerce Clause]"). Despite evidence to support this position, it is difficult to prove decisively because for the first century of our history the Clause was seldom invoked by Congress (if at all), and then only negatively to prevent the interference with commerce by individual states. This necessarily means that there is a lack of early congressional and judicial pronouncements on the subject. This, in turn, makes it harder to conclusively determine how far the commerce power was originally intended to reach. It was not until 1824 (more than three decades after ratification) that the Supreme Court was first called upon in Gibbons v. Ogden to consider the commerce power. By that time, it would appear that the Clause was given a rather expansive treatment by Chief Justice Marshall, who wrote:

> [The commerce power] is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the constitution . . . If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several States, is vested in Congress as absolutely as it would be in a single government, having in its constitution the same restrictions on the exercise of the power as are found in the constitution of the United States. The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances . . . the sole restraints on which they have relied, to secure them from its abuse.

Gibbons, supra, 22 U.S. at 75. Notwithstanding this seemingly broad interpretation of Congress' power to negate New York's assertion of authority over its navigable waters, it was not until 1887, one hundred years after ratification, that Congress first exercised its power to affirmatively and positively regulate commerce among the states. And when it did, the Supreme Court at that time rejected the broad

conception of commerce and the power of Congress to regulate the economy was sharply restricted. See, e.g., Kidd v. Pearson, supra (1888). Thus, for most of the first century and a half of Constitutional government (with the possible exception of Gibbons v. Ogden in 1824), the Clause was narrowly construed and given "miserly construction." See EEOC, supra, 460 U.S. at 246 (Stevens, J., concurring) (citing Kidd, supra, 128 U.S. at 20-21 (manufacturing not subject to the commerce power of Congress); United States v. E.C. Knight Co., 156 U.S. 1, 12-16, 15 S. Ct. 249, 39 L. Ed. 325 (1895) (manufacturing monopoly not subject to commerce power); Adair v. United States, 208 U.S. 161, 178-179, 28 S. Ct. 277, 52 L. Ed. 436 (1908) (connection between interstate commerce and membership in a labor union insufficient to authorize Congress to make it a crime for an interstate carrier to fire employee for his union membership); Hammer v. Dagenhart, 247 U.S. 251, 276, 38 S. Ct. 529, 62 L. Ed. 1101 (1918) (Congress without power to prohibit the interstate transportation of goods produced with child labor); Carter v. Carter Coal Co., 298 U.S. 238, 298, 308-10, 56 S. Ct. 855, 80 L. Ed. 1160 (1936) (holding that commerce power does not extend to the regulation of wages, hours, and working conditions of coal miners; defining commerce --- consistent with the original understanding of the term --- as "the equivalent of the phrase 'intercourse for the purposes of trade'")).

For example, in A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S. Ct. 837, 79 L. Ed. 1570 (1935), a case well known to first year law students, the Court invalidated regulations fixing employee hours and wages in an intrastate business because the activity being regulated only related to interstate commerce "indirectly." The Supreme Court characterized the distinction between "direct" and "indirect" effects on interstate commerce as "a fundamental one, essential to the maintenance of our constitutional system," for without it "there would be virtually no limit to the federal power and for all practical purposes we

should have a completely centralized government." Id. at 548.

But, everything changed in 1937, beginning with the first of three significant New Deal cases. In N.L.R.B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S. Ct. 615, 81 L. Ed. 893 (1937), the Supreme Court, after recognizing the well known principle "that acts which directly burden or obstruct interstate or foreign commerce, or its free flow, are within the reach of the congressional power" [see id. at 31], held for the first time that Congress could also regulate purely intrastate activities that could be said to have a "substantial effect" on interstate commerce. "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control." Id. at 37. The question was now "the effect upon interstate commerce of the [intrastate activity] involved." Id. at 40 (emphasis added).

Four years later, in United States v. Darby, 312 U.S. 100, 61 S. Ct. 451, 85 L. Ed. 609 (1941), the Supreme Court overruled Hammer v. Dagenhart, supra. In upholding the wage and hour requirements in the Fair Labor Standards Act, and its suppression of substandard labor conditions, the Court reaffirmed that with respect to intrastate "transactions" and "activities" having a substantial effect on interstate commerce, Congress may regulate them without doing violence to the Constitution. See id. at 118-23.

And then came Wickard v. Filburn, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942), which, until recently, was widely considered the most far-reaching expansion of Commerce Clause regulatory authority over intrastate activity. At issue in Wickard were amendments to the Agricultural Adjustment Act of 1938 that set acreage allotments for wheat farmers in an effort to control supply and avoid surpluses that could result in abnormally low wheat prices. The plaintiff in

that case, Roscoe Filburn, owned a small farm on which he raised and harvested

wheat, among other things. When he exceeded his allotment by 12 acres (which

yielded 239 bushels of wheat), he was penalized under the statute. Although the

intended disposition of the crop involved in the case was not "expressly stated,"

[id. at 114], the Supreme Court assumed and analyzed the issue as though the

excess wheat was "not intended in any part for commerce but wholly for

consumption on the farm." See id. at 118. Even though production of such wheat

"may not be regarded as commerce" in the strictest sense of the word, [see id. at

125], consumption on the farm satisfied needs that would (theoretically, at least)

be otherwise filled by another purchase or commercial transaction. See id. at 128

(explaining that homegrown wheat "supplies a need of the man who grew it which

would otherwise be reflected by purchases in the open market [and] in this sense

competes with wheat in commerce"). In holding that Congress had power under

the Commerce Clause to regulate production intended for personal consumption,

the Supreme Court stated:

> [E]ven if appellee's activity be local and though it may not
> be regarded as commerce, it may still, whatever its
> nature, be reached by Congress if it exerts a substantial
> economic effect on interstate commerce and this
> irrespective of whether such effect is what might at some
> earlier time have been defined as "direct" or "indirect."
>
> * * *
>
> That appellee's own contribution to the demand for
> wheat may be trivial by itself is not enough to remove
> him from the scope of federal regulation where, as here,
> his contribution, taken together with that of many others
> similarly situated, is far from trivial.

Id. at 125, 127-28. The latter statement is commonly known and described as the

"aggregation principle." It allows Congress under the Commerce Clause to reach a

"class of activities" that have a substantial impact on interstate commerce when those activities are aggregated with all similar and related activities --- even though the activities within the class may be themselves trivial and insignificant. See, e.g., Maryland v. Wirtz, 392 U.S. 183, 192-93, 196 n.27, 88 S. Ct. 2017, 20 L. Ed. 2d 1020 (1968) (any claim that reviewing courts have the power to excise, as trivial, individual activity within a broader class of activities "has been put entirely to rest" as the "de minimis character of individual instances arising under [the] statute is of no consequence"). To illustrate this principle, as applied in Wickard, even though Filburn's 239 bushels were presumably for his own consumption and seed, and did not significantly impact interstate commerce, if every farmer in the country did the same thing, the aggregate impact on commerce would be cumulatively substantial.

Together, Jones & Laughlin Steel, Darby, and Wickard either "ushered in" a new era of Commerce Clause jurisprudence "that greatly expanded the previously defined authority of Congress under that Clause" [Lopez, supra, 514 U.S. at 556], or they merely "restored" the "broader view of the Commerce Clause announced by Chief Justice Marshall." Perez, supra, 402 U.S. at 151. Regardless of whether the cases represented a new era or simply a restoration of the old, it seemed that from that point forward congressional action under the Commerce Clause was to be given virtually insurmountable deference. See Kenneth Klukowski, Citizen Gun Rights: Incorporating the Second Amendment Through the Privileges or Immunities Clause, 39 N.M. L. Rev. 195, 232-33 (2009) (noting that in these New Deal cases "the Court read the Commerce Clause so broadly that it is a bold statement to say that the provision even nominally constrained federal action"). And, indeed, from the New Deal period through the next five decades, not a single federal legislative enactment was struck down as exceeding Congress' power under the Commerce Clause power --- until Lopez in 1995.

In United States v. Lopez the Supreme Court considered the Constitutionality

of the Gun Free School Zones Act of 1990, which criminalized the possession of a firearm in a school zone. In holding that the statute exceeded Congress' authority under the Commerce Clause, the Supreme Court began by recognizing the "first principles" behind the limitations on federal power as set forth in the Constitution. See supra, 514 U.S. at 552. Then, after detailing the history and transformation of Commerce Clause jurisprudence --- from Gibbons, to A.L.A. Schechter Poultry, and up through Wickard --- the Court observed that even in cases which had interpreted the Commerce Clause more expansively, every decision to date had recognized that the power granted by the Clause is necessarily "subject to outer limits" which, if not recognized and respected, could lead to federal action that would "effectually obliterate the distinction between what is national and what is local and create a completely centralized government." See generally id. at 553-57. Consistent with those limits, the Lopez Court stated "we have identified three broad categories of activity that Congress may regulate under its commerce power." See id. at 558 (emphasis added). The "substantially affects" category was the one at issue there, and in holding that the statute did not pass muster thereunder, the Supreme Court focused on four considerations: (i) the activity being regulated (guns near schools) was not economic in nature; (ii) the statute did not contain jurisdictionally limiting language; (iii) Congress did not make any formal findings concerning the effect of the regulated activity on commerce; and (iv) the connection between that activity and its effect on commerce was attenuated. See generally id. at 559-67.

As for the fourth consideration, the Court impliedly conceded the claims by the government and the dissent that: (1) gun-related violence is a serious national problem with substantial costs that are spread throughout the population; (2) such violence has adverse effects on classroom learning (which can result in decreased productivity) and discourages traveling into areas felt to be unsafe; all of which, in turn, (3) represents a substantial threat to interstate commerce. The Lopez majority

made a point to "pause to consider the implications" of such arguments, however.

See id. at 563-65. It found that if such theories were sufficient to justify regulation

under the Commerce clause (even though their underlying logic and truth were not

questioned), "it is difficult to perceive any limitation on federal power" and "we are

hard pressed to posit any activity by an individual that Congress is without power

to regulate." See id. at 564. To accept such arguments and uphold the statute, the

majority concluded, would require the Court:

> . . . to pile inference upon inference in a manner that
> would bid fair to convert congressional authority under
> the Commerce Clause to a general police power of the
> sort retained by the States. Admittedly, some of our prior
> cases have taken long steps down that road, giving great
> deference to congressional action. The broad language in
> these opinions has suggested the possibility of additional
> expansion, but we decline here to proceed any further. To
> do so would require us to conclude that the
> Constitution's enumeration of powers does not
> presuppose something not enumerated, and that there
> never will be a distinction between what is truly national
> and what is truly local. This we are unwilling to do.

