IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| STATE OF FLORIDA, by and through PAM BONDI, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 3:10-cv-91-RV/EMT ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' MOTION TO CLARIFY

Defendants, through undersigned counsel, respectfully move the Court to clarify that its January 31, 2011, declaratory judgment does not relieve the parties of their rights and obligations under the Affordable Care Act while the declaratory judgment is the subject of appellate review.

In accordance with Local Rule 7.1(B), defendants' counsel conferred with plaintiffs' counsel to request their position on this motion. Plaintiffs indicated that they oppose.

In support of this motion, the Court is respectfully referred to the accompanying memorandum.

Dated: February 17, 2011

Respectfully submitted,

TONY WEST
Assistant Attorney General

IAN HEATH GERSHENGORN
Deputy Assistant Attorney General

THOMAS F. KIRWIN
United States Attorney

SHEILA LIEBER
Deputy Director

 /s/ *Eric Beckenhauer*
BRIAN G. KENNEDY
Senior Trial Counsel, D.C. Bar No. 228726
ERIC B. BECKENHAUER, Cal. Bar No. 237526
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW
Washington, DC 20530
Telephone: (202) 514-3338
Facsimile: (202) 616-8470
E-mail: eric.beckenhauer@usdoj.gov

*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| STATE OF FLORIDA, by and through PAM BONDI, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. 3:10-cv-91-RV/EMT ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO CLARIFY

This Court has held that Congress lacked authority to enact the minimum coverage provision of the Patient Protection and Affordable Care Act ("Affordable Care Act," "ACA," or the "Act").[1] The Court has also held that the provision is not severable from the remainder of the statute, and that therefore "the entire Act must be declared void." Order Granting Summ. J. ("Op.") 76 [Doc. No. 150]. The Court's declaratory judgment potentially implicates hundreds of provisions of the Act and, if it were interpreted to apply to programs currently in effect, duties currently in force, taxes currently being collected, and tax credits that may be owed at this time or in the near future, would create substantial uncertainty. Because of the sweeping nature of the declaratory judgment, such an interpretation would pose a risk of substantial disruption and hardship for those who rely on the provisions that have already been implemented.

---

[1] Pub. L. No. 111-148, 124 Stat. 119 (2010), *as amended by* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (2010).

Defendants will appeal both the Court's judgment and the rulings that underlie it.  This motion respectfully asks the Court to clarify the scope of its order, in particular that its declaratory judgment does not relieve the parties to this case of any obligations or deny them any rights under the Affordable Care Act while the judgment is the subject of appellate review, or, if the Court anticipated otherwise, to address specifically what the Court intends the parties' obligations and rights to be under the judgment while appellate review is pending.

1.      The minimum coverage provision does not take effect until 2014 and thus creates no immediately enforceable obligations or rights with respect to any of the parties.  As the Court observed, however, the Act "has approximately 450 separate pieces," Op. 73, many of which are currently in effect.  The Court did not find that these other provisions of the ACA violate the Constitution; indeed, the Court expressly rejected plaintiffs' arguments that several other provisions of the Act are unconstitutional.  The Court's opinion also recognized that "many . . . provisions in the Act can stand independently without the individual mandate." Op. 74.  For example, the Court stated that "there is little doubt that the provision in the Act requiring employers to provide a 'reasonable break time' and separate room for nursing mothers to go and express breast milk [Act § 4207] can function without the individual mandate." Op. 65.  Nevertheless, the Court's judgment declares the entire Act unconstitutional because, in its view, there "are simply too many moving parts in the Act and too many provisions dependent (directly and indirectly) on the individual mandate and other health insurance provisions . . . for me to try and dissect out the proper from the improper, and the able-to-stand-alone from the unable-to-stand-alone." Op. 73-74.

