IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

STATE OF FLORIDA, by and through
Attorney General Pam Bondi, et al.;

    Plaintiffs,

  v.                                                  Case No.: 3:10-cv-91-RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, et al.,

    Defendants.
_____/

## ORDER

My order of January 31, 2011 ("Order"), granted summary judgment for the plaintiffs (in part); held the "individual mandate" provision of The Patient Protection and Affordable Care Act (the "Act") unconstitutional; and declared the remainder of the Act void because it was not severable. The defendants have now filed a motion to "clarify" this ruling (doc. 156) ("Def. Mot."). During the four-plus weeks since entry of my order, the defendants have seemingly continued to move forward and implement the Act. In their response in opposition to the defendants' motion, the plaintiffs have asserted that "[i]f the Government was not prepared to comply with the Court's judgment, the proper and respectful course would have been to seek an immediate stay, not an untimely and unorthodox motion to clarify" (doc. 158 at 2) ("Pl. Resp.").

While I believe that my order was as clear and unambiguous as it could be, it is possible that the defendants may have perhaps been confused or misunderstood its import. Accordingly, I will attempt to synopsize the 78-page order and clarify its intended effect. To that extent, the defendants' motion to clarify is GRANTED.

I. **Clarification**

Let me begin the clarification by emphasizing, once again, what this case is

all about. The plaintiffs filed this case to challenge the Constitutionality of the Act. The complaint raised several causes of action, but the crux of the case centered on the Constitutionality of the individual mandate, which, beginning in 2014, will require everyone (with certain stated exceptions) to buy federally-approved health insurance or pay a monetary "penalty." Like every single district court to consider this issue so far --- including those that have ruled for the federal government --- I rejected the defendants' argument that the penalty should be construed as a tax barred by the Anti-Injunction Act. Instead, I concluded that it was a civil regulatory penalty which could not be based on the federal government's broad taxing power. The issue was thus narrowed to whether the individual mandate fell within, or went beyond, Congress's Constitutional authority "To regulate Commerce . . . among the several States." U.S. Const. art I, § 8, cl. 3.

In granting summary judgment in favor of the plaintiffs on that question, I traced the historical roots of the Commerce Clause and the evolution of its judicial interpretation. I noted that the word "commerce" had a well-understood meaning when the Founding Fathers drafted our Constitution and when "We the People" later adopted it. I analyzed and discussed (in detail) every significant and pertinent Commerce Clause case decided by the Supreme Court, including the primary cases relied on by the defendants: <u>Wickard v. Filburn</u>, 317 U.S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942); and <u>Gonzales v. Raich</u>, 545 U.S. 1, 125 S. Ct. 2195, 162 L. Ed. 2d 1 (2005). I concluded, however, that those (and other) cases neither supported the defendants' position nor directly resolved the Constitutional question at issue. Indeed, as Congress's own attorneys (in the Congressional Research Service) have explained:

> While in <u>Wickard</u> and <u>Raich</u>, the individuals were
> participating in their own home activities (i.e., producing
> wheat for home consumption and cultivating marijuana
> for personal use), they were acting of their own volition,
> and this activity was determined to be economic in nature

*Case No.: 3:10-cv-91-RV/EMT*

>and affected interstate commerce. However, [the individual mandate] could be imposed on some individuals who engage in virtually no economic activity whatsoever. <u>This is a novel issue</u>: whether Congress can use its Commerce Clause authority to require a person to buy a good or a service and whether this type of required participation can be considered economic activity.

Congressional Research Service, <u>Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis</u>, July 24, 2009, at 6 ("CRS Analysis") (emphasis added).[1]

    I recognized in my order that "novel" and unprecedented did not, by itself, mean "unconstitutional," so I then proceeded to address the defendants' several arguments in support of the individual mandate. Following the Supreme Court's precedent in <u>United States v. Lopez</u>, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), I "pause[d] to consider the implications of the Government's arguments" by discussing possible hypothetical extensions of the logic underlying them. <u>See</u> <u>id.</u> at 564-65. For example, in <u>Lopez</u>, the Court also used hypothetical examples to illustrate other areas that "Congress could regulate" and activities that "Congress could mandate" in the future under the federal government's logic, and concluded that, under such reasoning, it would be hard "to posit any activity by an individual that Congress is without power to regulate." <u>See</u> <u>id.</u> I similarly concluded that the government's arguments in this case --- including the "economic decisions"