Id. at 567-68; see also id. at 578, 580 (explaining that it is the Court's duty to

"recognize meaningful limits on the commerce power" and intervene if Congress

"has tipped the scales too far" as federal balance "is too essential a part of our

constitutional structure and plays too vital a role in securing freedom") (Kennedy,

J., concurring) .

The next significant Commerce Clause case to be decided by the Supreme

Court was the 2000 case of United States v. Morrison, supra, 529 U.S. at 598,

which involved a challenge to the Violence Against Women Act of 1994. The

government argued in that case --- similar to what it did in Lopez --- that Congress

could regulate gender-motivated violence based on a syllogistic theory that victims

of such violence are deterred from traveling and engaging in interstate business or

employment; they are thus less productive (and incur increased medical and other costs); all of which, in turn, substantially affects interstate commerce. See id. at 615. The Court began its analysis by recognizing the foundational principle that the power of the federal government is "defined and limited" and therefore: "Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution." See id. at 607. It emphasized that while the legal analysis of the Commerce Clause "has changed as our Nation has developed," which has resulted in Congress having "considerably greater latitude in regulating conduct and transactions under the Commerce Clause than our previous case law permitted," authority under the Clause "is not without effective bounds." See id. at 607-08. The Court then looked to the four "significant considerations" that were identified in Lopez and found that, "[w]ith these principles underlying our Commerce Clause jurisprudence as reference points, the proper resolution of the present cases is clear." See id. at 610-13. First, the statute at issue in Morrison did not regulate economic activity:

> Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity. While we need not adopt a categorical rule against aggregating the effects of any noneconomic activity in order to decide these cases, thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature.

Id. at 613. Further, the statute did not contain jurisdictionally limiting language; and while it was supported, in contrast to Lopez, with numerous congressional findings regarding the personal, familial, and economic impact of gender-motivated violence, those findings were insufficient to sustain the legislation as they relied on the same "method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers." Id. at 615. In other words, it would require the Court "to pile inference upon inference," and, in the process, run

the risk of "completely obliterat[ing] the Constitution's distinction between national and local authority." See id.

In light of the circumscriptial rulings in Lopez and Morrison, many were surprised by the Supreme Court's subsequent decision in Gonzales v. Raich, 545 U.S. 1, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005), which was not only seen as a return to the more expansive Commerce Clause jurisprudence [see, e.g., Matthew Farley, Challenging Supremacy: Virginia's Response to the Patient Protection and Affordable Care Act, 45 U. Rich. L. Rev. 37, 65 (2010)], but was, in fact, viewed by some as even going beyond and "displacing" Wickard as the most far-reaching of all Commerce Clause cases. See Douglas W. Kmiec, Gonzales v. Raich: Wickard v. Filburn Displaced, 2005 Cato Sup. Ct. Rev. 71 (2005).

At issue in Raich was whether Congress had authority under the Commerce and Necessary and Proper Clauses to prohibit, via the Controlled Substances Act, "the local cultivation and use of marijuana in compliance with California law." See Raich, supra, 545 U.S. at 5. The marijuana at issue, which was being used by two seriously ill women for medicinal purposes pursuant to state law, had been neither bought nor sold and never crossed state lines. It was, and is, illegal in most states, and does not have a legal free market in interstate commerce, the normal attribute of any economic analysis. Nevertheless, the Supreme Court began its analysis by stating: "Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." Id. at 17. The Court found Wickard to be "striking" in similarity and "of particular relevance" to the analysis as that case "establishes that Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut regulation of the interstate market in that commodity." Id. at 17-18. The Court held that Congress had a "rational basis" for finding that

leaving home-consumed marijuana outside of federal control would affect the price and market conditions for that commodity because, as was noted in Wickard, the "production of the commodity meant for home consumption, be it wheat or marijuana, has a substantial effect on supply and demand in the national market for that commodity." See id. at 19. Surprisingly, "[t]hat the market in Raich happened to be an illegal one did not affect the Court's analysis in the least." Maxwell, supra, 446 F.3d at 1214.

The Eleventh Circuit has indicated that the distinguishing feature between Raich and Wickard on the one hand, and Morrison and Lopez on the other, "was the comprehensiveness of the economic component of the regulation." Maxwell, supra, 446 F.3d at 1214. The statute in Lopez, for example, was a brief, single-subject criminal statute that did not regulate any economic activity. By contrast, the statute in Raich was a broader legislative scheme "at the opposite end of the regulatory spectrum." Supra, 545 U.S. at 24. It was "a lengthy and detailed statute creating a comprehensive framework for regulating the production, distribution, and possession of [controlled substances]," which were "activities" the Supreme Court determined to be "quintessentially economic" in nature. See id. at 24-25. The Court reached this conclusion by "quite broadly defin[ing] 'economics' as 'the production, distribution, and consumption of commodities.'" See Maxwell, supra, 446 F.3d at 1215 n.4 (quoting Raich, supra, 545 U.S. at 25-26, in turn quoting Webster's Third New International Dictionary 720 (1966)).[13]

### (c) Application of the Foregoing to the Facts of this Case

Unsurprisingly, the plaintiffs rely heavily on Lopez and Morrison in framing

---

[13] In objecting to the majority's use of this "broadest possible" definition, Justice Thomas argued in dissent that "economics" is not defined as broadly in other dictionaries, and "the majority does not explain why it selects a remarkably expansive 40-year-old definition." Raich, supra, 545 U.S. at 69 and n.7 (Thomas, J., dissenting).

their arguments, while the defendants, of course, look principally to <u>Wickard</u> and <u>Raich</u>. These cases (along with the others discussed above) all have something to add to the discussion. However, while they frame the analysis, and are important from a historical perspective, they do not by themselves resolve this case. That is because, as Congress' attorneys in the Congressional Research Service ("CRS") and Congressional Budget Office ("CBO") advised long before the Act was passed into law, the notion of Congress having the power under the Commerce Clause to directly impose an individual mandate to purchase health care insurance is "novel" and "unprecedented." <u>See</u> Jennifer Staman & Cynthia Brougher, Congressional Research Service, <u>Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis</u>, July 24, 2009, at 3, 6 ("whether Congress can use its Commerce Clause authority to require a person to buy a good or a service" raises a "novel issue" and "most challenging question") ("CRS Analysis"); Congressional Budget Office Memorandum, <u>The Budgetary Treatment of an Individual Mandate to Buy Health Insurance</u>, August 1994 ("A mandate requiring all individuals to purchase health insurance would be an unprecedented form of federal action.") ("CBO Analysis"). Never before has Congress required that everyone buy a product from a private company (essentially for life) just for being alive and residing in the United States.[14]

---

[14] The individual mandate differs from the regulations in <u>Wickard</u> and <u>Raich</u>, for example, in that the individuals being regulated in those cases were engaged in an activity (regardless of whether it could readily be deemed interstate commerce in itself) and each had the choice to discontinue that activity and avoid penalty. <u>See</u>, <u>e.g.</u>, <u>Wickard v. Filburn</u>, 317 U.S. 111, 130, 63 S. Ct. 82, 87 L. Ed. 122 (1942) (noting Congress "gave the farmer a choice" of several options under the statute). Here, people have no choice but to buy insurance or be penalized. And their freedom is actually more restricted as they do not even have a choice as to the minimum level or type of insurance to buy because Congress established the floor. A single twenty-year old man or woman who only needs and wants major medical or catastrophic coverage, for example, is precluded from buying such a policy under the Act.

*Case No.: 3:10-cv-91-RV/EMT*

As I explained in my earlier order, the fact that legislation is unprecedented does not by itself render it unconstitutional. To the contrary, all federal legislation carries with it a "presumption of constitutionality." Morrison, supra, 529 U.S. at 607. However, the presumption is arguably weakened, and an "absence of power" might reasonably be inferred where --- as here --- "earlier Congresses avoided use of this highly attractive power." Printz v. United States, 521 U.S. 898, 905, 908, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997); id. at 907-08 ("the utter lack of statutes imposing obligations [like the one at issue in that case] (notwithstanding the attractiveness of that course to Congress), suggests an assumed absence of such power") (emphasis in original); id. at 918 ("almost two centuries of apparent congressional avoidance of the practice [at issue] tends to negate the existence of the congressional power asserted here").[15] The mere fact that the defendants have tried to analogize the individual mandate to things like jury service, participation in the census, eminent domain proceedings, forced exchange of gold bullion for paper currency under the Gold Clause Cases, and required service in a "posse" under the Judiciary Act of 1789 (all of which are obviously distinguishable) only underscores and highlights its unprecedented nature.

However, unprecedented or not, I will assume that the individual mandate can be Constitutional under the Commerce Clause and will analyze it accordingly. This analysis requires the resolution of two essential questions.

**(i) Is Activity Required Under the Commerce Clause?**

The threshold question that must be addressed is whether activity is required before Congress can exercise its power under the Commerce Clause. As previously

---

[15] Indeed, as the plaintiffs have persuasively noted, not even in the context of insurance under the National Flood Insurance Program did Congress mandate that all homeowners buy flood insurance directly from a private company. See Pl. Opp. at 26-27.

*Case No.: 3:10-cv-91-RV/EMT*

discussed, Commerce Clause jurisprudence has "'taken some turns,'" [see Lopez, supra, 514 U.S. at 579 (Kennedy, J., concurring)], and contracted and expanded (and contracted and expanded again) during our nation's development. But, in every one of the cases --- in both the contractive and expansive --- there has always been clear and inarguable activity, from exerting control over and using navigable waters (Gibbons) to growing or consuming marijuana (Raich).[16] In all the cases discussed above, the Supreme Court was called upon to decide different issues (e.g., whether commerce encompassed navigation; whether it included manufacture and agriculture or was limited to trade or exchange of goods; whether the activity at issue was interstate or intrastate and had a direct or indirect effect on commerce; whether that effect was substantial; whether the activity was economic or non-economic; and whether it was part of a single-subject statute or a necessary and essential component of a broader comprehensive scheme), but it has never been called upon to consider if "activity" is required. On this point at least, the district courts that have reached opposite conclusions on the individual mandate agree. Compare Thomas More Law Center, supra, 720 F. Supp. 2d at 893 (noting that the Supreme Court "has never needed to address the activity/inactivity distinction advanced by plaintiffs because in every Commerce Clause case presented thus far, there has been some sort of activity"; then proceeding to uphold the individual mandate), with Virginia, supra, 728 F. Supp. 2d at 781 (noting that "every application of Commerce Clause power found to be constitutionally sound by the

---

[16] The defendants cite to Raich for the proposition that Congress may reach "even wholly intrastate, non-commercial matters when it concludes that the failure to do so would undercut a larger program regulating interstate commerce." See Def. Mem. at 13. By paraphrasing Raich here rather than quoting from the decision the defendants have attempted to obscure the importance of "activity," for the cited portion, and Justice Scalia's concurrence (on which the defendants also rely), do not talk at all of "matters" --- either commercial or not. They only mention (and often) "activities."