In holding that the entire Act must "stand or fall as a single unit" and thereby declaring all provisions of the ACA invalid, the Court expressly acknowledged that it was deviating from

the "'normal rule' that reviewing courts should ordinarily refrain from invalidating more than the unconstitutional part of a statute." Op. 74.  The Court observed that "[s]everability is a doctrine of judicial restraint," and that "just this past year," the Supreme Court reaffirmed that courts should "'try to limit the solution to the problem,' severing any 'problematic portions while leaving the remainder intact,'" and that the "'*normal* rule' is that partial invalidation is proper." Op. 64 (quoting *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3161 (2010)).  At the same time, the Court correctly noted that its decision to nonetheless invalidate the entire Act would have "indeterminable implications."  Op. 76.

In addition, this Court recognized that two other district courts have upheld the minimum coverage provision, which is the only provision that this Court held to be beyond the reach of Congress's power.  The minimum coverage provision does not take effect until 2014, and the Court's decision casts no doubt on the constitutionality of any of the individual statutory provisions that are in effect now or will become effective before 2014.  (Indeed, those provisions that are already in effect can clearly stand alone because they have become operative years before the minimum coverage provision takes effect.)  The only other court to hold the minimum coverage provision invalid rejected the contention that it should declare the Act invalid in its entirety and did not enter an injunction.  *Virginia ex rel. Cuccinelli v. Sebelius*, 728 F. Supp. 2d 768 (E.D. Va. 2010).[2]  That court explained that "[i]t would be virtually impossible within the present record to determine whether Congress would have passed this bill, encompassing a wide

---

[2] Appellate review of the decisions that were issued prior to this Court's judgment is already proceeding on an expedited basis.  The Fourth Circuit has calendared oral argument in *Virginia ex rel. Cuccinelli v. Sebelius*, Nos. 11-1057, 11-1058 (4th Cir.), and *Liberty University v. Geithner*, No. 10-2347 (4th Cir.), for its May 2011 sitting, and the Sixth Circuit has granted the parties' request to hear *Thomas More Law Center v. Obama*, No. 10-2388 (6th Cir.), during its May 30–June 10, 2011, session.

variety of topics related and unrelated to heath care, without Section 1501," and "[e]ven then, the Court's conclusions would be speculative at best." *Id.* at 789.

Given (a) the wide-ranging and indeterminate consequences that would occur if the declaratory judgment were assumed to have immediate injunction-like effect; (b) the Court's acknowledgment that it was deviating from the "'normal rule'" of severability; (c) the concededly unique nature of the Court's judgment, *see, e.g.*, Op. 74 ("This is not a situation that is likely to be repeated."); and (d) the fact that the Court declined to impose an injunction, *see* Op. 75, defendants do not interpret the Court's order as requiring them to immediately cease operating programs, implementing Medicare reforms, collecting taxes, extending grants, providing tax credits, and enforcing duties created by the ACA with regard to the plaintiff states, National Federation of Independent Business ("NFIB") members, and individual plaintiffs pending appeal, and defendants are proceeding on that basis.

2. Despite expressly declining to impose an injunction, the Court noted that "there is a long-standing presumption 'that officials of the Executive Branch will adhere to the law as declared by the court. As a result, the declaratory judgment is the functional equivalent of an injunction.'" Op. 75 (quoting *Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008)). This general point is not drawn into issue by this motion to clarify. Indeed, defendants' opposition to plaintiffs' summary judgment motion noted the same presumption. Defs.' Opp'n to Pls.' Mot. for Summ. J. 43 [Doc. No. 137].

However, defendants' opposition brief went on to note that this injunction-like effect of a declaratory judgment against defendants here would apply "*after appellate review is exhausted*." *Id.* (emphasis added). In other declaratory judgment cases, pending appellate review, "the Government has been free to continue to apply [a] statute" following entry of a declaratory

4

judgment.  *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 155 (1963); *accord, e.g.*, *Carreno v. Johnson*, 899 F. Supp. 624, 628 (S.D. Fla. 1995) ("[a]bsent an injunctive sanction, a district court's declaration that a statute is unconstitutional does not bar the government from continuing to apply the statute pending review by the Court of Appeals and the . . . Supreme Court"). *Mendoza-Martinez* contrasted that rule for declaratory relief with the different immediate consequences of an injunction, under which "a single federal judge" could "paralyze totally the operation of an entire regulatory scheme, either state or federal, by issuance of a broad injunctive order" prior to appellate review.  372 U.S. at 154.