---

[1] Even the district courts that have upheld the individual mandate seem to agree that "activity" is indeed required before Congress can exercise its authority under the Commerce Clause. They have simply determined that an individual's <u>decision</u> not to buy health insurance qualifies as <u>activity</u>. For example, in the most recent case, <u>Mead v. Holder</u>, --- F. Supp. 2d ---, 2011 WL 611139 (D.C.C. Feb. 22, 2011), the District Court for the District of Columbia concluded that "[m]aking a choice is an affirmative action, whether one decides to do something or not do something," and, therefore, Congress can regulate "<u>mental activity</u>" under the commerce power. <u>See</u> <u>id.</u> at *18 (emphasis added). As that court acknowledged, however, there is "little judicial guidance" from the Supreme Court with respect to this issue as "previous Commerce Clause cases have all involved physical activity." <u>Id.</u>

*Case No.: 3:10-cv-91-RV/EMT*

argument --- could authorize Congress to regulate almost any activity (or inactivity). This could not be reconciled with a federal government of limited and enumerated powers. I thus concluded that the meaning of the term "commerce" as understood by the Founding Fathers would not have encompassed the individual mandate, not because of some vague "original intent," but because it would have violated the fundamental and foundational principles upon which the Constitution was based: a federal government with limited enumerated powers which can only exercise those specific powers granted to it.

Similarly, I determined (consistent with the Lopez majority's rejection of the dissent's arguments) that "market uniqueness" is not an adequate limiting principle as the same basic arguments in support of the individual mandate could be applied in other contexts outside the "unique" health care market, and could be used to require that individuals buy (under threat of penalty) virtually any good or service that Congress has a "rational basis" to conclude would help the national economy, from cars to broccoli.[2] I thus held that the individual mandate exceeded Congress's

---

[2] Although some have suggested that the possibility of Congress being able to claim such a power is Constitutionally implausible, subsequent events have only reinforced the legitimacy of this concern. On February 2, 2011, two days after my order was entered, the Senate Judiciary Committee held a hearing to explore the Constitutionality of the individual mandate. The possibility of a "broccoli mandate" was discussed at this hearing. Former Solicitor General and Harvard law professor Charles Fried testified (during the course of defending the Constitutionality of the individual mandate) that under this view of the commerce power Congress could, indeed, mandate that everyone buy broccoli. See Transcript of Senate Judiciary Committee Hearing: Constitutionality of the Affordable Care Act (Feb. 2, 2011); see also Written Testimony of Charles Fried, Beneficial Professor of Law, Harvard Law School, Before the Senate Judiciary Committee on "The Constitutionality of the Affordable Care Act" (Feb. 2, 2011), at 4. This testimony only highlights my concern because it directly undercuts the defendants' principal argument for why an economic mandate is justified here; to wit, that it is justified in this case (and only this case) because the broad health care market is "unique" and because the failure to buy health insurance constitutes an "economic financing decision" about how to pay for an unavoidable service that hospital emergency rooms (unlike sellers

authority under the Commerce Clause (at least as understood, defined, and applied in existing case law). Such an unprecedented and potentially radical expansion of Congress's commerce power could only be authorized in the first instance by the Supreme Court, or possibly by a Constitutional amendment. It is not for a lower court to expand upon Supreme Court jurisprudence, and in the process authorize the exercise of a "highly attractive power" that Congress has never before claimed in the history of the country [see generally Printz v. United States, 521 U.S. 898, 905-18, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997)], and which Congress's very own attorneys have warned "could be perceived as virtually unlimited in scope." See CRS Analysis, supra, at 7. After concluding that the individual mandate could not be supported by existing Commerce Clause precedent --- nor under Necessary and Proper Clause case law, including the recent doctrinal analysis articulated in United States v. Comstock, --- U.S. ---, 130 S. Ct. 1949, 176 L. Ed. 2d 878 (2010) --- I then considered the question of severability.