Supreme Court involved some form of action, transaction, or deed placed in motion by an individual or legal entity"; then proceeding to strike down the individual mandate).

The defendants contend, however, that despite the inarguable presence of activity in every Supreme Court case to date, activity is not required under the Commerce Clause. See Def. Mem. at 31 (maintaining that "there is no 'activity' clause in the constitution"). In fact, they go so far as to suggest that to impose such a requirement would be bold and radical. According to the defendants, because the Supreme Court has never identified a distinction between activity and inactivity as a limitation on Congress' commerce power, to hold otherwise would "break new legal ground" and be "novel" and "unprecedented." See Def. Opp. at 1, 2, 16. First, it is interesting that the defendants --- apparently believing the best defense is a good offense --- would use the words "novel" and "unprecedented" since, as previously noted, those are the exact same words that the CRS and CBO used to describe the individual mandate before it became law. Furthermore, there is a simple and rather obvious reason why the Supreme Court has never distinguished between activity and inactivity before: it has not been called upon to consider the issue because, until now, Congress had never attempted to exercise its Commerce Clause power in such a way before. See CBO Analysis (advising Congress during the previous health care reform efforts in 1994 that "[t]he government has never required people to buy any good or service as a condition of lawful residence in the United States."). In every Supreme Court case decided thus far, Congress was not seeking to regulate under its commerce power something that could even arguably be said to be "passive inactivity."[17]

---

[17] I note that in Gibbons v. Ogden, where Chief Justice Marshall "described the Federal Commerce power with a breadth never yet exceeded" [Wickard, supra, 317 U.S. at 111], commerce was defined as "intercourse." Even that word would

It would be a radical departure from existing case law to hold that Congress can regulate inactivity under the Commerce Clause. If it has the power to compel an otherwise passive individual into a commercial transaction with a third party merely by asserting --- as was done in the Act --- that compelling the actual transaction is itself "commercial and economic in nature, and substantially affects interstate commerce" [see Act § 1501(a)(1)], it is not hyperbolizing to suggest that Congress could do almost anything it wanted. It is difficult to imagine that a nation which began, at least in part, as the result of opposition to a British mandate giving the East India Company a monopoly and imposing a nominal tax on all tea sold in America would have set out to create a government with the power to force people to buy tea in the first place. If Congress can penalize a passive individual for failing to engage in commerce, the enumeration of powers in the Constitution would have been in vain for it would be "difficult to perceive any limitation on federal power" [Lopez, supra, 514 U.S. at 564], and we would have a Constitution in name only. Surely this is not what the Founding Fathers could have intended. See id. at 592 (quoting Hamilton at the New York Convention that there would be just cause to reject the Constitution if it would allow the federal government to "penetrate the recesses of domestic life, and control, in all respects, the private conduct of individuals") (Thomas, J., concurring). In Lopez, the Supreme Court struck down the Gun Free School Zones Act of 1990 after stating that, if the statute were to be

---

seem to carry with it an implicit presumption of at least some sort of preexisting dealing between people or entities. See 1 Samuel Johnson, A Dictionary of the English Language (4th ed. 1773) (defining "intercourse" as "Commerce; exchange" and "Communication"). Furthermore, as one of the amici notes in their brief, the word "regulate" in the Commerce Clause itself would also appear to presuppose action upon some object or activity that is already extant (see doc. 121 at 4 n.1, citing Samuel Johnson's dictionary defining "regulate" as "to adjust by rule or method" or "to direct"). Thus, a regulator "comes to an existing phenomenon and orders it." Id.

upheld, "we are <u>hard pressed</u> to posit any <u>activity</u> by an individual that Congress is without power to regulate." <u>See id.</u> at 564. (emphasis added). If some type of already-existing activity or undertaking were not considered to be a prerequisite to the exercise of commerce power, we would go beyond the concern articulated in <u>Lopez</u> for it would be virtually <u>impossible</u> to posit <u>anything</u> that Congress would be without power to regulate.

As previously noted, the Supreme Court has summarized and defined the current state of the law under the Commerce Clause, and it has uniformly and consistently declared that it applies to "three broad categories of <u>activity</u>." <u>Lopez</u>, <u>supra</u>, 514 U.S. at 558 (emphasis added); <u>accord Morrison</u>, <u>supra</u>, 529 U.S. at 608. It has further described the third category as "the power to regulate those <u>activities</u> having a substantial relation to interstate commerce." <u>Lopez</u>, <u>supra</u>, 514 U.S. at 558-59 (emphasis added); <u>accord Morrison</u>, <u>supra</u>, 529 U.S. at 609; <u>see also Raich</u>, <u>supra</u>, 545 U.S. at 17; <u>Perez</u>, 402 U.S. at 150; <u>Wickard</u>, <u>supra</u>, 317 U.S. at 124; <u>Darby</u>, <u>supra</u>, 312 U.S. at 119-20; <u>Jones & Laughlin Steel</u>, <u>supra</u>, 301 U.S. at 37. Without doubt, existing case law thus extends only to those "activities" that have a substantial relationship to, or substantially affect, interstate commerce. I am required to interpret this law as the Supreme Court presently defines it. Only the Supreme Court can redefine it or expand it further --- a point implicitly made by one of the defendants' own cited authorities. <u>See Stern</u>, <u>supra</u>, at 1363 (stating that the Supreme Court had at one point in time only talked about "movement" of goods across state lines under the Commerce Clause because it was necessary to decide those earlier cases and there had "been no need for a broader definition" of commerce; going on to opine that "it would seem timely that the <u>Supreme Court</u>" expand the definition, as "the time has now arrived for the <u>[Supreme] Court</u> to cut loose from the 'old' approach and to select the 'new' one") (emphasis added).

Having found that "activity" is an indispensable part the Commerce Clause

analysis (at least as currently understood, defined, and applied in Supreme Court case law), the Constitutionality of the individual mandate will turn on whether the failure to buy health insurance is "activity."

**(ii) Is the Failure to Purchase Health Insurance "Activity"?**

Preliminarily, based solely on a plain reading of the Act itself (and a common sense interpretation of the word "activity" and its absence), I must agree with the plaintiffs' contention that the individual mandate regulates inactivity. Section 1501 states in relevant part: "If an applicable individual fails to [buy health insurance], there is hereby imposed a penalty." By its very own terms, therefore, the statute applies to a person who does not buy the government-approved insurance; that is, a person who "fails" to act pursuant to the congressional dictate. In fact, prior to final passage of the Act, CRS attorneys advised Congress that it was "unclear" if the individual mandate had "solid constitutional foundation" specifically because:

> One could argue that while regulation of the health insurance industry or the health care system could be considered economic activity, regulating a choice to purchase health insurance is not. It may also be questioned whether a requirement to purchase health insurance is really a regulation of an economic activity or enterprise, if individuals who would be required to purchase health insurance are not, but for this regulation, a part of the health insurance market. In general, Congress has used its authority under the Commerce Clause to regulate individuals, employers, and others who voluntarily take part in some type of economic activity. While in <u>Wickard</u> and <u>Raich</u>, the individuals were participating in their own home activities (i.e., producing wheat for home consumption and cultivating marijuana for personal use), they were acting of their own volition, and this activity was determined to be economic in nature and affected interstate commerce. <u>However, [the individual mandate] could be imposed on some individuals who engage in virtually no economic activity whatsoever</u>. This is a novel issue: whether . . . this type of required

participation can be considered economic activity.

CRS Analysis, <u>supra</u>, at 3, 6 (emphasis added).

The defendants insist that the uninsured are active. In fact, they even go so far as to make the claim --- which the plaintiffs call "absurd" --- that going without health insurance constitutes "economic activity to an even greater extent than the plaintiffs in <u>Wickard</u> or <u>Raich</u>." <u>See</u> Def. Mem. at 29. They offer two (somewhat overlapping) arguments why the appearance of inactivity here is just an "illusion."

**(iii)  <u>The Purported "Uniqueness" of the Health Care Market</u>**

The defendants contend that there are three unique elements of the health care market which, when viewed cumulatively and in combination, belie the claim that the uninsured are inactive.[18] First, as living and breathing human beings who are always susceptible to sudden and unpredictable illness and injury, no one can "opt out" of the health care market. Second, if and when health services are sought, hospitals are required by law to provide care, regardless of inability to pay. And third, if the costs incurred cannot be paid (which they frequently cannot, given the high cost of medical care), they are passed along (cost-shifted) to third parties, which has economic implications for everyone. Congress found that the uninsured received approximately $43 billion in "uncompensated care" in 2008 alone. These three things, according to the defendants and various health care industry experts and scholars on whom they rely, are "replicated in no other market" and defeat the

---

[18] During oral argument, the plaintiffs opposed defining the relevant market broadly as one for health <u>care</u>, insisting that the only relevant market for purposes of analyzing the individual mandate is the more specific health <u>insurance</u> market. I agree that the plaintiffs' position is the more precise and accurate. Every market can be broadly defined in a way that encompasses the specific characteristics one seeks to reach or include. Nonetheless, I will consider and examine the defendants' claim that the individual mandate is justifiable because the much broader "health care market" is purportedly unique.

argument that uninsured individuals are inactive.[19]

First, it is not at all clear whether or why the three allegedly unique factors of the health care market are Constitutionally significant. What if only one of the three factors identified by the defendants is present? After all, there are lots of markets --- especially if defined broadly enough --- that people cannot "opt out" of. For example, everyone must participate in the food market. Instead of attempting to control wheat supply by regulating the acreage and amount of wheat a farmer could grow as in Wickard, under this logic, Congress could more directly raise too-low wheat prices merely by increasing demand through mandating that every adult purchase and consume wheat bread daily, rationalized on the grounds that because everyone must participate in the market for food, non-consumers of wheat bread adversely affect prices in the wheat market. Or, as was discussed during oral argument, Congress could require that people buy and consume broccoli at regular intervals, not only because the required purchases will positively impact interstate commerce, but also because people who eat healthier tend to be healthier, and are thus more productive and put less of a strain on the health care system. Similarly, because virtually no one can be divorced from the transportation market, Congress could require that everyone above a certain income threshold buy a General Motors automobile --- now partially government-owned --- because those who do not buy GM cars (or those who buy foreign cars) are adversely impacting commerce and a taxpayer-subsidized business.