That point has particular force here given the sweeping nature of the Court's declaratory judgment, which, although finding only one provision of the Act unconstitutional — the minimum coverage provision, which does not go into effect until 2014 and which the government thus would not enforce pending appeal in any event — proceeds to declare the rest of the Act inseverable and therefore invalid on that distinct ground.  *Miers*, by contrast, presented a narrow and focused issue concerning compliance with a specific subpoena that purported to create a legal duty that was challenged (as was the declaratory judgment) on constitutional grounds.  542 F.3d at 910.  And in the other case cited by the Court, *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 & n.8 (D.C. Cir. 1985) (Scalia, J.), the D.C. Circuit relied on a parallel between declaratory and injunctive relief in concluding that intrusive declaratory relief should not have been entered in the first place.  Consistent with the concededly unique nature of the Court's judgment, defendants are not aware of any past examples of a court relying on a general presumption that the government would adhere to the legal rulings in a declaratory judgment to conclude that the government would immediately halt implementation

5

of so many statutory provisions with respect to so many plaintiffs, and indirectly affecting so many people, while appellate review is pending.

As such, the critical point this motion addresses is one of *timing*, which the Court's opinion and judgment do not clearly address. In particular, we do not understand the Court's declaratory judgment of its own force to relieve the parties to this case of any obligations or deny them any rights under the Act while appellate review is pending. Many of the plaintiff states have publicly affirmed a similar view.[3] But, if defendants are wrong about what the Court anticipated, all parties must know that in determining specifically how to proceed while appellate review is pending.

Defendants therefore respectfully request that the Court confirm that its declaratory judgment does not in itself automatically and in a self-executing manner relieve the parties of their obligations or rights under the Affordable Care Act while appellate review is pending.

---

[3] Amy Goldstein & N.C. Aizenman, *State Officials Divided on Meaning of Judge's Health-Care Ruling*, Wash. Post, Feb. 1, 2011 ("Meanwhile, the governors of Georgia, Iowa and Mississippi said through spokesmen that they did not think the court decision gave them license to stop work on the law, in part because the ruling is destined to be appealed to higher courts," and quoting Georgia Governor Nathan Deal as stating that "[w]e'll be required to move forward until such time relief is granted or an appellate decision is finalized"), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/02/01/AR2011020105041.html; Andrew M. Harris & Margaret Cronin Fisk, *Health-Care Law Goes to Appeals Courts, States Weigh Enforcement*, Bloomberg News, Feb. 2, 2011 (quoting Ohio Attorney General Mike DeWine as stating "[w]e don't think we can advise that this law is void"), *available at* http://www.bloomberg.com/news/2011-02-01/health-care-law-goes-to-appeals-courts-as-states-differ-on-statute-s-scope.html; David Wahlberg, *Walker Accepts $38m to Create Health Care Exchange*, Wisc. State Journal, Feb. 16, 2011 (Wisconsin "Gov. Scott Walker is accepting nearly $38 million from the federal health care reform law to create a health care exchange, even though he has said he opposes the law"), *available at* http://host.madison.com/wsj/news/local/ health_med_ fit/article_8640ead4-3a08-11e0-aacc-001cc4c03286.html. *But see* Kevin Sack et al., *States Diverge on How to Deal With Health Care Ruling*, N.Y. Times, Feb. 2, 2011, at A16 (quoting state attorney general J. B. Van Hollen as stating, "[e]ffectively, Wisconsin was relieved of any obligations or duties that were created under terms of the federal health care law"), *available at* http://www.nytimes.com/2011/02/02/health/policy/02states.html (all Internet addresses last visited February 17, 2011).