     In deciding the severability issue, I began by recognizing and acknowledging that, if at all possible, courts will usually only strike down the unconstitutional part of a statute and leave the rest intact. However, I noted that this was not the usual

---

of produce and other commodities) are required under law to provide regardless of ability to pay. As noted, to the extent that one may respond to this hypothetical concern by suggesting that "political accountability" would prevent Congress from ever imposing a "broccoli mandate" (even though it could), the Supreme Court has specifically rejected that as the appropriate test for "the limitation of congressional authority is not solely a matter of legislative grace." See United States v. Morrison, 529 U.S. 598, 616, 120 S. Ct. 1740, 146 L. Ed. 2d 658 (2000); see also id. at 616 n.7 (explaining that Congress's authority under the Commerce Clause is not "limited only by public opinion and the Legislature's self-restraint," and thereby rejecting the claim that "political accountability is . . . the only limit on Congress' exercise of the commerce power"); cf. United States v. Stevens, --- U.S. ---, 130 S. Ct. 1577, 1591, 176 L. Ed. 2d 435 (2010) ("[T]he [Constitution] protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

*Case No.: 3:10-cv-91-RV/EMT*

case, and that its unique facts required a finding of non-severability. In particular, I noted that:

(i) At the time the Act was passed, Congress knew for certain that legal challenges to the individual mandate were coming;

(ii) Congress's own Research Service had essentially advised that the legal challenges would have merit (and therefore might result in the individual mandate being struck down) as it could not be said that the individual mandate had "solid constitutional foundation" [CRS Analysis, supra, at 3];

(iii) And yet, Congress specifically (and presumably intentionally) deleted the "severability clause" that had been included in the earlier version of the Act.

I concluded that, in light of the foregoing facts, the conspicuous absence of a severability clause --- which is ordinarily included in complex legislation as a matter of routine --- could be viewed as strong evidence that Congress recognized that the Act could not operate as intended if the individual mandate was eventually struck down by the courts.

I also found that the defendants' own arguments in defense of the individual mandate on Necessary and Proper grounds necessarily undermined its argument for severability. I noted, for example, that during this case the defendants consistently and repeatedly highlighted the "essential" role that the individual mandate played in the regulatory reform of the interstate health care and health insurance markets, which was the entire point of the Act. As the defendants themselves made clear:

> [The individual mandate] is essential to the Act's comprehensive scheme to ensure that health insurance coverage is available and affordable [and it "works in tandem" with the health benefit exchanges, employer incentives, tax credits, and the Medicaid expansion].
>
> * * *
>
> [The absence of an individual mandate] would undermine the "comprehensive regulatory regime" in the Act.

*Case No.: 3:10-cv-91-RV/EMT*

\* \* \*

> [The individual mandate] is essential to Congress's overall regulatory reform of the interstate health care and health insurance markets . . . [it] is "essential" to achieving key reforms of the interstate health insurance market . . . [and it is] necessary to make the other regulations in the Act effective.

Memorandum in Support of Defendants' Motion to Dismiss (doc. 56-1), at 46-48 (emphasis added). Therefore, according to the defendants' own arguments, the individual mandate and the insurance reform provisions must rise or fall together.[3]

In the course of applying the two-part severability analysis, I noted that the Supreme Court has stressed that the "relevant inquiry in evaluating severability is whether the statute [with the unconstitutional provision removed] will function in a manner consistent with the intent of Congress." See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 685, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987). In light of the defendants' own arguments as quoted above and dozens of similar representations that they made throughout this case, I had no choice but to find that the individual mandate was essential to, and thus could not be severed from, the rest of the Act.

I further noted that, because the Act was extremely lengthy and many of its provisions were dependent (directly or indirectly) on the individual mandate, it was improper for me (a judge) to engage in the quasi-legislative undertaking of deciding which of the Act's several hundred provisions could theoretically survive without the individual mandate (as a technical or practical matter) and which could not --- or which provisions Congress could have arguably wanted to survive. To demonstrate

---

[3] As explained in my order, the mere fact that the individual mandate was "necessary" to the Act as drafted does not mean it was Constitutionally "proper." See, e.g., Printz v. United States, 521 U.S. 898, 923-24, 117 S. Ct. 2365, 138 L. Ed. 2d 914 (1997) ("When a 'Law for carrying into Execution' the Commerce Clause violates [other Constitutional principles], it is not a 'Law proper for carrying into Execution the Commerce Clause'") (emphasis in original) (ellipses omitted).

Case No.: 3:10-cv-91-RV/EMT

this problem, I discussed the Act's much-maligned Internal Revenue Service Form 1099 reporting requirement, which was an apparent revenue-generating provision with no connection to health care:

> How could I possibly determine if Congress intended the 1099 reporting provision to stand independently of the insurance reform provisions? Should the fact that it has been widely criticized by both Congressional supporters and opponents of the Act and the fact that there have been bipartisan efforts to repeal it factor at all into my determination?