I pause here to emphasize that the foregoing is not an irrelevant and fanciful

---

[19] For example, in their briefs and during oral argument, the defendants cited to and relied on the amicus brief filed by an impressive list of nearly forty economic scholars, who have urged that these "three observations . . . do not exist in other contexts" and establish that the uninsured are not inactive and passive bystanders, but rather they "participate in the market for medical services and necessarily affect the market for health insurance" (doc. 125 at 6-13).

"parade of horribles." Rather, these are some of the serious concerns implicated by the individual mandate that are being discussed and debated by legal scholars. For example, in the course of <u>defending</u> the Constitutionality of the individual mandate, and responding to the same concerns identified above, often-cited law professor and dean of the University of California Irvine School of Law Erwin Chemerinsky has opined that although "what people choose to eat well <u>might</u> be regarded as a personal liberty" (and thus unregulable), "Congress <u>could</u> use its commerce power to require people to buy cars." <u>See</u> ReasonTV, <u>Wheat, Weed, and Obamacare: How the Commerce Clause Made Congress All-Powerful</u>, August 25, 2010, available at: http://reason.tv/video/show/wheat-weed-and-obamacare-how-t. When I mentioned this to the defendants' attorney at oral argument, he allowed for the possibility that "maybe Dean Chemerinsky is right." <u>See</u> Tr. at 69. Therefore, the potential for this assertion of power has received at least some theoretical consideration and has not been ruled out as Constitutionally implausible.[20]

Or what if two of the purported "unique" factors --- inevitable participation coupled with cost-shifting --- are present? For example, virtually no one can opt out of the housing market (broadly defined) and a majority of people will at some point

---

[20] There is perhaps a general assumption that it is "ridiculous" to believe that Congress <u>would</u> do such a thing, even though it <u>could</u>. However, before <u>Wickard</u> was decided, it is likely that most people (including legal scholars and judges) would have thought it equally "ridiculous" to believe that Congress would one day seek (and be permitted) to regulate (as interstate commerce) the amount of wheat that a farmer grew on a small private farm for his personal consumption. In any event, even if such an assumption is well-founded, "the limitation of congressional authority is not solely a matter of legislative grace." <u>See</u> <u>Morrison</u>, <u>supra</u>, 529 U.S. at 616; <u>see</u> <u>also</u> <u>id.</u> at 616 n.7 (stating that legislative power is not limited only by "the Legislature's self-restraint"); <u>cf.</u> <u>United States v. Stevens</u>, --- U.S. ---, 130 S. Ct. 1577, 1591, 176 L. Ed. 2d 435 (2010) ("[T]he [Constitution] protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

buy a home. The vast majority of those homes will be financed with a mortgage, a large number of which (particularly in difficult economic times, as we have seen most recently) will go into default, thereby cost-shifting billions of dollars to third parties and the federal government. Should Congress thus have power under the Commerce Clause to preemptively regulate and require individuals above a certain income level to purchase a home financed with a mortgage (and secured with mortgage guaranty insurance) in order to add stability to the housing and financial markets (and to guard against the possibility of future cost-shifting because of a defaulted mortgage), on the theory that most everyone is currently, or inevitably one day will be, active in the housing market?

In alluding to these same general concerns, another court has observed that requiring advance purchase of health insurance based on a future contingency that will substantially affect commerce could also "apply to transportation, housing, or nutritional decisions. This broad definition of the economic activity subject to congressional regulation lacks logical limitation and is unsupported by Commerce Clause jurisprudence." See Virginia, supra, 728 F. Supp. 2d at 781. That the defendants' argument is "unsupported by Commerce Clause jurisprudence" can perhaps best be seen by looking to Lopez. Although that case is distinct from this one in some notable ways (e.g., it involved a brief, single-subject criminal statute that did not contain detailed legislative findings), in the context of the defendants' "health care is unique" argument, it is quite similar.

In Lopez, the majority was concerned that using the Commerce Clause to regulate things such as possession of guns in school zones would "obliterate" the distinction between what is national and what is local and effectively create a centralized government that could potentially permit Congress to begin regulating "any and all aspects" of our lives, including marriage, divorce, child custody, and education. The dissent insisted that this concern was unfounded because the

statute at issue was "aimed at curbing a particularly acute threat" of violence in schools that had "singularly disruptive potential." Supra, 514 U.S. at 624 (Breyer, J., dissenting). Relying on "empirical evidence . . . documented by scholars," the dissent highlighted the link between education and the national economy and "the special way in which guns and education are incompatible." See id. The impact on commerce, it was urged, derived from the unchallenged fact that "violent crime in school zones has brought about a decline in the quality of education" which, in turn, has "an adverse impact on interstate commerce." See id. at 623 (citation and quotation marks omitted). This was "the rare case, then, that a statute strikes at conduct that (when considered in the abstract) seems so removed from commerce, but which (practically speaking) has so significant an impact upon commerce." Id. (all emphasis added).

Two things become apparent after reading these arguments attempting to justify extending Commerce Clause power to the legislation in that case, and the majority opinion (which is the controlling precedent) rejecting those same arguments. First, the contention that Commerce Clause power should be upheld merely because the government and its experts or scholars claim that it is being exercised to address a "particularly acute" problem that is "singular[ ]," "special," and "rare" --- that is to say "unique" --- will not by itself win the day. Uniqueness is not an adequate limiting principle as every market problem is, at some level and in some respects, unique. If Congress asserts power that exceeds its enumerated powers, then it is unconstitutional, regardless of the purported uniqueness of the context in which it is being asserted.

Second, and perhaps more significantly, under Lopez the causal link between what is being regulated and its effect on interstate commerce cannot be attenuated and require a court "to pile inference upon inference," which is, in my view, exactly what would be required to uphold the individual mandate. For example, in contrast

to individuals who grow and consume marijuana or wheat (even in extremely small amounts), the mere status of being without health insurance, in and of itself, has absolutely no impact whatsoever on interstate commerce (not "slight," "trivial," or "indirect," but no impact whatsoever) --- at least not any more so than the status of being without any particular good or service. If impact on interstate commerce were to be expressed and calculated mathematically, the status of being uninsured would necessarily be represented by zero. Of course, any other figure multiplied by zero is also zero. Consequently, the impact must be zero, and of no effect on interstate commerce. The uninsured can only be said to have a substantial effect on interstate commerce in the manner as described by the defendants: (i) if they get sick or injured; (ii) if they are still uninsured at that specific point in time; (iii) if they seek medical care for that sickness or injury; (iv) if they are unable to pay for the medical care received; and (v) if they are unable or unwilling to make payment arrangements directly with the health care provider, or with assistance of family, friends, and charitable groups, and the costs are thereafter shifted to others. In my view, this is the sort of piling "inference upon inference" rejected in Lopez, supra, 514 U.S. at 567, and subsequently described in Morrison as "unworkable if we are to maintain the Constitution's enumeration of powers." Supra, 529 U.S. at 615.[21]

I do not mean to suggest that these inferences are illogical or unreasonable to draw. As did the majority in Lopez and Morrison, I do not dispute or question their underlying existence. Indeed, while $43 billion in uncompensated care from

---

[21] I suppose it is also possible to contend that being uninsured impacts the economy because (regardless of whether the uninsured receive care that is cost-shifted to others) people without insurance tend to be less healthy and thus less productive. This seems to be the basis of one of Congress' findings. See Act § 1501(a)(2)(E) (finding that the national economy "loses up to $207,000,000,000 a year because of the poorer health and shorter lifespan of the uninsured"). However, such a claim would be similar to the argument that was rejected in Morrison, i.e., that victims of gender-motivated violence also tend to be less productive.

2008 was only 2% of national health care expenditures for that year, it is clearly a large amount of money; and it demonstrates that a number of the uninsured are taking the five sequential steps. And when they do, Congress plainly has the power to regulate them at that time (or even at the time that they initially seek medical care), a fact with which the plaintiffs agree. But, to cast the net wide enough to reach everyone in the present, with the expectation that they will (or could) take those steps in the future, goes beyond the existing "outer limits" of the Commerce Clause and would, I believe, require inferential leaps of the sort rejected in Lopez. To the extent the defendants have suggested it is "empty formalism" [Def. Mem. at 16] to hold that the uninsured can be regulated at the time they seek or fail to pay for medical care (but not before) the Supreme Court has explained:

> Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "formalistic" in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day . . . . [A] judiciary that licensed extra-constitutional government with each issue of comparable gravity would, in the long run, be far worse [than the crisis itself].

New York, supra, 505 U.S. at 187.

In short, the defendants' argument that people without health insurance are actively engaged in interstate commerce based on the purported "unique" features of the much broader health care market is neither factually convincing nor legally

supportable.[22]

**(iv) The "Economic Decision" to Forego Health Insurance**

The defendants next contend that the uninsured have made the calculated decision to engage in market timing and try to finance their future medical needs out-of-pocket rather than through insurance, and that this "economic decision" is tantamount to activity. The plaintiffs respond by suggesting that it is "a remarkable exaggeration of [the] rational aspects of human nature" to claim that the uninsured (as a rule) make structured and calculated decisions to forego insurance and engage in market timing, as opposed to simply not having it. See Tr. at 16 ("All we know is some people do not have insurance and some people do"). The plaintiffs describe the defendants' argument on this point "Orwellian," because they seek "to redefine the inactivity of not having healthcare insurance as an affirmative economic activity of 'deciding' not to buy insurance, or deciding now how to pay (or not to pay) for potential future economic activity in the form of obtaining medical services." See Pl. Opp. at 10 (emphasis in original). This "economic decision" argument has been accepted by two district courts, Liberty Univ., Inc., supra, 2010 WL 4860299, at *15; Thomas More Law Center, supra, 720 F. Supp. 2d at 893-94. For example, in Liberty University, the District Court for the Western District of Virginia stated that "by choosing to forego insurance, Plaintiffs are making an economic decision to try to pay for health care services later, out of pocket, rather than now, through the purchase of insurance," and concluded that these decisions constitute economic activity "[b]ecause of the nature of supply and demand, Plaintiff's choices directly

---

[22] The defendants also suggest that the uninsured are "active" in the health insurance market --- and therefore can be regulated and forced to buy insurance --- because a large percentage of them have had insurance within the past year. The defendants have provided no authority for the suggestion that once someone is in the health insurance market at a particular point in time, they are forever in that market, always subject to regulation, and not ever permitted to leave.