3. The importance of clarification is underscored by the variety of statutory provisions that would be subject to significant disruption if, contrary to defendants' understanding, the declaratory judgment was anticipated to operate as an immediate injunction with respect to programs currently in effect.

a. The Affordable Care Act provides tax credits to eligible small businesses that offer insurance to their employees, offsetting up to 35 percent of employer premium costs beginning in tax year 2010. *See* ACA § 1421(a). Clarification would confirm defendants' view that the Court did not anticipate that its declaratory judgment would relieve the parties to this case of any obligations or deny them any rights under the Act, and that the federal government may continue to make these tax credits available to eligible small businesses among the hundreds of thousands of NFIB members[4] that offer insurance to their employees.[5]

b. More than 20 sections of the ACA effected changes to Medicare payment rates for 2011, including extensions of a number of payment adjustments (such as add-on payments and exceptions to payment caps) that pre-date the ACA. These changes have already been incorporated through notice and comment rulemaking into Medicare payment regulations and implemented through edits to nearly every major Medicare claims processing system, including

---

[4] NFIB claims to have more than 350,000 members as of August 2010. *See* Kathy Barber, Legislative Director, NFIB/Texas, Testimony Before the Committee on Ways & Means, Texas House of Representatives (Aug. 17, 2010), *available at* http://www.nfib.com/nfib-in-my-state/nfib-in-my-state-content?cmsid=52329.

[5] With respect to the many tax provisions of the ACA that this Court's order would seem to reach as a result of its severability ruling, serious questions concerning jurisdiction are raised because of the Anti-Injunction Act, 26 U.S.C. § 7421(a), and the injunction exception to the Declaratory Judgment Act, 28 U.S.C. § 2201(a). This Court's holding that the minimum coverage provision is not a tax and so may be challenged notwithstanding those jurisdictional provisions, Order & Mem. Op. 7-30 (Oct. 14, 2010) [Doc. No. 79], does not imply that provisions of the ACA that the Court did recognize as taxes, *see, e.g.*, *id.* at 19-20; Op. 73, may also be enjoined or even declared invalid.

those for inpatient services, outpatient services, and physician services.[6] To attempt at this juncture to devise an alternative, pre-ACA rate structure for plaintiff state-owned or operated Medicare providers (and NFIB member Medicare providers) would impose staggering administrative burdens on HHS and its fiscal intermediaries, and could cause major delays and errors in the payment of the roughly 100 million Medicare claims processed *each month*. Clarification would confirm defendants' view that the Court did not anticipate an interpretation that could yield these highly disruptive consequences, especially since there are procedures under the Medicare program for reconciliation of payments at the end of a cost year for certain providers and through different mechanisms for others.[7]

    c.       To prevent fraud and waste in the Medicaid program, the ACA required all states, by the end of 2010, to enter into contracts with auditors ("Recovery Audit Contractors") to identify incorrectly paid claims and to recoup overpayments. *See* ACA § 6411. Moreover, the Act requires states to suspend Medicaid payments to providers or suppliers when an

---

[6] 75 Fed. Reg. 73170 (Nov. 29, 2010) (changes to physician fee schedule and other revisions to Medicare Part B for calendar year 2011); 75 Fed. Reg. 71800 (Nov. 24, 2010) (changes to outpatient prospective payment system effective January 1, 2011); 75 Fed. Reg. 50042 (Aug. 16, 2010) (revising Medicare hospital inpatient prospective payment system for federal fiscal year 2011).