Order at 73. In fact, on February 2, 2011, two days after entry of my order, the Senate voted (with bipartisan support) to repeal the Form 1099 provision (and the House is expected to follow with a similar vote in upcoming weeks). This is exactly how the process should be, as it highlights that it is Congress --- and not courts --- that should consider and decide the quintessentially legislative questions of which, if any, of the statute's hundreds of provisions should stay and which should go.

Because of these atypical and unusual circumstances (e.g., the <u>deletion of a severability clause</u> in the face of inevitable and well-founded legal challenges; the defendants' <u>repeated acknowledgment</u> in this case that the individual mandate was the keystone or lynchpin of the statute's overall purpose; and the obvious difficulty (if not impropriety) of reconfiguring an <u>extremely lengthy and comprehensive statute</u> with so many interconnected provisions), I concluded that these facts were not likely to be present in future litigation, and that the "normal rule" of severability --- which would still apply in the vast majority of cases --- was not applicable here.

Compare, for example, the unusual facts of this case with a case where the "normal rule" has been applied. In <u>New York v. United States</u>, 505 U.S. 144, 157, 112 S. Ct. 2408, 120 L. Ed. 2d 120 (1992), the Supreme Court was called upon to consider the Constitutionality of the Low–Level Radioactive Waste Policy Act, which, in an effort to address a looming shortage of disposal sites of low level radioactive waste, set forth three "incentives" to states that provided for disposal

of waste generated within their borders. The Supreme Court held that the first two incentives were Constitutional, but the third --- the take title provision --- was not. In holding that provision could be severed from the statute, the Court explained:

> Common sense suggests that where Congress has enacted a statutory scheme for an obvious purpose, and where Congress has included a series of provisions operating as incentives to achieve that purpose, the invalidation of one of the incentives should not ordinarily cause Congress' overall intent to be frustrated. . . . [The one incentive] may fail, and still the great body of the statute have operative force, and the force contemplated by the legislature in its enactment . . . .
>
> [T]he take title provision may be severed <u>without doing violence</u> to the rest of the Act. The Act is still operative and it <u>still serves Congress' objective</u> of encouraging the States to attain local or regional self-sufficiency in the disposal of low level radioactive waste. It still includes two incentives that coax the States along this road. . . . <u>The purpose of the Act</u> is not defeated by the invalidation of the take title provision, so we may leave the remainder of the Act in force.

<u>Id.</u> at 186-67 (emphasis added). Plainly, the "normal case" is very different from the one presented here, where the federal government has repeatedly made clear that the primary and overall <u>purpose</u> (albeit not necessarily every single provision) of the Act would be directly and irretrievably compromised by the removal of the central feature that Congress described as "essential" in the words of the Act itself. <u>See</u> Act § 1501(a)(2)(I).[4]

---

[4] For example, during the summary judgment hearing and oral argument, the defendants' attorney stressed that the individual mandate is absolutely necessary to the health insurance reforms as those reforms "literally can't work without" the individual mandate [<u>see</u> Tr. 83]. As noted, this was very significant because the insurance reform provisions were not a small or inconsequential part of the Act. In fact, they were its primary purpose and main objective --- as clearly demonstrated, <u>inter alia</u>, by the title of the Act itself and the fact that its proponents frequently

After determining that the individual mandate was unconstitutional and that it could not be severed from the remainder of the Act --- and thus "the entire Act must be declared void" --- I finally considered the plaintiffs' request for injunctive relief. I explained that the "extraordinary" and "drastic" remedy of an injunction is not typically required against the federal government because:

> . . . there is a long-standing presumption "that officials of the Executive Branch will adhere to the law as declared by the court. As a result, the declaratory judgment is the functional equivalent of an injunction." See Comm. on Judiciary of U.S. House of Representatives v. Miers, 542 F.3d 909, 911 (D.C. Cir. 2008); accord Sanchez-Espinoza v. Reagan, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985) ("declaratory judgment is, in a context such as this where federal officers are defendants, the practical equivalent of specific relief such as an injunction . . . since it must be presumed that federal officers will adhere to the law as declared by the court") (Scalia, J.) (emphasis added).
>
> There is no reason to conclude that this presumption should not apply here. Thus, the award of declaratory relief is adequate and separate injunctive relief is not necessary.