*Case No.: 3:10-cv-91-RV/EMT*

affect the price of insurance in the market, which Congress set out in the Act to control." <u>See</u> 2010 WL 4860299, at *15.

The problem with this legal rationale, however, is it would essentially have unlimited application. There is quite literally <u>no</u> decision that, in the natural course of events, does not have an economic impact of some sort. The decisions of whether and when (or not) to buy a house, a car, a television, a dinner, or even a morning cup of coffee also have a financial impact that --- when aggregated with similar economic decisions --- affect the price of that particular product or service and have a substantial effect on interstate commerce. To be sure, it is not difficult to identify an economic decision that has a cumulatively substantial effect on interstate commerce; rather, the difficult task is to find a decision that does not.[23]

Some of our wisest jurists have pointed out the threat that lies in an over-expansive Commerce Clause construction. The words that Judge Learned Hand wrote in 1935 are even truer today:

> In an industrial society bound together by means of transport and communication as rapid and certain as ours, it is idle to seek for any transaction, however apparently isolated, which may not have an effect elsewhere; such a society is an elastic medium which transmits all tremors throughout its territory; the only question is of their size.

<u>United States v. A.LA. Schechter Poultry Corp.</u>, 76 F.2d 617, 624 (2d Cir. 1935), <u>aff'd in part and rev'd in part</u>, <u>supra</u>, 295 U.S. at 554 (noting in an elastic society like ours everything affects commerce in the sense that "[m]otion at the outer rim is communicated perceptibly, though minutely, to recording instruments at the center;" but to hold that everything may thus be regulated under the Commerce Clause "will be an end to our federal system") (Cardozo, J., concurring). As the

---

[23] As was discussed at the hearing, even personal decisions about whether to marry, whom to marry, or whether to have children could also be characterized as "economic decisions."

Supreme Court emphasized in Morrison, supra: "'In a sense any conduct in this interdependent world of ours has an ultimate commercial origin or consequence, but we have not yet said the commerce power may reach so far.'" 529 U.S. at 611 (quoting Lopez, supra, 514 U.S. at 580 (Kennedy, J., concurring)); accord Patton, supra, 451 F.3d at 628 (explaining that everything could be said to affect interstate commerce "in the same sense in which a butterfly flapping its wings in China might bring about a change of weather in New York," but if all things affecting interstate commerce were held to be within Congress' regulatory power, "the Constitution's enumeration of powers would have been in vain").

      Attempting to deflect this rather common sense rebuttal to their argument, the defendants emphasized during oral argument that it is not just the "economic decision" itself that renders the failure to buy insurance activity; rather, it is that decision coupled with the fact that the uninsured are guaranteed access to medical care in hospital emergency rooms as a "backstop," the use of which can and does shift costs onto third parties. The defendants thus refer to the failure to buy health insurance as a "financing decision." However, this is essentially true of any and all forms of insurance. It could just as easily be said that people without burial, life, supplemental income, credit, mortgage guaranty, business interruption, or disability insurance have made the exact same or similar economic and financing decisions based on their expectation that they will not incur a particular risk at a particular point in time; or that if they do, it is more beneficial for them to self-insure and try to meet their obligations out-of-pocket, but always with the benefit of "backstops" provided by law, including bankruptcy protection and other government-funded financial assistance and services. See, e.g., Katie Zezima, Indigent Burials Are On the Rise, New York Times, Oct. 11, 2009, at A23 (reporting the number of burials of those who die with insufficient assets are increasing across the country, up 50% in Oregon, and that funeral expenses are frequently borne by governmental entities;

noting that Illinois alone budgets $12 million for these expenses). The "economic decision" to forego virtually any and all types of insurance can (and cumulatively do) similarly result in significant cost-shifting to third parties.[24]

The important distinction is that "economic decisions" are a much broader and far-reaching category than are "activities that substantially affect interstate commerce." While the latter necessarily encompasses the first, the reverse is not true. "Economic" cannot be equated to "commerce." And "decisions" cannot be equated to "activities." Every person throughout the course of his or her life makes hundreds or even thousands of life decisions that involve the same general sort of thought process that the defendants maintain is "economic activity." There will be no stopping point if that should be deemed the equivalent of activity for Commerce Clause purposes.[25]

---

[24] To the extent that people dying without burial insurance is by itself not as severe a problem as people without health insurance --- and I readily acknowledge it is not --- that is merely a difference in degree, not in kind. The fact that people without health insurance pose a more serious problem than people without burial insurance may give Congress more of a reason to act; but it does not give it more Constitutional authority to do so. See United States v. A.L.A. Schechter Poultry Corp., 76 F.2d 617, 624 (2d Cir. 1935) (noting that "emergency does not create the power [of Congress to act], but it may furnish the occasion for the exercise of the power conferred by the Constitution"), aff'd in part and rev'd in part, 295 U.S. 495, 55 S. Ct. 837, 79 L. Ed. 1570 (1935).

[25] For example, if the decision to forego insurance qualifies as activity, then presumably the decision to not use that insurance once it has been obtained is also activity. The government acknowledged during oral argument in Virginia v. Sebelius that although people are required to buy health insurance under the Act, they are not yet required to use it. See Transcript of Oral Argument on Defendants' Motion to Dismiss, July 1, 2010, at 26 ("the statute doesn't require anybody to [actually] get medical services"); see also id. at 30 ("Congress isn't saying go see a doctor, or you have to go. What Congress is saying is you have to purchase health insurance."). But what happens if the newly-insured (as a class) do not seek preventive medical care? Because Congress found in the Act that the economy

The Commerce Clause originally applied to the trade and exchange of goods as it sought to eliminate trade barriers by and between the states. Over the years, the Clause's reach has been expanded from covering actual interstate commerce (and its channels and instrumentalities) to intrastate activities that substantially affect interstate commerce. It has even been applied to activities that involve the mere consumption of a product (even if there is no legal commercial interstate market for that product). To now hold that Congress may regulate the so-called "economic decision" to <u>not</u> purchase a product or service in anticipation of <u>future</u> consumption is a "bridge too far." It is without logical limitation and far exceeds the existing legal boundaries established by Supreme Court precedent.

Because I find both the "uniqueness" and "economic decision" arguments unpersuasive, I conclude that the individual mandate seeks to regulate economic inactivity, which is the very opposite of economic activity. And because activity is required under the Commerce Clause, the individual mandate exceeds Congress' commerce power, as it is understood, defined, and applied in the existing Supreme Court case law.

**(2)** <u>**The Necessary and Proper Clause**</u>

The defendants contend that the individual mandate is "also a valid exercise of Congress's authority if the provision is analyzed under the Necessary and Proper Clause." <u>See</u> Def. Mem. at 23. This argument has been appropriately called "the last, best hope of those who defend ultra vires congressional action." <u>See</u> <u>Printz</u>, <u>supra</u>, 521 U.S. at 923. Oversimplified, the defendants' argument on this point can be reduced to the following: (i) the Act bans insurers from denying health coverage

--------------------------------

loses money each year "because of the poorer health and shorter lifespan of the uninsured" [<u>see</u> <u>supra</u> note 19], it would seem only logical under the defendants' rationale that Congress may also regulate the "economic decisions" not to go to the doctor for regular check-ups and screenings to improve health and longevity, which, in turn, is intended and expected to increase economic productivity.

(guaranteed issue), or charging higher premiums (community rating), to individuals with pre-existing medical conditions (which increases the insurers' costs); (ii) as a result of these bans, individuals will be incentivized to delay obtaining insurance as they are now guaranteed coverage if they get sick or injured (which decreases the insurers' revenues); and (iii) as a result of the foregoing, there will be fewer healthy people in the insured pool (which will raise the premiums and costs for everyone). Consequently, it is necessary to require that everyone "get in the pool" so as to protect the private health insurance market from inevitable collapse.

At the outset, I note that in United States v. Comstock, --- U.S. ---, 130 S. Ct. 1949, 176 L. Ed. 2d 878 (2010), the Supreme Court's most recent discussion and application of the Necessary and Proper Clause, the Court identified and looked to five "considerations" that informed its decision about whether the legislation at issue was sustainable: (1) the breadth of the Necessary and Proper Clause; (2) the history of federal involvement in the relevant arena, and the modest addition to that arena; (3) the sound reasons for the legislation in light of the government's interest; (4) the statute's accommodation of state interests; and (5) its narrow scope. It is not entirely clear if this constitutes a "five-factor test," as Justice Thomas urged in dissent, see id. at 1974, or whether the "considerations" were merely factors that the majority believed relevant to deciding that particular case. To the extent that they constitute a "test," the individual mandate clearly gets a failing score on at least two (and possibly a couple more) of the five elements. A statute mandating that everyone purchase a product from a private company or be penalized (merely by virtue of being alive and a lawful citizen) is not a "modest" addition to federal involvement in the national health care market, nor is it "narrow [in] scope." I will assume, however, that the Comstock "considerations" were just that, and that they did not bring about any fundamental change in the Court's long established Necessary and Proper Clause analysis.

The Necessary and Proper Clause provides that Congress shall have the power:

> To make all Laws which shall be <u>necessary and proper for carrying into Execution the foregoing Powers</u>, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.

U.S. Const. art. I, § 8, cl. 18 (emphasis added). The Supreme Court has repeatedly held, and the emphasized text makes clear, that the Clause is not an independent source of federal power; rather, it is simply "a caveat that the Congress possesses all the means necessary to carry out the specifically granted 'foregoing' powers of [section] 8 'and all other Powers vested by this Constitution.' [It] is 'but merely a declaration, for the removal of all uncertainty, that the means of carrying into execution those (powers) otherwise granted are included in the grant.'" <u>Kinsella v. United States ex rel. Singleton</u>, 361 U.S. 234, 247, 80 S. Ct. 297, 4 L. Ed. 2d 268 (1960); <u>see</u> <u>also</u> <u>Raich</u>, <u>supra</u>, 545 U.S. at 39 (Scalia, J., concurring in judgment) (stating that, while the Clause "empowers Congress to enact laws . . . that are not within its authority to enact in isolation," those laws must be "in effectuation of [Congress'] enumerated powers"); <u>Kansas v. Colorado</u>, 206 U.S. 46, 88, 27 S. Ct. 655, 51 L. Ed. 956 (1907) (stating that the Necessary and Proper Clause "is not the delegation of a new and independent power, but simply provision for making effective the powers theretofore mentioned").