[7] These Medicare payment provisions were not challenged by plaintiffs or discussed by the parties, and the inclusion of those provisions in the Court's declaration that the entire Act is invalid also raises substantial jurisdictional issues. Ordinarily, a provider — including a plaintiff state-owned or operated provider or NFIB member provider — challenging a Medicare statute, regulation, or payment decision must proceed through the special procedures designed by Congress for the precise purpose of channeling such challenges. *E.g.*, *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1 (2000); *Weinberger v. Salfi*, 422 U.S. 749 (1975) (applying similar bar to require such channeling of challenge to constitutionality of statutory provision); *see generally Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 246 (1952) ("[T]he declaratory judgment procedure will not be used to preempt and prejudge issues that are committed for initial decision to an administrative body or special tribunal any more than it will be used as a substitute for statutory methods of review.").

investigation into a credible allegation of fraud is pending, unless good cause exists not to. *See* ACA § 6402(h)(2). Clarification of the anticipated effect of the declaratory judgment would confirm that these anti-fraud measures remain fully effective in the plaintiff states, protecting the integrity of federal Medicaid expenditures.

      d.      Twenty-five plaintiff states (all but Alaska) have applied for and been awarded federal grants to begin to take measures to ensure that their exchanges will be operational by 2014. *See* ACA § 1311(a). Clarification that the Court did not anticipate that the declaratory judgment would have an immediate effect on the duty of the Secretary and these plaintiff states to carry out their grant agreements, will confirm that these plaintiff states can continue to use the more than $24 million already made available to them, and that they can continue to apply for additional exchange grants that are currently available.

      e.      Twelve plaintiff states have contracted with HHS to run federally funded high-risk insurance pools (Pre-existing Condition Insurance Plan, or PCIP, programs) established pursuant to the Affordable Care Act. *See* ACA § 1101. These pools provide coverage to eligible Americans who have been uninsured for more than 6 months because of a pre-existing condition. Clarification of the declaratory judgment's anticipated effect will confirm that these plaintiff states may continue to administer these pools under the Act to provide coverage for their most high-risk citizens, thus avoiding potential coverage disruptions for current enrollees.

      f.      In their role as employers, most plaintiff states sponsor their own group health plans. Thus, they are subject to ACA provisions already in effect that, for example, generally require insurers to offer parents the option to keep children on their plans until age 26, bar insurers from placing lifetime limits on the dollar value of coverage, and prohibit insurers from rescinding coverage unexpectedly after an illness or accident because of a mistake on an

application. *See* ACA § 1001. Clarification of the anticipated effect of the declaratory judgment will confirm that millions of participants in these plans — employees of these plaintiff states and their families, who are not parties to this suit — are not deprived of coverage or denied benefits while the Court's ruling is under review.

        g.        All plaintiff states, either as employers or through at least one state entity, currently participate in the ACA's Early Retiree Reinsurance Program ("ERRP"). *See* ACA § 1102. Early retirees are often ineligible for coverage from their former employers, but are too young to qualify for Medicare and too old, or too ill, to obtain coverage in the individual market. To encourage employers to continue coverage to early retirees and their families, the Act provides for $5 billion in ERRP subsidies through 2013. These subsidies reimburse 80 percent of the costs of certain medical claims of early retirees and their family members. Clarification of the anticipated effect of the declaratory judgment will confirm that funding under this program may continue to be provided to the plaintiff states, as well as to NFIB members that elect to participate, avoiding potential coverage disruptions.

        h.        All 50 states have applied for and received funding under the ACA's Maternal, Infant, and Early Childhood Home Visiting Program, which appropriates $1.5 billion in funding over five years for states to deliver health care and other social services — such as prenatal care and domestic violence prevention — to families in at-risk communities who lack other resources. *See* ACA § 2951. In fiscal year 2010, for example, Florida was allocated $3.4 million, Michigan $2.1 million, and Pennsylvania $2.2 million. Clarification that the anticipated effect of the declaratory judgment was not to require that such funding be halted will confirm that the plaintiff states have continued access to grants under this program to help families at great risk of health and developmental problems, child maltreatment, and domestic violence.

   i. Twenty-two plaintiff states have been awarded a total of $22 million in grants to create or improve state oversight of health insurance premium increases. *See* ACA § 1003.[8] Clarification of the anticipated effect of the declaratory judgment will confirm that these plaintiff states may continue to use these grants (and to apply for $204 million in grants that have yet to be awarded) to protect the public from unreasonable premium increases.