Order at 75. The above language seems to be plain and unambiguous. Even though I expressly declared that the entire Act was "void," and even though I emphasized that "separate injunctive relief is not necessary" only because it must be presumed that "the Executive Branch will adhere to the law as declared by the court," which means that "declaratory judgment is the functional equivalent of an injunction," the defendants have indicated that they "do not interpret the Court's order as requiring

---

referred to the legislative efforts as "health insurance reform." It is, quite frankly, difficult to comprehend how severing and removing the "health insurance reform provisions" from "health insurance reform legislation" could even arguably leave a statute that would "function in a manner consistent with the intent of Congress." See Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 685, 107 S. Ct. 1476, 94 L. Ed. 2d 661 (1987)

*Case No.: 3:10-cv-91-RV/EMT*

them to immediately cease [implementing and enforcing the Act]." See Def. Mot. at 4; see also id. at 6 ("we do not understand the Court's declaratory judgment of its own force to relieve the parties to this case of any obligations or deny them any rights under the Act"). They have reportedly continued with full implementation of the Act. They claim that they have done so based on certain language in (and legal analyses left out of) my order, which they believe suggests that the ruling "does not in itself automatically and in self-executing manner relieve the parties of their obligations or rights under the [Act] while appellate review is pending." See id.

The defendants have suggested, for example, that my order and judgment could not have been intended to have the full force of an injunction because, if I had so intended, I would have been "required to apply the familiar four-factor test" to determine if injunctive relief was appropriate. See Def. Mot. at 14. That well-settled four-factor test requires the party seeking an injunction to demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006). I did not undertake this four-factor analysis for a simple reason: it was not necessary. Even though the defendants had technically disputed that the plaintiffs could satisfy those four factors, the defendants had acknowledged in their summary judgment opposition brief that, if I were to find for the plaintiffs, separate injunctive relief would be superfluous and unnecessary. The defendants expressly assured the court that, in light of the "long-standing presumption that a declaratory judgment provides adequate relief as against an executive officer, as it will not be presumed that that officer will ignore the judgment of the Court," any declaratory judgment in the plaintiffs' favor "would [ ] be adequate to vindicate [the plaintiffs']

*Case No.: 3:10-cv-91-RV/EMT*

claims." Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment (doc. 137), at 43. Consequently, there was no need to discuss and apply the four-factor test to determine if injunctive relief was appropriate because the defendants had confirmed that they would "not . . . ignore the judgment of the Court" and that my "declaratory judgment would [ ] be adequate." In other words, the defendants are now claiming that it is somehow confusing that I bypassed the four-factor test and applied the "long-standing presumption" that they themselves had identified and specifically insisted that they would honor.

I am aware that in their opposition brief the defendants attempted to qualify and limit the "long-standing presumption" --- and avoid the declaratory judgment's <u>immediate</u> injunction-like effect --- by intimating that it should apply "after appellate review is exhausted." <u>See</u> <u>id.</u> There were several problems with this claim (which is why I rejected it <u>sub</u> <u>silentio</u>). First of all, the case the defendants cited in making their qualifying statement [<u>Miers</u>, <u>supra</u>, 542 F.3d at 911] does not at all support the position that a district court's declaratory judgment will only be presumed to have injunctive effect against federal officials "after appellate review is exhausted." Quite to the contrary, in that case the Court of Appeals for the District of Columbia determined that the presumption attached <u>immediately</u> and thus the district court's declaratory judgment had immediate injunction-like effect (which is why the order under review was "immediately appealable" in the first instance). <u>See</u> <u>id.</u> at 910-11. Accordingly, while the defendants may have tried to qualify the long-standing presumption and limit it to post-appeal, I was (and still am) unpersuaded that the presumption can (or should) be limited in such fashion. Indeed, I note that the federal government previously advanced the exact same "after appellate review is exhausted" argument (almost word-for-word) in one of the Virginia cases [<u>see</u> doc. 96, in 3:10-cv-188, at 34-35], where it appears to have been rejected <u>sub</u> <u>silentio</u> as well. <u>See</u> <u>Virginia v. Sebelius</u>, 728 F. Supp. 2d 768, 790 (E.D. Va. 2010) (declaring individual mandate unconstitutional, but declining to issue injunction

*Case No.: 3:10-cv-91-RV/EMT*

because, in light of the long-standing presumption against enjoining federal officers, "the award of declaratory judgment is sufficient to stay the hand of the Executive branch pending appellate review") (emphasis added).