Hamilton wrote the following in response to the concern voiced by some that the Necessary and Proper Clause --- and the Supremacy Clause as well --- could be used to expand federal power and destroy liberties:

> These two clauses have been the source of much virulent invective and petulant declamation against the proposed Constitution. They have been held up to the people in all the exaggerated colors of misrepresentation as the pernicious engines by which their local governments were

> to be destroyed and their liberties exterminated; as the
> hideous monster whose devouring jaws would spare
> neither sex nor age, nor high nor low, nor sacred nor
> profane; and yet, strange as it may appear, after all this
> clamor, to those who may not have happened to
> contemplate them in the same light, it may be affirmed
> with perfect confidence, that the constitutional operation
> of the intended government would be precisely the same,
> if these clauses were entirely obliterated, as if they were
> repeated in every article. They are only declaratory of a
> truth, which would have resulted by necessary and
> unavoidable implication from the very act of constituting
> a federal government, and vesting it with certain specific
> powers.

The Federalist No. 33, at 204-05. To the extent there was anything to fear in the
Constitution, Hamilton explained, it must be found in the specific powers that were
enumerated and not in the Necessary and Proper Clause, for though the latter "may
be chargeable with tautology or redundancy, [it] is at least perfectly harmless." See
id. at 206. Madison concurred with this view. See The Federalist No. 44, at 302
(explaining that the Clause is entirely redundant for if it had been omitted, "there
can be no doubt" that the same power and authority "would have resulted to the
government, by unavoidable implication"). If these advocates for ratification had
any inkling that, in the early twenty-first century, government proponents of the
individual health insurance mandate would attempt to justify such an assertion of
power on the basis of this Clause, they probably would have been the strongest
opponents of ratification. They would have recognized how such an interpretation
and application of the Necessary and Proper Clause would eviscerate the bedrock
enumerated powers principle upon which the Constitution rests.

One of the amicus curiae briefs illustrates how using the Necessary and
Proper Clause in the manner as suggested by the defendants would vitiate the
enumerated powers principle (doc. 119). It points out that the defendants' are

essentially admitting that the Act will have serious negative consequences, e.g., encouraging people to forego health insurance until medical services are needed, increasing premiums and costs for everyone, and thereby bankrupting the health insurance industry --- unless the individual mandate is imposed. Thus, rather than being used to implement or facilitate enforcement of the Act's insurance industry reforms, the individual mandate is actually being used as the means to avoid the adverse consequences of the Act itself. Such an application of the Necessary and Proper Clause would have the perverse effect of enabling Congress to pass ill-conceived, or economically disruptive statutes, secure in the knowledge that the more dysfunctional the results of the statute are, the more essential or "necessary" the statutory fix would be. Under such a rationale, the more harm the statute does, the more power Congress could assume for itself under the Necessary and Proper Clause. This result would, of course, expand the Necessary and Proper Clause far beyond its original meaning, and allow Congress to exceed the powers specifically enumerated in Article I. Surely this is not what the Founders anticipated, nor how that Clause should operate.

Ultimately, the Necessary and Proper Clause vests Congress with the power and authority to exercise <u>means</u> which may not in and of themselves fall within an enumerated power, to accomplish <u>ends</u> that must be within an enumerated power. Although Congress' authority to act in furtherance of those ends is unquestionably broad, there are nevertheless "restraints upon the Necessary and Proper Clause authority." <u>See</u> <u>Raich</u>, <u>supra</u>, 545 U.S. at 39 (Scalia, J., concurring in judgment). Thomas Jefferson warned against an overly expansive application of cause and effect in interpreting the interplay between Congress' enumerated powers and the Necessary and Proper Clause:

> Congress are authorized to defend the nation. Ships are necessary for defense; copper is necessary for ships; mines necessary for copper; a company necessary to

> work mines; and who can doubt this reasoning who has
> ever played at "This is the House that Jack Built?"

Letter from Thomas Jefferson to Edward Livingston (Apr. 30, 1800), in 31 The
Papers of Thomas Jefferson 547 (B. Oberg ed., 2004); accord Comstock, supra,
130 S. Ct. at 1966 (referencing same analogy and stating that the Necessary and
Proper Clause "must be controlled by some limitations lest, as Thomas Jefferson
warned, congressional powers become completely unbounded by linking one power
to another ad infinitum") (Kennedy, J., concurring); see also id. at 1970 (explaining
that the Clause "does not give Congress carte blanche," and it is the "obligation of
this Court" to impose limitations) (Alito, J., concurring). As for where the restraints
and limitations might be, it is --- as is often the case --- appropriate to look to Chief
Justice Marshall, who first considered this issue and articulated the still-governing
analysis:

> Let the end be legitimate, let it be within the scope of the
> constitution, and all means which are appropriate, which
> are plainly adapted to that end, which are not prohibited,
> but consist with the letter and spirit of the constitution,
> are constitutional.
>
> * * *
>
> [However,] should congress, in the execution of its
> powers, adopt measures which are prohibited by the
> constitution; or should congress, under the pretext of
> executing its powers, pass laws for the accomplishment
> of objects not intrusted to the government; it would
> become the painful duty of this tribunal, should a case
> requiring such a decision come before it, to say, that
> such an act was not the law of the land.

McCulloch, supra, 17 U.S. at 421, 423.

In light of United States v. South-Eastern Underwriters, 322 U.S. 533, 64 S.
Ct. 1162, 88 L. Ed. 1440 (1944), the "end" of regulating the health care insurance

industry (including preventing insurers from excluding or charging higher rates to people with pre-existing conditions) is clearly "legitimate" and "within the scope of the constitution." But, the means used to serve that end must be "appropriate," "plainly adapted," and not "prohibited" or inconsistent "with the letter and spirit of the constitution." These phrases "are not merely hortatory." Raich, supra, 545 U.S. at 39 (Scalia, J., concurring in judgment).

The Necessary and Proper Clause cannot be utilized to "pass laws for the accomplishment of objects" that are not within Congress' enumerated powers. As the previous analysis of the defendants' Commerce Clause argument reveals, the individual mandate is neither within the letter nor the spirit of the Constitution. To uphold that provision via application of the Necessary and Proper Clause would authorize Congress to reach and regulate far beyond the currently established "outer limits" of the Commerce Clause and effectively remove all limits on federal power. As the Supreme Court explained in Printz:

> When a "Law . . . for carrying into Execution" the Commerce Clause [violates other Constitutional principles], it is not a "Law . . . proper for carrying into Execution the Commerce Clause," and is thus, in the words of the Federalist, "merely an act of usurpation" which "deserves to be treated as such."

Printz, supra, 521 U.S. at 923-24 (citations and brackets omitted) (emphasis in original); see also Comstock, supra, 130 S. Ct. at 1967-68 ("It is of fundamental importance to consider whether essential attributes [of federalism embodied in the Constitution] are compromised by the assertion of federal power under the Necessary and Proper Clause; if so, that is a factor suggesting that the power is not one properly within the reach of federal power.") (Kennedy, J., concurring). Here, the "essential attributes" of the Commerce Clause limitations on the federal government's power would definitely be compromised by this assertion of federal power via the Necessary and Proper Clause. If Congress is allowed to define the

scope of its power merely by arguing that a provision is "necessary" to avoid the negative consequences that will potentially flow from its own statutory enactments, the Necessary and Proper Clause runs the risk of ceasing to be the "perfectly harmless" part of the Constitution that Hamilton assured us it was, and moves that much closer to becoming the "hideous monster [with] devouring jaws" that he assured us it was not.

The defendants have asserted again and again that the individual mandate is absolutely "necessary" and "essential" for the Act to operate as it was intended by Congress. I accept that it is.[26] Nevertheless, the individual mandate falls outside the boundary of Congress' Commerce Clause authority and cannot be reconciled with a limited government of enumerated powers. By definition, it cannot be "proper."

**(3) Constitutionality of the Individual Mandate**

The individual mandate is outside Congress' Commerce Clause power, and it cannot be otherwise authorized by an assertion of power under the Necessary and Proper Clause. It is not Constitutional. Accordingly, summary judgment must be granted in favor of the plaintiffs on Count I.

**(4) Severability**

Having determined that the individual mandate exceeds Congress' power under the Commerce Clause, and cannot be saved by application of the Necessary and Proper Clause, the next question is whether it is severable from the remainder of the Act. In considering this issue, I note that the defendants have acknowledged that the individual mandate and the Act's health insurance reforms, including the guaranteed issue and community rating, will rise or fall together as these reforms "cannot be severed from the [individual mandate]." See, e.g., Def. Opp. at 40. As explained in my order on the motion to dismiss: "the defendants concede that [the

---

[26] As will be seen, the defendants' repeated assertions on this point impact the severability analysis.

*Case No.: 3:10-cv-91-RV/EMT*

individual mandate] is absolutely necessary for the Act's insurance market reforms to work as intended. In fact, they refer to it as an 'essential' part of the Act at least fourteen times in their motion to dismiss." Thus, the only question is whether the Act's other, non-health-insurance-related provisions can stand independently or whether they, too, must fall with the individual mandate.[27]

Severability is a doctrine of judicial restraint, and the Supreme Court has applied and reaffirmed that doctrine just this past year: "'Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact.'" Free Enterprise Fund v. Public Co. Accounting Oversight Board, --- U.S. ---, 130 S. Ct. 3138, 3161, 177 L. Ed. 2d 706 (2010) (citation omitted) (emphasis added). Because the unconstitutionality of one provision of a legislative scheme "does not necessarily defeat or affect the validity of its remaining provisions," the "normal rule" is that partial invalidation is proper. Id. (citations omitted) (emphasis added). Where Congress has "enacted a statutory scheme for an obvious purpose, and where Congress has included a series of provisions operating as incentives to achieve that purpose, the invalidation of one of the incentives should not ordinarily cause Congress' overall intent to be frustrated." New York, supra, 505 U.S. at 186 (emphasis added). As the emphasized text shows, the foregoing is not a rigid and inflexible rule, but rather it is the general standard that applies in the typical case. However, this is anything but the typical case.

The question of severability ultimately turns on the nature of the statute at issue. For example, if Congress intended a given statute to be viewed as a bundle of separate legislative enactment or a series of short laws, which for purposes of

---

[27] In considering this issue, I will at times borrow heavily from one of the amicus briefs filed in the case for it quite cogently and effectively sets forth the applicable standard and governing analysis of severability (doc. 123).