   j. Thirteen plaintiff states have been awarded over $11.1 million in grants pursuant to the Act's Consumer Assistance Program, which authorizes and appropriates funding for states to help consumers navigate the health care market by, for example, facilitating enrollment in health plans and assisting with complaints and appeals against insurers. *See* ACA § 1002.[9] Clarification of the anticipated effect of the declaratory judgment will confirm that these plaintiff states may continue to use these funds to benefit their citizens.[10]

  4. The fact that the Court did not consider with specificity the entities entitled to invoke the Court's judgment, *cf.* Fed. R. Civ. P. 65(d), further suggests that it did not anticipate that its declaratory order would have immediate injunction-like effect. Non-parties are of course not entitled to the benefits of a judgment against the government, *see United States v. Mendoza*, 464 U.S. 154 (1984), but neither are nominal parties who lack standing, *see Allen v. Wright*, 468

---

[8] By letter dated February 1, 2011, Florida's State Insurance Commissioner advised HHS that Florida was rescinding its earlier acceptance of a $1 million rate review grant award and that it would not draw down any of this amount.

[9] On February 10, 2011, Wisconsin advised HHS that it would be returning a $238,000 Consumer Assistance Program grant that it had been awarded by HHS.

[10] The recitation above identifies only some provisions of the Act that are currently in effect and are being implemented. Issues concerning some other provisions of the Act that are not yet in effect or that have not given rise to any concrete disputes are not ripe for consideration here, and, in any event, may have their own special statutory procedures for administrative and judicial review in which the application of the ACA should be considered in the first instance. *See, e.g.*, 42 U.S.C. § 1316 (special review procedures for proposed amendments to state plans).

U.S. 737, 752 (1984) (Article III standing limitations are designed "to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted") (emphasis added). Here, the Court did not address whether 24 of the 26 plaintiff states have standing to challenge the minimum coverage provision. The Court addressed the standing of only two plaintiff states with regard to the minimum coverage provision, finding that Utah and Idaho had standing because they had enacted statutes before the ACA became law that arguably conflict with the minimum coverage provision. Op. 18. The Court's opinion thus did not address whether the other plaintiff states — many of which do not have comparable statutes — had Article III standing and on what basis. The Court observed that to resolve the merits of the legal issue it was sufficient to find that some plaintiffs had standing. That the Court found that it had jurisdiction to resolve the merits of the legal issue as to at least one party does not, however, address its authority to grant relief to any, much less all, other parties. The Court's not having addressed with specificity the issue of who is subject to the declaratory judgment further suggests that it was not anticipated that it would provide immediate injunction-like relief pending appeal.

The existence of an associational plaintiff adds an additional layer of uncertainty if the declaratory judgment is interpreted to apply to provisions already in effect. Aside from Mary Brown and a handful of other declarants — who claimed standing and rested their constitutional challenge on the basis of the asserted impact on them of the minimum coverage provision, which does not go into effect until 2014 — defendants do not know who were NFIB members at the time the First Amended Complaint was filed such that they may be affected by the judgment (for example, NFIB members may be unable to receive tax credits available to small businesses, *see supra* ¶ 3(a)). That the Court did not address this issue or any matters concerning the tax credit

12

(or other provisions that would affect some or all parties) suggests that it did not anticipate that its declaratory judgment would have immediate injunction-like effect.

     5.     In issuing a broad declaratory judgment, the Court was aware that its ruling would have "indeterminable implications." Op. 76. The Court gave no indication, however, that it intended or anticipated the specific potential disruptions of ongoing programs and operations (discussed above) and the questions that would arise about which parties are bound by the Court's order while the appellate courts resolve constitutional challenges to the Affordable Care Act. And despite its clear recognition of the complexity of the ACA and the difficulty in determining how the reasoning of its declaratory judgment would affect existing programs, this Court expressly declined to grant "injunctive relief enjoining implementation of the Act." Op. 75-76.