Furthermore, as the plaintiffs have correctly pointed out [see Pl. Resp. at 3-6], to suggest that a declaratory judgment will only be effective and binding on the parties after the appeals process has fully run its course is manifestly incorrect and inconsistent with well established statutory and case law. A declaratory judgment establishes and declares "the rights and other legal relations" between the parties before the court and has "the force and effect of a final judgment." See 28 U.S.C. § 2201(a). "A declaratory judgment cannot be enforced by contempt proceedings, but it has the same effect as an injunction in fixing the parties' legal entitlements . . . . A litigant who tries to evade a federal court's judgment --- and a declaratory judgment is a real judgment, not just a bit of friendly advice --- will come to regret it." Badger Catholic, Inc. v. Walsh, 620 F.3d 775, 782 (7th Cir. 2010). If it were otherwise, a federal court's declaratory judgment would serve "no useful purpose as a final determination of rights." See Public Service Comm'n of Utah, v. Wycoff Co., Inc., 344 U.S. 237, 247, 73 S. Ct. 236, 97 L. Ed. 2d 291 (1952). For the defendants to suggest that they were entitled (or that in the weeks after my order was issued they thought they might be entitled) to basically ignore my declaratory judgment until "after appellate review is exhausted" is unsupported in the law.[5]

---

[5] The defendants have claimed that "[i]n other declaratory judgment cases, pending appellate review, 'the Government has been free to continue to apply [a] statute' following entry of a declaratory judgment." See Def. Mot. at 4-5 (citing Kennedy v. Mendoza-Martinez, 372 U.S. 144, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963); Carreno v. Johnson, 899 F. Supp. 624 (S. D. Fla. 1995)). Quoting from Mendoza-Martinez, the defendants further claim that "'a single federal judge'" is not authorized to "'paralyze totally the operation of an entire regulatory scheme, either state or federal, by issuance of a broad injunctive order' prior to appellate review." See id. at 5. The two cited cases are plainly inapposite for the reasons identified by the plaintiffs. See Pl. Resp. at 4-5. Mendoza-Martinez, for example,

So to "clarify" my order and judgment: The individual mandate was declared unconstitutional. Because that "essential" provision was unseverable from the rest of the Act, the entire legislation was void. This declaratory judgment was expected to be treated as the "practical" and "functional equivalent of an injunction" with respect to the parties to the litigation. This expectation was based on the "long-standing presumption" that the defendants themselves identified and agreed to be bound by, which provides that a declaratory judgment against federal officials is a de facto injunction. To the extent that the defendants were unable (or believed that they were unable) to comply, it was expected that they would immediately seek a stay of the ruling, and at that point in time present their arguments for why such a stay is necessary, which is the usual and standard procedure. It was not expected that they would effectively ignore the order and declaratory judgment for two and one-half weeks, continue to implement the Act, and only then file a belated motion to "clarify."[6]

The plaintiffs have contended that the defendants did not actually need any of the above clarification as they were not really confused by, or unsure of, the effect of my order and judgment. They have suggested that if the defendants had

---

applied a statute that precluded single-judge district courts from enjoining an Act of Congress; but that statute was repealed by Congress thirty-five years ago, in 1976. The defendants' selective quoting from those cases --- to suggest that the federal government may simply ignore a declaratory judgment by a district court until the appeals process has fully run its course --- borders on misrepresentation.

[6] The defendants have suggested in reply to the plaintiffs' response that the reason for the delay was due to the fact that my order "required careful analysis," and it was only after this "careful review" that the defendants could determine its "potential impact" with respect to implementation of the Act (see doc. 164 at 11). This seems contrary to media reports that the White House declared within hours after entry of my order that "implementation will proceed apace" regardless of the ruling. See, e.g., N.C. Aizenman and Amy Goldstein, U.S. Judge in Florida Rejects Health Law, Washington Post, Feb. 1, 2011, at A01 (quoting a senior White House official).

*Case No.: 3:10-cv-91-RV/EMT*

truly believed there was any uncertainty or ambiguity, they would have immediately sought clarification rather than continuing to move forward with implementing the Act as if nothing had happened. The plaintiffs have asserted that the defendants' motion to clarify is, "in fact, a transparent attempt, through the guise of seeking clarification, to obtain a stay pending appeal." See Pl. Resp. at 2. At certain parts in the pleading, the defendants' motion does seem to be more of a motion to stay than a motion to clarify. Because the defendants have stated that they intend to file a subsequent motion to stay [Def. Mot. at 15] if I were to "clarify" that I had intended my declaratory judgment to have immediate injunction-like effect (which I just did), I will save time in this time-is-of-the-essence case by treating the motion to clarify as one requesting a stay as well.