*Case No.: 3:10-cv-91-RV/EMT*

convenience and efficiency were arranged together in a single legislative scheme, it is presumed that any provision declared unconstitutional can be struck and severed without affecting the remainder of the statute. If, however, the statute is viewed as a carefully-balanced and clockwork-like statutory arrangement comprised of pieces that all work toward one primary legislative goal, and if that goal would be undermined if a central part of the legislation is found to be unconstitutional, then severability is not appropriate. As will be seen, the facts of this case lean heavily toward a finding that the Act is properly viewed as the latter, and not the former.

The standard for determining whether an unconstitutional statutory provision can be severed from the remainder of the statute is well-established, and it consists of a two-part test. First, after finding the challenged provision unconstitutional, the court must determine if the other provisions can function independently and remain "fully operative as a law." See Free Enterprise Fund, supra, 130 S. Ct. at 3161. In a statute that is approximately 2,700 pages long and has several hundred sections --- certain of which have only a remote and tangential connection to health care --- it stands to reason that some (perhaps even most) of the remaining provisions can stand alone and function independently of the individual mandate. The defendants have identified several provisions that they believe can function independently: the prohibition on discrimination against providers who will not furnish assisted suicide services; an "Independence at Home" project for chronically ill seniors; a special Medicare enrollment period for disabled veterans; Medicare reimbursement for bone-marrow density tests; and provisions devised to improve women's health, prevent abuse, and ameliorate dementia [Def. Opp. at 40], as well as abstinence education and disease prevention [doc. 74 at 14]. And as was mentioned during oral argument, there is little doubt that the provision in the Act requiring employers to provide a "reasonable break time" and separate room for nursing mothers to go and express breast milk [Act § 4207] can function without the individual mandate.

Importantly, this provision and many others are already in effect and functioning. However, the question is not whether these and the myriad other provisions can function as a technical or practical matter; instead, the "more relevant inquiry" is whether these provisions will comprise a statute that will function "in a manner consistent with the intent of Congress." See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 685, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987) (emphasis in original). Thus, the first step in the severability analysis requires (at least to some extent) that I try to infer Congress' intent. Although many of the remaining provisions, as just noted, can most likely function independently of the individual mandate, there is nothing to indicate that they can do so in the manner intended by Congress. The analysis at the second step of the severability test makes that conclusion pretty clear.

At this second step, reviewing courts may look to "the statute's text or historical context" to determine if Congress, had it been presented with a statute that did not contain the struck part, would have preferred to have no statute at all. See Free Enterprise Fund, supra, 130 S. Ct. at 3161-62. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law." See Alaska Airlines, Inc., supra, 480 U.S. at 684. But once again, that presupposes that the provisions left over function in a manner consistent with the main objective and purpose of the statute in the first place. Cf. New York, supra, 505 U.S. at 187 (unconstitutional provision held to be severable where the remaining statute "still serves Congress' objective" and the "purpose of the Act is not defeated by the invalidation" of the unconstitutional provision) (emphasis added). While this inquiry "can sometimes be 'elusive'" [Free Enterprise Fund, supra, 130 S. Ct. at 3161], on the unique facts of this particular case, the record seems to strongly indicate that Congress would not have passed the Act in

its present form if it had not included the individual mandate. This is because the individual mandate was indisputably essential to what Congress was ultimately seeking to accomplish. It was, in fact, the keystone or lynchpin of the entire health reform effort. After looking at the "statute's text" (or, rather, its conspicuous lack of text) and the "historical record" [see Free Enterprise Fund, supra, 130 S. Ct. at 3162], there are two specific facts that are particularly telling in this respect.

First, the Act does not contain a "severability clause," which is commonly included in legislation to provide that if any part or provision is held invalid, then the rest of the statute will not be affected. Although it is true that the absence of such a clause, in and of itself, "does not raise a presumption against severability," [New York, supra, 505 U.S. at 186], that is not the same thing as saying that its absence is irrelevant to the analysis. In INS v. Chadha, 462 U.S. 919, 103 S. Ct. 2764, 77 L. Ed. 2d 317 (1983), for example, the Supreme Court concluded that it did not have to embark on the "elusive inquiry" of whether Congress intended the unconstitutional provision in that case to be severable from the rest of the statute because Congress included a severability clause with language that was plain and unambiguous. See id. at 931-32. And, in Alaska Airlines, Inc., supra, 480 U.S. at 686, the Court similarly held that the severability analysis is "eased" when there is a severability clause in the statute, such that only "strong evidence" can overcome it. By necessary implication, the evidence against severability need not be as strong to overcome the general presumption when there is no such clause.

The lack of a severability clause in this case is significant because one had been included in an earlier version of the Act, but it was removed in the bill that subsequently became law. "Where Congress includes [particular] language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the [omitted provision] was not intended." Russello v. United States, 464 U.S. 16, 23-24, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983). In other words, the severability

clause was intentionally left out of the Act. The absence of a severability clause is further significant because the individual mandate was controversial all during the progress of the legislation and Congress was undoubtedly well aware that legal challenges were coming. Indeed, as noted earlier, even before the Act became law, several states had passed statutes declaring the individual mandate unconstitutional and purporting to exempt their residents from it; and Congress' own attorneys in the CRS had basically advised that the challenges might well have legal merit as it was "unclear" if the individual mandate had "solid constitutional foundation." See CRS Analysis, supra, at 3. In light of the foregoing, Congress' failure to include a severability clause in the Act (or, more accurately, its decision to not include one that had been included earlier) can be viewed as strong evidence that Congress recognized the Act could not operate as intended without the individual mandate.

Moreover, the defendants have conceded that the Act's health insurance reforms cannot survive without the individual mandate, which is extremely significant because the various insurance provisions, in turn, are the very heart of the Act itself. The health insurance reform provisions were cited repeatedly during the health care debate, and they were instrumental in passing the Act. In speech after speech President Obama emphasized that the legislative goal was "health insurance reform" and stressed how important it was that Congress fundamentally reform how health insurance companies do business, and "protect every American from the worst practices of the insurance industry." See, for example, Remarks of President Obama, The State of the Union, delivered Jan. 27, 2009.[28] Meanwhile,

---

[28] See also, e.g., The White House, Office of the Press Secretary, Official Transcript of President Obama's News Conference, July 22, 2009, available at: http://www.whitehouse.gov/the-press-office/news-conference-president-july-22-2009; The White House, Office of the Press Secretary, Official Transcript of President Obama's Remarks at Health Care Reform Town Hall, July 23, 2009, available at: http://www.whitehouse.gov/the_press_office/Remarks-by-the-President-at-Health-C

the Act's supporters in the Senate and House similarly spoke repeatedly and often of the legislative efforts as being the means to comprehensively reform the health insurance industry.[29]

To be sure, the words "protection" and "affordable" in the title of the Act itself are inextricably tied to the health insurance reform provisions (and the individual mandate in particular), as the defendants have emphasized throughout the course of this litigation. See, e.g., Def. Mem. at 1 ("Focusing on insurance industry practices that prevented millions of Americans from obtaining affordable insurance, the Act bars insurers from denying coverage to those with pre-existing conditions or from charging discriminatory premiums on the basis of medical history. Congress recognized that these reforms of insurance industry practices were required to protect consumers . . . ") (emphasis added); Reply in Support of Defendants' Motion to Dismiss, filed August 27, 2010 (doc. 74), at 21 (stating that the individual mandate "is necessary for Congress's insurance reforms to work"; that "those provisions protect millions of Americans"; and that "Congress plainly regarded their protection as a core objective of the Act") (emphasis added). The defendants have further identified and highlighted the essential role that the individual mandate played in the overall regulatory reform of the interstate health care and health insurance markets:

> [T]he [individual mandate] is essential to the Act's

_____

are-Reform-Town-Hall/.

[29] See, e.g., David Welna, Analyzing Democrats' Word Shift on Health Care, National Public Radio, Nov. 17, 2009 (reporting that during the health care reform debate the Act's proponents referred to the ongoing efforts as "health insurance reform," which, according to the head of a nonpartisan health care organization, "is a much more accurate label" as the "health care makeover has ended up being largely about [reforming] insurance companies"), available at http://www.npr.org/templates/story/story.php?storyId=120464701.

comprehensive scheme to ensure that health insurance coverage is available and <u>affordable</u>. In addition to regulating industry underwriting practices, the Act promotes availability and <u>affordability</u> through (a) "health benefit exchanges" that enable individuals and small businesses to obtain competitive prices for health insurance; (b) financial incentives for employers to offer expanded insurance coverage, (c) tax credits to low-income and middle-income individuals and families, and (d) extension of Medicaid to additional low-income individuals. <u>The [individual mandate] works in tandem with these and other reforms</u>. . . .

Congress thus found that failure to regulate the decision to forgo insurance . . . would undermine the "comprehensive regulatory regime" in the Act. . . .

<u>[The individual mandate] is essential to Congress's overall regulatory reform of the interstate health care and health insurance markets . . . is "essential" to achieving key reforms of the interstate health insurance market . . . [and is] necessary to make the other regulations in the Act effective.</u>

Memorandum in Support of Defendants' Motion to Dismiss, filed June 17, 2010 (doc. 56-1), at 46-48 (emphasis added).

Congress has also acknowledged in the Act itself that the individual mandate is absolutely "essential" to the Act's overarching goal of expanding the availability of affordable health insurance coverage and protecting individuals with pre-existing medical conditions:

[I]f there were no [individual mandate], many individuals would wait to purchase health insurance until they needed care . . . The [individual mandate] is <u>essential</u> to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold.

Act § 1501(a)(2)(I) (emphasis added).

In other words, the individual mandate is indisputably necessary to the Act's insurance market reforms, which are, in turn, indisputably necessary to the purpose of the Act. This is obviously a very different situation than in Alaska Airlines, Inc., supra, 480 U.S. at 694 n.18 and 696 (unconstitutional provision severed from rest of statute where the provision was "uncontroversial," and the debate on the final bill demonstrated its "relative unimportance"), and is more in line with the situation alluded to in New York, supra, 505 U.S. at 187 (suggesting by implication that the entire legislation should be struck when "the purpose of the Act is . . . defeated by the invalidation" of one of its provisions).

In weighing the Act's provisions and attempting to discern legislative intent and purpose, I have kept in mind the rationale underlying the severability doctrine, which the Supreme Court has described as follows:

> Three interrelated principles inform our approach to remedies. First, we try not to nullify more of a legislature's work than is necessary, for we know that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people. . . . Second, mindful that our constitutional mandate and institutional competence are limited, we restrain ourselves from rewriting [a] law to conform it to constitutional requirements even as we strive to salvage it . . . Third, the touchstone for any decision about remedy is legislative intent, for a court cannot use its remedial powers to circumvent the intent of the legislature.