     If the Court had entered an injunction, its order would have been required to be "specific in terms" and to "describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." Fed. R. Civ. P. 65(d). That requirement is "'designed to prevent precisely the sort of confusion'" that can arise from a vague district court order. *Gunn v. Univ. Comm. to End the War in Vietnam*, 399 U.S. 383, 389 (1970) (quoting *Int'l Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 74 (1967)). Given the "extraordinary" nature of an injunctive order, Congress required "'that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.'" *Id.* (quoting *Int'l Longshoremen's Ass'n*, 389 U.S. at 76). The Supreme Court has observed that this requirement is especially "vital" in cases concerning the validity of duly enacted statutes. *Id.*

Moreover, before the Court could have entered an injunction barring the federal government from implementing any of the provisions of the Act, it would have been required to apply the familiar four-factor test, which consists of not only the likelihood of success on the merits, but also the respective equities of the parties and where the public interest lies, including an injunction's effect on parties not before the Court. Similarly, even if the Court had anticipated that its declaratory judgment would serve as the functional equivalent of an injunction during the pendency of an appeal (which, in defendants' view, it did not), it would have had to satisfy the "equivalen[t] . . . criteria for issuance," including the requirements for issuance of equitable relief. *Sanchez-Espinoza*, 770 F.2d at 208 n.8; *cf. Samuels v. Mackell*, 401 U.S. 66, 72 (1971) (where federal declaratory judgment would result in "interference with and disruption of state proceedings," "the propriety of declaratory and injunctive relief should be judged by essentially the same standards"). These omissions are additional reasons why defendants do not understand the Court's order to have immediate injunction-like effect.

6. Clarification that the Court anticipated that its declaratory judgment would not affect the parties' rights and obligations until after the conclusion of appellate review will also shape the contours of further litigation of this case, both here and in the appellate courts. As outlined above, a contrary understanding would threaten serious harm to many Americans currently benefitting from provisions of the Affordable Care Act that are already in effect and would significantly interfere with defendants' statutory duty to implement the Act as Congress directed. Defendants do not understand the Court to have anticipated that its judgment would operate in that self-executing manner to halt the operation of the Act as to all plaintiffs, especially since numerous provisions of the ACA clearly *benefit* the plaintiffs, or affect third parties not before the Court. Defendants therefore move the Court to clarify that its judgment

14

indeed does not, *pending appellate review*, relieve the parties to this case of any rights or obligations under the ACA.

If the Court disagrees with defendants' understanding and instead issues an order stating that it did, in fact, anticipate its judgment to have immediate injunction-like effect, defendants will consider how to respond pending appellate review, including whether to seek a stay pending appeal. Otherwise, defendants will proceed based on their understanding of the judgment as reflected above.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court clarify that its January 31, 2011, declaratory judgment does not relieve the parties of their rights and obligations under the Affordable Care Act while the declaratory judgment is the subject of appellate review.

Dated: February 17, 2011                Respectfully submitted,

  TONY WEST
  Assistant Attorney General

  IAN HEATH GERSHENGORN
  Deputy Assistant Attorney General

  THOMAS F. KIRWIN
  United States Attorney

  SHEILA LIEBER
  Deputy Director

   /s/ *Eric Beckenhauer*
  BRIAN G. KENNEDY
  Senior Trial Counsel, D.C. Bar No. 228726
  ERIC B. BECKENHAUER, Cal. Bar No. 237526
  Trial Attorney
  U.S. Department of Justice
  Civil Division, Federal Programs Branch
  20 Massachusetts Ave. NW

                Washington, DC 20530
                Telephone: (202) 514-3338
                Facsimile: (202) 616-8470
                E-mail: eric.beckenhauer@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

      I hereby certify that on February 17, 2011, the foregoing document was filed with the Clerk of Court via the CM/ECF system, causing it to be served on Plaintiffs' counsel of record.

                                              /s/ *Eric Beckenhauer*
                                              ERIC B. BECKENHAUER