## II. Motion to Stay

In deciding whether to grant a stay pending appeal, courts should generally examine four factors: (1) whether the applicants have made a strong showing that they are likely to prevail; (2) whether the applicants will be irreparably injured if a stay is not granted; (3) whether granting the stay will substantially injure the other parties interested in the proceeding; and (4) "where the public interest lies." Hilton v. Braunskill, 481 U.S. 770, 776, 107 S. Ct. 2113, 95 L. Ed. 2d 724 (1987).

For the first factor, I cannot say that the defendants do not have a likelihood of success on appeal. They do. And so do the plaintiffs. Although I strongly believe that expanding the commerce power to permit Congress to regulate and mandate mental decisions not to purchase health insurance (or any other product or service) would emasculate much of the rest of the Constitution and effectively remove all limitations on the power of the federal government, I recognize that others believe otherwise. The individual mandate has raised some novel issues regarding the Constitutional role of the federal government about which reasonable and intelligent people (and reasonable and intelligent jurists) can disagree. To be sure, members of Congress, law professors, and several federal district courts have already reached

varying conclusions on whether the individual mandate is Constitutional. It is likely that the Courts of Appeal will also reach divergent results and that, as most court-watchers predict, the Supreme Court may eventually be split on this issue as well. Despite what partisans for or against the individual mandate might suggest, this litigation presents a question with some strong and compelling arguments on both sides. Ultimately, I ruled the way I did, not only because I believe it was the right overall result, but because I believe that is the appropriate course for a lower court to take when presented with a (literally) unprecedented argument whose success depends on stretching existing Supreme Court precedent well beyond its current high water mark and further away from the "first principles" that underlie our entire federalist system. Under these circumstances, I must conclude that the defendants do have some (sufficient for this test only) likelihood of success on appeal.

I must next consider the injury to the defendants if the stay is not entered, and the injury to the plaintiffs if it is. The Act, as previously noted, is obviously very complicated and expansive. It contains about 450 separate provisions with different time schedules for implementation. Some are currently in effect, while others, including the individual mandate, are not scheduled to go into effect for several years. In their motion, the defendants have identified and described the "significant disruption" and "wide-ranging and indeterminate consequences" that could result if implementation of the entire Act must stop immediately [see Def. Mot. at 4, 7-11], and, upon review and consideration of these arguments, I agree that it would indeed be difficult to enjoin and halt the Act's implementation while the case is pending appeal. It would be extremely disruptive and cause significant uncertainty.

Against this, however, I must balance the potential injury to the plaintiffs if a stay is entered. Relying on their previous summary judgment filings, the plaintiffs have argued that the Act is causing them substantial harm now because the state plaintiffs are being required to expend significant funds and resources in order to

*Case No.: 3:10-cv-91-RV/EMT*

comply with the Act's numerous provisions. In this respect, it is apparent that the plaintiffs will be injured by a stay of my ruling.[7] Similarly, businesses, families, and individuals are having to expend time, money, and effort in order to comply with all of the Act's requirements. Further, I do not doubt that --- assuming that my ruling is eventually affirmed --- the plaintiffs will sustain injury if the Act continues to be implemented. Reversing what is presently in effect (and what will be put into effect in the future) may prove enormously difficult. Indeed, one could argue that was the entire point in front-loading certain of the Act's provisions in the first place. It could also be argued that the Executive Branch seeks to continue the implementation, in part, for the very reason that the implemented provisions will be hard to undo once they are fully in place. However, after balancing the potential harm to the plaintiffs against the potential harm to the defendants, I find that, on balance, these two factors weigh in favor of granting a stay --- particularly in light of several unusual facts present in this case.