Ayotte v. Planned Parenthood of Northern New England, 546 U.S. 321, 329-30, 126 S. Ct. 961, 163 L. Ed. 2d 812 (2006) (citations and brackets omitted). The first principle merely reflects the general judicial policy discussed at the beginning of this section; that is, because a ruling of unconstitutionality frustrates the intent of democratically-elected representatives of the people, the "normal rule" --- in the "normal" case --- will ordinarily require that as little of a statute be struck down as

possible. The two other principles, however, require closer analysis.

As for the second principle, the Ayotte Court explained:

> Our ability to devise a judicial remedy that does not entail quintessentially legislative work often depends on how clearly we have already articulated the background constitutional rules at issue . . . But making distinctions in a murky constitutional context, or where line-drawing is inherently complex, may call for a "far more serious invasion of the legislative domain" than we ought to undertake.

Supra, 546 U.S. at 329-30. Thus, cleanly and clearly severing an unconstitutional provision is one thing, but having to re-balance a statutory scheme by engaging in quasi-legislative "line drawing" is a "'far more serious invasion of the legislative domain'" than courts should undertake. See id. This analysis merges into the third principle identified in Ayotte:

> After finding an application or portion of a statute unconstitutional, we must next ask: Would the legislature have preferred what is left of its statute to no statute at all? All the while, we are wary of legislatures who would rely on our intervention, for it would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside to announce to whom the statute may be applied. This would, to some extent, substitute the judicial for the legislative department of the government.

Id. at 330 (citations and brackets omitted).

Severing the individual mandate from the Act along with the other insurance reform provisions --- and in the process reconfiguring an exceedingly lengthy and comprehensive legislative scheme --- cannot be done consistent with the principles set out above. Going through the 2,700-page Act line-by-line, invalidating dozens (or hundreds) of some sections while retaining dozens (or hundreds) of others, would not only take considerable time and extensive briefing, but it would, in the

end, be tantamount to rewriting a statute in an attempt to salvage it, which is foreclosed by Ayotte, supra. Courts should not even attempt to do that. It would be impossible to ascertain on a section-by-section basis if a particular statutory provision could stand (and was intended by Congress to stand) independently of the individual mandate. The interoperative effects of a partial deletion of legislative provisions are often unforseen and unpredictable. For me to try and "second guess" what Congress would want to keep is almost impossible. To highlight one of many examples, consider the Internal Revenue Service Form 1099 reporting requirement, which requires that businesses, including sole proprietorships, issue 1099 tax forms to individuals or corporations to whom or which they have paid more than $600 for goods or services in any given tax year [Act § 9006]. This provision has no discernable connection to health care and was intended to generate offsetting revenue for the Act, the need of which is greatly diminished in the absence of the "health benefit exchanges," subsidies and tax credits, and Medicaid expansion (all of which, as the defendants have conceded, "work in tandem" with the individual mandate and other insurance reform provisions). How could I possibly determine if Congress intended the 1099 reporting provision to stand independently of the insurance reform provisions? Should the fact that it has been widely criticized by both Congressional supporters and opponents of the Act and the fact that there have been bipartisan efforts to repeal it factor at all into my determination?

In the final analysis, this Act has been analogized to a finely crafted watch, and that seems to fit. It has approximately 450 separate pieces, but one essential piece (the individual mandate) is defective and must be removed. It cannot function as originally designed. There are simply too many moving parts in the Act and too many provisions dependent (directly and indirectly) on the individual mandate and other health insurance provisions --- which, as noted, were the chief engines that drove the entire legislative effort --- for me to try and dissect out the proper from

the improper, and the able-to-stand-alone from the unable-to-stand-alone. Such a quasi-legislative undertaking would be particularly inappropriate in light of the fact that any statute that might conceivably be left over after this analysis is complete would plainly not serve Congress' main purpose and primary objective in passing the Act. The statute is, after all, called "The Patient Protection and Affordable Care Act," not "The Abstinence Education and Bone Marrow Density Testing Act." The Act, like a defectively designed watch, needs to be redesigned and reconstructed by the watchmaker.

If Congress intends to implement health care reform --- and there would appear to be widespread agreement across the political spectrum that reform is needed --- it should do a comprehensive examination of the Act and make a legislative determination as to which of its hundreds of provisions and sections will work as intended without the individual mandate, and which will not. It is Congress that should consider and decide these quintessentially legislative questions, and not the courts.

In sum, notwithstanding the fact that many of the provisions in the Act can stand independently without the individual mandate (as a technical and practical matter), it is reasonably "evident," as I have discussed above, that the individual mandate was an essential and indispensable part of the health reform efforts, and that Congress did not believe other parts of the Act could (or it would want them to) survive independently. I must conclude that the individual mandate and the remaining provisions are all inextricably bound together in purpose and must stand or fall as a single unit. The individual mandate cannot be severed. This conclusion is reached with full appreciation for the "normal rule" that reviewing courts should ordinarily refrain from invalidating more than the unconstitutional part of a statute, but non-severability is required based on the unique facts of this case and the particular aspects of the Act. This is not a situation that is likely to be repeated.

**(5) Injunction**

The last issue to be resolved is the plaintiffs' request for injunctive relief enjoining implementation of the Act, which can be disposed of very quickly.

Injunctive relief is an "extraordinary" [Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S. Ct. 1798, 72 L. Ed. 2d 91 (1982)], and "drastic" remedy [Aaron v. S.E.C., 446 U.S. 680, 703, 100 S. Ct. 1945, 64 L. Ed. 2d 611 (1980) (Burger, J., concurring)]. It is even more so when the party to be enjoined is the federal government, for there is a long-standing presumption "that officials of the Executive Branch will adhere to the law as declared by the court. As a result, the declaratory judgment is the functional equivalent of an injunction." See Comm. on Judiciary of U.S. House of Representatives v. Miers, 542 F.3d 909, 911 (D.C. Cir. 2008); accord Sanchez-Espinoza v. Reagan, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) ("declaratory judgment is, in a context such as this where federal officers are defendants, the practical equivalent of specific relief such as an injunction . . . since it must be presumed that federal officers will adhere to the law as declared by the court") (Scalia, J.) (emphasis added).

There is no reason to conclude that this presumption should not apply here. Thus, the award of declaratory relief is adequate and separate injunctive relief is not necessary.

## CONCLUSION

The existing problems in our national health care system are recognized by everyone in this case. There is widespread sentiment for positive improvements that will reduce costs, improve the quality of care, and expand availability in a way that the nation can afford. This is obviously a very difficult task. Regardless of how laudable its attempts may have been to accomplish these goals in passing the Act, Congress must operate within the bounds established by the Constitution. Again, this case is not about whether the Act is wise or unwise legislation. It is about the

Constitutional role of the federal government.

For the reasons stated, I must reluctantly conclude that Congress exceeded the bounds of its authority in passing the Act with the individual mandate. That is not to say, of course, that Congress is without power to address the problems and inequities in our health care system. The health care market is more than one sixth of the national economy, and without doubt Congress has the power to reform and regulate this market. That has not been disputed in this case. The principal dispute has been about how Congress chose to exercise that power here.[30]

Because the individual mandate is unconstitutional and not severable, the entire Act must be declared void. This has been a difficult decision to reach, and I am aware that it will have indeterminable implications. At a time when there is virtually unanimous agreement that health care reform is needed in this country, it is hard to invalidate and strike down a statute titled "The Patient Protection and Affordable Care Act." As Judge Luttig wrote for an en banc Fourth Circuit in

---

[30] On this point, it should be emphasized that while the individual mandate was clearly "necessary and essential" to the Act as drafted, it is not "necessary and essential" to health care reform in general. It is undisputed that there are various other (Constitutional) ways to accomplish what Congress wanted to do. Indeed, I note that in 2008, then-Senator Obama supported a health care reform proposal that did not include an individual mandate because he was at that time strongly opposed to the idea, stating that "if a mandate was the solution, we can try that to solve homelessness by mandating everybody to buy a house." See Interview on CNN's American Morning, Feb. 5, 2008, transcript available at: http://transcripts.cnn.com/TRANSCRIPTS/0802/05/ltm.02.html. In fact, he pointed to the similar individual mandate in Massachusetts --- which was imposed under the state's police power, a power the federal government does not have --- and opined that the mandate there left some residents "worse off" than they had been before. See Christopher Lee, Simple Question Defines Complex Health Debate, Washington Post, Feb. 24, 2008, at A10 (quoting Senator Obama as saying: "In some cases, there are people [in Massachusetts] who are paying fines and still can't afford [health insurance], so now they're worse off than they were . . . They don't have health insurance, and they're paying a fine . . .").

striking down the "Violence Against Women Act" (before the case was appealed and the Supreme Court did the same):

> No less for judges than for politicians is the temptation to affirm any statute so decorously titled. We live in a time when the lines between law and politics have been purposefully blurred to serve the ends of the latter. And, when we, as courts, have not participated in this most perniciously machiavellian of enterprises ourselves, we have acquiesced in it by others, allowing opinions of law to be dismissed as but pronouncements of personal agreement or disagreement. The judicial decision making contemplated by the Constitution, however, unlike at least the politics of the moment, emphatically is not a function of labels. If it were, the Supreme Court assuredly would not have struck down the "Gun-Free School Zones Act," the "Religious Freedom Restoration Act," the "Civil Rights Act of 1871," or the "Civil Rights Act of 1875." And if it ever becomes such, we will have ceased to be a society of law, and all the codification of freedom in the world will be to little avail.

Brzonkala, supra, 169 F.3d at 889.

In closing, I will simply observe, once again, that my conclusion in this case is based on an application of the Commerce Clause law as it exists pursuant to the Supreme Court's current interpretation and definition. Only the Supreme Court (or a Constitutional amendment) can expand that.

For all the reasons stated above and pursuant to Rule 56 of the Federal Rules of Civil Procedure, the plaintiffs' motion for summary judgment (doc. 80) is hereby GRANTED as to its request for declaratory relief on Count I of the Second Amended Complaint, and DENIED as to its request for injunctive relief; and the defendants' motion for summary judgment (doc. 82) is hereby GRANTED on Count IV of the Second Amended Complaint. The respective cross-motions are each DENIED.

In accordance with Rule 57 of the Federal Rules of Civil Procedure and Title

28, United States Code, Section 2201(a), a Declaratory Judgment shall be entered separately, declaring "The Patient Protection and Affordable Care Act" unconstitutional.

DONE and ORDERED this 31st day of January, 2011.

/s/ *Roger Vinson*
ROGER VINSON
Senior United States District Judge