For example, my declaratory judgment, of course, only applies to the parties to this litigation. The State of Michigan is one of those parties. However, a federal district court in Michigan has already upheld the Act and the individual mandate. See Thomas More Law Center v. Obama, 720 F. Supp. 2d 882 (E.D. Mich. 2010). Can (or should) I enjoin and halt implementation of the Act in a state where one of its federal courts has held it to be Constitutional? In addition, many of the plaintiff states have publicly represented that they will immediately halt implementation of the Act in light of my declaratory judgment, while at least eight plaintiff states (as identified by the defendants in their motion and reply) have suggested that, in an abundance of caution, they will <u>not</u> stop implementing the Act pending appeal. In

---

[7] Although the severity of that injury is undercut by the fact that at least eight of the plaintiff states (noted further infra) have represented that they will continue to implement and fully comply with the Act's requirements --- in an abundance of caution while this case is on appeal --- irrespective of my ruling.

*Case No.: 3:10-cv-91-RV/EMT*

addition to these apparent disagreements <u>among</u> the plaintiff states, there is even disagreement <u>within</u> the plaintiff states as to whether the implementation should continue pending appeal. For example, while the plaintiffs (a group that includes the <u>Attorney General</u> of Washington) have requested that I enjoin the defendants from implementing the Act, the <u>Governor</u> of Washington has just filed an amicus brief specifically opposing that request (doc. 163). At this point in time, and in light of all this uncertainty, it would be difficult to deny the defendants a stay pending appeal. Nonetheless, in light of the potential for ongoing injury to the plaintiffs, the stay should be in place for as short of time as possible (months, and not years), as discussed immediately below.

Finally, for the last factor, I must consider "where the public interest lies." Although the defendants' pleadings present a reasonably persuasive argument for why the "public interest lies" in having my declaratory judgment and <u>de facto</u> injunction stayed pending appeal, almost every argument that the defendants have advanced speaks much more persuasively to why the case should be immediately appealed and pursued in the most expeditious and accelerated manner allowable. As both sides have repeatedly emphasized throughout this case, the Act seeks to comprehensively reform and regulate more than one-sixth of the national economy. It does so via several hundred statutory provisions and thousands of regulations that put myriad obligations and responsibilities on individuals, employers, and the states. It has generated considerable uncertainty while the Constitutionality of the Act is being litigated in the courts. The sooner this issue is finally decided by the Supreme Court, the better off the entire nation will be. And yet, it has been more than one month from the entry of my order and judgment and still the defendants have not filed their notice of appeal.

It should not be at all difficult or challenging to "fast-track" this case.[8] The briefing with respect to the general issues involved are mostly already done, as the federal government is currently defending several other similar challenges to the Act that are making their way through the appellate courts. Furthermore, the legal issues specific to this case have already been fully and very competently briefed. With a few additional modifications and edits (to comply with the appellate rules), the parties could probably just change the caption of the case, add colored covers, and be done with their briefing.

After careful consideration of the factors noted above, and all the arguments set forth in the defendants' motion to clarify, I find that the motion, construed as a motion for stay, should be GRANTED. However, the stay will be conditioned upon the defendants filing their anticipated appeal within seven (7) calendar days of this order and seeking an expedited appellate review, either in the Court of Appeals or with the Supreme Court under Rule 11 of that Court. See, e.g., NML Capital Ltd. v. Republic of Argentina, 2005 WL 743086, at *5 (S.D.N.Y. Mar. 31, 2005) (district court granted motion to stay its own ruling, "conditioned on as prompt as possible appeal and a motion for an expedited appeal").

### III. Conclusion

As I wrote about two weeks after this litigation was filed: "the citizens of this country have an interest in having this case resolved as soon as practically possible" (doc. 18 at 4). That was nearly eleven months ago. In the time since, the battle lines have been drawn, the relevant case law marshaled, and the legal arguments refined. Almost everyone agrees that the Constitutionality of the Act is an issue that will ultimately have to be decided by the Supreme Court of the United States. It is very important to everyone in this country that this case move forward

---

[8] I note that two of the pending appeals (in the Fourth and Sixth Circuits) are apparently proceeding on an expedited basis.

*Case No.: 3:10-cv-91-RV/EMT*

as soon as practically possible.

Therefore, the defendants' motion to clarify (doc. 156) is GRANTED, as set forth above. To the extent that motion is construed as a motion to stay, it is also GRANTED, and the summary declaratory judgment entered in this case is STAYED pending appeal, conditioned upon the defendants filing their notice of appeal within seven (7) calendar days of this order and seeking an expedited appellate review.

DONE and ORDERED this 3rd day of March, 2011.

> /s/ *Roger Vinson*
> ROGER VINSON
> Senior United States District Judge